FILED

2015 Oct-30  PM 06:04
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| DRUMMOND COMPANY, INC.; and DRUMMOND LTD. <br><br> Plaintiffs, <br><br> vs. <br><br> TERRENCE P. COLLINGSWORTH, individually and as agent of Conrad & Scherer, LLP, International Rights Advocates, Inc., and Albert van Bilderbeek; CONRAD & SCHERER, LLP; WILLIAM R. SCHERER, JR., individually and as agent of Conrad & Scherer, LLP; INTERNATIONAL RIGHTS ADVOCATES, INC.; IVAN ALFREDO OTERO MENDOZA; FRANCISCO RAMIREZ CUELLAR; and ALBERT van BILDERBEEK. <br><br> Defendants. | Case No. 2:15-cv-00506-RDP |

## DRUMMOND'S CONSOLDATED RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL  35259
(205) 868-6000
fax: (205) 868-6099

Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc. and Drummond Ltd.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 4

    I.      DEFENDANTS' RULE 9(B) ARGUMENT MISCONSTRUES THE LAW AND IGNORES THE ALLEGATIONS IN DRUMMOND'S COMPLAINT. ........................................................ 4

          A.    Defendants misapprehend what must be pled and proven for claims of mail and wire fraud. .................................................................................. 4

          B.    Drummond adequately pled numerous acts of wire and mail fraud. .......... 7

          C.    Drummond's Complaint states a claim against Defendant William R. Scherer, Jr., for both direct liability and conspiracy to violate RICO ....... 16

    II.     NEITHER THE FIRST AMENDMENT NOR *NOERR-PENNINGTON* COMPELS THE DISMISSAL OF THIS CASE. ................................................................................... 22

          A.    Defendants wrongfully argue that Drummond's RICO claim is premised entirely on their conduct in *Balcero* ........................................................... 22

          B.    The *Noerr-Pennington* doctrine does not immunize Defendants from the conduct committed here, which includes witness bribery, obstruction of justice and intentional fraud. .................................................................... 23

          C.    *Baloco*, *Balcero* and *Melo* all constitute "Sham Litigation" within the meaning of the *Noerr-Pennington* doctrine. ............................................. 30

    III.    THERE IS NO FEDERAL LITIGATION PRIVILEGE APPLICABLE TO RICO CLAIMS. ... 34

          A.    *Pendergraft*'s holding was expressly "Narrow," and was narrowed further by the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008). ......................................................................... 35

              1.    *Pendergraft* does not immunize conduct related to litigation from constituting Hobbs Act extortion. .................................................. 36

              2.    Defendants' use of *Pendergraft* to urge dismissal of the mail and wire fraud claims presupposes Drummond must rely on (i.e., be deceived by) their fraudulent statements, which is no longer the law in the Eleventh Circuit. .......................................................... 40

      B.     Defendants' request for the Court to essentially create a federal litigation privilege against claims of RICO should be rejected..............................44

IV.    DRUMMOND'S COMPLAINT WAS TIMELY FILED...................................48

V.    DRUMMOND ALLEGES CONCRETE INJURIES TO BUSINESS OR PROPERTY INTERESTS....................................................................................57

VI.   DRUMMOND'S COMPLAINT HAS CLEARLY ALLEGED VALID STATE LAW CLAIMS AGAINST THE DEFENDANTS. ...................................................................60

      A.     Civil Conspiracy ........................................................................60

      B.     Willful and/or Reckless Misrepresentation................................62

      C.     Fraudulent Concealment ...........................................................64

      D.     Drummond's state law claims are not barred by the statute of limitations..................................................................................67

CONCLUSION...................................................................................................68

CERTIFICATE OF SERVICE ..............................................................................69

# TABLE OF AUTHORITIES

**Cases**                                                **Page(s)**

*Acosta v. Campbell*,
No. 6:04CV761ORL28DAB, 2006 WL 146208 (M.D. Fla. Jan. 18, 2006)....................46

*Aldridge v. Lily–Tulip, Inc. Salary Ret. Plan Benefits Comm.*,
953 F.2d 587 (11th Cir. 1992) ........................................................................14

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)........................................................................................23

*Am. United Life Ins. Co. v. Martinez*,
480 F.3d 1043 (11th Cir. 2007) ......................................................................15

*Aron v. United States*,
291 F.3d 708 (11th Cir. 2002) ........................................................................49

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................................4, 39

*Astech-Marmon, Inc. v. Lenoci*,
349 F. Supp. 2d 265 (D. Conn. 2004).............................................................59

*Bank v. Pitt*,
928 F.2d 1108 (11th Cir. 1991) ................................................................15, 22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................4, 39

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*,
461 U.S. 731 (1983)....................................................................................24, 33

*Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., Inc.*,
906 F.2d 1546 (11th Cir. 1990) ......................................................................56

*Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*,
778 F. Supp. 695 (S.D.N.Y. 1991)..................................................................55

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008).............................................................................. *passim*

*Brooks v. Blue Cross & Blue Shield of Florida, Inc.*,
116 F.3d 1364 (11th Cir. 1997) ........................................................................8

*Brush v. Sears Holdings Corp.*,
    466 F. App'x 781 (11th Cir. 2012) ...................................................25

*Bryant v. Dupree*,
    252 F.3d 1161 (11th Cir. 2001) .....................................................22

*Buckmasters, Ltd. v. Action Archery, Inc.*,
    915 F. Supp. 1188 (M.D. Ala. 1996) ..............................................13

*Cal. Motor Transp. Co. v. Trucking Unltd.*,
    404 U.S. 508 (1972)...............................................................24, 28

*Carter v. Chrysler Corp.*,
    743 So. 2d 456 (Ala. Civ. App. 1998) ............................................67

*Chevron Corp. v. Donziger*,
    871 F. Supp. 2d 229 (S.D.N.Y. 2012).........................................3, 38

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)....................................9, 21, 38

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) .......................................................30

*Clute v. Davenport Co.*,
    584 F. Supp. 1562 (D. Conn. 1984) ...............................................55

*Collins v. Davol, Inc.*,
    56 F. Supp. 3d 1222 (N.D. Ala. 2014) ............................................68

*Colonial Bank of Alabama v. Ridley & Schweigert*,
    551 So. 2d 390 (Ala. 1989)............................................................67

*CSX Transp., Inc. v. Gilkison*,
    406 F. App'x 723 (4th Cir. 2010) ...................................................55

*Distrib. Res. Mgmt., Inc. v. Peacock*,
    No. 2:12-CV-00188-SLB, 2012 WL 2930787 (N.D. Ala. July 13, 2012)......................64

*Dole Food Co. v. Gutierrez*,
    No. CV039416 NM(PJWX), 2004 WL 3737123 (C.D. Cal. July 13, 2004)...................47

*Downs v. McNeil*,
    520 F.3d 1311 (11th Cir. 2008) ................................................49, 54

*Durham v. Business Management Associates,*
    847 F.2d 1505 (11th Cir. 1988) ....................................................................8

*Feld Entertainment, Inc. v. American Society for the Prevention of Cruelty to Animals,*
    873 F. Supp. 2d 288 (D.D.C. 2012) ...................................................... *passim*

*Fla. Evergreen Foliage v. E.I. Dupont De Nemours and Co.,*
    336 F. Supp. 2d 1239 (S.D. Fla. 2004) ...............................................34, 38, 46

*Flood v. Makowski*, No.
    CIV.A. 3:CV-03-1803, 2004 WL 1908221 (M.D. Pa. Aug. 24, 2004) ...........................55

*Ford Motor Co. v. Conley,*
    757 S.E.2d 20 (Ga. 2014)............................................................................65

*Frankford Trust Co. v. Advest, Inc.,*
    943 F. Supp. 531 (E.D. Pa. 1996) ..............................................................58, 59

*Frantz v. Walled,*
    513 F. App'x 815 (11th Cir. 2013) ...................................................................56

*Freeman v. Lasky, Haas & Cohler,*
    410 F.3d 1180 (9th Cir. 2005) .......................................................................27

*Garrett v. Stanton,*
    No. CIV A 08-0175WSM, 2008 WL 4853388 (S.D. Ala. Nov. 7, 2008) .......................28

*Glus v. Brooklyn E. Dist. Terminal,*
    359 U.S. 231 (1959).....................................................................................57

*Giles v. Phelan, Hallinan & Schmieg, LLP,*
    No. 11-6239 (JBS/KMW), 2013 WL 2444036 (D.N.J. June 4, 2013) ...........................47

*Grimmet v. Brown,*
    75 F.3d 506 (9th Cir. 1996) ..........................................................................54

*Guarantee Co. of N. Am. USA v. Wainwright,*
    No. 2:09-CV-1003-MEF, 2011 WL 1807454 (M.D. Ala. May 11, 2011) ......................13

*Hale v. State Farm Mutual Auto. Ins. Co.,*
    No. 12-0660-DRH, 2013 WL 1287054 (S.D. Ill. March 28, 2013)...............................46

*Herring v. Sec'y, Dep't of Corr.,*
    397 F.3d 1338 (11th Cir. 2005) .................................................................34, 64

*Hill v. Morehouse Med. Associates, Inc.,*
    No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003) .........................................9

*Hines v. Riverside Chevrolet–Olds, Inc.,*
    655 So. 2d 909 (Ala.1994)...................................................................................................67

*Holland v. Florida,*
    560 U.S. 631 (2010)....................................................................................................49, 54

*Hufsmith v. Weaver,*
    817 F.2d 455 (8th Cir. 1987) .............................................................................................25

*In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, AL on Sept. 22, 1993,*
    136 F. Supp. 2d 1251 (S.D. Ala.) *aff'd sub nom. In re Amtrak*, 29 F. App'x 575 (11th
    Cir. 2001) ...........................................................................................................................66

*In re Cardiac Devices Qui Tam Litig.,*
    221 F.R.D. 318 (D. Conn. 2004)....................................................................................8, 9

*In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litigation,*
    690 F. Supp. 2d 1296 (S.D. Fla. 2010) ......................................................................49, 57

*In re Int'l Admin. Servs., Inc.,*
    408 F.3d 689 (11th Cir. 2005) ...........................................................................................49

*In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig.,*
    No. 00 CIV. 7804 (LMM), 2004 WL 487222 (S.D.N.Y. Mar. 12, 2004) .......................57

*In re Morrison,*
    No. 05-45926, 2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009) .........................25, 33

*Jackson v. BellSouth Telecommunications,*
    372 F.3d 1250 (11th Cir. 2004) .........................................................................................14

*Jerry Kubecka, Inc. v. Avellino,*
    898 F. Supp. 963 (E.D.N.Y. 1995) ...................................................................................55

*Kearney v. Foley & Lardner, LLP,*
    590 F.3d 638 (9th Cir. 2009) .......................................................................................26, 27

*Klehr v. A.O. Smith Corp.,*
    521 U.S. 179 (1997)...........................................................................................................49

*Kottle v. Nw. Kidney Ctrs.,*
    146 F.3d 1056 (9th Cir. 1998) .....................................................................................27, 31

*Lawson v. Harris Culinary Enterprises, LLC,*
 83 So. 3d 483 (Ala. 2011) ........................................................................64

*Liberty Nat'l Life Ins. Co. v. Parker,*
 703 So. 2d 307 (Ala. 1997) ......................................................................68

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,*
 431 F.3d 353 (9th Cir. 2005) ....................................................27, 31, 32, 47

*Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.,*
 257 F. Supp. 2d 819 (M.D. La. 2002) ........................................................43

*Magluta v. Samples,*
 256 F.3d 1282 (11th Cir. 2001) .................................................................22

*Maiz v. Virani,*
 253 F.3d 641 (11th Cir. 2001) ...................................................................59

*Marco Island Cable, Inc. v. Comcast Cablevision of S., Inc.,*
 No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333 (M.D. Fla. July 3, 2006) ................30

*McCulloch v. PNC Bank Inc.,*
 298 F.3d 1217 (11th Cir. 2002) .................................................................15

*McDonald v. Smith,*
 472 U.S. 479 (1985).................................................................................23

*Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia,*
 23 F. Supp. 2d 439 (S.D.N.Y. 1998)..........................................................55

*Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.,*
 615 F.2d 1372 (5th Cir. 1980) ...................................................................23

*Mizzaro v. Home Depot, Inc.,*
 544 F.3d 1230 (11th Cir. 2008) .................................................................21

*NAACP v. Button,*
 371 U.S. 414 (1963).................................................................................24

*New York Dist. Council of Carpenters Pension Fund v. Forde,*
 939 F. Supp. 2d 268 (S.D.N.Y. 2013).....................................................53, 54

*NOW v. Scheidler,*
 510 U.S. 249 (1994).................................................................................58

*Payne v. United States,*
    247 F.2d 481 (8th Cir. 1957) ....................................................................8

*Pelletier v. Zweifel,*
    921 F.2d 1465 (11th Cir. 1991) ..............................................................41

*Pilkington v. United Airlines,*
    112 F.3d 1532 (11th Cir. 1997) ..............................................................56

*Potter v. First Real Estate Co.,*
    844 So. 2d 540 (Ala. 2002) ....................................................................67

*Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n,*
    663 F.2d 253 (D.C. Cir. 1981) ...............................................................27

*Raber v. Osprey Alaska, Inc.,*
    187 F.R.D. 675 (M.D. Fla. 1999)..............................................................9

*Raney v. Allstate Ins. Co.,*
    370 F.3d 1086 (11th Cir. 2004) ..............................................................38

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993)................................................................................16

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979)................................................................................58

*Richards v. Mileski,*
    662 F.2d 65 (D.C. Cir. 1981) .................................................................54

*Rivell v. Private Health Care Sys., Inc.,*
    520 F.3d 1308 (11th Cir. 2008) ........................................................17, 18

*Robbins v. Wilkie,*
    300 F.3d 1208 (10th Cir. 2002) ..............................................................58

*Roper v. Dep't of Corr.,*
    434 F. App'x 786 (11th Cir. 2011) .........................................................54

*Rotella v. Wood,*
    528 U.S. 549 (2000)....................................................................48, 49, 56

*S.E.C. v. Huff,*
    758 F. Supp. 2d 1288 (S.D. Fla. 2010) ..................................................49

*Salinas v. United States,*
    522 U.S. 52 (1997)............................................................................20, 21

*Schmuck v. United States,*
    489 U.S. 705 (1989)...........................................................................5, 7

*Sikes v. Teleline, Inc.,*
    281 F.3d 1350 (11th Cir. 2002) ....................................................41, 42

*Sky Medical Supply, Inc. v. SCS Support Claims Services, Inc.,*
    17 F. Supp. 3d 207 (E.D.N.Y. 2014) .................................................54

*Snyder v. Faget,*
    326 So. 2d 113 (Ala. 1976)...............................................................61

*Sosa v. DIRECTV, Inc.,*
    437 F.3d 923 (9th Cir. 2006) ...........................................25, 26, 27, 30, 31

*St. Germain v. Howard,*
    556 F.3d 261 (5th Cir. 2009) ............................................................43

*St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,*
    795 F.2d 948 (11th Cir. 1986) ....................................................24, 30

*State Farm Mut. Auto. Ins. Co. v. Grafman,*
    655 F. Supp. 2d 212 (E.D.N.Y. 2009) ...............................................7

*Strong v. Demopolis City Bd. of Ed.,*
    515 F. Supp. 730 (S.D. Ala. 1981)....................................................54

*Strong v. KIMC Investments, Inc.,*
    472 F. App'x 886 (11th Cir. 2012) ...................................................39

*Suchite v. Kleppin,*
    819 F. Supp. 2d 1284 (S.D. Fla. 2011) .............................................47

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...........................................................................17

*Thomas v. Halstead,*
    605 So. 2d 1181 (Ala. 1992)..............................................................63

*Thomas v. Town of Davie,*
    847 F.2d 771 (11th Cir. 1988) ..........................................................22

*Three Crown Ltd. Partnership v. Salomon Bros., Inc.*,
  906 F. Supp. 876 (S.D.N.Y. 1995)...................................................................59

*U.S. ex rel. Johnson v. Shell Oil Co.*,
  183 F.R.D. 204 (E.D. Tex. 1998)......................................................................8

*U.S. v. Brewster*,
  506 F.2d 62 (D.C. Cir. 1974) ..........................................................................30

*U.S. v. Mellen*,
  393 F.3d 175 (D.C. Cir. 2004) .........................................................................20

*United States v. Cherif*,
  943 F.2d 692 (7th Cir. 1991) .............................................................................5

*United States v. Farrell*,
  877 F.2d 870 (11th Cir. 1989) ..........................................................................19

*United States v. Lee*,
  427 F.3d 881 (11th Cir. 2005) .......................................................3, 36, 44, 46

*United States v. Pendergraft*,
  297 F.3d 1198 (11th Cir. 2002) ............................................................. *passim*

*United States v. Philip Morris USA, Inc.*,
  566 F.3d 1095 (D.C. Cir. 2009) .......................................................................24

*United States v. Poirier*,
  321 F.3d 1024 (11th Cir. 2003) ........................................................................15

*United States v. Romero*,
  518 F. App'x 648 (11th Cir. 2013) ...................................................................15

*United States v. Rude*,
  88 F.3d 1538 (9th Cir. 1996), *as amended on denial of reh'g* (Sept. 10, 1996)................5

*United States v. Shields*,
  999 F.2d 1090 (7th Cir. 1993) ..........................................................................19

*United States v. Suba*,
  132 F.3d 662 (11th Cir. 1998) ............................................................................5

*United States v. Zichettello*,
  208 F.3d 72 (2d Cir. 2000)................................................................................20

*USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council,*
    31 F.3d 800 (9th Cir. 1994) ................................................................31

*Utilities Bd. of City of Opp v. Shuler Bros.,*
    138 So. 3d 287 (Ala. 2013), *reh'g denied* (Aug. 23, 2013) ..............................67

*Vandegrift v. Lagrone,*
    477 So. 2d 292 (Ala. 1985) ................................................................68

*Venetian Casino Resort, L.L.C. v. N.L.R.B.,*
    484 F.3d 601 (D.C. Cir. 2007) ............................................................26

*Weiland v. Palm Beach County Sheriff's Office,*
    792 F.3d 1313 (11th Cir. 2015) ..........................................................22

*Whelan v. Abell,*
    48 F.3d 1247 (D.C. Cir. 1995) ........................................................24, 27

*Wyeth, Inc. v. Weeks,*
    159 So. 3d 649 (Ala. 2014) (Shaw, J., concurring) ......................................67

## Statutes and Rules                         Page(s)

18 U.S.C. § 201 ..............................................................................12

18 U.S.C. § 1503 ..........................................................................12, 14

18 U.S.C. § 1512 ..........................................................................12, 47

18 U.S.C. § 1341 ..........................................................................12, 42

18 U.S.C. § 1343 ......................................................................12, 14, 15

18 U.S.C. § 1951 ..........................................................................18, 20

18 U.S.C. § 1956(a)(2)(A) ..................................................................12

18 U.S.C.A. § 1961(1) ....................................................................3, 47

18 U.S.C. § 1962 ............................................................16, 20, 21, 57, 60

18 U.S.C. § 1962(d) ......................................................................20, 21

18 U.S.C.A. § 1964(c) ........................................................................6

Ala. Code § 6-2-3 ...................................................................................................68

Ala. Code § 6-5-1 ...................................................................................................62

Ala. Code § 6-5-102 ...............................................................................................66

Fed. R. Civ. P. 9(b) .......................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)................................................................................28, 59, 68

**Other Authorities**                                                         **Page(s)**

10A Fletcher Cyc. Corp. § 4991.05 ........................................................................25

15A C.J.S. Conspiracy § 16 ...................................................................................61

37 C.J.S. *Fraud* § 60 (1943) .................................................................................63

James D. Hurwitz, <u>Abuse of Governmental Processes, the First Amendment, and the Boundaries of Noerr</u>, 74 Geo. L.J. 65, 66 (1985)............................................................................25

The Plaintiffs Drummond Company, Inc. and Drummond Ltd. (collectively "Drummond") hereby file this consolidated brief in opposition to the motions to dismiss filed by defendants Conrad & Scherer LLP, William R. Scherer, Jr., Terrence P. Collingsworth, and International Rights Advocates, Inc.[1]

## INTRODUCTION

Defendants mischaracterize the scheme at issue as "pure litigation conduct," and paint Drummond's RICO claims as simply an attempt to criminalize the filing of a lawsuit. This is nothing but a straw man. This case is not about the mere filing of a meritless lawsuit. Rather, it is about the formation of a criminal enterprise (the "Enterprise") to engage in a massive and worldwide extortionate campaign, with litigation serving as only a piece of a much larger scheme. Doc. 1 at ¶¶ 42-44.

After the jury found in Drummond's favor in *Romero*, the decision was made to do whatever it took to "close down Drummond," and the Enterprise began to form. *Id.* Needing financial backing for what would amount to close to half-a-million dollars in witness payments, Mr. Collingsworth joined forces with Bill Scherer and his firm, Conrad & Scherer. *Id.* Shortly thereafter, Ivan Otero, the Colombian criminal attorney for numerous imprisoned paramilitaries, joined the fold. *Id.* at ¶¶ 56-58. He was promised a contingency fee in new cases which would be filed against Drummond using fabricated testimony from his criminal clients, and he was also given a large, lump sum cash payment ($80,000) to obtain his clients' testimony. *Id.* Conrad & Scherer made this $80,000 payment from its firm bank account. Within a few months of this

---

[1] As noted in their respective briefs, Conrad and Scherer LLP and William R. ("Bill") Scherer adopted all arguments in Collingsworth's and IRA's motion to dismiss, and vice versa. In addition to adopting each others' arguments, the arguments in each of their briefs substantially overlap. Therefore, Drummond responds in one consolidated brief to all arguments made by all defendants. Except where reference to an individual defendant is required, Drummond refers to the movants collectively as "Defendants."

large payment, the Enterprise began paying a monthly salary to another imprisoned paramilitary (Charris). *Id.* at ¶ 73. Conrad & Scherer also funded all of these payments from its firm bank account. *Id.*

The Enterprise also added a competitor of Drummond, Llanos Oil and its principal Albert van Bilderbeek, to its extortionate scheme. *Id.* at ¶¶ 62-65, 158-60. In addition to assisting in the spread of the Enterprise's false message to Europe, and the Netherlands in particular, Llanos ultimately paid at least $120,000 to another witness (Blanco) to falsely accuse Drummond of heinous crimes. *Id.* at ¶¶ 94-106.

Litigation was only one facet of a much larger campaign. The Enterprise urged both the United States and Colombian authorities to institute criminal investigations against Drummond. *Id.* at ¶ 170; *see also id.* at App'x E. They engaged in a worldwide effort to "close down Drummond" by spreading false claims of Drummond's complicity with a mass murdering terrorist organization to the media, activist groups, and Drummond's customers and business partners. *Id.* at ¶¶ 153-69. They bribed witnesses, suborned perjury, committed perjury themselves, repeatedly lied to this Court, and fabricated, hid, and altered evidence.

Defendants' contention that this case is all about an improvidently filed lawsuit is simply wrong. In rejecting arguments similar to those advanced by the Defendants here, and faced with analogous facts, Judge Lewis Kaplan wrote:

> The cases the Donziger Defendants rely upon hold only that frivolous litigation and defamatory statements are not alone sufficient to constitute extortion. But Chevron's amended complaint goes far beyond that.
>
> Chevron does not allege a scheme that consisted of the allegedly baseless Lago Agrio litigation, either in and of itself or in combination with allegedly false and defamatory statements. Rather, it alleges that the RICO Defendants are executing a multi-faceted, extortionate scheme that has included not only bringing the Lago Agrio litigation, but also intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges, all for the purpose of coercing Chevron "into

paying to stop the campaign against it." Chevron's extortion allegations are more than sufficient.

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012) (distinguishing, *inter alia*, *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002)).

Nevertheless, Defendants cite policy justifications in parade of horribles fashion and invite the Court to rule that no one could commit a crime (a RICO predicate act) so long as that person is somehow involved in litigation.   That proposition finds no support in the primary Eleventh Circuit case relied upon by Defendants,[2] Supreme Court precedent,[3] or the RICO statute itself.  Indeed, Congress specifically included as RICO predicate acts several examples of what Defendants argue to this Court is "pure litigation conduct."   18 U.S.C.A. § 1961(1) (defining "racketeering activity" as including "bribery," "obstruction of justice," and "tampering with a witness").  Surely Defendants would not seriously suggest that bribing a witness is not a crime as long as it takes place in the course of civil litigation.  If it is, and of course it is, it constitutes a RICO predicate act, and Defendants' request for a litigation privilege immunizing them from RICO liability falls apart.

Accepting as true, as is required at this stage, the allegations of the Complaint and all reasonable inferences therefrom, the Defendants have provided no sound basis on which to dismiss the claims against them.  Defendants' motions should be denied in full.

---

[2] *See Pendergraft*, 297 F.3d at 1208 ("But, as always, we are primarily concerned with the language of the statute, not its policy implications."); *see also United States v. Lee*, 427 F.3d 881, 890 (11th Cir. 2005) (making clear that the policy observations contained in *Pendergraft* "were simply dicta" and the Court's decision was "not [based] upon any policy concerns relating to using the mails in connection with litigation").

[3] *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 660 (2008) ("Whatever the merits of petitioners' arguments as a policy matter, we are not at liberty to rewrite RICO to reflect their—or our—views of good policy.  We have repeatedly refused to adopt narrowing constructions of RICO in order to make it conform to a preconceived notion of what Congress intended to proscribe. . . . 'It is not for the judiciary to eliminate the private action in situations where Congress has provided it.'").

**ARGUMENT**

I.  **DEFENDANTS' RULE 9(B) ARGUMENT MISCONSTRUES THE LAW AND IGNORES THE ALLEGATIONS IN DRUMMOND'S COMPLAINT.**

   A.  **Defendants misapprehend what must be pled and proven for claims of mail and wire fraud.**

As an initial matter, the Rule 9(b) particularity standard does not apply to non-fraud-based predicate acts, such as bribery, obstruction of justice, witness tampering, or money laundering, which are subject to the normal *Twombly/Iqbal* plausibility standard.[4]   Drummond has pled all of those predicate acts with exacting particularity, and these alleged criminal violations are more than sufficient, on their own, to state a civil RICO claim.   *See* Doc. 1, Appendices A-E.   Defendants offer no argument to the contrary.

With respect to the predicate acts of mail and wire fraud, Defendants argue that Drummond "fails Rule 9(b)'s requirement that mail and wire fraud allegations be pleaded with particularity and show either how Drummond was misled by the alleged fraud or what any Defendant gained thereby."   Doc. 14 at 10; *see also* Doc. 15 at 6 (arguing that Drummond must plead that it was misled by the statements and "what the Defendants gained").   Defendants contend that the particularity problems with the Complaint are, "[s]pecifically, Drummond fails to allege for each act '(3) the content and manner in which these statements misled ***the Plaintiffs***; and (4) ***what the defendants gained*** by the alleged fraud.'"   Doc. 14 at 9 (emphasis supplied by Defendants).   The problem with this argument is that neither of these things is a necessary element of mail or wire fraud.

The Supreme Court has explicitly held that a RICO plaintiff is not required to allege or prove that he relied to his detriment on (i.e., was misled by) any misrepresentations.   *Bridge v.*

---

[4] Indeed, Collingsworth's motion concedes as much. Doc. 15 at 6 (attacking the "fraud based" predicate acts alleged by Drummond, specifically "mail and wire fraud").

*Phoenix Bond & Indem. Co.,* 553 U.S. at 661 ("we hold that a plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations"). Indeed, the plaintiff need not even allege he ever received or knew about the misrepresentations. *Id.* at 648-49 (rejecting the argument that no mail fraud occurred because the misrepresentations "were made to the county, not the [victims]," and the victims therefore could not have been deceived by them).[5]

Nor is Drummond required to allege "***what the defendants gained*** by the alleged fraud," Doc. 14 at 9, or that they gained anything at all.  *See, e.g., Schmuck v. United States*, 489 U.S. 705, 721 (1989) (affirming the defendant used car salesman's conviction on mail fraud charges even though he had no contact with, and received nothing from, ultimate car purchasers he victimized); *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998) ("The Government must establish only that the fraudulent scheme existed; conviction for mail fraud 'need not rest on the success of the fraudulent scheme.'") (citation omitted); *United States v. Cherif*, 943 F.2d 692, 698 (7th Cir. 1991) ("A major premise underlying this argument seems to be that to violate the mail and wire fraud statutes, a scheme must actually succeed in obtaining somebody else's property. That premise is incorrect. '[T]he mail fraud statute [and the wire fraud statute] proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed....'") (citation omitted); *United States v. Rude*, 88 F.3d 1538, 1547 (9th Cir. 1996), *as*

---

[5] Accordingly, and as discussed further in Section III-A-2, *infra*, Defendants' are simply wrong to argue that "the federal mail and wire fraud statutes do not criminalize fraudulent conduct aimed at 'third parties' rather than the alleged victim of the crime."  Doc. 14 at 10 (complaining that Appendix E, detailing fraudulent communications to third parties, "consists entirely of wire (and one mail) fraud 'violations,' none of which alleges that any Defendant thereby 'intended to deceive' the victim of the so-called fraud, Drummond").  Rather, "'[a] scheme that injures D by making false statements through the mail to E is mail fraud, and actionable by D through RICO . . . .'" *Bridge*, 533 U.S. at 648 (quoting and affirming the analysis of the Seventh Circuit Court of Appeals).

*amended on denial of reh'g* (Sept. 10, 1996) ("An unsuccessful scheme to defraud is as illegal as a scheme or plan that is ultimately successful."). Indeed, the RICO statute provides a private right of action to "[a]ny person injured in his business or property by reason of" a pattern of racketeering activity. 18 U.S.C.A. § 1964(c). The remedy is for an injury to the plaintiff; there is no requirement that the defendant gain anything.

Moreover, Defendants' arguments focus only on the fraudulent statements concerning Drummond's complicity with the AUC. They completely ignore the misrepresentations to Drummond, the courts, and others regarding their persistent scheme of witness bribery. The Defendants' lies about witness payments misled Drummond into not being able to discover evidence of those payments, to Drummond's severe detriment. *See* Doc. 1 at ¶¶ 74, 88, 102-05, 113, 126, 137-41. Drummond spent enormous amounts of money combating the allegations of these witnesses, both in the courts and in the marketplace, without knowing they had all been paid hundreds of thousands of dollars. Numerous third parties also relied on Defendants' misrepresentations:

- This Court relied on Defendants' perjured testimony, as well as the testimony of witnesses who were paid;

- This Court relied on Defendants' misrepresentations regarding their witness payments;

- The Colombian Fiscalia relied on Defendants' misrepresentations to criminally investigate Drummond;

- Drummond's customers relied on Defendants' misrepresentations, to the detriment of Drummond's business;

- Media outlets and reporters relied on Defendants' misrepresentations to publish stories and spread the false message that Drummond was complicit with Colombian paramilitaries.

And even though Drummond need not plead it, Defendants did indeed "gain" something through their wire and mail fraud. For example, with respect to the witness payments sent

through the wires, Defendants gained the testimony of witnesses falsely implicating Drummond in murder and conspiring with the AUC.  *See* Doc. 1 at ¶¶ 66-127 (chronicling dates, sum, and substance of how witnesses' testimony changed only after Defendants made payments to witnesses, their families, and/or criminal lawyer).  Defendants then utilized these "statements" and testimony to exert economic pressure against Drummond by using them as the basis for fraudulent lawsuits and as ammunition in media and public relations campaigns all across the globe.  *Id.* at ¶ 2.

**B.    Drummond adequately pled numerous acts of wire and mail fraud.**

Defendants' technical pleading arguments with respect to wire and mail fraud are also unavailing.  To start, Defendants contend that the Court should analyze every use of the mails or wires to see whether each, independently, satisfies Rule 9(b)'s particularity requirement.  *See* Doc. 14 at 10-11.  This is not the appropriate analysis.  "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' *Schmuck v. United States,* 489 U.S. 705, 712, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (citation and internal quotation marks omitted), ***even if the mailing itself 'contain[s] no false information,*** ' *id.*, at 715, 109 S.Ct. 1443."  *Bridge*, 553 U.S. at 647 (emphasis added).  In other words, the question is whether the scheme to defraud is adequately pleaded, not every independent communication in furtherance of that scheme.  *See State Farm Mut. Auto. Ins. Co. v. Grafman*, 655 F. Supp. 2d 212, 227-28 (E.D.N.Y. 2009) ("[I]n a complex civil RICO action involving multiple defendants, Rule 9(b) does not require that the 'temporal or geographic particulars of each mailing be stated with particularity,' but only that the 'plaintiff delineate, with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme.'").

It is true that when wire and mail fraud serve as the predicate acts for a RICO claim, such claims are subject to Rule 9(b) of the Federal Rules of Civil Procedure.  But Rule 9(b) is not a "one-size fits all" rule.  Nor is it as rigid as Defendants suggest.  *See* Doc. 14 at 8-10.  As noted in *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997), a case relied upon by Defendants, "Rule 9(b) **may be satisfied** if the complaint sets forth:" "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants "obtained as a consequence of the fraud." (Emphasis added). "**However, 'alternative means are also available to satisfy the rule**.'" *Id.* (*citing Durham v. Business Management Associates*, 847 F.2d 1505, 1511 (11th Cir. 1988)) (emphasis added).

"It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend 'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'" *U.S. ex rel. Johnson v. Shell Oil Co.,* 183 F.R.D. 204, 206-07 (E.D. Tex. 1998) (citing *Payne v. United States,* 247 F.2d 481, 486 (8th Cir. 1957)).  Moreover, "it has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied."  *In re Cardiac Devices Qui Tam Litig*., 221 F.R.D. 318, 333-34 (D. Conn. 2004) (collecting cases).  "In particular, 'where the alleged fraudulent scheme involved numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent

conduct.'" *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 633 n.1766 (S.D.N.Y. 2014) (citing *Cardiac Devices*).

The Eleventh Circuit is in accord. *See Hill v. Morehouse Med. Associates, Inc.*, No. 02-14429, 2003 WL 22019936 (11th Cir. Aug. 15, 2003); *Raber v. Osprey Alaska, Inc.*, 187 F.R.D. 675, 681 (M.D. Fla. 1999) ("courts recognize that if the alleged fraud occurred over an extended period of time and the acts were numerous, the specificity requirements are less stringently applied"). In cases alleging prolonged, multi-act schemes of fraud, "the plaintiff is not required to provide 'a detailed allegation of all facts supporting each and every instance of submission of a false claim,' . . . but the complaint must set forth a representative sample 'detail[ing] . . . the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hill*, 2003 WL 22019936, at *5 n.6. That is precisely what Drummond's Complaint does here.

The case of *Feld Entertainment, Inc. v. American Society for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288 (D.D.C. 2012) is instructive. There, the court was faced with facts analogous to those here, and considered similar arguments to those raised by the Defendants regarding what is required to adequately plead mail and wire fraud as predicate acts to a complex RICO scheme. The RICO claims in *Feld Entertainment* arose out of an underlying lawsuit in which the parent company for Ringling Bros. Circus ("Feld") was sued by a former employee, Tom Rider, and various non-profit organizations such as the American Society for Prevention of Cruelty to Animals ("ASPCA") and the Humane Society of the United States ("HSUS"), alleging that Feld had abused circus elephants in violation of the Endangered Species Act ("ESA"). *Id.* at 299. Following protracted litigation, Feld ultimately prevailed at a bench trial. *Id.*

Feld then sued the plaintiffs and their counsel of record after it discovered that the non-profit plaintiffs and plaintiffs' counsel had paid Rider more than $190,000 in "financial support"

9

during the course of litigation.  *See id.* at 301.  Feld alleged that the ESA plaintiffs and their

counsel of record made the payments for the purpose of inducing Rider to testify falsely and to

secure his participation in the lawsuit, which amounted to bribery and illegal witness payments.

*Id.* at 302.[6]  Further, Rider and some of the nonprofit plaintiffs failed to disclose the payments

and provided false and incomplete answers in interrogatories and depositions, which Feld alleged

was obstruction of justice.  *Id.* at 303.  Feld's lawsuit alleged numerous predicate acts under

RICO, including mail and wire fraud, and sought a recovery of the legal fees it incurred in

defending the ESA action.

Like Drummond here, Feld was ultimately successful in the underlying litigation (i.e., it

paid no money to the RICO defendants), but based its RICO claim on the fact that the ESA

plaintiffs and their lawyers had paid "financial support" to the lead witness throughout the

litigation and then misrepresented the fact that they had done so.  Further, as in this case, the

defendants' witness payment scheme was complex, spanned a number of years, and involved

multiple participants.  The court rejected the defendants' arguments that the mail and wire fraud

allegations lacked sufficient particularity, finding rather that the overall scheme to defraud had

been adequately described:

> [D]efendants claim [Feld] did not meet the particularity requirement of Rule 9(b)
> because it failed to specify "what . . . statements were made and in which context,
> when they were made, who made them, and the manner in which these statements
> were misleading."  This is inaccurate.  The FAC explains the alleged scheme to

---

[6] The scheme of payments at issue in *Feld* case is strikingly similar to the facts here.  As in this case, the method of making payments varied, but at times, the money was funneled either directly from the law firm itself or through a non-profit advocacy group ("Wildlife Advocacy Project ("WAP")) founded by the counsel of record.  *Id.* at 302.  In turn, WAP was alleged to have made "regular and systematic payments of $1,000 every two weeks to Rider."  *Id.* The law firms' own characterization of these payments also shifted throughout the course of litigation, at times variously referring to the payments as "legal expenses," "grants" for "media and public education efforts," or "PR efforts," which Feld alleged was done to deliberately conceal the payments and cover up the ESA plaintiffs' fraudulent scheme.  *Id.*  Feld alleged these payments constituted the predicate acts of wire fraud and money laundering.  *Id.*

> defraud generally, setting forth how some of the defendants allegedly provided Rider with "grants" and "donations" through the mail, and arranged a cover for their payments to induce him to fraudulently participate in the ESA lawsuit. The FAC further sets out how those of the defendants who are alleged to have committed wire fraud did so, with references to specific communications, dates, senders and recipients.

*Id.* at 318.

This is not a simple case of fraud involving a single transaction. Defendants' multi-faceted scheme to extort money from Drummond spanned years, continents, and languages. As explained in the Complaint, the general scheme is as follows: Defendants paid imprisoned Colombian paramilitaries and murderers to lie and say Drummond collaborated with the AUC to murder innocent civilians. Doc. 1 at ¶¶ 66-127. Defendants used that testimony to manufacture fraudulent lawsuits and create a worldwide campaign accusing Drummond of some of the most heinous crimes imaginable, with the express purpose of "closing down Drummond." *See, e.g., id.* at ¶¶ 2, 63-65, 153-54, 157-70. In order for their scheme to work and to instill fear of massive economic losses in Drummond, the allegations had to appear credible, at least to the courts, criminal authorities, Drummond's customers and the general public. Accordingly, Defendants misrepresented the fact that they had actually purchased that testimony through bribes, repeatedly lying to both Drummond and the Court about doing so. *Id.* at App'x D. This crippled Drummond's ability to defend itself in this Court as well as the court of public opinion (in which its customers reside). At the same time Defendants were utilizing testimony secured by bribery to prosecute fraudulent lawsuits against Drummond, the Defendants engaged in a much larger, global media and public relations campaign, broadcasting the false allegations of these paid-for witnesses all over the world in an effort to harm Drummond's business interests and exert additional pressure on Drummond to succumb to Defendants' extortionate scheme. *Id.* at App'x E.

Mail or wire fraud "occurs whenever a person, 'having devised any scheme or artifice to defraud,' uses the mail [or wires] 'for the purpose of executing such scheme or artifice or attempting to do so.'" *Bridge*, 553 U.S. at 647 (quoting 18 U.S.C. § 1341); *see also* 18 U.S.C. § 1343. Many of the wire fraud acts at issue here are premised on Defendants' use of U.S. and international wires to send their illegal witness payments from the United States to bribe incarcerated witnesses in Colombia.[7] Doc. 1 at ¶¶ 5, 66-127, App'x A (Charris Payments), App'x B (El Tigre and Samario payments), App'x C (Halcon payments). The Complaint lays out in detail the purpose and effect of the payments as to each witness, the genesis of the payments to each witness, who was responsible for facilitating and/or aware of the payments, and the specific circumstances of how each payment was made (including date of transfer, payor, payee, and means of sending the transfer). *Id.* at ¶¶ 5, 66-127. Rather than analyzing each allegation in isolation, as Defendants do throughout their motions, the allegations in the Appendices have to be read in conjunction with the corresponding allegations in the body of the Complaint that give context to the transactions and explain why each constitutes, among other things, wire and/or mail fraud.

For example, paragraphs 78-89 of the Complaint describe how Defendants' scheme was carried out with respect to Samario and El Tigre. Paragraphs 79-80 describe who El Tigre and Samario are and their connection to RICO Defendant Ivan Otero. Paragraphs 81 through 85 describe El Tigre's and Samario's testimony regarding Drummond's connections to the AUC and how that testimony changed after Collingsworth made payments to Otero and promised him

---

[7] As alleged in the Complaint, Defendants' payments also constitute the predicate acts of witness bribery (18 U.S.C. § 201), money laundering (18 U.S.C. § 1956(a)(2)(A)), obstruction of justice (18 U.S.C. § 1503), and witness tampering (18 U.S.C. § 1512). *See Feld Entertainment*, 873 F. Supp. 2d at 320.

a contingency fee in the cases against Drummond.  Paragraphs 86 and 87 provide an overview of

the Defendants' payments, via wire transfer, to El Tigre and Samario.

> These payments [to El Tigre and Samario] began at least by February 2011 and
> continue to present day.  Most of the payments are made by sending $2,700 every
> month via international wires from Conrad & Scherer's bank account in the United
> States to Otero's bank account in Colombia, and Otero then funnels them to the
> witnesses and their families.  In a May 2011 email to several Parker Waichman
> lawyers, Collingsworth advised that the Enterprise would be providing $2,700 per
> month to Otero, El Tigre, and Samario "until we get the deps in the can," referring
> to the ultimate trial testimony of El Tigre and Samario.  Bill Scherer was copied on
> this email. These payments continue to present day, and at present exceed
> $134,000.

*Id.* at ¶ 87.  Finally, paragraphs 88 and 89 describe Defendants' misrepresentations regarding

those payments and how Defendants' specific actions fit into the larger purpose of their overall

extortionate scheme against Drummond.   Because Defendants made so many regular and

systematic payments to El Tigre and Samario, the Complaint specifically sets out each individual

transfer (including the date, participants, method, and source and amount of funds) in a separate

Appendix, which is specifically incorporated by reference into the Complaint.  *See id.* at ¶ 89.

Drummond supplied similarly specific allegations with respect to Duarte, Charris, Blanco,

Halcon and Gelvez.  Defendants cannot legitimately contend that these allegations, viewed in

their totality, fail to fulfill the purpose of Rule 9(b), which "is to 'provide fair notice of the

alleged fraud to the opposing party.'" *Guarantee Co. of N. Am. USA v. Wainwright*, No. 2:09-

CV-1003-MEF, 2011 WL 1807454, at *6 (M.D. Ala. May 11, 2011) (quoting *Buckmasters, Ltd.*

*v. Action Archery, Inc.,* 915 F. Supp. 1188, 1194-95 (M.D. Ala. 1996)).

   In addition to effecting their witness payments, Defendants also used the mail and wires

to fraudulently conceal those payments. *Id.* at ¶¶ 133-140, 146-52, App'x. D.  Drummond's

Complaint describes the sender and recipient of the misrepresentations, the substance of the

representations, and when they were made.  *See id.*  As but one example, paragraph 137 of the

Complaint describes a responsive filing by Collingsworth in the *Balcero* case "on November 8, 2011, falsely representing to the federal court in Alabama that he had disclosed all responsive information as to all identified witnesses" which the Enterprise transmitted "to both the federal court in Alabama and Drummond's counsel through the United States wire, in violation of 18 U.S.C. § 1343 (wire fraud) and 18 U.S.C. § 1503 (obstruction of justice)."   The Complaint specifically explains this filing was false because Charris, Duarte, El Tigre, Samario, and Blanco, by that time, had all received substantial payments which were not disclosed.  *Id.*  As described elsewhere in the Complaint, Mr. Scherer knew about and approved these payments and was counsel of record in *Balcero*.  Doc. 1 at ¶¶ 77, 89, 116, 127, 123.  These misrepresentations furthered the fraudulent scheme by hiding the fact that the testimony on which it was based was purchased, and prevented Drummond from being able to uncover the evidence it needed to dispel the false allegations of Enterprise's paid witnesses.   These misrepresentations therefore constitute mail and wire fraud (in addition to obstruction of justice under 18 U.S.C. § 1503).

Defendants' matter-of-fact contention that "acts of concealment" cannot "be considered 'predicate acts' under Eleventh Circuit law" is simply wrong.  Doc. 14 at 11.  The Eleventh Circuit has never held such a thing.  What the Eleventh Circuit *has* held is that fraudulent concealment or cover-up of a prior completed scheme does not extend the length of the scheme for purposes of determining whether the "continuity" element of a "pattern" of racketeering has been established.  *Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1268 (11th Cir. 2004) ("in this Circuit, there is little question that attempts to conceal an initial fraudulent act are not sufficient to establish open-ended continuity"); *Aldridge v. Lily–Tulip, Inc. Salary Ret. Plan Benefits Comm.,* 953 F.2d 587, 592-94 (11th Cir. 1992) ("continuity" not established where defendant allegedly committed mail fraud over a period of five years to conceal an initial

14

wrongdoing). Defendants have not argued that continuity has not been met here, so this principle has no relevance to the issues before the Court.[8]

Finally, the mail and wires were an integral part of Defendants' worldwide campaign to spread their false message and assert additional pressure on Drummond through the media, governmental agencies, and various other outside groups. Doc. 1 at ¶¶ 153-70, App'x E. As with the other acts of mail and wire fraud mentioned above, the factual allegations of the Complaint also describe the circumstances of each of these acts, including the date of communication, the sender and recipient, the method of transmission, the substance of the communication, and why/how the statement was misleading. *See id.*[9]

---

[8] And "acts of concealment" certainly ***can*** serve as predicate acts in the Eleventh Circuit. The Eleventh Circuit explicitly holds "that 'nondisclosure of material information can constitute a violation of the mail and wire fraud statutes where a defendant has a duty to disclose either by statute or otherwise.'" *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1065 (11th Cir. 2007) (quoting *McCulloch v. PNC Bank Inc.*, 298 F.3d 1217, 1225 (11th Cir. 2002)). Moreover, concealment of prior wrongdoing from federal tribunals is the definition of obstruction of justice. *See United States v. Romero*, 518 F. App'x 648, 651-52 (11th Cir. 2013) (affirming conviction for obstruction of justice for concealing criminal activity, and finding that defendant's "argument that obstruction does not cover omissions is refuted by the statutory definition of 'misleading conduct,' which specifically includes omissions and concealment."); *United States v. Poirier*, 321 F.3d 1024, 1036 (11th Cir. 2003) ("The record clearly establishes that both defendants obstructed justice. They each provided false testimony to the Securities and Exchange Commission in an effort to conceal their conduct.").

[9] Defendants claim that the Complaint "failed to allege the individual who made each alleged misrepresentation." Doc. 15 at 14. That is flatly false. Appendices A-E alleges numerous instances of wire and mail fraud with exacting specificity. For example, Entry No. 35 in Appendix E details an instance of wire fraud under 18 U.S.C. § 1343, identifies Defendant Albert van Bilderbeek as the RICO Defendant responsible for the communication, alleges his intent in sending the communication, sets forth detail of the communication, and lists all of the recipients. Defendants cannot seriously claim that such detail (which is repeated throughout the Appendices), when juxtaposed with the allegations in the body of the Complaint, are insufficient.

To the extent the Court believes, in spite of the detailed allegations of the Complaint, that Defendants truly have not been provided "any notice . . . as to how they might go about defending Drummond's claims," Doc. 14 at 7, the proper course is not dismissal, but granting leave to amend to cure any alleged pleading deficiencies. *See, e.g., Bank v. Pitt*, 928 F.2d 1108, 1112 (11th Cir. 1991) ("[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice").

C.      **Drummond's Complaint states a claim against Defendant William R. Scherer, Jr., for both direct liability and conspiracy to violate RICO.**

In summary fashion, Defendant Scherer argues that Drummond's Complaint fails to plausibly allege that he conducted or participated in the RICO Enterprise's affairs. *See* Doc. 14 at 7-8.  This argument lacks merit because, as established by the factual allegations in the Complaint, Bill Scherer's participation was vital to the very existence of the Enterprise *and* its witness payments in furtherance of its extortionate scheme against Drummond.

To be liable under RICO, a person must "participate, directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962(c).  Importantly, the Supreme Court has held that "the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Bill Scherer is the managing partner of Defendant Conrad & Scherer, LLP.  Doc. 1 at ¶ 13.  The Complaint alleges that following *Romero*, the Enterprise began to take shape as Collingsworth and IRA joined forces with Scherer and his firm.  As admitted by co-defendant IRAdvocates, this was a decision made by Bill Scherer himself:

> In February, 2008, IRAdvocates formed an important partnership with a private law firm, Conrad & Scherer.  One of the founding partners of that firm, William Scherer, had collaborated on human rights cases with IRAdvocates and decided to become fully involved in the pursuit of justice in the global economy.  The central component of the agreement is that Conrad & Scherer funds all U.S. litigation costs for the ATS cases, freeing IRAdvocates to use its resources to support fact finding in the countries where the violations occur and to train and support local lawyers who collaborate with us on the litigation. Based on this arrangement, 100% of any funds raised by IRAdvocates goes to the field to help local human rights advocates and lawyers perform their crucial role in these cases.

16

*Id.* at ¶ 44.   Bill Scherer was instrumental in securing funding for pursuing the Enterprise's fraudulent cases against Drummond, which was used by the Enterprise to pay witnesses, their families, and/or their criminal lawyers.   Doc. 1 at ¶ 61 ("In or around late 2009, Collingsworth and **Bill Scherer** approached the law firm of Parker, Waichman and Alonso, LLP (now Parker Waichman, LLP) regarding providing financing for the fraudulent lawsuits against Drummond, as well as ATS cases against other corporations." ) (emphasis added).

But Bill Scherer's role was far more than that of a managerial funder for the Enterprise's extortionate scheme (though that would easily suffice under Supreme Court precedent); he was also admitted *pro hac vice* to this Court to serve as counsel of record for the plaintiffs in *Balcero* and *Baloco*, which he has done since 2009.   *Id.* at ¶ 33.   As counsel of record, he is directly responsible for all pleadings and other filings in *Balcero* in which the Enterprise denied making any of the witness payments made the basis of this RICO action.   *See, e.g.*, Doc. 1 at ¶ 137.

Mr. Scherer was also intimately involved in the payments.   The witness payments to Charris, El Tigre, Samario, Gelvez, Duarte, and Gelvez all originated from Conrad & Scherer's operating account.   *Id.* at ¶¶ 77, 89, 116, 127, 133.   As managing partner, Scherer knew of and approved these payments.   *Id.*[10]   In fact, in May 2011, Scherer received a copy of an email from

---

[10]Without citation to any authority, Defendants describe this allegation as "conclusory" and "implausible."   *See* Doc. 14 at 7.   On a motion to dismiss, the court must accept the factual allegations as true and construe all reasonable inferences in Drummond's favor.   *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008).   Furthermore, even where heightened particularity is required under Rule 9(b), "'[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally.'"   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting Fed. R. Civ. P. 9(b)).

It is certainly reasonable to infer that as the managing partner of a relatively small law firm, Scherer would be both aware of and responsible for approving the Defendants' regular and systematic witness payments, which equate to more than $30,000 a year for El Tigre and Samario alone.   Even without such an inference, Mr. Scherer was notified ***in writing*** that El Tigre and Samario were being paid monthly out of his firm's funds.   Doc. 1 at ¶ 87.   That allegation certainly satisfies the requirement that Drummond's Complaint "'identify[] facts that are suggestive enough to render [Mr. Scherer's knowledge

17

Collingsworth which discussed the Enterprise's plan to pay $2,700 a month to Otero, El Tigre, and Samario until the witnesses' trial testimony was secured.  Doc. 1 at ¶ 87.  Despite this knowledge, Scherer did not attempt to correct any of the filings in *Balcero*, falsely representing that the payments did not exist. *See, e.g.*, Doc. 1 at ¶ 137.  To the contrary, when Drummond sought information from Conrad & Scherer's bank which would shed light on payments and misrepresentations the Enterprise made as part of their extortionate scheme, Bill Scherer himself filed, and signed in accordance with Rule 11, a brief falsely claiming the Enterprise had never made payments to El Tigre or Samario:

> As noted, these 'payments' were necessary costs to relocate family members of three witnesses whose family members were threatened by armed thugs after the three witnesses were on record implicating Drummond in human rights crimes and before the witnesses were about to testify against Drummond. Dr. Opp. Ex. 4, Collingsworth Decl. at ¶¶ 34-44. For Drummond to now challenge the legitimacy of that emergency assistance is pure Chutzpah; for Drummond to continue to assert without foundation that Defendants 'paid witnesses' is a deliberate misrepresentation to the Court.

Doc. 1, App'x D, No. 18.  The above allegations are more than sufficient to establish Defendant Scherer's "direct" participation in multiple acts of wire fraud, obstruction of justice, witness bribery, witness tampering, and money laundering.  They are certainly enough to plausibly allege his "indirect" participation, which is all that RICO requires.

Defendants also attempt to downplay the significance of Scherer's settlement demand to Drummond during the course of *Balcero*, generally reciting the definition of extortion under 18 U.S.C. § 1951(a) and then labeling Drummond's allegation as "thoroughly ridiculous."  Doc. 14

---

of the payments] plausible.'" *Rivell*, 520 F.3d at 1309.  And while the Court need not go outside the face of the Complaint to find Drummond's allegations plausible, it is worth noting that since the filing of Defendants' motion to dismiss, Mr. Scherer has admitted he knew about the payments to Gelvez, Duarte and Charris, which also originated from his firm's Operating Account.  *Drummond Co. Inc. v. Collingsworth,* 2:11-cv-03695-RDP-TMP ("*Collingsworth*")*,* Doc. 348-9 (B. Scherer Dep.) at 74:5-17; *Collingsworth* Doc. 390 (Sept. 1-3 Hrg. Tr.) at 393:18-19.  If the Court believes additional allegations such as these are necessary, Drummond requests leave to amend to include them.

at 8.   While Defendants apparently view a settlement demand in a case accusing someone of mass murder and collaboration with a terrorist organization as a meaningless and "thoroughly ridiculous" act, reasonable people – including Drummond – do not.

The timing of Scherer's approach to Drummond is also critically important.   Drummond had been defending itself for years against the Defendants' false claims of mass murder based on the paid-for testimony of Colombian criminals.   Drummond had also been defending itself in the marketplace against the claims of these bribed witnesses, which the Enterprise spread as far and wide as humanly possible.   At the time Scherer made this overture in June 2012, all of the Defendants' paid witnesses had just finished giving their trial testimony against Drummond in the *Balcero* letters rogatory process, and Defendants had concealed the fact that *all* of them had been paid.  Doc. 1 at ¶¶ 142-45.   The Enterprise even elicited perjured testimony from their "key witness" about his not having been promised or provided any sort of benefits.  *Id.* at ¶¶ 65, 103. The Enterprise then publicized this "testimony" all over the globe.  *Id.* at ¶¶ 140, 156.

With this false, paid-for testimony in hand, the Enterprise made the strategic decision to make direct, extortionate overtures to Drummond.   In other words, Defendants perpetrated their extortionate scheme to the point at which the fear of economic loss would be at its highest, and then seized upon that opportunity to try to cash in.   The fact that Drummond rebuffed Scherer's demand in no way diminishes its extortionate nature:   "[a]ttempted extortion under the Hobbs Act requires proof of intended extortion through acts reasonably calculated to arouse fear.   No proof of actual inducement is required."  *United States v. Farrell*, 877 F.2d 870, 876 (11th Cir. 1989); *see also United States v. Shields*, 999 F.2d 1090, 1098 (7th Cir. 1993) ("[T]he Hobbs Act proscribes not just successful extortion schemes but '*attempts* to induce a victim engaged in

interstate commerce to part with property.'  Thus one may be convicted of violating the Hobbs Act even though no money has changed hands.") (internal citation omitted).

Taking all these factual allegations as true, which the Court must at this point, the Complaint sufficiently states a claim that Scherer's intimate participation and conduct in furtherance of the Enterprise's affairs constitutes a violation of both the Hobbs Act (18 U.S.C. § 1951) and RICO, despite the fact that Drummond ultimately resisted Scherer and the other Defendants' extortionate scheme.

Putting aside Mr. Scherer's liability for RICO violations under 18 U.S.C. § 1962(c) ("Count I"), Defendants do not even argue—nor could they possibly—that the allegations against Scherer do not establish a claim for conspiracy to violate RICO under 18 U.S.C. § 1962(d).  *See* ("Count II").  Section 1962(d) of RICO provides as follows: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  18 U.S.C. § 1962(d).  Thus, under § 1962(d), a RICO conspirator need not commit an overt act, but "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."  *Salinas v. United States,* 522 U.S. 52, 64 (1997).

A conspirator may be held liable when he "knew about and agreed to facilitate the scheme" of his co-defendants.  *Id.* at 66.  *See also United States v. Zichettello,* 208 F.3d 72, 99 (2d Cir. 2000) ("We need inquire only whether an alleged conspirator knew what the other conspirators were up to or whether the situation would logically lead an alleged conspirator to suspect he was part of a larger enterprise.").  Moreover, "a conspiracy can be inferred from a combination of close relationships or knowing presence and other supporting circumstantial evidence."  *U.S. v. Mellen,* 393 F.3d 175, 191 (D.C. Cir. 2004).

For example, in *Feld Entertainment*, the court held that although the complaint failed to sufficiently plead direct liability under § 1962(c) against one of the RICO defendants, it did adequately state a claim for RICO conspiracy under § 1962(d) where it alleged that

> Ockene (1) was counsel of record in the ESA Action both as an attorney at MGC and at FFA/HSUS, FAC ¶ 45, (2) "deliberately misrepresented Rider's purported standing in pleadings and other filings before this Court and the D.C. Circuit in the ESA Action," *id.* ¶ 329, and, (3) "during some or all of the time period material to this lawsuit ... had actual knowledge of the payments to Rider," *id.* ¶ 45.

873 F. Supp. 2d at 327-28.  Similarly, Drummond's Complaint alleges that Scherer (1) is counsel of record in the *Balcero* and *Baloco* actions (Doc. 1 at ¶ 33), (2) deliberately made misrepresentations about witness payments in court filings (*id.* at App'x D, No. 18), and (3) had actual knowledge of and approved payments to Charris, El Tigre, Samario, Gelvez, Duarte, and Halcon.  Doc. 1 at ¶¶ 77, 87, 89, 116, 127, 133.  Taking the allegations as true and construing all inferences in the light most favorable to Drummond, the Complaint more than adequately alleges Scherer "knew about and agreed to facilitate the scheme" of his co-defendants, and that he is therefore liable for RICO conspiracy under § 1962(d).  *See Salinas*, 522 U.S. at 66.

*     *     *

Drummond's Complaint clearly describes Defendants' extortionate scheme, and also provides specific examples of "who, what, when, where, and how" the fraud (as well as witness bribery, witness tampering, money laundering, extortion and obstruction of justice) was carried out using the mail and wires.  *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).  Accordingly, Defendants' "Rule 9(b) argument is baseless. The notice and other functions of the rule were more than served here."  *See Donziger*, 974 F. Supp. 2d at 633.[11]

---

[11] To the extent this Court believes that the extensive allegations in Drummond's Complaint are insufficient to state a claim against any one of the Defendants, Drummond requests that it be granted leave to file an amended complaint to correct any such deficiencies:

## II.   NEITHER THE FIRST AMENDMENT NOR *NOERR-PENNINGTON* COMPELS THE DISMISSAL OF THIS CASE.

### A.   Defendants wrongfully argue that Drummond's RICO claim is premised entirely on their conduct in *Balcero*.

Defendants would have this Court believe that this lawsuit is premised entirely on *Balcero*. But what Drummond has alleged goes far beyond the filing of a lawsuit. Rather, Drummond has alleged a multifaceted, international scheme spearheaded by the RICO Defendants that consisted not just of the fraudulent and extortionate *Balcero* (and *Baloco* and *Melo*) litigation, but also media campaigns, joint efforts with "activist" groups, communications with Drummond's customers, and the instigation of criminal investigations. Such conduct has

---

> A district court's discretion to dismiss a complaint without leave to amend "is 'severely restrict[ed]' by Fed.R.Civ.P. 15(a), which directs that leave to amend 'shall be freely given when justice so requires.'" *Thomas v. Town of Davie,* 847 F.2d 771, 773 (11th Cir. 1988) (citation omitted). Generally, "[w]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir. 1991).

*Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

Defendants Collingsworth and IRAdvocates also characterize Drummond's Complaint as an "impermissible shotgun pleading," asserting that this Court should either dismiss it or direct Drummond to amend it. Doc. 15 at Section II. As Drummond explained above in response to Defendants' 9(b) arguments, the factual allegations of the Complaint extensively describe the overall nature of the extortionate scheme made the basis of its claims, as well as the specific role played by the various Defendants in carrying out the plan. *See supra* Section I. The Complaint also alleges literally hundreds of separate predicate acts. *See* Appendices A-E to Doc. 1. Rather than re-allege all the acts under each specific count, the "Counts" allege the elements required for those claims and incorporate the factual allegations in both the body of the Complaint and Appendices. That is entirely permissible, and it does not prejudice the Defendants' ability to ascertain the factual basis for the counts in the Complaint. *See Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1324-25 (11th Cir. 2015) (reversing the district court's dismissal of an allegedly "shotgun" complaint, explaining that while the plaintiff referenced and incorporated the factual allegations of the complaint into each count for relief, "this is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count"). Nevertheless, to the extent this Court agrees with Defendants that it is "virtually impossible", Doc. 15 at 8, for them to ascertain what facts support what claims for relief, the appropriate outcome is not dismissal, but granting leave to amend. *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (reversing district court's dismissal of a "shotgun" complaint and directing the lower court to issue an order instructing the plaintiff to file an amended complaint).

nothing to do with their First Amendment right to petition the U.S. government for relief, and it is independently sufficient to state a claim under RICO even in the total absence of *Balcero*. Indeed, the RICO Defendants' predicate acts involving the media, foreign governments, and Drummond's customers, by definition, all fall outside the purview of the protection afforded by the *Noerr-Pennington* doctrine. *Mid-Texas Commc'ns Sys., Inc. v. Am. Tel. & Tel. Co.*, 615 F.2d 1372, 1383 (5th Cir. 1980) ("Until the governmental process is initiated, however, Noerr-Pennington immunity should not extend to actions occurring in an essentially private context."). Defendants' *Noerr-Pennington* argument should be quickly dismissed for this reason alone.

   **B.    The *Noerr-Pennington* doctrine does not immunize Defendants from the conduct committed here, which includes witness bribery, obstruction of justice and intentional fraud.**

   Even if Drummond's RICO claim were entirely based on Defendants' crimes committed in the course of prosecuting *Balcero* (which it is not), Defendants' *Noerr-Pennington* argument nonetheless fails. Defendants claim that "none of the 228 'violations' alleged by Drummond . . . extends the alleged 'pattern of racketeering activity,' Compl. ¶ 1, beyond litigation conduct that … is nothing more or less than petitioning activity protected by the First Amendment." Doc. 14 at 12. But those "228 violations" include bribery, obstruction of justice, wire and mail fraud, money laundering, witness tampering and suborning perjury. The Supreme Court has made clear that such activity does not fall under *Noerr-Pennington*: "[O]ne could imagine situations where the most effective means of influencing government officials is bribery, and we have never suggested that that kind of attempt to influence the government merits protection." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 504 (1988) (emphasis added).

   Contrary to Defendants' argument, the First Amendment right to petition is not absolute, *McDonald v. Smith*, 472 U.S. 479, 484 (1985), and no citizen enjoys a First Amendment right to

petition the government for relief by bribing witnesses, tampering with witnesses, laundering money, and/or obstructing justice. *See* Doc. 1 at Appendices A-E. Indeed, "[n]either the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." *Feld Entertainment*, 873 F. Supp. 2d at 307 (quoting *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009)). Under binding Eleventh Circuit precedent, misrepresentations to a governmental body "acting judicially" do not enjoy *Noerr-Pennington* immunity. *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948, 955 (11th Cir. 1986) (citing *Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 513 (1972)).

Stated differently, "attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process) are not normal and legitimate exercises of the right to petition, and activities of this sort have been held to be beyond the protection of *Noerr*." *Feld Entertainment*, 873 F. Supp. 2d at 307 (quoting *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995)) (other citations omitted). *See also Cal. Motor Transp. Co*, 404 U.S. at 513 ("Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."). As one court aptly put it:

> One cannot cleanse unlawful conduct by conducting the unlawful conduct through a lawful medium. The right to petition the government does not include the right to bribe a public official. The right to file a lawsuit does not include the right to tamper with a jury. The right to access a public park will not immunize liability for an assault in the park. The right to petition a court does not include the right to file a false or frivolous claim. [*Cal. Motor Transport Co*, 404 U.S. at 512.] "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils.'" *Id* at 515 (quoting *NAACP v. Button*, 371 U.S. 414, 444, 83 S.Ct. 328, 343, 9 L.Ed.2d 405 (1963)); *Bill Johnson's Rests ., Inc.*, 461 U.S. at 743 ("The first amendment interests involved in private litigation—compensation for violated rights and interest, the psychological benefits of vindication, public airing of disputed facts—are not advanced when litigation is based on intentional falsehoods or on knowingly frivolous claims ... [j]ust as false statements are not immunized by the First Amendment right to freedom of speech

24

... baseless litigation is not immunized by the First Amendment right to petition.").

*In re Morrison*, No. 05-45926, 2009 WL 1856064, at *8 (Bankr. S.D. Tex. June 26, 2009) (denying defendants' motion to dismiss RICO claim based on underlying litigation where plaintiffs alleged defendants made intentional misrepresentations to the court).[12]

In support of their *Noerr-Pennington* argument, the Defendants rely almost entirely on the Ninth Circuit's holding in *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), a case in which the plaintiffs asserted pre-suit demand letters sent by the defendants constituted the predicate acts for their RICO claims. *See* Doc. 14 at 12-16. As an initial matter, Defendants' argument that "Drummond's Complaint . . . fails *Sosa*'s test" is inapposite because a litigant in the Northern District of Alabama is not required to pass any "test" enunciated by the Ninth Circuit. *Brush v. Sears Holdings Corp.*, 466 F. App'x 781, 787 n.7 (11th Cir. 2012) ("it should go without saying that we are not bound by the decisions of other circuits").

More importantly, *Sosa* involved a completely different fact pattern than what Drummond has alleged here. Indeed, *Sosa* involved neither allegations of witness bribery, obstruction of justice, witness tampering, nor intentional misrepresentations during the adjudicatory process, but rather the "mailing of presuit demand letters" relating to the allegedly

---

[12] Federal courts uniformly agree on this point. *Hufsmith v. Weaver*, 817 F.2d 455, 459 (8th Cir. 1987) ("[W]here a defendant's resort to the court is accompanied or characterized by *illegal and reprehensible practices* such as perjury, *fraud, conspiracy with or bribery of government decision makers, or misrepresentation,* or is so clearly baseless as to amount to an *abuse of process,* . . . the *Noerr-Pennington* cloak of immunity provides no protection.") (citation omitted). Legal scholars and commentators are also in accord. James D. Hurwitz, <u>Abuse of Governmental Processes, the First Amendment, and the Boundaries of Noerr</u>, 74 Geo. L.J. 65, 66 (1985) (*Noerr-Pennington* inapplicable "where the offending party has engaged in some egregious, corrupting activity-such as bribery or intentional misrepresentation-or has initiated the governmental process to harass its victims rather than to achieve the redress or resolution that the invoked process legitimately could offer"); 10A Fletcher Cyc. Corp. § 4991.05 ("Courts have also declined to extend Noerr-Pennington immunity to protect illegal activity").

illegal accessing of satellite television signals.  437 F.3d at 926.[13]  In holding that DIRECTV's statements in the pre-suit demand letters were protected by *Noerr-Pennington*, the Ninth Circuit emphasized the legitimate role that pre-suit demand letters play in litigation, as well as the public policy and statutory provisions that immunize statements made in pre-suit demand letters under the litigation privilege.  *Id.* at 935-939.  *Cf. Venetian Casino Resort, L.L.C. v. N.L.R.B.*, 484 F.3d 601, 613 (D.C. Cir. 2007) (distinguishing *Sosa* and holding that the alleged acts at issue "are neither common features of litigation nor statutorily protected litigation privileges," and therefore *Sosa* was inapposite).  Critically, the Ninth Circuit also acknowledged that pre-suit demand letters would not be protected under *Noerr-Pennington* "if the allegedly unlawful conduct consists of making intentional misrepresentations to the court, [because] litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy."  *Id.* at 938 (citations and internal quotation marks omitted).

Although omitted from Defendants' motions, the Ninth Circuit issued another decision addressing the *Noerr-Pennington* doctrine a few years after *Sosa* that is highly instructive.  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638 (9th Cir. 2009).  There, the court held that Kearney's complaint – which alleged intentional misrepresentations and fraud upon the court through suppression of evidence – stated a claim under RICO.  It rejected the defendants' *Noerr-Pennington* defense while simultaneously distinguishing *Sosa*:

---

[13] Defendants tell this Court that "so far as DIRECTV knew, **many of its demand letters were false**."  Doc. 14 at 13.  That is not an accurate recital of the facts in *Sosa*.  Rather, the *Sosa* court held that DIRECTV's alleged misrepresentations regarding the law were merely opinions, and thus not actionable. 437 F.3d at 941.  With respect to the alleged misrepresentations of fact, the *Sosa* court expressly declined to make any finding in this regard, instead holding that the statements were "ambiguous" and that, in any event, Sosa failed to show how those alleged misrepresentations caused him to suffer any injury.  *Id.* at 941-42.  Those facts are a far cry from what Drummond has pled here, where it has suffered millions of dollars in damages as a result of Defendants' categorically false and intentional misrepresentations, which were premised on bribery.

Kearney has alleged intentional misrepresentations to the court, and fraud upon the court through the suppression of evidence, that ultimately led to her property being valued lower than it should have been. In *Sosa v. DIRECTV, Inc.,* the court described a similar situation of a RICO suit predicated on "fraudulent discovery conduct in prior litigation that induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud." 437 F.3d 923, 940 (9th Cir. 2006) (discussing *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* 431 F.3d 353 (9th Cir. 2005)). Although *Living Designs* was not considered under *Noerr–Pennington,* the *Sosa* court said "the conduct alleged quite clearly fell within the third prong of *Kottle*'s sham litigation exception, in that it amounted to a 'knowing fraud ... upon the court depriv[ing] the litigation of its legitimacy.'" *Id.* (quoting *Kottle,* 146 F.3d at 1060). Kearney's allegations are very similar to those described by the *Sosa* court in *Living Designs* and so should also fall within the third prong of the sham litigation exception. *See also Freeman v. Lasky, Haas & Cohler,* 410 F.3d 1180, 1185 (9th Cir. 2005) ("Had [the discovery misconduct] not been brought to light in time, it is entirely possible that [it] would so have infected the defense of the lawsuit as to make it a sham.").

*Id.* at 646-47. As *Kearney* makes clear, the Ninth Circuit's opinion in *Sosa* does not support the Defendants' blanket assertion that all conduct incidental to litigation, no matter how egregious or criminal, is entitled to *Noerr-Pennington* immunity. In fact, Ninth Circuit precedent strongly supports rejection of Defendants' arguments.

What Drummond has alleged here is far beyond the conduct discussed by the Ninth Circuit in *Sosa*, and is analogous to the more recent *Feld Entertainment* case, discussed above, wherein the court directly considered allegations of both witness bribery and misrepresentations about the alleged bribes as predicate acts to a RICO claim. Citing D.C. Circuit and United States Supreme Court precedent, the court agreed that "*Noerr-Pennington* does not apply to bribery or to deliberate misrepresentations to the Court." *Id.* at 307 ("*Noerr-Pennington* does not apply, first and foremost, to bribes, 'in any context.' . . . Moreover '[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.'") (citing *Whelan v. Abell,* 48 F.3d 1247, 1255 (D.C. Cir. 1995) (quoting *Federal Prescription Serv., Inc. v. Am.*

*Pharmaceutical Ass'n,* 663 F.2d 253, 263 (D.C. Cir. 1981)), and also citing *Cal. Motor Transp. Co. v. Trucking Unltd.,* 404 U.S. at 512–13).

Drummond has alleged that Conrad & Scherer LLP, Bill Scherer, Terrence Collingsworth, and International Rights Advocates (as well as the other Defendants and individuals) all knew about and participated in the Defendants' scheme of payments to the witnesses that accused Drummond of conspiring with a terrorist organization.[14]  Further, Drummond's Complaint also alleges that Defendants knew and intended what they now euphemistically refer to as "assistance payments" — such as those made to get El Tigre's and Samario's "deps in the can" — were actually made for the purpose of inducing the witnesses' false testimony against Drummond.  *See, e.g.,* Doc. 1 at ¶¶ 77, 89, 116, 127, 123.  In other words, Defendants paid hundreds of thousands of dollars in witness bribes.

While Defendants argue about the purpose of the payments, which is inappropriate at the motion to dismiss stage, they nowhere dispute that payments were made (nor could they). Defendants will have the opportunity to dispute the true intent behind those payments after discovery.  *See Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1177 (M.D. Fla. 2005) ("The intent of the parties is a factual matter that cannot be resolved on a motion to dismiss.").[15]

---

[14]  *See, e.g.,* Doc. 1 at ¶¶ 77, 89, 116, 127, 123 (regarding Bill Scherer's knowledge of and approval for payments to Charris, El Tigre and Samario, Gelvez, Duarte, and Halcon with funds originating from Conrad & Scherer's bank account); *Id.* at ¶¶ 66-132 (describing Collingsworth' knowledge of and facilitation of payments to all six of the incarcerated witnesses who gave trial testimony against Drummond in the *Balcero* case).

[15]  Defendants' argument in their motion to dismiss that "[w]itness assistance payments" were not bribes should be entirely disregarded.  *See, e.g.,* Doc. 14 at 15.  As one court put it when similarly asked to assume facts contrary to what was pled in a complaint, "Defendants' reasoning disregards the Rule 12(b) standard and would instead have the Court conjure facts from thin air to favor defendants' position, thereby bending over backwards to grant their motion to dismiss."  *Garrett v. Stanton*, No. CIV A 08-0175WSM, 2008 WL 4853388, at *2 (S.D. Ala. Nov. 7, 2008).

Moreover, the Complaint sets forth how each witness's testimony changed to implicate Drummond only after receiving the fraudulently concealed payments from the Defendants. Doc. 1 at ¶¶ 66-127 (chronicling dates, sum, and substance of how witnesses' testimony changed after Defendants made payments to witnesses, their families, and/or criminal lawyer); App'x D (setting forth the fraudulent concealment of those payments). Defendants certainly cannot establish for purposes of their motion to dismiss that, based solely on the face of the allegations in the Complaint, their payments are not bribery.[16] Defendants' scheme of bribery alone is enough to take their actions out of the purview of the protections afforded by the First Amendment or *Noerr-Pennington*. In addition to bribing witnesses, however, the Complaint also alleges in detail how Conrad & Scherer LLP, Bill Scherer, Terrence Collingsworth, and International Rights Advocates knowingly made false representations to numerous courts regarding those payments, and also willfully submitted perjured testimony of these paid witnesses. Doc. 1 at ¶¶ 133-140, 146-152, App'x D; Doc. 1 at ¶¶ 103-104. In deciding the instant motions to dismiss, the Court must accept all of these facts as true. *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir. 2003).

Just as in *Feld Entertainment*, "[a]s discussed throughout, the [Complaint] is premised on allegations of bribery and deliberate misrepresentations by defendants throughout the [underlying] Action. Accordingly, defendants are not entitled to *Noerr-Pennington* immunity at the motion to dismiss stage as to their litigation efforts." 873 F. Supp. 2d at 307.

---

[16] A person commits bribery if he "directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court." 18 U.S.C.A. § 201(b)(3).

Filing a lawsuit may be as "American as apple pie" (*see* Doc. 14 at 5, 23), but paying off every single supporting fact witness, laundering money, obstructing justice, and lying to multiple courts all across the country is not.  There is no need for First Amendment "breathing space" to commit bribery, obstruction, or the other predicate crimes alleged in the Complaint.  *See U.S. v. Brewster*, 506 F.2d 62, 77 (D.C. Cir. 1974) (preserving the integrity of government operations by outlawing the payment and receipt of illegal gratuities "superseded any conceivable First Amendment value related to such concept").

**C.**  **Baloco, Balcero** and **Melo** all constitute "Sham Litigation" within the meaning of the *Noerr-Pennington* doctrine.

Consistent with the law of the Eleventh Circuit, the Ninth Circuit also recognizes an exception to *Noerr-Pennington* immunity where an individual makes misrepresentations to a court.  *See Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1261 (9th Cir. 1982) (holding there is "no first amendment protection for furnishing with predatory intent false information to an . . . adjudicative body").[17] The Ninth Circuit characterizes this fraud exception to the right to petition an adjudicative body as a specific category falling under the "sham litigation" exception.

Indeed, the *Sosa* opinion, which Defendants cite extensively as being authoritative on the *Noerr-Pennington* doctrine and argue is consistent with Eleventh Circuit precedent, notes that there are three circumstances in which the sham litigation exception is potentially applicable:

> In *Kottle,* we identified three circumstances in which the sham litigation exception might apply: first, where the lawsuit is objectively baseless and the defendant's motive in bringing it was unlawful, 146 F.3d at 1060; second, where the conduct involves a series of lawsuits "brought pursuant to a policy of starting legal

---

[17] "The Eleventh Circuit has held that alleged misrepresentations to the government agency 'acting judicially' in making a decision are not entitled to *Noerr* immunity."  *Marco Island Cable, Inc. v. Comcast Cablevision of S., Inc.*, No. 2:04-CV-26-FTM-29DNF, 2006 WL 1814333, at *10 (M.D. Fla. July 3, 2006) (citing *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948).

> proceedings without regard to the merits" and for an unlawful purpose, *id.* (citing *USS–POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council,* 31 F.3d 800, 810–11 (9th Cir. 1994)); and **third, if the allegedly unlawful conduct "consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'"** *Id.* (quoting *Liberty Lake,* 12 F.3d at 159).

*Sosa*, 437 F.3d at 938 (citing *Kottle v. Nw. Kidney Ctrs.,* 146 F.3d 1056, 1060 (9th Cir. 1998)) (emphasis added).

As an example of this third circumstance, the *Sosa* court discussed the Ninth Circuit's previous holding in *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.,* 431 F.3d 353 (9th Cir. 2005), in which the court "permitted the plaintiffs to maintain a RICO suit predicated on fraudulent discovery conduct in prior litigation" where the "defendants had failed during the prior litigation to disclose damaging evidence which was solely in their possession and had falsely claimed that the evidence did not exist." *Sosa,* 437 at 940 (citing *Living Designs*, 431 F.3d at 356–58). The court explained that it had "concluded that such conduct could amount to mail fraud, notwithstanding its connection to a legal proceeding." *Id.* (citing *Living Designs*, 431 F.3d at 364–65). Further, the "conduct alleged quite clearly fell within the third prong of *Kottle's* sham litigation exception, in that it amounted to a 'knowing fraud upon . . . the court depriv[ing] the litigation of its legitimacy,' *Kottle,* 146 F.3d at 1060 (citing *Liberty Lake,* 12 F.3d at 159), and was done for the prohibited purpose of injuring plaintiffs' business or property interests. *Living Designs,* 431 F.3d at 363–64." *Sosa*, 437 F.3d at 940.

As alleged throughout the Complaint in this case, Defendants' repeated misrepresentations regarding damaging witness payment information were clearly made for the purpose of furthering their multi-faceted campaign focused on "closing down Drummond." Thus, Defendants' conduct quite clearly constitutes sham litigation. Accordingly, Defendants' misrepresentations made in discovery responses and court filings do not receive constitutional

31

protection but amount to mail fraud, "notwithstanding [their] connection to a legal proceeding." *See Sosa*, 437 at 940 (citing *Living Designs*, 431 F.3d at 364–65). Moreover, "[a]lthough obstruction of justice charges are not often applied to lies or misrepresentations in the course of civil discovery, courts have permitted parties to pursue it under certain circumstances." *See Feld Entertainment*, 873 F. Supp. 2d at 320 ("In light of the subject matter of the allegedly false information provided in discovery—information regarding bribery of a plaintiff and a witness so that he would, in turn, provide false testimony to the Court regarding the merits of the underlying case—the Court finds that [plaintiff] has sufficiently pled the elements of obstruction of justice, as well as money laundering and bribery, to survive a motion to dismiss.").

Defendants argue that their claims in *Balcero* were "objectively reasonable" and thus are not sham litigation because they initially survived dispositive motions. *See* Doc. 14 at 24-25.[18] As alleged in the Complaint, however, the *Balcero* case survived dismissal based almost exclusively on the false allegations of El Tigre (Doc. 1 at ¶ 7), which, unbeknownst to the Court and Drummond at that time, were manufactured by Defendants' scheme of bribery. Doc. 1 at ¶¶ 78-89. Defendants not only hid the evidence of these payments from the Court, but also affirmatively represented such evidence did not exist. *See id.* at 133-140, 146-52, App'x D. As this example illustrates, the only reason the Defendants' "evidence" appeared reasonable and allowed the case to continue was because of Defendants' massive fraud on the Court:

> The Court cannot find that a party acted with objective reasonableness when the reasonableness depends on a belief in the success of a fraudulent scheme. If a party has rigged the process, it may have an objectively reasonable belief that the rigging of the process will lead to a successful outcome. But the belief stems from the rigging, not the merits of the petition.

---

[18] Defendants' arguments regarding *Romero* are a red herring. Doc. 14 at 24-25. Drummond has not claimed as damages its attorneys' fees and costs in that lawsuit as damages in this case. Accordingly, whether *Romero* falls under the "sham" litigation exception under the *Noerr-Pennington* doctrine is irrelevant in this case.

*In re Morrison*, No. 05-45926, 2009 WL 1856064, at *7.

The Complaint alleges that Defendants' entire case against Drummond in *Balcero* was based on the "testimony" of bought and paid for "witnesses."  Doc. 1 at ¶¶ 2, 51-60, 66-132.  Defendants' belief about the success of their case was premised on their confidence that their fraudulent scheme would be successful and would remain unexposed.  Defendants could not have had an objectively reasonable belief that their lawsuit would lead to a judgment against Drummond. "A contrary interpretation of the 'sham' exception would allow parties to avoid the exception by committing fraud. Such a result would be contrary to the purposes of *Noerr–Pennington,* justice, and basic common sense."  *In re Morrison*, No. 05-45926, 2009 WL 1856064, at *7.

Thus, Defendants cannot avoid application of the "sham litigation" doctrine by purchasing false "testimony," hiding any evidence that testimony was bought and paid for by lying to the Court and Drummond about its existence, and then pointing to the Court's reliance on that testimony to support the supposed objective reasonableness of their claims.  Whether categorized under the "sham litigation" exception or the more general fraud exception, Defendants' conduct clearly falls outside the protections of the First Amendment and *Noerr-Pennington*:

> The first amendment interests involved in private litigation-compensation for violated rights and interests, the psychological benefits of vindication, public airing of disputed facts-are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims.

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 743 (1983).[19]

---

[19] Defendants offer no argument with respect to the second prong of the "sham" litigation exception to the *Noerr-Pennington* doctrine – that *Balcero* was intended to interfere with Drummond's business relationships.  Instead, they baldly claim that they "are not required" to address this prong.  Doc. 14 at 26.  The Complaint clearly alleges that the *Balcero* case was part of a larger, concerted effort with Llanos Oil and its principals – one of Drummond's competitors – to harm Drummond's business

**III**.     **THERE IS NO FEDERAL LITIGATION PRIVILEGE APPLICABLE TO RICO CLAIMS.**

In the Complaint, Drummond alleges a pattern of racketeering activity by the Defendants including multiple instances of (1) mail fraud, (2) wire fraud, (3) extortion, (4) money laundering, (5) obstruction of justice, (6) witness bribery, and (7) witness tampering.  Doc. 1 at ¶¶ 88-199.  Notwithstanding Defendants' suggestion to the contrary, there is no federal litigation privilege applicable to RICO claims that insulates individuals from liability for perpetrating these criminal activities during litigation.  *See, e.g., Fla. Evergreen Foliage v. E.I. Dupont De Nemours and Co.*, 336 F. Supp. 2d 1239, 1267 (S.D. Fla. 2004) (noting that research "failed to yield a controlling case applying the litigation privilege to [federal] RICO claims").

Nevertheless, Defendants rely heavily on *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002), and request the Court to expand its holding to reach two conclusions:  (1) conduct related to pending civil litigation can never serve as predicate acts of extortion, mail fraud, or wire fraud; and (2) this Court should extend that principle to essentially create a federal litigation privilege against RICO claims, meaning that obstruction of justice, money laundering, witness bribery, and witness tampering could never be criminal if committed in connection with civil litigation.  Neither of these conclusions is supported by the law.

Moreover, Defendants' entire argument on this point ignores the fact that a major part of the criminal scheme alleged does not involve "litigation conduct."  Defendants provide no explanation as to how extortion, mail fraud, and wire fraud would not all be satisfied by the extrajudicial campaign alleged in the Complaint.  Doc. 1 at ¶¶ 17, 21, 26, 44, 62-65, 153-170; App'x E.  As illustrated by the Supreme Court:

---

interests.  Doc. 1 at ¶¶ 17, 37, 62-65, 96-106, 158-160.  Defendants' failure to address the second prong of the "sham" litigation exception waives any argument they might otherwise have raised, and this Court should not permit them to attempt to cure that deficiency on reply.  *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[a]rguments raised for the first time in a reply brief are not properly before a reviewing court") (collecting cases).

> [T]o take another example, suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.  If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud . . . .

*Bridge,* 553 U.S. at 649-50.  The Supreme Court's example is not too far removed from many of the allegations here.  *See* Doc. 1 at ¶¶ 62-65 (Collingsworth discussing with van Bilderbeek their goal of "closing down Drummond" and garnering media coverage to spread throughout Europe their false message about Drummond).  It defies logic to contend the Supreme Court would find the above example is somehow removed from criminality if you add to the equation that the enterprise bribed witnesses with hundreds of thousands of dollars, and used their purchased testimony to damage Drummond's customer relations, have Drummond criminally investigated on multiple continents, and urge the media and activist groups to continue spreading the enterprise's false message to a worldwide audience.  Defendants' reliance on *Pendergraft* provides no ground for the dismissal of Drummond's RICO claims premised on such conduct.

Turning to Defendants' no doubt intentionally myopic focus on the conduct in the fraudulent litigation itself, *Pendergraft* does not go near as far as Defendants would have this Court believe.

### A. *Pendergraft*'s holding was expressly "Narrow," and was narrowed further by the Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008).

Although Defendants quote throughout their motion various policy considerations raised in the *Pendergraft* decision, none of those considerations formed the basis of the Eleventh Circuit's holding.  Indeed, the Eleventh Circuit made clear three years after *Pendergraft* that the cited policy observations "were simply dicta" and the Court's decision was "not [based] upon any policy concerns relating to using the mails in connection with litigation."  *United States v.*

*Lee*, 427 F.3d at 890.  Rather, the Court found, based on application of the facts of that case to the statutory language at issue, that neither the Hobbs Act nor the mail fraud statute was violated. Furthermore, the Court's decision with respect to mail fraud was based on the law as it existed in the Eleventh Circuit at the time, which has since been abrogated by the Supreme Court in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008).

### 1. *Pendergraft* does not immunize conduct related to litigation from constituting Hobbs Act extortion.

Defendants' first argue that *Pendergraft* stands for the proposition that conduct in connection with litigation "cannot support a claim based on extortion."   Doc. 14 at 16. *Pendergraft* contains no such holding.

The extortion claim in *Pendergraft* was based on the specific facts before the Court:  that the defendants (Pendergraft and Spielvogel) sent two false affidavits to a government entity (Marion County) and threatened to file a claim based on the affidavits if the County did not settle.  The affiants were Pendergraft and Spielvogel.  The question the Eleventh Circuit sought to answer was "whether their threat to file the lawsuit was 'wrongful'" so as to constitute a Hobbs Act violation.  *Pendergraft*, 297 F.3d at 1206.  The Court first held that "[a] threat to litigate, *by itself*, is not necessarily 'wrongful' within the meaning of the Hobbs Act."   *Id.* (emphasis added).  This conclusion was bolstered by the fact that the threat to litigate was against a government:

> Moreover, in this case, we are not dealing with a typical threat to litigate.  Instead, we are dealing with a threat to litigate against a county government.  The right of citizens to petition their government for the redress of grievances is fundamental to our constitutional structure. *See* U.S. Const. amend. I.   A threat to file suit against a government, then, cannot be "wrongful" in itself.

*Id.* at 1207.

The question then became whether Pendergraft and Spielvogel's fabrication of their affidavits was enough to make the threat to sue "wrongful":

> But, in this case, we have an allegation that Pendergraft and Spielvogel fabricated evidence to support their suit.   The fabrication of evidence is certainly not "rightful."   The question is whether the fabrication of evidence makes a threat to sue a government "wrongful."

*Id.*  The Court found on the facts of the case that Pendergraft and Spielvogel's fabrication of their own affidavits was not enough to make their threat to sue "wrongful" because courts have been careful not to expand the scope of witness liability beyond perjury:

- The law jealously guards *witnesses* who participate in judicial proceedings; witnesses should be "unafraid to testify fully and openly."

- Because the rigors of cross-examination and the penalty of perjury sufficiently protect the reliability of witnesses, courts have been unwilling to expand the scope of *witness liability*, since, by doing so, " 'the risk of self-censorship becomes too great.' "

- Criminalizing false testimony via the Hobbs Act would expand the scope of *witness liability*.

- Such a possibility is unsettling, and we do not believe that Congress intended to expand the scope of *witness liability* in this way.

*Id.* (emphasis added and internal citations omitted).   In other words, because Pendergraft and Spielvogel were witnesses, the Court held that the allegation that they testified falsely in support of their threatened litigation was not "wrongful" under the Hobbs Act.

While the Court did express some general policy concerns over RICO claims in the context of civil litigation, the Court did *not* base its decision on any such concerns and expressly limited its holding to the facts of the case:  "Nevertheless, ***our holding is a narrow one***.  We hold that Pendergraft and Spielvogel's threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not 'wrongful' within the meaning of the Hobbs Act."  *Id.* at 1207 (emphasis added).

37

The *Pendergraft* Court was not dealing with witness bribery, witness tampering, concealment and alteration of evidence, direct misrepresentations to a court, or a worldwide extrajudicial campaign aimed at destroying a company.  Nor was the Court in *Raney v. Allstate Ins. Co.*, 370 F.3d 1086 (11th Cir. 2004), the other case cited by Defendants on this issue.  The allegations in *Raney* were simply that the defendants filed what the plaintiff contended were fraudulent lawsuits, and nothing more.  Indeed, the *Raney* Court distinguished *Florida Evergreen Foliage v. Du Pont,* 135 F. Supp. 2d 1271 (S.D. Fla. 2001) on the basis that it "involved a pattern of witness intimidation, fraudulent depositions, and concealment of data and documents." *Raney*, 370 F.3d at 1088 n.3.

The lone court that *has* examined extortion claims premised on allegations of bribery, deliberate misrepresentations to the court, and other conduct similar to that alleged here held that such allegations state a claim for extortion. *See Donziger*, 871 F. Supp. 2d at 249 (finding allegations "that the RICO Defendants are executing a multi-faceted, extortionate scheme that has included not only bringing the Lago Agrio litigation, but also intimidating of Ecuadorian judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media" went "far beyond" the mere filing of frivolous litigation) (distinguishing, *inter alia*, *Pendergraft*); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d at 580-81 (distinguishing *Pendergraft* and other cases finding that meritless litigation is not "wrongful" under the Hobbs Act: "But we are dealing here with something else entirely.  Chevron's claim with respect to the Lago Agrio case itself, insofar as it pertains to the predicate acts of attempted extortion, is not that the case was entirely baseless.  Rather, it is that Donziger and others corrupted the case by bribing the judge and by other corrupt and fraudulent means . . . .").

Furthermore, Defendants' contention that the only extortion alleged is the single act of Bill Scherer making a settlement overture, Doc. 14 at 3, is a mischaracterization of the Complaint.[20]   A cursory reading of the Hobbs Act claim reveals the error in Defendants' oversimplification of the extortion at issue.  The Defendants are alleged to have:

- "[O]rchestrated a massive and multifaceted campaign of public attacks against Drummond based on false and misleading statements, evidence procured through bribery, a threatened civil judgment, investigations by U.S. and Colombian law enforcement agencies, and ongoing harassment and disruptions of business operations, all with the intent and effect of causing a reasonable fear of economic loss on the part of Drummond and to negatively affect Drummond's production and sale of coal in interstate commerce."  Doc. 1 at ¶ 184.

- "[M]anufactured false evidence – which they are relying on in their cases against Drummond – with the intent and effect of causing a reasonable fear of economic loss on the part of Drummond."  *Id.* at ¶ 185.

- "[A]ttempted to instigate criminal proceedings against Drummond in Colombia and the U.S. in order to extort a payment from Drummond."  *Id.* at ¶ 186.

- "[I]ntended to induce in Drummond the fear that the RICO Defendants will, among other things:  (1) continue to pursue a scheme of misrepresentation and fraud to the great harm and public destruction of Drummond, unless and until Drummond pays the RICO Defendants under the guise of settlement or judgment to cease their extortionate scheme; (2) continue to seek to have Drummond indicted criminally in Colombia and the U.S. based on false evidence; (3) disseminate false evidence and statements to the media and Drummond's customers to harm Drummond's business operations."  *Id.* at ¶ 187.

We are not dealing here with the simple filing of a lawsuit Drummond believed to be meritless (as in *Rainey*) or one supported by testimony Drummond believed to be false (as in

---

[20] Defendants' argument on this point implies that every fact in the Complaint supporting the Hobbs Act violation must be followed by a citation to the statute.  This is not what is required under federal law.  "To survive a motion to dismiss, a plaintiff must allege 'enough ***facts*** to state a claim to relief that is plausible on its face.' 'A claim has facial plausibility when the plaintiff pleads ***factual*** content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  ***Strong v. KIMC Investments, Inc.***, 472 F. App'x 886, 886-87 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (emphasis added).

To the extent the Court believes the Defendants were justifiably confused about whether the claim of extortion extended beyond the single settlement demand made by Bill Scherer, Drummond requests the opportunity to cure this through amendment.

*Pendergraft*).  Rather, as in *Donziger*, "we are dealing here with something else entirely."  974 F. Supp. 2d at 580.  Defendants bribed incarcerated witnesses, employed their criminal lawyer as part of their scheme, repeatedly lied to Drummond and the Court and elicited perjured testimony from the witnesses regarding whether they had been paid, urged U.S. and Colombian authorities to rely on this paid-for testimony to institute criminal investigations against Drummond, and proliferated the testimony of their bribed witnesses to media outlets, activist groups, and directly to Drummond's customers and business partners.  It strains credulity to contend the Eleventh Circuit would find this conduct not to be "wrongful" within the meaning of the Hobbs Act.

> **2.      Defendants' use of *Pendergraft* to urge dismissal of the mail and wire fraud claims presupposes Drummond must rely on (i.e., be deceived by) their fraudulent statements, which is no longer the law in the Eleventh Circuit.**

Defendants' next argument premised on *Pendergraft* is that, because Drummond knew that it never paid the AUC, Drummond could not have been deceived by Defendants' fraudulent scheme and therefore Defendants "could never have had the requisite intent to deceive Drummond, the victim of the alleged fraud."  Doc. 14 at 20-21.  First, this argument wholly ignores the fact that the only communications *directed to Drummond* that are included as instances of wire and mail fraud concern Defendants' repeated misrepresentations regarding whether and to what extent they were paying witnesses.  *See* Doc. 1, App'x D.  Drummond (and this Court) clearly did not know at the time these representations were made that they were unequivocally false.  Defendants do not argue otherwise, or provide any basis for dismissal of this aspect of the wire and mail fraud claims.

With respect to what Defendants *do* focus upon — spreading the false allegations of bribed witnesses that Drummond collaborated with a terrorist organization — Defendants' argument also fails because it is based on what *used to be* the law in the Eleventh Circuit:  that

40

the plaintiff must rely upon, and therefore be deceived by, the misrepresentations at issue.  In *Pendergraft* the Court held while the falsity of the affidavits at issue "might have deceived some, it could not deceive Marion County" (the plaintiff).  297 F.3d at 1209.  Therefore, the Court concluded there could be no mail fraud.  *Id.*  That was a sound conclusion based on the law of the Eleventh Circuit at the time *Pendergraft* was decided, because at that time the Eleventh Circuit required a RICO plaintiff to have in fact relied to their detriment on the defendant's misrepresentations in order to state a claim for mail or wire fraud.  Because Marion County knew the allegations were false, it could not have relied upon them.  Indeed, in support of its conclusion, the *Pendergraft* Court cited *Pelletier v. Zweifel*, 921 F.2d 1465, 1499-500 (11th Cir. 1991), which held "when the alleged predicate act is mail or wire fraud, the plaintiff must have been a target of the scheme to defraud ***and*** must have relied to his detriment on misrepresentations made in furtherance of that scheme."[21] (Emphasis added).

But this aspect of Eleventh Circuit law was abrogated by the Supreme Court in *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008).  In that case, a county had set rules on who could bid on tax liens that were being auctioned by the county.  The defendants submitted affidavits to the county falsely attesting to their compliance with the bidding rules, which allowed them to acquire more liens than they were entitled to under the rules.  The plaintiffs, other interested bidders, alleged they were injured by this fraudulent scheme because they were deprived of the ability to acquire their fair share of the tax liens.  The district court dismissed the claims of mail fraud, finding that the plaintiffs "'were not recipients of the alleged

---

[21] Three months before *Pendergraft* was decided, the Eleventh Circuit released *Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002), which also cited *Pelletier* for the proposition that Eleventh Circuit law requires "when a plaintiff brings a civil RICO case predicated upon mail or wire fraud, he must prove that he was 'a target of the scheme to defraud' and that he "'relied to his detriment on misrepresentations made in furtherance of that scheme.'" *Sikes*, 281 F.3d at 1360 (quoting *Pelletier*, 921 F.2d at 1499-500).

misrepresentations and, at best were indirect victims of the alleged fraud.'" *Id.* at 645. The Seventh Circuit reversed, rejecting the argument that the plaintiffs were "not entitled to relief under RICO because they did not receive, and therefore did not rely on, any false statements." *Id.* The Supreme Court granted certiorari to resolve a circuit split on this issue, expressly noting that the Eleventh Circuit fell on the side of the split which required that "the plaintiff must show that it in fact relied on the defendant's misrepresentations." *Id.* at 646 (citing *Sikes v. Teleline, Inc.*, 281 F.3d 1350 (11th Cir. 2002)).

Justice Thomas, writing for a unanimous Court, abrogated the law of the Eleventh Circuit and other Circuits which imposed a requirement that the victim of the scheme to defraud must have relied to his detriment on any of the alleged misrepresentations. Indeed, the victim does not even have to have been aware of the misrepresentations to be injured by them and therefore have a claim for redress under RICO.

The *Bridge* defendants contended that "the alleged misrepresentations—[defendants'] attestations of compliance with the Single, Simultaneous Bidder Rule—were made to the county, not [plaintiffs]." *Id.* at 648. According to the defendants, "[t]he *county* may well have relied on [defendants'] misrepresentations when it permitted them to participate in the auction, but [*plaintiffs*], never having received the misrepresentations, could not have done so." *Id.*

In rejecting this argument, the Court explained that "RICO provides a private right of action for treble damages to any person injured in his business or property by reason of" a pattern of mail fraud, and "[m]ail fraud, in turn, occurs whenever a person, 'having devised any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting to do so.'" *Id.* at 647 (quoting 18 U.S.C. § 1341). The Court then held that "[n]othing on the face of the relevant statutory provisions imposes" a requirement that the victim

rely upon the misrepresentations at issue. *Id.* at 648. The Court made clear that "a person can be injured 'by reason of' a pattern of mail fraud even if he has not relied on any misrepresentations," and that this was such a case. *Id.* at 649. Although the misrepresentations were made to, and were intended to deceive, the county, it was the plaintiffs who were injured by the fraudulent scheme. *Id.* "And this is true even though they did not rely on petitioners' false attestations of compliance with the county's rules." *Id.*

So Defendants are flatly wrong when they argue that mail and wire fraud claims cannot be premised on fraudulent communications to others that result in injury to Drummond:

> Appendix E consists entirely of wire (and one mail) fraud "violations," none of which alleges that any Defendant thereby "intended to deceive" the victim of the so-called fraud, Drummond. Compl., App. E. The title of the Appendix helpfully acknowledges that the target of each allegedly fraudulent communication is "the Media, the United States Department of Justice, and Other Third Parties." *Id.* at p. 1. But the federal mail and wire fraud statutes do not criminalize fraudulent conduct aimed at "third parties" rather than the alleged victim of the crime.

Doc. 14 at 10; *see also id.* at 21 ("And the target of the deceit matters. Any intent to deceive the court, though unsavory and inadvisable, is ***not*** sufficient to form a RICO predicate act."). This is simply not the law after *Bridge*.[22]

The Court in *Bridge* provided an example of an actionable mail fraud scheme, which renders meritless Defendants' contention that because the lies about Drummond's complicity

---

[22] The other case cited by Defendants for this proposition, *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819 (M.D. La. 2002), predated *Bridge* and arose out of the Fifth Circuit, which like the Eleventh Circuit was on the wrong side of the circuit split resolved by *Bridge*. *See St. Germain v. Howard*, 556 F.3d 261, 263 (5th Cir. 2009) (recognizing that prior Fifth Circuit precedent requiring the plaintiff "to demonstrate detrimental reliance" for purposes of mail fraud "is no longer good law" after *Bridge*).

Indeed, in *Livingston Downs*, the court found "[t]he import of the Eleventh Circuit's ruling [in *Pendergraft*] is that one cannot commit fraud by fooling one person to receive something of value from another." 257 F. Supp. 2d at 831. As explicitly held in *Bridge*, this is not an accurate statement of the law: "[A]ny such notion would be contradicted by the long line of cases in which courts have permitted a plaintiff to recover even though it was a third party, and not the plaintiff, who relied on defendant's misrepresentation." *Bridge,* 553 U.S. at 656.

with the AUC concern Drummond's own conduct, and Drummond knows that any such allegation "*must* be untrue," there could not possibly be mail or wire fraud.  Doc. 14 at 20-21. As illustrated in *Bridge*:

> [T]o take another example, suppose an enterprise that wants to get rid of rival businesses mails misrepresentations about them to their customers and suppliers, but not to the rivals themselves.  If the rival businesses lose money as a result of the misrepresentations, it would certainly seem that they were injured in their business "by reason of" a pattern of mail fraud . . . .

553 U.S. at 649-50.  In Justice Thomas's example, the misrepresentations are about the rival businesses, who no doubt know they are false.  The misrepresentations are not directed to the rival businesses, but to customers and suppliers, so the intent is to deceive third-parties, not the intended victims.  Nevertheless, if the rival businesses are injured by the fraudulent scheme, they have an actionable mail fraud claim.  *Id.*

That is precisely the situation here.  Putting aside the misrepresentations to Drummond regarding whether witnesses were being paid (which clearly *were* intended to deceive Drummond), Defendants' misrepresentations regarding Drummond's complicity with the AUC were made to the media, the courts, U.S. and Colombian criminal authorities, activist groups, and Drummond's customers, all with the purpose of injuring Drummond.  Drummond, the intended victim of the fraudulent scheme, has an actionable RICO claim under *Bridge*.

**B.      Defendants' request for the Court to essentially create a federal litigation privilege against claims of RICO should be rejected.**

Defendants next urge the Court to rely on the policy concerns expressed in *Pendergraft*, which the Eleventh Circuit has since made clear "were simply dicta," *U.S. v. Lee*, 427 F.3d at 890, to create what amounts to a federal litigation privilege providing immunity from RICO claims.  Defendants recognize that "*Pendergraft* did not involve allegations of obstruction of justice, bribery, money laundering (based on alleged bribery), or witness tampering," but

nevertheless ask the Court to hold that "*all* allegations of litigation misconduct" are immunized from RICO.  Doc. 14 at 22.  If such immunity is not granted, say the Defendants, it will result in "a 'flood' of civil RICO suits" based on claims that would better be characterized as state law torts.  *Id.* at 23.

As an initial matter, anyone with any faith in the integrity of our system of civil litigation would presume (and surely hope) that very few cases would present facts analogous to this one.  Indeed, Defendants' motions only cite one, *Chevron Corp. v. Donziger*, which of course found that RICO claims premised on criminal activities in connection with litigation were actionable.  It is difficult to imagine a "flood" of similar suits where allegations could be made, consistent with Rule 11, that plaintiffs' lawyers enlisted the assistance of a competitor of a business, as well as the criminal lawyer for incarcerated terrorists, to pay close to half-a-million dollars in bribes to those terrorists in order to fabricate the false message that said business was complicit with terrorists, and to spread that message in an outright attempt to destroy the business in every way imaginable:  urging its customers to stop doing business with it, having activist groups start worldwide boycotting campaigns, and seeking to have the business criminally prosecuted.

Putting aside the extreme unlikelihood that any court could be inundated with claims similar to this one, Defendants' request for this Court to dismiss otherwise actionable RICO claims on policy grounds is also foreclosed by the Supreme Court's *Bridge* decision.  Similar to Defendants here, the *Bridge* defendants argued that the claims at issue were essentially state law tortious interference claims, and the Court should as a policy matter disallow them in order "'to prevent garden-variety disputes between local competitors (such as this case) from being converted into federal racketeering actions.'"  553 U.S. at 659-60.  The Court strongly rejected any attempt to allow policy concerns to override the text of RICO:

> Whatever the merits of petitioners' arguments as a policy matter, we are not at
> liberty to rewrite RICO to reflect their—or our—views of good policy.  We have
> repeatedly refused to adopt narrowing constructions of RICO in order to make it
> conform to a preconceived notion of what Congress intended to proscribe. . . . We
> see no reason to change course here.  RICO's text provides no basis for imposing
> a first-party reliance requirement.

*Id.* at 660 (citations omitted).  The Court also took no stock in the argument that its holding could result in a flood of RICO suits, finding that such a concern was a matter for Congress, not the courts.  *Id.* ("If the absence of such a requirement leads to the undue proliferation of RICO suits, the 'correction must lie with Congress.' 'It is not for the judiciary to eliminate the private action in situations where Congress has provided it.'") (internal citations omitted).

Defendants cite no authority to support their proposed overarching immunity from RICO liability for all conduct somehow related or incidental to civil litigation.  This proposition is certainly not supported by *Pendergraft*.  *See Fla. Evergreen Foliage*, 336 F. Supp. 2d at 1267 (recognizing the *Pendergraft* "court emphasized that its 'holding was a narrow one'" and finding that the defendant "has still been unable to cite an Eleventh Circuit or Florida state case dismissing federal or state RICO claims based on immunity for litigation conduct"); *see also U.S. v. Lee*, 427 F.3d at 890-91 (holding that the *Pendergraft* decision was based on a lack of intent to deceive and "not upon any policy concerns relating to using the mails in connection with litigation"); *Hale v. State Farm Mutual Auto. Ins. Co.*, No. 12-0660-DRH, 2013 WL 1287054, at *19 (S.D. Ill. March 28, 2013) (rejecting defendants' citation of *Pendergraft* "for the proposition that 'serving legal documents by mail' cannot constitute mail fraud").

Numerous courts have held that there simply is no litigation privilege applicable to RICO claims.  *See Florida Evergreen*, 336 F. Supp. 2d at 1267; *Acosta v. Campbell*, No. 6:04CV761ORL28DAB, 2006 WL 146208, at *12 (M.D. Fla. Jan. 18, 2006) (noting that "it is not clear that the litigation privilege applies to RICO or other statutory claims in the Eleventh

Circuit"); *Living Designs*, 421 F.3d at 364-65 ("DuPont has not cited any federal case which holds that a party's litigation conduct in a prior case is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim."); *Dole Food Co. v. Gutierrez*, No. CV039416 NM(PJWX), 2004 WL 3737123, at *8 (C.D. Cal. July 13, 2004) ("The litigation privilege, however, does not apply to Dole's federal claims, including its claims under RICO."); *Giles v. Phelan, Hallinan & Schmieg, LLP*, No. 11-6239 (JBS/KMW), 2013 WL 2444036, at *5 (D.N.J. June 4, 2013) ("Federal precedent shows that state litigation privileges do not bar federal RICO claims"); *see also Suchite v. Kleppin*, 819 F. Supp. 2d 1284, 1292 (S.D. Fla. 2011) (holding, albeit not in the context of RICO, that a "state absolute privilege purporting to confer immunity from suit cannot defeat a federal cause of action").

Indeed, as the Ninth Circuit Court of Appeals has pointed out, application of a litigation privilege to RICO claims would be directly contrary to the "RICO statute, itself, [which] provides that conduct relating to litigation may constitute racketeering activity." *Living Designs*, 421 F.3d at 365 (citing 18 U.S.C. § 1961(1)(b) defining racketeering activity as including an act indictable under 18 U.S.C. § 1512, which relates to tampering with a witness).  To accept Defendants' argument would require the conclusion that witness tampering, bribing witnesses, obstruction of justice, and money laundering are just not criminal acts so long as they are committed in connection with civil litigation.  That is plainly not the law.

Defendants' request for an "extension" of *Pendergraft* to effectively provide immunity for "***all*** allegations of litigation misconduct" should be denied as contrary to established law and the language of the RICO statute itself.

## IV.   DRUMMOND'S COMPLAINT WAS TIMELY FILED.

Defendants tell this Court that Drummond has "filed suit far too late" because "Collingsworth filed his first lawsuit against Drummond fourteen years ago."  Doc. 14 at 31; *see also id.* at 38-40 (arguing that "the six-year effort Drummond expended defending the *Romero* litigation" should have "put [Drummond] on notice that it should look into the source of the injury of which it now complains").

Defendants' argument that *Romero* supposedly "start[ed] the clock" is a *non sequitur*. Drummond has not alleged that *Romero* is included in the Enterprise's pattern of racketeering activity.  Indeed, that would be factually impossible, as Drummond's Complaint specifically alleges that the Enterprise did not begin to form until **after** *Romero*.  It was Collingsworth's defeat in *Romero* which motivated him to assemble the Enterprise and commence a massive, multifaceted international campaign designed to extort Drummond.  *See* Doc. 1 at ¶¶ 40-46. Notably, while Defendants make much of *Romero*, they acknowledge that Drummond is not seeking its legal fees from *Romero* as damages in this lawsuit, and therefore concede that Drummond's injury "cannot have begun later than March 2009, when it began paying attorney fees to defend *Baloco*."  Doc. 14 at 36 n.15.

Drummond was first injured by Defendants' extortionate scheme, *at the earliest*, in the first half of 2009 when it was forced to defend *Baloco* (filed March 2009) and *Balcero* (filed May 2009), both of which were based on illegally-obtained witness testimony.  Seizing on these filings, Defendants twist the Supreme Court's decision in *Rotella v. Wood* and argue that "the limitations period begins to run at the point of discovery of injury regardless of whether the plaintiff *ever* discovers the pattern of racketeering activity."  Doc. 14 at 36.  Defendants are simply wrong.  While *Rotella* makes clear that RICO claims are subject to the "injury discovery

48

rule," *Rotella* makes equally clear that the RICO statute of limitations is equitably tolled "where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it." *Rotella v. Wood*, 528 U.S. 549, 561 (2000).

Thus, where a pattern of racketeering activity is fraudulently concealed, the statute of limitations for RICO claims only begins to run once a plaintiff knew or should have known of defendants' pattern of racketeering activity.  To invoke the doctrine of equitable tolling based on defendants' fraudulent concealment, a plaintiff must establish that (1) the defendant wrongfully concealed material facts related to its wrongdoing; (2) the concealment prevented the plaintiff's discovery of the nature of the claim within the limitations period; and (3) the plaintiff exercised due diligence in pursing the discovery of the claim during the period they seek to have tolled.  *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litigation*, 690 F. Supp. 2d 1296, 1306 (S.D. Fla. 2010); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 195-96 (1997).

"The diligence required for equitable tolling purposes is 'reasonable diligence,' . . . not 'maximum feasible diligence.'"  *Holland v. Florida*, 560 U.S. 631, 653, 130 S. Ct. 2549, 2565 (2010) (citations omitted).  Stated differently, ""[d]ue diligence ... does not require a [plaintiff] to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts."  *Downs v. McNeil*, 520 F.3d 1311, 1323 (11th Cir. 2008) (quoting *Aron v. United States,* 291 F.3d 708, 712 (11th Cir. 2002)).   "'When fraudulent concealment is established, the statute of limitations is tolled until the plaintiff actually discovers the fraud.'"  *S.E.C. v. Huff*, 758 F. Supp. 2d 1288, 1339 (S.D. Fla. 2010) (quoting *In re Int'l Admin. Servs., Inc.*, 408 F.3d 689, 701 (11th Cir. 2005)).

In an attempt to preemptively address equitable tolling, Defendants assert that Drummond had an "obligation . . . to get to the bottom of why it was being forced to defend what must have been ***absolutely shocking***, as well as 'false,' allegations" and that "Drummond did not bother to complete that investigation in the four-year period permitted by statute."  Doc. 14 at 43. That argument entirely ignores the allegations of the Complaint.  Indeed, Drummond's diligence in seeking to discover the Defendants' pattern of racketeering activity – discussed in detail below and specifically pled in the Complaint – cannot be reasonably debated.

Defendants' concealment of their dealings with witnesses and lawyers, which included blatant misrepresentations to Drummond and the Court, as well as Drummond's diligence in attempting to uncover these facts, is set forth in detail in the Complaint.  Doc. 1 at ¶¶ 74, 88, 102-105, 113, 126, 133-141.  After the *Baloco* and *Balcero* litigation was filed by the Defendants against Drummond in 2009, and the initial motion practice was concluded, Drummond utilized the discovery process to seek information regarding payments to witnesses in exchange for testimony.  *Id.* at ¶¶ 133-34.  A few examples of Drummond's diligent yet unsuccessful efforts to uncover the very core of Defendants' racketeering activity, as well as Defendants' affirmative acts to conceal it, are as follow:

- Between May 2009 and the end of 2010, the *Balcero* plaintiffs filed an original and two amended complaints, which resulted in three rounds of motion to dismiss briefing.  On January 6, 2011, the Court acted on Drummond's last motion to dismiss.  Doc. 112, *Balcero v. Drummond Company, Inc*., No. 2:09-cv-1041-RDP (N.D. Ala.).

- On June 3, 2011, Drummond served a document request and interrogatory seeking documents and information "relating to anything of value offered or given to any [disclosed witness], any current or former Colombian paramilitary or any other potential witness in this litigation, whether offered or given by Plaintiffs, Plaintiffs' counsel, or any other person or entity."  Doc. 1 at ¶ 134.

- On July 5, 2011, Collingsworth signed the responses to these requests.  Doc. 1 at ¶ 135.  None of the documents evidencing payments or offers of payment to any potential witnesses were disclosed.  *Id.* at ¶ 135.  The discovery responses stated

50

that the only benefits offered or provided were relocation costs for the lead *Balcero* plaintiff, "reasonable transportation, food, and lodging costs" for the *Balcero* plaintiffs who were being deposed in Alabama, and "hamburgers and other food" for Duarte during meetings discussing his false allegations against Drummond.  Doc. 1 at ¶ 135.

- On October 25, 2011, Drummond filed a motion to compel a full response to its interrogatory regarding the provision of anything of value to witnesses, seeking to ensure that witness payments were not concealed based on some inappropriate claim of privilege or other objection.  Doc. 1 at ¶ 137.

- On November 8, 2011, Collingsworth filed a response to Drummond's motion to compel and affirmatively and falsely represented to Drummond and the Court that all responsive information had been disclosed.  Doc. 1 at ¶ 137.

- On March 8, 2012 the U.S. District Court for the Northern District of Alabama ordered Collingsworth and Conrad & Scherer to disclose witness payment information.  Doc. 1 at ¶ 138.

- On the same day, Collingsworth, acting on behalf of both himself and as an agent for Conrad & Scherer, falsely represented to the court that Llanos Oil and its principals had "no connection" to the *Balcero* case, despite the fact that they knew Llanos and its principals had already paid Blanco close to a hundred thousand dollars in exchange for his testimony against Drummond.  Doc. 1, App'x D at No. 4.

It was not until August 2012, after the close of discovery in the *Balcero* litigation, that the Defendants first produced documents showing payments to any individual in response to Drummond's June 2011 discovery requests.  Doc. 1 at ¶ 143.  Even then, the only payment documents produced revealed payments to someone named Jose Pinzon, a person completely unknown to Drummond at the time.  *Id.*[23]  Documents relating to Charris, Gelvez and Duarte were not produced until January 2013.  Doc. 1 at ¶ 144.

Although Defendants waited until after discovery was closed in *Balcero* to produce these documents, Drummond utilized the discovery process in its defamation action against

---

[23] The evidence of payments that Drummond actually received in August 2012 was simply unexplained records of international money wires via MoneyGram and Western Union to an individual named Jose Pinzon.  It was not until in July 2013, in response to discovery requests by Drummond in the defamation action, that Defendants disclosed Pinzon was supposedly an intermediary for payments to alias "Halcon."  *See* Doc. 1, App'x C.

Collingsworth and Conrad & Scherer to seek to learn the scope of Defendants' witness payments.  This Court is all too familiar with the fraudulent concealment from Drummond, and lies to this Court, that followed.  Doc. 1 at ¶ 148.  A full description of over twenty separate instances, spanning from July 2011 to October 2014, in which Defendants actively concealed the fact of payments to witnesses in court filings and sworn testimony is included in Appendix D to the Complaint.

It was not until November 2014, after a third-party produced documents in response to a subpoena, that Drummond first learned that key witnesses El Tigre and Samario were paid by the Defendants.  Doc. 1 at ¶¶ 145, 152.  Payments to another key witness, Blanco, were not discovered until January 2015, only two months prior to the filing of this suit.  *Id.* at ¶ 145.  The fallacy of Defendants' argument that Drummond's suit is time-barred is perhaps best illustrated by their assertion that "the statute of limitations ran out, at the very latest, on April 30, 2014, almost a year before this suit was filed" with respect to Drummond's claim for $8.5 million in legal fees in *Balcero*, which were incurred due to El Tigre's false accusations.  April 30, 2014, is nine days *after* Defendants lied in response to a direct question from this Court – an act that can only be described as the epitome of intentional, fraudulent concealment – and represented that El Tigre had not been paid.  Doc. 1 at ¶ 191; App'x D at No. 16.  Indeed, Defendants did not disclose their payments to El Tigre (or Samario) until nearly seven months later, on November 17, 2014.  Doc. 1 at ¶ 209.

In addition to Defendants' misrepresentations in court filings, open court, and sworn testimony, Defendants actively concealed payments to witnesses by suborning perjured testimony from the witnesses themselves.  Doc. 1 at ¶¶ 103, 190, App'x D at No. 5.  Specifically, Collingsworth questioned Jaime Blanco about any offers made to him regarding his testimony:

Q:     Have you had any promises or benefits provided to you?
A:     No, no kind whatsoever.

Doc. 1 at ¶ 103. Collingsworth and the other members of the Enterprise present knew that Blanco would answer in the negative and knew that the answer would be false. *Id.*

Defendants also took affirmative steps to conceal the payments by routing the payments through various channels and to individuals not known by Drummond to be connected to the witnesses who ultimately received the funds.[24] *See, e.g.,* Doc. 1 at ¶¶ 69-73. For example, payments to Charris were initially made by a Colombian "field attorney" for IRAdvocates to a member or friend of Charris' family by making a deposit into her bank account. Doc. 1 at ¶ 69. Later, payments were effectuated via cash withdrawal from the Conrad & Scherer bank account, and a Conrad & Scherer employee taking that money to Western Union or MoneyGram to wire it to Colombia, where Defendant Francisco Ramirez's assistant, Yineth Baeza, would deposit the money into Charris' wife's account. Doc. 1 at ¶ 73. And in January 2012, Defendants complicated their payment scheme even further when, for yet-to-be-disclosed reasons, they began laundering these payments through IRAdvocates' bank account. *Id*. A complete statement of known payments to Charris including the various payors, payees, and payment methods is included in Appendix A to the Complaint. Descriptions of known payments to other witnesses - El Tigre, Samario, and Halcon – are included in Appendices B & C to the Complaint. As a result of this scheme, even when documentation was produced, Drummond was unable to determine, despite exercising due diligence, the precise nature of the funds transfers and their relationship to the litigation.

---

[24] The fact that this conduct in making the payments to witnesses "is the same conduct alleged to constitute the basis for the action itself does not detract from the additional effect the conduct had in concealing the racketeering scheme from Plaintiff." *New York Dist. Council of Carpenters Pension Fund v. Forde*, 939 F. Supp. 2d 268, 279 (S.D.N.Y. 2013).

These affirmative acts by the Defendants, coupled with the "extraordinary circumstances" of this case and Drummond's "due diligence," *Downs v. McNeil*, 530 F.3d at 1323, are more than sufficient to establish fraudulent concealment and thereby toll the statute of limitations on Drummond's claims. *Roper v. Dep't of Corr.*, 434 F. App'x 786, 791 n.5 (11th Cir. 2011) (reversing as clearly erroneous the district court's determination that a plaintiff failed to exercise reasonable diligence so as to invoke the equitable tolling doctrine, explaining that "[u]pon being told by counsel that a Rule 3.850 motion had been filed, Roper was not required to discount counsel's representation in order to show 'reasonable diligence.'") (citing *Holland*, 130 S.Ct. at 2656); *Strong v. Demopolis City Bd. of Ed.*, 515 F. Supp. 730, 734 (S.D. Ala. 1981) (holding that the doctrine of equitable tolling applied to make a complaint timely because "[t]he complaint affirmatively alleges a lack of knowledge concerning the discrimination in pay, and the Court must accept the allegation as true when ruling upon a motion to dismiss.").

The purpose of the fraudulent concealment doctrine is to "prevent a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it." *Forde*, 939 F. Supp. 2d at 279 (holding that complaint stated claim for equitable tolling of civil RICO claim). Courts have held that affirmative misrepresentations to the plaintiff regarding the existence of evidence as well as untruthful testimony constitute fraudulent concealment sufficient to toll a RICO claim. *Richards v. Mileski*, 662 F.2d 65, 70 (D.C. Cir. 1981); *see also Grimmet v. Brown*, 75 F.3d 506, 514-15 (9th Cir. 1996) (RICO statute of limitations tolled by "active concealment" of the "scheme"). [25]

---

[25] Indeed, numerous federal courts have equitably tolled the statute of limitations where a RICO plaintiff establishes fraudulent concealment. *See Sky Medical Supply, Inc. v. SCS Support Claims Services, Inc.*, 17 F. Supp. 3d 207, 222 (E.D.N.Y. 2014) ("[T]he Court notes that plaintiff's causes of action under RICO accrued when plaintiff discovered or should have discovered that its claims were

Defendants also strangely argue that the simple fact that Drummond was required to defend itself against the false allegations *Baloco* and *Balcero* means it was on notice of its RICO claims.  Doc. 14 at 40-42 ("the initial pleadings in both *Baloco* and *Balcero* . . . should have put Drummond on notice well before March 2011 of the injury").  But there is a huge difference between defending a meritless lawsuit (which happens regularly), and defending oneself against a lawsuit that was part of a massive, multifaceted scheme of extortion premised on bribery, obstruction of justice, money laundering, witness tampering, and wire and mail fraud.  Stated differently, while Drummond certainly knew that the allegations in *Baloco* and *Balcero* were utterly false, it had no idea that the "evidence" supporting those allegations was procured through a pattern of racketeering activity.  Once it did, it timely filed suit.  *See CSX Transp., Inc. v. Gilkison*, 406 F. App'x 723, 730 (4th Cir. 2010) (reversing the dismissal of a RICO claim premised on the filing of fraudulent asbestosis lawsuits and holding that "[t]he fact that an underlying asbestos suit was filed or settled, without more, does not establish as a matter of law that the separate gravamen of RICO fraud should have been known by that event alone.  The district court thus erred in making the unilateral finding that either the date of the filing or of the settlement of the underlying lawsuits was dispositive on this question.  It does not follow from the facts pled on the face of the complaint that CSX knew or should have known that the underlying asbestos lawsuits were *fraudulently* filed when they were filed.  Nor does reading the face of the complaint show that CSX knew or should have known of the alleged fraudulent

---

fraudulently denied, and not when its claims for reimbursement were denied, as some defendants suggest"); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 778 F. Supp. 695, 700-01 (S.D.N.Y. 1991); *Clute v. Davenport Co.*, 584 F. Supp. 1562, 1578-79 (D. Conn. 1984); *Jerry Kubecka, Inc. v. Avellino*, 898 F. Supp. 963, 971 (E.D.N.Y. 1995); *Meridien Int'l Bank Ltd. v. Gov't of the Republic of Liberia*, 23 F. Supp. 2d 439, 447 (S.D.N.Y. 1998); *Flood v. Makowski*, No. CIV.A. 3:CV-03-1803, 2004 WL 1908221, at *6-7 (M.D. Pa. Aug. 24, 2004).

screening scheme when the lawsuits were filed or settled.").[26]

For obvious reasons, Defendants largely omit any discussion of the specifics of their fraudulent concealment, and instead urge this Court to summarily dismiss Drummond's claim as untimely.  But as explained above, Drummond pled numerous examples of Defendants actively concealing the acts and transactions that would have put Drummond on notice of an injury caused by the Enterprise's pattern of racketeering activity.  Moreover, all of this active concealment was perpetrated in the face of Drummond's repeated and diligent attempts to discover this information.  As aptly stated by Justice Hugo Black:

> To decide the case we need look no further than the maxim that no man may take advantage of his own wrong. Deeply rooted in our jurisprudence this principle has been applied in many diverse classes of cases by both law and equity courts and has frequently been employed to bar inequitable reliance on statutes of limitations.
>
> [. . .]
>
> The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not in a court

---

[26] Drummond notes that the Eleventh Circuit also follows the "separate accrual" rule for civil RICO claims, which provides:

> If a single RICO violation gives rise to multiple "new and independent injur[ies]", a new civil RICO claim may accrue with each injury, regardless of when the original acts occurred.  See *Bivens Gardens Office Bldg., Inc. v. Barnett Bank of Fla., Inc.,* 906 F.2d 1546, 1552 (11th Cir. 1990), *abrogated on other grounds by Rotella,* 528 U.S. at 555, 120 S.Ct. at 1080. However, when a subsequent injury is not "new and independent" of the original injury, the plaintiff must bring his claim alleging the subsequent injury within four years of when he knew or should have known of his original injury. *Pilkington v. United Airlines,* 112 F.3d 1532, 1537–38 (11th Cir. 1997).

*Frantz v. Walled,* 513 F. App'x 815, 821 (11th Cir. 2013).  Drummond's payment of legal fees in *Baloco* and *Balcero* are not the only injuries pled in the Complaint.  Indeed, some of the injuries alleged by Drummond were caused by RICO predicate acts – such as wire or mail fraud – that were committed well after the filing of *Baloco* and *Balcero*.  For example, the Complaint alleges that the Enterprise published and disseminated the PAX Report to Drummond's customers and foreign governments in 2014, Doc. 1 at ¶¶ 166 & 167, thereby resulting in a "new and independent" injury to Drummond.  *Id.* at ¶ 169.  Under the "separate accrual" rule, the statute of limitations with respect to this particular injury did not begin to run until 2014.  *Frantz,* 513 F. App'x 1537-38.

> of justice be permitted to avail himself of that advantage.  And although the
> cases to which this principle is to be applied are not as well defined as could be
> wished, the general doctrine is well understood and is applied by courts of law as
> well as equity where the technical advantage thus obtained is set up and relied on
> to defeat the ends of justice or establish a dishonest claim.

*Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232-34 (1959) (applying the doctrine of

equitable tolling to reverse the dismissal of a lawsuit as time-barred).  Drummond's claims are

not time barred.  To hold otherwise would only allow Defendants to "take advantage of [their]

own wrong[s]." *Id.*

Finally, where a complaint contains well-pled allegations of concealment, "[w]hether the

limitations period should be tolled is a factual question which cannot be resolved on a motion to

dismiss." *In re Chiquita Brands*, 690 F. Supp. 2d at 1306 (denying motion to dismiss where

Complaint contained twelve detailed paragraphs alleging, *inter alia*, secret payments made via

personally transporting cash, false and misleading entries in records, and filings false and/or

misleading documents with U.S. and international governments); *In re Issuer Plaintiff Initial

Pub. Offering Antitrust Litig.*, No. 00 CIV. 7804 (LMM), 2004 WL 487222, at *5 (S.D.N.Y.

Mar. 12, 2004) ("This court agrees with the many courts which have held that the issues of

fraudulent concealment and due diligence are questions of fact that should not be decided on a

motion to dismiss.").  Dismissal based on the statute of limitations would be improper for this

additional reason.

## V.   DRUMMOND ALLEGES CONCRETE INJURIES TO BUSINESS OR PROPERTY INTERESTS.

Drummond specifically alleges the following injuries caused by Defendants' violations of

18 U.S.C. § 1962(c):

- Attorneys' fees, costs, and other expenses incurred defending itself in the sham
  litigation in the Northern District of Alabama;

- Damage to Drummond's business interests, including adverse effects on its sale of
  coal to European customers;

- Disruption of its business, including substantial loss and diversion of time of key personnel and damage to its union relations; and

- Expenses of responding to and dealing with the political and public effects of the RICO Defendants' fraudulent schemes.

Doc. 1 at ¶ 197.  Defendants do not dispute that Drummond's legal fees and costs incurred in defending itself in *Baloco* and *Balcero* are cognizable damages under RICO.  They do, however, argue that all of Drummond's other claimed damages are too "intangible", "speculative" and "not concrete enough to confer RICO standing."  Doc. 14 at 32-35.  That argument fails.[27]

Each of these categories of damages constitutes a concrete, tangible, and quantifiable economic loss suffered by Drummond as a result of Defendants' activities.  Defendants' contention that these damages are not recoverable is contrary to established case law.  *See Frankford Trust Co. v. Advest, Inc.*, 943 F. Supp. 531, 533-34 (E.D. Pa. 1996) ("'When a commercial enterprise suffers a loss of money it suffers an injury in both its "business" and its "property".'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).  Defendants' suggestion that Drummond's RICO damages must be pleaded with specificity, i.e., Drummond must put a dollar amount on each category of damages, is also wrong.  *See* Doc. 14 at 32 ("none of these injuries are 'quantified'").  It is well-settled that "at the pleading stage of civil RICO actions, a plaintiff must plead damages to business or property in a manner consistent with Rule 8 to show standing and is not required to plead with the particularity required by Rule 9(b)." *Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (citing *NOW v. Scheidler*, 510 U.S. 249, 256 (1994)).

---

[27] Defendants strenuously argue that "[r]eputational injuries . . . cannot confer RICO standing," Doc. 14 at 32, but the Complaint does not seek damages to Drummond's reputation.  Indeed, the types of damages Drummond is seeking are alleged in the Complaint.  Doc. 1 at ¶ 197.  Defendants' arguments in this regard are moot.

In fact, the Eleventh Circuit has specifically held that "lost profits" and "lost value" are cognizable damages under RICO that can be established with more specificity in discovery. *Maiz v. Virani*, 253 F.3d 641, 662-65 (11th Cir. 2001) (admitting expert economist testimony to establish the extent of those damages and explaining that "[t]he touchstone of the [damages] inquiry . . . is proximate cause; there is no automatic rule against the recovery of any type of lost profits or lost value damages if proximate cause is shown."); *see also Frankford Trust*, 943 F. Supp. at 533; *Three Crown Ltd. Partnership v. Salomon Bros., Inc.*, 906 F. Supp. 876, 891 (S.D.N.Y. 1995) (holding that victim of RICO violation may recover lost profits subject to the ordinary limitations concerning remoteness and speculativeness).   Thus, "[a]lthough it is axiomatic that a plaintiff must plead concrete damages, Fed.R.Civ.P. 12(b)(6) does not require a complaint to plead the amount of damages with mathematical precision."  *Astech-Marmon, Inc. v. Lenoci*, 349 F. Supp. 2d 265, 271 (D. Conn. 2004) (denying a motion to dismiss a civil RICO complaint and explaining that it "sufficiently stated a claim for lost profits").  Such damages are not mere "reputational injury," nor are they "unrealized."  Doc. 14 at 34.

Defendants also tell this Court that "Drummond has not pointed to any 'injury-causing event' that has led to any actual, quantifiable harm to its business interests in Europe or elsewhere."  Doc. 14 at 34.  To accept that argument would be to ignore the allegations of the Complaint, which is a persistent theme in Defendants' motions to dismiss.  Paragraphs 153 through 170 of the Complaint detail the Enterprise's public relations and media campaign against Drummond.  Drummond alleges that the Enterprise has blasted the false, paid-for testimony of their "witnesses" all over the world, including to governments and the media.  Doc. 1 at ¶ 154.  Those events most certainly have occurred, resulting in concrete damages the amount of which will have to be determined by a jury.  Drummond also details one of the specific facets of this

campaign – the Enterprise's role, in concert with non-party co-conspirator PAX, in compiling and disseminating to Drummond's European customers and to European governments the fraudulent and false "report" titled "The Dark Side of Coal:  Paramilitary Violence in the Mining Region of Cesar, Colombia."  *Id.* at ¶ 166.  The Complaint alleges that Drummond has been directly damaged due to the Enterprise's dissemination of this "report" to its customers and European governments.  *Id.* at ¶¶ 167-169.

Drummond has properly alleged that it was injured, in numerous respects, in its property or business by reason of Defendants' violation of 18 U.S.C. § 1962, which is all it must plead to state a claim.  The amount and extent of those damages is an issue for the jury.[28]

## VI.   DRUMMOND'S COMPLAINT HAS CLEARLY ALLEGED VALID STATE LAW CLAIMS AGAINST THE DEFENDANTS.

### A.   Civil Conspiracy

Defendants argue Drummond's state law claim for civil conspiracy should be dismissed for two reasons: 1) there is no underlying tort claim on which it can be based (*see* Doc. 14 at 44; Doc. 15 at 15); and 2) under the "general rule" in Alabama, a civil conspiracy claim cannot be based on testimony offered in a judicial proceeding (Doc. 14 at 44).  As established elsewhere in this brief, Drummond has clearly stated valid underlying claims under RICO (Sections I through V *supra*), willful and/or reckless misrepresentation (Section VI-B, *infra*), and suppression/fraudulent concealment (Section VI-C, *infra*).  Thus, Defendants' first argument should be summarily rejected.

---

[28] The sole argument offered by Defendants in support of the dismissal of the RICO Conspiracy Claim is that the Complaint fails to state an underlying RICO claim.  Doc. 14 at 43.  For the reasons set forth herein, the Complaint states a RICO claim against the Defendants.  Accordingly, Defendants' argument that the RICO Conspiracy Claim is due to be dismissed fails, and Drummond does not belabor the point with any further argument outside of this footnote.

Defendants' second argument regarding the "general rule" of the testimonial privilege is fatally flawed in its incompleteness.  In fact, the very case cited by Defendants in support of their argument recognizes that the "general rule" does not bar a civil conspiracy claim when the testimony is only part of a larger, overall fraudulent scheme:

> Since, as a general rule, in the absence of statute, no action lies to recover damages caused by perjury, false swearing, subornation of perjury, or an attempt to suborn . . . an action for damages for conspiracy to commit perjury and for the giving of false testimony or for subornation or attempted subornation of perjury, cannot ordinarily be maintained.  **It has been held, however, that where the giving of false testimony is but a part of a plan or scheme to defraud a person, an action for the conspiracy will lie.** . . .

*Snyder v. Faget*, 326 So. 2d 113, 116-18 (Ala. 1976) (quoting 15A C.J.S. Conspiracy § 16 and collecting cases in support of this proposition) (emphasis added).  Moreover, the *Snyder* court held that the plaintiff in that case could proceed with his civil conspiracy claim based on his allegation that a doctor submitted false testimony during the course of commitment proceedings in furtherance of the defendants' alleged conspiracy to deprive Plaintiff of his liberty and/or property.  *Id.* at 118-19.

Similarly, in the instant case, Drummond is not attempting to assert a claim based solely on a false statement given by a witness during the course of a judicial proceeding.  Rather, Drummond has alleged Defendants conspired to use bribes and perjured testimony as part of a massive, multi-faceted scheme to extort money from Drummond either through a settlement or fraudulent judgment.  *See, e.g.,* Doc. 1 at ¶ 2 (providing overview of artifices and illegal conduct used in Defendants' massive scheme).  The Alabama Supreme Court has clearly recognized that a claim for civil conspiracy exists in these circumstances despite any general rule regarding the testimonial privilege.  *See Snyder*, 326 So. 2d at 116-18.

## B.     Willful and/or Reckless Misrepresentation

Defendants' motion cites the general elements of a fraudulent misrepresentation claim under Ala. Code § 6-5-1 and then makes a passing argument, without citation to further authority, that Drummond's Complaint fails to meet certain of those elements.   None of Defendants' arguments have any merit.  First, Defendants' argument that Drummond could not have "justifiably" relied on statements which it "knew" to be false is inapposite.  *See* Doc. 14 at 45.   Drummond's claim for willful and/or reckless misrepresentation ("Count III") does not merely allege that Drummond was defrauded by the allegations on the face of the *Balcero* Complaint or by the content of the false "testimony" of the "witnesses" that accused Drummond of collaborating with the AUC.   Rather, Drummond's claim is based on Defendants' misrepresentations during the course of litigating those claims.[29]

Specifically, what Drummond relied on was that Defendants had not manufactured all the evidence against it by making payments to the witnesses, their families, and/or criminal lawyers in exchange for testimony implicating Drummond. *See, e.g.*, Doc. 1 at ¶ 208 ("The RICO Defendants fraudulently concealed the fact that in order to procure El Tigre and Samario's testimony, their criminal lawyer Ivan Otero was promised a contingency fee in the cases against Drummond as well as given $ 80,000.").  Defendants repeatedly misrepresented to Drummond

---

[29] Certainly, as Defendants suggest, a cause of action does not accrue if a plaintiff merely files a complaint containing untruthful allegations which a defendant "knows" to be false.  For instance, consider the most simple car wreck case in which the Plaintiff's complaint alleges the Defendant was negligent because he ran a red light, but the Defendant "knows" from his personal involvement in the accident that the light was green. No fraud claim arises. On the other hand, suppose the Plaintiff's attorneys decide to pay every single supposed "fact witness" to the accident to say the Defendant ran the red light as part of a scheme to use the lawsuit to extort money either though a settlement or judgment against the Defendant. On top of that, during the course of litigation, the Plaintiff's attorneys go to great lengths to cover up the witness payments and repeatedly misrepresent in discovery responses, court filings, and responses to the judge's questioning that no such payments exist. Both in this hypothetical and in the instant case, Defendants are entitled to bring a fraud action once they discover that such misrepresentations do exist.

(and the Court) that such payments did not occur.  Doc. 1 at ¶¶ 133-40, 146-52, and App'x D.  In fact, Defendants' interrogatory responses in *Balcero* even attempted mislead Drummond into believing that all forms of "assistance" had been disclosed, listing the Defendants' provision of innocuous benefits such as "reasonable transportation, food, and lodging costs" for the *Balcero* plaintiffs being deposed in Alabama and "hamburgers and other food" for Duarte during their meetings with him.  Doc. 1 at ¶ 135.  Drummond and the Court justifiably relied on these misrepresentations.

Defendants also argue that their misrepresentations were only made to deceive parties other than Drummond, and Drummond's claims therefore fail because it cannot plead that Defendants possessed the requisite intent to deceive. Doc. 14 at 45.  This argument is incorrect as a matter of both law and fact.

First, consistent with federal law, "[i]n Alabama, it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured."  *Thomas v. Halstead*, 605 So. 2d 1181, 1184 (Ala. 1992).  Rather, "[i]f a third person is injured by the deceit, he may recover against the one who made possible the damages to him by practicing the deceit in the first place."  *Id.* (quoting 37 C.J.S. *Fraud* § 60, p. 344 (1943)).  Thus, even if Defendants' misrepresentations were only meant to deceive parties other than Drummond, the Complaint clearly alleges adequate facts to establish that Drummond was injured by Defendants' misrepresentations.  *E.g.*, Doc. 1 at ¶¶ 7, 8 (injury in the form of legal fees and damage to business interests).

Moreover, Defendants cannot possibly explain how their repeated misrepresentations regarding their witness payments were not made with the intent to deceive Drummond, as opposed to the Court or some other third party.  As this Court is well aware, in federal court

practice, discovery responses are not served on opposing parties by filing them with the court. Rather, the responding party must serve its responses directly to the requesting party. Thus, Defendants' misrepresentations in discovery responses were served *only* on Drummond and made in direct response to *Drummond's* discovery requests. *See* Doc. 1 at ¶ 133-39.

### C.    Fraudulent Concealment

In support of their motion to dismiss Count IV of Drummond's Complaint (fraudulent concealment/suppression) Defendants cite the four prong test required for a *prima facie* case of fraudulent concealment/suppression, but only dispute Drummond's ability to establish the third prong—that the defendant's "concealment or failure to disclose induced plaintiff to act."[30]  Doc. 14 at 45 (citing *Lawson v. Harris Culinary Enterprises, LLC*, 83 So. 3d 483, 492 (Ala. 2011)). While Defendants correctly argue that their concealment did not change Drummond's position that the *Balcero* witnesses' testimony accusing it of collaborating with paramilitaries is false (it is), this argument completely misses the point.

Again, what Drummond relied on was that Defendants had not engaged in a massive scheme of extortion founded on paying bribes to witnesses to testify falsely against Drummond. Defendants were in sole control of the evidence as to whether and to what extent they paid witnesses. The Defendants had an affirmative obligation under the Federal Rules of Civil Procedure, ethics rules (Doc. 1 at ¶ 214), and this Court's orders to disclose the fact of their payments to witnesses. *Id.* at ¶¶ 138-39.  They did not do so, and by concealing their witness

---

[30] With respect to any of the three other prongs, Defendants have waived those arguments and cannot raise them for the first time on reply. *Distrib. Res. Mgmt., Inc. v. Peacock*, No. 2:12-CV-00188-SLB, 2012 WL 2930787, at *2 (N.D. Ala. July 13, 2012) (quoting *Herring v. Sec'y Dep't of Corr.,* 397 F.3d 1338, 1342 (11th Cir. 2005)) (collecting cases and noting that "as [the Eleventh Circuit] repeatedly ha[s] admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.'").

payments, Defendants' conduct deprived Drummond of critical evidence it needed to defend itself and which could explain to the Court, its customers, and to the world why the witnesses changed their testimony to implicate Drummond.

In furtherance of their concealment, Defendants solicited perjured testimony from their "key witness" to say that he had not received any promises nor had any benefits offered to him. *Id.* at ¶¶ 102-05.  As alleged in the Complaint, this "testimony" was blatantly false (*id.* at ¶¶ 94-102), and was clearly part of Defendants' scheme to mislead Drummond into a false sense that the witnesses were not being paid so that Drummond would not be able to cross examine them about the benefits they received, and would not be able to effectively defend itself against the massive fraudulent public campaign being perpetrated by Defendants.  Through the close of discovery in *Balcero* and after all witnesses had given their trial testimony, Defendants' discovery responses and filings consistently denied making any of the witness payments described in the Complaint, and Defendants withheld all documentary evidence to the contrary. *Id.* at ¶¶ 133-39.  As the Supreme Court of Georgia has recognized, "[d]ue diligence does not require the requesting party to disbelieve the substantive answers an opposing party has provided in discovery":

> "An interrogatory answer that falsely denies the existence of discoverable information is not exactly equivalent to no response. It is *worse* than no response. When there is no response to an interrogatory or the response is devoid of content, the party serving the interrogatory at least knows that it has not received an answer. It can move the court for an order to compel a response.... If the response is false, however, the party serving the interrogatory may never learn that it has not really received the answer to the interrogatory...."

*Ford Motor Co. v. Conley*, 757 S.E.2d 20, 32 (Ga. 2014) (emphasis in original; citations omitted).

Defendants' scheme of fraudulent concealment worked.  Drummond did not cross examine the witnesses about any of the benefits they received from Defendants, and therefore was unable to uncover Defendants' witness bribes.  The one witness Drummond did attempt to ask a general question about whether he had been provided benefits by Collingsworth, Blanco, lied after being coached by the Defendants to do so.  Doc. 1 at ¶¶ 102-05.  Drummond was not able to further test Blanco's trial testimony that he had not been given any benefits by Defendants, because the Defendants fraudulently concealed the very evidence Drummond needed to be able to do so.  *See In re Amtrak "Sunset Limited" Train Crash in Bayou Canot, AL on Sept. 22, 1993*, 136 F. Supp. 2d 1251, 1260 (S.D. Ala.) *aff'd sub nom. In re Amtrak*, 29 F. App'x 575 (11th Cir. 2001) ("Defendants are not to be penalized for accepting as true plaintiff Farmer's answers to the interrogatories – answers which were made under oath and were plainly responsive. Because of plaintiff Farmer's perjurious answers, defendants were deceived into believing that there was no reason for them to ask him questions about a criminal record during his deposition; his own conduct effectively took away defendants' opportunity to depose him on those issues.").

Furthermore, Drummond can also state a claim under Ala. Code § 6-5-102 for fraudulent concealment based on Defendants' concealment of their witness payments with respect to third parties.[31]  Accordingly, Defendants' fraudulent misrepresentations with respect to third parties,

---

[31] "In cases where fraudulent conduct is directed to third parties, this State's caselaw generally holds that a duty to disclose may be owed to a person with whom the defendant has had no prior dealings, specifically, where there is a 'duty' not to make a false representation:

  1. To those to whom a defendant intends, for his or her own purposes, to reach and influence by the representation;
  2. to those to whom the defendant has a public duty created by statute or pursuant to a statute; and
  3. to those members of a group or class that the defendant has special reason to expect to be influenced by the representation."

66

such as this Court, Drummond's customers, the media, law enforcement agencies, and foreign governments, are actionable.

### D. Drummond's state law claims are not barred by the statute of limitations.

Defendants Collingsworth and IRAdvocates make a cursory argument in their brief that Drummond's state law claims are time barred. This is not so. As alleged in the Complaint, the *Balcero* case was not dismissed due primarily to the Court's reliance on the purchased testimony of El Tigre. Doc. 1 at ¶ 208. Despite Drummond's due diligence in attempting to discover whether El Tigre had been paid, Defendants' fraudulent concealment prevented Drummond from learning of the payments until November 2014. *Id.* at ¶ 209. This was the same for Samario. *Id.* Also because of Defendants' fraudulent concealment, Drummond did not learn until October 2013 that Defendants had provided substantial benefits to the criminal lawyer of El Tigre and Samario in order to procure their testimony. *Id.* at ¶ 208. Moreover, Defendants fraudulently concealed the fact they paid Jaime Blanco until January 2015. *Id.* at ¶ 209. All of these discoveries were within two years of filing suit.

"The 'discovery rule' in Alabama applies only to fraud actions, *see* Ala. Code § 6–2–3, and cases involving the fraudulent concealment of the existence of a cause of action." *Utilities Bd. of City of Opp v. Shuler Bros.*, 138 So. 3d 287, 293 (Ala. 2013), *reh'g denied* (Aug. 23, 2013). Like the doctrine of equitable tolling, "Section 6–2–3 supplies an objective test, tolling the statute of limitations on a fraud claim until the aggrieved party discovers or, in the exercise of reasonable care, should have discovered, the facts constituting the fraud." *Potter*, 844 So. 2d at

---

*Wyeth, Inc. v. Weeks*, 159 So. 3d 649, 679 (Ala. 2014) (Shaw, J., concurring) (citing *Hines v. Riverside Chevrolet–Olds, Inc.,* 655 So. 2d 909, 919–20 (Ala.1994); *Carter v. Chrysler Corp.,* 743 So. 2d 456, 461 (Ala. Civ. App. 1998); *Potter v. First Real Estate Co.,* 844 So. 2d 540, 553 (Ala. 2002); and *Colonial Bank of Alabama v. Ridley & Schweigert,* 551 So. 2d 390, 396 (Ala. 1989)).

545.   For the reasons explained above (and in Section IV), Drummond has alleged sufficient facts evidencing its due diligence and reasonable care in attempting to discover the Defendants' witness payments, which are the lynchpin of their extortionate and fraudulent scheme.   Rather than truthfully respond to Drummond's (and the Court's) inquiries in this regard, Defendants affirmatively misrepresented the existence of critical facts.   *Id.*   Accordingly, § 6-2-3 applies to make Drummond's state law claims timely filed.   *See Vandegrift v. Lagrone*, 477 So. 2d 292 (Ala. 1985) (holding that the statute of limitations was tolled by the defendant's fraudulent concealment, which included affirmative misrepresentations to an heir that a will did not exist).[32]

## CONCLUSION

For all of the foregoing reasons, Drummond respectfully submits that the motions to dismiss filed by Mr. Collingsworth, IRAdvocates, Mr. Scherer, and Conrad & Scherer should be denied in full.

---

[32] Moreover, the question of whether § 6-2-3 applies to toll the statute of limitations with respect to Drummond's state law fraud and misrepresentation claims is not appropriately resolved on a motion to dismiss:  "[t]he Alabama Supreme Court has repeatedly held that " 'the question of when [a] party discovered or should have discovered the fraud is generally one for the jury.' " *Wheeler*, 39 So.3d at 1082 (quoting *Liberty Nat'l Life Ins. Co. v. Parker*, 703 So. 2d 307, 308 (Ala. 1997)).  It has further held that " '[t]he question of when a plaintiff should have discovered fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff *actually knew* of facts that would have put a reasonable person on notice of fraud.'"   *Collins v. Davol, Inc.*, 56 F. Supp. 3d 1222, 1226-27 (N.D. Ala. 2014) (denying defendant's 12(b)(6) motion to dismiss fraud and misrepresentation claims).

Respectfully submitted,

*s/ H. Thomas Wells, III*
William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL  35259
(205) 868-6000

Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc. and Drummond Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that on **October 30, 2015**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notice to the following counsel of record.

Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
1819 5th Avenue N., Suite 1050
Birmingham, Alabama 35203
Telephone: (205) 986-3620
rks@spotswoodllc.com
msansbury@spotswoodllc.com
wpaulk@spotswoodllc.com

W. Percy Badham
Brannon J. Buck
Brett A. Ialacci
BADHAM & BUCK, LLC
2001 Park Place North, Suite 500
Birmingham, Alabama 35203
Telephone:  (205) 521-0036
Fax:  (205) 521-0037

pbadham@badhambuck.com
bbuck@badhambuck.com
bialacci@badhambuck.com

Kenneth E. McNeil (*pro hac vice*)
Stuart V. Kusin (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002
Telephone: (713) 653-9366
kmcneil@susmangodfrey.com
skusin@susmangodfrey.com

Lindsey Godfrey Eccles (*pro hac vice*)
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880
leccles@susmangodfrey.com

Christopher S. Niewoehner (*pro hac vice*)
STEPTOE & JOHNSON LLP
115 S. LaSalle Street, Suite 3100
Chicago, Illinois 60603
Telephone: (312) 577-1240
cniewoehner@steptoe.com

Kendall R. Enyard (*pro hac vice*)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue NW
Washington, D.C. 20036
Telephone: (202) 429-6489
kenyard@steptoe.com

*s/ H. Thomas Wells, III*
H. Thomas Wells, III (ASB-4318-H62W)