## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DRUMMOND COMPANY, INC. et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:15-cv-506-RDP** |
| | } | |
| **TERRENCE P. COLLINGSWORTH,** | } | |
| **et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it Motions to Dismiss filed by Defendants Albert van Bilderbeek and Francisco Ramirez Cuellar. (Docs. # 121 and 122). The Motions have been fully briefed (Docs. # 125, 126, 128 and 129), and are ripe for decision.

## I.    Introduction

On March 27, 2015, Plaintiffs Drummond Company, Inc. and Drummond Ltd. (hereinafter collectively referred to as "Plaintiff" or "Drummond") filed its Complaint in this action. The Complaint alleges (1) violations of RICO, 18 U.S.C. § 1962(c) (Count I), (2) conspiracy to violate RICO, 18 U.S.C. § 1962(d) (Count II), (3) willful and/or reckless misrepresentation in violation of Alabama Code § 6-5-101 (1975) (Count III), (4) fraudulent concealment/suppression of material facts in violation of Alabama Code § 6-5-102 (1975) (Count IV), and (5) civil conspiracy (Count V). (Doc. # 1-1). Van Bilderbeek and Ramirez, like Ivan Alfredo Otero Mendoza before them, seek to have the claims against them dismissed for lack of personal jurisdiction and failure to state a claim.   (*See* Docs. #121 and 122).

## II.    Standard of Review

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a

defendant. *See* Fed.R.Civ.P. 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir.2009); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir.1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction."). If a plaintiff satisfies his initial burden and a defendant then submits affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction. *See Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268 (11th Cir.2002); *see also Posner*, 178 F.3d at 1214 ("'The plaintiff bears the burden of proving 'by affidavit the basis upon which jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support of his position.'" (citation omitted)). When the issue of personal jurisdiction is decided on the record evidence, but without a discretionary hearing, a plaintiff demonstrates a "prima facie case of personal jurisdiction" by submitting evidence sufficient to defeat a motion made pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir.2006). At this evidentiary juncture, the court construes the complaint's allegations as true if they are uncontroverted by affidavits or deposition testimony, *id.* at 1317; where there are conflicts, the court "construe[s] all reasonable inferences in favor of the plaintiff." *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 199 Fed. Appx. 738, 741 (11th Cir.2006) (quoting *Meier*, 288 F.3d at 1269).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). A court may dismiss

a complaint under Rule 12(b)(6) if a plaintiff fails to provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). That is, if a plaintiff "ha[s] not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed." *Id.*; *see Ashcroft v. Iqbal*, 139 S.Ct. 1937, 1953 (2009) (holding that *Twombly* was not limited to antitrust cases but rather was based on an interpretation and application of Federal Rule of Civil Procedure 8).

In deciding a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the complaint as true and construe the facts in a light most favorable to the non-moving party." *Dacosta v. Nwachukwa*, 304 F.3d 1045, 1047 (11th Cir. 2002) (citing *GJR Invs., Inc. v. County of Escambia, Fla.*, 132 F.3d 1359, 1367 (11th Cir. 1998)). "[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno*, 334 F.3d 991, 996 (11th Cir. 2003) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc)). Further, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on *any* [plausible] theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)). Nevertheless, conclusory allegations, unwarranted deductions of facts, or legal conclusions masquerading as facts will not prevent dismissal. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002); *see Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) ("[A] plaintiff must plead specific facts, not mere conclusional allegations, to avoid dismissal for failure to state a claim. We will thus not accept as true conclusory allegations or

unwarranted deductions of fact.") (internal citations omitted); *Kirwin v. Price Commc'ns. Corp.*, 274 F. Supp. 2d 1242, 1248 (M.D. Ala. 2003) ("[A]lthough the complaint must be read liberally in favor of the plaintiff, the court may not make liberal inferences beyond what has actually been alleged."), *aff'd in part*, 391 F.3d 1323 (11th Cir. 2004).

## III.    Relevant Factual Allegations

The court addresses separately the allegations made against the two moving Defendants.

### A.    Allegations Regarding Albert van Bilderbeek

Van Bilderbeek is defined in the Complaint as one of the "RICO Defendants." (Doc. # 1-1 at ¶ 1. Therefore, all general allegations regarding the "RICO Defendants" made in the Complaint apply to van Bilderbeek.[1] Additionally, the Complaint contains very specific factual allegations about van Bilderbeek:

> Defendant Albert van Bilderbeek is a citizen and resident of the Netherlands. Albert van Bilderbeek and his brother, Hendrik van Bilderbeek, are the principals of Llanos Oil Exploration Ltd. ("Llanos Oil"), a Dutch entity that views Drummond as a competitor in Colombia. Llanos Oil has made the wild accusation that Drummond conspired with the Colombian government to steal oil and gas rights from Llanos Oil. [Defendant] Collingsworth has a contract with the van Bilderbeeks which entitles him [Collingsworth] to 33.3% of any recovery obtained by Llanos Oil in relation to these oil and gas rights. In furtherance of the RICO Defendants' massive extortion campaign, Albert van Bilderbeek has in fact paid at least one witness – Jaime Blanco Maya – at least $95,000 in exchange for Blanco's false testimony against Drummond. Van Bilderbeek's personal interest in such payments was to use this false testimony to not only harm Drummond, but also to cause the Colombian government to cancel Drummond's oil rights in Colombia and give them to Llanos Oil. At Collingsworth's direct request, Albert van Bilderbeek paid money to Blanco, using Otero as a conduit, with the purpose of obtaining false testimony against Drummond that the RICO Defendants could utilize in their multifaceted and fraudulent scheme to extort money from Drummond. Albert van Bilderbeek has also conspired with and assisted the RICO Defendants in obtaining media exposure in Europe for the false allegations levied against Drummond by witnesses who have been paid in exchange for their

---

[1] By the court's count, the term "RICO Defendants" appears 117 times in the Complaint. (Doc. # 1-1).

testimony. During the times relevant to this Complaint, Albert van Bilderbeek has conducted business in Birmingham, Alabama through his agent, Collingsworth.

(Doc. # 1-1 at ¶ 17).

Albert van Bilderbeek has (i) assisted the co-defendants in funneling money to witnesses in Colombia which was sent by Albert van Bilderbeek to Ivan Otero, or his employees or agents, in Colombia; (ii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in Alabama; (iii) entered into a contractual agreement with co-defendant Collingsworth to pursue fraudulent claims against Drummond, a known Alabama resident, relating to oil and gas rights in Colombia; (iv) participated in or directed numerous phone calls, emails and other forms of communications with the other RICO defendants and coconspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (v) participated in and orchestrated media campaigns in Europe designed to fraudulently influence government officials and the media for the purpose of extorting money from Drummond. Albert van Bilderbeek committed his illegal and wrongful acts with the purposeful intent that the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known Alabama resident. Albert van Bilderbeek's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Albert van Bilderbeek was aware of the effects in Alabama of those acts, which were for the benefit of van Bilderbeek, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of van Bilderbeek in committing those acts.

(Doc. # 1-1 at ¶ 37).

The Enterprise also solicited financial assistance from Albert van Bilderbeek, a principal of Llanos Oil. Llanos Oil previously sued Drummond in 2005 claiming its oil rights in Colombia were "stolen" by Drummond, and that Drummond conspired with the Colombian government to have Hendrik van Bilderbeek-- the brother of Albert and another principal of Llanos Oil -- imprisoned in Colombia on suspicion of money laundering and involvement with Colombian drug-traffickers. Llanos Oil's lawsuit against Drummond was dismissed approximately 6 months after it was filed.

(Doc. # 1-1 at ¶ 62).

By at least early 2010, Collingsworth and Albert van Bilderbeek began working together on a plan to, in Collingsworth's words, "clos[e] down Drummond." On May 3, 2010, Collingsworth and Albert van Bilderbeek entered into a contingency fee agreement which provided that Collingsworth would receive 33% of any

recovery against Drummond in connection with oil and gas rights allegedly taken from Llanos Oil. The agreement stated that Collingsworth had been providing legal advice on this issue for approximately four months prior to the date of the agreement.

(Doc. # 1-1 at ¶ 63).

On June 29, 2010, Collingsworth and Albert van Bilderbeek discussed media coverage of Collingsworth's allegations against Drummond, and strategized on ways to garner additional media coverage with the Dutch press. During the course of these discussions, Collingsworth informed Albert van Bilderbeek, "I look forward to meeting and together closing down Drummond." (Doc. # 1-1 at ¶ 64). Over the next several months, Collingsworth worked with Albert van Bilderbeek in attempting to secure funding for the Enterprise's fraudulent litigation against Drummond, as well as spreading the false allegations of Drummond's complicity with the AUC throughout Europe. As described in more detail below, it is known that Albert van Bilderbeek provided more than $95,000 to be paid to a person Collingsworth has described as the "key witness" against Drummond.

(Doc. # 1-1 at ¶ 65).

[Jaime] Blanco was arrested in September 2010 in connection with the murders [of the three union leaders], and he provided testimony to the Colombian authorities. He testified, under oath, that … he had no knowledge of Drummond being involved with the deaths of the union leaders.

(Doc. # 1-1 at ¶ 91).

Collingsworth began ingratiating himself with Blanco, asking Blanco to provide testimony against Drummond … . Collingsworth told Blanco that Drummond was trying to pin the union murders on him, and called Drummond their "mutual enemy." According to testimony by Collingsworth, at some point Blanco requested assistance with his criminal legal fees.

(Doc. # 1-1 at ¶ 94).

Collingsworth met with Blanco in July 2011 and told him that Conrad & Scherer would be unable to make direct payments to him, but he had a person named Albert van Bilderbeek that would be willing to pay. Collingsworth admits that he facilitated these payments. The arrangement was set up for van Bilderbeek to wire funds to Otero, who would then deliver them to Blanco.

(Doc. # 1-1 at ¶ 96).

Collingsworth has admitted under oath that Blanco would not sign a declaration

for the Enterprise unless and until he was paid.

(Doc. # 1-1 at ¶ 97).

In September 2011, Albert van Bilderbeek sent $60,000 to Otero to be given to Blanco.

(Doc. # 1-1 at ¶ 98).

Less than 30 days later, Blanco signed a declaration for the Enterprise falsely accusing Drummond of being complicit in the union leader killings, as well as providing regular payments to the AUC through Blanco's food services company.

(Doc. # 1-1 at ¶ 99).

In December 2011, Collingsworth facilitated another payment from van Bilderbeek to Blanco, via Otero.

(Doc. # 1-1 at ¶ 100).

In July 2012, the Enterprise made another $35,000 payment to Blanco. Collingsworth facilitated another bank wire from Albert van Bilderbeek to Otero, which Otero then gave to Blanco.

(Doc. # 1-1 at ¶ 106).

[I]n 2010, Collingsworth began meeting with Albert van Bilderbeek in the Netherlands, not only to discuss financing the fraudulent litigation against Drummond, but also to garner media attention in the Netherlands. In an email from June 2010 discussing their efforts with the Dutch press, Collingsworth revealed his shared goal with van Bilderbeek of "closing down Drummond." Collingsworth has at times described the subject of his communications with van Bilderbeek as "campaign case strategy."

(Doc. # 1-1 at ¶ 158).

In December 2010, … , Albert van Bilderbeek requested that Collingsworth send him a letter addressed to members of the Dutch Parliament repeating the Enterprise's false claims. … Collingsworth finalized the letter on January 18, 2011, and emailed it to Albert van Bilderbeek to be hand-delivered to government officials in Amsterdam. Van Bilderbeek also immediately published the letter on the Llanos Oil website. After characterizing as "objective facts" the Enterprise's false allegations of Drummond's complicity in human rights violations and mass murder, Collingsworth concluded the letter by telling the Dutch Prime Minister, "I hope that you will urge your government to terminate any business relationship

with Drummond until it makes full amends for the atrocities it committed in Colombia."

(Doc. # 1-1 at ¶ 159).

In February 2011, Collingsworth, with the editorial assistance of Albert van Bilderbeek, prepared and sent another letter to Dutch government officials, repeating the false claims that Drummond was complicit in murder. This letter, too, was immediately published on the Llanos Oil website.

(Doc. # 1-1 at ¶ 160).

Defendant Albert van Bilderbeek made payments to Jaime Blanco -- the "key witness" against Drummond according to Mr. Collingsworth -- in exchange for his false testimony against Drummond. Van Bilderbeek has also been intimately involved in orchestrating media coverage in Europe for the false testimony of these witnesses. Van Bilderbeek orchestrated this media coverage in an effort to pressure Drummond's European customers to cease doing business with Drummond, to damage Drummond's business interests, and to seek to have Drummond implicated in criminal activity for his own financial benefit.

(Doc. # 1-1 at ¶ 174(d)).

Plaintiff's RICO claim against van Bilderbeek is premised on violations of (1) the obstruction of justice statute, 18 U.S.C. § 1503 (Doc. # 1-1 at 164) and (2) the wire fraud statute, 18 U.S.C. § 1343. (Doc. # 1-1 at ¶¶ 176-77). Plaintiff's conspiracy to violate RICO claim, misrepresentation and fraudulent suppression claims, and civil conspiracy claim are all also stated against van Bilderbeek. (Doc. # 1-1 at ¶¶ 98-104).

In support of his Motion to Dismiss, van Bilderbeek has presented his own affidavit, as well as the affidavit of Terrence Collingsworth. (Doc. 121-1 and 121-2). In his affidavit, van Bilderbeek states that both he and Collingsworth were involved in litigation against Drummond and that they discussed their respective cases. (Doc. # 121-1 at ¶¶ 25, 26). He further admits that Collingsworth provided him "with statements concerning Drummond for dissemination in the Netherlands" and that he "was able to refer contact details of Dutch government officials to assist

8

Mr. Collingsworth in sending certain statements about Drummond to them." (Doc. # 121-1 at ¶ 26). Van Bilderbeek confirms that "[p]ublic media statements issued by Mr. Collingsworth and others were placed on Llanos Oil's website." (Doc. # 121-1 at ¶ 27). However, van Bilderbeek denies any nefarious intent in these actions and asserts that these statements did not influence any Alabama proceedings. (Doc. # 121-1 at ¶ 28). Van Bilderbeek further admits to arranging payments to Jaime Blanco, but denies that those payments were for the purpose of securing testimony against Drummond. (Doc. # 121-1 at ¶¶ 30-31).

In response to van Bilderbeek's evidentiary submission, Plaintiff has cited to evidence developed in the record in *Drummond v. Collingsworth, et al.*, Case No. 2:11-cv-03695-RDP-TMP ("the Defamation case"). More specifically, Plaintiff points to factual evidence filed in support of its Renewed Motion for Sanctions and to the court's Memorandum Opinion and Order on that Motion. (Case No. 2:11-cv-03695-RDP-TMP Docs. # 174, 417) Evidentiary materials and testimony taken in that case show the following:

> On September 8, 2010, Blanco was arrested and testified before the Colombian Fiscalia that the allegation that Drummond paid the AUC through Blanco's food services company "is absolutely false and accounting-wise impossible."

(Case No. 2:11-cv-03695-RDP-TMP, Doc. # 417 at 23).

> On February 21, 2011 Collingsworth made email contact with Blanco.

(*Id.*).

> On March 1, 2011, Collingsworth emailed Blanco and told him that Drummond was trying to blame the union murders on Blanco.

(*Id.*).

> In April 2011, Blanco requested that Defendants pay him $150,000 to cover legal fees.

(*Id.*).

        In July 2011, Collingsworth met with Ivan Otero and Blanco in a prison in Colombia. Collingsworth sought a declaration from Blanco against Drummond. (*Id.*). During that meeting Collingsworth stated to Blanco that he would ask Albert van Bilderbeek to pay Blanco's criminal legal fees. (*Id.*). That same month, Collingsworth contacted van Bilderbeek, and Van Bilderbeek agreed to make payments to Blanco via Ivan Otero.

(*Id.*).

        On September 3, 2011 Albert van Bilderbeek made an initial $60,000 payment to Blanco.

(*Id.*).

        Blanco had refused to sign his declaration against Drummond until he received the $60,000 payment.

(Case No. 2:11-cv-03695-RDP-TMP, Doc. # 417 at 24).

        In October 2011, the month after he received the initial $60,000 payment, Blanco signed a declaration for Defendants to be used in the civil cases against Drummond. Two more payments were made from Albert van Bilderbeek to Blanco totaling $85,000.

(*Id.*).

        On April 19, 2012, Collingsworth handed Ivan Otero $10,000 in cash after Blanco had provided (earlier that same day) the first day of his letters rogatory testimony in *Balcero*.

(*Id.*).

        On July 19, 2012 Collingsworth confirmed a third payment to Blanco from Albert van Bilderbeek in the amount of $35,000.

(*Id.*).

### B.    Allegations Regarding Francisco Ramirez Cuellar ("Ramirez")

Ramirez is also named in the Complaint as one of the "RICO Defendants." (Doc. # 1-1 at

¶ 1). Therefore the Complaint's general allegations regarding the "RICO Defendants" apply to

him. Additionally, the Complaint contains the following specific factual allegations as to Ramirez:

> Defendant Ramirez is believed to be a citizen of Colombia. Ramirez is sued both individually and as an agent of Conrad & Scherer and IRAdvocates. He is a Colombian lawyer, activist, and former President of a Colombian mineworkers' union. In furtherance of the Enterprise's extortionate schemes, he has used his positions and influence with Colombian unions to damage Drummond's union relations. He has contracted with U.S. citizens Collingsworth and Conrad & Scherer whereby he is promised a contingency fee in at least three U.S. civil cases pending in Birmingham, Alabama, and has paid witnesses for testimony to be used in those U.S. proceedings. In connection with those U.S. proceedings, he has appeared as counsel during depositions in Birmingham, Alabama. He has been represented to be a collaborating attorney with U.S.-based IRAdvocates. Upon information and belief, he is married to a U.S. citizen, and resides at times in the U.S. at an apartment he maintains in Flushing, New York.

(Doc. 1-1 at ¶ 15).

> Upon information and belief, Ramirez maintains a residence in New York. Ramirez has also transacted business and engaged in illegal acts in the United States and Alabama which give rise, in part, to Drummond's claims. For example, Ramirez has (i) met with the co-defendants and co-conspirators in the United States, and in Alabama, to plan and execute their fraudulent scheme to extort Drummond; (ii) assisted the co-defendants in funneling money to witnesses in Colombia which was sent by the co-defendants from the United States to Ramirez, or his employees or agents, in Colombia; (iii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in Alabama; (iv) received thousands of dollars in payments from his co-defendants in the United States which he used to further their multifaceted and extortionate campaign against Drummond; (v) caused to be filed in the Northern District of Alabama three fraudulent actions against Drummond (*Baloco*, *Balcero* and *Melo*); (vi) entered into contractual agreements with co-defendants Collingsworth and Conrad & Scherer entitling Ramirez to contingency fees in at least *Baloco* and *Balcero*; (vii) participated in or directed numerous phone calls, emails and other forms of communications with the other RICO defendants and co-conspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (viii) participated in and orchestrated campaigns in the United States designed to fraudulently influence government officials and the media for the purpose of extorting money from Drummond. Ramirez committed his illegal and wrongful acts with the purposeful intent that the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known

Alabama resident. Ramirez's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Ramirez was aware of the effects in Alabama of those acts, which were for the benefit of Ramirez, and his coconspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Ramirez in committing those acts.

(Doc. 1-1 at ¶ 35).

On March 14, 2002, Collingsworth, who was then the general counsel for a group called the International Labor Rights Fund, filed a lawsuit against Drummond falsely alleging Drummond had paid Colombian paramilitaries to murder three leaders of the dominant labor union at the Colombian Mine: Valmore Locarno, Victor Hugo Orcasita and Gustavo Soler. In his attempts to prosecute these false claims, Collingsworth teamed up with Daniel Kovalik, general counsel of the United Steelworkers of America, and Francisco Ramirez, then the president of a Colombian mineworkers' union.

(Doc. 1-1 at ¶ 39).

The *Romero* [defense] verdict in July 2007 came as a crushing blow to Collingsworth and his Colombian union collaborators, including Francisco Ramirez. Following the verdict, Ramirez told the Miami Herald, "We're just getting started. . . . We are going to multiply our efforts to start a boycott. It's the only way to get justice in this case."

(Doc. 1-1 at ¶ 42).

After the vindication of Drummond by an Alabama court, Defendants began a multifaceted campaign to destroy Drummond, and procure a fraudulent financial windfall, using, inter alia, three fraudulent lawsuits, media campaigns in the U.S., Colombia and Europe, and multiple unions and activist groups, to spread the false message that Drummond was complicit with a terrorist organization in the murders of hundreds of Colombians. In an effort to bolster these claims, the Enterprise funneled hundreds of thousands of dollars to Colombian criminals, their families, and their lawyers. Based on information uncovered to date, the payments exceed $478,000.

(Doc. 1-1 at ¶ 43).

[A]fter the failure of Romero, Collingsworth and Ramirez needed to find new financial backing for their fraudulent and extortionate campaign. Upon information and belief, Romero was funded by the United Steelworkers … .

(Doc. 1-1 at ¶ 44).

In 2008, the Enterprise's agents "in the field" in Colombia included: Francisco Ramirez … these individuals participated in recruiting plaintiffs for Defendants' fraudulent lawsuits, and facilitating payments to witnesses to support the lawsuits.

(Doc. 1-1 at ¶ 46).

In March 2012, both El Tigre and Samario gave their trial testimony in *Balcero* via the letters rogatory process. Drummond and its counsel traveled to Colombia, and each paramilitary was transferred by the authorities from their respective prison to a Colombian courthouse to give this testimony. Francisco Ramirez appeared as an attorney for the *Balcero* plaintiffs at the testimony of Samario.

(Doc. 1-1 at ¶ 88).

The Enterprise also corruptly secured the false testimony of paramilitary Jose del Carmen Gelvez Albarracin ("El Canoso"). Between 2006 and 2012, El Canoso testified at least six times in the Justice and Peace process, and never once claimed Drummond had any connections to paramilitaries.

(Doc. 1-1 at ¶ 108).

Charris informed El Canoso that he had already provided a declaration to the Enterprise, and offered to introduce him to Francisco Ramirez to provide testimony against Drummond. El Canoso met with Ramirez in approximately February 2011. In July 2011, Lorraine Leete (of IRAdvocates) met with El Canoso's wife in Colombia regarding his proposed "testimony." On November 21, 2011, El Canoso, too, signed a declaration typed for him by the Enterprise.

(Doc. 1-1 at ¶ 110).

In that declaration, El Canoso did not claim to have much knowledge about Drummond, … . But the limited knowledge El Canoso claimed to have regarding Drummond is objectively false. El Canoso claimed that he attended a meeting with Drummond security officials during which Drummond and Prodeco allegedly agreed to provide support to the paramilitaries. One of the employees of Drummond Ltd. supposedly present was Luis Carlos Rodriguez. Although he did not specify the date of the meeting, El Canoso testified it was during the time he was employed by Prodeco and his employment ended in 1997. Luis Carlos Rodriguez did not begin working for Drummond Ltd. until November of 1999, some two years later.

(Doc. 1-1 at ¶ 111).

Within seven days of El Canoso signing this declaration, a wire transfer in the amount of $2,084 was made from the Conrad & Scherer Operating Account in the

United States to the Colombian bank account of El Canoso's wife.

(Doc. 1-1 at ¶ 112).

During El Canoso's trial testimony, Yineth Baeza, assistant to Francisco Ramirez, was present for the Enterprise. Collingsworth knowingly elicited perjured testimony from El Canoso.

(Doc. 1-1 at ¶ 114).

All members of the Enterprise present for El Canoso's testimony (Collingsworth, Leete, and Baeza) knew his testimony was unequivocally false, but did nothing to correct the record. Instead, they submitted El Canoso's false testimony to federal district court in Alabama in support of their fraudulent lawsuits and as part of their massive extortionate scheme.

(Doc. 1-1 at ¶ 115)

The Enterprise utilized the resulting false, paid-for testimony in official proceedings against Drummond to corruptly influence, obstruct, and impede the due administration of justice in federal district court in Alabama and to further their overarching fraudulent and multifaceted criminal campaign to extort money from Drummond and otherwise damage its business interests.

(Doc. 1-1 at ¶ 116).

[C]onsistent with Francisco Ramirez's promise after the failed *Romero* case that they would "multiply [their] efforts to start a boycott" of Drummond, the Enterprise engaged in a worldwide public relations campaign, spreading their false allegations and the "testimony" of their witnesses to anyone who would listen.

(Doc. 1-1 at ¶ 154).

Shortly after Collingsworth, with the editorial assistance of Albert van Bilderbeek, prepared and sent two letters to Dutch government officials repeating the false claims that Drummond was complicit in murder, Francisco Ramirez had his assistant, Yineth Baeza, email Collingsworth to ask him to send the letters to Marianne Moor of Pax Christi of the Netherlands (now called PAX, The Netherlands), a non-governmental advocacy group. Collingsworth did so via email on March 2, 2011. Upon information and belief, up to this point PAX, The Netherlands had never published anything about Drummond. This all changed when the Enterprise started feeding PAX their false and fraudulent allegations.

(Doc. 1-1 at ¶¶ 160 161).

In October 2014, Marianne Moor and Francisco Ramirez publicly presented the PAX "report" in Valledupar, Colombia.

(Doc. 1-1 at ¶ 167).

Defendant Francisco Ramirez has been responsible for facilitating many of the payments to, and procuring the false testimony of, Colombian criminals who testified against Drummond. Ramirez has been intimately involved in recruiting imprisoned Colombian criminals willing to offer false testimony in exchange for money. He has also been instrumental in fabricating the substance of that false testimony. Ramirez has also served as one of the most active members of the criminal enterprise in disseminating false and fraudulent testimony and lies about Drummond in the Colombian and U.S. media. Ramirez has also participated in the fraudulent concealment of the Enterprise's illegal activity.

(Doc. 1-1 at ¶ 174(b)).

RICO Defendants Collingsworth, Bill Scherer, Conrad & Scherer, and IRAdvocates have on multiple occasions, knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to themselves and to RICO Defendants Ivan Otero and Francisco Ramirez with the intent that those funds be used to promote the carrying on of unlawful activity, including but not limited to violations of 18 U.S.C. §§ 201, 1341, 1343 and 1951, including payments to Colombian witnesses in exchange for false testimony against Drummond.

(Doc. 1-1 at ¶ 189).

The same claims asserted against van Bilderbeek are also asserted against Ramirez. (Doc. # 1-1 at pp. 84-105.).

IV.     **Analysis**

Defendants' Motions present challenges to both the court's personal jurisdiction over them, the manner of service, and the sufficiency of Plaintiff's pleadings. This court is bound to address the issue of personal jurisdiction first. "As a general rule, when the court is confronted by a motion raising a combination of 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint." C. Wright & A. Miller, *Federal*

*Practice and Procedure: Civil 2d*, 1351 at 243-44; *see also Arrowsmith v. United Press Int'l.*, 320 F.2d 219, 221 (2d. Cir. 1963) (holding that it was error for district court to dismiss action for failure to state a claim prior to addressing challenges to personal jurisdiction and venue, because dismissal on the former ground would be with prejudice, while dismissal for either of the two latter grounds would be without prejudice).

### A.        Personal Jurisdiction

The court applies a two-part analysis in determining whether there is personal jurisdiction over a nonresident defendant. *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir.1990); *see also Alexander Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989).   First, the court considers the jurisdictional question under the state long-arm statute.[2] *See Cable/Home Communication Corp.*, 902 F.2d at 855; *see also Alexander Proudfoot Co.*, 877 F.2d at 919. If there is a basis for asserting personal jurisdiction under the state statute, the next determination to be made is whether sufficient minimum contacts exist to satisfy the Due Process Clause of the Fourteenth Amendment so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)); *see also Cable/Home Communication Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919.   The nature and quality of the contacts may vary depending on the type of jurisdiction being asserted (specific or general).  *See Consolidated Dev. Corp. v.*

---

[2] When jurisdiction is based on a federal question arising under a statute that is silent regarding service of process, the Federal Rules of Civil Procedure direct this court to look to the state long-arm statute in order to determine the existence of personal jurisdiction.  *Cable/Home Communication Corp.*, 902 F.2d at 855. Drummond does not contend that RICO's nationwide service of process provision should apply here for purposes

*Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  Only if both prongs of the analysis are satisfied may a federal or state court exercise personal jurisdiction over a nonresident defendant.

The reach of the Alabama long-arm statute is interpreted according to Alabama law. Federal courts are required to construe the statute as would the Supreme Court of Alabama. *See Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 890-891 (11th Cir. 1983). Alabama has made clear that its long-arm statute permits personal jurisdiction to the extent it "is not inconsistent with the constitution of this state or the Constitution of the United States." Ala.R.Civ.P.. 4.2(b). Thus, the question here is whether assertion of personal jurisdiction over the individual defendants comports with the Fourteenth Amendment's Due Process Clause. *See Olivier v. Merritt Dredging Co., Inc.*, 979 F.2d 827 (11th Cir. 1992) (citing *Alabama Waterproofing Co., Inc. v. Hanby*, 431 So.2d 141, 145 (Ala. 1983)). The requirements of the Fourteenth Amendment's Due Process Clause are met where the defendant has minimum contacts with the forum state, and where the exercise of personal jurisdiction does not offend "traditional notions of fair play and substantial justice." *Olivier*, 979 F.2d at 830-831; *Madara v. Hall*, 916 F.2d 1510, 1516 (11th Cir. 1990) (quoting *International Shoe*, 326 U.S. at 316).

There are two types of personal jurisdiction: specific and general. Plaintiff contends that this court has personal jurisdiction over van Bilderbeek and Ramirez based upon specific jurisdiction. (*See* Docs. # 125 at 14 and 126 at 10).  Specific jurisdiction is based on a party's contacts with the forum state that arise out of or are related to the cause of action. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984); *see also Consolidated Dev.*, 216 F.3d at 1291.

The exercise of specific jurisdiction is proper over a nonresident defendant when he has "'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King v. Rudzewicz*, 471 U.S. 462, 473, 475 (1985) (internal citations omitted); *Consolidated Dev.*, 216 F.3d at 1291. Requiring there to be minimum contacts before a court exercises personal jurisdiction is grounded in fairness. That requirement assures that "the defendant's conduct and connection with the forum State [is] such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 297 (1980). In cases of international defendants, the court should also consider "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system." *Asahi Metal Indust. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114 (1987).

In assessing whether litigation "arises out of" the activities in the forum state, the Eleventh Circuit does not use "mechanical or quantitative" tests, *see Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222 (11th Cir. 2009); however, it is "not enough that there [merely] be some similarity between the activities that connect the defendant to the forum and the plaintiff's claim." *Licciardello v. Lovelady*, 544 F.3d 1280, 1285 n. 3 (11th Cir. 2008). The defendant's contacts with the forum must be related to the "operative facts of the controversy." *Id.* Questions of specific jurisdiction are examined in the context of the particular claims asserted — here, those claims are grounded in intentional tort. To properly determine jurisdiction, "a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'" *Calder v. Jones*, 465 U.S. 783 (1984) (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)).

The court applies this analysis in considering whether it has personal jurisdiction over van Bilderbeek and Ramirez.

### 1.      Specific Personal Jurisdiction Analysis regarding van Bilderbeek

Plaintiff focuses on the *Calder* effects test in arguing that this court has personal jurisdiction over van Bilderbeek.   (Doc. # 125 at 14-21). Under *Calder*, a nonresident defendant is subject to a court's jurisdiction so long as his alleged conduct was "(1) intentional; (2) aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Licciardello v. Lovelady*, 544 F.3d 1280, 1286 (11th Cir. 2008). The test is used regularly in Alabama when determining whether a court has personal jurisdiction over a nonresident. *See, e.g., Duke v. Young*, 496 So.2d 37 (Ala. 1986) (holding that defendants' intentional and allegedly tortious actions were expressly aimed at Alabama); *Shrout v. Thoren*, 470 So.2d 1222 (Ala. 1985) (holding that defendant had acted aggressively to further a plan which specifically contemplated the injury of an Alabama resident); *Alfa Corp. v. Alfagres, S.A.*, 385 F.Supp.2d 1230 (M.D. Ala. 2005) (holding that defendant knew it was committing a tort against an Alabama entity and continued to do so anyway).

As set forth in detail above, Plaintiff has alleged that van Bilderbeek perpetrated intentional, tortious and/or criminal acts that were intended to cause, and actually caused, injury in Alabama. In particular, Plaintiff makes the following allegations in its Complaint:

> Albert van Bilderbeek has (i) assisted the co-defendants in funneling money to witnesses in Colombia which was sent by Albert van Bilderbeek to Ivan Otero, or his employees or agents, in Colombia; (ii) assisted the co-defendants in obtaining false testimony against Drummond, and did so with full knowledge that it would be submitted in court proceedings in Alabama; (iii) entered into a contractual agreement with co-defendant Collingsworth to pursue fraudulent claims against Drummond, a known Alabama resident, relating to oil and gas rights in Colombia; (iv) participated in or directed

numerous phone calls, emails and other forms of communications with the other RICO defendants and coconspirators in the United States for the purpose of planning and carrying out their conspiracy and extortionate scheme; (v) participated in and orchestrated media campaigns in Europe designed to fraudulently influence government officials and the media for the purpose of extorting money from Drummond. Albert van Bilderbeek committed his illegal and wrongful acts with the purposeful intent that the effects of his acts be felt in the United States, and Alabama in particular, by Drummond, a known Alabama resident. Albert van Bilderbeek's co-conspirators and agents have also engaged in wrongful and illegal acts in the United States and in Alabama. Albert van Bilderbeek was aware of the effects in Alabama of those acts, which were for the benefit of van Bilderbeek, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of van Bilderbeek in committing those acts.

(Doc. # 1-1 at & 37).

Plaintiff has alleged, and cited to evidence of, intentional acts by van Bilderbeek directed at Plaintiff, an Alabama resident. Where intentional acts are at issue, "'the defendant may be held to have expected its conduct to have an effect in that state, and further to have expected that the victim will bring suit for redress there.'" *Alfa Corp. v. Alfagres, S.A.*, 385 F. Supp. 2d 1230, 1235 (M.D. Ala. 2005) (quoting *Coblentz v. General Motors Corp.*, 724 F.Supp. 1364 (M.D. Ala. 1989)). "'[W]hen the origin of a deliberate, nonfortuitous tort is in one state, and the intended injury to a recognized victim is in another state, the tortfeasor has affirmatively established minimum contacts with the state in which the injury occurred, if the tortfeasor knew at the time it committed the alleged tort that the victim would be injured in that state.'" *Alfa Corp.*, 385 F. Supp. 2d at 1235 (quoting *Coblentz*, 724 F.Supp. at 1369 (citing *Calder v. Jones*, 465 U.S. 783 (1984)). At least for *Calder* effects purposes, this rule applies equally to extraterritorial conduct which is intended to cause injury in a particular state in the United States.

Van Bilderbeek is alleged to have intentionally paid witnesses for their testimony in a case that was being litigated in Alabama and it is further alleged he intended to cause harm to an

Alabama business and this court (each located in Alabama). *Licciardello*, 544 F.3d at 1286; *see also Calder*, 465 U.S. at 791 ("jurisdiction over petitioners in California is proper because of their intentional conduct in Florida calculated to cause injury to respondent in California). That van Bilderbeek alleges that the payments were for a legitimate purpose is inconsequential, at least at this stage. *See Garrett v. Stanton*, 2008 WL 4853388 at *2 (S.D. Ala. Nov. 7, 2008) ("Defendants' reasoning disregards the Rule 12(b) standard and would instead have the court conjure facts from thin air to favor defendants' position, thereby bending over backwards to grant their motion to dismiss.").

The Complaint alleges that Collingsworth and van Bilderbeek discussed financing the fraudulent litigation against Drummond, as well as a media campaign designed to disseminate false allegations of Drummond's complicity in human rights violations and mass murder characterized as "objective facts." (Doc. # 1-1 at ¶ 158-59). The court agrees with Plaintiff that it has sufficiently established purposeful availment under the *Calder* "effects test." "'Under the "effects test," a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum' if the intentional conduct has a direct impact on [an Alabama] resident." *Gubarev v. Buzzfeed, Inc*., 2017 WL 2293550, at *7 (S.D. Fla. May 22, 2017) (citing *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013)); *see also Licciardello*, 544 F.3d at 1285-88 (summarizing cases employing *Calder* test and concluding that non-resident was subject to jurisdiction in Florida because his out-of-state conduct was calculated to cause injury to a person in Florida). Accordingly, van Bilderbeek cannot claim to be surprised that he has been haled into court in the Northern District of Alabama. For these reasons, the exercise of personal jurisdiction over van

Bilderbeek in Alabama is reasonable, and his Motion to Dismiss (Doc. # 121) on this ground is due to be denied.[3]

Because Plaintiff has established the relatedness and purposeful availment prongs of the specific jurisdiction inquiry, the burden shifts to van Bilderbeek to present a "compelling case" that the exercise of personal jurisdiction over him in Alabama would be unreasonable. *See Burger King Corp.*, 471 U.S. at 476-78. In considering this issue, the court must consider the following factors: (1) the burden on the defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, and (4) the judicial system's interest in resolving the dispute. *Lovelady*, 544 F.3d at 1288. When litigation involves international defendants, courts are to consider "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system." *Asahi Metal Indust. Co., Ltd. v. Superior Court*, 480 U.S. 102, 114 (1987). However, "it is only in highly unusual cases [where] that inconvenience will rise to a level of a constitutional concern." *Republic of Panama*, 119 F.3d at 947 (citing

---

[3] Because specific personal jurisdiction over van Bilderbeek is proper under the *Calder* test, the court need not engage in a protracted inquiry into whether personal jurisdiction might be proper under the alternate theories of conspiracy jurisdiction and Rule 4(k)(2) jurisdiction. Under the conspiracy theory of jurisdiction, "personal jurisdiction can be exercised over a defendant who lacks minimum contacts to the forum state in the traditional sense if a substantial connection exists between that forum and a conspiracy entered into by that defendant ... Alabama courts have recognized and adopted the conspiracy theory of personal jurisdiction." *Matthews v. Brookstone Stores, Inc.*, 469 F.Supp.2d 1056, 1066 (S.D. Ala. 2007). Under the Rule 4(k)(2) jurisdictional inquiry, the federal long arm statute "authorizes the exercise of territorial jurisdiction over the person of any defendant against whom is made a claim arising under federal law if that person is subject to personal jurisdiction in no state." Advisory Committee Notes to 1993 Amendments to Federal Rule of Civil Procedure 4(k)(2). In such cases, the rule "authorizes a district court to aggregate a foreign defendant's nationwide contacts to allow for service of process provided that two conditions are met: (1) plaintiff's claim must 'arise under federal law,' and (2) the exercise of jurisdiction must 'be consistent with the Constitution and laws of the United States.'" *Oldfield*, 558 F.3d at 1216.

Here, Drummond has alleged conspiracy and overt acts with particularity. *Prof'l Locate v. Prime, Inc.*, 2007 WL 1624792 at *3 (S.D. Ala. June 4, 2007). (*See* Doc. # 1-1 ¶¶ 37, 6-65, 200-05, 220-25). Drummond has also set forth well-pleaded allegations as to van Bilderbeek's's contacts with the United States as a whole. (*See* Doc. # 1-1 ¶¶ 37, 63-65. 158-160). As such, the court alternatively concludes that Drummond has established jurisdiction over van Bilderbeek under the theories of conspiracy and 4(k)(2) as well.

*Asahi*, 480 U.S. at 116 (Brennan, J., concurring in part and concurring in the judgment)).

Van Bilderbeek argues that he cannot be haled into court in Alabama because (1) he conducts no business in the United States; (2) he has no relationship with Alabama whatsoever; and (3) the only conspiracies in which van Bilderbeek is alleged to have participated took place in Europe and Colombia. (Doc. # 121 at 12-14).

However, van Bilderbeek's argument fails to acknowledge that Plaintiff has alleged that his activities were "purposefully directed" at an Alabama resident and allegedly caused injuries to a resident in this forum. *See Licciardello*, 544 F.3d at 1284. Therefore, van Bilderbeek had "fair warning" that his activities could subject him to jurisdiction in Alabama. Finally, any issues of burden (which, notably, have not been articulated by van Bilderbeek) are quickly ameliorated because of modern technology. *Chevron Corp. v. Donziger*, 974 F. Supp.2d 362, 628 (S.D. N.Y. 2014) ("Even if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago.").

Nor has van Bilderbeek, a United States citizen (Doc. # 1-1 at ¶ 37), shown that he faces "especially onerous" burdens from litigating in this forum or that the inconvenience of litigating in this forum rises to a "constitutional magnitude." *Diamond Crystal Brands, Inc. v. Food Movers International, Inc.*, 593 F.3d 1249, 1274 (11th Cir. 2010). Indeed, van Bilderbeek has provided little indication to the court of what specific burdens he faces from litigating in this forum, and generalized statements that litigation in a particular forum is burdensome are typically insufficient to show that the forum's exercise of personal jurisdiction offends due process. *See*

*Grail Semiconductor, Inc. v. Stern*, 2012 WL 5903817, at *5 (S.D. Fla. Nov. 26, 2012). Moreover, for at least two decades, our court of appeals has recognized that "modern methods of transportation and communication have significantly ameliorated" the burdens that corporations face when defending suits in states where they are not incorporated and do not have places of business. *See Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 632 (11th Cir. 1996).

But even if that were not the case, Plaintiff's interest in litigating here would nevertheless outweigh any purported prejudice to van Bilderbeek. Plaintiff "is not required to travel to a nonresident's [country] of residence to obtain a remedy" because it was injured by the alleged intentional misconduct of van Bilderbeek expressly aimed at it in Alabama. *Licciardello*, 544 F.3d at 1288 (citing *Calder*, 465 U.S. at 1487). And the state of Alabama "has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in [Alabama]." *Licciardello*, 544 F.3d at 1288. Finally, the judicial interest in efficient resolution of this action is best served by the court's exercise of personal jurisdiction over van Bilderbeek in this action. *See Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830, 834 (11th Cir. 1992) (concluding that multiple suits would waste judicial resources).

In conclusion, van Bilderbeek is subject to personal jurisdiction under the *Calder* effects doctrine of personal jurisdiction, and this court's exercise of personal jurisdiction over van Bilderbeek comports with due process.

### 2. Specific Personal Jurisdiction Analysis regarding Ramirez

Plaintiff again focuses on the *Calder* effects test in arguing that this court has personal jurisdiction over Ramirez. Ramirez argues that the "allegations lodged directly against [him] are sparing," and that he "is not mentioned once" in the Appendices of the Complaint "in which

Plaintiffs purport to set forth the predicate acts of the alleged RICO and RICO conspiracy claims." (Doc. # 122 at 2). This argument is, frankly, disingenuous. (*See* Section III(B) above).

The Complaint alleges, among other things, that Ramirez:

> [C]ontracted with U.S. citizens Collingsworth and Conrad & Scherer whereby he is promised a contingency fee in at least three U.S. civil cases pending in Birmingham, Alabama, and has paid witnesses for testimony to be used in those U.S. proceedings. In connection with those U.S. proceedings, he has appeared as counsel during depositions in Birmingham, Alabama.

(Doc. 1-1 at ¶ 15). Further,

> Defendants [including Ramirez] began a multifaceted campaign to destroy Drummond, and procure a fraudulent financial windfall, using, inter alia, three fraudulent lawsuits [filed in Birmingham Alabama], media campaigns in the U.S., Colombia and Europe, and multiple unions and activist groups, to spread the false message that Drummond was complicit with a terrorist organization in the murders of hundreds of Colombians. In an effort to bolster these claims, the Enterprise funneled hundreds of thousands of dollars to Colombian criminals, their families, and their lawyers. Based on information uncovered to date, the payments exceed $478,000.

(Doc. 1-1 at ¶ 43).

That is, Ramirez is alleged to have been involved in bribing witnesses to provide false testimony against Plaintiff, an Alabama resident, in lawsuits pending in Alabama, in which he had a contract to receive a contingency fee. He is also alleged to have appeared in Birmingham, Alabama at depositions related to those cases.

As discussed above, "'[u]nder the "effects test," even a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum' if the intentional conduct has a direct impact on [an Alabama] resident." *Gubarev*, 2017 WL 2293550, at *7 (citing *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1356; *see also Licciardello*, 544 F.3d at 1285-88. But, here, Ramirez is alleged to have been

involved in more than one tortious act directed at an Alabama resident and causing damage here.

Moreover, Ramirez's due process concerns simply cannot be squared with the well-pled facts: he is alleged to have held a contingency fee interest in cases litigated in Birmingham, Alabama, and appeared at depositions in Birmingham, Alabama in those cases. Nor has he shown that he faces "especially onerous" burdens from litigating in this forum or that the inconvenience of litigating in this forum rises to a "constitutional magnitude." *Diamond Crystal Brands, Inc. v. Food Movers International, Inc.*, 593 F.3d 1249, 1274 (11th Cir. 2010). Ramirez has previously voluntarily participated in litigation in Alabama. Therefore, any such concerns are unwarranted.

Like Otero and van Bilderbeek, Ramirez cannot claim surprise at being haled into court in the Northern District of Alabama. Therefore, Ramirez's Motion to Dismiss (Doc. # 122) on this ground is due to be denied.[4]

### B. Service by E-Mail Was Proper

Van Bilderbeek and Ramirez also assert that service by e-mail on them was improper. Rule 4(f) provides that "[u]nless federal law provides otherwise, an individual -- other than a minor, an incompetent person, or a person whose waiver has been filed --may be served at a place not within any judicial district of the United States:…. (3) by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f). Alternative service under Rule 4(f) is proper where the method of service is (1) not prohibited by international agreement, and (2) is reasonably calculated to apprise the interested parties of the pendency of the action and

---

[4] Again, the court need not address whether personal jurisdiction might be proper under the alternative theories of conspiracy jurisdiction and Rule 4(k)(2) jurisdiction, although, for similar reasons to those discussed in footnote 3, jurisdiction is also proper under those theories.

afford them an opportunity to present their objections. *See U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617, 619 (S.D. Fla. 2011); *Prewitt Enterprises, Inc. v. Organization of Petroleum Exporting Countries*, 353 F.3d 916, 927-28 (11th Cir. 2003). "[A] proposed alternative method of service of process is not offensive to the forum's law if such method is not "expressly prohibited" by the forum's law. *TracFone Wireless, Inc. v. Hernandez*, 126 F. Supp. 3d 1357, 1365 (S.D. Fla. 2015) (citing *TracFone Wireless, Inc. v. Distelec Distribuciones Electronicas, S.A. de DV*, 268 F.R.D. 687, 690–91 (S.D. Fla. 2010).

A court is afforded wide discretion in ordering service of process under Rule 4(f)(3). *See Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016 (9th Cir. 2002). Courts have authorized a wide variety of alternative methods of service. *See SEC v. Tome*, 833 F.2d 1086, 1094 (2d Cir. 1987) (service of process by publication*); Int'l Controls Corp. v. Vesco*, 593 F.2d 166, 176-78 (2d Cir. 1979) (service by mail to last known address); *New Eng. Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co*., 495 F. Supp. 73, 80 (S.D.N.Y. 1980) (service by telex for Iranian defendants*); Levin v. Ruby Trading Corp*., 248 F. Supp. 537, 541-44 (S.D.N.Y. 1965) (service by ordinary mail); *Forum Fin. Group, LLC v. President & Fellows of Harvard Coll.*, 199 F.R.D. 22, 23-24 (D. Me. 2001) (service on defendant's attorney); *In re Int'l Telemedia Assoc*., 245 B.R. 713, 719-20 (Bankr. N.D. Ga. 2000) (service by email).

An order for alternative service must comply with due process requirements, which call for notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950). Where a defendant cannot be reached by mail, service of process via email may be appropriate. *Rio Properties*, 284 F.3d at 1017-18. "E-mail service on defendants is not prohibited

by the Hague Convention or the law of the Netherlands." *McBride v. Wille*, 2013 WL 12130463, at *3 (W.D. Tex. Dec. 2, 2013) (citing *Liberty Media Holdings, LLC v. March*, 2011 WL 197838, at *1–2 (S.D. Cal. 2011)).

### 1. Van Bilderbeek

On September 1, 2016, Plaintiff filed a Motion for Entry of an Order Allowing Alternative Methods of Service on Albert van Bilderbeek and Francisco Ramirez Cuellar. (Doc. # 99). Prior to filing the Motion, Plaintiff had conducted discovery regarding van Bilderbeek's location. Plaintiff enlisted a private investigation firm in an attempt to locate van Bilderbeek, but was unsuccessful. (Doc. # 99-12). In response to discovery requests, Defendant Collingsworth responded that van Bilderbeek's contact information was "highly confidential for security reasons." (Doc. # 99-4).

Van Bilderbeek argues that Plaintiff's claims against him should be dismissed because the court allowed him to be served by e-mail and the Hague Convention does not provide for service by email. (Doc. # 121 at 15). However, that argument is simply off the mark. Numerous federal courts, including district courts within this circuit, have found the lack of an express prohibition on a type of service is dispositive. *See Cartwright v. Fokker Aircraft U.S.A., Inc.*, 713 F. Supp. 389, 395 (N.D. Ga. 1988), *disapproved of on other grounds by Vermeulen v. Renault, U.S.A. Inc.*, 965 F.2d 1014 (11th Cir. 1992) ("Defendant has not pointed to any provision in the internal law of The Netherlands which would suggest that service by mail violates a deeply-rooted local policy of that nation; the mere fact that the internal laws of The Netherlands make no provision for service of process by mail is insufficient to demonstrate that any use of the mails for service is incompatible with the law of The Netherlands."); *see also Tracfone Wireless,*

*Inc.*, 126 F. Supp. 3d at, 1365 ("[T]his district has confirmed that a proposed alternative method of service of process is not offensive to the forum's law if such method is not 'expressly prohibited' by the forum's law.").

Van Bilderbeek does not deny that he received a Summons and a copy of the Complaint via e-mail. (*See* Doc. # 121). Nor does van Bilderbeek argue that this method of service failed to apprise him of the allegations against him and afford him an opportunity to respond. (*See* Doc. # 121 at 14-16). It clearly did both — he has appeared in this action, retained able counsel, and moved to dismiss the claims against him. Therefore, e-mail service on van Bilderbeek was appropriate.

### 2. Ramirez

Ramirez, too, argues that service by e-mail was improper. He bases this argument on the assertion that Colombia's Code of Civil Procedure makes no mention of e-mail. (Doc. # 122 at 5). Plaintiff responds that the Code referred to by Ramirez has been repealed, and that the General Procedure Code, which replaced it, expressly allows service by e-mail. (Doc. # 126 at 8). Plaintiff provided the Declaration of a Colombian attorney attesting to this fact. (Doc. # 126-1). In reply, Ramirez argues that Plaintiff did not comply with certain Colombian pre-requisites to e-mail service. (Doc. # 129). However, like van Bilderbeek, Ramirez does not argue that this method of service failed to apprise him of the allegations against him and afford him an opportunity to respond. (*See* Doc. # 121 at 14-16). Again, it clearly did both — he has appeared in this action, retained able counsel, and moved to dismiss the claims against him. Therefore, email service on Ramirez was appropriate.

Because e-mail service on both van Bilderbeek and Ramirez was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action," their Motions to Dismiss on this issue are due to be denied. *See Mullane*, 339 U.S. at 314.

### E.      Plaintiff's RICO Claims Apply Extraterritorially

Van Bilderbeek, but not Ramirez, makes the argument that Plaintiff's RICO claims should be dismissed because RICO does not apply extraterritorially. (Doc. # 121 at 17-18; Doc. # 122). In *RJR Nabisco, Inc. v. European Community*, 136 S.Ct. 2090, 2102 (2016), the Supreme Court considered whether 18 U.S.C. § 1962 (the substantive RICO statute) applies to conduct committed abroad. Section 1962 prohibits certain activities that are conducted through a pattern of racketeering activity. *See* 18 U.S.C. § 1962(a)–(c). Section 1961 includes all of the possible crimes, or "predicate acts," that can constitute racketeering activity for the purposes of RICO. *See* 18 U.S.C. § 1961(1). The Supreme Court determined that, because some RICO predicates "plainly apply to at least some foreign conduct," Section 1962 was intended to apply and, so long as a private RICO plaintiff alleges and proves a domestic injury to its business or property, does apply to racketeering conduct abroad "to the extent that the predicates alleged in the particular case themselves apply extraterritorially." *RJR Nabisco, Inc.*, 136 S.Ct. at 2102, 2106. The Court concluded that "[t]his unique structure makes RICO the rare statute that clearly evidences extraterritorial effect despite lacking an express statement of extraterritoriality." *Id.* at 2103. That is, "the domestic and extraterritorial reach of the RICO statute is coterminous with that of the underlying predicate offenses in a given case." *United States v. Hawit*, 2017 WL 663542, at *10 (E.D. N.Y. Feb. 17, 2017).

The Complaint alleges that van Bilderbeek paid Blanco on at least three separate occasions for his testimony and participation in cases filed in Alabama. Based on those allegations, it further asserts that "The Enterprise's conduct with respect to Blanco violates 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 201 (witness bribery), 18 U.S.C. § 1956(a)(2)(A) (money laundering), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512 (witness tampering)." (Doc. # 1 at ¶ 107). The Complaint further alleges that the "adverse effects" of van Bilderbeek's witness bribery, witness tampering, money laundering, obstruction of justice and wire fraud were felt by Plaintiff here in Alabama, and asserts a domestic injury. (Doc. # 1 at ¶¶ 107, 164-70). Therefore, RICO may apply extraterritorially, depending on the underlying predicate offense.

All of the predicate offenses for Plaintiff's RICO claims have extraterritorial application. "Congress expressly provided for extraterritorial application of jurisdiction in the obstruction of justice statute." *United States v. Bocachica*, 57 F. Supp. 3d 630, 632 (E.D. Va. 2014) (citing 18 U.S.C. § 1512(c)). Section 1512(h) states that "[t]here is extraterritorial Federal jurisdiction over an offense under this section." 18 U.S.C. § 1512(h). *See also United States v. DSD Shipping, A.S.*, 2015 WL 5444094, at *5 (S.D. Ala. Sept. 15, 2015) ("[T]he obstruction statutes, 18 U.S.C. §§ 1505 and 1519, apply extraterritorially because such foreign offenses cause domestic harm and are not logically dependent on their locality."). The money laundering statute also specifically provides for extraterritorial application where the alleged conduct is by a United States citizen. 18 U.S.C. § 1956(f) ("There is extraterritorial jurisdiction over the conduct prohibited by this section if -- (1) the conduct is by a United States citizen."). The Complaint

alleges that van Bilderbeek is a United States citizen. (Doc. # 1 at ¶ 37). Although his affidavit addresses his residence, it does not contradict the allegation regarding his citizenship. (Doc. # 121-1). There is authority for the proposition that the witness bribery statute applies extraterritorially. *Cockerham v. Willis*, 2016 WL 345590, at *4 (W.D. Tex. Jan. 27, 2016), *aff'd*, 671 F. App'x 348 (5th Cir. 2016) (18 U.S.C. § 201 has extraterritorial reach). And, as to the extraterritorial application of the wire fraud statute,

> While the Second Circuit has held that 18 U.S.C. § 1343 does not have extraterritorial application, *European Cmty. v. RJR Nabisco, Inc.(RJR Nabisco, Inc.* 2d Cir.), 764 F.3d 129, 140–41 (2d Cir. 2014) (finding the wire fraud statute does not overcome the presumption against extraterritoriality), *rev'd on other grounds, RJR Nabisco, Inc.*, —— U.S. ——, 136 S.Ct. 2090, 195 L.Ed.2d 476, other courts have held to the contrary, *see United States v. Georgiou*, 777 F.3d 125, 137–38 (3d Cir. 2015); *United States v. Lyons*, 740 F.3d 702, 718 (1st Cir. 2014), [] it does not appear that the Eleventh Circuit has opined on the issue.

*Absolute Activist Value Master Fund Ltd. v. Devine*, 2017 WL 519066, at *19 (M.D. Fla. Feb. 8, 2017). The First and Third Circuits have specifically held that "Section 1343 applies extraterritorially." *Georgiou*, 777 F.3d at 137, *cert. denied,* 136 S. Ct. 401 (2015); *see also Lyons*, 740 F.3d 702, 718 ("the wire fraud statute punishes frauds executed in 'interstate or foreign commerce,'" and therefore can be applied extraterritorially because Congress did not have "only 'domestic concerns in mind.'") (quoting *Pasquantino v. United States*, 544 U.S. 349, 371–72 (2005), in turn quoting 18 U.S.C. § 1343). The court concludes that the First and Third Circuits have the better side of the debate. Therefore, van Bilderbeek's argument that Plaintiff's RICO claim fails due to its extraterritorial application is without merit.

**F.     The RICO Claim Against Ramirez is Appropriately Pled**

Ramirez, but not van Bilderbeek makes the argument that Plaintiff's RICO claims are due to be dismissed as conclusory and insufficiently pled. The court disagrees. In the Complaint, Ramirez is defined as one of the "RICO Defendants" and a member of the "RICO Enterprise." (Doc. # 1-1 at 2). The Complaint further alleges that the Enterprise (which includes Ramirez) made witness payments to Charris which were sent "from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity" ─ namely, witness bribery, witness tampering, obstruction of justice, and wire fraud. (Doc. # 1-1 at 38-42, 107-125). Ramirez is also alleged to have facilitated virtually all of the witness payments. (Doc. # 1-1 at 38-43). The Complaint further alleges that Ramirez was active in disseminating the Enterprise's false message and fraudulent testimony. (Doc. # 1-1 at 80, 86).

The court understands that certain RICO claims must be pled with particularity, but Plaintiff has done that here. As explained at length in the court's March 8, 2016 Memorandum Opinion and Order (Doc. #58), and also in the court's August 12, 2016 Memorandum Opinion and Order (Doc. #91), predicate acts of mail and wire fraud are prohibited acts under RICO which must be pled with particularity. (Doc. #58 at 8-9). Other predicate acts, such as bribery, obstruction of justice, witness tampering, and money laundering need only meet the *Iqbal/Twombly* standard of pleading. (Doc. #58 at 6). Applying these standards here, the court concludes Plaintiff has successfully (and with particularity) stated a claim against Ramirez. (*See, e.g.* Doc. # 1-1 at 28-30, 55-59, 76-77, 86).

For these reasons, as well as those stated in the Memorandum Opinion and Order (Doc. #58) of March 8, 2016, and the Memorandum Opinion and Order (Doc. # 91), the Motions to Dismiss Plaintiff's RICO claims filed by Van Bilderbeek and Ramirez are due to be denied.

## G.    Plaintiff's State Law Fraud Claims

In its Complaint, Plaintiff asserts two fraud claims: Count III, a willful and/or reckless misrepresentation claim, and Count IV, a fraudulent concealment/suppression claim. (Doc. 1-1 at 100-01). Van Bilderbeek and Ramirez argue that Plaintiff has failed to plausibly allege these claims against them. The elements of the two fraud claims differ and are addressed, in turn, below.

### 1.    Misrepresentation Fraud Claim

The elements of a misrepresentation fraud claim are: "(1) a false representation; (2) concerning a material fact; (3) reliance upon the false representation, and; (4) damage as a proximate result." *Aliant Bank, a Div. of USAmeribank v. Four Star Investments, Inc*., 2017 WL 1787935, at *18 (Ala. May 5, 2017) (quoting *Harmon v. Motors Insurance Corp.*, 493 So.2d 1370, 1373 (Ala. 1986)). "[R]eliance is an essential part of any fraud claim." *Aliant Bank*, 2017 WL 1787935, at *18. "'Although the terminology varies from state to state, the underlying principle is the same — for a plaintiff to state a fraud claim, he must show that a misrepresentation induced him to act in a way that he would not otherwise have acted, that is, that he took a different course of action because of the misrepresentation.'" *Aliant Bank*, 2017 WL 1787935, at *19 (quoting *Hunt Petroleum Corp. v. State*, 901 So.2d 1, 4–5 (Ala. 2004)).

Although Plaintiff has properly alleged misrepresentations made by van Bilderbeek and Ramirez, the court agrees with these Defendants that Plaintiff has failed to properly allege facts supporting the reliance element of the claim. Plaintiff alleges that these Defendants made misrepresentations about it and that it was damaged as a result. But Plaintiff has not sufficiently alleged that it took any action or changed its course *in reliance* on the misrepresentations. Nor could it have done so because its position is that it knew all along the misrepresentations were false. Without the reliance element, Plaintiff's misrepresentation claim is essentially a repackaged defamation claim. Therefore, Plaintiff's misrepresentation claims against van Bilderbeek and Ramirez are due to be granted.

### 2.      Suppression Fraud Claim

"The elements of a suppression claim[under Alabama Code § 6-5-102] are (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; (4) action by the plaintiff to his or her injury." *Aliant Bank*, 2017 WL 1787935, at *23 (internal quotations omitted but quoting *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So.2d 883, 891 (Ala. 2005) and in turn quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So.2d 61, 63 (Ala. 1996)).

Defendants van Bilderbeek and Ramirez argue that Plaintiff has not properly alleged any duty to speak on their part. (Docs. # 121 at 19-20 and # 122 at 7). Plaintiff responds that, by electing to speak on a topic, Defendants undertook a duty to do so truthfully. (Docs. # 126 at 24 and 125 at 30). The court agrees with Plaintiff on this point:

> [E]ven though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state

the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure." . . . Thus, once a party elects to speak, he or she assumes a duty not to suppress or conceal those facts that materially qualify the facts already stated.

*Freightliner*, 932 So. 2d at 895. *See also First Alabama Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1056 (11th Cir. 1990) ("Finally, even if one is not under a duty to speak, if he decides to do so, 'he must make a full and fair disclosure,' without concealing any facts within his knowledge." (quoting *Ellis v. Zuck*, 409 F.Supp. 1151, 1158 (N.D. Ala. 1976), and citing *Jackson Co. v. Faulkner*, 55 Ala.App. 354, 315 So.2d 591 (1975))).

Van Bilderbeek and Ramirez are both alleged to have disseminated the RICO Enterprise's message that Plaintiff was complicit in murder to the media and government officials in the Netherlands. Neither Defendant had any duty to speak on this issue, but once they chose to speak, they assumed a duty to speak truthfully. *Freightliner*, 932 So. 2d at 895. Therefore, Plaintiff has sufficiently alleged a duty to speak truthfully on the part of both van Bilderbeek and Ramirez.

However, Plaintiff's concealment/suppression claims suffer from the same infirmity as its misrepresentation claims — Plaintiff has failed to allege that it was induced to act by any suppression or concealment, or that it acted to its injury because of any suppression or concealment. Again, Plaintiff could not have acted on the suppressed information to its detriment because its position is that it knew the concealed truth. Plaintiff cannot establish the inducement to act element, and therefore its concealment/suppression claims fail, and the Motions to Dismiss the concealment/suppression claims are due to be granted.

## V.  **Conclusion**

For the foregoing reasons, the Motions to Dismiss filed by Defendants Albert van Bilderbeek and Francisco Ramirez Cuellar (Docs.# 121 and 122) are due to be granted in part and denied in part. A separate order will be entered.

**DONE** and **ORDERED** this August 1, 2017.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE