FILED
2023 Oct-12  PM 05:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 11



# Transcript of Christian Levesque, Esquire

**Date:** September 18, 2023
**Case:** Drummond Company, Inc., et al. -v- Collingsworth, et al.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ALABAMA
 2              SOUTHERN DIVISION
 3  DRUMMOND COMPANY, INC., et al., )
 4       Plaintiffs,          )
 5  v.                        ) CIVIL ACTION NUMBER:
 6  TERRENCE P. COLLINGSWORTH, ) 2:15-cv-00506-RDP
 7  et al,                    )
 8       Defendants.          )
 9  ------------------------------)
10
11
12      Videotaped Deposition of CHRISTIAN LEVESQUE, ESQ.
13              Washington, D.C.
14          Monday, September 18, 2023
15              9:01 a.m. EST.
16
17
18
19
20
21
22
23  Job No.: 507544
24  Pages: 1 - 302
25  Transcribed by:  Jerome E. Harris, Stenographer
```

Page 2

```
 1       Videotaped Deposition of CHRISTIAN LEVESQUE,
 2  ESQ., held at the offices of:
 3
 4
 5              KROPF MOSELEY PLLC
 6              1100 H Street NW
 7              Suite 1220
 8              Washington, D.C. 20005
 9              (202) 627-6900
10
11
12       Pursuant to agreement, before Brendon Cuenca,
13  Notary Public in and for the District of Columbia.
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1            A P P E A R A N C E S
 2  ON BEHALF OF THE PLAINTIFF, DRUMMOND:
 3       H. THOMAS WELLS, III, ESQUIRE
 4       BEN PRESLEY, ESQUIRE
 5       ANNA CATHERINE SHERMAN, ESQUIRE
 6       TONY DAVIS, ESQUIRE - via Zoom
 7       STARNES DAVIS FLORIE LLP
 8       100 Brookwood Place, 7th Floor
 9       P.O. Box 598512
10       Birmingham, Alabama 35259
11       (205) 868-6083
12
13  ON BEHALF OF THE DEFENDANT, TERRENCE P. COLLINGSWORTH:
14       TERRENCE P. COLLINGSWORTH, ESQUIRE - Pro Se
15       INTERNATIONAL RIGHTS ADVOCATES
16
17  ON BEHALF OF THE DEFENDANTS, WILLIAM R. SCHERER, JR.,
18  CONRAD & SCHERER, LLP:
19       WILLIAM T. PAULK, ESQUIRE
20       SPOTSWOOD SANSOM & SANSBURY LLC
21       Financial Center
22       505 20th Street North, Suite 700
23       Birmingham, Alabama 35203
24       (205) 986-3620
25            (Continued on next page.)
```

Page 4

```
 1  ON BEHALF OF THE DEPONENT:
 2       LIZ LOCKWOOD, ESQUIRE
 3       ALI & LOCKWOOD LLP
 4       300 New Jersey Avenue NW
 5       Suite 7
 6       Washington, D.C. 20001
 7       (202) 651-2475
 8
 9
10  ALSO PRESENT:
11       Blake Andrews, Drummond
12       Eric J. Hager, Esq.
13       Robert Leonard, Videographer
14       Doru Halip, Remote tech
15
16
17
18
19
20
21
22
23
24
25
```

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

5

1                C O N T E N T S
2  Examination of CHRISTIAN LEVESQUE, ESQ.        PAGE
3    By Mr. Wells                              10, 293
4    By Mr. Paulk                                  269
5
6            EXHIBITS (Attached.)
7  LEVESQUE'S
8  Exhibit 1      Tab 180, Judge Proctor's        19
9                 Opinion and Order
10 Exhibit 2      Tab 3, 1/2011 emails            22
11 Exhibit 3      Tab 4, 2/2011 email             28
12 Exhibit 4      Tab 6, 3/2011 email             36
13 Exhibit 5      Tab 5, 3/2011 email             36
14 Exhibit 6      Tab 7, 5/2011 email             42
15 Exhibit 7      Tab 10, 5/2011 email            47
16 Exhibit 8      Tab 11, 5/2011 Email            53
17 Exhibit 9      Tab 22, 8/2011 emails           59
18 Exhibit 10     Tab 6, 6/2011 email             62
19 Exhibit 11     Tab 14, 7/2011 email            63
20 Exhibit 12     Tab 17, 7/2011 email            68
21 Exhibit 13     Tab 18, 7/2011 email            70
22 Exhibit 14     Tab 19, 7/2011 email            76
23 Exhibit 15     Tab 21, 7/2011 email            78
24 Exhibit 16     Tab 20, 7/2011 email            81
25             (Continued on next page.)

6

1  Exhibit 17     Tab 131, email             83
2  Exhibit 18     Tab 23, 8/2011 emails        91
3  Exhibit 19     Tab 24, 8/2011 email         98
4  Exhibit 20     Tab 27, 11/2011 email       105
5  Exhibit 21     Tab 26, 9/2011 emails       107
6  Exhibit 22     Tab 28, 9/2011 email        108
7  Exhibit 23     Tab 29, 9/2011 email        112
8  Exhibit 24     Tab 41, 9/2011 email        112
9  Exhibit 25     Tab 32, 9/2011 Loan Agreement  117
10 Exhibit 26     Tab 40, 9/2011 Loan Agreement  118
11 Exhibit 27     Tab 30, 9/2011 Cooperation     119
12             Agreement
13 Exhibit 28     Tab 36, 9/2011 Cooperation     122
14             Agreement
15 Exhibit 29     Tab 37, 9/2011 Cooperation     127
16             Agreement
17 Exhibit 30     Tab 38, 9/2011 Cooperation     129
18             Agreement
19 Exhibit 31     Tab 43, 9/2011 email        130
20 Exhibit 32     Tab 45, 9/2011 email        130
21 Exhibit 33     Tab 44, 9/2011 Email        137
22 Exhibit 34     Tab 25, 8/2011 email        138
23 Exhibit 35     Tab 47, 9/2011 email        142
24 Exhibit 36     Tab 16, 7/2011 emails       144
25             (Continued on next page.)

7

1  Exhibit 37     Tab 52, 1/2011 email        156
2  Exhibit 38     Tab 49, 10/2011 email       158
3  Exhibit 39     Tab 58, 3/2012 transcript   159
4  Exhibit 40     Tab 69, 6/2012 email        165
5  Exhibit 41     Tab 70, 6/2012 email        167
6  Exhibit 42     Tab 59, 3/2012 email        169
7  Exhibit 43     Tab 61, 5/2012 email        175
8  Exhibit 44     Tab 68, 6/2012 email        182
9  Exhibit 45     Tab 67, 6/2012 email        182
10 Exhibit 46     Tab 181, Text Messages      182
11 Exhibit 47     Tab 167, 11/2015 email      182
12 Exhibit 48     Tab 80, 7/2012 email        197
13 Exhibit 49     Tab 108, 6/2013 email       207
14 Exhibit 50     Tab 112, 7/2013 email       209
15 Exhibit 51     Tab 116, 7/2013 email       210
16 Exhibit 52     Tab 151, 8/2013 email       212
17 Exhibit 53     Tab 153, 8/2013 email       215
18 Exhibit 54     Tab 159, 8/2013 email       217
19 Exhibit 55     Tab 130, 9/2013 email       222
20 Exhibit 56     Tab 133, 9/2013 email       230
21 Exhibit 57     Tab 134, 9/2013 email       233
22 Exhibit 58     Tab 137, 9/2013 email       240
23 Exhibit 59     Tab 141, 10/2013 letter     243
24 Exhibit 60     Tab 142, 10/2013 email      246
25             (Continued on next page.)

8

1  Exhibit 61     Tab 163, 10/2015 email      253
2  Exhibit 62     Tab 164, 11/2015 email      257
3  Exhibit 63     Tab 126, 11/2015 email      262
4  Exhibit 64     Tab 165, 11/2015 email      263
5  Exhibit 65     Tab 168, 11/2015 Email      265
6  Exhibit 66     Tab 171, 7/2016 email       267
7  Exhibit 67     7/2011 email                279
8  Exhibit 68     11/2011 Email               280
9  Exhibit 69     Complaint                   287
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

9

1    P R O C E E D I N G S
2        THE VIDEOGRAPHER: Here begins video file number
3    1 in the video deposition of Christian Levesque, in the
4    matter of Drummond Company, Inc., et al, v.
5    Collingsworth, et al, in the United States District
6    Court for the Northern District of Alabama, Case Number
7    2:15-cv-00506-RDP.
8        Today's date is September 18th, 2023.  The time
9    on my video monitor is 9:01 a.m. Eastern Time.
10       My name is Robert Leonard, I'm the video
11   specialist, I represent Planet Depos.
12       This deposition is being taken at Kropf and
13   Moseley in Washington, D.C.
14       Will counsel please identify themselves
15   verbally and state who they represent.
16       MR. WELLS: Trey Wells for the Plaintiff,
17   Drummond.
18       MR. PRESLEY: Ben Presley for Drummond.
19       MS. SHERMAN: Anna Catherine Sherman for
20   Drummond.
21       MS. LOCKWOOD: Liz Lockwood for the witness.
22       MR. PAULK: William Paulk for Conrad & Scherer
23   and Bill Scherer.
24       MR. COLLINGSWORTH: Terry Collingsworth,
25   representing Terry Collingsworth.

10

1        THE VIDEOGRAPHER: The court reporter today is?
2        THE COURT REPORTER: Brendon Cuenca.
3        THE VIDEOGRAPHER: He also represents Planet
4    Depos.
5        Will the court reporter please swear in the
6    witness.
7        MR. WELLS: Well, one second.  It looks like on
8    Zoom, we have Blake Andrews, who is with Drummond, Tony
9    Davis is with my firm for Drummond, and Eric Hager, who
10   is with Conrad & Scherer.
11       THE COURT REPORTER: And Ms. Levesque, would you
12   mind raising your right hand, please.
13   Whereupon,
14           CHRISTIAN LEVESQUE, ESQ.,
15   being first duly sworn or affirmed to testify to the
16   truth, the whole truth, and nothing but the truth, was
17   examined and testified as follows:
18       THE COURT REPORTER: Thank you.
19       Counsel.
20       EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
21   BY MR. WELLS:
22   Q    Will you please state your full name for the
23   record.
24   A    Christian is my first name, and Levesque is my
25   last name.  Do you want me to spell it?

11

1    Q    Sure.
2    A    L-E-V-E-S-Q-U-E.
3    Q    Ms. Levesque, I imagine you've taken
4    depositions before.  Have you ever given one before?
5    A    As a witness giving one, no.
6    Q    But you understand the ground rules in terms of
7    not talking over each other and that kind of thing?  We
8    don't need to go through that, do we?
9    A    I don't think so.
10   Q    Okay.  You've been a lawyer for how many years?
11   A    So I graduated in 2001, and I think became a
12   member of the Bar in 2001.
13   Q    Where did you attend law school?
14   A    American University.
15   Q    And what did you do after law school?
16   A    So after law school, I clerked for four years.
17   Q    For a judge?
18   A    Two judges.  A federal judge and a D.C. Court
19   of Appeals judge.
20   Q    And what did you do after that?
21   A    So I had a brief legal fellowship approximately
22   six months or so in Sierra Leone.  It was a legal
23   capacity building fellowship.  And then, I began work in
24   private practice.
25   Q    And what was your next job after the legal

12

1    fellowship?
2    A    I was in private practice for a plaintiff's
3    side law firm, Sprenger & Lang, about two years.
4    Q    And then, after that?
5    A    After that is when I joined Conrad & Scherer.
6    Q    Was that in 2008?
7    A    Yes.
8    Q    Did you join in the D.C. office?
9    A    Yes.
10   Q    Okay.  So did you join with Mr. Collingsworth?
11   A    I did.
12   Q    Okay.  And how did you get connected with Mr.
13   Collingsworth?
14   A    So that's a good question.  I think at some
15   point, I don't remember exactly how, our paths had
16   crossed, but I had sent him a résumé, and I think when
17   he was looking for an associate or a person to work with
18   him, he came across my résumé again, and we reconnected.
19   Q    International Rights Advocates, that's a
20   nonprofit group that I understand you've been involved
21   with, at least in the past; is that correct?
22   A    That's right.  I think when I first was in
23   touch with Terry, I think it was via International
24   Rights Advocates, and then, in the course of that hiring
25   process, he had joined Conrad & Scherer, and I was hired

13

1  as an associate at Conrad & Scherer.
2     Q  Okay.  So you were not involved in what I'll
3  call IRA prior to joining Conrad & Scherer?
4     A  Right.
5     Q  Okay.  And we're here in Washington, D.C.,
6  which is where you live and work; is that correct?
7     A  Correct.
8     Q  And as a seasoned lawyer, you understand we
9  cannot subpoena you to come to Birmingham to testify.
10 You understand that?
11    A  Understood.
12    Q  So if you are to come to Birmingham for trial,
13 it would have to be voluntarily on your part, right?
14    A  That's correct.
15       MS. LOCKWOOD: Make sure you speak up.
16       THE WITNESS: Okay.
17       MS. LOCKWOOD: Yeah.
18
19    Q  Any as a lawyer, you understand that you are
20 bound by certain ethical rules, don't you?
21    A  Of course.
22    Q  For example, you have an ethical duty to
23 zealously represent your clients, right?
24    A  Correct.
25    Q  But you also have ethical duties to the court,

14

1  correct?
2     A  I do.
3     Q  For example, you cannot lie to the court,
4  right?
5     A  Uh-hum.  That's right.
6     Q  Even if would help your client's case, you
7  cannot lie to the court, correct?
8     A  That's right.
9     Q  And you also owe ethical duties to opposing
10 counsel, correct?
11    A  Correct.
12    Q  So you cannot lie to opposing counsel, correct?
13    A  Correct.
14    Q  Even if it would be very bad for your case to
15 tell opposing counsel something, if you're asked it, you
16 cannot lie about it, correct?
17    A  That's right.
18    Q  Back to International Rights Advocates, when
19 did you become involved with that group?
20    A  So involved in that group, at some point, I
21 mean, IRAdvocates was always, I guess, in operation
22 while I was an associate at Conrad & Scherer.  At some
23 point, I think I became a member of the board of
24 IRAdvocates.  I don't remember what position, if any,
25 that I held other than just a board member.  I just

15

1  don't recall.  And it was for, I think, a pretty short
2  period of time that I was in that sort of capacity.
3     Q  I've seen reference to a position of a deputy
4  director, deputy executive director of IRA.  Does that
5  sound familiar to you?
6     A  Possibly.  I just -- I just really don't
7  remember.  I mean, I don't have any reason to question
8  it, but I also don't remember.
9     Q  And what was your understanding of what IRA
10 did?
11    A  So I guess my understanding of what IRAdvocates
12 did was in -- in a similar vein to some of the work that
13 Conrad & Scherer was doing.  Through the time that I
14 recall being an associate at Conrad & Scherer, I don't
15 think IRAdvocates was doing active litigation, but maybe
16 more capacity building type things.  Beyond that, I
17 really don't have a good recollection of what they were
18 doing separate from just the work of Conrad & Scherer,
19 which, you know, Terry was involved in both.
20    Q  Do you remember when in 2008 you joined Conrad
21 & Scherer in the D.C. office?
22    A  I don't.  I know that's information you would
23 easily have access to.  I just don't remember when in
24 2008.
25    Q  And do you know what role you were being hired

16

1  into?
2     A  As an associate at Conrad & Scherer.
3     Q  But in terms of what cases or types of cases
4  you would be working on?
5     A  Yes.  International human rights cases.  Maybe
6  not exclusively, but that was definitely the -- the
7  primary focus, and predominantly using the Alien Tort
8  Statute and the Torture Victim Protection Act.  Those
9  were the two primary areas.
10    Q  When did you start working on cases involving
11 Colombia?
12    A  So I don't remember exactly when.  When I
13 initially started working at Conrad & Scherer, I was
14 working on a different case, Firestone, which was not
15 Colombia-related at all.  It was obviously sometime,
16 years, I think, after that, but I don't really remember
17 exactly when I started working on Colombia-related
18 cases.
19    Q  So the -- there are two cases that Conrad &
20 Scherer filed against Drummond in 2009.  One, I at least
21 refer to as Balcero and the other Baloco.  Do you
22 recognize those?
23    A  Yes.
24    Q  And those were both filed in 2009; is that
25 correct?

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

17

1    A  So I -- I don't actually recall the date.  I
2  think at least one of them was filed in 2009.  But
3  again, you have access to that.
4    Q  With respect to the filing of Balcero or
5  Baloco, were you involved in drafting the complaint,
6  investigating the facts leading into it, that type of
7  thing?
8    A  I don't think so.  I think my involvement
9  started after that.  That's what I recall.  But I will
10  say it's been a very long time, and there's no doubt I
11  was involved in those litigations.  I just don't recall
12  if I was involved in the complaint.  I think it was
13  later.
14    Q  And I know there were -- prior to the filing of
15  the complaint, there were meetings in Colombia with
16  potential plaintiffs to talk about potentially being
17  plaintiffs.  Were you involved in any of those?
18    A  I don't think so.  I don't recall being
19  involved in any of that.
20    Q  Were you involved in the initial contact with
21  Ivan Otero?
22    A  No.
23    Q  When is the last time you spoke to Mr.
24  Collingsworth?
25    A  Spoke to, which is including via text, probably

18

1  a little over a year ago.
2    Q  When is the last time you have spoken to, and
3  I'm including just communicated with --
4    A  Yeah.
5    Q  -- anyone at Conrad & Scherer?
6    A  Oh, gosh.  I don't think I know the answer to
7  that.  It's I -- I think it's been quite sometime,
8  certainly.
9    Q  And same question for Francisco Ramirez?
10    A  No idea.  Years.
11    Q  Same question for Ivan Otero?
12    A  So I don't -- I think I maybe met him once, and
13  that was many years ago.  And other than that, I don't
14  recall having communications.  And I might have -- I
15  think it was once that I met him.  I just I -- I really
16  don't recall.  But years ago.
17    Q  And you speak Spanish, correct?
18    A  I do speak Spanish, but at various levels at
19  various times.  Anyone who speaks a foreign language
20  knows if you're not using it all the time, there have
21  been times when I have been more proficient, and times
22  when I'm much more rusty.  So you know, it's a qualified
23  answer, but there you have it.
24    Q  But back in the time where you were dealing
25  with these Colombia cases and dealing with Spanish

19

1  speaking lawyers, and witnesses, and investigators, you
2  were able to communicate without a translator?
3    A  So sometimes, and I didn't do a ton of that
4  kind of communicating directly.  I think that there
5  times when I was communicating with plaintiffs during
6  the discovery process, and I would have always been with
7  other people who also spoke Spanish.  So there -- I
8  think it would have been a mixture.
9    Q  Okay.  And can you also read Spanish maybe a
10  little better than speaking rapidly?
11    A  So yes, but I will say when it came to work, I
12  was always pretty careful about not overly relying on my
13  Spanish because of that fluctuating sort of proficiency,
14  if you will.
15    MR. WELLS: Exhibit Coordinator, if we can show
16  tab 180, and this will be Exhibit 1 to the deposition.
17    THE TECHNICIAN: Please stand by.  180 is coming
18  and will be marked as Exhibit 1.  Do you want me to use
19  the witness' last name or just mark as Exhibit 01?
20    MR. WELLS: Ah, yes, put the witness' last name
21  on there as well.
22    THE TECHNICIAN: Okay.  Please stand by.
23    (Levesque Exhibit 1, Tab 180, Judge Proctor's
24  Opinion and Order, was marked for identification and is
25  attached to the transcript.)

20

1    THE TECHNICIAN: Exhibit 1 is on the screen.
2    Q  So Exhibit 1 is an opinion and order written by
3  Judge -- Judge Proctor finding the crime fraud exception
4  applies in this case.  Have you read that before?
5    A  So I have read this before.  It's been quite
6  sometime.  Probably closer to when it -- maybe in 2016
7  or so, but it's been a while.
8    Q  And so you're aware that Judge Proctor has
9  found that Mr. Collingsworth and his team made numerous
10  misrepresentations both to Drummond and to the Court
11  about the nature and extent of witness payments in you
12  all's Colombia cases, correct?
13    MS. LOCKWOOD: Objection to the extent, and not
14  saying it does, but to the extent it mischaracterizes
15  the opinion in any way.  The opinion speaks for itself.
16    A  So I'm going to say it's been a very long time
17  since I read this.  And yeah, I -- I'm not certain what
18  exactly he found as it related to witness payments.
19  There's no doubt this memorandum opinion references that
20  and is about that as it relates to the crime fraud
21  exception.  But I don't have a recollection of the
22  specifics of what he found and the extent of what he
23  found.
24    Q  Well, are you aware that one of the issues in
25  this case is the failure to disclose fully the witness

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

21

1  payments that were made in the Balcero case?
2       MS. LOCKWOOD: Object to the form. I'm not sure
3  what witness payments you're referring to.
4       MR. COLLINGSWORTH: I also object to the form
5  and the characterization.
6       **A So I guess I'm -- I'm just not sure. I also,**
7  **in terms of my recollection -- yeah, I guess -- I guess**
8  **I'm just not sure of what specifically those findings**
9  **were.**
10      Q Well, you were still at Conrad & Scherer when
11 that opinion was entered, correct?
12      **A I was. I was just several weeks away, I think,**
13 **from my separation. That's right.**
14      Q And you were at Conrad & Scherer in the lead-up
15 to the hearing that resulted in that opinion, correct?
16      **A That's right.**
17      Q And you were, I imagine, being asked questions
18 by lawyers and others within Conrad & Scherer about
19 witness payments, and what had been disclosed, and what
20 had not, and why, right?
21      **A So I'm not sure that that's accurate. I mean,**
22 **this -- this is certainly an opinion and there was a**
23 **lead-up to this opinion as it related to the defamation**
24 **suit. I was not at this point working on the defamation**
25 **suit in the sense of, you know, defending the defamation**

---

22

1  **suit. And I'm -- I'm -- I'm just not really able to**
2  **recall what I was being asked, if anything, at -- at**
3  **around that period of time. I think it's pretty broad**
4  **-- I mean, what you're asking is pretty broad.**
5       Q You're not telling the jury in this case that
6  you were not involved in discovery in the defamation
7  suit, are you?
8       **A No, I was involved in a portion of the**
9  **discovery, but there came a point in time in which I was**
10 **then not involved. But I'm not saying I wasn't involved**
11 **at all, no.**
12      MR. WELLS: All right. Exhibit Coordinator, if
13 we can pull up tab 3, please, and this will be --
14      THE TECHNICIAN: Please --
15      MR. WELLS: -- Exhibit 2.
16      THE TECHNICIAN: Please stand by.
17      Counsel, there are two tab -- oh. Okay. Maybe
18 it was just loading. Yeah, this is the same. Okay.
19 Stand by. I'm marking now.
20      (Levesque Exhibit 2, Tab 3, 1/2011 Emails, was
21 marked for identification and is attached to the
22 transcript.)
23      THE TECHNICIAN: Exhibit 2 on the screen.
24      Q All right, Ms. Levesque, Exhibit 2 is a January
25 2011 series of emails involving you and others, correct?

---

23

1       **A Yes.**
2       Q And if we look at the bottom of the first page,
3  we've got Mr. Collingsworth writing to Bhavani
4  Raveendran; is that correct?
5       **A Well, that's what it says here, yeah.**
6       Q Who was that?
7       **A So I don't -- I don't recall who that is.**
8  **Yeah.**
9       Q And copied on the email are Piper Hendricks,
10 you, and Eric Hager?
11      **A Right.**
12      Q We've identified Mr. Hager already. Who is
13 Piper Hendricks?
14      **A She was an associate at the firm. And when I**
15 **say associate, I mean, I think she was an associate, she**
16 **could have been a fellow, but she was at Conrad &**
17 **Scherer.**
18      Q And Mr. Collingsworth says here at the bottom,
19 In Drummond, we need to explore the "work product"
20 privilege under the discovery rules. The precise
21 question is if an attorney personally visits a key
22 witness and there are difficult logistical issues as to
23 how he was able to do that, does he have to disclose to
24 the opposition in response to an interrogatory? The
25 concrete issue is that I managed to interview and get a

---

24

1  great declaration from a demobilized AUC paramilitary,
2  El Tigre. To get to him, I used a series of contacts,
3  three different people, one knew ET's lawyer, then ET's
4  lawyer, and then, a guy ET's lawyer introduced me to,
5  who got me in to see ET. I don't want Drummond to know
6  the names of these people.
7       Did I read that correctly?
8       **A Yes.**
9       Q Do you know the various people Mr.
10 Collingsworth is referring to that led to him getting in
11 touch with El Tigre?
12      MS. LOCKWOOD: Objection. Calls for
13 speculation.
14      **A I don't know who's -- who he's referencing**
15 **here.**
16      Q It was your understanding, at least for a large
17 period of time, that Ivan Otero was El Tigre's lawyer,
18 correct?
19      **A So —**
20      MR. COLLINGSWORTH: Objection. Mischaracterizes
21 the record.
22      **A So I don't — I don't actually recall what my**
23 **understanding was in terms of what or who Ivan Otero was**
24 **representing. I know he represented at some point some**
25 **people. It could have been El Tigre, it could have been**

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

25

1  others.  I just don't recall now.
2      Q  Do you know anything about Francisco Ramirez'
3  involvement in arranging contact with El Tigre?
4      A  I don't.  I can't recall that.
5      Q  And do you know how El Tigre was contacted in
6  the first instance?
7      A  I don't.
8      Q  Why is this something that doesn't need to be
9  disclosed to Drummond?
10         MS. LOCKWOOD:  Objection.  Calls for speculation
11  and legal conclusion.
12      A  Yeah, I'm also not -- I'm also not sure that
13  that is the conclusion that it doesn't need to be
14  disclosed.
15      Q  Well, Mr. Collingsworth is saying he doesn't
16  want Drummond to know.  So do you have any recollection
17  or understanding as to why that would be something
18  Drummond should not know?
19         MR. COLLINGSWORTH:  Objection --
20         MS. LOCKWOOD:  Objection.
21         MR. COLLINGSWORTH:  -- calls for a legal
22  conclusion.
23         I'm sorry, go ahead.
24         MS. LOCKWOOD:  Join, and calls for speculation.
25         And if you can just let her finish her answer

26

1  before you ask your questions.
2      A  Yeah, can you just ask the specific question
3  again, I'm sorry.
4      Q  Yes.  Mr. Collingsworth, after talking about
5  the way he got in touch with El Tigre, says, I don't
6  want Drummond to know the names of these people.
7      A  Um-hum.
8      Q  And I'm asking you do you know why that would
9  be something that shouldn't be disclosed to Drummond?
10      A  I -- no, I don't.  I just --
11      Q  And at the front page of the email, there is a
12  response from you that is redacted.  So apparently, you
13  offered some sort of response.  What, if any,
14  involvement did you have in deciding whether or not to
15  disclose to Drummond how El Tigre was contacted?
16      A  I don't know.  I don't -- I don't recall.  This
17  is going back 12 or more years ago.  12 years ago.
18      Q  How many times did you go to Colombia?
19         Approximately.  I know it was a lot.
20      A  Yeah, it wasn't -- it wasn't a lot.  So I -- I
21  was certainly in Colombia at least once, and it might
22  have been a few times or a time or two beyond that.
23  Yeah, I don't -- I don't remember the -- beyond that.
24      Q  Did you enter a Colombian prison at any time
25  you were in Colombia?

27

1      A  I did one time, I believe.
2      Q  To go see Libardo Duarte?
3      A  That's right.
4      Q  How did you gain access to the prison?
5      A  So I don't -- I don't remember.  I mean, I went
6  through the guards, et cetera, there but I don't know if
7  there were any arrangements that were made beforehand.
8  I didn't visit the prison, I think, beyond that one
9  time, so it was somewhat unusual, is what I'm
10  remembering.  But yeah, I don't remember exactly how I
11  gained access.
12      Q  Was anybody with you?
13      A  No.  I don't believe in that instance anybody
14  was with me.
15      Q  In any of the times that you traveled to
16  Colombia, did you bring large sums of cash with you?
17      A  No.
18      Q  Were you aware that Mr. Collingsworth did bring
19  large sums of cash with him to Colombia?
20      A  I don't recall that.
21      Q  Do you know whether any payments were made to
22  Colombian government officials, whether prison guards or
23  anyone associated with prison, to allow you to gain
24  access to the prison?
25      A  I don't know that.

28

1         MR. WELLS:  Pull up tab 4, Exhibit Coordinator.
2         THE TECHNICIAN:  Yes.  Tab 4 is coming, Mr.
3  Wells.
4         MR. WELLS:  This will be Exhibit 3 to your
5  deposition.
6         THE TECHNICIAN:  It will be marked Exhibit 3.
7         (Levesque Exhibit 3, Tab 4, 2/2011 Email, was
8  marked for identification and is attached to the
9  transcript.)
10         THE TECHNICIAN:  Exhibit 3 on the screen.
11      Q  Exhibit 3 is a February 2011 email from Mr.
12  Collingsworth to you and others providing a revised work
13  plan.  Do you see that?
14      A  Yes.
15      Q  And Mr. Collingsworth says, Susana please send
16  to LL by hush mail.
17         Is LL Lorraine Leete?
18      A  I think that's right.
19      Q  And what is hush mail?
20      A  I don't know.
21      Q  If you can flip to the second page of the
22  exhibit.  It says, We (Francisco Ramirez, Lorraine
23  Leete, Ivan Torres, and me), met first with El Tigre in
24  Barranquilla jail.  He claimed repeatedly that he was
25  being threatened and told to stop talking about

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

29

1 Drummond, and that he would not give us a final
2 deposition until his family was moved, temporarily, to a
3 safe location. We need to do this.
4     Do you recall the circumstances of providing
5 support to the family of El Tigre?
6     MS. LOCKWOOD: Objection. Vague.
7     **A   Yeah, that seems to be more than what this**
8 **document is saying, but in either event, I don't -- I**
9 **don't recall the circumstances.**
10    Q   Do you recall that money was paid for the
11 support of El Tigre's family?
12    MS. LOCKWOOD: Objection. Lack of foundation.
13    **A   So at some point, I became aware of that, but**
14 **-- over the course of this litigation, but I -- I don't**
15 **recall when.**
16    Q   The, I would say, third-to-last sentence of
17 that paragraph says, Note that Bam Bam, see below, told
18 us that Jamie Blanco had tried to bribe him while in
19 jail and in doing so said that El Tigre has taken the
20 money.
21     You see that?
22    **A   I do see that.**
23    Q   Now, Bam Bam is Libardo Duarte, correct?
24    **A   I think that's right as you say it. I would**
25 **not have remembered that on -- on my own, but --**

30

1     Q   And Jamie Blanco was another person in
2 Colombian prison that was a witness for you and Mr.
3 Collingsworth's cases against Drummond, correct?
4     **A   That's right.**
5     Q   As was El Tigre, correct?
6     **A   Correct.**
7     Q   Did it cause you any concern that one of your
8 witnesses was claiming that another witness had tried to
9 bribe him?
10    **A   So that is concerning. I just don't recall**
11 **what was happening at this particular time period, but**
12 **that is concerning.**
13    Q   Do you know why that information was not
14 disclosed to the court or Drummond?
15    MS. LOCKWOOD: Objection. Calls for speculation
16 and legal conclusion.
17    **A   So I -- I don't know that it wasn't at some**
18 **point, and it would be in response to specific discovery**
19 **requests, so I -- I don't have any recollection beyond**
20 **-- beyond what I just said. So no.**
21    Q   Moving to the second paragraph, there's a
22 discussion about Samario. That is another imprisoned
23 paramilitary witness that was one of you all's witnesses
24 in the Balcero case, correct?
25    **A   That's right.**

31

1     Q   At the end of that paragraph, it says, He too
2 insists that he will agree to be deposed, that he will
3 work with us for another day to prep, but that we first
4 needed to move his family to a safe place.
5     Did I read that correctly?
6     **A   Yes.**
7     Q   And do you recall that support payments were
8 made for Samario's family as well?
9     **A   So again, I -- I don't recall. At a certain**
10 **point, I became aware of that, and in the course of the**
11 **litigation and in subsequent years, but I don't know**
12 **when.**
13    Q   If we can look at the Bates numbers at the
14 bottom right-hand corner, and I'm just going to read out
15 the last three. If you can go to 192.
16     This memorandum continues, We have to clarify
17 terms and give funds for security to Ivan for ET and
18 Samario's families.
19     You see that?
20    **A   Yes.**
21    Q   Were you involved in getting funds for the
22 families of El Tigre and Samario?
23    **A   I don't believe so.**
24    Q   But you were aware that was happening, correct?
25    **A   Again, I don't know when I became aware of it.**

32

1 **I acknowledged that I'm on this email but I -- beyond**
2 **that, yeah, I don't have any other information about**
3 **that.**
4     Q   Number 14 says, Ivan with FR and LL prodding --
5 now FR would be Francisco Ramirez, correct?
6     **A   That makes sense.**
7     Q   And then, LL is Lorraine Leete?
8     **A   I believe so.**
9     Q   They will meet with Jamie Blanco to see if he
10 will talk to us.
11     So at some point after Mr. Blanco was put in
12 prison, was he not talking to you or your team?
13    **A   I don't know, I don't recall. I wasn't really**
14 **interfacing with these individuals, Jamie Blanco and**
15 **others. That just wasn't the area that I was focused**
16 **on, so I don't recall.**
17    Q   Who was interfacing?
18    **A   Terry was interfacing with -- with them. That**
19 **was part of what he was doing.**
20    Q   Anybody else that you know that had that role?
21    **A   Well, there are other people identified in here**
22 **who are engaged in communications of various sorts, but**
23 **beyond that, I don't know of others that were**
24 **communicating with him or these people.**
25    Q   Do you recall that at no point during the

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

33

1  Balcero case did you or your team ever disclose to
2  Drummond or the court that support was being provided to
3  El Tigre and Samario's family?
4      MS. LOCKWOOD: Objection. Calls for
5  speculation. Legal conclusion.
6      **A  Yes, so I think with Balcero, we were**
7  **responding to Interrogatories at various points, and so**
8  **I think it would have been a matter of whether that was**
9  **responsive to Interrogatories, but I just don't recall**
10 **providing that information.**
11     Q  Is paying money to the families of imprisoned
12 witnesses something that was commonplace in your
13 practice?
14     **A  No. And not something that I had experience**
15 **with when I was at Conrad & Scherer or since that time.**
16     Q  In other words, the only time you had
17 experience with that was when you were working on cases
18 with Terry Collingsworth, correct?
19     MR. COLLINGSWORTH: Objection.
20     **A  Well, I --**
21     MR. COLLINGSWORTH: Mischaracterizes her
22 testimony.
23     **A  I also wouldn't say I have or had experience**
24 **with that, but it was the only time in my career that**
25 **issues of witness safety and things of that sort that**

---

34

1  **you're talking about here were, you know, came up.**
2      Q  Was it concerning to you that payments were
3  being made to witnesses or their family members?
4      **A  So again, I am -- I'm not sure when I had that**
5  **understanding. Acknowledging that I was on this**
6  **particular email, it's not where my focus was in**
7  **general. These are serious issues, and I take my**
8  **ethical responsibilities seriously. So I think your**
9  **question was, Is it concerning, or I mean, I -- I just**
10 **-- I'm not sure at what point the concern or there was a**
11 **concern, but it's something that everyone should, you**
12 **know, think about seriously. They are complex issues.**
13     Q  And just as a general matter, paying witnesses
14 would be something that would be a concern from an
15 ethical perspective, correct?
16     **A  I would say --**
17     MR. COLLINGSWORTH: Objection to form.
18     **A  I would say that paying witnesses in something**
19 **that you need to pay attention to because there are**
20 **potentially ethical issues depending on the**
21 **circumstances.**
22     Q  And also potentially criminal issues, correct?
23     MS. LOCKWOOD: Objection. Calls for legal
24 conclusion.
25     **A  Depending on the circumstances.**

---

35

1      Q  Did you, when taking your ethical
2  responsibilities seriously, contact the Bar Association
3  to seek an opinion on whether it would be ethical to
4  provide any sorts of payments to witnesses or their
5  families?
6      MR. COLLINGSWORTH: Object to the form.
7      **A  So again, with the caveat of not being clear on**
8  **when I had an understanding of -- of what was happening,**
9  **I did not contact the Bar, but I was deferring to -- I**
10 **was, you know, a part of the team, and deferring to, I**
11 **think, decisionmaking that I understood to have**
12 **incorporated, you know, an ethical assessment as well.**
13     Q  Did you ever see a written opinion from any Bar
14 Association on the subject of paying witnesses?
15     **A  I don't recall seeing an ethical opinion, no.**
16     Q  Are you aware of anyone on your team contacting
17 the Bar to solicit an opinion on whether it would be
18 ethical to providing the payments that were paid in
19 Balcero?
20     **A  I don't -- I'm not aware of that.**
21     MR. WELLS: Let's pull up tab 6.
22     THE TECHNICIAN: Stand by.
23     It will be marked as Exhibit 4.
24     THE TECHNICIAN: One moment.
25     (Levesque Exhibit 4, Tab 6, 3/2011 email, was

---

36

1  marked for identification and is attached to the
2  transcript.)
3      MR. WELLS: Actually, correction, let's go back
4  to tab 5, and we will make that Exhibit 5.
5      MS. LOCKWOOD: Are we keeping this as Exhibit 4?
6      MR. WELLS: Yes, we are.
7      THE TECHNICIAN: Stand by.
8      All right. Tab 5 becomes Exhibit 5.
9      (Levesque Exhibit 5, Tab 5, 3/2011 Email, was
10 marked for identification and is attached to the
11 transcript.)
12     THE TECHNICIAN: Exhibit is on the screen.
13     Q  So this is a March 2011 email from Mr.
14 Collingsworth including you -- to a number of people,
15 but including you, saying, My new friend, Jaime, has
16 been keeping us posted.
17     Do you see that?
18     **A  I do.**
19     Q  And he's forwarding an email from Jamie Blanco,
20 correct?
21     **A  Yes.**
22     Q  And Jamie Blanco says something in Spanish
23 here. Can you translate that for us.
24     **A  It looks like he's just saying, I'm moving the**
25 **thing.**

---

37

1    Q  Now, Jamie Blanco, to your understanding, was
2  tried and convicted of being the mastermind behind the
3  killings of union leaders, Valmore Locarno and Víctor
4  Orcasita, correct?
5    A  So I wouldn't have necessarily remembered that.
6  It goes back to a time.  Perhaps in Colombia, that might
7  be the case, but --
8    Q  You know he was charged with a crime relating
9  to the murders of those men, correct?
10   A  Right.
11   Q  And the family members of those men were your
12  clients, right?
13     In the Baloco case?
14   A  I believe so, uh-hum.
15   Q  Did you ever speak to Jamie Blanco?
16   A  I don't believe so.
17   Q  Now, during the course of the case, and your
18  work on it, did you do research into the backgrounds of
19  the imprisoned paramilitaries whose testimony on which
20  you all relied on?
21   A  I don't recall doing research on the
22  backgrounds of the paramilitaries.
23   Q  Were you aware they were pretty bad people?
24   A  Yes.
25   Q  Killed a lot of people?

38

1    A  Yes, potentially so, right.
2    Q  Did you ever read anything about El Tigre and
3  the El Salado massacre?
4    A  I don't recall that.
5    Q  Did you ever read anything about El Tigre and
6  his men dismembering people with chainsaws?
7    A  I -- I don't recall that either.  This was a
8  long time ago.  So and it just -- these very specific
9  questions I -- I just don't remember.
10   Q  But fair to say you understood these imprisoned
11  paramilitaries were people that you needed to be careful
12  with in terms of whether they were telling the truth or
13  not?
14   A  Yes, I think that would be true of any
15  witnesses that you're relying on.
16   Q  And especially true of witnesses serving time
17  in prison for mass murder, right?
18   A  Again, I think you're careful with all of your
19  witnesses, but including those, yes.
20   Q  So let's go back to Exhibit 4, which is at tab
21  6.
22     THE TECHNICIAN:  Stand by.
23     Counsel, I would like to ask the witness if
24  it's possible to speak a little closer to the
25  microphone.  I don't know if the people that are

39

1  connected can hear it properly.
2     THE WITNESS:  Okay.
3     THE TECHNICIAN:  Thank you.
4     Exhibit 4 is back on the screen.
5    Q  All right.  So not the top email heading, but
6  just the very little bit of what is down.  You see from
7  Terry Collingsworth, sent Monday, March 28, 2011, at
8  10:09 a.m.
9    A  Yes, um-hum.
10   Q  This one just isn't spaced out very well.
11   A  Yeah.
12   Q  To Eric Hager, you, and others, correct?
13   A  Yes.
14   Q  Would those all be members of the Drummond
15  Colombia team?
16   A  Or at least the Drummond team.  I don't know
17  how you're differentiating Colombian team, but yeah.
18   Q  For Drummond team, I'm looking for nomenclature
19  we can use throughout today.
20   A  No, no, that's fine, I just -- yeah.
21   Q  Who is Erica Morin?
22   A  So I am having a hard time remembering.  The
23  name looks familiar.  I would assume she was either an
24  associate for Conrad & Scherer.
25   Q  And then, the cc, Hiba Hafiz, who is that?

40

1    A  That name does not ring a bell.
2    Q  So Terry is writing to this team, and about the
3  middle of the unredacted part says, Unfortunately, I
4  need to make a quick trip to Amsterdam based on Albert
5  van Bilderbeek's promise that he has 2 new witnesses and
6  some documents for the Drummond case.  He usually comes
7  through, so I'll go see.  I'm leaving today.
8     Did I read that correctly?
9    A  Yes.
10   Q  And who is Albert van Bilderbeek?
11   A  So Albert van Bilderbeek was an individual that
12  Terry was working with, but I -- I say working just in
13  the general sense.  I'm having a hard time recalling the
14  exact nature or even the more general nature of the work
15  that they did together, but clearly it references the
16  Drummond case here.
17   Q  And do you recall that Albert van Bilderbeek
18  and his brother, Hendrik, owned a company called Llanos
19  Oil?
20   A  That sounds familiar, yes.
21   Q  And those brothers and Llanos Oil had filed
22  claims alleging that their oil concession in Colombia
23  had been wrongfully taken from them.  Do you recall
24  that?
25   A  That sounds right as you say it.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

41

1    Q   And they blamed Drummond for that, correct?
2    A   I think that's right.
3    Q   Have you ever spoken with or communicated in
4  any way with Albert van Bilderbeek?
5    A   I don't think so.
6    Q   Do you know what the nature of his involvement
7  in the Drummond cases was?
8    A   I don't.  I just don't remember.
9    Q   Did you know that Mr. Van Bilderbeek's -- well,
10 they are both van Bilderbeek.  Strike that.
11       Did you know that Hendrik van Bilderbeek was
12 sent to prison for a time in Colombia?
13   A   I didn't know that.
14   Q   Do you know approximately when Albert van
15 Bilderbeek became involved in the Drummond cases?
16   A   I don't.
17   Q   All right.  So we've got Mr. Collingsworth on
18 March 28th saying he is leaving that day for Amsterdam
19 to see Albert van Bilderbeek.  You with me so far?
20   A   Uh-hum.  Yep.
21       MR. WELLS:All right.  Let's go to tab 7, which
22 will be Exhibit 6 to your deposition.
23       THE TECHNICIAN: Please stand by.
24       (Levesque Exhibit 6, Tab 7, 5/2011 Email, was
25 marked for identification and is attached to the

42

1  transcript.)
2       THE TECHNICIAN: Exhibit 6 on the screen.
3    Q   So Ms. Levesque, on this email, focused on the
4  second from the top, April 5th email to you and others,
5  with the subject, Updated work plan.  Do you see that?
6    A   Yes.
7    Q   And if we can go to the Bates number 057 of
8  that work plan.  And again, I'm just using the last
9  three and I'll do that throughout today.
10   A   Yep.  Okay.
11   Q   There's a paragraph entitled, To do for
12 Drummond.  And about three sentences in, it says, FYI, I
13 had two very productive meetings with Rafael Garcia on
14 March 29th and 30th.  And Albert van Bilderbeek is making
15 some arrangements for RG's security.  So he's talking
16 again and has agreed to be deposed.
17       Do you see that?
18   A   I do.
19   Q   And do you know what arrangements Mr. Van
20 Bilderbeek was making for Rafael Garcia's security?
21   A   I don't.
22   Q   Did it involve money?
23   A   I don't know.
24   Q   Now, Garcia is someone that you all were
25 attempting to get to testify favorably for your case,

43

1  correct?
2    A   So I was will say Garcia is not -- it's not a
3  name that I -- that I recall.  I mean, I see it here,
4  and the context, I just don't remember that name and
5  the way that some of the other names are more familiar.
6    Q   So the email we just looked at, Mr.
7  Collingsworth was saying he was going to see Albert van
8  Bilderbeek about two witnesses, this document seems to
9  suggest Rafael Garcia may have been one of them.  Do you
10 know who the other was?
11   A   I don't.
12   Q   If we can turn to 059.  Number 4, JBM -- you
13 recognize that to be a reference to Jamie Blanco Maya?
14   A   That sounds right.
15   Q   -- has been regularly emailing me and clearly
16 wants to make some kind of deal.  He wants help with his
17 lawyers in Colombia to avoid being convicted of murder
18 of the three union leaders.
19       Did I read that correctly?
20   A   Yes.
21   Q   Now, have you seen any emails where Jamie
22 Blanco was asking Mr. Collingsworth or anyone else on
23 your team for money for his lawyers?
24   A   I don't recall that.
25   Q   Do you recall that Mr. Blanco was making

44

1  requests for money for his lawyers from your team?
2    A   I don't recall that independent from what's
3  written here.
4    Q   And what's written here is he's telling Mr.
5  Collingsworth he wants to make some sort of deal; is
6  that right?
7    A   That's what the document says.
8    Q   Now, at any time, did you solicit a Bar opinion
9  on whether it would be ethical to provide money for
10 lawyers for a imprisoned witness?
11       MR. COLLINGSWORTH: Objection to form.
12   A   I did not.
13   Q   Are you aware of anyone on your team doing so?
14   A   I'm -- I'm not aware of that.
15   Q   Let's go to 061.  This says, We made one
16 payment for security to Ivan for ET and Samario's
17 families.
18       Do you recognize ET to be El Tigre?
19   A   That sounds right.
20   Q   Did you do anything to investigate whether
21 security payments were necessary for El Tigre or
22 Samario?
23   A   I -- I did not.  I was not working on that part
24 of the litigation in terms of again interfacing with
25 these guys, the para -- ex-paramilitaries, or working on

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

45

1   that, so I did not.
2      Q   Okay. I think I'm going to know the answers to
3   these next series of questions, but I'll ask them just
4   to make sure we close the loop.
5         So is it fair to assume you did not do any
6   independent investigation to see if there were any
7   actual threats made to any witness in the Drummond
8   cases; is that correct?
9      **A   I did not. I deferred to others on this area.**
10     Q   And the money that was sent to witnesses or
11  their family members, did you do any independent due
12  diligence to determine how that money was used?
13     **A   I did not. Again, I was not dealing with that**
14  **aspect of the litigation.**
15     Q   And have you ever seen any documentation that
16  evidences how the money sent to these witnesses and
17  their families was used?
18     **A   No, not that I recall seeing anything like**
19  **that.**
20     Q   Have you seen any documentation that any
21  security measures were actually implemented for any
22  witness?
23     **A   I don't recall seeing that.**
24     Q   So whatever money was paid for quote, unquote,
25  Security, you don't have any knowledge as to 1, whether

46

1   security was needed, or 2, whether the money actually
2   went for security; is that true?
3      **A   That's correct, I don't have knowledge of that,**
4   **right.**
5         MR. WELLS: We've been going almost an hour.
6   Let's take a quick break. And if you need a break at
7   any point, you can let me know.
8         THE WITNESS: Yeah, yep. Thank you.
9         THE VIDEOGRAPHER: We're going off the record.
10  The time is 9:53 a.m. Eastern Time.
11        (A brief recess was taken.)
12        THE VIDEOGRAPHER: We're going back on the
13  record at 10:06 a.m. Eastern Time.
14        MR. WELLS: If we can -- well, before we do
15  that.
16  BY MR. WELLS:
17     Q   Ms. Levesque, what, if anything, did you do to
18  prepare for this deposition?
19     **A   So I met with my lawyer, Ms. Lockwood.**
20     Q   Did you meet with or communicate with anyone
21  else to prepare?
22     **A   I did not.**
23     Q   Did you review any documents?
24     **A   With my lawyer, I did.**
25     Q   What kind of volume are we talking about?

47

1      **A   Not a huge number. I don't know. Maybe 10 to**
2   **15 documents, and that's very approximate.**
3      Q   About how long did you all spend preparing?
4      **A   So we met for about two-and-a-half hours, I**
5   **would say, and then, did a quicker touch-base yesterday.**
6         MR. WELLS: All right. Can we pull up tab 10,
7   Exhibit Coordinator, please.
8         THE TECHNICIAN: Yes, please stand by. Tab 10
9   will be -- tab 10 will be marked as Exhibit 7.
10        (Levesque Exhibit 7, Tab 10, 5/2011 email, was
11  marked for identification and is attached to the
12  transcript.)
13     Q   So what is marked as Exhibit 7 is a May 22nd
14  email, subject, Confidential trip report. Correct?
15     **A   Yes. Did you say May 22nd? Yes.**
16     Q   Yes. And it is Mr. Collingsworth writing to
17  you and others on the Drummond team, correct?
18     **A   Correct.**
19     Q   The first sentence he's saying that Lorraine
20  and Mr. Collingsworth had met with Ivan who is our
21  intermediary to Jamie Blanco, correct?
22     **A   Correct.**
23     Q   And then, he says, Unfortunately, he wants
24  significantly -- significant help with his legal fees
25  for his defense as a condition. He says he 's not

48

1   helping anyone if he's going to prison for the rest of
2   his life. His number is a 150,000. Likely can move on
3   that. He says his lawyers are about to walk.
4         Did I read that correctly?
5      **A   You did.**
6      Q   So clearly, at least as of the date of this
7   email, you were aware that Jamie Blanco was asking for
8   $150,000 for criminal legal fees?
9         MR. COLLINGSWORTH: Object to the form.
10     Q   Correct?
11     **A   Well, as of this date, I'm certainly on an**
12  **email where that's -- where that's being discussed, so**
13  **yes. I don't recall it, though, but yes.**
14     Q   And do you have any reason to believe that when
15  you were getting these emails, you were not actually
16  reading them?
17        MR. COLLINGSWORTH: Object to the form.
18     **A   So I mean, Terry is sending this to a lot of**
19  **people on -- on the team, and there's a lot going at any**
20  **given time. And again, I'm not focusing on interfacing**
21  **with the ex-paramilitaries. So there could be emails**
22  **that I had not read and likely were emails that I hadn't**
23  **read. I don't have any independent recollection of this**
24  **particular email and whether I read it at the time or**
25  **didn't.**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

49

1    Q  Is the concept of paying criminal legal fees
2  for an imprisoned witness in your case a concern to you?
3    **A  It's something to pay attention to.**
4    Q  Did you pay attention to it?
5    **A  You know, again, I'm not sure what I -- what I**
6  **was clueing into at that time, and I -- I note here that**
7  **it also indicates Terry is discussing it with the firm**
8  **and with PWA, which I think is another firm.  So --**
9    Q  Parker Waichman Alonso, does that sound
10  familiar to you?
11    **A  That -- that makes sense.**
12        **And so I'm simply saying here it looks like**
13  **people are paying attention to it.  I think that's all**
14  **can I say.  I just don't have any other recollection of**
15  **this.**
16    Q  So the last couple things we've looked at where
17  there's references to money either being paid or
18  requested was your sort of view on the world, that's
19  somebody else's wheelhouse, I don't have to worry about
20  that?
21        MS. LOCKWOOD:  Object to the form.
22    **A  You know, I wouldn't phrase it in that way, but**
23  **I think this email is a further indication that clearly**
24  **there are discussions, and this even references an**
25  **opinion, an ethical opinion, that somebody had gotten.**

50

1  **So again, I was focused on a different part of the**
2  **litigation, and deferring to those who were integrally**
3  **involved in -- in this decisionmaking.**
4    Q  And you've already told us you never saw an
5  ethical opinion from the Bar, correct?
6    **A  I didn't -- I didn't personally see that,**
7  **right.**
8    Q  And you're not aware of anyone else seeing one?
9    **A  I'm not aware of anybody else seeing one,**
10  **right.**
11    Q  Flip to the next page, please.
12        Number 10, gave Ivan $5,400 for security costs
13  for him, El Tigre and Samario.  Need to pay $2,700 per
14  month to maintain until we get the deps in the can, and
15  depending on what happens we may be need to do more for
16  the families.
17        You see that?
18    **A  I do.**
19    Q  And deps is short for depositions, right?
20    **A  I would assume so.**
21    Q  So obviously, as of the time of this email, you
22  are being told that money has been provided for the
23  benefit of El Tigre and Samario, correct?
24        MR. COLLINGSWORTH: Objection.  Mischaracterizes
25  the testimony.

51

1    **A  And again, so I'm not being told.  It's a group**
2  **email, and again, it looks like it's related to security**
3  **here.  But beyond what we're seeing here, I just don't**
4  **have anything else I can add.**
5    Q  Do you have any reason to testify under oath
6  today that as of May 2011 when you received this email
7  saying El Tigre and Samario were being paid, that you
8  didn't know it at the time?
9    **A  I'm on this email, so what I'm saying is not**
10  **denying I'm on this email.  I'm just not having a**
11  **recollection of how much I am clued into that and**
12  **understanding what is happening because I'm not dealing**
13  **with that part of the litigation.**
14    Q  And number 11 in this report says, Gave
15  Duarte's family another two million Colombia pesos,
16  about $1,000, to complete their relocation following
17  threats.  Did I read that correctly?
18    **A  Yes.**
19    Q  So you and the Colombia team in this email are
20  also being told that Duarte has been provided money for
21  quote, unquote, Security, correct?
22    **A  That is what it says here, and this is the**
23  **general Drummond team.  It's not just those that are**
24  **focused on what's happening in Colombia, but the**
25  **entirety of the Drummond litigation.**

52

1    Q  Well, again, I ask, when you received emails
2  like this talking about paying money for the benefit of
3  witnesses, did you just sort of cast it aside saying
4  that is not part of my role, that's somebody else's
5  role?
6    **A  No, that's not what I'm testifying to.  This is**
7  **one email of many concerning litigation presumably that**
8  **is happening during this time period.  So when we're**
9  **talking about matters that involve the witnesses in**
10  **Colombia, that is not what I was focusing on.  So I'm**
11  **not saying I just cast it aside, but rather, there**
12  **clearly are individuals, including two firms, that are**
13  **focusing on these very issues, and I -- I think in many**
14  **respects, in all respects, was deferring to that part of**
15  **the litigation.**
16    Q  And as to whether it was ethical or unethical,
17  you were deferring to others who were handling that; is
18  that true?
19    **A  I am in this instance one of a member of a**
20  **team, and there are members of the team who are, in**
21  **fact, assessing the permissibility of those kinds of**
22  **payments.  That is what I'm saying.**
23    Q  So in other words, you are deferring to others
24  on your team as to whether these payments are legitimate
25  or not?  Is that true?

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

14 (53 to 56)

---

53

1    A  In this instance, or in at that time, I -- I
2  think that's right.
3      MR. WELLS: Let's go to tab 11.
4      THE TECHNICIAN:  Stand by.  Tab 11 will be
5  marked as Exhibit 8.
6      (Levesque Exhibit 8, Tab 11, 5/2011 Email, was
7  marked for identification and is attached to the
8  transcript.)
9      THE TECHNICIAN: Exhibit 8 on the screen.
10    Q  And this is Exhibit 8, and at the top, it's an
11  email from Mr. Collingsworth to you on May 26, 2011,
12  correct?
13    A  Yes.
14    Q  And he's forwarding you an email below which is
15  two pages long.
16    A  That's right.
17    Q  In that email, Mr. Collingsworth says, I've
18  been less than happy lately as my efforts to promote
19  human rights through the rule of law has ironically now
20  got me dealing with some extremely sleazy people.  On
21  one side, we have Ivan and his friends, and on the other
22  side, the equally greedy and morally rudderless lawyers
23  at PWA, Most particularly, Mike Hugo.
24      Did I read that correctly.
25    A  You did.

---

54

1    Q  Did you have any information during your course
2  of working on the Drummond cases that led you to believe
3  that Ivan Otero was a sleazy person?
4    A  Not -- not one way or the other.  I wasn't
5  engaging with Ivan Otero.
6    Q  When you said --
7    A  Not --
8    Q  I'm sorry, were you finished?
9    A  I think so.
10    Q  Okay.  You said Mr. Collingsworth was the one
11  primarily dealing with Mr. Otero; is that correct?
12    A  Or he was at least one of the people that was
13  dealing with him.
14    Q  And Mr. Collingsworth, whose role was in part
15  to deal with Ivan Otero, was telling the rest of the
16  Colombian team that Ivan Otero was sleazy, correct?
17    A  Well, he's recording that -- I mean, he's
18  recording that here.
19    Q  Do you have any information at your disposal to
20  dispute that characterization of Mr. Otero as being a
21  sleazy person?
22    A  I just don't know one way or the other.
23    Q  This has a reference to Ivan and his friends.
24  Who are the friends?
25      MS. LOCKWOOD: Objection. Calls for

---

55

1  speculation.
2    A  That I don't know.
3    Q  I haven't seen any email where you ask Mr.
4  Collingsworth for clarification on this email.  Do you
5  recall ever asking for clarification as to what he was
6  talking about?
7    A  I don't even recall this email, so no, I don't
8  recall subsequent emails.
9    Q  And following down, there's some updates.  The
10  first one is JBM, which would be Jamie Blanco; is that
11  correct?
12    A  That sounds right.
13    Q  And Mr. Collingsworth is saying, I can't get
14  major funds freed up without a face-to-face meeting with
15  Jerry Parker who is unavailable most likely on vacation
16  until June 6th.
17      Do you see that?
18    A  I do.
19    Q  Was it your understanding that Mr.
20  Collingsworth was seeking funds from Parker Waichman to
21  meet Jamie Blanco's requests for payment of up to a
22  $150,000?
23    A  I don't think that -- I don't think that was or
24  was not my understanding.  I'm just -- I'm just simply
25  not sure.  I'm looking at this and just reading it on

---

56

1  the face of this email as anybody would be reading it.
2  So --
3    Q  Well, we just read some emails where one of
4  which is Jamie Blanco was asking for $150,000 for his
5  criminal legal fees, right?
6    A  Yes.
7    Q  And now Mr. Collingsworth is saying that he
8  needs to meet with Jerry Parker of Parker Waichman to
9  get major funds freed up, right?
10    A  It looks like -- it looks like that.
11    Q  Did you contact anyone about funding sources to
12  meet Mr. Blanco's requests to be paid?
13    A  No.
14    Q  Did you solicit any advice or input from anyone
15  as to whether such a payment would be ethically
16  permissible?
17    A  I did not.
18    Q  Did you seek any advice or input as to whether
19  such a payment would be illegal?
20    A  I did not.
21    Q  Again, you were deferring to those who were
22  involved in that?
23    A  I was one of the team, and I was not focused on
24  though issues.  I was focusing elsewhere, so I deferred.
25    Q  At the very bottom, Mr. Collingsworth is

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

15 (57 to 60)

57

1  telling Lorraine, who I think we've established is
2  Lorraine Leete, correct?
3     A  Yes.
4     Q  Please translate this and get it to Ivan with
5  any improvements he wants to suggest before we get to
6  the message.
7        Mr. Collingsworth, to your understanding, does
8  not speak Spanish, right?
9     A  Correct.
10    Q  In other words, when he needed to speak to
11 Spanish speaking people, he would either do so through
12 an interpreter or have someone translate for him?
13    A  Right.
14    Q  All right.  The message that Mr. Collingsworth
15 is asking to be transmitted to Ivan Otero, and the email
16 on which you are a recipient, says, Ivan, I hope you are
17 well.  Our last visit emphasized that we have some
18 difficult issues to address.  First, with JBM, I'm
19 virtually certain that I can get a package close to what
20 was asked for, provided that we warrant that it is
21 attorneys -- for attorneys fees and costs associated
22 with his defense and also helping to prepare his
23 testimony for us.
24        Did I read that correctly?
25    A  Yes.

58

1     Q  At the end, Mr. Collingsworth asks Mr. Otero
2  to, Please use your considerable skill to keep Jamie
3  Blanco on our side until I can get final confirmation.
4  Do you see that?
5     A  I do.
6     Q  Do you know what skill Mr. Otero has in keeping
7  an imprisoned witness, quote, unquote, On your side?
8     A  I don't know what's been referenced here, no.
9        MR. WELLS: Let's go to tab 22.
10       THE TECHNICIAN: Please stand by.
11       MR. WELLS: And this will be Exhibit 9.
12       THE TECHNICIAN: Exhibit 9.
13       (Levesque Exhibit 9, Tab 22, 8/2011 Emails, was
14 marked for identification and is attached to the
15 transcript.)
16       THE TECHNICIAN: Exhibit 9 on the screen.
17    Q  So this is a series of emails in August of 2011
18 including you, correct?
19    A  Yes.
20    Q  And if we flip to the second page --
21    A  Yes.
22    Q  -- at the very end, number 6, Mr. Collingsworth
23 is saying, Folks, no harm was done yet, but Nadia the
24 journalist had some derogatory things to say about Ivan
25 that were based on facts that only our team would know.

59

1  Whoever is talking to her socially needs to be
2  absolutely clear that you are not to be revealing inside
3  information.  This is a waiver of attorney client and
4  work product privilege, and to waive it to a journalist
5  is about as bad as it gets.  Further, like it or not,
6  Ivan is an important partner of ours in this process,
7  and we need to be protective and supportive of his
8  interests as they largely overlap with ours.
9        Did I read that correctly?
10    A  Yes.
11    Q  And if we flip over to the first page --
12       MS. LOCKWOOD: I -- I don't want to interrupt
13 your flow, but just do you have enough time to read the
14 full document --
15       THE WITNESS: Yeah, just a -- just another
16 minute or two.
17    A  Okay.
18    Q  A little more than halfway down the page, you
19 see the email from you at 6:30 p.m.?
20    A  Yes.
21    Q  And if you could please read for the jury what
22 you wrote there.
23    A  So got it re discovery.  Not sure Lorraine will
24 raise this issue first as that doesn't seem to be her
25 communication style.  Maybe keep in mind if you discuss

60

1  with Lorraine that Nadia met Ivan through Francisco a
2  while back and has had substantive contact socially with
3  Rebecca and Francisco.  She might be piecing some
4  information together from more than one source.  Maybe
5  you already know this, but just throwing that out there
6  in case you discuss further with Lorraine.  Talk to you
7  soon.  Christian.
8     Q  And can you please tell the jury what
9  derogatory information about Ivan Otero you are
10 discussing here.
11    A  So I don't -- I don't know that I am talking
12 about derogatory information here.  I -- first of all, I
13 don't have any independent recollection of this issue or
14 this email.  Yet, to me, this email is not indicating
15 one way or the other that I know anything about
16 derogatory information.  I think I'm just talking based
17 on this about contacts that were social that might have
18 been had, so --
19    Q  Well, we just looked at Mr. Collingsworth
20 telling the team, We can't say bad things about Ivan
21 Otero especially to a journalist.
22       At the bottom of this page, he is sending an
23 email directly to you saying, Christian, as I told
24 Susana today, of course I'm a hundred percent sure that
25 Lorraine was the source of Nadia, the journalist's,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

61

1  information.
2  **A   Yep.**
3  Q   And then.  You just read out the response.  So
4  you don't know what information derogatory about Ivan
5  Otero was revealed?
6  MS. LOCKWOOD: Objection.  Misstates the
7  document.
8  **A   Yeah, I think I'm just saying that I don't have**
9  **an independent recollection, and from this document,**
10 **it's not indicating to me one way or the other whether I**
11 **know what that derogatory information is.  It's just**
12 **this is going back 13 years.  I just -- I just don't**
13 **recall.  I don't even recall this issue having come up.**
14 Q   So you don't recall any derogatory information
15 about Ivan Otero; is that right?
16 **A   Yeah, I don't know what this is referring to**
17 **specifically.**
18 MR. WELLS: Let's go to tab 12, which will be
19 Exhibit 10.
20 THE TECHNICIAN: Stand by.  You said tab 12?
21 MR. WELLS: Yes.
22 THE TECHNICIAN: Thank you.  It will be marked
23 as Exhibit 10.
24 (Levesque Exhibit 10, Tab 12, 6/2011 email, was
25 marked for identification and is attached to the

62

1  transcript.)
2  THE TECHNICIAN: Exhibit 10 is on the screen.
3  Q   So Ms. Levesque, this is a June 2011 email from
4  Mr. Collingsworth to you and others, correct?
5  **A   Yes.**
6  Q   And without reading the whole thing, Mr.
7  Collingsworth is basically saying he's looking to part
8  ways with Parker Waichman because they have not
9  responded to requests about paying secure point and the
10 extremely urgent need to work something out with Jamie
11 Blanco's lawyers.  Fair characterization?
12 **A   Seems to be.**
13 Q   Do you recall this instance?
14 **A   I don't.**
15 Q   Do you recall that Parker Waichman refused to
16 pay money to Jamie Blanco for his lawyers?
17 MR. COLLINGSWORTH: Objection.  Mischaracterizes
18 the document.
19 **A   Yeah, I -- I don't recall anything about that.**
20 Q   Do you recall that after Parker Waichman
21 refused to pay Jamie Blanco, your team went to Albert
22 van Bilderbeek to source those founds?
23 MS. LOCKWOOD: Objection.  Lack of foundation.
24 **A   I don't recall that.**
25 MR. WELLS: Let's go to tab 14, which will be

63

1  Exhibit 11, I believe.
2  THE TECHNICIAN: Correct, tab 14 will be marked
3  as Exhibit 11.
4  (Levesque Exhibit 11, Tab 14, 7/2011 email, was
5  marked for identification and is attached to the
6  transcript.)
7  THE TECHNICIAN:  Exhibit 11 is on the screen.
8  Q   So the -- again, this is a July 2011 email from
9  Terry Collingsworth to Rebecca Pendleton, copying you
10 and others, correct?
11 **A   Yes.**
12 Q   And the others are what you would call the
13 Drummond team?
14 **A   Yeah, or at least some of them, yeah.**
15 Q   So who was Rebecca Pendleton?
16 **A   So Rebecca was a paralegal in our office.**
17 Q   And she ended up marrying Francisco Ramirez?
18 **A   That's right.**
19 Q   She's no longer -- well, at this time, was she
20 still a paralegal or was she --
21 **A   Oh, with that I have no idea.  I don't recall**
22 **the dates.**
23 Q   Looking at the middle email from Rebecca to you
24 and others, it says, Terry, although JMB -- which I
25 assume is supposed to toad JBM -- is on board, we still

64

1  need to be looking for support.  Do you have an update
2  on that to provide to Ivan?
3  Do you see that?
4  **A   I do.**
5  Q   And Mr. Collingsworth responds, well, I realize
6  that and I've just hung up with Albert VB.
7  That would be Albert van Bilderbeek?
8  **A   I'm assuming so.**
9  Q   He says he hopes by Wednesday of next week to
10 confirm some funding.  Correct?
11 **A   Yes.**
12 Q   Does this at all refresh your recollection that
13 Albert van Bilderbeek was contacted to source the funds
14 to pay Jamie Blanco?
15 **A   It doesn't refresh my recollection.  I**
16 **acknowledge that you have emails here that are**
17 **temporally in that time period.  It doesn't refresh my**
18 **independent recollection.**
19 Q   Do you have any reason to dispute that you were
20 aware of it at the time you received this email telling
21 you about it?
22 **A   I would say the same thing that I've said**
23 **before, which is I don't have an independent**
24 **recollection looking back as to whether, you know, my**
25 **understanding of what was happening here.  I acknowledge**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

65

1  I -- I'm on this email and I -- I got that email, but
2  it's not what I was addressing in this litigation.
3      Q  So this is another one where payments were
4  being talked about and you figured that's somebody
5  else's role, right?
6      A  I'm just saying I'm one of a member of the
7  team, and I am focusing elsewhere.  There are other
8  people who are handling that liaising with those
9  witnesses and the issues that are arising around that.
10  That's what I'm saying.
11      Q  So was your view of the world that you were
12  just trusting that the other members of the team were
13  acting appropriately?  Is that --
14      A  It -- it was my understanding that there were
15  others on the team, Terry and others, who were
16  experienced, who were supervising me, and who were the
17  ones who liaising with those witnesses in Colombia.
18  That was my understanding of what was happening.
19      Q  Was it your understanding that Mr.
20  Collingsworth at this point had great experience in
21  paying witnesses?
22      A  Not --
23      MR. COLLINGSWORTH: Objection.
24      A  Yeah.
25      MS. LOCKWOOD: Object to the form.

66

1      A  Yeah, that is not what I would say or was
2  saying.  He had experience as an attorney and he was
3  working on those issues.  Meaning liaising with those
4  witnesses, dealing with that part of the litigation.
5      Q  Dealing with providing money for their benefit?
6      A  That's not what I just provided to you either.
7      MR. COLLINGSWORTH: Mischaracterizes the
8  document.
9      Q  That's what this last few emails we've just
10  looked at are talking about, is paying money for the
11  benefit of the witness.  Do we have a disagreement
12  there?
13      MS. LOCKWOOD: Objection.  Misstates the
14  documents.
15      A  Yeah, I'm not disputing what the documents
16  said.  I think the way you're asking the question,
17  though, is confusing.  I'm simply saying that there were
18  others on the team who were communicating with the
19  Colombian witnesses, arranging for their testimony, and
20  dealing with the complicated issues that were arising in
21  that context.  That is what I'm saying was being dealt
22  with by others on the team.
23      Q  And my question is prior to you getting these
24  emails talking about these witness payments, were you
25  aware of any others on the team that had prior

67

1  experience with how to properly make witness payments?
2      MS. LOCKWOOD: Object to the form.
3      A  Yeah, I -- I mean, it's a strange -- honestly,
4  it's a little bit of a strange question.  I don't -- I
5  would not frame it as who had experience making payments
6  to witnesses.  Just I think I've already given you my
7  answer.
8      Q  And what I'm trying to figure out is are you
9  relying on other's experience just as lawyers or
10  experience in these issues, which I think you told me
11  you had no prior experience with?  These issues being
12  providing money for the benefit of either witnesses or
13  their families?
14      A  I'm saying I'm -- I'm relying on individuals
15  with more lawyer experience who are dealing with these
16  complicated legal questions and factual questions, who
17  had more information about the facts, and more
18  experience with those legal assessments, and assessing
19  the facts through those legal assessments.  That's what
20  I'm saying.
21      Q  And who other than Mr. Collingsworth were you
22  deferring to on the issue of providing money for the
23  benefit of witnesses and/or their families?
24      A  In -- in this -- in this instance, I mean,
25  Terry is leading that part of the team, so I was

68

1  deferring to -- to his assessments.
2      Q  But was there anyone else that you were
3  deferring to in that area?
4      A  I don't think anybody else on this email chain
5  would have been making those decisions.
6      MR. WELLS: Let's go to tab 17.
7      THE TECHNICIAN: Please stand by.
8      Q  While we're waiting on that, were you involved
9  in the Chiquita case?
10      A  So I don't -- I don't recall my level of
11  involvement in the Chiquita case.  I don't think I was
12  terribly involve, but I -- but I might have been.  I was
13  trying to remember and I'm just I'm having a hard time
14  remembering that.
15      Q  But that was another case that your team had
16  filed against Chiquita alleging Chiquita had involvement
17  with Colombian paramilitaries?
18      A  That's right.
19      Q  Let's look at Exhibit 12.
20      (Levesque Exhibit 12, Tab 17, 7/2011 email, was
21  marked for identification and is attached to the
22  transcript.)
23      Q  So at the top of Exhibit 12 is an email from
24  Mr. Collingsworth to you in July of 2011, correct?
25      A  Yes.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

69

1    Q   And he's forwarding you an email from Jack
2  Scarola, correct?
3    A   Yes.
4    Q   Who is Mr. Scarola?
5    A   So I don't know.  I -- the name is familiar,
6  but I don't remember who he was.
7    Q   There's a copy on Jack Scarola email addressees
8  to the Chiquita-ats-all@googlegroups.  Were you a part
9  of that Listserv?
10   A   So I don't -- I don't know if I'd ever signed
11 up for that Listserv.
12   Q   In any event, Scarola is addressing his email
13 to Mr. Collingsworth and Bill Scherer, correct?
14   A   Right.
15   Q   Bill Scherer being the managing partner of
16 Conrad & Scherer, correct?
17   A   That's right.
18   Q   And he was in Fort Lauderdale; is that right?
19   A   Yes.
20   Q   And Scarola is saying, Bill and Terry, you
21 agreed in our meeting to provide us with a copy of the
22 ethics opinion you received regarding compensation to
23 witnesses and members of their families.  Right?
24   A   Yes.
25   Q   And Mr. Collingsworth then forwards that email

70

1  to you and asks you to get an intern to basically
2  research the ethics of the issue.  Fair?
3    A   Yes.
4    Q   So prior to him asking you to have an intern
5  research whether paying witnesses or their families was
6  ethical, had you seen any ethics opinion as is
7  referenced in Mr. Scarola's email?
8    A   I have not.
9    Q   Have you to this day seen an ethics opinion
10 predating this email?
11   A   I don't recall seeing such an opinion.
12       MR. WELLS: Let's go to tab 18.
13       THE TECHNICIAN: Stand by.
14   Q   This is Exhibit 12.
15   A   Do you mean 13?
16   Q   13.  Yes, thank you.
17       THE TECHNICIAN: It has been marked as Exhibit
18 13.
19       (Levesque Exhibit 13, Tab 18, 7/2011 email, was
20 marked for identification and is attached to the
21 transcript.)
22   Q   All right.  So Exhibit 13 is another July 2011
23 email from Mr. Collingsworth to the Colombia team
24 including you, correct?
25   A   To the Drummond team, yes.

71

1    Q   The Drummond team, excuse me.
2    A   Uh-hum.
3    Q   And the email he is forwarding to that team is
4  from Rebecca Pendleton, and discusses Jamie Blanco
5  potentially starting to slide away.  Do you see that?
6    A   Just if you can --
7    Q   Sure.
8    A   -- give me a second, please.  Thank you.
9        I'm ready for your question.
10   Q   Okay.  In the email that is sent to you,
11 there's discussion about Jamie Blanco being willing to
12 work with you all on the conditions that have been
13 discussed.  Right?
14   A   Are you saying that's what it says here?
15   Q   Not verbatim.  I'm trying to avoid just reading
16 --
17   A   Yeah, that's fine.
18   Q   -- them all to you.
19   A   So yes, that is what this email says, sent to
20 me and the rest of the team.
21   Q   And there's also a reference to, If they don't
22 have an answer for Mr. Blanco, Ms. Pendleton at least
23 sees Blanco starting to slide away from us.
24       Do you see that?
25   A   I do see that.

72

1    Q   Do you know what that means?
2    A   I don't.
3    Q   Do you know if that means if he does not get
4  paid, he will not testify the way you think he will?
5        MR. COLLINGSWORTH: Objection.  Mischaracterizes
6  the document.
7    A   As I said, I don't know what that means.
8    Q   And what conditions were there that required,
9  or that were required for Mr. Blanco to quote, Work with
10 you all?
11       MS. LOCKWOOD: Objection.  Calls for
12 speculation?
13   A   I don't know what those conditions are.
14   Q   Do you know of any other conditions other than
15 the $150,000 that we've already seen that he requested?
16   A   I don't know anything about the conditions, no.
17   Q   Did it cause you any concern that you had a
18 witness that was not willing to testify without being
19 paid?
20       MR. COLLINGSWORTH: Objection.  Mischaracterizes
21 the document and the record.
22   A   Yes, so I -- I'm not sure that's what is
23 being said here, but at any rate, again, if you're
24 asking in the past did that cause me concern, I just
25 don't recall when I received this email, you know,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

73

1 whether I read it, what I was -- I just was not -- I --
2 I've already said this many times, I just was not --
3 this was not my -- my focus in this litigation.  Are
4 these matters generally concerning?  Yes, of course, and
5 there is an indication that people are discussing these
6 issues, but I don't have any additional information
7 about it or recollection.
8     Q   And you as a lawyer understand that if you are
9 found to have bribed a witness, you can lose your Bar
10 license, correct?
11     A   Of course.
12     Q   I would imagine you know yourself -- well, you
13 may not know what was happening in your mind on this
14 particular day, whether discussions about potentially
15 bribing a witness would be concerning to you or not,
16 right?
17     A   Yes.
18     Q   And it would, right?
19     A   Of course.
20     Q   Now, the emails we've seen about providing
21 money for Jamie Blanco, none of them have anything to do
22 with Mr. Blanco's security, do they?
23         MS. LOCKWOOD: Objection.  Calls for
24 speculation.
25     A   So that I -- I don't know.  I -- I don't -- I

---

74

1 don't have a complete understanding of what that money
2 was for.  So I just don't think I can say that it was
3 not for security.
4     Q   Well, all we've seen thus far today is Mr.
5 Collingsworth saying it's for $150,000 worth of criminal
6 legal fees, right?
7     A   That's what at least one of the documents or
8 maybe a few others said, yes.
9     Q   And Jamie Blanco was, in fact, deposed in the
10 Balcero case, correct?
11     A   I think that's right.
12     Q   And that was through the letters rogatory
13 process?
14     A   That's correct.
15     Q   And for probably most everybody viewing this
16 testimony to explain a little bit about that, sort of
17 equivalent to an international subpoena, you can require
18 someone in another country to appear in that country and
19 provide testimony?
20     A   I think that's roughly right, sure.
21     Q   In other words, you all had the mechanism of
22 the court to require Jamie Blanco to appear and testify
23 in your case, correct?
24     A   Or at least that was the process through which
25 to have him testify.

---

75

1     Q   In other words, you did not need to pay money
2 to him in order to compel his appearance at testimony,
3 did you?
4         MR. COLLINGSWORTH: Objection.  Calls for
5 speculation.  Misstates the document.
6     A   So I mean, you don't pay a witness to have them
7 appear through a letters rogatory process, if that's
8 your question.  I --
9     Q   Do you know of any reason Jamie Blanco needed
10 to be paid other than to influence his testimony?
11     A   So I -- I don't have an understanding of why
12 money was being paid beyond what you're showing me with
13 these documents.  So I don't think I have anything else
14 that I can say on that.
15     Q   All right.  You remember the last email we
16 looked at where Mr. Collingsworth is asking you to have
17 an intern research the ethics of paying witnesses or
18 their families?
19     A   Yes.
20         MR. WELLS: Let's go to tab 19.
21         THE TECHNICIAN: Please stand by.  Okay this
22 will be marked as Exhibit 14.
23         (Levesque Exhibit 14, Tab 19, 7/2011 email, was
24 marked for identification and is attached to the
25 transcript.)

---

76

1         THE TECHNICIAN: Exhibit 14 on the screen.
2     Q   All right.  So this is an email from Piper
3 Hendricks to you and Mr. Collingsworth, in July of 2011,
4 attaching a memo on the ethics of payment of witnesses'
5 fees, correct?
6     A   Yeah, on the ethics of paying witnesses'
7 criminal legal fees.
8     Q   And was Ms. Hendricks an intern at the time as
9 the prior email seemed to suggest?
10     A   So you all can check the employee records.  I
11 don't think she was an intern.  I think she was a
12 lawyer.  I think she was either an associate or a
13 fellow.  I don't think she was an intern.  But I could
14 be wrong.
15     Q   Do you know how many years she had been
16 practicing as of July of 2011?
17     A   I don't, but I think she was a Barred attorney.
18     Q   She was young, though, right?
19     A   I -- you know, I don't know.  Again, I think
20 you could just easily check -- check this.  I just don't
21 recall how many years out of law school she was.
22     Q   She was less experienced than you at this time,
23 correct?
24     A   I think that's right.
25     Q   Any reason you didn't do this research

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

77

1  yourself?
2      **A  Well, I mean, again, I was one of a member of**
3  **the team, and it's not unusual in any case to have other**
4  **associates, including those who are more junior to you,**
5  **conduct legal research.**
6      Q  Are you aware of any lawyer in the D.C. office
7  at this time that was less experienced than Ms.
8  Hendricks?
9      **A  I don't know.  In the D.C. office, I'm not**
10 **sure.  In part because I don't even remember how many**
11 **years out Piper was, so --**
12     Q  And the memorandum that's attached, is this the
13 only memorandum or written document that you saw
14 analyzing the ethics of paying witnesses?
15     **A  I really -- I really don't recall.  Yeah, I**
16 **mean, it's just we're going back 13 years.  I don't**
17 **remember if there were any others.  I don't think so,**
18 **but I -- I don't know.**
19     Q  Did you ever research the ethics of paying
20 witnesses?
21     **A  I don't know if I did.  I think that -- I think**
22 **that Piper, in this instance, was the one who clearly**
23 **did that.  I just don't -- I don't recall doing it.**
24     MR. WELLS:Let's go to tab 21.
25     THE TECHNICIAN: Please stand by.

---

78

1      Tab 21 will be marked as Exhibit 15.
2      MR. WELLS: This is Exhibit 15.
3      (Levesque Exhibit 15, Tab 21, 7/2011 email,
4  was marked for identification and is attached to the
5  transcript.)
6      Q  Exhibit 15 is a July 22nd, 2011 email from Eric
7  Hager to you, correct?
8      **A  Yes.**
9      Q  Attaching Piper Hendricks' memo on the ethics
10 of witness payments, correct?
11     **A  Yes.**
12     Q  If we look at the email that Mr. Hager is
13 forwarding to you, it is from Mr. Collingsworth to the
14 -- that Chiquita group we were talking about, right?
15     **A  Yes.**
16     Q  And Mr. Collingsworth is saying, First,
17 attached is a memo from Piper Hendricks, one of our
18 associates, on the ethics of paying costs and fees for a
19 witness.  Clearly can do.  The question is doing so in a
20 way to minimize impact on credibility.  In this case --
21 which he would be talking about Chiquita there, right?
22     **A  I think so from the context here.**
23     Q  In this case, we have a legitimate basis to ask
24 if we can get Raul Hasbun to give us admissible evidence
25 that will destroy Chiquita's bogus story that the AUC

---

79

1  coerced Chiquita, and he has told me that Chiquita's
2  Charles Kaiser, helped the AUC structure itself, then we
3  won't likely ever have to put him before a jury.  We
4  need to discuss.  For those reluctant, tell me how else
5  we get truthful evidence of an AUC-Chiquita discussion.
6      Now, Raúl Hasbún was an imprisoned AUC leader,
7  correct?
8      **A  I think that's right.**
9      Q  And what payments to him are you aware of?
10     **A  I'm -- I don't recall payments to him.  I'm not**
11 **disputing that there could have been payments to him,**
12 **but when you ask me what am I aware of, I'm -- I'm just**
13 **I'm not recalling payments to him.**
14     Q  And do you have any understanding of why a memo
15 on the ethics of paying witnesses would be sent in
16 connection with discussions about getting Raúl Hasbún's
17 testimony?
18     **A  No, other than there's clearly a question here**
19 **as to whether that can be done under the circumstances.**
20     Q  Did you consider Raúl Hasbún to be an expert
21 witness?
22     **A  I don't recall one way or the other.  I -- I**
23 **don't -- the name is familiar to me and I understand he**
24 **was an AUC leader, but I really don't have a**
25 **recollection of his role in this beyond that.**

---

80

1      Q  Did you ever consider characterizing payments
2  to witnesses in Colombia as expert witness fees?
3      **A  I don't recall that one way or the other.**
4      Q  Now, back to the first page.  Mr. Hager is
5  forwarding that email along with Piper Hendricks' memo
6  to you, with copies to Lorraine Leete and Susana Tellez,
7  both members of the Drummond team, correct?
8      **A  Correct.**
9      Q  Do you recall any concern about this memo
10 internally such that Mr. Collingsworth wouldn't be
11 included on this email?
12     **A  I don't recall that.**
13     Q  Mr. Collingsworth, according to his statement
14 here, is clearly you can pay costs and fees for a
15 witness.  Did you have a view on that?
16     **A  I -- I mean, there's an entire memo that was**
17 **done, and I think I'm -- I'm not clear one way or the**
18 **other whether his assessment of what that memo says is**
19 **would be consistent with mine or not.  I just -- yeah.**
20     MR. WELLS:Let's go to tab 20.
21     THE TECHNICIAN: Stand by.
22     MR. WELLS: This will be Exhibit 16.
23     (Levesque Exhibit 16, Tab 20, 7/2011 email, was
24 marked for identification and is attached to the
25 transcript.)

Transcript of Christian Levesque, Esquire

Conducted on September 18, 2023

---

81

1    Q   So this is a July 22nd, 2011 email from Eric
2  Hager to Mr. Collingsworth, with copies to you and
3  Lorraine Leete, correct?
4    **A   Uh-hum.  Yes.**
5    Q   Mr. Hager is saying, Terry, I'm not convinced
6  by Piper's memo that we're in the clear.  While I see
7  some arguments we could make, I would recommend we get
8  more solid authority before moving forward with any
9  payments.
10   Did I read that correctly?
11   **A   Yes.**
12   Q   Did you ever see any more quote, unquote, Solid
13 authority?
14   **A   I -- I don't -- I don't recall.**
15   Q   Are you aware of anybody on your team seeking
16 out more solid authority on whether it would be proper
17 to pay witnesses?
18   **A   I just don't recall.**
19   Q   And Eric Hager, I think, is actually on the
20 line right now.  Do you consider him to be a good
21 lawyer?
22   **A   Yes.**
23   Q   Knows what the law is, knows what's right and
24 what's not?
25   MS. LOCKWOOD:  Objection.  Calls for

---

82

1  speculation.  And it's vague.
2    **A   Yeah, it's -- it's -- this is just broad.  I --**
3  **look, Eric is a good lawyer.  I have no reason to**
4  **question his judgment, so --**
5    Q   Do you consider him to be an ethical lawyer?
6    **A   Yes, I have no reason to question his ethics.**
7    Q   And here he's saying he's not convinced that
8  Ms. Hendricks' memo actually reveals that it is ethical
9  to proceed with paying witnesses, correct?
10   MS. LOCKWOOD:  Objection.  Misstates the
11 document.
12   **A   Yeah, can you just -- just restate.  I mean,**
13 **again, it says what it says, so it says he's not**
14 **convinced by her memo that we're in the clear.  But he**
15 **can also see arguments that we could make.  And then,**
16 **he's recommending a next step.**
17   Q   And I take from your prior answers, did you not
18 do anything yourself to follow up on this issue; is that
19 correct?
20   **A   I don't recall doing anything to -- to follow**
21 **up.  Again, it's been 13 years.**
22   MR. WELLS:  Let's go to tab 131.
23   THE TECHNICIAN:  Stand by.
24   MR. WELLS:  Which is Exhibit 17.
25   (Levesque Exhibit 17, Tab 131, email, was

---

83

1  marked for identification and is attached to the
2  transcript.)
3    Q   This is another email on which you're copied,
4  providing a copy of the Piper Hendricks' memo, but this
5  time it says it's prepared with comments from Lorraine.
6  Do you see that?
7    **A   Yes.**
8    Q   Let's turn to the memo itself.
9    **A   Okay.**
10   MS. LOCKWOOD:  Can you read it?
11   THE WITNESS:  Yeah, I'm okay.  It just it would
12 have been easier, but it's fine.
13   Q   Would you be more comfortable with -- oh, you
14 do have glasses?
15   **A   I do.  They are outdated prescriptions, so**
16 **anyway, we can proceed.  It's --**
17   Q   All right.  The bottom of the first page before
18 the footnote, it says, In making payments to fact
19 witnesses, attorneys should consider six steps.
20   And then, it lists out six steps kind of with a
21 really helpful first letter of each spelling out the
22 word, Ethics.  Right?
23   **A   Oh, yeah, I see 1 through 6 on page 2.  Okay.**
24   Q   Number 1, Explain to the witness and her lawyer
25 that the lawyer's fees are being paid only to recover a

---

84

1  witness' expenses and are not an inducement for her to
2  testify.
3    Did I read that correctly?
4    **A   Yes.**
5    Q   Are you aware of whether that was done as it
6  relates to Jamie Blanco?
7    **A   I'm not aware one way or the other.**
8    Q   You certainly didn't do it, did you?
9    **A   I didn't communicate with him, no.**
10   Q   Number 2, Type an agreement between you, the
11 witness, and her attorney to cover only reasonable
12 attorneys fees, and ensure that the witness understands
13 it is neither an inducement nor a payment for her
14 testimony.
15   Did I read that correctly?
16   **A   Yes.**
17   Q   And have you ever seen an agreement with Jamie
18 Blanco where that was done?
19   **A   Not that I recall.**
20   Q   Number 3, Help from your state Bar Association.
21 Seek an advisory opinion from your state Bar on the
22 particular facts of your case.
23   I think you've already told me that was not
24 done, right?
25   **A   Not that I'm aware of.**

---

85

1    Q   Number 4, Identify your intentions to your
2  adversary.
3       In other words, disclose it to the other side,
4  correct?
5    **A   I would assume that's what that means.**
6    Q   And that was not done either, was it?
7    **A   So not that I'm aware of.  Not that I'm aware**
8  **of.**
9    Q   Number 5, Carefully review the witness'
10 attorneys fees.  Meticulously review invoices.
11      Did you ever see any invoices from any lawyer
12 that supposedly represented Jamie Blanco?
13   **A   I did not.  Not that I recall.**
14   Q   Are you aware of any such invoices existing?
15   **A   Not one way or the other.**
16   Q   Do you know who the lawyers supposedly were
17 that Jamie Blanco needed money for?
18   **A   No.**
19   Q   All right.  Under the ethics discussion of the
20 steps, we got the first comment Lorraine Leete.  It
21 looks like she's commenting on this citation to white
22 collar crime treatise.  You see that?
23   **A   I do.**
24   Q   And she says, These factors are those
25 considered when a witness' attorneys fees are being paid

86

1  to allow the attorney to attend the testimony, not in
2  relation to existing lawyer fees.
3       Do you see that?
4    **A   I do.**
5    Q   In other words, it can be permissible for, for
6  example, your former employer to pay your lawyer's fees
7  to represent you at a deposition about your former
8  employment.  Do you understand that?
9    **A   That sounds right.**
10   Q   Which is what's happening here.  Conrad &
11 Scherer is paying the fees for your lawyer to be here
12 with you today, correct?
13   **A   Correct.**
14   Q   And that is not what occurred with Mr. Blanco,
15 is it?
16   **A   It seems to be a different situation.**
17   Q   To your knowledge, did anybody on the Drummond
18 team pay Mr. Blanco's attorneys fees for someone to be
19 present for him at his letters rogatory testimony in the
20 Balcero case?
21   **A   I just don't know that one way or the other.**
22   Q   Going to the next page, Ms. Hendricks states,
23 In other words, the fact that payments for witnesses'
24 expenses are not directly linked to the proceedings of
25 our civil case does not mean they are prohibited

87

1  inducement, so long as it is clear that the payments are
2  independent of the outcome of our case in the content of
3  any testimony that a witness gives.
4       And then, Ms. Leete has a comment to that one
5  as well, correct?
6    **A   Yes.**
7    Q   She says, This conclusion seems like a stretch
8  since in all examples given, the payment was related to
9  the proceeding.  I.e., paying for lawyers of a witness
10 to be present for the testimony.
11      Right?
12   **A   Yes.**
13   Q   So we've now seen that Mr. Hager had concerns
14 about the conclusions reached by Ms. Hendricks, and now
15 Ms. Leete is calling them a stretch, right?
16   **A   Yes.**
17   Q   Did you have any view on the conclusions
18 reached on this -- in this memo saying paying legal fees
19 for an imprisoned criminal witness --
20   **A   I --**
21   Q   -- was ethically appropriate?
22   **A   I -- I don't recall what concerns I had.  I**
23 **mean, you're asking me about a memo that was written 13**
24 **years ago.  Certainly, I would review or look at**
25 **comments and I -- but I don't -- I just don't have any**

88

1  **recollection of what my concerns were based on this.**
2    Q   So you got out of law school in 2001, I think
3  you said you were Barred in 2002, so you have been a
4  lawyer for 21 years, correct?
5    **A   As of now.  I think I was Barred in 2001.  Not**
6  **sure if you just said 2002, but --**
7    Q   I did, but I thought I heard you -- doesn't
8  matter.
9    **A   Yeah.**
10   Q   Over 20 years?
11   **A   Yes.**
12   Q   At any point in your 20-year career, putting
13 aside the issue of Jamie Blanco, have you ever paid an
14 imprisoned witness' legal fees for their criminal case
15 that is not related to your civil case?
16   **A   No.  Have I?  No.**
17   Q   Have you ever been involved when anyone on your
18 team was doing that?  Again, putting aside the issue of
19 Jamie Blanco?
20   **A   No.**
21   Q   In other words, this Jamie Blanco situation
22 we're talking about paying $150,000 to an imprisoned
23 criminal witness, is the only time that's happened in
24 your entire career?
25   **A   Yes.**

89

1    Q   And you have no recollection of it whatsoever?
2    **A   This was going back 13 years ago when there**
3    **were many things happening in this litigation.  I'm just**
4    **simply saying in that time period, I don't recall this**
5    **memo, I don't recall again the particulars.  This is not**
6    **the area that I was predominantly focused on.  It's, I**
7    **mean, it's this was a case, I had several cases, it was**
8    **just -- no, I -- I don't recall.**
9    Q   And I'm moving away from the particular memo
10   and just the issue of paying over $100,000 to imprisoned
11   witness.  You have no recollection of that either --
12   **A   I --**
13   Q   -- that that payment occurred?
14   **A   I don't have a recollection of that, no.**
15   Q   Other than -- and again, putting aside the
16   Jamie Blanco situation, have you ever been involved in
17   paying over $100,000 to an imprisoned fact witness?
18   **A   No.**
19   Q   At least that you can recall?
20   **A   Well, certainly, absolutely, that I can recall,**
21   **no.  I --**
22   MR. WELLS: All right.  Let's take another quick
23   break.  We've gone another hour.
24   THE VIDEOGRAPHER: We're going off the record at
25   11:07 a.m.

90

1    (A brief recess was taken.)
2    THE VIDEOGRAPHER: We're going back on the
3    record at 11:20 a.m. Eastern Time.
4    BY MR. WELLS:
5    Q   Ms. Levesque, you recall the email we were
6    looking at earlier where Mr. Collingsworth was telling
7    you and the team that ET and -- El Tigre and his lawyer
8    had been paid $2,700 and need to keep it going hopefully
9    until the deps were in the can?
10   **A   So I -- yes, I remember -- yeah, I remember**
11   **that email.  I just the document speaks for itself to**
12   **the extent you're, you know, characterizing it, but --**
13   Q   I'm leading to the next question to make --
14   **A   Okay.**
15   Q   -- sure you remember that that email reflected
16   that the monthly payments will be $2,700?
17   **A   Yes.**
18   Q   Okay.
19   MR. WELLS: Exhibit Coordinator, if we can pull
20   up tab 23, which is Exhibit 16.
21   **A   Thanks.**
22   THE TECHNICIAN: Yes, please stand by.
23   **A   Is it 16 or 18?**
24   Q   18.  I need glasses.
25   THE TECHNICIAN: Tab 23, correct?

91

1    MR. WELLS: Correct.
2    THE TECHNICIAN: Please stand by.
3    (Levesque Exhibit 18, Tab 23, 8/2011 emails,
4    was marked for identification and is attached to the
5    transcript.)
6    THE TECHNICIAN: Exhibit 18 on the screen.
7    Q   So Ms. Levesque, this is a series of emails in
8    August of 2011 involving you, correct?
9    **A   Well, I mean, there's an email, clearly it's**
10   **I'm on this email chain at the top, but there's a number**
11   **of emails I think below that I'm not on, but it's been**
12   **forwarded to me, I guess.**
13   Q   Right.  Being on the top chain, you would have
14   -- you have seen -- you would have received all the
15   emails below, correct?
16   **A   Yeah, I'm not disputing that, I just want to be**
17   **clear.**
18   Q   All right.  And toward the bottom of the first
19   page, Victoria Ryan, who is she?
20   **A   She was an administrative assistant for Conrad**
21   **& Scherer in -- in the D.C. office.**
22   Q   Okay.  And Ms. Ryan is asking Mr. Collingsworth
23   for approval of the following requests, right?
24   **A   Yes.**
25   Q   One of which is a monthly wire in the amount of

92

1    $575 to Claudia Balcero, who was the lead plaintiff in
2    the Balcero case, correct?
3    **A   Yes.**
4    Q   Were you aware that Ms. Balcero was being paid
5    monthly?
6    **A   Again, I'm -- I'm on this email chain up here,**
7    **but I just I -- I don't, I don't recall that.**
8    Q   And I'm again not talking necessarily about
9    this email, but just the general subject.  Do you have a
10   recollection that you all were paying the lead plaintiff
11   in the case --
12   **A   I don't.**
13   Q   -- money per month?
14   **A   I don't.**
15   Q   Flip the page.  Number 2, A monthly wire in the
16   amount of $2,700 to Ivan Otero, which Mr. Collingsworth
17   says is for security.  Do you see that?
18   **A   I do.**
19   Q   And again, moving away from the document, just
20   the general subject.  Were you, or do you remember, that
21   Ivan Otero was receiving money every month for El Tigre
22   and Samario or their families?
23   **A   I -- I don't recall that.  I mean, I**
24   **acknowledge that I'm on emails that you've showed, but I**
25   **don't recall that separate from -- separate from what**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

24 (93 to 96)

93

1  you've shown me today.
2      Q   You have no recollection whatsoever?
3      A   No.  It's 13 years ago.
4      Q   Number 3, Monthly Halcon wire.  Talking about
5  sending $1,250 per month for some person named Halcon.
6  Do you have any recollection of that person being paid
7  on a monthly basis by your team?
8      A   No.
9      Q   Do you know who Halcon is?
10     A   I -- I mean, again, an AUC person.  I -- I
11  don't recall anything more specific than that.
12     Q   Do you have any recollection in general that
13  your team was making payments to some AUC people?
14     A   It looks like these documents are also talking
15  about payments that were being made to family members
16  and for security, so it is not clear to me from these
17  documents or otherwise what payments, if any, were going
18  to these witnesses, or the circumstances beyond what
19  you're again showing me.  I don't recall that.
20     Q   Again, I'm moving away from what I'm showing
21  you.  Do you have a recollection that your team was
22  making payments to people in Colombia that were either
23  AUC members or families of AUC members?
24     A   I don't have an independent recollection of
25  that, no.  Again, it's 13 years ago.  This was a very

94

1  long time ago.  I don't.
2      Q   You don't have a recollection at all about the
3  subject of paying witnesses in Colombia?  You solicited
4  a memo on it, right?
5      A   I'm not --
6      Q   Correct?  That's the question?
7      A   Did I --
8      Q   Did you solicit a legal research memorandum --
9      A   Terry asked me to --
10     Q   Let me finish my question.
11     A   I'm sorry.
12     Q   Did you solicit a legal memorandum on the
13  ethics of paying witnesses?
14     A   Terry asked me to have an intern obtain a legal
15  memor -- or do some legal research.  I presume that I
16  did that because we see that there was, in fact, a memo
17  that was done.  I'm just simply saying that this has
18  been eight or more years of litigation in which payments
19  have been discussed.  You are sitting there with the
20  benefit of many, many documents.  I do not recall,
21  looking back, knowing what my understanding was of
22  payments that were being made.  Not -- I acknowledge I'm
23  on emails, but I -- I just don't have that recollection.
24  That is not what I was dealing with in the litigation.
25  I was focused on other aspects of the litigation.

95

1      Q   I'm just asking you sitting here today.  I'm
2  not asking about the particulars.  I'm just asking about
3  the broad subject of paying witnesses or their family
4  members.  Do you have a recollection that that was done
5  in the case?
6      A   In the course of the litigation, in the course
7  of the defamation suit, it obviously became apparent
8  that payments had been made.  So at some point, I became
9  aware, but I'm not -- I'm not really sure what you're
10  asking me in terms of when exactly I have that
11  awareness.  Again, I don't know that I can add more to
12  my answers than what I've already given you.
13     Q   I'm -- I'm asking you specifically sitting here
14  today, do you have a recollection that witnesses were
15  paid?
16         MS. LOCKWOOD: Objection.  Asked and answered.
17     A   I -- my answer is not -- is not changing.  I
18  can see that witnesses or family members for security
19  payments or otherwise were paid, and I'm not disputing
20  that.  Do I recall back in that time period?  I just
21  don't recall what I knew at what point in that time
22  period.  I don't know how else to answer this.
23     Q   I'm just asking if you -- if you were walking
24  on the street and somebody said, Hey, Christian, did any
25  witnesses or their family members get paid in Balcero,

96

1  your answer would be I don't recall?
2      A   No, that's a different question.  I've --
3      Q   That's the question I'm trying to ask you.
4      A   Okay.  I'm seeing the documents, and there has
5  been litigation, and clearly, payments of various kinds
6  were made.  So if you're asking me do I -- do I
7  understand today?  Yes, I understand today that there
8  were payments.  Do you want to say recall?  I mean, I --
9  I guess I recall from looking at the documents through
10  the litigation and looking back that that was the case.
11  I don't know what else I can say about that.
12     Q   And I guess you don't recall any sort of
13  sleepless nights you were having because you were
14  receiving all these emails about paying witnesses in
15  Colombia?
16     A   I don't think that's a fair question.
17     Q   That is the question on the table.
18     A   It is a question but I -- I don't know what I
19  was thinking back 13 years ago as this was happening.
20  Clearly, there are emails, and at the time, I would
21  imagine at some point I had an understanding and was
22  thinking about these issues.  That's all I can say.  I
23  don't -- it just I don't recall 13 years ago where --
24  what was happening at what point.
25     Q   The only time in your career where payments

97

1  were made to fact witnesses, true?
2      **A  Yes.**
3      Q  Number 4, Monthly Charris wire, $870.
4          You have no recollection of that either; is
5  that your testimony?
6      **A  That's right.**
7      Q  Well, based on at least what we've seen so far
8  today, your team was sending monthly payments to the
9  lead plaintiff in the Balcero case, correct?
10     **A  Based on what we've seen today.**
11     Q  El Tigre and Samario, correct?
12     **A  Yes.**
13     Q  Halcon, correct, and Charris, correct?
14     **A  Yes.**
15     Q  And there have been discussions about making a
16  more than $100,000 payment to Jamie Blanco, correct?
17     **A  Yes.**
18     Q  But other than seeing the documents, you have
19  no independent recollection of any of that?
20         MS. LOCKWOOD: Objection.  Asked and answered
21  several times now.
22     Q  Is that true?
23     **A  Yes.  You -- you've taken these documents, and**
24  **you've presented them all at the same time.  During this**
25  **time period, it's over months, we're dealing with**

98

1  **multiple litigation issues, this is not -- it's not that**
2  **we're siting there constantly being bombarded by emails**
3  **related to the payments.  So this is just it's not an**
4  **accurate representation of the volume of what we were**
5  **dealing with in litigation and who was focusing on -- on**
6  **what.  And it's been 13 years.  I just I don't have**
7  **anything else to add in terms of my recollection.**
8      Q  Which is you don't have one?
9          MS. LOCKWOOD: Objection.
10     **A  I've already answered.**
11         MS. LOCKWOOD: Asked and answered.  Let's move
12  on.
13         MR. WELLS:Let's go to tab 24.
14         THE TECHNICIAN: Stand by.
15         MR. WELLS: That is Exhibit 19.
16     **A  Thank you.**
17         (Levesque Exhibit 19, Tab 24, 8/2011 email,
18  was marked for identification and is attached to the
19  transcript.)
20     Q  Exhibit 19 is another August 2011 email from
21  Mr. Collingsworth to Lorraine Leete, Susana Tellez, and
22  you, correct?
23     **A  Right.**
24     Q  Down at the bottom, you see the number, 2?
25     **A  Yes.**

99

1      Q  It says, JBM is getting impatient because -- or
2  since we initially told the brothers would likely make
3  the funding the week of August 8th. He is not working
4  on his declaration until he gets this funding.
5          Did I read that correctly?
6      **A  Yes.**
7      Q  So you're being told here that Jamie Blanco
8  will not work on his declaration until he gets money,
9  true?
10     **A  It looks that way here.**
11     Q  And you have no recollection that that was the
12  case; is that true?
13     **A  That is true.  I don't.**
14     Q  Does it concern you just the general concept
15  that a witness will not work on his testimony without
16  being paid?  Is that a concerning situation to you?
17     **A  Yes.**
18     Q  Did you do anything about it?
19     **A  I don't recall one way or the other.**
20     Q  Did you ever raise an objection?
21         MS. LOCKWOOD: Objection.  Vague.
22     **A  Again, I -- I don't recall one way or the**
23  **other.  I don't even recall -- I mean, I don't recall**
24  **the email.  I'm on the email.  I just I don't -- this is**
25  **not -- this is not what I was focusing on in that**

100

1  **litigation.**
2      Q  Do you know whether it is ethical to pay a
3  witness who is refusing to testify unless they are paid?
4      **A  You cannot pay a witness for testimony.**
5      Q  Can you pay a witness to get them to testify?
6      **A  No.**
7      Q  And in this email, the funding is supposedly
8  coming from quote, The brothers, unquote.  Do you know
9  what that referred to?
10     **A  So I don't know what that referred to.  You**
11  **showed me other documents today that referenced the van**
12  **Bilderbeeks, who were brothers.  So but beyond that, I**
13  **don't know what that's referring to.**
14     Q  Did you all make a concerted effort to speak in
15  code when you were talking about witness payments?
16         MS. LOCKWOOD: Object to the form.
17     **A  No.**
18     Q  Any reason not to use the van Bilderbeeks'
19  names when you're talking about witness payments?
20     **A  I have no idea.**
21     Q  In the email above the redacted portion, the
22  last couple sentences, Mr. Collingsworth is saying,
23  Please tell Jamie Blanco to chill out.  We're on the
24  same team, and the only other team just tried to screw
25  him with Tolemaida's declaration.  I will keep the

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

101

1  promise, but I can't control the timing.
2      Did I read that correctly?
3      **A  Yes.**
4      Q  So you are being told in this email that Mr.
5  Collingsworth had made a promise to Jaime Blanco, are
6  you not?
7      MS. LOCKWOOD: Objection. Misstates the
8  document.
9      **A  I mean, it says, I will keep the promise. I'm**
10 **-- I'm reading that there.**
11     Q  What's the promise?
12     **A  I don't know what the promise is.**
13     Q  Do you know of anything it could be other than
14 we will pay the hundred somewhat thousand dollars you've
15 asked for?
16     MS. LOCKWOOD: Objection. Calls for
17 speculation.
18     **A  No, I don't know one way or the other what the**
19 **promise is that's being referenced here.**
20     Q  Weren't you heavily involved in discovery
21 responses in Balcero?
22     **A  I was involved in discovery responses as it**
23 **related to the plaintiffs.**
24     Q  And whether to disclose benefits provided to
25 witnesses? You don't recall that?

---

102

1      **A  So -- so there were discovery requests, and I**
2  **was involved in discovery requests, and responding to**
3  **discovery requests. And there were some discovery**
4  **requests later in the litigation that asked various**
5  **questions, and we answered them, and I answered them to**
6  **the best of my ability, and so I wasn't involved, yes.**
7      Q  In order to accurately and truthfully respond
8  to those discovery requests, you would need to be paying
9  attention to emails like we've been looking at today
10 talking about benefits to witnesses, right?
11     MS. LOCKWOOD: Object to the form.
12     **A  That's not the whole story. I wouldn't be**
13 **answering those interrogatory responses in a vacuum.**
14 **Again, I was a member on a team. I would have consulted**
15 **with my team to answer those interrogatory responses.**
16 **So it's not just a matter of remembering what was in an**
17 **email, and particularly emails in which I am one of**
18 **many. That is not this case, but there were many emails**
19 **you showed me where I'm one of many on those. So --**
20     Q  And we're going to go through, if we have time,
21 probably over a hundred emails where you are being told
22 about witness payments, and is it your testimony that
23 you just did didn't know about that at the time you were
24 responding to discovery?
25     MS. LOCKWOOD: Objection. Lack of foundation.

---

103

1      **A  And that's not what I -- that's no what I said.**
2  **I'm simply saying I -- I'm simply saying I answered**
3  **interrogatory responses or requests to the best of my**
4  **ability based on what I knew or what I recalled and**
5  **based on consultation with the team. That's all I'm**
6  **saying.**
7      Q  In your view, if a witness would not testify
8  without receiving money, is it ethical to pay them that
9  money?
10     MS. LOCKWOOD: Objection. Asked and answered.
11 She can answer it again.
12     MR. COLLINGSWORTH: Calls for speculation.
13     **A  I've already -- I've already testified that you**
14 **cannot pay a witness in order to receive testimony. We**
15 **have also talked about very complicated legal issues as**
16 **it relates to security and other issues, and so I think**
17 **there's nothing more that I can say beyond the fact that**
18 **you cannot pay for in exchange for testimony if that**
19 **way.**
20     Q  Can you tell the jury anything about any
21 security issues that Jamie Blanco had?
22     **A  I can only say from what I've seen in the**
23 **documents today that there were security concerns that**
24 **were raised. I don't know beyond that. Again, I was**
25 **not liaising with him or deal ing with him. I don't**

---

104

1  have anything else to add in that regard.
2      Q  So your testimony is you don't know, and didn't
3  know then, whether Jamie Blanco had any security issues
4  at all?
5      MS. LOCKWOOD: Objection. Asked and answered
6  earlier.
7      **A  Yeah, I -- I don't know beyond what I've seen**
8  **today.**
9      Q  Down here at the bottom after Mr. Collingsworth
10 says that, Blanco has stopped working on his declaration
11 until he gets the funding. He's saying, I'm on the
12 phone to Albert every day hearing new intricacies of his
13 financial situation including today. He's waiting for
14 some banker to sign off on his deal. Sorry to use an
15 old saying, but it is what it is. I can't get an ulcer
16 over this. I'm doing all I can, and I'm certain the
17 funds are coming. Timing is unclear. Today he said
18 Monday, August 29the. Let's see. If Jamie Blanco wants
19 to stop working until we have it in hand, so be it.
20     Did I read that correctly?
21     **A  Yes.**
22     Q  And then, I'm reading this correctly that
23 Albert van Bilderbeek is being sourced or asked for
24 funds to make a payment to Jamie Blanco?
25     MS. LOCKWOOD: Objection. Misstates the

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

105

1  document.
2  **A I can't say any more than what's in this**
3  **document right here.**
4  MR. WELLS: Let's go to tab 27.
5  THE TECHNICIAN: Please stand by.
6  Tab 27 will be marked as Exhibit 20.
7  (Levesque Exhibit 20, Tab 27, 11/2011 email,
8  was marked for identification and is attached to the
9  transcript.)
10  Q  This is Exhibit 20.  This is September 7th of
11  2011, Lorraine Leete, to you, Mr. Collingsworth, and
12  Susana Tellez, correct?
13  **A Yes.**
14  Q  Saying, Hey, Terry, I'm sorry to add to your
15  headache.  I just got a call from Jamie Blanco who said
16  he's very worried about this promise to him a month ago
17  that hasn't been met.
18  Did I read that correctly?
19  **A Yes.**
20  Q  Do you know of any promise made to Jamie Blanco
21  by your team?
22  **A No.  Again, not beyond the documents that**
23  **you're showing me, I -- I don't.**
24  Q  And the only documents we've seen relating to
25  anything offered to Jamie Blanco was payment of his

106

1  criminal legal fees, correct?
2  **A I believe so.**
3  Q  And the second paragraph says, I know you're
4  working on this and talking to the brothers every day.
5  Did I read that correctly?
6  **A Yes.**
7  Q  Last sentence, Ivan also said neither the PWA
8  funds or the fees from the brothers have come through as
9  of this afternoon.
10  Did I read that correctly?
11  **A Yes.**
12  Q  And your surmise is that the brothers refers to
13  the brothers van Bilderbeek, correct?
14  **A It might be.**
15  Q  Well, reading up in the email, Mr.
16  Collingsworth says, I expect to hear from Albert in the
17  morning.  Does that help you out?
18  **A Yeah, I mean, it could be.  I've already**
19  **indicated the brothers could be them, so --**
20  MR. WELLS:All right.  Let's go to tab 26.
21  THE TECHNICIAN: Please stand by.  Tab 26 will
22  be marked Exhibit 21.
23  MR. WELLS: This is Exhibit 21.
24  (Levesque Exhibit 21, Tab 26, 9/2011 emails,
25  was marked for identification and is attached to the

107

1  transcript.)
2  Q  This is a couple of September 2011 emails on
3  which you are included, correct?
4  **A That's right.**
5  Q  And the bottom email on this first page,
6  Lorraine Leete is telling you and others, second-to-last
7  sentence, I had a missed call from Jamie Blanco this
8  morning, but I told Ivan to call him back as I think
9  it's better if Jamie Blanco doesn't have conversations
10  about the deal with the brothers with us, and this seems
11  to be the only thing on his mind.
12  Did I read that correctly?
13  **A Yes.**
14  Q  Did you have any concerns about directly
15  discussing with Jamie Blanco this deal to pay his
16  criminal legal fees?
17  **A I just don't -- I don't know what concerns I**
18  **had back in the -- that time.  I don't -- I don't recall**
19  **receiving this email.  I'm not -- I acknowledge I'm on**
20  **the email, but I don't -- I don't recall.**
21  Q  And seeing this all today, is it concerning to
22  you at all that this situation was happening?
23  MS. LOCKWOOD: Object to the form.
24  **A Yes, I mean, I'm -- yes.**
25  Q  And Mr. Collingsworth responds, Call Jaime back

108

1  and say please we're a hundred percent sure.  The funds
2  have to come from Amsterdam, and they've driving me
3  crazy looking at three different funding options.  This
4  will happen.  I'm honored every single day.  I'm
5  speaking to Albert this afternoon.
6  Did I read that correctly?
7  **A Yes.**
8  Q  And do you know of any other Albert than Albert
9  van Bilderbeek that that could be referring to?
10  **A No.**
11  MR. WELLS:  Let's go to tab 28.
12  THE TECHNICIAN: Stand by.  Tab 28 will be
13  marked as Exhibit 22.
14  (Levesque Exhibit 22, Tab 28, 9/2011 email,
15  was marked for identification and is attached to the
16  transcript.)
17  Q  This is Exhibit 22.  It's a September 8th of
18  2011, which is literally days after the last couple
19  emails we just looked at, right?
20  **A Yes.**
21  Q  And just you and Mr. Collingsworth are on this
22  email, right?
23  **A Yes.**
24  Q  And this is you writing the email, correct?
25  **A Uh-hum.**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

28 (109 to 112)

109

1    Q   Is that a yes?
2    A   Yes, I'm sorry.
3    Q   You're telling Mr. Collingsworth, Attached are
4  discovery responses to Drummond. These are short. Need
5  to fill in a little information in response to the
6  Interrogatories regarding attorney-client relationship
7  with the brothers and Garcia.
8    A   Yes.
9    Q   We can go to 927. And there's an interrogatory
10  requesting a description of the relationship between
11  Albert van Bilderbeek, Llanos Oil, and the plaintiffs or
12  their attorneys, right?
13    A   Yes. Number 1, yes.
14    Q   And after the objections, the response is,
15  Plaintiffs respond that Terrence Collingsworth has an
16  attorney-client relationship with Hendrik van Bilderbeek
17  and Albert van Bilderbeek as well as Llanos Oil. The
18  attorney-client relationship began for the purpose of
19  seeking legal advice concerning -- blank -- which is
20  unrelated to the present litigation.
21        And there is no disclosure here that just days
22  before this, you all are discussing with Albert van
23  Bilderbeek paying a witness in your case, right?
24        MS. LOCKWOOD: Objection, to the extent it
25  mischaracterizes this draft document.

110

1    A   Yeah, there -- there's not, but here it seems
2  like this is asking specifically about an
3  attorney-client relationship between Terry and those
4  individuals. So I'm -- it's not clear to me that that's
5  even responsive to the question that you -- or the link
6  that you're making, but --
7    Q   Well, let me ask you, when you're writing out
8  these discovery responses, did you have any discussions
9  with anybody about, Hey, we ought to disclose the fact
10  that Albert van Bilderbeek is looking for funds to pay
11  Jamie Blanco?
12        MS. LOCKWOOD: Objection. Lack of foundation as
13  to who wrote the document.
14        MR. COLLINGSWORTH: Calls for speculation.
15    A   Yeah, I -- and I also I -- I don't -- I don't
16  recall what discussions we had. Yeah, I don't -- I
17  don't recall if any. I mean, I just I --
18    Q   Did you ever --
19    A   -- it's going back 13 years.
20    Q   Did you ever raise your hand and say, Hey,
21  team, we need to disclose this to our adversary just
22  like Piper Hendricks' memo said we should?
23        MS. LOCKWOOD: Object to the form.
24    Q   Did you ever say that or anything to that
25  effect to your team?

111

1    A   I -- I -- I don't recall. I -- and again, this
2  seems to be asking specifically for representation. I
3  -- I think I was doing the best I could do to answer the
4  question -- to answer the question.
5    Q   Well, without even a discovery request, the
6  only ethics memo you had seen said one of the steps you
7  need to take is to disclose your intentions to your
8  adversary. Did you ever have any discussions with
9  anybody about, Hey, we need to just come out front and
10  disclose to the court and Drummond that we're making
11  these payments?
12        MS. LOCKWOOD: Objection to the form?
13    A   I don't recall discussions of that sort.
14    Q   I'm not trying to be cute or offensive with
15  this question, but just so we can make sure our record
16  is clear and no objections could be made on this basis,
17  do you have any condition that impacts your memory?
18    A   No.
19    Q   Are you under any medication today that would
20  prohibit you or impair your ability to answer my
21  questions truthfully?
22    A   No.
23        MR. WELLS: We can go ahead and take our lunch
24  break.
25        THE VIDEOGRAPHER: We're going off the record at

112

1  11:52 a.m. Eastern Time.
2        (Lunch was taken.)
3        THE VIDEOGRAPHER: We're going back on the
4  record at 12:49 p.m. Eastern Time.
5  BY MR. WELLS:
6    Q   All right, Ms. Levesque, I'm going to show you
7  two documents. One is marked Exhibit 23, and the next
8  is Exhibit 24.
9        MR. WELLS: So first, for our Exhibit
10  Coordinator, 23 is tab 29 and 24 is tab 41.
11        (Levesque Exhibit 23, Tab 29, 9/2011 email, was
12  marked for identification and is attached to the
13  transcript.)
14        (Levesque Exhibit 24, Tab 41, 9/2011 email, was
15  marked for identification and is attached to the
16  transcript.)
17    Q   So the first thing first, Ms. Levesque, 23 and
18  24 are a day apart, right?
19    A   Yep, looks to be.
20    Q   Both in September of 2011, correct?
21    A   Correct.
22    Q   Looking at Exhibit 23, the bottom email from
23  Mr. Collingsworth -- well, let's just identify who's on
24  this. This is email conversation between Lorraine
25  Leete, Terry Collingsworth, Susana Tellez, and you,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

113

1  correct?
2  **A  Yep, I'm cc'd on it.**
3     Q  And Mr. Collingsworth, on the bottom email,
4  says, Sorry to add to the pile, but can you please draft
5  a quick invoice for the documents work -- I assume
6  that's Ivan Otero did on the declaration including hours
7  and travel time in meeting with us. We need to get PWA
8  an invoice to justify the 25,000. Don't take it too
9  seriously, but have enough hours to get to 25,000.
10    Did I read that correctly?
11 **A  Yes.**
12    Q  And Ms. Leete responds, Attaching a draft
13 timesheet. And she says, If we pay him $150 an hour,
14 that will equal 125 -- or excuse me, $25,000, correct?
15 **A  Yep.**
16    Q  And then, the last sentence of her email says,
17 If you think PWA wants to pay him a lower rate, let me
18 know and I can add more in -- in -- I can add in more
19 time for travel time and meetings with us. Did I read
20 that correctly?
21 **A  Yes.**
22    Q  In other words, Ms. Leete is saying if the rate
23 gets reduced, I can just bump up the time and we'll
24 still get $25,000, right?
25 **A  I guess that's what she's saying from here.**

114

1     Q  Let's go to Exhibit 24, the next day. This is
2  Mr. Collingsworth writing to you, Lorraine Leete, Susana
3  Tellez -- well, just the three of you, correct?
4  **A  Yep, I'm cc'd.**
5     Q  And number 1, Mr. Collingsworth says, Lorraine,
6  I just signed all kinds of bizarre documents with Albert
7  to confirm a finance plan. He says the 60,000 will be
8  wired Monday, September 12th. I also now expect that we
9  will get 25,000 from PWA about that same time. My plan
10 is that that the 25,000 can be used for Ivan's new
11 security to buy three computers for the guys, and then,
12 when we see what is left, we will hold that for a
13 bizarre things can happen fund. When we get the
14 declaration from Jamie Blanco, Ivan will receive the
15 rest of his fees, $50,000.
16    Did I read that correctly?
17 **A  Yep.**
18    Q  Now, with respect to the $25,000 from Parker
19 Waichman, Mr. Collingsworth is saying here that is not
20 to compensate him for attorneys fees; that is for
21 security to buy computers and a bizarre things that can
22 happen fund, right?
23 **A  It looks like that's what he's saying here.**
24    Q  Is extracting money from someone under false
25 pretenses considered fraud?

115

1     MS. LOCKWOOD: Objection. Calls for
2  speculation.
3  **A  So it -- it can be. I'm not clear what's**
4  **happening here, though, to the extent you're asking me**
5  **about what's happening here, but --**
6     Q  Right, I'm asking you, who was copied on the
7  emails. I was not, so I'm trying to figure out what you
8  know about it. And I guess your answer is you don't
9  recall this?
10 **A  I don't -- I don't know what's happening in**
11 **this -- in this email, and no, I -- I don't recall this**
12 **email.**
13    Q  Are you familiar with the concept of willful
14 ignorance?
15 **A  Yes.**
16    Q  Where someone charged with a crime tries to
17 defend themselves by saying they didn't know, but
18 really, they were just burying their head in the sand?
19    MS. LOCKWOOD: Objection. Argumentative.
20    Q  Is that basically the concept?
21 **A  I think that's part of the concept.**
22    Q  In terms of you deferring to others about all
23 these witness payment emails you're getting, and sounds
24 like not really paying a lot of attention to it, were
25 you just burying your head in the sand?

116

1  **A  No, I was not burying my head in the sand.**
2  **Again, this is not the area that I was focused on, and**
3  **I'm just simply saying I just don't recall what is**
4  **happening in this email.**
5     Q  Back to the reference to signing all kinds of
6  bizarre documents with Albert to confirm a finance plan,
7  and an initial $60,000 payment, what do you recall about
8  that?
9  **A  I don't know what that's in reference to.**
10    Q  You don't remember witnessing a number of
11 documents in which Mr. Collingsworth took out a loan in
12 order to get the funds to pay Jamie Blanco?
13 **A  So I don't -- I don't recall witnessing a**
14 **number of documents. I have more recently seen a**
15 **document that I witnessed. I don't know what the**
16 **purpose of that document was. And I think it might fall**
17 **within -- I -- I just -- you may be referencing that**
18 **document. I don't know. But just to be clear on that.**
19    Q  All right.
20    MR. WELLS: Well, let's go to tab 32. Is that
21 Exhibit 25?
22    MS. LOCKWOOD: Can she put these aside?
23    MR. WELLS: Yes, she can.
24    (Levesque Exhibit 25, Tab 32, 9/2011 Loan
25 Agreement, was marked for identification and is attached

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

117

1  to the transcript.)
2     Q  So Exhibit 25 is a Loan Agreement, dated
3  September 9th, 2011, between Terry Collingsworth and
4  Nicox BV, right?
5     **A  Yes.**
6     Q  And the last page of that exhibit --
7     **A  Last page, uh-hum.  Yes.**
8     Q  -- is that your signature as the witness?
9     **A  Yes.**
10    Q  And if we go to the second page, the Loan, do
11 you see Nicox BV is loaning $1.5 million to Mr.
12 Collingsworth?
13    **A  I do see that.**
14    Q  And number 5, the Security for the loan is Mr.
15 Collingsworth's contingency fees in the Drummond case
16 and the Chiquita case, correct?
17    **A  I see that, yep.**
18    Q  Turning back to the last page, Nicox BV, it
19 looks like, is going to be signed on behalf of by
20 Herman De Leeuw.  Do you see that?
21    **A  I do.**
22    Q  Who is that?
23    **A  I don't know.**
24    Q  What is Nicox BV?
25    **A  I also don't know.**

118

1     Q  Why is Mr. Collingsworth getting a
2  million-and-a-half dollar loan from Nicox BV that you
3  were witnessing?
4     **A  I don't know.**
5        MR. WELLS: Let's go to tab 40.  This is Exhibit
6  26.
7        (Levesque Exhibit 26, Tab 40, 9/2011 Loan
8  Agreement, was marked for identification and is attached
9  to the transcript.)
10    Q  This is another Loan Agreement, dated the same
11 date, except this one is between Albert van Bilderbeek
12 and Terry Collingsworth, correct?
13    **A  Yes.**
14    Q  On the last page, you signed as the witness,
15 correct?
16    **A  I did.**
17    Q  And number 1 on the second page, Mr.
18 Collingsworth is loaning Albert van Bilderbeek $750,000,
19 correct?
20    **A  Yes.**
21    Q  And number 5, the security shows that the loan
22 is secured by, Expected proceeds from the Llanos Oil/van
23 Bilderbeek claim.  Do you see that?
24    **A  I do.**
25    Q  Do you know what that is in reference to?

119

1     **A  I don't -- I don't know what that's in**
2  **reference to.**
3     Q  You do know that Llanos Oil had a claim
4  alleging that Drummond stole their oil rights, correct?
5     **A  I do.**
6     Q  Do you know of any other claim that Llanos Oil
7  had that could have secured this loan?
8     **A  No, I don't.**
9        MR. WELLS: Let's go to tab 30, which is Exhibit
10 27.
11       (Levesque Exhibit 27, Tab 30, Cooperation
12 Agreement, was marked for identification and is attached
13 to the transcript.)
14    Q  This is a Cooperation Agreement, also dated
15 September 9th, 2011, between Albert van Bilderbeek and
16 Terry Collingsworth, correct?
17    **A  Yes.**
18    Q  And if we look at the signature pages, you
19 signed that as the witness as well, correct?
20    **A  That's correct.**
21    Q  Number 1, The agreement between Albert van
22 Bilderbeek and Terry Collingsworth is intended to
23 supplement the loan agreement between the two, which is
24 what we just looked at, right?
25    **A  Appears to be.**

120

1     Q  And the September 9th, 2011 Cooperation
2  Agreement between van Bilderbeek and James Ellwood.  Who
3  is James Ellwood?
4     **A  I -- can you just tell me where you're looking**
5  **-- oh --**
6     Q  We are still --
7     **A  -- paragraph 2?**
8     Q  We're still on number 1.
9     **A  Oh, number 1.  Yeah, I don't -- I don't know**
10 **who James Ellwood is.**
11    Q  Number 3, looks like we've got some original
12 language that has been altered by -- scratched out and
13 replaced by pen written language, right?
14    **A  Right.**
15    Q  Van Bilderbeek will wire on behalf of Terry
16 Collingsworth, funded by Terry Collingsworth, to Ivan
17 Otero $60,000 to the following account.  And then, it
18 provides account information, correct?
19    **A  Correct.**
20    Q  And then, number 4, In approximately 45 days
21 when the work completed for Ivan Otero -- work
22 contemplated for Ivan Otero is completed, van Bilderbeek
23 will wire him $50,000.  Correct?
24    **A  That's right.**
25    Q  So we've got a million-and-a-half dollar loan

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

121

1  from Nicox BV, whatever that is, correct?
2  **A  Right.**
3  Q  Mr. Collingsworth then loans $750,000 to Albert
4  van Bilderbeek, correct?
5  **A  Correct.**
6  Q  And then, agrees that Mr. Van Bilderbeek will
7  pay on behalf of Mr. Collingsworth $60,000 to Ivan
8  Otero, and then, approximately 45 days later $50,000 to
9  Ivan Otero, correct?
10  **A  Yes.**
11  Q  And do you know that that money was for the
12  purpose of paying Jamie Blanco?
13  **A  No.**
14  Q  Did you ask any questions while you were being
15  asked to sign all these documents?
16  **A  I don't -- I don't know if I asked any**
17  **questions.**
18  Q  I mean this --
19  **A  I'm not --**
20  Q  Go ahead.
21  **A  No, no, I just -- yeah, I don't remember these**
22  **documents with the exception of one of the three that I**
23  **had more recently seen.**
24  Q  I mean, so far, we've got a one-and-a-half
25  million dollar loan being taken out and secured by the

122

1  contingency fees that you all have in the Drummond
2  Chiquita cases, right?
3  **A  Appears that way.**
4  Q  Cases on which you were working, correct?
5  Drummond, at least?
6  **A  Correct.**
7  Q  And you didn't ask Mr. Collingsworth, What is
8  this all about?  Why are you promising away some of our
9  contingency fees?
10  **A  I -- don't -- I don't know if I asked him about**
11  **that.  I'm just saying again I -- I don't -- I don't**
12  **remember that.**
13  MR. WELLS:Let's go to tab 36.
14  **A  Did you -- sorry.**
15  Q  This is Exhibit 28.
16  (Levesque Exhibit 28, Tab 36, 9/2011
17  Cooperation Agreement, was marked for identification and
18  is attached to the transcript.)
19  Q  So this is another Cooperation Agreement, also
20  September 9th, 2011, but this one between Terry
21  Collingsworth and James Ellwood, correct?
22  **A  Yes.**
23  Q  Mr. Ellwood is referenced to be of the Old
24  Courthouse, Athol Street, Douglas, Isle of Man
25  Solicitor.  Right?

123

1  **A  Yep.**
2  Q  Services, During the term of this agreement,
3  Ellwood has and will provide Collingsworth with
4  logistical support, suitable contacts, and information
5  so as to assist Collingsworth in the pursuance of the
6  following litigation claims.
7  And then, it lists the Drummond case and
8  Chiquita case, right?
9  **A  Correct.**
10  Q  And you don't have any idea what this person
11  was doing on a case that you were working on?
12  **A  I -- I don't.  Again, I wasn't involved in that**
13  **part of the litigation, no.**
14  Q  Well, when you were seeing these documents, you
15  looked at them before you signed them, correct?
16  THE TECHNICIAN: I hope you guys did not start.
17  I can see you guys keep on talking, but you're on mute.
18  THE WITNESS: Oh.  Want me to hit unmute?
19  MR. WELLS: Yes.
20  THE WITNESS: Can you hear us?
21  THE TECHNICIAN: Yes, I can hear you.  Did you
22  guys start?
23  MR. WELLS: Yes.  We'll fill you in later.
24  THE TECHNICIAN: Okay.  We have counsel taking
25  their lunches.  I don't think they could hear it.

124

1  MR. WELLS: To summarize, we have gone through a
2  Loan Agreement where Nicox BV loaned Mr. Collingsworth
3  $1.5 million; on the same day, Mr. Collingsworth loaned
4  $750,000 to Albert van Bilderbeek; and they also entered
5  into agreement where Albert van Bilderbeek would use
6  some of that money to pay $60,000 to Ivan Otero, and
7  then, another $50,000 to Ivan Otero.  And she doesn't,
8  remember any of that.
9  THE TECHNICIAN: Okay.
10  MS. LOCKWOOD: Do -- well, I assume folks will
11  have access to the transcript.
12  MR. WELLS: Yes.
13  MS. LOCKWOOD: But do folks on the line need to
14  know what exhibits have been entered?  Do they have that
15  in whatever system they're looking at?
16  MR. WELLS: Yes.  So the exhibits that have been
17  shown thus far -- so we've been on mute this whole time?
18  THE WITNESS: I guess so.  I didn't realize.
19  MS. LOCKWOOD: I don't think we hit anything.
20  THE WITNESS: No, I -- no, I mean.
21  MR. WELLS: Okay.  Exhibit Coordinator, I don't
22  know if you can send this like in a chat feature I guess
23  just so people can be reviewing these.
24  THE TECHNICIAN: Yes, absolutely.  As soon as
25  you can, let me know which exhibits were marked.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

125

1       MR. WELLS: All right. Let's do that. It's tab
2   29 --
3       THE TECHNICIAN: All right. Tab 29 will be
4   marked as Exhibit 23.
5       MR. WELLS: Tab 41.
6       THE TECHNICIAN: Tab 29, tab 41.
7       MR. WELLS: Let's go off the record while we
8   handle all this.
9       THE VIDEOGRAPHER: We're going off the record at
10  1:06 p.m. Eastern Time.
11      (A brief recess was taken.)
12      THE VIDEOGRAPHER: We're going back on the
13  record at 1:08 p.m. Eastern Time.
14  BY MR. WELLS:
15   Q   Ms. Levesque, we were talking about Exhibit 28,
16  which was the Cooperation Agreement between Mr.
17  Collingsworth and someone named James Ellwood, who
18  appears to be a lawyer in the Isle of Man. Right?
19   **A   Yeah. Yes.**
20   Q   And you witnessed this document as well,
21  correct?
22   **A   Yes, I witnessed the signature, yeah.**
23   Q   And the question is don't you think it's likely
24  that you reviewed the documents before placing your
25  signature on them?

126

1    **A   I just don't recall what the process was. I**
2   **clearly have signed this as a witness. I -- I -- I may**
3   **very well have read through it. I -- I just -- I really**
4   **just don't recall. And it's been 12 -- 12 years.**
5    Q   Do you recall just in general that Mr.
6   Collingsworth got a $1.5 million loan during the course
7   of the Drummond case secured by Drummond fees?
8    **A   No, not until seeing these documents, I would**
9   **not have recalled that without seeing these documents.**
10   Q   While the Balcero discovery was ongoing, and
11  you all were responding to discovery requests relating
12  both to Albert van Bilderbeek and to the general subject
13  of witness payments, did --
14   **A   I'm sorry, was there -- is there a question?**
15   Q   That was the preface to the question.
16   **A   Okay.**
17   Q   Did you not have these documents available to
18  you?
19   **A   I -- I don't know. I mean, this is a long time**
20  **ago and over the course of a period of litigation, so**
21  **where there are multiple requests, discovery requests,**
22  **and then, these documents that you're showing me on**
23  **September 9th of 2011. So I'm -- I'm just I'm not clear**
24  **on the -- on the sequencing there and what I had**
25  **available to me.**

127

1    Q   So I'll represent to you that there was never
2   any disclosure until about a week ago, or two weeks ago,
3   that Albert van Bilderbeek and Mr. Collingsworth entered
4   into a loan agreement to pay the $60,000 that went to
5   Jamie Blanco. Accepting that as true, do you have any
6   explanation?
7    **A   No, I have no information about whether or why**
8   **that's the case.**
9        MR. WELLS: Let's go to tab 37. This is Exhibit
10  29.
11      (Levesque Exhibit 29, Tab 37, 9/2011
12  Cooperation Agreement, was marked for identification and
13  is attached to the transcript.)
14   Q   This is a Cooperation Agreement, September 8th,
15  2011, between James Ellwood and Paul Akkermans of the
16  Netherlands, right?
17   **A   Yes.**
18   Q   Which you witnessed as well, correct?
19   **A   I -- I'm not seeing a witness signature, and I**
20  **don't recall this.**
21   Q   Oh, yeah, because you wouldn't have been with
22  these guys.
23      In any event, do you know who Paul Akkermans
24  is?
25   **A   No.**

128

1    Q   Do you have any idea what he was doing in
2   connection to the Drummond case or the Chiquita case
3   that's referenced in the services part of this
4   agreement?
5    **A   No.**
6    Q   And under Fees and Payment, BA, it looks like
7   James Ellwood is promising to pay a third of any fees he
8   gets out of Drummond or Chiquita to Paul Akkermans.
9   Right?
10   **A   I guess, so but I mean, the document is what it**
11  **says. Like, I just have nothing to add to this, but --**
12   Q   No recollection whatsoever?
13   **A   No, I don't -- I don't recall ever seeing this**
14  **document.**
15      MR. WELLS: And then, go to tab 38.
16      THE TECHNICIAN: Do you want (inaudible) stops
17  exhibits or not?
18      THE WITNESS: I didn't hear what he said.
19      Oh, 30?
20      MR. WELLS: It's tab 38, Exhibit 30.
21      THE TECHNICIAN: Counsel, would you like me to
22  share the document?
23      MR. WELLS: Yes.
24      THE TECHNICIAN: Thank you.
25      (Levesque Exhibit 30, Tab 38, 9/2011

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

129

1  Cooperation Agreement, was marked for identification and
2  is attached to the transcript.)
3      Q  So this is another September 9, 2011
4  Cooperation Agreement, but this one is between James
5  Ellwood and Nicox BV, right?
6      **A  Appears so, yes.**
7      Q  Do you have any explanation for what is going
8  on in this transaction?
9      **A  No, and I don't see my signature on this**
10  **document either.**
11      Q  Have you ever met with Albert van Bilderbeek?
12      **A  I don't think I have ever met him.**
13      Q  Have you ever spoken to him?
14      **A  I don't believe so.**
15      Q  The witnessing of the documents that you did
16  witness, would that have been in D.C., or do you think
17  you traveled to the Netherlands for that?
18      **A  Oh, I -- I did not travel to the Netherlands**
19  **for sure.**
20      MR. WELLS: Let's go to tab 43.
21      MS. LOCKWOOD: Is that the witness' copy?
22      MR. WELLS: Yeah.
23      MS. LOCKWOOD: Okay.
24      MR. WELLS: Yeah, just looking here.  We're
25  going to hold that for a second.

---

130

1      (Levesque Exhibit 31, Tab 43, 9/2011 email, was
2  marked for identification and is attached to the
3  transcript.)
4      MR. WELLS: Let's go to tab 45, which will be
5  Exhibit 32.
6      THE WITNESS: Did this get marked as 31?
7      MR. WELLS: Yes.
8      THE WITNESS: Okay.
9      (Levesque Exhibit 32, Tab 45, 9/2011 email,
10  was marked for identification and is attached to the
11  transcript.)
12      Q  So this is a September 12th, 2011 from Terry
13  Collingsworth to Susana Tellez, you, and Lorraine Leete,
14  correct?
15      **A  Yes, I'm cc'd, yeah.**
16      Q  And he's saying that, Albert confirmed that he
17  received his funds, and will wire today to Ivan.  Might
18  take a day or so to clear, but this is definite now.
19      Did I read that correctly?
20      **A  Yes.**
21      Q  So do you have any explanation for why Mr.
22  Collingsworth took a loan, loaned money to Albert van
23  Bilderbeek so that he could then send money to Jamie
24  Blanco?
25      MS. LOCKWOOD: Objection.  Calls for

---

131

1  speculation.
2      **A  So no, I don't.**
3      Q  Do you know that that's what's going on here?
4      **A  I don't.**
5      Q  Did you just not ask any questions when you
6  were getting all these things and signing bizarre Isle
7  of Man documents as to, What is really going on here,
8  Terry?
9      MR. COLLINGSWORTH: Objection.  Argumentative.
10  Calls for speculation.
11      **A  Again, I think what's happening is you all have**
12  **spent years in litigation and have pulled documents, and**
13  **pieced together your theory of what's happened.  For me,**
14  **at the time, I was working on the substantive case of**
15  **Balcero during this -- this time period, and I was not**
16  **the person, again, liaising or conducting this part of**
17  **the litigation that you're showing me these documents**
18  **on.  These are also not the only emails I'm getting**
19  **during that time period.  I'm busy doing worker bee work**
20  **for litigation.  So I -- I just I don't recall being**
21  **involved in that way.  I just don't.**
22      Q  So from your viewpoint, it's Mr. Collingsworth
23  that is involved with liaising with witnesses and any
24  payments that may be necessary?
25      **A  I think these documents are clearly indicating**

---

132

1  **that there are emails from him and loan agreements that**
2  **he has signed.  I don't -- I mean, it's that -- that is**
3  **the role that he was playing at that point.  I don't**
4  **know what else to say about that.**
5      Q  Well, and what I'm trying to figure out is
6  there someone other than Mr. Collingsworth I ought to be
7  asking about liaising with witnesses and determining
8  what payments should or should not be made?
9      **A  I don't have any other information about who**
10  **would be making those decisions other than as you see**
11  **documents, if there are people on those documents, they**
12  **may or may not have additional information.  But other**
13  **than that, I don't have separate information about other**
14  **people that he is or was communicating with about that.**
15      Q  We went through earlier the emails stating that
16  Mr. Blanco would not work on his declaration until he
17  received the payment, correct?
18      **A  That's what it appeared on those.**
19      Q  And you say that was concerning to you,
20  correct?
21      **A  I'm saying that as I read that, I -- there is a**
22  **con -- you know, a concern.**
23      Q  Please tell the jury what that concern is.
24      **A  Just that there are -- there is a discussion**
25  **regarding payments, and we know that this is a very**

---

Transcript of Christian Levesque, Esquire

Conducted on September 18, 2023

133

1  complicated area of the law in terms of whether it's for
2  security, whether there are credible security concerns,
3  et cetera, lawyers fees.  We saw a memo, a legal memo,
4  that was written about that.  And so these are things
5  that were being discussed at that time certainly.
6      Q  And the concern would be are we crossing any
7  ethical lines here, right?
8      A  The concern would be are we -- are -- yes, are
9  we doing the right --- the right thing.
10      Are we done with this one?
11  Q  Yes.
12      You said you went into prison to meet Libardo
13  Duarte, correct?
14  A  I did.
15  Q  Just one time or multiple times?
16  A  So I -- I recall one time.  If there is an
17  indication that I went more than once, then so be it.  I
18  just remember one time doing that.
19  Q  And where did you meet?  Was it in his cell, in
20  a patio --
21  A  No, I think it was --
22  Q  -- common area?
23  A  I think it was in his cell.
24  Q  And was it just you or did you have people with
25  you?

134

1      A  I think it was just me.
2      Q  And do you recall anything he discussed with
3  you?
4      A  I don't.  And I don't recall why I was meeting
5  with him on that occasion in particular.  I would
6  imagine it was as part of the discovery process, but I
7  -- that was unique that I was meaning -- meeting with
8  him.
9      Q  Do you recall coming to the conclusion that Mr.
10  Duarte was a liar?
11  A  No, I don't -- no, I don't remember coming to
12  that conclusion.
13  Q  Do you recall coming to the conclusion that he
14  lacked credibility?
15  A  No, I -- I think with all of these -- I think
16  with all of these witnesses, you would view them through
17  a lens of just, you know, being critical in general, as
18  you would with any witness.
19  Q  All right.  Let's go back to Exhibit 31, which
20  is tab 43.
21      And just so the jury understands, Libardo
22  Duarte is a man who claimed to have been a paramilitary
23  but was serving time in Colombian prison, correct?
24  A  Um-um.  Can you say that again.  He claimed to
25  be a paramilitary --

135

1      Q  And was serving time in prison --
2      A  I believe --
3      Q  -- at the time you all communicated with him?
4      A  I believe so, yeah.
5      Q  All right.  This is a September 11, 2011 email
6  involving -- or chain involving you, Mr. Collingsworth,
7  Susana Tellez and Lorraine Leete, correct?
8      A  Yes.
9      Q  And Ms. Leete's email to that group in the
10  middle of page says, Additionally, LD called last night
11  and says he wants to meet with you, Terry.  I told him
12  he can tell me anything he would tell you, but he says
13  he wants to meet with you directly.  He also asked if we
14  were going to take his testimony on September 22nd, and
15  I said not if he had accepted a bribe from Drummond.  On
16  the phone, he said that he had not accepted money from
17  them, and had borrowed money from a friend to pay his
18  fees/debts.  I don't trust that this is true.
19      And your response to that was, God, LD turned
20  out crazier than crazy.  Wonder if he was ever
21  approached by Drummond or if it was all a ploy to get us
22  to pay in the first place.
23      Did I read that correctly?
24  A  Uh-hum.
25  Q  Is that a yes?

136

1      A  Yes.
2      Q  And do you recall doubting Mr. Duarte's claims
3  that he had either been threatened or bribed by anyone
4  in order to get you all to pay him money?
5      A  I -- I don't recall that.  I mean, clearly I'm
6  having some questions here, but I -- I don't recall
7  separately having that particular concern.  It's just
8  again very long time ago.
9      Q  And do you understand as a lawyer that you are
10  ethically prohibited from offering testimony of a
11  witness that you believe not to be telling the truth?
12  A  Yes, and that is not what I believe was
13  happening here, but yes.
14      MR. WELLS: Let's go to tab 44, which is Exhibit
15  what, I'm sorry?
16  A  33.
17  Q  33?
18  A  Uh-hum.
19      (Levesque Exhibit 33, Tab 44, 9/2011 email, was
20  marked for identification and is attached to the
21  transcript.)
22  Q  So this is the same email from Ms. Leete that
23  we just went through talking about Libardo Duarte that
24  you had responded to earlier, but this one has Mr.
25  Collingsworth's response, right?

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

137

1    A  Yes.
2    Q  And Mr. Collingsworth says, If Jamie Blanco
3  lights up, I'll be there when you return to meet him and
4  can see LD briefly.
5       And we can agree LD is Libardo Duarte correct?
6    A  Seems that way.
7    Q  He's scum, but why not if we're there.  Right?
8    A  It says that, yeah.
9    Q  When you met with Libardo Duarte, did you have
10 any impressions that this is not a credible person?
11    A  I just don't recall that assessment one way or
12 the other.  As I said a couple of times, with all of
13 these witness -- witnesses, I think we had, you know, as
14 you would with every witness, a skepticism that is just
15 a general what you would do when you are meeting with
16 individuals who are ex-paramilitaries.  But I don't know
17 that I had that assessment one way or the other that he
18 was particularly a problem or incredible per se.
19    Q  And --
20    A  I just don't remember.
21    Q  -- these paramilitaries you're meeting with, El
22 Tigre, Samario, Libardo Duarte, they were former members
23 of the AUC, correct?
24       MR. COLLINGSWORTH: Object to the form.
25    A  Yeah, and when you say you, I don't -- I don't

138

1  recall meeting with any of those except Duarte -- did I
2  do -- I'm sorry, I'm sorry -- except Duarte.  But yeah,
3  that's my understanding is they were ex-paramilitaries.
4    Q  And the AUC was a U.S. designated terrorist
5  organization, correct?
6    A  Correct.
7    Q  So you're dealing with some pretty shady
8  people, fair?
9    A  I mean, they've done bad things, yeah.
10    Q  I mean, even before you even talk to them, you
11 got to go in with a matter of skepticism, right?
12    A  In general, yes.
13    Q  And then, if you hear they may be lying you, I
14 would imagine that would have increased your skepticism,
15 correct?
16    A  Yes.
17       MR. WELLS: Let's go to tab 45.  Excuse me, just
18 did that one.  Tab 25.
19       (Levesque Exhibit 34, Tab 25, 8/2011 email, was
20 marked for identification and is attached to the
21 transcript.)
22    Q  And this is Exhibit 34.
23    A  Okay.
24    Q  So at the bottom of this email, and this is the
25 subject is LD meeting, so we're still in the Libardo

139

1  Duarte area.
2       At the bottom, it says, LD says that he is
3  prepared to accept this money now after refusing three
4  offers in the past (two offers of 350 million Colombian
5  pesos and 500 million Colombian pesos from Jamie Blanco,
6  and one offer of 250 million from Bocanegra) because now
7  the only thing keeping him in prison is his inability to
8  pay off debts and fees that he owes since he has served
9  all his time.  He says that he -- if he gets 15 million
10 Colombia pesos, he will be able to pay a judge to whom
11 hes owe 8 million Colombia pesos, and cover his other
12 fees.
13       Did I read what I read correctly?
14    A  Yeah.  Yes.
15    Q  And you would agree that has nothing to do with
16 security, what we just read?
17       MS. LOCKWOOD: Objection.  Calls for
18 speculation.
19    A  Yeah, I mean, I'm not -- I'm not sure what
20 exactly this has to do with other than what it says
21 here.
22    Q  And Mr. Collingsworth's response to this in
23 this email chain that you're copied on, is, Wow.  Tell
24 him I want my watch back.
25       Do you see that?

140

1    A  Yes.
2    Q  And so you're being told here Mr. Collingsworth
3  had given Libardo Duarte his watch?
4       MS. LOCKWOOD: Objection.  Calls for
5  speculation.
6    A  I mean, I'm reading the same document you are.
7  I don't know beyond what it says there, what he's
8  referencing.
9    Q  But Ms. Levesque, you're working on this case
10 you're receiving these emails in realtime, you're
11 dealing with these witnesses, you're offering these
12 witnesses in support of your case, you are being asked
13 discovery requests about whether these witnesses had
14 been provided any benefits.  And you can't provide any
15 explanation as to what benefits these witnesses
16 provided; is that correct?
17       MS. LOCKWOOD: Objection.
18       MR. COLLINGSWORTH: Objection to form.
19       MS. LOCKWOOD: Lack of foundation.  Misstates
20 testimony.
21    A  Yeah, I'm just saying that I'm reading the same
22 documents that you are reading now, and I don't have
23 additional information or additional recall of what --
24 of what is happening with this particular witness beyond
25 this.

141

1    Q  Well, in reading these documents, Mr.
2  Collingsworth is saying here you he needs his watch back
3  from Libardo Duarte.  Does that cause you concern?
4    **A  Well, it looks like he gave him -- looks like**
5  **there is a I guess a watch that he gave him if -- I just**
6  **don't know what's going on, I guess is the -- is what**
7  **I'm saying.  I don't know what's going on.**
8    Q  And is that because you've now forgotten or did
9  you know what was going on in realtime?
10   **A  No, I don't -- I don't know beyond what I'm**
11 **seeing in these documents and I'm not -- I don't**
12 **remember what my understanding was or know what my**
13 **understanding was at the time.  Again, you've looked at**
14 **many documents over the course of very long litigation**
15 **and have put together a -- a timeline.  I -- looking**
16 **back, I'm not -- I'm just not able to recall more than**
17 **that.**
18     MR. WELLS: Let's go to tab 47, which will be
19 Exhibit 35.
20     (Levesque Exhibit 35, Tab 47, 9/2011 email, 1
21 was marked for identification and is attached to the
22 transcript.)
23   Q  And do you remember Carlos Toro being a lawyer
24 for Libardo Duarte?
25   **A  I don't.**

142

1    Q  Well, I'll represent to you that is what he was
2  represented to be at Libardo Duarte's Interrogatory
3  testimony at which Carlos Toro was present?
4    **A  Okay.**
5    Q  This exhibit is September 20th, 2011, and
6  again, an email discussion in which you were involved,
7  correct?
8    **A  Yes, I'm cc'd here.**
9    Q  And Lorraine Leete is saying, I just met with
10 Carlos Toro.  Carlos thinks that Libardo Duarte invented
11 stories about offers of money from Drummond in order to
12 try to get money from us.  Now that his attempt to bribe
13 us backfired, he is ready to go forward with his
14 deposition.  For example -- I imagine we're missing some
15 context with the redaction, but I'm just continuing to
16 read what we can read.
17     Carlos said he learned through Libardo Duarte
18 that we paid to move his family after they were
19 threatened.  Carlos says he thinks the story of Duarte's
20 family being threatened was likely invented as well
21 because Duarte has three times in the past told Carlos
22 that his wife was killed, and she always turned out to
23 be still alive.
24     Did I read that correctly?
25   **A  Yes.**

143

1    Q  And learning this information above in this
2  email and the others that we just looked at, did it
3  cause you concern Libardo Duarte could not be trusted to
4  tell the truth in your case?
5    **A  I -- I don't know what I thought at the time or**
6  **when this was happening in relation to the letters**
7  **rogatory deposition, but it is -- I mean, it is**
8  **concerning as to credibility.**
9    Q  Well, it's also concerning as to whether he's
10 actually going to tell the truth when he testifies,
11 right?
12   **A  Which is part of credibility.**
13   Q  And were you aware that Libardo Duarte was
14 provided thousands of dollars of security payments
15 supposedly for his family?
16     MS. LOCKWOOD: Objection.  Lack of foundation.
17   Q  Do you have any information about that subject
18 other than what you're seeing here that his lawyer
19 thinks he invented those stories ?
20   **A  I don't.**
21     MR. WELLS: Let's go to tab 16, which is Exhibit
22 36.
23     (Levesque Exhibit 36, Tab 16, 7/2011 emails,
24 was marked for identification and is attached to the
25 transcript.)

144

1    Q  So this is an email discussion between you and
2  Terry Collingsworth with Susana Tellez copied, correct?
3    **A  Yes.**
4    Q  And if we turn to the last page, we'll get to
5  the temporally first email in the chain.  You all are
6  discussing how to respond to Interrogatories concerning
7  benefits to witnesses, correct?
8    **A  Yes.  I don't know how the Interrogatory was**
9  **asked, but we are discussing a response to an**
10 **Interrogatory.**
11   Q  And --
12   **A  Or Interrogatories.**
13   Q  -- on Bates number 557, your email in the
14 middle of the page, you say you agree these aren't
15 benefits but they ask for anything of quote, unquote, of
16 value, which you say is vague and ambiguous, so that is
17 a little broader than benefit.  Does that help you at
18 all as to what you were trying to respond to?
19   **A  I -- so I'm -- I'm not disputing that there's a**
20 **that we're responding to in this general space.  It's**
21 **just having not seen the rog again now.  I guess I'm not**
22 **even really sure what you're asking.  Clearly there is**
23 **an Interrogatory asking for anything of value.**
24   Q  And going to the very last page, just to try
25 one more clarity, Mr. Collingsworth is saying he doesn't

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

145

1  define it as a benefit to x that we moved his family
2  because they're going to be killed. Indeed, we could
3  argue it's not a benefit to move RG, Rafael Garcia, or
4  Halcon because they were going to be killed and not
5  disclose that either. Let's discuss.
6      **A  I see that.**
7      Q  We are trying to figure out do we disclose
8  these various benefits that have been provided to
9  witnesses and/or their families, correct?
10     **A  So I think -- I think I'm trying to assess the**
11 **Interrogatories and determine what is fairly within the**
12 **scope and what is not.**
13     Q  Now, back to 557, after you explained to Mr.
14 Collingsworth that they're asking for things of value,
15 not technically benefits, his response is, Okay. Let's
16 discuss. FYI, Garcia is not going to testify. Halcon,
17 we don't know if he will. Duarte, just thought it would
18 be funny to disclose the burgers. Maybe we just
19 disclose the burgers.
20     Did I read that correctly?
21     **A  Yes.**
22     Q  And did you not only disclose in the
23 Interrogatory responding to anything of value offered to
24 any witness in the case, that you all had just provided
25 burgers to Duarte while meeting with him?

146

1      MS. LOCKWOOD: Objection. Calls for
2  speculation. Should we just look at the document.
3      **A  Yeah, we can look at the document, but I'm not**
4  **-- I'm not sure what else we disclosed or not, but --**
5      Q  So going to the very first email in the chain
6  on the first page --
7      **A  Uh-hum.**
8      Q  -- this is you writing and attaching the final
9  Plaintiffs' Responses to Second Document Requests and
10 Third Interrogatories, correct?
11     **A  Yes.**
12     Q  And you say, Regarding payments, in short, I'm
13 sure defendants will push back here -- or will push.
14 Here is what I would do given the less than clear stated
15 case law and the fact that we've asked for the same
16 information from defendants given allegations of bribes.
17 The objections/responses currently reflecting -- will
18 reflect the reasoning below. We're going to produce
19 documents relating to things of value to the plaintiffs.
20     Am I reading that correctly?
21     **A  Yes.**
22     Q  And number 2 Potential witnesses, do not
23 produce, correct?
24     **A  Correct.**
25     Q  JB, which I assume is Jamie Blanco, will not be

147

1  disclosed, in your words, correct?
2      **A  As a potential witness, right. I -- I -- I**
3  **believe that's what this is saying. I'm interpreting**
4  **the scope of the Interrogatories.**
5      Q  Do you have any reason to disagree that Jamie
6  Blanco had received something of value as of the date of
7  this email when you were deciding not to disclose him
8  because he's a potential witness?
9      **A  So it would seem that as of the date of this**
10 **email, he had received something, but I'm not -- it's**
11 **not clear to me -- I guess it's not clear to me as I**
12 **look at this in terms of interpreting. I -- I think we**
13 **were -- I think we were interpreting the Interrogatory**
14 **response as it related to potential witnesses is what it**
15 **seems to be saying here. I think I'm doing the best I**
16 **can do to interpret the Interrogatories in a way that is**
17 **accurate.**
18     Q  Well, this whole section you say is regarding
19 payments, so there will be no reason for Jamie Blanco to
20 even be mentioned unless there was a payment to either
21 disclose or withhold, right?
22     **A  Yeah, it would seem that way, but here what**
23 **we're talking about, I guess, is the potential -- actual**
24 **witnesses we're calling versus potential witnesses that**
25 **we're calling. Again, I think I'm doing the best to**

148

1  interpret the discovery at that time.
2      Q  And what you're doing is basically just reading
3  the document; you have no independent testimony as to
4  what was going through your mind as to why you were not
5  disclosing Jamie Blanco at that time. Is that correct?
6      **A  I -- I don't beyond what is here. It was a**
7  **long time ago.**
8      Q  You go on, Rafael Garcia, no, because he's not
9  going to be a witness. Right?
10     **A  Uh-hum. Yes.**
11     Q  Halcon, no, because not sure if we're calling
12 him. Correct?
13     **A  Right.**
14     Q  Yes, as to Duarte and hamburgers because he's
15 going to be a witness and is not potential, correct?
16     **A  Right.**
17     Q  And why not disclose any other payments that
18 were provided to Duarte and/or his family?
19     MS. LOCKWOOD: Objection. Misstates the
20 document.
21     **A  Yeah, and it also looks like here we're**
22 **interpreting these as not including payments to family**
23 **members.**
24     Q  Well, Mr. Collingsworth has already admitted
25 under oath that Duarte or his family members received

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

---

149

1  money from your team prior to this date. Taking that as
2  true, what's your explanation for that not being
3  disclosed and just saying he got hamburgers?
4      A  I -- I don't -- I don't know. I think it's --
5  yeah. I don't remember why that was the case.
6      Q  Libardo Duarte had received thousands of
7  dollars prior to this email, and you all just say, We
8  only gave him hamburgers. You would agree that's
9  misleading?
10     MR. COLLINGSWORTH: That misstates the testimony
11 and the document.
12     A  Yeah, and it's -- it's not necessarily
13 misleading if it wasn't deliberate. I mean -- I -- I
14 don't recall at that time whether I tracked that that
15 was the case and whether I tracked that that was
16 responsive. So I -- I believe now, as I did then, that
17 I was accurately answering to the best of my ability. I
18 was not trying to misrepresent something.
19     Q  But it sounds like from your testimony thus far
20 you don't have enough recollection to say whether it was
21 deliberate, negligent, intentional or unintentional or
22 otherwise, do you?
23     A  Well, I'm saying I don't -- I don't recall what
24 I may have understood, but I also know that I do take my
25 responsibilities seriously and would not intentionally

150

1  misrepresent, and there's nothing here suggesting that
2  I'm intentionally misrepresenting something.
3      Q  And Jamie Blanco, we've already gone through,
4  he's -- he's asked for or are discussing paying him
5  money that otherwise he would not work on his
6  declaration without receiving, right?
7      MR. COLLINGSWORTH: Objection. That
8  mischaracterizes those documents.
9      A  I mean, there were documents that we're
10 discussing that was discussing the declaration and that
11 amount.
12     Q  And he is, from the documents we've seen,
13 working on a declaration. So again, how were you saying
14 that is a potential witness and not someone we need to
15 disclose if we provided any benefit to him?
16     A  It would indicate from here again that I was
17 trying, and we were trying to make calls as to the
18 scope, and it is saying here, Not sure we'll call as a
19 witness. So the fact that he's working on a
20 declaration, if that is what was happening, does not
21 necessarily mean he will be disclosed or called as a
22 witness. I'm really going on what the reasoning is
23 here. I was trying to make an appropriate scope call.
24     Q  Did you at any time after Balcero was over and
25 you all were having to deal with a whole lot of new

151

1  lawyers coming in in the defamation case about what has
2  been disclosed, we have the motion for sanctions filed
3  against us, Judge Proctor is very upset, did you at any
4  time come to the conclusion that you had some regrets
5  about how things were done?
6      MS. LOCKWOOD: Objection. Lack of foundation.
7      MR. WELLS: Let's clear up the foundation
8  argument.
9      Q  Ms. Levesque, you are aware that it was finally
10 disclosed in the defamation case that a number of
11 witnesses had been paid that had not been previously
12 been disclosed?
13     A  Yes.
14     Q  You are aware that Judge Proctor was not
15 pleased with that situation?
16     A  Yes.
17     Q  You are aware that we moved for sanctions based
18 on that?
19     A  Yes.
20     Q  With that foundation, did you ever come to the
21 conclusion that, Maybe I didn't do everything the right
22 way?
23     A  I don't -- I don't think that's how that
24 sequencing played out. A lot of what you've just spoken
25 about occurred in the context of the defamation lawsuit,

152

1  and there was only a point at time -- up to a point in
2  time where I was involved in assisting with some of the
3  responses for the defamation lawsuit, and then, I was
4  not involved after that. And I did not have any
5  particularized knowledge alone. And when I was no
6  longer working on that part of the case, it's not --
7  it's not the situation that I was constantly reengaging
8  or assessing. I understood that that was on a process,
9  there were other lawyers involved, including lawyers
10 that were representing the firm, and representing Terry
11 I think as part of the firm, and that that was being
12 addressed. And I think that that was my understanding
13 of how that was playing out.
14     Q  We'll get to it here at some point today, but
15 you were involved in the discovery process in the
16 defamation case back when Brad Smith was the lawyer?
17     A  So I was involved up to a certain point. I
18 don't know when Brad Smith was -- I mean, you can help
19 with your questions in terms of what overlapping time
20 that was. I don't -- I don't know when Brad Smith was
21 involved.
22     Q  But that --
23     A  And I'm not really sure which firm he was at
24 but --
25     Q  That -- that involvement including drafting

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

153
1 briefs for Brad Smith to file in the case, correct?
2    A  So I'm not -- I'm not sure about that.  I -- I
3 recall being involved in earlier stages of discovery
4 responses for the defamation lawsuit and not later.  And
5 I recall being involved up to a certain point in time.
6 I -- I don't know when those briefs were drafted.  And
7 if you have something to refresh my recollection, then,
8 please, by all means, show me.  But otherwise, I don't
9 know what, if any, briefing I was involved in on that.
10    Q  Well, I'm just testing what you do recall.
11 We'll get into the documents.
12       Do you -- you recall being involved in
13 searching for documents in trying to determine what
14 should or should not be disclosed in response to
15 discovery requests in the defamation case?
16       MS. LOCKWOOD:  Objection as to time frame.
17    A  So I -- I guess the answer is I -- without the
18 knowing time frame, I'm not sure.  I think it's -- it's
19 probable that I was involved in some searches of
20 documents if it was up to the point at which I was no
21 longer involved.  But that was on my email system.  So
22 all of that Conrad & Scherer had access to.  I mean, all
23 of those are teams that could have been, you know,
24 done.  So whether I was doing them personally or not,
25 they had access to that, I believe.  At least, that's

154
1 what I would understand to be the case.
2    Q  You and the Drummond team primarily were in the
3 D.C. office of Conrad & Scherer, correct?
4    A  Correct.
5    Q  And the home office is in Fort Lauderdale,
6 Florida?
7    A  That's right.
8    Q  And that's where Bill Scherer is primarily
9 located, correct?
10    A  Right.
11    Q  Were you or anyone else to your knowledge in
12 the D.C. office hiding information about the case from
13 the Florida office?
14    A  No.  Not that I'm aware of, no.
15    Q  Was there any information that you were aware
16 of during the case that you intentionally did not
17 disclose to the Florida office?
18    A  No, not that I'm aware of.
19    Q  Back to Balcero.  At any point, did you ever
20 come to the conclusion that you might should have
21 disclosed more than you did in response to discovery?
22       MS. LOCKWOOD:  Objection.  Vague.
23    A  So again, I don't think that's how this -- this
24 played out.  I think as I was going through the process,
25 I was trying to do the best that I could do, and I think

155
1 the point at which the defamation lawsuit was unfolding,
2 and you had years of litigation where you've amassed,
3 you know, documents in various ways, that was already
4 after Balcero was -- had been dismissed.  So I think I
5 was doing the best I could do at each juncture to
6 disclose what was appropriate.  I -- beyond that, I
7 guess your -- your question was did I ever -- just
8 restate your question just --
9    Q  Did you ever have a thought in your mind, or
10 regret, anything, however you want to describe it, you
11 know hat, I may have should have disclosed on witness
12 payments more than I did?
13    A  Again, I think I -- I think my thinking was I
14 had done the best I could do as I was going through that
15 process for the amount that I was not involved, not
16 liaising with these witnesses, and you know, doing the
17 best I could do to consult with the team as I answered
18 Interrogatories.  And Balcero concluded, and at that
19 point, the defamation lawsuit was well underway.
20       MR. WELLS:  All right.  We've been going more
21 than an hour.  Let's take another break.
22       THE VIDEOGRAPHER:  We're going off the record at
23 1:52 p.m. Eastern Time.
24       (A brief recess was taken.)
25       THE VIDEOGRAPHER:  We're going back on the

156
1 record at 2:07 p.m. Eastern Time.
2 BY MR. WELLS:
3    Q  All right, Ms. Levesque, we're going to go to
4 tab 52 now, which is being marked as Exhibit 37.
5    A  Thank you.
6       (Levesque Exhibit 37, Tab 52, 1/2011 email, was
7 marked for identification and is attached to the
8 transcript.)
9    Q  You're welcome.
10       So this is an October of 2011, excuse me, email
11 from Mr. Collingsworth attaching the Jamie Blanco
12 declaration.  Do you see that?
13    A  Yes.
14    Q  And do you recognize Bruce Rogers, Laina Lopez,
15 Tom Wilson as lawyers for Jim Adkins in the Balcero
16 case?
17    A  I don't, actually.  I mean, I have no reason to
18 doubt what you're saying, but --
19    Q  Okay.  We can agree that there is no disclosure
20 in this email providing them with Jamie Blanco's
21 declaration that Jamie Blanco has received any money, is
22 there?
23    A  I'm sorry, are you asking me about a
24 declaration?  No.
25    Q  I'm asking you about the email.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

157

1    A    Okay.  Let me read the email then.
2    Q    Sure.
3    A    Okay.  And your question is in this email, is
4  there anything regarding payments to Blanco?  Is that
5  your question?
6    Q    Correct.  There is -- there is no disclosure
7  that Blanco has received payments prior to this
8  declaration being provided?
9    A    No.
10   Q    Did you ever disclose payments to Blanco to
11 anyone else out of your team?
12   A    I don't think so.  I don't recall, but I don't
13 think so.
14   Q    All right.  After the first sentence, you're
15 saying, Declaration is attached.  Mr. Collingsworth
16 says, As you know, I've provided Tom and Laina with Mr.
17 Blanco's phone number as he wanted to speak to Mr.
18 Adkins before releasing the declaration.  Mr. Blanco
19 never heard from Mr. Adkins so he signed the declaration
20 on October 14th.
21       Did I read that correctly?
22   A    Yes.
23   Q    And you were aware, were you not, that Mr.
24 Blanco was going to try to reach out to Mr. Adkins prior
25 to signing his declaration?

158

1    A    No, I don't know that I'm aware of that.  I'm
2  seeing this email now, and I don't -- I'm -- I'm not
3  recalling what that -- again, I wasn't talking to Mr.
4  Blanco, so I'm going based on what this email says.
5       MR. WELLS:  All right.  Let's go to tab 49,
6  which is Exhibit 38.
7       (Levesque Exhibit 38, Tab 49, 10/2011 email,
8  was marked for identification and is attached to the
9  transcript.)
10   Q    This email is dated October 1st, 2011, which
11 would be prior to the prior email we just looked at,
12 correct?
13   A    I think so.  Yeah.
14   Q    And this email is between Terry Collingsworth,
15 Lorraine Leete, you and Susana Tellez, correct?
16   A    Yes.
17   Q    And Mr. Collingsworth's email that starts this
18 chain says, Lorraine, please tell Ivan to stress to
19 Jamie Blanco that to even suggest or hint to Adkins that
20 he received funds from anyone, even Albert, will cause
21 us a world of trouble.  Obvious maybe, but this is
22 really serious stuff.
23       Did I read that correctly?
24   A    You did.
25   Q    So what trouble is it going to cause to

159

1  disclose the fact that Jamie Blanco had received funds
2  from Albert van Bilderbeek?
3    A    I -- I think the issues that we're here
4  discussing and whether those were permissible payments
5  or not.  I mean, that seems like that's the issue, but I
6  don't know what I understood at that point based on
7  again you've pieced this all together after many years,
8  and I just, I mean, I think that's all I can say.
9    Q    Well, you're being told in this email that
10 Jamie Blanco has received funds from Albert, and don't
11 disclose it to Adkins, right?
12       MS. LOCKWOOD:  Objection.  Assumes that the
13 document --
14   A    I mean, I think the document just it -- it says
15 what it -- what it says, right?  I mean, and you've
16 already -- you've already read that.  Again, I -- this
17 I'm not clear on -- this was not the area that I was
18 focused on, as I've said many times, so I'm just not --
19 I don't know that I have anything to add beyond what
20 I've already said.
21   Q    Did you try to distance yourself from these
22 payments?
23   A    I don't think I was distancing myself, but I
24 wasn't -- I was not responsible for making decisions
25 around that.  I was focused on other aspects of the

160

1  litigation, and in many instances, I was one of many on
2  a team who was cc'd.  There are obviously less
3  people, but yeah, this was not what I was focusing on.
4  I'm not talking to these guys I'm not -- yeah.
5    Q    What were you focusing on?
6    A    So the plaintiffs' side, plaintiffs' discovery
7  responses, that would have been part of what I was
8  working on.  I was definitely taking substantive
9  depositions in the Balcero case at various points.  I
10 was not dealing with the Colombia stuff for the most
11 part.  That's just not what I was focused on.  I met
12 with Duarte that one time, but other filings, things of
13 that sort, but the AUC witnesses was not what I was
14 focused on.
15   Q    So whoever was focused on the AUC witnesses and
16 whether to disclose payments to them, that was not you;
17 is that correct?
18   A    Yeah, I was not -- I mean, that's not what I
19 was working on.
20   Q    Who was working on that?
21   A    I think your documents already indicate that
22 Terry was the primary liaison with our AUC witnesses.
23 That's very -- I mean you have the documents.  He has
24 acknowledged that.  I don't know who else was also
25 involved with decisionmaking around that.

161

1    Q   And not just the liaisoning -- liaising with
2  witnesses, the decision whether to disclose or not
3  disclose that witnesses had received payments, was that
4  Mr. Collingsworth's role as well?
5    **A   He -- he was -- he was the lead counsel on**
6  **these issues, and he was certainly involved in that**
7  **decisionmaking.  I was in a different role.  I was**
8  **deferring.  And as I said, doing I think at the time**
9  **with what I knew at various points doing the best I**
10 **could do.**
11   Q   Okay.  You mentioned he was involved in the
12 decisionmaking on disclosure versus nondisclosure.  Who
13 else was involved in that decisionmaking, or was it just
14 Mr. Collingsworth?
15   **A   I don't know if anybody else was in terms of**
16 **the decisionmaking of disclosures.  I don't know who**
17 **else was involved.**
18       MR. WELLS: Let's go to tab 58, which is Exhibit
19 39.
20       (Levesque Exhibit 39, Tab 58, 3/2012
21 transcript, was marked for identification and is
22 attached to the transcript.)
23   Q   This is a transcript from a March 8th, 2012
24 hearing before Judge Proctor in the Balcero case, and
25 lists as attendees for the plaintiffs Mr. Collingsworth

162

1  and you, correct?
2    **A   Yes.**
3    Q   Let's go to page 8.  Starting on line 8, you
4  see there starts to be discussion about Llanos Oil?
5    **A   Yes.**
6    Q   And then, line 23, Judge Proctor asked this
7  question:  First, what is the relationship between
8  Llanos and Drummond?
9        Mr. Collingsworth answers, summarizing
10 basically, They're competitors, and talks about the
11 dispute over the oil rights?  Fair?
12   **A   Sorry, let me just -- okay.**
13   Q   And Mr. Collingsworth concludes his answer by
14 saying, There is no relationship to this case, Your
15 Honor.
16       Did I read that correctly?
17   **A   Yes.**
18   Q   This is just a couple months after the last
19 email we looked at about making sure Blanco does not
20 tell Adkins that he received funds from Albert van
21 Bilderbeek, correct?
22   **A   I guess that's right with the timing, yep.**
23   Q   And you would agree that it is not accurate to
24 say that Albert van Bilderbeek and Llanos Oil have no
25 relationship to the Drummond case, wouldn't you?

163

1    **A   Yes, having reviewed that other document and**
2  **seeing this, yes.**
3    Q   Did that thought cross your mind in realtime
4  when you're sitting there, you and your co-counsel,
5  making representations to the court?
6    **A   I -- I don't know what crossed my mind, but I**
7  **don't believe that I would intentionally withhold**
8  **something like that.  I think you've pointed out emails**
9  **that I was on and -- but I -- I don't think that for me**
10 **that shows that I was intentionally trying to not**
11 **disclose something to the court.  Again, those weren't**
12 **relationships that I was working on, I was not meeting**
13 **with those people directly, and so I had a very**
14 **different exposure to that.**
15   Q   Well, based on the emails we have seen today on
16 which you were copied relating to Albert van Bilderbeek
17 and funds for Jamie Blanco, do you think it was
18 appropriate for Mr. Collingsworth to represent to Judge
19 Proctor that there was no relationship between Llanos
20 Oil and the Drummond case?
21   **A   So it appears from this, or from those other**
22 **documents that there was some kind of relationship, and**
23 **this may not have been, you know, accurate.**
24   Q   Do you believe it is a misrepresentation to the
25 court?

164

1    **A   I don't -- I don't know if he was**
2  **misrepresenting to the court.  I'm -- I -- I'm not sure**
3  **what was happening here.**
4    Q   You also don't know whether he was, in fact,
5  intentionally misrepresenting this to the court, do you?
6    **A   I'm -- I'm not in his head, so I don't know.**
7    Q   But from your standpoint and in your head, you
8  just don't recall whether you knew at the time you're
9  hearing this representation being made to the court that
10 Albert van Bilderbeek and Llanos Oil actually made a
11 payment to a witness in the case?
12   **A   Yeah, I don't know.  I -- from this, I -- I**
13 **don't -- I don't know, but I don't believe that I would**
14 **misrepresent.**
15       MR. WELLS: Let's go to tab 69.
16   **A   Are we done with this?**
17   Q   Yes.
18       (Levesque Exhibit 40, Tab 69, 6/2012 email, was
19 marked for identification and is attached to the
20 transcript.)
21   Q   Do you recall there being an effort on your
22 team's part to limit your written communications with
23 Jamie Blanco for fear that they would be discovered?
24   **A   I don't recall that.**
25       MR. COLLINGSWORTH: I think, guys, we have to

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

42 (165 to 168)

165

1  make a copy, you can go ahead, go ahead with that.
2        MR. WELLS: Okay.
3    Q   So this is Exhibit 40 --
4        MS. LOCKWOOD: Yeah, if we can just wait until
5  we get a copy.  You can have him come in --
6        MR. WELLS: I'm going to have to share on this
7  one.
8        MS. LOCKWOOD: Happy to share it on this side.
9        (Pause.)
10       MR. WELLS: Have they had --
11       MS. LOCKWOOD: Yeah, we got it.
12   Q   All right, Ms. Levesque, this email chain,
13  we'll see you're copied at the top, that you received
14  everything below, correct?
15   A   Presumably so.
16   Q   And the first message in the chain is directly
17  from Jamie Blanco to Lorraine Leete, correct?
18   A   Down at the bottom you mean?
19   Q   Yes.
20   A   Yes.
21   Q   And if you could, take a look at what Jamie
22  Blanco writes in Spanish, and then, what Ms. Leete is
23  translating for Mr. Collingsworth, and basically tell me
24  is Lorraine catching the substance of it or is it just
25  totally inaccurate?

166

1    A   I'm not -- I'm not gonna -- her Spanish is
2  impeccable, or it was at the time  --
3    Q   Okay.
4    A   -- so I mean, I can see that --
5    Q   I just want to make sure there's no dispute on
6  the translation --
7    A   I'm just not one way or the other commenting on
8  that. I'm going to look at the English translation.
9    Q   Sure.  So Ms. Leete is translating Blanco's
10  message to say, Terry, how are you?  I need to urgently
11  speak to you about a subject that I do not want to
12  discuss over this media.
13       And then, Lorraine Leete commenting on that
14  says, I've past on your messages through Ivan but Blanco
15  has emailed us in any case.
16       Do you see that?
17   A   Yes, I do.
18   Q   And if we can go up to the top of that email,
19  Mr. Collingsworth, in the second email from the very
20  top, says, Make sure he is clear that Drummond can get
21  any emails he sends me.
22       Did I read that correctly?
23   A   Yes.
24   Q   Does that help refresh your recollection at all
25  about trying to limit a paper trail with Jamie Blanco?

167

1    A   No, I mean, I -- I see that's that's written
2  here, but again, I'm not communicating with Jamie
3  Blanco, so I -- I see it written here.  I'm not
4  disputing that the document says what it says.
5    Q   And I'm not suggesting you are telling Blanco
6  don't send us emails, but you are on a team in the U.S.,
7  I'm wondering if you all had discussions about, Look, we
8  need to make sure Blanco doesn't send us emails because
9  this stuff is going to look terrible?
10   A   I don't remember having those kinds of
11  discussions.
12       MR. WELLS: And then, let's go to tab 70, which
13  is Exhibit 41.
14       (Levesque Exhibit 41, Tab 70, 6/2012 email, was
15  marked for identification and is attached to the
16  transcript.)
17   Q   This is June 20th, 2012 email between Lorraine
18  Leete, Terry Collingsworth, Susana Tellez, and you.
19  Correct?
20   A   Yes.
21   Q   That seems to be a consistent group when we're
22  talking about these Blanco payments.  I know we've seen
23  those same four people on a number of the emails we've
24  been looking today.
25   A   So we have seen some emails today with these

168

1  people. I don't know what other emails also exist or
2  not. And frankly, I don't know why at this point I'm on
3  this email.
4    Q   But you are on the email?
5    A   Yeah, I'm not disputing that.
6    Q   And Ms. Leete is telling Mr. Collingsworth,
7  you, and Susana Tellez, Okay, I've past on the messages
8  through Ivan who had told Blanco not to send us messages
9  via email.
10       Did I read that correctly?
11   A   Yes.
12   Q   Were you aware of any efforts of the team that
13  you were a part of to limit their written communications
14  with any other witness other than Mr. Blanco?
15   A   No.
16   Q   Were you directing that?
17   A   No, not that I'm aware.
18   Q   So that would have been someone else's
19  direction to do, limit email communications with Mr.
20  Blanco?
21   A   It -- it would have to be if I -- if it's not
22  me.
23       MR. WELLS: Let's go to tab 59, which is Exhibit
24  42.
25       (Levesque Exhibit 42, Tab 59, 3/2012 email, was

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

43 (169 to 172)

169

1   marked for identification and is attached to the
2   transcript.)
3       Q   And this is an email from you just to Terry,
4   correct?
5       **A   Yes, it looks that way.**
6       Q   And it's just really the first page that has
7   the text, so if you want to go ahead and peruse that.
8       **A   Yeah.**
9       Q   You don't even need having to try and read that
10  little thing.
11      **A   Uh-hum.**
12      Q   All right.  Generally, it looks like you are
13  discussing your thoughts with Mr. Collingsworth about an
14  Interrogatory that could call for information regarding
15  payments to Rafael Garcia, correct?
16      **A   Yeah, it appears that way, yep.**
17      Q   And second-to-last full paragraph, I've studied
18  this to see how we can avoid answering the Interrogatory
19  and disclosing the security payment to Garcia.
20          Did I read that correctly?
21      **A   Yes.**
22      Q   Last sentence of that paragraph, you say, I
23  tried to parse the words of the Court but it is clear
24  that the Court did not find anything of value to be too
25  broad, and although the last sentence above says

170

1   "information on payments or offers of payments," I think
2   the context makes very clear that defendants are
3   entitled to information for any person on initial
4   disclosures who received anything of value.
5           Did I read that correctly?
6       **A   Yes.**
7       Q   And you go on to say, Given all this, do you
8   have any ideas about how to not disclose security
9   payments to Rafael Garcia given the court's order.  I am
10  stumped as to how not to disclose and comply with the
11  court's order, but maybe you have an idea.
12          Did I read that correctly?
13      **A   Yes.**
14      Q   So in your mind, given those are your words,
15  why are you working so hard not to disclose payments to
16  Garcia?
17      **A   I don't think I am working so hard to not**
18  **disclose.  I think I'm working to interpret -- interpret**
19  **the Court's order, and our obligations, and do what I**
20  **think we all do in our cases, which is to answer the**
21  **questions accurately and honestly.  That is zealous**
22  **representation, and I -- it also shows I'm trying to**
23  **comply with the Court's order.  And I've even said I**
24  **think the Court has said it's broad.  I'm doing the best**
25  **I can do here.  With complicated issues.**

171

1       Q   You don't feel you have an obligation to either
2   the Court or opposing counsel to disclose the fact that
3   you have made payments to potential witnesses in the
4   case, regardless of whether you were asked?
5           MS. LOCKWOOD: Objection.  Misstates testimony.
6       **A   I think in this instance, we had an obligation**
7   **to answer the Interrogatories as they were asked and to**
8   **comply with the Court orders, and I think here that is**
9   **what I'm -- I'm trying to do.  And again, I'm doing the**
10  **best I can do, I think, with a complicated situation.**
11  **But it shows that I'm trying to comply with my**
12  **obligations.**
13      Q   It seems like what I'm reading here is your
14  read of the Court order is you're going to have to
15  disclose Garcia, correct?
16      **A   It would seem to be the case that I'm**
17  **suggesting that.**
18      Q   And you are stumped as to how not to disclose
19  it?  That you were studying it to see how we can avoid
20  answering the Interrogatory and disclosing security
21  payment to Garcia.  So my question again, why were you
22  working so hard not to disclose it given the fact that
23  your interpretation of the Court order was it needed to
24  be disclosed?
25      **A   I don't know that that really indicates I'm**

172

1   **working hard not to disclose something.  I think it**
2   **indicates I'm working hard to comply.  We all study as**
3   **lawyers Interrogatory requests and discovery requests**
4   **and we do the best we can do.  And I think that's what I**
5   **was doing here?**
6       Q   What is the harm in disclosing it?
7       **A   I -- I think that the issue here, which is what**
8   **we always as -- as lawyers, I think in every case, we**
9   **look at discovery requests, and we are always in a**
10  **position where we are objecting to scope.  That happens**
11  **all the time on all sides in every litigation, and I**
12  **think that is what I'm doing here.  I don't think this**
13  **shows that I'm deliberately trying to not disclose**
14  **things.**
15      Q   Well, putting deliberately or otherwise out of
16  the picture, my question is in all honesty, the reason
17  you didn't want to disclose payments to witnesses is
18  because it would have hurt your case, right?
19      **A   No, I don't.  I don't think that's accurate to**
20  **say that that's the reason I didn't want to disclose.  I**
21  **-- I think the issue is in litigation again, you work to**
22  **represent and to answer what's asked and to fulfill your**
23  **obligations.  That's what I think I was trying to do**
24  **here based on what I'm reading.**
25      Q   But you would agree with me, as you already did

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

173

1  this morning, that regardless of if it will hurt your
2  client's case, you cannot lie to opposing counsel --
3      MS. LOCKWOOD: Ob --
4      Q  -- and misrepresent anything to opposing
5  counsel, correct?
6      MS. LOCKWOOD: Objection.  Calls for legal and
7  ethical conclusion.
8      A  I think that's -- these are complex issues, and
9  the way to approach them I think is the way I was trying
10 to do so here, which is I was not back-dooring it in the
11 way you just suggested.  Rather, I was looking at what
12 the question was -- the request was, and I was looking
13 at the Court's order, and again, trying to do the right
14 thing.  I was not asking whether it would hurt or not
15 hurt and then making a determination based on that.
16     Q  And other than this case, you had not been
17 involved previously and have not been involved since in
18 any case in which you were dealing with payments to fact
19 witnesses like this; is that correct?
20     A  That's right.
21     Q  And you did not seek any guidance from the Bar
22 as to whether that should be disclosed with or without a
23 request, did you?
24     A  I -- I did not seek guidance.  Again, I was a
25 member of a team, there were discussions that were had

174

1  concerning the ethics of various payments, including to
2  family members or for legal fees, so this was not in a
3  vacuum.  It's not that there was no, you know,
4  consideration or consultation concerning those matters.
5  But no, I did not seek ethical guidance from the Bar.
6      Q  And I think you've told me you are a member of
7  the team and you were just deferring to other members of
8  the team as to what should or should not be disclosed?
9      A  I was a member of the team, and there were
10 certainly instances in which I was deferring on these
11 complicated issues of when payments could or not be
12 made.  And here, I was certainly weighing in on the fact
13 that I thought -- thought certain things would be -- or
14 needed to be disclosed pursuant to the court order.
15     Q  And the person you were deferring to on that
16 subject was Terry Collingsworth, correct?
17     A  I think that would be -- that would be right.
18     MR. WELLS: Let's go to tab 61, which is Exhibit
19 43.
20     (Levesque Exhibit 43, Tab 61, 5/2012 email, was
21 marked for identification and is attached to the
22 transcript.)
23     Q  This is an email discussion --
24     A  Can I pause just for a minute?
25     Q  Sure.

175

1      A  Okay.
2      Q  -- again, just between you and Mr.
3  Collingsworth, correct?
4      A  Yes.
5      Q  And if we can go to the last or second-to-last
6  page so we can get to the first email in the chain.
7      A  Yes.
8      Q  And it is you writing to Mr. Collingsworth
9  about an Interrogatory that you all were discussing how
10 to respond to.  Right?
11     A  Just let me catch up, please.
12     Q  Sure.
13     A  Yes, that's right.
14     Q  And before we get into the Interrogatory, just
15 for the jury's benefit, what are Rule 26 Disclosures?
16     A  Disclosures that come at the beginning of a
17 case that -- a civil case that relate to individuals
18 with relevant knowledge or potential witnesses.
19     Q  And you all provided initial disclosures in
20 Balcero listing people you thought may have relevant
21 knowledge or may be potential witnesses, correct?
22     A  Correct.
23     Q  So this Interrogatory is asking to, Describe
24 anything of value offered or given by plaintiffs or
25 anyone acting on plaintiffs' behalf, including counsel,

176

1  to any person disclosed on plaintiffs' Rule 26
2  Disclosures, any former paramilitary, or any other
3  potential witness in this litigation?
4      A  Uh-hum.
5      Q  Did I read that correctly?
6      A  Yes.
7      Q  And it looks like above that, you are offering
8  your comments of, What do we do about Jamie Blanco and
9  Halcon because they were both listed on your initial
10 disclosures, correct?
11     A  Correct.
12     Q  And reading up the chain, Mr. Collingsworth,
13 trying to find out what the deadline is, you're
14 providing information on what the Court had ruled up to
15 that point.  I'm trying to get us up to the top of 714
16 Bates number.
17     A  Okay.
18     Q  Mr. Collingsworth is writing to you saying,
19 Don't want to make a big deal.  Yes on Garcia for
20 relocation.  I'd be dramatic here and say that when he
21 was released without notice on the street in Bogota,
22 counsel arranged for a temporary safe house, and then,
23 transportation to a third country from which Mr. Garcia
24 has since relocated.  On Jamie Blanco, no.  We have not
25 given anything.

Transcript of Christian Levesque, Esquire
45 (177 to 180)
Conducted on September 18, 2023

177

1    Did I read that correctly?
2    **A   Yes.**
3    Q   So was the decision between you and Mr.
4  Collingsworth to not disclose Jamie Blanco based on the
5  concept that you, meaning your team, had not directly
6  provided money to Mr. Blanco?
7    **A   So from here, it looks to be that that is the**
8  **case in terms of how we're interpreting the**
9  **Interrogatory request.**
10    Q   Based on the documents we've seen where you
11  know that the coordination of the payment to Blanco was
12  through your team, payment came from Albert van
13  Bilderbeek, but with money loaned by Mr. Collingsworth,
14  do you think that is a fair interpretation to make a
15  representation in response to that discovery request?
16    **A   Yes, so in looking at the documents today, I**
17  **think my answer is I'm -- I'm not -- I'm not sure.  I --**
18  **I can tell you that at that time I again would not -- I**
19  **would not have purposely misrepresented anything.  And**
20  **it's not clear to he here when I'm doing this.  Again, I**
21  **don't -- I don't recall what I was tracking in that way.**
22  **I think that's simply the best I can -- I can say now.**
23    **We sit here with the benefit again of seeing**
24  **documents that are very sequentially laid out.  And at**
25  **that time, I think I had potentially a different**

178

1  **understanding.  I'm just -- I'm just not sure.  I don't**
2  **-- I don't recall.**
3    Q   Well, the documents we've seen that was
4  sequentially laid out was sequentially laid out in the
5  order in which you received them in realtime --
6    MR. COLLINGSWORTH: Object to the form.
7    Q   -- right?
8    MR. COLLINGSWORTH: Object to the form.
9    **A   Yes, but again, in a vacuum, right.  So here**
10  **you're laying them out as you've put on your case, and**
11  **during that time period, again, I'm sometimes one of**
12  **three or four, sometimes one of a larger group that is**
13  **cc'd on these documents, and I'm again focusing on other**
14  **things.  So I'm doing, I think, the best I can do here**
15  **to interpret these Interrogatories and to answer in a**
16  **way that was responsive and compliant to the Court**
17  **order.**
18    Q   Let's go to the next page to your response.
19  You respond to Mr. Collingsworth, This sounds fine.
20    And then, below that you say, Agreed.  Do not
21  want to make a big deal.  Right?
22    **A   Yes, and then, I'm indicating that we will**
23  **supplement tonight or tomorrow morning.  So I've**
24  **indicated that we are -- it looks like we are doing some**
25  **kind of supplementation.**

179

1    Q   Wouldn't you agree that it is a big deal to pay
2  a fact witness and not tell the other party or the Court
3  about it?
4    **A   So I think you're taking that out of context**
5  **here.  If you read this email where it says, Agreed, do**
6  **not want to make a big deal, I -- and indicating that we**
7  **will supplement tonight or tomorrow morning, I think**
8  **it's simply in the manner in which we are providing the**
9  **information.  I'm not suggesting that any of this may be**
10  **taken lightly or not seriously.  That's not how I read**
11  **this.**
12    Q   Well, if you wouldn't mind handing that over to
13  your lawyer because I'm done with that one.
14    A   Okay.
15    Q   Now, to be clear, I'm not asking about the
16  email that is no longer sitting in front of you.  I'm
17  asking you here an entirely new question.
18    Would you agree it is a big deal to make a
19  $100,000 plus payment to a fact witness and not disclose
20  it to the Court or opposing counsel?
21    MS. LOCKWOOD: Objection.  Misstates the
22  documents.
23    **A   I -- I think these are serious issues.  I think**
24  **they are complex questions of fact and of law.  And I**
25  **think we've already discussed today the circumstances in**

180

1  **which you cannot make payments for testimony, and there**
2  **are circumstances where that is sometimes permissible.**
3  **Reimbursement or -- or security or some other reason**
4  **where there may be a question as to whether it is**
5  **permissible.  So it's not that I'm suggesting it's not**
6  **serious or significant.**
7    Q   The only written document that I have seen
8  analyzing the permissibility of witness payments was the
9  one talking about paying a witness' criminal legal fees.
10  Correct?
11    Well, let me ask you this: Have you seen
12  another document analyzing the propriety of making
13  witness payments in other circumstances, such as
14  security?
15    **A   I don't recall seeing another document.  I**
16  **think there was reference potentially to another**
17  **document, and I don't recall seeing that one way or the**
18  **other.**
19    Q   Did you see any document or receive any advice
20  from Bar counsel or a lawyer that you respect that
21  making payments to witnesses purportedly for quote,
22  unquote, Security, is one of those things the courts
23  have found to be permissible?
24    **A   I had -- I don't recall seeing that.  Again, I**
25  **was one a member of a team, and on -- this was**

Transcript of Christian Levesque, Esquire

46 (181 to 184)

Conducted on September 18, 2023

181

1  the first time that I had ever dealt with these issues,
2  and I -- I did defer to those who were more experienced
3  than -- than me in this area.  But I don't recall seeing
4  an opinion or getting a formal advice on that.
5      Q  And the those you refer to in that answer is
6  Terry Collingsworth?
7      A  And anyone else that he was consulting with.  I
8  think there was also reference in one of those emails to
9  another law firm as well that was involved with that.
10 But I'm -- I mean, beyond that I -- I don't know.
11     MR. WELLS:  All right.  I'm about to switch
12 gears.  I've lost track of time.  If we keep going --
13     Q  Do you need a break?
14     A  Do you know how long your next segment is going
15 to be?
16     MS. LOCKWOOD:  We've been going about 40 minutes
17 just so --
18     MR. WELLS:  Yeah, I didn't feel like quite an
19 hour.
20     A  Yeah, it's okay.  Let's --
21     Q  I think I can knock that out before the hour.
22     A  You don't have to stick exactly to it.  It's
23 just good to have a break about every hour.
24     Q  All right.
25     MR. WELLS:  Let's go to tab 68.

182

1      Actually, let's -- let's do this:  We're going
2  to mark tab 68 as Exhibit 44, tab 67 as Exhibit 45, tab
3  181 as Exhibit 46, and tab 167 as Exhibit 47.
4      (Levesque Exhibit 44, Tab 68, 6/2012 email, was
5  marked for identification and is attached to the
6  transcript.)
7      (Levesque Exhibit 45, Tab 67, 6/2012 email, was
8  marked for identification and is attached to the
9  transcript.)
10     (Levesque Exhibit 46, Tab 181, Text messages,
11 was marked for identification and is attached to the
12 transcript.)
13     (Levesque Exhibit 47, Tab 167, 11/2015 email
14 was marked for identification and is attached to the
15 transcript.)
16     THE TECHNICIAN:  What was the last one?
17     MR. WELLS:  Tab 167 will be Exhibit 47.
18     THE TECHNICIAN:  Thank you.
19     MR. WELL:  Actually, why don't we go ahead and
20 take a break so we can get the documents.
21     A  Okay.
22     THE VIDEOGRAPHER:  We're going off the record at
23 2:48 p.m.
24     (A brief recess was taken.)
25     THE VIDEOGRAPHER:  We're going back on the

183

1  record at 3 o'clock p.m. Eastern Time.
2  BY MR. WELLS:
3      Q  Okay.  We've got these organized here.  I'm
4  handing you Exhibit 45, 46, and 47, and you should have
5  44 in front of you.
6      A  That's right.
7      Q  All right.  Let's start with 46.
8      A  Okay.
9      Q  I've kind of explained why it looks the way it
10 does.  So these are the format in which the defendants
11 in this case have produced to us text messages between
12 Terry Collingsworth and whoever was relevant to this
13 case.  So if you look on the left column, if the form is
14 blank, that is Terry --
15     A  Uh --
16     Q  -- the Party/Participants.
17     A  Uh-hum.
18     Q  If the form is blank, that is --
19     A  I see.
20     Q  -- Terry.
21     A  Okay.
22     Q  If the To clearly says you, and then, the
23 reverse from you to blank.  That's these are all with --
24     A  Terry.
25     Q  -- between you and Mr. Collingsworth.

184

1      A  Okay.
2      Q  The time, I believe, should be, and maybe if
3  I'm misstating this, just let me know.  The time should
4  be when it was sent, and the message, what the text
5  message says.
6      A  Okay.
7      Q  You with me?
8      A  Yep.
9      Q  All right.  So let's start with Exhibit 44.
10     A  Okay.
11     Q  Actually, while you get that, we're going to be
12 focusing on June 18th, 2012.
13     A  Yes.
14     Q  So those are in chronological order.  If we can
15 get to --
16     A  June 18th, 2012.  So it's on the second page?
17     Q  Should be, yes.  And leading on to the -- I
18 guess you have those handy.  Just let me know when
19 you're ready.
20     A  Sure.  Okay.
21     Q  Okay.  So we're starting with Exhibit 44.  This
22 will be part of it, at least part of it.
23     A  Okay.
24     Q  Exhibit --
25     A  Oh, I'm sorry.  Sorry about that.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

185

1    Q   Exhibit 44, at least the top two, are June
2  18th, 2012 emails between Mr. Collingsworth, Lorraine
3  Leete, Susana Tellez, and you, correct?
4    **A   That's right.**
5    Q   And Ms. Leete, in the middle, says, Terry, I
6  met with Ivan on several of these follow-up issues you
7  wrote about last week.  I have written up a summary of
8  our meeting.
9       And basically asks can she send a summary.
10 Fair characterization?
11   **A   Yes.  Yes.**
12   Q   This is out of curiosity, can you send
13 documents via Skype?
14   **A   I have no idea.**
15   Q   Okay.  And Mr. Collingsworth responds, Skype is
16 not good.  Please send an email and speak general.
17      Did I read that correctly?
18   **A   Yes.**
19   Q   Were you aware of any reason why you all needed
20 to speak in general terms about things Mr. Otero was
21 telling Lorraine Leete?
22   **A   No.**
23   Q   And if we can go to Exhibit 45.  This is an
24 email from you the same day to Mr. Collingsworth,
25 copying Ms. Levesque, saying, Point 5, Ivan Otero needs

186

1  assistance with logistic for P&Y and preparation cannot
2  be completed without this.  Re Y -- or regarding Y,
3  preparations still have not been completed.
4       So who are P&Y?  Is that Penata (phonetic) and
5  Yuca?
6    **A   I have no idea.**
7    Q   But this is your email to Mr. --
8    **A   I understand.  I -- I understand that.  It's 12**
9  **years ago.  I -- or 11 years ago, whatever.  I -- I just**
10 **I don't know.**
11   Q   And that is one problem with not actually using
12 people's names in emails, when someone is asking about
13 it later, it's not apparent from the face of the
14 document who you're talking about, right?
15   **A   Well, it's not apparent to me who -- who we're**
16 **referencing here, who I'm referencing here.**
17   Q   All right.  Let's go to Exhibit 47.  See if
18 that helps.  Really what I'm interested in this document
19 is the Lorraine Leete memorandum on the last two pages.
20   **A   Okay.**
21   Q   This is a summary of Ms. Leete's meeting with
22 Ivan Otero in June of 2012.  Is that what it appears to
23 be to you?
24   **A   Looks like that way.**
25   Q   And your email talks about Point 5 logistics

187

1  for P&Y.  Point 5 in this memorandum refers to P&Y, but
2  in one instance does state the name, Yuca.  You see
3  that?
4    **A   I do see that, yeah.**
5    Q   And Ms. Leete's comment here is what -- do you
6  have any reason to believe -- do you have any reason it
7  believe that P refers to anyone other than Penata?
8    **A   I don't.  I just don't.  I don't remember.  And**
9  **I'm clearly in my email taking this from Lorraine's**
10 **notes, so I -- I don't know.**
11   Q   You knew about it at the time.  You would not
12 have just used random letters to communicate with your
13 team, would you?
14   **A   No, certainly not, but Point 5 is just P&Y is**
15 **what I'm saying, so I just don't -- I just don't recall**
16 **who those people are.**
17   Q   Number 5 in Ms. Leete's memo talks about
18 needing $2,700 for logistics and for keeping Yuca from
19 being transferred.  Do you see that?
20   **A   I do.**
21   Q   And what do you know about money needed to keep
22 Yuca from being transferred?
23   **A   I don't know.**
24   Q   Yuca was in prison at the time, correct?
25   **A   It would seem so from this.**

188

1    Q   You do not recall producing declarations in
2  Balcero from paramilitaries that were both in prison
3  named Yuca and Penata?
4    **A   I'm -- I'm not denying that that was done.**
5  **It's just, again, a long time ago.  It -- that seems**
6  **like it could have happened.**
7    Q   And why would anyone need money to keep a
8  prisoner from being transferred?
9       MR. COLLINGSWORTH: Object to the form.  Calls
10 for speculation.
11   **A   Yeah, I don't -- I don't know.**
12   Q   Are you aware of any money paid by your team,
13 which I'm including Ivan Otero and any of your Colombian
14 folks, to Colombian officials to bribe them to do
15 anything?
16   **A   No.  Not.**
17   Q   And right after this sentence we just read,
18 Yuca will not sign the declaration until he gets
19 security money which still hasn't arrived, the extra
20 $2,200 monthly.  Did I read that correctly?
21   **A   Yes.**
22   Q   And was Yuca provided a monthly payment of
23 $2,200?
24   **A   I don't know.**
25   Q   I'll represent to you, Judge Proctor is already

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

189

1 aware of it, there was a monthly $2,200 payment that
2 went down to Ivan Otero from Conrad & Scherer --
3    **A   Okay.**
4    Q   -- starting after this memorandum.
5    **A   Okay.**
6    Q   Do you have any explanation for what that
7 $2,200 was for other than for as this memo states?
8    **A   No.  No.**
9      MS. LOCKWOOD: Just make sure you speak up a
10 little bit.
11      THE WITNESS: Okay.
12      MS. LOCKWOOD: Yeah, it's been a little --
13      THE WITNESS: Sorry.
14    Q   And if we can go to tab -- or excuse me,
15 Exhibit 46 now, which is the text messages.  You're tell
16 -- the second message down, you're telling Mr.
17 Collingsworth, Lorraine has some info from Ivan that is
18 a little time sensitive.  Tomorrow Tuesday would be
19 fine.  I can either talk to you through -- talk you
20 through it or we can send over Skype.  Otherwise, I will
21 send you an update on a few things this evening that
22 just require you to look and agree or disagree, but are
23 not complicated.  I'll send you an email so it's
24 organized and not piecemeal.
25      Mr. Collingsworth responds, Email is good.

190

1 Speak general and I'll get it.
2      Now, can you explain why it would be necessary
3 to speak generally to Mr. Collingsworth in an email?
4    **A   No.**
5    Q   You're saying that's not to hide what you all
6 were doing?
7    **A   I wasn't trying to hide something.**
8    Q   Mr. Collingsworth responds, Wondering where the
9 email is.
10      Your response, second from the bottom, Sorry,
11 when I saw Lorraine's email, I thought she was going to.
12 I'm on my way home and will do it when I get there...
13 involves payments, as I'm sure you know.
14      And his response is, Well it is what it is.
15 Correct?
16    **A   Yes.**
17    Q   Your next text to him is, Sent you an email but
18 regarding no. 5 --
19    **A   Can you just -- okay.  On the next page, sorry.**
20    Q   Oh, I'm sorry.
21    **A   That's okay.  Yeah.**
22    Q   Your next text to Mr. Collingsworth is, Sent
23 you an email but regarding no. 5.  Ivan Otero needs
24 $2,700 for logistics in order to make letters rogatory
25 for P and Y happen and to keep Y from being transferred.

191

1      I'll stop there.  Did I read that correctly?
2    **A   Yes.**
3    Q   Are you aware of any paramilitary witness in
4 Balcero that you sought letters rogatory from that P and
5 Y can be referring to other than Penata and Yuca?
6    **A   Not aware of anybody else.**
7    Q   And you say in this text to Mr. Collingsworth,
8 Y -- who I'm assuming is Yuca -- still has not received
9 the $2,200 and will not sign without it.  Lucho will not
10 sign without security money.  Charris needs $7,000 for
11 his transfer.  Sorry.
12      So you are clearly telling Mr. Collingsworth
13 that this witness here will not sign their declaration
14 without the $2,200, correct?
15    **A   I -- I am.  I'm giving information that's come**
16 **from Lorraine's notes from that meeting.  So it looks**
17 **like I'm conveying that.**
18    Q   Okay.
19    **A   From her to him I guess.**
20    Q   And Yuca did eventually sign a declaration for
21 you all that you had produced in Balcero, correct?
22    **A   I -- I think that's -- that sounds right, but I**
23 **don't recall.**
24      THE VIDEOGRAPHER: Ms. Levesque, people on Zoom
25 are having a hard time hearing you.

192

1      THE WITNESS: Sorry.
2      THE VIDEOGRAPHER: That microphone, that one
3 right there, that's the Zoom, pick it up a little bit.
4      THE WITNESS: Okay.  Yeah, I'm sorry.
5    Q   So as of June of 2012, you clearly, because
6 you're writing it, are aware that Yuca is not going to
7 sign his declaration until he gets paid $2,200, correct?
8    **A   It -- it looks like that's what I'm conveying**
9 **here from this information in this meeting notes.**
10    Q   Do you have any basis to dispute that Yuca, in
11 fact, was paid $2,200 in order to get him to sign his
12 declaration?
13      MR. COLLINGSWORTH: Object to the form.
14    **A   I don't one way or the other.  I wasn't**
15 **involved in making those payments if they were made, and**
16 **that's -- I think here I'm conveying a message.  I don't**
17 **-- I don't know -- I don't have any other information**
18 **about that.**
19    Q   The message is, This witness will not sign
20 their declaration without $2,200, correct?
21    **A   Yeah, it looks like that's what it's saying.**
22    Q   And I think you told me earlier it would be a
23 concerning situation to have to pay money to a witness
24 to get them to sign a declaration, right?
25      MS. LOCKWOOD: Objection.  Misstates testimony.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

49 (193 to 196)

193

1    Q   Well, you tell me.
2    **A   Yeah, so --**
3    Q   Is that concerning to you to have to pay a
4 witness thousands of dollars to get them to sign a
5 declaration?
6    **A   So as we've discussed, you cannot pay in order**
7 **to receive testimony. You have already seen in multiple**
8 **instances discussions regarding permissibility when**
9 **there are other factors at play, such as security or**
10 **things of that sort, legal fees, et cetera. So it very**
11 **much depends, it's complicated, it depends on those**
12 **circumstances. But it is concerning, and I have said it**
13 **is concerning.**
14    Q   Is this another situation where you are
15 deferring to Mr. Collingsworth's judgment as to whether
16 such a payment was permissible or not?
17    **A   I think in this instance, yes, I'm simply**
18 **conveying a message concerning what has happened. It --**
19 **or what is the situation. That's what I'm doing here.**
20    Q   And you're also telling him that Lucho, which
21 is another former paramilitary in prison, will not sign
22 his declaration without quote, unquote, Security money,
23 correct?
24    **A   That's right, and I believe that also came from**
25 **this information as well from that meeting.**

194

1    Q   And you're also telling him that Charris, who
2 is another imprisoned witness that you all were relying
3 on needs $7,000 for his transfer, correct?
4    **A   I'm passing that message on in that instance,**
5 **yes.**
6    Q   And why in the world would anybody need $7,000
7 to get a prisoner transferred from one place to another?
8      MS. LOCKWOOD: Objection. Calls for
9 speculation.
10    **A   I don't know. I wasn't involved in arranging**
11 **that if it was ever arranged. I -- I don't know.**
12    Q   Did you not ask anybody any questions: Why are
13 we sending all this money; is it going to prison
14 officials; is this illegal? Did you ask anybody any of
15 those questions?
16      MS. LOCKWOOD: I object to the form.
17    **A   Yeah, I -- I don't recall. It was a long time**
18 **ago. I don't recall.**
19    Q   Well, Terry's response to this text from you
20 is, Well, please tell all concerned -- I'm sure he was
21 probably trying to say -- that I will get any day
22 $35,000 from my uncle, and I can't let it go any faster,
23 but it will happen.
24      Did I read that correctly?
25    **A   Yes.**

195

1    Q   And we can go through the emails if we need to,
2 but do you recall seeing today or just in general
3 multiple times you all were referring to Albert van
4 Bilderbeek as quote, unquote, The uncle?
5    **A   I -- I don't recall that. I see here that he's**
6 **referring to, My uncle, and it may very well be the case**
7 **that he was referring to Albert van Bilderbeek as his**
8 **uncle. I just I -- I see that here. I'm not disputing**
9 **that it's referring to my uncle here.**
10    Q   In all your work on the case -- let me ask you
11 this foundational question.
12      How long were you working on the Drummond
13 Colombia cases?
14    **A   I'm not sure when I first started working on**
15 **those cases. In 2013 is when Balcero stopped or was**
16 **dismissed. I don't know when I first started working on**
17 **that, on -- on the Colombia cases for Drummond.**
18    Q   A number of years?
19    **A   It was, I mean it was --**
20    Q   Not a couple weeks?
21    **A   Correct, it wasn't.**
22    Q   In all of that time, are you aware of Mr.
23 Collingsworth actually having an uncle providing
24 thousands of dollars for you all's use in the case?
25    **A   No. It was a -- it was a nickname that he was**

196

1   **using, but no, I did not.**
2    Q   And why are there multiple references to Albert
3 van Bilderbeek as just being the uncle?
4    **A   I don't know.**
5    Q   Were you all trying to use code words?
6    **A   No, I was not trying to use code words.**
7    Q   You were not trying to hide what was going on?
8    **A   No.**
9    Q   Do you have any explanation for why things like
10 the brothers, uncle, vague terms other than specific
11 terms were used in many of these witness payment emails
12 that we've looked at today?
13      MS. LOCKWOOD: Object to the form.
14    **A   No. And in fact, here I've sent a text that is**
15 **not using vague terms so I'm -- I -- I don't -- I don't**
16 **know.**
17    Q   You mean your text saying, P&Y?
18    **A   No, my text that refers to Lucho and Charris**
19 **that you just pointed out to me. Those are not vague**
20 **terms.**
21      MR. WELLS: Let's go to tab 80.
22    **A   Are we putting this to the side now?**
23    Q   Yes.
24      (Levesque Exhibit 48, Tab 80, 7/2012 email, was
25 marked for identification and is attached to the

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

197

1  transcript.)
2      Q  And this is Exhibit 48.  And this is another
3  email chain with Mr. Collingsworth, you, Lorraine Leete,
4  and Susana Tellez, correct?
5      A  So sorry, from me and can you -- can you just
6  repeat that.  I started to read it, I'm sorry.
7      Q  This is another -- another email chain
8  involving you, Terry Collingsworth, Lorraine Leete, and
9  Susana Tellez, correct?
10     A  Yes.
11     Q  Flip to the second page, you will see the first
12  email in the chain.
13     A  Okay.
14     Q  We've got Mr. Collingsworth writing to you
15  about Interrogatory Responses, correct?
16     A  Yes.
17     Q  And it says, Christian, great job on the
18  objections.  Right?
19     A  Yes.
20     Q  In other words, he's directing this to you, not
21  the others, right?
22     A  Yes.
23     Q  Down on number 9, you see the sentence
24  beginning with on number 9?
25     A  Uh-hum.

198

1      Q  I note that I DID provide some cash to guards
2  at Valledupar through Ivan Otero.  MUST we disclose
3  this?  I think so unless we can raise a self
4  incrimination objection, which would be odd and
5  troubling.
6          Did I read that correctly?
7      A  Yes.
8      Q  Did you ever disclose that money had been given
9  to Ivan Otero with the expectation that it be given to
10  prison guards?
11     A  I don't know.
12     Q  Is this something you also do not recall?
13     A  Yes.  It's a very long time ago.
14     Q  Would you agree that it would be very
15  concerning to you based on your knowledge of the law if,
16  in fact, money was being provided from your team to
17  Colombian prison guards?
18     A  I -- I think that it could be.  I -- I think
19  also here I'm responding that if money was given to
20  guards to rent -- to rent a conference room, I'm saying
21  it should be disclosed, so --
22     Q  Well, let's go through it since you're pointing
23  that out.
24          Mr. Collingsworth's follow-up email to you at
25  the bottom on the first page --

199

1      A  Uh-hum.
2      Q  -- says, Just to be accurate, for interrogatory
3  number 9, I did not personally give funds to any guards.
4  I gave funds to Ivan who most likely gave it to the
5  guards.
6          Did I read that correctly?
7      A  Yes.
8      Q  Does that lessen your concern that money was
9  funneled through Ivan Otero with the knowledge that it
10  was most likely given to the guards?
11     A  I -- no, not necessarily.  And I think I've
12  responded in that way that if it was given to the
13  guards, with the intent that it be given to the guards,
14  that it would -- it should be disclosed.
15          Again, I think this is an instance where I'm
16  doing the best I can to answer the Interrogatories in
17  a way that's accurate.
18     Q  Well, don't you think if you got wind that
19  money from your team was paid to Colombian prison
20  guards, you wouldn't need to be just disclosing it in
21  response to discovery request; you would have an
22  affirmative ethical obligation to report that to the
23  authorities, correct?
24          MS. LOCKWOOD: Object --
25          MR. COLLINGSWORTH: Object to the form.

200

1          MS. LOCKWOOD: Join, and calls for legal
2  conclusion.
3      A  Yeah, I think these are complicated issues, and
4  I'm not -- I mean, I think they're complicated, and
5  they're complicated legally and factually.  And so I'm
6  -- I'm thoroughly grappling here with what to disclose,
7  and beyond that, I think the answer is I just don't
8  know.  It would just really depend on the facts and the
9  circumstances.
10     Q  None of which you remember; is that correct?
11     A  No.  This was many years ago.  No.
12     Q  Mr. Collingsworth follows up, second email from
13  the top, I don't know exactly what was done with the
14  money or who received it.  I gave it to Ivan and good
15  things happened.
16          Did I read that correctly?
17     A  Yes.
18     Q  Do you think it is okay to give money to
19  someone who Mr. Collingsworth at least thought at the
20  time was going to be giving it to prison guards and it's
21  not a problem just because I gave it to him and I didn't
22  see him actually do it?
23     A  No, not necessarily, but again, here I think
24  I'm doing the best I can to understand what's happened,
25  and he's saying he doesn't know what was done with the

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

201

1  **money, or who received it.  So I just think I'm doing**
2  **the best I can do here.**
3  Q  Okay.  Just to summarize these emails, the way
4  I read it, you tell me if you disagree, Mr.
5  Collingsworth's first statement is, I gave money to Ivan
6  Otero who then gave it to prison guards, correct?
7  A  So --
8  MS. LOCKWOOD: Objection.  Misstates the
9  document.
10 **A  Yeah, I mean, I'm going through the document**
11 **here.  Okay.**
12 Q  I DID provide some cash to guards at Valledupar
13 through Ivan Otero.
14 **A  Yes.**
15 Q  Then, he responds, Well, I don't know for sure,
16 I didn't actually see it, I didn't -- I didn't
17 personally give any funds to anybody, but I gave it to
18 Ivan who most likely gave it to the guards, right?
19 **A  Yes.**
20 Q  And then, your response is, Well, in that case,
21 we probably need to disclose it, right?
22 **A  Right.**
23 Q  And then, Terry changes again and says, Well, I
24 don't know what happened with the money.  I just gave it
25 to Ivan and good things happened.  Right?

202

1  **A  Right.**
2  Q  You didn't have any questions about whether
3  that was legitimate?
4  **A  I'm not saying I didn't have questions.  I**
5  **don't know what other conversations may or may have been**
6  **had, but to me, this chain indicates I'm doing the best**
7  **I can do to answer these in a way that's accurate, and I**
8  **am not the one who -- like, I wasn't there to know what**
9  **the funds were given for or to whom they were given to,**
10 **so I think I'm doing the best I can do here.**
11 Q  Well, Mr. Collingsworth, after changing his
12 story a couple times, your response basically
13 immediately is, Okay.  That clears it up.  Thanks.
14 Right?
15 **A  Well, he said he didn't know what happened with**
16 **the money or who received it, so I -- again, I -- I**
17 **think I was trying here.**
18 Q  In all this, is this just a situation if Mr.
19 Collingsworth says it, it goes?
20 **A  No, not necessarily.  But this is a situation**
21 **where I wasn't the person who was engaged in these**
22 **actions and didn't have all of the facts, and as a**
23 **result, I was relying on the person who did have those**
24 **facts, and then, separately was also doing the best I**
25 **could do to have -- to exercise judgment around**

203

1  answering these Interrogatories.
2  Q  As we've seen in a number of emails today, a
3  lot of other money was sent to Ivan Otero, right?
4  **A  There was other money sent to him.**
5  Q  Was any of that money sent to Ivan Otero in
6  connection with Jamie Blanco, correct?
7  **A  Yes.**
8  Q  Money sent to Ivan Otero in connection with Y
9  and P, who I assume is Yuca and Penata, correct?
10 **A  Yes.**
11 Q  And after sending that money to Ivan Otero,
12 each one of those witnesses ultimately signed a
13 declaration for use in your case against Drummond,
14 correct?
15 **A  That appears to be the case.**
16 Q  And you all submitted those declarations to the
17 Court, correct?
18 **A  Yes.**
19 Q  And you requested the Court for letters
20 rogatory testimony that was going to serve as their
21 trial testimony, the imprisoned witnesses' trial
22 testimony in the case, correct?
23 **A  Yes.**
24 Q  And --
25 MS. LOCKWOOD: Ms. Levesque, just speak up a

204

1  little.
2  THE WITNESS: Oh, I'm sorry.
3  MS. LOCKWOOD: Again, maybe move the --
4  THE WITNESS: Yeah.
5  MS. LOCKWOOD: -- speaker closer to you too.
6  Q  At no time prior to the trial testimony or
7  prior to submitting that trial testimony to the Court on
8  summary judgment did you or anyone else on your team
9  disclose any of those payments, did you?
10 MR. COLLINGSWORTH: Object to the form.
11 **A  Yeah, I -- so again, I think that you know, it**
12 **was a team, I was one of a team, and I was again doing**
13 **the best I could do to uphold discovery obligations and**
14 **to answer those Interrogatories, and also that was not**
15 **-- I was not involved in making those payments or making**
16 **those decisions.  So I was doing the best I could do.**
17 **But in terms of disclosure, I don't -- I don't recall**
18 **there being a disclosure, but I also recall that we were**
19 **trying to answer those Interrogatories in a way that was**
20 **accurate.  At least I was trying to do that.**
21 Q  And your testimony is that even though you are
22 copied on numerous emails -- we are up to 48 so far --
23 discussing the subject of varying witness payments, that
24 the person that was involved with that and was making
25 those decision was Terry Collingsworth?

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

52 (205 to 208)

---

205

1      MS. LOCKWOOD: Objection. Misstates the
2   documents.
3      **A   Yeah, I mean, I -- I think the documents and**
4   **Terry have been clear in terms of what decisionmaking he**
5   **was doing, and it's clear from this where I was involved**
6   **and answering certain Interrogatories and things of that**
7   **sort, but I am not making those decisions, and I think**
8   **Terry has indicated he did make decisions, I mean.**
9      Q   And at all times when you were receiving every
10  email that we have looked at so far side today, you were
11  acting as an employee of Conrad & Scherer, correct?
12     **A   I was acting as an employee of Conrad &**
13  **Scherer.**
14     Q   Do you remember a paramilitary witness who was
15  also in prison by the alias, El Canoso?
16     **A   I don't remember that one.**
17     Q   His last two names were Gelvez Albarracin.
18     **A   That sounds more familiar, yes.**
19     Q   Are you aware that your team made payments for
20  the benefit of he and/or his family?
21     **A   I don't recall that.**
22     Q   Have you ever communicated in any form or
23  fashion with the Colombian Fiscalia?
24     **A   No.**
25     Q   And for our jury's purpose, the Colombian

---

206

1   Fiscalia is basically Colombia's equivalent to the U.S.
2   Department of Justice?
3      **A   Yeah, or a Prosecutor General's Office type of**
4   **department, yes.**
5      Q   Have you been involved in any communications of
6   any sort while you were at Conrad & Scherer with the
7   U.S. Department of Justice about Drummond?
8      **A   No.**
9      Q   Were you aware that Mr. Collingsworth was?
10     **A   I don't -- I don't think so. Yeah, I guess the**
11  **answer to that is I don't -- I don't know. I don't**
12  **think I was while I was at Conrad & Scherer. I feel**
13  **like at some point, he might have become aware of an**
14  **MLAT that had been submitted, but I don't -- I wasn't --**
15  **I don't think -- I think I was not aware of that while I**
16  **was at Conrad & Scherer.**
17     Q   And tell us what MLAT is.
18     **A   A mutual Legal Assistance Treaty request. It's**
19  **done government-to-government in a prosecution, and he**
20  **might have been aware of.**
21     Q   That was after you left Conrad & Scherer?
22     **A   I -- right, I think so.**
23     MR. WELLS: All right. Let's take another quick
24  break. The next section is kinda document heavy. I'll
25  try to get it as efficiently organized as possible.

---

207

1      THE WITNESS: Okay.
2      MS. LOCKWOOD: Okay.
3      THE VIDEOGRAPHER: We're going off the record at
4   3:35 p.m.
5      (A brief recess was taken.)
6      THE VIDEOGRAPHER: We're going back on the
7   record at 3:55 p.m. Eastern Time.
8   BY MR. WELLS:
9      Q   Ms. Levesque, we've referenced a couple of
10  times today the defamation case that Drummond filed
11  against Mr. Collingsworth and Conrad & Scherer, right?
12     **A   Right.**
13     Q   And is it your general recollection that round
14  about the time that Balcero was dismissed, discovery in
15  the defamation case started heating up in earnest?
16     **A   I think that's right.**
17     MR. WELLS: Let's go to tab 108, which is
18  Exhibit 49.
19     (Levesque Exhibit 49, Tab 108, 6/2013 email,
20  was marked for identification and is attached to the
21  transcript.)
22     Q   So the first email in the chain is from Alana
23  Duke with a copy to Brad Smith. Now, Brad Smith was
24  originally counsel for Mr. Collingsworth and the firm in
25  the defamation case, right?

---

208

1      **A   That sounds right. I think earlier I said I**
2   **didn't recall, but in hearing you say that and then**
3   **seeing that, that makes sense to me.**
4      Q   Okay. And providing Mr. Collingsworth draft
5   responses to some requests for production, correct?
6      **A   Yes.**
7      Q   And Mr. Collingsworth sends that along to you,
8   Lorraine Leete, and Susana Tellez, correct?
9      **A   Yes.**
10     Q   And he says in the second sentence, We aren't
11  producing anything yet and will just submit objections
12  on Friday, but we should have a sense of whether we have
13  any docs at all or whether we will need to fight hard
14  because we have a problem with the docs we do have. As
15  to number 10, when Christian and I are down -- or done
16  with the current briefs, we will review our current
17  position in Balcero with Ivan's docs.
18     Did I read that correctly?
19     **A   Yes.**
20     Q   So fair to say you were involved in some manner
21  in responding to discovery in the defamation case?
22     **A   Yes.**
23     MR. WELLS: Let's go to doc -- or tab 112, which
24  is Exhibit 50.
25     (Levesque Exhibit 50, Tab 112, 7/2013 email,

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

209

1  was marked for identification and is attached to the
2  transcript.)
3      MS. SHERMAN: Yeah, can you all hear us on Zoom?
4      THE TECHNICIAN: Yes.
5      MS. SHERMAN: Okay.
6      Q  So this is an email from Mr. Collingsworth to
7  Brad Smith, with copies to Susana Tellez and you,
8  attaching an opposition to the motion to compel in the
9  defamation case, correct?
10     **A  Yes, I'm sorry, just what did you say about the**
11 **motion to compel?  I'm still just sort of reading what's**
12 **attached here.  There is --**
13     Q  Well, the subject line is, Opp Compel.  Do you
14 --
15     **A  Um-hum.**
16     Q  -- read that to be opposition to a motion to
17 compel?
18     **A  Yeah, that looks right, yeah.**
19     Q  And Mr. Collingsworth is telling Mr. Smith,
20 Hey, Brad, attached please fiend my Draft Declaration
21 and the Factual Context section.
22     **A  Yes.**
23     Q  And looking at the attachment without reading
24 it, it looks like he has drafted a portion of the
25 opposition to motion to compel as it relates to factual

211

1  attached is my review of Christian's draft with my draft
2  changes.
3      **A  Okay.**
4      Q  Did I read that correctly?
5      **A  Yes.**
6      Q  And what is attaching there are TC edits to CL
7  draft.  Terry Collingsworth's edits to Christian
8  Levesque's draft, correct?
9      **A  Yes.**
10     Q  So I ask again, is it fair to say that you were
11 involved in the drafting of discovery briefing in the
12 early stages of the defamation case?
13     **A  Yes, it -- and it looks like here based on what**
14 **we saw that Terry was drafting the factual aspects, and**
15 **I might have been drafting other parts.  But I'm again**
16 **trying to piece this together because I just don't**
17 **independently remember beyond that.**
18     Q  But this is a brief to be signed and filed by
19 Brad Smith, the firm's counsel, correct?
20     **A  Yes, I believe so.**
21     Q  But at least as this email reflects, you and
22 Terry have a hand in actually drafting that brief signed
23 by Mr. Smith?
24     **A  Yes, and at least some portion of it, that's**
25 **right.**

210

1  and legal context?
2      **A  Yes, that looks right.**
3      Q  And fair to say you were involved in some
4  manner in the drafting of discovery briefs in the early
5  stages of the defamation case?
6      **A  Yes, so I don't -- I don't -- I don't know if**
7  **that's accurate or not.  I -- I'm trying to piece this**
8  **together as we go.  I mean, he has clearly drafted**
9  **something and has sent it to his counsel.  He has cc'd**
10 **me.**
11     Q  Let me just stop you there.
12     MR. WELLS: Let's look at tab 116, which is
13 Exhibit 51.
14     **A  Okay.**
15     (Levesque Exhibit 51, Tab 116, 7/2013 email,
16 was marked for identification and is attached to the
17 transcript.)
18     **A  Okay.**
19     THE TECHNICIAN: Tab 16?
20     MR. WELLS: Tab 116.
21     THE TECHNICIAN: Thank you.  116.
22     Q  So the first email in this chain is you to
23 Terry Collingsworth, Susana Tellez, and Brad Smith, but
24 your -- the text of your email is redacted, but Mr.
25 Collingsworth responds, Thanks Christian.  Susana,

212

1      Q  And do you recall that once Drummond started
2  finding out about certain payments to witnesses, that
3  Drummond started issuing subpoenas all over the country
4  looking for other evidence of witness payments?
5      **A  I don't recall that specifically, but I mean,**
6  **that makes sense as you say that; that that's what**
7  **happened.**
8      Q  And for example, there was a subpoena to
9  International Rights Advocates --
10     **A  Yes.**
11     Q  -- for which you were actually counsel of
12 record on behalf of International Rights Group, maybe on
13 Conrad & Scherer, I don't know which, but we will get to
14 it.  But you were involved in the briefing of that
15 subpoena?
16     **A  Again, I don't independently recall that, but**
17 **you know, I'm sure you might have documents that refresh**
18 **on that, and that's fine.**
19     MR. WELLS: Let's go to tab 121.
20     (Levesque Exhibit 52, Tab 121, 8/2013 email,
21 was marked for identification and is attached to the
22 transcript.)
23     **A  I don't have that yet, do I?**
24     Q  No, it is Exhibit 52.
25     THE WITNESS: Can we take some of these --

213

1    MS. LOCKWOOD: Does she need these other ones?
2    MR. WELLS: No, those are --
3    A  Okay.
4    Q  So this is an email from Lorraine Leete, to
5  you, with copy to Susana Tellez, talking about
6  objections to the Parker Waichman subpoena, correct?
7    A  I see, yes.
8    Q  And it also references the request being
9  identical to the subpoena that was also sent to
10 International Rights Advocates. So basically, they only
11 had to tweak the International Rights Advocates'
12 response just a little bit?
13   A  Right, except for the last request, yes.
14   Q  So I'm not getting into what you did or did not
15 draft in terms of particular sections, but you are at
16 least in the loop as to the drafting of the briefs
17 before they were filed for the Parker Waichman and
18 IRAdvocates subpoenas?
19   A  Has to be -- did you say the briefing? I mean,
20 at least the objections here, right, the objections? Is
21 that what you meant, the objections?
22   Q  Well, for IRAdvocates you signed the brief, so
23 I assume you had a hand in drafting it?
24   A  Sorry, which -- which brief are you referring
25 to?

214

1    Q  The International Rights Advocates.
2    A  Okay. The reason I'm confused is because I'm
3  looking at this email, and it's talking about objections
4  to the subpoena, and the IRAdvocates subpoena, are you
5  saying there was a motion to quash the subpoena as well?
6    Q  There were motions to quash every single
7  subpoena along with --
8    A  That's fine, I'm trying to understand what
9  you're --
10   Q  -- requests for sanctions of Drummond for even
11 asking the questions.
12   A  I'm just trying to determine what --
13   Q  Do you recall that?
14   A  -- you're asking.
15   MS. LOCKWOOD: You guys are talking over each
16 other. Can we just back up.
17   MR. WELLS: Yeah.
18   MS. LOCKWOOD: Okay.
19   A  Yeah.
20   Q  Do you recall that in response to every
21 subpoena that Drummond was issuing around this time
22 seeking evidence of witness payments, the response by
23 Conrad & Scherer was to file motions to quash and also
24 move for sanctions against Drummond for even asking for
25 witness payment information?

215

1    A  Okay. Again, ten years ago, I don't recall
2  that, but I don't have a reason to question that that
3  was the case. So I'm -- I -- yes, okay.
4    MR. WELLS: And then, tab 123 is Exhibit 53.
5    (Levesque Exhibit 53, Tab 123, 8/2013 email,
6  was marked for identification and is attached to the
7  transcript.)
8    Q  And this is an email from you to -- to
9  summarize, are those all people in the D.C. office of
10 Conrad & Scherer?
11   A  That's right, yes.
12   Q  Except for Lorraine Leete who I guess was in
13 Colombia?
14   A  Yeah. I'm sorry, yes.
15   Q  And you were sending to that group two draft
16 motions to quash. One for Google/Yahoo in the Northern
17 District of California, and the second one for a
18 subpoena to Microsoft in the Northern District of
19 Alabama, correct?
20   A  Yes.
21   Q  Any reason you disagree that you were involved
22 in the briefing relating to those subpoenas?
23   A  No.
24   Q  Could you tell the jury, please, what a
25 privilege log is?

216

1    A  So a privilege log is when in the course of a
2  discovery -- in the course of civil discov -- well, it
3  can be in criminal too. But in the course of discovery,
4  there are discovery requests, and when certain documents
5  are responsive but are otherwise protected by
6  attorney-client privilege, work product, or some other
7  privilege potentially, they go on a log.
8    Q  And it is one way to ensure that although
9  you're not producing documents that you claim are
10 privileged, at least there's a listing of them so you
11 know those documents exist?
12   A  That's right.
13   Q  So if the parties have a dispute over the
14 privilege, they can at least look at the privilege log
15 and say, I want the Court to look at this document and
16 see if it should be produced?
17   A  That's right.
18   Q  But without producing the document, or putting
19 it on a log, the opposing party has no information to
20 know that those documents that are not on the log even
21 exist?
22   A  That's right.
23   Q  And do you recall there being a directive from
24 Judge Proctor in the defamation case for Conrad &
25 Scherer and Mr. Collingsworth to create a privilege log

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

55 (217 to 220)

217

1  of everything they claimed was privileged in the
2  defamation case?
3      MR. COLLINGSWORTH: Object to the form.
4      **A  Yes, so I'll just say right now, I don't**
5  **remember him proclaiming that, but we did a privilege**
6  **log, and so I mean, I'm not disputing the Court's order**
7  **in that regard.**
8      MR. WELLS:Let's go to tab 129, which is Exhibit
9  54.
10      (Levesque Exhibit 54, Tab 129, 8/2013 email,
11  was marked for identification and is attached to the
12  transcript.)
13      Q  This is an August 29th, 2013 email from Charity
14  Ryerson to Terry Collingsworth and you, correct?
15      **A  Yes.**
16      Q  And Cherry -- Charity Ryerson is whom?
17      **A  So Charity was a lawyer, and she worked with us**
18  **in our group, and I think she did some -- I mean,**
19  **clearly this is showing she did some work on the**
20  **defamation -- at least in the privilege log. She -- I**
21  **think I already said that she was a lawyer. She might**
22  **have been technically a fellow IRAdvocates, but in the**
23  **D.C. office.**
24      Q  Do you know if she was ever an employee of
25  Conrad & Scherer as opposed to IRAdvocates?

218

1      **A  So I -- that I would be guessing. You would**
2  **obviously have access to that to clear that up one way**
3  **or the other.**
4      Q  Okay. And the email starts, Here are the
5  privileged documents. I just looked through my notes on
6  these to highlight a few. You may want to look at and
7  there a few that could be problematic.
8      Did I read that correctly.
9      **A  Yes.**
10      Q  Was Charity Ryerson, Terry Collingsworth, and
11  you the people involved in creating the privilege log in
12  the defamation case?
13      **A  In creating it, yes. And then, at various**
14  **points, like, for example, I was involved with the**
15  **privilege log, I think, only up to a certain point. I**
16  **think these were the people that were involved. We had**
17  **assistance from a paralegal, but I think you're asking**
18  **more about lawyers, right?**
19      Q  Correct.
20      **A  Okay.**
21      Q  I mean, you would not allow an assistant --
22      **A  Of -- of --**
23      Q  -- to create a privilege log without a lawyer
24  at least confirming it is correct and appropriate?
25      **A  Of course. I just think when you said**

219

1      **involved, I just wanted to clarify.**
2      Q  And she gives some examples of really what
3  she's attaching is a bunch of what she says are
4  privileged emails that could be problematic, right?
5      **A  Yes.**
6      Q  And in her email, she flags a few of them. She
7  says, For example  --and I'm looking at number 2, May
8  22nd, 2011, confidential trip report, outlines some
9  payments, et cetera. If anything in the world is
10  privileged, this is.
11      Did I read that correctly?
12      **A  Yes.**
13      Q  So that would be a document that relates to
14  payments that would need to go on a privilege log if it
15  is indeed privileged, correct?
16      MR. COLLINGSWORTH: Object to the form.
17      **A  Yes, if that document, and I think from this**
18  **context, it is responsive, it would need to go on a**
19  **privilege log.**
20      Q  And if we go to Bates page 689. This is a
21  confidential trip report from May 22nd, 2011, correct?
22      **A  Yes.**
23      Q  And this is a document we have reviewed today.
24  First part talking about Ivan being an intermediary to
25  Jamie Blanco, unfortunately he wants significant help

220

1  with his legal fees for his defenses as a condition, et
2  cetera and so forth.
3      **A  Yeah --**
4      Q  That's fine. We reviewed it for the first time
5  right now --
6      **A  -- it's -- it's it's fine. I just wasn't certain if**
7  **we had actually if it was already given an exhibit**
8  **number. I don't --**
9      Q  So this document in the first paragraph
10  definitely at least suggests that Jamie Blanco wants to
11  be paid $150,000 as a condition, correct?
12      **A  Yes. I'm sorry, and now as I see this first**
13  **paragraph here, I'm -- that I'm remembering that from**
14  **today. I'm sorry, there was just a lot here that --**
15
16      MS. LOCKWOOD: Just so --
17      **A  -- different.**
18      MS. LOCKWOOD: Sorry. Just to make sure we have
19  a clear record, I believe it's Exhibit 7 which is the
20  redacted version of this.
21      THE WITNESS: Ah.
22      MS. LOCKWOOD: Is that fair, Trey, on this? I
23  want to make sure we're clear.
24      MR. WELLS: Yes, we have received --
25      MS. LOCKWOOD: Oh, okay.

221

1    MR. WELLS: -- over the course of this case a
2  number of inconsistent redactions. So this is a less
3  redacted version of Exhibit 7.
4    MS. LOCKWOOD: Okay.
5    Q  And if we flip to number 10 on this email --
6    A  Uh-hum.
7    Q  -- this shows that security payments were made
8  for El Tigre and Samario, correct?
9    A  It does appear to say that, yes.
10   Q  And it says that those payments will continue
11 each month in the amount of $2,700, correct?
12   A  Yes.
13   Q  So this email, had it been produced, would have
14 disclosed to Drummond that there were at least
15 discussions about paying Blanco, and there were, in
16 fact, payments to El Tigre and Samario, right?
17   A  Yes.
18   Q  And none of the payments to any of those three
19 witnesses had been disclosed to either Drummond or the
20 Court at this point. Do you have any reason to disagree
21 with that?
22   A  No, again, I think we were -- at least I was
23 doing the best I could do to interpret those
24 Interrogatories.
25   MR. WELLS: So let's go to tab 130.

222

1    Q  Before we get to that one, obviously, if they
2  hadn't been disclosed to the Court or Drummond in the
3  defamation case, they weren't disclosed to the Court and
4  Drummond in Balcero, right? El Tigre, Samario and Jamie
5  Blanco?
6    A  I -- I think that's right based on what I'm
7  remembering from the Interrogatory Responses. Again,
8  our requests and responses, again, did our best to
9  interpret what's being asked.
10   MR. WELLS: And this was Exhibit 55.
11   (Levesque Exhibit 55, Tab 130, 9/2013 email,
12 was marked for identification and is attached to the
13 transcript.)
14   Q  So if you look at the bottom email in the first
15 page, that's the email we just looked at with attaching
16 the problematic documents including the confidential
17 trip report with information about, Hey, let's relating
18 to Blanco --
19   A  Yes.
20   Q  -- El Tigre and Samario?
21   A  I'm sorry, I'm sorry.
22   Q  You're good.
23   Is that correct? I'm not sure we got it
24 through the cough.
25   A  Yes.

223

1    Q  And reading up the chain to the top, it looks
2  like you were responding to that chain with the final
3  opposition to the motion to compel that was filed in the
4  defamation case; is that correct?
5    A  I mean, that is definitely an attachment, it
6  looks like, yes.
7    Q  If we can go to Bates page 642. In the section
8  entitled, Drummond falsely asserts that Mr.
9  Collingsworth and his legal team made improper payments
10 to witnesses, it reads, In purporting to seek further
11 discovery regarding payments made to witnesses, Drummond
12 asserts, as if it had discovered a nefarious plot, that
13 it, quote, Has evidence, unquote, Mr. Collingsworth paid
14 witnesses and their families. First, all of the quote,
15 Evidence, unquote, Drummond has was produced by
16 plaintiffs in the Balcero case and plaintiffs produced
17 every responsive document they had.
18   Did I read that correctly?
19   A  Yes.
20   Q  And it is not a true statement to argue to the
21 Court that in Balcero, your team produced to Drummond
22 every responsive document you had regarding payments to
23 either witnesses or their families, is it?
24   MS. LOCKWOOD: Object to the form.
25   A  Yes, so I don't -- I don't think what you said

224

1  is -- is accurate. You said responsive, and I think
2  we've already talked about several times that when there
3  were discovery requests, in particular in terms of the
4  role I was playing and what I knew, was doing the best
5  to answer those responsive -- answer those in a way that
6  was responsive, and presumably -- presumably also
7  produce responsive documents. So as it relates to the
8  Balcero case, I --
9    Q  And we've gone through the realtime emails of
10 you making those calls in the Balcero case, and your
11 determination was that payments to family members wasn't
12 responsive because payments to family members wasn't, in
13 fact, requested; it was payments to witnesses?
14   MS. LOCKWOOD: Objection.
15   Q  Correct?
16   MS. LOCKWOOD: Objection. Misstates the
17 testimony.
18   A  I think what we talked about was that as we
19 would do in any case where there is discovery on both
20 sides, we were interpreting the scope, making
21 objections, and interpreting the scope, and also
22 interpreting the subsequent Court's orders as well. And
23 that's what we were -- that's what we were doing. So as
24 it relates to this statement, I don't believe at the
25 time that I would have understood that to have not -- to

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

57 (225 to 228)

225

1  have been a misrepresentation.
2     Q  You understand it to be a misrepresentation
3  sitting here today?
4     A  So I am not misrepresenting anything as I sit
5  here today, it says, Paid witnesses and their families.
6  And I think we were limiting the scope to payments that
7  did not -- if they had gone to family members, that that
8  was not included. So looking at all of this, I don't
9  think it's -- again, I'm not misrepresenting, but I
10  would want to go back and review that to make sure that
11  it would be accurate if you are asking me to do it again
12  right now.
13     Q  Well, the record will be what it would be.
14  We'll move on to 660. At the top, it says, As to the
15  merits, Defendants have provided Drummond all responsive
16  documents, and the only reason Drummond knows about the
17  security payments is because Defendants provided the
18  documents. As discussed -- and it cites another part of
19  the brief -- Mr. Collingsworth fully explained that
20  security measures were needed because family members of
21  Charris and Duarte were in grave danger, likely because,
22  based on substantial evidence, Drummond hired an
23  assassin, Tolemaida, to attempt to silence the
24  witnesses.
25     Did I read that correctly?

226

1     A  Yes.
2     Q  And there is no disclosure, hint, or otherwise
3  that security quote, unquote, Payments were actually
4  made to El Tigre, Samario, and possibly Yuca as well, is
5  there?
6     MS. LOCKWOOD: Object --
7     MR. COLLINGSWORTH: Object to form.
8     A  I'm not clear on what -- on what you're asking
9  here. Are you asking if there's evidence that security
10  payment were made --
11     Q  We've gone through --
12     A  -- or that there is security issues? I'm
13  sorry, I just I'm not clear on what you're asking me.
14     Q  We've gone through a number of documents that
15  reflect that payments supposedly for security were made
16  for the benefit of El Tigre and Samario, correct?
17     A  Yes.
18     Q  And then, more recently, we've gone through
19  documents where you were writing that Yuca will not sign
20  his declaration without receiving a security payment,
21  correct?
22     A  I was conveying a message.
23     Q  And none of that is disclosed in this argument
24  to the Court, is it?
25     A  Well, it's indicating here, though, that I

227

1  mean, based on the information that Terry was providing,
2  he's explaining that security measures were needed. And
3  again, in the past, I think we were trying, or at least
4  I was trying to interpret those discovery requests in a
5  way that was accurate and to disclose what was required
6  of those. I don't know what else to say. This is -- to
7  that question.
8     Q  Do you now agree that this argument to the
9  Court suggests that only the security payments, the only
10  security payments that had been made, were those that
11  you all had disclosed in Balcero?
12     MS. LOCKWOOD: Object to the form. Lack of
13  foundation. What responsive documents are we talking
14  about.
15     A  Yeah, I guess I'm just -- I'm not -- I'm not
16  clear on the scope of your question now or on the basis
17  for answering. I think the question is I just don't
18  know.
19     Q  Yeah, that's what I was actually about to ask
20  you because it seemed like up to the -- this question or
21  series of questions, you haven't remembered any document
22  I've shown to you, yet now you are offering an
23  explanation as to what you were thinking when making
24  these representations in these briefs.
25     MS. LOCKWOOD: Objection.

228

1     Q  Is that what you're doing?
2     MS. LOCKWOOD: Objection. Misstates testimony.
3     A  Yeah, I don't -- I don't think that's accurate.
4  I think you're asking me to read a paragraph and then to
5  determine whether the past discovery responses that we
6  have gone over today were accurate. I don't have a
7  recollection that is separate from what I am reading
8  here. I'm reading these things, and I'm doing the best
9  I can do to answer your questions.
10     Q  So you don't think --
11     A  And this goes back quite a bit of time, yeah.
12     Q  You don't think this was misleading at all as
13  to the scope of security payments that you and your team
14  were involved in?
15     A  It -- I mean, it is again referencing
16  responsive documents. Responsive indicates that they
17  were, in fact, in response to discovery requests. So as
18  I'm sitting here today, it's not clear to me whether
19  this is a -- is accurate or not, but I was not
20  intentionally misrepresenting something. We're relying
21  on information here also that Terry has provided in his
22  declaration. I -- I just beyond that don't -- I don't
23  know beyond that.
24     Q  Okay. While these representations were being
25  made to the Court, were there any internal discussions

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

58 (229 to 232)

---

229

1 about what do we do about El Tigre, Samario, and Jamie
2 Blanco; should we put that in the brief or should we
3 not?
4    A  I -- I don't know if there were internal
5 discussions.  Terry was assisting in the factual part at
6 least.  I don't -- I don't recall there being
7 discussions about what else theoretically could be in
8 there.  I --
9    Q  I'm just trying to figure out if you know
10 sitting here today and have an explanation that I need
11 to know now as to why these types of representations
12 were made, and if there was some conscious decision of
13 we didn't think it was actually responsive, or are you
14 just reading this not remembering it as you sit here
15 today and kind of offering an explanation on the fly?
16    MS. LOCKWOOD: Object to the form.
17    A  Yeah, I'm -- I'm doing neither of those things
18 except that I'm reading this and I'm trying to answer
19 your -- answer your questions.  I don't recall internal
20 discussions that we had ten or so years ago concerning a
21 brief that was filed and whether this was accurate to
22 say all responsive documents had been provided.  I -- I
23 don't recall.
24    Q  So what I'm trying to make sure is you're
25 not going to testify to the jury that, I know what we

---

230

1 were thinking when this statement was put in the brief
2 and here is the explanation?
3    A  I'm saying I don't recall.  I don't -- I don't
4 know what I was thinking back then when this was
5 drafted.
6    MR. WELLS: Let's go to tab 133, which is
7 Exhibit 56.
8    (Levesque Exhibit 56, Tab 133, 9/2013 email, as
9 marked for identification and is attached to the
10 transcript.)
11    THE TECHNICIAN: Counsel, would you repeat the
12 tab number, please.
13    MR. WELLS: Yes.  It is tab 133.
14    THE TECHNICIAN: Thank you.
15    Q  So this is an email from you to Mr.
16 Collingsworth with the subject, Agenda of meeting with
17 Brad and agreement attached, correct?
18    A  Yes.
19    Q  And Brad would be Brad Smith, I assume?
20    A  I'm assuming so.  I think that's right.
21    Q  And your statement number 1 here is,
22 Communications about payments -- concerning because they
23 want internal communications between lawyers concerning
24 communications.  Biggest concerns:  Number 1), payments;
25 number 2), Ivan Otero communications.

---

231

1    Did I read that correctly?
2    A  Yes.
3    Q  And what were the big concerns of yours that
4 you're writing about in this email?
5    A  I think at this point in the litigation, it's
6 -- it's clear that the issue of payments is of focus, it
7 is clear that we have communications, and of course,
8 internal communications generally between lawyers,
9 putting aside any exceptions or Court rulings, are
10 privileged.  And so I think I -- I think I'm stating the
11 obvious at this point by the nature of the Interrogatory
12 Requests, the subpoenas, et cetera.
13    Q  And the nature of those is that they called for
14 payments you have yet to disclose?
15    A  No, not necessarily.  The issue is or the
16 concern is that they are concerning witnesses and
17 payments, you know, with -- with large in terms of
18 questions that are being asked.  I mean, in terms of
19 concern.  I don't know what else I can say about that.
20    Q  Well, the Ivan Otero communications, at least
21 the ones we've looked at today, talk about witness
22 payments, right?
23    A  Yes.
24    Q  And then, obviously, if there are documents
25 talking about payments, they are going to talk about

---

232

1 witness payments too, right?
2    MS. LOCKWOOD: Calls for speculation again.
3    MR. WELLS: It's her email.  What's the basis of
4 that objection?
5    MS. LOCKWOOD: You're talking about documents
6 that we're not looking at, and you're saying if they
7 refer to payments, then they must refer to witness
8 payments.
9    MR. WELLS: I'm asking the author of the email
10 what she meant by what her concern --
11    MS. LOCKWOOD: That wasn't the question.
12    MR. WELLS: -- payments was.
13    MS. LOCKWOOD: You can feel free to ask that
14 question.  I won't object.
15    A  I'm sorry, I've lost the train.  I -- I'm
16 basing --
17    Q  Your biggest concern as it relates to number 1,
18 payments, is that a concern over documents relating to
19 witness payments?
20    A  Yes, that's what I think we're talking.  It
21 seems like that's what we're talking about here.
22    Q  Seems pretty obvious to me as well.
23    MR. WELLS: All right.  Let's go to tab 134.
24    (Levesque Exhibit 57, Tab 134, 9/2013 email,
25 was marked for identification and is attached to the

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

233

1   transcript.)
2       Q   Let me ask you this before we get there, did
3   you, Ms. Levesque -- Levesque, excuse me, ever tell Brad
4   Smith, counsel in the defamation case, while you all are
5   writing briefs about discovery relating to witness
6   payments, that, By the way, in addition to Charris,
7   Duarte, and the others that Drummond knows about, we
8   also paid El Tigre, Samario and Jamie Blanco?
9       A   I don't recall what communications I was having
10  with Brad Smith at the time, if any.  Again, here, I --
11  I think, as I've stated before, I was doing the best I
12  could to ensure that responses to discovery were
13  accurate, and that briefings, to the extent I was
14  participating, were accurate.  I didn't have all the
15  information, or if I did, it was simply that I was cc'd
16  on certain emails.  My point is that again, that was not
17  an area that I was -- had ben sort of in charge of.  So
18  I think I'm doing the best I can do here.  But I don't
19  recall communications specifically with -- it seemed
20  like you meant oral communications, but --
21      Q   Any communications.
22      A   -- I mean.
23      Q   Are you aware of anybody --
24      A   You have the -- I'm sorry.
25      Q   Are you aware of anybody on your team

234

1   disclosing to Brad Smith while these briefs are going
2   around that El Tigre, Samario and Jamie Blanco were
3   paid?
4       A   I don't know what Terry is disclosing to Brad
5   submit or anybody else on the team, but Terry was
6   obviously working on these issues.  And I don't know
7   what he was disclosing.
8       Q   All right.  Going to tab 134, which is Exhibit
9   57.  This is a September 25th, 2013 email from Susana
10  Tellez to you, correct?
11      A   Yes.
12      Q   Subject, Privilege log, correct?
13      A   Yes.
14      Q   Attaching a Master Internal Privilege Log with,
15  quote, CL Notes, correct?
16      A   Yes.
17      Q   And would CL be Christian Levesque?
18      A   Yes.
19      Q   And if we can turn to the attached draft, the
20  internal notes on the right-hand column of the first
21  page --
22      A   Yeah.
23      Q   -- whose notes are those?
24      A   So I don't -- I don't know whose notes those
25  are because there seems to be another column after that

235

1   that's CL Notes.  So I don't -- I don't know.  It could
2   -- I just don't know.  I would -- I would be
3   speculating.
4       Q   Well, regardless of whose notes are in that
5   internal notes column, those notes were sent to you in
6   this document such that you could read them, right?
7       A   That would appear to be the case.
8       Q   And if we look at the first page, entry number
9   6, so and just to help us work through this document,
10  you've got it broken up between requests for production.
11  So the first section is Request for Production 36, next
12  section is Request for Production 39, All documents
13  evidencing any communications between the defendants and
14  Daniel Kovalik, and the rest of the log is broken up by
15  requests, okay.
16      A   Yeah.
17      Q   So we've got here number 6, a January 5th, 2009
18  email from Mr. Collingsworth to Rebecca Pendleton, and
19  the note in red on the right says that, Chain includes
20  an email from Rebecca Pendleton to Terry Collingsworth
21  discussing declarations and attorney Cooperation
22  Agreement.  He understands that he won't get paid as
23  soon as the declarations are turned in.  He just wants a
24  time line because he's being asked.
25          Did I read that correctly?

236

1       A   Yes.
2       Q   And what was your involvement in this privilege
3   log process?
4       A   So I -- I think -- I think I was involved with
5   an initial -- an initial draft in some way, right, like
6   I think inputting certain information.  And then, I
7   think after I did that, the timing is such that this is
8   about the time that I was talking about segueing off
9   around that time, off of the defamation case.
10      Q   But in terms of --
11      A   And so I think I sent that -- just to finish my
12  answer, if you don't mind.
13      Q   Sure, I didn't know you weren't finished.
14      A   No, no, it's fine.
15          So I think I did an initial draft of some kind,
16  and whether that was one or whatever, but -- and then, I
17  think that went on to Terry, I think.  And I think --
18      Q   So --
19      A   -- at that point, I wasn't involved afterwards.
20      Q   So on this -- well, forget this document.  The
21  -- the people -- if I'm looking for the team that was
22  making decisions on what should or should not be
23  included in this privilege log, we've got you.  Who
24  else?
25      A   So me, and I -- I think Terry after me.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

237

1 Clearly Charity had some involvement, but I don't -- I
2 -- I don't know that she was -- I mean, I think it was
3 Charity, me, participating in it in various ways, and
4 then, I think the final decisions were going like Terry
5 was making those in terms of the -- and I don't know if
6 counsel was involved also at this time. That I don't
7 know.
8       Q  If we can go to Bates 494. So we've got a
9 section here on line 81, Request for production 62, 63,
10 which is described as from January 1, 2000 to present,
11 all documents evidencing any type of payment from Llanos
12 Oil or any of its principals, representatives, agents,
13 or in -- employees, I guess, if you look on the next
14 page. Just the way these come out sometimes.
15      A  Yeah.
16      Q  The first one, Email between Albert van
17 Bilderbeek and Collingsworth, that's line 82, a wire
18 confirmation of a payment from Albert to Ivan Otero for
19 $35,000. Correct?
20      A  Yes.
21      Q  The next entry, another email between Albert
22 van Bilderbeek and Collingsworth, an email and wire
23 confirmation of a payment from Albert to Ivan Otero for
24 $60,000. Correct?
25      A  Yes.

238

1       Q  Next entry, another email between Mr. Van
2 Bilderbeek and Mr. Collingsworth. Terry, this wire was
3 held up by the correspondent bank for a lack of
4 documentation last Thursday. They took the whole day
5 today getting this cleared, and funds were issued last
6 week and confirmed, correct?
7       A  Yes.
8       Q  And to your knowledge, Mr. Van Bilderbeek was
9 the one providing funds for the payment to Jamie Blanco,
10 correct?
11      A  I think that's right based on what we've seen
12 today, yeah.
13      Q  If we can go to 499 and 500. Actually, let's
14 move on. I'm going to streamline this a little bit.
15         Let's go to 502.
16         Actually, sorry, that was the reason I wanted
17 to go to 499.
18      A  Are we back --
19      Q  This is --
20      A  -- back on 499?
21      Q  Yeah, just to confirm, the section we're
22 talking about involve line 25, Second request for
23 production 8. All documents reflecting emails between
24 defendants and anyone working on their behalf and Ivan
25 Otero, correct?

239

1       A  Yes.
2       Q  And if we go to -- back to 502, we've got an
3 email with Ivan Otero that a quote --
4       A  Which number are you on?
5       Q  I'm sorry, line 45.
6       A  Yep.
7       Q  The quote of the email says which is where he
8 said the money for his El Tigre and Samario security
9 should be deposited. Right?
10      A  Uh-hum.
11      Q  And then, on the next page, we've got number
12 52. April 15th, 2011 email involving Ivan Otero, which
13 is described as to Samario and El Tigre, $800 -- $1,800
14 each was given. From this, 800 was for the transfer of
15 their nuclear families, and 1,000 to sustain them for
16 one month. This makes an initial total of $3,600.
17 Right?
18      A  Yes.
19      Q  So this is the draft privilege log as it
20 existed when Susana Tellez sent it to you on September
21 25th, 2013, correct?
22      A  Yeah, it would appear to be.
23         MR. WELLS: And if we can now go to 137, tab
24 137, which is Exhibit 58.
25         (Levesque Exhibit 58, Tab 137, 9/2013 email,

240

1 was marked for identification and is attached to the
2 transcript.)
3       Q  So this is a couple days later, you are sending
4 back to Susan -- Susana Tellez, a Master Internal
5 privilege log with CL ST notes, correct?
6       A  Yes.
7       Q  So did Ms. Tellez take the first crack at the
8 log, and then, you make edits, or how did that process
9 work?
10      A  I really don't -- I don't remember the -- the
11 particulars. I mean, she would obviously be doing that
12 administrative function, and I was involved in some --
13 you know, involved, but I'm not certain what, if
14 anything, else was happening around this time period
15 with this process. I don't know, but --
16      Q  All right. Well, let's turn to Bates 295 on
17 the log you're sending to Ms. Tellez. And on line 63,
18 we've got the section entitled, Request for production
19 62, 63 from January 1, 2000 to present, all documents
20 evidencing any type of payments from Llanos Oil or any
21 of its principal, et cetera and so forth. We read it
22 earlier.
23      A  Um-hum.
24      Q  All of the entries we just went through in that
25 section have been removed, correct?

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

241

1    A   Perhaps so.
2    Q   You don't remember pulling those off the log?
3    A   No, I don't remember pulling off. And I'm not
4  the only one working on this at this time, so I
5  acknowledge there's an email from the 25th from Susana
6  from me, and then, there's one that goes back, but I
7  don't --
8    Q   Well --
9    A   Can you just drop -- let's see where it is in
10  here. I don't -- I don't recall taking documents off
11  the log. I don't think I'm going to have a better
12  recollection than that.
13    Q   All right. We have compared it. And the log
14  that Susana sent to you contained a number of entries
15  that would have revealed that El Tigre, Samario, and
16  Jamie Blanco were paid. The log that you sent back to
17  her contained none of those. Do you have an explanation
18  for that?
19    A   I don't, and I don't recall removing things
20  that were already on the log. If they were responsive,
21  and those were already on the log, I don't recall doing
22  that.
23    Q   And are you aware that the privilege log that
24  was ultimately finalized and produced to Drummond did
25  not include any entries where documents would show that

242

1  El Tigre, Samario, and Jamie Blanco, the three that had
2  yet to be disclosed and probably the three most
3  important witnesses in your case, weren't on there
4  either?
5    A   No. At -- at around this time when we were
6  getting into October, that is when I was not -- I -- I
7  think I was not working any longer on the defamation
8  suit.
9        I also just want to point out that when you
10  asked about process, at some point, I had already been
11  involved in that process since that version that Susana
12  sent on September 25th included my notes, so those were
13  already on a log that I had been involved in, and I
14  can't -- I don't know why it's not on the next version
15  that Susana, or that I -- I guess I sent back. And I
16  don't know if there were intermediary steps in between
17  there.
18    Q   Well, really, the question I'm most interested
19  in is why is it that there is a log that clearly is
20  referencing and quoting emails that would show that El
21  Tigre, Samario, and Jamie Blanco were paid, and the one
22  that was produced to Drummond didn't have any of that?
23        MS. LOCKWOOD: Objection. Calls for
24  speculation.
25    A   Yeah, I -- I don't know. I -- yeah. I -- I

243

1  simply don't know. And again, really at this time, I
2  was segueing off of this. This was, I think, one of the
3  last things that I worked on, and I don't -- I mean,
4  unless you have something to refresh, I don't know that
5  I saw it after this September 29th period.
6        MR. WELLS: All right. Let's go to tab 141.
7        (Levesque Exhibit 59, Tab 141, 10/2013 letter,
8  was marked for identification and is attached to the
9  transcript.)
10    Q   While we're waiting on that, so just to be
11  clear, if Judge Proctor is looking for an explanation as
12  to why documents that would have revealed the
13  undisclosed witnesses had, in fact, been paid, but
14  pulled off the log and not disclosed to Drummond or the
15  Court because this eventually had to get filed with the
16  court, you don't have an explanation?
17    A   I -- I don't. I don't -- I don't know why they
18  weren't on there. I -- also, as I said, I was not the
19  only person working on this privilege log, so --
20    Q   You've mentioned Charity Ryerson and Terry
21  Collingsworth.
22    A   Yes. And I think Charity was, from what you've
23  showed me today, she was making some notes and
24  initially, so that seems to be at this point or earlier.
25  But I mean, Terry was also involved in this after --

244

1  after me at various points, or while I was doing this.
2  I just don't -- I don't -- I don't know.
3    Q   All right. Tan 141 is Exhibit 59. And this is
4  it the letter that Brad Smith sent to Drummond on
5  October 2nd, 2013, attaching what was purported to be
6  Defendants' privilege log.
7    A   Okay.
8    Q   And in the first paragraph after the heading,
9  The Privilege Log, it states, Enclosed is the privilege
10  log. Although Defendants contest the relevancy of
11  certain requests and hence the need to log those
12  documents, Defendants have nevertheless, in most
13  instances, logged even those documents that they believe
14  lack relevance to this libel suit.
15        Did I read that correctly?
16    A   Yes.
17    Q   Flipping over to the second page, the first
18  full paragraph. As to Plaintiff's Second Request for
19  Documents No. 8 relating to Ivan Otero, Defendants have
20  searched for and logged internal communications with
21  Ivan Otero as it related to Drummond.
22        Did I read that correctly?
23    A   Yes.
24    Q   So all of the communications with Ivan Otero
25  that related to payments to El Tigre, Samario and Jamie

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

62 (245 to 248)

245

1  Blanco were not on the log, so how is this
2  representation being made to Drummond's counsel?
3  **A   I don't -- I don't know the answer to that, but**
4  **I'm not making this representation.   At -- at this -- at**
5  **this time period, I'm -- I was not -- I was traveling**
6  **for health reasons and undergoing treatment in Colorado,**
7  **so this was right at that time where I was removing or**
8  **segueing off of the defamation work, and so I don't -- I**
9  **don't know.**
10     Q   So your testimony is this is a letter you had
11  no hand in drafting?
12     **A   I just don't recall.   I mean, again, if you**
13  **have something that indicates that I was involved, but**
14  **at around this time, I was -- as I've already stated, I**
15  **was segueing off, and I don't recall drafting this**
16  **letter.**
17     Q   So if we are looking to find out who can
18  provide an explanation for why documents were pulled off
19  the log that was provided to Drummond, I think you said
20  you can't provide us an explanation, Terry would be one.
21  Anybody else you think might have an explanation for why
22  that decision was made?
23     **A   Not that I can -- not that I can think of.**
24        MR. WELLS: Let's take a quick break.
25     **A   Okay.**

246

1        THE VIDEOGRAPHER: Going off the record at 4:53
2  p.m. Eastern Time.
3        (A brief recess was taken.)
4        THE VIDEOGRAPHER: We're going back on the
5  record at 5:10 p.m. Eastern Time.
6  BY MR. WELLS:
7     Q   All right, Ms. Levesque, when we were -- I
8  guess when we broke, we were talking about the letter
9  from Brad Smith to Drummond's counsel attaching the
10  privilege log.   You recall that?
11     **A   Yeah.**
12        MR. WELLS: If we can look at tab 142.
13        THE TECHNICIAN: Tab 142?
14        MR. WELLS: Yes, sir.   Which is Exhibit 60 to
15  your deposition.
16        (Levesque Exhibit 60, Tab 142, 10/2013 email,
17  was marked for identification and is attached to the
18  transcript.)
19     Q   This is an email, sent on October 2nd, 2013,
20  the same date as the final signed letter, from Mr.
21  Collingsworth to Brad Smith and Eric Bonner, who is one
22  of his partners, attaching the letter that it appears
23  Mr. Collingsworth and you had a hand in drafting.
24  Correct?
25     **A   Yes.   It looks like I had some comments,**

247

1  **apparently.**
2     Q   Do you have any explanation for why there was
3  no disclosure in this letter that removed all of the
4  entries from the privilege log that would have revealed
5  El Tigre, Samario, and Jamie Blanco were paid?
6     **A   No, and I'm -- I'm not even clear that I**
7  **tracked what had been removed.   I just don't know one**
8  **way or the other.   I know you've sent two different --**
9  **you've provided two different versions, I understand**
10  **that, but I don't know that -- I don't know if I made a**
11  **comparison.   I just don't know, I don't remember.**
12     Q   Well, at least as it relates to the few that I
13  read out to you on the original log where they were
14  included, and I'll tell you there were a lot more that
15  were moved.   For the ones that we did go through, can
16  you provide any explanation as to go they would have
17  been removed from the log?
18     **A   No.**
19     Q   While you were going through the process of
20  looking at documents, and putting together a privilege
21  log, and whatever involvement you had in the discovery
22  process in the early stages of the defamation case, did
23  you notice that significant gaps of -- or significant
24  gaps existed in Mr. Collingsworth's emails?
25     **A   No, I don't -- I don't know that I was -- yeah,**

248

1  **I -- I don't -- I just don't remember one way or the**
2  **other noticing gaps or what have you.**
3     Q   So the firm's counsel in this case ultimately
4  notified us after a year or so that there were
5  significant gaps; you know, months, years, just missing
6  in Mr. Collingsworth's emails.   That was not something
7  you ever noticed in your involvement in the discovery
8  process?
9     **A   No.**
10     Q   Who was involved in searching for and reviewing
11  documents for production in the defamation case?
12     **A   So I don't -- I don't know who was involved in**
13  **searching.   This goes back -- or I don't recall.   This**
14  **goes back quite a -- quite a time.   Yeah.   I mean, I**
15  **would be speculating as to who was doing what searches.**
16     Q   We have touched on this -- well, before we get
17  there, who is Andre Lazare (phonetic)?
18     **A   That name is not ringing a bell.**
19     Q   I've got some emails, but I'm trying to
20  streamline.
21        Andre Lazare was apparently paid between 100
22  and $200,000 by Mr. Collingsworth to help get the
23  depositions approved by the Colombian Government.   Do
24  you know anything about what transpired in that
25  arrangement?

249

1    A   No.
2        MS. LOCKWOOD: Don't forget to speak up.
3        THE WITNESS: Okay.
4        MS. LOCKWOOD: Speak up.
5    Q   All right.  So we've touched on this a little
6    bit today, but Brad Smith, who was originally counsel
7    for the firm.  After these issues about potential
8    nondisclosure of witness payments came up and Drummond
9    filed a motion for sanctions, do you recall that the
10   firm hired new counsel from the firm, Steptoe & Johnson,
11   Susman Godfrey, and Mr. Paulk's firm, Spotswood
12   Sansbury?
13   **A   So I -- that sounds -- that sounds right.  I**
14   **don't have an independent recollection of it, but it**
15   **sounds like we had several -- that the firm had several**
16   **counsel.**
17   Q   And a lot of what those lawyers were doing
18   right when they got on the case was asking everybody
19   about who got paid and when, what was disclosed, what
20   was not, we got to make sure we know what has been
21   disclosed and whatnot.  Do you recall something similar
22   to that?
23   **A   Again, I -- I don't recall specifically being**
24   **asked, but I'm not disputing that that could have been**
25   **the case.**

250

1    Q   One second.
2        MR. WELLS: Let's go to tab 181.
3        MR. PRESLEY: It's been marked.  It's
4    Plaintiff's 46.
5        MR. WELLS: Thank you.
6    Q   Plaintiff's 46.
7        MS. LOCKWOOD: Is that the text messages?
8        MR. WELLS: Yes, spreadsheet of text messages.
9    Q   If we go to look for the date, November 22nd,
10   2014.
11   **A   November 22nd, 2014?**
12   Q   Yes.  And they are in chronological order at
13   that time.
14   **A   Yes.**
15   Q   Okay.  Who is Eldon Hillis (phonetic)?
16   **A   I don't know.**
17   Q   You don't remember somebody --
18   **A   I don't remember.**
19   Q   -- here --
20   **A   Named Eldon?  I don't.**
21   Q   So on this text spreadsheet, we've got the one
22   ID# 1900 on the far left.  Making sure we're looking at
23   the same thing.
24   **A   I'm sorry.  Just -- oh, yeah, um-um.  Yep.**
25       MS. LOCKWOOD: What date are we on?  Sorry I

251

1    lost you.
2        MR. WELLS: November 21st, 2014.
3        MS. LOCKWOOD: Okay.
4    Q   And this is from you to Mr. Collingsworth
5    saying, Can you check your email.  Eldon was talking to
6    Steptoe attorneys and wants information.  It may or may
7    not be urgent as he says, but you'll want to address or
8    make the call -- or make the call that all can wait.
9        Did I read that correctly?
10   **A   Yeah.  Yes.**
11   Q   Did you have discussions with the new set of
12   attorneys about what payments were made, and what had
13   been disclosed, and what had not been disclosed, and
14   why?
15   **A   I -- I don't recall.  I was on maternity leave**
16   **during this point in time.**
17   Q   All right.  If we go down a couple with the
18   texts, there are several, but the first text dated
19   January 8th, 2015.
20   **A   Uh-hum.**
21   Q   This is from Mr. Collingsworth to you, saying,
22   Hey, just heard that our new lawyers want to talk to
23   you.  They did not tell me this.  You definitely must
24   speak to me before you speak to them.  Try to stall or
25   ignore you are on leave.  Sorry for interrupting.

252

1        You respond, I've not responded and was
2    ignoring.  If they press me, I'll stall and will speak
3    to you before I talk to them.
4        Did I read that correctly?
5    **A   Yes.**
6    Q   Now, were you and Mr. Collingsworth trying to
7    get your stories straight before you talked to your new
8    lawyers?
9    **A   I have no reason to think that's what I would**
10   **be doing.  I'm out on maternity leave, but I don't**
11   **recall why he wanted to speak to me before I spoke to**
12   **them, but --**
13   Q   You have no explanation for why, as you say,
14   you would stall to talk to them before -- or stalled
15   talking to them until you had talked to him first?
16   **A   No, I don't -- I don't recall.  I was on**
17   **maternity leave, so this -- I was not at the firm, like**
18   **actively at the firm at that time, so I don't -- I don't**
19   **know.**
20   Q   Do you recall telling any untruths to your new
21   set of lawyers about your knowledge of witness payments?
22   **A   I don't recall conversations with them --**
23   Q   Or emails?
24   **A   -- then, or emails with them.  I -- I just I**
25   **don't recall that, but I can say that as a general**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

64 (253 to 256)

253
1  matter, I would not be telling untruths.
2       MR. WELLS: Let's go to tab 163.
3       THE TECHNICIAN: 163?
4       MR. WELLS: Yes.
5       THE TECHNICIAN: Okay. Thank you.
6       MR. WELLS: Which is Exhibit 61.
7       (Levesque Exhibit 61, Tab 163, 10/2015 email,
8  was marked for identification and is attached to the
9  transcript.)
10      Q  So on this first page of the email, it's an
11 exchange between you and William Paulk, who is here with
12 us today, correct?
13      A  Uh-huh.
14      Q  Yes?
15      A  Yes. I'm sorry.
16      Q  And you are telling Mr. Paulk, William, Can you
17 send me the following document, which is referenced in
18 Drummond's crime fraud brief -- and provide a citation.
19 I think I've seen them reference this document before in
20 the spoliation brief, and it is a misrepresentation that
21 I received an email about a Blanco payment.
22      Did I read that correctly?
23      A  Yes.
24      Q  Now, we have seen a number of emails today that
25 you received about a Blanco payment, correct?

254
1       A  So yes, there have been emails that I've seen
2  today.
3       Q  Were you intentionally trying to misrepresent
4  the facts to your new counsel in this email?
5       A  No, I don't believe I was intentionally trying
6  to misrepresent. And I don't know what other context
7  existed here, but I wasn't trying to misrepresent
8  something.
9       Q  You would agree that that is not an accurate
10 statement to claim that you had never seen any emails
11 relating to a Blanco payment?
12      MS. LOCKWOOD: Objection. Misstates the
13 document.
14      A  I'm also not sure -- so I'm just simply not
15 sure of the context here and whether we were talking
16 about the payments or whether it was discussions of
17 payments, but I don't -- I mean, we have seen certain
18 documents today that discuss Blanco and payments, so I
19 just -- I don't -- I don't know what's happening in this
20 email. I don't remember.
21      Q  And you don't tell Mr. Paulk here that you
22 don't remember; you're saying it is a misrepresentation
23 that you received such an email, correct.
24      A  I -- I am saying that here, but I don't know in
25 what greater context this was. And I'm not sure at that

255
1  point what I also recalled. Again, I was on emails, and
2  at times it was a group that was on those emails, but I
3  don't know what I recalled at that point either, so --
4       Q  And is it your testimony to the jury in this
5  case that as it pertains to all of the payments, and all
6  of the discussions of payments that we've gone through
7  in these emails that you received in realtime, that
8  sitting here today, you've just forgotten about them?
9       A  I'm --
10      MS. LOCKWOOD: Objection. Misstates testimony.
11      A  -- I'm doing the best I can do to answer your
12 questions and to recall back eight to ten years ago, or
13 11 years ago depending on when the emails were. I do
14 not recall -- I do not recall those emails and
15 communications and about those payments. This has been
16 a long litigation. Again, you have pieced together your
17 theory of what happened, and in realtime, those are not
18 the only emails I'm receiving. I was litigating. And
19 no, I -- I don't recall. When I've said I don't recall,
20 I don't recall.
21      Q  Well, I think you can see from what we've gone
22 through what our theory of what happened is. Can you
23 provide testimony for the jury to explain what did
24 happen?
25      MS. LOCKWOOD: Object to the form.

256
1       A  I --
2       Q  What payments were made, why were only some
3  disclosed, why were none disclosed during Balcero when
4  those witnesses were being deposed?
5       MS. LOCKWOOD: Object -- object to the form.
6       A  I -- I think you've -- you have documents that
7  show at various points the kinds of payments that were
8  made, and you also have information that indicates as a
9  group those of us who were responding to
10 Interrogatories, again, I go back to we were doing -- or
11 at least I was doing the best I could do to answer
12 things in a responsive way. But that's not the area of
13 this litigation that I was focused on. So I can't
14 provide testimony about things that I don't know. You
15 have clearly provided documents that discuss payments of
16 various kinds and attempts to make certain decisions on
17 discovery responses, but --
18      Q  Do you know anybody other than Mr.
19 Collingsworth that can provide that explanation?
20      A  I don't -- I don't think so. I mean, you --
21 you see the documents yourself, you see who's on those
22 documents. But Terry has acknowledged in these
23 documents and elsewhere that he was the one talking to
24 people on the ground in Colombia and making the
25 arrangements there and elsewhere. So I don't know who

257

1 else would have information.
2      MR. WELLS: All right. The next one is tab 164,
3 and this is Exhibit 62.
4      (Levesque Exhibit 62, Tab 164, 11/2015 email,
5 was marked for identification and is attached to the
6 transcript.)
7      Q  And I'm looking at the bottom email on the
8 first page from Brad Goldstein. Who was Brad Goldstein?
9      A  Brad was an associate at Conrad & Scherer.
10     Q  It looks like from the signature he's in the
11 D.C. office as well?
12     A  Yes.
13     Q  And he is asking Eric Hager and Jenny Z, with a
14 copy to you, Off the top, do you guys know if we had any
15 witnessed in any of the Drummond cases that were not
16 paid. Correct?
17     A  Right.
18     Q  Can you, Ms. Levesque, identify for us a single
19 witness that testified via letters rogatory in Balcero
20 on behalf of the plaintiffs or favorable to the
21 plaintiffs that did not receive some sort of payment in
22 some form or fashion?
23     MR. COLLINGSWORTH: Object to the form.
24     A  Yeah, I can't say one way or the other. You've
25 obviously provided documents that show certain witnesses

258

1 were paid. I don't recall who all the witnesses were,
2 and I can't speculate on whether there were some that
3 were not paid in various ways. I just don't simply know
4 or recall.
5      Q  So you cannot, sitting here today, identify a
6 witness that testified in letters rogatory process that
7 was not paid in some form or fashion?
8      A  I cannot testify to a negative like that, no.
9      Q  When did you leave Conrad & Scherer?
10     A  I left Conrad & Scherer in December of 2015.
11     MR. WELLS: Can we pull out Exhibit 1, please.
12     THE COURT REPORTER: Sure. Just give me a
13 second.
14     Q  And Exhibit 1 is Judge Proctor's opinion
15 finding that the crime fraud exception applied, correct?
16     A  Right.
17     Q  And what is the date?
18     A  December 7th, 2015.
19     Q  And was there any connection between Judge
20 Proctor's findings that misrepresentations had been made
21 about the scope and nature of witness payments and your
22 departure from Conrad & Scherer?
23     A  No. I was already prior to this time moving
24 on.
25     Q  Mr. Collingsworth left Conrad & Scherer around

259

1 the same time you did as well, correct?
2      A  I think that's right.
3      Q  And really, the whole Drummond (sic) team in
4 the D.C. office, correct?
5      A  I think that's right.
6      Q  What were the circumstances of that departure?
7      A  So are you asking about my circumstances or
8 others? I mean, you've asked that's a pretty broad
9 question.
10     Q  Yeah, the reason I'm asking is it seems kind of
11 odd if everybody has their own reasons for everybody
12 just up and bolt at the exact same time, so I'm --
13     A  Oh, I see.
14     Q  -- trying to figure out if there was some
15 reason that the group of you all either left on your own
16 or was pushed out the door. So --
17     A  Yes. So --
18     Q  That's the circumstances.
19     A  Okay. So at that -- at that time, things had
20 been unwinding for really several years already as it
21 related to the Kiobel decision, and the fact that this
22 type of litigation was drying up, which really was our
23 sole purpose of having this D.C. office. I mean, that's
24 why most of us went there in the first place. And so at
25 -- at this time, I think for whatever reasons, Conrad &

260

1 Scherer was not going to continue to have the D.C.
2 office. I think the D.C. office was closing.
3      Now, prior to this time, it was months before
4 that I would be leaving already at this point,
5 but I think the D.C. office was closing.
6      Q  Okay.
7      MR. WELLS: If we can pull out -- 47 is the
8 texts. 47 again.
9      MS. LOCKWOOD: 46 the texts.
10     MR. COLLINGSWORTH: 46.
11     MS. LOCKWOOD: 46.
12     MR. WELLS: It's a lot.
13     Q  And go to March 24th of 2015.
14     A  You said March 24th of 2014?
15     Q  Yes. It is the third-to-last -- well, excuse
16 me.
17     A  March 24th, 2015.
18     Q  It is the second-to-last page.
19     A  Yep. Okay.
20     Q  All right. So basically, without reading all
21 of them, I mean, there was, I would say, upset or
22 some anger, or some disappointment on your and Terry's
23 behalf as it relates to some decisions that Conrad &
24 Scherer is making.
25     A  Yeah, I don't -- I don't know what exactly the

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

66 (261 to 264)

261

1  email is. I mean, he obviously -- or I'm referencing an
2  email that he forwarded, but at that point, I would
3  imagine they are talking about shutting down the D.C.
4  office. I really don't know, though, what specifically
5  is happening.
6      Q   Okay. The one with ID number 1335, is on the
7  far left-hand corner --
8      A   Yeah.
9      Q   -- kind of in the middle of the page. You are
10 telling Mr. Collingsworth, I don't want to stir you up,
11 but that email you forwarded is outrageous. They are
12 reaching and trying to shut us down. Obvious but I'm
13 livid on your behalf.
14     He responds, Oh, yeah, I don't need any further
15 stirring up. I've set an emergency call with 2 possible
16 funders. This is over but you should preserve what we
17 should -- we've discussed.
18     And you say, Yes. I agree.
19     So what is being talked about there?
20     A   I don't know. I mean, obviously, there is a
21 transition of some kind that's happening, but I'm really
22 not sure if he's suggesting I preserve my employment or
23 otherwise. I just don't know you.
24     You know, in the context of shutting down the
25 office, I just really am not sure.

262

1      Q   Okay.
2      MR. WELLS: Let's go to tab 166.
3      MS. LOCKWOOD: Take these back.
4      THE WITNESS: Yeah.
5      MR. WELLS: Which is Exhibit 63.
6      (Levesque Exhibit 63, Tab 166, 11/2015 email,
7  was marked for identification and is attached to the
8  transcript.)
9      Q   So this is in November of 2015, shortly before
10 you all's departure from Conrad & Scherer, and Mr.
11 Collingsworth is emailing you, correct?
12     A   Yes.
13     Q   Attaching what I'm interpreting is Terry
14 Collingsworth's revised Conrad & Scherer Disassociation
15 Agreement. Is that fair?
16     A   Yeah, that looks fair.
17     Q   And most is redacted, but on Bates number 749,
18 we've got a section called, Transition Funding?
19     A   Uh-hum.
20     Q   One Hundred Thousand Fifty Thousand Dollars and
21 no cents would be paid on the Date of Dissociation.
22     Do you know what that payment was for?
23     A   No.
24     MR. WELLS: Let's go to tab 165, which is
25 Exhibit 64.

263

1      (Levesque Exhibit 64, Tab 165, 11/2015 email,
2  was marked for identification and is attached to the
3  transcript.)
4      Q   So this is looks to be several hours later on
5  the same day, Mr. Collingsworth is emailing you another
6  version of the Disassociation Agreement which looks like
7  has edits from Al Frevola?
8      A   Okay.
9      Q   Who is Al Frevola?
10     A   So Al was an attorney at Conrad & Scherer, a
11 partner in the Fort Lauderdale office.
12     Q   And it looks like the -- on, excuse me, the
13 Bates number page 819 --
14     A   Yep.
15     Q   -- that Transition Funding paragraph we just
16 looked at, looks to have been edited to now read
17 One Hundred Thousand Fifty -- no, well, that's wrong --
18 $150,000 I think is what that's probably supposed to
19 say.
20     A   Oh, yeah, right, yes.
21     Q   Is going to be paid on the date of
22 disassociation. The amount actually paid to the partner
23 shall be reduced by B, The amount of any funds the
24 partnership advanced to pay for counsel or security for
25 Ivan Otero or others in Colombia as of November 1st,

264

1  2015.
2      A   Yeah.
3      Q   Do you know whether the ongoing payments to the
4  imprisoned witnesses or their family members continued
5  after you all's departure from Conrad & Scherer?
6      A   No idea.
7      Q   Do you know whether all or any of this $150,000
8  was used to continue to send witness payments down to
9  Colombia?
10     A   I don't know.
11     MR. WELLS: Let's go to tab 168, which is
12 Exhibit 65.
13     (Levesque Exhibit 65, Tab 168, 11/2015 email,
14 was marked for identification and is attached to the
15 transcript.)
16     Q   This is an email on November 19th, 2015, from
17 Terry Collingsworth to ask you and Charity Ryerson,
18 correct?
19     A   Yes.
20     Q   And if we look at the attachment, it's a
21 document entitled the Post Conrad & Scherer Plan.
22     A   Yes.
23     Q   And most of it is redacted, but if we go to
24 Bates number 743 --
25     A   Yep.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

67 (265 to 268)

---

265

1    Q  -- part of this plan is to, Clean up Colombia
2  payments mess.  Everyone from Yina, Edgardo, Ivan, and
3  the security assistance got cut off and no November
4  payment was made. Everyone is furious just when I need
5  them.  I will have to deal with this but not sure what
6  to do on some issues.
7        Did I read that correctly?
8    **A  You did.**
9    Q  What do you know was done to clean up this
10 Colombia payments mess?
11   **A  I have -- I have no idea.  There was -- there**
12 **was like an office in Colombia, you know, a legal**
13 **office, right.  So Gina was involved in that.  I think**
14 **she was an assistant.  And so with all of this, it**
15 **sounds like it's referring, just reading this, I don't**
16 **recall this, but referring to what's happening with the**
17 **Colombia office, and then, it also says, of course,**
18 **security assistance.  But I don't know beyond that what**
19 **this document says, I don't know what it's referencing.**
20   Q  This is only involving -- this email is only
21 involving Terry, you, and Charity Ryerson.  So do you
22 know whether you all had any discussions about what to
23 do about the need for ongoing security payments?
24   **A  No, I don't.  I don't know.  And I don't -- as**
25 **I sit here, I'm also not sure why just Charity and I are**

266

1  on this.  I just don't know.
2    Q  Can you testify to the jury in this case that
3  the payments going down to witnesses in Colombia ever
4  stopped?
5    **A  No, I have no idea what happened to those**
6  **payments or any others.**
7    Q  And at the time this email was sent, talking
8  about post-Conrad & Scherer plan, was a part of Ms.
9  Levesque's plan to continue to working with Mr.
10 Collingsworth?
11   **A  No.  I was already employed.  I already had**
12 **another plan and had for months before this.**
13   Q  So there wasn't a period of time after this
14 that you continued working under the IRAdvocates
15 umbrella, for example?
16   **A  I don't -- I don't think so.**
17   Q  And I imagine you recall because I think you
18 were present at his deposition, that the long-time CEO
19 of Drummond was named Gary Drummond?
20   **A  That's right.**
21   Q  If we can go to tab 171, Exhibit 66.
22        (Levesque Exhibit 66, Tab 171, 7/2016 email,
23 was marked for identification and is attached to the
24 transcript.)
25   Q  This is an email in July of 2016, from Mr.

267

1  Collingsworth to you, Charity Ryerson, and Susana
2  Tellez, forwarding an article from al.com, correct --
3    **A  Yes.**
4    Q  -- stating that Garry Drummond has died?
5    **A  Yes.**
6    Q  And Mr. Collingsworth's comment to you all was,
7  My reaction was not very Christian.
8    **A  Yes.**
9    Q  I mean, is he celebrating the death of Mr.
10 Drummond here?
11   **A  I don't know -- I don't know what he's doing**
12 **here.**
13   Q  Were you celebrating the death of Mr.
14 Drummond?
15   **A  Absolutely not.  This was a case -- an**
16 **international human rights case that was like any other**
17 **for me.**
18   Q  So we've talked a number of times today about
19 just the general concept of paying fact witnesses is
20 something you need to pay attention to and can be a
21 serious concern, right?
22   **A  Yes.**
23   Q  I mean, it's something that if done
24 inappropriately could result in loss of Bar licenses and
25 potential criminal charges, correct?

268

1    **A  Correct.**
2    Q  And we've gone through a number of documents
3  today demonstrating that thousands of dollars, more like
4  hundreds of thousands of dollars, are being sent down to
5  Ivan Otero relating to various witnesses, correct?
6    **A  Yes.**
7    Q  And what measures, if any, are you aware of
8  that were put in place to ensure that Mr. Otero was not
9  just using that money to bribe witnesses?
10   **A  I'm not aware of what Mr. Otero was doing or**
11 **not doing or what -- what was the word; limitations or**
12 **the word that you had used -- I'm just not aware of**
13 **that.**
14   Q  Guardrails procedural issues.  I used the --
15   **A  Yeah.**
16   Q  -- word, measures.
17   **A  Measures, yeah.**
18   Q  Anything done so you all could have a check to
19 make sure that Mr. Otero down there, who Mr.
20 Collingsworth called sleazy, wasn't using all these
21 thousands of dollars to pay bribes to witnesses?
22   **A  I -- I'm not aware of that one way or the**
23 **other.  Again, that's not where I was engaging my**
24 **efforts.**
25        MR. WELLS: We will reserve the rest of our time

Transcript of Christian Levesque, Esquire

68 (269 to 272)

Conducted on September 18, 2023

---

269

1   for redirect.
2       MR. PAULK: Okay.  Let me get something.
3       THE VIDEOGRAPHER: We're going off the record at
4   5:45 p.m. Eastern Time.
5       (A brief recess was taken.)
6       THE VIDEOGRAPHER: We're going back on the
7   record at 5:57 p.m. Eastern Time.
8       EXAMINATION BY COUNSEL FOR THE DEFENDANTS:
9   WILLIAM R. SCHERER, JR., CONRAD & SCHERER, LLP:
10  BY MR. PAULK:
11      Q   Christian, my name is William Paulk, I
12  represent Conrad & Scherer.  We have not before today,
13  have we?
14      A   I don't -- I don't think so.
15      Q   We've exchanged emails along the way --
16      A   Yeah.
17      Q   -- we saw some of those that, but you and I
18  have never -- never spoken, as far as you recall, right?
19      A   I think that's right, yeah.
20      Q   Are you currently employed?
21      A   I am.
22      Q   Who is your employer?
23      A   Department of Justice.
24      Q   And is that -- are you based here in D.C.?
25      A   I am.

---

270

1       Q   Do you work at the main Department of Justice
2   office?
3       A   I do.
4       Q   And when did you join the Department of
5   Justice?
6       A   In 2016.  February of 2016.
7       Q   Did you work at all between leaving Conrad &
8   Scherer and joining the Department of Justice?
9       A   I don't think so.  I think, I mean, I know I
10  was asked about any interim period, and I don't think
11  there was.  I think I went from Conrad & Scherer and
12  took I think that month off, is what I recall.
13      Q   And you testified earlier that I think you may
14  have said for several months you were planning to leave
15  Conrad & Scherer.  Was your plan during that time to
16  join the Department of Justice?
17      A   Yeah, I think starting in July might have been
18  when I had gotten the offer, around July.
19      Q   And how did that offer come about?  Did you
20  approach them, or did someone approach you?
21      A   No, I -- I had applied, I want to say back in
22  January or February of 2015.  But I'm really estimating
23  here.  It's just it was a long process.
24      Q   And did any of the issues that were beginning
25  to develop in the defamation and RICO cases which we'll

---

271

1   talk about for a minute relating to these witnesses,
2   witness payment issues, did that have any factor in your
3   deciding when to leave Conrad & Scherer?
4       A   So not the issue of the payments, per se, but
5   there was definitely starting even before I went out on
6   maternity leave, I think in that fall of 2013 period, it
7   was very clear that a lot of what was happening in the
8   D.C. office was responding to this defamation lawsuit.
9   This defensive work, if you will.  And that's not why I
10  went to Conrad & Scherer, it's not what I was trying to
11  do as a lawyer.  And I didn't want to do that kind of
12  work.  I really wanted to be focusing on the
13  international human rights issues.
14      Q   And that's why you joined Conrad & Scherer, was
15  to prosecute international human rights cases?
16      A   Yeah, on the --
17      Q   What do you --
18      A   -- civil rights side, yeah.
19      Q   Sorry.  What do you do for the Department of
20  Justice?
21      A   So I work in a section in the criminal division
22  called the Human Rights and Special Prosecution Section.
23  And some of the work that we do there involves war
24  crime, torture, and other international human rights
25  abuses.

---

272

1       Q   Okay.  I'm going to jump around a bit just to
2   streamline things, so --
3       A   Yeah.
4       Q   -- bear with me.  Thank you.
5       Okay.  During the roughly 2010, 2011 time frame
6   when you were at Conrad & Scherer, were the underlying
7   Drummond cases -- and by that I mean Balcero and Baloco,
8   were those the only cases you were working on for the
9   firm?
10      A   No.  I was also working on Firestone.  I also
11  think I had a couple of other cases, like I had a case
12  against Coca-Cola Turkey, meaning in the location
13  Turkey.  There might have been some other -- I might
14  have worked on the Coke case for Colombia, but I just
15  I'm having a hard time remembering all the case work,
16  but in the early days, there were other cases I was
17  working on.  Firestone took up a lot of time.
18      Q   And were the Firestone and Coke cases similar
19  cases to the Drummond cases in the sense they were
20  international cases that involved allegations of whether
21  there's human rights violations or child labor?
22      A   Yes, that's right.
23      Q   And I'm sure like all lawyers your hours
24  fluctuate, you know, month-to-month and year-to-year,
25  but do you have a general sense of 2010 and 2011, how

---

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

273

1 many hours you may have been working in a given week?
2 **A  Gosh.  It would be impossible for me to, I**
3 **think, really remember back.  In terms of I felt busy.**
4 Q  Would you -- is it safe to assume maybe more
5 than 40 hours a week?
6 **A  Oh, certainly probably so.**
7 Q  You were asked a lot earlier about a variety of
8 security payments being made to witnesses or their
9 families in Colombia.  Did anyone at Conrad & Scherer
10 ever express to you concern or doubt about whether those
11 payments were legitimately for security related
12 concerns?
13 **A  No.**
14 Q  Did you personally have any doubt about whether
15 those payments were legitimately needed for security
16 related concerns?
17     MR. COLLINGSWORTH: Object to the form.
18 **A  No, I was relying on representations that they**
19 **were for security issues.**
20 Q  Did you ever have a conversation with Bill
21 Scherer about payments going to Colombia, whether it be
22 for security or attorneys fees for witnesses?
23 **A  I don't recall.  I don't think so, but I don't**
24 **recall.**
25 Q  How about his son, Billy Scherer, did you have

274

1 any conversations with him about those payments?
2 **A  Same.  I don't recall those conversations,**
3 **yeah.**
4 Q  Do you recall having a conversation with anyone
5 at Conrad & Scherer in the Fort Lauderdale office about
6 payments to Colombia?
7 **A  No, I don't recall that.**
8 Q  Were you ever advised by Terry or anyone else,
9 not to provide that information to the Florida office?
10 **A  No, I don't believe so.**
11 Q  Do you recall generally what the allegations in
12 Balcero and Baloco were against Drummond?
13 **A  In a -- in a general way.**
14 Q  What about Baloco? I know they are slightly
15 different cases, but do you remember?
16 **A  I don't recall the difference between Baloco**
17 **and Balcero.**
18 Q  What's your general understanding of what the
19 allegations were?
20 **A  The general understanding is that Drummond was**
21 **collaborating paying working with the AUC to clear the**
22 **area, the train line area, to bring coal to their mining**
23 **facility, from FARC, et cetera, and then, in the course**
24 **of doing so, they were aware of innocent people being**
25 **murdered and -- I guess murdered.**

275

1 Q  And you're talking about rail facilities in
2 Colombia, South America, right?
3 **A  That's right.**
4 Q  And the AUC you mentioned, that in 2011, that
5 group was designated as a terrorist organization by the
6 United States Government, right?
7 **A  That's right.**
8 Q  All right.  And there were other companies
9 operating -- other U.S. companies operating in similar
10 regions in Colombia, right?
11 **A  That's right.**
12 Q  One of which I think you worked on a little
13 bit, a case that Conrad & Scherer had against Chiquita?
14 **A  Yeah, that's right.**
15 Q  The banana company we all know, right?
16 **A  Right.**
17 Q  When you were at Conrad & Scherer, did you have
18 an understanding that Chiquita actually pleaded guilty
19 to providing financial support to the AUC?
20     MR. COLLINGSWORTH: Object to the form.
21 **A  I think that sounds right.**
22 Q  Do you remember that?
23 **A  Yeah.**
24     MR. COLLINGSWORTH: William, can we stipulate
25 that object to the form is sufficient to preserve

276

1 objections?
2     MR. PAULK: Yes.
3 Q  Was it common language, at least among the D.C.
4 group, the human rights group of Conrad & Scherer, that
5 Chiquita had pleaded guilty to supporting the AUC?
6     MR. COLLINGSWORTH: Object to the form.
7 **A  Probably so. I mean, I'm speculating a little**
8 **bit, but I think that was pretty well-known at the time.**
9 Q  You were asked some questions about a witness,
10 Jamie Blanco, requesting assistance for criminal
11 attorneys fees.  Do you have any understanding of why he
12 would have been asking for that type of legal
13 assistance, support for his legal assistance?
14 **A  Not really, I don't -- I don't recall at this**
15 **point.  He was facing charges obviously, but beyond**
16 **that, I don't.**
17 Q  You don't recall the details of the procedures
18 he was going through or might have to go through in
19 Colombia about why he would need help with his legal
20 fees?
21 **A  I really don't.  It's a long time ago.**
22 Q  In the course of working on the discovery
23 responses that we've looked at today, both in Balcero
24 and in the defamation case, did you yourself have any
25 concerns that there wasn't information being disclosed

277

1 that should be disclosed?
2    **A   No, I think during that time, at each segment,**
3 **I thought we were disclosing what we needed to disclose**
4 **based on what I knew at the time and based on what the**
5 **questions were.  Again, it's been a very long**
6 **litigation, and a lot of documents and information has**
7 **come out over that time period.  So at any given time, I**
8 **was trying to do the right thing.**
9    Q   You don't recall having any feelings of
10 uneasiness about where lines were being drawn about what
11 to disclose or not?
12    **A   I think that -- I think that in reviewing the**
13 **documents today, I -- I can see areas where we are**
14 **clearly exploring where those lines are with the**
15 **recognition that these were really tricky questions.  So**
16 **I -- I think imbedded in that idea is you know, an**
17 **uneasiness of -- of a -- of, you know, of a kind.  But**
18 **again, I think we were trying to take this seriously.**
19    Q   We looked at a number of emails where you,
20 Terry, Susana Tellez, and Lorraine Leete, those four
21 people were copied on.  Or were all four of those
22 individuals located in the D.C. office?
23    **A   No, so Lorraine was working in Colombia.**
24    Q   Okay.
25    **A   And Susana was associated with the D.C. office,**

278

1 **as was Lorraine, associated with the D.C. office, but**
2 **Lorraine was physically in Colombia.  Susana was in the**
3 **D.C. office early on, and then, spent time in Colombia**
4 **working remotely -- well, I mean, remote from the D.C.**
5 **office but on these issues in Colombia.  And what I**
6 **don't recall is how long she was there.**
7    Q   Is Lorraine Leete an attorney?
8    **A   She is.**
9    Q   What about Susana Tellez?
10    **A   No, Susana is a paralegal and is not an**
11 **attorney.**
12    Q   And during your tenure at Conrad & Scherer,
13 were you always based in the D.C. office?
14    **A   I was always based in the D.C. office, yes.**
15    Q   How about Terry?
16    **A   Yes.**
17    MR. PAULK:  Can I get the stickers?  I'm just
18 dealing with the numbering.
19    And I apologize for our Zoom participants, I
20 didn't get my act together in time.  I just have a
21 couple new ones I'm going to introduce here.
22    I hand you what I'm marking as Exhibit 67.
23 This is actually an exhibit that we looked at earlier
24 and I couldn't quickly find what you guys have marked
25 it, so I'm just going to --

279

1    THE TECHNICIAN:  What tab is it?
2    MR. PAULK:  Yeah, I'm sorry, I don't -- I don't
3 have a tab for it.  This is one they pulled up earlier,
4 and I just couldn't quickly find what number you all, so
5 I just thought I'd mark it again real quick.
6    (Levesque Exhibit 67, Email, 7/2011 email, was
7    marked for identification and is attached to the
8    transcript.)
9    Q   Do you recall seeing this exhibit earlier in
10 the day?
11    **A   I do.  At least part of this.  There -- I think**
12 **there's a portion of this that looks new to me, but --**
13    Q   Okay.  And I really just want to ask you about
14 on the second page of this exhibit, 536, in your
15 paragraph to Terry and Susana.  You were asked about
16 some of this, but not this particular sentence, which is
17 the second sentence of that paragraph where you say,
18 They've never made an allegation that we paid anyone
19 exchange for testimony, which of course none of this
20 was.
21    **A   Yes.**
22    Q   Was it your genuine belief at the time and
23 understanding that you were not -- that Conrad & Scherer
24 were was not paying anyone in exchange for testimony?
25    **A   Yes.**

280

1    MR. WELLS:  What exhibit was that?
2    MR. PAULK:  That was 67.  This is going to be
3 68.
4    (Levesque Exhibit 68, 11/2011 email,  was
5    marked for identification and is attached to the
6    transcript.)
7    **A   Thank you.**
8    Q   I don't think we looked at this one today.  If
9 you need a minute to orient yourself, that's fine.  I
10 just want to ask about the second and third page --
11 excuse me, second and first pages.
12    So if you look at the top of the second page,
13 there's an email from Lorraine to you, which is blacked
14 out, and then, you respond on the first page, Yes,
15 security payments are considered something of value
16 because they asked it in such a broad way.  So as not to
17 play games and in compromise, if they are witnesses that
18 we MAY call, we have disclosed.  Only for those we are
19 not calling have we invoked the privilege.
20    Then, Lorraine asks in the middle email, For
21 the second part, we only disclosed
22 hamburgers given to LD, but not security payments to the
23 families of ET, Sam, Charris, who are witnesses (not
24 potential witnesses.  This because the payments were
25 made to family members and not the witness himself.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

71 (281 to 284)

281

1    To which you respond at top -- up top, Right -
2  we interpreted the rog, fairly, I think, to be just
3  asking for things of value given to the witnesses
4  themselves.
5        As far as you can recall, does this basically
6  lay out your understanding or your recollection of where
7  you and the D.C. team were drawing the lines about what
8  to disclose or not disclose?
9    **A  I think that's right.  Like I said, I was**
10 **really trying to do the right thing and draw those lines**
11 **appropriately based on what was being asked.**
12   Q   Christian, have you ever been sanctioned by a
13 court?
14   **A  No.**
15   Q   Have you ever had a Bar complaint filed against
16 you?
17   **A  No.**
18   Q   Have you ever been in trouble with any Bar in
19 which you were admitted?
20   **A  No.**
21   Q   You take your obligations and the
22 responsibilities as a lawyer seriously?
23   **A  I do.**
24   Q   Did you do so while you were employed with
25 Conrad & Scherer?

282

1    **A  I did.**
2    Q   You mentioned earlier that for a -- for a time,
3  it seems like thing were beginning to wind down in the
4  D.C. office, and you referenced a Kiobel decision.  Can
5  you elaborate what you meant by that?
6    **A  Sure.  I think that decision happened in 2013,**
7    **but it's when the Supreme Court fairly significantly**
8    **limited the Alien Tort Statute both as it related to**
9    **corporate accountability under that statute, corporate**
10   **liability under that statute, and then, through that,**
11   **and subsequent decisions also, the extraterritorial**
12   **aspect of the reach of the Alien Tort Statute.**
13   Q   Is it safe to say that that decision really
14 hurt your ability to pursue the types of claims that you
15 were previously pursuing against Drummond?
16   **A  Yes, absolutely.**
17   Q   If you could pull up Exhibit 54 again.
18   THE WITNESS: Thank you.  Um-hum.
19   Q   I just want to ask you as you're reading
20 through these bullet points here on the first page --
21 well, let me ask you this:  Do you recall a company by
22 the name of Secure Pointe Partners International?
23   **A  So I recall the name, but I'm having trouble**
24   **remembering what it was that that company did.**
25   Q   All right.  I'll represent you to that Secure

283

1  Pointe provided investigative services for Conrad &
2  Scherer --
3    **A  Okay.**
4    Q   -- in Colombia and other places.
5    **A  Okay.**
6    Q   Do you recall that at some point, I believe it
7  was in 2013, that Secure Pointe and Conrad & Scherer had
8  disagreement over payment issues and they ended up going
9  to arbitration?
10   **A  So I don't really recall that, but it sounds**
11   **vaguely familiar.  The arbitration part.**
12   Q   Were you responsible at all for collecting
13 documents that were going to be produced in that
14 arbitration?
15   **A  I don't think so.**
16   Q   Okay.  So you can't say one way or the other
17 whether or not this Exhibit 54 relates to the
18 arbitration as opposed to something being done in
19 connection with the Drummond cases?
20   **A  Right, I couldn't say that.**
21   Q   You were asked earlier about whether anyone
22 informed Brad Smith -- let me back up.
23        You recall, don't you, that Brad Smith was a
24 lawyer in Birmingham that represented Conrad & Scherer
25 and Mr. Collingsworth in the defamation case?

284

1    **A  I -- I do recall that now.**
2    Q   He was outside counsel representing Conrad &
3  Scherer?
4    **A  Right.**
5    Q   And as we've seen from the emails, it looked
6  like Terry and others in the D.C. office played a role
7  in providing Brad information that he was going to use
8  in defense of the defamation case?
9    **A  Right.**
10   Q   Do you recall if Terry or anyone else ever
11 instructed you not to tell Brad certain information such
12 as the fact that El Tigre and Samario's families had
13 received security assistance?
14   **A  Yeah, I don't recall being directed in that**
15   **way.**
16   Q   You don't recall having some sort of global
17 instruction to withhold certain information from Brad?
18   **A  No.**
19   Q   Do you recall whether you were on any of the
20 pleadings in the Balcero case?
21   **A  So when you say pleadings, do you mean the**
22   **complaint?**
23   Q   Right.
24   **A  I -- I know I was asked this previously.  I**
25   **don't remem -- I don't -- I'm sorry.  Sorry.  I -- I**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

72 (285 to 288)

285

1  don't remember -- I don't remember being on the
2  pleadings, the initial, like, filing papers for Balcero.
3     Q   Okay. I'll represent that I think you were
4  eventually maybe on the Second Or Third Amended
5  Complaint.
6     A   Okay, that's -- that's possible.
7     Q   Okay.
8     A   I mean, yeah.
9     Q   Which I believe was filed in 2011.
10    A   Okay. That that makes sense as it got further
11 along.
12    Q   By that time. Had you been doing some
13 investigative work in the Balcero case? I mean, had you
14 dug into the facts of that case at all?
15    A   Yeah, I mean, at that point, I would have had
16 more of a familiarity of what the allegations were, et
17 cetera.
18    Q   Would you have had conversations with Terry
19 about those allegations?
20    A   I would -- I would presume so, but I just don't
21 recall conversations, per se, but that would make sense
22 if we were doing a second or third amended complaint.
23    Q   A little earlier in response to one of my
24 questions, you summarized at a very general level what
25 the allegations were against Drummond. If you recall

286

1  back then, did you believe those allegations to be true?
2     A   Yes, I had no reason to think any of those
3  allegation were not true.
4     Q   Did anyone at Conrad & Scherer ever express
5  skepticism to you about whether those allegations were
6  true?
7     A   No.
8     Q   Do you think Mr. Collingsworth believed those
9  allegations were true?
10    A   I think --
11       MR. COLLINGSWORTH: Objection to form.
12    A   I think he did believe those allegations were
13 true.
14    Q   Did he ever say anything to you that would give
15 you skepticism about whether he believed them to be
16 true?
17    A   No. Not at all.
18    Q   Did you believe that Conrad & Scherer did a
19 thorough job of investigating facts before they filed,
20 let's say, the complaint that you were on in Balcero?
21       MR. COLLINGSWORTH: Object to the form.
22    A   Yes.
23    Q   Ms. Levesque, there's we've been talking a lot
24 about the defamation case that we're here that certain
25 discovery responses were made, and that's the case in

287

1  the privilege log that was disclosed that we've been
2  talking about. And do you have an understanding of what
3  the defamation case is about?
4     A   I do, but at a very general level. It's been a
5  long time on that as well.
6     Q   Do you have a general sense that Drummond
7  alleges it was defamed by several letters that Terry
8  sent to government and corporation essentially repeating
9  a lot of the allegations that were made in Balcero? Do
10 you have kind of that understanding?
11    A   Yes. Yes.
12    Q   There's another case that Drummond filed in
13 2015 against Mr. Collingsworth and Conrad & Scherer and
14 others that we've referred to as the RICO case. Are you
15 generally familiar with that case?
16    A   Yes.
17       (Levesque Exhibit 69, Complaint, was marked for
18 identification and is attached to the transcript.)
19    Q   All right. I'm going to hand you what I've
20 marked as Exhibit 69.
21    A   Thank you.
22    Q   This is just a very small portion of it, which
23 I think we can all stipulate it's got the eFiling at the
24 top, and I just want to ask you about a couple of
25 things. You are not named as a defendant in this

288

1  complaint, right?
2     A   Correct.
3     Q   But you are named on page -- it ends on page 11
4  over to page 12 as a nonparty coconspirator.
5     A   Yes.
6     Q   What is your understanding of what it means to
7  be named as a nonparty coconspirator in a RICO
8  complaint?
9     A   So that I'm -- I'm obviously not a defendant,
10 but I think the allegation is that I in some way
11 participated in a scheme or conspiracy to purchase, I
12 guess, false testimony against -- against Drummond, and
13 to cause -- I mean, it's laid out here. And to cause
14 false testimony to be submitted to the court.
15    Q   So I want to ask you on page 12, paragraph 20,
16 it says, Levesque was aware of the many illegal witness
17 payments described in this complaint.
18       Were you aware of any illegal witness payments
19 being made by Conrad & Scherer?
20    A   No.
21       MR. WELLS: Object to the form.
22    A   No.
23    Q   She also knew that the purpose of those
24 payments was to purchase false testimony against
25 Drummond.

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

289

1      Were you aware that the purpose of any payments
2  being made was to purchase false testimony against
3  Drummond?
4      **A  No.**
5      MR. WELLS: Object to the form.
6      THE WITNESS: I'm sorry.
7      MR. PAULK: I'm asking about her knowledge of
8  allegations.
9      MR. WELLS: You're asking about a complaint in
10 the case that we're in.
11     MR. PAULK: Right.
12     MR. WELLS: That is the form objection.  You can
13 keep doing that, I'm going to object every time.
14     MR. PAULK: Well, I don't understand the basis
15 of the form objection.
16     MR. WELLS: You can't put the complaint in
17 evidence at trial.
18     MR. PAULK: I'm asking her about her knowledge
19 regarding certain things.
20     MR. WELLS: We can argue all day.  I'm going to
21 disagree with you.
22     MR. PAULK: I'll just continue then.
23     Q  The next paragraph says -- excuse me, sentence.
24 Levesque -- Levesque has caused that false testimony be
25 submitted in judicial proceedings with the intent to

290

1  further the RICO Defendants' multifaceted fraudulent
2  extortion scheme.
3      At any point during your tenure at Conrad &
4  Scherer, did you knowingly submit false testimony in any
5  judicial proceeding?
6      MR. WELLS: Object to the form.
7      **A  No.**
8      Q  Did you ever intend to submit any testimony to
9  further the RICO Defendants' multifaceted and fraudulent
10 extortion scheme?
11     MR. WELLS: Object to the form.
12     **A  No.**
13     Q  All right.  Going from 12 to 13, it says that,
14 The RICO Defendants' direction with their full
15 knowledge, Levesque has also disseminated this false
16 paid for testimony to members of the media and
17 nongovernmental activist groups.
18     Have you ever knowingly disseminated any false
19 testimony to members of the media or activist groups?
20     MR. WELLS: Object to the form.
21     **A  No.**
22     Q  Next to the last sentence says, Levesque --
23 Levesque also conspired with the RICO Defendants to
24 fraudulently conceal the fact of the illegal witness
25 payments described in this complaint.

291

1      At any point, did you conspire with any of the
2  defendants named in the first page of this complaint to
3  fraudulently conceal witness payments?
4      MR. WELLS: Object to the form.
5      **A  No.**
6      Q  What was your reaction when you read this about
7  you?
8      **A  I certainly disagreed with the way it was being**
9  **characterized.  I don't -- I don't believe that I've**
10 **done any of these things.  And I've said multiple times,**
11 **I've certainly tried to do the right thing with my**
12 **obligations.**
13     THE TECHNICIAN: Excuse me, may I ask what tab
14 are you looking into?  I -- I couldn't hear properly,
15 I'm sorry.
16     MR. WELLS: He didn't provide any of the
17 exhibits he's attaching to you, so you won't have these.
18     THE TECHNICIAN: Thank you.
19     Q  Are you aware that in 2012, I believe, or '13,
20 that Conrad & Scherer, through intermediary, approached
21 Drummond to see if they had any interest in trying to
22 settle the litigation between them?
23     **A  I -- I mean, I don't recall that specifically,**
24 **but it doesn't surprise me, I mean.**
25     Q  Why doesn't it surprise you?

292

1      **A  You said -- can you just -- can you actually**
2  **just repeat that again so I just make sure -- I'm sorry,**
3  **it's been a long day.**
4      Q  Sure.  It was either in late 2012 or early
5  2013, I believe, that Conrad & Scherer approached
6  counsel for Drummond -- not directly, through someone
7  else --
8      **A  Um-hum.**
9      Q  -- to engage Drummond's interest in either
10 mediating or beginning settlement discussions.  I'm
11 asking back in that time, do you recall if that was
12 going on?
13     MS. LOCKWOOD: Can -- can we clarify what
14 litigation --
15     THE WITNESS: Yeah.
16     MS. LOCKWOOD: -- we're talking about.
17     **A  Defamation?**
18     Q  Yeah, I think it would have been probably
19 defamation.  I don't remember if -- I think Balcero may
20 still have been pending, so it could have been --
21     **A  Um-hum.**
22     Q  -- I don't know the exact contours of it, if it
23 was just Balcero and defamation.
24     **A  Yep.**
25     Q  I'm just wondering do you recall any

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

293

1 discussions about that at the time?

2    **A  I -- I don't recall discussions, and I guess**
3 **when I said it just wouldn't -- however I phrased it --**
4 **not surprising because I mean, settlement negotiations**
5 **can happen all the time in litigation and approaches can**
6 **be made.**

7    Q  Okay.  And that happens a lot in litigation,
8 doesn't it?

9    **A  Yeah, it does.  That's right.**

10    MR. PAULK: All right.  I think that's all I
11 have for now.

12    THE WITNESS: Can I just ask can we just take a
13 quick break?  Like it could be very fast, but --

14    MR. WELLS: Yeah.  Take as much as you need.

15    THE VIDEOGRAPHER:  We are going off the record
16 at 6:29 p.m. Eastern Time.

17    (A brief recess was taken.)

18    THE VIDEOGRAPHER: We're going back on the
19 record at 6:35 p.m. Eastern Time.

20    EXAMINATION BY COUNSEL FOR THE PLAINTIFF:
21 BY MR. WELLS:

22    Q  All right, Ms. Levesque, if you can get back
23 out Exhibits 67 that Mr. Paulk showed you.

24    **A  Sure.**

25    THE WITNESS: Thanks.

294

1    Q  And I believe he was asking you about the
2 second page, email on the bottom.

3    **A  Yes.**

4    Q  And he was asking about your comment that They,
5 referring to Drummond, had never made an allegation that
6 we paid anyone in exchange for testimony, which, of
7 course, none of this was, right?  You remember that
8 questioning?

9    **A  Yes.**

10    Q  You all had not disclosed to Drummond that
11 anybody had been paid for any purpose, had you?

12    **A  At this point, it would appear not, but again,**
13 **we were interpreting Interrogatories and et cetera in**
14 **the best way we could.**

15    Q  In any event, as a lawyer complying with their
16 ethical responsibilities, it would be at least up to the
17 line if not over the line of those ethical
18 responsibilities to make an allegation that people had
19 paid witnesses when the other side had denied it in
20 discovery and claimed there were no payments?

21    MS. LOCKWOOD: Object to the form.

22    Q  Right?

23    **A  I'm -- I'm sorry, I just -- I'm just trying to**
24 **figure out where -- which part of that you're asking.**

25    Q  I'm just going to ask it a little more plainly.

295

1    It's kind of hard to allege you all had been
2 bribing witnesses or making payments to witnesses when
3 you all were not disclosing that you are, isn't it?

4    MR. COLLINGSWORTH: Object to the form.

5    **A  Yeah, I mean, in order to file a complaint,**
6 **you're not basing it on evidence.  You had some -- you**
7 **had asked various Interrogatories and asked for**
8 **documents concerning payments, but if you're asking**
9 **whether the subsequent filing was based on the**
10 **information you learned there, I guess I'm -- I'm just**
11 **not understanding exactly what you're asking me.**

12    Q  Well, at the time that you're saying there
13 hadn't been allegation that you paid anyone in exchange
14 for testimony, how is an allegation like that going to
15 be made when you all have not disclosed that anyone has
16 been paid except for you gave hamburgers to Duarte?

17    MR. COLLINGSWORTH: Object to the form.

18    **A  I -- I think simply because there was no**
19 **evidence and I -- still my understanding is that there**
20 **was no evidence that payments had been made in exchange**
21 **for testimony.  So I think that's was the case and still**
22 **is the case.**

23    Q  And so in Mr. Paulk's questioning of you about
24 this email that dates back to July of 2011, you seem to
25 recall what you meant by the statement in this email,

296

1 right?

2    **A  I'm reading it here.**

3    Q  And he asked you if you remember and believed
4 at the time that that was true.

5    **A  I don't think I would have written this if I**
6 **didn't have that understanding.  I just -- yeah, I mean,**
7 **I am reading what the email says, and I'm reading what I**
8 **put there, so that would make sense.**

9    Q  And if we can look at Exhibit 68 Mr. Paulk
10 showed you.

11    THE WITNESS: Thank you.

12    **A  Yes.**

13    Q  And he was asking about the distinction between
14 things of value provided to the witness or things of
15 value provided to their family.  Do you recall that
16 questioning?

17    **A  Yes.**

18    Q  Even if we assume that these payments were
19 actually for support of these imprisoned paramilitaries'
20 families while they were in prison, you don't think it
21 is valuable to those paramilitaries that their families
22 are being supported while they can't support them in
23 prison?

24    MR. COLLINGSWORTH: Object to the form.

25    **A  Yeah, and I don't think that's what I was**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

75 (297 to 300)

297

1  saying here. I -- I think nevertheless, we were
2  interpreting it not just as to things of value at large
3  but whether it was asking about things that went to the
4  witnesses or things that went to the family, and I think
5  again, I'm one person on a team trying to understand
6  what has happened or what had transpired. And I think
7  that was our best interpretation based on the
8  information that I had at the -- at the time.
9      Q  But --
10     A  But I was not the person arranging for payments
11  or nor did I have an understanding of what the full --
12  just the scope of that. Again, I'm really just trying
13  to, I think, answer the -- the Interrogatories fairly.
14        And I'm not even looking at the Interrogatory
15  here, the actual Interrogatory either, so --
16     Q  Mr. Paulk didn't show it to you either, did he?
17     A  I'm just saying that I don't -- I'm not looking
18  at it here as we're trying to interpret this email, you
19  know, 12 years later.
20     Q  You were asked about the allegations in your
21  cases against Drummond and they involved the AUC
22  paramilitary group murdering hundreds of civilians.
23  That's part of the case, correct?
24     A  It's part of the case, but also Drummond's
25  involvement in that is, I mean, we didn't sue the AUC.

298

1  We sued Drummond.
2      Q  And the witnesses that were receiving these
3  payments we've been talking about all day, you allege
4  were complicit in the murders of those people including
5  your clients' family members, correct?
6      A  I think that we alleged that Drummond was --
7  Drummond had reached an agreement with those AUC members
8  concerning the killings that had then subsequently
9  happened.
10     Q  I'm focused on the actual killings. Your
11  understanding of the testimony of these witnesses that
12  were in prison that were receiving payments was that
13  they were complicit in the killings of those Colombian
14  citizens, correct?
15     A  Yes.
16     Q  Including the family members of the clients you
17  represented, correct?
18     A  Correct.
19     Q  Did you disclose to any of those clients whose
20  family members were killed that you all were making
21  payments for the benefit of the people you allege killed
22  their family members?
23     A  I -- I don't have any reason to believe that
24  that was -- I -- I -- the reality is I don't -- I don't
25  know, but I don't think we discussed with them the

299

1  issues that we've been discussing today.
2      MR. WELLS:  No further questions.
3      THE VIDEOGRAPHER:  Since there are no more
4  question s, this marks the end of video deposition of
5  Christian Levesque.  We're going off the record of the
6  video deposition at 6:43 p.m. Eastern Time.  Thank you.
7      THE COURT REPORTER:  All right.  And Counsel,
8  can I ask if you would like transcript orders today.
9      MR. PAULK:  I would.
10     MS. LOCKWOOD:  We'll read and sign but we don't
11  -- the witness doesn't need --
12     MR. WELLS:  Yes, and we want a transcript only
13  electronic and --
14     THE COURT REPORTER:  In sync with the --
15     MR. WELLS:  Hold on the video.  We'll let you
16  know.  It is very likely we're going to need it --
17     THE VIDEOGRAPHER:  No problem.
18     MR. WELLS:  -- but we are well over a year from
19  trial.
20     MR. PAULK:  Same here.
21     THE VIDEOGRAPHER:  Just let Planet Depos know
22  when you're ready.  They'll have it --
23     MR. PAULK:  Fair enough.
24     MR. WELLS:  Good deal.  Thank you.
25     THE VIDEOGRAPHER:  I assume you have a standing

300

1  order for the video when it -- when you do order it, do
2  you want it synched with the transcript or --
3      MR. WELLS:  Yeah, we'll need it synched.
4      THE COURT REPORTER:  Ms. Lockwood, did you say
5  you don't want one or --
6      MS. LOCKWOOD:  I mean, I don't think we need to
7  purchase another -- I don't -- we can have her --
8      THE COURT REPORTER:  Making sure.  Thank you.
9      (Off the record at 6:43 p.m. EST.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

301

1      CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC
2          I, Brendon Cuenca, the officer
3   before whom the foregoing proceedings were
4   taken, do hereby certify that any witness(es) in
5   the foregoing proceedings were fully sworn;
6   that the proceedings were recorded by me and
7   thereafter reduced to typewriting by a
8   qualified transcriptionist; that said digital
9   audio recording of said proceedings are a
10  true and accurate record to the best of my
11  knowledge, skills, and ability; and that I am
12  neither counsel for, related to, nor employed
13  by any of the parties to this case and have
14  no interest, financial or otherwise, in its
15  outcome.
16
17
18
19  _____
20  BRENDON CUENCA, NOTARY PUBLIC
21  FOR THE DISTRICT OF COLUMBIA
22
23
24
25

302

1          CERTIFICATE OF TRANSCRIBER
2          I, Jerome E. Harris, do hereby certify that
3   this transcript was prepared from the digital audio
4   recording of the foregoing proceeding; that
5   said transcript is a true and accurate record of
6   the proceedings to the best of my knowledge, skills,
7   and ability; and that I am neither counsel for,
8   related to, nor employed by any of the parties to
9   the case and have no interest, financial or
10  otherwise, in its outcome.
11
12
13  _____
14  JEROME E. HARRIS, STENOGRAPHER
15  SEPTEMBER 27, 2023
16
17
18
19
20
21
22
23
24
25

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    77

## A

**ability**
102:6, 103:4,
111:20, 149:17,
282:14, 301:11,
302:7
**able**
19:2, 22:1,
23:23, 139:10,
141:16
**above**
100:21, 143:1,
169:25, 176:7
**absolutely**
59:2, 89:20,
124:24, 267:15,
282:16
**abuses**
271:25
**accept**
139:3
**accepted**
135:15, 135:16
**accepting**
127:5
**access**
15:23, 17:3,
27:4, 27:11,
27:24, 124:11,
153:22, 153:25,
218:2
**according**
80:13
**account**
120:17, 120:18
**accountability**
282:9
**accurate**
21:21, 98:4,
147:17, 162:23,
163:23, 172:19,
199:2, 199:17,
202:7, 204:20,
210:7, 224:1,
225:11, 227:5,
228:3, 228:6,
228:19, 229:21,

233:13, 233:14,
254:9, 301:10,
302:5
**accurately**
102:7, 149:17,
170:21
**acknowledge**
64:16, 64:25,
92:24, 94:22,
107:19, 241:5
**acknowledged**
32:1, 160:24,
256:22
**acknowledging**
34:5
**across**
12:18
**act**
16:8, 278:20
**acting**
65:13, 175:25,
205:11, 205:12
**action**
1:6
**actions**
202:22
**active**
15:15
**actively**
252:18
**activist**
290:17, 290:19
**actual**
45:7, 147:23,
297:15, 298:10
**actually**
17:1, 24:22,
36:3, 45:21,
46:1, 48:15,
81:19, 82:8,
143:10, 156:17,
164:10, 182:1,
182:19, 184:11,
186:11, 195:23,
200:22, 201:16,
211:22, 212:11,
220:7, 226:3,
227:19, 229:13,

238:13, 238:16,
263:22, 275:18,
278:23, 292:1,
296:19
**add**
51:4, 95:11,
98:7, 104:1,
105:14, 113:4,
113:18, 128:11,
159:19
**addition**
233:6
**additional**
73:6, 132:12,
140:23
**additionally**
135:10
**address**
57:18, 251:7
**addressed**
152:12
**addressees**
69:7
**addressing**
65:2, 69:12
**adkins**
156:15, 157:18,
157:19, 157:24,
158:19, 159:11,
162:20
**administrative**
91:20, 240:12
**admissible**
78:24
**admitted**
148:24, 281:19
**advanced**
263:24
**adversary**
85:2, 110:21,
111:8
**advice**
56:14, 56:18,
109:19, 180:19,
181:4
**advised**
274:8
**advisory**
84:21

**advocates**
3:15, 12:19,
12:24, 14:18,
212:9, 213:10,
213:11, 214:1
**affirmative**
199:22
**affirmed**
10:15
**after**
11:15, 11:16,
11:20, 11:25,
12:4, 12:5,
16:16, 17:9,
26:4, 32:11,
62:20, 104:9,
108:18, 109:14,
139:3, 142:18,
145:13, 150:24,
152:4, 155:4,
157:14, 159:7,
162:18, 188:17,
189:4, 202:11,
203:11, 206:21,
234:25, 236:7,
236:25, 243:5,
243:25, 244:1,
244:8, 248:4,
249:7, 264:5,
266:13
**afternoon**
106:9, 108:5
**afterwards**
236:19
**against**
16:20, 30:3,
68:16, 151:3,
203:13, 207:11,
214:24, 272:12,
274:12, 275:13,
281:15, 282:15,
285:25, 287:13,
288:12, 288:24,
289:2, 297:21
**agenda**
230:16
**agents**
237:12

ago
18:1, 18:13,
18:16, 26:17,
38:8, 87:24,
89:2, 93:3,
93:25, 94:1,
96:19, 96:23,
105:16, 126:20,
127:2, 136:8,
148:7, 186:9,
188:5, 194:18,
198:13, 200:11,
215:1, 229:20,
255:12, 255:13,
276:21
agree
31:2, 137:5,
139:15, 144:14,
149:8, 156:19,
162:23, 172:25,
179:1, 179:18,
189:22, 198:14,
227:8, 254:9,
261:18
agreed
42:16, 69:21,
178:20, 179:5
agreement
2:13, 6:9,
6:10, 6:12,
6:14, 6:16,
6:18, 84:10,
84:17, 116:25,
117:2, 118:8,
118:10, 119:12,
119:14, 119:21,
119:23, 120:2,
122:17, 122:19,
123:2, 124:2,
124:5, 125:16,
127:4, 127:12,
127:14, 128:4,
129:1, 129:4,
230:17, 235:22,
262:15, 263:6,
298:7
agreements
132:1

agrees
121:6
ah
19:20, 220:21
ahead
25:23, 111:23,
121:20, 165:1,
169:7, 182:19
akkermans
127:15, 127:23,
128:8
al
1:4, 1:8, 9:4,
9:5, 263:7,
263:9, 263:10,
267:2
alabama
1:2, 3:10,
3:23, 9:6,
215:19
alana
207:22
albarracin
205:17
albert
40:4, 40:10,
40:11, 40:17,
41:4, 41:14,
41:19, 42:14,
43:7, 62:21,
64:6, 64:7,
64:13, 104:12,
104:23, 106:16,
108:5, 108:8,
109:11, 109:17,
109:22, 110:10,
114:6, 116:6,
118:11, 118:18,
119:15, 119:21,
121:3, 124:4,
124:5, 126:12,
127:3, 129:11,
130:16, 130:22,
158:20, 159:2,
159:10, 162:20,
162:24, 163:16,
164:10, 177:12,
195:3, 195:7,

196:2, 237:16,
237:18, 237:21,
237:23
ali
4:3
alias
205:15
alien
16:7, 282:8,
282:12
alive
142:23
all's
20:12, 30:23,
195:24, 262:10,
264:5
allegation
279:18, 286:3,
288:10, 294:5,
294:18, 295:13,
295:14
allegations
146:16, 272:20,
274:11, 274:19,
285:16, 285:19,
285:25, 286:1,
286:5, 286:9,
286:12, 287:9,
289:8, 297:20
allege
295:1, 298:3,
298:21
alleged
298:6
alleges
287:7
alleging
40:22, 68:16,
119:4
allow
27:23, 86:1,
218:21
almost
46:5
alone
152:5
along
80:5, 208:7,

214:7, 269:15,
285:11
alonso
49:9
already
23:12, 50:4,
60:5, 67:6,
72:15, 73:2,
84:23, 95:12,
98:10, 103:13,
106:18, 148:24,
150:3, 155:3,
159:16, 159:20,
160:21, 172:25,
179:25, 188:25,
193:7, 217:21,
220:7, 224:2,
241:20, 241:21,
242:10, 242:13,
245:14, 258:23,
259:20, 260:4,
266:11
also
4:10, 10:3,
13:25, 14:9,
15:8, 19:7,
19:9, 21:4,
21:6, 25:12,
33:23, 34:22,
49:7, 51:20,
57:22, 71:21,
82:15, 93:14,
103:15, 106:7,
110:15, 114:8,
117:25, 119:14,
122:19, 124:4,
131:18, 135:13,
143:9, 148:21,
149:24, 160:24,
164:4, 168:1,
170:22, 181:8,
193:20, 193:24,
194:1, 198:12,
198:19, 202:24,
204:14, 204:18,
205:15, 213:8,
213:9, 214:23,
224:6, 224:21,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    79

228:21, 233:8,
237:6, 242:9,
243:18, 243:25,
254:14, 255:1,
256:8, 265:17,
265:25, 272:10,
282:11, 288:23,
290:15, 290:23,
297:24
**altered**
120:12
**although**
63:24, 169:25,
216:8, 244:10
**always**
14:21, 19:6,
19:12, 142:22,
172:8, 172:9,
278:13, 278:14
**amassed**
155:2
**ambiguous**
144:16
**amended**
285:4, 285:22
**america**
275:2
**american**
11:14
**among**
276:3
**amount**
91:25, 92:16,
150:11, 155:15,
221:11, 263:22,
263:23
**amsterdam**
40:4, 41:18,
108:2
**analyzing**
77:14, 180:8,
180:12
**andre**
248:17, 248:21
**andrews**
4:11, 10:8
**anger**
260:22

**anna**
3:5, 9:19
**another**
30:1, 30:8,
30:22, 31:3,
49:8, 51:15,
59:15, 65:3,
68:15, 70:22,
74:18, 83:3,
89:22, 89:23,
98:20, 118:10,
122:19, 124:7,
129:3, 155:21,
180:12, 180:15,
180:16, 181:9,
193:14, 193:21,
194:2, 194:7,
197:2, 197:7,
206:23, 225:18,
234:25, 237:21,
238:1, 263:5,
266:12, 287:12,
300:7
**answer**
18:6, 18:23,
25:25, 67:7,
71:22, 95:17,
95:22, 96:1,
102:15, 103:11,
111:3, 111:4,
111:20, 115:8,
153:17, 162:13,
170:20, 171:7,
172:22, 177:17,
178:15, 181:5,
199:16, 200:7,
202:7, 204:14,
204:19, 206:11,
224:5, 228:9,
229:18, 229:19,
236:12, 245:3,
255:11, 256:11,
297:13
**answered**
95:16, 97:20,
98:10, 98:11,
102:5, 103:2,
103:10, 104:5,

155:17
**answering**
102:13, 149:17,
169:18, 171:20,
203:1, 205:6,
227:17
**answers**
45:2, 82:17,
95:12, 162:9
**anybody**
27:12, 27:13,
32:20, 50:9,
56:1, 68:4,
81:15, 86:17,
110:9, 111:9,
161:15, 191:6,
194:6, 194:12,
194:14, 201:17,
233:23, 233:25,
234:5, 245:21,
256:18, 294:11
**anyone**
18:5, 18:19,
27:23, 35:16,
43:22, 44:13,
46:20, 48:1,
50:8, 56:11,
56:14, 68:2,
88:17, 136:3,
154:11, 157:11,
158:20, 175:25,
181:7, 187:7,
188:7, 204:8,
238:24, 273:9,
274:4, 274:8,
279:18, 279:24,
283:21, 284:10,
286:4, 294:6,
295:13, 295:15
**anything**
22:2, 25:2,
38:2, 38:5,
44:20, 45:18,
46:17, 51:4,
60:15, 62:19,
72:16, 73:21,
75:13, 82:18,
82:20, 93:11,

98:7, 99:18,
101:13, 103:20,
104:1, 105:25,
110:24, 124:19,
134:2, 135:12,
144:15, 144:23,
145:23, 155:10,
157:4, 159:19,
169:24, 170:4,
173:4, 175:24,
176:25, 177:19,
188:15, 208:11,
219:9, 225:4,
240:14, 248:24,
268:18, 286:14
**anyway**
83:16
**apart**
112:18
**apologize**
278:19
**apparent**
95:7, 186:13,
186:15
**apparently**
26:12, 247:1,
248:21
**appeals**
11:19
**appear**
74:18, 74:22,
75:7, 221:9,
235:7, 239:22,
294:12
**appearance**
75:2
**appeared**
132:18
**appears**
119:25, 122:3,
125:18, 129:6,
163:21, 169:16,
186:22, 203:15,
246:22
**applied**
258:15, 270:21
**applies**
20:4

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    80

approach
173:9, 270:20
approached
135:21, 291:20,
292:5
approaches
293:5
appropriate
87:21, 150:23,
155:6, 163:18,
218:24
appropriately
65:13, 281:11
approval
91:23
approved
248:23
approximate
47:2
approximately
11:21, 26:19,
41:14, 120:20,
121:8
april
42:4, 239:12
arbitration
283:9, 283:11,
283:14, 283:18
area
32:15, 45:9,
68:3, 89:6,
116:2, 133:1,
133:22, 139:1,
159:17, 181:3,
233:17, 256:12,
274:22
areas
16:9, 277:13
aren't
144:14, 208:10
argue
145:3, 223:20,
289:20
argument
151:8, 226:23,
227:8
argumentative
115:19, 131:9

arguments
81:7, 82:15
arising
65:9, 66:20
around
22:3, 65:9,
159:25, 160:25,
202:25, 214:21,
234:2, 236:9,
240:14, 242:5,
245:14, 258:25,
270:18, 272:1
arranged
176:22, 194:11
arrangement
248:25
arrangements
27:7, 42:15,
42:19, 256:25
arranging
25:3, 66:19,
194:10, 297:10
arrived
188:19
article
267:2
aside
52:3, 52:11,
88:13, 88:18,
89:15, 116:22,
231:9
asked
14:15, 21:17,
22:2, 57:20,
94:9, 94:14,
95:16, 97:20,
98:11, 101:15,
102:4, 103:10,
104:5, 104:23,
121:15, 121:16,
122:10, 135:13,
140:12, 144:9,
146:15, 150:4,
162:6, 171:4,
171:7, 172:22,
222:9, 231:18,
235:24, 242:10,
249:24, 259:8,

270:10, 273:7,
276:9, 279:15,
280:16, 281:11,
283:21, 284:24,
295:7, 296:3,
297:20
asking
22:4, 26:8,
43:22, 48:7,
55:5, 56:4,
57:15, 66:16,
70:4, 72:24,
75:16, 87:23,
91:22, 95:1,
95:2, 95:10,
95:13, 95:23,
96:6, 110:2,
111:2, 115:4,
115:6, 132:7,
144:22, 144:23,
145:14, 156:23,
156:25, 173:14,
175:23, 179:15,
179:17, 186:12,
214:11, 214:14,
214:24, 218:17,
225:11, 226:8,
226:9, 226:13,
228:4, 232:9,
249:18, 257:13,
259:7, 259:10,
276:12, 281:3,
289:7, 289:9,
289:18, 292:11,
294:1, 294:4,
294:24, 295:8,
295:11, 296:13,
297:3
asks
58:1, 70:1,
185:9, 280:20
aspect
45:14, 282:12
aspects
94:25, 159:25,
211:14
assassin
225:23

asserts
223:8, 223:12
assess
145:10
assessing
52:21, 67:18,
152:8
assessment
35:12, 80:18,
137:11, 137:17
assessments
67:18, 67:19,
68:1
assist
123:5
assistance
186:1, 206:18,
218:17, 265:3,
265:18, 276:10,
276:13, 284:13
assistant
91:20, 218:21,
265:14
assisting
152:2, 229:5
associate
12:17, 13:1,
14:22, 15:14,
16:2, 23:14,
23:15, 39:24,
76:12, 257:9
associated
27:23, 57:21,
277:25, 278:1
associates
77:4, 78:18
association
35:2, 35:14,
84:20
assume
39:23, 45:5,
50:20, 63:25,
85:5, 113:5,
124:10, 146:25,
203:9, 213:23,
230:19, 273:4,
296:18, 299:25
assumes
159:12

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

81

assuming
64:8, 191:8,
230:20
athol
122:24
attached
5:6, 19:25,
22:21, 28:8,
36:1, 36:10,
41:25, 47:11,
53:7, 58:14,
61:25, 63:5,
68:21, 70:20,
75:24, 77:12,
78:4, 78:17,
80:24, 83:1,
91:4, 98:18,
105:8, 106:25,
108:15, 109:3,
112:12, 112:15,
116:25, 118:8,
119:12, 122:18,
127:13, 129:2,
130:2, 130:10,
136:20, 138:20,
141:21, 143:24,
156:7, 157:15,
158:8, 161:22,
164:19, 167:15,
169:1, 174:21,
182:5, 182:8,
182:11, 182:14,
196:25, 207:20,
209:1, 209:12,
209:20, 210:16,
211:1, 212:21,
215:6, 217:11,
222:12, 230:9,
230:17, 232:25,
234:19, 240:1,
243:8, 246:17,
253:8, 257:5,
262:7, 263:2,
264:14, 266:23,
279:7, 280:5,
287:18
attaching
76:4, 78:9,

113:12, 146:8,
156:11, 209:8,
211:6, 219:3,
222:15, 234:14,
244:5, 246:9,
246:22, 262:13,
291:17
attachment
209:23, 223:5,
264:20
attempt
142:12, 225:23
attempting
42:25
attempts
256:16
attend
11:13, 86:1
attendees
161:25
attention
34:19, 49:3,
49:4, 49:13,
102:9, 115:24,
267:20
attorney
23:21, 59:3,
66:2, 76:17,
84:11, 86:1,
235:21, 263:10,
278:7, 278:11
attorney-client
109:6, 109:16,
109:18, 110:3,
216:6
attorneys
57:21, 83:19,
84:12, 85:10,
85:25, 86:18,
109:12, 114:20,
251:6, 251:12,
273:22, 276:11
auc
24:1, 78:25,
79:2, 79:6,
79:24, 93:10,
93:13, 93:23,
137:23, 138:4,

160:13, 160:15,
160:22, 274:21,
275:4, 275:19,
276:5, 297:21,
297:25, 298:7
auc-chiquita
79:5
audio
301:9, 302:3
august
58:17, 91:8,
98:20, 99:3,
104:18, 217:13
author
232:9
authorities
199:23
authority
81:8, 81:13,
81:16
available
126:17, 126:25
avenue
4:4
avoid
43:17, 71:15,
169:18, 171:19
aware
20:8, 20:24,
27:18, 29:13,
31:10, 31:24,
31:25, 35:16,
35:20, 37:23,
44:13, 44:14,
48:7, 50:8,
50:9, 64:20,
66:25, 77:6,
79:9, 79:12,
81:15, 84:5,
84:7, 84:25,
85:7, 85:14,
92:4, 95:9,
143:13, 151:9,
151:14, 151:17,
154:14, 154:15,
154:18, 157:23,
158:1, 168:12,
168:17, 185:19,

188:12, 189:1,
191:3, 191:6,
192:6, 195:22,
205:19, 206:9,
206:13, 206:15,
206:20, 233:23,
233:25, 241:23,
268:7, 268:10,
268:12, 268:22,
274:24, 288:16,
288:18, 289:1,
291:19
awareness
95:11
away
21:12, 71:5,
71:23, 89:9,
92:19, 93:20,
122:8

**B**

ba
128:6
back
14:18, 18:24,
26:17, 36:3,
37:6, 38:20,
39:4, 46:12,
60:2, 61:12,
64:24, 77:16,
80:4, 89:2,
90:2, 94:21,
95:20, 96:10,
96:19, 107:8,
107:18, 107:25,
110:19, 112:3,
116:5, 117:18,
125:12, 134:19,
139:24, 141:2,
141:16, 145:13,
146:13, 152:16,
154:19, 155:25,
182:25, 207:6,
214:16, 225:10,
228:11, 230:4,
238:18, 238:20,
239:2, 240:4,
241:6, 241:16,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    82

242:15, 246:4,
248:13, 248:14,
255:12, 256:10,
262:3, 269:6,
270:21, 273:3,
283:22, 286:1,
292:11, 293:18,
293:22, 295:24
**back-dooring**
173:10
**backfired**
142:13
**backgrounds**
37:18, 37:22
**bad**
14:14, 37:23,
59:5, 60:20,
138:9
**balcero**
16:21, 17:4,
21:1, 30:24,
33:1, 33:6,
35:19, 74:10,
86:20, 92:1,
92:2, 92:4,
95:25, 97:9,
101:21, 126:10,
131:15, 150:24,
154:19, 155:4,
155:18, 156:15,
160:9, 161:24,
175:20, 188:2,
191:4, 191:21,
195:15, 207:14,
208:17, 222:4,
223:16, 223:21,
224:8, 224:10,
227:11, 256:3,
257:19, 272:7,
274:12, 274:17,
276:23, 284:20,
285:2, 285:13,
286:20, 287:9,
292:19, 292:23
**baloco**
16:21, 17:5,
37:13, 272:7,
274:12, 274:14,

274:16
**bam**
29:17, 29:23
**banana**
275:15
**bank**
238:3
**banker**
104:14
**bar**
11:12, 35:2,
35:9, 35:13,
35:17, 44:8,
50:5, 73:9,
84:20, 84:21,
173:21, 174:5,
180:20, 267:24,
281:15, 281:18
**barranquilla**
28:24
**barred**
76:17, 88:3,
88:5
**based**
40:4, 58:25,
60:16, 88:1,
97:7, 97:10,
103:4, 103:5,
151:17, 158:4,
159:6, 163:15,
172:24, 173:15,
177:4, 177:10,
198:15, 211:13,
222:6, 225:22,
227:1, 238:11,
269:24, 277:4,
278:13, 278:14,
281:11, 295:9,
297:7
**basically**
62:7, 70:1,
115:20, 148:2,
162:10, 165:23,
185:9, 202:12,
206:1, 213:10,
260:20, 281:5
**basing**
232:16, 295:6

**basis**
78:23, 93:7,
111:16, 192:10,
227:16, 232:3,
289:14
**bates**
31:13, 42:7,
144:13, 176:16,
219:20, 223:7,
237:8, 240:16,
262:17, 263:13,
264:24
**bear**
272:4
**became**
11:11, 14:23,
29:13, 31:10,
31:25, 41:15,
95:7, 95:8
**because**
19:13, 34:19,
51:12, 62:8,
77:10, 94:16,
96:13, 99:1,
127:21, 139:6,
141:8, 142:21,
145:2, 145:4,
147:8, 148:8,
148:11, 148:14,
167:8, 172:18,
176:9, 179:13,
192:5, 200:21,
208:14, 211:16,
214:2, 224:12,
225:17, 225:20,
225:21, 227:20,
230:22, 234:25,
235:24, 243:15,
266:17, 280:16,
280:24, 293:4,
295:18
**become**
14:19, 206:13
**becomes**
36:8
**bee**
131:19
**before**
2:13, 11:4,

20:4, 20:5,
26:1, 46:14,
57:5, 64:23,
79:3, 81:8,
83:17, 109:22,
123:15, 125:24,
138:10, 157:18,
161:24, 175:14,
181:21, 213:17,
222:1, 233:2,
233:11, 248:16,
251:24, 252:3,
252:7, 252:11,
252:14, 253:19,
260:3, 262:9,
266:12, 269:12,
271:5, 286:19,
301:3
**beforehand**
27:7
**began**
11:23, 109:18
**beginning**
175:16, 197:24,
270:24, 282:3,
292:10
**begins**
9:2
**behalf**
3:2, 3:13,
3:17, 4:1,
117:19, 120:15,
121:7, 175:25,
212:12, 238:24,
257:20, 260:23,
261:13
**behind**
37:2
**being**
9:12, 10:15,
15:14, 15:25,
17:16, 17:18,
21:17, 22:2,
28:25, 33:2,
34:3, 35:7,
37:2, 43:17,
48:12, 49:17,
50:22, 51:1,

51:7, 51:20,
54:20, 65:4,
66:21, 67:11,
69:15, 71:11,
72:18, 72:23,
75:12, 83:25,
85:25, 91:13,
92:4, 93:6,
93:15, 94:22,
98:2, 99:7,
99:16, 101:4,
101:19, 102:21,
104:23, 121:14,
121:25, 131:20,
133:5, 134:17,
140:2, 140:12,
141:23, 142:20,
149:2, 152:11,
153:3, 153:5,
153:12, 156:4,
157:8, 159:9,
164:9, 164:21,
187:19, 187:22,
188:8, 190:25,
196:3, 198:16,
204:18, 213:8,
216:23, 219:24,
222:9, 228:24,
229:6, 231:18,
235:24, 245:2,
249:23, 256:4,
261:19, 268:4,
273:8, 274:24,
276:25, 277:10,
281:11, 283:18,
284:14, 285:1,
288:19, 289:2,
291:8, 296:22
**belief**
279:22
**believe**
27:1, 27:13,
31:23, 32:8,
37:14, 37:16,
48:14, 54:2,
63:1, 106:2,
129:14, 135:2,
135:4, 136:11,

136:12, 147:3,
149:16, 153:25,
163:7, 163:24,
164:13, 184:2,
187:6, 187:7,
193:24, 211:20,
220:19, 224:24,
244:13, 254:5,
274:10, 283:6,
285:9, 286:1,
286:12, 286:18,
291:9, 291:19,
292:5, 294:1,
298:23
**believed**
286:8, 286:15,
296:3
**bell**
40:1, 248:18
**below**
29:17, 53:14,
91:11, 91:15,
146:18, 165:14,
178:20
**ben**
3:4, 9:18,
233:17
**benefit**
50:23, 52:2,
66:5, 66:11,
67:12, 67:23,
94:20, 144:17,
145:1, 145:3,
150:15, 175:15,
177:23, 205:20,
226:16, 298:21
**benefits**
101:24, 102:10,
140:14, 140:15,
144:7, 144:15,
145:8, 145:15
**best**
102:6, 103:3,
111:3, 147:15,
147:25, 149:17,
154:25, 155:5,
155:14, 155:17,
161:9, 170:24,

171:10, 172:4,
177:22, 178:14,
199:16, 200:24,
201:2, 202:6,
202:10, 202:24,
204:13, 204:16,
221:23, 222:8,
224:4, 228:8,
233:11, 233:18,
255:11, 256:11,
294:14, 297:7,
301:10, 302:6
**better**
19:10, 107:9,
241:11
**between**
84:10, 109:10,
110:3, 112:24,
117:3, 118:11,
119:15, 119:21,
119:23, 120:2,
122:20, 125:16,
127:15, 129:4,
144:1, 158:14,
162:7, 163:19,
167:17, 175:2,
177:3, 183:11,
183:25, 185:2,
230:23, 231:8,
235:10, 235:13,
237:16, 237:21,
238:1, 238:23,
242:16, 248:21,
253:11, 258:19,
270:7, 274:16,
291:22, 296:13
**beyond**
15:16, 26:22,
26:23, 27:8,
30:19, 30:20,
32:1, 32:23,
51:3, 75:12,
79:25, 93:18,
100:12, 103:17,
103:24, 104:7,
105:22, 140:7,
140:24, 141:10,
148:6, 155:6,

159:19, 181:10,
200:7, 211:17,
228:22, 228:23,
265:18, 276:15
**bhavani**
23:3
**big**
176:19, 178:21,
179:1, 179:6,
179:18, 231:3
**biggest**
230:24, 232:17
**bilderbeek**
40:10, 40:11,
40:17, 41:4,
41:10, 41:11,
41:15, 41:19,
42:14, 42:20,
43:8, 62:22,
64:7, 64:13,
104:23, 106:13,
108:9, 109:11,
109:16, 109:17,
109:23, 110:10,
118:11, 118:18,
118:23, 119:15,
119:22, 120:2,
120:15, 120:22,
121:4, 121:6,
124:4, 124:5,
126:12, 127:3,
129:11, 130:23,
159:2, 162:21,
162:24, 163:16,
164:10, 177:13,
195:4, 195:7,
196:3, 237:17,
237:22, 238:2,
238:8
**bilderbeek's**
40:5, 41:9
**bilderbeeks**
100:12, 100:18
**bill**
9:23, 69:13,
69:15, 69:20,
154:8, 273:20
**billy**
273:25

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

84

**birmingham**
3:10, 3:23,
13:9, 13:12,
283:24
**bit**
39:6, 67:4,
74:16, 189:10,
192:3, 213:12,
228:11, 238:14,
249:6, 272:1,
275:13, 276:8
**bizarre**
114:6, 114:13,
114:21, 116:6,
131:6
**blacked**
280:13
**blake**
4:11, 10:8
**blamed**
41:1
**blanco's**
55:21, 56:12,
62:11, 73:22,
86:18, 156:20,
157:17, 166:9
**blank**
109:19, 183:14,
183:18, 183:23
**board**
14:23, 14:25,
63:25
**bocanegra**
139:6
**bogota**
176:21
**bogus**
78:25
**bolt**
259:12
**bombarded**
98:2
**bonner**
246:21
**borrowed**
135:17
**both**
15:19, 16:24,

20:10, 41:10,
80:7, 112:20,
126:12, 176:9,
188:2, 224:19,
276:23, 282:8
**bottom**
23:2, 23:18,
31:14, 56:25,
60:22, 83:17,
91:18, 98:24,
104:9, 107:5,
112:22, 113:3,
138:24, 139:2,
165:18, 190:10,
198:25, 222:14,
257:7, 294:2
**bound**
13:20
**box**
3:9
**brad**
152:16, 152:18,
152:20, 153:1,
207:23, 209:7,
209:20, 210:23,
211:19, 230:17,
230:19, 233:3,
233:10, 234:1,
234:4, 244:4,
246:9, 246:21,
249:6, 257:8,
257:9, 283:22,
283:23, 284:7,
284:11, 284:17
**break**
46:6, 89:23,
111:24, 155:21,
181:13, 181:23,
182:20, 206:24,
245:24, 293:13
**brendon**
2:13, 10:2,
301:2, 301:20
**bribe**
29:18, 30:9,
135:15, 142:12,
188:14, 268:9
**bribed**
73:9, 136:3

**bribes**
146:16, 268:21
**bribing**
73:15, 295:2
**brief**
11:21, 46:11,
90:1, 125:11,
155:24, 182:24,
207:5, 211:18,
211:22, 213:22,
213:24, 225:19,
229:2, 229:21,
230:1, 246:3,
253:18, 253:20,
269:5, 293:17
**briefing**
153:9, 211:11,
212:14, 213:19,
215:22
**briefings**
233:13
**briefly**
137:4
**briefs**
153:1, 153:6,
208:16, 210:4,
213:16, 227:24,
233:5, 234:1
**bring**
27:16, 27:18,
274:22
**broad**
22:3, 22:4,
82:2, 95:3,
169:25, 170:24,
259:8, 280:16
**broader**
144:17
**broke**
246:8
**broken**
235:10, 235:14
**brookwood**
3:8
**brother**
40:18
**brothers**
40:21, 99:2,

100:8, 100:12,
106:4, 106:8,
106:12, 106:13,
106:19, 107:10,
109:7, 196:10
**bruce**
156:14
**building**
11:23, 15:16
**bullet**
282:20
**bump**
113:23
**bunch**
219:3
**burgers**
145:18, 145:19,
145:25
**burying**
115:18, 115:25,
116:1
**busy**
131:19, 273:3
**buy**
114:11, 114:21
**bv**
117:4, 117:11,
117:18, 117:24,
118:2, 121:1,
124:2, 129:5

**C**

**california**
215:17
**call**
13:3, 63:12,
105:15, 107:7,
107:8, 107:25,
150:18, 150:23,
169:14, 251:8,
261:15, 280:18
**called**
40:18, 135:10,
150:21, 231:13,
262:18, 268:20,
271:22
**calling**
87:15, 147:24,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                        85

**calls** 147:25, 148:11, 280:19
**calls**
24:12, 25:10, 25:21, 25:24, 30:15, 33:4, 34:23, 54:25, 72:11, 73:23, 75:4, 81:25, 101:16, 103:12, 110:14, 115:1, 130:25, 131:10, 139:17, 140:4, 146:1, 150:17, 173:6, 188:9, 194:8, 200:1, 224:10, 232:2, 242:23
**came**
12:18, 19:11, 22:9, 34:1, 177:12, 193:24, 249:8
**can't**
25:4, 55:13, 60:20, 101:1, 104:15, 105:2, 140:14, 194:22, 242:14, 245:20, 256:13, 257:24, 258:2, 283:16, 289:16, 296:22
**cannot**
13:9, 14:3, 14:7, 14:12, 14:16, 100:4, 103:14, 103:18, 173:2, 180:1, 186:1, 193:6, 258:5, 258:8
**canoso**
205:15
**capacity**
11:23, 15:2, 15:16
**career**
33:24, 88:12, 88:24, 96:25

**careful**
19:12, 38:11, 38:18
**carefully**
85:9
**carlos**
141:23, 142:3, 142:10, 142:17, 142:19, 142:21
**cases**
16:3, 16:5, 16:10, 16:18, 16:19, 18:25, 20:12, 30:3, 33:17, 41:7, 41:15, 45:8, 54:2, 89:7, 122:2, 122:4, 170:20, 195:13, 195:15, 195:17, 257:15, 270:25, 271:15, 272:7, 272:8, 272:11, 272:16, 272:18, 272:19, 272:20, 274:15, 283:19, 297:21
**cash**
27:16, 27:19, 198:1, 201:12
**cast**
52:3, 52:11
**catch**
175:11
**catching**
165:24
**catherine**
3:5, 9:19
**cause**
30:7, 72:17, 72:24, 141:3, 143:3, 158:20, 158:25, 288:13
**caused**
289:24
**caveat**
35:7
**cc**
39:25

**cc'd**
113:2, 114:4, 130:15, 142:8, 160:2, 178:13, 210:9, 233:15
**celebrating**
267:9, 267:13
**cell**
133:19, 133:23
**center**
3:21
**cents**
262:21
**ceo**
266:18
**certain**
13:20, 20:17, 31:9, 57:19, 104:16, 152:17, 153:5, 174:13, 205:6, 212:2, 216:4, 218:15, 220:6, 233:16, 236:6, 240:13, 244:11, 254:17, 256:16, 257:25, 284:11, 284:17, 286:24, 289:19
**certainly**
18:8, 21:22, 26:21, 48:11, 84:8, 87:24, 89:20, 133:5, 161:6, 174:10, 174:12, 187:14, 273:6, 291:8, 291:11
**certificate**
301:1, 302:1
**certify**
301:4, 302:2
**cetera**
27:6, 133:3, 193:10, 219:9, 220:2, 231:12, 240:21, 274:23, 285:17, 294:13
**chain**
68:4, 91:10,

91:13, 92:6, 135:6, 139:23, 144:5, 146:5, 158:18, 165:12, 165:16, 175:6, 176:12, 197:3, 197:7, 197:12, 202:6, 207:22, 210:22, 223:1, 223:2, 235:19
**chainsaws**
38:6
**changes**
201:23, 211:2
**changing**
95:17, 202:11
**characterization**
21:5, 54:20, 62:11, 185:10
**characterized**
291:9
**characterizing**
80:1, 90:12
**charge**
233:17
**charged**
37:8, 115:16
**charges**
267:25, 276:15
**charity**
217:13, 217:16, 217:17, 218:10, 237:1, 237:3, 243:20, 243:22, 264:17, 265:21, 265:25, 267:1
**charles**
79:2
**charris**
97:3, 97:13, 191:10, 194:1, 196:18, 225:21, 233:6, 280:23
**chat**
124:22
**check**
76:10, 76:20, 251:5, 268:18

**cherry**
217:16
**child**
272:21
**chill**
100:23
**chiquita**
68:9, 68:11,
68:16, 78:14,
78:21, 79:1,
117:16, 122:2,
123:8, 128:2,
128:8, 275:13,
275:18, 276:5
**chiquita's**
78:25, 79:1
**chiquita-ats-all-**
**@googlegroups**
69:8
**christian**
1:13, 2:1, 5:2,
9:3, 10:14,
10:24, 60:7,
60:23, 95:24,
197:17, 208:15,
210:25, 211:7,
234:17, 267:7,
269:11, 281:12,
299:5
**christian's**
211:1
**chronological**
184:14, 250:12
**circumstances**
29:4, 29:9,
34:21, 34:25,
79:19, 93:18,
179:25, 180:2,
180:13, 193:12,
200:9, 259:6,
259:7, 259:18
**citation**
85:21, 253:18
**cites**
225:18
**citizens**
298:14
**civil**
1:6, 86:25,

**88:15**, 175:17,
216:2, 271:18
**civilians**
297:22
**cl**
211:6, 234:15,
234:17, 235:1,
240:5
**claim**
118:23, 119:3,
119:6, 216:9,
254:10
**claimed**
28:24, 134:22,
134:24, 217:1,
294:20
**claiming**
30:8
**claims**
40:22, 123:6,
136:2, 282:14
**clarification**
55:4, 55:5
**clarify**
31:16, 219:1,
292:13
**clarity**
144:25
**claudia**
92:1
**clean**
265:1, 265:9
**clear**
35:7, 59:2,
80:17, 81:6,
82:14, 87:1,
91:17, 93:16,
110:4, 111:16,
115:3, 116:18,
126:23, 130:18,
146:14, 147:11,
151:7, 159:17,
166:20, 169:23,
170:2, 177:20,
179:15, 205:4,
205:5, 218:2,
220:19, 220:23,
226:8, 226:13,

**227:16**, 228:18,
231:6, 231:7,
243:11, 247:6,
271:7, 274:21
**cleared**
238:5
**clearly**
40:15, 43:15,
48:6, 49:23,
52:12, 77:22,
78:19, 79:18,
80:14, 91:9,
96:5, 96:20,
126:2, 131:25,
136:5, 144:22,
183:22, 187:9,
191:12, 192:5,
210:8, 217:19,
237:1, 242:19,
256:15, 277:14
**clears**
202:13
**clerked**
11:16
**client**
59:3
**client's**
14:6, 173:2
**clients**
13:23, 37:12,
298:5, 298:16,
298:19
**close**
45:4, 57:19
**closer**
20:6, 38:24,
204:5
**closing**
260:2, 260:5
**clued**
51:11
**clueing**
49:6
**co-counsel**
163:4
**coal**
274:22
**coca-cola**
272:12

**coconspirator**
288:4, 288:7
**code**
100:15, 196:5,
196:6
**coerced**
79:1
**coke**
272:14, 272:18
**collaborating**
274:21
**collar**
85:22
**collecting**
283:12
**collingsworth's**
30:3, 117:15,
136:25, 139:22,
158:17, 161:4,
193:15, 198:24,
201:5, 211:7,
247:24, 248:6,
262:14, 267:6
**colombia**
16:11, 17:15,
18:25, 20:12,
26:18, 26:21,
26:25, 27:16,
27:19, 37:6,
39:15, 40:22,
41:12, 43:17,
51:15, 51:19,
51:24, 52:10,
65:17, 70:23,
80:2, 93:22,
94:3, 96:15,
139:10, 139:11,
160:10, 195:13,
195:17, 215:13,
256:24, 263:25,
264:9, 265:1,
265:10, 265:12,
265:17, 266:3,
272:14, 273:9,
273:21, 274:6,
275:2, 275:10,
276:19, 277:23,
278:2, 278:3,

278:5, 283:4
**colombia's**
206:1
**colombia-related**
16:15, 16:17
**colombian**
26:24, 27:22,
30:2, 39:17,
54:16, 66:19,
68:17, 134:23,
139:4, 139:5,
188:13, 188:14,
198:17, 199:19,
205:23, 205:25,
248:23, 298:13
**colorado**
245:6
**columbia**
2:14, 301:21
**column**
183:13, 234:20,
234:25, 235:5
**com**
267:2
**come**
13:9, 13:12,
61:13, 106:8,
108:2, 111:9,
151:4, 151:20,
154:20, 165:5,
175:16, 191:15,
237:14, 270:19,
277:7
**comes**
40:6
**comfortable**
83:13
**coming**
19:17, 28:2,
100:8, 104:17,
134:9, 134:11,
134:13, 151:1
**comment**
85:20, 87:4,
187:5, 267:6,
294:4
**commenting**
85:21, 166:7,

166:13
**comments**
85:5, 87:25,
176:8, 246:25
**common**
133:22, 276:3
**commonplace**
33:12
**communicate**
19:2, 46:20,
84:9, 187:12
**communicated**
18:3, 41:3,
135:3, 205:22
**communicating**
19:4, 19:5,
32:24, 66:18,
132:14, 167:2
**communication**
59:25
**communications**
18:14, 32:22,
164:22, 168:13,
168:19, 206:5,
230:22, 230:23,
230:24, 230:25,
231:7, 231:8,
231:20, 233:9,
233:19, 233:20,
233:21, 235:13,
244:20, 244:24,
255:15
**companies**
275:8, 275:9
**company**
1:4, 9:4,
40:18, 275:15,
282:21, 282:24
**compared**
241:13
**comparison**
247:11
**compel**
75:2, 209:8,
209:11, 209:13,
209:17, 209:25,
223:3
**compensate**
114:20

**compensation**
69:22
**competitors**
162:10
**complaint**
8:9, 17:5,
17:12, 17:15,
281:15, 284:22,
285:5, 285:22,
286:20, 287:17,
288:1, 288:8,
288:17, 289:9,
289:16, 290:25,
291:2, 295:5
**complete**
51:16, 74:1
**completed**
120:21, 120:22,
186:2, 186:3
**complex**
34:12, 173:8,
179:24
**compliant**
178:16
**complicated**
66:20, 67:16,
103:15, 133:1,
170:25, 171:10,
174:11, 189:23,
193:11, 200:3,
200:4, 200:5
**complicit**
298:4, 298:13
**comply**
170:10, 170:23,
171:8, 171:11,
172:2
**complying**
294:15
**compromise**
280:17
**computers**
114:11, 114:21
**con**
132:22
**conceal**
290:24, 291:3
**concept**
49:1, 99:14,

115:13, 115:20,
115:21, 177:5,
267:19
**concern**
30:7, 34:10,
34:11, 34:14,
49:2, 72:17,
72:24, 80:9,
99:14, 132:22,
132:23, 133:6,
133:8, 136:7,
141:3, 143:3,
199:8, 231:16,
231:19, 232:10,
232:17, 232:18,
267:21, 273:10
**concerned**
194:20
**concerning**
30:10, 30:12,
34:2, 34:9,
52:7, 73:4,
73:15, 99:16,
107:21, 109:19,
132:19, 143:8,
143:9, 144:6,
174:1, 174:4,
192:23, 193:3,
193:12, 193:13,
193:18, 198:15,
229:20, 230:22,
230:23, 231:16,
295:8, 298:8
**concerns**
87:13, 87:22,
88:1, 103:23,
107:14, 107:17,
133:2, 230:24,
231:3, 273:12,
273:16, 276:25
**concerted**
100:14
**concession**
40:22
**concluded**
155:18
**concludes**
162:13

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                          88

conclusion
25:11, 25:13,
25:22, 30:16,
33:5, 34:24,
87:7, 134:9,
134:12, 134:13,
151:4, 151:21,
154:20, 173:7,
200:2
conclusions
87:14, 87:17
concrete
23:25
condition
47:25, 111:17,
220:1, 220:11
conditions
71:12, 72:8,
72:13, 72:14,
72:16
conduct
77:5
conducting
131:16
conference
198:20
confidential
47:14, 219:8,
219:21, 222:16
confirm
64:10, 114:7,
116:6, 238:21
confirmation
58:3, 237:18,
237:23
confirmed
130:16, 238:6
confirming
218:24
confused
214:2
confusing
66:17
connected
12:12, 39:1
connection
79:16, 128:2,
203:6, 203:8,

258:19, 283:19
conrad
3:18, 9:22,
10:10, 12:5,
12:25, 13:1,
13:3, 14:22,
15:13, 15:14,
15:18, 15:20,
16:2, 16:13,
16:19, 18:5,
21:10, 21:14,
21:18, 23:16,
33:15, 39:24,
69:16, 86:10,
91:20, 153:22,
154:3, 189:2,
205:11, 205:12,
206:6, 206:12,
206:16, 206:21,
207:11, 212:13,
214:23, 215:10,
216:24, 217:25,
257:9, 258:9,
258:10, 258:22,
258:25, 259:25,
260:23, 262:10,
262:14, 263:10,
264:5, 264:21,
269:9, 269:12,
270:7, 270:11,
270:15, 271:3,
271:10, 271:14,
272:6, 273:9,
274:5, 275:13,
275:17, 276:4,
278:12, 279:23,
281:25, 283:1,
283:7, 283:24,
284:2, 286:4,
286:18, 287:13,
288:19, 290:3,
291:20, 292:5
conscious
229:12
consider
79:20, 80:1,
81:20, 82:5,
83:19

considerable
58:2
consideration
174:4
considered
85:25, 114:25,
280:15
consistent
80:19, 167:21
conspiracy
288:11
conspire
291:1
conspired
290:23
constantly
98:2, 152:7
consult
155:17
consultation
103:5, 174:4
consulted
102:14
consulting
181:7
contact
17:20, 25:3,
35:2, 35:9,
56:11, 60:2
contacted
25:5, 26:15,
64:13
contacting
35:16
contacts
24:2, 60:17,
123:4
contained
241:14, 241:17
contemplated
120:22
content
87:2
contest
244:10
context
43:4, 66:21,
78:22, 142:15,

151:25, 170:2,
179:4, 209:21,
210:1, 219:18,
254:6, 254:15,
254:25, 261:24
contingency
117:15, 122:1,
122:9
continue
221:10, 260:1,
264:8, 266:9,
289:22
continued
3:25, 5:25,
6:25, 7:25,
264:4, 266:14
continues
31:16
continuing
142:15
contours
292:22
control
101:1
conversation
112:24, 273:20,
274:4
conversations
107:9, 202:5,
252:22, 274:1,
274:2, 285:18,
285:21
conveying
191:17, 192:8,
192:16, 193:18,
226:22
convicted
37:2, 43:17
convinced
81:5, 82:7,
82:14
cooperation
6:11, 6:13,
6:15, 6:17,
119:11, 119:14,
120:1, 122:17,
122:19, 125:16,
127:12, 127:14,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                               89

129:1, 129:4,
235:21
**coordination**
177:11
**coordinator**
19:15, 22:12,
28:1, 47:7,
90:19, 112:10,
124:21
**copied**
23:9, 83:3,
115:6, 139:23,
144:2, 163:16,
165:13, 204:22,
277:21
**copies**
80:6, 81:2,
209:7
**copy**
69:7, 69:21,
83:4, 129:21,
165:1, 165:5,
207:23, 213:5,
257:14
**copying**
63:9, 185:25
**corner**
31:14, 261:7
**corporate**
282:9
**corporation**
287:8
**correction**
36:3
**correctly**
24:7, 31:5,
40:8, 43:19,
48:4, 51:17,
53:24, 57:24,
59:9, 81:10,
84:3, 84:15,
99:5, 101:2,
104:20, 104:22,
105:18, 106:5,
106:10, 107:12,
108:6, 113:10,
113:20, 114:16,
130:19, 135:23,

139:13, 142:24,
145:20, 146:20,
157:21, 158:23,
162:16, 166:22,
168:10, 169:20,
170:5, 170:12,
176:5, 177:1,
185:17, 188:20,
191:1, 194:24,
198:6, 199:6,
200:16, 208:18,
211:4, 218:8,
219:11, 223:18,
225:25, 231:1,
235:25, 244:15,
244:22, 251:9,
252:4, 253:22,
265:7
**correspondent**
238:3
**costs**
50:12, 57:21,
78:18, 80:14
**cough**
222:24
**could**
23:16, 24:25,
48:21, 59:21,
76:13, 76:20,
79:11, 81:7,
82:15, 101:13,
106:18, 106:19,
108:9, 111:3,
111:16, 119:7,
123:25, 130:23,
143:3, 145:2,
153:23, 154:25,
155:5, 155:14,
155:17, 161:10,
165:21, 169:14,
174:11, 188:6,
198:18, 202:25,
204:13, 204:16,
215:24, 218:7,
219:4, 221:23,
229:7, 233:12,
235:1, 235:6,
249:24, 256:11,

267:24, 268:18,
282:17, 292:20,
293:13, 294:14
**couldn't**
278:24, 279:4,
283:20, 291:14
**counsel**
9:14, 10:19,
10:20, 14:10,
14:12, 14:15,
22:17, 38:23,
123:24, 128:21,
161:5, 171:2,
173:2, 173:5,
175:25, 176:22,
179:20, 180:20,
207:24, 210:9,
211:19, 212:11,
230:11, 233:4,
237:6, 245:2,
246:9, 248:3,
249:6, 249:10,
249:16, 254:4,
263:24, 269:8,
284:2, 292:6,
293:20, 299:7,
301:12, 302:7
**country**
74:18, 176:23,
212:3
**couple**
49:16, 100:22,
107:2, 108:18,
137:12, 162:18,
195:20, 202:12,
207:9, 240:3,
251:17, 272:11,
278:21, 287:24
**course**
12:24, 13:21,
29:14, 31:10,
37:17, 54:1,
60:24, 73:4,
73:11, 73:19,
95:6, 126:6,
126:20, 141:14,
216:1, 216:2,
216:3, 218:25,

221:1, 231:7,
265:17, 274:23,
276:22, 279:19,
294:7
**court**
1:1, 9:6, 10:1,
10:2, 10:5,
10:11, 10:18,
11:18, 13:25,
14:3, 14:7,
20:10, 30:14,
33:2, 74:22,
111:10, 163:5,
163:11, 163:25,
164:2, 164:5,
164:9, 169:23,
169:24, 170:24,
171:2, 171:8,
171:14, 171:23,
174:14, 176:14,
178:16, 179:2,
179:20, 203:17,
203:19, 204:7,
216:15, 221:20,
222:2, 222:3,
223:21, 226:24,
227:9, 228:25,
231:9, 243:15,
243:16, 258:12,
281:13, 282:7,
288:14, 299:7,
299:14, 300:4,
300:8, 301:1
**court's**
170:9, 170:11,
170:19, 170:23,
173:13, 217:6,
224:22
**courthouse**
122:24
**courts**
180:22
**cover**
84:11, 139:11
**crack**
240:7
**crazier**
135:20

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

90

crazy
108:3, 135:20
create
216:25, 218:23
creating
218:11, 218:13
credibility
78:20, 134:14,
143:8, 143:12
credible
133:2, 137:10
crime
20:3, 20:20,
37:8, 85:22,
115:16, 253:18,
258:15, 271:24
criminal
34:22, 48:8,
49:1, 56:5,
74:5, 76:7,
87:19, 88:14,
88:23, 106:1,
107:16, 180:9,
216:3, 267:25,
271:21, 276:10
critical
134:17
cross
163:3
crossed
12:16, 163:6
crossing
133:6
cuenca
2:13, 10:2,
301:2, 301:20
curiosity
185:12
current
208:16
currently
146:17, 269:20
cut
265:3
cute
111:14

**D**

danger
225:21

daniel
235:14
date
9:8, 17:1,
48:6, 48:11,
118:11, 147:6,
147:9, 149:1,
246:20, 250:9,
250:25, 258:17,
262:21, 263:21
dated
117:2, 118:10,
119:14, 158:10,
251:18
dates
63:22, 295:24
davis
3:6, 3:7, 10:9
day
31:3, 41:18,
70:9, 73:14,
104:12, 106:4,
108:4, 112:18,
114:1, 124:3,
130:18, 185:24,
194:21, 238:4,
263:5, 279:10,
289:20, 292:3,
298:3
days
108:18, 109:21,
120:20, 121:8,
240:3, 272:16
de
117:20
deadline
176:13
deal
43:16, 44:5,
54:15, 103:25,
104:14, 107:10,
107:15, 150:25,
176:19, 178:21,
179:1, 179:6,
179:18, 265:5,
299:24
dealing
18:24, 18:25,

45:13, 51:12,
53:20, 54:11,
54:13, 66:4,
66:5, 66:20,
67:15, 94:24,
97:25, 98:5,
138:7, 140:11,
160:10, 173:18,
278:18
dealt
66:21, 181:1
death
267:9, 267:13
debts
135:18, 139:8
december
258:10, 258:18
deciding
26:14, 147:7,
271:3
decision
161:2, 177:3,
204:25, 229:12,
245:22, 259:21,
282:4, 282:6,
282:13
decisionmaking
35:11, 50:3,
160:25, 161:7,
161:12, 161:13,
161:16, 205:4
decisions
68:5, 132:10,
159:24, 204:16,
205:7, 205:8,
236:22, 237:4,
256:16, 260:23,
282:11
declaration
24:1, 99:4,
99:8, 100:25,
104:10, 113:6,
114:14, 132:16,
150:6, 150:10,
150:13, 150:20,
156:12, 156:21,
156:24, 157:8,
157:15, 157:18,

157:19, 157:25,
188:18, 191:13,
191:20, 192:7,
192:12, 192:20,
192:24, 193:5,
193:22, 203:13,
209:20, 226:20,
228:22
declarations
188:1, 203:16,
235:21, 235:23
defamation
21:23, 21:24,
21:25, 22:6,
95:7, 151:1,
151:10, 151:25,
152:3, 152:16,
153:4, 153:15,
155:1, 155:19,
207:10, 207:15,
207:25, 208:21,
209:9, 210:5,
211:12, 216:24,
217:2, 217:20,
218:12, 222:3,
223:4, 233:4,
236:9, 242:7,
245:8, 247:22,
248:11, 270:25,
271:8, 276:24,
283:25, 284:8,
286:24, 287:3,
292:17, 292:19,
292:23
defamed
287:7
defend
115:17
defendant
3:13, 287:25,
288:9
defendants
1:9, 3:17,
146:13, 146:16,
170:2, 183:10,
225:15, 225:17,
235:13, 238:24,
244:6, 244:10,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    91

244:12, 244:19,
269:8, 290:1,
290:9, 290:14,
290:23, 291:2
**defending**
21:25
**defense**
47:25, 57:22,
284:8
**defenses**
220:1
**defensive**
271:9
**defer**
181:2
**deferred**
45:9, 56:24
**deferring**
35:9, 35:10,
50:2, 52:14,
52:17, 52:23,
56:21, 67:22,
68:1, 68:3,
115:22, 161:8,
174:7, 174:10,
174:15, 193:15
**define**
145:1
**definite**
130:18
**definitely**
16:6, 160:8,
220:10, 223:5,
251:23, 271:5
**deliberate**
149:13, 149:21
**deliberately**
172:13, 172:15
**demobilized**
24:1
**demonstrating**
268:3
**denied**
294:19
**denying**
51:10, 188:4
**department**
206:2, 206:4,

206:7, 269:23,
270:1, 270:4,
270:8, 270:16,
271:19
**departure**
258:22, 259:6,
262:10, 264:5
**depend**
200:8
**depending**
34:20, 34:25,
50:15, 255:13
**depends**
193:11
**deponent**
4:1
**depos**
9:11, 10:4,
299:21
**deposed**
31:2, 42:16,
74:9, 256:4
**deposited**
239:9
**deposition**
1:13, 2:1, 9:3,
9:12, 19:16,
28:5, 29:2,
41:22, 46:18,
86:7, 142:14,
143:7, 246:15,
266:18, 299:4,
299:6
**depositions**
11:4, 50:19,
160:9, 248:23
**deps**
50:14, 50:19,
90:9
**deputy**
15:3, 15:4
**derogatory**
58:24, 60:9,
60:12, 60:16,
61:4, 61:11,
61:14
**describe**
155:10, 175:23

**described**
237:10, 239:13,
288:17, 290:25
**description**
109:10
**designated**
138:4, 275:5
**destroy**
78:25
**details**
276:17
**determination**
173:15, 224:11
**determine**
45:12, 145:11,
153:13, 214:12,
228:5
**determining**
132:7
**develop**
270:25
**died**
267:4
**difference**
274:16
**different**
16:14, 24:3,
50:1, 86:16,
96:2, 108:3,
161:7, 163:14,
177:25, 220:17,
247:8, 247:9,
274:15
**differentiating**
39:17
**difficult**
23:22, 57:18
**digital**
301:8, 302:3
**diligence**
45:12
**directed**
284:14
**directing**
168:16, 197:20
**direction**
168:19, 290:14
**directive**
216:23

**directly**
19:4, 60:23,
86:24, 107:14,
135:13, 163:13,
165:16, 177:5,
292:6
**director**
15:4
**disagree**
147:5, 189:22,
201:4, 215:21,
221:20, 289:21
**disagreed**
291:8
**disagreement**
66:11, 283:8
**disappointment**
260:22
**disassociation**
262:14, 263:6,
263:22
**disclose**
20:25, 23:23,
26:15, 33:1,
85:3, 101:24,
110:9, 110:21,
111:7, 111:10,
145:5, 145:7,
145:18, 145:19,
145:22, 147:7,
147:21, 148:17,
150:15, 154:17,
155:6, 157:10,
159:1, 159:11,
160:16, 161:2,
161:3, 163:11,
170:8, 170:10,
170:15, 170:18,
171:2, 171:15,
171:18, 171:22,
172:1, 172:13,
172:17, 172:20,
177:4, 179:19,
198:2, 198:8,
200:6, 201:21,
204:9, 227:5,
231:14, 277:3,
277:11, 281:8,

298:19
**disclosed**
21:19, 25:9,
25:14, 26:9,
30:14, 146:4,
147:1, 149:3,
150:21, 151:2,
151:10, 151:12,
153:14, 154:21,
155:11, 171:24,
173:22, 174:8,
174:14, 176:1,
198:21, 199:14,
221:14, 221:19,
222:2, 222:3,
226:23, 227:11,
242:2, 243:14,
249:19, 249:21,
251:13, 256:3,
276:25, 277:1,
280:18, 280:21,
287:1, 294:10,
295:15
**disclosing**
148:5, 169:19,
171:20, 172:6,
199:20, 234:1,
234:4, 234:7,
277:3, 295:3
**disclosure**
109:21, 127:2,
156:19, 157:6,
161:12, 204:17,
204:18, 226:2,
247:3
**disclosures**
161:16, 170:4,
175:15, 175:16,
175:19, 176:2,
176:10
**discov**
216:2
**discovered**
164:23, 223:12
**discovery**
19:6, 22:6,
22:9, 23:20,
30:18, 59:23,

101:20, 101:22,
102:1, 102:2,
102:3, 102:8,
102:24, 109:4,
110:8, 111:5,
126:10, 126:11,
126:21, 134:6,
140:13, 148:1,
152:15, 153:3,
153:15, 154:21,
160:6, 172:3,
172:9, 177:15,
199:21, 204:13,
207:14, 208:21,
210:4, 211:11,
216:2, 216:3,
216:4, 223:11,
224:3, 224:19,
227:4, 228:5,
228:17, 233:5,
233:12, 247:21,
248:7, 256:17,
276:22, 286:25,
294:20
**discuss**
59:25, 60:6,
79:4, 145:5,
145:16, 166:12,
254:18, 256:15
**discussed**
48:12, 71:13,
94:19, 133:5,
134:2, 179:25,
193:6, 225:18,
261:17, 298:25
**discusses**
71:4
**discussing**
49:7, 60:10,
73:5, 107:15,
109:22, 144:6,
144:9, 150:4,
150:10, 159:4,
169:13, 175:9,
204:23, 235:21,
299:1
**discussion**
30:22, 71:11,

79:5, 85:19,
132:24, 142:6,
144:1, 162:4,
174:23
**discussions**
49:24, 73:14,
79:16, 97:15,
110:8, 110:16,
111:8, 111:13,
167:7, 167:11,
173:25, 193:8,
221:15, 228:25,
229:5, 229:7,
229:20, 251:11,
254:16, 255:6,
265:22, 292:10,
293:1, 293:2
**dismembering**
38:6
**dismissed**
155:4, 195:16,
207:14
**disposal**
54:19
**dispute**
54:20, 64:19,
162:11, 166:5,
192:10, 216:13
**disputing**
66:15, 79:11,
91:16, 95:19,
144:19, 167:4,
168:5, 195:8,
217:6, 249:24
**disseminated**
290:15, 290:18
**dissociation**
262:21
**distance**
159:21
**distancing**
159:23
**distinction**
296:13
**district**
1:1, 1:2, 2:14,
9:5, 9:6,
215:17, 215:18,

301:21
**division**
1:3, 271:21
**doc**
208:23
**docs**
208:13, 208:14,
208:17
**document**
29:8, 43:8,
44:7, 59:14,
61:7, 61:9,
62:18, 66:8,
72:6, 72:21,
75:5, 77:13,
82:11, 90:11,
92:19, 101:8,
105:1, 105:3,
109:25, 110:13,
116:15, 116:16,
116:18, 125:20,
128:10, 128:14,
128:22, 129:10,
140:6, 146:2,
146:3, 146:9,
148:3, 148:20,
149:11, 159:13,
159:14, 163:1,
167:4, 180:7,
180:12, 180:15,
180:17, 180:19,
186:14, 186:18,
201:9, 201:10,
206:24, 216:15,
216:18, 219:13,
219:17, 219:23,
220:9, 223:17,
223:22, 227:21,
235:6, 235:9,
236:20, 253:17,
253:19, 254:13,
264:21, 265:19
**documentation**
45:15, 45:20,
238:4
**doing**
15:13, 15:15,
15:18, 29:19,

32:19, 37:21,
44:13, 77:23,
78:19, 82:20,
88:18, 104:16,
111:3, 123:11,
128:1, 131:19,
133:9, 133:18,
147:15, 147:25,
148:2, 153:24,
155:5, 155:16,
161:8, 161:9,
170:24, 171:9,
172:5, 172:12,
177:20, 178:14,
178:24, 190:6,
193:19, 199:16,
200:24, 201:1,
202:6, 202:10,
202:24, 204:12,
204:16, 205:5,
221:23, 224:4,
224:23, 228:1,
228:8, 229:17,
233:11, 233:18,
240:11, 241:21,
244:1, 248:15,
249:17, 252:10,
255:11, 256:10,
256:11, 267:11,
268:10, 268:11,
274:24, 285:12,
285:22, 289:13

**dollar**
118:2, 120:25,
121:25

**dollars**
101:14, 143:14,
149:7, 193:4,
195:24, 262:20,
268:3, 268:4,
268:21

**done**
58:23, 79:19,
80:17, 84:5,
84:18, 84:24,
85:6, 94:17,
95:4, 133:10,
138:9, 151:5,

153:24, 155:14,
164:16, 179:13,
188:4, 200:13,
200:25, 206:19,
208:15, 265:9,
267:23, 268:18,
283:18, 291:10

**door**
259:16

**doru**
4:14

**doubt**
17:10, 20:19,
156:18, 273:10,
273:14

**doubting**
136:2

**douglas**
122:24

**down**
39:6, 55:9,
59:18, 98:24,
104:9, 165:18,
189:2, 189:16,
197:23, 208:15,
251:17, 261:3,
261:12, 261:24,
264:8, 266:3,
268:4, 268:19,
282:3

**draft**
109:25, 113:4,
113:12, 208:4,
209:20, 211:1,
211:7, 211:8,
213:15, 215:15,
234:19, 236:5,
236:15, 239:19

**drafted**
153:6, 209:24,
210:8, 230:5

**drafting**
17:5, 152:25,
210:4, 211:11,
211:14, 211:15,
211:22, 213:16,
213:23, 245:11,
245:15, 246:23

**dramatic**
176:20

**draw**
281:10

**drawing**
281:7

**drawn**
277:10

**driving**
108:2

**drop**
241:9

**drummond's**
245:2, 246:9,
253:18, 292:9,
297:24

**drying**
259:22

**duarte**
27:2, 29:23,
51:20, 133:13,
134:10, 134:22,
136:23, 137:5,
137:9, 137:22,
138:1, 138:2,
139:1, 140:3,
141:3, 141:24,
142:10, 142:17,
142:21, 143:3,
143:13, 145:17,
145:25, 148:14,
148:18, 148:25,
149:6, 160:12,
225:21, 233:7,
295:16

**duarte's**
51:15, 136:2,
142:2, 142:19

**due**
45:11

**dug**
285:14

**duke**
207:23

**duly**
10:15

**during**
19:5, 32:25,

37:17, 52:8,
54:1, 97:24,
123:2, 126:6,
131:15, 131:19,
154:16, 178:11,
251:16, 256:3,
270:15, 272:5,
277:2, 278:12,
290:3

**duties**
13:25, 14:9

**duty**
13:22

---

**E**

**each**
11:7, 83:21,
155:5, 203:12,
214:15, 221:11,
239:14, 277:2

**earlier**
90:6, 104:6,
132:15, 136:24,
153:3, 192:22,
208:1, 240:22,
243:24, 270:13,
273:7, 278:23,
279:3, 279:9,
282:2, 283:21,
285:23

**early**
210:4, 211:12,
247:22, 272:16,
278:3, 292:4

**earnest**
207:15

**easier**
83:12

**easily**
15:23, 76:20

**eastern**
9:9, 46:10,
46:13, 90:3,
112:1, 112:4,
125:10, 125:13,
155:23, 156:1,
183:1, 207:7,
246:2, 246:5,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                   94

| | | | |
|---|---|---|---|
| 269:4, 269:7, 293:16, 293:19, 299:6 | 44:18, 44:21, 50:13, 50:23, 51:7, 90:7, | 65:5, 168:18 | 255:18, 269:15, 277:19, 284:5 |
| **edgardo** | 92:21, 97:11, | **elsewhere** | **emergency** |
| 265:2 | 137:21, 205:15, | 56:24, 65:7, | 261:15 |
| **edited** | 221:8, 221:16, | 256:23, 256:25 | **emphasized** |
| 263:16 | 222:4, 222:20, | **emailed** | 57:17 |
| **edits** | 226:4, 226:16, | 166:15 | **employed** |
| 211:6, 211:7, | 229:1, 233:8, | **emailing** | 266:11, 269:20, |
| 240:8, 263:7 | 234:2, 239:8, | 43:15, 262:11, | 281:24, 301:12, |
| **effect** | 239:13, 241:15, | 263:5 | 302:8 |
| 110:25 | 242:1, 242:20, | **emails** | **employee** |
| **efficiently** | 244:25, 247:5, | 5:10, 5:17, | 76:1, 205:11, |
| 206:25 | 284:12 | 6:2, 6:5, 6:24, | 205:12, 217:24 |
| **effort** | **elaborate** | 22:20, 22:25, | **employees** |
| 100:14, 164:21 | 282:5 | 43:21, 48:15, | 237:13 |
| **efforts** | **eldon** | 48:21, 48:22, | **employer** |
| 53:18, 168:12, | 250:15, 250:20, | 52:1, 55:8, | 86:6, 269:22 |
| 268:24 | 251:5 | 56:3, 58:13, | **employment** |
| **efiling** | **electronic** | 58:17, 64:16, | 86:8, 261:22 |
| 287:23 | 299:13 | 66:9, 66:24, | **enclosed** |
| **eight** | **ellwood** | 73:20, 91:3, | 244:9 |
| 94:18, 255:12 | 120:2, 120:3, | 91:7, 91:11, | **end** |
| **either** | 120:10, 122:21, | 91:15, 92:24, | 31:1, 58:1, |
| 29:8, 38:7, | 122:23, 123:3, | 94:23, 96:14, | 58:22, 299:4 |
| 39:23, 49:17, | 125:17, 127:15, | 96:20, 98:2, | **ended** |
| 57:11, 66:6, | 128:7, 129:5 | 102:9, 102:17, | 63:17, 283:8 |
| 67:12, 76:12, | **else** | 102:18, 102:21, | **ends** |
| 85:6, 89:11, | 32:20, 43:22, | 106:24, 107:2, | 288:3 |
| 93:22, 97:4, | 46:21, 50:8, | 108:19, 115:7, | **engage** |
| 129:10, 136:3, | 50:9, 51:4, | 115:23, 131:18, | 292:9 |
| 145:5, 147:20, | 68:2, 68:4, | 132:1, 132:15, | **engaged** |
| 171:1, 189:19, | 75:13, 79:4, | 140:10, 143:23, | 32:22, 202:21 |
| 221:19, 223:23, | 95:22, 96:11, | 163:8, 163:15, | **engaging** |
| 242:4, 255:3, | 98:7, 104:1, | 166:21, 167:6, | 54:5, 268:23 |
| 259:15, 292:4, | 132:4, 146:4, | 167:8, 167:23, | **english** |
| 292:9, 297:15, | 154:11, 157:11, | 167:25, 168:1, | 166:8 |
| 297:16 | 160:24, 161:13, | 181:8, 185:2, | **enough** |
| **el** | 161:15, 161:17, | 186:12, 195:1, | 59:13, 113:9, |
| 24:2, 24:11, | 181:7, 191:6, | 196:11, 201:3, | 149:20, 299:23 |
| 24:17, 24:25, | 204:8, 227:6, | 203:2, 204:22, | **ensure** |
| 25:3, 25:5, | 229:7, 231:19, | 219:4, 224:9, | 84:12, 216:8, |
| 26:5, 26:15, | 234:5, 236:24, | 233:16, 238:23, | 233:12, 268:8 |
| 28:23, 29:5, | 240:14, 245:21, | 242:20, 247:24, | **enter** |
| 29:11, 29:19, | 257:1, 274:8, | 248:6, 248:19, | 26:24 |
| 30:5, 31:22, | 284:10, 292:7 | 252:23, 252:24, | **entered** |
| 33:3, 38:2, | **else's** | 253:24, 254:1, | 21:11, 124:4, |
| 38:3, 38:5, | 49:19, 52:4, | 254:10, 255:1, | 124:14, 127:3 |
| | | 255:2, 255:7, | **entire** |
| | | 255:13, 255:14, | 80:16, 88:24 |

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    95

entirely
179:17
entirety
51:25
entitled
42:11, 170:3,
223:8, 240:18,
264:21
entries
240:24, 241:14,
241:25, 247:4
entry
235:8, 237:21,
238:1
equal
113:14
equally
53:22
equivalent
74:17, 206:1
eric
4:12, 10:9,
23:10, 39:12,
78:6, 81:1,
81:19, 82:3,
246:21, 257:13
erica
39:21
especially
38:16, 60:21
esq
1:13, 2:2,
4:12, 5:2, 10:14
esquire
3:3, 3:4, 3:5,
3:6, 3:14, 3:19,
4:2
essentially
287:8
est
1:16, 300:9
established
57:1
estimating
270:22
et
1:4, 1:8, 9:4,
9:5, 24:5, 27:6,

31:17, 44:16,
44:18, 90:7,
133:3, 193:10,
219:9, 220:1,
231:12, 240:21,
274:23, 280:23,
285:16, 294:13
et's
24:3, 24:4
ethical
13:20, 13:22,
13:25, 14:9,
34:8, 34:15,
34:20, 35:1,
35:3, 35:12,
35:15, 35:18,
44:9, 49:25,
50:5, 52:16,
70:6, 82:5,
82:8, 100:2,
103:8, 133:7,
173:7, 174:5,
199:22, 294:16,
294:17
ethically
56:15, 87:21,
136:10
ethics
69:22, 70:2,
70:6, 70:9,
75:17, 76:4,
76:6, 77:14,
77:19, 78:9,
78:18, 79:15,
82:6, 83:22,
85:19, 94:13,
111:6, 174:1
even
14:6, 14:14,
40:14, 49:24,
55:7, 61:13,
77:10, 99:23,
110:5, 111:5,
138:10, 144:22,
147:20, 158:19,
158:20, 169:9,
170:23, 204:21,
214:10, 214:24,

216:20, 244:13,
247:6, 271:5,
296:18, 297:14
evening
189:21
event
29:8, 69:12,
127:23, 294:15
eventually
191:20, 243:15,
285:4
ever
11:4, 33:1,
35:13, 37:15,
38:2, 38:5,
41:3, 45:15,
55:5, 69:10,
77:19, 79:3,
80:1, 81:12,
84:17, 85:11,
88:13, 88:17,
89:16, 99:20,
110:18, 110:20,
110:24, 111:8,
128:13, 129:11,
129:12, 129:13,
135:20, 151:20,
154:19, 155:7,
155:9, 157:10,
181:1, 194:11,
198:8, 205:22,
217:24, 233:3,
248:7, 266:3,
273:10, 273:20,
274:8, 281:12,
281:15, 281:18,
284:10, 286:4,
286:14, 290:8,
290:18
every
92:21, 104:12,
106:4, 108:4,
137:14, 172:8,
172:11, 181:23,
205:9, 214:6,
214:20, 223:17,
223:22, 289:13
everybody
74:15, 249:18,

259:11
everyone
34:11, 265:2,
265:4
everything
151:21, 165:14,
217:1
evidence
78:24, 79:5,
212:4, 214:22,
223:13, 223:15,
225:22, 226:9,
289:17, 295:6,
295:19, 295:20
evidences
45:16
evidencing
235:13, 237:11,
240:20
ex-paramilitaries
44:25, 48:21,
137:16, 138:3
exact
40:14, 259:12,
292:22
exactly
12:15, 16:12,
16:17, 20:18,
27:10, 95:10,
139:20, 181:22,
200:13, 260:25,
295:11
examination
5:2, 10:20,
269:8, 293:20
examined
10:17
example
13:22, 14:3,
86:6, 142:14,
212:8, 218:14,
219:7, 266:15
examples
87:8, 219:2
except
118:11, 138:1,
138:2, 213:13,
215:12, 229:18,

295:16
**exception**
20:3, 20:21,
121:22, 258:15
**exceptions**
231:9
**exchange**
103:18, 253:11,
279:19, 279:24,
294:6, 295:13,
295:20
**exchanged**
269:15
**exclusively**
16:6
**excuse**
71:1, 113:14,
138:17, 156:10,
189:14, 233:3,
260:15, 263:12,
280:11, 289:23,
291:13
**executive**
15:4
**exercise**
202:25
**exhibits**
5:6, 124:14,
124:16, 124:25,
128:17, 291:17,
293:23
**exist**
168:1, 216:11,
216:21
**existed**
239:20, 247:24,
254:7
**existing**
85:14, 86:2
**expect**
106:16, 114:8
**expectation**
198:9
**expected**
118:22
**expenses**
84:1, 86:24
**experience**
33:14, 33:17,

33:23, 65:20,
66:2, 67:1,
67:5, 67:9,
67:10, 67:11,
67:15, 67:18
**experienced**
65:16, 76:22,
77:7, 181:2
**expert**
79:20, 80:2
**explain**
74:16, 83:24,
190:2, 255:23
**explained**
145:13, 183:9,
225:19
**explaining**
227:2
**explanation**
127:6, 129:7,
130:21, 140:15,
149:2, 189:6,
196:9, 227:23,
229:10, 229:15,
230:2, 241:17,
243:11, 243:16,
245:18, 245:20,
245:21, 247:2,
247:16, 252:13,
256:19
**explore**
23:19
**exploring**
277:14
**exposure**
163:14
**express**
273:10, 286:4
**extent**
20:11, 20:13,
20:14, 20:22,
90:12, 109:24,
115:4, 233:13
**extortion**
290:2, 290:10
**extra**
188:19
**extracting**
114:24

**extraterritorial**
282:11
**extremely**
53:20, 62:10

### F

**face**
56:1, 186:13
**face-to-face**
55:14
**facilities**
275:1
**facility**
274:23
**facing**
276:15
**fact**
52:21, 74:9,
83:18, 86:23,
89:17, 94:16,
97:1, 103:17,
110:9, 146:15,
150:19, 159:1,
164:4, 171:2,
171:22, 173:18,
174:12, 179:2,
179:19, 179:24,
192:11, 196:14,
198:16, 221:16,
224:13, 228:17,
243:13, 259:21,
267:19, 284:12,
290:24
**factor**
271:2
**factors**
85:24, 193:9
**facts**
17:6, 58:25,
67:17, 67:19,
84:22, 200:8,
202:22, 202:24,
254:4, 285:14,
286:19
**factual**
67:16, 209:21,
209:25, 211:14,
229:5

**factually**
200:5
**failure**
20:25
**fair**
38:10, 45:5,
62:11, 70:2,
96:16, 138:8,
162:11, 177:14,
185:10, 208:20,
210:3, 211:10,
220:22, 262:15,
262:16, 299:23
**fairly**
145:11, 281:2,
282:7, 297:13
**fall**
116:16, 271:6
**false**
114:24, 288:12,
288:14, 288:24,
289:2, 289:24,
290:4, 290:15,
290:18
**falsely**
223:8
**familiar**
15:5, 39:23,
40:20, 43:5,
49:10, 69:5,
79:23, 115:13,
205:18, 283:11,
287:15
**familiarity**
285:16
**families**
31:18, 31:22,
33:11, 35:5,
44:17, 45:17,
50:16, 67:13,
67:23, 69:23,
70:5, 75:18,
92:22, 93:23,
145:9, 223:14,
223:23, 225:5,
239:15, 273:9,
280:23, 284:12,
296:20, 296:21

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    97

**family**
29:2, 29:5,
29:11, 31:4,
31:8, 33:3,
34:3, 37:11,
45:11, 51:15,
93:15, 95:3,
95:18, 95:25,
142:18, 142:20,
143:15, 145:1,
148:18, 148:22,
148:25, 174:2,
205:20, 224:11,
224:12, 225:7,
225:20, 264:4,
280:25, 296:15,
297:4, 298:5,
298:16, 298:20,
298:22
**far**
41:19, 74:4,
97:7, 121:24,
124:17, 149:19,
204:22, 205:10,
250:22, 261:7,
269:18, 281:5
**farc**
274:23
**fashion**
205:23, 257:22,
258:7
**fast**
293:13
**faster**
194:22
**favorable**
257:20
**favorably**
42:25
**fear**
164:23
**feature**
124:22
**february**
28:11, 270:6,
270:22
**federal**
11:18

**feel**
171:1, 181:18,
206:12, 232:13
**feelings**
277:9
**fees**
47:24, 48:8,
49:1, 56:5,
57:21, 74:6,
76:5, 76:7,
78:18, 80:2,
80:14, 83:25,
84:12, 85:10,
85:25, 86:2,
86:6, 86:11,
86:18, 87:18,
88:14, 106:1,
106:8, 107:16,
114:15, 114:20,
117:15, 122:1,
122:9, 126:7,
128:6, 128:7,
133:3, 135:18,
139:8, 139:12,
174:2, 180:9,
193:10, 220:1,
273:22, 276:11,
276:20
**fellow**
23:16, 76:13,
217:22
**fellowship**
11:21, 11:23,
12:1
**felt**
273:3
**few**
26:22, 66:9,
74:8, 189:21,
218:6, 218:7,
219:6, 247:12
**fiend**
209:20
**fifty**
262:20, 263:17
**fight**
208:13
**figure**
67:8, 115:7,

132:5, 145:7,
229:9, 259:14,
294:24
**figured**
65:4
**file**
9:2, 153:1,
214:23, 295:5
**filed**
16:20, 16:24,
17:2, 40:21,
68:16, 151:2,
207:10, 211:18,
213:17, 223:3,
229:21, 243:15,
249:9, 281:15,
285:9, 286:19,
287:12
**filing**
17:4, 17:14,
285:2, 295:9
**filings**
160:12
**fill**
109:5, 123:23
**final**
29:1, 58:3,
146:8, 223:2,
237:4, 246:20
**finalized**
241:24
**finally**
151:9
**finance**
114:7, 116:6
**financial**
3:21, 104:13,
275:19, 301:14,
302:9
**find**
169:24, 176:13,
245:17, 278:24,
279:4
**finding**
20:3, 212:2,
258:15
**findings**
21:8, 258:20

**fine**
39:20, 71:17,
83:12, 178:19,
189:19, 212:18,
214:8, 220:4,
220:6, 236:14,
280:9
**finish**
25:25, 94:10,
236:11
**finished**
54:8, 236:13
**firestone**
16:14, 272:10,
272:17, 272:18
**firm**
10:9, 12:3,
23:14, 49:7,
49:8, 152:10,
152:11, 152:23,
181:9, 207:24,
249:7, 249:10,
249:11, 249:15,
252:17, 252:18,
272:9
**firm's**
211:19, 248:3
**firms**
52:12
**first**
10:15, 10:24,
12:22, 23:2,
25:6, 28:23,
31:3, 47:19,
55:10, 57:18,
59:11, 59:24,
60:12, 78:16,
80:4, 83:17,
83:21, 85:20,
91:18, 107:5,
112:9, 112:17,
135:22, 144:5,
146:5, 146:6,
157:14, 162:7,
165:16, 169:6,
175:6, 181:1,
195:14, 195:16,
197:11, 198:25,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

98

201:5, 207:22,
210:22, 219:24,
220:4, 220:9,
220:12, 222:14,
223:14, 234:20,
235:8, 235:11,
237:16, 240:7,
244:8, 244:17,
251:18, 252:15,
253:10, 257:8,
259:24, 280:11,
280:14, 282:20,
291:2
**fiscalia**
205:23, 206:1
**flags**
219:6
**flip**
28:21, 50:11,
58:20, 59:11,
92:15, 197:11,
221:5
**flipping**
244:17
**floor**
3:8
**florida**
154:6, 154:13,
154:17, 274:9
**florie**
3:7
**flow**
59:13
**fluctuate**
272:24
**fluctuating**
19:13
**fly**
229:15
**focus**
16:7, 34:6,
73:3, 231:6
**focused**
32:15, 42:3,
50:1, 51:24,
56:23, 89:6,
94:25, 116:2,
159:18, 159:25,

160:11, 160:14,
160:15, 256:13,
298:10
**focusing**
48:20, 52:10,
52:13, 56:24,
65:7, 98:5,
99:25, 160:3,
160:5, 178:13,
184:12, 271:12
**folks**
58:23, 124:10,
124:13, 188:14
**follow**
82:18, 82:20
**follow-up**
185:6, 198:24
**following**
51:16, 55:9,
91:23, 120:17,
123:6, 253:17
**follows**
10:17, 200:12
**footnote**
83:18
**foregoing**
301:3, 301:5,
302:4
**foreign**
18:19
**forget**
236:20, 249:2
**forgotten**
141:8, 255:8
**form**
21:2, 21:4,
34:17, 35:6,
44:11, 48:9,
48:17, 49:21,
65:25, 67:2,
100:16, 102:11,
107:23, 110:23,
111:12, 137:24,
140:18, 178:6,
178:8, 183:13,
183:18, 188:9,
192:13, 194:16,
196:13, 199:25,

204:10, 205:22,
217:3, 219:16,
223:24, 226:7,
227:12, 229:16,
255:25, 256:5,
257:22, 257:23,
258:7, 273:17,
275:20, 275:25,
276:6, 286:11,
286:21, 288:21,
289:5, 289:12,
289:15, 290:6,
290:11, 290:20,
291:4, 294:21,
295:4, 295:17,
296:24
**formal**
181:4
**format**
183:10
**former**
86:6, 86:7,
137:22, 176:2,
193:21
**fort**
69:18, 154:5,
263:11, 274:5
**forth**
220:2, 240:21
**forward**
81:8, 142:13
**forwarded**
91:12, 261:2,
261:11
**forwarding**
36:19, 53:14,
69:1, 71:3,
78:13, 80:5,
267:2
**forwards**
69:25
**found**
20:9, 20:18,
20:22, 20:23,
73:9, 180:23
**foundation**
29:12, 62:23,
102:25, 110:12,

140:19, 143:16,
151:6, 151:7,
151:20, 227:13
**foundational**
195:11
**founds**
62:22
**four**
11:16, 167:23,
178:12, 277:20,
277:21
**fr**
32:4, 32:5
**frame**
67:5, 153:16,
153:18, 272:5
**francisco**
18:9, 25:2,
28:22, 32:5,
60:1, 60:3,
63:17
**frankly**
168:2
**fraud**
20:3, 20:20,
114:25, 253:18,
258:15
**fraudulent**
290:1, 290:9
**fraudulently**
290:24, 291:3
**free**
232:13
**freed**
55:14, 56:9
**frevola**
263:7, 263:9
**friday**
208:12
**friend**
36:15, 135:17
**friends**
53:21, 54:23,
54:24
**front**
26:11, 111:9,
179:16, 183:5
**fulfill**
172:22

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    99

**full**
10:22, 59:14,
169:17, 244:18,
290:14, 297:11
**fully**
20:25, 225:19,
301:5
**function**
240:12
**fund**
114:13, 114:22
**funded**
120:16
**funders**
261:16
**funding**
56:11, 64:10,
99:3, 99:4,
100:7, 104:11,
108:3, 262:18,
263:15
**funds**
31:17, 31:21,
55:14, 55:20,
56:9, 64:13,
104:17, 104:24,
106:8, 108:1,
110:10, 116:12,
130:17, 158:20,
159:1, 159:10,
162:20, 163:17,
199:3, 199:4,
201:17, 202:9,
238:5, 238:9,
263:23
**funneled**
199:9
**funny**
145:18
**furious**
265:4
**further**
49:23, 59:5,
60:6, 223:10,
261:14, 285:10,
290:1, 290:9,
299:2
**fyi**
42:12, 145:16

**G**

**gain**
27:4, 27:23
**gained**
27:11
**games**
280:17
**gaps**
247:23, 247:24,
248:2, 248:5
**garcia**
42:13, 42:24,
43:2, 43:9,
109:7, 145:3,
145:16, 148:8,
169:15, 169:19,
170:9, 170:16,
171:15, 171:21,
176:19, 176:23
**garcia's**
42:20
**garry**
267:4
**gary**
266:19
**gave**
50:12, 51:14,
141:4, 141:5,
149:8, 199:4,
200:14, 200:21,
201:5, 201:6,
201:17, 201:18,
201:24, 295:16
**gears**
181:12
**gelvez**
205:17
**general**
34:7, 34:13,
40:13, 40:14,
51:23, 92:9,
92:20, 93:12,
99:14, 126:5,
126:12, 134:17,
137:15, 138:12,
144:20, 185:16,
185:20, 190:1,

195:2, 207:13,
252:25, 267:19,
272:25, 274:13,
274:18, 274:20,
285:24, 287:4,
287:6
**general's**
206:3
**generally**
73:4, 169:12,
190:3, 231:8,
274:11, 287:15
**genuine**
279:22
**getting**
24:10, 31:21,
48:15, 66:23,
79:16, 99:1,
115:23, 118:1,
131:6, 131:18,
181:4, 213:14,
238:5, 242:6
**gina**
265:13
**give**
29:1, 31:17,
71:8, 78:24,
199:3, 200:18,
201:17, 258:12,
286:14
**given**
11:4, 48:20,
67:6, 87:8,
95:12, 140:3,
146:14, 146:16,
170:7, 170:9,
170:14, 171:22,
175:24, 176:25,
198:8, 198:9,
198:19, 199:10,
199:12, 199:13,
202:9, 220:7,
239:14, 273:1,
277:7, 280:22,
281:3
**gives**
87:3, 219:2
**giving**
11:5, 191:15,

**glasses**
83:14, 90:24
**global**
284:16
**god**
135:19
**godfrey**
249:11
**goes**
37:6, 202:19,
228:11, 241:6,
248:13, 248:14
**goldstein**
257:8
**gone**
89:23, 124:1,
150:3, 224:9,
225:7, 226:11,
226:14, 226:18,
228:6, 255:6,
255:21, 268:2
**gonna**
166:1
**good**
12:14, 15:17,
81:20, 82:3,
181:23, 185:16,
189:25, 200:14,
201:25, 222:22,
299:24
**google**
215:16
**gosh**
18:6, 273:2
**gotten**
49:25, 270:18
**government**
27:22, 248:23,
275:6, 287:8
**government-to-go-vernment**
206:19
**graduated**
11:11
**grappling**
200:6
**grave**
225:21

**200:20**

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

100

**great**
24:1, 65:20,
197:17
**greater**
254:25
**greedy**
53:22
**ground**
11:6, 256:24
**group**
12:20, 14:19,
14:20, 51:1,
78:14, 135:9,
167:21, 178:12,
212:12, 215:15,
217:18, 255:2,
256:9, 259:15,
275:5, 276:4,
297:22
**groups**
290:17, 290:19
**guardrails**
268:14
**guards**
27:6, 27:22,
198:1, 198:10,
198:17, 198:20,
199:3, 199:5,
199:10, 199:13,
199:20, 200:20,
201:6, 201:12,
201:18
**guess**
14:21, 15:11,
21:6, 21:7,
91:12, 96:9,
96:12, 113:25,
115:8, 124:18,
124:22, 128:10,
141:5, 141:6,
144:21, 147:11,
147:23, 153:17,
155:7, 162:22,
184:18, 191:19,
206:10, 215:12,
227:15, 237:13,
242:15, 246:8,
274:25, 288:12,

293:2, 295:10
**guessing**
218:1
**guidance**
173:21, 173:24,
174:5
**guilty**
275:18, 276:5
**guy**
24:4
**guys**
44:25, 114:11,
123:16, 123:17,
123:22, 127:22,
160:4, 164:25,
214:15, 257:14,
278:24

### H

**hafiz**
39:25
**hager**
4:12, 10:9,
23:10, 23:12,
39:12, 78:7,
78:12, 80:4,
81:2, 81:5,
81:19, 87:13,
257:13
**halcon**
93:4, 93:5,
93:9, 97:13,
145:4, 145:16,
148:11, 176:9
**halfway**
59:18
**halip**
4:14
**hamburgers**
148:14, 149:3,
149:8, 280:22,
295:16
**hand**
10:12, 104:19,
110:20, 211:22,
213:23, 245:11,
246:23, 278:22,
287:19

**handing**
179:12, 183:4
**handle**
125:8
**handling**
52:17, 65:8
**handy**
184:18
**happen**
108:4, 114:13,
114:22, 190:25,
194:23, 255:24,
293:5
**happened**
88:23, 131:13,
188:6, 193:18,
200:15, 200:24,
201:24, 201:25,
202:15, 212:7,
255:17, 255:22,
266:5, 282:6,
297:6, 298:9
**happening**
30:11, 31:24,
35:8, 51:12,
51:24, 52:8,
64:25, 65:18,
73:13, 86:10,
89:3, 96:19,
96:24, 107:22,
115:4, 115:5,
115:10, 116:4,
131:11, 136:13,
140:24, 143:6,
150:20, 164:3,
240:14, 254:19,
261:5, 261:21,
265:16, 271:7
**happens**
50:15, 172:10,
293:7
**happy**
53:18, 165:8
**hard**
39:22, 40:13,
68:13, 170:15,
170:17, 171:22,
172:1, 172:2,

191:25, 208:13,
272:15, 295:1
**harm**
58:23, 172:6
**harris**
1:26, 302:2,
302:14
**hasbun**
78:24
**hasbún**
79:6, 79:20
**hasbún's**
79:16
**hat**
155:11
**head**
115:18, 115:25,
116:1, 164:6,
164:7
**headache**
105:15
**heading**
39:5, 244:8
**health**
245:6
**hear**
39:1, 106:16,
123:20, 123:21,
123:25, 128:18,
138:13, 209:3,
291:14
**heard**
88:7, 157:19,
251:22
**hearing**
21:15, 104:12,
161:24, 164:9,
191:25, 208:2
**heating**
207:15
**heavily**
101:20
**heavy**
206:24
**held**
2:2, 14:25,
238:3
**help**
14:6, 43:16,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    101

| | | | |
|---|---|---|---|
| 47:24, 84:20, 106:17, 144:17, 152:18, 166:24, 219:25, 235:9, 248:22, 276:19 | **himself** 280:25 **hint** 158:19, 226:2 **hired** 12:25, 15:25, 225:22, 249:10 | **human** 16:5, 53:19, 267:16, 271:13, 271:15, 271:22, 271:24, 272:21, 276:4 | 116:25, 118:8, 119:12, 122:17, 127:12, 129:1, 130:2, 130:10, 136:20, 138:20, 141:21, 143:24, |
| **helped** 79:2 | **hiring** 12:24 | **hundred** 60:24, 101:14, 102:21, 108:1, 262:20, 263:17 | 156:7, 158:8, 161:21, 164:19, 167:15, 169:1, 174:21, 182:5, |
| **helpful** 83:21 | **hit** 123:18, 124:19 | **hundreds** 268:4, 297:22 | 182:8, 182:11, 182:14, 196:25, 207:20, 209:1, |
| **helping** 48:1, 57:22 | **hold** 114:12, 129:25, 299:15 | **hung** 64:6 | 210:16, 212:21, 215:6, 217:11, |
| **helps** 186:18 | **home** 154:5, 190:12 | **hurt** 172:18, 173:1, 173:14, 173:15, 282:14 | 222:12, 230:9, 232:25, 240:1, 243:8, 246:17, |
| **hence** 244:11 | **honestly** 67:3, 170:21 | **hush** 28:16, 28:19 | 253:8, 257:5, 262:7, 263:2, |
| **hendricks** 23:9, 23:13, 76:3, 76:8, 77:8, 78:9, 78:17, 80:5, 82:8, 83:4, 86:22, 87:14, 110:22 | **honesty** 172:16 **honor** 162:15 **honored** 108:4 | **I** **id** 250:22, 261:6 **idea** 18:10, 63:21, 100:20, 123:10, 128:1, 170:11, | 264:14, 266:23, 279:7, 280:5, 287:18 **identified** 23:12, 32:21 **identify** 9:14, 85:1, |
| **hendrik** 40:18, 41:11, 109:16 | **hope** 57:16, 123:16 | 185:14, 186:6, 264:6, 265:11, 266:5, 277:16 | 112:23, 257:18, 258:5 **ignorance** |
| **hereby** 301:4, 302:2 | **hopefully** 90:8 | **ideas** 170:8 | 115:14 **ignore** |
| **herman** 117:20 | **hopes** 64:9 | **identical** 213:9 | 251:25 **ignoring** |
| **hes** 139:11 | **hour** 46:5, 89:23, | **identification** 19:24, 22:21, | 252:2 **iii** |
| **hey** 95:24, 105:14, 110:9, 110:20, 111:9, 209:20, 222:17, 251:22 | 113:13, 155:21, 181:19, 181:21, 181:23 **hours** 47:4, 113:6, 113:9, 263:4, | 28:8, 36:1, 36:10, 41:25, 47:11, 53:7, 58:14, 61:25, 63:5, 68:21, | 3:3 **illegal** 56:19, 194:14, 288:16, 288:18, 290:24 **imagine** |
| **hiba** 39:25 | 272:23, 273:1, 273:5 | 70:20, 75:24, 78:4, 80:24, | 11:3, 21:17, 73:12, 96:21, |
| **hide** 190:5, 190:7, 196:7 | **house** 176:22 | 83:1, 91:4, 98:18, 105:8, | 134:6, 138:14, 142:14, 261:3, |
| **hiding** 154:12 | **however** 155:10, 293:3 | 106:25, 108:15, 112:12, 112:15, | 266:17 **imbedded** 277:16 |
| **highlight** 218:6 | **huge** 47:1 | | |
| **hillis** 250:15 | **hugo** 53:23 | | |

immediately
202:13
impact
78:20
impacts
111:17
impair
111:20
impatient
99:1
impeccable
166:2
implemented
45:21
important
59:6, 242:3
impossible
273:2
impressions
137:10
imprisoned
30:22, 33:11,
37:19, 38:10,
44:10, 49:2,
58:7, 79:6,
87:19, 88:14,
88:22, 89:10,
89:17, 194:2,
203:21, 264:4,
296:19
improper
223:9
improvements
57:5
inability
139:7
inaccurate
165:25
inappropriately
267:24
inc
1:4, 9:4
include
241:25
included
80:11, 107:3,
225:8, 236:23,
242:12, 247:14

includes
235:19
including
17:25, 18:3,
36:14, 36:15,
38:19, 52:12,
58:18, 70:24,
77:4, 104:13,
113:6, 148:22,
152:9, 152:25,
174:1, 175:25,
188:13, 222:16,
298:4, 298:16
inconsistent
221:2
incorporated
35:12
increased
138:14
incredible
137:18
incrimination
198:4
indeed
145:2, 219:15
independent
44:2, 45:6,
45:11, 48:23,
60:13, 61:9,
64:18, 64:23,
87:2, 93:24,
97:19, 148:3,
249:14
independently
211:17, 212:16
indicate
150:16, 160:21
indicated
106:19, 178:24,
205:8
indicates
49:7, 171:25,
172:2, 202:6,
228:16, 245:13,
256:8
indicating
60:14, 61:10,
131:25, 178:22,

179:6, 226:25
indication
49:23, 73:5,
133:17
individual
40:11
individuals
32:14, 52:12,
67:14, 110:4,
137:16, 175:17,
277:22
inducement
84:1, 84:13,
87:1
influence
75:10
info
189:17
information
15:22, 30:13,
32:2, 33:10,
54:1, 54:19,
59:3, 60:4,
60:9, 60:12,
60:16, 61:1,
61:4, 61:11,
61:14, 67:17,
73:6, 109:5,
120:18, 123:4,
127:7, 132:9,
132:12, 132:13,
140:23, 143:1,
143:17, 146:16,
154:12, 154:15,
169:14, 170:1,
170:3, 176:14,
179:9, 191:15,
192:9, 192:17,
193:25, 214:25,
216:19, 222:17,
227:1, 228:21,
233:15, 236:6,
251:6, 256:8,
257:1, 274:9,
276:25, 277:6,
284:7, 284:11,
284:17, 295:10,
297:8

informed
283:22
ing
103:25
initial
17:20, 116:7,
170:3, 175:19,
176:9, 236:5,
236:15, 239:16,
285:2
initially
16:13, 99:2,
243:24
innocent
274:24
input
56:14, 56:18
inputting
236:6
inside
59:2
insists
31:2
instance
25:6, 27:13,
52:19, 53:1,
62:13, 67:24,
77:22, 171:6,
187:2, 193:17,
194:4, 199:15
instances
160:1, 174:10,
193:8, 244:13
instructed
284:11
instruction
284:17
integrally
50:2
intend
290:8
intended
119:22
intent
199:13, 289:25
intentional
149:21
intentionally
149:25, 150:2,

154:16, 163:7,
163:10, 164:5,
228:20, 254:3,
254:5
**intentions**
85:1, 111:7
**interest**
291:21, 292:9,
301:14, 302:9
**interested**
186:18, 242:18
**interests**
59:8
**interfacing**
32:14, 32:17,
32:18, 44:24,
48:20
**interim**
270:10
**intermediary**
47:21, 219:24,
242:16, 291:20
**intern**
70:1, 70:4,
75:17, 76:8,
76:11, 76:13,
94:14
**internal**
228:25, 229:4,
229:19, 230:23,
231:8, 234:14,
234:20, 235:5,
240:4, 244:20
**internally**
80:10
**international**
3:15, 12:19,
12:23, 14:18,
16:5, 74:17,
212:9, 212:12,
213:10, 213:11,
214:1, 267:16,
271:13, 271:15,
271:24, 272:20,
282:22
**interpret**
147:16, 148:1,
170:18, 178:15,

221:23, 222:9,
227:4, 297:18
**interpretation**
171:23, 177:14,
297:7
**interpreted**
281:2
**interpreter**
57:12
**interpreting**
147:3, 147:12,
147:13, 148:22,
177:8, 224:20,
224:21, 224:22,
262:13, 294:13,
297:2
**interrogatories**
33:7, 33:9,
109:6, 144:6,
144:12, 145:11,
146:10, 147:4,
147:16, 155:18,
171:7, 178:15,
199:16, 203:1,
204:14, 204:19,
205:6, 221:24,
256:10, 294:13,
295:7, 297:13
**interrogatory**
23:24, 102:13,
102:15, 103:3,
109:9, 142:2,
144:8, 144:10,
144:23, 145:23,
147:13, 169:14,
169:18, 171:20,
172:3, 175:9,
175:14, 175:23,
177:9, 197:15,
199:2, 222:7,
231:11, 297:14,
297:15
**interrupt**
59:12
**interrupting**
251:17
**interview**
23:25

**intricacies**
104:12
**introduce**
278:21
**introduced**
24:4
**invented**
142:10, 142:20,
143:19
**investigate**
44:20
**investigating**
17:6, 286:19
**investigation**
45:6
**investigative**
283:1, 285:13
**investigators**
19:1
**invoice**
113:5, 113:8
**invoices**
85:10, 85:11,
85:14
**invoked**
280:19
**involve**
42:22, 52:9,
68:12, 238:22
**involved**
12:20, 13:2,
14:19, 14:20,
15:19, 17:5,
17:11, 17:12,
17:17, 17:19,
17:20, 22:6,
22:8, 22:10,
31:21, 41:15,
50:3, 56:22,
68:8, 88:17,
89:16, 101:20,
101:22, 102:2,
102:6, 123:12,
131:21, 131:23,
142:6, 152:2,
152:4, 152:9,
152:15, 152:17,
152:21, 153:3,

153:5, 153:9,
153:12, 153:19,
153:21, 155:15,
160:25, 161:6,
161:11, 161:13,
161:17, 173:17,
181:9, 192:15,
194:10, 204:15,
204:24, 205:5,
206:5, 208:20,
210:3, 211:11,
212:14, 215:21,
218:11, 218:14,
218:16, 219:1,
228:14, 236:4,
236:19, 237:6,
240:12, 240:13,
242:11, 242:13,
243:25, 245:13,
248:10, 248:12,
265:13, 272:20,
297:21
**involvement**
17:8, 25:3,
26:14, 41:6,
68:11, 68:16,
152:25, 236:2,
237:1, 247:21,
248:7, 297:25
**involves**
190:13, 271:23
**involving**
16:10, 22:25,
91:8, 135:6,
197:8, 239:12,
265:20, 265:21
**ira**
13:3, 15:4,
15:9
**iradvocates**
14:21, 14:24,
15:11, 15:15,
213:18, 213:22,
214:4, 217:22,
217:25, 266:14
**ironically**
53:19
**isle**
122:24, 125:18,

131:6
**issue**
23:25, 59:24,
60:13, 61:13,
67:22, 70:2,
82:18, 88:13,
88:18, 89:10,
159:5, 172:7,
172:21, 231:6,
231:15, 271:4
**issued**
238:5
**issues**
20:24, 23:22,
33:25, 34:7,
34:12, 34:20,
34:22, 52:13,
56:24, 57:18,
65:9, 66:3,
66:20, 67:10,
67:11, 73:6,
96:22, 98:1,
103:15, 103:16,
103:21, 104:3,
159:3, 161:6,
170:25, 173:8,
174:11, 179:23,
181:1, 185:6,
200:3, 226:12,
234:6, 249:7,
265:6, 268:14,
270:24, 271:2,
271:13, 273:19,
278:5, 283:8,
299:1
**issuing**
212:3, 214:21
**itself**
20:15, 79:2,
83:8, 90:11
**ivan**
17:21, 18:11,
24:17, 24:23,
28:23, 31:17,
32:4, 44:16,
47:20, 50:12,
53:21, 54:3,
54:5, 54:15,

54:16, 54:23,
57:4, 57:15,
57:16, 58:24,
59:6, 60:1,
60:9, 60:20,
61:4, 61:15,
64:2, 92:16,
92:21, 106:7,
107:8, 113:6,
114:14, 120:16,
120:21, 120:22,
121:7, 121:9,
124:6, 124:7,
130:17, 158:18,
166:14, 168:8,
185:6, 185:25,
186:22, 188:13,
189:2, 189:17,
190:23, 198:2,
198:9, 199:4,
199:9, 200:14,
201:5, 201:13,
201:18, 201:25,
203:3, 203:5,
203:8, 203:11,
219:24, 230:25,
231:20, 237:18,
237:23, 238:24,
239:3, 239:12,
244:19, 244:21,
244:24, 263:25,
265:2, 268:5
**ivan's**
114:10, 208:17

---

**J**

**jack**
69:1, 69:7
**jail**
28:24, 29:19
**jaime**
36:15, 101:5,
107:25
**james**
120:2, 120:3,
120:10, 122:21,
125:17, 127:15,
128:7, 129:4

**jamie**
29:18, 30:1,
32:9, 32:14,
36:19, 36:22,
37:1, 37:15,
43:13, 43:21,
47:21, 48:7,
55:10, 55:21,
56:4, 58:2,
62:10, 62:16,
62:21, 64:14,
71:4, 71:11,
73:21, 74:9,
74:22, 75:9,
84:6, 84:17,
85:12, 85:17,
88:13, 88:19,
88:21, 89:16,
97:16, 99:7,
100:23, 103:21,
104:3, 104:18,
104:24, 105:15,
105:20, 105:25,
107:7, 107:9,
107:15, 110:11,
114:14, 116:12,
121:12, 127:5,
130:23, 137:2,
139:5, 146:25,
147:5, 147:19,
148:5, 150:3,
156:11, 156:20,
156:21, 158:19,
159:1, 159:10,
163:17, 164:23,
165:17, 165:21,
166:25, 167:2,
176:8, 176:24,
177:4, 203:6,
219:25, 220:10,
222:4, 229:1,
233:8, 234:2,
238:9, 241:16,
242:1, 242:21,
244:25, 247:5,
276:10
**january**
22:24, 235:17,

237:10, 240:19,
251:19, 270:22
**jb**
146:25
**jbm**
43:12, 55:10,
57:18, 63:25,
99:1
**jenny**
257:13
**jerome**
1:26, 302:2,
302:14
**jerry**
55:15, 56:8
**jersey**
4:4
**jim**
156:15
**jmb**
63:24
**job**
1:24, 11:25,
197:17, 286:19
**johnson**
249:10
**join**
12:8, 12:10,
25:24, 200:1,
270:4, 270:16
**joined**
12:5, 12:25,
15:20, 271:14
**joining**
13:3, 270:8
**journalist**
58:24, 59:4,
60:21
**journalist's**
60:25
**jr**
3:17, 269:9
**judge**
5:8, 11:17,
11:18, 11:19,
19:23, 20:3,
20:8, 139:10,
151:3, 151:14,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    105

161:24, 162:6,
163:18, 188:25,
216:24, 243:11,
258:14, 258:19
**judges**
11:18
**judgment**
82:4, 193:15,
202:25, 204:8
**judicial**
289:25, 290:5
**july**
63:8, 68:24,
70:22, 76:3,
76:16, 78:6,
81:1, 266:25,
270:17, 270:18,
295:24
**jump**
272:1
**juncture**
155:5
**june**
55:16, 62:3,
167:17, 184:12,
184:16, 185:1,
186:22, 192:5
**junior**
77:4
**jury**
22:5, 59:21,
60:8, 79:3,
103:20, 132:23,
134:21, 215:24,
229:25, 255:4,
255:23, 266:2
**jury's**
175:15, 205:25
**justice**
206:2, 206:7,
269:23, 270:1,
270:5, 270:8,
270:16, 271:20
**justify**
113:8

---
**K**
---
**kaiser**
79:2

**keep**
58:2, 59:25,
90:8, 100:25,
101:9, 123:17,
181:12, 187:21,
188:7, 190:25,
289:13
**keeping**
36:5, 36:16,
58:6, 139:7,
187:18
**key**
23:21
**killed**
37:25, 142:22,
145:2, 145:4,
298:20, 298:21
**killings**
37:3, 298:8,
298:10, 298:13
**kind**
11:7, 19:4,
43:16, 46:25,
83:20, 163:22,
178:25, 183:9,
229:15, 236:15,
259:10, 261:9,
261:21, 271:11,
277:17, 287:10,
295:1
**kinda**
206:24
**kinds**
52:21, 96:5,
114:6, 116:5,
167:10, 256:7,
256:16
**kiobel**
259:21, 282:4
**knew**
24:3, 95:21,
103:4, 161:9,
164:8, 187:11,
224:4, 260:4,
277:4, 288:23
**knock**
181:21
**knowing**
94:21, 153:18

**knowingly**
290:4, 290:18
**knowledge**
45:25, 46:3,
86:17, 152:5,
154:11, 175:18,
175:21, 198:15,
199:9, 238:8,
252:21, 289:7,
289:18, 290:15,
301:11, 302:6
**knows**
18:20, 81:23,
225:16, 233:7
**kovalik**
235:14
**kropf**
2:5, 9:12

---
**L**
---
**l-e-v-e-s-q-u-e**
11:2
**labor**
272:21
**lack**
29:12, 62:23,
102:25, 110:12,
140:19, 143:16,
151:6, 227:12,
238:3, 244:14
**lacked**
134:14
**laid**
177:24, 178:4,
288:13
**laina**
156:14, 157:16
**lang**
12:3
**language**
18:19, 120:12,
120:13, 276:3
**large**
24:16, 27:16,
27:19, 231:17,
297:2
**largely**
59:8

**larger**
178:12
**last**
10:25, 17:23,
18:2, 19:19,
19:20, 31:15,
42:8, 49:16,
57:17, 66:9,
75:15, 100:22,
106:7, 108:18,
113:16, 117:6,
117:7, 117:18,
118:14, 135:10,
144:4, 144:24,
162:18, 169:22,
169:25, 175:5,
182:16, 185:7,
186:19, 205:17,
213:13, 238:4,
238:5, 243:3,
290:22
**late**
292:4
**lately**
53:18
**later**
17:13, 102:4,
121:8, 123:23,
153:4, 186:13,
240:3, 263:4,
297:19
**lauderdale**
69:18, 154:5,
263:11, 274:5
**law**
11:13, 11:15,
11:16, 12:3,
53:19, 76:21,
81:23, 88:2,
133:1, 146:15,
179:24, 181:9,
198:15
**lawsuit**
151:25, 152:3,
153:4, 155:1,
155:19, 271:8
**lawyer**
11:10, 13:8,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

13:19, 24:3,
24:4, 24:17,
46:19, 46:24,
67:15, 73:8,
76:12, 77:6,
81:21, 82:3,
82:5, 83:24,
85:11, 86:2,
86:11, 88:4,
90:7, 125:18,
136:9, 141:23,
143:18, 152:16,
179:13, 180:20,
217:17, 217:21,
218:23, 271:11,
281:22, 283:24,
294:15
**lawyer's**
83:25, 86:6
**lawyers**
19:1, 21:18,
43:17, 43:23,
44:1, 44:10,
48:3, 53:22,
62:11, 62:16,
67:9, 85:16,
87:9, 133:3,
151:1, 152:9,
156:15, 172:3,
172:8, 218:18,
230:23, 231:8,
249:17, 251:22,
252:8, 252:21,
272:23
**lay**
281:6
**laying**
178:10
**lazare**
248:17, 248:21
**ld**
135:10, 135:19,
137:4, 137:5,
138:25, 139:2,
280:22
**lead**
92:1, 92:10,
97:9, 161:5

**lead-up**
21:14, 21:23
**leader**
79:6, 79:24
**leaders**
37:3, 43:18
**leading**
17:6, 67:25,
90:13, 184:17
**learned**
142:17, 295:10
**learning**
143:1
**least**
12:21, 16:20,
17:2, 24:16,
26:21, 39:16,
48:6, 54:12,
63:14, 71:22,
74:7, 74:24,
89:19, 97:7,
122:5, 153:25,
184:22, 185:1,
200:19, 204:20,
211:21, 211:24,
213:16, 213:20,
216:10, 216:14,
217:20, 218:24,
220:10, 221:14,
221:22, 227:3,
229:6, 231:20,
247:12, 256:11,
276:3, 279:11,
294:16
**leave**
251:15, 251:25,
252:10, 252:17,
258:9, 270:14,
271:3, 271:6
**leaving**
40:7, 41:18,
260:4, 270:7
**led**
24:10, 54:2
**leete**
28:17, 28:23,
32:7, 57:2,
80:6, 81:3,

85:20, 87:4,
87:15, 98:21,
105:11, 107:6,
112:25, 113:12,
113:22, 114:2,
130:13, 135:7,
136:22, 142:9,
158:15, 165:17,
165:22, 166:9,
166:13, 167:18,
168:6, 185:3,
185:5, 185:21,
186:19, 197:3,
197:8, 208:8,
213:4, 215:12,
277:20, 278:7
**leete's**
135:9, 186:21,
187:5, 187:17
**leeuw**
117:20
**left**
114:12, 183:13,
206:21, 250:22,
258:10, 258:25,
259:15
**left-hand**
261:7
**legal**
11:21, 11:22,
11:25, 25:11,
25:21, 30:16,
33:5, 34:23,
47:24, 48:8,
49:1, 56:5,
67:16, 67:18,
67:19, 74:6,
76:7, 77:5,
87:18, 88:14,
94:8, 94:12,
94:14, 94:15,
103:15, 106:1,
107:16, 109:19,
133:3, 173:6,
174:2, 180:9,
193:10, 200:1,
206:18, 210:1,
220:1, 223:9,

265:12, 276:12,
276:13, 276:19
**legally**
200:5
**legitimate**
52:24, 78:23,
202:3
**legitimately**
273:11, 273:15
**lens**
134:17
**leonard**
4:13, 9:10
**leone**
11:22
**less**
53:18, 76:22,
77:7, 146:14,
160:2, 221:2
**lessen**
199:8
**let's**
35:21, 36:3,
38:20, 41:21,
44:15, 46:6,
58:9, 61:18,
62:25, 68:6,
68:19, 70:12,
75:20, 82:22,
83:8, 89:22,
98:11, 104:18,
105:4, 106:20,
108:11, 112:23,
114:1, 116:20,
118:5, 119:9,
125:1, 125:7,
127:9, 129:20,
130:4, 134:19,
136:14, 138:17,
141:18, 143:21,
145:5, 145:15,
151:7, 155:21,
158:5, 161:18,
162:3, 164:15,
167:12, 168:23,
174:18, 178:18,
181:20, 181:25,
182:1, 183:7,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

107

184:9, 186:17,
196:21, 198:22,
206:23, 207:17,
208:23, 210:12,
212:19, 221:25,
222:17, 230:6,
232:23, 238:13,
238:15, 240:16,
241:9, 243:6,
245:24, 250:2,
253:2, 262:2,
262:24, 264:11,
286:20
**letter**
7:23, 83:21,
243:7, 244:4,
245:10, 245:16,
246:8, 246:20,
246:22, 247:3
**letters**
74:12, 75:7,
86:19, 143:6,
187:12, 190:24,
191:4, 203:19,
257:19, 258:6,
287:7
**level**
68:10, 285:24,
287:4
**levels**
18:18
**levesque's**
5:7, 211:8,
266:9
**liability**
282:10
**liaising**
65:8, 65:17,
66:3, 103:25,
131:16, 131:23,
132:7, 155:16,
161:1
**liaison**
160:22
**liaisoning**
161:1
**liar**
134:10

**libardo**
27:2, 29:23,
133:12, 134:21,
136:23, 137:5,
137:9, 137:22,
138:25, 140:3,
141:3, 141:24,
142:2, 142:10,
142:17, 143:3,
143:13, 149:6
**libel**
244:14
**license**
73:10
**licenses**
267:24
**lie**
14:3, 14:7,
14:12, 14:16,
173:2
**life**
48:2
**lightly**
179:10
**lights**
137:3
**likely**
48:2, 48:22,
55:15, 79:3,
99:2, 125:23,
142:20, 199:4,
199:10, 201:18,
225:21, 299:16
**limit**
164:22, 166:25,
168:13, 168:19
**limitations**
268:11
**limited**
282:8
**limiting**
225:6
**line**
81:20, 124:13,
162:3, 162:6,
209:13, 235:24,
237:9, 237:17,
238:22, 239:5,

240:17, 274:22,
294:17
**lines**
133:7, 277:10,
277:14, 281:7,
281:10
**link**
110:5
**linked**
86:24
**listed**
176:9
**listing**
175:20, 216:10
**lists**
83:20, 123:7,
161:25
**listserv**
69:9, 69:11
**literally**
108:18
**litigating**
255:18
**litigation**
15:15, 29:14,
31:11, 44:24,
45:14, 50:2,
51:13, 51:25,
52:7, 52:15,
65:2, 66:4,
73:3, 89:3,
94:18, 94:24,
94:25, 95:6,
96:5, 96:10,
98:1, 98:5,
100:1, 102:4,
109:20, 123:6,
123:13, 126:20,
131:12, 131:17,
131:20, 141:14,
155:2, 160:1,
172:11, 172:21,
176:3, 231:5,
255:16, 256:13,
259:22, 277:6,
291:22, 292:14,
293:5, 293:7
**litigations**
17:11

**little**
18:1, 19:10,
38:24, 39:6,
59:18, 67:4,
74:16, 109:5,
144:17, 169:10,
189:10, 189:12,
189:18, 192:3,
204:1, 213:12,
238:14, 249:5,
275:12, 276:7,
285:23, 294:25
**live**
13:6
**livid**
261:13
**liz**
4:2, 9:21
**llanos**
40:18, 40:21,
109:11, 109:17,
118:22, 119:3,
119:6, 162:4,
162:8, 162:24,
163:19, 164:10,
237:11, 240:20
**llc**
3:20
**llp**
3:7, 3:18, 4:3,
269:9
**loading**
22:18
**loan**
6:9, 6:10,
116:11, 116:24,
117:2, 117:10,
117:14, 118:2,
118:7, 118:10,
118:21, 119:7,
119:23, 120:25,
121:25, 124:2,
126:6, 127:4,
130:22, 132:1
**loaned**
124:2, 124:3,
130:22, 177:13
**loaning**
117:11, 118:18

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    108

**loans**
121:3
**locarno**
37:3
**located**
154:9, 277:22
**location**
29:3, 272:12
**log**
215:25, 216:1,
216:7, 216:14,
216:19, 216:20,
216:25, 217:6,
217:20, 218:11,
218:15, 218:23,
219:14, 219:19,
234:12, 234:14,
235:14, 236:3,
236:23, 239:19,
240:5, 240:8,
240:17, 241:2,
241:11, 241:13,
241:16, 241:20,
241:21, 241:23,
242:13, 242:19,
243:14, 243:19,
244:6, 244:9,
244:10, 244:11,
245:1, 245:19,
246:10, 247:4,
247:13, 247:17,
247:21, 287:1
**logged**
244:13, 244:20
**logistic**
186:1
**logistical**
23:22, 123:4
**logistics**
186:25, 187:18,
190:24
**long**
17:10, 20:16,
38:8, 47:3,
53:15, 87:1,
94:1, 126:19,
136:8, 141:14,
148:7, 181:14,

188:5, 194:17,
195:12, 198:13,
255:16, 270:23,
276:21, 277:5,
278:6, 287:5,
292:3
**long-time**
266:18
**longer**
63:19, 152:6,
153:21, 179:16,
242:7
**look**
23:2, 31:13,
68:19, 78:12,
82:3, 87:24,
119:18, 146:2,
146:3, 147:12,
165:21, 166:8,
167:7, 167:9,
172:9, 183:13,
189:22, 210:12,
216:14, 216:15,
218:6, 222:14,
235:8, 237:13,
246:12, 250:9,
264:20, 280:12,
296:9
**looked**
43:6, 49:16,
60:19, 66:10,
75:16, 108:19,
119:24, 123:15,
141:13, 143:2,
158:11, 162:19,
196:12, 205:10,
218:5, 222:15,
231:21, 263:16,
276:23, 277:19,
278:23, 280:8,
284:5
**looking**
12:17, 39:18,
55:25, 62:7,
63:23, 64:1,
64:24, 90:6,
94:21, 96:9,
96:10, 102:9,

108:3, 110:10,
112:22, 120:4,
124:15, 129:24,
141:15, 167:24,
173:11, 173:12,
177:16, 209:23,
212:4, 214:3,
219:7, 225:8,
232:6, 236:21,
243:11, 245:17,
247:20, 250:22,
257:7, 291:14,
297:14, 297:17
**looks**
10:7, 36:24,
39:23, 49:12,
51:2, 56:10,
85:21, 93:14,
99:10, 112:19,
114:23, 117:19,
120:11, 128:6,
141:4, 148:21,
169:5, 169:12,
176:7, 177:7,
178:24, 183:9,
186:24, 191:16,
192:8, 192:21,
209:18, 209:24,
210:2, 211:13,
223:1, 223:6,
246:25, 257:10,
262:16, 263:4,
263:6, 263:12,
263:16, 279:12
**loop**
45:4, 213:16
**lopez**
156:14
**lorraine**
28:17, 28:22,
32:7, 47:19,
57:1, 57:2,
59:23, 60:1,
60:6, 60:25,
80:6, 81:3,
83:5, 85:20,
98:21, 105:11,
107:6, 112:24,

114:2, 114:5,
130:13, 135:7,
142:9, 158:15,
158:18, 165:17,
165:24, 166:13,
167:17, 185:2,
185:21, 186:19,
189:17, 197:3,
197:8, 208:8,
213:4, 215:12,
277:20, 277:23,
278:1, 278:2,
278:7, 280:13,
280:20
**lorraine's**
187:9, 190:11,
191:16
**lose**
73:9
**loss**
267:24
**lost**
181:12, 232:15,
251:1
**lot**
26:19, 26:20,
37:25, 48:18,
48:19, 115:24,
150:25, 151:24,
203:3, 220:14,
247:14, 249:17,
260:12, 271:7,
272:17, 273:7,
277:6, 286:23,
287:9, 293:7
**lower**
113:17
**lucho**
191:9, 193:20,
196:18
**lunch**
111:23, 112:2
**lunches**
123:25
**lying**
138:13

**M**

**made**
20:9, 21:1,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                      109

27:7, 27:21,
31:8, 34:3,
44:15, 45:7,
93:15, 94:22,
95:8, 96:6,
97:1, 101:5,
105:20, 111:16,
132:8, 164:9,
164:10, 171:3,
174:12, 192:15,
205:19, 221:7,
223:9, 223:11,
226:4, 226:10,
226:15, 227:10,
228:25, 229:12,
245:2, 245:22,
247:10, 251:12,
256:2, 256:8,
258:20, 265:4,
273:8, 279:18,
280:25, 286:25,
287:9, 288:19,
289:2, 293:6,
294:5, 295:15,
295:20
**mail**
28:16, 28:19
**main**
270:1
**maintain**
50:14
**major**
55:14, 56:9
**make**
13:15, 36:4,
40:4, 43:16,
44:5, 45:4,
67:1, 81:7,
82:15, 90:13,
99:2, 100:14,
104:24, 111:15,
150:17, 150:23,
165:1, 166:5,
166:20, 167:8,
176:19, 177:14,
178:21, 179:6,
179:18, 180:1,
189:9, 190:24,

205:8, 220:18,
220:23, 225:10,
229:24, 240:8,
249:20, 251:8,
256:16, 268:19,
285:21, 292:2,
294:18, 296:8
**makes**
32:6, 49:11,
170:2, 208:3,
212:6, 239:16,
285:10
**making**
42:14, 42:20,
43:25, 67:5,
68:5, 83:18,
93:13, 93:22,
97:15, 110:6,
111:10, 132:10,
159:24, 162:19,
163:5, 173:15,
180:12, 180:21,
192:15, 204:15,
204:24, 205:7,
224:10, 224:20,
227:23, 236:22,
237:5, 243:23,
245:4, 250:22,
256:24, 260:24,
295:2, 298:20,
300:8
**man**
122:24, 125:18,
131:7, 134:22
**managed**
23:25
**managing**
69:15
**manner**
179:8, 208:20,
210:4
**many**
11:10, 18:13,
26:18, 52:7,
52:13, 73:2,
76:15, 76:21,
77:10, 89:3,
94:20, 102:18,

102:19, 141:14,
159:7, 159:18,
160:1, 196:11,
200:11, 273:1,
288:16
**march**
36:13, 39:7,
41:18, 42:14,
161:23, 260:13,
260:14, 260:17
**mark**
19:19, 182:2,
279:5
**marked**
19:18, 19:24,
22:21, 28:6,
28:8, 35:23,
36:1, 36:10,
41:25, 47:9,
47:11, 47:13,
53:5, 53:7,
58:14, 61:22,
61:25, 63:2,
63:5, 68:21,
70:17, 70:20,
75:22, 75:24,
78:1, 78:4,
80:24, 83:1,
91:4, 98:18,
105:6, 105:8,
106:22, 106:25,
108:13, 108:15,
112:7, 112:12,
112:15, 116:25,
118:8, 119:12,
122:17, 124:25,
125:4, 127:12,
129:1, 130:2,
130:6, 130:10,
136:20, 138:20,
141:21, 143:24,
156:4, 156:7,
158:8, 161:21,
164:19, 167:15,
169:1, 174:21,
182:5, 182:8,
182:11, 182:14,
196:25, 207:20,

209:1, 210:16,
212:21, 215:6,
217:11, 222:12,
230:9, 232:25,
240:1, 243:8,
246:17, 250:3,
253:8, 257:5,
262:7, 263:2,
264:14, 266:23,
278:24, 279:7,
280:5, 287:17,
287:20
**marking**
22:19, 278:22
**marks**
299:4
**marrying**
63:17
**mass**
38:17
**massacre**
38:3
**master**
234:14, 240:4
**mastermind**
37:2
**maternity**
251:15, 252:10,
252:17, 271:6
**matter**
9:4, 33:8,
34:13, 88:8,
102:16, 138:11,
253:1
**matters**
52:9, 73:4,
174:4
**maya**
43:13
**maybe**
15:15, 16:5,
18:12, 19:9,
20:6, 22:17,
47:1, 59:25,
60:4, 74:8,
145:18, 151:21,
158:21, 170:11,
184:2, 204:3,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    110

212:12, 273:4,
285:4
**meaning**
66:3, 134:7,
177:5, 272:12
**means**
72:1, 72:3,
72:7, 85:5,
153:8, 288:6
**meant**
213:21, 232:10,
233:20, 282:5,
295:25
**measures**
45:21, 225:20,
227:2, 268:7,
268:16, 268:17
**mechanism**
74:21
**media**
166:12, 290:16,
290:19
**mediating**
292:10
**medication**
111:19
**meet**
32:9, 46:20,
55:21, 56:8,
56:12, 133:12,
133:19, 135:11,
135:13, 137:3
**meeting**
55:14, 69:21,
113:7, 134:4,
134:7, 137:15,
137:21, 138:1,
138:25, 145:25,
163:12, 185:8,
186:21, 191:16,
192:9, 193:25,
230:16
**meetings**
17:15, 42:13,
113:19
**member**
11:12, 14:23,
14:25, 52:19,

65:6, 77:2,
102:14, 173:25,
174:6, 174:9,
180:25
**members**
34:3, 37:11,
39:14, 45:11,
52:20, 65:12,
69:23, 80:7,
93:15, 93:23,
95:4, 95:18,
95:25, 137:22,
148:23, 148:25,
174:2, 174:7,
224:11, 224:12,
225:7, 225:20,
264:4, 280:25,
290:16, 290:19,
298:5, 298:7,
298:16, 298:20,
298:22
**memo**
76:4, 78:9,
78:17, 79:14,
80:5, 80:9,
80:16, 80:18,
81:6, 82:8,
82:14, 83:4,
83:8, 87:18,
87:23, 89:5,
89:9, 94:4,
94:16, 110:22,
111:6, 133:3,
187:17, 189:7
**memor**
94:15
**memorandum**
20:19, 31:16,
77:12, 77:13,
94:8, 94:12,
186:19, 187:1,
189:4
**memory**
111:17
**men**
37:9, 37:11,
38:6
**mentioned**
147:20, 161:11,

243:20, 275:4,
282:2
**merits**
225:15
**mess**
265:2, 265:10
**message**
57:6, 57:14,
165:16, 166:10,
184:4, 184:5,
189:16, 192:16,
192:19, 193:18,
194:4, 226:22
**messages**
7:10, 166:14,
168:7, 168:8,
182:10, 183:11,
189:15, 250:7,
250:8
**met**
18:12, 18:15,
28:23, 46:19,
47:4, 47:20,
60:1, 105:17,
129:11, 129:12,
137:9, 142:9,
160:11, 185:6
**meticulously**
85:10
**microphone**
38:25, 192:2
**microsoft**
215:18
**middle**
40:3, 63:23,
135:10, 144:14,
185:5, 261:9,
280:20
**might**
18:14, 26:21,
37:6, 60:3,
60:17, 68:12,
106:14, 116:16,
130:17, 154:20,
206:13, 206:20,
211:15, 212:17,
217:21, 245:21,
270:17, 272:13,

276:18
**mike**
53:23
**million**
51:15, 117:11,
121:25, 124:3,
126:6, 139:4,
139:5, 139:6,
139:9, 139:11
**million-and-a-ha-**
**lf**
118:2, 120:25
**mind**
10:12, 59:25,
73:13, 107:11,
148:4, 155:9,
163:3, 163:6,
170:14, 179:12,
236:12
**mine**
80:19
**minimize**
78:20
**mining**
274:22
**minute**
59:16, 174:24,
271:1, 280:9
**minutes**
181:16
**mischaracterizes**
20:14, 24:20,
33:21, 50:24,
62:17, 66:7,
72:5, 72:20,
109:25, 150:8
**misleading**
149:9, 149:13,
228:12
**misrepresent**
149:18, 150:1,
164:14, 173:4,
254:3, 254:6,
254:7
**misrepresentation**
163:24, 225:1,
225:2, 253:20,
254:22

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

111

misrepresentations
20:10, 258:20
misrepresented
177:19
misrepresenting
150:2, 164:2,
164:5, 225:4,
225:9, 228:20
missed
107:7
missing
142:14, 248:5
misstates
61:6, 66:13,
75:5, 82:10,
101:7, 104:25,
140:19, 148:19,
149:10, 171:5,
179:21, 192:25,
201:8, 205:1,
224:16, 228:2,
254:12, 255:10
misstating
184:3
mixture
19:8
mlat
206:14, 206:17
moment
35:24
monday
1:15, 39:7,
104:18, 114:8
money
29:10, 29:20,
33:11, 42:22,
43:23, 44:1,
44:9, 45:10,
45:12, 45:16,
45:24, 46:1,
49:17, 50:22,
51:20, 52:2,
62:16, 66:5,
66:10, 67:12,
67:22, 73:21,
74:1, 75:1,
75:12, 85:17,

92:13, 92:21,
99:8, 103:8,
103:9, 114:24,
121:11, 124:6,
130:22, 130:23,
135:16, 135:17,
136:4, 139:3,
142:11, 142:12,
149:1, 150:5,
156:21, 177:6,
177:13, 187:21,
188:7, 188:12,
188:19, 191:10,
192:23, 193:22,
194:13, 198:8,
198:16, 198:19,
199:8, 199:19,
200:14, 200:18,
201:1, 201:5,
201:24, 202:16,
203:3, 203:4,
203:5, 203:8,
203:11, 239:8,
268:9
monitor
9:9
month
50:14, 92:13,
92:21, 93:5,
105:16, 221:11,
239:16, 270:12
month-to-month
272:24
monthly
90:16, 91:25,
92:5, 92:15,
93:4, 93:7,
97:3, 97:8,
188:20, 188:22,
189:1
months
11:22, 97:25,
162:18, 248:5,
260:3, 266:12,
270:14
morally
53:22
more
15:16, 18:21,

18:22, 26:17,
29:7, 40:14,
43:5, 50:15,
59:18, 60:4,
67:15, 67:17,
77:4, 81:8,
81:12, 81:16,
83:13, 93:11,
94:18, 95:11,
97:16, 103:17,
105:2, 113:18,
116:14, 121:23,
133:17, 141:16,
144:25, 154:21,
155:12, 155:20,
181:2, 205:18,
218:18, 226:18,
247:14, 268:3,
273:4, 285:16,
294:25, 299:3
morin
39:21
morning
106:17, 107:8,
173:1, 178:23,
179:7
moseley
2:5, 9:13
most
53:23, 55:15,
74:15, 160:10,
199:4, 199:10,
201:18, 242:2,
242:18, 244:12,
259:24, 262:17,
264:23
motion
151:2, 209:8,
209:11, 209:16,
209:25, 214:5,
223:3, 249:9
motions
214:6, 214:23,
215:16
move
31:4, 48:2,
98:11, 142:18,
145:3, 204:3,

214:24, 225:14,
238:14
moved
29:2, 145:1,
151:17, 247:15
moving
30:21, 36:24,
81:8, 89:9,
92:19, 93:20,
258:23
much
18:22, 51:11,
193:11, 293:14
multifaceted
290:1, 290:9
multiple
98:1, 126:21,
133:15, 193:7,
195:3, 196:2,
291:10
murder
38:17, 43:17
murdered
274:25
murdering
297:22
murders
37:9, 298:4
must
198:2, 232:7,
251:23
mute
123:17, 124:17
mutual
206:18
myself
159:23

### N

nadia
58:23, 60:1,
60:25
name
9:10, 10:22,
10:24, 10:25,
19:19, 19:20,
39:23, 40:1,
43:3, 43:4,

69:5, 79:23,
187:2, 248:18,
269:11, 282:22,
282:23
**named**
93:5, 125:17,
188:3, 250:20,
266:19, 287:25,
288:3, 288:7,
291:2
**names**
24:6, 26:6,
43:5, 100:19,
186:12, 205:17
**nature**
20:11, 40:14,
41:6, 231:11,
231:13, 258:21
**nd**
47:13, 47:15,
78:6, 81:1,
135:14, 219:8,
219:21, 250:9,
250:11
**necessarily**
37:5, 92:8,
149:12, 150:21,
199:11, 200:23,
202:20, 231:15
**necessary**
44:21, 131:24,
190:2
**need**
11:8, 23:19,
25:8, 25:13,
29:3, 34:19,
40:4, 46:6,
50:13, 50:15,
59:7, 62:10,
64:1, 75:1,
79:4, 90:8,
90:24, 102:8,
109:4, 110:21,
111:7, 111:9,
113:7, 124:13,
150:14, 166:10,
167:8, 169:9,
181:13, 188:7,

194:6, 195:1,
199:20, 201:21,
208:13, 213:1,
219:14, 219:18,
229:10, 244:11,
261:14, 265:4,
265:23, 267:20,
276:19, 280:9,
293:14, 299:11,
299:16, 300:3,
300:6
**needed**
31:4, 38:11,
46:1, 57:10,
75:9, 85:17,
171:23, 174:14,
185:19, 187:21,
225:20, 227:2,
273:15, 277:3
**needing**
187:18
**needs**
56:8, 59:1,
141:2, 185:25,
190:23, 191:10,
194:3
**nefarious**
223:12
**negative**
258:8
**negligent**
149:21
**negotiations**
293:4
**neither**
84:13, 106:7,
229:17, 301:12,
302:7
**netherlands**
127:16, 129:17,
129:18
**never**
50:4, 127:1,
157:19, 254:10,
269:18, 279:18,
294:5
**nevertheless**
244:12, 297:1

**new**
4:4, 36:15,
40:5, 104:12,
114:10, 150:25,
179:17, 249:10,
251:11, 251:22,
252:7, 252:20,
254:4, 278:21,
279:12
**next**
3:25, 5:25,
6:25, 7:25,
11:25, 45:3,
50:11, 64:9,
82:16, 86:22,
90:13, 112:7,
114:1, 178:18,
181:14, 190:17,
190:19, 190:22,
206:24, 235:11,
237:13, 237:21,
238:1, 239:11,
242:14, 257:2,
289:23, 290:22
**nickname**
195:25
**nicox**
117:4, 117:11,
117:18, 117:24,
118:2, 121:1,
124:2, 129:5
**night**
135:10
**nights**
96:13
**nomenclature**
39:18
**nondisclosure**
161:12, 249:8
**none**
73:21, 200:10,
221:18, 226:23,
241:17, 256:3,
279:19, 294:7
**nongovernmental**
290:17
**nonparty**
288:4, 288:7

**nonprofit**
12:20
**north**
3:22
**northern**
1:2, 9:6,
215:16, 215:18
**notary**
2:14, 301:1,
301:20
**note**
29:17, 49:6,
198:1, 235:19
**notes**
187:10, 191:16,
192:9, 218:5,
234:15, 234:20,
234:23, 234:24,
235:1, 235:4,
235:5, 240:5,
242:12, 243:23
**nothing**
10:16, 103:17,
128:11, 139:15,
150:1
**notice**
176:21, 247:23
**noticed**
248:7
**noticing**
248:2
**notified**
248:4
**november**
250:9, 250:11,
251:2, 262:9,
263:25, 264:16,
265:3
**nuclear**
239:15
**number**
1:6, 9:2, 9:6,
32:4, 36:14,
42:7, 43:12,
47:1, 48:2,
50:12, 51:14,
58:22, 83:24,
84:10, 84:20,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    113

85:1, 85:9,
91:10, 92:15,
93:4, 97:3,
98:24, 109:13,
114:5, 116:10,
116:14, 117:14,
118:17, 118:21,
119:21, 120:8,
120:9, 120:11,
120:20, 144:13,
146:22, 151:10,
157:17, 167:23,
176:16, 187:17,
195:18, 197:23,
197:24, 199:3,
203:2, 208:15,
219:7, 220:8,
221:2, 221:5,
226:14, 230:12,
230:21, 230:24,
230:25, 232:17,
235:8, 235:17,
239:4, 239:11,
241:14, 253:24,
261:6, 262:17,
263:13, 264:24,
267:18, 268:2,
277:19, 279:4
numbering
278:18
numbers
31:13
numerous
20:9, 204:22
nw
2:6, 4:4

O

o'clock
183:1
oath
51:5, 148:25
ob
173:3
object
21:2, 21:4,
35:6, 48:9,
48:17, 49:21,

65:25, 67:2,
100:16, 102:11,
107:23, 110:23,
137:24, 178:6,
178:8, 188:9,
192:13, 194:16,
196:13, 199:24,
199:25, 204:10,
217:3, 219:16,
223:24, 226:6,
226:7, 227:12,
229:16, 232:14,
255:25, 256:5,
257:23, 273:17,
275:20, 275:25,
276:6, 286:21,
288:21, 289:5,
289:13, 290:6,
290:11, 290:20,
291:4, 294:21,
295:4, 295:17,
296:24
objecting
172:10
objection
20:13, 24:12,
24:20, 25:10,
25:19, 25:20,
29:6, 29:12,
30:15, 33:4,
33:19, 34:17,
34:23, 44:11,
50:24, 54:25,
61:6, 62:17,
62:23, 65:23,
66:13, 72:5,
72:11, 72:20,
73:23, 75:4,
81:25, 82:10,
95:16, 97:20,
98:9, 99:20,
99:21, 101:7,
101:16, 102:25,
103:10, 104:5,
104:25, 109:24,
110:12, 111:12,
115:1, 115:19,
130:25, 131:9,

139:17, 140:4,
140:17, 140:18,
143:16, 146:1,
148:19, 150:7,
151:6, 153:16,
154:22, 159:12,
171:5, 173:6,
179:21, 192:25,
194:8, 198:4,
201:8, 205:1,
224:14, 224:16,
227:25, 228:2,
232:4, 242:23,
254:12, 255:10,
286:11, 289:12,
289:15
objections
109:14, 111:16,
146:17, 197:18,
208:11, 213:6,
213:20, 213:21,
214:3, 224:21,
276:1
obligation
171:1, 171:6,
199:22
obligations
170:19, 171:12,
172:23, 204:13,
281:21, 291:12
obtain
94:14
obvious
158:21, 231:11,
232:22, 261:12
obviously
16:15, 50:21,
95:7, 160:2,
218:2, 222:1,
231:24, 234:6,
240:11, 257:25,
261:1, 261:20,
276:15, 288:9
occasion
134:5
occurred
86:14, 89:13,
151:25

october
156:10, 157:20,
158:10, 242:6,
244:5, 246:19
odd
198:4, 259:11
offensive
111:14
offer
139:6, 270:18,
270:19
offered
26:13, 105:25,
145:23, 175:24
offering
136:10, 140:11,
176:7, 227:22,
229:15
offers
139:4, 142:11,
170:1
office
12:8, 15:21,
63:16, 77:6,
77:9, 91:21,
154:3, 154:5,
154:12, 154:13,
154:17, 206:3,
215:9, 217:23,
257:11, 259:4,
259:23, 260:2,
260:5, 261:4,
261:25, 263:11,
265:12, 265:13,
265:17, 270:2,
271:8, 274:5,
274:9, 277:22,
277:25, 278:1,
278:3, 278:5,
278:13, 278:14,
282:4, 284:6
officer
301:2
offices
2:2
officials
27:22, 188:14,
194:14

**oh**
18:6, 22:17,
63:21, 83:13,
83:23, 120:5,
120:9, 123:18,
127:21, 128:19,
129:18, 184:25,
190:20, 204:2,
220:25, 250:24,
259:13, 261:14,
263:20, 273:6
**oil**
40:19, 40:21,
40:22, 109:11,
109:17, 118:22,
119:3, 119:4,
119:6, 162:4,
162:11, 162:24,
163:20, 164:10,
237:12, 240:20
**old**
104:15, 122:23
**once**
18:12, 18:15,
26:21, 133:17,
212:1
**one-and-a-half**
121:24
**ones**
65:17, 213:1,
231:21, 247:15,
278:21
**ongoing**
126:10, 264:3,
265:23
**only**
33:16, 33:24,
58:25, 77:13,
83:25, 84:11,
88:23, 96:25,
100:24, 103:22,
105:24, 107:11,
111:6, 131:18,
139:7, 145:22,
149:8, 152:1,
180:7, 213:10,
218:15, 225:16,
227:9, 241:4,

243:19, 255:18,
256:2, 265:20,
272:8, 280:18,
280:21, 299:12
**operating**
275:9
**operation**
14:21
**opinion**
5:9, 19:24,
20:2, 20:15,
20:19, 21:11,
21:15, 21:22,
21:23, 35:3,
35:13, 35:15,
35:17, 44:8,
49:25, 50:5,
69:22, 70:6,
70:9, 70:11,
84:21, 181:4,
258:14
**opp**
209:13
**opposed**
217:25, 283:18
**opposing**
14:9, 14:12,
14:15, 171:2,
173:2, 173:4,
179:20, 216:19
**opposition**
23:24, 209:8,
209:16, 209:25,
223:3
**options**
108:3
**oral**
233:20
**orcasita**
37:4
**order**
5:9, 19:24,
20:2, 75:2,
102:7, 103:14,
116:12, 136:4,
142:11, 170:9,
170:11, 170:19,
170:23, 171:14,

171:23, 173:13,
174:14, 178:5,
178:17, 184:14,
190:24, 192:11,
193:6, 217:6,
250:12, 295:5,
300:1
**orders**
171:8, 224:22,
299:8
**organization**
138:5, 275:5
**organized**
183:3, 189:24,
206:25
**orient**
280:9
**original**
120:11, 247:13
**originally**
207:24, 249:6
**otero**
17:21, 18:11,
24:17, 24:23,
54:3, 54:5,
54:11, 54:15,
54:16, 54:20,
57:15, 58:1,
58:6, 60:9,
60:21, 61:5,
61:15, 92:16,
92:21, 113:6,
120:17, 120:21,
120:22, 121:8,
121:9, 124:6,
124:7, 185:20,
185:25, 186:22,
188:13, 189:2,
190:23, 198:2,
198:9, 199:9,
201:6, 201:13,
203:3, 203:5,
203:8, 203:11,
230:25, 231:20,
237:18, 237:23,
238:25, 239:3,
239:12, 244:19,
244:21, 244:24,

263:25, 268:5,
268:8, 268:10,
268:19
**other's**
67:9
**others**
21:18, 22:25,
25:1, 28:12,
32:15, 32:23,
39:12, 42:4,
45:9, 47:17,
52:17, 52:23,
62:4, 63:10,
63:12, 63:24,
65:15, 66:18,
66:22, 66:25,
74:8, 77:17,
107:6, 115:22,
143:2, 197:21,
233:7, 259:8,
263:25, 266:6,
284:6, 287:14
**otherwise**
93:17, 95:19,
149:22, 150:5,
153:8, 172:15,
189:20, 216:5,
226:2, 261:23,
301:14, 302:10
**ought**
110:9, 132:6
**out**
31:14, 39:10,
60:5, 61:3,
62:10, 67:8,
76:21, 77:11,
81:16, 83:20,
83:21, 88:2,
100:23, 106:17,
110:7, 111:9,
115:7, 116:11,
120:12, 121:25,
128:8, 132:5,
135:20, 142:22,
145:7, 151:24,
152:13, 154:24,
157:11, 157:24,
163:8, 172:15,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    115

176:13, 177:24,
178:4, 178:10,
179:4, 181:21,
185:12, 196:19,
198:23, 212:2,
229:9, 237:14,
242:9, 245:17,
247:13, 252:10,
258:11, 259:14,
259:16, 260:7,
271:5, 277:7,
280:14, 281:6,
288:13, 293:23,
294:24
**outcome**
87:2, 301:15,
302:10
**outdated**
83:15
**outlines**
219:8
**outrageous**
261:11
**outside**
284:2
**over**
11:7, 18:1,
29:14, 59:11,
88:10, 89:10,
89:17, 97:25,
102:21, 104:16,
126:20, 141:14,
150:24, 162:11,
166:12, 179:12,
189:20, 212:3,
214:15, 216:13,
221:1, 228:6,
232:18, 244:17,
261:16, 277:7,
283:8, 288:4,
294:17, 299:18
**overlap**
59:8
**overlapping**
152:19
**overly**
19:12
**owe**
14:9, 139:11

**owes**
139:8
**own**
29:25, 259:11,
259:15
**owned**
40:18

**P**

**p&y**
186:1, 186:4,
187:1, 187:14,
196:17
**package**
57:19
**page**
3:25, 5:2,
5:25, 6:25,
7:25, 23:2,
26:11, 28:21,
50:11, 58:20,
59:11, 59:18,
60:22, 80:4,
83:17, 83:23,
86:22, 91:19,
92:15, 107:5,
117:6, 117:7,
117:10, 117:18,
118:14, 118:17,
135:10, 144:4,
144:14, 144:24,
146:6, 162:3,
169:6, 175:6,
178:18, 184:16,
190:19, 197:11,
198:25, 219:20,
222:15, 223:7,
234:21, 235:8,
237:14, 239:11,
244:17, 253:10,
257:8, 260:18,
261:9, 263:13,
279:14, 280:10,
280:12, 280:14,
282:20, 288:3,
288:4, 288:15,
291:2, 294:2
**pages**
1:25, 53:15,

119:18, 186:19,
280:11
**paid**
29:10, 35:18,
45:24, 49:17,
51:7, 56:12,
72:4, 72:19,
75:10, 75:12,
83:25, 85:25,
88:13, 90:8,
92:4, 93:6,
95:15, 95:19,
95:25, 99:16,
100:3, 142:18,
151:11, 188:12,
192:7, 192:11,
199:19, 220:11,
223:13, 225:5,
233:8, 234:3,
235:22, 241:16,
242:21, 243:13,
247:5, 248:21,
249:19, 257:16,
258:1, 258:3,
258:7, 262:21,
263:21, 263:22,
279:18, 290:16,
294:6, 294:11,
294:19, 295:13,
295:16
**paper**
166:25
**papers**
285:2
**para**
44:25
**paragraph**
29:17, 30:21,
31:1, 42:11,
106:3, 120:7,
169:17, 169:22,
220:9, 220:13,
228:4, 244:8,
244:18, 263:15,
279:15, 279:17,
288:15, 289:23
**paralegal**
63:16, 63:20,

218:17, 278:10
**paramilitaries**
37:19, 37:22,
38:11, 68:17,
137:21, 188:2,
296:19, 296:21
**paramilitary**
24:1, 30:23,
134:22, 134:25,
176:2, 191:3,
193:21, 205:14,
297:22
**parker**
49:9, 55:15,
55:20, 56:8,
62:8, 62:15,
62:20, 114:18,
213:6, 213:17
**parse**
169:23
**part**
13:13, 32:19,
35:10, 40:3,
44:23, 50:1,
51:13, 52:4,
52:14, 54:14,
62:7, 66:4,
67:25, 69:8,
77:10, 115:21,
123:13, 128:3,
131:16, 134:6,
143:12, 152:6,
152:11, 160:7,
160:11, 164:22,
168:13, 184:22,
219:24, 225:18,
229:5, 265:1,
266:8, 279:11,
280:21, 283:11,
294:24, 297:23,
297:24
**participants**
183:16, 278:19
**participated**
288:11
**participating**
233:14, 237:3
**particular**
30:11, 34:6,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                           116

48:24, 73:14,
84:22, 89:9,
134:5, 136:7,
140:24, 213:15,
224:3, 279:16
**particularized**
152:5
**particularly**
53:23, 102:17,
137:18
**particulars**
89:5, 95:2,
240:11
**parties**
216:13, 301:13,
302:8
**partner**
59:6, 69:15,
263:11, 263:22
**partners**
246:22, 282:22
**partnership**
263:24
**parts**
211:15
**party**
179:2, 183:16,
216:19
**passing**
194:4
**past**
12:21, 72:24,
139:4, 142:21,
166:14, 168:7,
227:3, 228:5
**paths**
12:15
**patio**
133:20
**paul**
127:15, 127:23,
128:8
**paulk**
3:19, 5:4,
9:22, 253:11,
253:16, 254:21,
269:2, 269:10,
269:11, 276:2,

278:17, 279:2,
280:2, 289:7,
289:11, 289:14,
289:18, 289:22,
293:10, 293:23,
296:9, 297:16,
299:9, 299:20,
299:23
**paulk's**
249:11, 295:23
**pause**
165:9, 174:24
**pay**
34:19, 49:3,
49:4, 50:13,
62:16, 62:21,
64:14, 75:1,
75:6, 80:14,
81:17, 86:6,
86:18, 100:2,
100:4, 100:5,
101:14, 103:8,
103:14, 103:18,
107:15, 110:10,
113:13, 113:17,
116:12, 121:7,
124:6, 127:4,
128:7, 135:17,
135:22, 136:4,
139:8, 139:10,
179:1, 192:23,
193:3, 193:6,
263:24, 267:20,
268:21
**paying**
33:11, 34:13,
34:18, 35:14,
49:1, 49:13,
52:2, 62:9,
65:21, 66:10,
70:5, 75:17,
76:6, 77:14,
77:19, 78:18,
79:15, 82:9,
86:11, 87:9,
87:18, 88:22,
89:10, 89:17,
92:10, 94:3,

94:13, 95:3,
96:14, 102:8,
109:23, 115:24,
121:12, 150:4,
180:9, 221:15,
267:19, 274:21,
279:24
**payment**
44:16, 55:21,
56:15, 56:19,
76:4, 84:13,
87:8, 89:13,
97:16, 104:24,
105:25, 115:23,
116:7, 128:6,
132:17, 147:20,
164:11, 169:19,
171:21, 177:11,
177:12, 179:19,
188:22, 189:1,
193:16, 196:11,
214:25, 226:10,
226:20, 237:11,
237:18, 237:23,
238:9, 253:21,
253:25, 254:11,
257:21, 262:22,
265:4, 271:2,
283:8
**pen**
120:13
**penata**
186:4, 187:7,
188:3, 191:5,
203:9
**pending**
292:20
**pendleton**
63:9, 63:15,
71:4, 71:22,
235:18, 235:20
**people**
19:7, 24:3,
24:6, 24:9,
24:25, 26:6,
32:21, 32:24,
36:14, 37:23,
37:25, 38:6,

38:11, 38:25,
48:19, 49:13,
53:20, 54:12,
57:11, 65:8,
73:5, 93:13,
93:22, 124:23,
132:11, 132:14,
133:24, 138:8,
160:3, 163:13,
167:23, 168:1,
175:20, 187:16,
191:24, 215:9,
218:11, 218:16,
236:21, 256:24,
274:24, 277:21,
294:18, 298:4,
298:21
**people's**
186:12
**percent**
60:24, 108:1
**perhaps**
37:6, 241:1
**period**
15:2, 22:3,
24:17, 30:11,
52:8, 64:17,
89:4, 95:20,
95:22, 97:25,
126:20, 131:15,
131:19, 178:11,
240:14, 243:5,
245:5, 266:13,
270:10, 271:6,
277:7
**permissibility**
52:21, 180:8,
193:8
**permissible**
56:16, 86:5,
159:4, 180:2,
180:5, 180:23,
193:16
**person**
12:17, 30:1,
54:3, 54:21,
93:5, 93:6,
93:10, 123:10,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

117

131:16, 137:10,
170:3, 174:15,
176:1, 202:21,
202:23, 204:24,
243:19, 297:5,
297:10
**personally**
23:21, 50:6,
153:24, 199:3,
201:17, 273:14
**perspective**
34:15
**pertains**
255:5
**peruse**
169:7
**pesos**
51:15, 139:5,
139:10, 139:11
**phone**
104:12, 135:16,
157:17
**phonetic**
186:4, 248:17,
250:15
**phrase**
49:22
**phrased**
293:3
**physically**
278:2
**pick**
192:3
**picture**
172:16
**piece**
210:7, 211:16
**pieced**
131:13, 159:7,
255:16
**piecemeal**
189:24
**piecing**
60:3
**pile**
113:4
**piper**
23:9, 23:13,

76:2, 77:11,
77:22, 78:9,
78:17, 80:5,
83:4, 110:22
**piper's**
81:6
**place**
3:8, 31:4,
135:22, 194:7,
259:24, 268:8
**places**
283:4
**placing**
125:24
**plainly**
294:25
**plaintiff**
3:2, 9:16,
10:20, 92:1,
92:10, 97:9,
293:20
**plaintiff's**
12:2, 244:18,
250:4, 250:6
**plaintiffs**
1:5, 17:16,
17:17, 19:5,
101:23, 109:11,
109:15, 146:9,
146:19, 160:6,
161:25, 175:24,
175:25, 176:1,
223:16, 257:20,
257:21
**plan**
28:13, 42:5,
42:8, 114:7,
114:9, 116:6,
264:21, 265:1,
266:8, 266:9,
266:12, 270:15
**planet**
9:11, 10:3,
299:21
**planning**
270:14
**play**
193:9, 280:17

**played**
151:24, 154:24,
284:6
**playing**
132:3, 152:13,
224:4
**pleaded**
275:18, 276:5
**pleadings**
284:20, 284:21,
285:2
**please**
9:14, 10:5,
10:12, 10:22,
19:17, 19:22,
22:13, 22:14,
22:16, 28:15,
41:23, 47:7,
47:8, 50:11,
57:4, 58:2,
58:10, 59:21,
60:8, 68:7,
71:8, 75:21,
77:25, 90:22,
91:2, 100:23,
105:5, 106:21,
108:1, 113:4,
132:23, 153:8,
158:18, 175:11,
185:16, 194:20,
209:20, 215:24,
230:12, 258:11
**pleased**
151:15
**pllc**
2:5
**plot**
223:12
**ploy**
135:21
**plus**
179:19
**point**
12:15, 14:20,
14:23, 21:24,
22:9, 24:24,
29:13, 30:18,
31:10, 32:11,

32:25, 34:10,
46:7, 62:9,
65:20, 88:12,
95:8, 95:21,
96:21, 96:24,
132:3, 152:1,
152:14, 152:17,
153:5, 153:20,
154:19, 155:1,
155:19, 159:6,
168:2, 176:15,
185:25, 186:25,
187:1, 187:14,
206:13, 218:15,
221:20, 231:5,
231:11, 233:16,
236:19, 242:9,
242:10, 243:24,
251:16, 255:1,
255:3, 260:4,
261:2, 276:15,
283:6, 285:15,
290:3, 291:1,
294:12
**pointe**
282:22, 283:1,
283:7
**pointed**
163:8, 196:19
**pointing**
198:22
**points**
33:7, 160:9,
161:9, 218:14,
244:1, 256:7,
282:20
**portion**
22:8, 100:21,
209:24, 211:24,
279:12, 287:22
**position**
14:24, 15:3,
172:10, 208:17
**possible**
38:24, 206:25,
261:15, 285:6
**possibly**
15:6, 226:4

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    118

post
264:21
post-conrad
266:8
posted
36:16
potential
17:16, 146:22,
147:2, 147:8,
147:14, 147:23,
147:24, 148:15,
150:14, 171:3,
175:18, 175:21,
176:3, 249:7,
267:25, 280:24
potentially
17:16, 34:20,
34:22, 38:1,
71:5, 73:14,
177:25, 180:16,
216:7
practice
11:24, 12:2,
33:13
practicing
76:16
precise
23:20
predating
70:10
predominantly
16:7, 89:6
preface
126:15
prep
31:3
preparation
186:1
preparations
186:3
prepare
46:18, 46:21,
57:22
prepared
83:5, 139:3,
302:3
preparing
47:3

prescriptions
83:15
present
4:10, 86:19,
87:10, 109:20,
142:3, 237:10,
240:19, 266:18
presented
97:24
preserve
261:16, 261:22,
275:25
presley
3:4, 9:18,
250:3
press
252:2
presumably
52:7, 165:15,
224:6
presume
94:15, 285:20
pretenses
114:25
pretty
15:1, 19:12,
22:3, 22:4,
37:23, 138:7,
232:22, 259:8,
276:8
previously
151:11, 173:17,
282:15, 284:24
primarily
54:11, 154:2,
154:8
primary
16:7, 16:9,
160:22
principal
240:21
principals
237:12
prior
13:3, 17:14,
66:23, 66:25,
67:11, 70:4,
76:9, 82:17,

149:1, 149:7,
157:7, 157:24,
158:11, 204:6,
204:7, 258:23,
260:3
prison
26:24, 27:4,
27:8, 27:22,
27:23, 27:24,
30:2, 32:12,
38:17, 41:12,
48:1, 133:12,
134:23, 135:1,
139:7, 187:24,
188:2, 193:21,
194:13, 198:10,
198:17, 199:19,
200:20, 201:6,
205:15, 296:20,
296:23, 298:12
prisoner
188:8, 194:7
private
11:24, 12:2
privilege
23:20, 59:4,
215:25, 216:1,
216:6, 216:7,
216:14, 216:25,
217:5, 217:20,
218:11, 218:15,
218:23, 219:14,
219:19, 234:12,
234:14, 236:2,
236:23, 239:19,
240:5, 241:23,
243:19, 244:6,
244:9, 246:10,
247:4, 247:20,
280:19, 287:1
privileged
216:10, 217:1,
218:5, 219:4,
219:10, 219:15,
231:10
pro
3:14
probable
153:19

probably
17:25, 20:6,
74:15, 102:21,
194:21, 201:21,
242:2, 263:18,
273:6, 276:7,
292:18
problem
137:18, 186:11,
200:21, 208:14,
299:17
problematic
218:7, 219:4,
222:16
procedural
268:14
procedures
276:17
proceed
82:9, 83:16
proceeding
87:9, 290:5,
302:4
proceedings
86:24, 289:25,
301:3, 301:5,
301:6, 301:9,
302:6
proceeds
118:22
process
12:25, 19:6,
59:6, 74:13,
74:24, 75:7,
126:1, 134:6,
152:8, 152:15,
154:24, 155:15,
236:3, 240:8,
240:15, 242:10,
242:11, 247:19,
247:22, 248:8,
258:6, 270:23
proclaiming
217:5
proctor
20:3, 20:8,
151:3, 151:14,
161:24, 162:6,

163:19, 188:25,
216:24, 243:11
**proctor's**
5:8, 19:23,
258:14, 258:20
**prodding**
32:4
**produce**
146:18, 146:23,
224:7
**produced**
183:11, 191:21,
216:16, 221:13,
223:15, 223:16,
223:21, 241:24,
242:22, 283:13
**producing**
188:1, 208:11,
216:9, 216:18
**product**
23:19, 59:4,
216:6
**production**
208:5, 235:10,
235:11, 235:12,
237:9, 238:23,
240:18, 248:11
**productive**
42:13
**proficiency**
19:13
**proficient**
18:21
**prohibit**
111:20
**prohibited**
86:25, 136:10
**promise**
40:5, 101:1,
101:5, 101:9,
101:11, 101:12,
101:19, 105:16,
105:20
**promising**
122:8, 128:7
**promote**
53:18
**proper**
81:16

**properly**
39:1, 67:1,
291:14
**propriety**
180:12
**prosecute**
271:15
**prosecution**
206:19, 271:22
**prosecutor**
206:3
**protected**
216:5
**protection**
16:8
**protective**
59:7
**provide**
35:4, 44:9,
64:2, 69:21,
74:19, 123:3,
140:14, 198:1,
201:12, 245:18,
245:20, 247:16,
253:18, 255:23,
256:14, 256:19,
274:9, 291:16
**provided**
33:2, 50:22,
51:20, 57:20,
66:6, 101:24,
140:14, 140:16,
143:14, 145:8,
145:24, 148:18,
150:15, 157:8,
157:16, 175:19,
177:6, 188:22,
198:16, 225:15,
225:17, 228:21,
229:22, 245:19,
247:9, 256:15,
257:25, 283:1,
296:14, 296:15
**provides**
120:18
**providing**
28:12, 29:4,
33:10, 35:18,

66:5, 67:12,
67:22, 73:20,
83:4, 156:20,
176:14, 179:8,
195:23, 208:4,
227:1, 238:9,
275:19, 284:7
**public**
2:14, 301:1,
301:20
**pull**
22:13, 28:1,
35:21, 47:6,
90:19, 258:11,
260:7, 282:17
**pulled**
131:12, 243:14,
245:18, 279:3
**pulling**
241:2, 241:3
**purchase**
288:11, 288:24,
289:2, 300:7
**purported**
244:5
**purportedly**
180:21
**purporting**
223:10
**purpose**
109:18, 116:16,
121:12, 205:25,
259:23, 288:23,
289:1, 294:11
**purposely**
177:19
**pursuance**
123:5
**pursuant**
2:13, 174:14
**pursue**
282:14
**pursuing**
282:15
**push**
146:13
**pushed**
259:16

**put**
19:20, 32:11,
79:3, 116:22,
141:15, 178:10,
229:2, 230:1,
268:8, 289:16,
296:8
**putting**
88:12, 88:18,
89:15, 172:15,
196:22, 216:18,
231:9, 247:20
**pwa**
49:8, 53:23,
106:7, 113:7,
113:17, 114:9

**Q**

**qualified**
18:22, 301:8
**quash**
214:5, 214:6,
214:23, 215:16
**question**
12:14, 15:7,
18:9, 18:11,
23:21, 26:2,
34:9, 66:16,
66:23, 67:4,
71:9, 75:8,
78:19, 79:18,
82:4, 82:6,
90:13, 94:6,
94:10, 96:2,
96:3, 96:16,
96:17, 96:18,
110:5, 111:4,
111:15, 125:23,
126:14, 126:15,
155:7, 155:8,
157:3, 157:5,
162:7, 171:21,
172:16, 173:12,
179:17, 180:4,
195:11, 215:2,
227:7, 227:16,
227:17, 227:20,
232:11, 232:14,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    120

242:18, 259:9,
299:4
**questioning**
294:8, 295:23,
296:16
**questions**
21:17, 26:1,
38:9, 45:3,
67:16, 102:5,
111:21, 121:14,
121:17, 131:5,
136:6, 152:19,
170:21, 179:24,
194:12, 194:15,
202:2, 202:4,
214:11, 227:21,
228:9, 229:19,
231:18, 255:12,
276:9, 277:5,
277:15, 285:24,
299:2
**quick**
40:4, 46:6,
89:22, 113:5,
206:23, 245:24,
279:5, 293:13
**quicker**
47:5
**quickly**
278:24, 279:4
**quite**
18:7, 20:5,
181:18, 228:11,
248:14
**quote**
45:24, 51:21,
58:7, 72:9,
81:12, 100:8,
144:15, 180:21,
193:22, 195:4,
223:13, 223:14,
226:3, 234:15,
239:3, 239:7
**quoting**
242:20

**R**

**rafael**
42:13, 42:20,

43:9, 145:3,
148:8, 169:15,
170:9
**rail**
275:1
**raise**
59:24, 99:20,
110:20, 198:3
**raised**
103:24
**raising**
10:12
**ramirez**
18:9, 25:2,
28:22, 32:5,
63:17
**random**
187:12
**rapidly**
19:10
**rate**
72:23, 113:17,
113:22
**rather**
52:11, 173:11
**raul**
78:24
**raveendran**
23:4
**raúl**
79:6, 79:16,
79:20
**reach**
157:24, 282:12
**reached**
87:14, 87:18,
298:7
**reaching**
261:12
**reaction**
267:7, 291:6
**read**
19:9, 20:4,
20:5, 20:17,
24:7, 31:5,
31:14, 38:2,
38:5, 40:8,
43:19, 48:4,

48:22, 48:23,
48:24, 51:17,
53:24, 56:3,
57:24, 59:9,
59:13, 59:21,
61:3, 73:1,
81:10, 83:10,
84:3, 84:15,
99:5, 101:2,
104:20, 105:18,
106:5, 106:10,
107:12, 108:6,
113:10, 113:19,
114:16, 126:3,
130:19, 132:21,
135:23, 139:13,
139:16, 142:16,
142:24, 145:20,
157:1, 157:21,
158:23, 159:16,
162:16, 166:22,
168:10, 169:9,
169:20, 170:5,
170:12, 171:14,
176:5, 177:1,
179:5, 179:10,
185:17, 188:17,
188:20, 191:1,
194:24, 197:6,
198:6, 199:6,
200:16, 201:4,
208:18, 209:16,
211:4, 218:8,
219:11, 223:18,
225:25, 228:4,
231:1, 235:6,
235:25, 240:21,
244:15, 244:22,
247:13, 251:9,
252:4, 253:22,
263:16, 265:7,
291:6, 299:10
**reading**
48:16, 55:25,
56:1, 62:6,
71:15, 101:10,
104:22, 106:15,
140:6, 140:21,

140:22, 141:1,
146:20, 148:2,
171:13, 172:24,
176:12, 209:11,
209:23, 223:1,
228:7, 228:8,
229:14, 229:18,
260:20, 265:15,
282:19, 296:2,
296:7
**reads**
223:10
**ready**
71:9, 142:13,
184:19, 299:22
**real**
279:5
**reality**
298:24
**realize**
64:5, 124:18
**really**
15:6, 15:17,
16:16, 18:15,
22:1, 32:13,
77:15, 79:24,
83:21, 95:9,
115:18, 115:24,
126:3, 131:7,
144:22, 150:22,
152:23, 158:22,
169:6, 171:25,
186:18, 200:8,
219:2, 240:10,
242:18, 243:1,
259:3, 259:20,
259:22, 261:4,
261:21, 261:25,
270:22, 271:12,
273:3, 276:14,
276:21, 277:15,
279:13, 281:10,
282:13, 283:10,
297:12
**realtime**
140:10, 141:9,
163:3, 178:5,
224:9, 255:7,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    121

255:17
**reason**
15:7, 48:14,
51:5, 64:19,
75:9, 76:25,
82:3, 82:6,
100:18, 147:5,
147:19, 156:17,
172:16, 172:20,
180:3, 185:19,
187:6, 214:2,
215:2, 215:21,
221:20, 225:16,
238:16, 252:9,
259:10, 259:15,
286:2, 298:23
**reasonable**
84:11
**reasoning**
146:18, 150:22
**reasons**
245:6, 259:11,
259:25
**rebecca**
60:3, 63:9,
63:15, 63:16,
63:23, 71:4,
235:18, 235:20
**recalled**
103:4, 126:9,
255:1, 255:3
**recalling**
40:13, 79:13,
158:3
**receive**
103:14, 114:14,
180:19, 193:7,
257:21
**received**
51:6, 52:1,
64:20, 69:22,
72:25, 91:14,
130:17, 132:17,
147:6, 147:10,
148:25, 149:6,
156:21, 157:7,
158:20, 159:1,
159:10, 161:3,

162:20, 165:13,
170:4, 178:5,
191:8, 200:14,
201:1, 202:16,
220:24, 253:21,
253:25, 254:23,
255:7, 284:13
**receiving**
92:21, 96:14,
103:8, 107:19,
140:10, 150:6,
205:9, 226:20,
255:18, 298:2,
298:12
**recently**
116:14, 121:23,
226:18
**recess**
46:11, 90:1,
125:11, 155:24,
182:24, 207:5,
246:3, 269:5,
293:17
**recipient**
57:16
**recognition**
277:15
**recognize**
16:22, 43:13,
44:18, 156:14
**recollection**
15:17, 20:21,
21:7, 25:16,
30:19, 48:23,
49:14, 51:11,
60:13, 61:9,
64:12, 64:15,
64:18, 64:24,
73:7, 79:25,
88:1, 89:1,
89:11, 89:14,
92:10, 93:2,
93:6, 93:12,
93:21, 93:24,
94:2, 94:23,
95:4, 95:14,
97:4, 97:19,
98:7, 99:11,

128:12, 149:20,
153:7, 166:24,
207:13, 228:7,
241:12, 249:14,
281:6
**recommend**
81:7
**recommending**
82:16
**reconnected**
12:18
**record**
10:23, 24:21,
46:9, 46:13,
72:21, 89:24,
90:3, 111:15,
111:25, 112:4,
125:7, 125:9,
125:13, 155:22,
156:1, 182:22,
183:1, 207:3,
207:7, 212:12,
220:19, 225:13,
246:1, 246:5,
269:3, 269:7,
293:15, 293:19,
299:5, 300:9,
301:10, 302:5
**recorded**
301:6
**recording**
54:17, 54:18,
301:9, 302:4
**records**
76:10
**recover**
83:25
**red**
235:19
**redacted**
26:12, 100:21,
210:24, 220:20,
221:3, 262:17,
264:23
**redaction**
142:15
**redactions**
221:2

**redirect**
269:1
**reduced**
113:23, 263:23,
301:7
**reengaging**
152:7
**refer**
16:21, 181:5,
232:7
**reference**
15:3, 43:13,
54:23, 71:21,
116:5, 116:9,
118:25, 119:2,
180:16, 181:8,
253:19
**referenced**
58:8, 70:7,
100:11, 101:19,
122:23, 128:3,
207:9, 253:17,
282:4
**references**
20:19, 40:15,
49:17, 49:24,
196:2, 213:8
**referencing**
24:14, 116:17,
140:8, 186:16,
228:15, 242:20,
261:1, 265:19
**referred**
100:9, 100:10,
287:14
**referring**
21:3, 24:10,
61:16, 100:13,
108:9, 191:5,
195:3, 195:6,
195:7, 195:9,
213:24, 265:15,
265:16, 294:5
**refers**
106:12, 187:1,
187:7, 196:18
**reflect**
146:18, 226:15

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

122

**reflected**
90:15
**reflecting**
146:17, 238:23
**reflects**
211:21
**refresh**
64:12, 64:15,
64:17, 153:7,
166:24, 212:17,
243:4
**refused**
62:15, 62:21
**refusing**
100:3, 139:3
**regard**
104:1, 217:7
**regarding**
69:22, 109:6,
132:25, 146:12,
147:18, 157:4,
169:14, 186:2,
190:18, 190:23,
193:8, 223:11,
223:22, 289:19
**regardless**
171:4, 173:1,
235:4
**regions**
275:10
**regret**
155:10
**regrets**
151:4
**regularly**
43:15
**reimbursement**
180:3
**relate**
175:17
**related**
20:18, 21:23,
51:2, 87:8,
88:15, 98:3,
101:23, 147:14,
244:21, 244:25,
259:21, 273:11,
273:16, 282:8,

301:12, 302:8
**relates**
20:20, 84:6,
103:16, 209:25,
219:13, 224:7,
224:24, 232:17,
247:12, 260:23,
283:17
**relating**
37:8, 105:24,
126:11, 146:19,
163:16, 215:22,
222:17, 232:18,
233:5, 244:19,
254:11, 268:5,
271:1
**relation**
86:2, 143:6
**relationship**
109:6, 109:10,
109:16, 109:18,
110:3, 162:7,
162:14, 162:25,
163:19, 163:22
**relationships**
163:12
**released**
176:21
**releasing**
157:18
**relevance**
244:14
**relevancy**
244:10
**relevant**
175:18, 175:20,
183:12
**relied**
37:20
**relocated**
176:24
**relocation**
51:16, 176:20
**reluctant**
79:4
**relying**
19:12, 38:15,
67:9, 67:14,

194:2, 202:23,
228:20, 273:18
**remem**
284:25
**remember**
12:15, 14:24,
15:7, 15:8,
15:20, 15:23,
16:12, 16:16,
26:23, 27:5,
27:10, 38:9,
41:8, 43:4,
68:13, 69:6,
75:15, 77:10,
77:17, 90:10,
90:15, 92:20,
116:10, 121:21,
122:12, 124:8,
133:18, 134:11,
137:20, 141:12,
141:23, 149:5,
167:10, 187:8,
200:10, 205:14,
205:16, 211:17,
217:5, 240:10,
241:2, 241:3,
247:11, 248:1,
250:17, 250:18,
254:20, 254:22,
273:3, 274:15,
275:22, 285:1,
292:19, 294:7,
296:3
**remembered**
29:25, 37:5,
227:21
**remembering**
27:10, 39:22,
68:14, 102:16,
220:13, 222:7,
229:14, 272:15,
282:24
**remote**
4:14, 278:4
**remotely**
278:4
**removed**
240:25, 247:3,

247:7, 247:17
**removing**
241:19, 245:7
**rent**
198:20
**repeat**
197:6, 230:11,
292:2
**repeatedly**
28:24
**repeating**
287:8
**replaced**
120:13
**report**
47:14, 51:14,
199:22, 219:8,
219:21, 222:17
**reporter**
10:1, 10:2,
10:5, 10:11,
10:18, 258:12,
299:7, 299:14,
300:4, 300:8,
301:1
**represent**
9:11, 9:15,
13:23, 86:7,
127:1, 142:1,
163:18, 172:22,
188:25, 269:12,
282:25, 285:3
**representation**
98:4, 111:2,
164:9, 170:22,
177:15, 245:2,
245:4
**representations**
163:5, 227:24,
228:24, 229:11,
273:18
**representatives**
237:12
**represented**
24:24, 85:12,
142:2, 283:24,
298:17
**representing**
9:25, 24:24,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    123

152:10, 284:2
**represents**
10:3
**request**
111:5, 173:12,
173:23, 177:9,
177:15, 199:21,
206:18, 213:8,
213:13, 235:11,
235:12, 237:9,
238:22, 240:18,
244:18
**requested**
49:18, 72:15,
203:19, 224:13
**requesting**
109:10, 276:10
**requests**
30:19, 44:1,
55:21, 56:12,
62:9, 91:23,
102:1, 102:2,
102:3, 102:4,
102:8, 103:3,
126:11, 126:21,
140:13, 146:9,
153:15, 172:3,
172:9, 208:5,
214:10, 216:4,
222:8, 224:3,
227:4, 228:17,
231:12, 235:10,
235:15, 244:11
**require**
74:17, 74:22,
189:22
**required**
72:8, 72:9,
227:5
**research**
37:18, 37:21,
70:2, 70:5,
75:17, 76:25,
77:5, 77:19,
94:8, 94:15
**reserve**
268:25
**respect**
17:4, 114:18,

180:20
**respects**
52:14
**respond**
102:7, 109:15,
144:6, 144:18,
175:10, 178:19,
252:1, 280:14,
281:1
**responded**
62:9, 136:24,
199:12, 252:1
**responding**
33:7, 102:2,
102:24, 126:11,
144:20, 145:23,
198:19, 208:21,
223:2, 256:9,
271:8
**responds**
64:5, 107:25,
113:12, 185:15,
189:25, 190:8,
201:15, 210:25,
261:14
**response**
23:24, 26:12,
26:13, 30:18,
61:3, 109:5,
109:14, 135:19,
136:25, 139:22,
144:9, 145:15,
147:14, 153:14,
154:21, 177:15,
178:18, 190:10,
190:14, 194:19,
199:21, 201:20,
202:12, 213:12,
214:20, 214:22,
228:17, 280:21,
285:23
**responses**
101:21, 101:22,
102:13, 102:15,
103:3, 109:4,
110:8, 146:9,
146:17, 152:3,
153:4, 160:7,

197:15, 208:5,
222:7, 222:8,
228:5, 233:12,
256:17, 276:23,
286:25
**responsibilities**
34:8, 35:2,
149:25, 281:22,
294:16, 294:18
**responsible**
159:24, 283:12
**responsive**
33:9, 110:5,
149:16, 178:16,
216:5, 219:18,
223:17, 223:22,
224:1, 224:5,
224:6, 224:7,
224:12, 225:15,
227:13, 228:16,
229:13, 229:22,
241:20, 256:12
**rest**
48:1, 54:15,
71:20, 114:15,
235:14, 268:25
**restate**
82:12, 155:8
**result**
202:23, 267:24
**resulted**
21:15
**return**
137:3
**revealed**
61:5, 241:15,
243:12, 247:4
**revealing**
59:2
**reveals**
82:8
**reverse**
183:23
**review**
46:23, 85:9,
85:10, 87:24,
208:16, 211:1,
225:10

**reviewed**
125:24, 163:1,
219:23, 220:4
**reviewing**
124:23, 248:10,
277:12
**revised**
28:12, 262:14
**rg**
145:3
**rg's**
42:15
**rico**
270:25, 287:14,
288:7, 290:1,
290:9, 290:14,
290:23
**right-hand**
31:14, 234:20
**rights**
3:15, 12:19,
12:24, 14:18,
16:5, 53:19,
119:4, 162:11,
212:9, 212:12,
213:10, 213:11,
214:1, 267:16,
271:13, 271:15,
271:18, 271:22,
271:24, 272:21,
276:4
**ring**
40:1
**ringing**
248:18
**robert**
4:13, 9:10
**rog**
144:21, 281:2
**rogatory**
74:12, 75:7,
86:19, 143:7,
190:24, 191:4,
203:20, 257:19,
258:6
**rogers**
156:14
**role**
15:25, 32:20,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    124

| | | | |
|---|---|---|---|
| 52:4, 52:5, | 66:16, 72:7, | 97:24, 100:24, | 149:20, 159:8, |
| 54:14, 65:5, | 72:23, 73:2, | 114:9, 118:10, | 162:24, 166:10, |
| 79:25, 132:3, | 74:8, 88:3, | 124:3, 136:22, | 169:22, 170:7, |
| 161:4, 161:7, | 88:6, 95:24, | 140:6, 140:21, | 172:20, 176:20, |
| 224:4, 284:6 | 103:1, 104:17, | 146:15, 167:23, | 177:22, 178:20, |
| **room** | 105:15, 106:7, | 185:24, 246:20, | 191:7, 194:21, |
| 198:20 | 110:22, 111:6, | 250:23, 259:1, | 208:2, 208:20, |
| **roughly** | 128:18, 133:12, | 259:12, 263:5, | 209:10, 210:3, |
| 74:20, 272:5 | 135:15, 135:16, | 274:2, 299:20 | 211:10, 212:6, |
| **round** | 137:12, 142:17, | **sanctioned** | 213:19, 216:15, |
| 207:13 | 159:18, 159:20, | 281:12 | 217:4, 221:9, |
| **rudderless** | 161:8, 170:23, | **sanctions** | 227:6, 229:22, |
| 53:22 | 170:24, 193:12, | 151:2, 151:17, | 231:19, 252:13, |
| **rule** | 202:15, 208:1, | 214:10, 214:24, | 252:25, 257:24, |
| 53:19, 175:15, | 217:21, 218:25, | 249:9 | 260:21, 261:18, |
| 176:1 | 223:25, 224:1, | **sand** | 263:19, 270:21, |
| **ruled** | 239:8, 243:18, | 115:18, 115:25, | 279:17, 282:13, |
| 176:14 | 245:19, 255:19, | 116:1 | 283:16, 283:20, |
| **rules** | 260:14, 270:14, | **sansbury** | 284:21, 286:14, |
| 11:6, 13:20, | 281:9, 291:10, | 3:20, 249:12 | 286:20, 300:4 |
| 23:20 | 292:1, 293:3, | **sansom** | **saying** |
| **rulings** | 301:8, 301:9, | 3:20 | 20:14, 22:10, |
| 231:9 | 302:5 | **saw** | 25:15, 29:8, |
| **rusty** | **salado** | 50:4, 77:13, | 36:15, 36:24, |
| 18:22 | 38:3 | 133:3, 190:11, | 41:18, 43:7, |
| **ryan** | **sam** | 211:14, 243:5, | 47:19, 49:12, |
| 91:19, 91:22 | 280:23 | 269:17 | 51:7, 51:9, |
| **ryerson** | **samario** | **say** | 52:3, 52:11, |
| 217:14, 217:16, | 30:22, 31:22, | 17:10, 19:11, | 52:22, 55:13, |
| 218:10, 243:20, | 44:22, 50:13, | 20:16, 23:15, | 56:7, 58:23, |
| 264:17, 265:21, | 50:23, 51:7, | 29:16, 29:24, | 60:23, 61:8, |
| 267:1 | 92:22, 97:11, | 33:23, 34:16, | 62:7, 65:6, |
| **résumé** | 137:22, 221:8, | 34:18, 38:10, | 65:10, 66:2, |
| 12:16, 12:18 | 221:16, 222:4, | 40:12, 40:25, | 66:17, 66:21, |
| S | 222:20, 226:4, | 43:2, 47:5, | 67:14, 67:20, |
| **s** | 226:16, 229:1, | 47:15, 49:14, | 69:20, 71:14, |
| 47:25 | 233:8, 234:2, | 58:24, 60:20, | 74:5, 78:16, |
| **safe** | 239:8, 239:13, | 64:22, 66:1, | 81:5, 82:7, |
| 29:3, 31:4, | 241:15, 242:1, | 74:2, 75:14, | 87:18, 89:4, |
| 176:22, 273:4, | 242:21, 244:25, | 96:8, 96:11, | 94:17, 100:22, |
| 282:13 | 247:5 | 96:22, 103:17, | 103:2, 103:6, |
| **safety** | **samario's** | 103:22, 105:2, | 104:11, 104:15, |
| 33:25 | 31:8, 31:18, | 108:1, 110:20, | 105:14, 113:22, |
| **said** | 33:3, 44:16, | 110:24, 132:4, | 113:25, 114:19, |
| 29:19, 30:20, | 284:12 | 132:19, 134:24, | 114:23, 115:17, |
| 54:6, 54:10, | **same** | 137:25, 144:14, | 116:3, 122:11, |
| 61:20, 64:22, | 18:9, 18:11, | 144:16, 146:12, | 130:16, 132:21, |
| | 22:18, 64:22, | 147:18, 149:7, | 140:21, 141:2, |

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                              125

141:7, 142:9,
144:25, 147:3,
147:15, 149:3,
149:23, 150:13,
150:18, 156:18,
157:15, 162:14,
176:18, 185:25,
187:15, 190:5,
192:21, 196:17,
198:20, 200:25,
202:4, 214:5,
230:3, 232:6,
251:5, 251:21,
254:22, 254:24,
295:12, 297:1,
297:17
**says**
23:5, 23:18,
26:5, 28:15,
28:22, 29:17,
31:1, 32:4,
36:22, 40:3,
42:12, 44:7,
44:15, 47:23,
47:25, 48:3,
51:14, 51:22,
53:17, 57:16,
63:24, 64:9,
71:14, 71:19,
80:18, 82:13,
83:5, 83:18,
85:24, 87:7,
92:17, 99:1,
101:9, 104:10,
106:3, 106:16,
113:4, 113:13,
113:16, 114:5,
114:7, 128:11,
135:10, 135:11,
135:12, 137:2,
137:8, 139:2,
139:9, 139:20,
140:7, 142:19,
157:16, 158:4,
158:18, 159:14,
159:15, 166:14,
166:20, 167:4,
169:25, 179:5,

183:22, 184:5,
185:5, 197:17,
199:2, 201:23,
202:19, 208:10,
219:3, 219:7,
221:10, 225:5,
225:14, 235:19,
239:7, 251:7,
265:17, 265:19,
288:16, 289:23,
290:13, 290:22,
296:7
**scarola**
69:2, 69:4,
69:7, 69:12,
69:20
**scarola's**
70:7
**scheme**
288:11, 290:2,
290:10
**scherer**
3:17, 3:18,
9:22, 9:23,
10:10, 12:5,
12:25, 13:1,
13:3, 14:22,
15:13, 15:14,
15:18, 15:21,
16:2, 16:13,
16:20, 18:5,
21:10, 21:14,
21:18, 23:17,
33:15, 39:24,
69:13, 69:15,
69:16, 86:11,
91:21, 153:22,
154:3, 154:8,
189:2, 205:11,
205:13, 206:6,
206:12, 206:16,
206:21, 207:11,
212:13, 214:23,
215:10, 216:25,
217:25, 257:9,
258:9, 258:10,
258:22, 258:25,
260:1, 260:24,

262:10, 262:14,
263:10, 264:5,
264:21, 266:8,
269:9, 269:12,
270:8, 270:11,
270:15, 271:3,
271:10, 271:14,
272:6, 273:9,
273:21, 273:25,
274:5, 275:13,
275:17, 276:4,
278:12, 279:23,
281:25, 283:2,
283:7, 283:24,
284:3, 286:4,
286:18, 287:13,
288:19, 290:4,
291:20, 292:5
**school**
11:13, 11:15,
11:16, 76:21,
88:2
**scope**
145:12, 147:4,
150:18, 150:23,
172:10, 224:20,
224:21, 225:6,
227:16, 228:13,
258:21, 297:12
**scratched**
120:12
**screen**
20:1, 22:23,
28:10, 36:12,
39:4, 42:2,
53:9, 58:16,
62:2, 63:7,
76:1, 91:6
**screw**
100:24
**scum**
137:7
**se**
3:14, 137:18,
271:4, 285:21
**searched**
244:20
**searches**
153:19, 153:23,

248:15
**searching**
153:13, 248:10,
248:13
**seasoned**
13:8
**second**
10:7, 28:21,
30:21, 42:4,
58:20, 71:8,
106:3, 117:10,
118:17, 129:25,
146:9, 166:19,
184:16, 189:16,
190:10, 197:11,
200:12, 208:10,
215:17, 238:22,
244:17, 244:18,
250:1, 258:13,
279:14, 279:17,
280:10, 280:11,
280:12, 280:21,
285:4, 285:22,
294:2
**second-to-last**
107:6, 169:17,
175:5, 260:18
**section**
147:18, 206:24,
209:21, 223:7,
235:11, 235:12,
237:9, 238:21,
240:18, 240:25,
262:18, 271:21,
271:22
**sections**
213:15
**secure**
62:9, 282:22,
282:25, 283:7
**secured**
118:22, 119:7,
121:25, 126:7
**security**
31:17, 42:15,
42:20, 44:16,
44:21, 45:21,
45:25, 46:1,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    126

46:2, 50:12,
51:2, 51:21,
73:22, 74:3,
92:17, 93:16,
95:18, 103:16,
103:21, 103:23,
104:3, 114:11,
114:21, 117:14,
118:21, 133:2,
139:16, 143:14,
169:19, 170:8,
171:20, 180:3,
180:14, 180:22,
188:19, 191:10,
193:9, 193:22,
221:7, 225:17,
225:20, 226:3,
226:9, 226:12,
226:15, 226:20,
227:2, 227:9,
227:10, 228:13,
239:8, 263:24,
265:3, 265:18,
265:23, 273:8,
273:11, 273:15,
273:19, 273:22,
280:15, 280:22,
284:13
**see**
24:5, 27:2,
28:13, 29:17,
29:21, 29:22,
31:19, 32:9,
35:13, 36:17,
39:6, 40:7,
41:19, 42:5,
42:17, 43:3,
43:7, 45:6,
50:6, 50:17,
55:17, 58:4,
59:19, 64:3,
71:5, 71:24,
71:25, 81:6,
81:12, 82:15,
83:6, 83:23,
85:11, 85:22,
86:3, 92:17,
94:16, 95:18,

98:24, 104:18,
114:12, 117:11,
117:13, 117:17,
117:20, 118:23,
123:17, 129:9,
132:10, 137:4,
139:25, 145:6,
156:12, 162:4,
165:13, 166:4,
166:16, 167:1,
167:3, 169:18,
171:19, 180:19,
183:19, 186:17,
187:2, 187:4,
187:19, 195:5,
195:8, 197:11,
197:23, 200:22,
201:16, 213:7,
216:16, 220:12,
241:9, 255:21,
256:21, 259:13,
277:13, 291:21
**seeing**
35:15, 45:18,
45:23, 50:8,
50:9, 51:3,
70:11, 96:4,
97:18, 107:21,
123:14, 126:8,
126:9, 127:19,
128:13, 141:11,
143:18, 158:2,
163:2, 177:23,
180:15, 180:17,
180:24, 181:3,
195:2, 208:3,
279:9
**seek**
35:3, 56:18,
84:21, 173:21,
173:24, 174:5,
223:10
**seeking**
55:20, 81:15,
109:19, 214:22
**seem**
59:24, 147:9,
147:22, 171:16,

187:25, 295:24
**seemed**
76:9, 227:20,
233:19
**seems**
29:7, 43:8,
62:12, 86:16,
87:7, 107:10,
110:1, 111:2,
137:6, 147:15,
159:5, 167:21,
171:13, 188:5,
232:21, 232:22,
234:25, 243:24,
259:10, 282:3
**seen**
15:3, 43:21,
45:15, 45:20,
55:3, 70:6,
70:9, 72:15,
73:20, 74:4,
84:17, 87:13,
91:14, 97:7,
97:10, 103:22,
104:7, 105:24,
111:6, 116:14,
121:23, 144:21,
150:12, 163:15,
167:22, 167:25,
177:10, 178:3,
180:7, 180:11,
193:7, 203:2,
238:11, 253:19,
253:24, 254:1,
254:10, 254:17,
284:5
**sees**
71:23
**segment**
181:14, 277:2
**segueing**
236:8, 243:2,
245:8, 245:15
**self**
198:3
**send**
28:15, 124:22,
130:23, 167:6,

167:8, 168:8,
185:9, 185:12,
185:16, 189:20,
189:21, 189:23,
253:17, 264:8
**sending**
48:18, 60:22,
93:5, 97:8,
194:13, 203:11,
215:15, 240:3,
240:17
**sends**
166:21, 208:7
**sense**
21:25, 32:6,
40:13, 49:11,
208:3, 208:12,
212:6, 272:19,
272:25, 285:10,
285:21, 287:6,
296:8
**sensitive**
189:18
**sent**
12:16, 39:7,
41:12, 45:10,
45:16, 71:10,
71:19, 79:15,
184:4, 190:17,
190:22, 196:14,
203:3, 203:4,
203:5, 203:8,
210:9, 213:9,
235:5, 236:11,
239:20, 241:14,
241:16, 242:12,
242:15, 244:4,
246:19, 247:8,
266:7, 268:4,
287:8
**sentence**
29:16, 47:19,
106:7, 107:7,
113:16, 157:14,
169:22, 169:25,
188:17, 197:23,
208:10, 279:16,
279:17, 289:23,

290:22
**sentences**
42:12, 100:22
**separate**
15:18, 92:25,
132:13, 228:7
**separately**
136:7, 202:24
**separation**
21:13
**september**
1:15, 9:8,
105:10, 107:2,
108:17, 112:20,
114:8, 117:3,
119:15, 120:1,
122:20, 126:23,
127:14, 129:3,
130:12, 135:5,
135:14, 142:5,
234:9, 239:20,
242:12, 243:5,
302:15
**sequencing**
126:24, 151:24
**sequentially**
177:24, 178:4
**series**
22:25, 24:2,
45:3, 58:17,
91:7, 227:21
**serious**
34:7, 158:22,
179:23, 180:6,
267:21
**seriously**
34:8, 34:12,
35:2, 113:9,
149:25, 179:10,
277:18, 281:22
**serve**
203:20
**served**
139:8
**services**
123:2, 128:3,
283:1
**serving**
38:16, 134:23,

135:1
**set**
251:11, 252:21,
261:15
**settle**
291:22
**settlement**
292:10, 293:4
**several**
21:12, 89:7,
97:21, 185:6,
224:2, 249:15,
251:18, 259:20,
263:4, 270:14,
287:7
**shady**
138:7
**shall**
263:23
**share**
128:22, 165:6,
165:8
**sherman**
3:5, 9:19,
209:3, 209:5
**short**
15:1, 50:19,
109:4, 146:12
**shortly**
262:9
**should**
25:18, 34:11,
83:19, 110:22,
132:8, 146:2,
153:14, 154:20,
155:11, 173:22,
174:8, 183:4,
184:2, 184:3,
184:17, 198:21,
199:14, 208:12,
216:16, 229:2,
236:22, 239:9,
261:16, 261:17,
277:1
**shouldn't**
26:9
**show**
19:15, 112:6,

153:8, 241:25,
242:20, 256:7,
257:25, 297:16
**showed**
92:24, 100:11,
102:19, 243:23,
293:23, 296:10
**showing**
75:12, 93:19,
93:20, 105:23,
126:22, 131:17,
217:19
**shown**
93:1, 124:17,
227:22
**shows**
118:21, 163:10,
170:22, 171:11,
172:13, 221:7
**shut**
261:12
**shutting**
261:3, 261:24
**sic**
259:3
**side**
12:3, 53:21,
53:22, 58:3,
58:7, 85:3,
160:6, 165:8,
196:22, 205:10,
271:18, 294:19
**sides**
172:11, 224:20
**sierra**
11:22
**sign**
104:14, 121:15,
188:18, 191:9,
191:10, 191:13,
191:20, 192:7,
192:11, 192:19,
192:24, 193:4,
193:21, 226:19,
299:10
**signature**
117:8, 119:18,
125:22, 125:25,

127:19, 129:9,
257:10
**signature-5tm1q**
301:18
**signature-bi6ds**
302:12
**signed**
69:10, 114:6,
117:19, 118:14,
119:19, 123:15,
126:2, 132:2,
157:19, 203:12,
211:18, 211:22,
213:22, 246:20
**significant**
47:24, 180:6,
219:25, 247:23,
248:5
**significantly**
47:24, 282:7
**signing**
116:5, 131:6,
157:25
**silence**
225:23
**similar**
15:12, 249:21,
272:18, 275:9
**simply**
49:12, 55:24,
66:17, 89:4,
94:17, 103:2,
116:3, 177:22,
179:8, 193:17,
233:15, 243:1,
254:14, 258:3,
295:18
**since**
20:17, 33:15,
87:8, 99:2,
139:8, 173:17,
176:24, 198:22,
242:11, 299:3
**single**
108:4, 214:6,
257:18
**sir**
246:14

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

128

sit
177:23, 225:4,
229:14, 265:25
siting
98:2
sitting
94:19, 95:1,
95:13, 163:4,
179:16, 225:3,
228:18, 229:10,
255:8, 258:5
situation
86:16, 88:21,
89:16, 99:16,
104:13, 107:22,
151:15, 152:7,
171:10, 192:23,
193:14, 193:19,
202:18, 202:20
six
11:22, 83:19,
83:20
skepticism
137:14, 138:11,
138:14, 286:5,
286:15
skill
58:2, 58:6
skills
301:11, 302:6
skype
185:13, 185:15,
189:20
sleazy
53:20, 54:3,
54:16, 54:21,
268:20
sleepless
96:13
slide
71:5, 71:23
slightly
274:14
small
287:22
smith
152:16, 152:18,
152:20, 153:1,

207:23, 209:7,
209:19, 210:23,
211:19, 211:23,
230:19, 233:4,
233:10, 234:1,
244:4, 246:9,
246:21, 249:6,
283:22, 283:23
social
60:17
socially
59:1, 60:2
sole
259:23
solicit
35:17, 44:8,
56:14, 94:8,
94:12
solicited
94:3
solicitor
122:25
solid
81:8, 81:12,
81:16
some
12:14, 14:20,
14:22, 15:12,
24:24, 26:13,
29:13, 30:17,
32:11, 40:6,
42:15, 43:5,
43:16, 44:5,
53:20, 55:9,
56:3, 57:17,
58:24, 60:3,
63:14, 64:10,
81:7, 93:5,
93:13, 94:15,
95:8, 96:21,
102:3, 104:14,
120:11, 122:8,
124:6, 136:6,
138:7, 142:14,
151:4, 152:2,
152:14, 153:19,
163:22, 167:25,
178:24, 180:3,

189:17, 198:1,
201:12, 206:13,
208:5, 208:20,
210:3, 211:24,
212:25, 216:6,
217:18, 217:19,
219:2, 219:8,
229:12, 236:5,
236:15, 237:1,
240:12, 242:10,
243:23, 246:25,
248:19, 256:2,
257:21, 257:22,
258:2, 258:7,
259:14, 260:21,
260:22, 260:23,
261:21, 265:6,
269:17, 271:23,
272:13, 276:9,
279:16, 283:6,
284:16, 285:12,
288:10, 295:6
somebody
49:19, 49:25,
52:4, 65:4,
95:24, 250:17
someone
42:24, 57:12,
74:18, 86:18,
114:24, 115:16,
125:17, 132:6,
150:14, 168:18,
186:12, 200:19,
270:20, 292:6
something
14:15, 25:8,
25:17, 26:9,
33:12, 33:14,
34:11, 34:14,
34:18, 36:22,
49:3, 62:10,
147:6, 147:10,
149:18, 150:2,
153:7, 163:8,
163:11, 172:1,
190:7, 198:12,
210:9, 228:20,
243:4, 245:13,

248:6, 249:21,
254:8, 267:20,
267:23, 269:2,
280:15, 283:18
sometime
16:15, 18:7,
20:6
sometimes
19:3, 178:11,
178:12, 180:2,
237:14
somewhat
27:9, 101:14
son
273:25
soon
60:7, 124:24,
235:23
sorry
25:23, 26:3,
54:8, 94:11,
104:14, 105:14,
109:2, 113:4,
122:14, 126:14,
136:15, 138:2,
156:23, 162:12,
184:25, 189:13,
190:10, 190:19,
190:20, 191:11,
192:1, 192:4,
197:5, 197:6,
204:2, 209:10,
213:24, 215:14,
220:12, 220:14,
220:18, 222:21,
226:13, 232:15,
233:24, 238:16,
239:5, 250:24,
250:25, 251:25,
253:15, 271:19,
279:2, 284:25,
289:6, 291:15,
292:2, 294:23
sort
15:2, 19:13,
26:13, 33:25,
44:5, 49:18,
52:3, 74:16,

96:12, 111:13,
160:13, 193:10,
205:7, 206:6,
209:11, 233:17,
257:21, 284:16
**sorts**
32:22, 35:4
**sought**
191:4
**sound**
15:5, 49:9
**sounds**
40:20, 40:25,
43:14, 44:19,
55:12, 86:9,
115:23, 149:19,
178:19, 191:22,
205:18, 208:1,
249:13, 249:15,
265:15, 275:21,
283:10
**source**
60:4, 60:25,
62:22, 64:13
**sourced**
104:23
**sources**
56:11
**south**
275:2
**southern**
1:3
**space**
144:20
**spaced**
39:10
**spanish**
18:17, 18:18,
18:25, 19:7,
19:9, 19:13,
36:22, 57:8,
57:11, 165:22,
166:1
**speak**
13:15, 18:17,
18:18, 37:15,
38:24, 57:8,
57:10, 100:14,

157:17, 166:11,
185:16, 185:20,
189:9, 190:1,
190:3, 203:25,
249:2, 249:4,
251:24, 252:2,
252:11
**speaker**
204:5
**speaking**
19:1, 19:10,
57:11, 108:5
**speaks**
18:19, 20:15,
90:11
**special**
271:22
**specialist**
9:11
**specific**
26:2, 30:18,
38:8, 93:11,
196:10
**specifically**
21:8, 61:17,
95:13, 110:2,
111:2, 212:5,
233:19, 249:23,
261:4, 291:23
**specifics**
20:22
**speculate**
258:2
**speculating**
235:3, 248:15,
276:7
**speculation**
24:13, 25:10,
25:24, 30:15,
33:5, 55:1,
72:12, 73:24,
75:5, 82:1,
101:17, 103:12,
110:14, 115:2,
131:1, 131:10,
139:18, 140:5,
146:2, 188:10,
194:9, 232:2,

242:24
**spell**
10:25
**spelling**
83:21
**spend**
47:3
**spent**
131:12, 278:3
**spoke**
17:23, 17:25,
19:7, 252:11
**spoken**
18:2, 41:3,
129:13, 151:24,
269:18
**spoliation**
253:20
**spotswood**
3:20, 249:11
**spreadsheet**
250:8, 250:21
**sprenger**
12:3
**st**
240:5, 251:2
**stages**
153:3, 210:5,
211:12, 247:22
**stall**
251:24, 252:2,
252:14
**stalled**
252:14
**stand**
19:17, 19:22,
22:16, 22:19,
35:22, 36:7,
38:22, 41:23,
47:8, 53:4,
58:10, 61:20,
68:7, 70:13,
75:21, 77:25,
80:21, 82:23,
90:22, 91:2,
98:14, 105:5,
106:21, 108:12
**standing**
299:25

**standpoint**
164:7
**starnes**
3:7
**start**
16:10, 123:16,
123:22, 183:7,
184:9
**started**
16:13, 16:17,
17:9, 195:14,
195:16, 197:6,
207:15, 212:1,
212:3
**starting**
71:5, 71:23,
162:3, 184:21,
189:4, 270:17,
271:5
**starts**
158:17, 162:4,
218:4
**state**
9:15, 10:22,
84:20, 84:21,
187:2
**stated**
146:14, 233:11,
245:14
**statement**
80:13, 201:5,
223:20, 224:24,
230:1, 230:21,
254:10, 295:25
**states**
1:1, 9:5,
86:22, 189:7,
244:9, 275:6
**stating**
132:15, 231:10,
267:4
**statute**
16:8, 282:8,
282:9, 282:10,
282:12
**stenographer**
1:26, 302:14
**step**
82:16

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                130

steps
83:19, 83:20,
85:20, 111:6,
242:16
steptoe
249:10, 251:6
stick
181:22
stickers
278:17
still
21:10, 63:20,
63:25, 113:24,
120:6, 120:8,
138:25, 142:23,
186:3, 188:19,
191:8, 209:11,
292:20, 295:19,
295:21
stipulate
275:24, 287:23
stir
261:10
stirring
261:15
stole
119:4
stop
28:25, 104:19,
191:1, 210:11
stopped
104:10, 195:15,
266:4
stops
128:16
stories
142:11, 143:19,
252:7
story
78:25, 102:12,
142:19, 202:12
straight
252:7
strange
67:3, 67:4
streamline
238:14, 248:20,
272:2

street
2:6, 3:22,
95:24, 122:24,
176:21
stress
158:18
stretch
87:7, 87:15
strike
41:10
structure
79:2
studied
169:17
study
172:2
studying
171:19
stuff
158:22, 160:10,
167:9
stumped
170:10, 171:18
style
59:25
subject
35:14, 42:5,
47:14, 92:9,
92:20, 94:3,
95:3, 126:12,
138:25, 143:17,
166:11, 174:16,
204:23, 209:13,
230:16, 234:12
submit
208:11, 234:5,
290:4, 290:8
submitted
203:16, 206:14,
288:14, 289:25
submitting
204:7
subpoena
13:9, 74:17,
212:8, 212:15,
213:6, 213:9,
214:4, 214:5,
214:7, 214:21,

215:18
subpoenas
212:3, 213:18,
215:22, 231:12
subsequent
31:11, 55:8,
224:22, 282:11,
295:9
subsequently
298:8
substance
165:24
substantial
225:22
substantive
60:2, 131:14,
160:8
sue
297:25
sued
298:1
sufficient
275:25
suggest
43:9, 57:5,
76:9, 158:19
suggested
173:11
suggesting
150:1, 167:5,
171:17, 179:9,
180:5, 261:22
suggests
220:10, 227:9
suit
21:24, 21:25,
22:1, 22:7,
95:7, 242:8,
244:14
suitable
123:4
suite
2:7, 3:22, 4:5
summarize
124:1, 201:3,
215:9
summarized
285:24

summarizing
162:9
summary
185:7, 185:9,
186:21, 204:8
sums
27:16, 27:19
supervising
65:16
supplement
119:23, 178:23,
179:7
supplementation
178:25
support
29:5, 29:11,
31:7, 33:2,
64:1, 123:4,
140:12, 275:19,
276:13, 296:19,
296:22
supported
296:22
supporting
276:5
supportive
59:7
supposed
63:25, 263:18
supposedly
85:12, 85:16,
100:7, 143:15,
226:15
supreme
282:7
sure
11:1, 13:15,
21:2, 21:6,
21:8, 21:21,
25:12, 34:4,
34:10, 45:4,
49:5, 55:25,
59:23, 60:24,
71:7, 72:22,
74:20, 77:10,
88:6, 90:15,
95:9, 108:1,
111:15, 129:19,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    131

139:19, 144:22,
146:4, 146:13,
148:11, 150:18,
152:23, 153:2,
153:18, 157:2,
162:19, 164:2,
166:5, 166:9,
166:20, 167:8,
174:25, 175:12,
177:17, 178:1,
184:20, 189:9,
190:13, 194:20,
195:14, 201:15,
212:17, 220:18,
220:23, 222:23,
225:10, 229:24,
236:13, 249:20,
250:22, 254:14,
254:15, 254:25,
258:12, 261:22,
261:25, 265:5,
265:25, 268:19,
272:23, 282:6,
292:2, 292:4,
293:24, 300:8

**surmise**
106:12
**surprise**
291:24, 291:25
**surprising**
293:4
**susan**
240:4
**susana**
28:15, 60:24,
80:6, 98:21,
105:12, 112:25,
114:2, 130:13,
135:7, 144:2,
158:15, 167:18,
168:7, 185:3,
197:4, 197:9,
208:8, 209:7,
210:23, 210:25,
213:5, 234:9,
239:20, 240:4,
241:5, 241:14,
242:11, 242:15,

267:1, 277:20,
277:25, 278:2,
278:9, 278:10,
279:15
**susman**
249:11
**sustain**
239:15
**swear**
10:5
**switch**
181:11
**sworn**
10:15, 301:5
**sync**
299:14
**synched**
300:2, 300:3
**system**
124:15, 153:21

**T**

**table**
96:17
**take**
34:7, 46:6,
82:17, 89:22,
111:7, 111:23,
113:8, 130:18,
135:14, 149:24,
155:21, 165:21,
182:20, 206:23,
212:25, 240:7,
245:24, 262:3,
277:18, 281:21,
293:12, 293:14
**taken**
9:12, 11:3,
29:19, 40:23,
46:11, 90:1,
97:23, 112:2,
121:25, 125:11,
155:24, 179:10,
182:24, 207:5,
246:3, 269:5,
293:17, 301:4
**taking**
35:1, 123:24,

149:1, 160:8,
179:4, 187:9,
241:10
**talk**
17:16, 32:10,
60:6, 138:10,
189:19, 231:21,
231:25, 251:22,
252:3, 252:14,
271:1
**talked**
65:4, 103:15,
224:2, 224:18,
252:7, 252:15,
261:19, 267:18
**talking**
11:7, 26:4,
28:25, 32:12,
34:1, 42:15,
46:25, 52:2,
52:9, 55:6,
59:1, 60:11,
60:16, 66:10,
66:24, 78:14,
78:21, 88:22,
92:8, 93:4,
93:14, 100:15,
100:19, 102:10,
106:4, 123:17,
125:15, 136:23,
147:23, 158:3,
160:4, 167:22,
180:9, 186:14,
213:5, 214:3,
214:15, 219:24,
227:13, 231:25,
232:5, 232:20,
232:21, 236:8,
238:22, 246:8,
251:5, 252:15,
254:15, 256:23,
261:3, 266:7,
275:1, 286:23,
287:2, 292:16,
298:3
**talks**
162:10, 186:25,
187:17

**tan**
244:3
**tc**
211:6
**team**
20:9, 32:12,
33:1, 35:10,
35:16, 39:15,
39:16, 39:17,
39:18, 40:2,
43:23, 44:1,
44:13, 47:17,
48:19, 51:19,
51:23, 52:20,
52:24, 54:16,
56:23, 58:25,
60:20, 62:21,
63:13, 65:7,
65:12, 65:15,
66:18, 66:22,
66:25, 67:25,
68:15, 70:23,
70:25, 71:1,
71:3, 71:20,
77:3, 80:7,
81:15, 86:18,
88:18, 90:7,
93:7, 93:13,
93:21, 97:8,
100:24, 102:14,
102:15, 103:5,
105:21, 110:21,
110:25, 149:1,
154:2, 155:17,
157:11, 160:2,
167:6, 168:12,
173:25, 174:7,
174:8, 174:9,
177:5, 177:12,
180:25, 187:13,
188:12, 198:16,
199:19, 204:8,
204:12, 205:19,
223:9, 223:21,
228:13, 233:25,
234:5, 236:21,
259:3, 281:7,
297:5

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    132

**team's**
164:22
**tech**
4:14
**technically**
145:15, 217:22
**technician**
19:17, 19:22,
20:1, 22:14,
22:16, 22:23,
28:2, 28:6,
28:10, 35:22,
35:24, 36:7,
36:12, 38:22,
39:3, 41:23,
42:2, 47:8,
53:4, 53:9,
58:10, 58:12,
58:16, 61:20,
61:22, 62:2,
63:2, 63:7,
68:7, 70:13,
70:17, 75:21,
76:1, 77:25,
80:21, 82:23,
90:22, 90:25,
91:2, 91:6,
98:14, 105:5,
106:21, 108:12,
123:16, 123:21,
123:24, 124:9,
124:24, 125:3,
125:6, 128:16,
128:21, 128:24,
182:16, 182:18,
209:4, 210:19,
210:21, 230:11,
230:14, 246:13,
253:3, 253:5,
279:1, 291:13,
291:18
**tell**
14:15, 60:8,
79:4, 100:23,
103:20, 120:4,
132:23, 135:12,
139:23, 143:4,
143:10, 158:18,

162:20, 165:23,
177:18, 179:2,
189:15, 193:1,
194:20, 201:4,
206:17, 215:24,
233:3, 247:14,
251:23, 254:21,
284:11
**tellez**
80:6, 98:21,
105:12, 112:25,
114:3, 130:13,
135:7, 144:2,
158:15, 167:18,
168:7, 185:3,
197:4, 197:9,
208:8, 209:7,
210:23, 213:5,
234:10, 239:20,
240:4, 240:7,
240:17, 267:2,
277:20, 278:9
**telling**
22:5, 38:12,
44:4, 54:15,
57:1, 60:20,
64:20, 90:6,
107:6, 109:3,
136:11, 167:5,
168:6, 185:21,
189:16, 191:12,
193:20, 194:1,
209:19, 252:20,
253:1, 253:16,
261:10
**temporally**
64:17, 144:5
**temporarily**
29:2
**temporary**
176:22
**ten**
215:1, 229:20,
255:12
**tenure**
278:12, 290:3
**term**
123:2

**terms**
11:6, 16:3,
21:7, 24:23,
31:17, 38:12,
44:24, 95:10,
98:7, 115:22,
133:1, 147:12,
152:19, 161:15,
177:8, 185:20,
196:10, 196:11,
196:15, 196:20,
204:17, 205:4,
213:15, 224:3,
231:17, 231:18,
236:10, 237:5,
273:3
**terrence**
1:7, 3:13,
3:14, 109:15
**terrible**
167:9
**terribly**
68:12
**terrorist**
138:4, 275:5
**terry**
9:24, 9:25,
12:23, 15:19,
32:18, 33:18,
39:7, 40:2,
40:12, 48:18,
49:7, 63:9,
63:24, 65:15,
67:25, 69:20,
81:5, 94:9,
94:14, 105:14,
110:3, 112:25,
117:3, 118:12,
119:16, 119:22,
120:15, 120:16,
122:20, 130:12,
131:8, 135:11,
144:2, 152:10,
158:14, 160:22,
166:10, 167:18,
169:3, 174:16,
181:6, 183:12,
183:14, 183:20,

183:24, 185:5,
197:8, 201:23,
204:25, 205:4,
205:8, 210:23,
211:7, 211:14,
211:22, 217:14,
218:10, 227:1,
228:21, 229:5,
234:4, 234:5,
235:20, 236:17,
236:25, 237:4,
238:2, 243:20,
243:25, 245:20,
256:22, 262:13,
264:17, 265:21,
274:8, 277:20,
278:15, 279:15,
284:6, 284:10,
285:18, 287:7
**terry's**
194:19, 260:22
**testified**
10:17, 103:13,
257:19, 258:6,
270:13
**testifies**
143:10
**testify**
10:15, 13:9,
42:25, 51:5,
72:4, 72:18,
74:22, 74:25,
100:5, 103:7,
145:16, 229:25,
258:8, 266:2
**testifying**
52:6
**testimony**
33:22, 37:19,
50:25, 57:23,
66:19, 74:16,
74:19, 75:2,
75:10, 79:17,
84:14, 86:1,
86:19, 87:3,
87:10, 97:5,
99:15, 100:4,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    133

102:22, 103:14,
103:18, 104:2,
135:14, 136:10,
140:20, 142:3,
148:3, 149:10,
149:19, 171:5,
180:1, 192:25,
193:7, 203:20,
203:21, 203:22,
204:6, 204:7,
204:21, 224:17,
228:2, 245:10,
255:4, 255:10,
255:23, 256:14,
279:19, 279:24,
288:12, 288:14,
288:24, 289:2,
289:24, 290:4,
290:8, 290:16,
290:19, 294:6,
295:14, 295:21,
298:11
**testing**
153:10
**text**
7:10, 17:25,
169:7, 182:10,
183:11, 184:4,
189:15, 190:17,
190:22, 191:7,
194:19, 196:14,
196:17, 196:18,
210:24, 250:7,
250:8, 250:21,
251:18
**texts**
251:18, 260:8,
260:9
**th**
3:22, 9:8,
41:18, 42:14,
114:8, 130:12,
142:5, 157:20,
167:17, 184:12,
184:16, 185:2,
217:13, 234:9,
239:12, 239:21,
241:5, 242:12,

243:5, 260:13,
260:14, 260:17,
264:16
**thank**
10:18, 39:3,
46:8, 61:22,
70:16, 71:8,
98:16, 128:24,
156:5, 182:18,
210:21, 230:14,
250:5, 253:5,
272:4, 280:7,
282:18, 287:21,
291:18, 296:11,
299:6, 299:24,
300:8
**thanks**
90:21, 202:13,
210:25, 293:25
**themselves**
9:14, 115:17,
281:4
**theoretically**
229:7
**theory**
131:13, 255:17,
255:22
**thereafter**
301:7
**thing**
11:7, 17:7,
36:25, 62:6,
64:22, 107:11,
112:17, 133:9,
139:7, 169:10,
173:14, 250:23,
277:8, 281:10,
282:3, 291:11
**things**
15:16, 33:25,
49:16, 58:24,
60:20, 89:3,
114:13, 114:21,
131:6, 133:4,
138:9, 145:14,
146:19, 151:5,
160:12, 172:14,
174:13, 178:14,

180:22, 185:20,
189:21, 193:10,
196:9, 200:15,
201:25, 205:6,
228:8, 229:17,
241:19, 243:3,
256:12, 256:14,
259:19, 272:2,
281:3, 287:25,
289:19, 291:10,
296:14, 297:2,
297:3, 297:4
**thinking**
96:19, 96:22,
155:13, 227:23,
230:1, 230:4
**thinks**
142:10, 142:19,
143:19
**third**
128:7, 146:10,
176:23, 280:10,
285:4, 285:22
**third-to-last**
29:16, 260:15
**thomas**
3:3
**thorough**
286:19
**thoroughly**
200:6
**thought**
88:7, 143:5,
145:17, 155:9,
163:3, 174:13,
175:20, 190:11,
200:19, 277:3,
279:5
**thoughts**
169:13
**thousand**
101:14, 262:20,
263:17
**thousands**
143:14, 149:6,
193:4, 195:24,
268:3, 268:4,
268:21

**threatened**
28:25, 136:3,
142:19, 142:20
**threats**
45:7, 51:17
**three**
24:3, 31:15,
42:9, 42:12,
43:18, 108:3,
114:3, 114:11,
121:22, 139:3,
142:21, 178:12,
221:18, 242:1,
242:2
**through**
11:8, 15:13,
27:6, 40:7,
53:19, 57:11,
60:1, 67:19,
74:12, 74:24,
75:7, 83:23,
96:9, 102:20,
106:8, 124:1,
126:3, 132:15,
134:16, 136:23,
142:17, 148:4,
150:3, 154:24,
155:14, 166:14,
168:8, 177:12,
189:19, 189:20,
195:1, 198:2,
198:22, 199:9,
201:10, 201:13,
218:5, 222:24,
224:9, 226:11,
226:14, 226:18,
235:9, 240:24,
247:15, 247:19,
255:6, 255:22,
268:2, 276:18,
282:10, 282:20,
291:20, 292:6
**throughout**
39:19, 42:9
**throwing**
60:5
**thursday**
238:4

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

134

**tigre**
24:2, 24:11,
24:25, 25:3,
25:5, 26:5,
26:15, 28:23,
29:5, 29:19,
30:5, 31:22,
33:3, 38:2,
38:5, 44:18,
44:21, 50:13,
50:23, 51:7,
90:7, 92:21,
97:11, 137:22,
221:8, 221:16,
222:4, 222:20,
226:4, 226:16,
229:1, 233:8,
234:2, 239:8,
239:13, 241:15,
242:1, 242:21,
244:25, 247:5,
284:12
**tigre's**
24:17, 29:11
**timeline**
141:15
**times**
18:19, 18:21,
19:5, 26:18,
26:22, 27:15,
73:2, 97:21,
133:15, 137:12,
142:21, 159:18,
195:3, 202:12,
205:9, 207:10,
224:2, 255:2,
267:18, 291:10
**timesheet**
113:13
**timing**
101:1, 104:17,
162:22, 236:7
**toad**
63:25
**today**
10:1, 39:19,
40:7, 42:9,
51:6, 60:24,

74:4, 86:12,
93:1, 95:1,
95:14, 96:7,
97:8, 97:10,
100:11, 102:9,
103:23, 104:8,
104:13, 104:17,
107:21, 111:19,
130:17, 152:14,
163:15, 167:24,
167:25, 177:16,
179:25, 195:2,
196:12, 203:2,
205:10, 207:10,
219:23, 220:14,
225:3, 225:5,
228:6, 228:18,
229:10, 229:15,
231:21, 238:5,
238:12, 243:23,
249:6, 253:12,
253:24, 254:2,
254:18, 255:8,
258:5, 267:18,
268:3, 269:12,
276:23, 277:13,
280:8, 299:1,
299:8
**today's**
9:8
**together**
40:15, 60:4,
131:13, 141:15,
159:7, 210:8,
211:16, 247:20,
255:16, 278:20
**told**
28:25, 29:17,
50:4, 50:22,
51:1, 51:20,
60:23, 67:10,
79:1, 84:23,
99:2, 99:7,
101:4, 102:21,
107:8, 135:11,
140:2, 142:21,
159:9, 168:8,
174:6, 192:22

**tolemaida**
225:23
**tolemaida's**
100:25
**tom**
156:15, 157:16
**tomorrow**
178:23, 179:7,
189:18
**ton**
19:3
**tonight**
178:23, 179:7
**tony**
3:6, 10:8
**took**
116:11, 130:22,
238:4, 270:12,
272:17
**top**
39:5, 42:4,
53:10, 68:23,
91:10, 91:13,
165:13, 166:18,
166:20, 176:15,
185:1, 200:13,
223:1, 225:14,
257:14, 280:12,
281:1, 287:24
**toro**
141:23, 142:3,
142:10
**torres**
28:23
**tort**
16:7, 282:8,
282:12
**torture**
16:8, 271:24
**total**
239:16
**totally**
165:25
**touch**
12:23, 24:11,
26:5
**touch-base**
47:5

**touched**
248:16, 249:5
**toward**
91:18
**track**
181:12
**tracked**
149:14, 149:15,
247:7
**tracking**
177:21
**trail**
166:25
**train**
232:15, 274:22
**transaction**
129:8
**transcribed**
1:26
**transcriber**
302:1
**transcript**
7:3, 19:25,
22:22, 28:9,
36:2, 36:11,
42:1, 47:12,
53:8, 58:15,
62:1, 63:6,
68:22, 70:21,
75:25, 78:5,
80:25, 83:2,
91:5, 98:19,
105:9, 107:1,
108:16, 112:13,
112:16, 117:1,
118:9, 119:13,
122:18, 124:11,
127:13, 129:2,
130:3, 130:11,
136:21, 138:21,
141:22, 143:25,
156:8, 158:9,
161:21, 161:22,
161:23, 164:20,
167:16, 169:2,
174:22, 182:6,
182:9, 182:12,
182:15, 197:1,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                     135

207:21, 209:2,
210:17, 212:22,
215:7, 217:12,
222:13, 230:10,
233:1, 240:2,
243:9, 246:18,
253:9, 257:6,
262:8, 263:3,
264:15, 266:24,
279:8, 280:6,
287:18, 299:8,
299:12, 300:2,
302:3, 302:5
**transcriptionist**
301:8
**transfer**
191:11, 194:3,
239:14
**transferred**
187:19, 187:22,
188:8, 190:25,
194:7
**transition**
261:21, 262:18,
263:15
**translate**
36:23, 57:4,
57:12
**translating**
165:23, 166:9
**translation**
166:6, 166:8
**translator**
19:2
**transmitted**
57:15
**transpired**
248:24, 297:6
**transportation**
176:23
**travel**
113:7, 113:19,
129:18
**traveled**
27:15, 129:17
**traveling**
245:5
**treatise**
85:22

**treatment**
245:6
**treaty**
206:18
**trey**
9:16, 220:22
**trial**
13:12, 203:21,
204:6, 204:7,
289:17, 299:19
**tricky**
277:15
**tried**
29:18, 30:8,
37:2, 100:24,
169:23, 291:11
**tries**
115:16
**trip**
40:4, 47:14,
219:8, 219:21,
222:17
**trouble**
158:21, 158:25,
281:18, 282:23
**troubling**
198:5
**true**
38:14, 38:16,
46:2, 52:18,
52:25, 97:1,
97:22, 99:9,
99:12, 99:13,
127:5, 135:18,
149:2, 223:20,
286:1, 286:3,
286:6, 286:9,
286:13, 286:16,
296:4, 301:10,
302:5
**trust**
135:18
**trusted**
143:3
**trusting**
65:12
**truth**
10:16, 38:12,

136:11, 143:4,
143:10
**truthful**
79:5
**truthfully**
102:7, 111:21
**try**
142:12, 144:24,
157:24, 159:21,
169:9, 206:25,
251:24
**trying**
67:8, 68:13,
71:15, 96:3,
111:14, 115:7,
132:5, 144:18,
145:7, 145:10,
149:18, 150:17,
150:23, 153:13,
154:25, 163:10,
166:25, 170:22,
171:9, 171:11,
172:13, 172:23,
173:9, 173:13,
176:13, 176:15,
190:7, 194:21,
196:5, 196:6,
196:7, 202:17,
204:19, 204:20,
210:7, 211:16,
214:8, 214:12,
227:3, 227:4,
229:9, 229:18,
229:24, 248:19,
252:6, 254:3,
254:5, 254:7,
259:14, 261:12,
271:10, 277:8,
277:18, 281:10,
291:21, 294:23,
297:5, 297:12,
297:18
**tuesday**
189:18
**turkey**
272:12, 272:13
**turn**
43:12, 83:8,

144:4, 234:19,
240:16
**turned**
135:19, 142:22,
235:23
**turning**
117:18
**tweak**
213:11
**two**
11:18, 12:3,
16:9, 16:19,
22:17, 26:22,
42:13, 43:8,
51:15, 52:12,
53:15, 59:16,
112:7, 119:23,
127:2, 139:4,
185:1, 186:19,
205:17, 215:15,
247:8, 247:9
**two-and-a-half**
47:4
**type**
15:16, 17:6,
84:10, 206:3,
237:11, 240:20,
259:22, 276:12
**types**
16:3, 229:11,
282:14
**typewriting**
301:7

| U |
| --- |

**uh**
183:15
**uh-hum**
14:5, 37:14,
41:20, 71:2,
81:4, 108:25,
117:7, 135:24,
136:18, 146:7,
148:10, 169:11,
176:4, 183:17,
197:25, 199:1,
221:6, 239:10,
251:20, 253:13,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                                    136

262:19
**ulcer**
104:15
**ultimately**
203:12, 241:24,
248:3
**um-hum**
26:7, 39:9,
209:15, 240:23,
282:18, 292:8,
292:21
**um-um**
134:24, 250:24
**umbrella**
266:15
**unavailable**
55:15
**uncle**
194:22, 195:4,
195:6, 195:8,
195:9, 195:23,
196:3, 196:10
**unclear**
104:17
**under**
23:20, 51:5,
79:19, 85:19,
111:19, 114:24,
128:6, 148:25,
266:14, 282:9,
282:10
**undergoing**
245:6
**underlying**
272:6
**understand**
11:6, 12:20,
13:8, 13:10,
13:19, 73:8,
79:23, 86:8,
96:7, 136:9,
154:1, 186:8,
200:24, 214:8,
225:2, 247:9,
289:14, 297:5
**understanding**
15:9, 15:11,
24:16, 24:23,

25:17, 34:5,
35:8, 37:1,
51:12, 55:19,
55:24, 57:7,
64:25, 65:14,
65:18, 65:19,
74:1, 75:11,
79:14, 94:21,
96:21, 138:3,
141:12, 141:13,
152:12, 178:1,
274:18, 274:20,
275:18, 276:11,
279:23, 281:6,
287:2, 287:10,
288:6, 295:11,
295:19, 296:6,
297:11, 298:11
**understands**
84:12, 134:21,
235:22
**understood**
13:11, 35:11,
38:10, 149:24,
152:8, 159:6,
224:25
**underway**
155:19
**undisclosed**
243:13
**uneasiness**
277:10, 277:17
**unethical**
52:16
**unfolding**
155:1
**unfortunately**
40:3, 47:23,
219:25
**unintentional**
149:21
**union**
37:3, 43:18
**unique**
134:7
**united**
1:1, 9:5, 275:6
**university**
11:14

**unless**
100:3, 147:20,
198:3, 243:4
**unmute**
123:18
**unquote**
45:24, 51:21,
58:7, 81:12,
100:8, 144:15,
180:22, 193:22,
195:4, 223:13,
223:15, 226:3
**unredacted**
40:3
**unrelated**
109:20
**until**
29:2, 50:14,
55:16, 58:3,
90:9, 99:4,
99:8, 104:11,
104:19, 126:8,
127:2, 132:16,
165:4, 188:18,
192:7, 252:15
**untruths**
252:20, 253:1
**unusual**
27:9, 77:3
**unwinding**
259:20
**update**
64:1, 189:21
**updated**
42:5
**updates**
55:9
**uphold**
204:13
**upset**
151:3, 260:21
**urgent**
62:10, 251:7
**urgently**
166:10
**use**
19:18, 39:19,
58:2, 100:18,

104:14, 124:5,
195:24, 196:5,
196:6, 203:13,
284:7
**using**
16:7, 18:20,
42:8, 186:11,
196:1, 196:15,
268:9, 268:20
**usually**
40:6

---
**V**
---

**vacation**
55:15
**vacuum**
102:13, 174:3,
178:9
**vague**
29:6, 82:1,
99:21, 144:16,
154:22, 196:10,
196:15, 196:19
**vaguely**
283:11
**valledupar**
198:2, 201:12
**valmore**
37:3
**valuable**
296:21
**value**
144:16, 144:23,
145:14, 145:23,
146:19, 147:6,
169:24, 170:4,
175:24, 280:15,
281:3, 296:14,
296:15, 297:2
**van**
40:5, 40:10,
40:11, 40:17,
41:4, 41:9,
41:10, 41:11,
41:14, 41:19,
42:14, 42:19,
43:7, 62:22,
64:7, 64:13,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

137

100:11, 100:18,
104:23, 106:13,
108:9, 109:11,
109:16, 109:17,
109:22, 110:10,
118:11, 118:18,
118:22, 119:15,
119:21, 120:2,
120:15, 120:22,
121:4, 121:6,
124:4, 124:5,
126:12, 127:3,
129:11, 130:22,
159:2, 162:20,
162:24, 163:16,
164:10, 177:12,
195:3, 195:7,
196:3, 237:16,
237:22, 238:1,
238:8
**variety**
273:7
**various**
18:18, 18:19,
24:9, 32:22,
33:7, 96:5,
102:4, 145:8,
155:3, 160:9,
161:9, 174:1,
218:13, 237:3,
244:1, 256:7,
256:16, 258:3,
268:5, 295:7
**varying**
204:23
**vb**
64:6
**vein**
15:12
**verbally**
9:15
**verbatim**
71:15
**version**
220:20, 221:3,
242:11, 242:14,
263:6
**versions**
247:9

**versus**
147:24, 161:12
**via**
3:6, 12:23,
17:25, 168:9,
185:13, 257:19
**victim**
16:8
**victoria**
91:19
**video**
9:2, 9:3, 9:9,
9:10, 299:4,
299:6, 299:15,
300:1
**videographer**
4:13, 9:2,
10:1, 10:3,
46:9, 46:12,
89:24, 90:2,
111:25, 112:3,
125:9, 125:12,
155:22, 155:25,
182:22, 182:25,
191:24, 192:2,
207:3, 207:6,
269:3, 269:6,
293:15, 293:18,
299:3, 299:17,
299:21, 299:25
**videotaped**
1:13, 2:1
**view**
49:18, 65:11,
80:15, 87:17,
103:7, 134:16
**viewing**
74:15
**viewpoint**
131:22
**violations**
272:21
**virtually**
57:19
**visit**
27:8, 57:17
**visits**
23:21

**volume**
46:25, 98:4
**voluntarily**
13:13
**víctor**
37:3

**W**

**waichman**
49:9, 55:20,
56:8, 62:8,
62:15, 62:20,
114:19, 213:6,
213:17
**wait**
165:4, 251:8
**waiting**
68:8, 104:13,
243:10
**waive**
59:4
**waiver**
59:3
**walk**
48:3
**walking**
95:23
**want**
10:25, 19:18,
24:5, 25:16,
26:6, 59:12,
91:16, 96:8,
123:18, 128:16,
139:24, 155:10,
166:5, 166:11,
169:7, 172:17,
172:20, 176:19,
178:21, 179:6,
216:15, 218:6,
220:23, 225:10,
230:23, 242:9,
251:7, 251:22,
261:10, 270:21,
271:11, 279:13,
280:10, 282:19,
287:24, 288:15,
299:12, 300:2,
300:5

**wanted**
157:17, 219:1,
238:16, 252:11,
271:12
**wants**
43:16, 44:5,
47:23, 57:5,
104:18, 113:17,
135:11, 135:13,
219:25, 220:10,
235:23, 251:6
**war**
271:23
**warrant**
57:20
**washington**
1:14, 2:8, 4:6,
9:13, 13:5
**watch**
139:24, 140:3,
141:2, 141:5
**way**
20:15, 26:5,
41:4, 43:5,
49:22, 54:4,
54:22, 60:15,
61:10, 66:16,
72:4, 78:20,
79:22, 80:3,
80:17, 84:7,
85:15, 86:21,
99:10, 99:19,
99:22, 101:18,
103:19, 122:3,
131:21, 137:6,
137:11, 137:17,
147:16, 147:22,
151:22, 166:7,
169:5, 169:16,
173:9, 173:11,
177:21, 178:16,
180:17, 183:9,
186:24, 190:12,
192:14, 199:12,
199:17, 201:3,
202:7, 204:19,
216:8, 218:2,
224:5, 227:5,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                              138

233:6, 236:5,
237:14, 247:8,
248:1, 256:12,
257:24, 268:22,
269:15, 274:13,
280:16, 283:16,
284:15, 288:10,
291:8, 294:14
**ways**
62:8, 155:3,
237:3, 258:3
**we'll**
113:23, 123:23,
144:4, 150:18,
152:14, 153:11,
165:13, 225:14,
270:25, 299:10,
299:15, 300:3
**we're**
13:5, 46:9,
46:12, 51:3,
52:8, 68:8,
77:16, 81:6,
82:14, 88:22,
89:24, 90:2,
97:25, 98:2,
100:23, 102:20,
108:1, 111:10,
111:25, 112:3,
120:8, 125:9,
125:12, 129:24,
137:7, 138:25,
142:14, 144:20,
146:18, 147:23,
147:24, 147:25,
148:11, 148:21,
150:9, 155:22,
155:25, 156:3,
159:3, 167:21,
177:8, 182:1,
182:22, 182:25,
184:11, 184:21,
186:15, 207:3,
207:6, 220:23,
228:20, 232:6,
232:20, 232:21,
238:21, 243:10,
246:4, 250:22,

269:3, 269:6,
286:24, 289:10,
292:16, 293:18,
297:18, 299:5,
299:16
**we've**
23:3, 23:12,
41:17, 46:5,
49:16, 57:1,
66:9, 72:15,
73:20, 74:4,
87:13, 89:23,
97:7, 97:10,
102:9, 105:24,
120:11, 120:25,
121:24, 124:17,
146:15, 150:3,
150:12, 155:20,
167:22, 167:23,
177:10, 178:3,
179:25, 181:16,
183:3, 193:6,
196:12, 197:14,
203:2, 207:9,
224:2, 224:9,
226:11, 226:14,
226:18, 231:21,
235:17, 236:23,
237:8, 238:11,
239:2, 239:11,
240:18, 249:5,
250:21, 255:6,
255:21, 261:17,
262:18, 267:18,
268:2, 269:15,
276:23, 284:5,
286:23, 287:1,
287:14, 298:3,
299:1
**wednesday**
64:9
**week**
64:9, 99:3,
127:2, 185:7,
238:6, 273:1,
273:5
**weeks**
21:12, 127:2,

195:20
**weighing**
174:12
**welcome**
156:9
**well-known**
276:8
**wells:all**
41:21, 106:20
**wells:let's**
53:3, 77:24,
80:20, 98:13,
122:13, 217:8
**went**
27:5, 46:2,
62:21, 127:4,
132:15, 133:12,
133:17, 136:23,
189:2, 236:17,
240:24, 259:24,
270:11, 271:5,
271:10, 297:3,
297:4
**weren't**
101:20, 163:11,
222:3, 236:13,
242:3, 243:18
**whatever**
45:24, 121:1,
124:15, 186:9,
236:16, 247:21,
259:25
**whatnot**
249:21
**whatsoever**
89:1, 93:2,
128:12
**wheelhouse**
49:19
**whereupon**
10:13
**whether**
26:14, 27:21,
27:22, 33:8,
35:3, 35:17,
38:12, 44:9,
44:20, 45:25,
46:1, 48:24,

52:16, 52:24,
56:15, 56:18,
61:10, 64:24,
70:5, 73:1,
73:14, 79:19,
80:18, 81:16,
84:5, 100:2,
101:24, 104:3,
127:7, 133:1,
133:2, 140:13,
143:9, 149:14,
149:15, 149:20,
153:24, 159:4,
160:16, 161:2,
164:4, 164:8,
171:4, 173:14,
173:22, 180:4,
193:15, 202:2,
208:12, 208:13,
228:5, 228:18,
229:21, 236:16,
254:15, 254:16,
258:2, 264:3,
264:7, 265:22,
272:20, 273:10,
273:14, 273:21,
283:17, 283:21,
284:19, 286:5,
286:15, 295:9,
297:3
**white**
85:21
**whoever**
59:1, 160:15,
183:12
**whole**
10:16, 62:6,
102:12, 124:17,
147:18, 150:25,
238:4, 259:3
**wife**
142:22
**willful**
115:13
**william**
3:17, 3:19,
9:22, 253:11,
253:16, 269:9,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

139

269:11, 275:24
**willing**
71:11, 72:18
**wilson**
156:15
**wind**
199:18, 282:3
**wire**
91:25, 92:15,
93:4, 97:3,
120:15, 120:23,
130:17, 237:17,
237:22, 238:2
**wired**
114:8
**withhold**
147:21, 163:7,
284:17
**within**
21:18, 116:17,
145:11
**without**
19:2, 55:14,
62:6, 72:18,
99:15, 103:8,
111:5, 126:9,
150:6, 153:17,
173:22, 176:21,
186:2, 191:9,
191:10, 191:14,
192:20, 193:22,
209:23, 216:18,
218:23, 226:20,
260:20
**witness(es**
301:4
**witnessed**
116:15, 125:20,
125:22, 127:18,
257:15
**witnessing**
116:10, 116:13,
118:3, 129:15
**wonder**
135:20
**wondering**
167:7, 190:8,
292:25

**word**
83:22, 268:11,
268:12, 268:16
**words**
33:16, 52:23,
57:10, 74:21,
75:1, 85:3,
86:5, 86:23,
88:21, 113:22,
147:1, 169:23,
170:14, 196:5,
196:6, 197:20
**work**
11:23, 12:17,
13:6, 15:12,
15:18, 19:11,
23:19, 28:12,
31:3, 37:18,
40:14, 42:5,
42:8, 59:4,
62:10, 71:12,
72:9, 99:8,
99:15, 113:5,
120:21, 131:19,
132:16, 150:5,
172:21, 195:10,
216:6, 217:19,
235:9, 240:9,
245:8, 270:1,
270:7, 271:9,
271:12, 271:21,
271:23, 272:15,
285:13
**worked**
217:17, 243:3,
272:14, 275:12
**worker**
131:19
**working**
16:4, 16:10,
16:13, 16:14,
16:17, 21:24,
33:17, 40:12,
44:23, 44:25,
54:2, 66:3,
99:3, 104:10,
104:19, 106:4,
122:4, 123:11,

131:14, 140:9,
150:13, 150:19,
152:6, 160:8,
160:19, 160:20,
163:12, 170:15,
170:17, 170:18,
171:22, 172:1,
172:2, 195:12,
195:14, 195:16,
234:6, 238:24,
241:4, 242:7,
243:19, 266:9,
266:14, 272:8,
272:10, 272:17,
273:1, 274:21,
276:22, 277:23,
278:4
**world**
49:18, 65:11,
158:21, 194:6,
219:9
**worried**
105:16
**worry**
49:19
**worth**
74:5
**wouldn't**
33:23, 37:5,
49:22, 80:10,
102:12, 127:21,
162:25, 179:1,
179:12, 199:20,
293:3
**wow**
139:23
**writes**
165:22
**writing**
23:3, 40:2,
47:16, 108:24,
110:7, 114:2,
146:8, 175:8,
176:18, 192:6,
197:14, 226:19,
231:4, 233:5
**written**
20:2, 35:13,

44:3, 44:4,
77:13, 87:23,
120:13, 133:4,
164:22, 167:1,
167:3, 168:13,
180:7, 185:7,
296:5
**wrong**
76:14, 263:17
**wrongfully**
40:23
**wrote**
59:22, 110:13,
185:7

**Y**

**yahoo**
215:16
**year**
18:1, 88:12,
248:4, 299:18
**year-to-year**
272:24
**years**
11:10, 11:16,
12:3, 16:16,
18:10, 18:13,
18:16, 26:17,
31:11, 61:12,
76:15, 76:21,
77:11, 77:16,
82:21, 87:24,
88:4, 88:10,
89:2, 93:3,
93:25, 94:18,
96:19, 96:23,
98:6, 110:19,
126:4, 131:12,
155:2, 159:7,
186:9, 195:18,
200:11, 215:1,
229:20, 248:5,
255:12, 255:13,
259:20, 297:19
**yep**
41:20, 42:10,
46:8, 61:2,
112:19, 113:2,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023

140

113:15, 114:4,
114:17, 117:17,
123:1, 162:22,
169:16, 184:8,
239:6, 250:24,
260:19, 263:14,
264:25, 292:24
**yesterday**
47:5
**yina**
265:2
**young**
76:18
**yourself**
73:12, 77:1,
82:18, 159:21,
256:21, 276:24,
280:9
**yuca**
186:5, 187:2,
187:18, 187:22,
187:24, 188:3,
188:18, 188:22,
191:5, 191:8,
191:20, 192:6,
192:10, 203:9,
226:4, 226:19

**Z**

**zealous**
170:21
**zealously**
13:23
**zoom**
3:6, 10:8,
191:24, 192:3,
209:3, 278:19

**$**

**$1,000**
51:16
**$1,250**
93:5
**$1,800**
239:13
**$1.5**
117:11, 124:3,
126:6

**$100,000**
89:10, 89:17,
97:16, 179:19
**$150**
113:13
**$150,000**
48:8, 55:22,
56:4, 72:15,
74:5, 88:22,
220:11, 263:18,
264:7
**$2,200**
188:20, 188:23,
189:1, 189:7,
191:9, 191:14,
192:7, 192:11,
192:20
**$2,700**
50:13, 90:8,
90:16, 92:16,
187:18, 190:24,
221:11
**$200,000**
248:22
**$25,000**
113:14, 113:24,
114:18
**$3,600**
239:16
**$35,000**
194:22, 237:19
**$5,400**
50:12
**$50,000**
114:15, 120:23,
121:8, 124:7
**$575**
92:1
**$60,000**
116:7, 120:17,
121:7, 124:6,
127:4, 237:24
**$7,000**
191:10, 194:3,
194:6
**$750,000**
118:18, 121:3,
124:4

**$800**
239:13
**$870**
97:3

**0**

**00506**
1:7, 9:7
**01**
1:16, 9:9,
19:19
**057**
42:7
**059**
43:12
**06**
46:13, 125:10
**061**
44:15
**07**
89:25, 156:1
**08**
125:13
**09**
39:8

**1**

**1**
125:10, 125:13,
155:23, 230:24
**1,000**
239:15
**10**
5:3, 5:15,
5:18, 7:2, 7:23,
7:24, 8:1, 39:8,
46:13, 47:1,
47:6, 47:8,
47:9, 47:10,
50:12, 61:19,
61:23, 61:24,
62:2, 158:7,
208:15, 221:5,
243:7, 246:5,
246:16, 253:7
**100**
3:8, 248:21
**105**
6:4

**107**
6:5
**108**
6:6, 7:13,
207:17, 207:19
**11**
5:16, 5:19,
5:24, 6:4, 7:11,
8:2, 8:3, 8:4,
8:5, 8:8, 51:14,
53:3, 53:4,
53:6, 63:1,
63:3, 63:4,
63:7, 80:23,
89:25, 90:3,
105:7, 112:1,
135:5, 142:5,
182:13, 186:9,
255:13, 257:4,
262:6, 263:1,
264:13, 280:4,
288:3
**1100**
2:6
**112**
6:7, 6:8, 7:14,
208:23, 208:25
**116**
7:15, 210:12,
210:15, 210:20,
210:21
**117**
6:9
**118**
6:10
**119**
6:11
**12**
5:18, 5:20,
26:17, 61:18,
61:20, 61:24,
68:19, 68:20,
68:23, 70:14,
112:4, 114:8,
126:4, 130:12,
167:17, 186:8,
288:4, 288:15,
290:13, 297:19

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                     141

| | | | |
|---|---|---|---|
| **121**<br>212:19, 212:20<br>**122**<br>6:13<br>**1220**<br>2:7<br>**123**<br>215:4, 215:5<br>**125**<br>113:14<br>**126**<br>8:3<br>**127**<br>6:15<br>**129**<br>6:17, 217:8,<br>217:10<br>**13**<br>5:21, 61:12,<br>70:15, 70:16,<br>70:18, 70:19,<br>70:22, 77:16,<br>82:21, 87:23,<br>89:2, 93:3,<br>93:25, 96:19,<br>96:23, 98:6,<br>110:19, 290:13,<br>291:19<br>**130**<br>6:19, 6:20,<br>7:19, 221:25,<br>222:11<br>**131**<br>6:1, 82:22,<br>82:25<br>**133**<br>7:20, 230:6,<br>230:8, 230:13<br>**1335**<br>261:6<br>**134**<br>7:21, 232:23,<br>232:24, 234:8<br>**137**<br>6:21, 7:22,<br>239:23, 239:24,<br>239:25<br>**138**<br>6:22 | **14**<br>5:19, 5:22,<br>32:4, 62:25,<br>63:2, 63:4,<br>75:22, 75:23,<br>76:1, 157:20<br>**141**<br>7:23, 243:6,<br>243:7, 244:3<br>**142**<br>6:23, 7:24,<br>246:12, 246:13,<br>246:16<br>**144**<br>6:24<br>**15**<br>1:7, 5:23, 9:7,<br>47:2, 78:1,<br>78:2, 78:3,<br>78:6, 139:9,<br>239:12<br>**150,000**<br>48:2<br>**151**<br>7:16<br>**153**<br>7:17<br>**156**<br>7:1<br>**158**<br>7:2<br>**159**<br>7:3, 7:18<br>**16**<br>5:24, 6:24,<br>80:22, 80:23,<br>90:20, 90:23,<br>143:21, 143:23,<br>210:19<br>**163**<br>8:1, 253:2,<br>253:3, 253:7<br>**164**<br>8:2, 257:2,<br>257:4<br>**165**<br>7:4, 8:4,<br>262:24, 263:1 | **166**<br>262:2, 262:6<br>**167**<br>7:5, 7:11,<br>182:3, 182:13,<br>182:17<br>**168**<br>8:5, 264:11,<br>264:13<br>**169**<br>7:6<br>**17**<br>5:20, 6:1,<br>68:6, 68:20,<br>82:24, 82:25<br>**171**<br>8:6, 266:21,<br>266:22<br>**175**<br>7:7<br>**18**<br>1:15, 5:21,<br>6:2, 9:8, 70:12,<br>70:19, 90:23,<br>90:24, 91:3,<br>91:6, 184:12,<br>184:16, 185:2<br>**180**<br>5:8, 19:16,<br>19:17, 19:23<br>**181**<br>7:10, 182:3,<br>182:10, 250:2<br>**182**<br>7:8, 7:9, 7:10,<br>7:11<br>**19**<br>5:8, 5:22, 6:3,<br>75:20, 75:23,<br>98:15, 98:17,<br>98:20, 264:16<br>**1900**<br>250:22<br>**192**<br>31:15<br>**197**<br>7:12<br>**1st**<br>158:10, 263:25 | **2**<br>156:1, 182:23,<br>230:25<br>**20**<br>3:22, 5:16,<br>5:19, 5:24, 6:4,<br>8:8, 53:6, 63:4,<br>80:20, 80:23,<br>88:10, 88:12,<br>90:3, 105:6,<br>105:7, 105:10,<br>135:5, 142:5,<br>167:17, 280:4,<br>288:15<br>**2000**<br>237:10, 240:19<br>**20001**<br>4:6<br>**20005**<br>2:8<br>**2001**<br>11:11, 11:12,<br>88:2, 88:5<br>**2002**<br>88:3, 88:6<br>**2008**<br>12:6, 15:20,<br>15:24<br>**2009**<br>16:20, 16:24,<br>17:2, 235:17<br>**2010**<br>272:5, 272:25<br>**2012**<br>7:3, 7:4, 7:5,<br>7:6, 7:7, 7:8,<br>7:9, 7:12,<br>161:20, 161:23,<br>164:18, 167:14,<br>167:17, 168:25,<br>174:20, 182:4,<br>182:7, 184:12,<br>184:16, 185:2,<br>186:22, 192:5,<br>196:24, 291:19,<br>292:4 |

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    142

**2013**
7:13, 7:14,
7:15, 7:16,
7:17, 7:18,
7:19, 7:20,
7:21, 7:22,
7:23, 7:24,
195:15, 207:19,
208:25, 210:15,
212:20, 215:5,
217:10, 217:13,
222:11, 230:8,
232:24, 234:9,
239:21, 239:25,
243:7, 244:5,
246:16, 246:19,
271:6, 282:6,
283:7, 292:5
**2014**
250:10, 250:11,
251:2, 260:14
**2015**
7:11, 8:1, 8:2,
8:3, 8:4, 8:5,
182:13, 251:19,
253:7, 257:4,
258:10, 258:18,
260:13, 260:17,
262:6, 262:9,
263:1, 264:1,
264:13, 264:16,
270:22, 287:13
**2016**
8:6, 20:6,
266:22, 266:25,
270:6
**202**
2:9, 4:7
**2023**
1:15, 9:8,
302:15
**205**
3:11, 3:24
**207**
7:13
**209**
7:14
**21**
5:23, 6:5,

77:24, 78:1,
78:3, 88:4,
106:22, 106:23,
106:24, 251:2
**210**
7:15
**212**
7:16
**215**
7:17
**217**
7:18
**22**
5:10, 5:17,
6:6, 47:13,
47:15, 58:9,
58:13, 78:6,
81:1, 108:13,
108:14, 108:17,
135:14, 219:8,
219:21, 250:9,
250:11
**222**
7:19
**23**
6:2, 6:7,
90:20, 90:25,
91:3, 112:7,
112:10, 112:11,
112:17, 112:22,
125:4, 162:6
**230**
7:20
**233**
7:21
**24**
6:3, 6:8,
98:13, 98:17,
112:8, 112:10,
112:14, 112:18,
114:1, 260:13,
260:14, 260:17
**240**
7:22
**243**
7:23
**246**
7:24

**2475**
4:7
**25**
6:9, 6:22,
116:21, 116:24,
117:2, 138:18,
138:19, 234:9,
238:22, 239:21,
241:5, 242:12
**25,000**
113:8, 113:9,
114:9, 114:10
**250**
139:6
**253**
8:1
**257**
8:2
**26**
6:5, 6:10,
53:11, 106:20,
106:21, 106:24,
118:6, 118:7,
175:15, 176:1
**262**
8:3
**263**
8:4
**265**
8:5
**267**
8:6
**269**
5:4
**27**
6:4, 6:11,
105:4, 105:6,
105:7, 119:10,
119:11, 302:15
**279**
8:7
**28**
5:11, 6:6,
6:13, 39:7,
41:18, 108:11,
108:12, 108:14,
122:15, 122:16,
125:15

**280**
8:8
**287**
8:9
**29**
6:7, 6:15,
42:14, 104:18,
112:10, 112:11,
125:2, 125:3,
125:6, 127:10,
127:11, 217:13,
243:5, 293:16
**293**
5:3
**295**
240:16
**2:-cv--rdp**
1:7, 9:7
**2nd**
244:5, 246:19

---
                3
---

**3**
207:4, 207:7
**30**
6:11, 6:17,
42:14, 59:19,
119:9, 119:11,
128:19, 128:20,
128:25
**300**
4:4
**302**
1:25
**31**
6:19, 130:1,
130:6, 134:19
**32**
6:9, 6:20,
116:20, 116:24,
130:5, 130:9
**33**
6:21, 136:16,
136:17, 136:19
**34**
6:22, 138:19,
138:22
**35**
6:23, 141:19,

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    143

141:20, 207:4,
293:19
**350**
139:4
**35203**
3:23
**35259**
3:10
**36**
5:12, 5:13,
6:13, 6:24,
122:13, 122:16,
143:22, 143:23,
235:11
**3620**
3:24
**37**
6:15, 7:1,
127:9, 127:11,
156:4, 156:6
**38**
6:17, 7:2,
128:15, 128:20,
128:25, 158:6,
158:7
**39**
7:3, 161:19,
161:20, 235:12

---
**4**
---

**4**
246:1
**40**
6:10, 7:4,
118:5, 118:7,
164:18, 165:3,
181:16, 273:5
**41**
6:8, 7:5,
112:10, 112:14,
125:5, 125:6,
167:13, 167:14
**42**
5:14, 7:6,
168:24, 168:25
**43**
6:19, 7:7,
129:20, 130:1,

134:20, 174:19,
174:20, 299:6,
300:9
**44**
6:21, 7:8,
136:14, 136:19,
182:2, 182:4,
183:5, 184:9,
184:21, 185:1
**45**
6:20, 7:9,
120:20, 121:8,
130:4, 130:9,
138:17, 182:2,
182:7, 183:4,
185:23, 239:5,
269:4
**46**
7:10, 182:3,
182:10, 183:4,
183:7, 189:15,
250:4, 250:6,
260:9, 260:10,
260:11
**47**
5:15, 6:23,
7:11, 141:18,
141:20, 182:3,
182:13, 182:17,
183:4, 186:17,
260:7, 260:8
**48**
7:12, 182:23,
196:24, 197:2,
204:22
**49**
7:2, 7:13,
112:4, 158:5,
158:7, 207:18,
207:19
**494**
237:8
**499**
238:13, 238:17,
238:20

---
**5**
---

**5**
246:5, 269:4,

269:7
**50**
7:14, 208:24,
208:25
**500**
139:5, 238:13
**502**
238:15, 239:2
**505**
3:22
**507544**
1:24
**51**
7:15, 210:13,
210:15
**52**
7:1, 7:16,
112:1, 155:23,
156:4, 156:6,
212:20, 212:24,
239:12
**53**
5:16, 7:17,
46:10, 215:4,
215:5, 246:1
**536**
279:14
**54**
7:18, 217:9,
217:10, 282:17,
283:17
**55**
7:19, 207:7,
222:10, 222:11
**557**
144:13, 145:13
**56**
7:20, 230:7,
230:8
**57**
7:21, 232:24,
234:9, 269:7
**58**
7:3, 7:22,
161:18, 161:20,
239:24, 239:25
**59**
5:17, 7:6,

7:23, 168:23,
168:25, 243:7,
244:3
**598512**
3:9
**5th**
42:4, 235:17

---
**6**
---

**6**
59:19, 293:16,
293:19, 299:6,
300:9
**60**
7:24, 246:14,
246:16
**60,000**
114:7
**6083**
3:11
**61**
7:7, 8:1,
174:18, 174:20,
253:6, 253:7
**62**
5:18, 8:2,
237:9, 240:19,
257:3, 257:4
**627**
2:9
**63**
5:19, 8:3,
237:9, 240:17,
240:19, 262:5,
262:6
**64**
8:4, 262:25,
263:1
**642**
223:7
**65**
8:5, 264:12,
264:13
**651**
4:7
**66**
8:6, 266:21,
266:22

Transcript of Christian Levesque, Esquire
Conducted on September 18, 2023                    144

**660**
225:14
**67**
7:9, 8:7,
182:2, 182:7,
278:22, 279:6,
280:2, 293:23
**68**
5:20, 7:8, 8:8,
181:25, 182:2,
182:4, 280:3,
280:4, 296:9
**689**
219:20
**69**
7:4, 8:9,
164:15, 164:18,
287:17, 287:20
**6900**
2:9
**6th**
55:16

**7**

**70**
5:21, 7:5,
167:12, 167:14
**700**
3:22
**714**
176:15
**743**
264:24
**749**
262:17
**76**
5:22
**78**
5:23
**7th**
3:8, 105:10,
258:18

**8**

**80**
7:12, 196:21,
196:24
**800**
239:14

**81**
5:24, 237:9
**819**
263:13
**82**
237:17
**83**
6:1
**868**
3:11
**8th**
99:3, 108:17,
127:14, 161:23,
251:19

**9**

**9**
1:16, 9:9,
46:10
**91**
6:2
**927**
109:9
**98**
6:3
**986**
3:24
**9th**
117:3, 119:15,
120:1, 122:20,
126:23