FILED

2024 Feb-15  PM 01:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 1

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC., | ) | |
| | ) | |
| Plaintiff , | ) | Case No. 2:11-cv-3695-RDP-TMP |
| | ) | |
| vs. | ) | **Contains information designated as** |
| | ) | **"Confidential Information" under the** |
| TERRENCE P. COLLINGSWORTH, | ) | **Protective Order.** |
| individually and as agent of Conrad & Scherer, | ) | |
| LLP; and CONRAD & SCHERER, LLP, | ) | **OPPOSED** |
| | ) | |
| Defendants . | ) | |

## DRUMMOND COMPANY, INC.'S MOTION FOR SPOLIAITON SANCTIONS

William Anthony Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
Benjamin T. Presley (ASB-0136-I71P)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL 35259
(205) 868-6000
fax: (205) 868-6099

Sara E. Kropf
LAW OFFICE OF SARA KROPF PLLC
1001 G St. NW, Suite 800
Washington, DC 20001
(202) 627-6900

*Attorneys for Drummond Company, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 2

LEGAL ARGUMENT ..................................................................................................... 8

    I.    Default is Warranted Under this Court's Inherent Authority Because Defendants Failed to Preserve, and Actively Disposed of, Critical Electronic Evidence ......... 9

        A.    It is Undisputed that Defendants Violated Their Duty to Preserve Electronic Evidence Related to this Litigation ........................................... 9

        B.    Considering the Applicable Factors, Severe Sanctions for Spoliation are Warranted ....................................................................................... 10

            1. Relevance and Importance of Evidence ................................... 11

            2. Prejudice to Drummond ...................................................... 13

            3. Culpability of Defendants – Bad Faith ................................... 14

            4. Fundamental Fairness ......................................................... 23

            5. Alternative Sources of Information ........................................ 23

        C.    Default is the Only Appropriate Sanction ................................... 24

    II.    Sanctions are Also Warranted under Rule 37 Because Defendants Repeatedly and Willfully Violated This Court's Orders to Preserve All Electronic Evidence ....... 25

        A.    The Court's Preservation Orders ................................................ 25

        B.    Defendants Repeatedly Violated These Orders .......................... 26

        C.    These Repeated Violations Support the Imposition of a Default Sanction ..................................................................... 26

CONCLUSION ........................................................................................................... 29

CERTIFICATE OF SERVICE ....................................................................................... 30

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                       **Page(s)**

*Allstate Ins. Co. v. Palterovich*,
    No. 04-21402, 2008 WL 274119 (S.D. Fla. July 12, 2008)............................................27

*Bashir v. Amtrak*,
    119 F.3d 929 (11th Cir. 1997) ......................................................................................20

*Britton v. Wal-Mart Stores East, L.P.*,
    No. 4:11-cv-32, 2011 WL 3236189 (N.D. Fla. June 8, 2011) ...........................................15

*Brown v. Chertof*,
    563 F. Supp. 2d 1372 (S.D. Ga. 2008)...........................................................................11

*Computer Assocs. Int'l v. Am. Fundware, Inc.*,
    133 F.R.D. 166 (D. Colo. 1990) ...................................................................................14

*Cooper v. Toshiba Home Tech. Corp.*,
    76 F. Supp. 2d 1269 (M.D. Ala. 1999) ................................................................15, 23, 29

*Danny Lynn Elec. v. Veolia Es Solid Waste*,
    No. 2:09CV192-MHT, 2012 WL 786843 (M.D. Ala. Mar. 9, 2012) *aff'd sub nom. Danny Lynn Elec. & Plumbing, LLC v. Veolia Es Solid Waste Se., Inc.*, No. 2:09CV192-MHT, 2012 WL 1571314 (M.D. Ala. May 4, 2012) ..................................................................11

*Eli Lilly & Co. v. Air Exp. Intern. USA, Inc.*,
    615 F.3d 1305 (11th Cir. 2010) .............................................................................10, 11, 14

*Evans v. Mobile County Health Dept.*,
    No. CA 10-0600-WS-C, 2012 WL 206141 (S.D. Ala. Jan. 24, 2012) .................11, 13, 18

*Flury v. Daimler-Chrysler Corp.*,
    427 F.3d 939 (11th Cir. 2005) ...................................................................8, 10, 13, 24, 29

*Graff v. Baja Marine Corp.*,
    310 Fed. App'x 298 (11th Cir. 2009) ....................................................................8, 14, 24

*Malautea v. Suzuki Motor Co.*,
    987 F.2d 1536 (11th Cir. 1993) ............................................................................15, 26, 27

*Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*,
    736 F. Supp. 2d 1317 (S.D. Fla. 2010) ...........................................................................9

*Mann v. Taser Int'l, Inc.*,
    588 F.3d 1291 (11th Cir. 2009) ...........................................................10

*Ray v. Ford Motor Co.*,
    792 F. Supp. 2d 1274 (M.D. Ala. 2011) ..........................................10

*Rosenthal Collins Group LLC v. Trading Technologies Int'l*,
    No. 05-C-4088, 2011 WL 722467 (N.D. Ill. Feb. 23, 2011) ............................18

*Story v. RAJ Properties, Inc.*,
    909 So. 2d 797 (Ala. 2005) ...............................................................11

*Swofford v. Eslinger*,
    671 F. Supp. 2d 1274 (M.D. Fla. 2009) ...................................................9, 23

*United States ex rel. King v. DSE. Inc.*,
    No. 8:08-cv-2416-T-23EAJ, 2013 WL 610531 (M.D. Fla. Jan. 17, 2013) ...................19

*West v. Goodyear Tire & Rubber Co.*,
    167 F.3d 776 (2d Cir. 1999).................................................................8

*Zubulake v. UBS Warburg LLC*,
    229 F.R.D. 422 (S.D.N.Y. 2004) ...........................................................10

**Statutes and Rules**                                                            **Page(s)**

Fed. R. Civ. P. 37(c)(2)(A)(iv) ...............................................................8

Fed. R. Civ. P. 37(e) ..........................................................................29

iii

Drummond hereby moves for spoliation sanctions against Defendants pursuant to Rule 37 and this Court's inherent powers.

\*       \*       \*

On March 12, 2015, Defendants disclosed to Drummond and this Court that large swaths of Mr. Collingsworth's emails have been irretrievably "disposed of" during the course of this litigation, as well as the computers and external storage devices which would have housed this information. Indeed, when Defendants' forensic computer expert first looked at Mr. Collingsworth's email accounts, there were *no* emails whatsoever prior to March 23, 2013 contained in Mr. Collingsworth's Conrad & Scherer Inbox, or in the Inbox or Sent Items of his IRAdvocates email account.[1] Even after forensic data recovery efforts by Defendants' expert, there remain large "gaps" in Mr. Collingsworth's emails which correspond with the most critical time periods in this case.

The effect of the loss of this evidence cannot be overstated. Defendants have repeatedly demonstrated a refusal to disclose, and indeed lie about, critical facts until they are caught with a document revealing the truth. The spoliation of thousands of Mr. Collingsworth's emails means the full truth may never be discovered.

Simply put, Defendants' spoliation of this crucial evidence, standing alone, warrants severe sanctions. But when coupled with Defendants' repeated misrepresentations to this Court, to Drummond, and to other courts across the country (as detailed in Drummond's Renewed Motion for Sanctions), the case for terminating sanctions is overwhelming.

---

[1] As is explained in further detail below, Mr. Collingsworth utilizes three email accounts: a Conrad & Scherer account, which based on the production in this case appears to have been used sparingly; an IRAdvocates account, which was Mr. Collingsworth's primary email account; and a Gmail account, which Mr. Collingsworth has used for some of the more incriminating communications discovered thus far.

1

# STATEMENT OF FACTS

## *Introduction to Mr. Collingsworth's Email Accounts*

Evidence uncovered to date[2] shows that Mr. Collingsworth utilized at least three email accounts between 2008 and March 22, 2013: tcollingsworth@conradscherer.com, tc@iradvocates.org, and terrypc56@gmail.com. Based on production to date, it appears that much of Mr. Collingsworth's email activity involved his IRAdvocates and Gmail accounts.[3] For example, production to date shows that Mr. Collingsworth used his IRAdvocates account to write some of the most significant emails discovered thus far, including the following:

- Responding to concerns from his co-counsel that payments to Blanco will "likely be viewed as a form of bribery" by stating that the alternative was Blanco "saying Drummond has nothing at all to do with it" (Doc. 104 at 1, 8-10);

- Stating that El Tigre and Samario need to be paid $2,700 per month "at least until we get the deps in the can" (Doc. 174-6);

- Stating "[i]f we don't like what we see, we don't pay" before paying $20,000 in cash to a witness in Colombia[4] (Doc. 104 at 6-8); and

- Transmitting a memorandum analyzing the propriety of payments to witnesses' lawyers (Ex. 26).

Mr. Collingsworth also used his IRAdvocates account to correspond with Albert van Bilderbeek

---

[2] Drummond is still in the midst of expedited discovery on the issue of spoliation. Although Drummond made clear its need to depose him immediately, Defendants refused to put Mr. Collingsworth up for deposition prior to August 17, 2015, and therefore Drummond has not yet had the opportunity to take his testimony. Ex. 1 (July 13, 2015 Correspondence). Other witnesses, including Bill Scherer and Juan Carlos Rodriguez, are presently scheduled to be deposed the week of August 24. *Id.* Drummond reserves its right to supplement this motion with additional evidence it uncovers between now and the evidentiary hearing.

[3] In fact, Mr. Collingsworth had an auto-forward rule on his Conrad & Scherer email account that simply pushed his incoming emails from that account to his IRAdvocates mailbox. Ex. 2 (CS_TC 7204). There is also evidence that Mr. Collingsworth specifically instructed people to use his IRAdvocates email address, rather than his Conrad & Scherer address, when communicating with him. Ex. 3 (CS_TC 5535-36) (responding to a Dutch journalist's email sent to his C&S account and stating "we really need press and Drummond has been getting away with murder . . . Please use my other email – tc@iradvocates.org").

[4] Defendants told this Court that this was a "nontestifying expert witness" in the *Dole* case. Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 15:4-5. That, too, was apparently false. On May 5, 2015, a California state court ordered Mr. Collingsworth to disclose this payment recipient's identity. Ex. 4 (May 5, 2015 Order). That court-ordered disclosure allowed Dole to discover that "**this purported consulting expert is a former employee of a former Dole subsidiary, and not a 'consulting expert,' but if anything, a fact witness.**" Ex. 5 (*Dole* Joint Status Statement) at 15 (emphasis added).

2

regarding the defamatory letter to Itochu (Doc. 62-13), coordinate litigation funding efforts for *Balcero* (Doc. 62-9), authorize witness payments (Doc. 174-5), communicate directly with witnesses (Doc. 101-16), and discuss El Tigre's Fiscalia testimony in which he disclaimed any knowledge of Drummond's complicity with the AUC.  Ex. 6 (CS 820-830).

Based on presently available evidence, it appears that Mr. Collingsworth used his Gmail account for his most "sensitive" communications.  For example, Mr. Collingsworth utilized his Gmail account to confirm with Albert van Bilderbeek a $35,000 payment to Jamie Blanco.  Doc. 174-20 at CS_TC 2827-2828.   Mr. Collingsworth also used his Gmail account to set up telephone and Skype sessions with Albert van Bilderbeek.  *See* Ex. 7 (CS 1041; 1105).

***The Evidence Lost***

This case was filed in October 2011.  *See* Compl. (Doc. 1).  Since that time, Mr. Collingsworth has destroyed or otherwise disposed of virtually every electronic device he had in his possession, including:

| Device | Time Period Used | Status |
|---|---|---|
| Dell Latitude laptop | Used as Conrad & Scherer work computer from May 2008 – March 2010, and thereafter used at Mr. Collingsworth's home. | Taken to an e-cycle recycling center (Ft. Totten Station[5]) in Washington, D.C., during the pendency of this case, where it was destroyed. Ex. 9 (Williams Dep.) at 125-129 ("***These devices, you know, were disposed of and would have been during the course of this litigation***."); *id.* at 154:9-13 (emphasis added). |
| HP Compaq Desktop | Used as a Conrad & Scherer work computer from March 2010 – May 2010, and thereafter used at Mr. Collingsworth's | Taken to an e-cycle recycling center (Ft. Totten Station) in Washington, D.C., during the pendency of this case, where it was destroyed. Ex. 9 (Williams Dep.) at 125-129; 154:9-13. |

---

[5] Ft. Totten Transfer Station "makes it easy for residents to dispose properly of solid waste, household hazardous waste, ***unwanted electronic equipment*** and provides personal document shredding."  Ex. 8 (Ft. Totten Station screenshot) (emphasis added).

3

| Device | Time Period Used | Status |
|---|---|---|
| | | home. |
| MacBook Laptop | February 2011 – June 2013 | This computer was "given away" *after* Mr. Collingsworth had been served with Drummond's first two sets of document requests in this case. According to Defendants' computer expert, Dennis Williams, Mr. Collingsworth told him that he gave this laptop to his niece in Brazil, where it was subsequently "stolen." Ex. 9 (Williams Dep.) at 155. Prior to disposing of this computer, Mr. Collingsworth specifically instructed Conrad & Scherer IT personnel ***not*** to transfer any emails or other data off of it. Ex. 10 (CS_TC 7546). |
| Seagate 500 GB external hard drive | January 2011 – at least December 8, 2014 | This external hard drive, which was purchased in January 2011 with the express purpose of storing "Terry's files," Ex. 11 (CS_TC 11045), was used from 2011 through 2014, and was ***plugged into Mr. Collingsworth's desktop computer in Conrad & Scherer's Washington, D.C. office as recently as December 8, 2014***. Ex. 9 (Williams Dep.) at 171. It was specifically formatted for use with the MacBook, as well as with a PC. That external hard drive is ***now mysteriously missing***. |
| ACER notebook computer | 2008 – 2011 | Mr. Williams testified that this computer was still in existence, but was ***reformatted within the last year, resulting in the deletion of all data and emails on the computer***. Ex. 9 (Williams Dep.) at 10:2-22. |
| Apple iPad[6] | 2010 – August 2013 | According to Mr. Williams, Mr. Collingsworth's iPad was "***disposed of at a computer recycling center***" in August 2013. Ex. 13 (Williams Report) ¶ 37 (emphasis added); Ex. 14 (CS_TC 11183-86). |
| Unknown number | 2008 - ? | Mr. Collingsworth often worked from his "home office," sent emails from his "home |

---

[6] There is documentary proof that Mr. Collingsworth used his iPad to send emails relevant to this case, including emails to Albert van Bilderbeek. Ex. 12 (CS 1036-1040).

{B2016092}

| Device | Time Period Used | Status |
|---|---|---|
| of computers utilized at Mr. Collingsworth's home for work purposes | | computers," and archived thousands of emails onto computers at his home. Ex. 9 (Williams Dep.) at 122:24-123:7; 140:5-24. Mr. Williams did not examine those computers, and it is his understanding these computers no longer exist:<br><br>A. And there were two other desktops there [at Mr. Collingsworth's home].<br>Q. What -- what are those?<br>A. I don't know.<br>Q. So we don't know whether those contained any of the emails we're looking for today or whether they're still in existence somewhere?<br>A. **We do not have access to those devices**.<br>Q. And do not know if they still exist, do we?<br>A. **My understanding is, they not -- they do not exist.**<br><br>*Id.* at 136:19-137:4 (emphasis added); *see also id.* at 137:21-138:6.<br><br>Q. And it says there toward the end of that repair remark that the technician restored a pst file of over 8.5 gigabytes on that home PC?<br>A. Yes, sir.<br>Q. That's a very large email file, is it not?<br>A. Yes, sir.<br>Q. What PC is that?<br>A. That should be the HP Compaq desktop.<br>Q. Okay. Let's go down to "Equipment Information" by "Serial number." It says the word "dell."<br>A. Okay.<br>Q. Do you know whether that was the HP Compaq, whether that was the Dell laptop or whether that was just some other Dell computer?<br>A. I'm not certain.<br>Q. Okay. What we do know is, whatever that computer was, it had 8.5 gigs of emails on it of Mr. Collingsworth?<br>MR. KUSIN: Objection. Form.<br>A. It says they restored a pst file over 8.5 |

5

| Device | Time Period Used | Status |
|---|---|---|
| | | gigabytes.<br>Q. (BY MR. WELLS) And that was in November of 2011?<br>A. Yes, sir.<br>*Q. What we also know is, whatever that computer is, you haven't analyzed it?*<br>*A. That's correct.*<br>*Q. So as far as you know, it does not exist anymore?*<br>*A. That's correct*.<br><br>*Id.* at 140:8-141:14 (emphasis added). |

What is more, shortly after Drummond began serving discovery requests in this case, the emails which were generated and/or stored using these various devices disappeared. On February 28, 2013, Drummond served its First Request for Production of Documents, and one of those requests sought all of Mr. Collingsworth's communications with Llanos Oil or its principals, Hendrik and Albert van Bilderbeek. Doc. 43-6 at Req. No. 43. Production of those communications would reveal the fact that Mr. Collingsworth assisted Albert van Bilderbeek in funneling approximately $100,000 to Jaime Blanco, a fact Mr. Collingsworth had previously lied about during the course of *Balcero*. Doc. 174 at 18-20. On April 3, 2013, Drummond served its second set of requests for production, one of which requested all of Mr. Collingsworth's emails with Ivan Otero. Doc. 43-12 at Req. No. 8. Of course, it is now represented by Defendants that Otero served as the conduit for not only the payments to Blanco, but also monthly payments to El Tigre and Samario, facts which Mr. Collingsworth also concealed and lied about in *Balcero*. Doc. 174 at 5-20.

But before a single email was produced by Defendants in this case, Mr. Collingsworth's emails prior to March 23, 2013, vanished. As testified to by Defendants' expert, at the time he

{B2016092}

became involved and looked at Mr. Collingsworth's email accounts, there was *nothing* in Mr. Collingsworth's Conrad & Scherer Inbox, or in the Inbox or Sent Items of his IRAdvocates email account, prior to March 23, 2013. Ex. 9 (Williams Dep.) at 65:13-66:23. Defendants' expert was able to fill in some of the gaps, but is still unable to retrieve emails for large and very critical time periods:

- All incoming and outgoing emails from Mr. Collingsworth's IRAdvocates email account are missing between June 2, 2008 and early- to mid-2010. Ex. 25; Ex. 9 (Williams Dep.) at 54:19-64:17. It is in this time period when the payments to Charris were negotiated and began. It is also in this time period when the deal was struck with Ivan Otero—the criminal lawyer for numerous paramilitary witnesses against Drummond—for him to receive a substantial contingency fee in the cases against Drummond. Doc. 69 at ¶ 51.

- Virtually all incoming and outgoing emails from Mr. Collingsworth's IRAdvocates email account are missing between mid- to late-2011 and March 23, 2013. Ex. 25; Ex. 9 (Williams Dep.) at 54:19-64:17. During this time frame, Mr. Collingsworth was facilitating large lump sum payments to Jaime Blanco. It is also when Collingsworth was emailing regarding setting up monthly payments to El Tigre and Samario "until the deps are in the can." In fact, the May 22, 2011 "deps in the can" email is only in Defendants' possession by virtue of the fact Bill Scherer was copied on it. There is no such email available from Mr. Collingsworth's email accounts. Doc. 174-6.

- Incredibly, Defendants' expert did not even bother to analyze Mr. Collingsworth's Gmail account, and therefore he has no idea whether emails have also been deleted from it. Ex. 9 (Williams Dep.) at 72:3-21. He did confirm that no litigation hold whatsoever has been placed on that account. *Id.* at 92-93.

In other words, all emails between Mr. Collingsworth and Francisco Ramirez, or other Colombian "team" members involved in the payments to Charris, are irretrievably lost during the time Mr. Collingsworth's team began communicating with Charris and began making payments to him. All emails between Mr. Collingsworth and Ivan Otero during the time his contingency fee interest and initial $80,000 payment were being negotiated are gone. Likewise, all emails between Collingsworth and Albert van Bilderbeek of Llanos Oil around the time Jaime Blanco was signing his declaration, which we now know was made contingent on substantial payments

{B2016092}

by Mr. van Bilderbeek, are irrecoverable. The same is true of emails between Messrs. Collingsworth and van Bilderbeek during the time Mr. Collingsworth was drafting and sending the defamatory letter to Itochu Corp. which precipitated this lawsuit.

Defendants are also no longer in possession of litigation team member Lorraine Leete's[7] computers or hard drives, having failed to preserve those items before Ms. Leete left in September 2014, in direct violation of this Court's Order "to maintain and preserve in their present form all computer servers, hard drives, email accounts, and all other electronic files or data storage systems which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond." Doc. 119 (Apr. 21, 2014 Order) at 1.[8]

## LEGAL ARGUMENT

This Court's authority to sanction Defendants for spoliation arises both from Federal Rule of Civil Procedure 37 and from its "inherent power to manage its own affairs and to achieve the orderly and expeditious disposition of cases." *Flury v. Daimler-Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). A default judgment is a permissible sanction under either source of authority. Fed. R. Civ. P. 37(c)(2)(A)(iv); *Flury*, 427 F.3d at 944.

Spoliation is the "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Graff v. Baja Marine Corp.*, 310 Fed. App'x 298, 301 (11th Cir. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). That is precisely what

---

[7] Ms. Leete paid witnesses, Doc. 231-8 at CS_TC 3650, appears on correspondence relating to payments to witnesses, *id.* at CS_TC 5475, drafted witness declarations, *id.* at CS 10222, and had substantial direct communications with Ivan Otero. *See, e.g.,* Doc. 101-16.

[8] Additionally, the emails and files of other members of Mr. Collingsworth's litigation team, including Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca Pendleton and Ivan Otero have not been preserved or searched, in direct violation of this Court's express orders. Doc. 105; Doc. 111; Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 19:10-18; Doc. 119; Doc. 101-4 at ¶ 10 (Daniel Kovalik, Francisco Ramirez Cuellar, Rebecca L. Pendleton, and Lorraine M. Leete are "part of my current or former legal teams"); Doc. 69 at ¶ 51 (Ivan Otero is "a key member of our Colombian team" and "a member of our legal team").

happened here: key evidence mysteriously disappeared while in Defendants' sole custody or was never preserved in the first place.  Given these undisputed facts, only two questions remain for the Court:  (1) whether Defendants' conduct with respect to this spoliation is sufficient to impose sanctions, and if so, (2) what sanction should be imposed.  In light of the repeated and serious pattern of spoliation by Defendants, as well as the irreversible prejudice to Drummond, the entry of a default judgment against Defendants is the only appropriate sanction.

## I.  Default is Warranted Under this Court's Inherent Authority Because Defendants Failed to Preserve, and Actively Disposed of, Critical Electronic Evidence

Defendants' destruction of—and utter failure to preserve—evidence violated their well-settled duty to preserve evidence when litigation is "reasonably anticipated."  Defendants instituted no litigation hold, and as a result at least *six* of Mr. Collingsworth's hard drives were destroyed, deleted, or otherwise disposed of during this litigation.  An untold number of his emails during the most critical time periods relevant to this case are also irretrievably lost.

### A.  It is Undisputed that Defendants Violated Their Duty to Preserve Electronic Evidence Related to this Litigation

"A party has an obligation to retain relevant documents, including emails, where litigation is reasonably anticipated." *Managed Care Solutions, Inc. v. Essent Healthcare, Inc.*, 736 F. Supp. 2d 1317, 1324 (S.D. Fla. 2010).  Drummond filed the present lawsuit in October 2011.  There is no question that a duty to preserve electronic evidence related to the allegations in this case arose at least by October 2011.

Defendants, as a sophisticated lawyer and law firm, should have imposed a litigation hold and ensured that it was enforced. *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1281 (M.D. Fla. 2009) ("'It is not sufficient to notify employees of a litigation hold and expect that the [employee] will then retain and produce all relevant information. Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and

9

searched [and in this case, preserved.]'") (quoting *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004)). Defendants have never produced a litigation hold letter in this litigation. Their expert has certainly never seen one. Ex. 9 (Williams Dep.) at 88:20 – 89:5. If one was issued, then it was plainly ignored. Many pieces of critical electronic evidence have now "disappeared" or were never preserved in a way that can be presently searched.

### B. Considering the Applicable Factors, Severe Sanctions for Spoliation are Warranted.

Federal law governs the imposition of sanctions for spoliation of evidence in a diversity suit because spoliation sanctions are an evidentiary matter. *Flury*, 427 F.3d at 944. "[A] party moving for sanctions must establish, among other things, that the destroyed evidence was relevant to a claim or defense such that the destruction of that evidence resulted in prejudice." *Eli Lilly & Co. v. Air Exp. Intern. USA, Inc.*, 615 F.3d 1305, 1318 (11th Cir. 2010) (citing *Flury*, 427 F.3d at 943). In addition to showing relevance and prejudice, the Eleventh Circuit requires a showing of bad faith to support sanctions for spoliation: "'While this circuit does not require a showing of malice in order to find bad faith, mere negligence in losing or destroying records is not sufficient to draw an adverse inference.'" *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1310 (11th Cir. 2009).

"The Eleventh Circuit also has explained . . . that in evaluating the need for sanctions, federal courts look to factors enumerated in state law, because federal law does not set forth specific guidelines regarding sanctions for spoliation." *Ray v. Ford Motor Co.*, 792 F. Supp. 2d 1274, 1279 (M.D. Ala. 2011) (citing *Flury*, 427 F.3d at 944). Accordingly, when deciding whether to impose spoliation sanctions, Alabama federal courts often look to and apply the factors delineated by the Alabama Supreme Court:

(1) the importance of the evidence destroyed; (2) the culpability of the offending

10

party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal.'

*Danny Lynn Elec. v. Veolia Es Solid Waste*, No. 2:09CV192-MHT, 2012 WL 786843, at *2 (M.D. Ala. Mar. 9, 2012) *aff'd sub nom. Danny Lynn Elec. & Plumbing, LLC v. Veolia Es Solid Waste Se., Inc.*, No. 2:09CV192-MHT, 2012 WL 1571314 (M.D. Ala. May 4, 2012) (quoting *Story v. RAJ Properties, Inc.,* 909 So. 2d 797, 802-03 (Ala. 2005)).

### 1.      Relevance and Importance of Evidence.

In order to warrant spoliation sanctions, it is not necessary to demonstrate that the evidence lost would have been damaging to the spoliator's case. *See Evans v. Mobile County Health Dept.*, No. CA 10-0600-WS-C, 2012 WL 206141, at *12 (S.D. Ala. Jan. 24, 2012) ("'To require a party to show, before obtaining sanctions, that *unproduced* evidence contains damaging information would simply turn 'spoliation law' on its head.'") (quoting *Brown v. Chertof*, 563 F. Supp. 2d 1372, 1379 (S.D. Ga. 2008)).  The evidence that is either missing or destroyed is highly relevant to Drummond's claims. *Eli Lilly*, 615 F.3d at 1318.  As the Court is aware, the most critical evidence discovered to date in this case has come in the form of emails, and has revealed numerous misrepresentations by the Defendants both to Drummond and this Court.  And as explained above, the gaps in Mr. Collingsworth's emails are during critically relevant time periods in this case.

This defamation case arose when Defendants wrote a series of letters to Drummond's customers and business partners stating as "objective facts" that Drummond conspired with a terrorist organization and is guilty of mass murder and major human rights crimes.  Defendants premise their defense on the contention that Mr. Collingsworth had a subjective belief in the truth of those statements because he reasonably relied on the testimony of several Colombian paramilitary witnesses.  Given this defense, evidence of substantial payments to these witnesses

11

is clearly relevant to his reasonable belief in the truthfulness of the paramilitary testimony.  It is also plainly relevant to the credibility of these witnesses, should their testimony be offered to the jury.

One of those witnesses is Jairo de Jesus Charris.  It is now known that Defendants have been paying Charris a monthly salary since at least July 2009.  Defendants and their "team" had been meeting with Charris for some time prior to that—and prior to Charris ever providing testimony claiming Drummond's involvement with paramilitaries.  Mr. Collingsworth's emails are missing during this critical time period (all of 2009), and therefore his discussions with Charris, Francisco Ramirez (whose office makes the payments), and others involved in setting up these payments are not available.

Additionally, Drummond has already outlined for the Court the fact that paramilitaries El Tigre and Samario never claimed to have knowledge regarding Drummond until their criminal lawyer, Ivan Otero, was promised a contingency fee in the Drummond cases around December of 2008.  Mr. Collingsworth's emails during this time period are also missing, depriving Drummond and this Court of the ability to discover the contemporaneous communications which might shed light on the true purpose of this unheard-of contingency fee arrangement with a witness's criminal lawyer.

Moreover, the gaps in Mr. Collingsworth's email accounts coincide with declarations relied upon[9] and the payments made to El Tigre, Samario, and Jaime Blanco.  For example, one email that was lost from Mr. Collingsworth's accounts *was* able to be discovered through third party discovery and reflects Mr. Collingsworth's intent to make monthly payments to El Tigre and Samario "until the deps are in the can," Doc. 174-6, and this Court has already noted the

---

[9] Other evidence lost could include emails to or from Mr. Collingsworth which reflect that other witnesses were saying that Drummond had no involvement with paramilitaries.

importance of an email such as this in rebutting Defendants' proffered explanation that their witness payments were for "security." Ex. 15 (May 21, 2015 Hrg. Tr. Excerpt) at 27:9-13 ("THE COURT: . . . I have seen an email where Mr. Collingsworth tells others we need to keep up these monthly payments until the deps are in the can. That doesn't sound like security. That sounds like ensuring a certain version of testimony.").

Without doubt, there is relevant evidence in the years' worth of gaps in Mr. Collingsworth's emails, and Drummond is severely prejudiced by the loss of that evidence. *See Evans*, 2010 WL 206141, at *11 (imposing sanctions for plaintiff's burning of her computer that contained emails and her "diary/narrative" of events at issue in the case and explaining that "[t]here can be little doubt that evidence on plaintiff's destroyed computer was important because it would have filled in the months-long gaps in her narrative/diary.").

### 2. Prejudice to Drummond.

Drummond has been irreparably prejudiced by Defendants' spoliation of evidence. Searches on Collingsworth's and Leete's emails could provide evidence of their contemporaneous intent in making the witness payments (as well as reveal other witness payments). This type of evidence is "critically important to this case." *Flury*, 427 F.3d at 946 (finding prejudice where defendant disposed of car that allegedly had manufacturing defect because "spoliation of the vehicle forced experts to use much less reliable means of examining the product's condition."). Defendants' own expert emphasizes the importance of such evidence: "During my years as an investigator, I have learned that contemporaneous information such as emails that are occurring at the time, reflecting what is happening at the time can be more reliable than information provided years later." Ex. 9 (Williams Dep.) at 153:18-22. Here, without contemporaneous emails, only the testimony of Mr. Collingsworth is available to prove

13

the reason for the payments. Given his record of misrepresentations to Drummond and Court in this matter—not to mention his interest in the outcome—requiring Drummond to rely solely on Mr. Collingsworth's testimony for any fact in this case is extremely prejudicial. Indeed, were it not for the discovery of emails from sources other than Defendants, Drummond and this Court would still be left to believe that they had found "the shortest way to the truth" by directly asking Mr. Collingsworth what witnesses were paid and receiving the answer that it was "exactly three." Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 30:1-31:19.

Because the spoliated evidence is now irretrievable, Drummond has been denied the ability to search that critical electronic data for documents to test and challenge Defendants' claim that the witness payments were not in exchange for testimony. This has become a key issue in the litigation; spoliation of evidence related to this issue has caused substantial prejudice to Drummond. *See Graff v. Baja Marine Corp.*, 310 F. App'x at 302 (explaining that defendants "suffered severe prejudice due to plaintiff's [spoliation] conduct because the [destroyed evidence] was *the* critical piece of evidence in this case" and because defendants were denied the opportunity to test the evidence); *Computer Assocs. Int'l v. Am. Fundware, Inc.*, 133 F.R.D. 166, 170 (D. Colo. 1990) (ordering default judgment and explaining that "[d]estroying the best evidence relating to the core issue in the case inflicts the ultimate prejudice upon the opposing party").

### 3. Culpability of Defendants – Bad Faith.

Defendants' active disposal of evidence and their complete failure to preserve other evidence bears all the hallmarks of bad faith conduct. *Eli Lilly*, 615 F.3d at 1318. To show bad faith, Drummond need not have "evidence of intentional destruction of evidence" because "proof of malicious destruction of evidence would rarely be available where one party has full control

14

of the evidence." *Britton v. Wal-Mart Stores East, L.P.*, No. 4:11-cv-32, 2011 WL 3236189, * 13 (N.D. Fla. June 8, 2011). There is no dispute that all of the evidence at issue in this motion was in the "full control" of Defendants.

As an initial matter, Defendants did not preserve evidence for this litigation. Defendants' expert admitted that, if a proper litigation hold had been put in place, then Defendants "should have" Mr. Collingsworth's missing emails that predate May 2010 and "should have" his missing emails between January 2011 and March 2013. Ex. 9 (Williams Dep.) at 171:17-24; 96:3-9.

This complete failure to make any effort to preserve evidence cannot be condoned. Collingsworth is a lawyer. Conrad & Scherer is a law firm touted to have "the resources, experience, and legal insight to handle the most complex factual and legal issues at any stage of the dispute." Ex. 16 (Conrad & Scherer webpage screenshot). These are sophisticated parties who are well aware of their legal obligations to preserve evidence and the steps needed to do so. A "party deemed to have knowledge as to the importance of evidence for litigation will be held to a higher standard with regards to spoliation." *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d 1269, 1275 (M.D. Ala. 1999). This is not a case where "simple negligence" or a "misunderstanding" led to the spoliation of evidence. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544 (11th Cir. 1993). Defendants knew precisely what they were doing—and what they were failing to do.

Furthermore, Defendants lack any "credible explanation" for their conduct. *Malautea*, 987 F.2d at 1544. Defendants' expert offers speculative hypotheses as to why the email gaps exist, none of which are objectively verifiable. First, with respect to gaps in Mr. Collingsworth's emails that predate February 2010, he blames an IT company routinely used by Conrad & Scherer for allegedly failing to properly transfer data from one computer (a Dell Latitude

Laptop) to another (an HP Desktop). Second, with respect to the gaps that postdate January 2011, Mr. Williams postulates that, unbeknownst to everyone at Conrad & Scherer, including Mr. Collingsworth, all of Mr. Collingsworth's emails were being saved directly onto his MacBook notebook (as opposed to or in addition to the Conrad & Scherer email server), and those emails were therefore lost when Mr. Collingsworth gave the MacBook to his niece in June 2013 and it was later "stolen" in Brazil.

Without even beginning to test the credibility of these explanations, the simple fact remains: the gaps would not exist had Defendants not destroyed or otherwise disposed of these computers during the course of this litigation. If the Dell Latitude Laptop still existed, it would not matter if Conrad & Scherer's contracted IT company had failed to properly transfer emails stored on it. The emails could still be retrieved from the computer. If the MacBook had not been disposed of *two years* into this litigation and *after* the first two sets of discovery requests had been served on Mr. Collingsworth, there would be no missing emails during the critical 2011 to 2013 time period.

Moreover, Defendants have not produced a single shred of objective evidence to support their bizarre story about the disposal of the MacBook. Collingsworth supposedly gave his niece his MacBook computer in 2013 to take to Brazil, where it was subsequently "stolen." Prior to "giving away" the MacBook, Collingsworth had already received two requests for production of his emails in this case, but for some reason specifically instructed Conrad & Scherer IT personnel **NOT** to transfer any emails or other data from the MacBook to his new computer. Ex. 10 (CS_TC 7546). Also, at the time of this "gift," no one had done anything to secure, delete, or otherwise remove any data from the MacBook, which was Mr. Collingsworth's primary work computer for more than two years and contained all of his privileged and confidential work

16

emails. Ex. 9 (Williams Dep.) at 231:11-24. There is no independent evidence of this supposed "gift" or the later (and rather convenient) "theft" of the laptop, such as a police report, insurance claim, or even emails discussing the "fact" this computer was stolen. Defendants' expert testified that he did not "follow[] up on the theft of the Mac," and that he did not know (or even ask for) the name of the niece to whom Collingsworth supposedly gave the MacBook. *Id.* at 157:15-158:12. Rather, the expert "relied on Mr. Collingsworth to tell [him] the truth." *Id.* at 158:10-12.

Defendants' uncorroborated story would have this Court believe that Defendants first committed a serious ethical breach by simply handing over this work computer—containing his privileged emails with clients and colleagues as well as work-product-protected documents—to a relative overseas. Defendants then ask this Court to believe Collingsworth's statements that this computer was coincidentally stolen. Defendants further ask this Court to believe that after this supposed "theft" of a law firm computer, there were no emails whatsoever regarding the theft or the potential disclosure of confidential client data or other privileged material.

Also according to Defendants' story, Mr. Collingsworth was no longer in possession of *years* of his emails predating March 23, 2013 the instant he gave his MacBook to his niece in June 2013. Significantly, Defendants have not produced a single email postdating June 2013 in which Collingsworth tells another Conrad & Scherer employee that he cannot locate his emails older than March 23, 2013. Defendants were clearly aware of the importance of such emails, as their expert explicitly asked for them. Ex. 17 (CS_TC 11361). It is absolutely unbelievable that there was not a firestorm regarding the loss of all of Mr. Collingsworth's emails relating to years of major litigation. Mr. Collingsworth describes his cases against Drummond as "particularly complicated" and "complex," Ex. B to Defs' Opp. FoF (July 15, 2015 Collingsworth Decl.) ¶¶

17

12 and 13, and states that he currently has "major cases" against nine other multinational corporations. *Id.* at ¶ 11. Documentary evidence produced by the Defendants reflects that Mr. Collingsworth accumulated "over 15,000 emails" just in his Inbox (i.e., not including his Sent emails) over a seven month period. Ex. 18 (CS_TC 7538). That amounts to over 25,000 emails per year. *Id.* For Defendants to contend that they simply lost several years worth of Mr. Collingsworth's case-related emails without realizing it, and then subsequently did nothing to attempt to recover them, is not credible. Instead, it is evidence of bad faith.

Even if Defendants' story is true, they offer "no viable reason for taking such action [to spoliate evidence] as opposed to simply retaining it pending the conclusion of this case or transferring the information on the computer to a new computer." *Evans*, 2010 WL 206141, *12 (finding bad faith where plaintiff burned her computer that contained important emails and other documents relevant to case); *Rosenthal Collins Group LLC v. Trading Technologies Int'l*, No. 05-C-4088, 2011 WL 722467 (N.D. Ill. Feb. 23, 2011) (noting that it is "impossible to believe that it is merely coincidence" that electronic data had been deleted after party was under obligation to preserve). This case was almost two years old and Mr. Collingsworth had already been served with two sets of document requests at the time he "gave away" his primary work computer and specifically instructed that no data whatsoever should be transferred off of it. It cannot credibly be argued this was done in good faith observance of his preservation obligations.

The loss of this computer might not be so critical had a back-up of the emails stored on it been available. It is undisputed that when the MacBook was purchased in January 2011, Conrad & Scherer purchased a 500 GB external hard drive manufactured by Seagate with serial number "na02nq70" (the "External Hard Drive') for the purpose of "backing up [Mr. Collingsworth's] files, including his emails." Ex. 9 (Williams Dep.) at 171:2-10, 187:13-20. This External Hard

Drive was configured for use with both a PC and a Mac, so it could therefore be used to back up emails from the MacBook. *Id.* at 191:22-192:17. There is documentary proof that this External Hard Drive was used to archive emails from Mr. Collingsworth's computers. *Id.* at 192:9-17; Ex. 19 (CS_TC 7547-7548).

Moreover, during his use of the MacBook, Mr. Collingsworth wanted all of his "sensitive" emails to be backed up to an external hard drive. Ex. 20 (CS_TC 7540-41). Conrad & Scherer employee Maggie Crosby stated that an external hard drive was used to periodically archive Mr. Collingsworth's emails. Ex. 21 (CS_TC 12161-62). The External Hard Drive was in existence and in use up to **December 8, 2014**, when it was last plugged in to Mr. Collingsworth's desktop computer. Ex. 9 (Williams Dep.) at 171:18-22; Ex. 22 (CS_TC 10092-10095). In other words, it was in existence long after this Court specifically ordered in April 2014 that all hard drives or other electronic storage devices be preserved in their present form. **That External Hard Drive is now missing**, and there has been no factual explanation for its disappearance.[10] Defendants' expert admitted that the explanation provided in his report (that it was lost during an office move) was not based on anything anyone at Conrad & Scherer actually told him, but was simply his "own surmise." Ex. 9 (Williams Dep.) at 241: 14-17.

The Court should not credit Defendants' uncorroborated explanations of the missing computers or the External Hard Drive. A recent case in this Circuit is instructive. In *United States ex rel. King v. DSE. Inc.*, 2013 WL 610531 (M.D. Fla. Jan. 17, 2013), the plaintiff-relator stored recorded video diaries of relevant events on an external hard drive. He claimed that the hard drive had been stolen but "did not produce any police reports documenting" the supposed

---

[10] At least three other external data storage devices were also plugged into Mr. Collingsworth's desktop computer on December 8, 2014. Although asked directly, Defendants' expert could not answer whether these devices were also missing, or whether he had examined them as part of his engagement. Ex. 9 (Williams Dep.) at 209:15-210:15.

robbery. *Id.* at *8. He also "failed to take any precautions to preserve the video diaries." *Id.* The court concluded that the plaintiff's "explanation for the alleged loss of video diaries is unworthy of belief and is an attempt to mislead this Court and opposing counsel about this evidence." *Id.* Because of this and other discovery abuses, the court imposed terminating sanctions and dismissed the plaintiff's claims. Like the plaintiff in *King*, Defendants' explanations that the MacBook was stolen from his niece, and that numerous other computers were taken to the local dump, are simply "unworthy of belief," and the Court should reject them.

Bad faith can also be inferred where the spoliator possessed the "motive and opportunity to try to tamper with" the evidence. *Bashir v. Amtrak*, 119 F.3d 929, 932 (11th Cir. 1997). The discovery of emails about previously-undisclosed paramilitary interviews and witness payments would be very harmful to Defendants, not only in this case but in their numerous other cases premised on the testimony of Colombian paramilitaries. In addition, all of the evidence at issue was within Defendants' sole control. They had both the motive and opportunity to destroy it or let it be "disposed of" without making the required effort to preserve it.

Defendants' bad faith is also reflected by their deliberate concealment of the spoliation. Defendants' repeated misrepresentations regarding the scope, nature and extent of their witness payments are well documented. Docs 174, 190 & 243. What Drummond did not know until March 12, 2015, is that the Defendants also repeatedly lied regarding what documents they actually had in their possession. Indeed, if Defendants' story is to be believed, and Defendants "disposed of" Mr. Collingsworth's emails predating March 23, 2013, then that means Defendants made numerous misrepresentations to Drummond, this Court, and other federal courts regarding what documents they had in their possession. As set out below, Defendants repeatedly represented that they had searched all of their files, including Mr. Collingsworth's emails, while

20

simultaneously and falsely representing that no emails or documents had been deleted, and that

they had in their possession all of the documents Drummond had subpoenaed from third parties:

| Date | Representation |
|---|---|
| August 16, 2013 | Conrad & Scherer, LLP represents to the United States District Court for the District of Columbia that "in his capacity as Defendant in the libel action and as counsel in the *Balcero* litigation, Mr. Collingsworth has searched the files of IRAdvocates and has never taken the position that he would not search IRAdvocates' files." Doc. 1 in *Drummond Co., Inc. v. Collingsworth, et al.*, 2:14-mc-00621-RDP at n.1. |
| | Also on August 16, Christian Levesque, a Conrad & Scherer lawyer and counsel of record in *Balcero*, signs a sworn declaration testifying that "Mr. Collingsworth and his staff had searched all of IRAdvocates' files for responsive, nonprivileged documents in both this libel action and the *Balcero* litigation." Ex. 23 (Aug. 16, 2013 Levesque Decl.) ¶ 2. |
| | If these representations are true, and Defendants searched their files, then Defendants knew as of August 16, 2013, that all of Mr. Collingsworth's IRAdvocates emails prior to March 23, 2013 were gone. |
| August 16, 2013 | Defendants move to quash Drummond's subpoena to Parker Waichman, LLP, submitting Mr. Collingsworth's testimony that "[a]ny document that Parker Waichman has or had in its custody, possession or control was provided to them by me or my staff or I have the identical documents in my custody, possession or control." Doc. 101-3 (Aug. 16, 2013 Collingsworth Decl.) ¶ 4. Mr. Collingsworth made the identical misrepresentation in a sworn affidavit in support of IRAdvocates' effort to quash Drummond's subpoena. Doc. 101-5 (Aug. 16, 2013 Collingsworth Decl.) ¶ 4. |
| | This testimony was knowingly false. Mr. Collingsworth was clearly aware that he did not have "the identical documents in [his] custody, possession or control," as he had already "disposed of" his emails. |
| September 23, 2013 | Conrad & Scherer represents in a letter to Drummond that Mr. Collingsworth's IRAdvocates' email has been searched in response to prior requests, stating "in previous productions Drummond has received emails to or from Lorraine Leete and Terry Collingsworth…you received emails from Terry Collingsworth, which included those with an 'iradvocates.org' email suffix." Doc. 118-7 (Sept. 23, 2013 C. Levesque Ltr.). If this is true, it is impossible for Defendants not to have discovered that Mr. Collingsworth had precisely *zero* emails in his IRAdvocates account prior to March 23, 2013. |
| March 18, 2014 | Defendants send a letter representing that "[t]he following email accounts and computers have been searched: |
| | Terrence Collingsworth- searched tc@iradvocates.org; |

21

| | |
|---|---|
| | terrypc@gmail.com; and his work desktop and laptop." |
| | Doc. 101-6 (Mar. 18, 2014 B. Smith Ltr.).  There is no disclosure of the fact that years of Mr. Collingsworth's emails are missing, which Defendants had to know if they performed even the most cursory search of Mr. Collingsworth's emails.  Nor is there any disclosure that a number of computers he utilized during the most important time periods in this case no longer exist. |
| April 2, 2014 | Drummond moves for sanctions after Parker Waichman produces emails that Defendants represented did not exist.  In its motion, Drummond requests the following relief:<br><br>Drummond requests that this Court order the Defendants to produce the hard drives from computers utilized by Defendants' litigation team during their pursuit of litigation against Drummond for forensic imaging and analysis by an independent expert. Drummond also requests that this Court order an independent forensic analysis of all file management and email servers utilized by Defendants and their litigation team. [. . .] Finally, Drummond asks that this Court treat this motion as an emergency motion and render an expedited ruling to ensure crucial evidence is preserved and not destroyed.<br><br>Doc. 104 at 1-2. |
| April 14, 2014 | Defendants file an opposition to Drummond's motion for sanctions, adamantly and falsely proclaiming that their document searches were adequate and that no evidence had been destroyed or lost:<br><br>There is absolutely no issue of the propriety of Defendants' searches or the completeness of their production. . . .<br><br>Defendants have now completed their document search and supplemental log in full compliance with the Court's discovery Order. . . .<br><br>There is no evidence of any discovery violation, let alone destruction of any documents, electronic or otherwise….Further, the objective record of Drummond using this libel case to obtain evidence for the human rights cases it could not otherwise obtain, and harassing Defendants in the meantime, itself warrants denial because "allowing [Drummond] to gain access to Defendants' hard drives . . . would permit . . . a fishing expedition." . . . |

{B2016092}

|  | There is no evidence that Defendants 'may have erased or [are] withholding still other responsive documents' as there was in the *Donziger* case, Order, *In re Application of Chevron Corp.*, No. 1:10-mc-00002(LAK) (S.D.N.Y. Jan. 21, 2011) (Kaplan, J.) (ordering production of Defendant's hard drives for imaging by Chevron).<br><br>Doc. 114 at 1, 2, 17, 18. |
|---|---|

In the end, this "is a case of knowing and willful disregard for the clear obligation to preserve evidence that was solely within the possession and control of the Defendants." *Swofford v. Eslinger*, 671 F. Supp. 2d at 1282 (concluding that "bad faith is clear" and imposing sanctions for spoliation, including when the gun at issue in the case was "returned to the manufacturer" rather than preserved). Not only that, Defendants misled both Drummond and this Court about it for over a year.

### 4. Fundamental Fairness.

Fundamental fairness also militates in favor of spoliation sanctions. It cannot be credibly disputed that Mr. Collingsworth's payments to witnesses and arrangements with their criminal lawyers are critical issues in this litigation. As outlined above, Drummond has been deprived of *years* of Mr. Collingsworth's emails during the very times these payments and arrangements were being instituted. *Cf. Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d at 1275 (concluding that spoliation of certain evidence did not violate fundamental fairness because "these items are not critical to the case before the court"). There may very well be emails prior to these payments where these and other witnesses disclaim any knowledge about Drummond, but this Court will never be able to see it. Fairness demands that Defendants not benefit from their spoliation efforts and failure to preserve critical evidence.

### 5. Alternative Sources of Information.

{B2016092}

The final factor for the Court to consider under Alabama law is whether there are alternative sources of the missing and destroyed information. Although *some* of Collingsworth's and Leete's emails were obtained from third parties (over Defendants' repeated objections to this effort), they are far from a reliable or complete set. Plus, documents (such as memoranda, interview notes, or drafts of the defamatory letters) that had been saved on Collingsworth's MacBook, on Leete's computer, or on the "missing" External Hard Drive are not available elsewhere. By failing to preserve—or actively disposing of—that evidence, Defendants have likely succeeded in preventing the parties and the Court from discovering all of the evidence related to witness payments and developing a reliable understanding of the facts of the case. *Graff*, 310 Fed. App'x at 301 (spoliation efforts "'effectively prevented everyone—plaintiffs, defendants, and the Court—from receiving more reliable test results'") (quoting district court).

## C. Default is the Only Appropriate Sanction.

The only appropriate sanction is to enter a default judgment against Defendants. Drummond has already explained to the Court how this case has become impossible to litigate because neither Drummond nor the Court can rely on the primary alleged wrongdoer to testify truthfully, either about the facts or the existence of critical evidence. Doc. 190. That fact alone fundamentally cripples the just functioning of the adversary process. But when compounded with the fact that, due to Defendants' affirmative conduct, years worth of the documentary evidence which could reveal the truth has been irretrievably lost, no sanction less than default will suffice.

As the Eleventh Circuit explained in imposing terminating sanctions, "[w]e cannot imagine a case in which the evidence destroyed would prove more critical. The resulting prejudice to defendant is incurable by any sanction other than dismissal." *Flury*, 427 F.3d at 947.

24

Entry of a default judgment under this Court's inherent authority is more than justified.

## II.     Sanctions are Also Warranted under Rule 37 Because Defendants Repeatedly and Willfully Violated This Court's Orders to Preserve All Electronic Evidence

In April 2014, this Court twice ordered Defendants to preserve all electronic evidence related to their litigation against Drummond. After assuring the Court they would do so, Doc. 108 at ¶ 8, Defendants repeatedly and willfully violated these orders by failing to preserve Lorraine Leete's computers and emails, failing to preserve at least one External Hard Drive used to store Collingsworth's emails and files, and deleting email storage files (PSTs) and individual emails from Collingsworth's computer.

### A.     The Court's Preservation Orders

On April 3, 2014, one day after Drummond filed an Emergency Motion for Sanctions (Doc. 101) requesting that Defendants' hard drives be mirrored to prevent the loss or destruction of evidence, the Court entered an order stating:

> Defendants are DIRECTED to maintain and preserve all hard drives and email accounts, in their present form, which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond under further direction from the Court.

Doc. 105 (Apr. 3, 2014 Text Order).  Following a hearing on April 21, the Court denied Drummond's request for forensic imaging of Defendants' computers, but reiterated its previous preservation order:

> Defendants SHALL continue to maintain and preserve in their present form all computer servers, hard drives, email accounts, and all other electronic files or data storage systems which have been utilized by Defendants' litigation team during their entire pursuit of litigation against Drummond.

Doc. 119 (Apr. 21, 2014 Order), at 1.

There is no ambiguity in these orders. Defendants were ordered to preserve all electronic data, including hard drives and email accounts, used by any member of their litigation team in

{B2016092}

their litigation against Drummond.

### B. Defendants Repeatedly Violated These Orders

Defendants repeatedly violated these orders by failing to preserve electronic data used by members of their litigation team. Specifically, Defendants:

- Failed to preserve the External Hard Drive that contained Collingsworth's "files, including his emails." This hard drive was plugged into Collingsworth's computer as late as December 8, 2014, and is now mysteriously missing.

- Failed to preserve a copy of Collingsworth's Gmail account.

- Failed to preserve Lorraine Leete's laptop computer or her email accounts. Leete used this computer for her work on the Drummond matters. Leete left IRAdvocates in September 2014, taking her computer and email accounts with her. Defendants have twice refused to accept service of a subpoena on her behalf, including one in August 2013 when Leete still worked at IRAdvocates.

- Failed to preserve a copy of Collingsworth's computer as it existed at the time of the Court's preservation order. Documentary evidence shows that on December 8, 2014 (the same day the missing External Hard Drive was last plugged in), multiple PST files, as well as individual emails, were deleted from Collingsworth's computer. Ex. 9 (Williams Dep.) at 212:5-219:1.

- Failed to preserve Mr. Collingsworth's Dropbox account, which the evidence shows he used to "access my files." Ex. 24 (CS_TC 11162).

Had Defendants followed the Court's ruling, Conrad & Scherer would have copied all of all these critical pieces of evidence immediately. Their failure to do so, resulting in the loss of evidence, violates both the letter and the spirit of the Court's orders. This violation is even more severe given the fact that the Court gave Defendants the benefit of the doubt in ordering *them* to preserve their electronic data rather than ordering the independent forensic imaging requested by Drummond.

### C. These Repeated Violations Support the Imposition of a Default Sanction

To warrant the sanction of default under Rule 37, Drummond must show that these violations were committed willfully or in bad faith. *Malautea*, 987 F.2d at 1542. A violation

{B2016092}

caused by "simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default judgment or dismissal." *Id*. For the following reasons, Defendants' violations were committed willfully and in bad faith.

*First*, the Court's orders were clear—mandating preservation of all electronic evidence, including hard drives and email accounts, for any member of Defendants' litigation team. At no time did Defendants request a clarification of the Court's order or indicate that they were unable to comply with it. They also did not inform the Court during the hearing on the Emergency Motion for Sanctions that many years of Collingsworth's email were already missing, but rather falsely represented that there had been no loss of evidence whatsoever.

*Second*, Defendants' failure to preserve demonstrates a pattern of repeated violations. Defendants did not fail to preserve one email account or even one computer, but rather *several* electronic devices, *several* email accounts, and at least one remote data storage account used by Collingsworth (Dropbox). *Allstate Ins. Co. v. Palterovich*, No. 04-21402, 2008 WL 274119 (S.D. Fla. July 12, 2008) (awarding default judgment based on defendant's "pattern of willful and bad faith disobedience of Court Orders as well as his discovery obligations.").

*Third*, no "credible explanation" exists for Defendants' failure to preserve these devices and email accounts. *Malautea*, 987 F.2d at 1544 (awarding default where "[n]either defendant has provided a credible explanation of how it interpreted the discovery order not to encompass the [discoverable] information."). For example, with respect to the missing External Hard Drive, even Defendants' expert had no explanation for its disappearance. Ex. 9 (Williams Dep.) at 241: 14-17 (testifying that the conclusion in his report that the hard drive went missing in an office move was his "own surmise, not something somebody specifically told [him]").

*Fourth*, there is no reason why Defendants were unable to comply with the Court's order.

27

*Malautea*, 987 F.2d at 1542 (identifying an "inability to comply" as a reason to excuse non-compliance with court order). Defendants hold themselves out as a "highly reputable law firm" which "has the resources, experience, and legal insight to handle the most complex factual and legal issues at any stage of the dispute." Doc. 187 at 4; Ex. 16. They clearly do not lack the financial wherewithal to preserve this evidence, as they have retained at least four law firms to represent them in this litigation and 13 lawyers have entered an appearance on their behalf. There is simply no reason why Defendants could not have complied with these orders, especially given the gravity of the circumstances which led the Court to enter them.

**Fifth**, this electronic data was not "lost as a result of the routine, good-faith operation of an electronic information system." Fed. R. Civ. P. 37(e). The External Hard Drive, for example, was not destroyed as a result of an internal Conrad & Scherer device destruction policy. Certainly, Defendants' failure to preserve the electronic data of litigation team member Lorraine Leete was not the result of a "routine, good faith operation." This is not akin to a situation where a company recycles back-up tapes on a weekly basis and fails to stop the recycling process when a litigation hold is in place.

**Sixth**, Drummond sought forensic imaging of Defendants' computers and email accounts in its Emergency Motion for Sanctions on April 2, 2014. Defendants were on notice that forensic imaging was a possible outcome of that motion (which was denied without prejudice). The Court effectively gave Defendants a "second chance" by denying Drummond's motion. Defendants misled the Court into denying Drummond's motion and then took advantage of the Court's ruling to engage in additional spoliation.

**Seventh**, Collingsworth is a lawyer; Conrad & Scherer is a law firm. These are sophisticated parties who are well aware of their legal obligations to preserve evidence and the

{B2016092}

steps needed to do so. A "party deemed to have knowledge as to the importance of evidence for litigation will be held to a higher standard with regards to spoliation." *Cooper v. Toshiba Home Tech. Corp.*, 76 F. Supp. 2d at 1275. Defendants' complete failure to take any steps to comply with this Court's Orders and preserve Mr. Collingsworth's and other litigation team members' emails, hard drives and data should not be excused.

## CONCLUSION

"Sanctions for discovery abuses are intended to prevent unfair prejudice to litigants and to insure the integrity of the discovery process." *Flury*, 427 F.3d at 944. It is difficult to conceive of a situation where a party's affront to the integrity of the judicial process could be any more plain: Defendants have willfully disobeyed **six** court orders, Doc. 174-22 (Mar. 8, 2012 *Balcero* Mem. Op.); Doc. 63; Doc. 105; Doc. 111; Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 19:10-18; Doc. 119, and have repeatedly lied in response to direct questions from a federal judge. Doc. 123 (Apr. 21, 2014 Hrg. Tr.) at 30:1-31:19; Doc. 174-3 (Mar. 8, 2012 Hrg. Tr.) at 8:20-9:7. It is also difficult to imagine a case where a plaintiff has been more unfairly prejudiced. One of the primary issues to be decided by the jury in this case is Mr. Collingsworth's subjective state of mind—his subjective intent in paying the witnesses upon whom he relies for the truth of his defamatory statements and his subjective belief in those witnesses' testimony. Mr. Collingsworth has demonstrated the propensity to lie repeatedly about critical facts in this case, only disclosing them when a document appears revealing the truth. It is now known that most of the documents that could reveal the truth about what happened with these witnesses have been irretrievably lost due to the affirmative acts of the Defendants, leaving the Court and Drummond to rely solely on the testimony of Mr. Collingsworth to fill in the gaps. The prejudice of this

29

result is incurable, and it undoubtedly cripples to the Court and Drummond's efforts to uncover

the truth. Default is the only appropriate outcome.

Respectfully submitted,

/s/ H. Thomas Wells, III    /s/ Sara E. Kropf

William Anthony Davis, III (ASB-5657-D65W) Sara E. Kropf
H. Thomas Wells, III (ASB-4318-H62W) LAW OFFICE OF SARA KROPF PLLC
Benjamin T. Presley (ASB-0136-I71P) 1001 G St. NW, Suite 800
STARNES DAVIS FLORIE LLP Washington, DC 20001
P.O. Box 59812 (202) 627-6900
Birmingham, AL 35259
(205) 868-6000
fax: (205) 868-6099

*Attorneys for Drummond Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on **July 23, 2015**, I electronically filed the foregoing with the Clerk
of the Court using the CM/ECF system which will send notification of such filing to the
following:

Bradley J. Smith, Esq.
Eric D. Bonner, Esq.
Clark, Hair & Smith, P.C.
1000 Urban Center Drive
Suite 125
Birmingham, Alabama 35242

Christopher S. Niewoehner
Kendall Enyard
Savannah E. Marion
STEPTOE & JOHNSON, LLP
115 S. LaSalle Street
Suite 3100
Chicago, IL 60603
Tel: (312) 577-1240

{B2016092}

Special Master T. Michael Brown, Esq.
Ms. Carly Miller, Esq.
Bradley Arant Boult Cummings, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203
mbrown@babc.com
camiller@babc.com

Kenneth McNeil
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
kmcneil@SusmanGodfrey.com

Robert Spotswood
William K. Paulk
SPOTSWOOD SANSOM & SANSBURY, LLC
One Federal Place
1819 Fifth Avenue North, Suite 1050
Birmingham, Alabama 35203
rks@spotswoodllc.com
wpaulk@spotswoodllc.com

*/s/ H. Thomas Wells, III*
H. Thomas Wells, III (ASB-4318-H62W)

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 2

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

Message

| | |
|---|---|
| **From:** | Terrence Collingsworth [TCollingsworth@conradscherer.com] |
| **Sent:** | 4/21/2010 8:31:07 PM |
| **To:** | tc@iradvocates.org |
| **Subject:** | FW: Western Union Charris- PLEASE SEND TO MINDY AS FORM OF APPROVAL |

--------------------------------------------

From: Terry Collingsworth[SMTP:TC@IRADVOCATES.ORG]
Sent: Wednesday, April 21, 2010 4:35:10 PM
To: Susana Tellez; Terrence Collingsworth
Cc: Mindy K. Drath
Subject: RE: Western Union Charris- PLEASE SEND TO MINDY AS FORM OF APPROVAL
Auto forwarded by a Rule
Ok to pay

----------------------------------------------------------------

**From:** Susana Tellez [mailto:STellez@conradscherer.com]
**Sent:** Wednesday, April 21, 2010 4:27 PM
**To:** tc@iradvocates.org; Terrence Collingsworth
**Cc:** Mindy K. Drath
**Subject:** Western Union Charris- PLEASE SEND TO MINDY AS FORM OF APPROVAL

Terry, Please send to Mindy as form of approval. We need to send $800 for Charris regarding Drummond Matter 090501.

Mindy, please send the amount of $800 via Western Union to Gilma Yineth Baeza Acosta in Bogota , Colombia , and she will get it to the corresponding people.

Thank you

Susana

Susana Tellez
Legal Assistant
Conrad & Scherer
1156 15th St. NW
Suite 502
Washington , DC 20003
202.527.7983

The information contained in this transmission may contain privileged and confidential information. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review,

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007204

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 9

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

Dennis Williams CONFIDENTIAL

ORIGINAL

1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
 2                       SOUTHERN DIVISION

 3


 4    DRUMMOND COMPANY,
      INC.,                      )
 5                               )
          Plaintiff,             )
 6                               )    Case No.
      VS.                        )    2:11-cv-3695-RDP-TMP
 7                               )
      TERRENCE P.                )
 8    COLLINGSWORTH,             )
      individually and as        )
 9    agent of Conrad &          )
      Scherer, LLP; and          )
10    CONRAD & SCHERER,LLP,      )
          Defendants.            )
11

12


13    **********************************************************

14                    <<<CONFIDENTIAL>>>

15              ORAL/VIDEOTAPED DEPOSITION OF

16                    DENNIS WILLIAMS

17                    JUNE 30, 2015

18    **********************************************************

19

20         ORAL AND VIDEOTAPED DEPOSITION of DENNIS WILLIAMS,
      produced as a witness at the instance of the
21    Plaintiff, and duly sworn, was taken in the
      above-styled and numbered cause on June 30, 2015, from
22         a.m. to 6:20 p.m., before Denyce M. Sanders, RDR,
      CRR, TCRR, in and for the State of Texas, recorded by
23    machine shorthand, at the offices of SUSMAN GODFREY,
      1000 Louisiana, 51st Floor, Houston, Texas, pursuant
24    to the Federal Rules of Civil Procedure and the
      provisions stated on the record or attached hereto;
25    signature having been waived.
```

**Dennis Williams CONFIDENTIAL** 2

```
 1              A P P E A R A N C E S

 2
      FOR THE PLAINTIFF:
 3
           STARNES DAVIS FLORIE LLP
 4         100 Brookwood Place, Seventh Floor
           Birmingham, Alabama  35259
 5         Mr. H. Thomas (Trey) Wells III
           205.868.6000
 6         twells@starneslaw.com
           Mr. Benjamin T. Presley
 7         bpresley@starneslaw.com

 8
      FOR THE DEFENDANTS:
 9
           SUSMAN GODFREY
10         1000 Louisiana, 51st Floor
           Houston, Texas  77002
11         Mr. Stuart V. Kusin
           713.653.7812
12         skusin@susmangodfrey.com

13
               -and-
14
           STEPTOE & JOHNSON, LLP
15         115 S. LaSalle Street, Suite 3100
           Chicago, Illinois  60603
16         Mr. Christopher S. Niewoehner
           312.577.1240
17         chris.niewoehner@steptoe.com

18

19    VIDEOGRAPHER:

20         Rachel Hymel

21
      ALSO PRESENT:
22
           Mr. Blake Andrews
23         Mr. Jason Bergerson
           Mr. Tony Davis
24

25
```

```
 1                          INDEX

 2            ORAL AND VIDEOTAPED DEPOSITION OF

 3               DENNIS WILLIAMS, JUNE 30, 2015

 4                                              Page

 5    APPEARANCES...........................    2

 6    BY MR. WELLS..........................    7

 7    BY MR. KUSIN..........................   242

 8    BY MR. WELLS..........................   253

 9

10

11

12

13    REPORTER CERTIFICATION.................   258

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        EXHIBIT INDEX

 2              ORAL AND VIDEOTAPED DEPOSITION OF

 3               DENNIS WILLIAMS, JUNE 30, 2015

 4                        Description                     Page

 5
         Williams 1          Exhibit B to Mr. Williams' ... 15
 6                           report

 7       Williams 2          March 2015 report............. 23

 8       Williams 3          April 2015 report............ 44

 9       Williams 4          Chart of Terry .............. 48
                             Collingsworth's Computers
10
         Williams 5          Email Timeline............... 55
11
         Williams 6          Exhibit T to Mr. Williams' ... 60
12                           report

13       Williams 7          Handwritten notes............ 86

14       Williams 8          Email string ending with ..... 88
                             3/24/15 email from Dennis
15                           Williams to Kendall Enyard

16       Williams 9          Email string ending with ..... 89
                             4/6/15 email from Juan
17                           Carlos Rodriguez to Dennis
                             Williams and Kendall Enyard
18
         Williams 10         Chart of All Electronic ...... 91
19                           Sources Searched for
                             December 12, 2014 Drummond
20                           v. Collingsworth, et al.
                             Privilege Log
21
         Williams 11         3/14/15 email from Juan ...... 98
22                           Carlos Rodriguez to Chris
                             Graham
23
         Williams 12         3/4/15 email from Juan ....... 121
24                           Carlos Rodriguez to Chris
                             Graham
25
```

**Dennis Williams CONFIDENTIAL**          **5**

| | | |
|---|---|---|
| 1 | Williams 13 | Exhibit C to Mr. Williams' ... 132 report |
| 2 | Williams 14 | Exhibit H to Mr. Williams' ... 134 report |
| 3 | | |
| 4 | Williams 15 | Email string ending with ..... 137 4/6/11 email from Victoria |
| 5 | | Ryan to Terry Collingsworth |
| 6 | Williams 16 | Exhibit V to Mr. Williams' ... 139 report |
| 7 | | |
| | Williams 17 | Email string ending with ..... 148 3/23/15 email from Kendall |
| 8 | | Enyard to Dennis Williams, |
| 9 | | et al. |
| 10 | Williams 18 | 2/17/12 email from Maggie .... 165 Crosby to Juan Rodriguez |
| 11 | | |
| | Williams 19 | Email string ending with ..... 165 2/27/12 email from Maggie |
| 12 | | Crosby to CTSS |
| 13 | | |
| | Williams 20 | Email string ending with ..... 177 3/3/15 email from Juan |
| 14 | | Carlos Rodriguez to Dennis |
| 15 | | Williams, et al. |
| 16 | Williams 21 | Email string ending with ..... 171 4/6/15 from Chris Graham to |
| 17 | | Dennis Williams |
| 18 | Williams 22 | 3/12/15 email from Chris ..... 180 Graham to Dennis Williams |
| 19 | | |
| | Williams 23 | Exhibit M to Mr. Williams' ... 190 report |
| 20 | | |
| 21 | Williams 24 | Exhibit Q to Mr. Williams' ... 192 report |
| 22 | | |
| | Williams 25 | Exhibit W to Mr. Williams' ... 197 report |
| 23 | | |
| 24 | Williams 26 | 4/2/15 email from Dennis ..... 210 Williams to Chris Graham |
| 25 | | |

**Freedom Court Reporting, Inc**       **877-373-3660**

**Dennis Williams CONFIDENTIAL**                                      **6**

| | | | |
|---|---|---|---|
| 1 | Williams 27 | Email string ending with ..... 211 | |
| 2 | | 4/3/15 email from Chris Graham to Dennis Williams | |
| 3 | Williams 28 | Notes from Victoria Ryan ..... 204 interview | |
| 4 | | | |
| | Williams 29 | Mac instructions............. 208 | |
| 5 | | | |
| | Williams 30 | Exhibit Y to Mr. Williams' ... 222 | |
| 6 | | report | |
| 7 | Williams 31 | 4/3/13 email from Maggie ..... 224 Crosby to Juan Carlos | |
| 8 | | Rodriguez | |
| 9 | Williams 32 | Exhibit BB to Mr. Williams' .. 225 report | |
| 10 | | | |
| | Williams 33 | 3/5/15 email from Chris ...... 236 | |
| 11 | | Graham to Juan Carlos Rodriguez and Dennis | |
| 12 | | Williams | |
| 13 | Williams 34 | 6/11/13 email from Maggie .... 233 Crosby to Terrence | |
| 14 | | Collingsworth and Juan Carlos Rodriguez | |
| 15 | | | |
| | Williams 35 | Pathway Forensics invoice..... 242 | |
| 16 | | | |

17

18       •—————————————————————•

19

20

21

22

23

24

25

1        THE VIDEOGRAPHER:  We're on the

2        record at the start the deposition at 9:05

3        a.m.

4              DENNIS WILLIAMS,

5    having been first duly sworn, testified as follows:

6        MR. KUSIN:  Before we get started, a

7        couple things:  first, can we have an

8        agreement that if I just say, "Objection.

9        Form," that preserves the objection unless

10       you request me to state the basis?

11       MR. WELLS:  Yes.

12       MR. KUSIN:  Okay.  And just to let

13       you know, I'll probably ask for a break

14       about every hour, just because I think it

15       usually is my experience that witnesses

16       need it about after every hour.

17       MR. WELLS:  Okay.

18       MR. KUSIN:  Okay?

19           E X A M I N A T I O N

20   BY MR. WELLS:

21       Q.    Would you please state your name.

22       A.    Dennis Williams.

23       Q.    Is that your full name?

24       A.    Dennis Paul Williams.

25       Q.    Mr. Williams, have you given a

1    deposition before?

2          A.      Yes, sir.

3          Q.      How many times?

4          A.      Oh, about four or five times.

5          Q.      Okay.  So you know how this goes.  I'll

6    be asking you a series of questions today.  Your

7    duty here is to answer them truthfully to the best

8    of your ability.

9                  Do you understand that?

10         A.      Yes, sir.

11         Q.      If I ask you any questions that are

12   unclear to you or you don't think makes sense,

13   please ask me to rephrase it so I can get you a

14   question you understand.

15                 Will you agree to do that for me?

16         A.      Yes, sir.

17         Q.      All right.  If you do answer one of my

18   questions, I can only assume that you understood

19   what I was asking.  Is that fair?

20         A.      Yes, sir.

21         Q.      All right.  We sent your office a

22   subpoena for your entire file in this case.

23                 Do you recall that?

24         A.      Yes, sir.

25         Q.      Have we been provided -- well, let me

```
 1    ask it this way:  Was your entire file provided to

 2    the defendants' counsel for review and production?

 3         A.    Our -- my entire file was provided to

 4    our in-house counsel.

 5         Q.    Did your in-house counsel withhold

 6    anything from the defendants' counsel?

 7         A.    I don't know.

 8         Q.    With respect to what has been produced,

 9    should all of the work that you have done in this

10    case be reflected in those documents?

11         A.    Yes, sir.

12         Q.    Have you done any work since your last

13    report, which was in April of this year?

14         A.    Just reviewing for the deposition.

15         Q.    Okay.  But you've not done any further

16    analysis of any additional computers?

17         A.    I don't believe so.

18         Q.    Okay.  In the reports, there was mention

19    of an Acer notebook that was being shipped back from

20    Quito, Ecuador.

21                     Do you recall that?

22         A.    Yes, sir.

23         Q.    Did that ever get provided to you?

24         A.    Yes, sir.

25         Q.    Was it analyzed?
```

```
 1        A.      Yes, sir.

 2        Q.      That was not done at the time of your

 3   last report.

 4                Did you prepare any sort of

 5   documentation or analysis of that Acer notebook?

 6        A.      Yes, sir.

 7        Q.      And what would that reflect?  Because I

 8   don't think we've seen it.

 9        A.      We were not able to recover any old data

10   from that notebook.  It was -- had been wiped or

11   reformatted, and only current documents were on

12   there.  We were not able to recover any old email

13   files.

14        Q.      And by "current," what do you mean by

15   that?  What date to the present?

16        A.      I'd have to go back and -- and check.

17        Q.      Can you give me your best judgment?

18        A.      I would say it was probably within the

19   past year of activity.

20        Q.      So it appears it was wiped and

21   reformatted within the past year?

22        A.      Yes, sir.

23        Q.      Okay.  When you analyzed it, could you

24   determine how it was wiped?  In other words, I

25   understand there are various ways you can clear a
```

```
 1     computer.   There's something called a DoD wipe.

 2                         Are you familiar with that?

 3        A.       Yes, sir.

 4        Q.       Department of Defense wipe --

 5        A.       Yes, sir.

 6        Q.       -- is that what that is?

 7                         Were you able to determine whether

 8     it was something like that or some other sort of

 9     process to wipe the computer?

10        A.       My -- my recollection is that it was

11     probably just reformatted and a new operating system

12     loaded and -- with current data for users -- for a

13     user down in South America.

14        Q.       Okay.   And that was one of the computers

15     that was used by Mr. Collingsworth in the past,

16     correct?

17        A.       Yes, sir.

18        Q.       For what period of time was that?

19        A.       I don't recall exactly.

20        Q.       But you've analyzed it and determined

21     that you were unable to find any of the data from

22     the time period when Mr. Collingsworth was using it;

23     is that correct?

24        A.       That's correct.

25        Q.       And that's because it's been wiped
```

```
 1    within the last year?

 2         A.     It had been, I would say, at least

 3    reformatted and reloaded with an operating system

 4    since -- in the past year or so.

 5         Q.     Did you create any documentation with

 6    respect to that work?

 7         A.     Yes, sir.

 8         Q.     And when was that work done?

 9         A.     It would have been done in April.

10         Q.     Okay.

11                MR. WELLS:  Chris, are you aware

12            whether or not that's been produced?

13                MR. NIEWOEHNER:  I'm not.  We can

14            talk on the break about it, or if you want

15            to talk about it now.

16                MR. WELLS:  Well, I don't think it

17            has, and we can deal with that at a later

18            time; but if it has not, we reserve the

19            right to depose him further on those

20            additional documents if they are at issue.

21                MR. NIEWOEHNER:  If they are, we'll

22            obviously -- the documents didn't go to

23            us, it went to the in-house counsel, who

24            then got what was sent to the special

25            master, so we can discuss that.
```

1      Q.     (BY MR. WELLS)  All right.  So we know

2   you did do an analysis of an Acer notebook that was

3   used by Mr. Collingsworth, and that analysis was

4   done after your last report.

5                Have you done any other work since

6   your last report?

7      A.     Not that I can recall.

8      Q.     Have you been asked to do any work in

9   the future?

10     A.     No, sir.

11     Q.     Do you expect to be doing any work on

12   this in the future other than maybe preparing to

13   testify to opinions you've already given?

14     A.     No, sir.

15     Q.     Can we be comfortable today that based

16   on the two reports that you've provided, we know the

17   opinions you plan to give in this case?

18     A.     Based on the information that's

19   available right now, yes, that is correct.

20     Q.     All right.  I did not notice in your

21   production any invoices that were submitted.

22                Have there been invoices submitted?

23     A.     Yes, sir.

24     Q.     How many?

25     A.     I believe there's been two.

```
 1        Q.     At what time?
 2        A.     Probably sometime in -- one in April,
 3   and I would think one in May.
 4        Q.     How would those have been submitted?  Be
 5   email?  Hard copy?
 6        A.     I believe it would have been a hard copy
 7   sent.
 8        Q.     To whom?
 9        A.     I believe a copy went to counsel and one
10   went to Conrad Scherer.
11                    MR. WELLS:  We request that those be
12               provided as well.  We've not seen any
13               invoices.
14        Q.     (BY MR. WELLS)  How much have you
15   invoiced to date?
16        A.     I would say it's in the neighborhood of
17   $70,000 or so.
18        Q.     And is that a total figure for all the
19   work you've done, or is there some work that you've
20   accumulated, additional charges that you've not yet
21   invoiced?
22        A.     There are some additional charges that
23   we have not billed for.
24        Q.     Okay.  You have a judgment as of today
25   what the total charges you've incurred in this case?
```

```
 1        A.      No, sir.

 2        Q.      What is your hourly rate?

 3        A.      $325 an hour.

 4        Q.      Is that dependent on whether you're

 5   doing regular work or testifying?

 6        A.      No, sir.

 7        Q.      It's 325 whether you're doing your

 8   forensic work or whether you're testifying in

 9   deposition or whether you're testifying at trial?

10        A.      That's correct.  That's my -- my

11   standard rate.

12        Q.      Okay.  Many of the documents that we

13   were provided pursuant to the subpoena for your file

14   were redacted.

15                Did you receive redacted copies of

16   documents?

17        A.      There might have been a few redacted

18   that I received.

19                (Williams Exhibit 1

20                marked/introduced.)

21        Q.      (BY MR. WELLS)  Show you what I'm

22   marking as Plaintiff's Exhibit 1 to your deposition,

23   an email which was also attached as Exhibit B to

24   your report.  And as you can see, that email on

25   every page but the last one has boxes blocking out
```

1    text, and it says "Non-responsive."

2                        Do you see that?

3         A.      Yes, sir.

4         Q.      Was that how that document was provided

5    to you, with the nonresponsive redaction included?

6         A.      I would have to check and compare it to

7    the document that I have to make certain.  There

8    were emails that had some redactions in them that I

9    received.

10        Q.      Do you recall emails that were redacted

11   as nonresponsive as opposed to privilege or some

12   other reason?

13        A.      I do recall the nonresponsive section in

14   some of the emails.

15        Q.      Did you have any explanation to you of

16   why things were being redacted from emails you were

17   being asked to review?

18        A.      No, sir.

19        Q.      And, for example, this email is a

20   January 22, 2010, email between Mr. Collingsworth's

21   assistant and internal Conrad & Scherer IT person

22   and -- actually, two of Collingsworth's assistants

23   and internal Conrad & Scherer IT person.

24                        Did you receive any explanation for

25   why only portions of those communications were

1    produced to you?

2         A.    No, sir.

3         Q.    You relied on counsel to provide you

4    what they determined was relevant to your review of

5    the email history and computer history of

6    Mr. Collingsworth; is that right?

7                   MR. KUSIN:  Objection.  Form.

8         A.    Majority of the emails I received were

9    not redacted.  There were just a few.

10        Q.    (BY MR. WELLS)  With respect to this

11   one -- and we'll see several others over the course

12   of today -- is it your understanding you were not

13   provided with the text underneath these redactions

14   to determine for yourself whether it would be

15   relevant to your opinions?

16        A.    There was a protection order on another

17   matter that Conrad & Scherer was involved in that I

18   was not on the -- on the protection order.  So I was

19   precluded from viewing certain information related

20   to certain matters not involved with Drummond.  So

21   if it pertained to a different -- to that protective

22   order, you know, I was not allowed to view that.

23        Q.    Right.  And we'll -- we'll get there,

24   but I'm asking, with respect to this email, do you

25   have any idea whether that relates to the protective

```
1    order or just some decision that you were not going

2    to be allowed to see that particular portion of the

3    email?

4                     MR. KUSIN:  Objection.  Form.

5         A.      Could you ask that question again,

6    please?

7         Q.      (BY MR. WELLS)  I was asking you about

8    the redactions in this email, and you went on this

9    explanation about a protective order and there were

10   certain information you had not seen.

11                     I asked you, with respect to this

12   particular email, do you know whether these

13   redactions were due to a protective order issue or

14   some other reason it was redacted and not provided

15   to you for review?

16        A.      I believe it was due to the protective

17   order.

18        Q.      Okay.  What case was that protective

19   order in?

20        A.      It's DynCorp.

21        Q.      And it's your understanding that under

22   that protective order, Conrad & Scherer cannot

23   produce to your its own internal emails?

24        A.      They were concerned about -- I was not

25   on the protective order, and they were concerned
```

```
 1    about me having access to DynCorp information.

 2         Q.      Right.  But this is all internal Conrad

 3    & Scherer people talking about looking for internal

 4    Conrad & Scherer emails; is that what this email is

 5    about?  At least the parts that you can read?

 6         A.      This is an email where they're asking

 7    for and looking for Mr. Collingsworth's emails.

 8         Q.      And it was represented to you that

 9    because of a protective order in DynCorp, you could

10    not review portions of internal Conrad & Scherer

11    emails talking about searching for other internal

12    Conrad & Scherer emails?

13                 MR. KUSIN:  Objection.  Form.

14         A.      That's not correct.  If there was

15    something in there that pertained to DynCorp

16    particular, that would be protected.  But if it was

17    talking generally about looking for emails and so

18    forth, I was able to view that.

19         Q.      Okay.  Were you provided a copy of the

20    protective order?

21         A.      No, sir.

22         Q.      What was your understanding of the

23    restrictions?  Who -- who was allowed to review

24    documents subject to that protective order?

25         A.      I don't know.
```

```
 1          Q.      Do you have an understanding?  I imagine
 2     you asked to see a full picture of the email history
 3     and the traffic of these redacted documents and you
 4     were told for some reason you were not able to.
 5                     Did you ask who -- who would be able
 6     to look at the documents?
 7          A.      The -- there were employees at Conrad &
 8     Scherer that could look at those documents.
 9          Q.      Not outside technological experts?
10          A.      That's not correct.  I don't know
11     who-all was on the protective order, who had been
12     approved for the protective order.
13          Q.      Do you know if the people at Cool Spring
14     Consulting and whatever its subsequent name was were
15     on that protective order?
16          A.      I do not know.
17          Q.      Were you involved in any way in
18     selecting or searching for the internal Conrad &
19     Scherer emails that you ultimately reviewed and
20     relied upon for your report?
21          A.      Yes, sir.
22          Q.      And explain that to me.  What did you do
23     to search for emails?
24          A.      We were at the Fort Lauderdale office
25     going through the -- the emails.
```

1       Q.      Well, how were they protecting you from

2   seeing protective order information?

3       A.      I was with their IT director and

4   counsel, and, you know, when we came to a topic that

5   we needed to look at, and then they made certain

6   that it did not apply to DynCorp, and then we

7   reviewed it.

8       Q.      So the counsel would first review it

9   before allowing you to see it?

10      A.      We would see the -- the heading of the

11  email, the to and from, subject and so forth, and,

12  you know, they were -- just wanted to make certain

13  that, you know, we didn't violate the protection

14  order.

15      Q.      And this email here that's been marked

16  as Exhibit 1, subject "unsuccessful email searches,"

17  it's your understanding that that raised the DynCorp

18  flag?

19              MR. KUSIN:  Objection.  Form.

20      A.      I would -- it could be for a different

21  matter that's not related to Drummond matter.  You

22  probably need to check with an attorney on this.

23      Q.      (BY MR. WELLS)  You didn't ask when you

24  were provided redacted documents discussing the

25  history of Mr. Collingsworth's emails why those

**Dennis Williams CONFIDENTIAL**                                    22

```
 1    documents were redacted?
 2         A.      I did, and I was told that that was
 3    pertaining to a different matter and that there was
 4    a protective order on the DynCorp case.
 5         Q.      What have you done to prepare for this
 6    deposition?
 7         A.      I reviewed the material.
 8         Q.      When was that review?
 9         A.      I started on -- a little bit last
10    Thursday, some on Friday.
11         Q.      Did you meet with counsel?
12         A.      Yes, sir.
13         Q.      Discuss with counsel over the telephone?
14         A.      I don't know if we discussed the review
15    over the telephone.
16         Q.      Did you discuss something over the
17    telephone?
18         A.      Scheduling to meet.
19         Q.      Who did you meet with?
20         A.      Stuart Kusin on last -- as a matter of
21    fact, I stand corrected.  It was last Wednesday
22    on -- and we met yesterday.
23         Q.      How long did you meet on Wednesday?
24         A.      Approximately four or five hours.
25         Q.      How about yesterday?
```

```
 1          A.      Approximately six to seven hours.
 2          Q.      Would your invoices reflect the amount
 3   of time that you billed and have itemized invoice
 4   entries as far as how much time you spent on a
 5   particular task each day?
 6          A.      Yes, sir.
 7          Q.      You have -- at least we've been provided
 8   two reports in this case, one dated in March of this
 9   year and the next dated in April of this year.
10                  Have you prepared any other reports
11   for this case?
12          A.      No, sir.
13                  (Williams Exhibit 2
14               marked/introduced.)
15          Q.      (BY MR. WELLS)  I'm going to mark as
16   Exhibit 2 to your deposition the March 2015 report.
17                  If you can just look over that and
18   confirm for me that's what that is.
19                  MR. KUSIN:  Do you have another
20               copy?
21          A.      Yes, sir.
22          Q.      (BY MR. WELLS)  At the end of your
23   report, you attach your CV.
24                  Is that a up-to-date, as of today,
25   copy of your CV, or has it been updated since March?
```

24

1    A.    I don't know if I've updated it, but I

2  have had another deposition and testimony since

3  then.

4    Q.    And what case was that in?

5    A.    Deposition was in the Cardone,

6  C-A-R-D-O-N-E, versus -- I want to say BBB

7  Corporation.  That was a deposition and then a

8  testimony yesterday in a arbitration hearing.

9    Q.    So you -- since March, you've given a

10  deposition and testimony in an arbitration hearing,

11  or was that just one?

12    A.    I gave a deposition probably about a

13  month ago on the Cardone matter and did a testimony

14  in a different matter, arbitration hearing,

15  yesterday.

16    Q.    Okay.  What was the arbitration matter?

17    A.    Trade secrets case involving Visible

18  Changes Hair Salon versus Stephanie Wiley and Flair

19  Salon.

20    Q.    So employee leaving --

21    A.    Correction.  Flair Salon may not be as a

22  named defendant in that matter.

23    Q.    Is that an employee that left one salon

24  for another salon and may have taken some electronic

25  information with her?

```
 1          A.      That, plus noncompete, nonsolicitation.
 2          Q.      Okay.  But your scope of your testimony,
 3   I imagine, would not involve the noncompete,
 4   nonsolicit aspect of the case, would it?
 5                  I'll just rephrase the question.
 6                  Is the focus of your testimony based
 7   on some analysis of some computer that they believe
 8   she may have taken electronic information off of?
 9          A.      No.
10          Q.      What -- what was the scope of your
11   engagement in the salon case?
12          A.      Preserving her Facebook page and the
13   posts and messages in the Facebook page and
14   collecting and analyzing her -- her cell phone.
15          Q.      To determine what?
16          A.      On the cell phone, the analysis showed
17   that all her messages had been deleted up to the day
18   before she turned it in to us to be examined.
19                  The collection on the Facebook page
20   reflected her comments about her previous employer
21   and directing friends where her new employment was
22   located.
23          Q.      How about the Cardone v. BBB Corp.
24   deposition, what was the scope of your engagement in
25   that case?
```

```
 1        A.      To be a summary expert on a -- again, a
 2   intellectual property or trade secret matter.
 3   Basically, an individual left Cardone and went to a
 4   competitor, and there's evidence that data from his
 5   previous employer was transferred to the computer of
 6   his new employer, along with external devices.
 7        Q.      All right.  So who were you employed by
 8   in the Cardone matter, plaintiff or the defendant?
 9        A.      Plaintiff.
10        Q.      Which is the employer?
11        A.      The previous employer, which is Cardone.
12        Q.      And the allegations, I guess, are
13   Cardone downloaded some sort of information off of
14   his previous employer's computer and took that to
15   his new employer; is that fair?
16        A.      That's not the employer -- employee's
17   name, the previous company's name is Cardone.
18        Q.      Okay.  Excuse me.
19        A.      And I'm trying to recall the employee's
20   name.
21        Q.      I don't need the name.
22                But is the case about an employee
23   plugging in either a flash drive or external hard
24   drive, downloading information from his previous
25   employer and taking that over to his new employer?
```

**Dennis Williams CONFIDENTIAL**                                    **27**

1        A.      That's part of it.

2        Q.      Okay.  Did you do an analysis to

3   determine whether that had, in fact, happened?

4        A.      Yes, sir.

5        Q.      And what did you determine?

6        A.      That the records showed that files had

7   been transferred to an external device.  External

8   device had been plugged into his new employer's

9   computer or his -- his computer that was assigned to

10   him by his new employer, and files from that

11   external device had been copied over to that new

12   employer's computer, and some of those files had

13   been accessed.

14       Q.      In your examination, you were able to

15   look at his previous employer's computer and make

16   the determination, one, that the employee had

17   plugged in an external device.  Are we okay so far?

18       A.      Mentioned earlier, I am a summary

19   witness.  Someone else did the actual -- a different

20   company actually did the exam on the -- on that

21   particular computer, but they were able to give me

22   their report.  And, yes, there was evidence that

23   external devices had been connected to the -- to the

24   Cardone laptop.

25       Q.      Okay.  And the analysis was also able to

1  determine that certain files had been transferred to

2  that external device?

3        A.     Yes, sir.

4        Q.     How was that determined?  And I'm not

5  asking necessarily in that case, but you have

6  personally done that type of analysis before,

7  haven't you?

8        A.     Yes, sir.

9        Q.     Okay.  Walk me through how you

10  determined what files were transferred to an

11  external device on a particular date.

12        A.     Generally or in this particular case?

13        Q.     If you want to tie it to this particular

14  case, we can start there.

15        A.     Well, on the Cardone matter, there was a

16  crash log that the company had that tracked file

17  updates and was able to -- we were able to get data

18  from that and see what files were being accessed.

19                     In addition, they had a program -- I

20  don't recall the name -- that tracked any external

21  device usage.  So it would provide a -- produce a

22  report that showed files being transferred to any

23  external devices.  So we had those reports to

24  confirm the transfer to an external device.

25        Q.     Okay.  Stepping back from the Cardone

**Dennis Williams CONFIDENTIAL**

1  matter and just more generally, take me through how

2  you would determine whether someone had downloaded

3  particular files to a particular external device.

4       A.      You would -- you would look at various

5  Windows artifacts to determine that.

6       Q.      What are those?

7       A.      There are link files.

8       Q.      What do the link files show?

9       A.      That would indicate the access

10  potentially to files that are on an external device.

11      Q.      What other artifacts or other

12  information would you look at to try to determine

13  what files were transferred to a particular external

14  device?

15      A.      There is the Windows Internet Explorer

16  history cache.

17      Q.      What does that show you?

18      A.      That could show files being -- being

19  accessed on the computer.

20      Q.      You look to see what files were accessed

21  around the plug-in date of the external hard drive?

22      A.      That's -- yes, sir.

23      Q.      Okay.  Is there something called an

24  index buffer?

25      A.      You can look at -- you can look at index

1    buffers.

2         Q.    What's that?

3         A.    That's a -- in a Windows folder,

4    there -- it keeps a record of the files that are in

5    that directory or folder.

6         Q.    All right.  Would you be so kind to

7    provide to defendants' counsel the case information

8    for the Cardone case and this arbitration case so

9    that they can provide updated prior testimony

10   information to us?

11        A.    Just to -- are you talking about just a

12   case number or...

13        Q.    The same information that you would

14   provide on your CV.

15        A.    Oh.

16        Q.    I'm not going to ask you to repeat the

17   case number right now.

18        A.    Right.

19        Q.    But if you could go back and get that,

20   give that to them so we can find those cases.

21        A.    Yes, sir.

22        Q.    Looking at the cases that are on your

23   CV, before we get there, those two, are those the

24   only ones that wouldn't be reflected on this March

25   CV?  Only testimony?

1        A.        Yes, sir, as far as testimonies, yes.

2        Q.        All right.  The first one on

3   here -- this is on page 2 of 3 of your CV.  Are you

4   with me?

5        A.        Yes, sir.

6        Q.        Daily Instruments Corp. v. Eric Heidt,

7   what was the nature of that case?

8        A.        That, again, intellectual property-type

9   matter.

10        Q.        Did it involve an employee allegedly

11   downloading information off an employer's computer?

12        A.        Yes, sir.

13        Q.        Okay.  Using an external device?

14        A.        That was part of it, yes, sir.

15        Q.        Okay.  Was part of your engagement to

16   determine whether that employee -- was his name

17   Mr. Heidt?

18        A.        The employee -- the employee's name was

19   Mr. Heidt.

20        Q.        Was part of your engagement to determine

21   whether Mr. Heidt had indeed transferred information

22   from the employer's computer to an external device?

23        A.        Yes, sir.

24        Q.        Did Mr. Heidt admit to doing that?

25        A.        No, sir.

1        Q.      Your engagement was to determine whether

2    Mr. Heidt was not being truthful on whether or not

3    he had actually taken information and downloaded it

4    onto an external device; is that fair?

5        A.      That would be correct.

6        Q.      All right.  And in cases -- that --

7    we've already talked about two of them -- or three

8    of them.  But you've -- you've testified in several

9    cases where that is the issue, an employee has left

10   and there's an allegation that he may have -- or she

11   may have downloaded information to an external

12   device and taken it with them.  You've testified --

13       A.      Yes.

14       Q.      -- in cases like that?

15               And in those cases, the employees

16   typically deny having done that, right?

17       A.      I believe so.

18       Q.      I mean, there's not much use for getting

19   a computer forensic person involved if the employee

20   admits to doing it?

21       A.      I'm not aware exactly on some cases when

22   they end up doing an interview or a deposition of

23   the employee, so, I mean, I'm not -- sometimes we

24   jump right in before there's a chance to

25   even -- they even have a chance to take statements,

1    whatever.

2         Q.     Right.

3               Well, Mr. Heidt, at least, denied

4    having taken any information, didn't he?

5         A.    I would have to go back and -- I'm not

6    privileged to all the information in a case.

7         Q.    All right.  Any event, your job was to

8    go in and look at the computer to determine,

9    regardless of what the employee says, what actually

10   occurred with respect to transfer of data?

11        A.    That's correct.

12        Q.    And in that case, did you determine

13   Mr. Heidt had, in fact, transferred data to an

14   external device?

15        A.    I don't believe so.

16        Q.    What did you determine?

17        A.    Was able to determine that -- I think it

18   was four USB devices had been connected to his

19   previous employer's computer approximately two days

20   or maybe four days before he left work or terminated

21   his employment with the previous employer and that

22   he also had a couple of cloud accounts.

23        Q.    What type of testimony did you give in

24   the Heidt case?  And by that, I mean, did you give a

25   deposition as well as trial testimony?  Did you only

1    give a report?  Did you only give an affidavit?  I

2    want to know all the forms of testimony that you

3    provided in that case.

4         A.     Did a -- did a report, did a deposition

5    and testified in court.

6         Q.     The next case on here is Amistco

7    Separation Products versus Robert Lasser.

8                     Was that also an employee transfer

9    of data case?

10        A.     Yes, sir.

11        Q.     All right.  The employee was Robert

12   Lasser?

13        A.     Yes, sir.

14        Q.     And what were you engaged to do in that

15   case?

16        A.     Review his -- the work computer assigned

17   to him by his previous employer to determine if

18   there had been any files or any data transferred.

19        Q.     Were you able to determine that data

20   had, in fact, been transferred from his former

21   employer's computer to an external device?

22        A.     After receiving external devices, we

23   were able to confirm that data had been transferred.

24        Q.     In that case, you actually got the

25   external devices?

```
 1        A.      Yes, sir.

 2        Q.      And then you analyzed those and looked

 3   on them and saw the data that had been transferred,

 4   or how did you determine that?

 5        A.      Initial examination indicated files had

 6   been created -- a large number of files had been

 7   created on his work computer; and a short time

 8   later, a USB device had been connected to that same

 9   computer, so, you know, subsequent request was made

10   for any -- any of the USB devices that had been

11   connected to that computer.

12                He ended up having to turn over a

13   large number of USB devices which were analyzed, and

14   some of them contained company information.

15        Q.      Okay.  So at the outset, your job was to

16   determine whether USB devices had been plugged into

17   the computer and also make an analysis to see if

18   there was reason to believe information had, in

19   fact, been downloaded to them?  This is before you

20   had gotten the USB devices?

21        A.      I would say the engagement was to

22   determine if there was any evidence of a

23   transfer -- potential transfer of data.

24        Q.      And you did an analysis and found

25   evidence of that; is that right?
```

```
 1          A.      Yes, sir.

 2          Q.      And what did you look at to lead you to

 3   believe there might have been company data on those

 4   external devices?

 5          A.      Looked at the number of files that had

 6   been created.  There was a large number,

 7   approximately 1,000 files, that had been created on

 8   his computer, and company officials indicated that

 9   those were confidential or sensitive or proprietary

10   files.  And the fact that a USB device had been

11   connected a short time later.

12          Q.      In that case, you analyzed -- did you

13   analyze the link files that we talked about earlier?

14          A.      Yes, sir.

15          Q.      And the index buffering information?

16          A.      Probably not.

17          Q.      Anything else you would have looked at

18   to lead you to believe that company data might have

19   been transferred to that external device?

20          A.      Well, the link files did not provide any

21   evidence.

22          Q.      Is there anything else you looked at to

23   determine whether there was evidence?

24          A.      The -- fortunately, the file listings

25   show these files being created on the computer, so
```

1    that was -- that, in conjunction with the USB device

2    being connected a short time later.

3         Q.     When it's showing that the file is being

4    created on the computer, what is that telling you?

5         A.     That a file was created on the computer.

6         Q.     Yeah, but me and probably most anybody

7    that's going to watch this videotape is not really

8    going to understand what that means.

9                Does that mean just someone is

10   opening a file that's already on the computer?

11   Somebody is typing up a Word document or somebody is

12   dragging and dropping a file from one place onto the

13   computer for the first time?

14               MR. KUSIN:  Objection.  Form.

15        A.     It means that a file is being created

16   for the first time on the computer.

17        Q.     (BY MR. WELLS)  Okay.  So in

18   Mr. Lasser's case, would it indicate he was

19   downloading information from the company server onto

20   his computer and then transferring it to an external

21   device?

22        A.     It showed that he had created these

23   files on his laptop, and they may have come from the

24   server.

25        Q.     Okay.  What all type of testimony did

1    you provide in that case?  And I include in

2    testimony reports, even though they might not

3    necessarily be sworn.

4        A.      There's the Lasser case --

5        Q.      Right.

6        A.      -- did a report.  Did a deposition and

7    testified -- testified at a hearing.  Not certain if

8    I did -- I'd have to go back and see if I did a

9    report on that one.

10       Q.      All right.  The next one is Dr. Willis

11   J. Pumphrey v. Worldwide Lending and others.

12               What was the nature of that case?

13       A.      I'm trying to recall what we collected

14   on that case.

15       Q.      Do you know what the allegations are,

16   before we get into what you collected?

17       A.      The allegations had to do with an

18   apartment complex and whether or not it

19   was -- permits were approved for -- for residents to

20   be in some of the apartments.  That's the general

21   nature of it.

22       Q.      Okay.  What about Vortex Ventures v.

23   Proven Technologies, what was the nature of that

24   case?

25       A.      That was an intellectual property-type

1    case.

2         Q.     Similar to what we've discussed before,

3    employee taking some information, or is it something

4    different?

5         A.     It's similar.

6         Q.     Did you again represent -- not

7    represent -- get engaged by the employer to see if

8    that employee had, in fact, taken some information?

9         A.     No, sir.

10        Q.     Were you engaged by the employee?

11        A.     Yes, sir.

12        Q.     And what was your ultimate conclusion?

13        A.     That data from the -- from Vortex was on

14   the servers at Proven Technology.

15        Q.     What all did your analysis entail?

16        A.     Search for various search terms to try

17   to locate records pertaining to Vortex Ventures.

18        Q.     Okay.  But you weren't doing an analysis

19   to see if an external device had been used to take

20   it from Vortex to Proven Technology, or did you?

21        A.     That may have been included.

22        Q.     All right.  What all kind of testimony

23   did you give in that case, including in that

24   question, reports?

25        A.     I believe that was a -- a deposition and

```
1    a hearing.

2         Q.     Was it the Amistco Separation case where

3    you actually were provided the external devices at

4    some point?

5         A.     Yes, sir.

6         Q.     What analysis did you perform to

7    determine whether company information either was or

8    had been on those devices?

9         A.     We ran forensic processing on the

10   external device to see -- to find any active or

11   deleted files.

12        Q.     And I think you said you did determine

13   there were -- there was company information.

14               Was it still on the device, or was

15   it in a deleted file?

16        A.     I believe we found it on a few of the

17   devices, and it was still active, I believe.  I'd

18   have to go back and check.

19        Q.     When you're doing a forensic examination

20   of the external device itself, that doesn't tell you

21   anything about where that device has been plugged

22   in, does it?

23        A.     It may.

24        Q.     Explain that for me.  How does it tell

25   you where it has been plugged in?
```

```
 1        A.     One -- there may be a system volume
 2   information folder that gets created, and that
 3   creation would indicate it was connected to a
 4   Windows-type computer, and that -- there would be a
 5   date for that.  So that's an indication that it had
 6   been connected possibly to a Windows machine at some
 7   point in time.
 8                  In addition, if it was connected to
 9   a -- a Mac/Apple operating system, there could be a
10   trashes folder, spotlight folder that was created,
11   and you would have those dates of when those folders
12   were created, which would give you an indication
13   that it was connected into a -- a Apple or Mac-type
14   device.
15                  In addition, you've got recycle bin
16   folders, and you have the security ID in the --
17   security in the recycle bin folder which would
18   indicate what security ID was used on that
19   particular folder if there were files being -- that
20   had been deleted off of that external device.
21        Q.     And what does the security ID tell you
22   about which computer it was plugged into?
23        A.     It will tell you the overall network
24   that the computer came from and a particular
25   four-digit code -- usually four digit -- code of
```

1    the -- the user on that network.

2         Q.     Okay.  For example, you can look at a

3    computer itself and run a report that will tell you

4    down to the serial number what USB devices were

5    plugged into it, right?

6         A.     Yes, sir.

7         Q.     Now, flipping that around, you cannot

8    get down to the serial number, make and model of a

9    computer by looking at the USB device?  You can't

10   just look at the USB device and say, I know it's

11   been plugged into that exact computer on such and

12   such a date?

13        A.     That's correct.

14        Q.     Next case on here is Hunter Buildings &

15   Manufacturing versus MB Industries.

16               What was your scope of engagement in

17   that case?

18        A.     To determine if there was any transfer

19   of information from Hunter Buildings -- from an

20   employee at Hunter Buildings to MB Industries.

21        Q.     Was this another case where the

22   allegation was that he or she had plugged in an

23   external device to the former employer's computer,

24   downloaded something and transported it over to the

25   new employer?

```
 1        A.      I don't -- I don't think it involved any

 2   USB devices.  I would have to double check, but I

 3   don't think USB devices were involved.

 4        Q.      The Denise Marie Jacobsen v. James

 5   Matthew Jacobsen, is that a divorce case?

 6        A.      Yes, sir.  Family law matter.

 7        Q.      What was the nature of your engagement

 8   in that case?

 9        A.      Primarily to determine if the husband

10   was tracking the wife.

11        Q.      Okay.  The last one on here is from back

12   in 2002.

13                Was that back when you were still in

14   the FBI?

15        A.      Yes, sir.

16        Q.      Okay.  Between 2002 and 2011, did you

17   provide any expert testimony?

18        A.      I don't think so.

19        Q.      Okay.  Have you ever published any

20   writings?

21        A.      No, sir.

22                MR. KUSIN:  Trey, is this a good

23           time to take that quick break?

24                MR. WELLS:  Yeah.  Yeah, that's

25           fine.
```

```
 1                     THE VIDEOGRAPHER:  We are off the
 2              record with the end of DVD Number 1 at
 3              10:05.
 4                     (Break.)
 5                     (Williams Exhibit 3
 6              marked/introduced.)
 7                     THE VIDEOGRAPHER:  We're back on the
 8              record with the start of DVD Number 2 at
 9              10:23.
10         Q.    (BY MR. WELLS)  Mr. Williams, I'm
11    marking as Plaintiff's Exhibit 3 a copy of your
12    April 2015 report.  And I'll state that we've
13    excluded the numerous exhibits to it.  It's just the
14    report and your CV.
15                     Would you mind confirming for me
16    that's what that is?
17         A.    Yes, sir, that's correct.
18         Q.    Do either of the reports in this case
19    have any errors in them that you've noticed that
20    need to be corrected?
21         A.    No, sir.
22         Q.    Do those reports comprise all of your
23    opinions in this case?
24         A.    Yes, sir.
25         Q.    Was there any sort of analysis that you
```

1    thought should have been done but you were

2    instructed not to do it?

3        A.    No, sir.

4        Q.    Is there any analysis that you suggested

5    to be done that was not done for one reason or

6    another?

7        A.    No, sir.

8        Q.    So you did everything that you thought

9    you needed to do to come to the opinions that you

10   wrote in these reports?

11       A.    Yes, sir.

12       Q.    Okay.  Did you have any help in writing

13   these reports?

14       A.    No, sir.

15       Q.    Counsel did not assist in any way?

16       A.    I sent drafts to counsel for the review.

17       Q.    I imagine the first draft is not

18   identical to the final draft we saw; is that

19   correct?

20            MR. KUSIN:  Objection.  Form.

21       A.    It's not identical.

22       Q.    (BY MR. WELLS)  All right.  There were

23   some changes made along the way; is that fair?

24       A.    Yes, sir.

25       Q.    Going to your first report -- this is

```
 1    the March 12, 2015, report, which I believe is

 2    Exhibit 2; is that correct?

 3         A.     Yes, sir.

 4         Q.     This says you were engaged in February

 5    of 2015; is that right?  Paragraph 13?

 6         A.     Yes, sir.

 7         Q.     Okay.  Do you know when in February you

 8    were engaged?

 9         A.     No, sir.

10         Q.     Can you give me a judgment on beginning

11    of the month or end of the month?

12         A.     No, sir.

13         Q.     And when you were engaged, what was your

14    understanding of what you were being asked to do?

15         A.     To locate emails for Terry Collingsworth

16    to determine if their e-discovery search process was

17    sufficient and to, you know, see if there's any

18    indication of any intentional deletion of emails.

19         Q.     Okay.  By the time you were engaged, I

20    imagine someone had determined, we can't find all of

21    Terry Collingsworth's emails; is that right?

22                MR. KUSIN:  Objection.  Form.

23         Q.     (BY MR. WELLS)  Was that communicated to

24    you?

25         A.     I was told that they were wanting to
```

1    look for additional emails.

2         Q.     Were you told that they had looked and

3    were not able to find anything?

4         A.     I was told there was missing gaps for

5    emails.

6         Q.     What were those gaps before you did any

7    of your work?

8         A.     There was emails prior to 2010, 2011,

9    and there were some emails in -- in 2012 that were

10   missing.

11        Q.     Paragraph 16a says that all incoming

12   emails to Mr. Collingsworth's Conrad & Scherer email

13   account were missing prior to the date of March 23,

14   2013; is that right?

15        A.     Yes, sir.

16        Q.     And the way this is written, it says

17   there weren't incoming emails between June of '08

18   and March 22nd of 2013.  But isn't it your

19   understanding that June of '08 was when

20   Mr. Collingsworth first started using his Conrad &

21   Scherer email account?

22        A.     That's -- around that time, he started

23   using the Conrad & Scherer email account.

24        Q.     Okay.  So it's fair to say that at the

25   time of your engagement, all incoming Conrad &

1    Scherer email accounts -- excuse me.  Let me start

2    that over.

3                    All Terry Collingsworth Conrad &

4    Scherer incoming emails prior to March 23, 2013,

5    were missing?

6                    MR. KUSIN:  Objection.  Form.

7         A.    That's correct.

8         Q.    (BY MR. WELLS)  16b just says certain

9    emails from Mr. Collingsworth's international rights

10   email account were also missing but doesn't really

11   provide specifically what that means.

12                   What email -- what emails from

13   Mr. Collingsworth's International Rights Advocates

14   email account were missing at the time you first

15   were engaged?

16        A.    I'd have to go back and check the

17   documentation.

18                   (Williams Exhibit 4

19              marked/introduced.)

20        Q.    (BY MR. WELLS)  I'm marking as

21   Plaintiff's Exhibit 4 a document that was produced

22   to us from your file.  Appears to be a chart of some

23   sort.

24                   What -- what is your understanding

25   of what that is?

```
 1          A.      This is a document labeled "Chart of
 2   Terry Collingsworth's Computers."
 3          Q.      Go to page 3.
 4                  You see that box with the boldfaced
 5   heading "March 22, 2013"?
 6          A.      Yes, sir.
 7          Q.      The last sentence in that box says:
 8   "There are no IRA emails on TC's work desktop prior
 9   to this date."
10                  Do you see that?
11          A.      Yes, sir.
12          Q.      Is that your understanding of the state
13   of Mr. Collingsworth's IRA email account as of the
14   time you came on board?
15          A.      I believe there were some that had been
16   located when I came on board.
17          Q.      When were those located and what were
18   they?
19          A.      I don't know.
20          Q.      When this says, "There are no IRA emails
21   on Terry Collingsworth's work desktop prior to March
22   22, 2013," [as read] that means, if he opens up his
23   email account on, say, March 24, 2013, he's not
24   seeing any IRA email accounts prior to March 22nd?
25                  MR. KUSIN:  Objection.  Form.
```

```
 1        A.      I didn't prepare this document, so I'm

 2   not -- I don't know what that specific line is

 3   intended to mean.

 4        Q.      (BY MR. WELLS)  You don't know what it

 5   means -- well, who created this document, first and

 6   foremost?

 7        A.      I don't know.

 8        Q.      All right.  It was provided to you to, I

 9   imagine, provide some information on, I guess, what

10   had been done and determined prior to you coming on

11   board?

12        A.      It was -- it was provided to me.

13        Q.      Somebody was telling you that there are

14   no IRA emails on Terry Collingsworth's work desktop

15   prior to March 22, 2013, right?

16        A.      My recollection is that there were some

17   IRAdvocates emails that had been located when I came

18   on board.

19        Q.      But you cannot tell us which emails

20   those were?

21        A.      I would have to go back and check my

22   records.

23        Q.      As far as what it would look like to

24   Terry Collingsworth when he opened up his Outlook

25   account on his desktop, say, in 2014, prior to you
```

1    coming on board in, say, January of 2014, when he

2    opened that up, what was --

3         A.    Excuse me.  Before I came on board when?

4         Q.    I'm just giving you an example.

5               Say Terry Collingsworth opens his

6    email account on January 1st of 2014.  What does he

7    see?

8               MR. KUSIN:  Objection.  Form.

9         Q.    (BY MR. WELLS)  No emails prior to March

10   23rd of 2013?

11        A.    He -- if he knew where to look, he would

12   see emails in a folder where emails were being

13   forwarded.  Any -- any email, though, addressed to

14   both Collingsworth and -- Conrad & Scherer and

15   Collingsworth at -- or tc@iradvocates was going into

16   a folder in his Outlook.

17        Q.    And we'll get to that.

18               How about if he opens up his iPhone?

19        A.    I don't know.

20        Q.    All right.  In order for his iPhone to

21   be downloading emails from his -- either of those

22   accounts, those emails have to exist on the server;

23   is that right?

24        A.    Yes, sir.

25        Q.    In other words, if those emails had

**Dennis Williams CONFIDENTIAL**                                    **52**

1   already been archived and taken off the server, they

2   would not download to his iPhone if he was, say, in

3   Colombia?

4          A.     That's correct.

5          Q.     So if he opened up his iPhone at the end

6   of March 2013, he wouldn't see anything prior to

7   March 23rd, 2013, in emails?

8          A.     I don't agree with that.

9          Q.     Okay.  Why not?

10         A.     Depends on what's on the server at that

11   time.

12         Q.     Well, do you know when those emails were

13   taken off the server?

14                MR. KUSIN:  Objection.  Form.

15         A.     No, sir.

16         Q.     (BY MR. WELLS)  We do know that at the

17   time you came on board, there were no emails on the

18   server prior to March 23, 2013; is that fair?

19         A.     That's not correct.

20         Q.     Okay.  Why not?

21         A.     There were emails up until February, I

22   want to say, it was 2012 where a rule had been set

23   up to move his emails into a separate folder on his

24   Outlook account.  So we were able to locate that

25   folder, and there were a lot of emails in there.

53

1       Q.      Okay.  What -- what do we have now as

2   far as time periods of emails that we do have for

3   Mr. Collingsworth?

4       A.      Well, we have emails from --

5               MR. KUSIN:  Objection.  Form.

6       A.      We have Mr. Collingsworth's incoming

7   emails for his IRAdvocates account from February 26,

8   2010, through January 27, 2011, and we have his

9   outgoing emails from those IRAdvocates account from

10  May 4, 2010, through May 17, 2011.

11      Q.      (BY MR. WELLS)  Before we keep going,

12  those two time periods were located by you during

13  your engagement, right?  That's the way I read your

14  report.

15      A.      They may -- may have been already

16  recovered and processed.  We just -- we further

17  identified them.

18      Q.      Do you know that for a fact, or are you

19  just saying that's a possibility?

20      A.      We -- we had the IT director go

21  and -- and check on the computer, recover those.

22      Q.      You had the IT director go and recover

23  those time periods?

24      A.      Yes, sir.

25      Q.      Okay.  What other time periods do we

1   have now?  And since you've started with the IRA

2   account, let's stick with that for right now.

3        A.      As I mentioned before, we have his

4   IRAdvocates emails from February 22nd of 2012

5   through the present.  That those -- those were

6   emails that were sent to both his IRAdvocate account

7   and his Conrad & Scherer account.  There was a rule

8   set up in his Outlook that IT personnel were -- were

9   not aware of.

10       Q.      The rule being what?

11       A.      To move any email that came into his

12  Conrad & Scherer account to a folder -- well,

13  anywhere there was an email addressed to both Terry

14  Collingsworth at IRAdvocates and Terrence

15  Collingsworth at Conrad & Scherer to move it into a

16  separate folder.

17       Q.      Onto what computer?

18       A.      It was into -- into his Outlook account.

19       Q.      All right.  For that February 22, 2012,

20  to present time period, if the email is sent just to

21  the IRA account, it's not there?  It's only if it's

22  sent to both at the same time?

23       A.      In that folder.  It's only emails that

24  were sent to both accounts are in that folder.

25       Q.      All right.  This may help.  Let's try to

```
 1   work through this, because I'm having a hard time

 2   figuring out what we have and what we don't have.

 3                  (Williams Exhibit 5

 4             marked/introduced.)

 5        Q.    (BY MR. WELLS)  Marked as Exhibit 5, a

 6   time line that we attempted to create to reflect

 7   what is there and what is not there.  And I'll just

 8   explain to you, the black lines and time periods

 9   there are meant to reflect, at least upon our

10   reading of the report, what is there.  And the empty

11   spaces would be what is not there.

12                  If you could go through and tell me

13   on that exhibit what is right and what you have a

14   disagreement with.

15        A.    On your first row, the "IRA Incoming" is

16   incorrect.

17        Q.    Okay.  How?

18        A.    We have some of his incoming from

19   February -- from February 2012 to -- you know, to

20   the present.  That was the -- the ones that

21   were -- if they would have been addressed to both

22   accounts, that there was a --

23        Q.    Excuse me.  Were you finished?

24        A.    Yes, sir.

25        Q.    So if it was -- only if it was addressed
```

1    to both his IRA account and his Conrad & Scherer

2    account at the same time, would you have it between

3    February 22, 2012, and March 22nd of 2013?

4         A.    Yes, sir.

5         Q.    Okay.

6         A.    In addition, a lot of this is somewhat

7    inaccurate, because we've gone -- you know, Conrad &

8    Scherer has gone and searched for any emails that

9    any of the Conrad & Scherer employees have where

10   they were either copied on, blind copied on, they

11   were also in the "To" address or any outgoing and so

12   forth.  So they've done an extensive job of getting

13   any and all emails that would be related to Terry

14   Collingsworth.

15        Q.    Do you know who Albert Van Bilderbeek

16   is?

17        A.    No, sir.

18        Q.    Do you know who Ivan Otero is?

19        A.    No, sir.

20        Q.    Do you know who Francisco Ramirez is?

21        A.    No, sir.

22        Q.    Do you know why Mr. Collingsworth might

23   be communicating privately with those individuals?

24             MR. KUSIN:  Objection.  Form.

25        A.    No, sir.

```
 1        Q.      (BY MR. WELLS)  Do you know that none of

 2   those individuals have Conrad & Scherer email

 3   accounts?

 4        A.      No, sir.

 5        Q.      Assume for me that none of those do have

 6   Conrad & Scherer email accounts.

 7                Any of Mr. Collingsworth's private

 8   email conversations with them which were not for

 9   some reason copied to some other Conrad & Scherer

10   employee would be missing for the gap periods,

11   correct?

12        A.      I don't know.

13        Q.      Okay.  I want to focus our discussions

14   today just on Mr. Collingsworth's email account.

15   And I understand that people have gone out to try to

16   see where he had maybe copied somebody else and

17   tried to fill holes that way, but I'm focused on

18   what is in Mr. Collingsworth's email accounts.  And

19   that is what we're trying to determine the scope of

20   in this Exhibit No. 5.

21                So if we could, you've helped me

22   with this rule started in, say, February of 2012,

23   about sending to both email accounts at the same

24   time.

25                Any of these other periods where we
```

```
 1    have stated something inaccurately?
 2         A.     I'd have to review it to make certain
 3    that it's accurate.
 4         Q.     Okay.  Why don't we take a break and you
 5    do that right now.  This will make this deposition a
 6    lot less painful.
 7         A.     Okay.
 8                THE VIDEOGRAPHER:  We're off the
 9         record at 10:47.
10                (Break.)
11                THE VIDEOGRAPHER:  We're back on the
12         record at 10:59.
13         Q.     (BY MR. WELLS)  All right.
14    Mr. Williams, have you had an opportunity to review
15    that time line exhibit and see what is or is not
16    accurate?
17         A.     Yes, sir.
18         Q.     Okay.  Walk me through it.
19         A.     As far as what's not -- not accurate?
20         Q.     We can do what is accurate, either way
21    you want to do it.  I just want to know what the
22    real dates are, if we have misstated something.
23         A.     Like, the first row --
24         Q.     "IRA Incoming"?
25         A.     Correct.  There is emails from February
```

**Dennis Williams CONFIDENTIAL**                                    59

```
 1    22, 2012, in -- in his Conrad & Scherer account.

 2    And that would be also down on the Conrad & Scherer

 3    incoming, there's a -- there would be

 4    email -- incoming emails.  From --

 5         Q.     But that was -- I didn't mean to

 6    interrupt you.  Go ahead.

 7         A.     From February 22, 2012.

 8         Q.     But that's only if they are sent to both

 9    his IRA and Conrad & Scherer account at the same

10    time?

11         A.     Yes, sir.

12         Q.     Did you analyze that folder that those

13    emails were going to?

14         A.     Yes, sir.

15         Q.     How many emails was it?

16         A.     My recollection is, like, well over

17    1,000.

18         Q.     Over a three-year period?

19         A.     Yes, sir.

20         Q.     In the documents that we've been

21    provided, there's some work tickets from this CTSS

22    group that was doing IT consulting for

23    Mr. Collingsworth.

24                Do you recall reviewing those?

25         A.     Yes, sir.
```

1          Q.     One had a notation that -- I think it

2    was October of 2011 -- 15,000 emails from

3    Mr. Collingsworth's IRA account were archived from

4    the period October 2011 back to April of 2011, about

5    seven months.

6                    Do you recall that?

7                    MR. KUSIN:  Objection.  Form.

8          A.     I'd have to look at the actual work

9    ticket to see exactly what it -- it states.

10                   (Williams Exhibit 6

11               marked/introduced.)

12         Q.     (BY MR. WELLS)  This was an attachment

13   to your report I'm going to mark as Exhibit 6.  It

14   was Exhibit T to your report.

15                   Do you see where they archived over

16   15,000 emails from April 2011 to October 2011?

17         A.     Yes, sir.

18         Q.     That's about a seven-month time period?

19         A.     Yes, sir.

20         Q.     Yet this -- this rule that was created

21   that only captures emails sent to both

22   Mr. Collingsworth's International Rights Advocates

23   email account and his Conrad & Scherer account at

24   the same time only had about 1,000 emails in it over

25   a three-year time period.

1      A.      I think you're misstating my previous

2   testimony.  I said had over 1,000.  I didn't say it

3   had about 1,000.

4      Q.      How many did it have in it?

5      A.      I'd have to look at my notes.

6      Q.      Roughly 1,000?

7      A.      No, sir.  It had over 1,000.

8      Q.      1,001 or 1,900?

9      A.      I'd have to -- I'd have to review my

10  notes to give you an accurate number.

11     Q.      It didn't have 15,000 in it, did it?

12     A.      It may have.

13     Q.      You just really have no idea.

14             MR. KUSIN:  Objection.  Form.

15     Q.      (BY MR. WELLS)  And the reason I ask is,

16  1,000 and 15,000 are very, very different numbers.

17     A.      I don't know.

18     Q.      Who set up that rule to folder just the

19  emails that are going to both Mr. Collingsworth's

20  IRA account and Conrad & Scherer account at the same

21  time?

22     A.      I don't know.

23     Q.      Okay.  And just to break this down, if

24  I'm writing an email and I just type in

25  tc@iradvocates.com or org, whichever it is, that's

1    not going to go into that folder, is it?

2        A.     No, sir.

3        Q.     I would have to address it to both

4    tc@iradvocates and tc@conradscherer?

5        A.     Yes, sir.

6        Q.     Did you say you didn't know who created

7    that folder or created that rule, or do you?

8        A.     I do not know.

9        Q.     Why was it created?

10       A.     I don't know.

11       Q.     How did you determine that such a rule

12   had been created?

13       A.     We reviewed the Outlook account for

14   Mr. Collingsworth.

15       Q.     On a particular computer or the

16   web-based account?

17       A.     On his Outlook account.

18       Q.     Right.

19              But sounds like, from your report,

20   everybody but Terry Collingsworth was using -- at

21   least in the DC office -- was using a web-based

22   application to access their Conrad & Scherer emails.

23   Collingsworth was using an Outlook program installed

24   directly on his computer; is that your

25   understanding?

1          A.      Mr. Collingsworth had an Outlook client

2     installed on his computers.

3          Q.      Okay.  That folder that create -- that

4     holds these over 1,000 emails to both of his

5     accounts, where was that folder stored?  Was it on a

6     computer, or was it on a server, or was it on a

7     web-based application?

8          A.      It was -- it was in the Outlook server.

9          Q.      Based on your review of the Outlook

10    server, could you see any other rules that had been

11    created?

12         A.      No, sir.

13         Q.      The only -- the only rule that you've

14    actually seen created on Mr. Collingsworth's account

15    with your own eyes is this folder that was created

16    to house emails that went to both his IRAdvocates

17    account and his Conrad & Scherer at the same time?

18         A.      Yes, sir.

19         Q.      Okay.  Is that just incoming?

20         A.      Yes, sir.

21         Q.      Okay.  So on our Exhibit No. 4 -- is

22    that correct?  Is the time line No. 4?

23         A.      Looks like 5.

24         Q.      Okay.  On our Exhibit No. 5, that rule,

25    February 22, 2012, to present, where it's just going

1  to both accounts at the same time, that would only

2  apply to the first line, "IRA Incoming," and then

3  the line immediately below the time line, "C&S

4  Incoming"?

5        A.      Yes, sir.

6        Q.      Okay.  All right.  What else do we need

7  to correct on here?

8        A.      I'd have to go back and check on the

9  Conrad & Scherer outgoing.  He did not get a Conrad

10  & Scherer account until around 2008.

11        Q.      Okay.  So that -- that beginning date

12  should be June of 2008?

13        A.      I'd have to verify that, but...

14        Q.      Best judgment sitting here today?

15        A.      Yes, sir.

16        Q.      Okay.  Is everything else correct?

17        A.      Yes, sir.

18        Q.      All right.  I had one question about

19  your April report.

20              You say, in Paragraph 17(a), you're

21  talking about your continued investigation led to

22  discovery of additional emails.

23              You found incoming emails for the

24  IRA account from February 26, 2010, through January

25  27, 2011.

1          A.      Yes, sir.

2          Q.      And then, in Paragraph 19, where you're

3    describing the gaps that remain, you say the

4    incoming IRAdvocates gap starts on October 27th of

5    2011 as opposed to January 27, 2011.  I'm just

6    wondering if that's an error or if there's some

7    other explanation that I'm missing.

8          A.      I'll have to -- I'll have to double

9    check that.

10         Q.      Do you think you'll be able to determine

11   that today at some point?

12         A.      Probably not.

13         Q.      Were you able to review

14   Mr. Collingsworth's actual email account?

15         A.      Reviewed portions of it, yes, sir.

16         Q.      And by that, I mean, were you able to go

17   sit down at his computer and open up his Outlook and

18   see what was there?

19         A.      We did open up his Outlook account.  It

20   was from -- from Florida, not from his computer.

21         Q.      So you -- you used the web-based

22   application to log on to it?

23         A.      I don't recall.

24         Q.      And when you opened it up, were there

25   any emails from any account prior to March 23rd of

1    2013?

2         A.        For incoming or outgoing?

3         Q.        Let's start with incoming.

4         A.        I mean, there's the emails I mentioned

5    that we found in the folder that were emails going

6    back to February of 2012.

7         Q.        Right.  I'm just saying, you open up

8    your Outlook, you just start scrolling through your

9    emails, you don't start going into archive folders,

10   you don't start doing any deep data recovery like

11   you would do.  I'm just talking about sitting down

12   at your computer, opening up your Outlook, going to

13   the first email -- or the -- the oldest email you

14   have in there, what was that?

15        A.        Which -- which folder are you in?

16        Q.        Your inbox.

17        A.        The inbox went back to February -- I

18   mean, March of 2013.

19        Q.        For both IRA and Conrad & Scherer?

20        A.        Yes, sir.

21        Q.        How about the outbox for IRA?  It also

22   would go back to March 23, 2013?

23        A.        Yes, sir.

24        Q.        All right.  On Exhibit 5, there is this

25   tiny little space where there are emails from IRA

**Dennis Williams CONFIDENTIAL**                                      67

1    outgoing between February 4, 2012, and February 21,

2    2012.

3                    Where were those emails?

4         A.      I believe those were recovered from one

5    of the computers.

6         Q.      Do you have any explanation for

7    what -- what was the significance of that 17-day

8    time period?

9         A.      No, sir.

10        Q.      Was it just some emails from that time

11   period that were drug into a folder somewhere, or do

12   you know if it was all emails during that 17 days?

13        A.      I don't know.

14        Q.      Okay.  For all these time periods where

15   we do have emails, the black lines on this exhibit,

16   do you know whether we have all the emails?

17        A.      I don't know.

18        Q.      Okay.  There could very well be

19   individual emails deleted in these time periods that

20   you don't know whether they're there or not?

21        A.      I don't know.

22        Q.      Okay.  There could also be large chunks,

23   say, to or from a particular person in these time

24   periods where we do have emails but we're not sure

25   we have every email?

1      A.      I wouldn't agree with that.  It's -- but

2   I don't know.

3      Q.      Okay.  Let's take it a little bit

4   further.

5              How about you're looking for a

6   particular person and only discussing a particular

7   subject and individually deleting those.

8              You don't know whether that has

9   occurred in these time periods where we actually do

10  have emails, do you?

11     A.      Again, the information we have doesn't

12  support that, so, I mean, that's a hypothetical,

13  and, you know, I wouldn't agree with that

14  hypothetical.

15     Q.      All right.  Let's take May 17th of 2011

16  as an example.

17             What information do you have that

18  shows you no emails were deleted on that day?

19     A.      I just have his -- the outgoing emails.

20     Q.      So you know what's there, but you don't

21  necessarily know what's not there?  I mean, you know

22  he didn't delete every email on that particular day,

23  right?

24     A.      I know we have emails for that day.

25     Q.      Right.

1              And what I'm trying to ask, do you

2    know whether you have every email from that day?

3        A.      I do not know.

4        Q.      So based on the information you have, it

5    is entirely possible that individual emails were

6    deleted on particular days in this time period where

7    we do have emails that you don't necessarily know

8    about?

9                MR. KUSIN:  Objection.  Form.

10       A.      Could you rephrase that question?

11       Q.      (BY MR. WELLS)  For all these black

12   lines on this exhibit, these are meant to reflect

13   the time periods we do have some emails for those

14   days.

15              Based on the information you have,

16   isn't it possible that there are individual emails

17   on those days that may have been deleted that you

18   don't know about?

19       A.      I don't agree with that.  There's all

20   kinds of possibilities.  Based on my examination,

21   Mr. Collingsworth and his assistants were very

22   diligent in wanting to preserve their emails, so I

23   would think that they would want to preserve the

24   emails that were important.

25       Q.      So that opinion's based on what somebody

1   told you, that they were diligent in trying to

2   preserve emails?

3              MR. KUSIN:  Objection.  Form.

4        A.    No, sir.

5        Q.    (BY MR. WELLS)  Okay.  Well, how -- how

6   can you make the determination that everybody was

7   diligent in saving every single email that Terry

8   Collingsworth ever sent or received?

9        A.    That's not what I stated.

10       Q.    Explain to me how you can say they were

11  diligent in saving emails to the point that you can

12  say here that you don't think it's possible he

13  deleted emails on a particular day and you wouldn't

14  know about it.

15             MR. KUSIN:  Objection.  Form.

16       Q.    (BY MR. WELLS)  Are you telling us that

17  that's not possible, based on the information you've

18  seen?

19       A.    I'm saying that the hypothetical you

20  proposed, based upon my review, there were numerous

21  emails, work slips to preserve and maintain the

22  emails.  They did reasonable efforts to preserve

23  their emails.

24       Q.    Okay.  The one we looked at talked about

25  archiving 15,000 emails over a seven-month time

1    period.

2                    Do you remember that one?

3        A.    Yes, sir.

4        Q.    That would archive the emails that were

5    still in existence as of the date of archiving,

6    right?

7        A.    Yes, sir.

8        Q.    In other words, had not yet been

9    deleted?

10       A.    Yes, sir.

11       Q.    It is entirely possible and, in fact,

12   probable, based on most anybody's email usage, that

13   individual emails over that seven-month time period

14   were deleted prior to the archive date?

15                    MR. KUSIN:   Objection.

16       Q.    (BY MR. WELLS)  Don't you think that's

17   probable?

18       A.    There may have been a few emails

19   deleted.

20       Q.    But based on the objective data, you

21   were able to see -- as far as examining the

22   computer, you can't tell us what those emails were

23   or how many they were, can you?

24       A.    That's correct.

25       Q.    All right.  This chart only reflects

**Dennis Williams CONFIDENTIAL**                                72

```
 1    Mr. Collingsworth's IRA and Conrad & Scherer email

 2    accounts.

 3                    What about his Gmail account?  What

 4    time periods for that account do we have?

 5    A.    I don't know.

 6    Q.    You did not look at his Gmail account?

 7    A.    No, sir.

 8    Q.    Did you ask to look at it?

 9    A.    No, I did not.

10    Q.    Is there any reason you did not?

11    A.    I was concentrating on his IRAdvocates

12    and his Conrad & Scherer accounts.

13    Q.    Are you aware that he is an individual

14    defendant in this case, not just as an employee of

15    either of those entities?

16    A.    Yes, sir.

17    Q.    You didn't think it was relevant to look

18    at his Gmail account?

19                    MR. KUSIN:  Objection.  Form.

20    A.    I did -- I did not look at his Gmail

21    account.

22    Q.    (BY MR. WELLS)  Okay.  So if -- if there

23    are gaps in that account or no gaps in that account,

24    you don't know at all; that was not part of your

25    engagement?
```

```
 1          A.      That's correct.
 2          Q.      Are you aware of any other email
 3   accounts Mr. Collingsworth used over the time period
 4   you were focusing on?
 5          A.      There were some emails that were -- we
 6   recovered from the International Labor Rights forum
 7   account back in 2005 through 2007.
 8          Q.      Okay.  Are you aware of any others such
 9   as Hotmail, a different Gmail account, any other
10   non-Conrad & Scherer or International Rights
11   Advocates accounts he maybe used?
12          A.      No, sir.
13          Q.      Did you request a complete listing of
14   all email accounts Mr. Collingsworth had used at
15   least dating back to 2008?
16          A.      No, sir.
17          Q.      Based on the work you did, did you gain
18   an understanding of -- I don't know how to say
19   this -- the pattern or habits through which
20   Mr. Collingsworth utilized his two email accounts?
21   Did you get an understanding whether he used
22   IRAdvocates more than Conrad & Scherer?
23          A.      There is indications that he -- at one
24   point early on, he was forwarding emails from Conrad
25   & Scherer to his IRAdvocates account.
```

1      Q.     And when you say that, he was not

2   hitting the forward button, he had set up a rule for

3   anything that hits his Conrad & Scherer inbox to

4   automatically get pushed to his IRAdvocates account?

5                MR. KUSIN:  Objection.  Form.

6      A.     I'm not -- I'm not certain how that was

7   set up.

8      Q.     (BY MR. WELLS)  You don't have any

9   documents in your file reflecting an auto forward

10  rule?

11     A.     No, I do not.

12     Q.     Okay.  Did you get any understanding of

13  the amount of email traffic sent to IRA as opposed

14  to Conrad & Scherer?

15     A.     No, I did not.

16     Q.     There's some discussions in some of the

17  documents we'll get to at some point today about

18  distinguishing between sensitive emails and the

19  routine stuff.

20                Do you remember that?

21     A.     I remember something to that effect.

22     Q.     Based on your work, did you gain any

23  understanding of whether Mr. Collingsworth used one

24  account or the other, IRA or Conrad & Scherer, when

25  he was dealing with sensitive emails as opposed to

```
 1    routine stuff?

 2         A.     No, I did not.

 3         Q.     Did you ask?

 4         A.     No, sir.

 5         Q.     We talked a little bit about this at the

 6    beginning, but your report mentions a specific

 7    restriction on your access to certain information

 8    due to a restricted protective order.

 9                I think we've identified that as the

10    DynCorp protective order?

11         A.     Yes, sir.

12         Q.     Were there any particular email accounts

13    or computers that you were not -- you or your team

14    were not allowed to put your own eyes on as opposed

15    to relying on a Conrad & Scherer person?

16         A.     None.

17         Q.     Looking back to your April 2015 report,

18    do you mind reading off the exhibit number for that?

19                MR. PRESLEY:  3.

20         Q.     (BY MR. WELLS)  Exhibit 3, Paragraph 12

21    talks about the scope of your engagement, and you

22    told us a little bit about this today.

23                First was an attempt to locate

24    certain electronic data that the defendants were

25    unable to find, right?
```

1      A.    Yes, sir.

2      Q.    And, b, to "review the sufficiency and

3  thoroughness of Defendants' initial e-discovery

4  efforts," [as read] correct?

5      A.    Yes, sir.

6      Q.    And, c, to determine, after you found

7  any additional information, whether any of the

8  information that was still missing appeared to have

9  been intentionally deleted or otherwise disposed of?

10              MR. KUSIN:  Objection.  Form.

11              You're misstating what the sentence

12         says.  Please read it correctly.  If

13         you're going to be reading from the

14         document, read it accurately.

15      Q.    (BY MR. WELLS)  Is that your

16  understanding, without even looking at that

17  document, of one of the scopes of your engagement?

18      A.    You mentioned -- you're asking one of

19  the scopes or all the scopes?

20      Q.    One of the things you were asked to do

21  was make a determination whether something had been

22  intentionally deleted or otherwise disposed of; is

23  that fair?

24      A.    Yes, sir.

25      Q.    Please tell me how you would go about

```
 1    determining forensically whether email had been

 2    intentionally deleted or otherwise disposed of.

 3         A.    You would examine the computer and try

 4    to recover any deleted files.

 5         Q.    What else?

 6         A.    Just, you know, try to determine if any

 7    files had been -- you know, email files had been

 8    deleted.

 9         Q.    Okay.  Is that all you would do to

10    determine whether -- forensically whether something

11    had been intentionally or unintentionally deleted?

12         A.    You could look at other Windows

13    artifacts to see if files -- any indication of those

14    files.

15         Q.    Okay.

16         A.    In this case, we also reviewed work

17    tickets, emails, and traced -- to transition from

18    computer to computer.

19         Q.    All right.  Now, would you consider

20    looking at work tickets to be a forensic analysis?

21         A.    Computer forensic analysis or forensic

22    analysis as far as document analysis?

23         Q.    A computer forensic analysis.

24         A.    It may be a little bit outside the

25    scope, but the information from work tickets can
```

1    help indicate what was transpiring and what was

2    occurring at the time.

3        Q.      Work tickets, you're looking at sort of

4    circumstantial evidence to try to make some judgment

5    as to what you think may or may not have occurred?

6                      MR. KUSIN:   Objection.   Form.

7        A.      I'm looking at activities that would

8    indicate what occurred.

9        Q.      (BY MR. WELLS)   Right.

10                     And that work ticket that we've

11   marked as an exhibit talking about archiving 15,000

12   emails, you don't know whether, during that time

13   period, certain emails were intentionally deleted,

14   do you?  That work ticket doesn't tell you that,

15   does it?

16       A.      The work ticket just indicates what was

17   archived.

18       Q.      Right.

19                     It does not tell you if something

20   had been intentionally deleted before the archiving

21   date?

22       A.      Again, the work ticket just states what

23   was archived.

24       Q.      Not what may have been deleted before

25   the archiving date?

1        A.      Again, the work ticket just indicates

2     what was archived on that date.

3        Q.      All right.  Pull out that work ticket

4     for me, please.

5                        MR. WELLS:  What exhibit is that?

6                        MR. PRESLEY:  6.

7        Q.      (BY MR. WELLS)  It's Exhibit No. 6.

8                        Please --

9                        MR. DAVIS:  I'm going to just say

10                    something to you.  There's a question

11                    being asked to you, and you're not

12                    answering it.  So we need to --

13                        MR. KUSIN:  Well, Counsel, you're

14                    not asking the questions.

15                    If -- if -- if --

16                        MR. DAVIS:  You're right about that.

17                    But I want to say this, we've come a long

18                    way.  And when a question is asked of this

19                    expert, we're entitled to get an answer.

20                        MR. KUSIN:  And Trey is -- Trey can

21                    object to a response as nonresponsive if

22                    he so chooses and -- and can ask his

23                    questions.

24        Q.      (BY MR. WELLS)  Read for me off that

25     document where it says nothing in the archival

1    period was intentionally deleted.

2         A.       There's nothing on this document for

3    that.

4         Q.       Okay.  If you wanted to determine during

5    that seven-month time period whether individual

6    emails, say, with a particular person or about a

7    particular subject had been deleted intentionally,

8    how would you go about determining that?

9         A.       You could try to recover any files from

10   the pst folder and see if there's any deleted files

11   in that pst folder.

12        Q.       Right.

13               You need to examine the computer,

14   don't you?

15        A.       Yes, sir.

16        Q.       And the computer that housed those

17   15,000 emails, as well as any other emails that may

18   have been deleted prior to that archival date, is no

19   longer in existence, to our knowledge, is it?

20        A.       That's correct.

21               MR. WELLS:  All right.  Now is

22          probably a pretty good time for a break.

23               THE VIDEOGRAPHER:  We're off the

24          record at 11:36.

25               (Lunch break.)

```
 1                THE VIDEOGRAPHER:  Okay.  We're back
 2          on the record with the start of DVD Number
 3          3 at 12:34.
 4                MR. KUSIN:  Trey, before you start,
 5          I just wanted to put on the record that we
 6          have provided you the invoices for Pathway
 7          that was -- that were mentioned earlier in
 8          the deposition.
 9                MR. WELLS:  Okay.  And we will
10          attach them as exhibits before we leave
11          today.  Thank you.
12      Q.    (BY MR. WELLS)  Mr. Williams, before we
13  broke, we were discussing how you forensically
14  analyze a computer to try to determine whether
15  something had been intentionally deleted.
16                Do you recall that line of
17  questioning?
18      A.    We discussed how you determine a file's
19  been deleted.
20      Q.    Assuming you do have the computer to
21  analyze, what are some indicators to you of
22  intentional deletion?
23      A.    That there are files deleted.
24      Q.    Okay.  So if you've got deleted files,
25  that indicates to you that they were intentionally
```

1    deleted?

2         A.     No, it's a -- I wouldn't agree with

3    that.  It's an indication that some files were

4    deleted.

5         Q.     Okay.  The question that you answered

6    right before that last one was, what are some

7    indicators of intentional deletion, and the first

8    thing you said was there were files that were

9    deleted.  So that's an indicator of intentional

10   deletion.  That's one, true?

11        A.     Having a deleted file is an indication

12   files were deleted, and it could have been

13   intentional.

14        Q.     What other indicators are there when

15   you're forensically examining a computer to try to

16   determine whether there was intentional deletion?

17        A.     If there was any wiping software used to

18   completely remove the file from the system so you

19   couldn't find any artifacts for -- if you loaded a

20   cleaning software on the machine that would try to

21   remove certain files, and if those were executed

22   around the time of interest, that would be an

23   indication.

24        Q.     Any others?

25        A.     Not that I recall at this time.

```
 1         Q.    I think you mentioned earlier the
 2    connection of an external device prior to file
 3    created dates and file deletion dates gives you some
 4    indication there may have been transfer to that
 5    external device; is that true?
 6         A.    Connection of a device to a computer
 7    could indicate transfer of files.
 8         Q.    All right.  In your reports where you're
 9    mentioning your scope of engagement, one of the
10    things you were asked to do was to "review the
11    sufficiency and thoroughness of Defendants' initial
12    e-discovery collection efforts"; is that right?
13         A.    Yes, sir.
14         Q.    And your report says "initial
15    e-discovery collection efforts."
16               What initial efforts were you
17    referring to there?
18         A.    Conrad & Scherer's search through their
19    email's Exchange Server looking for emails.
20         Q.    And what all did you do to determine the
21    sufficiency of those e-discovery collection efforts?
22         A.    One, reviewed what mailboxes they had
23    searched and, you know, that they had searched, you
24    know, across their Exchange Server and the variety
25    or variations of search terms that they used.
```

1       Q.      When were these initial e-discovery

2   collection efforts?  When were they undertaken

3   initially?

4       A.      They were done back in 2014.  There may

5   have been a few before that, but primarily in 2014.

6       Q.      You -- first off, do you know when this

7   suit was filed?

8       A.      No, I do not.

9       Q.      Do you know when certain discovery

10  requests were served?

11      A.      I have seen some discovery requests.

12      Q.      Did you take into account the timing of

13  those discovery requests in your review of the

14  sufficiency of searches?

15      A.      Yes, sir.

16      Q.      Okay.  Which discovery request have you

17  seen?

18      A.      There's one in -- there were a couple in

19  2014.

20      Q.      Those are the only ones you've seen?

21      A.      There was one, I believe, in 2013.

22      Q.      When in 2013?

23      A.      I -- I don't recall.

24      Q.      Did you review the content of the

25  requests to determine whether the search terms

**Dennis Williams CONFIDENTIAL**                                    **85**

```
1    utilized were sufficient to gather responsive
2    information to what was being asked for?
3         A.    No, sir.
4         Q.    So that was not part of your opinion?
5         A.    Correct.
6         Q.    You consult -- tell me if I'm
7    wrong -- you consult with people on e-discovery,
8    right?
9         A.    Yes, sir.
10        Q.    So if I was to hire you at the outset of
11   a case, I know nothing about e-discovery, you could
12   give me some advice on how best to do things?
13        A.    Yes, sir.
14        Q.    That's something your company does,
15   right?
16        A.    Yes, sir.
17        Q.    If I was to hire you for a case that was
18   filed today, I know nothing about e-discovery,
19   collection of emails, preservation of emails, what
20   would be the first thing you would tell me to do?
21        A.    I would tell you to preserve your data.
22        Q.    The first step in that would be putting
23   in place a litigation hold?
24        A.    Yes, sir.
25        Q.    When is it your understanding that a
```

1    litigation hold was put in place in this case?

2        A.      I don't know.

3        Q.      You don't have any idea?

4        A.      No, sir.

5        Q.      You're not offering any opinions about

6    the sufficiency of the litigation hold process?

7        A.      I don't know.

8        Q.      Well, are you or aren't you?  Are you

9    saying that there was an appropriate litigation hold

10   put in place in this case?

11       A.      I'm not aware of the litigation hold

12   process that was used.

13       Q.      Okay.  So are you not offering an

14   opinion about whether the litigation hold was

15   appropriate or inappropriate?

16       A.      I -- my report did not include anything

17   regarding that.

18       Q.      Well, one of your opinions mentioned the

19   initial e-discovery collection efforts.

20               So that opinion does not refer to

21   putting in place a litigation hold?

22       A.      That's correct.

23               (Williams Exhibit 7

24          marked/introduced.)

25       Q.      (BY MR. WELLS)  I'm showing you what I'm

1    marking as Exhibit 7, which appears to be some

2    handwritten notes.

3                    Are these your notes?

4    A.       Yes, sir.

5    Q.       Okay.  In the middle, you see the

6    heading that says "Office 365"?

7    A.       Yes, sir.

8    Q.       And then the last little bullet on there

9    says:  "Hold date July 10, 2014" [as read]?

10   A.       Yes, sir.

11   Q.       Is that your understanding of when a

12   litigation hold was put on that particular subset of

13   e-data?

14   A.       My recollection is, that would be the

15   indicator in that particular program for a

16   litigation hold.

17   Q.       Okay.  What does that mean?

18   A.       I'm not certain if there are other steps

19   taken prior to that in other systems for litigation

20   hold.

21   Q.       Okay.  And the next bullet here says:

22   "Litigation hold July 7, 2014, for the C&S Exchange

23   Server."  [As read.]

24                    Do you see that?

25   A.       Yes, sir.

1      Q.      So that's your understanding of the date

2   a litigation hold was put in place for the Conrad &

3   Scherer Exchange Server?

4      A.      Yes, sir.

5                  (Williams Exhibit 8

6              marked/introduced.)

7      Q.      (BY MR. WELLS)  Marking as Exhibit 8 a

8   March 24, 2015, email from you to one of the

9   defendants' counsel.  And looks like you're asking a

10  question.  Your question is:  "Also date IRAdvocates

11  account moved to office365 and was a hold put in

12  place on email?"

13                  Do you see that?

14     A.      That was my question, yes.

15     Q.      What was the answer?

16     A.      I think we reviewed the system, we got

17  the dates of -- as far as actually on the Exchange

18  Servers.  When a notice went out, I'm not certain as

19  far as a companywide litigation hold.

20     Q.      Okay.  You just mentioned something

21  there.

22                  A notice like a litigation hold

23  letter?

24     A.      Yes, sir.

25     Q.      Have you seen one of those in this case?

 1        A.      I have not.

 2        Q.      Did you ask for one?

 3        A.      No, sir.

 4        Q.      None were provided to you?

 5        A.      Not that I recall.

 6                    (Williams Exhibit 9

 7                marked/introduced.)

 8        Q.      (BY MR. WELLS)  Marking as Exhibit 9 an

 9   April 6, 2015, email from Juan Carlos Rodriguez to

10   you.

11                    Is Mr. Rodriguez the IT director or

12   IT person at Conrad & Scherer?

13        A.      Yes, sir.

14        Q.      You go down to the bottom of this first

15   page is your email to him where it looks like you're

16   asking a few questions, and you say:  "Juan, When

17   you get a chance, need the settings for

18   TC@IRAdvocates.org or all IRAdvocates email accounts

19   for retention policy for Office365 before you put

20   the litigation hold on the account."

21                    Do you see that?

22        A.      Yes, sir.

23        Q.      Sitting here today, are you aware of a

24   litigation hold being put on that account prior to

25   this July 2014 date that's reflected in your notes?

**Dennis Williams CONFIDENTIAL**                    **90**

1      A.      I'm not aware of an earlier date.

2      Q.      You go on to say:  "The default is items

3   in the deleted items folder are removed after 30

4   days.  This can be adjusted."

5              What are you saying there?

6      A.      The -- the normal settings on Outlook

7   is, you move something into a deleted items folder,

8   then sometimes it will be removed after 30 days.

9   But that can be adjusted.

10     Q.      Okay.  But the default setting is, it's

11  removed after 30 days, right?

12     A.      Yes, sir.

13     Q.      And then the last thing you say is:

14  "Recovering items removed from deleted items folder

15  is 14 days by default."

16              What does that mean?

17     A.      That even if an item got deleted from

18  the deleted items, it would still be on the server

19  for another 14 days, and it could be -- it could be

20  recovered.

21     Q.      Okay.  So if you got the default

22  settings in place, if something gets deleted after

23  30 days, it is, I guess, taken off the server, but

24  there's still a 14-day time period which you could

25  somehow recover that?

```
 1        A.       That's the -- the normal default

 2   settings.

 3        Q.       Okay.  And under the normal default

 4   settings, after 44 days, it's gone for good?

 5        A.       Normally speaking.

 6        Q.       Okay.  And Mr. Rodriguez's response to

 7   your question is, as far as what other

 8   documents -- what other settings, he says:  "it is

 9   the default, i have not changed the settings."

10                 Is that right?

11        A.       Yes, sir.

12        Q.       Is it your understanding that was still

13   the settings at the time you were asking this

14   question, these default settings?

15        A.       I know he has a hold on it so nothing is

16   being deleted from the system.  So my understanding

17   is, there's nothing -- they're not using the default

18   settings right now.

19        Q.       Okay.  Was it your understanding that he

20   was saying, at least until they put the litigation

21   hold on in July of 2014, that prior to that time, it

22   was the default settings?

23        A.       That's my understanding.

24                     (Williams Exhibit 10

25             marked/introduced.)
```

1        Q.      (BY MR. WELLS)   I am marking as Exhibit

2    10 a chart that was produced to us from your file

3    called "Chart of all Electronic Sources Searched for

4    December 12, 2014 Drummond v. Collingsworth

5    Privilege Log."

6                    Do you know who prepared that chart?

7        A.      No, sir.

8        Q.      Did this chart provide you some

9    information that you did not previously know?

10       A.      Yes, sir.

11       Q.      Flip to page 6.  You with me?

12       A.      Yes, sir.

13       Q.      All right.  At that last row at the

14   bottom, it says:  "TC's Gmail account."

15                    It's referring to

16   Mr. Collingsworth's Gmail account?

17       A.      Yes, sir.

18       Q.      And over on the far right, under the

19   heading "Any other issues?" the last sentence says:

20   "JC confirmed that there is no litigation hold on

21   Terry's or anyone else's G-mail or non-C&S account."

22                    Do you see that?

23       A.      Yes, sir.

24       Q.      Do you have any information to the

25   contrary, or do you accept that as a true statement?

1      A.      I don't know.

2      Q.      You don't have any information to say

3   that's not a true statement, do you?

4              MR. KUSIN:  Objection.  Form.

5      A.      I don't have any information either way.

6      Q.      (BY MR. WELLS)  We just got to take it

7   for what it is, but you can't dispute it?

8      A.      I wouldn't take everything you see on

9   these documents as fact.  There were -- it may --

10  may not be accurate.

11     Q.      Right.  And I'm asking for what you know

12  to be a fact.

13              Do you have any reason to dispute

14  that that portion about there being no litigation

15  hold on Mr. Collingsworth's Gmail account is not a

16  fact?

17     A.      Again, I don't know if it's correct or

18  not.  I would have to verify that.

19     Q.      Okay.  Is it your understanding that you

20  were being told that as of the time of your

21  engagement, there was still no litigation hold on

22  Mr. Collingsworth's Gmail account?

23              MR. KUSIN:  Objection.  Form.

24     A.      I don't -- I don't recall.

25     Q.      (BY MR. WELLS)  And you have not

1   reviewed his Gmail account to make any

2   determinations about it, have you?

3        A.    I have not.

4        Q.    Did you ask anybody, when you saw this,

5   why was there no litigation hold put on?

6        A.    No, sir.

7        Q.    That was not relevant to you?

8        A.    I don't recall seeing that, sir.

9        Q.    This is the first time you're seeing it?

10       A.    No, sir.  I remember the document.  I

11   don't remember the particular part of that document.

12       Q.    Does that cause you to have any

13   different opinions today, now that you have seen it

14   either for the first time or just now remembering

15   it?

16       A.    No, sir.

17       Q.    You called in your report -- well, let

18   me back up.

19             The litigation hold that was put on

20   the Exchange Server, what is your understanding of

21   what was done to it to put it in a state of hold?

22             MR. KUSIN:  Objection.  Form.

23       A.    My understanding is, the IT director

24   used Exchange services to invoke the litigation hold

25   on the system.

```
 1          Q.      (BY MR. WELLS)   That's an option you can

 2    select so the server will not allow messages on the

 3    server to be taken off of the server?

 4          A.      Correct.

 5          Q.      Had that been in place, say, in 2011,

 6    would that have prevented some sort of auto archive

 7    rule, if such a rule ever existed, from pulling

 8    emails off of the Conrad & Scherer server?

 9                  MR. KUSIN:   Objection.   Form.

10          A.      I would have to test that, but it could

11    have.

12          Q.      (BY MR. WELLS)   And that's how the --

13    the litigation hold function is designed to work, is

14    to prevent emails, whether through deletion, whether

15    through an auto archive, whether through manual

16    archive, from being pulled away from that server,

17    right?

18          A.      That's correct.

19          Q.      Okay.   So playing the game most

20    likely/least likely, isn't it most likely that that

21    litigation hold would have prevented the auto

22    archive rule from pulling emails off the server?

23          A.      Again, I would need to test it to -- to

24    confirm that.

25          Q.      You can't even say it would be likely
```

1   that it would have prevented that?

2        A.      I'm sorry, what's your question?

3        Q.      You can't even tell us, sitting here

4   today, without testing, that it's likely the

5   litigation hold functioning of the Exchange Server

6   would have prevented any auto archive rule from

7   pulling emails off the server?

8        A.      The litigation hold should have kept the

9   files on the server.  I would have to test to see

10  what the auto archive feature would do.

11       Q.      We'll get there at some point today, but

12  we don't know for a fact there was any sort of auto

13  archive rule enabled on Mr. Collingsworth's MacBook,

14  do we?

15       A.      We know it's highly likely that some

16  type of archive rule was set up on his Mac.

17       Q.      The only way to know that is to look at

18  the computer and look at the settings to see what

19  rules were or were not enabled, right?

20                MR. KUSIN:  Objection.  Form.

21       A.      Yes, sir.

22       Q.      (BY MR. WELLS)  One of the opinions

23  offered in your report is that the defendants

24  conducted a, quote, "...large-scale document

25  collection effort and thorough search for

1   documents..."

2                Do you still hold that opinion

3   today?

4       A.      What are you -- where are you quoting

5   from, sir?

6       Q.      Paragraph 15 in your April 2015 report.

7       A.      Are you talking about Paragraph 15?

8       Q.      Yes.

9       A.      And your question is?

10      Q.      Do you hold the opinion that the

11  defendants conducted a large-scale document

12  collection effort and thorough search for documents?

13      A.      Yes, sir.

14      Q.      Do you also hold the opinion that the

15  defendants conducted a thorough and reasonable

16  search, in light of the normal standards for

17  electronic discovery?

18      A.      Yes, sir.

19      Q.      When was that search conducted?

20      A.      They were doing searches across their

21  Exchange Server in 2014.

22      Q.      Okay.  And we've been provided some

23  spreadsheets that show certain Exchange Server

24  searches.

25                You were provided those as well,

```
 1    right?
 2         A.      Yes, sir.
 3         Q.      What other evidence do you have that
 4    reflects this reasonable search?
 5         A.      The process they went through on the
 6    search, searching for other Conrad & Scherer
 7    employees, checking their emails for any
 8    correspondence with Mr. Collingsworth, the variety
 9    of different search terms they used, the fact that
10    they went through all the employees' mailboxes and
11    just didn't limit their search to the scope of the
12    people involved in this matter.
13         Q.      Okay.  Anything else?
14         A.      That's all at this time.
15                 (Williams Exhibit 11
16              marked/introduced.)
17         Q.      (BY MR. WELLS)  I'm marking as Exhibit
18    11 a March 14, 2015, email from Juan Carlos
19    Rodriguez to one of your team members, Chris Graham;
20    is that right?
21         A.      Yes, sir.
22         Q.      What is your understanding of what this
23    is supposed to be?  Why is it being provided to you?
24         A.      I don't believe this email goes with the
25    following documentation.
```

```
 1        Q.        Okay.  It's sequentially Bates-numbered,

 2    so...

 3        A.        Well, the attachment is for a png file

 4    and not an Excel spreadsheet.

 5        Q.        Okay.

 6        A.        And looks like what you have here is the

 7    Excel -- an Excel -- excerpts from an Excel

 8    spreadsheet.

 9        Q.        Okay.  Do you have any idea where the

10    attachment to the email is, then?

11        A.        No, sir.

12        Q.        But you would expect, based on your

13    review of this -- the face of this email, there

14    should be an attachment behind it of a png file?

15        A.        Yes, sir.

16              MR. WELLS:  Okay.  We will request

17           that that be provided.

18              MR. NIEWOEHNER:  Again, Pathway is

19           the entity that produced the documents and

20           Bates labeled them the way they do.  I'm

21           happy to communicate that to the Pathway

22           folks.

23        Q.        (BY MR. WELLS)  We will request from you

24    that that attachment be provided.

25        A.        Yes, sir.
```

1          Q.      And if you wouldn't mind, we found that

2     in a few other places where there should be an

3     attachment and there's not.  We'll send you a list,

4     if you wouldn't mind double checking.

5          A.      Okay.

6          Q.      All right.  Let's -- with the

7     understanding that the first page of Exhibit 11 is

8     not really supposed to go with the rest of the

9     exhibits, anybody have any objection of me just

10    withdrawing that page and re-marking the exhibit as

11    it should be?

12                    MR. KUSIN:  No.  That's fine.

13         Q.      (BY MR. WELLS)  Exhibit 11 will now be

14    just the Excel spreadsheet.  What we're now marking

15    as Exhibit 11 is an Excel spreadsheet running from

16    the Conrad & Scherer Bates numbers CSTC 012016

17    through 12158.

18                    What is your understanding of what

19    that spreadsheet is supposed to reflect?

20         A.      This is a spreadsheet showing searches

21    done on the Conrad & Scherer Exchange Server.

22         Q.      All right.  The way these are produced

23    makes it a little difficult to go through them, but

24    can you just give us a summary of what types of

25    information is reflected on one of these reports?

1        A.      Each row indicates a search that was

2    done on the Exchange Server.

3        Q.      And then the columns give you various

4    information about those particular searches?

5        A.      Yes, sir.

6        Q.      Okay.  So this very first page of the

7    exhibit has got three searches that we can see, the

8    rest are redacted.

9                    Is it your understanding that the

10   rest that are redacted have nothing to do with this

11   case?

12       A.      I don't know.

13       Q.      Okay.  Did you ask to be provided

14   everything that had to do with their searches in

15   this case?

16       A.      Yes, sir.

17       Q.      Did they tell you, "We're going to be

18   withholding some of the things that we did to search

19   for documents in this case on a claim of privilege"?

20                    MR. KUSIN:  Objection.  Form.

21       A.      Can you repeat that question?

22       Q.      (BY MR. WELLS)  Did they inform you that

23   although you had requested everything related to

24   their searches for this case, they were not going to

25   be providing you everything related to their

1    searches for this case?

2                    MR. KUSIN:  Objection.  Form.

3        A.     I don't agree how that question is

4    phrased.  I believe they've provided me everything

5    pertaining to this case.

6        Q.     (BY MR. WELLS)  Okay.  That's all I'm

7    trying to get to.  We've got a lot of redactions

8    here.

9                    Do you have any reason to believe

10   that anything under these redactions is related to

11   this case?

12       A.     I don't believe that any redactions

13   pertain to the Drummond matter.

14       Q.     Okay.  So on this first page, we've got

15   searches in Row 3, Row 6 and Row 7, correct?

16       A.     Yes, sir.

17       Q.     Flip over to CSTC 12023.  And for the

18   remainder here, I'm just going to use the last three

19   numbers, if that's okay with you.

20       A.     12023?

21       Q.     Yes.

22       A.     Okay.

23       Q.     Do those columns with "LastStartTime,"

24   "LastEndTime" show when you those particular

25   searches were run?

```
 1          A.     Yes, sir.

 2          Q.     All right.  So we know the -- the one in

 3     Row 3 is June 15, 2012, correct?

 4          A.     Yes, sir.

 5          Q.     Row 6 and Row 7 were both on September

 6     18, 2013, correct?

 7          A.     Yes, sir.

 8          Q.     Now, flip back to 017, which is the

 9     second page of the exhibit.

10          A.     Okay.

11          Q.     Column E, does that tell you what

12     mailboxes that search was run on?

13          A.     Yes, sir.

14          Q.     All right.  So this -- the number 3

15     here, that's the one that was June 15, 2012.

16                 That search was only run on the

17     Exchange Server for Terry Collingsworth's email box,

18     right?

19          A.     Yes, sir.

20          Q.     Do you know -- well, how about you flip

21     over to 020, a couple pages back.

22                 Looking again in Column 3, which is

23     June 15, 2012, looks like the search is searching

24     for emails sent from two email addresses:

25     oteromivan@hotmail and jblanco1999@yahoo, correct?
```

```
 1        A.      Yes, sir.

 2        Q.      Do you know why that search was run on

 3   June 15, 2012?

 4        A.      No, sir.

 5        Q.      Do you know why it was only run on Terry

 6   Collingsworth's account?

 7        A.      No, sir.

 8        Q.      We do know that it was only run on Terry

 9   Collingsworth's account to the extent those emails

10   were on the Exchange Server, right?

11        A.      Yes, sir.

12        Q.      So if, whether be it auto archive or

13   manual archive, emails from his account were being

14   pulled off that server, this search would only get

15   what remained on the server, right?

16                MR. KUSIN:   Objection.  Form.

17        A.      This search would -- would recover

18   whatever files were on the server.

19        Q.      (BY MR. WELLS)  Right.

20                And we do know that for whatever

21   reason, whether it was auto archive, manual archive

22   or otherwise, some process was removing

23   Mr. Collingsworth's emails off the Conrad & Scherer

24   server?

25        A.      Yes, sir.
```

1      Q.     Okay.  So this search would not recover

2   any emails that had been removed from the server by

3   one of those processes we talked about?

4      A.     The -- the search did recover emails.

5   If they were not on the server, they would not have

6   been searched or recovered.

7      Q.     Okay.  And that was going to be my next

8   question.  Let's go to the emails that were

9   recovered, which is on page 024.

10          In Column AD, called "ResultNumber,"

11   that tells you how many emails were recovered?

12      A.     Yes, sir.  Well, how many -- I'm not

13   certain that's going to be the items or just the

14   emails.

15      Q.     When you say "items," that could

16   be -- an item could be an email or an attachment?

17      A.     Yes, sir.

18      Q.     So the actual number of emails could

19   very well be less than 23?

20      A.     It could be.

21      Q.     Substantially less if one email had a

22   lot of attachments?

23      A.     Well, the next column,

24   "ResultNumberEstimate," has 26.  So that result

25   number could be the emails, and the Column AE could

 1    be the emails and the attachments.

 2          Q.      In any event, we're looking at probably

 3    a max hit of 23 emails?

 4                      MR. KUSIN:  Objection.  Form.

 5          A.      23 or 26.

 6          Q.      (BY MR. WELLS)  Do you know how many

 7    emails have been produced reflecting communications

 8    between Mr. Collingsworth and those two email

 9    addresses?

10          A.      No, sir.

11          Q.      I think you already told me you don't

12    know who asked for this search to be done, do you?

13          A.      I do not.

14          Q.      Do you know who reviewed the results of

15    it?

16          A.      I do not.

17          Q.      Do you know if it was even done for this

18    case as opposed to some other case?

19          A.      The first page indicates "TC Drummond

20    Search."

21          Q.      Do you know how many cases

22    Mr. Collingsworth has going on with Drummond?

23          A.      No, sir.

24          Q.      All right.  Go back to the first page,

25    and the next two searches, we've got in

```
 1    rows -- excuse me -- yeah, Rows 6 and 7, and I think

 2    we already looked, they were in September of 2013?

 3         A.    I believe they were 2013.  Yes, sir.

 4    September 2013.

 5         Q.    All right.  Let's look at page 017,

 6    which is the second page of the exhibit.

 7                   Now, the "Source Mailboxes," again,

 8    that tells you whose emails are being searched for

 9    this particular search?

10         A.    Yes, sir.

11         Q.    In the course of your work, did you gain

12    an understanding of who works in Conrad & Scherer's

13    Fort Lauderdale office and who works in their DC

14    office?

15         A.    Yes.

16         Q.    Okay.  In these Searches Number 6 and

17    Number 7, do you see anybody that works in the DC

18    office?

19         A.    I do not recognize any names of the

20    people that I'm familiar with in the DC office on

21    this list.

22         Q.    We don't see Terry Collingsworth on this

23    list, do we?

24         A.    No, sir.

25         Q.    So his emails weren't searched in these
```

```
 1    Number 6 and Number 7, were they?

 2                    MR. KUSIN:  Objection.  Form.

 3         A.    His email box was not searched in the

 4    searches for Row 6 and 7.

 5         Q.    (BY MR. WELLS)  And same for Susana

 6    Tellez, her emails were not searched for these two

 7    rows?

 8         A.    I do not see the mailbox for Susana

 9    Tellez on the list.

10         Q.    We don't see Christian Levesque, right?

11         A.    No, sir.

12         Q.    Really, everybody we see is in the Fort

13    Lauderdale office, isn't it?

14         A.    I'm not certain where all these

15    employees work.  I know -- I don't recognize any of

16    the people that I have talked to in the DC office.

17         Q.    Do you know why this search was run?

18         A.    No, sir.

19         Q.    Or who asked for it to be run?

20         A.    No, sir.

21         Q.    Or who reviewed the results?

22         A.    No, sir.

23         Q.    Or what discovery request it was

24    supposed to respond to, if any?

25         A.    No, sir.
```

1        Q.      Let's flip over to 019.  And this gives

2    us the information about what search terms were run

3    on those Fort Lauderdale only email accounts in

4    September 2013, correct?

5                    MR. KUSIN:  Objection.  Form.

6        A.      It gives you the search terms that were

7    used in these two searches.

8        Q.      (BY MR. WELLS)  Number 6 is looking for

9    "'Fernando Rubio Hoyos' OR 'Fernando Rubio,'" two

10   versions of the same name, "OR ('Ivan Otero' AND

11   Mejia) OR 'Joe Carrera' OR 'Mark Carlson.'"

12                    Those were the search terms that

13   were run on those email accounts we just talked

14   about?

15       A.      Yes, sir.

16       Q.      Do you know who any of those individuals

17   are?

18       A.      No, sir.

19       Q.      And the next row searched only in Fort

20   Lauderdale was "(Secure OR 'Princeton Global

21   Holdings' OR PGH OR SPP)."  That was one of the

22   terms.

23                    Do you know what that is looking

24   for?

25       A.      No, sir.

```
 1          Q.     It's looking for any connection, any

 2     iteration of what I just read to you, Secure or

 3     Princeton Global or the various initials, "AND

 4     ('Mike Hugo' OR 'Lee Bialostok' OR 'Brian Witzer' OR

 5     'Mejia' OR 'Ivan Otero' OR Fernando OR payment OR

 6     nonpayment)."

 7                    Do you have any idea why those

 8     searches were run with those terms?

 9          A.     No, sir.

10          Q.     In coming to your conclusion that the

11     search in this case was thorough and reasonable in

12     accordance with current e-discovery standards, did

13     you ask why that search was run?

14                    MR. KUSIN:  Objection.  Form.

15          A.     No, sir.

16          Q.     (BY MR. WELLS)  Did you ask why nobody

17     in the DC office was searched for those particular

18     terms?

19                    MR. KUSIN:  Objection.  Form.

20          A.     No, sir.

21          Q.     (BY MR. WELLS)  All right.  Flip to 029.

22     And this is the next nonredacted search on the list.

23                    And is it your understanding that

24     this spreadsheet is in chronological order?

25          A.     Yes, sir.
```

1      Q.      Okay.  So as we go on, we should get

2    closer to present time?

3      A.      Yes, sir.

4      Q.      All right.  The next search we see is in

5    Row 24, and then if we flip over to page 036, we can

6    see the date that search was run.

7                  Can you tell me what that date is?

8      A.      May 21, 2014.

9      Q.      All right.  So prior to May 21, 2014,

10   there had only been three searches run on the Conrad

11   & Scherer Exchange Server, and we just talked about

12   them?

13                  MR. KUSIN:  Objection.  Form.

14     Q.      (BY MR. WELLS)  To your understanding?

15                  MR. KUSIN:  Objection.  Form.

16     A.      As far as what has been reported on this

17   exchange log, there's been three searches.

18     Q.      (BY MR. WELLS)  Okay.  Do you know of

19   anything outside of this exchange log?

20     A.      I do not.

21     Q.      So the best of your information, there

22   were three searches prior to May of 2014?

23                  MR. KUSIN:  Objection.  Form.

24     A.      I would have to check when entire

25   mailboxes were provided for review, the exact date

1    when Mr. Collingsworth, all of his emails or any of

2    the other employees' email boxes were provided.

3         Q.    (BY MR. WELLS)  How long did you meet

4    with Mr. Kusin yesterday?

5         A.    I would say between five to seven hours.

6         Q.    I think you said seven earlier.

7               Did you not review any of your notes

8    about this information during that seven hours?

9         A.    I reviewed some of the information.

10        Q.    All right.  When were actual email boxes

11   handed over and searched as opposed to these

12   Exchange Server searches?

13        A.    I'd have to go back and review the

14   records.

15        Q.    Can you tell me, sitting here today,

16   that that actually occurred prior to May of 2014?

17        A.    I don't know.

18        Q.    If it did, would it be reflected in the

19   documents we've been provided?

20        A.    Yes, sir.

21        Q.    Could you direct me to where I would

22   look?  Is there a particular report name that I

23   could look at?

24        A.    Can you hand me that document right

25   there, the one that we just...

1       Q.      We might mark it as another exhibit if
2    this gives you the answer.
3       A.      The -- the attachment to that may have
4    when those files were produced for counsel to
5    search.
6       Q.      Okay.  All right.  And you agree to go
7    look and find the attachment and provide it to
8    counsel to provide to us, correct?
9                       THE WITNESS:  Someone got a blank
10                  piece of paper?  Can I have one of your
11                  pieces of paper there?
12      Q.      (BY MR. WELLS)  We'll remind you, don't
13    worry.
14      A.      Okay.
15      Q.      Going back to this spreadsheet, Row 24,
16    the search on May 21, 2014.  Look at page 030.
17      A.      You said 030?
18      Q.      Yes.
19      A.      All right.
20      Q.      Column D, does that show what the source
21    of the search was as far as email boxes?
22      A.      Yes, sir.
23      Q.      And what's that, it says "Admin"?
24      A.      It appears it's searching all the
25    mailboxes.

1          Q.      Okay.  And if you flip over to 032, that

2    tells us the search terms, right?

3          A.      Yes, sir.

4          Q.      And it's just searching for MoneyGram or

5    Western Union?

6          A.      Well, it's doing MoneyGram as one

7    complete word and then -- or MoneyGram broke up in

8    two words.  And also searching for Western Union.

9    It's two words.

10         Q.      Okay.  Did you review, as part of your

11   work, any of the motion practice in this case?

12   Briefs filed back and forth?

13         A.      No, sir.

14         Q.      Did you review any sworn statements that

15   Mr. Collingsworth provided during the course of this

16   case?

17         A.      No, sir.

18         Q.      So you did not review any of the

19   representations that were made between September of

20   2013 and this May 21, 2014, date, do you?

21         A.      No, sir.

22         Q.      As far as sufficiency of searches, scope

23   of searches, you didn't look at any of that?

24         A.      I did not look at any motions or briefs

25   or -- regarding Mr. Collingsworth.

1    Q.    All right.  So that's our search in May

2    of 2014.  I will represent to you -- and you can

3    flip through, if you like, to double check me, that

4    the next many, many pages are totally redacted until

5    you get to page 068 and Row 85.

6    A.    68?

7    Q.    Yes.

8    A.    All right.

9    Q.    Are you with me?

10   A.    Yes, sir.

11   Q.    All right.  What month and year were

12   every one of these searches run?

13   A.    It was November 2014.

14   Q.    And then assuming this spreadsheet is in

15   chronological -- chronological order, as you say it

16   is, we can expect that every search in the following

17   pages after this were run after November 1st of

18   2014, can't we?

19   A.    Yes, sir.

20   Q.    Does your opinion about the sufficiency

21   of searches have anything to do with the timing of

22   those searches?

23   A.    My opinion is, the sufficiency, at the

24   time when I did my first report and my second

25   report, they had gone and done a thorough search of

**Dennis Williams CONFIDENTIAL**                                        **116**

1    the Exchange Server.

2         Q.    Okay.  Let me ask that again.

3              Does that opinion have to do with

4    the timing of those searches?  The searches that you

5    reviewed, all of them obviously had ultimately been

6    done at some point.

7              Did you make any determination as to

8    whether that was reasonable to do them when they

9    were done?

10        A.    I just reviewed the -- the searches,

11   time period, and the extent of the mailboxes

12   searched and the variations of the search terms.

13        Q.    Okay.  We saw one search run in the year

14   2012, right?

15        A.    Yes, sir.

16        Q.    And for the purposes of this case, you

17   say that's reasonable?

18              MR. KUSIN:  Objection.  Form.

19        A.    I'm saying, at the time when I did my

20   review and my investigations, these searches had

21   been done.  I mean, some of these were in 2014, and

22   these were very thorough search through an overly

23   broad set of mailboxes.

24        Q.    (BY MR. WELLS)  Right.

25              And I'm just trying to get an idea

1    of what searches are you saying were reasonable?

2    Are you saying these November and beyond that are

3    searching all the email boxes with various

4    iterations, those are what's reasonable?  Because

5    what I see here in 2012 and 2013 is one mailbox in

6    2012 and one search and only Florida mailboxes in

7    2013 --

8                    MR. KUSIN:  Objection.  Form.

9         Q.    (BY MR. WELLS)  -- for some Fernando

10   Rubio and Mejia search terms.

11                   Those standing alone, are those

12   reasonable for 2012 and 2013 efforts?

13        A.    Would have --

14                   MR. KUSIN:  Objection.

15        A.    -- to go back and look at the

16   documentation on requesting the production and

17   discovery information.

18        Q.    (BY MR. WELLS)  Okay.  So that's not

19   part of your opinions today?

20        A.    My opinion is that, you know, counsel

21   and -- had a thorough search done.

22        Q.    At some point?

23        A.    In the fall.  In 2014, latter part of

24   2014, through -- I think it's, like, well over

25   188 -- or, over 150 employee mailboxes searching for

1    any emails relevant in this matter.

2         Q.     When do you understand it was determined

3    that we got a problem with Mr. Collingsworth's email

4    box?

5                     MR. KUSIN:  Objection.  Form.

6         A.     I believe that was probably the early

7    part of 2015.

8         Q.     (BY MR. WELLS)  Okay.  And again, all

9    these searches back here in November -- and we can

10   keep going through them, but there's some in

11   December, there's some in January -- there may just

12   be one in January -- those are on the Exchange

13   Server?

14        A.     Yes, sir.

15        Q.     So we wouldn't be seeing any Terry

16   Collingsworth only emails that aren't cc'd to other

17   Conrad & Scherer employees prior to March of 2013 --

18        A.     I'm sorry --

19        Q.     -- right?

20        A.     -- ask -- ask the question again.

21        Q.     If you're running these search terms

22   just on the Exchange Server -- which is what this

23   reflects, right?

24        A.     Yes, sir.

25        Q.     -- we know that the emails prior to

1    March of 2013 in Mr. Collingsworth's email box were

2    not on the Exchange Server?

3        A.    That's not correct.  Again, you're

4    missing -- there were some emails that were in

5    his -- that folder that were emails from -- that

6    went into both and were addressed to both his

7    IRAdvocates account and his Conrad & Scherer

8    account.  They would have been on the server in the

9    folder, and those would have been searched in -- I

10   believe those were searched and produced.  That

11   was -- that's going back to February of 2012.

12       Q.    Okay.  Was it relayed to you how it was

13   determined that there was a problem with

14   Mr. Collingsworth's email accounts?

15       A.    Phone call.

16       Q.    Not how it was related to you.

17             Was it related to you how it was

18   determined that there was a problem?

19       A.    To a limited extent.

20       Q.    And what was related to you?

21       A.    That they had conducted a search and

22   looked at the emails, and they're missing gaps in

23   the emails.

24       Q.    I mean, running those searches clued

25   them in to the fact that we've got missing time

1    periods for Mr. Collingsworth, right?

2                    MR. KUSIN:  Objection.  Form.

3        A.    Not necessarily.

4        Q.    (BY MR. WELLS)  I wasn't on the

5    conversation.  What did they tell you?

6        A.    No, I mean, you've -- you've asked

7    another question.  Running these searches

8    clued -- clueing them in on missing emails.

9        Q.    All right.  Tell me how they were clued

10   in on it, to your understanding.

11                   MR. KUSIN:  Objection.  Form.

12       A.    All I was told was, they had some

13   missing emails.

14       Q.    (BY MR. WELLS)  They didn't say how it

15   was determined?

16       A.    I had a conversation with the IT

17   director who indicated that Mr. Collingsworth had a

18   small inbox.

19       Q.    How small?

20       A.    I don't recall.

21       Q.    You didn't review that in your seven

22   hours yesterday?

23       A.    No, sir.

24       Q.    How small was it in comparison to

25   everyone's else's email -- email inboxes?

```
1      A.      I don't recall.

2      Q.      Was it a glaring difference?

3      A.      There was a -- there was a difference.

4      Q.      Where would that be reflected in the

5   documents?  Would it be on this attachment?

6      A.      Possibly.

7                   (Williams Exhibit 12

8              marked/introduced.)

9      Q.      (BY MR. WELLS)  All right.  I'm going to

10  mark this as Exhibit 12.  This is that March 4,

11  2015, email that's missing the attachment.

12                  MR. WELLS:  Just for the purposes of

13             our record, make sure it's clean, that is

14             the attachment that we need to look at.

15                  MR. KUSIN:  Are we at a point where

16             we can take a break?  It's a little over

17             an hour.

18                  MR. WELLS:  Yeah.

19                  THE VIDEOGRAPHER:  We're off the

20             record.  End of DVD Number 3 at 1:37.

21             (Break.)

22             (Mr. Davis exits the deposition.)

23                  THE VIDEOGRAPHER:  We're back on the

24             record with the start of DVD Number 4 at

25             1:51.
```

```
 1        Q.     (BY MR. WELLS)  All right.  In your
 2   April 2015 report, you sort of went through a
 3   history of computers that had been used by
 4   Mr. Collingsworth over the course of time and to the
 5   extent you could determine what had happened to them
 6   as far as transfers, given to relatives, et cetera,
 7   right?
 8        A.     Yes, sir.
 9        Q.     Page 10 of that report has got a chart
10   with five computers listed on it, right?
11        A.     Yes, sir.
12        Q.     Now, after the last -- well, excuse me.
13   The last one on this chart is an HP laptop was used
14   up until May of 2014?
15        A.     Yes, sir.
16        Q.     We know that Mr. Collingsworth currently
17   uses, at least in the office, a Dell, is it
18   Vostro --
19        A.     Yes, sir.
20        Q.     -- desktop?
21        A.     Yes, sir.
22        Q.     When did he start using that?
23        A.     I'll have to go back and check.
24        Q.     All right.  In a lot of the documents
25   I've looked at, there are numerous references to a
```

```
 1    home office Mr. Collingsworth utilizes, as well as

 2    several home computers.  There's IT work tickets

 3    talking about going to his home to work on home

 4    computers.

 5                 Are those home computers listed

 6    anywhere on this page 10?

 7        A.    Yes.

 8        Q.    Okay.  Identify them for me, please.

 9        A.    The first one, the Dell Latitude, after

10    it was transitioned, the data was transitioned to

11    the second computer, it was taken home to

12    Mr. Collingsworth's home office.

13        Q.    And then used for a period after that?

14        A.    Yes, sir.

15        Q.    Okay.  How long did he use that Dell at

16    home?

17        A.    I don't know.

18        Q.    All right.  At some point, you state

19    that computer was disposed of at an e-cycle

20    recycling center; is that right?

21        A.    Yes, sir.

22        Q.    When did that take place?

23        A.    I don't know.

24        Q.    Do you know the year?

25        A.    No, sir.
```

```
 1          Q.      Did you ask?

 2          A.      Yes, sir.

 3          Q.      Who did you ask?

 4          A.      Mr. Collingsworth.

 5          Q.      And what did he tell you?

 6          A.      That his wife would have taken it to the

 7    e-cycle center.

 8          Q.      But he couldn't give you any kind of

 9    judgment as to when that was?

10          A.      No, sir.

11          Q.      Did you press him on that point?

12          A.      Yes, sir.

13          Q.      Still, he couldn't even give you a year?

14          A.      No, sir.

15          Q.      Did you contact the e-cycle center?

16          A.      No, sir.

17          Q.      Do you know whether they have any record

18    of receipt of recycled computers or computers for

19    recycling?

20          A.      I do not know that.

21          Q.      Okay.  Have you talked to

22    Mr. Collingsworth's wife?

23          A.      No, sir.

24          Q.      Did you ask to talk to her?

25          A.      No, sir.
```

1      Q.      All right.   Number 2 -- well, before we

2    get off the Dell Latitude laptop, we know that

3    computer is gone, right?

4      A.      Yes, sir.

5      Q.      We don't know when, but it's -- they're

6    no longer in existence?

7      A.      That's correct.

8      Q.      The next computer Mr. Collingsworth used

9    was this HP Compaq desktop.

10                That was only used for a few months,

11   and then it was also sent to his residence, correct?

12     A.      Yes, sir.

13     Q.      How about, how long did he use that

14   computer at -- at his residence?

15     A.      I don't know.

16     Q.      It was also recycled --

17     A.      Yes, sir.

18     Q.      -- true?

19                Do you know when that one was

20   recycled?

21     A.      No, sir.

22     Q.      Was it the same time as the other one?

23   Were they both taken in together?

24     A.      I don't know.

25     Q.      Okay.   And you don't know what year or

1    who took it in?

2        A.    My understanding, his wife took it in.

3        Q.    Would have done both of them?

4        A.    Yes, sir.

5        Q.    So on your notes, you looked like you

6    had asked Mr. Collingsworth whether he had taken any

7    sort of tax deduction with respect to the recycling

8    of these computers?

9        A.    Yes, sir.

10       Q.    Do you recall that?

11       A.    Yes, sir.

12       Q.    Would that -- to your knowledge, would

13   that be a tax deductible contribution to give away

14   an old computer?

15       A.    It's a -- could potentially been a

16   charitable contribution.  I'm not a tax accountant,

17   but we were looking for any potential records to try

18   to document when the computer might have been taken

19   to the e-cycle center.  And there's a possibility

20   there may have been some type of records to document

21   that.

22       Q.    Okay.  So you asked Mr. Collingsworth,

23   "Did you make any sort of tax deduction that could

24   narrow down for us the time when these things were

25   recycled?"

```
 1        A.      Yes, sir.

 2        Q.      And he told you no?

 3        A.      Correct.

 4        Q.      Did you review the tax return to double

 5   check that representation?

 6        A.      No, sir.

 7        Q.      Okay.  You assumed Mr. Collingsworth was

 8   telling you the truth?

 9        A.      I believe Mr. Collingsworth was telling

10   me the truth.

11        Q.      And a lot of your opinions are based, if

12   not in whole, at least in part, on the assumption

13   that Mr. Collingsworth told you the truth in

14   response to whatever questions you might have asked

15   him?

16                     MR. KUSIN:  Objection.

17        Q.      (BY MR. WELLS)  Isn't that true?

18        A.      No, sir.

19        Q.      Okay.  You didn't rely on the

20   truthfulness of Mr. Collingsworth's answers in any

21   of your opinions?

22        A.      I mean, that's two different questions

23   there.

24        Q.      Well, answer the second one.

25                     MR. KUSIN:  Objection.  Form.
```

```
 1        A.      We relied primarily on the emails,

 2   interviews of other employees, and also the

 3   interview with Mr. Collingsworth.

 4        Q.      (BY MR. WELLS)  Okay.  As far as the

 5   fact these two computers were taken to a recycling

 6   center, you're having to rely on Mr. Collingsworth

 7   and taking him at his word, right?

 8        A.      Yes, sir.

 9        Q.      You don't have any objective data

10   outside of what he told you to say that is or is not

11   true?

12        A.      I need to go back and look at the work

13   tickets to see if there's anything on any of the

14   work tickets that could put some dates, the last

15   time they were there, the last time there was work

16   done on them.

17        Q.      But as far as whether they were taken to

18   a recycling center, whether they were taken by his

19   wife, when they were taken, all that you're relying

20   on whatever information Mr. Collingsworth was able

21   to provide to you?

22        A.      Yes, sir.

23        Q.      So you can't tell us whether both this

24   Dell Latitude laptop and HP Compaq desktop were

25   disposed of during the course of this litigation?
```

**129**

```
 1        A.      Mr. Collingsworth stated to me that
 2   these were disposed of sometime after he had
 3   received them.  So...
 4        Q.      But do you know whether it was during
 5   the course of this case that you're testifying in
 6   right now?  After suit was filed?
 7        A.      The suit was filed back in -- which
 8   date?
 9        Q.      I think you told me you didn't know.
10        A.      I'm trying to get that from you.
11        Q.      I'm asking you, can you tell me, as the
12   expert you've been offered to, whether you can give
13   any opinion to the court whether these two computers
14   were disposed of during the course of this
15   litigation or not?
16        A.      These devices, you know, were disposed
17   of and would have been during the course of this
18   litigation.
19        Q.      And isn't the disposal of the -- at
20   least the HP Compaq, if not both of these computers,
21   doesn't that account for one of the gaps we have in
22   emails between 2008 and 2010?
23                     MR. KUSIN:  Objection.  Form.
24        A.      No, sir, I would say the improper work
25   by IT personnel in transferring data from the
```

 1    IP -- from the HP Compaq to the Dell OptiPlex

 2    accounts for a -- one of the gaps we have in the

 3    emails.

 4         Q.    (BY MR. WELLS)   Okay.  Well, let's

 5    say -- I want you to assume for the purposes of this

 6    question that the IT personnel did screw up.  We'll

 7    just assume that.  We'll also assume that the HP

 8    Compaq still exists.

 9                   Would we have the gap?

10                   MR. KUSIN:  Objection.  Form.

11         A.      There are several assumptions there, and

12    the time frame of having a old desktop computer and

13    whether or not it had ever been reformatted,

14    anything done with it, cleaned up over the years,

15    from 2010 to --

16         Q.    (BY MR. WELLS)   Let me go ahead and stop

17    you there.

18         A.      -- 2007 -- for seven years, it would be

19    very -- I really can't give you an opinion on that.

20         Q.      Let me go ahead and give you another

21    assumption that will clean that up.

22                   I want you to assume the HP Compaq

23    was placed on litigation hold at a time it had not

24    been reformatted and still existed, meaning nobody's

25    making any changes to it, nobody's messing with it.

```
 1                    Would we still have that gap?

 2                    MR. KUSIN:  Objection.  Form.

 3          A.    I have a hard time with your question,

 4    because is the computer still being used?

 5          Q.    (BY MR. WELLS)  No.  It's just -- it was

 6    stopped being used, it was put over in a box -- in a

 7    locked safe that was airtight and no one ever

 8    breathed on it until today.

 9          A.    That's -- that's a really far-fetched

10    situation.  But if the computer had not been

11    touched, there's a reasonable likelihood that email

12    files could be recovered from that.  I would

13    strongly caution that a hard drive sitting dormant

14    for several years, potentially five years, may not

15    even boot up again and may not even be able to be

16    accessed.

17          Q.    All right.  Let's do this assumption:

18    There was a forensic image made of the computer

19    before it was destroyed.

20                    Would we have the gap?

21                    MR. KUSIN:  Objection.  Form.

22          A.    If there was a forensic image, and at

23    the time the image was made, the files were as they

24    were on May 2010, you should have those files.

25                    (Williams Exhibit 13
```

```
 1                marked/introduced.)
 2        Q.     (BY MR. WELLS)  All right.  Mark as
 3   Exhibit 13 a string of emails that were marked as
 4   Exhibit C to your April report.
 5                Now, this is back on March 29, 2010,
 6   right?
 7        A.     Yes, sir.
 8        Q.     And some of the earlier emails go
 9   back earlier in the month, but we can say March of
10   2010.
11                The second page, Mr. Collingsworth
12   is providing information to his assistant about what
13   he wants done to his computers at his home, correct?
14        A.     The second page covers the install of a
15   new PC in his office and the transfer of files from
16   his laptop to the PC in his office and then what to
17   do with the laptop.
18        Q.     Which PC is being installed in his
19   office at that point?
20        A.     That would be the HP Compaq desktop.
21        Q.     At his house?
22        A.     No.  This would be -- this would be the
23   PC in his office at work.  Paragraph 3.
24        Q.     Uh-huh.  After Paragraph 5, you're
25   saying:  "Everything can be billed as work on
```

```
 1    Terry's home office - my firm supports my home
 2    office because I do a lot of work there."
 3         A.    Yes, sir.
 4         Q.    And it's not your understanding that
 5    this email, all of it's about his home office?
 6         A.    No, sir.
 7         Q.    Okay.
 8         A.    I believe there's another email that
 9    coincides with this about the work at the home -- I
10    mean, at his -- at Conrad & Scherer office.
11         Q.    Okay.  But what's his home desktop in
12    number 1, then?
13         A.    That's a computer that has a virus.
14         Q.    What model is it?  Where is it on this
15    chart in your report?
16         A.    I don't know.
17         Q.    So we don't know where that computer is
18    today?
19         A.    Correct.
20         Q.    You have not analyzed that computer?
21         A.    That's correct.
22         Q.    We don't know whether it may have
23    contained some of these gap emails we're talking
24    about today, do we?
25         A.    That's correct.
```

```
 1        Q.      Number 5 talks about the PC in the

 2   basement.

 3                Do you understand that also to be

 4   referring to a home computer?

 5        A.      Yes, sir.

 6        Q.      What make and model are we talking about

 7   there?

 8        A.      There's probably another work ticket

 9   that may cover some of the devices at his home.  I

10   would have to refer to those.

11                (Williams Exhibit 14

12                marked/introduced.)

13        Q.      (BY MR. WELLS)  I'll show you what I'm

14   marking as Defendants' -- excuse me, Plaintiff's

15   Exhibit 14, which was attached as Exhibit H to your

16   report.  It's one of the work tickets you're

17   referring to.

18        A.      Exhibit 14 includes a -- a work ticket.

19        Q.      All right.  Look at the third page of

20   that exhibit.  Should be an invoice dated May 1,

21   2010.

22                Is that what you're looking at?

23        A.      Yes, sir.

24        Q.      We've got a description in here, it

25   says, on April 2, 2010, a person named "Josh
```

1    Robinson 'set up new laptop at Terry's house.

2    Troubleshot and resolved connectivity issues with

3    desktop and netbook.  Troubleshot...slowness issue

4    on basement PC.  Scanned all 4 computers for

5    viruses.'"

6         A.     Yes, sir.

7         Q.     Is that your understanding of what that

8    was?

9         A.     Yes, sir.

10        Q.     So as of this date, there's four

11   computers at Mr. Collingsworth's house that this

12   person is working on?

13        A.     And you've -- there's a follow-up line

14   there that could be of -- of interest in this

15   matter.  The tech says he's deleted all -- "deleted

16   old e-mail from laptop to improve e-mail

17   performance" --

18        Q.     Does that mean there were not four

19   computers he was working on?  I'm just wondering why

20   you offered that information to me.

21        A.     -- well, I mean, there's email being

22   deleted by a tech person.

23        Q.     Uh-huh.  All right.  We've got four

24   computers at the home.

25               Can we agree there?

```
 1        A.      Yes, sir.

 2        Q.      Which four computers are those?  You

 3  think one of them may be the Dell -- or, excuse me,

 4  the HP Compaq.

 5                What do you think the other three

 6  are, or do you know?

 7        A.      Okay.  The laptop should -- is going to

 8  be the Dell Latitude laptop, the first one on my

 9  chart on page 10.

10        Q.      All right.  We know that one's been

11  recycled.  Okay.

12        A.      All right.  The Netbook is going to be

13  the Acer Netbook, most likely.

14        Q.      And that was the one that was wiped

15  within the last year?

16        A.      Well, it was reloaded, I would say, and

17  did not contain any emails.

18        Q.      Okay.

19        A.      And there were two other desktops there.

20        Q.      What -- what are those?

21        A.      I don't know.

22        Q.      So we don't know whether those contained

23  any of the emails we're looking for today or whether

24  they're still in existence somewhere?

25        A.      We do not have access to those devices.
```

1          Q.      And do not know if they still exist, do

2     we?

3          A.      My understanding is, they not -- they do

4     not exist.

5                          (Williams Exhibit 15

6                  marked/introduced.)

7          Q.      (BY MR. WELLS)  All right.  I'm going to

8     show you what I've marked as Exhibit 15, which is a

9     string of emails in April of 2011.

10                     That middle one is from

11    Mr. Collingsworth where he says he's working from

12    home and that his home computer email is working

13    fine, right?

14         A.      Which -- which paragraph are you

15    quoting?

16         Q.      The very first sentence of

17    Mr. Collingsworth's email says:  "I too am working

18    from home this morning."

19                     Do you see that?

20         A.      Yes, sir.

21         Q.      All right.  The last sentence says:

22    "BUT - AS THIS EMAIL DEMONSTRATES, my home computer

23    email is working fine."

24                     You see that?

25         A.      Yes, sir.

1      Q.      What home computer is he working on at

2   that point?

3      A.      I don't know.

4      Q.      You don't know where it is or whether

5   it's still in existence to be analyzed?

6      A.      I don't know where it is.

7      Q.      Go up to the email above that where

8   Ms. Ryan, who you understand was Mr. Collingsworth's

9   assistant at that time --

10     A.      Yes.

11     Q.      -- before you arrived?

12     A.      Yes, sir.

13     Q.      She says in the second paragraph there:

14  "Terry - did you have a chance to search for those

15  emails you wanted to grab before archiving?  Because

16  I could at least start archiving your emails on your

17  laptop, or we could have Josh do that."

18                  You see that?

19     A.      Yes, sir.

20     Q.      Now, that -- would that be called manual

21  archiving, what she would be doing there?  This

22  isn't an auto archive rule that she would be doing?

23     A.      Right.  It would be a manual archive.

24     Q.      All right.  And it's your understanding

25  from talking to -- did you talk to Ms. Ryan?

```
 1        A.      Yes, I did.

 2        Q.      Did you talk to her replacement, Maggie

 3   Crosby?

 4        A.      Yes, sir.

 5        Q.      And it's your understanding, from

 6   talking to them, that they did manually archive

 7   Mr. Collingsworth's emails to external hard drives

 8   on a periodic basis, didn't they?

 9                    MR. KUSIN:  Objection.  Form.

10        A.      I don't recall that.

11        Q.      (BY MR. WELLS)  Okay.  Do you have any

12   reason to dispute that, if I show you something

13   later today, that Maggie Crosby told you that?  You

14   just don't recall, or are you saying you don't think

15   that's the case?

16        A.      I don't recall that.

17        Q.      Okay.  We'll get there.

18                    (Williams Exhibit 16

19                 marked/introduced.)

20        Q.      (BY MR. WELLS)  Let me show you what I'm

21   marking as Exhibit 16, which is also Exhibit V to

22   your April report.

23                    This is a November 10, 2011, work

24   ticket regarding Mr. Collingsworth's computers,

25   right?
```

```
 1        A.      Yes, sir.

 2        Q.      And they are doing work at

 3   Mr. Collingsworth's house, right?

 4        A.      Yes, sir.

 5        Q.      Says:  "worked on" Terry's -- or, "Terry

 6   home's PC..."?

 7        A.      Yes, sir.

 8        Q.      And it says there toward the end of that

 9   repair remark that the technician restored a pst

10   file of over 8.5 gigabytes on that home PC?

11        A.      Yes, sir.

12        Q.      That's a very large email file, is it

13   not?

14        A.      Yes, sir.

15        Q.      What PC is that?

16        A.      That should be the HP Compaq desktop.

17        Q.      Okay.  Let's go down to "Equipment

18   Information" by "Serial number."  It says the word

19   "dell."

20        A.      Okay.

21        Q.      Do you know whether that was the HP

22   Compaq, whether that was the Dell laptop or whether

23   that was just some other Dell computer?

24        A.      I'm not certain.

25        Q.      Okay.  What we do know is, whatever that
```

1    computer was, it had 8.5 gigs of emails on it of

2    Mr. Collingsworth?

3                    MR. KUSIN:  Objection.  Form.

4        A.    It says they restored a pst file over

5    8.5 gigabytes.

6        Q.    (BY MR. WELLS)  And that was in November

7    of 2011?

8        A.    Yes, sir.

9        Q.    What we also know is, whatever that

10   computer is, you haven't analyzed it?

11       A.    That's correct.

12       Q.    So as far as you know, it does not exist

13   anymore?

14       A.    That's correct.

15       Q.    Okay.  And you asked for all the

16   computers, right?

17       A.    Yes, sir.

18       Q.    And you were told you were given every

19   one that they had possession of, true?

20       A.    Yes, sir.

21       Q.    Okay.  Let me ask you this:  Let's

22   assume that was the Dell Latitude laptop, for

23   purposes of my question.  That Dell Latitude laptop

24   contained emails that are part of our gap here,

25   between 2008 and 2010, didn't it?

1                    MR. KUSIN:  Objection.  Form.

2          A.      It could contain emails for that gap.

3          Q.      (BY MR. WELLS)  Okay.  Slightly

4   different question, but this time assume that it was

5   the HP Compaq that you thought it was.

6                    We know that also contained at one

7   point in time the email -- the 2008 to 2010 gap

8   period that we're now talking about, true?

9          A.      We'll need to back up here, because also

10  around this time there was an archive done of emails

11  from March of 2010 going forward.  So we do have

12  some of these emails.

13         Q.      I asked you about 2008 to 2010.

14         A.      I'm sorry, can you repeat the question

15  again?

16         Q.      The gap between 2008 and 2010, you say

17  it's because data that was on the HP Compaq was

18  improperly transferred to the Dell OptiPlex, true?

19         A.      Yes, sir.

20         Q.      Okay.  In order to be improperly

21  transferred, it had to be on the HP Compaq

22  originally, right?

23         A.      Yes, sir.

24         Q.      So if that HP Compaq is the computer

25  that's being referenced in this November 10, 2011,

1   work ticket and that email hadn't been deleted off

2   of it, that gap email would still be there, 2008 to

3   2010?

4                    MR. KUSIN:  Objection.  Form.

5        A.      It's -- it's hard to say.  I don't agree

6   with that.  It's hard to say what time period the

7   emails would be on that computer in 2011.

8        Q.      (BY MR. WELLS)  Well, it's hard to say

9   whether there was, in fact, a improper transfer of

10   emails.  You don't know that for a fact, do you?

11       A.      Yes, sir.

12       Q.      Did the techs tell you, "We improperly

13   transferred emails"?

14       A.      No, we examined the computer -- the Dell

15   OptiPlex and did not find any indications of the

16   archive pst file.

17       Q.      Right.

18                    And the transfer, if it was done,

19   would have been done in May of 2010, true?

20       A.      Yes, sir.

21       Q.      Almost five years before you looked at

22   the Dell OptiPlex, true?

23       A.      Yes, sir.

24       Q.      But during that almost five-year period,

25   it was continuously used by both Mr. Collingsworth

```
 1    and then subsequently his assistants, true?

 2         A.    Yes, sir.

 3         Q.    So if that email had been -- that gap

 4    period email had been deleted, say, in 2010, when

 5    they transferred -- or when he transferred to a new

 6    computer, you wouldn't necessarily have a record of

 7    that five years later, would you?

 8                    MR. KUSIN:  Objection.  Form.

 9         A.    We did a forensic exam on that computer

10    and recovered any potential files and did not find

11    that archived folder.

12         Q.    (BY MR. WELLS)  Right.

13                    But something that was deleted five

14    years ago could have easily been overwritten so that

15    it would not even show up on the master file list,

16    would it, five years later, either as a deleted

17    file?

18         A.    Well, when --

19         Q.    That's true, isn't it?

20         A.    When you run the recovered folders,

21    you're also pulling in deleted master file table

22    records and master file table records that

23    are -- may have been reallocated.  So you're going

24    through any indications of those -- you have

25    a -- you know, a -- a good likelihood of trying to
```

1    find any remnants of that file.

2         Q.     So you're trying to tell us that no

3    matter the time period, you can go into a computer

4    and determine if a file was deleted five years ago,

5    you can go in there and see it?

6         A.     I'm not saying we can do it all the

7    time, but we can do it on a regular basis.

8         Q.     And when a computer is being

9    continuously used, anything that's been deleted,

10   it's overriding those -- that file space, right,

11   that's available file space to be used and

12   overwritten with something else?

13        A.     Yes, sir.

14        Q.     And it can be used to the point where

15   that will not show up even as a deleted file many

16   years later?

17        A.     There is a potential of that.

18        Q.     Okay.  And if that is the case, if the

19   five years of use of that OptiPlex resulted in that

20   email file being deleted, that would not be

21   consistent with your opinion that there was some

22   sort of improper transfer, would it?

23        A.     Well, you're assuming that someone

24   deleted that archive file.  If that file would have

25   been put on the machine, it would have stayed

1    active, it would have been kept active.  Your

2    assumption is jumping to the fact that it's been

3    deleted and difficult to find.  There is no

4    indication from any of the documents that we

5    reviewed to indicate there was any attempt to delete

6    that archive file.

7          Q.     Did you look at external device plug-in

8    dates right around that transfer time to the Dell

9    OptiPlex?

10         A.     No, sir.

11         Q.     And that could tell you if an external

12   device was, in fact, plugged in to the Dell OptiPlex

13   near in time to the transfer of emails to that

14   device, at least in your hypothesis of the facts?

15         A.     We have a work ticket, I believe.  You

16   would have to go and -- and pull it indicating that

17   the technicians copy the data to a Passbook [sic],

18   which would be an external device, and transferred

19   it to the HP Compaq.

20         Q.     Right.

21                But an external device could have

22   been attached to that OptiPlex, and we, in fact,

23   know multiple external devices were attached to that

24   OptiPlex, don't we?

25         A.     Yes, sir.

```
 1        Q.      Going all the way back to January 21,
 2   2011?
 3        A.      Yes, sir.
 4        Q.      And repeatedly between then and now,
 5   right?
 6        A.      Yes, sir.
 7        Q.      And Mr. Collingsworth's assistants have
 8   told you that, in practice, they would occasionally
 9   back up his emails to an external device, true?
10        A.      I don't recall that.
11        Q.      You didn't review that yesterday either,
12   your notes of interviews with personnel?
13        A.      I went through some of my notes.
14        Q.      How about the interview with Maggie
15   Crosby?  Did you look at that?
16        A.      I went through some of my notes
17   regarding the employees.
18        Q.      Sir, if you wouldn't mind just answering
19   my question.  If the answer is "I don't know,"
20   that's fine.
21                But did you look at the interview
22   with Maggie Crosby?
23        A.      I don't -- I don't recall.
24        Q.      Okay.  We'll get out of here a lot
25   sooner if we can have an agreement to just answer
```

```
 1    the questions, please.

 2                    (Williams Exhibit 17

 3              marked/introduced.)

 4         Q.    (BY MR. WELLS)  I'm giving you what's

 5    been marked as Exhibit 17, which are interview notes

 6    with Maggie Crosby, correct?

 7         A.    Yes, sir.

 8         Q.    All right.  See number 5?  It

 9    says -- the question is:  "Did Terry Collingsworth"

10    [as read] -- it's referred to as "TC" -- "ever ask

11    her to help him archive any emails" -- and appears

12    to be her response -- "she thinks that process was

13    happening before she arrived and then she took it

14    over when she got there.  She couldn't archive the

15    e-mails so she ordered an external hard drive from

16    Office Depot (square box hard drive - high volume

17    external hard drives - connects to a computer with a

18    USB).  She thinks Conrad & Scherer IT helped him

19    with archiving."  [As read.]

20                    Does that refresh your recollection

21    about archiving to an external hard drive?

22         A.    I think your question to me was, did the

23    office assistants regularly archive email -- Terry

24    Collingsworth's emails.  And my answer to you was, I

25    do not recall that being told to me.  This paragraph
```

1    here does not indicate that Maggie Crosby was

2    regularly archiving emails.

3        Q.    What does it indicate to you, so I can

4    make sure I phrase it correctly?

5        A.    There are some other documents attached

6    to my report in which she's tried to go in and

7    archive, and I believe she states she's trying to

8    reorganize the folders, and she states that this is

9    a lot complicated [sic] on a Mac.  That might be

10   Victoria or Maggie.  I could be getting them

11   confused.  But the office admins are saying, "Hey,

12   this is a lot more difficult to do on a Mac."  The

13   techs from CTSS provided the wrong instructions on

14   how to do the archiving, and there -- I believe

15   there is a couple of communications in there in

16   which Mr. Collingsworth says, "Hey, I can't -- I

17   can't view what has been archived.  Can these guys

18   figure it out?"

19       Q.    So your opinion is, there were no emails

20   archived to an external hard drive?

21                 MR. KUSIN:  Objection.  Form.

22       A.    When --

23       Q.    (BY MR. WELLS)  I'm just trying to

24   figure out why you told me that long diatribe --

25                 MR. KUSIN:  Objection.  Form.

1          A.      Well, no, your -- your question was that

2    the office admins were regularly archiving his

3    emails to an external drive.  Wasn't that one of

4    your questions?

5          Q.      (BY MR. WELLS)  You told me that

6    somebody was saying, "I can't figure it out."

7                      So do you have an

8    understanding -- we'll just start over.

9                      Do you have an understanding that

10   somebody archived Mr. Collingsworth's emails to an

11   external hard drive?

12         A.      Yes.

13         Q.      Okay.  Let's go to number 7 and see what

14   Ms. Crosby says about that.  Go to -- after the

15   question, she says:  "TC had troubles with emails."

16   And then she says:  He had already -- "He already

17   had archived emails that were saved to an external

18   hard drive and she ordered a second hard drive for

19   archived emails."

20                      Does that suggest to you that there

21   were emails archived to an external hard drive?

22         A.      Yes, sir.

23         Q.      Not just one, in fact, two.

24         A.      There may have been two.

25         Q.      So she thinks the second set of emails

```
1    would have been saved to an external hard drive.

2    The older hard drive was kept at the office.  She

3    doesn't know where the newer hard drive would have

4    been.  I mean, this -- this is information somebody

5    that was there was giving to you.

6                    Do you disbelieve what Ms. Crosby is

7    saying here?

8         A.    Her statement is that there was emails

9    saved to an external hard drive.

10        Q.    On a periodic basis?

11        A.    Sir, I disagree with that.

12        Q.    Okay.  Let's go to number 9.  "She

13   thinks that the archiving was completed by the time

14   she had left.  Archiving was done periodically and

15   not every day."

16                    So it was not done periodically?

17        A.    I don't believe so.

18        Q.    So she's lying?

19                    MR. KUSIN:  Objection.  Form.

20        Q.    (BY MR. WELLS)  Don't you think she

21   would know better than you would?  She was there.

22        A.    We went through the emails at that time

23   contemporaneous with it, and they were having

24   difficulty trying to figure out how to archive.

25   They -- I mean, and that's potentially one of the
```

1   problems why emails got deleted, is because they

2   were in there trying to configure the archive

3   function, and there are several emails where Maggie

4   is asking Victoria, "Hey, has this been addressed

5   before, or are we still going over the same issues

6   about trying to archive these emails?"

7        Q.     Right.  And Ms. Crosby seems to be

8   saying here that emails were, in fact, successfully

9   archived to a hard drive.

10                 She doesn't say here, "They were

11   done" -- "They were attempted to be done

12   periodically, but we could not figure out how to do

13   it," does she?

14       A.     Well, in the -- in the paragraph above

15   that, sir, she says she thinks that archiving was

16   actually done by Conrad & Scherer.

17       Q.     Uh-huh.

18       A.     There is no -- no indication that Conrad

19   & Scherer did that, it was CTSS that came in several

20   times to try to archive the email.  So --

21       Q.     Does Conrad -- excuse me.

22       A.     So --

23                 MR. KUSIN:  Don't interrupt the

24            witness, please.

25                 MR. WELLS:  I said "excuse me."

1        A.      I mean, there -- there are numerous

2   inconsistencies in this, and I would caution you to

3   rely very heavily on this information.

4        Q.      (BY MR. WELLS)  So when you're going

5   through and looking at emails, trying to figure out

6   what happened to a computer that no longer exists

7   and emails on that computer that no longer exist, is

8   your review of emails and deciding which ones to

9   believe and which interviewees to believe, is that

10  considered a forensic analysis?

11                MR. KUSIN:  Objection.  Form.

12       A.      I would consider it an investigation.

13       Q.      (BY MR. WELLS)  So you made a judgment

14  as to I'm going to believe maybe what this email

15  indicates as opposed to what Ms. Crosby directly

16  says?

17                MR. KUSIN:  Objection.  Form.

18       A.      During my years as an investigator, I

19  have learned that contemporaneous information such

20  as emails that are occurring at the time, reflecting

21  what is happening at the time can be more reliable

22  than information provided years later.

23       Q.      (BY MR. WELLS)  So an email

24  contemporaneous, reflecting what a certain person

25  knows at a particular time is probably more accurate

 1    than what they may later tell you years down the

 2    road; is that true?

 3                    MR. KUSIN:   Objection.   Form.

 4         A.    I wouldn't necessarily agree -- I'm

 5    saying that reviewing what's happening

 6    contemporaneous, the current emails, can be a lot

 7    more helpful.

 8         Q.    (BY MR. WELLS)   All right.   Getting back

 9    to our chart of computers, I think we've identified

10    there's a few home computers reflected in the

11    contemporaneous emails that we're not necessarily

12    sure are included on this chart; is that fair?

13         A.    Yes, sir.

14         Q.    We do know the first two computers on

15    this chart were disposed of to the point that you

16    cannot analyze them or determine whether there's any

17    email on them?

18         A.    That's correct.

19         Q.    The Dell OptiPlex we still have?

20         A.    Yes, sir.

21         Q.    That was used up until early 2011,

22    right?

23         A.    That was used by Mr. Collingsworth up

24    until early 2011.

25         Q.    And then he switched over to a MacBook

1    laptop, right?

2         A.      Yes, sir.

3         Q.      And he used that from early 2011 through

4    June of 2013?

5         A.      Yes, sir.

6         Q.      And that has been disposed of to the

7    point where you've not been able to analyze it?

8         A.      I don't agree with that

9    characterization.  That was provided to a relative

10   and subsequently a -- it was stolen from a relative.

11        Q.      Who told you that?

12        A.      Mr. Collingsworth.

13        Q.      And in order to -- in order for you to

14   be telling me that that's what you think happened,

15   you have to assume Mr. Collingsworth is telling you

16   the truth, right?

17        A.      Yes, sir.

18        Q.      Do you have any objective evidence that

19   you can show for me today that shows a computer was

20   provided to his niece which was latter stolen in

21   Brazil?

22               MR. KUSIN:  Objection.  Form.

23        A.      I'd have to go back and review

24   the exhibits.  I'm not aware at this time of

25   something.

1          Q.       (BY MR. WELLS)   Were you provided a

2    police report reporting the computer stolen?

3          A.       No, sir.

4          Q.       Were you provided any emails after the

5    fact between Mr. Collingsworth and his niece or

6    anybody else saying, "Shucks, we -- I can't believe

7    that computer got stolen," or anything to that

8    effect?

9          A.       When I interviewed Mr. Collingsworth, he

10   discussed that his brother-in-law was up for a

11   fellowship working at Johns Hopkins and that he had

12   given the computer to his brother-in-law or to his

13   niece, and when he met with his niece around on the

14   holidays in December of 2013, that's when she told

15   him that it had been stolen.

16         Q.       Mr. Collingsworth is a Apple user.  He's

17   got iPhones and iPads, right?

18         A.       I wouldn't classify him as -- as a Apple

19   user necessarily.

20         Q.       Does he have -- during the relevant time

21   period we're talking about, did he utilize an

22   iPhone?

23         A.       Yes, sir.

24         Q.       He also had an iPad, right?

25         A.       Yes, sir.

```
 1        Q.      It's your understanding he had an iTunes
 2   account, correct?
 3        A.      I don't know.
 4        Q.      You didn't ask that?
 5        A.      No, sir.
 6        Q.      Do you know whether the Find My Mac was
 7   enabled on that MacBook?
 8        A.      Pardon me?
 9        Q.      Do you know what the Find My IPhone,
10   Find My iPad, Find My Mac function is?
11        A.      Yes, sir.
12        Q.      Do you know whether that function was
13   enabled on the MacBook?
14        A.      I do not know.
15        Q.      You've done no investigation to
16   determine whether it was enabled and if you could
17   use that to double check and see if
18   Mr. Collingsworth told you the truth?
19        A.      We have not followed up on the theft of
20   the Mac.
21        Q.      What is the niece's name?
22        A.      I don't know.
23        Q.      You didn't ask for that?
24        A.      No, sir.
25        Q.      Was she in Brazil by herself?
```

```
 1        A.    She was with her family.

 2        Q.    What's the brother-in-law's name?

 3        A.    I believe you probably have it in my

 4   notes.

 5        Q.    Somebody de Souza?

 6        A.    I don't recall.

 7        Q.    Okay.  You didn't interview any of those

 8   people?

 9        A.    No, sir.

10        Q.    You relied on Mr. Collingsworth to tell

11   you the truth?

12        A.    Yes, sir.

13        Q.    And be fair to say that the loss of that

14   Mac laptop is probably the biggest factor in not

15   having emails between 2011 and 2013?

16              MR. KUSIN:  Objection.  Form.

17        A.    Yes, sir.

18        Q.    (BY MR. WELLS)  Are you aware of --

19        A.    Can I -- can I correct that?

20        Q.    It's your testimony.

21        A.    The data from the Mac, when it was

22   transitioned to the HP laptop, if the email files

23   would have been transferred properly, then the Mac

24   may not be an issue.

25        Q.    Well, not properly, had they been
```

**Dennis Williams CONFIDENTIAL**                                    **159**

1    transferred at all?  I mean, it's your understanding

2    they weren't transferred at all?

3        A.    There are very limited files, some

4    programs transferred.  There's no indication of any

5    emails being transferred.

6        Q.    Right.

7              Because the contemporaneous emails

8    reflect that Mr. Collingsworth specifically said,

9    "Do not transfer over my emails.  I just want them

10   working forward"?

11             MR. KUSIN:  Objection.  Form.

12       A.    Would you like to give me a document

13   that quotes that?

14       Q.    (BY MR. WELLS)  Did you review your

15   report during the seven hours yesterday?

16             MR. KUSIN:  Objection.  Form.  And

17             objection.  Privilege.  I've tried to

18             be -- to be -- let you have some leeway

19             here.  But if you're going to start asking

20             him about specific documents he reviewed

21             with counsel, I'm going to object on the

22             basis of privilege and instruct him not to

23             answer.

24             MR. WELLS:  Even on the report that

25             he gave?  I would hope he looked at that

1          yesterday.

2                    MR. KUSIN:   If you're going to ask

3              him what he reviewed yesterday with

4              counsel, then I'm going to instruct him

5              not to answer.

6      Q.     (BY MR. WELLS)   All right.   Look at

7   Paragraph 115 of your April report.   And we'll get

8   to the email itself at some point in this

9   deposition, but this is how you characterized it.

10                   This is at the time the MacBook's

11  being replaced by the HP laptop, he says:   "At the

12  time, Collingsworth believed that the emails in both

13  accounts were being saved to the Conrad & Scherer

14  servers and so he instructed the Conrad & Scherer IT

15  department not to transfer his e-mails from his

16  MacBook to the new HP laptop."

17                   Is that your understanding of what

18  the email says?

19     A.     Yes, sir.

20     Q.     And those are your words right there,

21  you wrote those, right?

22     A.     Yes, sir.

23     Q.     And you believe they are true?

24     A.     Yes, sir.

25     Q.     So it was not an issue of an improper

```
1    transfer, somebody trying to make a transfer and
2    making a mistake, Mr. Collingsworth said, "Do not
3    transfer the emails"?
4         A.    I -- I don't agree with that.  You're --
5    you're assuming the -- a businessperson knows the
6    difference between emails on a Mac versus emails on
7    a Windows machine.  Mr. Collingsworth did not know
8    how to -- to set up the rules to archive.  It would
9    have been incumbent on IT personnel to have said,
10   "Hey, time-out here.  We need to get this
11   information preserved or get it transferred."
12        Q.    All right.  All that stuff about
13   Mr. Collingsworth does or does not know stuff, you
14   don't know that, that's what he told you, right?  Do
15   you know what Mr. Collingsworth knows?
16        A.    I have talked to Mr. Collingsworth on a
17   limited extent, and it appears that he has a limited
18   technical knowledge.
19        Q.    How many times have you talked to him?
20        A.    Maybe four or five times.
21        Q.    Are those in person or on the telephone?
22        A.    I'd say maybe three times in person and
23   once or twice on the phone.
24        Q.    And in any of those times, did you ask
25   him, "Why did you say don't transfer my emails from
```

1    the MacBook to my new computer?"

2         A.    Yes, sir.

3         Q.    And what was his response?

4         A.    He thought the emails were on the -- the

5    server --

6         Q.    Okay.

7         A.    -- you know.

8         Q.    And whether or not that is a fact, you

9    have to rely on him to tell you the truth, true?

10        A.    Can you -- could you repeat that

11   question?  You kind of, like, said, "Is that the

12   truth?"  I have to rely on the truth, is that the --

13   can you repeat that?

14        Q.    Sure.

15               You asked Mr. Collingsworth why he

16   instructed IT personnel not to transfer his emails,

17   and he told you, "Because I thought they were up on

18   the server," right?

19        A.    That's correct.

20        Q.    Other than what he told you, do you have

21   any other basis to say that's the reason he

22   instructed IT personnel not to transfer his emails?

23   Do you have any objective evidence outside of what

24   Mr. Collingsworth told you?

25        A.    As far as what his knowledge is?

```
 1        Q.      Yeah.  What his reasoning for making

 2   that request was.

 3        A.      I don't think I'm able to answer what

 4   his knowledge is.

 5        Q.      Well, I'll agree with you there.

 6                You're relying on him to tell you

 7   the truth as to why he did something?

 8        A.      Yes, sir.

 9                MR. KUSIN:  Is this a good place to

10                take a break.  We're right at an hour, I

11                think.

12                MR. WELLS:  Yeah, that's fine.

13                THE VIDEOGRAPHER:  We're off the

14                record at the end of DVD Number 4 at 2:53.

15                (Break.)

16                THE VIDEOGRAPHER:  We're back on the

17                record with the start of DVD Number 5 at

18                3:07.

19        Q.      (BY MR. WELLS)  Mr. Williams, before we

20   broke, we were discussing Mr. Collingsworth's

21   computer history as well as what computers are no

22   longer in the defendants' possession and which ones

23   are.

24                One thing I had a question about, I

25   understand the MacBook was lost sometime after June
```

```
 1    of 2013, right?

 2                  MR. KUSIN:  Objection.  Form.

 3         A.    I don't quite agree with that.  It was

 4    provided to his brother-in-law and niece, and

 5    they -- they took it, and then it was stolen from

 6    them.

 7         Q.    (BY MR. WELLS)  According to what

 8    Mr. Collingsworth told you?

 9         A.    Yes, sir.

10         Q.    In any event, whatever happened, it no

11    longer was available for inspection at some point

12    after June of 2013, so we can get our time frames

13    right?

14         A.    Sometime in -- after 2013, it was not

15    available for inspection.

16         Q.    Are you aware of Mr. Collingsworth

17    transferring from the Mac to a different computer

18    sometime in 2012?

19                  MR. KUSIN:  Objection.  Form.

20         A.    I wouldn't say it was a transfer.

21         Q.    (BY MR. WELLS)  What are you aware of?

22    It sounds like that's rung a bell with you.

23         A.    I believe there was a desktop computer

24    set up at the office.

25                  (Williams Exhibit 18
```

```
 1                marked/introduced.)
 2        Q.    (BY MR. WELLS)  I've marked as Exhibit
 3   18 a February 17, 2012, email between Maggie Crosby
 4   and Juan Rodriguez.  I'm just going to paraphrase
 5   rather than read the whole thing.  And just tell me
 6   if I'm paraphrasing it wrong, but essentially, she's
 7   passing along instructions that Mr. Collingsworth is
 8   providing to move some information from one computer
 9   to another, right?
10        A.    Yes, sir.
11                (Williams Exhibit 19
12                marked/introduced.)
13        Q.    (BY MR. WELLS)  I'm marking as Exhibit
14   19 -- it's another email also in February of '12
15   between Maggie Crosby and the CTSS people.
16                Is that what that is?
17        A.    Yes, sir.
18        Q.    Okay.  The CTSS person in the bottom
19   email is saying:  "Hello Maggie, I have an open
20   ticket to transfer data from Terry's old MAC to a
21   new computer and configure."
22                What transfer do you understand that
23   to be referring to?
24        A.    I believe he was getting a desktop
25   computer in the office.
```

1        Q.     Is that one of the computers in the

2    chart?

3        A.     No, sir.

4        Q.     What -- is it -- what is it?

5        A.     It's a -- I believe it's a -- I think

6    it's a Dell Vostro.

7        Q.     So that was the Dell Vostro that he's

8    currently using?

9        A.     Yes, sir.

10       Q.     And then Maggie responds to CTSS

11   saying -- again paraphrasing -- don't worry about

12   it, we've got him transferred from the Mac.

13                    Is that how you understand that

14   email?

15       A.     Yes, sir.

16       Q.     Okay.  So Conrad & Scherer internally

17   handled transfer of data from the Mac to the Dell

18   Vostro?

19       A.     Yes, sir.

20       Q.     Have you seen any indication that emails

21   housed on the Mac were transferred to the Dell

22   Vostro?

23       A.     No, sir.

24       Q.     Have you looked for that?

25       A.     We -- we did look for that.

1      Q.      Do you have any explanation for why that

2   Dell Vostro would not have any emails at least up to

3   February of 2012 that were otherwise housed on the

4   Mac computer?

5      A.      I don't believe they transferred emails.

6      Q.      Did somebody tell you that?

7      A.      This email just talks about

8   transferring -- trying to read this -- move contacts

9   and set -- set music to his new computer.  Is that

10  what the fourth word is in that -- can you make that

11  out?  On Exhibit 18.

12     Q.      That's my best guess.

13     A.      That's music.  There's no indication of

14  any emails being moved.

15     Q.      Okay.  Did you talk to IT personnel

16  about that transfer and ask about what was done and

17  why only certain things were done or whether

18  everything was done?

19     A.      I -- I believe we reviewed the -- the

20  emails at that time and talked to the IT director.

21     Q.      All right.  And what did he tell you

22  about whether or not emails were transferred, and if

23  not, why not?

24     A.      My recollection is that he said emails

25  were not transferred.

**Dennis Williams CONFIDENTIAL**                                     **168**

```
 1       Q.      Did he have a reason why?

 2       A.      I don't recall.

 3       Q.      Did you ask Mr. Collingsworth about

 4   that, whether he asked for emails not to be

 5   transferred off that Mac?

 6       A.      No, sir.

 7       Q.      The Dell Vostro had a hard drive failure

 8   a few months after it was purchased; is that right?

 9       A.      Yes, sir.  It was either hard

10   drive -- it had some type of failure.  It might have

11   been motherboard.

12       Q.      And that was, say, June or July of 2012,

13   couple months after these emails we've just been

14   looking at?

15       A.      I -- I believe -- I -- I'd have to go

16   back and check my records to be certain.

17       Q.      The documents will reflect it, but is

18   that your general understanding of the time frame?

19       A.      I believe it was sometime in the middle

20   of 2012.

21       Q.      Did that failure, whether it be hard

22   drive or motherboard, have any impact on data that

23   was on that computer prior to the failure?

24       A.      I don't know.

25       Q.      Okay.  So I guess one explanation could
```

```
 1   be emails were transferred back in February, there

 2   was a hard drive failure or a motherboard failure,

 3   and those emails that were transferred were lost?

 4        A.      That's a possibility.

 5        Q.      We -- we don't know?

 6        A.      Correct.

 7        Q.      All right.  So we are missing the Dell

 8   Latitude, true?

 9        A.      I wouldn't -- the Dell Latitude was

10   disposed of at the e-cycle center.

11        Q.      We don't have the Dell Latitude; is that

12   a better way?  Can we agree on that?

13        A.      Yes, we do not have the Dell Latitude.

14        Q.      We do not have the HP Compaq, true?

15        A.      Correct, we do not have that.

16        Q.      We do not have the MacBook, true?

17        A.      That's correct.

18        Q.      And there is also at least one external

19   hard drive that we do not have, true?

20        A.      That's correct.

21        Q.      Is that the only external hard drive

22   that we do not have?

23        A.      I -- I would have to go back and check.

24        Q.      Were you provided any sort of inventory

25   or listing of what external hard drives Conrad &
```

```
 1    Scherer or both defendants had in their possession?

 2         A.     No, I was not provided an inventory.

 3         Q.     Well, how do you know what is missing

 4    and what's not?

 5         A.     There is a particular external hard

 6    drive was -- which was used when the Mac was set up

 7    that was purchased on that day that was used to

 8    preserve emails and files.

 9         Q.     Right.

10                And that was the Seagate GoFlex?

11         A.     I'll have to double check that.

12         Q.     Please do, because we're going to be

13    talking about it a lot here in the next hour or so.

14                Just to be clear, you understand I'm

15    asking for the hard drive that you said in your

16    report was plugged in to a Conrad & Scherer computer

17    in December of 2014?

18         A.     Yes, sir.  Well, I thought you were --

19         Q.     I'm asking for the type of hard drive.

20                Is there numerous manufacturers of

21    external hard drives, right?

22         A.     Yes, sir.

23         Q.     All right.  I'm going to try to shortcut

24    this.  Let's look at Exhibit 21.

25                (Williams Exhibit 21
```

**Dennis Williams CONFIDENTIAL**                                    **171**

```
 1                  marked/introduced.)

 2        Q.    (BY MR. WELLS)   This is an email from

 3   Chris Graham of your team to you giving you a

 4   condensed list of only Seagate brand hard drives,

 5   right?

 6        A.    Yes, sir.

 7        Q.    The very bottom one is "Seagate

 8   FreeAgent GoFlex USB Device" with a serial number of

 9   "na02nq70," correct?

10        A.    Yes, sir.

11        Q.    And these make references to "Terry's

12   Secretary's Desktop."

13                  That's the OptiPlex, right?

14        A.    Yes, sir.

15        Q.    All right.   It was first plugged in to

16   that OptiPlex on January 21, 2011, correct?

17        A.    Yes, sir.

18        Q.    And then you flip over to the next page,

19   that same Seagate external hard drive, same serial

20   number, was last plugged in to Mr. Collingsworth's

21   current Dell Vostro desktop on December 8, 2014?

22        A.    Yes, sir.

23        Q.    So we agree that the hard drive you have

24   referenced in your report as being in the

25   defendants' possession at least as of December 8,
```

1   2014, is now missing?

2       A.      I wouldn't characterize that like that.

3       Q.      Characterize it however you like.  I'd

4   just like an answer.

5       A.      No.

6       Q.      Okay.  The Seagate hard drive is not

7   missing?

8       A.      That's not what I said.

9       Q.      Please tell me what the status of the

10  Seagate hard drive is.

11      A.      We have not been able to locate the

12  Seagate hard drive.

13      Q.      How is that different from missing?

14      A.      No.  Your question to me indicated that

15  Mr. Collingsworth had possession of this device on

16  December 8th.  I have no information to indicate

17  that he is the one that had possession of this

18  device on December 8th.

19      Q.      The defendants had possession of the

20  hard drive on December 8th.

21              One of the defendants is Conrad &

22  Scherer, true?

23      A.      Okay.  But your question to me was

24  Mr. Collingsworth.

25      Q.      Well, I'm asking you a different

```
 1   question now.

 2        A.     Oh, okay.

 3        Q.     You understand Conrad & Scherer is a

 4   defendant?

 5        A.     Yes, sir.

 6        Q.     You understand Terry's Dell desktop on

 7   this chart here is a computer owned by Conrad &

 8   Scherer?

 9        A.     Yes, sir.

10        Q.     And you understand that that Seagate

11   hard drive was plugged in to that Conrad &

12   Scherer-owned computer on December 8, 2014?

13        A.     Yes, sir.

14        Q.     Do you still disagree that the -- that

15   hard drive was in the defendants' possession at

16   least as late as December 8, 2014?

17        A.     And when you say "defendants," you're

18   talking about any employee of Conrad & Scherer?

19        Q.     Yeah.

20        A.     Okay.

21        Q.     Conrad & Scherer is an entity.

22               You understand an entity can only

23   act through its employees, right?  Conrad & Scherer,

24   LLP, cannot get up and plug a hard drive into a

25   computer, can it?
```

```
1        A.      It is highly likely that it was a Conrad

2   & Scherer employee that connected that device to

3   that computer.

4        Q.      Into Terry Collingsworth's computer?

5        A.      Yes, sir.

6        Q.      Who did it?

7        A.      I don't know.

8        Q.      This was five months ago, six months ago

9   now.

10               Nobody knows who's the one that last

11  had possession of that hard drive?

12               MR. KUSIN:  Objection.  Form.

13       A.      We do not know where that hard drive is

14  located.

15       Q.      (BY MR. WELLS)  Right.

16               And I'm just trying to figure out,

17  last time we did know where it was located --

18  sometime in December of '14 -- who was the last

19  person that saw it?

20       A.      I don't know.

21       Q.      Did you ask Mr. Collingsworth if he had

22  plugged that hard drive into the computer, his

23  computer, on December 8, 2014?

24       A.      I don't believe I asked him that

25  specific question.
```

```
 1       Q.     Okay.  Whether you asked it or not, did
 2    he offer that information to you?
 3       A.     I have talked to Mr. Collingsworth about
 4    external devices, and he provided me all the
 5    external devices he had and was not this device.
 6       Q.     Did he tell you, "I had another one, but
 7    I cannot find it"?
 8       A.     No, sir.
 9       Q.     He just said, "These are all of them"?
10       A.     He provided me all of his devices.
11       Q.     Okay.  Did you interview anybody else
12    about who may have been the one to plug in this
13    Seagate hard drive that was in use between January
14    of 2011 and December of 2014?
15       A.     We checked with employees there in the
16    DC office to see if they had any knowledge about
17    this activity.
18       Q.     Who all did you talk to?
19       A.     Their paralegal.
20       Q.     Susana Tellez?
21       A.     Pardon?
22       Q.     Susana Tellez?
23       A.     No.
24       Q.     Cristina Stam?
25       A.     No.
```

1        Q.      Grace Kaissal?

2        A.      No.  No, not Grace.

3        Q.      You didn't talk to any of those people

4    about this?

5        A.      Not -- not for December of 2014.

6                The current -- one of the current

7    paralegals.  I can't remember her name.

8        Q.      What did she tell you about it?

9        A.      You know, she was not aware of it.  You

10   know, we had already gone up and checked all of

11   their external devices and interviewed them for any

12   and all external devices.

13       Q.      Did you ask her about this specific one

14   and the date of December 8, 2014?

15       A.      One of my examiners did.

16       Q.      And her response was, "I don't know what

17   you're talking about"?

18       A.      She was not aware of the device.

19       Q.      She didn't even know there was a Seagate

20   external hard drive?

21       A.      I wouldn't agree with that.  I mean,

22   they were aware that we were looking for external

23   devices, and they were aware that we were looking

24   for a Seagate device.  But we were looking for any

25   and all devices.

```
 1        Q.      Okay.  Did she report, "Yes, I recognize
 2   that device; but, no, I don't know where it is now";
 3   or, "No, I've never even heard of Seagate"?
 4        A.      No, the -- there were -- there were
 5   several Seagate devices with the same size, color
 6   that were there in the office that we examined.
 7   There are other brands that were similar in size.
 8   So the description is a, you know, small, black
 9   external device.  This is the brand.
10        Q.      All right.  I'm going to show you what's
11   been marked as Exhibit 20.
12                    (Williams Exhibit 20
13            marked/introduced.)
14        Q.      (BY MR. WELLS)  Top email is from Juan
15   Carlos Rodriguez to you.  It's all redacted except
16   for he's telling you:  "Here is the spreadsheet.
17   Please let me know if you have any questions," and
18   he attaches an Excel file, right?
19        A.      Yes, sir.
20        Q.      And what he's providing to you is in
21   response to your email below that where you say, in
22   the fourth sentence:  "It is imperative that we get
23   the list of all the hard drives with the names or
24   initials of the associated employee for the hard
25   drive and the date (or approximate date) the hard
```

1    drive was obtained by the IT personnel."

2                    Do you recall asking for that

3    information?

4         A.    Yes, sir.

5         Q.    And is the fourth page of this exhibit

6    on CSTC 9429 the listing that you were provided?

7         A.    Yes, sir.

8         Q.    All right.  Was this represented to you

9    to be all of the external devices that Conrad &

10   Scherer had in its possession?

11        A.    No.

12        Q.    Okay.  What is this supposed to reflect?

13        A.    This reflects the hard drives that they

14   have in their possessions.

15        Q.    How is that different than what I asked?

16        A.    You asked if this was all the external

17   devices that they had in -- in their possession.

18        Q.    Okay.  So this is both hard drives,

19   external devices and computers?

20        A.    Could be hard drives from a computer and

21   external devices.

22        Q.    Okay.  But is this being represented to

23   you as, hey, this may have more information than

24   this, but it at least tells us every external hard

25   drive we have in our possession currently?

```
1         A.    No, sir.

2         Q.    Okay.  Did you ever get information of

3    what external hard drives they currently had in

4    their possession?

5         A.    No, sir.

6               And to go back, this is a list of

7    the hard drives and devices that the IT group has in

8    their control, that a lot of it is drives that have

9    gone bad or -- or computers that have been upgraded

10   and old devices.  So this -- this is not an

11   inventory of all of their devices.  This is what the

12   IT folks have as far as old hard drives.

13        Q.    Weren't you wanting to know what are all

14   the hard drives anybody has in their possession?  I

15   mean, you're -- you're looking for a missing hard

16   drive, aren't you?

17        A.    We're looking for a missing external

18   device, yes, sir.

19        Q.    All right.  Didn't you want to know, is

20   there an inventory of all the external devices in

21   Conrad & Scherer's possession?

22        A.    We -- we asked for that.

23        Q.    But you were never provided it, or were

24   you?

25        A.    We were never provided a list.  And
```

1   that's not unusual for most businesses, not to have

2   a list of all external devices that employees had

3   purchased.

4                    (Williams Exhibit 22

5               marked/introduced.)

6       Q.    (BY MR. WELLS)  Mark as Exhibit 22 an

7   email from Chris Graham of your team to you

8   attaching a spreadsheet called "USB Report

9   Combined."

10                   Is that what that is?

11      A.    Yes, sir.

12      Q.    Now, what is this spreadsheet

13  reflecting?  As briefly as you can, because we're

14  about to get into it in more detail.

15      A.    It reflects USB devices connected to

16  computers associated with Terry Collingsworth.

17      Q.    All right.  And Mr. Graham, when he's

18  sending this to you in his cover email, he says:  "I

19  am not sure how to best present this.  Maybe we

20  shouldn't have an opinion on which items are more

21  relevant than others."

22                   Do you see that?

23      A.    Yes, sir.

24      Q.    Why is he saying that?  Do you know?

25      A.    He just doesn't know what order to list

1      the items in.

2          Q.      He's talking about opinion on which

3      items are more relevant than others, not which go

4      first.

5                  Do you have an opinion or did you

6      and Mr. Graham discuss coming to an opinion about

7      which external devices are more relevant than

8      others?

9          A.      No, sir.

10          Q.      Okay.  In the spreadsheet, what does the

11      highlighting signify?

12          A.      He has the USB devices listed by -- in

13      order by serial number, and the highlighting

14      indicates a device that had been connected to

15      multiple computers.

16          Q.      All right.  Now, this -- this

17      spreadsheet report, does it -- does it have a name

18      that I could use that you would understand?

19          A.      USB report combined.

20          Q.      Okay.  I didn't know if there's some

21      special computer tool that you do to specifically

22      run this report.

23                  It doesn't have a name in your field

24      that this type of report is called?

25          A.      USB device history.

```
1        Q.      Okay.  This USB device history provides

2   various information.  It provides the type of USB --

3   USB device, it provides a serial number, it also

4   provides where that device was plugged into, meaning

5   what particular computer?

6        A.      Yes, sir.

7        Q.      And it also provides the first and last

8   time that device was plugged in to that particular

9   computer; is that correct?

10       A.      Yes, sir.

11       Q.      Now, Column F there on the first page on

12  the far right, does that show the first connected

13  date?

14       A.      Do you have a -- a better copy?  I -- I

15  believe it does.

16       Q.      This is how this was produced to us, so

17  there was some highlighting that makes it very

18  difficult to read.

19               The next page, Column G, would that

20  show the last connect date?

21       A.      It should, yes, sir.

22       Q.      Now, this is a report that you can do in

23  your business when you're analyzing a computer to

24  see what all USB devices were connected to that

25  computer, right?
```

```
 1        A.      Yes, sir.
 2        Q.      But the only thing you can determine is,
 3   with respect to a particular USB device, the first
 4   time it was plugged in and the last time, right?
 5        A.      Not necessarily.
 6        Q.      In general.
 7        A.      In general, okay.
 8        Q.      I mean, if you have a device plugged in
 9   in 2011 and then plugged in for the last time in
10   2014, this report will not tell you all the myriad
11   times it may have been plugged in in between there,
12   will it?
13        A.      This particular spreadsheet does not
14   have that information on it.
15        Q.      Do you have one that does?
16        A.      I would have to check.
17        Q.      All right.  Let's go to the Column G on
18   the second page, the last connect date.
19        A.      Yes, sir.
20        Q.      We have got many that were last
21   connected after April of 2014, right?
22        A.      Yes, sir.
23        Q.      Do you know what the status is of all
24   those external devices, whether they are in Conrad &
25   Scherer's possession or not?
```

```
 1        A.       I do not know.

 2        Q.       So we've identified in the report,

 3   there's one, this Seagate GoFlex hard drive, that we

 4   know is missing.

 5                  But it's possible there are other

 6   hard drives that have been plugged into these

 7   computers in mid-2014 and beyond that are also

 8   missing?

 9        A.       I wouldn't necessarily characterize it

10   as missing.

11        Q.       Gone, not in possession?

12        A.       I wouldn't characterize it like that

13   either.  My limited understanding is that they would

14   produce information during lawsuits, and they would

15   put data on USB devices to produce to plaintiffs or

16   defendants or whoever, so it would not be unusual

17   for USB devices to be connected to put discovery or

18   whatever material and produce it to -- on -- on

19   legal matters like I would assume all law firms do.

20        Q.       Well, do we have any information on

21   which one of these hard drives or which number of

22   these hard drives that is the circumstance with or

23   which of them were kept and used on a regular basis

24   to either back up information or transfer it to one

25   work computer to another work computer?  I mean,
```

1   have you analyzed any of the hard drive -- the

2   external devices on this list?

3       A.     We looked -- we were looking for that

4   Seagate GoFlex that was connected in January 21st of

5   2011, when the -- when the Mac was set up and files

6   were transferred from the -- from the Dell OptiPlex

7   to the MacBook.  We were trying to -- to locate that

8   device to see any files.

9       Q.     Right.

10              And I understand that's the one you

11  were looking for, but have you made any

12  determination that that is the only one that could

13  have been used to back up email data that is now not

14  able to be located?

15      A.     During our investigation, we went

16  through and previewed all of the external devices

17  they had in the Conrad & Scherer office in DC and

18  exported out or made file copies, file listings of

19  all email files on those devices.  There were

20  several devices that had email files, backups from

21  servers and so forth like that, but did not contain

22  any new relevant emails.

23      Q.     Okay.  Do you have any document that

24  compares what you were able tc examine to this

25  spreadsheet that shows all of the external devices

1    plugged into the DC computers to see what delta

2    might exist?

3         A.      There is another spreadsheet that shows

4    the examination of the devices in DC and which ones

5    were connected with some of those computers.

6         Q.      You don't know, sitting here today,

7    whether we can account for all of the devices on

8    this list or what number of them?

9         A.      I do not know.

10        Q.      I think it's Exhibit 21 that's already

11   in front of you, if you could get that back in front

12   of you.

13                This is kind of a condensed

14   spreadsheet providing some of the same information,

15   but this time only reflecting Seagate FreeAgent

16   external devices, right?

17        A.      Yes, sir.

18        Q.      Now, we've already talked about the one

19   that was plugged in January 21, 2011, for the first

20   time and December 8, 2014, for the last time, and we

21   know we cannot locate that one, right?

22        A.      That's correct.

23        Q.      How about any of the other ones on this

24   list?

25        A.      I would have to go back and compare it

1    to the devices that we examined.

2        Q.    All right.  Let's focus here on the one

3    we know is missing.

4              At the bottom of the first page of

5    this chart on this email, this shows the first and

6    last plug-in dates into the Dell OptiPlex, right?

7        A.    Yes, sir.

8        Q.    And the January 21, 2011, plug-in date,

9    the first date, that was actually the date that

10   Seagate was purchased, right?  You located a receipt

11   from Staples, I believe?

12       A.    Yes, sir.

13       Q.    And it was purchased for the specific

14   purpose of backing up Mr. Collingsworth's emails

15   prior to transferring to the MacBook; is that your

16   understanding?

17       A.    Yes, sir.

18       Q.    Okay.  That --

19       A.    I -- I would semi correct that and say

20   backing up his files, including his emails.

21       Q.    Okay.  That particular external hard

22   drive was last plugged in to that Dell OptiPlex on

23   September 5th of 2013, right?  I'm just focusing on

24   this particular computer.  I know it was plugged

25   into more than one.

1      A.      Most likely.  I would have to confirm

2  that date to -- the disk updates are not always 100

3  percent accurate.

4      Q.      In any event, we can't tell how many

5  times that particular Seagate external hard drive

6  was plugged in to that particular computer between

7  2011 and 2013, can we?

8      A.      No, sir.

9      Q.      It could have been every week, but the

10  computer really only keeps a record in general of

11  the first plug-in and the last plug-in?

12      A.      Yes, sir.

13      Q.      We know, obviously, that external hard

14  drive was in existence and in use during the entire

15  time Mr. Collingsworth was using the MacBook, true?

16      A.      Yes, sir.

17      Q.      The only way to determine when and how

18  many times that device was plugged in to the MacBook

19  would be to analyze the MacBook, right?

20      A.      It would be difficult to determine how

21  many times on the MacBook, but you would have to

22  analyze the MacBook to see any related USB activity

23  on it.

24      Q.      Okay.  I mean, it's possible that as it

25  was plugged into these other computers, it was also

**Dennis Williams CONFIDENTIAL**                                    **189**

1  being plugged into the MacBook to back up files; but

2  without the MacBook, we cannot objectively verify

3  that; is that right?

4          A.      That's correct.

5          Q.      Going on to the next page, this is still

6  the same Seagate FreeAgent GoFlex USB device, and it

7  was also plugged in to the -- Mr. Collingsworth's HP

8  laptop on March 29, 2014, right?

9          A.      Yes, sir.

10         Q.      Do you know what was being done with it

11  on that date?

12         A.      No, sir.

13         Q.      What files may have been transferred?

14         A.      No, sir.

15         Q.      And that same Seagate external device

16  was also first plugged in to Mr. Collingsworth's

17  Dell Vostro laptop -- excuse me, desktop for the

18  first time in -- in September of 2012, true?

19         A.      Yes, sir.

20         Q.      And for the last time in December of

21  2014?

22         A.      That's when it was plugged in to that

23  desktop, yes, sir.

24         Q.      And it is very possible that it was

25  plugged in numerous times in between those two time

1    periods?

2        A.    I -- I wouldn't put it that way.

3    There's a chance it may have been plugged in

4    additional times.  All we know is, it was plugged in

5    on these two times.

6        Q.    Right.

7              I mean, you can't tell us whether it

8    was a thousand times between these two times or

9    really just one time or really zero times.  We

10   just -- the computer doesn't keep that information,

11   does it?

12       A.    I can give you the facts at hand, and it

13   shows it was connected on these two times.

14       Q.    Right.

15             Did you examine any Lexar USB

16   devices?

17       A.    Yes, sir.

18       Q.    Which ones?

19       A.    I've examined numerous Lexar devices.

20       Q.    We would have to find the listing that

21   was documented somewhere in the documents you

22   produced?

23       A.    Yes, sir.

24             (Williams Exhibit 23

25             marked/introduced.)

```
 1        Q.      (BY MR. WELLS)   Show you what I'm

 2    marking as Exhibit 23, which is also Exhibit M to

 3    your report.

 4                      This is one of the CTSS work

 5    tickets, right?

 6        A.      It's an email from CTSS to Victoria Ryan

 7    with an attached client billing report.

 8        Q.      And that client billing report has an

 9    entry on January 21, 2011.

10                      That's the date the Seagate GoFlex

11    was purchased, right, from Staples?

12        A.      The Seagate GoFlex that we've been

13    talking about was purchased on January 21, 2011.

14        Q.      Right.   The one we can't locate?

15        A.      That's correct.

16        Q.      And this is a CTSS person describing his

17    work.  He says he's "On-site:   Configured new Mac

18    for Terry."

19                      That would be the MacBook we're

20    missing, right?

21        A.      Yes, sir.

22        Q.      He says he also "Configured a remote

23    attach drive for use with both Mac and PC."   [As

24    read.]

25                      It's your understanding that would
```

**Dennis Williams CONFIDENTIAL**                                    **192**

1    be referring to the Seagate we can't locate?

2         A.    Yes, sir.

3         Q.    So he could configure that external

4    device so that it could not only be plugged in and

5    utilized to transfer information from a PC, it could

6    also be plugged in and utilized to transfer

7    information from his new Mac?

8         A.    Yes, sir.

9         Q.    Also says he "Archived all email older

10   than 2011" and "Stored all documents on remote

11   attach drive."

12               So is this what's telling you that

13   that Seagate was used to archive not only all of his

14   emails that were on the OptiPlex at that time but

15   also to get all the documents off that computer?

16        A.    It indicates, yes, he archived emails

17   that were on the OptiPlex that were older than 2011.

18               (Williams Exhibit 24

19          marked/introduced.)

20        Q.    (BY MR. WELLS)  Showing you what I'm

21   marking as Exhibit 24, which is also Exhibit Q to

22   your report.  May 6, 2011, email.  Victoria Ryan is

23   talking to somebody at CTSS, right?

24        A.    This is an email from Vickie Shores at

25   CTSS to Victoria Ryan on May 6, 2011.

**Dennis Williams CONFIDENTIAL**                                    193

```
 1        Q.     It's actually several emails back and

 2   forth between them; but to sum it up, Ms. Shores is

 3   recommending a hosted exchange option for

 4   Mr. Collingsworth's emails.

 5                Is that your understanding?

 6        A.     Yes, sir.

 7        Q.     And is that the cloud option that was

 8   referenced in your report that Mr. Collingsworth

 9   didn't want to do?

10        A.     That's the email option that he was

11   concerned about.

12        Q.     Okay.  But this -- this email is part of

13   CTSS recommending that course of action?

14        A.     Yes, sir.

15        Q.     Okay.  And Ms. Ryan responds, and down

16   here in the fourth paragraph, she's saying -- before

17   that, she says, essentially, "I'll talk to Terry

18   about it."  But fourth paragraph, she says:  "Before

19   doing any kind of hosting switch, we

20   should...schedule an appointment to have a

21   technician archive Terry's email on a non-Mac.

22   Right now I'm not sure what his Outlook shows when

23   he opens it on his PC at home--- but that might be

24   where we take the emails and archive them (with a

25   copy to an external portable harddrive)."
```

```
 1                    You see that?

 2        A.    Yes, sir.

 3        Q.    Are you aware of whether that actually

 4   occurred?

 5        A.    I'd have to go back and check the work

 6   tickets to determine that.

 7        Q.    Sitting here today, you don't know?

 8        A.    My recollection, there was some activity

 9   in the end of 2010 or 2011 they archived a bunch of

10   emails.

11        Q.    So that October 2011 work ticket I

12   showed you long ago that talked about archiving

13   15,000 emails between April '11 and October of '11?

14   That's Exhibit 6.

15        A.    I think there were some other emails in

16   between this or work tickets that would paint the --

17   describe the scenario better.

18        Q.    All right.  Well, let's look at your

19   report and see how you describe it there.  Go to the

20   April -- one of the reports.

21                    On page 20, at the top, Paragraph b,

22   looks like you're describing an interview with

23   people at CTSS about what was actually done in that

24   October 2011 archival of 15,000 emails?

25        A.    Exhibit 6 is a work ticket for work done
```

```
 1    on October 11th on site, I believe, at the Conrad &

 2    Scherer offices.

 3                   Paragraph 94 is referring to

 4    activity a month later.

 5         Q.     Huh-uh.  Excuse me.  Paragraph b at the

 6    top of that page.

 7         A.     Oh, I'm sorry.

 8         Q.     Do you see work ticket October 11, 2011,

 9    more than 15,000 emails?

10         A.     Yes, sir.

11         Q.     And this is describing your interview

12    with the CTSS person trying to get some more

13    information about what happened that's reflected on

14    that work ticket in Exhibit 6?

15         A.     Yes, sir.

16         Q.     And you say here:  "Mr. Shores believed"

17    -- that's the CTS person, Mr. Shores?

18         A.     Mr. Shores, yes, he's the owner of CTSS.

19         Q.     It says:  "Mr. Shores believed that the

20    emails were archived to either Collingsworth's Mac

21    laptop or to an external hard drive."  Right?

22         A.     Yes, sir.

23         Q.     That's what he relayed to you?

24         A.     Yes, sir.

25         Q.     So based on the information in front of
```

1   you, it's entirely possible that those emails were

2   archived to the same Seagate external hard drive

3   that emails had been archived to just a few months

4   earlier?

5        A.     There's a possibility of that.  But with

6   Mr. Shores' familiarity with the Mac, it's highly

7   likely that they were archived to the Mac laptop

8   itself.

9        Q.     So you're not offering the opinion that

10  CTSS did not know how to archive emails to the Mac

11  itself.

12       A.     I think it's clear that CTSS had

13  problems trying to archive Outlook for Mac emails

14  that would have been on Mr. Collingsworth's Mac

15  laptop.

16       Q.     All right.  Well, were the emails

17  archived on his Mac successfully, or were they

18  archived on an external hard drive successfully, or

19  neither?  Do you know?

20       A.     I believe they were archived to the Mac

21  laptop.

22       Q.     Successfully?

23       A.     Somewhat successful.

24       Q.     What -- what leads you to say that?

25       A.     I believe there's communications where

1    Mr. Collingsworth refers to the fact that he's not

2    able to view the archived emails or one of his

3    office admins says they cannot see or view the

4    archived emails.

5                    (Williams Exhibit 25

6              marked/introduced.)

7         Q.    (BY MR. WELLS)  Show you Exhibit 25.

8    This is also Exhibit W to your report.  This is a

9    November 22, 2011, email chain involving Maggie

10   Crosby, Terry Collingsworth and Victoria Ryan at

11   various points in this discussion.

12                    The second email down is -- before

13   we get to that, we've already looked at the email

14   where CTSS is saying one option to help with your

15   email archiving issues would be a cloud-based

16   service?

17        A.    Hosted exchange is what they referred it

18   to.

19        Q.    Okay.  And here, Collingsworth calls it

20   "some cloud thing."

21        A.    Yes, sir.

22        Q.    We're talking about the same thing?

23        A.    I believe so.

24        Q.    Okay.  And Ms. Crosby is asking

25   Mr. Collingsworth, what's your feedback on that?

```
 1                    He responds:  "Well please confirm
 2    that they know how to put it on an external hard
 3    drive that I can access.  They keep wanting to do
 4    some cloud thing and I keep saying no, first let's
 5    clean out because the stuff I have is too sensitive
 6    and I don't want it out there.  I'd like to be able
 7    to save really sensitive stuff on an external hard
 8    drive and then the routine stuff I don't care - they
 9    can cloud it."  [As read.]
10                    Did I read that correctly?
11         A.     Yes, sir.
12         Q.     So Mr. Collingsworth is not completely
13    oblivious to the ability to archive his emails onto
14    an external hard drive, right?
15                    MR. KUSIN:  Objection.  Form.
16         A.     I don't -- I wouldn't put it that way.
17         Q.     (BY MR. WELLS)  Well, he's saying:  "I'd
18    like my sensitive stuff on an external hard drive."
19    [As read.]  We can agree on that?
20         A.     He -- he's saying that he would like it
21    archived on an external hard drive, yes, sir.
22         Q.     And we've looked at Ms. Crosby's
23    interview notes where she says it was her
24    recollection that there was a periodic practice of
25    archiving onto an external hard drive.  That's what,
```

```
 1   at least, the notes reflect.  I know you've quibbled
 2   with that.
 3       A.     No, I wouldn't -- I wouldn't agree with
 4   that -- I wouldn't put it that way.  I don't think
 5   her comments were accurate at the time.
 6       Q.     Okay.  You're saying there's no
 7   indication from the investigation you've done that
 8   anybody was doing any sort of email archiving to
 9   external hard drives?
10               MR. KUSIN:  Objection.  Form.
11       A.     There -- I mean, there are instances,
12   for example -- we've already covered it -- when
13   emails from the -- the Dell OptiPlex should have
14   been copied to the external hard drive when they
15   were transferring files and preparing the Mac
16   laptop.  So there is evidence that emails on some
17   occasions were being archived to an external device.
18       Q.     (BY MR. WELLS)  And Ms. Crosby said, in
19   fact, that was the case.  I'm just asking what she
20   said.  What do you understand she said?  I
21   don't -- I don't -- I'm not asking about whether you
22   agree or disagree with what she said.
23               What she told to either you or your
24   team was, there was a periodic practice of external
25   hard drive archiving?
```

1       A.      I think you're taking that up -- no, I

2    would not put it that way.

3       Q.      Okay.  That's fine.  That's fine.  You

4    won't put it that way.

5                    Did you discuss with

6    Mr. Collingsworth putting really sensitive stuff on

7    an external hard drive?

8       A.      No, sir.

9       Q.      Really?  You didn't ask him what you're

10   talking about in this email where you're actually

11   maintaining an external hard drive that you're

12   putting only the really sensitive stuff on?

13                    MR. KUSIN:  Objection.  Form.

14      A.      I asked him for any and all external

15   devices.

16      Q.      (BY MR. WELLS)  Right.

17                    Did you question him about this

18   particular email that was in your possession?

19      A.      I don't know if this email was one of

20   the ones I had told him to look at when we did our

21   interview.  I don't think it was, but we probably

22   have them -- may have notes of what items for him to

23   look at.

24      Q.      Did you interview anybody about whether

25   Mr. Collingsworth was -- Mr. Collingsworth's wishes,

| | |
|---|---|
| 1 | as expressed in this contemporaneous email, about |
| 2 | having sensitive stuff saved to an external hard |
| 3 | drive was, in fact, put into place? |
| 4 | MR. KUSIN:  Objection.  Form. |
| 5 | Q.    (BY MR. WELLS)  Did you talk to his |
| 6 | assistants about it?  Didn't talk to him about it. |
| 7 | Did you talk to anybody about it? |
| 8 | A.    I did not use the term "sensitive."  We |
| 9 | used the term "any devices used for any backups." |
| 10 | We were looking for any and all devices that were |
| 11 | used for backups. |
| 12 | Q.    Well, do you know whether he provided |
| 13 | the one that was used to store the sensitive stuff? |
| 14 | A.    Could you ask that question again? |
| 15 | Q.    This email says he wants to store his |
| 16 | sensitive emails on an external hard drive. |
| 17 | Did you make any determination |
| 18 | whether there was an external hard drive onto which |
| 19 | sensitive emails were put? |
| 20 | A.    I wouldn't put it that way.  We did an |
| 21 | investigation to determine any and all external |
| 22 | devices that had any data on it. |
| 23 | MR. KUSIN:  This might be a good |
| 24 | spot for a break.  It's been about an |
| 25 | hour. |

```
 1                    MR. WELLS:  We can take a -- we need
 2           to do a quick break.
 3                    MR. KUSIN:  That's fine.
 4                    THE VIDEOGRAPHER:  We are off the
 5           record.  End of DVD Number 5 at 4:14.
 6                    (Break.)
 7                    THE VIDEOGRAPHER:  We're back on the
 8           record, the start of DVD Number 6 at 4:27.
 9      Q.     (BY MR. WELLS)  All right.
10  Mr. Williams, we were talking about your discussions
11  with Mr. Collingsworth or others about the use of
12  external hard drives to back up emails or other
13  sensitive data.
14                    You talked to Mr. Collingsworth four
15  or five times, is that what you said?
16      A.     Yes, sir.
17      Q.     Did you ask him about his use of
18  external hard drives?
19      A.     Yes, sir.
20      Q.     And what did he respond to you?
21      A.     He provided a couple of external devices
22  that he had in his office and said that was all the
23  devices he had.
24      Q.     Did you ask him about how he used those
25  devices on a regular basis?
```

```
 1        A.     No, I did not.

 2        Q.     All right.  So what you asked him about

 3   external hard drives was, "Give me all your external

 4   hard drives"?

 5        A.     Yes, sir.

 6        Q.     But you didn't have any discussions with

 7   him about what his practice was in connection with

 8   using those external hard drives?

 9        A.     I'd have to look at -- back at my notes.

10   I don't distinctly recall talking about his normal

11   use of USB devices.

12        Q.     Okay.  Let me just try to short-circuit

13   this.

14               Other than what's reflected in your

15   notes, you don't have any independent recollection

16   of discussions with Mr. Collingsworth about usage or

17   possession of external hard drives, because I've got

18   your notes.

19        A.     Right.

20        Q.     I've got you here today.  So I need to

21   know if there's a difference between the two.

22        A.     I believe one of our associates was told

23   that, you know, Mr. Collingsworth recalled, when

24   they set up his devices, that they had backed data

25   up to an external hard drive.
```

**Dennis Williams CONFIDENTIAL**                                          **204**

```
1        Q.      At each point in time when these various

2   devices were being replaced?

3        A.      It was unclear at which point in time.

4        Q.      Okay.  Anything else that you can recall

5   about discussions with Mr. Collingsworth about his

6   use history of external hard drives?

7        A.      No, sir.

8        Q.      And we've discussed your discussions or

9   somebody's discussions with Maggie Crosby.  We're

10  going to have to agree to disagree on what those

11  discussions were.

12                   (Williams Exhibit 28

13              marked/introduced.)

14       Q.      (BY MR. WELLS)  I want to show you

15  Exhibit 28, which are some notes of what appears to

16  be an interview with Victoria Ryan.

17                   Are those your notes?

18       A.      Yes, sir.

19                   MR. KUSIN:  Could we have a copy?

20                   MR. PRESLEY:  Sorry.

21       Q.      (BY MR. WELLS)  Down here in the

22  second -- I'll call it a paragraph -- but looks like

23  she's saying she was with Conrad & Scherer between

24  fall of 2009 and September of 2011; am I

25  interpreting that correctly?
```

```
 1        A.     Yes, sir.

 2        Q.     And then from September '11 to February

 3   2012, she was working on a contract basis?

 4        A.     Yes, sir.

 5        Q.     And she told you she thought she had a

 6   password to the general IRAdvocates email account.

 7               Is that what that says?

 8        A.     Yes, sir.

 9        Q.     What were y'all discussing there about

10   how -- her having a password to the IRA email

11   account?

12        A.     You know, her knowledge on the account,

13   who had access to it.

14        Q.     And she told you she thought she did

15   have access to it?

16        A.     Yes, sir.

17        Q.     All right.  And the next, it says -- and

18   I guess this is her telling you this:  "It is

19   possible she put emails on an external hard drive"?

20   [As read.]

21        A.     Yes, sir.

22        Q.     Do you think she is also incorrect, that

23   she didn't really put any emails on an external hard

24   drive?

25               MR. KUSIN:  Objection.  Form.
```

 1          A.      I mean, the statement is that she thinks

 2     it's possible they put emails on an external hard

 3     drive.  You know, the important word there is

 4     "possible."  So, you know, she's saying it's

 5     possible they might have put emails on external hard

 6     drives.

 7          Q.      (BY MR. WELLS)  Okay.  Do you say it is

 8     not possible she put emails on an external hard

 9     drive, or do you agree with her that it is possible

10     that she did that?

11          A.      Well, it doesn't -- this doesn't say

12     that she did it.  She's stating that it's possible

13     that -- to put emails on external hard drive.  And

14     from the work tickets, it's -- there's evidence that

15     emails were put on an external hard drive.

16          Q.      What does that next line say?  I can't

17     read it.

18          A.      "Can check her email of archiving."

19          Q.      What does that mean?

20          A.      She's going to check her email account

21     for anything referring to archive, archiving of the

22     emails.

23          Q.      Did she ever give you anything that gave

24     you any clearer picture of whether or not emails had

25     been archived to external hard drives during her

1      employment?

2            A.      She sent us an email.

3            Q.      And it said what to you?

4            A.      I believe it's an exhibit to my report.

5            Q.      Can you give me a summary of it?   I

6      might be able to put my hands on it.

7            A.      I believe she was making a listing of

8      what needed to be done, probably would have been

9      around early -- well, you know, December,

10     January -- December 2011, January 2012.

11           Q.      Okay.  I don't know if it's in that

12     email or not, but there are several emails that I

13     reviewed that discussed forwarding or pushing

14     Mr. Collingsworth's IRAdvocates email account

15     through a Gmail account.

16                   Do you recall those discussions?

17     There were several of them in the 2012 time period

18     when they were talking about can we set up a Gmail

19     account that will appear like IRAdvocates but it's

20     going through Gmail as opposed to, I guess, some

21     other server.  Essentially Gmail, I guess, would act

22     as the server.

23           A.      I do recall an email that roughly

24     discussed that.

25           Q.      Do you know if that ever happened?

```
 1        A.      I don't believe that happened.

 2        Q.      Okay.

 3                   (Williams Exhibit 29

 4               marked/introduced.)

 5        Q.      (BY MR. WELLS)   Let me show you Exhibit

 6    29.

 7        A.      Okay.

 8        Q.      Can you tell me what that is?  This was

 9    included in your notes.  It's got a title "Mac

10    Instructions."  Top right, it says, "Created January

11    2011."  [As read.]

12        A.      Yes, sir.  This is a file that was on

13    the Conrad & Scherer server in their Washington, DC,

14    office.

15        Q.      Okay.  Why is this included in your

16    notes?

17        A.      It indicates wanting to get archived

18    email from Outlook on the -- on the Mac and viewing

19    content but not being able to open WordPerfect

20    files.

21        Q.      Are these the instructions you're saying

22    were wrong, or what are these instructions for?

23        A.      This is not the instructions from CTSS.

24        Q.      Okay.

25        A.      The first part of this is instructions
```

1    on how to get around on the Mac.

2        Q.    Okay.

3        A.    The --

4        Q.    So these instructions don't have

5    anything to do with archiving of email?

6        A.    The -- the top portion does not have

7    anything to do with archiving.  The lower portion,

8    the statement is "TBA-Josh to look into this for us:

9    Archiving Email from Outlook (on your Mac)."  Next

10   sentence -- next line:  "Viewing content but not

11   being able open Word Perfect files."

12              Josh, I believe, is a technician at

13   CTSS.  They are working on trying to archive emails

14   on the Mac.

15       Q.    Can you get back out Exhibit 22?  It's

16   the USB listing report.

17       A.    Yes, sir.

18       Q.    We know that the Seagate that we can't

19   find was last plugged in to one of Terry's computers

20   on December 8, 2014, right?

21       A.    That's correct.

22       Q.    If you look at Row 10 of this report,

23   looks like there was also a Kingston DataTraveler

24   that was plugged in to that same computer of

25   Mr. Collingsworth also on December 8th of 2014; is

1    that right?

2         A.       Yes, sir.

3         Q.       And flip over to Row 65, there's a Lexar

4    flash drive plugged in on December 8, 2014?

5         A.       Yes, sir.

6         Q.       Row 67, a different Lexar flash drive

7    also plugged in on December 8, 2014?

8         A.       Yes, sir.

9         Q.       Do you know whether you have examined

10   those particular devices?  We know the Seagate has

11   not been examined, but those other ones I just read

12   off to you, have you examined those?

13        A.       I would have to check the -- the

14   listing.  There's a listing we produced that would

15   have that.

16        Q.       All right.  Sitting here today, you

17   can't tell me whether or not you did it?

18        A.       I wouldn't -- I wouldn't put it that

19   way.  I would say I would need to refer to my

20   documentation to give you that answer.

21                     (Williams Exhibit 26

22                marked/introduced.)

23        Q.       (BY MR. WELLS)  Okay.  Show you what

24   I've marked as Exhibit 26.

25                     And I'm also going to show you a

```
 1    follow-up email to Exhibit 26 which is marked as

 2    Exhibit 27.

 3                    (Williams Exhibit 27

 4             marked/introduced.)

 5        Q.    (BY MR. WELLS)  Exhibit 26 is a very

 6    large -- well, that's an email attaching a very

 7    large spreadsheet that is what I think is called an

 8    EnCase file listing report; is that right?

 9        A.     This would be a file listing from

10    EnCase.

11        Q.     What -- what do these reports tell you?

12    What is that report telling you, what kind of

13    information is on there?

14        A.     These are a -- this is a listing of all

15    email that -- files.

16        Q.     On the Dell Vostro, Mr. Collingsworth's

17    current desktop computer?

18        A.     I believe -- well --

19             MR. WELLS:  Let's go off the record

20          while we figure this out.

21             THE VIDEOGRAPHER:  We're off the

22          record at 4:46.

23             (Off the record.)

24             THE VIDEOGRAPHER:  We're back on the

25          record at 4:48.
```

1        Q.      (BY MR. WELLS)  All right.  We can at

2    least agree that the attachment says the spreadsheet

3    reflects information from Terry's desktop --

4        A.      Yes, sir.

5        Q.      -- is what the attachment is called?

6                    All right.  In this file listing,

7    which is, I don't know, 100 pages, maybe, it is not

8    all email files found on that desktop, it's all

9    deleted email files, correct?

10       A.      It appears that it's all deleted files,

11   deleted email files.

12       Q.      All right.  Your cover email -- this is

13   you sending this document to somebody on your team.

14   You say:  "I have highlighted four possible files.

15   Looks like they are not overwritten and do not have

16   invalid clusters.  They have recent activity in

17   December 2014 which is not good.  But have created

18   date in July 2012 which is good."  [As read.]

19                    Why is it not good that they have

20   activity in December of 2014?

21       A.      Just shows that they may have had

22   activity on that file.

23       Q.      Why is that not good?

24       A.      We were looking for older pst files with

25   no activity.  Pst files from back in 2011, 2012,

Dennis Williams CONFIDENTIAL                                    **213**

1    2013.   Hoping to recover the missing archived pst

2    files.   If they had had recent activity, then it

3    would be, you know, a file that's being used

4    currently.

5          Q.     All right.   These four highlighted files

6    which are in Rows 2, 3, 4 and 5, there are three pst

7    files, which would be a storage file for PC-based

8    emails; and one is an ost file, which is a storage

9    email file for Mac-based emails, right?

10         A.     Yes, sir.

11         Q.     Were you able to --

12         A.     Could you ask that question again?   I'm

13    sorry.   The last part of it.

14         Q.     Ost relates to Mac, pst relates to PCs?

15         A.     No, sir.

16         Q.     Okay.   I don't need to get the answer to

17    that.

18                  Were you able to recover these

19    files?

20         A.     I don't believe so.

21         Q.     All right.   The second page of this

22    spreadsheet shows that all four of these files were

23    deleted, right?

24         A.     Yes, sir.

25         Q.     Now, the one in Row 3 was deleted on

**Freedom Court Reporting, Inc**                    **877-373-3660**

1    December 4, 2014, right?

2                    Before you answer that question, you

3    may want to look at the next marked exhibit, which

4    is the follow-up email where Chris Graham tells you

5    the columns don't line up correctly, which makes

6    this incredibly difficult to read.  That last part

7    was mine.

8        A.    Okay.

9        Q.    Oh.

10       A.    Could you ask the question again?

11       Q.    Well, one thing this report can tell you

12   is, one, whether the files have been deleted.  And

13   we can see in all of these highlighted files, the

14   ost's, the three pst, all of them have been deleted,

15   right?

16       A.    This version of it, yes.

17       Q.    All right.  Another thing this type of

18   report can tell you, without looking at the headings

19   which are mixed up, is when that file was last

20   accessed and when that file was created.

21       A.    Yes, sir.

22       Q.    Now, the last access is going to tell

23   you the last time that file was in existence before

24   it was deleted, right?

25       A.    It would be an indication of the last

1    activity on that file.

2         Q.    Right.

3               Is deletion an activity?

4         A.    Deletion is an activity but may not

5    cause the last access date to change.

6         Q.    All right.  We know the pst in number 3

7    was in existence as of December 4, 2014, but has now

8    been deleted, right?

9         A.    The tc@iradvocates.org.ost?

10        Q.    Uh-huh.

11        A.    And your question was, it was in...

12        Q.    It was in existence as of December 4,

13   2014, and it is now deleted?

14        A.    That's under the entry "Modified Date,"

15   I believe.  That -- that indicates that there

16   was -- the last activity on that file was on

17   December 4, 2014.

18        Q.    At that time, when there was activity on

19   it, it was not yet deleted?

20        A.    Correct.  It was still active.

21        Q.    Has to be active to have activity,

22   right?

23        A.    Yes, sir.

24        Q.    All right.  Now, that was an ost file

25   called tc@iradvocates.org.

1               Now, what type of operating systems

2    use ost files?

3         A.     Windows operating systems.

4         Q.     So you think that was from where?

5         A.     From his desktop computer.

6         Q.     Do you know what span of time those

7    emails were?

8         A.     No, I do not.

9         Q.     We know they were in existence as of

10   December of 2014, but they have now been deleted by

11   someone?

12        A.     The -- that -- that ost is probably a

13   duplicate of the active ost on the system.  These --

14   keep in mind, in EnCase, when you run recover

15   folders, try to recover all information, it will go

16   in and pull up master file table records, master

17   file table records that are in unallocated space,

18   especially when you have volume shadow copies, it

19   will go -- you know, volume shadow copies keep

20   rolling and deleting old master file table records.

21               So when you go in and do -- looking

22   for -- you run recover folders and say, hey, I'm

23   looking for anything, well, it pulls up files that

24   say -- have been -- say it's been deleted, but there

25   may also be an active file still for that.  Because

1   you could have files, you know, being, you know --

2   you know, continue to -- to be used, and this would

3   indicate, you know, that -- especially with an ost,

4   it's on a Windows machine, it's probably his current

5   email folder on his local machine.

6       Q.    You just told us that you didn't look at

7   that ost file to determine what was in it.

8       A.    I'm going by the Attachment 27, which is

9   an indication that that ost is probably a duplicate

10  of the active ost on the system.  I would have to go

11  back and compare those to see if that was an active

12  file on the system.

13      Q.    You haven't done that?

14      A.    I believe we did.

15      Q.    So you're now saying that you now know

16  that is an active file?

17      A.    Excuse me?

18              MR. KUSIN:  Objection.  Form.

19      A.    Excuse me?

20      Q.    (BY MR. WELLS)  Now your testimony is,

21  you know that that is an active file?

22              MR. KUSIN:  Objection.  Form.

23      A.    No.  No.  That's not -- okay.  We pull

24  fragments of old master file table records, and

25  these could be coming from volume shadow copies,

1      could be indicated as being, you know, deleted.

2           Q.      (BY MR. WELLS)  Right.  And I don't

3      really want to know about what they all could be.  I

4      want to know what you know sitting here today, you

5      can swear under oath that this is the fact.

6                    Is this, in fact, the active ost

7      file on his system?

8           A.      No.  This particular file that you're

9      pointing at is a deleted one, but there can be a

10     corresponding one that's still active.

11          Q.      All right.  Anyway, somebody deleted

12     this ost file in December of 2014?

13          A.      And that could have been a system

14     procedure or whatever at that time.

15          Q.      All right.  Number 4, there's a pst

16     file.  Also December 4, 2014, deleted.

17                   So we had a pst file at least as of

18     December 4th.  Now it's been deleted.  Right?

19          A.      Which one are you talking about?  On

20     Line Number 3?

21          Q.      Line Number 4.

22          A.      Okay.  That's a -- there's an indication

23     that that would have been deleted on that date.

24          Q.      Number 5, we've got another pst file in

25     existence on December 8, 2014.  Now deleted.  Right?

```
 1        A.      Yes, sir.

 2        Q.      Number 6, this is an individual email

 3   message, correct?

 4        A.      Yes, sir.

 5        Q.      In existence on December 15, 2014, now

 6   deleted?

 7        A.      Again, I would caution that these files

 8   are coming out of recovered folders processed in the

 9   EnCase forensic software, and when you do recover

10   folders, there can be -- it will show files as being

11   deleted.  Windows files may still be active on the

12   computer.  So you need to be very careful to compare

13   and make certain that what's showing up in recovered

14   folders is still not currently active on the system.

15        Q.      Okay.  Have you done that careful

16   analysis?

17        A.      I believe we have.

18        Q.      Where is that in your report?

19        A.      I don't think it's in my report.

20        Q.      All right.  Have you done any of the

21   analyses we talked about earlier today in the

22   context of your other engagements where you're hired

23   to see if somebody put something onto an external

24   hard drive, took it with them?  Have you done any

25   analysis to see what may have been put onto the
```

1    Seagate external hard drive on December 8th?

2        A.      I've taken a brief look of some link

3    files.

4        Q.      What do you mean a brief look?

5        A.      Looked at some link files.

6        Q.      Okay.  Did you document that anywhere?

7        A.      No, sir.

8        Q.      Didn't feel like that was a worthwhile

9    path to go down?

10                      MR. KUSIN:  Objection.  Form.

11       A.      Our main interest was to locate that

12   Seagate GoFlex external drive.

13       Q.      (BY MR. WELLS)  Right.  We've now

14   determined we can't locate it.

15                      Have you tried to see what may have

16   been put on that as recently as December 8, 2014?

17       A.      I have not done a thorough review of

18   that.

19       Q.      Okay.  But that is something you are

20   regularly engaged to do, that type of work?

21       A.      Yes, sir.

22       Q.      Were you not asked to do it here?

23       A.      We were asked to do a thorough

24   investigation, and were trying to locate that

25   particular device.

1        Q.      All right.  You have done a review of

2    contemporaneous emails, you've looked at work

3    tickets, you've interviewed people about the

4    transfer from one computer to another to another to

5    another over the course of the last several years in

6    Mr. Collingsworth's computer history, right?

7        A.      Yes, sir.

8        Q.      And in that review, have you seen a

9    pretty consistent practice of at least attempting to

10   transfer data when an old computer is being replaced

11   by a new computer?

12       A.      Yes, sir.

13       Q.      With the lone exception of the MacBook,

14   there was no attempt there to transfer data?

15                  MR. KUSIN:  Objection.  Form.

16       A.      There -- have to go back and look at the

17   information.  There might have been attempt to

18   collect -- to transfer some data.

19       Q.      (BY MR. WELLS)  All right.  What was

20   that?  This is my chance to talk to you, so...

21                  Well, we know no emails were

22   transferred.

23                  Can we agree on that without having

24   to go back to your notes?

25       A.      From the review of the documents,

```
 1    there's no indication that emails were transferred

 2    from the Mac to the new laptop.

 3                    (Williams Exhibit 30

 4             marked/introduced.)

 5         Q.    (BY MR. WELLS)  Showing you what I'm

 6    marking as Exhibit 30, which is also Exhibit Y to

 7    your report.  This is a June 14, 2012, email chain

 8    discussing searching for emails of

 9    Mr. Collingsworth, right?

10         A.     This is an email between Juan Rodriguez

11    and Maggie Crosby and Terry Collingsworth.

12         Q.     All right.  The first email down at the

13    bottom is Ms. Crosby saying:  "Hi Juan, I need to

14    run searches through Terry's old emails to produce

15    for defendants in a case.  I know that you had had

16    to pull them off and save them somewhere when his

17    computer got switched over.  What's the best way for

18    me to run searches through ALL his old emails?"

19                    Did I read that correctly?

20         A.     Yes, sir.

21         Q.     Juan Rodriguez responds to Maggie Crosby

22    and copies Terry Collingsworth, saying:  "Maggie,

23    his old emails are in the mac."  Right?

24         A.     Yes, sir.

25         Q.     Now, based on that contemporaneous
```

1    email, we can agree Mr. Collingsworth knew, as of

2    June 2012, that his old emails were stored on the

3    Mac?

4        A.      This would provide him information that

5    the emails were on his Mac.

6        Q.      Yet after that, many years down the

7    road, Mr. Collingsworth tells you he had no reason

8    to believe any emails were on his Mac, and that's

9    the reason he asked for none of the emails to be

10   transferred; isn't that what he told you?

11              MR. KUSIN:  Objection.  Form.

12       A.      He -- he thought the emails were on the

13   server when he transitioned from the Mac to the HP

14   laptop.  And again, that was one year or so --

15   approximately one year after this email.

16       Q.      (BY MR. WELLS)  Did you discuss this

17   email with him?

18       A.      I don't think so.

19       Q.      You understand Mr. Collingsworth was

20   using this MacBook for his work as a lawyer, right?

21       A.      Could you ask that again?

22       Q.      You understand Mr. Collingsworth's a

23   lawyer?

24       A.      Yes, sir.

25       Q.      You understand he was using his MacBook

1    pursuant to his work as a lawyer?

2        A.    Yes, sir.

3        Q.    Do you understand that lawyers owe a

4    strict duty of confidentiality to their clients

5    called the attorney-client privilege?

6        A.    Yes, sir.

7        Q.    Do you understand that, really, in

8    general, outside the attorney context, employers owe

9    all of their clients a very strict duty to make sure

10   their data doesn't just get disseminated out to the

11   world, right?

12       A.    Are you asking me a question?

13       Q.    Yeah.

14       A.    And the question is?

15       Q.    Do you think companies have a duty to

16   their clients to keep their information secure?

17       A.    Yes, sir.

18       Q.    And not just throw it out on the street,

19   right?

20       A.    You shouldn't -- you need to keep your

21   employees' data or your clients' data secure.

22                  (Williams Exhibit 31

23              marked/introduced.)

24       Q.    (BY MR. WELLS)  I'm showing you Exhibit

25   31, which is an email while the Mac is still with us

```
 1    where Maggie Crosby is telling Juan Carlos

 2    Rodriguez:  "Terry has traded out his mac.  Is there

 3    a time that you or someone from your team could

 4    transfer everything from his mac to his new

 5    computer?"

 6                    You see that?

 7         A.    Yes, sir.

 8         Q.    All right.  So at least as of this time,

 9    there's some discussion about transferring

10    everything from his Mac to his new computer, right?

11         A.    Yes, sir.

12         Q.    Which would have been consistent with

13    prior practices, with his other switches from

14    computer to computer, right?

15         A.    Yes, sir.

16         Q.    Not going to get into them, the

17    documents will reflect it, but there's some other

18    emails discussing going from Mac to new computer and

19    transferring all the data.  But on April 23, 2013,

20    Mr. Collingsworth tells Maggie Crosby he doesn't

21    want any emails, music, et cetera, transferred from

22    his Mac onto the new computer.

23                    (Williams Exhibit 32

24              marked/introduced.)

25         Q.    (BY MR. WELLS)  That's Exhibit 32, which
```

1    is also Exhibit BB to your report.

2         A.    Okay.

3         Q.    All right.  On April 23, 2013, Terry

4    Collingsworth sends an email to Maggie Crosby giving

5    her some instructions on the transfer of his Mac

6    computer to his new computer, right?

7         A.    Yes, sir.

8         Q.    In the middle of that email above the

9    sentence labeled number 1, it says:  "I brought in

10   my new laptop to be set up while I'm gone.  I won't

11   worry about transferring old emails, music etc."

12              You see that?

13        A.    Yes, sir.

14        Q.    Did you discuss with Mr. Collingsworth

15   why he wasn't going to have any of his emails,

16   music, et cetera, transferred off that computer?

17        A.    Yes, sir.

18              MR. KUSIN:  Objection.  Form.

19        Q.    (BY MR. WELLS)  And his response was?

20        A.    He thought the emails were stored on the

21   server.

22        Q.    Did he think his music was stored on the

23   Conrad & Scherer server?

24        A.    I don't know.

25        Q.    What about "et cetera"?  Do you think

```
 1    the "et cetera" data was stored on the Conrad &

 2    Scherer server?

 3                    MR. KUSIN:  Objection.  Form.

 4         A.    I don't know.

 5         Q.    (BY MR. WELLS)  Did you ask him what he

 6    meant by "et cetera"?

 7         A.    No, I did not.

 8         Q.    All right.  You didn't think it was odd

 9    at all that he instructed his IT person not to do

10    what they had typically done in the past, which

11    would be transfer all of his data?

12                    MR. KUSIN:  Objection.  Form.

13         Q.    (BY MR. WELLS)  Or did you think it was

14    odd?

15         A.    I didn't think it was odd that

16    Mr. Collingsworth would be stating this, due to his

17    limited knowledge on -- on computers.  I was

18    concerned that IT personnel didn't pick up on it and

19    try to do any archiving.

20         Q.    In number 3, he again talks

21    about -- well, this one specifically is about

22    emails, not just emails, music, et cetera.  Number 3

23    says:  "Set up my IRA and CS email.  I don't need

24    the old accounts transferred; just need it to work

25    going forward."
```

```
 1                    Right?

 2        A.     Yes, sir.

 3        Q.     Now, if he's so oblivious to technology,

 4   why would he be telling the IT person to do

 5   anything?  Wouldn't he just give it over and say,

 6   "Do your thing"?

 7               MR. KUSIN:  Objection.  Form.

 8        A.     I don't know.

 9        Q.     (BY MR. WELLS)  All right.  Now,

10   regardless of what he told them, this is an IT

11   person for a law firm dealing with a firm-owned

12   computer, right?

13        A.     Yes, sir.

14        Q.     That IT person followed

15   Mr. Collingsworth's instructions and did not

16   transfer over any of his emails, right?

17               MR. KUSIN:  Objection.  Form.

18        A.     None of the emails from the Mac were

19   transferred to the new computer.

20        Q.     (BY MR. WELLS)  All right.  What about

21   the music?  Did he follow Mr. Collingsworth's

22   instructions not to transfer over the music?

23        A.     I don't -- I don't believe the music was

24   transferred over.

25        Q.     All right.  He says "et cetera."
```

1              Are you aware of any data that was

2    actually transferred from the Mac to the new

3    computer by Conrad & Scherer?

4         A.    No, sir.

5         Q.    All right.  Now, Mr. Collingsworth was

6    allowed to give that computer to -- how old was the

7    niece?

8         A.    I don't recall.

9         Q.    You got a ballpark?  Was she

10   college-age?  Was she high school-age?  She in her

11   40s?  Do you know?

12        A.    I don't know.

13        Q.    All right.  Anyway, he's allowed to give

14   this company-owned computer over to a relative.

15              What did Conrad & Scherer do or

16   Collingsworth do to wipe the data off that computer,

17   if anything?

18        A.    I wouldn't put it that way.  I believe

19   that Mac was purchased by Mr. Collingsworth.  I

20   would have to verify that.

21        Q.    Well, whoever bought it, he's using it

22   to transact Conrad & Scherer business, to represent

23   Conrad & Scherer clients, to deal with extremely

24   confidential information that even you can't see,

25   right?

1                    MR. KUSIN:  Objection.  Form.

2        Q.    (BY MR. WELLS)  He's on the DynCorp

3   case, correct?

4        A.    I don't know.

5        Q.    Okay.  I'll represent to you that that's

6   his case.

7        A.    Okay.

8        Q.    That information is so super secret,

9   you, his own computer IT expert, cannot view it.

10                  That information was on the computer

11   as well?

12        A.    There is a protection order that I am

13   not allowed to review the DynCorp information.

14        Q.    It's very likely he had personal

15   identifying information for numerous of his clients,

16   Social Security numbers, or their equivalent in

17   foreign countries, right?

18        A.    No, I wouldn't put it that way.  I'm not

19   certain what was on there.

20        Q.    Okay.  Very possible it had medical

21   records of clients, right?

22        A.    Again, I wouldn't put it that way.  I

23   don't know what was on there.

24        Q.    So it's possible it had medical records?

25   I mean, I know what Mr. Collingsworth was producing

1    in that time period.  Cedula numbers, Social

2    Security numbers and medical records as well as

3    death certificates would have been among them.

4                    MR. KUSIN:  Objection.  Form.

5         Q.    (BY MR. WELLS)  You can't say it's not

6    possible that all that type of client confidential

7    information was housed on that Mac computer, can

8    you?

9         A.    I wouldn't put it that way.  And again,

10   I don't know what was on that computer.

11        Q.    All right.  So what was done by Conrad &

12   Scherer or Mr. Collingsworth to ensure that any

13   information on that computer that should not be seen

14   by the world at large was not allowed to just go off

15   to Brazil?

16        A.    Mr. Collingsworth told me he was relying

17   on his brother-in-law to delete the data.

18        Q.    Really?  So he gave a completely

19   unaltered work computer to his brother-in-law

20   without securing or deleting the data beforehand?

21                    MR. KUSIN:  Objection.  Form.

22        A.    My recollection, from talking to

23   Mr. Collingsworth, is that he was relying on his

24   brother-in-law to delete the data.

25        Q.    (BY MR. WELLS)  Did you discuss with

```
 1    Conrad & Scherer any sort of policies they have to

 2    protect client information, confidential

 3    information?

 4         A.     No, sir.

 5         Q.     Do you even know if they have policies?

 6         A.     Policies in general or...?

 7         Q.     To protect confidential client

 8    information.

 9         A.     I don't know.

10         Q.     But he told you he didn't delete it

11    before giving it to his brother-in-law, right?

12         A.     I believe that's correct.

13                     MR. KUSIN:  Objection.  Form.

14                     Go ahead.

15         Q.     (BY MR. WELLS)  I imagine you

16    interviewed Juan Rodriguez about this, and he told

17    you, "I didn't delete anything off of it before he

18    gave it to his brother-in-law"?

19                     MR. KUSIN:  Objection.  Form.

20         Q.     (BY MR. WELLS)  Or did y'all have that

21    conversation?

22         A.     My understanding is, Juan did not delete

23    any data off the Mac.

24                     MR. WELLS:  All right.  Let's take a

25                very short break.
```

```
1                    THE VIDEOGRAPHER:  We're off the
2           record at 5:25.
3                    (Break.)
4                    THE VIDEOGRAPHER:  We're back on the
5           record at 5:37.
6       Q.    (BY MR. WELLS)  All right.
7   Mr. Williams, is it your understanding that after
8   Mr. Collingsworth gave the instruction in April of
9   2013 not to transfer data over to his Mac, that he
10  went on some sort of extended trip?
11      A.    Yes, sir.
12      Q.    Okay.  And based on what I've been able
13  to glean, he didn't really start using the Mac until
14  June of 2013 -- excuse me.  Not the Mac, the new
15  computer that got set up to replace the Mac.
16      A.    It would have been sometime after that
17  trip, either June or July of 2013, I believe.
18      Q.    And that was the HP laptop?
19      A.    Yes, sir.
20      Q.    Show you what I've marked as Exhibit 34.
21                    (Williams Exhibit 34
22           marked/introduced.)
23      Q.    (BY MR. WELLS)  This is a June
24  11 -- well, actually, the email from
25  Mr. Collingsworth is dated June 10, 2013, and it
```

```
 1    says -- this is to Juan Rodriguez, the IT person at

 2    Conrad & Scherer, and his assistant, Maggie Crosby.

 3    He says:  "Thanks to both of you for getting this

 4    set up; it is working very well.  I have just one

 5    question.  I am working from home and have a good

 6    Internet connection.  How can I access my files on

 7    Drop box?"

 8              See that?

 9        A.    Yes, sir.

10        Q.    Is it your understanding -- this is

11    pretty close in time to the first time he's starting

12    to use the HP laptop?

13        A.    Yes, sir.

14        Q.    And one of the very first questions he

15    asked is, "How can I log in to my Dropbox," right?

16        A.    Yes, sir.

17        Q.    And Dropbox is a cloud-based service

18    that allows you to store files, whether they be

19    email files, Word files, pdf files, music files.

20    Just depending on how much you pay, you can store a

21    lot of stuff on Dropbox, right?

22        A.    It's a cloud-based account that allows

23    you to store files.

24        Q.    Have you analyzed Mr. Collingsworth's

25    Dropbox account?
```

 1          A.      No, sir.

 2          Q.      So you don't know what is in there now

 3    or what was in there back in June of 2013, do you?

 4          A.      That's correct.

 5          Q.      We do know one of the first things he

 6    asked when he starts using that new laptop is, "How

 7    do I get onto my cloud-based document storage

 8    system," right?

 9          A.      He asked how can he get onto Dropbox.

10          Q.      And we've already talked about this, but

11    March 23rd of 2013, that's as far back as

12    Mr. Collingsworth's inbox goes on the Conrad &

13    Scherer server?

14          A.      Yes, sir.

15          Q.      So when he booted up that HP laptop,

16    say, on June 10th and opened up his inbox, he would

17    only have emails going back to March 23, 2013,

18    right?

19          A.      Potentially, yes.

20          Q.      Now, you work in litigated cases, right?

21          A.      Yes, sir.

22          Q.      You understand they can take a very long

23    time?

24          A.      Yes, sir.

25          Q.      Do you ever utilize your email account

**Dennis Williams CONFIDENTIAL**                                    236

1    to go back, say, three months, four months, even a

2    year to see what was going on in a particular case?

3         A.    Yes, sir.

4         Q.    All right.  Don't you think you would be

5    a little bit alarmed if you had no work emails in

6    your inbox from prior to two months ago?

7              MR. KUSIN:  Objection.  Form.

8         A.    There would be at least three months or

9    so of emails in -- in the account, maybe more.

10        Q.    (BY MR. WELLS)  If you only had three

11   months of emails, if you logged in today and

12   thought, oh, my God, I only have the last three

13   months of emails, I don't know where the rest of

14   them are, would you be alarmed by that?

15             MR. KUSIN:  Objection.  Form.

16        A.    I -- I don't agree with that statement.

17   You log in to your emails, you would see all, you

18   know, your incoming emails you had not responded to.

19   You could be overloaded with a week, a month's worth

20   of emails just to look at that are in there.  It may

21   not -- you may not see older -- you know, the older

22   emails.

23             (Williams Exhibit 33

24             marked/introduced.)

25        Q.    (BY MR. WELLS)  All right.  Let me show

1    you Exhibit 33.

2                    What are you asking there?

3                    MR. KUSIN:  Objection.  Form.

4        Q.    (BY MR. WELLS)  What is your team

5    member, Chris Graham, asking you there?

6        A.    Checking to see any emails from around

7    June 23, 2013.

8        Q.    Looking around that date or slightly

9    after for any emails regarding Terry Collingsworth's

10   email, right?

11       A.    Yes, sir.

12       Q.    Such as, "Hey, Juan, where are all my

13   emails in all my cases that have been going on for

14   years?  From 2012 to 2011, I can't find them"?  Did

15   you get an email like that?

16                    MR. KUSIN:  Objection.  Form.

17       A.    Did I get an email like what?  From --

18       Q.    (BY MR. WELLS)  Let me just ask it this

19   way:  Did you receive any emails in response to this

20   request subsequent to June 23, 2013, discussing in

21   any way Mr. Collingsworth's emails, inability to

22   locate them, concern over not being able to locate

23   them?

24       A.    I did not receive any emails indicating

25   inability around that time to see emails.

1          Q.        How about in the almost two years from

2      that time to the present, have you been provided any

3      emails where Mr. Collingsworth, his assistants,

4      anybody that might be responsible for locating his

5      emails has said, "Hey, we can't find anything in

6      Terry's inbox prior to March of 2013"?

7                          MR. KUSIN:   Objection.   Form.

8          A.        I mean, there are several emails from

9      the office administrators looking for Terry's

10     emails.

11         Q.        (BY MR. WELLS)   After June of 2013?

12     I'll represent to you I have not seen any emails

13     from any Conrad & Scherer person that postdate June

14     23, 2013.

15                          Are you aware of one that you can

16     describe to us today?

17         A.        I do -- I do not recall one.

18         Q.        We had notes of your conversations with

19     Mr. Collingsworth.   I've asked you to try to expand

20     on those before, and at least with respect to

21     external hard drive usage.

22                          Without reviewing your notes, are

23     you -- can you recall today anything particularly

24     important to your opinions that Mr. Collingsworth

25     told you that may not be reflected in your notes?

1        A.      Not at this time.

2        Q.      Okay.  Because I don't want to get down

3    the road in a hearing and ask you some question and

4    you say, "Oh, now I remember Mr. Collingsworth told

5    me X or Y."

6                       Can you recall today anything of

7    import to your opinions that Mr. Collingsworth told

8    you?

9                       MR. KUSIN:  Objection.  Form.

10       Q.      (BY MR. WELLS)  That would not be

11   documented in your file.

12       A.      I'd have to refer to my notes, see

13   what's in my notes and my file to see what he said

14   and what got documented, to see if there's any

15   additional information.

16       Q.      All right.  Let me ask you this:  Did

17   you ask Mr. Collingsworth about, "Were you unable to

18   find your emails subsequent to June of 2013?  Did

19   you notice you couldn't find anything in your inbox

20   prior to March of 2013?"  Did y'all have that

21   discussion?

22                      MR. KUSIN:  Objection.  Form.

23       A.      I asked him if he was aware of any

24   missing emails.

25       Q.      (BY MR. WELLS)  And what did he tell

1    you?

2         A.    He said he, you know, routinely had

3    problems with his emails, and he would have other

4    associates, you know, send him emails that he was

5    looking for.

6         Q.    Specifically with respect to nothing in

7    his inbox prior to March 23, 2013, did you guys

8    discuss that?

9         A.    I don't know if I specifically said

10   March of 2013.  I just, you know, was asking about

11   any, you know, missing emails.

12        Q.    All right.  Can you point out anything

13   of particular significance to your opinions that

14   Mr. Collingsworth told you that you have not already

15   either testified about here today or put in your

16   report?

17              MR. KUSIN:  Objection.  Form.

18        A.    Again, I would have to look at my notes

19   to see if there's any additional information that,

20   you know, was not covered in the report or in my

21   testimony today.

22        Q.    (BY MR. WELLS)  All right.  Who told you

23   this Seagate external hard drive was lost in a move?

24        A.    I wouldn't necessarily agree to

25   that -- how that's phrased.

**Dennis Williams CONFIDENTIAL**

241

```
1        Q.      Phrase it however you like.

2                Who told you whatever you described

3   it in your report, it was somehow misplaced in a

4   move to the DC office?

5                MR. KUSIN:  Objection.  Form.

6        A.      We did a review of all the external

7   devices in the DC office.  Contacted all the

8   employees, including Mr. Collingsworth.  And we went

9   and examined all the external devices.  We saw that

10  that device had been connected on December 8th of

11  2014, and we know that the office moved about a week

12  later.  So it's likely that during the move, that

13  that device was lost.

14       Q.      (BY MR. WELLS)  So that was your own

15  surmise, not something somebody specifically told

16  you?

17       A.      That's correct.

18       Q.      Do you have any evidence, other than the

19  timing, that would suggest that's what occurred?

20       A.      Well, we did a thorough review and

21  looked through all the external devices in the DC

22  office for Conrad & Scherer, looking at all external

23  devices, and we did not find that, we asked

24  everybody.  You know, some of the employees brought

25  in devices that they had at home, and we went
```

**Dennis Williams CONFIDENTIAL**                                    242

```
 1    through all those trying to find that device.
 2                    (Williams Exhibit 35
 3              marked/introduced.)
 4         Q.    (BY MR. WELLS)  Let me show you what
 5    I've marked as Exhibit 35.
 6                    Is that all the invoices you have
 7    issued to date in this case?
 8         A.    I believe so.
 9                    MR. WELLS:  All right.  No further
10              questions.  Thank you.
11                    E X A M I N A T I O N
12    BY MR. KUSIN:
13         Q.    Mr. Williams, Stuart Kusin representing
14    Conrad & Scherer and Terry Collingsworth.  I just
15    have hopefully a few questions for you, not too
16    many.
17                    If you could, could you tell the
18    judge and jury about your work experience.
19         A.    I'm retired from the FBI.  Worked for
20    the FBI for 32 years.  Worked in white collar crime
21    cases for about eight or nine years.  I worked up in
22    a computer section at FBI headquarters.  Worked a
23    variety of cases in Houston.
24                    In the last seven years of
25    employment with the FBI, I became a computer
```

```
 1    forensic certified examiner with the FBI.  I was

 2    involved and managed the -- the collection of

 3    electronic storage information on the Enron

 4    investigation for the FBI.  Have done numerous

 5    computer forensic investigations.

 6         Q.     During your time at the FBI, were there

 7    specific types of training that you received in

 8    regard to computer forensics?

 9         A.     Yes, sir.

10         Q.     And --

11         A.     We did BASIC A+ training, which is

12    computer hardware training.  We did NET+, which was

13    network training.  We did basic and advanced

14    computer forensics training.  We did -- went to

15    National White Collar Crime Center in West Virginia

16    for their basic and advanced training.  We had a

17    three-week boot camp with a moot court for computer

18    forensics.  Went to various seminars and

19    conferences.

20              Also, I've had probably about four

21    Guidance software courses after I left the Bureau.

22    I'm a certified -- currently a certified Guidance

23    EnCase examiner.

24         Q.     All right.  If you could, could you put

25    in front of you what was previously marked as
```

```
 1    Exhibits 2 and Exhibit 3, which were your
 2    declarations which you prepared as your reports in
 3    this matter.
 4         A.    Yes, sir.
 5         Q.    Okay.  Now, each of these Exhibits 2 and
 6    3 set out the scope of your engagement; is that
 7    correct?
 8         A.    Yes, sir.
 9         Q.    Okay.  And let's take some of the tasks
10    that were in that scope and discuss how you went
11    about carrying them out.
12               So in Paragraph 12, for instance, of
13    Exhibit 3, which is your April report -- and I
14    know -- in regard to 12(a), you were asked to
15    attempt to locate certain electronic data that
16    Conrad & Scherer was unable to find in connection
17    with its recent document search in the
18    above-referenced litigation.
19               What process did you use?  How did
20    you go about carrying out this task?
21         A.    We interviewed Conrad & Scherer
22    employees, we interviewed IT support personnel,
23    third-party IT personnel.  We reviewed emails, we
24    reviewed work tickets, we conducted interviews of
25    employees there at the Conrad & Scherer office in
```

```
 1    DC.  We -- we talked to the IT personnel, going over

 2    any potential backups they may still have.  They

 3    were able to locate a backup they had done with the

 4    server and were able to find some missing emails

 5    that were on a backup server.

 6                    We talked about what secretaries or

 7    administrative assistants had worked with

 8    Mr. Collingsworth, identified their machines and

 9    tried to pull and locate emails on that.

10                    There was old Dell OptiPlex that

11    Mr. Collingsworth had used, which was then used by

12    his administration assistant.  There were archived

13    email folders on those that were located in DC.

14                    We went through all the external

15    devices in the office, we looked at any of the old

16    computers that would have been in use back in 2010,

17    2009, '10, '11, '12.

18                    We went through desks and drawers,

19    bookshelves in the office, looking for -- cabinets,

20    bins, looking for any possible external devices.

21    Thumb drives, you name it.  Reviewed the work

22    tickets from the IT support and determined that a

23    500-gig external drive that was currently attached

24    to the server was probably the same external drive

25    that was connected to the -- the old DC server.
```

```
 1                    We ran, you know, recovered folders
 2    on that, pulled off some old Outlook Express emails
 3    off of that from approximately 2007 or so.  We found
 4    some, you know, email files from some of the
 5    external drive, but they turned out to be email --
 6    email files that had already been collected and
 7    produced.
 8                    Again, we interviewed employees.  We
 9    reviewed the documentation.  We went down -- we went
10    down to Fort Lauderdale.  There was a protection
11    order, so I sat with Conrad & Scherer personnel, and
12    we went through emails, searching any emails that
13    were at all related to backing up computers, email
14    problems, work tickets, any -- anything IT-related
15    involving Mr. Collingsworth's computers.  We went
16    through everything trying to find anything of any
17    files for his emails.
18        Q.    You did that in Fort Lauderdale.
19                    Did you do that in Washington as
20    well?
21        A.    Well, we talked to all the employees up
22    in -- up in DC.  But in Fort Lauderdale, we went --
23    we sat down and went through his -- his emails,
24    Maggie Crosby's emails, Victoria's emails, Grace's
25    emails, any of his assistants that worked with him,
```

1   trying to find anything.  We checked the -- the

2   server in -- in the DC office for any additional

3   emails.

4                    You know, so we -- we did a thorough

5   review of all the devices available.

6        Q.    And did you undertake that same process

7   for each of the tasks that were part of your scope

8   of engagement as set out in either your March report

9   or your April report?

10                   MR. WELLS:  Object to the form.

11       A.    Yes, sir.

12       Q.    (BY MR. KUSIN)  All right.  Well,

13  let's -- let's take them -- let's take them one

14  by -- one by one.  We talked about 12(a).

15                   12(b):  "...review the sufficiency

16  and thoroughness of Defendants' initial e-discovery

17  collection efforts."

18                   Was that the same process you just

19  discussed?

20       A.    Yes, sir.  We got reports of what was --

21  was searched for.  Went over the fact that it's

22  not -- it's not a reasonable process or a normal

23  process to go and pull three-year-old backups off of

24  email servers.  And -- and at the time, IT personnel

25  had forgotten that they even existed.  And through

 1    our investigation, they were able to find a backup

 2    of the server and recover it from those emails.

 3                    The same way as far as going through

 4    the Dell OptiPlex, you know, trying to find -- you

 5    know, it's not normal on an e-discovery case to

 6    start, you know, going and -- and pulling files.

 7    You normally try to get those off of the Exchange

 8    Server.

 9                    MR. WELLS:  Move to strike as

10              nonresponsive.

11        Q.    (BY MR. KUSIN)  All right.  In regard to

12    12(c), you were asked to determine, after finding

13    any additional information, whether any of the

14    information still not located appears to have been

15    intentionally deleted or not.

16                    What process did you use to make

17    that determination?

18        A.    Well, we reviewed -- again, we had the

19    interviews of the employees, review of -- interviews

20    of the IT personnel, review of the -- the documents

21    and work tickets.  Fortunately, you know, the work

22    tickets and emails produced good information as far

23    as there was an archive done in March of 2010, and

24    that archive had emails older than February 26.

25                    Subsequently, there was an email

```
 1    that said, "Hey, we can't find any emails older than
 2    February 26."  That dovetails in.  We checked the --
 3    the Dell OptiPlex desktop and said, "Hey, you know,
 4    were those files transferred from the HP Compaq to
 5    the Dell OptiPlex?"  And, you know, we found no
 6    evidence that they had been -- that the archive that
 7    had been created on March 30th had been transferred
 8    to the Dell OptiPlex.
 9                    This -- this transfer of -- of data
10    was done by third-party IT personnel, and, you know,
11    they may have just transferred a current email
12    folder and did not transfer the archived pst folder.
13                    And, again, you know, when you have
14    a large, big gap of missing e-mails, if there's
15    certain -- from my investigative experience, if
16    there's certain sensitive emails, you would want to
17    delete just those individual emails.  You would want
18    to maybe call it cherry picking.  You're not going
19    to want to delete a big section of emails.  That
20    would be -- I mean, and the way that -- this first
21    gap ties in, it was archive done, and that archive
22    just wasn't transferred over to a new computer.
23                    One of the things we did, there was
24    a lot of concern back in March of 2015 about
25    Mr. Collingsworth's computers and missing computers,
```

1    and we don't know what happened to them and, you

2    know, stuff is missing.  And so, I mean, we took a

3    detailed analysis documenting the transfer, the

4    orderly -- to show there was an orderly transfer or

5    transition, or at least there was a request for it.

6    The computers -- you know, his work computers were

7    transitioned from one device to another.  It was IT

8    personnel, third- party IT personnel that didn't

9    transition it properly.

10       Q.     Let me stop you there.

11              Were there -- were there -- and you

12   may have already mentioned it, but were there

13   specific indicators that you saw that indicated

14   whether or not documents had been potentially

15   deleted?

16       A.     No, sir.  I mean, we went through all

17   the emails, talked to employees, looked at the USB

18   devices, and we did not see any indication of

19   deleted emails.

20       Q.     Okay.  And what about -- what about the

21   gaps?  Are those indications of deleted emails?

22              MR. WELLS:  Object to the form.

23       A.     No.  I mean, that first gap, I mean,

24   it's clear that it was archived in -- in March of

25   2010, and that archive was on the HP Compaq desktop.

```
 1    When the transition occurred from HP Compaq to the
 2    Dell OptiPlex, those files, that -- that archive
 3    file was not transferred over.  We looked at the
 4    Dell OptiPlex looking for an archive, a deleted one,
 5    we ran recovered folders.  You know, we -- you know,
 6    we could not locate that file.  I mean, the evidence
 7    indicates that it was not transferred by third-party
 8    IT personnel.
 9                    The -- to go along on 12(c), for
10    the -- I mean, in my report, and with the
11    attachments, I mean, it's clear that
12    Mr. Collingsworth had problems with his email.  Even
13    to the extent on the Mac where it was taking him
14    several, several minutes to even try to compose an
15    email.  He was not having that problem with other
16    programs, and he -- you know, there were several
17    emails where he had requested files be archived.
18    Technicians from -- from CTSS -- there's one email
19    where they say he did it.  Months later, there's an
20    email saying they can't do it.  There's, you know,
21    emails that they can't put the stuff onto -- back it
22    up to a server.  There -- there is -- there is no
23    mention in any of the work tickets or anything about
24    converting the email messages on the Mac to a pst or
25    Windows format.
```

```
 1                      The -- the Mac -- Outlook for Mac

 2   stores the email messages in an olm format, and you

 3   need to go through some steps to get those if you

 4   want to get those emails out and preserve them for a

 5   Windows machine.

 6                      It's not a simple auto archive

 7   feature on the Mac.  It's a rule-based.  It's an if

 8   this, then this, do this, put it here.

 9                      There are emails where either

10   Victoria or Maggie are saying, "Hey, this is not as

11   easy on Windows.  I've worked on it, and I moved the

12   files around to different folders."

13                      And one of the CTSS technicians

14   said, "Hey, having a hard time doing -- doing the

15   backup."

16                      You've had probably roughly four or

17   five people, when Terry had that Mac, trying to look

18   at his email, how to archive, try to set up the

19   archiving or -- or handle his emails, and it's

20   very -- there's no way to know who set up what, what

21   settings were put on the device, but it's clear that

22   they attempted to do an archive feature.

23        Q.     Mr. Williams, let me ask you this:

24   Sitting here today, do you stand by the opinions and

25   conclusions in each of your reports?
```

```
 1          A.      Yes, sir.

 2          Q.      Now, earlier, at the beginning of your

 3    deposition, you were shown an exhibit, I believe it

 4    was Exhibit 1, that had some redactions, and I think

 5    you were maybe shown some other exhibits that had

 6    redactions.

 7                  Do you know whether or not you saw

 8    the unredacted copies?

 9          A.      I'm not certain.  I'd have to go back

10    and check.

11                  MR. KUSIN:  Okay.  I pass the

12          witness.

13          F U R T H E R   E X A M I N A T I O N

14    BY MR. WELLS:

15          Q.      You had mentioned an auto archive rule,

16    and I think we've already discussed you've not seen

17    a work ticket or an actual document that says an

18    auto archive rule was instituted on that Mac, right?

19          A.      I've seen work tickets indicating that

20    they were setting up archiving.

21                  Now, on the Mac, it's -- it's --

22    it's a rule that gets set up.  It's not -- on a

23    Windows machine, it's called auto archiving.

24          Q.      Right.

25                  And you just mentioned that there
```

1    was an email you saw where Mr. Collingsworth had so

2    many emails in his account that it was taking him,

3    like, five minutes to compose an email.

4              Do you recall giving that testimony

5    about five minutes ago?

6        A.    I wouldn't state it that way.  I believe

7    what I said is, he had problems with his emails, and

8    even to the point where, on his Mac, it was taking

9    him several, several minutes to type an email

10   message.  I believe that's one of my exhibits

11   attached to my report.

12       Q.    Right.  And it -- it will speak for

13   itself.

14              But is it your conclusion that the

15   spinning wheel problem, taking five minutes to type

16   an email, was due to an inordinate number of emails

17   in Mr. Collingsworth's account?

18       A.    I'm not certain.

19       Q.    Is it your conclusion that the auto

20   archive rule was on or off at that time?

21       A.    It's -- it's highly likely that a -- an

22   archive rule had been implemented on his Mac.

23       Q.    Before the spinning wheel problem we

24   just discussed?

25       A.    Possibly, yes, sir.

1      Q.      It's also possible that it was after?

2      A.      It could have been the genius at the

3   genius bar at Apple.

4      Q.      It could have been there was no auto

5   archive and the email was manually archived onto the

6   Mac.

7              That would also explain emails being

8   pulled off the server and stored only on the Mac,

9   wouldn't it?

10             MR. KUSIN:  Objection.  Form.

11     A.      There's a -- there's a possibility of

12   that.

13     Q.      (BY MR. WELLS)  It's possible that on

14   March 22, 2013, Mr. Collingsworth plugged in an

15   external device and sucked all of the emails off of

16   the Conrad & Scherer server and stored them onto

17   that external device?  It's possible, right?

18     A.      I don't agree with that.

19     Q.      That's impossible?

20             MR. KUSIN:  Objection.  Form.

21     A.      That's a -- the information and evidence

22   that we have shows numerous attempts to set up an

23   archive function on the Mac.

24     Q.      (BY MR. WELLS)  To determine whether

25   what I just said was, in fact, what happened or not,

```
 1    you would need the Mac, because if you had the Mac,
 2    you'd be able to see if an external device was
 3    plugged in on that date and examine link files and
 4    other information that you've done in your other
 5    engagements to get some sort of indication whether
 6    that Mac was backed up to somewhere else before it
 7    was given away?
 8                    MR. KUSIN:  Objection.  Form.
 9        A.      That's not correct.  I don't agree with
10    that.  The -- the Mac does not have link files or
11    shortcut files to use.  It -- it has other
12    artifacts, but not as -- not as -- what's the right
13    word?  Not as many artifacts that you have on a
14    Windows-based machine to show activity involving a
15    USB device.
16        Q.      (BY MR. WELLS)  If I were to try to
17    engage you in a case where I want to know if my
18    employee has plugged an external device into a Mac
19    and taken information off of it, would you say I
20    can't do that, there's no information I can use on a
21    Mac to make that analysis?
22        A.      No, sir.
23        Q.      You could do an analysis.  It may not
24    include link files, but there's an analysis you
25    could do to try to determine whether, in fact,
```

```
 1    information had been transferred to an external
 2    device?
 3          A.      As far as -- I do not agree with that.
 4                      MR. WELLS:  All right.  I don't
 5                  think I have any further questions.
 6                      MR. KUSIN:  Before we get off the
 7                  record, we want to designate this
 8                  deposition as confidential.
 9                      MR. WELLS:  We object to that.  We
10                  will take it up at the appropriate time.
11                      MR. KUSIN:  Let's designate it as
12                  confidential, and then we'll take it up as
13                  need be.
14                      We'll reserve the remainder of our
15                  questions.
16                      THE VIDEOGRAPHER:  We're off the
17                  record.  End of the deposition.  End of
18                  DVD Number 6 at 6:19.
19
20
21
22
23
24
25
```

**Dennis Williams CONFIDENTIAL**                                    **258**

```
 1                    REPORTER CERTIFICATION

 2      THE STATE OF TEXAS :
        COUNTY  OF  HARRIS :
 3
               I, DENYCE SANDERS, a Certified Shorthand
 4      Reporter and Notary Public in and for the State of
        Texas, do hereby certify that the facts as stated by
 5      me in the caption hereto are true; that the above and
        foregoing answers of the witness, DENNIS WILLIAMS, to
 6      the interrogatories as indicated were made before me
        by the said witness after being first duly sworn to
 7      testify the truth, and same were reduced to
        typewriting under my direction; that the above and
 8      foregoing deposition as set forth in typewriting is a
        full, true, and correct transcript of the proceedings
 9      had at the time of taking of said deposition.

10             I further certify that I am not, in any
        capacity, a regular employee of the party in whose
11      behalf this deposition is taken, nor in the regular
        employ of his attorney; and I certify that I am not
12      interested in the cause, nor of kin or counsel to
        either of the parties;
13
               That the amount of time used by each party at
14      the deposition is as follows:

15             MR. WELLS - 06:31:12
               MR. KUSIN - 00:21:07
16

17
               GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
18      this, the 5th day of July, 2015.

19

20             _____
               DENYCE SANDERS, CSR, RPR, CRR, TCRR
21             Notary Public in and for
               Harris County, T E X A S
22
        My Commission Expires:  4-14-17
23      Certification No.:  4038
        Expiration Date:  12-31-15
24      U.S. LEGAL Support, Inc./Firm No. 122
        363 N. Sam Houston Parkway, 12th Floor,
25      Houston, Texas  77060; 713.653.7100
```

**Dennis Williams CONFIDENTIAL**                                    **259**

**WORD INDEX**

**< >**
**a.m** 1:21

**< $ >**
**$325** 15:3
**$70,000** 14:17

**< • >**
**•** 6:14, 14

**< 0 >**
**012016** 100:16
**017** 103:8 107:5
**019** 109:1
**020** 103:21
**024** 105:9
**029** 110:21
**030** 113:16, 17
**032** 114:1
**036** 111:5
**068** 115:5
**08** 47:17, 19

**< 1 >**
**1** 4:4 15:19, 22
21:16 44:2 133:12
134:20 226:9
253:4
**1,000** 36:7 59:17
60:24 61:2, 3, 6, 7,
16 63:4
**1,001** 61:8
**1,900** 61:8
**1:37** 121:20
**1:51** 121:25
**10** 4:17 87:9
91:24 92:2 122:9
123:6 136:9
139:23 142:25
209:22 233:25
245:17
**10:05** 44:3
**10:23** 44:9
**10:47** 58:9
**10:59** 58:12
**100** 2:4 188:2
212:7

**1000** 1:23 2:10
**10th** 235:16
**11** 4:20 5:4 6:13
98:15, 18 100:7, 13,
15 194:13, 13
195:8 205:2
233:24 245:17
**11:36** 80:24
**115** 2:15 160:7
**11th** 195:1
**12** 4:19, 22 5:10,
12, 18 46:1 75:20
92:4 121:7, 10
165:14 244:12, 14
245:17 247:14, 15
248:12 251:9
**12:34** 81:3
**12023** 102:17, 20
**121** 4:22
**12158** 100:17
**122** 258:24
**12-31-15** 258:23
**12th** 258:24
**13** 5:1 6:7, 13
46:5 131:25 132:3
**132** 5:1
**134** 5:1
**137** 5:4
**139** 5:6
**14** 4:20 5:1 90:15,
19 98:18 134:11,
15, 18 174:18
222:7
**148** 5:6
**14-day** 90:24
**15** 4:4, 14, 16, 20,
22 5:4, 8, 14, 16, 18,
24 6:1, 9 97:6, 7
103:3, 15, 23 104:3
137:5, 8 219:5
**15,000** 60:2, 16
61:11, 16 70:25
78:11 80:17
194:13, 24 195:9
**150** 117:25
**16** 5:6 139:18, 21
**165** 5:10, 10
**16a** 47:11
**16b** 48:8

**17** 5:6, 10 53:10
64:20 67:12 148:2,
5 165:3
**171** 5:16
**177** 5:12
**17-day** 67:7
**17th** 68:15
**18** 5:10 103:6
164:25 165:3
167:11
**180** 5:18
**188** 117:25
**19** 5:10 65:2
165:11, 14
**190** 5:18
**192** 5:21
**197** 5:21
**1st** 51:6 115:17

**< 2 >**
**2** 3:5 4:7 5:10, 12,
24 23:13, 16 31:3
44:8 46:2 125:1
134:25 213:6
244:1, 5
**2:11-cv-3695-RDP-T
MP** 1:6
**2:53** 163:14
**20** 5:12 177:11, 12
194:21
**2002** 43:12, 16
**2005** 73:7
**2007** 73:7 130:18
246:3
**2008** 64:10, 12
73:15 129:22
141:25 142:7, 13,
16 143:2
**2009** 204:24
245:17
**2010** 16:20 47:8
53:8, 10 64:24
129:22 130:15
131:24 132:5, 10
134:21, 25 141:25
142:7, 11, 13, 16
143:3, 19 144:4
194:9 245:16
248:23 250:25

**2011** 43:16 47:8
53:8, 10 60:2, 4, 4,
16, 16 64:25 65:5,
5 68:15 95:5
137:9 139:23
141:7 142:25
143:7 147:2
154:21, 24 155:3
158:15 171:16
175:14 183:9
185:5 186:19
187:8 188:7 191:9,
13 192:10, 17, 22,
25 194:9, 11, 24
195:8 197:9
204:24 207:10
208:11 212:25
237:14
**2012** 47:9 52:22
54:4, 19 55:19
56:3 57:22 59:1, 7
63:25 66:6 67:1, 2
103:3, 15, 23 104:3
116:14 117:5, 6, 12
119:11 164:18
165:3 167:3
168:12, 20 189:18
205:3 207:10, 17
212:18, 25 222:7
223:2 237:14
**2013** 47:14, 18
48:4 49:5, 23
50:15 51:10 52:6,
7, 18 56:3 66:1, 18,
22 84:21, 22 103:6
107:2, 3, 4 109:4
114:20 117:5, 7, 12
118:17 119:1
155:4 156:14
158:15 164:1, 12,
14 187:23 188:7
213:1 225:19
226:3 233:9, 14, 17,
25 235:3, 11, 17
237:7, 20 238:6, 11,
14 239:18, 20
240:7, 10 255:14
**2013,** 49:22
**2014** 4:19 50:25
51:1, 6 84:4, 5, 19

**Dennis Williams CONFIDENTIAL**                                      **260**

87:*9, 22* 89:*25*
91:*21* 92:*4* 97:*21*
111:*8, 9, 22* 112:*16*
113:*16* 114:*20*
115:*2, 13, 18*
116:*21* 117:*23, 24*
122:*14* 170:*17*
171:*21* 172:*1*
173:*12, 16* 174:*23*
175:*14* 176:*5, 14*
183:*10, 21* 186:*20*
189:*8, 21* 209:*20,*
*25* 210:*4, 7* 212:*17,*
*20* 214:*1* 215:*7, 13,*
*17* 216:*10* 218:*12,*
*16, 25* 219:*5*
220:*16* 241:*11*
**2015**  1:*17, 21* 3:*3*
4:*3, 7, 8* 23:*16*
44:*12* 46:*1, 5*
75:*17* 88:*8* 89:*9*
97:*6* 98:*18* 118:*7*
121:*11* 122:*2*
249:*24* 258:*18*
**204**  6:*3*
**205.868.6000**  2:*5*
**208**  6:*3*
**21**  5:*16* 67:*1*
111:*8, 9* 113:*16*
114:*20* 147:*1*
170:*24, 25* 171:*16*
186:*10, 19* 187:*8*
191:*9, 13*
**210**  5:*24*
**211**  6:*1*
**21st**  185:*4*
**22**  5:*18* 16:*20*
49:*5, 22* 50:*15*
54:*19* 56:*3* 59:*1, 7*
63:*25* 180:*4, 6*
197:*9* 209:*15*
255:*14*
**222**  6:*3*
**224**  6:*7*
**225**  6:*9*
**22nd**  47:*18* 49:*24*
54:*4* 56:*3*
**23**  4:*7* 5:*8, 18*
47:*13* 48:*4* 52:*18*
66:*22* 105:*19*

106:*3, 5* 190:*24*
191:*2* 225:*19*
226:*3* 235:*17*
237:*7, 20* 238:*14*
240:*7*
**233**  6:*13*
**236**  6:*9*
**23rd**  51:*10* 52:*7*
65:*25* 235:*11*
**24**  4:*14* 5:*21*
49:*23* 88:*8* 111:*5*
113:*15* 192:*18, 21*
**242**  3:*7* 6:*14*
**25**  5:*21* 197:*5, 7*
**253**  3:*8*
**258**  3:*13*
**26**  5:*24* 53:*7*
64:*24* 105:*24*
106:*5* 210:*21, 24*
211:*1, 5* 248:*24*
249:*2*
**27**  5:*12* 6:*1* 53:*8*
64:*25* 65:*5* 211:*2,*
*3* 217:*8*
**27th**  65:*4*
**28**  6:*3* 204:*12, 15*
**29**  6:*3* 132:*5*
189:*8* 208:*3, 6*

**< 3 >**

**3**  4:*8, 14, 20, 22*
5:*8, 14, 14, 18* 6:*1,*
*7, 9* 31:*3* 44:*5, 11*
49:*3* 75:*19, 20*
81:*3* 102:*15* 103:*3,*
*14, 22* 121:*20*
132:*23* 213:*6, 25*
215:*6* 218:*20*
227:*20, 22* 244:*1, 6,*
*13*
**3:07**  163:*18*
**30**  1:*17, 21* 3:*3*
4:*3* 6:*3* 90:*3, 8, 11,*
*23* 222:*3, 6*
**30th**  249:*7*
**31**  6:*7* 224:*22, 25*
**3100**  2:*15*
**312.577.1240**  2:*16*
**32**  6:*9* 225:*23, 25*

242:*20*
**325**  15:*7*
**33**  6:*9* 236:*23*
237:*1*
**34**  6:*13* 233:*20, 21*
**35**  6:*14* 242:*2, 5*
**35259**  2:*4*
**363**  258:*24*
**365**  87:*6*

**< 4 >**

**4**  4:*9, 16, 22* 5:*4,*
*16, 24* 6:*1, 7* 48:*18,*
*21* 53:*10* 63:*21, 22*
67:*1* 121:*10, 24*
135:*4* 163:*14*
213:*6* 214:*1* 215:*7,*
*12, 17* 218:*15, 16,*
*21*
**4:14**  202:*5*
**4:27**  202:*8*
**4:46**  211:*22*
**4:48**  211:*25*
**4038**  258:*23*
**40s**  229:*11*
**4-14-17**  258:*21*
**44**  4:*8* 91:*4*
**48**  4:*9*
**4th**  218:*18*

**< 5 >**

**5**  4:*9* 6:*9* 55:*3, 5*
57:*20* 63:*23, 24*
66:*24* 132:*24*
134:*1* 148:*8*
163:*17* 202:*5*
213:*6* 218:*24*
**5:25**  233:*2*
**5:37**  233:*5*
**500-gig**  245:*23*
**51st**  1:*23* 2:*10*
**55**  4:*9*
**5th**  187:*23* 258:*18*

**< 6 >**

**6**  4:*9, 16* 5:*4, 16*
6:*13* 60:*10, 13*
79:*6, 7* 89:*9* 92:*11*
102:*15* 103:*5*
107:*1, 16* 108:*1, 4*

109:*8* 192:*22, 25*
194:*14, 25* 195:*14*
202:*8* 219:*2*
257:*18*
**6:19**  257:*18*
**6:20 p.m**  1:*21*
**60**  4:*9*
**60603**  2:*15*
**65**  210:*3*
**67**  210:*6*
**68**  115:*6*

**< 7 >**

**7**  3:*6* 4:*13* 86:*23*
87:*1, 22* 102:*15*
103:*5* 107:*1, 17*
108:*1, 4* 150:*13*
**713.653.7100**
258:*25*
**713.653.7812**  2:*11*
**77002**  2:*10*
**77060**  258:*25*

**< 8 >**

**8**  4:*14* 88:*5, 7*
171:*21, 25* 173:*12,*
*16* 174:*23* 176:*14*
186:*20* 209:*20*
210:*4, 7* 218:*25*
220:*16*
**8.5**  140:*10* 141:*1, 5*
**85**  115:*5*
**86**  4:*13*
**88**  4:*14*
**89**  4:*16*
**8th**  172:*16, 18, 20*
209:*25* 220:*1*
241:*10*

**< 9 >**

**9**  4:*16* 89:*6, 8*
151:*12*
**9:05**  7:*2*
**91**  4:*17*
**94**  195:*3*
**9429**  178:*6*
**98**  4:*20*

**< A >**

a.m  7:3
ability  8:8  198:13
able  10:9, 12  11:7
  19:18  20:4, 5
  27:14, 21, 25  28:17,
  17  33:17  34:19, 23
  47:3  52:24  65:10,
  13, 16  71:21
  128:20  131:15
  155:7  163:3
  172:11  185:14, 24
  197:2  198:6  207:6
  208:19  209:11
  213:11, 18  233:12
  237:22  245:3, 4
  248:1  256:2
above-referenced
  244:18
above-styled  1:21
accept  92:25
access  19:1  29:9
  62:22  75:7  136:25
  198:3  205:13, 15
  214:22  215:5
  234:6
accessed  27:13
  28:18  29:19, 20
  131:16  214:20
account  47:13, 21,
  23  48:10, 14  49:13,
  23  50:25  51:6
  52:24  53:7, 9  54:2,
  6, 7, 12, 18, 21  56:1,
  2  57:14  59:1, 9
  60:3, 23, 23  61:20,
  20  62:13, 16, 17
  63:14, 17  64:10, 24
  65:14, 19, 25  72:3,
  4, 6, 18, 21, 23, 23
  73:7, 9, 25  74:4, 24
  84:12  88:11  89:20,
  24  92:14, 16, 21
  93:15, 22  94:1
  104:6, 9, 13  119:7,
  8  129:21  157:2
  186:7  205:6, 11, 12
  206:20  207:14, 15,
  19  234:22, 25
  235:25  236:9

254:2, 17
accountant  126:16
accounts  33:22
  48:1  49:24  51:22
  54:24  55:22  57:3,
  6, 18, 23  63:5  64:1
  72:2, 12  73:3, 11,
  14, 20  75:12  89:18
  109:3, 13  119:14
  130:2  160:13
  227:24
accumulated  14:20
accurate  58:3, 16,
  19, 20  61:10  93:10
  153:25  188:3
  199:5
accurately  76:14
Acer  9:19  10:5
  13:2  136:13
act  173:23  207:21
action  193:13
active  40:10, 17
  146:1, 1  215:20, 21
  216:13, 25  217:10,
  11, 16, 21  218:6, 10
  219:11, 14
activities  78:7
activity  10:19
  175:17  188:22
  194:8  195:4
  212:16, 20, 22, 25
  213:2  215:1, 3, 4,
  16, 18, 21  256:14
actual  27:19  60:8
  65:14  105:18
  112:10  253:17
AD  105:10
addition  28:19
  41:8, 15  56:6
additional  9:16
  12:20  14:20, 22
  47:1  64:22  76:7
  190:4  239:15
  240:19  247:2
  248:13
address  56:11  62:3
addressed  51:13
  54:13  55:21, 25
  119:6  152:4

addresses  103:24
  106:9
adjusted  90:4, 9
Admin  113:23
administration
  245:12
administrative
  245:7
administrators
  238:9
admins  149:11
  150:2  197:3
admit  31:24
admits  32:20
advanced  243:13,
  16
advice  85:12
Advocates  48:13
  60:22  73:11
AE  105:25
affidavit  34:1
agent  1:9
ago  24:13  144:14
  145:4  174:8, 8
  194:12  236:6
  254:5
agree  8:15  52:8
  68:1, 13  69:19
  82:2  102:3  113:6
  135:25  143:5
  154:4  155:8  161:4
  163:5  164:3
  169:12  171:23
  176:21  198:19
  199:3, 22  204:10
  206:9  212:2
  221:23  223:1
  236:16  240:24
  255:18  256:9
  257:3
agreement  7:8
  147:25
ahead  59:6  130:16,
  20  232:14
airtight  131:7
al  4:20  5:9, 15
ALABAMA  1:1
  2:4
alarmed  236:5, 14
Albert  56:15

allegation  32:10
  42:22
allegations  26:12
  38:15, 17
allegedly  31:10
allow  95:2
allowed  17:22
  18:2  19:23  75:14
  229:6, 13  230:13
  231:14
allowing  21:9
allows  234:18, 22
America  11:13
Amistco  34:6  40:2
amount  23:2
  74:13  258:12
analyses  219:21
analysis  9:16  10:5
  13:2, 3  25:7, 16
  27:2, 25  28:6
  35:17, 24  39:15, 18
  40:6  44:25  45:4
  77:20, 21, 22, 22, 23
  153:10  219:16, 25
  250:3  256:21, 23,
  24
analyze  36:13
  59:12  81:14, 21
  154:16  155:7
  188:19, 22
analyzed  9:25
  10:23  11:20  35:2,
  13  36:12  133:20
  138:5  141:10
  185:1  234:24
analyzing  25:14
  182:23
Andrews  2:20
answer  8:7, 14
  79:19  88:15  113:2
  127:24  147:19, 25
  148:24  159:23
  160:5  163:3  172:4
  210:20  213:16
  214:2
answered  82:5
answering  79:12
  147:18
answers  127:20
  258:5

**Dennis Williams CONFIDENTIAL**                                        **262**

anybody 37:6 94:4
100:9 107:17
156:6 175:11
179:14 199:8
200:24 201:7
238:4
anybody's 71:12
anymore 141:13
Anyway 218:11
229:13
apartment 38:18
apartments 38:20
appear 207:19
APPEARANCES
3:5
appeared 76:8
appears 10:20
48:22 87:1 113:24
148:11 161:17
204:15 212:10
248:14
Apple 41:9, 13
156:16, 18 255:3
application 62:22
63:7 65:22
apply 21:6 64:2
appointment 193:20
appropriate 86:9,
15 257:10
approved 20:12
38:19
approximate 177:25
Approximately
22:24 23:1 33:19
36:7 223:15 246:3
April 4:8 9:13
12:9 14:2 23:9
44:12 60:4, 16
64:19 75:17 89:9
97:6 122:2 132:4
134:25 137:9
139:22 160:7
183:21 194:13, 20
225:19 226:3
233:8 244:13
247:9
arbitration 24:8, 10,
14, 16 30:8
archival 79:25
80:18 194:24

archive 66:9 71:4,
14 95:6, 15, 16, 22
96:6, 10, 13, 16
104:12, 13, 21, 21
138:22, 23 139:6
142:10 143:16
145:24 146:6
148:11, 14, 23
149:7 151:24
152:2, 6, 20 161:8
192:13 193:21, 24
196:10, 13 198:13
206:21 209:13
248:23, 24 249:6,
21, 21 250:25
251:2, 4 252:6, 18,
22 253:15, 18
254:20, 22 255:5,
23
archived 52:1
60:3, 15 78:17, 23
79:2 144:11
149:17, 20 150:10,
17, 19, 21 152:9
192:9, 16 194:9
195:20 196:2, 3, 7,
17, 18, 20 197:2, 4
198:21 199:17
206:25 208:17
213:1 245:12
249:12 250:24
251:17 255:5
archiving 70:25
71:5 78:11, 20, 25
138:15, 16, 21
148:19, 21 149:2,
14 150:2 151:13,
14 152:15 194:12
197:15 198:25
199:8, 25 206:18,
21 209:5, 7, 9
227:19 252:19
253:20, 23
arrived 138:11
148:13
artifacts 29:5, 11
77:13 82:19
256:12, 13
asked 13:8 16:17
18:11 20:2 46:14

76:20 79:11, 18
83:10 85:2 106:12
108:19 120:6
126:6, 22 127:14
141:15 142:13
162:15 168:4
174:24 175:1
178:15, 16 179:22
200:14 203:2
220:22, 23 223:9
234:15 235:6, 9
238:19 239:23
241:23 244:14
248:12
asking 8:6, 19
17:24 18:7 19:6
28:5 76:18 79:14
88:9 89:16 91:13
93:11 129:11
152:4 159:19
170:15, 19 172:25
178:2 197:24
199:19, 21 224:12
237:2, 5 240:10
aspect 25:4
assigned 27:9
34:16
assist 45:15
assistant 16:21
132:12 138:9
234:2 245:12
assistants 16:22
69:21 144:1 147:7
148:23 201:6
238:3 245:7
246:25
associated 177:24
180:16
associates 203:22
240:4
assume 8:18 57:5
130:5, 7, 7, 22
141:22 142:4
155:15 184:19
assumed 127:7
Assuming 81:20
115:14 145:23
161:5

assumption 127:12
130:21 131:17
146:2
assumptions 130:11
attach 23:23 81:10
191:23 192:11
attached 1:24
15:23 134:15
146:22, 23 149:5
191:7 245:23
254:11
attaches 177:18
attaching 180:8
211:6
attachment 60:12
99:3, 10, 14, 24
100:3 105:16
113:3, 7 121:5, 11,
14 212:2, 5 217:8
attachments 105:22
106:1 251:11
attempt 75:23
146:5 221:14, 17
244:15
attempted 55:6
152:11 252:22
attempting 221:9
attempts 255:22
attorney 21:22
224:8 258:11
attorney-client
224:5
auto 74:9 95:6, 15,
21 96:6, 10, 12
104:12, 21 138:22
252:6 253:15, 18,
23 254:19 255:4
automatically 74:4
available 13:19
145:11 164:11, 15
247:5
aware 12:11 32:21
54:9 72:13 73:2, 8
86:11 89:23 90:1
155:24 158:18
164:16, 21 176:9,
18, 22, 23 194:3
229:1 238:15
239:23

**Dennis Williams CONFIDENTIAL**                                      **263**

**< B >**
**back** 9:*19* 10:*16*
28:*25* 30:*19* 33:*5*
38:*8* 40:*18* 43:*11,*
*13* 44:*7* 48:*16*
50:*21* 58:*11* 60:*4*
64:*8* 66:*6, 17, 22*
73:*7, 15* 75:*17*
81:*1* 84:*4* 94:*18*
103:*8, 21* 106:*24*
112:*13* 113:*15*
114:*12* 117:*15*
118:*9* 119:*11*
121:*23* 122:*23*
128:*12* 129:*7*
132:*5, 9* 142:*9*
147:*1, 9* 154:*8*
155:*23* 163:*16*
168:*16* 169:*1, 23*
179:*6* 184:*24*
185:*13* 186:*11, 25*
189:*1* 193:*1* 194:*5*
202:*7, 12* 203:*9*
209:*15* 211:*24*
212:*25* 217:*11*
221:*16, 24* 233:*4*
235:*3, 11, 17* 236:*1*
245:*16* 249:*24*
251:*21* 253:*9*
**backed** 203:*24*
256:*6*
**backing** 187:*14, 20*
246:*13*
**backup** 245:*3, 5*
248:*1* 252:*15*
**backups** 185:*20*
201:*9, 11* 245:*2*
247:*23*
**bad** 179:*9*
**ballpark** 229:*9*
**bar** 255:*3*
**based** 13:*15, 18*
25:*6* 63:*9* 69:*4, 15,*
*20, 25* 70:*17, 20*
71:*12, 20* 73:*17*
74:*22* 99:*12*
127:*11* 195:*25*
222:*25* 233:*12*

**basement** 134:*2*
135:*4*
**BASIC** 243:*11, 13,*
*16*
**Basically** 26:*3*
**basis** 7:*10* 139:*8*
145:*7* 151:*10*
159:*22* 162:*21*
184:*23* 202:*25*
205:*3*
**Bates** 99:*20* 100:*16*
**Bates-numbered**
99:*1*
**BB** 6:*9* 226:*1*
**BBB** 24:*6* 25:*23*
**beginning** 46:*10*
64:*11* 75:*6* 253:*2*
**behalf** 258:*11*
**believe** 9:*17* 13:*25*
14:*6, 9* 18:*16* 25:*7*
32:*17* 33:*15* 35:*18*
36:*3, 18* 39:*25*
40:*16, 17* 46:*1*
49:*15* 67:*4* 84:*21*
98:*24* 102:*4, 9, 12*
107:*3* 118:*6*
119:*10* 127:*9*
133:*8* 146:*15*
149:*7, 14* 151:*17*
153:*9, 9, 14* 156:*6*
158:*3* 160:*23*
164:*23* 165:*24*
166:*5* 167:*5, 19*
168:*15, 19* 174:*24*
182:*15* 187:*11*
195:*1* 196:*20, 25*
197:*23* 203:*22*
207:*4, 7* 208:*1*
209:*12* 211:*18*
213:*20* 215:*15*
217:*14* 219:*17*
223:*8* 228:*23*
229:*18* 232:*12*
233:*17* 242:*8*
253:*3* 254:*6, 10*
**believed** 160:*12*
195:*16, 19*
**bell** 164:*22*
**Benjamin** 2:*6*
**Bergerson** 2:*23*

**best** 8:*7* 10:*17*
64:*14* 85:*12*
111:*21* 167:*12*
180:*19* 222:*17*
**better** 151:*21*
169:*12* 182:*14*
194:*17*
**beyond** 117:*2*
184:*7*
**Bialostok** 110:*4*
**big** 249:*14, 19*
**biggest** 158:*14*
**Bilderbeek** 56:*15*
**billed** 14:*23* 23:*3*
132:*25*
**billing** 191:*7, 8*
**bin** 41:*15, 17*
**bins** 245:*20*
**Birmingham** 2:*4*
**bit** 22:*9* 68:*3*
75:*5, 22* 77:*24*
236:*5*
**black** 55:*8* 67:*15*
69:*11* 177:*8*
**Blake** 2:*20*
**blank** 113:*9*
**blind** 56:*10*
**blocking** 15:*25*
**board** 49:*14, 16*
50:*11, 18* 51:*1, 3*
52:*17*
**boldfaced** 49:*4*
**bookshelves** 245:*19*
**boot** 131:*15* 243:*17*
**booted** 235:*15*
**bottom** 89:*14*
92:*14* 165:*18*
171:*7* 187:*4*
222:*13*
**bought** 229:*21*
**box** 49:*4, 7* 103:*17*
108:*3* 118:*4* 119:*1*
131:*6* 148:*16*
234:*7*
**boxes** 15:*25* 112:*2,*
*10* 113:*21* 117:*3*
**bpresley@starnesla**
**w.com** 2:*7*
**brand** 171:*4* 177:*9*
**brands** 177:*7*

**Brazil** 155:*21*
157:*25* 231:*15*
**break** 7:*13* 12:*14*
43:*23* 44:*4* 58:*4,*
*10* 61:*23* 80:*22, 25*
121:*16, 21* 163:*10,*
*15* 201:*24* 202:*2, 6*
232:*25* 233:*3*
**breathed** 131:*8*
**Brian** 110:*4*
**brief** 220:*2, 4*
**briefly** 180:*13*
**Briefs** 114:*12, 24*
**broad** 116:*23*
**broke** 81:*13* 114:*7*
163:*20*
**Brookwood** 2:*4*
**brother-in-law**
156:*10, 12* 164:*4*
231:*17, 19, 24*
232:*11, 18*
**brother-in-law's**
158:*2*
**brought** 226:*9*
241:*24*
**buffer** 29:*24*
**buffering** 36:*15*
**buffers** 30:*1*
**Buildings** 42:*14, 19,*
*20*
**bullet** 87:*8, 21*
**bunch** 194:*9*
**Bureau** 243:*21*
**business** 182:*23*
229:*22*
**businesses** 180:*1*
**businessperson**
161:*5*
**button** 74:*2*

**< C >**
**cabinets** 245:*19*
**cache** 29:*16*
**call** 119:*15* 204:*22*
249:*18*
**called** 11:*1* 29:*23*
92:*3* 94:*17* 105:*10*
138:*20* 180:*8*
181:*24* 211:*7*

**Dennis Williams CONFIDENTIAL** 264

212:5  215:25
224:5  253:23
**calls**  197:19
**camp**  243:17
**capacity**  258:10
**caption**  258:5
**captures**  60:21
**Cardone**  24:5, 13
25:23  26:3, 8, 11,
13, 17  27:24  28:15,
25  30:8
**C-A-R-D-O-N-E**
24:6
**care**  198:8
**careful**  219:12, 15
**Carlos**  4:17, 22, 24
5:14  6:7, 11, 14
89:9  98:18  177:15
225:1
**Carlson.'**  109:11
**Carrera**  109:11
**carrying**  244:11, 20
**Case**  1:6  8:22
9:10  13:17  14:25
18:18  22:4  23:8,
11  24:4, 17  25:4,
11, 25  26:22  28:5,
12, 14  30:7, 8, 8, 12,
17  31:7  33:6, 12,
24  34:3, 6, 9, 15, 24
36:12  37:18  38:1,
4, 12, 14, 24  39:1,
23  40:2  42:14, 17,
21  43:5, 8  44:18,
23  72:14  77:16
85:11, 17  86:1, 10
88:25  101:11, 15,
19, 24  102:1, 5, 11
106:18, 18  110:11
114:11, 16  116:16
129:5  139:15
145:18  199:19
222:15  230:3, 6
236:2  242:7  248:5
256:17
**cases**  30:20, 22
32:6, 9, 14, 15, 21
106:21  235:20
237:13  242:21, 23

**cause**  1:21  94:12
215:5  258:12
**caution**  131:13
153:2  219:7
**cc'd**  118:16
**Cedula**  231:1
**cell**  25:14, 16
**center**  123:20
124:7, 15  126:19
128:6, 18  169:10
243:15
**certain**  16:7  17:19,
20  18:10  21:5, 12
28:1  38:7  48:8
58:2  74:6  75:7, 24
78:13  82:21  84:9
87:18  88:18  97:23
105:13  108:14
140:24  153:24
167:17  168:16
219:13  230:19
244:15  249:15, 16
253:9  254:18
**certificates**  231:3
**CERTIFICATION**
3:13  258:1, 23
**certified**  243:1, 22,
22  258:2
**certify**  258:4, 10, 11
**cetera**  122:6
225:21  226:16, 25
227:1, 6, 22  228:25
**chain**  197:9  222:7
**chance**  32:24, 25
89:17  138:14
190:3  221:20
**change**  215:5
**changed**  91:9
**Changes**  24:18
45:23  130:25
**characterization**
155:9
**characterize**  172:2,
3  184:9, 12
**characterized**  160:9
**charges**  14:20, 22,
25
**charitable**  126:16
**Chart**  4:9, 17
48:22  49:1  7:25

92:2, 3, 6, 8  122:9,
13  133:15  136:9
154:9, 12, 15  166:2
173:7  187:5
**check**  10:16  16:6
21:22  40:18  43:2
48:16  50:21  53:21
64:8  65:9  111:24
115:3  122:23
127:5  157:17
168:16  169:23
170:11  183:16
194:5  206:18, 20
210:13  253:10
**checked**  175:15
176:10  247:1
249:2
**checking**  98:7
100:4  237:6
**cherry**  249:18
**Chicago**  2:15
**chooses**  79:22
**Chris**  4:22, 24
5:16, 18, 24  6:1, 9
12:11  98:19  171:3
180:7  214:4  237:5
**chris.niewoehner@st**
**eptoe.com**  2:17
**Christian**  108:10
**Christopher**  2:16
**chronological**
110:24  115:15, 15
**chunks**  67:22
**circumstance**
184:22
**circumstantial**  78:4
**Civil**  1:23
**claim**  101:19
**classify**  156:18
**clean**  121:13
130:21  198:5
**cleaned**  130:14
**cleaning**  82:20
**clear**  10:25  170:14
196:12  250:24
251:11  252:21
**clearer**  206:24
**client**  63:1  191:7,
8  231:6  232:2, 7

**clients**  224:4, 9, 16,
21  229:23  230:15,
21
**close**  234:11
**closer**  111:2
**cloud**  33:22  193:7
197:20  198:4, 9
**cloud-based**  197:15
234:17, 22  235:7
**clued**  119:24
120:8, 9
**clueing**  120:8
**clusters**  212:16
**code**  41:25, 25
**coincides**  133:9
**collar**  242:20
243:15
**collect**  221:18
**collected**  38:13, 16
246:6
**collecting**  25:14
**collection**  25:19
83:12, 15, 21  84:2
85:19  86:19  96:25
97:12  243:2
247:17
**college-age**  229:10
**COLLINGSWORT**
**H**  1:8  4:20  5:5
6:14  11:15, 22
13:3  17:6  46:15
47:20  48:3  50:24
51:5, 14, 15  53:3
54:14, 15  56:14, 22
59:23  62:14, 20, 23
63:1  69:21  70:8
73:3, 14, 20  74:23
92:4  98:8  106:8,
22  107:22  112:1
114:15, 25  118:16
120:1, 17  122:4, 16
123:1  124:4  125:8
126:6, 22  127:7, 9,
13  128:3, 6, 20
129:1  132:11
137:11  141:2
143:25  148:9
149:16  154:23
155:12, 15  156:5, 9,
16  157:18  158:10

159:8  160:12
161:2, 7, 13, 15, 16
162:15, 24  164:8,
16  165:7  168:3
172:15, 24  174:21
175:3  180:16
188:15  193:8
197:1, 10, 19, 25
198:12  200:6, 25
202:11, 14  203:16,
23  204:5  209:25
222:9, 11, 22  223:1,
7, 19  225:20  226:4,
14  227:16  229:5,
16, 19  230:25
231:12, 16, 23
233:8, 25  238:3, 19,
24  239:4, 7, 17
240:14  241:8
242:14  245:8, 11
251:12  254:1
255:14

**Collingsworth's**
4:9  16:20, 22  19:7
21:25  46:21  47:12
48:9, 13  49:2, 13,
21  50:14  53:6
57:7, 14, 18  60:3,
22  61:19  63:14
65:14  72:1  92:16
93:15, 22  96:13
103:17  104:6, 9, 23
118:3  119:1, 14
123:12  124:22
127:20  135:11
137:17  138:8
139:7, 24  140:3
147:7  148:24
150:10  163:20
171:20  174:4
187:14  189:7, 16
193:4  195:20
196:14  200:25
207:14  211:16
221:6  223:22
228:15, 21  234:24
235:12  237:9, 21
246:15  249:25
254:17

**Colombia**  52:3
**color**  177:5
**Column**  103:11, 22
105:10, 23, 25
113:20  182:11, 19
183:17
**columns**  101:3
102:23  214:5
**Combined**  180:9
181:19
**come**  37:23  45:9
79:17
**comfortable**  13:15
**coming**  50:10  51:1
110:10  181:6
217:25  219:8
**comments**  25:20
199:5
**Commission**  258:21
**communicate**  99:21
**communicated**
46:23
**communicating**
56:23
**communications**
16:25  106:7
149:15  196:25
**companies**  224:15
**COMPANY**  1:4
27:20  28:16  35:14
36:3, 8, 18  37:19
40:7, 13  85:14
**company-owned**
229:14
**company's**  26:17
**companywide**  88:19
**Compaq**  125:9
128:24  129:20
130:1, 8, 22  132:20
136:4  140:16, 22
142:5, 17, 21, 24
146:19  169:14
249:4  250:25
251:1
**compare**  16:6
186:25  217:11
219:12
**compares**  185:24
**comparison**  120:24
**competitor**  26:4

**complete**  73:13
114:7
**completed**  151:13
**completely**  82:18
198:12  231:18
**complex**  38:18
**complicated**  149:9
**compose**  251:14
254:3
**comprise**  44:22
**computer**  11:1, 9
17:5  25:7  26:5, 14
27:9, 9, 12, 15, 21
29:19  31:11, 22
32:19  33:8, 19
34:16, 21  35:7, 9,
11, 17  36:8, 25
37:4, 5, 10, 13, 16,
20  41:4, 22, 24
42:3, 9, 11, 23
53:21  54:17  62:15,
24  63:6  65:17, 20
66:12  71:22  77:3,
18, 18, 21, 23  80:13,
16  81:14, 20  82:15
83:6  96:18  123:11,
19  125:3, 8, 14
126:14, 18  130:12
131:4, 10, 18
133:13, 17, 20
134:4  137:12, 22
138:1  140:23
141:1, 10  142:24
143:7, 14  144:6, 9
145:3, 8  148:17
153:6, 7  155:19
156:2, 7, 12  162:1
163:21  164:17, 23
165:8, 21, 25  167:4,
9  168:23  170:16
173:7, 12, 25  174:3,
4, 22, 23  178:20
181:21  182:5, 9, 23,
25  184:25, 25
187:24  188:6, 10
190:10  192:15
209:24  211:17
216:5  219:12
221:4, 6, 10, 11
222:17  225:5, 10,

14, 14, 18, 22  226:6,
6, 16  228:12, 19
229:3, 6, 14, 16
230:9, 10  231:7, 10,
13, 19  233:15
242:22, 25  243:5, 8,
12, 14, 17  249:22
**Computers**  4:9
9:16  11:14  49:2
63:2  67:5  75:13
122:3, 10  123:2, 4,
5  124:18, 18  126:8
128:5  129:13, 20
132:13  135:4, 11,
19, 24  136:2
139:24  141:16
154:9, 10, 14
163:21  166:1
178:19  179:9
180:16  181:15
184:7  186:1, 5
188:25  209:19
227:17  245:16
246:13, 15  249:25,
25  250:6, 6
**concentrating**  72:11
**concern**  237:22
249:24
**concerned**  18:24,
25  193:11  227:18
**conclusion**  39:12
110:10  254:14, 19
**conclusions**  252:25
**condensed**  171:4
186:13
**conducted**  96:24
97:11, 15, 19
119:21  244:24
**conferences**  243:19
**CONFIDENTIAL**
1:14  36:9  229:24
231:6  232:2, 7
257:8, 12
**confidentiality**
224:4
**configure**  152:2
165:21  192:3
**Configured**  191:17,
22

confirm 23:18
28:24 34:23 95:24
188:1 198:1
confirmed 92:20
confirming 44:15
confused 149:11
conjunction 37:1
connect 182:20
183:18
connected 27:23
33:18 35:8, 11
36:11 37:2 41:3, 6,
8, 13 174:2 180:15
181:14 182:12, 24
183:21 184:17
185:4 186:5
190:13 241:10
245:25
connection 83:2, 6
110:1 203:7 234:6
244:16
connectivity 135:2
connects 148:17
Conrad 1:9, 10
14:10 16:21, 23
17:17 18:22 19:2,
4, 10, 12 20:7, 18
47:12, 20, 23, 25
48:3 51:14 54:7,
12, 15 56:1, 7, 9
57:2, 6, 9 59:1, 2, 9
60:23 61:20 62:22
63:17 64:9, 9
66:19 72:1, 12
73:22, 24 74:3, 14,
24 75:15 83:18
88:2 89:12 95:8
98:6 100:16, 21
104:23 107:12
111:10 118:17
119:7 133:10
148:18 152:16, 18,
21 160:13, 14
166:16 169:25
170:16 172:21
173:3, 7, 11, 18, 21,
23 174:1 178:9
179:21 183:24
185:17 195:1
204:23 208:13

226:23 227:1
229:3, 15, 22, 23
231:11 232:1
234:2 235:12
238:13 241:22
242:14 244:16, 21,
25 246:11 255:16
consider 77:19
153:12
considered 153:10
consistent 145:21
221:9 225:12
consult 85:6, 7
Consulting 20:14
59:22
contact 124:15
Contacted 241:7
contacts 167:8
contain 136:17
142:2 185:21
contained 35:14
133:23 136:22
141:24 142:6
contemporaneous
151:23 153:19, 24
154:6, 11 159:7
201:1 221:2
222:25
content 84:24
208:19 209:10
context 219:22
224:8
continue 217:2
continued 64:21
continuously
143:25 145:9
contract 205:3
contrary 92:25
contribution
126:13, 16
control 179:8
conversation 120:5,
16 232:21
conversations 57:8
238:18
converting 251:24
Cool 20:13
copied 27:11
56:10, 10 57:9, 16
199:14

copies 15:15
185:18 216:18, 19
217:25 222:22
253:8
copy 14:5, 6, 9
19:19 23:20, 25
44:11 146:17
182:14 193:25
204:19
Corp 25:23 31:6
Corporation 24:7
correct 11:16, 23,
24 13:19 15:10
19:14 20:10 32:5
33:11 42:13 44:17
45:19 46:2 48:7
52:4, 19 57:11
58:25 63:22 64:7,
16 71:24 73:1
76:4 80:20 85:5
86:22 93:17 95:4,
18 102:15 103:3, 6,
25 109:4 113:8
119:3 125:7, 11
127:3 132:13
133:19, 21, 25
141:11, 14 148:6
154:18 157:2
158:19 162:19
169:6, 15, 17, 20
171:9, 16 182:9
186:22 187:19
189:4 191:15
209:21 212:9
215:20 219:3
230:3 232:12
235:4 241:17
244:7 256:9 258:8
corrected 22:21
44:20
Correction 24:21
correctly 76:12
149:4 198:10
204:25 214:5
222:19
correspondence
98:8
corresponding
218:10

counsel 9:2, 4, 5, 6
12:23 14:9 17:3
21:4, 8 22:11, 13
30:7 45:15, 16
79:13 88:9 113:4,
8 117:20 159:21
160:4 258:12
countries 230:17
COUNTY 258:2, 21
couple 7:7 33:22
84:18 103:21
149:15 168:13
202:21
course 17:11
107:11 114:15
122:4 128:25
129:5, 14, 17
193:13 221:5
courses 243:21
COURT 1:1 34:5
129:13 243:17
cover 134:9
180:18 212:12
covered 199:12
240:20
covers 132:14
crash 28:16
create 12:5 55:6
63:3
created 35:6, 7
36:6, 7, 25 37:4, 5,
15, 22 41:2, 10, 12
50:5 60:20 62:6, 7,
9, 12 63:11, 14, 15
83:3 208:10
212:17 214:20
249:7
creation 41:3
crime 242:20
243:15
Cristina 175:24
Crosby 5:10, 12
6:7, 13 139:3, 13
147:15, 22 148:6
149:1 150:14
151:6 152:7
153:15 165:3, 15
197:10, 24 199:18
204:9 222:11, 13,

*21* 225:*1, 20* 226:*4*
234:*2*
**Crosby's** 198:*22*
246:*24*
**CRR** 1:*22* 258:*20*
**CS** 227:*23*
**CSR** 258:*10*
**CSTC** 100:*16*
102:*17* 178:*6*
**CTS** 195:*17*
**CTSS** 5:*12* 59:*21*
149:*13* 152:*19*
165:*15, 18* 166:*10*
191:*4, 6, 16* 192:*23,*
*25* 193:*13* 194:*23*
195:*12, 18* 196:*10,*
*12* 197:*14* 208:*23*
209:*13* 251:*18*
252:*13*
**current** 10:*11*
11:*12* 110:*12*
154:*6* 171:*21*
176:*6, 6* 211:*17*
217:*4* 249:*11*
**current,** 10:*14*
**currently** 122:*16*
166:*8* 178:*25*
179:*3* 213:*4*
219:*14* 243:*22*
245:*23*
**CV** 23:*23, 25*
30:*14, 23, 25* 31:*3*
44:*14*

**< D >**
**Daily** 31:*6*
**data** 10:*9* 11:*12,*
*21* 26:*4* 28:*17*
33:*10, 13* 34:*9, 18,*
*19, 23* 35:*3, 23*
36:*3, 18* 39:*13*
66:*10* 71:*20* 75:*24*
85:*21* 123:*10*
128:*9* 129:*25*
142:*17* 146:*17*
158:*21* 165:*20*
166:*17* 168:*22*
184:*15* 185:*13*
201:*22* 202:*13*
203:*24* 221:*10, 14,*

*18* 224:*10, 21, 21*
225:*19* 227:*1, 11*
229:*1, 16* 231:*17,*
*20, 24* 232:*23*
233:*9* 244:*15*
249:*9*
**DataTraveler**
209:*23*
**date** 10:*15* 14:*15*
28:*11* 29:*21* 41:*5*
42:*12* 47:*13* 49:*9*
64:*11* 71:*5, 14*
78:*21, 25* 79:*2*
80:*18* 87:*9* 88:*1,*
*10* 89:*25* 90:*1*
111:*6, 7, 25* 114:*20*
129:*8* 135:*10*
176:*14* 177:*25, 25*
182:*13, 20* 183:*18*
187:*8, 9, 9* 188:*2*
189:*11* 191:*10*
212:*18* 215:*5*
218:*23* 237:*8*
242:*7* 256:*3*
258:*23*
**Date,** 215:*14*
**dated** 23:*8, 9*
134:*20* 233:*25*
**dates** 41:*11* 58:*22*
83:*3, 3* 88:*17*
128:*14* 146:*8*
187:*6*
**dating** 73:*15*
**DAVIS** 2:*1, 23*
79:*9, 16* 121:*22*
**day** 23:*5* 25:*17*
68:*18, 22, 24* 69:*2*
70:*13* 151:*15*
170:*7* 258:*18*
**days** 33:*19, 20*
67:*12* 69:*6, 14, 17*
90:*4, 8, 11, 15, 19,*
*23* 91:*4*
**DC** 62:*21* 107:*13,*
*17, 20* 108:*16*
110:*17* 175:*16*
185:*17* 186:*1, 4*
208:*13* 241:*4, 7, 21*
245:*1, 13, 25*

246:*22* 247:*2*
**de** 158:*5*
**deal** 12:*17* 229:*23*
**dealing** 74:*25*
228:*11*
**death** 231:*3*
**December** 4:*19*
92:*4* 118:*11*
156:*14* 170:*17*
171:*21, 25* 172:*16,*
*18, 20* 173:*12, 16*
174:*18, 23* 175:*14*
176:*5, 14* 186:*20*
189:*20* 207:*9, 10*
209:*20, 25* 210:*4, 7*
212:*17, 20* 214:*1*
215:*7, 12, 17*
216:*10* 218:*12, 16,*
*18, 25* 219:*5* 220:*1,*
*16* 241:*10*
**deciding** 153:*8*
**decision** 18:*1*
**declarations** 244:*2*
**deductible** 126:*13*
**deduction** 126:*7, 23*
**deep** 66:*10*
**default** 90:*2, 10, 15,*
*21* 91:*1, 3, 9, 14, 17,*
*22*
**defendant** 24:*22*
26:*8* 72:*14* 173:*4*
**Defendants** 1:*10*
2:*7* 9:*2, 6* 30:*7*
75:*24* 76:*3* 83:*11*
88:*9* 96:*23* 97:*11,*
*15* 134:*14* 163:*22*
170:*1* 171:*25*
172:*19, 21* 173:*15*
184:*16* 222:*15*
247:*16*
**defendants,** 173:*17*
**Defense** 11:*4*
**delete** 68:*22* 146:*5*
231:*17, 24* 232:*10,*
*17, 22* 249:*17, 19*
**deleted** 25:*17*
40:*11, 15* 41:*20*
67:*19* 68:*18* 69·*6,*
*17* 70:*13* 71:*9, 14,*
*19* 76:*9, 22* 77:·*2. 4,*

*8, 11* 78:*13, 20, 24*
80:*1, 7, 10, 18*
81:*15, 19, 23, 24*
82:*1, 4, 9, 11, 12*
90:*3, 7, 14, 17, 18,*
*22* 91:*16* 135:*15,*
*15, 22* 143:*1* 144:*4,*
*13, 16, 21* 145:*4, 9,*
*15, 20, 24* 146:*3*
152:*1* 212:*9, 10, 11*
213:*23, 25* 214:*12,*
*14, 24* 215:*8, 13, 19*
216:*10, 24* 218:*1, 9,*
*11, 16, 18, 23, 25*
219:*6, 11* 248:*15*
250:*15, 19, 21*
251:*4*
**deleting** 68:*7*
216:*20* 231:*20*
**deletion** 46:*18*
81:*22* 82:*7, 10, 16*
83:*3* 95:*14* 215:*3,*
*4*
**Dell** 122:*17* 123:*9,*
*15* 125:*2* 128:*24*
130:*1* 136:*3, 8*
140:*19, 22, 23*
141:*22, 23* 142:*18*
143:*14, 22* 146:*8,*
*12* 154:*19* 166:*6, 7,*
*17, 21* 167:*2* 168:*7*
169:*7, 9, 11, 13*
171:*21* 173:*6*
185:*6* 187:*6, 22*
189:*17* 199:*13*
211:*16* 245:*10*
248:*4* 249:*3, 5, 8*
251:*2, 4*
**delta** 186:*1*
**DEMONSTRATES**
137:*22*
**denied** 33:*3*
**Denise** 43:*4*
**DENNIS** 1:*16, 18*
3:*3* 4:*3, 14, 17* 5:*8,*
*14, 17, 18, 24* 6:*2,*
*11* 7:*4, 22, 24*
258:*5*
**deny** 32:*16*

**Dennis Williams CONFIDENTIAL**                                    **268**

**Denyce** 1:*21* 258:*2, 20*
**Department** 11:*4* 160:*15*
**dependent** 15:*4*
**depending** 234:*20*
**Depends** 52:*10*
**depose** 12:*19*
**DEPOSITION** 1:*15, 18* 3:*2* 4:*2* 7:*2* 8:*1* 9:*14* 15:*9, 22* 22:*6* 23:*16* 24:*2, 5, 7, 10, 12* 25:*24* 32:*22* 33:*25* 34:*4* 38:*6* 39:*25* 58:*5* 81:*8* 121:*22* 160:*9* 253:*3* 257:*8, 17* 258:*8, 9, 11, 14*
**Depot** 148:*16*
**describe** 194:*17, 19* 238:*16*
**described** 241:*2*
**describing** 65:*3* 191:*16* 194:*22* 195:*11*
**Description** 4:*4* 134:*24* 177:*8*
**designate** 257:*7, 11*
**designed** 95:*13*
**desks** 245:*18*
**desktop** 49:*8, 21* 50:*14, 25* 122:*20* 125:*9* 128:*24* 130:*12* 132:*20* 133:*11* 135:*3* 140:*16* 164:*23* 165:*24* 171:*12, 21* 173:*6* 189:*17, 23* 211:*17* 212:*3, 8* 216:*5* 249:*3* 250:*25*
**desktops** 136:*19*
**destroyed** 131:*19*
**detail** 180:*14*
**detailed** 250:*3*
**determination** 27:*16* 70:*6* 76:*21* 116:*7* 185:*12* 201:*17* 248:*17*
**determinations** 94:*2*

**determine** 10:*24* 11:*7* 17:*14* 25:*15* 27:*3, 5* 28:*1* 29:*2, 5, 12* 31:*16, 20* 32:*1* 33:*8, 12, 16, 17* 34:*17, 19* 35:*4, 16, 22* 36:*23* 40:*7, 12* 42:*18* 43:*9* 46:*16* 57:*19* 62:*11* 65:*10* 76:*6* 77:*6, 10* 80:*4* 81:*14, 18* 82:*16* 83:*20* 84:*25* 122:*5* 145:*4* 154:*16* 157:*16* 183:*2* 188:*17, 20* 194:*6* 201:*21* 217:*7* 248:*12* 255:*24* 256:*25*
**determined** 11:*20* 17:*4* 28:*4, 10* 46:*20* 50:*10* 118:*2* 119:*13, 18* 120:*15* 220:*14* 245:*22*
**determining** 77:*1* 80:*8*
**device** 27:*7, 8, 11, 17* 28:*2, 11, 21, 24* 29:*3, 10, 14* 31:*13, 22* 32:*4, 12* 33:*14* 34:*21* 35:*8* 36:*10, 19* 37:*1, 21* 39:*19* 40:*10, 14, 20, 21* 41:*14, 20* 42:*9, 10, 23* 83:*2, 5, 6* 146:*7, 12, 14, 18, 21* 147:*9* 171:*8* 172:*15, 18* 174:*2* 175:*5* 176:*18, 24* 177:*2, 9* 179:*18* 181:*14, 25* 182:*1, 3, 4, 8* 183:*3, 8* 185:*8* 188:*18* 189:*6, 15* 192:*4* 199:*17* 220:*25* 241:*10, 13* 242:*1* 250:*7* 252:*21* 255:*15, 17* 256:*2, 15, 18* 257:*2*
**devices** 26:*6* 27:*23* 28:*23* 33:*18* 34:*22, 25* 35:*10, 13, 16, 20*

36:*4* 40:*3, 8, 17* 42:*4* 43:*2, 3* 129:*16* 134:*9* 136:*25* 146:*23* 175:*4, 5, 10* 176:*11, 12, 23, 25* 177:*5* 178:*9, 17, 19, 21* 179:*7, 10, 11, 20* 180:*2, 15* 181:*7, 12* 182:*24* 183:*24* 184:*15, 17* 185:*2, 16, 19, 20, 25* 186:*4, 7, 16* 187:*1* 190:*16, 19* 200:*15* 201:*9, 10, 22* 202:*21, 23, 25* 203:*11, 24* 204:*2* 210:*10* 241:*7, 9, 21, 23, 25* 245:*15, 20* 247:*5* 250:*18*
**diatribe** 149:*24*
**difference** 121:*2, 3* 161:*6* 203:*21*
**different** 17:*21* 21:*20* 22:*3* 24:*14* 27:*19* 39:*4* 61:*16* 73:*9* 94:*13* 98:*9* 127:*22* 142:*4* 164:*17* 172:*13, 25* 178:*15* 210:*6* 252:*12*
**difficult** 100:*23* 146:*3* 149:*12* 182:*18* 188:*20* 214:*6*
**difficulty** 151:*24*
**digit** 41:*25*
**diligent** 69:*22* 70:*1, 7, 11*
**direct** 112:*21*
**directing** 25:*21*
**direction** 258:*7*
**directly** 62:*24* 153:*15*
**director** 21:*3* 53:*20, 22* 89:*11* 94:*23* 120:*17* 167:*20*
**directory** 30:*5*

**disagree** 151:*11* 173:*14* 199:*22* 204:*10*
**disagreement** 55:*14*
**disbelieve** 151:*6*
**discovery** 64:*22* 84:*9, 11, 13, 16* 97:*17* 108:*23* 117:*17* 184:*17*
**discuss** 12:*25* 22:*13, 16* 181:*6* 200:*5* 223:*16* 226:*14* 231:*25* 240:*8* 244:*10*
**discussed** 22:*14* 39:*2* 81:*18* 156:*10* 204:*8* 207:*13, 24* 247:*19* 253:*16* 254:*24*
**discussing** 21:*24* 68:*6* 81:*13* 163:*20* 205:*9* 222:*8* 225:*18* 237:*20*
**discussion** 197:*11* 225:*9* 239:*21*
**discussions** 57:*13* 74:*16* 202:*10* 203:*6, 16* 204:*5, 8, 9, 11* 207:*16*
**disk** 188:*2*
**disposal** 129:*19*
**disposed** 76:*9, 22* 77:*2* 123:*19* 128:*25* 129:*2, 14, 16* 154:*15* 155:*6* 169:*10*
**dispute** 93:*7, 13* 139:*12*
**disseminated** 224:*10*
**distinctly** 203:*10*
**distinguishing** 74:*18*
**DISTRICT** 1:*1, 1*
**DIVISION** 1:*2*
**divorce** 43:*5*
**document** 16:*4, 7* 37:*11* 48:*21* 49:*1* 50:*1, 5* 76:*14, 17* 77:*22* 79:*25* 80:*2*

**Dennis Williams CONFIDENTIAL**                                    **269**

94:*10, 11*  96:*24*
97:*11*  112:*24*
126:*18, 20*  159:*12*
185:*23*  212:*13*
220:*6*  235:*7*
244:*17*  253:*17*
**documentation**
10:*5*  12:*5*  48:*17*
98:*25*  117:*16*
210:*20*  246:*9*
**documented**  190:*21*
239:*11, 14*
**documenting**  250:*3*
**documents**  9:*10*
10:*11*  12:*20, 22*
15:*12, 16*  19:*24*
20:*3, 6, 8*  21:*24*
22:*1*  59:*20*  74:*9,*
*17*  91:*8*  93:*9*  97:*1,*
*12*  99:*19*  101:*19*
112:*19*  121:*5*
122:*24*  146:*4*
149:*5*  159:*20*
168:*17*  190:*21*
192:*10, 15*  221:*25*
225:*17*  248:*20*
250:*14*
**DoD**  11:*1*
**doing**  13:*11*  15:*5,*
*7*  31:*24*  32:*20, 22*
39:*18*  40:*19*  59:*22*
66:*10*  97:*20*  114:*6*
138:*21, 22*  140:*2*
193:*19*  199:*8*
252:*14, 14*
**dormant**  131:*13*
**double**  43:*2*  65:*8*
100:*4*  115:*3*  127:*4*
157:*17*  170:*11*
**dovetails**  249:*2*
**download**  52:*2*
**downloaded**  26:*13*
29:*2*  32:*3, 11*
35:*19*  42:*24*
**downloading**  26:*24*
31:*11*  37:*19*  51:*21*
**Dr**  38:*10*
**draft**  45:*17, 18*
**drafts**  45:*16*

**dragging**  37:*12*
**drawers**  245:*18*
**drive**  26:*23, 24*
29:*21*  131:*13*
148:*15, 16, 21*
149:*20*  150:*3, 11,*
*18, 18, 21*  151:*1, 2,*
*3, 9*  152:*9*  168:*7,*
*10, 22*  169:*2, 19, 21*
170:*6, 15, 19*
171:*19, 23*  172:*6,*
*10, 12, 20*  173:*11,*
*15, 24*  174:*11, 13,*
*22*  175:*13*  176:*20*
177:*25*  178:*1, 25*
179:*16*  184:*3*
185:*1*  187:*22*
188:*5, 14*  191:*23*
192:*11*  195:*21*
196:*2, 18*  198:*3, 8,*
*14, 18, 21, 25*
199:*14, 25*  200:*7,*
*11*  201:*3, 16, 18*
203:*25*  205:*19, 24*
206:*3, 9, 13, 15*
210:*4, 6*  219:*24*
220:*1, 12*  238:*21*
240:*23*  245:*23, 24*
246:*5*
**drives**  139:*7*
148:*17*  169:*25*
170:*21*  171:*4*
177:*23*  178:*13, 18,*
*20*  179:*3, 7, 8, 12,*
*14*  184:*6, 21, 22*
199:*9*  202:*12, 18*
203:*3, 4, 8, 17*
204:*6*  206:*6, 25*
245:*21*
**Drop**  234:*7*
**Dropbox**  234:*17,*
*21, 25*  235:*9*
**Dropbox,**  234:*15*
**dropping**  37:*12*
**drug**  67:*11*
**DRUMMOND**  1:*4*
4:*19*  17:*20*  21:*21*
92:*4*  102:*13*
106:*19, 22*

**due**  18:*13, 16*  75:*8*
227:*16*  254:*16*
**duly**  1:*20*  7:*5*
258:*6*
**duplicate**  216:*13*
217:*9*
**duty**  8:*7*  224:*4, 9,*
*15*
**DVD**  44:*2, 8*  81:*2*
121:*20, 24*  163:*14,*
*17*  202:*5, 8*  257:*18*
**DynCorp**  18:*20*
19:*1, 9, 15*  21:*6, 17*
22:*4*  75:*10*  230:*2,*
*13*

**< E >**
**earlier**  27:*18*
36:*13*  81:*7*  83:*1*
90:*1*  112:*6*  132:*8,*
*9*  196:*4*  219:*21*
253:*2*
**early**  73:*24*  118:*6*
154:*21, 24*  155:*3*
207:*9*
**easily**  144:*14*
**easy**  252:*11*
**Ecuador**  9:*20*
**e-cycle**  123:*19*
124:*7, 15*  126:*19*
169:*10*
**e-data**  87:*13*
**e-discovery**  46:*16*
76:*3*  83:*12, 15, 21*
84:*1*  85:*7, 11, 18*
86:*19*  110:*12*
247:*16*  248:*5*
**effect**  74:*21*  156:*8*
**effort**  96:*25*  97:*12*
**efforts**  70:*22*
83:*12, 15, 16, 21*
84:*2*  86:*19*  117:*12*
247:*17*
**efforts,**  76:*4*
**eight**  242:*21*
**either**  26:*23*  40:*7*
44:*18*  51:*21*  56:*10*
58:*20*  72:*15*  93:*5*
94:*14*  144:*16*
147:*11*  168:*9*

184:*13, 24*  195:*20*
199:*23*  233:*17*
240:*15*  247:*8*
252:*9*  258:*12*
**Electronic**  4:*17*
24:*24*  25:*8*  75:*24*
92:*3*  97:*17*  243:*3*
244:*15*
**else's**  92:*21*  120:*25*
**Email**  4:*9, 14, 14,*
*16, 16, 20, 22*  5:*4, 4,*
*6, 8, 10, 10, 12, 12,*
*14, 16, 18, 24*  6:*1, 1,*
*7, 9, 13*  10:*12*  14:*5*
15:*23, 24*  16:*19, 20*
17:*5, 24*  18:*3, 8, 12*
19:*4, 6*  20:*2*  21:*11,*
*15, 16*  47:*12, 21, 23*
48:*1, 10, 12, 14*
49:*13, 23, 24*  51:*6,*
*13*  54:*11, 13, 20*
57:*2, 6, 8, 14, 18, 23*
59:*4*  60:*23*  61:*24*
65:*14*  66:*13, 13*
67:*25*  68:*22*  69:*2*
70:*7*  71:*12*  72:*1*
73:*2, 14, 20*  74:*13*
75:*12*  77:*1, 7*  88:*8,*
*12*  89:*9, 15, 18*
98:*18, 24*  99:*10, 13*
103:*17, 24*  105:*16,*
*21*  106:*8*  108:*3*
109:*3, 13*  112:*2, 10*
113:*21*  117:*3*
118:*3*  119:*1, 14*
120:*25, 25*  121:*11*
131:*11*  133:*5, 8*
135:*21*  137:*12, 17,*
*22, 23*  138:*7*
140:*12*  142:*7*
143:*1, 2*  144:*3, 4*
145:*20*  148:*23*
152:*20*  153:*14, 23*
154:*17*  158:*22*
160:*8, 18*  165:*3, 14,*
*19*  166:*14*  167:*7*
171:*2*  177:*14, 21*
180:*7, 18*  185:*13,*
*19, 20*  187:*5*  191:*6*
192:*9, 22, 24*

**Dennis Williams CONFIDENTIAL**

193:*10, 12, 21*
197:*9, 12, 13, 15*
199:*8* 200:*10, 18,
19* 201:*1, 15* 205:*6,
10* 206:*18, 20*
207:*2, 12, 14, 23*
208:*18* 209:*5, 9*
211:*1, 6, 15* 212:*8,
9, 11, 12* 213:*9*
214:*4* 217:*5* 219:*2*
222:*7, 10, 12* 223:*1,
15, 17* 224:*25*
226:*4, 8* 227:*23*
233:*24* 234:*19*
235:*25* 237:*10, 15,
17* 245:*13* 246:*4, 5,
6, 13* 247:*24*
248:*25* 249:*11*
251:*12, 15, 18, 20,
24* 252:*2, 18* 254:*1,
3, 9, 16* 255:*5*
**e-mail** 135:*16, 16*
**emails** 16:*8, 10, 14,
16* 17:*8* 18:*23*
19:*4, 7, 11, 12, 17*
20:*19, 23, 25* 21:*25*
46:*15, 18, 21* 47:*1,
5, 8, 9, 12, 17* 48:*4,
9, 12* 49:*8, 20*
50:*14, 17, 19* 51:*9,
12, 12, 21, 22, 25*
52:*7, 12, 17, 21, 23,
25* 53:*2, 4, 7, 9*
54:*4, 6, 23* 56:*8, 13*
58:*25* 59:*4, 13, 15*
60:*2, 16, 21, 24*
61:*19* 62:*22* 63:*4,
16* 64:*22, 23* 65:*25*
66:*4, 5, 9, 25* 67:*3,
10, 12, 15, 16, 19, 24*
68:*10, 18, 19, 24*
69:*5, 7, 13, 16, 22,
24* 70:*2, 11, 13, 21,
22, 23, 25* 71:*4, 13,
18, 22* 73:*5, 24*
74:*18, 25* 77:*17*
78:*12, 13* 80:*6, 17,
17* 83:*19* 85:*19, 19*
95:*8, 14, 22* 96:*7*
98:*7* 103:*24* 104:*9,*

*13, 23*  105:*2, 4, 8,
11, 14, 18, 25*  106:*1,
3, 7*  107:*8, 25*
108:*6*  112:*1*  118:*1,
16, 25*  119:*4, 5, 22,
23*  120:*8, 13*  128:*1*
129:*22*  130:*3*
132:*3, 8*  133:*23*
136:*17, 23*  137:*9*
138:*15, 16*  139:*7*
141:*1, 24*  142:*2, 10,
12*  143:*7, 10, 13*
146:*13*  147:*9*
148:*11, 24*  149:*2,
19*  150:*3, 10, 15, 17,
19, 21, 25*  151:*8, 22*
152:*1, 3, 6, 8*  153:*5,
7, 8, 20*  154:*6, 11*
156:*4*  158:*15*
159:*5, 7, 9*  160:*12*
161:*3, 6, 6, 25*
162:*4, 16, 22*
166:*20*  167:*2, 5, 14,
20, 22, 24*  168:*4, 13*
169:*1, 3*  170:*8*
185:*22*  187:*14, 20*
192:*14, 16*  193:*1, 4,
24*  194:*10, 13, 15,
24*  195:*9, 20*  196:*1,
3, 10, 13, 16*  197:*2,
4*  198:*13*  199:*13,
16*  201:*16, 19*
202:*12*  205:*19, 23*
206:*2, 5, 8, 13, 15,
22, 24*  207:*12*
209:*13*  213:*8, 9*
216:*7*  221:*2, 21*
222:*1, 8, 14, 18, 23*
223:*2, 5, 8, 9, 12*
225:*18, 21*  226:*11,
15, 20*  227:*22, 22*
228:*16, 18*  235:*17*
236:*5, 9, 11, 13, 17,
18, 20, 22*  237:*6, 9,
13, 19, 21, 24, 25*
238:*3, 5, 8, 10, 12*
239:*18, 24*  240:*3, 4,
11*  244:*23*  245:*4, 9*
246:*2, 12, 12, 17, 23,
24, 24, 25*  247:*3*

248:*2, 22, 24*  249:*1,
16, 17, 19*  250:*17,
19, 21*  251:*17, 21*
252:*4, 9, 19*  254:*2,
7, 16*  255:*7, 15*
**email's** 83:*19*
**e-mails** 148:*15*
160:*15*  249:*14*
**employ** 258:*11*
**employed** 26:*7*
**employee** 24:*20, 23*
26:*22*  27:*16*  31:*10,
16, 18*  32:*9, 19, 23*
33:*9*  34:*8, 11*  39:*3,
8, 10*  42:*20*  57:*10*
72:*14*  117:*25*
173:*18*  174:*2*
177:*24*  256:*18*
258:*10*
**employees**  20:*7*
32:*15*  56:*9*  98:*7,
10*  108:*15*  112:*2*
118:*17*  128:*2*
147:*17*  173:*23*
175:*15*  180:*2*
224:*21*  241:*8, 24*
244:*22, 25*  246:*8,
21*  248:*19*  250:*17*
**employee's** 26:*16,
19*  31:*18*
**employer** 25:*20*
26:*5, 6, 10, 11, 15,
16, 25, 25*  27:*10*
33:*21*  34:*17*  39:*7*
42:*25*
**employers** 224:*8*
**employer's** 26:*14*
27:*8, 12, 15*  31:*11,
22*  33:*19*  34:*21*
42:*23*
**employment** 25:*21*
33:*21*  207:*1*
242:*25*
**empty** 55:*10*
**enabled** 96:*13, 19*
157:*7, 13, 16*
**EnCase** 211:*8, 10*
216:*14*  219:*9*
243:*23*

**ended** 35:*12*
**engage** 256:*17*
**engaged** 34:*14*
39:*7, 10*  46:*4, 8, 13,
19*  48:*15*  220:*20*
**engagement** 25:*11,
24*  31:*15, 20*  32:*1*
35:*21*  42:*16*  43:*7*
47:*25*  53:*13*  72:*25*
75:*21*  76:*17*  83:*9*
93:*21*  244:*6*  247:*8*
**engagements**
219:*22*  256:*5*
**Enron** 243:*3*
**ensure** 231:*12*
**entail** 39:*15*
**entire** 8:*22*  9:*1, 3*
111:*24*  188:*14*
**entirely** 69:*5*
71:*11*  196:*1*
**entities** 72:*15*
**entitled** 79:*19*
**entity** 99:*19*
173:*21, 22*
**entries** 23:*4*
**entry** 191:*9*  215:*14*
**Enyard** 4:*15, 17*
5:*8*
**Equipment** 140:*17*
**equivalent** 230:*16*
**Eric** 31:*6*
**error** 65:*6*
**errors** 44:*19*
**especially** 216:*18*
217:*3*
**essentially** 165:*6*
193:*17*  207:*21*
**et** 4:*20*  5:*9, 15*
122:*6*  225:*21*
226:*16, 25*  227:*1, 6,
22*  228:*25*
**event** 33:*7*  106:*2*
164:*10*  188:*4*
**everybody** 62:*20*
70:*6*  108:*12*
241:*24*
**everyone's** 120:*25*
**evidence** 26:*4*
27:*22*  35:*22, 25*
36:*21, 23*  78:*4*

**Dennis Williams CONFIDENTIAL**                    271

98:3  155:18
162:23  199:16
206:14  241:18
249:6  251:6
255:21
**exact**  42:11  111:25
**exactly**  11:19
32:21  60:9
**exam**  27:20  144:9
**examination**  27:14
35:5  40:19  69:20
186:4
**examine**  77:3
80:13  185:24
190:15  256:3
**examined**  25:18
143:14  177:6
187:1  190:19
210:9, 11, 12  241:9
**examiner**  243:1, 23
**examiners**  176:15
**examining**  71:21
82:15
**example**  16:19
42:2  51:4  68:16
199:12
**Excel**  99:4, 7, 7, 7
100:14, 15  177:18
**exception**  221:13
**excerpts**  99:7
**Exchange**  83:19, 24
87:22  88:3, 17
94:20, 24  96:5
97:21, 23  100:21
101:2  103:17
104:10  111:11, 17,
19  112:12  116:1
118:12, 22  119:2
193:3  197:17
248:7
**excluded**  44:13
**Excuse**  26:18  48:1
51:3  55:23  107:1
122:12  134:14
136:3  152:21, 25
189:17  195:5
217:17, 19  233:14
**executed**  82:21
**EXHIBIT**  4:1, 4, 9
5:1, 1, 6, 18, 21, 21

6:3, 9  15:19, 22, 23
21:16  23:13, 16
44:5, 11  46:2
48:18, 21  55:3, 5,
13  57:20  58:15
60:10, 13, 14  63:21,
24  66:24  67:15
69:12  75:18, 20
78:11  79:5, 7
86:23  87:1  88:5, 7
89:6, 8  91:24  92:1
98:15, 17  100:7, 10,
13, 15  101:7  103:9
107:6  113:1  121:7,
10  131:25  132:3, 4
134:11, 15, 15, 18,
20  137:5, 8  139:18,
21, 21  148:2, 5
164:25  165:2, 11,
13  167:11  170:24,
25  177:11, 12
178:5  180:4, 6
186:10  190:24
191:2, 2  192:18, 21,
21  194:14, 25
195:14  197:5, 7, 8
204:12, 15  207:4
208:3, 5  209:15
210:21, 24  211:1, 2,
3, 5  214:3  222:3, 6,
6  224:22, 24
225:23, 25  226:1
233:20, 21  236:23
237:1  242:2, 5
244:1, 13  253:3, 4
**exhibits**  44:13
81:10  100:9
155:24  244:1, 5
253:5  254:10
**exist**  51:22  137:1,
4  141:12  153:7
186:2
**existed**  95:7
130:24  247:25
**existence**  71:5
80:19  125:6
136:24  138:5
188:14  214:23
215:7, 12  216:9

218:25  219:5
**exists**  130:8  153:6
**exits**  121:22
**expand**  238:19
**expect**  13:11
99:12  115:16
**experience**  7:15
242:18  249:15
**expert**  26:1  43:17
79:19  129:12
230:9
**experts**  20:9
**Expiration**  258:23
**Expires**  258:21
**explain**  20:22
40:24  55:8  70:10
255:7
**explanation**  16:15,
24  18:9  65:7  67:6
167:1  168:25
**Explorer**  29:15
**exported**  185:18
**Express**  246:2
**expressed**  201:1
**extended**  233:10
**extensive**  56:12
**extent**  104:9
116:11  119:19
122:5  161:17
251:13
**external**  26:6, 23
27:7, 7, 11, 17, 23
28:2, 11, 20, 23, 24
29:3, 10, 13, 21
31:13, 22  32:4, 11
33:14  34:21, 22, 25
36:4, 19  37:20
39:19  40:3, 10, 20
41:20  42:23  83:2,
5  139:7  146:7, 11,
18, 21, 23  147:9
148:15, 17, 21
149:20  150:3, 11,
17, 21  151:1, 9
169:18, 21, 25
170:5, 21  171:19
175:4, 5  176:11, 12,
20, 22  177:9  178:9,
16, 19, 21, 24  179:3,
17, 20  180:2  181:7

183:24  185:2, 16,
25  186:16  187:21
188:5, 13  189:15
192:3  193:25
195:21  196:2, 18
198:2, 7, 14, 18, 21,
25  199:9, 14, 17, 24
200:7, 11, 14  201:2,
16, 18, 21  202:12,
18, 21  203:3, 3, 8,
17, 25  204:6
205:19, 23  206:2, 5,
8, 13, 15, 25  219:23
220:1, 12  238:21
240:23  241:6, 9, 21,
22  245:14, 20, 23,
24  246:5  255:15,
17  256:2, 18  257:1
**extremely**  229:23
**eyes**  63:15  75:14

**< F >**
**face**  99:13
**Facebook**  25:12, 13,
19
**fact**  22:21  27:3
33:13  34:20  35:19
36:10  39:8  53:18
71:11  93:9, 12, 16
96:12  98:9  119:25
128:5  143:9, 10
146:2, 12, 22
150:23  152:8
156:5  162:8  197:1
199:19  201:3
218:5, 6  247:21
255:25  256:25
**factor**  158:14
**facts**  146:14
190:12  258:4
**failure**  168:7, 10,
21, 23  169:2, 2
**fair**  8:19  26:15
32:4  45:23  47:24
52:18  76:23
154:12  158:13
**fall**  117:23  204:24
**familiar**  11:2
107:20

**Dennis Williams CONFIDENTIAL**                                    **272**

**familiarity** 196:*6*
**Family** 43:*6* 158:*1*
**far** 23:*4* 27:*17*
31:*1* 50:*23* 53:*2*
58:*19* 71:*21* 77:*22*
88:*17, 19* 91:*7*
92:*18* 111:*16*
113:*21* 114:*22*
122:*6* 128:*4, 17*
141:*12* 162:*25*
179:*12* 182:*12*
235:*11* 248:*3, 22*
257:*3*
**far-fetched** 131:*9*
**FBI** 43:*14* 242:*19,
20, 22, 25* 243:*1, 4,
6*
**feature** 96:*10*
252:*7, 22*
**February** 46:*4, 7*
52:*21* 53:*7* 54:*4,
19* 55:*19, 19* 56:*3*
57:*22* 58:*25* 59:*7*
63:*25* 64:*24* 66:*6,
17* 67:*1, 1* 119:*11*
165:*3, 14* 167:*3*
169:*1* 205:*2*
248:*24* 249:*2*
**Federal** 1:*23*
**feedback** 197:*25*
**feel** 220:*8*
**fellowship** 156:*11*
**Fernando** 109:*9*
110:*5* 117:*9*

< ' >
**'Fernando** 109:*9*

< F >
**field** 181:*23*
**figure** 14:*18*
149:*18, 24* 150:*6*
151:*24* 152:*12*
153:*5* 174:*16*
211:*20*
**figuring** 55:*2*
**file** 8:*22* 9:*1, 3*
15:*13* 28:*16* 36:*24*
37:*3, 5, 10, 12, 15*
40:*15* 48:*22* 74:*9*

82:*11, 18* 83:*2, 3*
92:*2* 99:*3, 14*
140:*10, 12* 141:*4*
143:*16* 144:*15, 17,
21, 22* 145:*1, 4, 10,
11, 15, 20, 24, 24*
146:*6* 177:*18*
185:*18, 18* 208:*12*
211:*8, 9* 212:*6, 22*
213:*3, 7, 8, 9*
214:*19, 20, 23*
215:*1, 16, 24*
216:*16, 17, 20, 25*
217:*7, 12, 16, 21, 24*
218:*7, 8, 12, 16, 17,
24* 239:*11, 13*
251:*3, 6*
**filed** 84:*7* 85:*18*
114:*12* 129:*6, 7*
**files** 10:*13* 27:*6,
10, 12* 28:*1, 10, 18,
22* 29:*3, 7, 8, 10, 13,
18, 20* 30:*4* 34:*18*
35:*5, 6* 36:*5, 7, 10,
13, 20, 25* 37:*23*
40:*11* 41:*19* 77:*4,
7, 7, 13, 14* 80:*9, 10*
81:*23, 24* 82:*3, 8,
12, 21* 83:*7* 96:*9*
104:*18* 113:*4*
131:*12, 23, 24*
132:*15* 144:*10*
158:*22* 159:*3*
170:*8* 185:*5, 8, 19,
20* 187:*20* 189:*1,
13* 199:*15* 208:*20*
209:*11* 211:*15*
212:*8, 9, 10, 11, 14,
24, 25* 213:*2, 5, 7,
19, 22* 214:*12, 13*
216:*2, 23* 217:*1*
219:*7, 10, 11* 220:*3,
5* 234:*6, 18, 19, 19,
19, 19, 23* 246:*4, 6,
17* 248:*6* 249:*4*
251:*2, 17* 252:*12*
256:*3, 10, 11, 24*
**file's** 81:*18*
**fill** 57:*17*
**final** 45:*18*

**find** 11:*21* 30:*20*
40:*10* 46:*20* 47:*3*
75:*25* 82:*19* 113:*7*
143:*15* 144:*10*
145:*1* 146:*3* 157:*6,
9, 10, 10* 175:*7*
190:*20* 209:*19*
237:*14* 238:*5*
239:*18, 19* 241:*23*
242:*1* 244:*16*
245:*4* 246:*16*
247:*1* 248:*1, 4*
249:*1*
**finding** 248:*12*
**fine** 43:*25* 100:*12*
137:*13, 23* 147:*20*
163:*12* 200:*3, 3*
202:*3*
**finished** 55:*23*
**firm** 133:*1* 228:*11*
258:*24*
**firm-owned** 228:*11*
**firms** 184:*19*
**first** 7:*5, 7* 21:*8*
31:*2* 37:*13, 16*
45:*17, 25* 47:*20*
48:*14* 50:*5* 55:*15*
58:*23* 64:*2* 66:*13*
75:*23* 82:*7* 84:*6*
85:*20, 22* 89:*14*
94:*9, 14* 100:*7*
101:*6* 102:*14*
106:*19, 24* 115:*24*
123:*9* 136:*8*
137:*16* 154:*14*
171:*15* 181:*4*
182:*7, 11, 12* 183:*3*
186:*19* 187:*4, 5, 9*
188:*11* 189:*16, 18*
198:*4* 208:*25*
222:*12* 234:*11, 14*
235:*5* 249:*20*
250:*23* 258:*6*
**five** 8:*4* 22:*24*
112:*5* 122:*10*
131:*14* 143:*21*
144:*7, 13, 16* 145:*4,
19* 161:*20* 174:*8*
202:*15* 252:*17*

254:*3, 5, 15*
**five-year** 143:*24*
**flag** 21:*18*
**Flair** 24:*18, 21*
**flash** 26:*23* 210:*4,
6*
**Flip** 92:*11* 102:*17*
103:*8, 20* 109:*1*
110:*21* 111:*5*
114:*1* 115:*3*
171:*18* 210:*3*
**flipping** 42:*7*
**Floor** 1:*23* 2:*4, 10*
258:*24*
**Florida** 65:*20*
117:*6*
**FLORIE** 2:*1*
**focus** 25:*6* 57:*13*
187:*2*
**focused** 57:*17*
**focusing** 73:*4*
187:*23*
**folder** 30:*3, 5* 41:*2,
10, 10, 17, 19* 51:*12,
16* 52:*23, 25* 54:*12,
16, 23, 24* 59:*12*
61:*18* 62:*1, 7* 63:*3,
5, 15* 66:*5, 15*
67:*11* 80:*10, 11*
90:*3, 7, 14* 119:*5, 9*
144:*11* 217:*5*
249:*12, 12*
**folders** 41:*11, 16*
66:*9* 144:*20* 149:*8*
216:*15, 22* 219:*8,
10, 14* 245:*13*
246:*1* 251:*5*
252:*12*
**folks** 99:*22* 179:*12*
**follow** 228:*21*
**followed** 157:*19*
228:*14*
**following** 98:*25*
115:*16*
**follows** 7:*5* 258:*14*
**follow-up** 135:*13*
211:*1* 214:*4*
**foregoing** 258:*5, 8*
**foreign** 230:*17*
**foremost** 50:*6*

**Dennis Williams CONFIDENTIAL**

273

forensic 15:8
32:19 40:9, 19
77:20, 21, 21, 23
131:18, 22 144:9
153:10 219:9
243:1, 5
forensically 77:1,
10 81:13 82:15
Forensics 6:14
243:8, 14, 18
forgotten 247:25
Form 17:7 18:4
19:13 21:19 37:14
45:20 46:22 48:6
49:25 51:8 52:14
53:5 56:24 60:7
61:14 69:9 70:3,
15 72:19 74:5
76:10 78:6 93:4,
23 94:22 95:9
96:20 101:20
102:2 104:16
106:4 108:2 109:5
110:14, 19 111:13,
15, 23 116:18
117:8 118:5 120:2,
11 127:25 129:23
130:10 131:2, 21
139:9 141:3 142:1
143:4 144:8
149:21, 25 151:19
153:11, 17 154:3
155:22 158:16
159:11, 16 164:2,
19 174:12 198:15
199:10 200:13
201:4 205:25
217:18, 22 220:10
221:15 223:11
226:18 227:3, 12
228:7, 17 230:1
231:4, 21 232:13,
19 236:7, 15 237:3,
16 238:7 239:9, 22
240:17 241:5
247:10 250:22
255:10, 20 256:8
Form, 7:9
format 251:25
252:2

former 34:20
42:23
forms 34:2
Fort 20:24 107:13
108:12 109:3, 19
246:10, 18, 22
forth 19:18 21:11
56:12 114:12
185:21 193:2
258:8
fortunately 36:24
248:21
forum 73:6
forward 74:2, 9
142:11 159:10
227:25
forwarded 51:13
forwarding 73:24
207:13
found 35:24 40:16
64:23 66:5 76:6
100:1 212:8 246:3
249:5
four 8:4 22:24
33:18, 20 41:25
135:10, 18, 23
136:2 161:20
202:14 212:14
213:5, 22 236:1
243:20 252:16
four-digit 41:25
fourth 167:10
177:22 178:5
193:16, 18
fragments 217:24
frame 130:12
168:18
frames 164:12
Francisco 56:20
FreeAgent 171:8
186:15 189:6
Friday 22:10
friends 25:21
front 186:11, 11
195:25 243:25
full 7:23 20:2
258:8
function 95:13
152:3 157:10, 12

255:23
functioning 96:5
further 9:15 12:19
53:16 68:4 242:9
257:5 258:10
future 13:9, 12

< G >
gain 73:17 74:22
107:11
game 95:19
gap 57:10 65:4
130:9 131:1, 20
133:23 141:24
142:2, 7, 16 143:2
144:3 249:14, 21
250:23
gaps 47:4, 6 65:3
72:23, 23 119:22
129:21 130:2
250:21
gather 85:1
general 38:20
168:18 183:6, 7
188:10 205:6
224:8 232:6
generally 19:17
28:12 29:1
genius 255:2, 3
getting 32:18
56:12 149:10
154:8 165:24
234:3
gigabytes 140:10
141:5
gigs 141:1
give 10:17 13:17
27:21 30:20 33:23,
24 34:1, 1 39:23
41:12 46:10 61:10
85:12 100:24
101:3 124:8, 13
126:13 129:12
130:19, 20 159:12
190:12 203:3
206:23 207:5
210:20 228:5
229:6, 13
given 7:25 13:13
24:9 122:6 141:18

156:12 256:7
258:15
gives 83:3 109:1, 6
113:2
giving 51:4 148:4
151:5 171:3 226:4
232:11 254:4
glaring 121:2
glean 233:13
Global 109:20
110:3
Gmail 72:3, 6, 18,
20 73:9 92:14, 16
93:15, 22 94:1
207:15, 18, 20, 21
G-mail 92:21
go 10:16 12:22
30:19 33:5, 8 38:8
40:18 48:16 49:3
50:21 53:20, 22
55:12 59:6 62:1
64:8 65:16 66:22
76:25 80:8 89:14
90:2 100:8, 23
105:8 106:24
111:1 112:13
113:6 117:15
122:23 128:12
130:16, 20 132:8
138:7 140:17
145:3, 5 146:16
149:6 150:13, 14
151:12 155:23
168:15 169:23
179:6 181:3
183:17 186:25
194:5, 19 211:19
216:15, 19, 21
217:10 220:9
221:16, 24 231:14
232:14 236:1
244:20 247:23
251:9 252:3 253:9
God 236:12
GODFREY 1:22
2:7
goes 8:5 98:24
235:12
GoFlex 170:10
171:8 184:3 185:4

**Dennis Williams CONFIDENTIAL**                                    **274**

189:*6*  191:*10, 12*
220:*12*
**going**  18:*1*  20:*25*
23:*15*  30:*16*  37:*7,*
*8*  45:*25*  51:*15*
53:*11*  59:*13*  60:*13*
61:*19*  62:*1*  63:*25*
66:*5, 9, 12*  76:*13*
79:*9*  101:*17, 24*
102:*18*  105:*7, 13*
106:*22*  113:*15*
118:*10*  119:*11*
121:*9*  123:*3*  136:*7,*
*12*  137:*7*  142:*11*
144:*23*  147:*1*
152:*5*  153:*4, 14*
159:*19, 21*  160:*2, 4*
165:*4*  170:*12, 23*
177:*10*  189:*5*
204:*10*  206:*20*
207:*20*  210:*25*
214:*22*  217:*8*
225:*16, 18*  226:*15*
227:*25*  235:*17*
236:*2*  237:*13*
245:*1*  248:*3, 6*
249:*18*
**good**  43:*22*  80:*22*
91:*4*  144:*25*  163:*9*
201:*23*  212:*17, 18,*
*19, 23*  234:*5*
248:*22*
**gotten**  35:*20*
**grab**  138:*15*
**Grace**  176:*1, 2*
**Grace's**  246:*24*
**Graham**  4:*22, 24*
5:*16, 18, 24*  6:*2, 11*
98:*19*  171:*3*  180:*7,*
*17*  181:*6*  214:*4*
237:*5*
**group**  59:*22*  179:*7*
**guess**  26:*12*  50:*9*
90:*23*  167:*12*
168:*25*  205:*18*
207:*20, 21*
**Guidance**  243:*21,*
*22*
**guys**  149:*17*  240:*7*

**< H >**
**habits**  73:*19*
**Hair**  24:*18*
**hand**  112:*24*
190:*12*  258:*15*
**handed**  112:*11*
**handle**  252:*19*
**handled**  166:*17*
**hands**  207:*6*
**Handwritten**  4:*13*
87:*2*
**happened**  27:*3*
122:*5*  153:*6*
155:*14*  164:*10*
195:*13*  207:*25*
208:*1*  250:*1*
255:*25*
**happening**  148:*13*
153:*21*  154:*5*
**happy**  99:*21*
**Hard**  14:*5, 6*
26:*23*  29:*21*  55:*1*
131:*3, 13*  139:*7*
143:*5, 6, 8*  148:*15,*
*16, 17, 21*  149:*20*
150:*11, 18, 18, 21*
151:*1, 2, 3, 9*  152:*9*
168:*7, 9, 21*  169:*2,*
*19, 21, 25*  170:*5, 15,*
*19, 21*  171:*4, 19, 23*
172:*6, 10, 12, 20*
173:*11, 15, 24*
174:*11, 13, 22*
175:*13*  176:*20*
177:*23, 24, 25*
178:*13, 18, 20, 24*
179:*3, 7, 12, 14, 15*
184:*3, 6, 21, 22*
185:*1*  187:*21*
188:*5, 13*  195:*21*
196:*2, 18*  198:*2, 7,*
*14, 18, 21, 25*  199:*9,*
*14, 25*  200:*7, 11*
201:*2, 16, 18*
202:*12, 18*  203:*3, 4,*
*8, 17, 25*  204:*6*
205:*19, 23*  206:*2, 5,*
*8, 13, 15, 25*  219:*24*

220:*1*  238:*21*
240:*23*  252:*14*
**harddrive**  193:*25*
**hardware**  243:*12*
**HARRIS**  258:*2, 21*
**heading**  21:*10*
49:*5*  87:*6*  92:*19*
**headings**  214:*18*
**headquarters**
242:*22*
**heard**  177:*3*
**hearing**  24:*8, 10,*
*14*  38:*7*  40:*1*
239:*3*
**heavily**  153:*3*
**Heidt**  31:*6, 17, 19,*
*21, 24*  32:*2*  33:*3,*
*13, 24*
**Hello**  165:*19*
**help**  45:*12*  54:*25*
78:*1*  148:*11*
197:*14*
**helped**  57:*21*
148:*18*
**helpful**  154:*7*
**hereto**  1:*24*  258:*5*
**Hey**  149:*11, 16*
152:*4*  161:*10*
178:*23*  216:*22*
237:*12*  238:*5*
249:*1, 3*  252:*10, 14*
**Hi**  222:*13*
**high**  148:*16*  229:*10*
**highlighted**  212:*14*
213:*5*  214:*13*
**highlighting**  181:*11,*
*13*  182:*17*
**highly**  96:*15*  174:*1*
196:*6*  254:*21*
**hire**  85:*10, 17*
**hired**  219:*22*
**history**  17:*5, 5*
20:*2*  21:*25*  29:*16*
122:*3*  163:*21*
181:*25*  182:*1*
204:*6*  221:*6*
**hit**  106:*3*
**hits**  74:*3*
**hitting**  74:*2*

**hold**  85:*23*  86:*1, 6,*
*9, 11, 14, 21*  87:*9,*
*12, 16, 20, 22*  88:*2,*
*11, 19, 22*  89:*20, 24*
91:*15, 21*  92:*20*
93:*15, 21*  94:*5, 19,*
*21, 24*  95:*13, 21*
96:*5, 8*  97:*2, 10, 14*
130:*23*
**Holdings**  109:*21*
**holds**  63:*4*
**holes**  57:*17*
**holidays**  156:*14*
**home**  123:*1, 2, 3, 3,*
*5, 11, 12, 16*  132:*13*
133:*1, 1, 5, 9, 11*
134:*4, 9*  135:*24*
137:*12, 12, 18, 22*
138:*1*  140:*10*
154:*10*  193:*23*
234:*5*  241:*25*
**home's**  140:*6*
**hope**  159:*25*
**hopefully**  242:*15*
**Hoping**  213:*1*
**Hopkins**  156:*11*
**hosted**  193:*3*
197:*17*
**hosting**  193:*19*
**Hotmail**  73:*9*
**hour**  7:*14, 16*  15:*3*
121:*17*  163:*10*
170:*13*  201:*25*
**hourly**  15:*2*
**hours**  22:*24*  23:*1*
112:*5, 8*  120:*22*
159:*15*
**house**  63:*16*
132:*21*  135:*1, 11*
140:*3*
**housed**  80:*16*
166:*21*  167:*3*
231:*7*
**Houston**  1:*23*  2:*10*
242:*23*  258:*24, 25*
**Hoyos**  109:*9*
**HP**  122:*13*  125:*9*
128:*24*  129:*20*
130:*1, 7, 22*  132:*20*
136:*4*  140:*16, 21*

142:*5, 17, 21, 24*
146:*19* 158:*22*
160:*11, 16* 169:*14*
189:*7* 223:*13*
233:*18* 234:*12*
235:*15* 249:*4*
250:*25* 251:*1*
**Hugo** 110:*4*
**Huh-uh** 195:*5*
**Hunter** 42:*14, 19,
20*
**husband** 43:*9*
**Hymel** 2:*20*
**hypothesis** 146:*14*
**hypothetical** 68:*12,
14* 70:*19*

**< I >**
**ID** 41:*16, 18, 21*
**idea** 17:*25* 61:*13*
86:*3* 99:*9* 110:*7*
116:*25*
**identical** 45:*18, 21*
**identified** 53:*17*
75:*9* 154:*9* 184:*2*
245:*8*
**Identify** 123:*8*
**identifying** 230:*15*
**III** 2:*5*
**Illinois** 2:*15*
**image** 131:*18, 22,
23*
**imagine** 20:*1* 25:*3*
45:*17* 46:*20* 50:*9*
232:*15*
**immediately** 64:*3*
**impact** 168:*22*
**imperative** 177:*22*
**implemented**
254:*22*
**import** 239:*7*
**important** 69:*24*
206:*3* 238:*24*
**impossible** 255:*19*
**improper** 129:*24*
143:*9* 145:*22*
160:*25*
**improperly** 142:*18,
20* 143:*12*

**improve** 135:*16*
**inability** 237:*21, 25*
**inaccurate** 56:*7*
**inaccurately** 58:*1*
**inappropriate** 86:*15*
**inbox** 66:*16, 17*
74:*3* 120:*18*
235:*12, 16* 236:*6*
238:*6* 239:*19*
240:*7*
**inboxes** 120:*25*
**include** 38:*1* 86:*16*
256:*24*
**included** 16:*5*
39:*21* 154:*12*
208:*9, 15*
**includes** 134:*18*
**including** 39:*23*
187:*20* 241:*8*
**incoming** 47:*11, 17,
25* 48:*4* 53:*6*
55:*15, 18* 58:*24*
59:*3, 4* 63:*19* 64:*4,
23* 65:*4* 66:*2, 3*
236:*18*
**Incoming,** 64:*2*
**inconsistencies**
153:*2*
**incorrect** 55:*16*
205:*22*
**incredibly** 214:*6*
**incumbent** 161:*9*
**incurred** 14:*25*
**independent** 203:*15*
**INDEX** 3:*1* 4:*1*
29:*24, 25* 36:*15*
**indicate** 29:*9*
37:*18* 41:*3, 18*
78:*1, 8* 83:*7* 146:*5*
149:*1, 3* 172:*16*
217:*3*
**indicated** 35:*5*
36:*8* 120:*17*
172:*14* 218:*1*
250:*13* 258:*6*
**indicates** 78:*16*
79:*1* 81:*25* 101:*1*
106:*19* 153:*15*
181:*14* 192:*16*

208:*17* 215:*15*
251:*7*
**indicating** 146:*16*
237:*24* 253:*19*
**indication** 41:*5, 12*
46:*18* 77:*13* 82:*3,
11, 23* 83:*4* 146:*4*
152:*18* 159:*4*
166:*20* 167:*13*
199:*7* 214:*25*
217:*9* 218:*22*
222:*1* 250:*18*
256:*5*
**indications** 73:*23*
143:*15* 144:*24*
250:*21*
**indicator** 82:*9*
87:*15*
**indicators** 81:*21*
82:*7, 14* 250:*13*
**individual** 26:*3*
67:*19* 69:*5, 16*
71:*13* 72:*13* 80:*5*
219:*2* 249:*17*
**individually** 1:*8*
68:*7*
**individuals** 56:*23*
57:*2* 109:*16*
**Industries** 42:*15, 20*
**inform** 101:*22*
**information** 13:*18*
17:*19* 18:*10* 19:*1*
21:*2* 24:*25* 25:*8*
26:*13, 24* 29:*12*
30:*7, 10, 13* 31:*11,
21* 32:*3, 11* 33:*4, 6*
35:*14, 18* 36:*15*
37:*19* 39:*3, 8* 40.*7,*
*13* 41:*2* 42:*19*
50:*9* 68:*11, 17*
69:*4, 15* 70:*17*
75:*7* 76:*7, 8* 77:*25*
85:*2* 92:*9, 24* 93:*2,
5* 100:*25* 101:*4*
109:*2* 111:*21*
112:*8, 9* 117:*17*
128:*20* 132:*12*
135:*20* 140:*18*
151:*4* 153:*3, 19, 22*
161:*11* 165:*8*

172:*16* 175:*2*
178:*3, 23* 179:*2*
182:*2* 183:*14*
184:*14, 20, 24*
186:*14* 190:*10*
192:*5, 7* 195:*13, 25*
211:*13* 212:*3*
216:*15* 221:*17*
223:*4* 224:*16*
229:*24* 230:*8, 10,
13, 15* 231:*7, 13*
232:*2, 3, 8* 239:*15*
240:*19* 243:*3*
248:*13, 14, 22*
255:*21* 256:*4, 19,
20* 257:*1*
**in-house** 9:*4, 5*
12:*23*
**Initial** 35:*5* 76:*3*
83:*11, 14, 16* 84:*1*
86:*19* 247:*16*
**initially** 84:*3*
**initials** 110:*3*
177:*24*
**inordinate** 254:*16*
**inspection** 164:*11,
15*
**install** 132:*14*
**installed** 62:*23*
63:*2* 132:*18*
**instance** 1:*20*
244:*12*
**instances** 199:*11*
**instituted** 253:*18*
**instruct** 159:*22*
160:*4*
**instructed** 45:*2*
160:*14* 162:*16, 22*
227:*9*
**instruction** 233:*8*
**instructions** 6:*3*
149:*13* 165:*7*
208:*10, 21, 22, 23,
25* 209:*4* 226:*5*
228:*15, 22*
**Instruments** 31:*6*
**intellectual** 26:*2*
31:*8* 38:*25*
**intended** 50:*3*

intentional 46:18
81:22 82:7, 9, 13,
16
intentionally 76:9,
22 77:2, 11 78:13,
20 80:1, 7 81:15,
25 248:15
interest 82:22
135:14 220:11
interested 258:12
internal 16:21, 23
18:23 19:2, 3, 10,
11 20:18
internally 166:16
international 48:9,
13 60:22 73:6, 10
Internet 29:15
234:6
interpreting 204:25
interrogatories
258:6
interrupt 59:6
152:23
interview 6:3
32:22 128:3
147:14, 21 148:5
158:7 175:11
194:22 195:11
198:23 200:21, 24
204:16
interviewed 156:9
176:11 221:3
232:16 244:21, 22
246:8
interviewees 153:9
interviews 128:2
147:12 244:24
248:19, 19
introduced 15:20
23:14 44:6 48:19
55:4 60:11 86:24
88:6 89:7 91:25
98:16 121:8 132:1
134:12 137:6
139:19 148:3
165:1, 12 171:1
177:13 180:5
190:25 192:19
197:6 204:13
208:4 210:22

211:4 222:4
224:23 225:24
233:22 236:24
242:3
invalid 212:16
inventory 169:24
170:2 179:11, 20
investigation 64:21
153:12 157:15
185:15 199:7
201:21 220:24
243:4 248:1
investigations
116:20 243:5
investigative 249:15
investigator 153:18
invoice 6:14 23:3
134:20
invoiced 14:15, 21
invoices 13:21, 22
14:13 23:2 81:6
242:6
invoke 94:24
involve 25:3 31:10
involved 17:17, 20
20:17 32:19 43:1,
3 98:12 243:2
involving 24:17
197:9 246:15
256:14
IP 130:1
iPad 156:24
157:10
iPads 156:17
iPhone 51:18, 20
52:2, 5 156:22
157:9
iPhones 156:17
IRA 49:8, 13, 20,
24 50:14 54:1, 21
55:15 56:1 58:24
59:9 60:3 61:20
64:2, 24 66:19, 21,
25 72:1 74:13, 24
205:10 227:23
IRAdvocate 54:6
IRAdvocates 50:17
53:7, 9 54:4, 14
63:16 65:4 72:11
73:22, 25 74:4

88:10 89:18 119:7
205:6 207:14, 19
issue 12:20 18:13
32:9 135:3 158:24
160:25
issued 242:7
issues 92:19 135:2
152:5 197:15
it, 152:13
item 90:17 105:16
itemized 23:3
items 90:2, 3, 7, 14,
14, 18 105:13
180:20 181:1, 3
200:22
items, 105:15
iteration 110:2
iterations 117:4
IT-related 246:14
its 18:23 20:14
173:23 178:10
244:17
iTunes 157:1
Ivan 56:18 110:5

< ' >
'Ivan 109:10

< J >
Jacobsen 43:4, 5
James 43:4
January 16:20
51:1, 6 53:8 64:24
65:5 118:11, 12
147:1 171:16
175:13 185:4
186:19 187:8
191:9, 13 207:10,
10 208:10
Jason 2:23
jblanco1999@yahoo
103:25
JC 92:20
job 33:7 35:15
56:12
Joe 109:11
Johns 156:11
JOHNSON 2:12
Josh 134:25
138:17 209:12

Juan 4:16, 20, 22
5:10, 14 6:7, 11, 14
89:9, 16 98:18
165:4 177:14
222:10, 13, 21
225:1 232:16, 22
234:1 237:12
judge 242:18
judgment 10:17
14:24 46:10 64:14
78:4 124:9 153:13
July 87:9, 22
89:25 91:21
168:12 212:18
233:17 258:18
jump 32:24
jumping 146:2
JUNE 1:17, 21 3:3
4:3 47:17, 19
64:12 103:3, 15, 23
104:3 155:4
163:25 164:12
168:12 222:7
223:2 233:14, 17,
23, 25 235:3, 16
237:7, 20 238:11,
13 239:18
jury 242:18

< K >
Kaissal 176:1
keep 53:11 118:10
190:10 198:3, 4
216:14, 19 224:16,
20
keeps 30:4 188:10
Kendall 4:15, 17
5:8
kept 96:8 146:1
151:2 184:23
kin 258:12
kind 30:6 39:22
124:8 162:11
186:13 193:19
211:12
kinds 69:20
Kingston 209:23
knew 51:11 223:1
know 7:13 8:5
9:7 13:1, 16 17:22

Dennis Williams CONFIDENTIAL

277

18:*12*  19:*25*  20:*10, 13, 16*  21:*4, 12, 13*
22:*14*  24:*1*  34:*2*
35:*9*  38:*15*  42:*10*
46:*7, 17*  49:*19*
50:*2, 4, 7*  51:*19*
52:*12, 16*  53:*18*
55:*19*  56:*7, 15, 18, 20, 22*  57:*1, 12*
58:*21*  61:*17, 22*
62:*6, 8, 10*  67:*12, 13, 16, 17, 20, 21*
68:*2, 8, 13, 20, 21, 21, 24*  69:*2, 3, 7, 18*
70:*14*  72:*5, 24*
73:*18*  77:*6, 7*
78:*12*  83:*23, 24*
84:*6, 9*  85:*11, 18*
86:*2, 7*  91:*15*  92:*6, 9*  93:*1, 11, 17*
96:*12, 15, 17*
101:*12*  103:*2, 20*
104:*2, 5, 8, 20*
106:*6, 12, 14, 17, 21*
108:*15, 17*  109:*16, 23*  111:*18*  112:*17*
117:*20*  118:*25*
122:*16*  123:*17, 23, 24*  124:*17, 20*
125:*2, 5, 15, 19, 24, 25*  129:*4, 9, 16*
133:*16, 17, 22*
136:*6, 10, 21, 22*
137:*1*  138:*3, 4, 6*
140:*21, 25*  141:*9, 12*  142:*6*  143:*10*
144:*25*  146:*23*
151:*3, 21*  154:*14*
157:*3, 6, 9, 12, 14, 22*  161:*7, 13, 14, 15*
162:*7*  168:*24*
169:*5*  170:*3*  174:*7, 13, 17, 20*  176:*9, 10, 16, 19*  177:*2, 8, 17*
179:*13, 19*  180:*24, 25*  181:*20*  183:*23*
184:*1, 4*  186:*6, 9, 21*  187:*3, 24*
188:*13*  189:*10*
190:*4*  194:*7*

196:*10, 19*  198:*2*
199:*1*  200:*19*
201:*12*  203:*21, 23*
205:*12*  206:*3, 4*
207:*9, 11, 25*
209:*18*  210:*9, 10*
212:*7*  213:*3*  215:*6*
216:*6, 9, 19*  217:*1, 1, 2, 3, 15, 21*  218:*1, 3, 4, 4*  221:*21*
222:*15*  226:*24*
227:*4*  228:*8*
229:*11, 12*  230:*4, 23, 25*  231:*10*
232:*5, 9*  235:*2, 5*
236:*13, 18, 21*
240:*2, 4, 9, 10, 11, 20*  241:*11, 24*
244:*14*  246:*1, 4*
247:*4*  248:*4, 5, 6, 21*  249:*3, 5, 10, 13*
250:*1, 2, 6*  251:*5, 5, 16, 20*  252:*20*
253:*7*  256:*17*
**know,**  147:*19*
**knowledge**  80:*19*
126:*12*  161:*18*
162:*25*  163:*4*
175:*16*  205:*12*
227:*17*
**knows**  153:*25*
161:*5, 15*  174:*10*
**Kusin**  2:*11*  3:*7*
7:*6, 12, 18*  17:*7*
18:*4*  19:*13*  21:*19*
22:*20*  23:*19*  37:*14*
43:*22*  45:*20*  46:*22*
48:*6*  49:*25*  51:*8*
52:*14*  53:*5*  56:*24*
60:*7*  61:*14*  69:*9*
70:*3, 15*  71:*15*
72:*19*  74:*5*  76:*10*
78:*6*  79:*13, 20*
81:*4*  93:*4, 23*
94:*22*  95:*9*  96:*20*
100:*12*  101:*20*
102:*2*  104:*16*
106:*4*  108:*2*  109:*5*
110:*14, 19*  111:*13, 15, 23*  112:*4*

116:*18*  117:*8, 14*
118:*5*  120:*2, 11*
121:*15*  127:*16, 25*
129:*23*  130:*10*
131:*2, 21*  139:*9*
141:*3*  142:*1*  143:*4*
144:*8*  149:*21, 25*
151:*19*  152:*23*
153:*11, 17*  154:*3*
155:*22*  158:*16*
159:*11, 16*  160:*2*
163:*9*  164:*2, 19*
174:*12*  198:*15*
199:*10*  200:*13*
201:*4, 23*  202:*3*
204:*19*  205:*25*
217:*18, 22*  220:*10*
221:*15*  223:*11*
226:*18*  227:*3, 12*
228:*7, 17*  230:*1*
231:*4, 21*  232:*13, 19*  236:*7, 15*  237:*3, 16*  238:*7*  239:*9, 22*
240:*17*  241:*5*
242:*12, 13*  247:*12*
248:*11*  253:*11*
255:*10, 20*  256:*8*
257:*6, 11*  258:*15*

**< L >**
**labeled**  49:*1*  99:*20*
226:*9*
**Labor**  73:*6*
**laptop**  27:*24*
37:*23*  122:*13*
125:*2*  128:*24*
132:*16, 17*  135:*1, 16*  136:*7, 8*  138:*17*
140:*22*  141:*22, 23*
155:*1*  158:*14, 22*
160:*11, 16*  189:*8, 17*  195:*21*  196:*7, 15, 21*  199:*16*
222:*2*  223:*14*
226:*10*  233:*18*
234:*12*  235:*6, 15*
**large**  35:*6, 13*  36:*6*
67:*22*  140:*12*
211:*6, 7*  231:*14*
249:*14*

**large-scale**  96:*24*
97:*11*
**LaSalle**  2:*15*
**Lasser**  34:*7, 12*
38:*4*
**Lasser's**  37:*18*
**LastEndTime**
102:*24*
**LastStartTime,**
102:*23*
**late**  173:*16*
**Latitude**  123:*9*
125:*2*  128:*24*
136:*8*  141:*22, 23*
169:*8, 9, 11, 13*
**Lauderdale**  20:*24*
107:*13*  108:*13*
109:*3, 20*  246:*10, 18, 22*
**law**  43:*6*  184:*19*
228:*11*
**lawsuits**  184:*14*
**lawyer**  223:*20, 23*
224:*1*
**lawyers**  224:*3*
**lead**  36:*2, 18*
**leads**  196:*24*
**learned**  153:*19*
**leave**  81:*10*
**leaving**  24:*20*
**led**  64:*21*
**Lee**  110:*4*
**leeway**  159:*18*
**left**  24:*23*  26:*3*
32:*9*  33:*20*  151:*14*
243:*21*
**legal**  184:*19*
258:*24*
**Lending**  38:*11*
**letter**  88:*23*
**Levesque**  108:*10*
**Lexar**  190:*15, 19*
210:*3, 6*
**light**  97:*16*
**likelihood**  131:*11*
144:*25*
**limit**  98:*11*
**limited**  119:*19*
159:*3*  161:*17, 17*
184:*13*  227:*17*

**Dennis Williams CONFIDENTIAL**                                    **278**

**line** 50:*2* 55:*6*
58:*15* 63:*22* 64:*2,*
*3, 3* 81:*16* 135:*13*
206:*16* 209:*10*
214:*5* 218:*20, 21*
**lines** 55:*8* 67:*15*
69:*12*
**link** 29:*7, 8* 36:*13,*
*20* 220:*2, 5* 256:*3,*
*10, 24*
**list** 100:*3* 107:*21,*
*23* 108:*9* 110:*22*
144:*15* 171:*4*
177:*23* 179:*6, 25*
180:*2, 25* 185:*2*
186:*8, 24*
**listed** 122:*10*
123:*5* 181:*12*
**listing** 73:*13*
169:*25* 178:*6*
190:*20* 207:*7*
209:*16* 210:*14, 14*
211:*8, 9, 14* 212:*6*
**listings** 36:*24*
185:*18*
**litigated** 235:*20*
**litigation** 85:*23*
86:*1, 6, 9, 11, 14, 21*
87:*12, 16, 19, 22*
88:*2, 19, 22* 89:*20,*
*24* 91:*20* 92:*20*
93:*14, 21* 94:*5, 19,*
*24* 95:*13, 21* 96:*5,*
*8* 128:*25* 129:*15,*
*18* 130:*23* 244:*18*
**little** 22:*9* 66:*25*
68:*3* 75:*5, 22*
77:*24* 87:*8* 100:*23*
121:*16* 236:*5*
**LLP** 1:*9* 2:*1, 12*
173:*24*
**loaded** 11:*12* 82:*19*
**local** 217:*5*
**locate** 39:*17* 46:*15*
52:*24* 75:*23*
172:*11* 185:*7*
186:*21* 191:*14*
192:*1* 220:*11, 14,*
*24* 237:*22, 22*

244:*15* 245:*3, 9*
251:*6*
**located** 25:*22*
49:*16, 17* 50:*17*
53:*12* 174:*14, 17*
185:*14* 187:*10*
245:*13* 248:*14*
**locating** 238:*4*
**locked** 131:*7*
**Log** 4:*20* 28:*16*
65:*22* 92:*5* 111:*17,*
*19* 234:*15* 236:*17*
**logged** 236:*11*
**lone** 221:*13*
**long** 22:*23* 79:*17*
112:*3* 123:*15*
125:*13* 149:*24*
194:*12* 235:*22*
**longer** 80:*19*
125:*6* 153:*6, 7*
163:*22* 164:*11*
**look** 20:*6, 8* 21:*5*
23:*17* 27:*15* 29:*4,*
*12, 20, 25, 25* 33:*8*
36:*2* 42:*2, 10* 47:*1*
50:*23* 51:*11* 60:*8*
61:*5* 72:*6, 8, 17, 20*
77:*12* 96:*17, 18*
107:*5* 112:*22, 23*
113:*7, 16* 114:*23,*
*24* 117:*15* 121:*14*
128:*12* 134:*19*
146:*7* 147:*15, 21*
160:*6* 166:*25*
170:*24* 194:*18*
200:*20, 23* 203:*9*
209:*8, 22* 214:*3*
217:*6* 220:*2, 4*
221:*16* 236:*20*
240:*18* 252:*17*
**looked** 35:*2* 36:*5,*
*17, 22* 47:*2* 70:*24*
107:*2* 119:*22*
122:*25* 126:*5*
143:*21* 159:*25*
166:*24* 185:*3*
197:*13* 198:*22*
220:*5* 221:*2*
241:*21* 245:*15*
250:*17* 251:*3*

**looking** 19:*3, 7, 17*
30:*22* 42:*9* 68:*5*
75:*17* 76:*16* 77:*20*
78:*3, 7* 83:*19*
103:*22* 106:*2*
109:*8, 23* 110:*1*
126:*17* 134:*22*
136:*23* 153:*5*
168:*14* 176:*22, 23,*
*24* 179:*15, 17*
185:*3, 11* 201:*10*
212:*24* 214:*18*
216:*21, 23* 237:*8*
238:*9* 240:*5*
241:*22* 245:*19, 20*
251:*4*
**Looks** 63:*23* 88:*9*
89:*15* 99:*6* 103:*23*
194:*22* 204:*22*
209:*23* 212:*15*
**loss** 158:*13*
**lost** 163:*25* 169:*3*
240:*23* 241:*13*
**lot** 52:*25* 56:*6*
58:*6* 102:*7* 105:*22*
122:*24* 127:*11*
133:*2* 147:*24*
149:*9, 12* 154:*6*
170:*13* 179:*8*
234:*21* 249:*24*
**Louisiana** 1:*23*
2:*10*
**lower** 209:*7*
**Lunch** 80:*25*
**lying** 151:*18*

**< M >**
**Mac** 6:*3* 41:*9*
96:*16* 149:*9, 12*
157:*6, 10, 20*
158:*14, 21, 23*
161:*6* 164:*17*
165:*20* 166:*12, 17,*
*21* 167:*4* 168:*5*
170:*6* 185:*5*
191:*17, 23* 192:*7*
195:*20* 196:*6, 7, 10,*
*13, 14, 17, 20*
199:*15* 208:*9, 18*
209:*1, 9, 14* 213:*14*

222:*2, 23* 223:*3, 5,*
*8, 13* 224:*25* 225:*2,*
*4, 10, 18, 22* 226:*5*
228:*18* 229:*2, 19*
231:*7* 232:*23*
233:*9, 13, 14, 15*
251:*13, 24* 252:*1, 1,*
*7, 17* 253:*18, 21*
254:*8, 22* 255:*6, 8,*
*23* 256:*1, 1, 6, 10,*
*18, 21*
**Mac-based** 213:*9*
**MacBook** 96:*13*
154:*25* 157:*7, 13*
160:*16* 162:*1*
163:*25* 169:*16*
185:*7* 187:*15*
188:*15, 18, 19, 21,*
*22* 189:*1, 2* 191:*19*
221:*13* 223:*20, 25*
**MacBook's** 160:*10*
**machine** 1:*22* 41:*6*
82:*20* 145:*25*
161:*7* 217:*4, 5*
252:*5* 253:*23*
256:*14*
**machines** 245:*8*
**Mac-type** 41:*13*
**Maggie** 5:*10, 12*
6:*7, 13* 139:*2, 13*
147:*14, 22* 148:*6*
149:*1, 10* 152:*3*
165:*3, 15, 19*
166:*10* 197:*9*
204:*9* 222:*11, 21,*
*22* 225:*1, 20* 226:*4*
234:*2* 246:*24*
252:*10*
**mailbox** 108:*8*
117:*5*
**mailboxes** 83:*22*
98:*10* 103:*12*
111:*25* 113:*25*
116:*11, 23* 117:*6,*
*25*
**Mailboxes,** 107:*7*
**main** 220:*11*
**maintain** 70:*21*
**maintaining** 200:*11*
**Majority** 17:*8*

**Dennis Williams CONFIDENTIAL**                               **279**

**making** 130:*25*
161:*2* 163:*1* 207:*7*
**managed** 243:*2*
**manual** 95:*15*
104:*13, 21* 138:*20,
23*
**manually** 139:*6*
255:*5*
**manufacturers**
170:*20*
**Manufacturing**
42:*15*
**March** 4:*7* 23:*8,
16, 25* 24:*9* 30:*24*
46:*1* 47:*13, 18*
48:*4* 49:*5, 21, 23,
24* 50:*15* 51:*9*
52:*6, 7, 18* 56:*3*
65:*25* 66:*18, 22*
88:*8* 98:*18* 118:*17*
119:*1* 121:*10*
132:*5, 9* 142:*11*
189:*8* 235:*11, 17*
238:*6* 239:*20*
240:*7, 10* 247:*8*
248:*23* 249:*7, 24*
250:*24* 255:*14*
**Marie** 43:*4*
**mark** 23:*15* 60:*13*
109:*11* 113:*1*
121:*10* 132:*2*
180:*6*
**marked** 15:*20*
21:*15* 23:*14* 44:*6*
48:*19* 55:*4, 5*
60:*11* 78:*11* 86:*24*
88:*6* 89:*7* 91:*25*
98:*16* 121:*8* 132:*1,
3* 134:*12* 137:*6, 8*
139:*19* 148:*3, 5*
165:*1, 2, 12* 171:*1*
177:*11, 13* 180:*5*
190:*25* 192:*19*
197:*6* 204:*13*
208:*4* 210:*22, 24*
211:*1, 4* 214:*3*
222:*4* 224:*23*
225:*24* 233:*20, 22*
236:*24* 242:*3, 5*
243:*25*

**marking** 15:*22*
44:*11* 48:*20* 87:*1*
88:*7* 89:*8* 92:*1*
98:*17* 100:*14*
134:*14* 139:*21*
165:*13* 191:*2*
192:*21* 222:*6*
**master** 12:*25*
144:*15, 21, 22*
216:*16, 16, 20*
217:*24*
**material** 22:*7*
184:*18*
**matter** 17:*17*
21:*21, 21* 22:*3, 20*
24:*13, 14, 16, 22*
26:*2, 8* 28:*15* 29:*1*
31:*9* 43:*6* 98:*12*
102:*13* 118:*1*
135:*15* 145:*3*
244:*3*
**matters** 17:*20*
184:*19*
**Matthew** 43:*5*
**max** 106:*3*
**MB** 42:*15, 20*
**mean** 10:*14* 32:*18,
23* 33:*24* 37:*9*
50:*3* 59:*5* 65:*16*
66:*4, 18* 68:*12, 21*
87:*17* 90:*16*
116:*21* 119:*24*
120:*6* 127:*22*
133:*10* 135:*18, 21*
151:*4, 25* 153:*1*
159:*1* 176:*21*
179:*15* 183:*8*
184:*25* 188:*24*
190:*7* 199:*11*
206:*1, 19* 220:*4*
230:*25* 238:*8*
249:*20* 250:*2, 16,
23, 23* 251:*6, 10, 11*
**meaning** 130:*24*
182:*4*
**means** 37:*8, 15*
48:*11* 49:*22* 50:*5*
**meant** 55:*9* 69:*12*
227:*6*

**medical** 230:*20, 24*
231:*2*
**meet** 22:*11, 18, 19,
23* 112:*3*
**Mejia** 109:*11*
110:*5* 117:*10*
**member** 237:*5*
**members** 98:*19*
**mention** 9:*18*
251:*23*
**Mentioned** 27:*18*
54:*3* 66:*4* 76:*18*
81:*7* 83:*1* 86:*18*
88:*20* 250:*12*
253:*15, 25*
**mentioning** 83:*9*
**mentions** 75:*6*
**message** 219:*3*
254:*10*
**messages** 25:*13, 17*
95:*2* 251:*24* 252:*2*
**messing** 130:*25*
**met** 22:*22* 156:*13*
**mid-2014** 184:*7*
**middle** 87:*5*
137:*10* 168:*19*
226:*8*

**< ' >**
**'Mike** 110:*4*

**< M >**
**mind** 44:*15* 75:*18*
100:*1, 4* 147:*18*
216:*14*
**mine** 214:*7*
**minutes** 251:*14*
254:*3, 5, 9, 15*
**misplaced** 241:*3*
**missing** 47:*4, 10,
13* 48:*5, 10, 14*
57:*10* 65:*7* 76:*8*
119:*4, 22, 25* 120:*8,
13* 121:*11* 169:*7*
170:*3* 172:*1, 7, 13*
179:*15, 17* 184:*4, 8,
10* 187:*3* 191:*20*
213:*1* 239:*24*
240:*11* 245:*4*

**249:*14, 25* 250:*2*
**misstated** 58:*22*
**misstating** 61:*1*
76:*11*
**mistake** 161:*2*
**mixed** 214:*19*
**model** 42:*8* 133:*14*
134:*6*
**Modified** 215:*14*
**MoneyGram** 114:*4,
6, 7*
**month** 24:*13*
46:*11, 11* 115:*11*
132:*9* 195:*4*
**months** 60:*5*
125:*10* 168:*8, 13*
174:*8, 8* 196:*3*
236:*1, 1, 6, 8, 11, 13*
251:*19*
**month's** 236:*19*
**moot** 243:*17*
**morning** 137:*18*
**motherboard**
168:*11, 22* 169:*2*
**motion** 114:*11*
**motions** 114:*24*
**move** 52:*23* 54:*11,
15* 90:*7* 165:*8*
167:*8* 240:*23*
241:*4, 12* 248:*9*
**moved** 88:*11*
167:*14* 241:*11*
252:*11*
**multiple** 146:*23*
181:*15*
**music** 167:*9, 13*
225:*21* 226:*11, 16,
22* 227:*22* 228:*21,
22, 23* 234:*19*
**myriad** 183:*10*

**< N >**
**na02nq70,** 171:*9*
**name** 7:*21, 23*
20:*14* 26:*17, 17, 20,
21* 28:*20* 31:*16, 18*
109:*10* 112:*22*
157:*21* 158:*2*
176:*7* 181:*17, 23*
245:*21*

**Dennis Williams CONFIDENTIAL**                                                    **280**

named 24:22
134:25
names 107:19
177:23
narrow 126:24
National 243:15
nature 31:7 38:12,
21, 23 43:7
near 146:13
necessarily 28:5
38:3 68:21 69:7
120:3 144:6 154:4,
11 156:19 183:5
184:9 240:24
need 7:16 21:22
26:21 44:20 64:6
79:12 80:13 89:17
95:23 121:14
128:12 142:9
161:10 202:1
203:20 210:19
213:16 219:12
222:13 224:20
227:23, 24 252:3
256:1 257:13
needed 21:5 45:9
207:8
neighborhood 14:16
neither 196:19
NET 243:12
netbook 135:3
136:12, 13
network 41:23
42:1 243:13
never 177:3
179:23, 25
new 11:11 25:21
26:6, 15, 25 27:8,
10, 11 42:25
132:15 135:1
144:5 160:16
162:1 165:21
167:9 185:22
191:17 192:7
221:11 222:2
225:4, 10, 18, 22
226:6, 10 228:19
229:2 233:14
235:6 249:22
newer 151:3

niece 155:20 156:5,
13, 13 164:4 229:7
niece's 157:21
Niewoehner 2:16
12:13, 21 99:18
nine 242:21
nobody's 130:24, 25
non-C 92:21
noncompete 25:1, 3
non-Conrad 73:10
non-Mac 193:21
nonpayment 110:6
nonredacted 110:22
nonresponsive 16:5,
11, 13 79:21
248:10
Non-responsive
16:1
nonsolicit 25:4
nonsolicitation 25:1
normal 90:6 91:1,
3 97:16 203:10
247:22 248:5
Normally 91:5
248:7
NORTHERN 1:1
Notary 258:4, 21
notation 60:1
notebook 9:19
10:5, 10 13:2
notes 4:13 6:3
61:5, 10 87:2, 3
89:25 112:7 126:5
147:12, 13, 16
148:5 158:4
198:23 199:1
200:22 203:9, 15,
18 204:15, 17
208:9, 16 221:24
238:18, 22, 25
239:12, 13 240:18
notice 13:20 88:18,
22 239:19
noticed 44:19
November 115:13,
17 117:2 118:9
139:23 141:6
142:25 197:9
number 30:12, 17
35:6, 13 36:5, 6

42:4, 8 44:2, 8
61:10 75:18 81:2
103:14 105:18, 25
107:16, 17 108:1, 1
109:8 121:20, 24
125:1 133:12
134:1 140:18
148:8 150:13
151:12 163:14, 17
171:8, 20 181:13
182:3 184:21
186:8 202:5, 8
215:6 218:15, 20,
21, 24 219:2 226:9
227:20, 22 254:16
257:18
numbered 1:21
numbers 61:16
100:16 102:19
230:16 231:1, 2
numerous 44:13
70:20 122:25
153:1 170:20
189:25 190:19
230:15 243:4
255:22

< O >
oath 218:5
object 79:21
159:21 247:10
250:22 257:9
Objection 7:8, 9
17:7 18:4 19:13
21:19 37:14 45:20
46:22 48:6 49:25
51:8 52:14 53:5
56:24 60:7 61:14
69:9 70:3, 15
71:15 72:19 74:5
76:10 78:6 93:4,
23 94:22 95:9
96:20 100:9
101:20 102:2
104:16 106:4
108:2 109:5
110:14, 19 111:13,
15, 23 116:18
117:8, 14 118:5
120:2, 11 127:16,

25 129:23 130:10
131:2, 21 139:9
141:3 142:1 143:4
144:8 149:21, 25
151:19 153:11, 17
154:3 155:22
158:16 159:11, 16,
17 164:2, 19
174:12 198:15
199:10 200:13
201:4 205:25
217:18, 22 220:10
221:15 223:11
226:18 227:3, 12
228:7, 17 230:1
231:4, 21 232:13,
19 236:7, 15 237:3,
16 238:7 239:9, 22
240:17 241:5
255:10, 20 256:8
objective 71:20
128:9 155:18
162:23
objectively 189:2
oblivious 198:13
228:3
obtained 178:1
obviously 12:22
116:5 188:13
occasionally 147:8
occasions 199:17
occurred 33:10
68:9 78:5, 8
112:16 194:4
241:19 251:1
occurring 78:2
153:20
October 60:2, 4, 16
65:4 194:11, 13, 24
195:1, 8
odd 227:8, 14, 15
offer 175:2
offered 96:23
129:12 135:20
offering 86:5, 13
196:9
office 8:21 20:24
62:21 87:6 107:13,
14, 18, 20 108:13,
16 110:17 122:17

**Dennis Williams CONFIDENTIAL**                                     **281**

123:*1, 12*  132:*15, 16, 19, 23*  133:*1, 2, 5, 10*  148:*16, 23*  149:*11*  150:*2*  151:*2*  164:*24*  165:*25*  175:*16*  177:*6*  185:*17*  197:*3*  202:*22*  208:*14*  238:*9*  241:*4, 7, 11, 22*  244:*25*  245:*15, 19*  247:*2*  258:*15*
**office365**  88:*11*  89:*19*
**offices**  1:*22*  195:*2*
**officials**  36:*8*
**Oh**  8:*4*  30:*15*  173:*2*  195:*7*  214:*9*  236:*12*  239:*4*
**Okay**  7:*12, 17, 18*  8:*5*  9:*15, 18*  10:*23*  11:*14*  12:*10*  14:*24*  15:*12*  18:*18*  19:*19*  24:*16*  25:*2*  26:*18*  27:*2, 17, 25*  28:*9, 25*  29:*23*  31:*13, 15*  35:*15*  37:*17, 25*  38:*22*  39:*18*  42:*2*  43:*11, 16, 19*  45:*12*  46:*7, 19*  47:*24*  52:*9, 20*  53:*1, 25*  55:*17*  56:*5*  57:*13*  58:*4, 7, 18*  61:*23*  63:*3, 19, 21, 24*  64:*6, 11, 16*  67:*14, 18, 22*  68:*3*  70:*5, 24*  72:*22*  73:*8*  74:*12*  77:*9, 15*  80:*4*  81:*1, 9, 24*  82:*5*  84:*16*  86:*13*  87:*5, 17, 21*  88:*20*  90:*10, 21*  91:*3, 6, 19*  93:*19*  95:*19*  97:*22*  98:*13*  99:*1, 5, 9, 16*  100:*5*  101:*6, 13*  102:*6, 14, 19, 22*  103:*10*  105:*1, 7*  107:*16*  111:*1, 18*  113:*6, 14*  114:*1, 10*  116:*2, 13*

117:*18*  118:*8*  119:*12*  123:*8, 15*  124:*21*  125:*25*  126:*22*  127:*7, 19*  128:*4*  130:*4*  133:*7, 11*  136:*7, 11, 18*  139:*11, 17*  140:*17, 20, 25*  141:*15, 21*  142:*3, 20*  145:*18*  147:*24*  150:*13*  151:*12*  158:*7*  162:*6*  165:*18*  166:*16*  167:*15*  168:*25*  172:*6, 23*  173:*2, 20*  175:*1, 11*  177:*1*  178:*12, 18, 22*  179:*2*  181:*10, 20*  182:*1*  183:*7*  185:*23*  187:*18, 21*  188:*24*  193:*12, 15*  197:*19, 24*  199:*6*  200:*3*  203:*12*  204:*4*  206:*7*  207:*11*  208:*2, 7, 15, 24*  209:*2*  210:*23*  213:*16*  214:*8*  217:*23*  218:*22*  219:*15*  220:*6, 19*  226:*2*  230:*5, 7, 20*  233:*12*  239:*2*  244:*5, 9*  250:*20*  253:*11*
**old**  10:*9, 12*  126:*14*  130:*12*  135:*16*  165:*20*  179:*10, 12*  216:*20*  217:*24*  221:*10*  222:*14, 18, 23*  223:*2*  226:*11*  227:*24*  229:*6*  245:*10, 15, 25*  246:*2*
**older**  151:*2*  192:*16, 17*  212:*24*  236:*21, 21*  248:*24*  249:*1*
**oldest**  66:*13*
**olm**  252:*2*
**once**  161:*23*
**ones**  30:*24*  55:*20*  84:*20*  153:*8*

163:*22*  186:*4, 23*  190:*18*  200:*20*  210:*11*
**one's**  136:*10*
**On-site**  191:*17*
**open**  65:*17, 19*  66:*7*  165:*19*  208:*19*  209:*11*
**opened**  50:*24*  51:*2*  52:*5*  65:*24*  235:*16*
**opening**  37:*10*  66:*12*
**opens**  49:*22*  51:*5, 18*  193:*23*
**operating**  11:*11*  12:*3*  41:*9*  216:*1, 3*
**opinion**  85:*4*  86:*14, 20*  97:*2, 10, 14*  115:*20, 23*  116:*3*  117:*20*  129:*13*  130:*19*  145:*21*  149:*19*  180:*20*  181:*2, 5, 6*  196:*9*
**opinions**  13:*13, 17, 17, 15*  44:*23*  45:*9*  86:*5, 18*  94:*13*  96:*22*  117:*19*  127:*11, 21*  238:*24*  239:*7*  240:*13*  252:*24*
**opinion's**  69:*25*
**opportunity**  58:*14*
**opposed**  16:*11*  65:*5*  74:*13, 25*  75:*14*  106:*18*  112:*11*  153:*15*  207:*20*
**option**  95:*1*  193:*3, 7, 10*  197:*14*
**OptiPlex**  130:*1*  142:*18*  143:*15, 22*  145:*19*  146:*9, 12, 22, 24*  154:*19*  171:*13, 16*  185:*6*  187:*6, 22*  192:*14, 17*  199:*13*  245:*10*  248:*4*  249:*3, 5, 8*  251:*2, 4*

**ORAL**  1:*15, 18*  3:*2*  4:*2*
**order**  17:*16, 18, 22*  18:*1, 9, 13, 17, 19, 22, 25*  19:*9, 20, 24*  20:*11, 12, 15*  21:*2, 14*  22:*4*  51:*20*  75:*8, 10*  110:*24*  115:*15*  142:*20*  155:*13, 13*  180:*25*  181:*13*  230:*12*  246:*11*
**ordered**  148:*15*  150:*18*
**orderly**  250:*4, 4*
**org**  61:*25*
**originally**  142:*22*
**ost**  213:*8, 14*  215:*24*  216:*2, 12, 13*  217:*3, 7, 9, 10*  218:*6, 12*
**ost's**  214:*14*
**Otero**  56:*18*  109:*10*  110:*5*
**oteromivan@hotmai l**  103:*25*
**outbox**  66:*21*
**outgoing**  53:*9*  56:*11*  64:*9*  66:*2*  67:*1*  68:*19*
**Outlook**  50:*24*  51:*16*  52:*24*  54:*8, 18*  62:*13, 17, 23*  63:*1, 8, 9*  65:*17, 19*  66:*8, 12*  90:*6*  193:*22*  196:*13*  208:*18*  209:*9*  246:*2*  252:*1*
**outset**  35:*15*  85:*10*
**outside**  20:*9*  77:*24*  111:*19*  128:*10*  162:*23*  224:*8*
**overall**  41:*23*
**overloaded**  236:*19*
**overly**  116:*22*
**overriding**  145:*10*
**overwritten**  144:*14*  145:*12*  212:*15*
**owe**  224:*3, 8*

**Dennis Williams CONFIDENTIAL**                                    **282**

owned  173:*7*
owner  195:*18*

< P >
Page  3:*4*  4:*4*
15:*25*  25:*12, 13, 19*
31:*3*  49:*3*  89:*15*
92:*11*  100:*7, 10*
101:*6*  102:*14*
103:*9*  105:*9*
106:*19, 24*  107:*5, 6*
111:*5*  113:*16*
115:*5*  122:*9*  123:*6*
132:*11, 14*  134:*19*
136:*9*  171:*18*
178:*5*  182:*11, 19*
183:*18*  187:*4*
189:*5*  194:*21*
195:*6*  213:*21*
pages  103:*21*
115:*4, 17*  212:*7*
painful  58:*6*
paint  194:*16*
paper  113:*10, 11*
Paragraph  46:*5*
47:*11*  64:*20*  65:*2*
75:*20*  97:*6, 7*
132:*23, 24*  137:*14*
138:*13*  148:*25*
152:*14*  160:*7*
193:*16, 18*  194:*21*
195:*3, 5*  204:*22*
244:*12*
paralegal  175:*19*
paralegals  176:*7*
paraphrase  165:*4*
paraphrasing
165:*6*  166:*11*
Pardon  157:*8*
175:*21*
Parkway  258:*24*
part  27:*1*  31:*14,*
*15, 20*  72:*24*  85:*4*
94:*11*  114:*10*
117:*19, 23*  118:*7*
127:*12*  141:*24*
193:*12*  208:*25*
213:*13*  214:*6*
247:*7*

particular  18:*2, 12*
19:*16*  23:*5*  27:*21*
28:*11, 12, 13*  29:*3,*
*3, 13*  41:*19, 24*
62:*15*  67:*23*  68:*6,*
*6, 22*  69:*6*  70:*13*
75:*12*  80:*6, 7*
87:*12, 15*  94:*11*
101:*4*  102:*24*
107:*9*  110:*17*
112:*22*  153:*25*
170:*5*  182:*5, 8*
183:*3, 13*  187:*21,*
*24*  188:*5, 6*  200:*18*
210:*10*  218:*8*
220:*25*  236:*2*
240:*13*
particularly  238:*23*
parties  258:*12*
parts  19:*5*
party  250:*8*
258:*10, 12*
pass  253:*11*
Passbook  146:*17*
passing  165:*7*
password  205:*6, 10*
path  220:*9*
Pathway  6:*14*
81:*6*  99:*18, 21*
pattern  73:*19*
Paul  7:*24*
pay  234:*20*
payment  110:*5*
PC  132:*15, 16, 18,*
*23*  134:*1*  135:*4*
140:*6, 10, 15*
191:*23*  192:*5*
193:*23*
PC-based  213:*7*
PCs  213:*14*
pdf  234:*19*
people  19:*3*  20:*13*
57:*15*  85:*7*  98:*12*
107:*20*  108:*16*
158:*8*  165:*15*
176:*3*  194:*23*
221:*3*  252:*17*
percent  188:*3*
Perfect  209:*11*
perform  40:*6*

performance
135:*17*
period  11:*18, 22*
54:*20*  59:*18*  60:*4,*
*18, 25*  67:*8, 11*
69:*6*  71:*1, 13*  73:*3*
78:*13*  80:*1, 5*
90:*24*  116:*11*
123:*13*  142:*8*
143:*6, 24*  144:*4*
145:*3*  156:*21*
207:*17*  231:*1*
periodic  139:*8*
151:*10*  198:*24*
199:*24*
periodically  151:*14,*
*16*  152:*12*
periods  53:*2, 12, 23,*
*25*  55:*8*  57:*10, 25*
67:*14, 19, 24*  68:*9*
69:*13*  72:*4*  120:*1*
190:*1*
permits  38:*19*
person  16:*21, 23*
32:*19*  67:*23*  68:*6*
75:*15*  80:*6*  89:*12*
134:*25*  135:*12, 22*
153:*24*  161:*21, 22*
165:*18*  174:*19*
191:*16*  195:*12, 17*
227:*9*  228:*4, 11, 14*
234:*1*  238:*13*
personal  230:*14*
personally  28:*6*
personnel  54:*8*
129:*25*  130:*6*
147:*12*  161:*9*
162:*16, 22*  167:*18*
178:*1*  227:*18*
244:*22, 23*  245:*1*
246:*11*  247:*24*
248:*20*  249:*10*
250:*8, 8*  251:*8*
pertain  102:*13*
pertained  17:*21*
19:*15*
pertaining  22:*3*
39:*17*  102:*5*
PGH  109:*21*

phone  25:*14, 16*
119:*15*  161:*23*
phrase  149:*4*  241:*1*
phrased  102:*4*
240:*25*
pick  227:*18*
picking  249:*18*
picture  20:*2*
206:*24*
piece  113:*10*
pieces  113:*11*
Place  2:*4*  37:*12*
85:*23*  86:*1, 10, 21*
88:*2, 12*  90:*22*
95:*5*  123:*22*  163:*9*
201:*3*
placed  130:*23*
places  100:*2*
Plaintiff  1:*5, 20*
2:*1*  26:*8, 9*
plaintiffs  184:*15*
Plaintiff's  15:*22*
44:*11*  48:*21*
134:*14*
plan  13:*17*
playing  95:*19*
please  7:*21*  8:*13*
18:*6*  76:*12, 25*
79:*4, 8*  123:*8*
148:*1*  152:*24*
170:*12*  172:*9*
177:*17*  198:*1*
plug  173:*24*  175:*12*
plugged  27:*8, 17*
35:*16*  40:*21, 25*
41:*22*  42:*5, 11, 22*
146:*12*  170:*16*
171:*15, 20*  173:*11*
174:*22*  182:*4, 8*
183:*4, 8, 9, 11*
184:*6*  186:*1, 19*
187:*22, 24*  188:*6,*
*18, 25*  189:*1, 7, 16,*
*22, 25*  190:*3, 4*
192:*4, 6*  209:*19, 24*
210:*4, 7*  255:*14*
256:*3, 18*
plugging  26:*23*

**Dennis Williams CONFIDENTIAL** 283

plug-in 29:*21*
146:*7* 187:*6, 8*
188:*11, 11*
plus 25:*1*
png 99:*3, 14*
point 40:*4* 41:*7*
65:*11* 70:*11* 73:*24*
74:*17* 96:*11* 116:*6*
117:*22* 121:*15*
123:*18* 124:*11*
132:*19* 138:*2*
142:*7* 145:*14*
154:*15* 155:*7*
160:*8* 164:*11*
204:*1, 3* 240:*12*
254:*8*
pointing 218:*9*
points 197:*11*
police 156:*2*
policies 232:*1, 5, 6*
policy 89:*19*
portable 193:*25*
portion 18:*2* 93:*14*
209:*6, 7*
portions 16:*25*
19:*10* 65:*15*
possession 141:*19*
163:*22* 170:*1*
171:*25* 172:*15, 17,*
*19* 173:*15* 174:*11*
178:*10, 17, 25*
179:*4, 14, 21*
183:*25* 184:*11*
200:*18* 203:*17*
possessions 178:*14*
possibilities 69:*20*
possibility 53:*19*
126:*19* 169:*4*
196:*5* 255:*11*
possible 69:*5, 16*
70:*12, 17* 71:*11*
184:*5* 188:*24*
189:*24* 196:*1*
205:*19* 206:*2, 4, 5,*
*8, 9, 12* 212:*14*
230:*20, 24* 231:*6*
245:*20* 255:*1, 13,*
*17*
possibly 41:*6*

121:*6* 254:*25*
postdate 238:*13*
posts 25:*13*
potential 35:*23*
126:*17* 144:*10*
145:*17* 245:*2*
potentially 29:*10*
126:*15* 131:*14*
151:*25* 235:*19*
250:*14*
practice 114:*11*
147:*8* 198:*24*
199:*24* 203:*7*
221:*9*
practices 225:*13*
precluded 17:*19*
prepare 10:*4* 22:*5*
50:*1*
prepared 23:*10*
92:*6* 244:*2*
preparing 13:*12*
199:*15*
PRESENT 2:*20*
10:*15* 54:*5, 20*
55:*20* 63:*25* 111:*2*
180:*19* 238:*2*
preservation 85:*19*
preserve 69:*22, 23*
70:*2, 21, 22* 85:*21*
170:*8* 252:*4*
preserved 161:*11*
preserves 7:*9*
Preserving 25:*12*
Presley 2:*6* 75:*19*
79:*6* 204:*20*
press 124:*11*
pretty 80:*22* 221:*9*
234:*11*
prevent 95:*14*
prevented 95:*6, 21*
96:*1, 6*
previewed 185:*16*
previous 25:*20*
26:*5, 11, 14, 17, 24*
27:*15* 33:*19, 21*
34:*17* 61:*1*
previously 92:*9*
243:*25*
Primarily 43:*9*
84:*5* 128:*1*

Princeton 109:*20*
110:*3*
prior 30:*9* 47:*8,*
*13* 48:*4* 49:*8, 21,*
*24* 50:*10, 15, 25*
51:*9* 52:*6, 18*
65:*25* 71:*14* 80:*18*
83:*2* 87:*19* 89:*24*
91:*21* 111:*9, 22*
112:*16* 118:*17, 25*
168:*23* 187:*15*
225:*13* 236:*6*
238:*6* 239:*20*
240:*7*
private 57:*7*
privately 56:*23*
Privilege 4:*20*
16:*11* 92:*5* 101:*19*
159:*17, 22* 224:*5*
privileged 33:*6*
probable 71:*12, 17*
probably 7:*13*
10:*18* 11:*11* 14:*2*
21:*22* 24:*12* 36:*16*
37:*6* 65:*12* 80:*22*
106:*2* 118:*6* 134:*8*
153:*25* 158:*3, 14*
200:*21* 207:*8*
216:*12* 217:*4, 9*
243:*20* 245:*24*
252:*16*
problem 118:*3*
119:*13, 18* 251:*15*
254:*15, 23*
problems 152:*1*
196:*13* 240:*3*
246:*14* 251:*12*
254:*7*
Procedure 1:*23*
218:*14*
proceedings 258:*8*
process 11:*9* 46:*16*
86:*6, 12* 98:*5*
104:*22* 148:*12*
244:*19* 247:*6, 18,*
*22, 23* 248:*16*
processed 53:*16*
219:*8*
processes 105:*3*
processing 40:*9*

produce 18:*23*
28:*21* 184:*14, 15,*
*18* 222:*14*
produced 1:*20* 9:*8*
12:*12* 17:*1* 48:*21*
92:*2* 99:*19* 100:*22*
106:*7* 113:*4*
119:*10* 182:*16*
190:*22* 210:*14*
246:*7* 248:*22*
producing 230:*25*
production 9:*2*
13:*21* 117:*16*
Products 34:*7*
program 28:*19*
62:*23* 87:*15*
programs 159:*4*
251:*16*
properly 158:*23, 25*
250:*9*
property 26:*2*
property-type 31:*8*
38:*25*
proposed 70:*20*
proprietary 36:*9*
protect 232:*2, 7*
protected 19:*16*
protecting 21:*1*
protection 17:*16,*
*18* 21:*13* 230:*12*
246:*10*
protective 17:*21,*
*25* 18:*9, 13, 16, 18,*
*22, 25* 19:*9, 20, 24*
20:*11, 12, 15* 21:*2*
22:*4* 75:*8, 10*
Proven 38:*23*
39:*14, 20*
provide 17:*3*
28:*21* 30:*7, 9, 14*
36:*20* 38:*1* 43:*17*
48:*11* 50:*9* 92:*8*
113:*7, 8* 128:*21*
223:*4*
provided 8:*25* 9:*1,*
*3, 23* 13:*16* 14:*12*
15:*13* 16:*4* 17:*13*
18:*14* 19:*19* 21:*24*
23:*7* 34:*3* 40:*3*
50:*8, 12* 59:*21*

**Dennis Williams CONFIDENTIAL** 284

81:6  89:4  97:22,
25  98:23  99:17, 24
101:13  102:4
111:25  112:2, 19
114:15  149:13
153:22  155:9, 20
156:1, 4  164:4
169:24  170:2
175:4, 10  178:6
179:23, 25  201:12
202:21  238:2
**provides**  182:1, 2, 3,
4, 7
**providing**  101:25
132:12  165:8
177:20  186:14
**provisions**  1:24
**pst**  80:10, 11
140:9  141:4
143:24  212:24, 25
213:1, 6, 14  214:14
215:6  218:15, 17,
24  249:12  251:24
**Public**  258:4, 21
**published**  43:19
**Pull**  79:3  146:16
216:16  217:23
222:16  245:9
247:23
**pulled**  95:16
104:14  246:2
255:8
**pulling**  95:7, 22
96:7  144:21  248:6
**pulls**  216:23
**Pumphrey**  38:11
**purchased**  168:8
170:7  180:3
187:10, 13  191:11,
13  229:19
**purpose**  187:14
**purposes**  116:16
121:12  130:5
141:23
**pursuant**  1:23
15:13  224:1
**pushed**  74:4
**pushing**  207:13
**put**  75:14  81:5
86:1, 10  87:12

88:2, 11  89:19, 24
91:20  94:5, 19, 21
128:14  131:6
145:25  184:15, 17
190:2  198:2, 16
199:4  200:2, 4
201:3, 19, 20
205:19, 23  206:2, 5,
8, 13, 15  207:6
210:18  219:23, 25
220:16  229:18
230:18, 22  231:9
240:15  243:24
251:21  252:8, 21
**putting**  85:22
86:21  200:6, 12

< Q >
**question**  8:14  18:5
25:5  39:24  64:18
69:10  79:10, 18
82:5  88:10, 10, 14
91:7, 14  96:2  97:9
101:21  102:3
105:8  118:20
120:7  130:6  131:3
141:23  142:4, 14
147:19  148:9, 22
150:1, 15  162:11
163:24  172:14, 23
173:1  174:25
200:17  201:14
213:12  214:2, 10
215:11  224:12, 14
234:5  239:3
**questioning**  81:17
**questions**  8:6, 11,
18  79:14, 23  89:16
127:14, 22  148:1
150:4  234:14
242:10, 15  257:5,
15
**questions,**  177:17
**quibbled**  199:1
**quick**  43:23  202:2
**quite**  164:3
**Quito**  9:20
**quote**  96:24
**quotes**  159:13

**quoting**  97:4
137:15

< R >
**Rachel**  2:20
**raised**  21:17
**Ramirez**  56:20
**ran**  40:9  246:1
251:5
**rate**  15:2, 11
**RDR**  1:21
**read**  19:5  49:22
53:13  76:4, 12, 14
79:24  87:9, 23
110:2  148:10, 19
165:5  167:8
182:18  191:24
198:9, 10, 19
205:20  206:17
208:11  210:11
212:18  214:6
222:19
**reading**  55:10
75:18  76:13
**real**  58:22
**reallocated**  144:23
**really**  37:7  48:10
61:13  100:8
108:12  130:19
131:9  188:10
190:9, 9  198:7
200:6, 9, 12  205:23
218:3  224:7
231:18  233:13
**reason**  16:12
18:14  20:4  35:18
45:5  57:9  61:15
72:10  93:13  102:9
104:21  139:12
162:21  168:1
223:7, 9
**reasonable**  70:22
97:15  98:4  110:11
116:8, 17  117:1, 4,
12  131:11  247:22
**reasoning**  163:1
**recall**  8:23  9:21
11:19  13:7  16:10,
13  26:19  28:20
38:13  59:24  60:6

65:23  81:16  82:25
84:23  89:5  93:24
94:8  120:20  121:1
126:10  139:10, 14,
16  147:10, 23
148:25  158:6
168:2  178:2
203:10  204:4
207:16, 23  229:8
238:17, 23  239:6
254:4
**recalled**  203:23
**receipt**  124:18
187:10
**receive**  15:15
16:24  237:19, 24
**received**  15:18
16:9  17:8  70:8
129:3  243:7
**receiving**  34:22
**recognize**  107:19
108:15  177:1
**recollection**  11:10
50:16  59:16  87:14
148:20  167:24
194:8  198:24
203:15  231:22
**recommending**
193:3, 13
**record**  1:24  7:2
30:4  44:2, 8  58:9,
12  80:24  81:2, 5
121:13, 20, 24
124:17  144:6
163:14, 17  188:10
202:5, 8  211:19, 22,
23, 25  233:2, 5
257:7, 17
**recorded**  1:22
**records**  27:6
39:17  50:22
112:14  126:17, 20
144:22, 22  168:16
216:16, 17, 20
217:24  230:21, 24
231:2
**recover**  10:9, 12
13:21, 22  77:4
80:9  90:25  104:17
105:1, 4  213:1, 18

**Dennis Williams CONFIDENTIAL**                    285

216:*14, 15, 22*
219:*9* 248:*2*
**recovered** 53:*16*
67:*4* 73:*6* 90:*20*
105:*6, 9, 11* 131:*12*
144:*10, 20* 219:*8,*
*13* 246:*1* 251:*5*
**Recovering** 90:*14*
**recovery** 66:*10*
**recycle** 41:*15, 17*
**recycled** 124:*18*
125:*16, 20* 126:*25*
136:*11*
**recycling** 123:*20*
124:*19* 126:*7*
128:*5, 18*
**redacted** 15:*14, 15,*
*17* 16:*10, 16* 17:*9*
18:*14* 20:*3* 21:*24*
22:*1* 101:*8, 10*
115:*4* 177:*15*
**redaction** 16:*5*
**redactions** 16:*8*
17:*13* 18:*8, 13*
102:*7, 10, 12* 253:*4,*
*6*
**reduced** 258:*7*
**refer** 86:*20* 134:*10*
210:*19* 239:*12*
**referenced** 142:*25*
171:*24* 193:*8*
**references** 122:*25*
171:*11*
**referred** 148:*10*
197:*17*
**referring** 83:*17*
92:*15* 134:*4, 17*
165:*23* 192:*1*
195:*3* 206:*21*
**refers** 197:*1*
**reflect** 10:*7* 23:*2*
55:*6, 9* 69:*12*
100:*19* 159:*8*
168:*17* 178:*12*
199:*1* 225:*17*
**reflected** 9:*10*
25:*20* 30:*24* 89:*25*
100:*25* 112:*18*
121:*4* 154:*10*

195:*13* 203:*14*
238:*25*
**reflecting** 74:*9*
106:*7* 153:*20, 24*
180:*13* 186:*15*
**reflects** 71:*25* 98:*4*
118:*23* 178:*13*
180:*15* 212:*3*
**reformatted** 10:*11,*
*21* 11:*11* 12:*3*
130:*13, 24*
**refresh** 148:*20*
**regard** 243:*8*
244:*14* 248:*11*
**regarding** 86:*17*
114:*25* 139:*24*
147:*17* 237:*9*
**regardless** 33:*9*
228:*10*
**regular** 15:*5* 145:*7*
184:*23* 202:*25*
258:*10, 11*
**regularly** 148:*23*
149:*2* 150:*2*
220:*20*
**related** 17:*19*
21:*21* 56:*13*
101:*23, 25* 102:*10*
119:*16, 17, 20*
188:*22* 246:*13*
**relates** 17:*25*
213:*14, 14*
**relative** 155:*9, 10*
229:*14*
**relatives** 122:*6*
**relayed** 119:*12*
195:*23*
**relevant** 17:*4, 15*
72:*17* 94:*7* 118:*1*
156:*20* 180:*21*
181:*3, 7* 185:*22*
**reliable** 153:*21*
**relied** 17:*3* 20:*20*
128:*1* 158:*10*
**reloaded** 12:*3*
136:*16*
**rely** 127:*19* 128:*6*
153:*3* 162:*9, 12*

**relying** 75:*15*
128:*19* 163:*6*
231:*16, 23*
**remain** 65:*3*
**remainder** 102:*18*
257:*14*
**remained** 104:*15*
**remark** 140:*9*
**re-marking** 100:*10*
**remember** 71:*2*
74:*20, 21* 94:*10, 11*
176:*7* 239:*4*
**remembering** 94:*14*
**remind** 113:*12*
**remnants** 145:*1*
**remote** 191:*22*
192:*10*
**remove** 82:*18, 21*
**removed** 90:*3, 8, 11,*
*14* 105:*2*
**removing** 104:*22*
**reorganize** 149:*8*
**repair** 140:*9*
**repeat** 30:*16*
101:*21* 142:*14*
162:*10, 13*
**repeatedly** 147:*4*
**rephrase** 8:*13*
25:*5* 69:*10*
**replace** 233:*15*
**replaced** 160:*11*
204:*2* 221:*10*
**replacement** 139:*2*
**report** 4:*6, 7, 8, 12*
5:*1, 3, 6, 20, 21, 23*
6:*6, 9* 9:*13* 10:*3*
13:*4, 6* 15:*24*
20:*20* 23:*16, 23*
27:*22* 28:*22* 34:*1,*
*4* 38:*6, 9* 42:*3*
44:*12, 14* 45:*25*
46:*1* 53:*14* 55:*10*
60:*13, 14* 62:*19*
64:*19* 75:*6, 17*
83:*14* 86:*16* 94:*17*
96:*23* 97:*6* 112:*22*
115:*24, 25* 122:*2, 9*
132:*4* 133:*15*
134:*16* 139:*22*
149:*6* 156:*2*

159:*15, 24* 160:*7*
170:*16* 171:*24*
177:*1* 180:*8*
181:*17, 19, 22, 24*
182:*22* 183:*10*
184:*2* 191:*3, 7, 8*
192:*22* 193:*8*
194:*19* 197:*8*
207:*4* 209:*16, 22*
211:*8, 12* 214:*11,*
*18* 219:*18, 19*
222:*7* 226:*1*
240:*16, 20* 241:*3*
244:*13* 247:*8, 9*
251:*10* 254:*11*
**reported** 111:*16*
**REPORTER** 3:*13*
258:*1, 4*
**reporting** 156:*2*
**reports** 9:*18* 13:*16*
23:*8, 10* 28:*23*
38:*2* 39:*24* 44:*18,*
*22* 45:*10, 13* 83:*8*
100:*25* 194:*20*
211:*11* 244:*2*
247:*20* 252:*25*
**represent** 39:*6, 7*
115:*2* 229:*22*
230:*5* 238:*12*
**representation**
127:*5*
**representations**
114:*19*
**represented** 19:*8*
178:*8, 22*
**representing** 242:*13*
**request** 7:*10* 14:*11*
35:*9* 73:*13* 84:*16*
99:*16, 23* 108:*23*
163:*2* 237:*20*
250:*5*
**requested** 101:*23*
251:*17*
**requesting** 117:*16*
**requests** 84:*10, 11,*
*13, 25*
**reserve** 12:*18*
257:*14*
**residence** 125:*11,*

**Dennis Williams CONFIDENTIAL**                              286

*14*

**residents** 38:*19*
**resolved** 135:*2*
**respect** 9:*8* 12:*6*
17:*10, 24* 18:*11*
33:*10* 126:*7* 183:*3*
238:*20* 240:*6*
**respond** 108:*24*
202:*20*
**responded** 236:*18*
**responds** 166:*10*
193:*15* 198:*1*
222:*21*
**response** 79:*21*
91:*6* 127:*14*
148:*12* 162:*3*
176:*16* 177:*21*
226:*19* 237:*19*
**responsible** 238:*4*
**responsive** 85:*1*
**rest** 100:*8* 101:*8,*
*10* 236:*13*
**restored** 140:*9*
141:*4*
**restricted** 75:*8*
**restriction** 75:*7*
**restrictions** 19:*23*
**result** 105:*24*
**resulted** 145:*19*
**ResultNumber,**
105:*10*
**ResultNumberEstim
ate,** 105:*24*
**results** 106:*14*
108:*21*
**retention** 89:*19*
**retired** 242:*19*
**return** 127:*4*
**review** 9:*2* 16:*17*
17:*4* 18:*15* 19:*10,*
*23* 21:*8* 22:*8, 14*
34:*16* 45:*16* 58:*2,*
*14* 61:*9* 63:*9*
65:*13* 70:*20* 76:*2*
83:*10* 84:*13, 24*
99:*13* 111:*25*
112:*7, 13* 114:*10,*
*14, 18* 116:*20*
120:*21* 127:*4*
147:*11* 153:*8*

155:*23* 159:*14*
220:*17* 221:*1, 8, 25*
230:*13* 241:*6, 20*
247:*5, 15* 248:*19,*
*20*
**reviewed** 20:*19*
21:*7* 22:*7* 62:*13*
65:*15* 77:*16* 83:*22*
88:*16* 94:*1* 106:*14*
108:*21* 112:*9*
116:*5, 10* 146:*5*
159:*20* 160:*3*
167:*19* 207:*13*
244:*23, 24* 245:*21*
246:*9* 248:*18*
**reviewing** 9:*14*
59:*24* 154:*5*
238:*22*
**right** 8:*17, 21*
12:*19* 13:*1, 19, 20*
17:*6, 23* 19:*2* 26:*7*
30:*6, 17, 18* 31:*2*
32:*6, 16, 24* 33:*2, 7*
34:*11* 35:*25* 38:*5,*
*10* 39:*22* 42:*5*
45:*22* 46:*5, 21*
47:*14* 50:*8, 15*
51:*20, 23* 53:*13*
54:*2, 19, 25* 55:*13*
58:*5, 13* 62:*18*
64:*6, 18* 66:*7, 24*
68:*15, 23, 25* 71:*6,*
*25* 75:*25* 77:*19*
78:*9, 18* 79:*3, 16*
80:*12, 21* 82:*6*
83:*8, 12* 85:*8, 15*
90:*11* 91:*10, 18*
92:*13, 18* 93:*11*
95:*17* 96:*19* 98:*1,*
*20* 100:*6, 22* 103:*2,*
*14, 18* 104:*10, 15,*
*19* 106:*24* 107:*5*
108:*10* 110:*21*
111:*4, 9* 112:*10, 24*
113:*6, 19* 114:*2*
115:*1, 8, 11* 116:*14,*
*24* 118:*19, 23*
120:*1, 9* 121:*9*
122:*1, 7, 10, 24*
123:*18, 20* 125:*1, 3*

128:*7* 129:*6*
131:*17* 132:*2, 6*
134:*19* 135:*23*
136:*10, 12* 137:*7,*
*13, 21* 138:*23, 24*
139:*25* 140:*3*
141:*16* 142:*22*
143:*17* 144:*12*
145:*10* 146:*8, 20*
147:*5* 148:*8* 152:*7*
154:*8, 22* 155:*1, 16*
156:*17, 24* 159:*6*
160:*6, 20, 21*
161:*12, 14* 162:*18*
163:*10* 164:*1, 13*
165:*9* 167:*21*
168:*8* 169:*7* 170:*9,*
*21, 23* 171:*5, 13, 15*
173:*23* 174:*15*
177:*10, 18* 178:*8*
179:*19* 180:*17*
181:*16* 182:*12, 25*
183:*4, 17, 21* 185:*9*
186:*16, 21* 187:*2, 6,*
*10, 23* 188:*19*
189:*3, 8* 190:*6, 14*
191:*5, 11, 14, 20*
192:*23* 193:*22*
194:*18* 195:*21*
196:*16* 198:*14*
200:*16* 202:*9*
203:*2, 19* 205:*17*
208:*10* 209:*20*
210:*1, 16* 211:*8*
212:*1, 6, 12* 213:*5,*
*9, 21, 23* 214:*1, 15,*
*17, 24* 215:*2, 6, 8,*
*22, 24* 218:*2, 11, 15,*
*18, 25* 219:*20*
220:*13* 221:*1, 6, 19*
222:*9, 12, 23*
223:*20* 224:*11, 19*
225:*8, 10, 14* 226:*3,*
*6* 227:*8* 228:*1, 9,*
*12, 16, 20, 25* 229:*5,*
*13, 25* 230:*17, 21*
231:*11* 232:*11, 24*
233:*6* 234:*15, 21*
235:*8, 18, 20* 236:*4,*
*25* 237:*10* 239:*16*

240:*12, 22* 242:*9*
243:*24* 247:*12*
248:*11* 253:*18, 24*
254:*12* 255:*17*
256:*12* 257:*4*
**rights** 48:*9, 13*
60:*22* 73:*6, 10*
**road** 154:*2* 223:*7*
239:*3*
**Robert** 34:*7, 11*
**Robinson** 135:*1*
**Rodriguez** 4:*17, 22,*
*24* 5:*10, 14* 6:*8, 11,*
*14* 89:*9, 11* 98:*19*
165:*4* 177:*15*
222:*10, 21* 225:*2*
232:*16* 234:*1*
**Rodriguez's** 91:*6*
**rolling** 216:*20*
**Roughly** 61:*6*
207:*23* 252:*16*
**routine** 74:*19* 75:*1*
198:*8*
**routinely** 240:*2*
**row** 55:*15* 58:*23*
92:*13* 101:*1*
102:*15, 15, 15*
103:*3, 5, 5* 108:*4*
109:*19* 111:*5*
113:*15* 115:*5*
209:*22* 210:*3, 6*
213:*25*
**rows** 107:*1, 1*
108:*7* 213:*6*
**RPR** 258:*20*
**Rubio** 109:*9*
117:*10*
**Rubio,'** 109:*9*
**rule** 52:*22* 54:*7,*
*10* 57:*22* 60:*20*
61:*18* 62:*7, 11*
63:*13, 24* 74:*2, 10*
95:*7, 7, 22* 96:*6, 13,*
*16* 138:*22* 253:*15,*
*18, 22* 254:*20, 22*
**rule-based** 252:*7*
**Rules** 1:*23* 63:*10*
96:*19* 161:*8*
**run** 42:*3* 102:*25*
103:*12, 16* 104:*2, 5,*

**Dennis Williams CONFIDENTIAL**                                    **287**

*8* 108:*17, 19* 109:*2,
13* 110:*8, 13* 111:*6,
10* 115:*12, 17*
116:*13* 144:*20*
181:*22* 216:*14, 22*
222:*14, 18*
**rung** 164:*22*
**running** 100:*15*
118:*21* 119:*24*
120:*7*
**Ryan** 5:*5* 6:*3*
138:*8, 25* 191:*6*
192:*22, 25* 193:*15*
197:*10* 204:*16*

< S >
**safe** 131:*7*
**Salon** 24:*18, 19, 21,
23, 24* 25:*11*
**Sam** 258:*24*
**Sanders** 1:*21*
258:*2, 20*
**sat** 246:*11, 23*
**save** 198:*7* 222:*16*
**saved** 150:*17*
151:*1, 9* 160:*13*
201:*2*
**saving** 70:*7, 11*
**saw** 35:*3* 45:*18*
94:*4* 116:*13*
174:*19* 241:*9*
250:*13* 253:*7*
254:*1*
**saying** 53:*19* 66:*7*
70:*19* 86:*9* 90:*5*
91:*20* 116:*19*
117:*1, 2* 132:*25*
139:*14* 145:*6*
149:*11* 150:*6*
151:*7* 152:*8* 154:*5*
156:*6* 165:*19*
166:*11* 180:*24*
193:*16* 197:*14*
198:*4, 17, 20* 199:*6*
204:*23* 206:*4*
208:*21* 217:*15*
222:*13, 22* 251:*20*
252:*10*
**says** 16:*1* 33:*9*
46:*4* 47:*11, 16*

48:*8* 49:*7, 20*
76:*12* 79:*25* 83:*14*
87:*6, 9, 21* 91:*8*
92:*14, 19* 113:*23*
134:*25* 135:*15*
137:*11, 17, 21*
138:*13* 140:*5, 8, 18*
141:*4* 148:*9*
149:*16* 150:*14, 15,
16* 152:*15* 153:*16*
160:*11, 18* 180:*18*
191:*17, 22* 192:*9*
193:*17, 18* 195:*19*
197:*3* 198:*23*
201:*15* 205:*7, 17*
208:*10* 212:*2*
226:*9* 227:*23*
228:*25* 234:*1, 3*
253:*17*
**Scanned** 135:*4*
**scenario** 194:*17*
**Scheduling** 22:*18*
**Scherer** 1:*9* 14:*10*
16:*21, 23* 17:*17*
18:*22* 19:*3, 4, 10,
12* 20:*8, 19* 47:*12,
21, 23* 48:*1, 4*
51:*14* 54:*7, 12, 15*
56:*1, 8, 9* 57:*2, 6, 9*
59:*1, 2, 9* 60:*23*
61:*20* 62:*22* 63:*17*
64:*9, 10* 66:*19*
72:*1, 12* 73:*10, 22,
25* 74:*3, 14, 24*
75:*15* 88:*3* 89:*12*
95:*8* 98:*6* 100:*16,
21* 104:*23* 111:*11*
118:*17* 119:*7*
133:*10* 148:*18*
152:*16, 19* 160:*13,
14* 166:*16* 170:*1,
16* 172:*22* 173:*3, 8,
18, 21, 23* 174:*2*
178:*10* 185:*17*
195:*2* 204:*23*
208:*13* 226:*23*
227:*2* 229:*3, 15, 22,
23* 231:*12* 232:*1*
234:*2* 235:*13*
238:*13* 241:*22*

242:*14* 244:*16, 21,
25* 246:*11* 255:*16*
**SCHERER,LLP**
1:*10*
**Scherer-owned**
173:*12*
**Scherer's** 83:*18*
107:*12* 179:*21*
183:*25*
**school-age** 229:*10*
**scope** 25:*2, 10, 24*
42:*16* 57:*19* 75:*21*
77:*25* 83:*9* 98:*11*
114:*22* 244:*6, 10*
247:*7*
**scopes** 76:*17, 19, 19*
**screw** 130:*6*
**scrolling** 66:*8*
**Seagate** 170:*10*
171:*4, 7, 19* 172:*6,
10, 12* 173:*10*
175:*13* 176:*19, 24*
177:*3, 5* 184:*3*
185:*4* 186:*15*
187:*10* 188:*5*
189:*6, 15* 191:*10,
12* 192:*1, 13* 196:*2*
209:*18* 210:*10*
220:*1, 12* 240:*23*
**SEAL** 258:*15*
**search** 20:*23*
39:*16, 16* 46:*16*
83:*18, 25* 84:*25*
96:*25* 97:*12, 16, 19*
98:*4, 6, 9, 11* 101:*1,
18* 103:*12, 16, 23*
104:*2, 14, 17* 105:*1,
4* 106:*12, 20* 107:*9*
108:*17* 109:*2, 6, 12*
110:*11, 13, 22*
111:*4, 6* 113:*5, 16,
21* 114:*2* 115:*1, 16,
25* 116:*12, 13, 22*
117:*6, 10, 21*
118:*21* 119:*21*
138:*14* 244:*17*
**Searched** 4:*19*
56:*8* 83:*23, 23*
92:*3* 105:*6* 107:*8,
25* 108:*3, 6* 109:*19*

110:*17* 112:*11*
116:*12* 119:*9, 10*
247:*21*
**searches** 84:*14*
97:*20, 24* 100:*20*
101:*4, 7, 14, 24*
102:*1, 15, 25*
106:*25* 107:*16*
108:*4* 109:*7* 110:*8*
111:*10, 17, 22*
112:*12* 114:*22, 23*
115:*12, 21, 22*
116:*4, 4, 10, 20*
117:*1* 118:*9*
119:*24* 120:*7*
222:*14, 18*
**searches,** 21:*16*
**searching** 19:*11*
20:*18* 98:*6* 103:*23*
113:*24* 114:*4, 8*
117:*3, 25* 222:*8*
246:*12*
**second** 103:*9*
107:*6* 115:*24*
123:*11* 127:*24*
132:*11, 14* 138:*13*
150:*18, 25* 183:*18*
197:*12* 204:*22*
213:*21*
**secret** 26:*2* 230:*8*
**secretaries** 245:*6*
**Secretary's** 171:*12*
**secrets** 24:*17*
**section** 16:*13*
242:*22* 249:*19*
**Secure** 109:*20*
110:*2* 224:*16, 21*
**securing** 231:*20*
**security** 41:*16, 17,
18, 21* 230:*16*
231:*2*
**see** 15:*24* 16:*2*
17:*11* 18:*2* 20:*2*
21:*9, 10* 28:*18*
29:*20* 35:*17* 38:*8*
39:*7, 19* 40:*10*
46:*17* 49:*4, 10*
51:*7, 12* 52:*6*
57:*16* 58:*15* 60:*9,
15* 63:*10* 65:*18*

**Dennis Williams CONFIDENTIAL**

**288**

71:*21* 77:*13* 80:*10*
87:*5, 24* 88:*13*
89:*21* 92:*22* 93:*8*
96:*9, 18* 101:*7*
107:*17, 22* 108:*8,*
*10, 12* 111:*4, 6*
117:*5* 128:*13*
137:*19, 24* 138:*18*
145:*5* 148:*8*
150:*13* 157:*17*
175:*16* 180:*22*
182:*24* 185:*8*
186:*1* 188:*22*
194:*1, 19* 195:*8*
197:*3* 214:*13*
217:*11* 219:*23, 25*
220:*15* 225:*6*
226:*12* 229:*24*
234:*8* 236:*2, 17, 21*
237:*6, 25* 239:*12,*
*13, 14* 240:*19*
250:*18* 256:*2*
**seeing** 21:*2* 49:*24*
94:*8, 9* 118:*15*
**seen** 10:*8* 14:*12*
18:*10* 63:*14* 70:*18*
84:*11, 17, 20* 88:*25*
94:*13* 166:*20*
221:*8* 231:*13*
238:*12* 253:*16, 19*
**select** 95:*2*
**selecting** 20:*18*
**semi** 187:*19*
**seminars** 243:*18*
**send** 100:*3* 240:*4*
**sending** 57:*23*
180:*18* 212:*13*
**sends** 226:*4*
**sense** 8:*12*
**sensitive** 36:*9*
74:*18, 25* 198:*5, 7,*
*18* 200:*6, 12* 201:*2,*
*8, 13, 16, 19* 202:*13*
249:*16*
**sent** 8:*21* 12:*24*
14:*7* 45:*16* 54:*6,*
*20, 22, 24* 59:*8*
60:*21* 70:*8* 74:*13*
103:*24* 125:*11*
207:*2*

**sentence** 49:*7*
76:*11* 92:*19*
137:*16, 21* 177:*22*
209:*10* 226:*9*
**separate** 52:*23*
54:*16*
**Separation** 34:*7*
40:*2*
**September** 103:*5*
107:*2, 4* 109:*4*
114:*19* 187:*23*
189:*18* 204:*24*
205:*2*
**sequentially** 99:*1*
**serial** 42:*4, 8*
140:*18* 171:*8, 19*
181:*13* 182:*3*
**series** 8:*6*
**served** 84:*10*
**server** 37:*19, 24*
51:*22* 52:*1, 10, 13,*
*18* 63:*6, 8, 10*
83:*19, 24* 87:*23*
88:*3* 90:*18, 23*
94:*20* 95:*2, 3, 3, 8,*
*16, 22* 96:*5, 7, 9*
97:*21, 23* 100:*21*
101:*2* 103:*17*
104:*10, 14, 15, 18,*
*24* 105:*2, 5* 111:*11*
112:*12* 116:*1*
118:*13, 22* 119:*2, 8*
162:*5* 207:*21, 22*
208:*13* 223:*13*
226:*21, 23* 227:*2*
235:*13* 245:*4, 5, 24,*
*25* 247:*2* 248:*2, 8*
251:*22* 255:*8, 16*
**server,** 162:*18*
**servers** 39:*14*
88:*18* 160:*14*
185:*21* 247:*24*
**service** 197:*16*
234:*17*
**services** 94:*24*
**set** 52:*22* 54:*8*
61:*18* 74:*2, 7*
96:*16* 116:*23*
135:*1* 150:*25*
161:*8* 164:*24*

167:*9, 9* 170:*6*
185:*5* 203:*24*
207:*18* 226:*10*
227:*23* 233:*15*
234:*4* 244:*6* 247:*8*
252:*18, 20* 253:*22*
255:*22* 258:*8*
**setting** 90:*10*
253:*20*
**settings** 89:*17*
90:*6, 22* 91:*2, 4, 8,*
*9, 13, 14, 18, 22*
96:*18* 252:*21*
**seven** 23:*1* 60:*5*
112:*5, 6, 8* 120:*21*
130:*18* 159:*15*
242:*24*
**seven-month** 60:*18*
70:*25* 71:*13* 80:*5*
**Seventh** 2:*4*
**shadow** 216:*18, 19*
217:*25*
**shipped** 9:*19*
**Shores** 192:*24*
193:*2* 195:*16, 17,*
*18, 19* 196:*6*
**short** 35:*7* 36:*11*
37:*2* 232:*25*
**short-circuit** 203:*12*
**shortcut** 170:*23*
256:*11*
**shorthand** 1:*22*
258:*2*
**shouldschedule**
193:*20*
**Show** 15:*21* 29:*8,*
*17, 18* 36:*25* 97:*23*
102:*24* 113:*20*
134:*13* 137:*8*
139:*12, 20* 144:*15*
145:*15* 155:*19*
177:*10* 182:*12, 20*
191:*1* 197:*7*
204:*14* 208:*5*
210:*23, 25* 219:*10*
233:*20* 236:*25*
242:*4* 250:*4*
256:*14*

**showed** 25:*16* 27:*6*
28:*22* 37:*22*
194:*12*
**showing** 37:*3*
86:*25* 100:*20*
192:*20* 219:*13*
222:*5* 224:*24*
**shown** 253:*3, 5*
**shows** 68:*18*
155:*19* 185:*25*
186:*3* 187:*5*
190:*13* 193:*22*
212:*21* 213:*22*
255:*22*
**Shucks** 156:*6*
**sic** 146:*17* 149:*9*
**signature** 1:*24*
**significance** 67:*7*
240:*13*
**signify** 181:*11*
**Similar** 39:*2, 5*
177:*7*
**simple** 252:*6*
**single** 70:*7*
**sir** 8:*2, 10, 16, 20,*
*24* 9:*11, 22, 24*
10:*1, 6, 22* 11:*3, 5,*
*17* 12:*7* 13:*10, 14,*
*23* 15:*1, 6* 16:*3, 18*
17:*2* 19:*21* 20:*21*
22:*12* 23:*6, 12, 21*
27:*4* 28:*3, 8* 29:*22*
30:*21* 31:*1, 5, 12,*
*14, 23, 25* 34:*10, 13*
35:*1* 36:*1, 14* 39:*9,*
*11* 40:*5* 42:*6* 43:*6,*
*15, 21* 44:*17, 21, 24*
45:*3, 7, 11, 14, 24*
46:*3, 6, 9, 12* 47:*15*
49:*6, 11* 51:*24*
52:*15* 53:*24* 55:*24*
56:*4, 17, 19, 21, 25*
57:*4* 58:*17* 59:*11,*
*14, 19, 25* 60:*17, 19*
61:*7* 62:*2, 5* 63:*12,*
*18, 20* 64:*5, 15, 17*
65:*1, 15* 66:*20, 23*
67:*9* 70:*4* 71:*3, 7,*
*10* 72:*7, 16* 73:*12,*
*16* 75:*4, 11* 76:*1, 5,*

**Dennis Williams CONFIDENTIAL**

289

*24* 80:*15* 83:*13*
84:*15* 85:*3, 9, 13,*
*16, 24* 86:*4* 87:*4, 7,*
*10, 25* 88:*4, 24*
89:*3, 13, 22* 90:*12*
91:*11* 92:*7, 10, 12,*
*17, 23* 94:*6, 8, 10,*
*16* 96:*21* 97:*5, 13,*
*18* 98:*2, 21* 99:*11,*
*15, 25* 101:*5, 16*
102:*16* 103:*1, 4, 7,*
*13, 19* 104:*1, 4, 7,*
*11, 25* 105:*12, 17*
106:*10, 23* 107:*3,*
*10, 24* 108:*11, 18,*
*20, 22, 25* 109:*15,*
*18, 25* 110:*9, 15, 20,*
*25* 111:*3* 112:*20*
113:*22* 114:*3, 13,*
*17, 21* 115:*10, 19*
116:*15* 118:*14, 24*
120:*23* 122:*8, 11,*
*15, 19, 21* 123:*14,*
*21, 25* 124:*2, 10, 12,*
*14, 16, 23, 25* 125:*4,*
*12, 17, 21* 126:*4, 9,*
*11* 127:*1, 6, 18*
128:*8, 22* 129:*24*
132:*7* 133:*3, 6*
134:*5, 23* 135:*6, 9*
136:*1* 137:*20, 25*
138:*12, 19* 139:*4*
140:*1, 4, 7, 11, 14*
141:*8, 17, 20*
142:*19, 23* 143:*11,*
*20, 23* 144:*2*
145:*13* 146:*10, 25*
147:*3, 6, 18* 148:*7*
150:*22* 151:*11*
152:*15* 154:*13, 20*
155:*2, 5, 17* 156:*3,*
*23, 25* 157:*5, 11, 24*
158:*9, 12, 17*
160:*19, 22, 24*
162:*2* 163:*8* 164:*9*
165:*10, 17* 166:*3, 9,*
*15, 19, 23* 168:*6, 9*
170:*18, 22* 171:*6,*
*10, 14, 17, 22* 173:*5,*
*9, 13* 174:*5* 175:*8*

177:*19* 178:*4, 7*
179:*1, 5, 18* 180:*11,*
*23* 181:*9* 182:*6, 10,*
*21* 183:*1, 19, 22*
186:*17* 187:*7, 12,*
*17* 188:*8, 12, 16*
189:*9, 12, 14, 19, 23*
190:*17, 23* 191:*21*
192:*2, 8* 193:*6, 14*
194:*2* 195:*10, 15,*
*22, 24* 197:*21*
198:*11, 21* 200:*8*
202:*16, 19* 203:*5*
204:*7, 18* 205:*1, 4,*
*8, 16, 21* 208:*12*
209:*17* 210:*2, 5, 8*
212:*4* 213:*10, 15,*
*24* 214:*21* 215:*23*
219:*1, 4* 220:*7, 21*
221:*7, 12* 222:*20,*
*24* 223:*24* 224:*2, 6,*
*17* 225:*7, 11, 15*
226:*7, 13, 17* 228:*2,*
*13* 229:*4* 232:*4*
233:*11, 19* 234:*9,*
*13, 16* 235:*1, 14, 21,*
*24* 236:*3* 237:*11*
243:*9* 244:*4, 8*
247:*11, 20* 250:*16*
253:*1* 254:*25*
256:*22*
**sit** 65:*17*
**site** 195:*1*
**sitting** 64:*14* 66:*11*
89:*23* 96:*3* 112:*15*
131:*13* 186:*6*
194:*7* 210:*16*
218:*4* 252:*24*
**situation** 131:*10*
**six** 23:*1* 174:*8*
**size** 177:*5, 7*
**skusin@susmangodf**
**rey.com** 2:*12*
**Slightly** 142:*3*
237:*8*
**slips** 70:*21*
**small** 120:*18, 19,*
*24* 177:*8*
**Social** 230:*16*
231:*1*

**software** 82:*17, 20*
219:*9* 243:*21*
**somebody** 37:*11,*
*11* 50:*13* 57:*16*
69:*25* 150:*6, 10*
151:*4* 158:*5* 161:*1*
167:*6* 192:*23*
212:*13* 218:*11*
219:*23* 241:*15*
**somebody's** 204:*9*
**somewhat** 56:*6*
196:*23*
**sooner** 147:*25*
**sorry** 96:*2* 118:*18*
142:*14* 195:*7*
204:*20* 213:*13*
**sort** 10:*4* 11:*8*
26:*13* 44:*25* 48:*23*
78:*3* 95:*6* 96:*12*
122:*2* 126:*7, 23*
145:*22* 169:*24*
199:*8* 232:*1*
233:*10* 256:*5*
**sounds** 62:*19*
164:*22*
**Source** 107:*7*
113:*20*
**Sources** 4:*19* 92:*3*
**South** 11:*13*
**SOUTHERN** 1:*2*
**Souza** 158:*5*
**space** 66:*25*
145:*10, 11* 216:*17*
**spaces** 55:*11*
**span** 216:*6*
**speak** 254:*12*
**speaking** 91:*5*
**special** 12:*24*
181:*21*
**specific** 50:*2* 75:*6*
159:*20* 174:*25*
176:*13* 187:*13*
243:*7* 250:*13*
**specifically** 48:*11*
159:*8* 181:*21*
227:*21* 240:*6, 9*
241:*15*
**spent** 23:*4*
**spinning** 254:*15, 23*

**spot** 201:*24*
**spotlight** 41:*10*
**SPP** 109:*21*
**spreadsheet** 99:*4, 8*
100:*14, 15, 19, 20*
110:*24* 113:*15*
115:*14* 177:*16*
180:*8, 12* 181:*10,*
*17* 183:*13* 185:*25*
186:*3, 14* 211:*7*
212:*2* 213:*22*
**spreadsheets** 97:*23*
**Spring** 20:*13*
**square** 148:*16*
**Stam** 175:*24*
**stand** 22:*21* 252:*24*
**standard** 15:*11*
**standards** 97:*16*
110:*12*
**standing** 117:*11*
**Staples** 187:*11*
191:*11*
**STARNES** 2:*1*
**start** 7:*2* 28:*14*
44:*8* 48:*1* 66:*3, 8,*
*9, 10* 81:*2, 4*
121:*24* 122:*22*
138:*16* 150:*8*
159:*19* 163:*17*
202:*8* 233:*13*
248:*6*
**started** 7:*6* 22:*9*
47:*20, 22* 54:*1*
57:*22*
**starting** 234:*11*
**starts** 65:*4* 235:*6*
**State** 1:*22* 7:*10, 21*
44:*12* 49:*12* 94:*21*
123:*18* 254:*6*
258:*2, 4*
**stated** 1:*24* 58:*1*
70:*9* 129:*1* 258:*4*
**statement** 92:*25*
93:*3* 151:*8* 206:*1*
209:*8* 236:*16*
**statements** 32:*25*
114:*14*
**STATES** 1:*1* 60:*9*
78:*22* 149:*7, 8*

**Dennis Williams CONFIDENTIAL**                                   **290**

stating 206:*12*
227:*16*
status 172:*9*
183:*23*
stayed 145:*25*
step 85:*22*
Stephanie 24:*18*
Stepping 28:*25*
steps 87:*18* 252:*3*
STEPTOE 2:*12*
stick 54:*2*
stolen 155:*10, 20*
156:*2, 15* 164:*5*
stolen, 156:*7*
stop 130:*16* 250:*10*
stopped 131:*6*
storage 213:*7, 8*
235:*7* 243:*3*
store 201:*13, 15*
234:*18, 20, 23*
stored 63:*5* 192:*10*
223:*2* 226:*20, 22*
227:*1* 255:*8, 16*
stores 252:*2*
Street 2:*15* 224:*18*
strict 224:*4, 9*
strike 248:*9*
string 4:*14, 16* 5:*4,
6, 10, 12, 16* 6:*1*
132:*3* 137:*9*
strongly 131:*13*
Stuart 2:*11* 22:*20*
242:*13*
stuff 74:*19* 75:*1*
161:*12, 13* 198:*5, 7,
8, 18* 200:*6, 12*
201:*2, 13* 234:*21*
250:*2* 251:*21*
subject 19:*24*
21:*11, 16* 68:*7*
80:*7*
submitted 13:*21,
22* 14:*4*
subpoena 8:*22*
15:*13*
subsequent 20:*14*
35:*9* 237:*20*
239:*18*
subsequently 144:*1*

155:*10* 248:*25*
subset 87:*12*
**Substantially**
105:*21*
successful 196:*23*
successfully 152:*8*
196:*17, 18, 22*
sucked 255:*15*
sufficiency 76:*2*
83:*11, 21* 84:*14*
86:*6* 114:*22*
115:*20, 23* 247:*15*
sufficient 46:*17*
85:*1*
suggest 150:*20*
241:*19*
suggested 45:*4*
suit 84:*7* 129:*6, 7*
Suite 2:*15*
sum 193:*2*
summary 26:*1*
27:*18* 100:*24*
207:*5*
super 230:*8*
support 68:*12*
244:*22* 245:*22*
258:*24*
supports 133:*1*
supposed 98:*23*
100:*8, 19* 108:*24*
178:*12*
sure 67:*24* 121:*13*
149:*4* 154:*12*
162:*14* 180:*19*
193:*22* 224:*9*
surmise 241:*15*
Susana 108:*5, 8*
175:*20, 22*
SUSMAN 1:*22* 2:*7*
swear 218:*5*
switch 193:*19*
switched 154:*25*
222:*17*
switches 225:*13*
sworn 1:*20* 7:*5*
38:*3* 114:*14* 258:*6*
system 11:*11* 12:*3*
41:*1, 9* 82:*18*
88:*16* 91:*16* 94:*25*

216:*13* 217:*10, 12*
218:*7, 13* 219:*14*
system, 235:*8*
systems 87:*19*
216:*1, 3*

**< T >**
table 144:*21, 22*
216:*16, 17, 20*
217:*24*
take 29:*1* 32:*25*
39:*19* 43:*23* 58:*4*
68:*3, 15* 84:*12*
93:*6, 8* 121:*16*
123:*22* 163:*10*
193:*24* 202:*1*
232:*24* 235:*22*
244:*9* 247:*13, 13*
257:*10, 12*
taken 1:*20* 24:*24*
25:*8* 32:*3, 12* 33:*4*
39:*8* 52:*1, 13*
87:*19* 90:*23* 95:*3*
123:*11* 124:*6*
125:*23* 126:*6, 18*
128:*5, 17, 18, 19*
220:*2* 256:*19*
258:*11*
talk 12:*14, 15*
124:*24* 138:*25*
139:*2* 167:*15*
175:*18* 176:*3*
193:*17* 201:*5, 6, 7*
221:*20*
talked 32:*7* 36:*13*
70:*24* 75:*5* 105:*3*
108:*16* 109:*13*
111:*11* 124:*21*
161:*16, 19* 167:*20*
175:*3* 186:*18*
194:*12* 202:*14*
219:*21* 235:*10*
245:*1, 6* 246:*21*
247:*14* 250:*17*
talking 19:*3, 11, 17*
30:*11* 64:*21* 66:*11*
78:*11* 97:*7* 123:*3*
133:*23* 134:*6*
138:*25* 139:*6*
142:*8* 156:*21*

170:*13* 173:*18*
176:*17* 181:*2*
191:*13* 192:*23*
197:*22* 200:*10*
202:*10* 203:*10*
207:*18* 218:*19*
231:*22*
talks 75:*21* 134:*1*
167:*7* 227:*20*
task 23:*5* 244:*20*
tasks 244:*9* 247:*7*
tax 126:*7, 13, 16,
23* 127:*4*
TBA-Josh 209:*8*
TC 106:*19* 148:*10*
150:*15*
tc@conradscherer
62:*4*
tc@iradvocates
51:*15* 62:*4*
tc@iradvocates.com
61:*25*
TC@IRAdvocates.o
rg 89:*18* 215:*25*
tc@iradvocates.org.
ost 215:*9*
TCRR 1:*22* 258:*20*
TC's 49:*8* 92:*14*
team 75:*13* 98:*19*
171:*3* 180:*7*
199:*24* 212:*13*
225:*3* 237:*4*
tech 135:*15, 22*
technical 161:*18*
technician 140:*9*
193:*21* 209:*12*
technicians 146:*17*
251:*18* 252:*13*
technological 20:*9*
Technologies 38:*23*
Technology 39:*14,
20* 228:*3*
techs 143:*12*
149:*13*
telephone 22:*13, 15,
17* 161:*21*
tell 40:*20, 24*
41:*21, 23* 42:*3*
50:*19* 55:*12* 71:*22*
76:*25* 78:*14, 19*

85:6, 20, 21  96:3
101:17  103:11
111:7  112:15
120:5, 9  124:5
128:23  129:11
143:12  145:2
146:11  154:1
158:10  162:9
163:6  165:5  167:6,
21  172:9  175:6
176:8  183:10
188:4  190:7  208:8
210:17  211:11
214:11, 18, 22
239:25  242:17
**Tellez**  108:6, 9
175:20, 22
**telling**  37:4  50:13
70:16  127:8, 9
155:14, 15  177:16
192:12  205:18
211:12  225:1
228:4
**tells**  105:11  107:8
114:2  178:24
214:4  223:7
225:20
**term**  201:8, 9
**terminated**  33:20
**terms**  39:16  83:25
84:25  98:9  109:2,
6, 12, 22  110:8, 18
114:2  116:12
117:10  118:21
**TERRENCE**  1:7
6:13  54:14
**Terry**  4:9  5:5
46:15, 21  48:3
49:2, 21  50:14, 24
51:5  54:13  56:13
62:20  70:7  103:17
104:5, 8  107:22
118:15  138:14
140:5  148:9, 23
174:4  180:16
191:18  193:17
197:10  222:11, 22
225:2  226:3  237:9
242:14  252:17

**Terry's**  92:21
133:1  135:1  140:5
165:20  171:11
173:6  193:21
209:19  212:3
222:14  238:6, 9
**test**  95:10, 23  96:9
**testified**  7:5  32:8,
12  34:5  38:7, 7
240:15
**testify**  13:13  258:7
**testifying**  15:5, 8, 9
129:5
**testimonies**  31:1
**testimony**  24:2, 8,
10, 13  25:2, 6  30:9,
25  33:23, 25  34:2
37:25  38:2  39:22
43:17  61:2  158:20
217:20  240:21
254:4
**testing**  96:4
**Texas**  1:22, 23
2:10  258:2, 4, 25
**text**  16:1  17:13
**Thank**  81:11
242:10
**Thanks**  234:3
**theft**  157:19
**thing**  82:8  85:20
90:13  163:24
165:5  183:2
197:20, 22  198:4
214:11, 17  228:6
**things**  7:7  16:16
76:20  83:10  85:12
101:18  126:24
167:17  235:5
249:23
**think**  7:14  8:12
10:8  12:16  14:3
33:17  40:12  43:1,
3, 18  60:1  61:1
65:10  69:23  70:12
71:16  72:17  75:9
78:5  83:1  88:16
106:11  107:1
112:6  117:24
129:9  136:3, 5
139:14  148:22

151:20  154:9
155:14  163:3, 11
166:5  186:10
194:15  196:12
199:4  200:1, 21
205:22  211:7
216:4  219:19
223:18  224:15
226:22, 25  227:8,
13, 15  236:4  253:4,
16  257:5
**thinks**  148:12, 18
150:25  151:13
152:15  206:1
**third**  134:19  250:8
**third-party**  244:23
249:10  251:7
**Thomas**  2:5
**thorough**  96:25
97:12, 15  110:11
115:25  116:22
117:21  220:17, 23
241:20  247:4
**thoroughness**  76:3
83:11  247:16
**thought**  45:1, 8
142:5  162:4, 17
170:18  205:5, 14
223:12  226:20
236:12
**thousand**  190:8
**three**  32:7  101:7
102:18  111:10, 17,
22  136:5  161:22
213:6  214:14
236:1, 8, 10, 12
**three-week**  243:17
**three-year**  59:18
60:25
**three-year-old**
247:23
**throw**  224:18
**Thumb**  245:21
**Thursday**  22:10
**ticket**  60:9  78:10,
14, 16, 22  79:1, 3
134:8, 18  139:24
143:1  146:15
165:20  194:11, 25
195:8, 14  253:17

**tickets**  59:21
77:17, 20, 25  78:3
123:2  128:13, 14
134:16  191:5
194:6, 16  206:14
221:3  244:24
245:22  246:14
248:21, 22  251:23
253:19
**tie**  28:13
**ties**  249:21
**time**  10:2  11:18,
22  12:18  14:1
23:3, 4  35:7  36:11
37:2, 13, 16  41:7
43:23  46:19  47:22,
25  48:14  49:14
52:11, 17  53:2, 12,
23, 25  54:20, 22
55:1, 6, 8  56:2
57:24  58:15  59:10
60:18, 24, 25  61:21
63:17, 22  64:1, 3
67:8, 10, 14, 19, 23
68:9  69:6, 13
70:25  71:13  72:4
73:3  78:2, 12  80:5,
22  82:22, 25  90:24
91:13, 21  93:20
94:9, 14  98:14
111:2  115:24
116:11, 19  119:25
122:4  125:22
126:24  128:15, 15
130:12, 23  131:3,
23  138:9  142:4, 7,
10  143:6  145:3, 7
146:8, 13  151:13,
22  153:20, 21, 25
155:24  156:20
160:10, 12  164:12
167:20  168:18
174:17  182:8
183:4, 4, 9  186:15,
20, 20  188:15
189:18, 20, 25
190:9  192:14
199:5  204:1, 3
207:17  214:23
215:18  216:6

**Dennis Williams CONFIDENTIAL** 292

218:*14*  225:*3, 8*
231:*1*  234:*11, 11*
235:*23*  237:*25*
238:*2*  239:*1*  243:*6*
247:*24*  252:*14*
254:*20*  257:*10*
258:*9, 12*
**Timeline**  4:*9*
**time-out**  161:*10*
**times**  8:*3, 4*
  152:*20*  161:*19, 20,*
*22, 24*  183:*11*
188:*5, 18, 21*
189:*25*  190:*4, 5, 8,*
*8, 9, 13*  202:*15*
**timing**  84:*12*
115:*21*  116:*4*
241:*19*
**tiny**  66:*25*
**title**  208:*9*
**today**  8:*6*  13:*15*
  14:*24*  17:*12*  23:*24*
  57:*14*  64:*14*  65:*11*
  74:*17*  75:*22*  81:*11*
  85:*18*  89:*23*  94:*13*
  96:*4, 11*  97:*3*
  112:*15*  117:*19*
  131:*8*  133:*18, 24*
  136:*23*  139:*13*
  155:*19*  186:*6*
  194:*7*  203:*20*
  210:*16*  218:*4*
  219:*21*  236:*11*
  238:*16, 23*  239:*6*
  240:*15, 21*  252:*24*
**told**  20:*4*  22:*2*
  46:*25*  47:*2, 4*  70:*1*
  75:*22*  93:*20*
  106:*11*  120:*12*
  127:*2, 13*  128:*10*
  129:*9*  139:*13*
  141:*18*  147:*8*
  148:*25*  149:*24*
  150:*5*  155:*11*
  156:*14*  157:*18*
  161:*14*  162:*17, 20,*
*24*  164:*8*  199:*23*
  2'0:*20*  203:*22*
  205:*5, 14*  217:*6*
  223:*10*  228:*10*

231:*16*  232:*10, 16*
238:*25*  239:*4, 7*
240:*14, 22*  241:*2,*
*15*
**Tony**  2:*23*
**tool**  181:*21*
**Top**  177:*14*
  194:*21*  195:*6*
  208:*10*  209:*6*
**topic**  21:*4*
**total**  14:*18, 25*
**totally**  115:*4*
**touched**  131:*11*
**traced**  77:*17*
**tracked**  28:*16, 20*
**tracking**  43:*10*
**Trade**  24:*17*  26:*2*
**traded**  225:*2*
**traffic**  20:*3*  74:*13*
**training**  243:*7, 11,*
*12, 13, 14, 16*
**transact**  229:*22*
**transcript**  258:*8*
**transfer**  28:*24*
  33:*10*  34:*8*  35:*23,*
*23*  42:*18*  83:*4, 7*
  132:*15*  143:*9, 18*
  145:*22*  146:*8, 13*
  159:*9*  160:*15*
  161:*1, 1, 3, 25*
  162:*16, 22*  164:*20*
  165:*20, 22*  166:*17*
  167:*16*  184:*24*
  192:*5, 6*  221:*4, 10,*
*14, 18*  225:*4*  226:*5*
  227:*11*  228:*16, 22*
  233:*9*  249:*9, 12*
  250:*3, 4*
**transferred**  26:*5*
  27:*7*  28:*1, 10, 22*
  29:*13*  31:*21*  33:*13*
  34:*18, 20, 23*  35:*3*
  36:*19*  142:*18, 21*
  143:*13*  144:*5, 5*
  146:*18*  158:*23*
  159:*1, 2, 4, 5*
  161:*11*  166:*12, 21*
  167:*5, 22, 25*  168:*5*
  169:*1, 3*  185:*6*
  189:*13*  221:*22*

222:*1*  223:*10*
225:*21*  226:*16*
227:*24*  228:*19, 24*
229:*2*  249:*4, 7, 11,*
*22*  251:*3, 7*  257:*1*
**transferring**  37:*20*
  129:*25*  164:*17*
  167:*8*  187:*15*
  199:*15*  225:*9, 19*
  226:*11*
**transfers**  122:*6*
**transition**  77:*17*
  250:*5, 9*  251:*1*
**transitioned**  123:*10,*
*10*  158:*22*  223:*13*
  250:*7*
**transpiring**  78:*1*
**transported**  42:*24*
**trashes**  41:*10*
**Trey**  2:*5*  43:*22*
  79:*20, 20*  81:*4*
**trial**  15:*9*  33:*25*
**tried**  57:*17*  149:*6*
  159:*17*  220:*15*
  245:*9*
**trip**  233:*10, 17*
**troubles**  150:*15*
**Troubleshot**  135:*2*

**Troubleshotslowness**
135:*3*
**true**  82:*10*  83:*5*
  92:*25*  93:*3*  125:*18*
  127:*17*  128:*11*
  141:*19*  142:*8, 18*
  143:*19, 22*  144:*1,*
*19*  147:*9*  154:*2*
  160:*23*  162:*9*
  169:*8, 14, 16, 19*
  172:*22*  188:*15*
  189:*18*  258:*5, 8*
**truth**  127:*8, 10, 13*
  155:*16*  157:*18*
  158:*11*  162:*9, 12,*
*12*  163:*7*  258:*7*
**truthful**  32:*2*
**truthfully**  8:*7*
**truthfulness**  127:*20*
**try**  29:*12*  39:*16*
  54:*25*  57:*15*  77:*3,*

*6*  78:*4*  80:*9*  81:*14*
  82:*15, 20*  126:*17*
  152:*20*  170:*23*
  203:*12*  216:*15*
  227:*19*  238:*19*
  248:*7*  251:*14*
  252:*18*  256:*16, 25*
**trying**  26:*19*  38:*13*
  57:*19*  69:*1*  70:*1*
  102:*7*  116:*25*
  129:*10*  144:*25*
  145:*2*  149:*7, 23*
  151:*24*  152:*2, 6*
  153:*5*  161:*1*  167:*8*
  174:*16*  185:*7*
  195:*12*  196:*13*
  209:*13*  220:*24*
  242:*1*  246:*16*
  247:*1*  248:*4*
  252:*17*
**turn**  35:*12*
**turned**  25:*18*  246:*5*
**twells@starneslaw.c
om**  2:*6*
**twice**  161:*23*
**two**  13:*16, 25*
  16:*22*  23:*8*  30:*23*
  32:*7*  33:*19*  53:*12*
  73:*20*  103:*24*
  106:*8, 25*  108:*6*
  109:*7, 9*  114:*8, 9*
  127:*22*  128:*5*
  129:*13*  136:*19*
  150:*23, 24*  154:*14*
  189:*25*  190:*5, 8, 13*
  203:*21*  236:*6*
  238:*1*
**type**  28:*6*  33:*23*
  37:*25*  61:*24*  96:*16*
  126:*20*  168:*10*
  170:*19*  181:*24*
  182:*2*  214:*17*
  216:*1*  220:*20*
  231:*6*  254:*9, 15*
**types**  100:*24*  243:*7*
**typewriting**  258:*7, 8*
**typically**  32:*16*
  227:*10*
**typing**  37:*11*

< U >
U.S 258:24
Uh-huh 132:24
135:23 152:17
215:10
ultimate 39:12
ultimately 20:19
116:5
unable 11:21
75:25 239:17
244:16
unallocated 216:17
unaltered 231:19
unclear 8:12 204:3
underneath 17:13
understand 8:9, 14
10:25 37:8 57:15
118:2 134:3 138:8
163:25 165:22
166:13 170:14
173:3, 6, 10, 22
181:18 185:10
199:20 223:19, 22,
25 224:3, 7 235:22
understanding
17:12 18:21 19:22
20:1 21:17 46:14
47:19 48:24 49:12
62:25 73:18, 21
74:12, 23 76:16
85:25 87:11 88:1
91:12, 16, 19, 23
93:19 94:20, 23
98:22 100:7, 18
101:9 107:12
110:23 111:14
120:10 126:2
133:4 135:7 137:3
138:24 139:5
150:8, 9 157:1
159:1 160:17
168:18 184:13
187:16 191:25
193:5 232:22
233:7 234:10
understood 8:18
undertake 247:6
undertaken 84:2

unintentionally
77:11
Union 114:5, 8
UNITED 1:1
unredacted 253:8
unsuccessful 21:16
unusual 180:1
184:16
updated 23:25
24:1 30:9
updates 28:17
188:2
upgraded 179:9
up-to-date 23:24
usage 28:21 71:12
203:16 238:21
USB 33:18 35:8,
10, 13, 16, 20 36:10
37:1 42:4, 9, 10
43:2, 3 148:18
171:8 180:8, 15
181:12, 19, 25
182:1, 2, 3, 24
183:3 184:15, 17
188:22 189:6
190:15 203:11
209:16 250:17
256:15
use 32:18 102:18
123:15 125:13
145:19 157:17
175:13 181:18
188:14 191:23
201:8 202:11, 17
203:11 204:6
216:2 234:12
244:19 245:16
248:16 256:11, 20
user 11:13 42:1
156:16, 19
users 11:12
uses 122:17
usually 7:15 41:25
utilize 156:21
235:25
utilized 73:20 85:1
192:5, 6
utilizes 123:1

< V >
Van 56:15
variations 83:25
116:12
variety 83:24 98:8
242:23
various 10:25 29:4
39:16 101:3 110:3
117:3 182:2
197:11 204:1
243:18
Ventures 38:22
39:17
verify 64:13 93:18
189:2 229:20
version 214:16
versions 109:10
versus 24:6, 18
34:7 42:15 161:6
Vickie 192:24
Victoria 5:4 6:3
149:10 152:4
191:6 192:22, 25
197:10 204:16
252:10
Victoria's 246:24
VIDEOGRAPHER
2:19 7:1 44:1, 7
58:8, 11 80:23
81:1 121:19, 23
163:13, 16 202:4, 7
211:21, 24 233:1, 4
257:16
videotape 37:7
VIDEOTAPED
1:15, 18 3:2 4:2
view 17:22 19:18
149:17 197:2, 3
230:9
viewing 17:19
208:18 209:10
violate 21:13
Virginia 243:15
virus 133:13
viruses.' 135:5
Visible 24:17
volume 41:1
148:16 216:18, 19
217:25

Vortex 38:22
39:13, 17, 20
Vostro 122:18
166:6, 7, 18, 22
167:2 168:7
171:21 189:17
211:16
VS 1:6

< W >
waived 1:24
Walk 28:9 58:18
want 12:14 24:6
28:13 34:2 52:22
57:13 58:21, 21
69:23 79:17 130:5,
22 159:9 179:19
193:9 198:6
204:14 214:3
218:3, 4 225:21
239:2 249:16, 17,
19 252:4 256:17
257:7
wanted 21:12 80:4
81:5 138:15
wanting 46:25
69:22 179:13
198:3 208:17
wants 132:13
201:15
Washington 208:13
246:19
watch 37:7
way 9:1 20:17
45:15, 23 47:16
53:13 57:17 58:20
79:18 93:5 96:17
99:20 100:22
147:1 169:12
188:17 190:2
198:16 199:4
200:2, 4 201:20
210:19 222:17
229:18 230:18, 22
231:9 237:19, 21
248:3 249:20
252:20 254:6
ways 10:25
web-based 62:16,
21 63:7 65:21

**Dennis Williams CONFIDENTIAL**                                    294

**Wednesday** 22:21, 23

**week** 188:9 236:19 241:11

**well** 8:25 12:16 14:12 21:1 28:15 33:3, 25 36:20 50:5 52:12 53:4 54:12 59:16 67:18 70:5 79:13 80:17 86:8, 18 94:17 97:25 99:3 103:20 105:12, 19, 23 114:6 117:24 122:12 123:1 125:1 127:24 130:4 135:21 136:16 143:8 144:18 145:23 150:1 152:14 158:25 163:5, 21 170:3, 18 172:25 184:20 194:18 196:16 198:1, 17 201:12 206:11 207:9 211:6, 18 214:11 216:23 221:21 227:21 229:21 230:11 231:2 233:24 234:4 241:20 246:20, 21 247:12 248:18

**Wells** 2:5 3:6, 8 7:11, 17, 20 12:11, 16 13:1 14:11, 14 15:21 17:10 18:7 21:23 23:15, 22 37:17 43:24 44:10 45:22 46:23 48:8, 20 50:4 51:9 52:16 53:11 55:5 57:1 58:13 60:12 61:15 69:11 70:5, 16 71:16 72:22 74:8 75:20 76:15 78:9 79:5, 7, 24 80:21 81:9, 12 86:25 88:7 89:8 92:1 93:6, 25 95:1,

12 96:22 98:17 99:16, 23 100:13 101:22 102:6 104:19 106:6 108:5 109:8 110:16, 21 111:14, 18 112:3 113:12 116:24 117:9, 18 118:8 120:4, 14 121:9, 12, 18 122:1 127:17 128:4 130:4, 16 131:5 132:2 134:13 137:7 139:11, 20 141:6 142:3 143:8 144:12 148:4 149:23 150:5 151:20 152:25 153:4, 13, 23 154:8 156:1 158:18 159:14, 24 160:6 163:12, 19 164:7, 21 165:2, 13 171:2 174:15 177:14 180:6 191:1 192:20 197:7 198:17 199:18 200:16 201:5 202:1, 9 204:14, 21 206:7 208:5 210:23 211:5, 19 212:1 217:20 218:2 220:13 221:19 222:5 223:16 224:24 225:25 226:19 227:5, 13 228:9, 20 230:2 231:5, 25 232:15, 20, 24 233:6, 23 236:10, 25 237:4, 18 238:11 239:10, 25 240:22 241:14 242:4, 9 247:10 248:9 250:22 253:14 255:13, 24 256:16 257:4, 9 258:15

**went** 12:23 14:9, 10 18:8 26:3

63:16 66:17 88:18 98:5, 10 119:6 122:2 147:13, 16 151:22 185:15 233:10 241:8, 25 243:14, 18 244:10 245:14, 18 246:9, 9, 12, 15, 22, 23 247:21 250:16

**We're** 7:1 44:7 57:19 58:8, 11 67:24 79:19 80:23 81:1 100:14 101:17 106:2 121:19, 23 133:23 136:23 142:8 154:11 156:21 163:10, 13, 16 170:12 179:17 180:13 191:19 197:22 202:7 204:9 211:21, 24 233:1, 4 257:16

**West** 243:15

**Western** 114:5, 8

**we've** 10:8 14:12 23:7 32:7 39:2 44:12 56:7 59:20 75:9 78:10 79:17 97:22 102:7, 14 106:25 112:19 119:25 134:24 135:23 154:9 166:12 168:13 184:2 186:18 191:12 197:13 198:22 199:12 204:8 218:24 220:13 235:10 253:16

**wheel** 254:15, 23

**whichever** 61:25

**white** 242:20 243:15

**who-all** 20:11

**wife** 43:10 124:6, 22 126:2 128:19

**Wiley** 24:18

**WILLIAMS** 1:16, 18 3:3 4:3, 4, 4, 7,

8, 9, 9, 9, 9, 13, 14, 15, 16, 17, 17, 20, 22 5:1, 1, 1, 1, 4, 6, 6, 6, 8, 10, 10, 12, 15, 16, 17, 18, 18, 18, 18, 21, 21, 21, 21, 24, 24 6:1, 2, 3, 3, 3, 3, 7, 9, 9, 9, 12, 13, 14 7:4, 22, 24, 25 15:19 23:13 44:5, 10 48:18 55:3 58:14 60:10 81:12 86:23 88:5 89:6 91:24 98:15 121:7 131:25 134:11 137:5 139:18 148:2 163:19 164:25 165:11 170:25 177:12 180:4 190:24 192:18 197:5 202:10 204:12 208:3 210:21 211:3 222:3 224:22 225:23 233:7, 21 236:23 242:2, 13 252:23 258:5

**Willis** 38:10

**Windows** 29:5, 15 30:3 41:6 77:12 161:7 216:3 217:4 219:11 251:25 252:5, 11 253:23

**Windows-based** 256:14

**Windows-type** 41:4

**wipe** 11:1, 4, 9 229:16

**wiped** 10:10, 20, 24 11:25 136:14

**wiping** 82:17

**wishes** 200:25

**withdrawing** 100:10

**withhold** 9:5

**withholding** 101:18

**witness** 1:20 27:19 113:9 152:24 253:12 258:5, 6

**Dennis Williams CONFIDENTIAL**                                    **295**

witnesses  7:*15*
Witzer  110:*4*
wondering  65:*6*
135:*19*
**Word**  37:*11*  114:*7*
128:*7*  140:*18*
167:*10*  206:*3*
209:*11*  234:*19*
256:*13*
**WordPerfect**
208:*19*
**words**  10:*24*  51:*25*
71:*8*  114:*8, 9*
160:*20*
**work**  9:*9, 12*  12:*6,*
*8*  13:*5, 8, 11*  14:*19,*
*19*  15:*5, 8*  33:*20*
34:*16*  35:*7*  47:*7*
49:*8, 21*  50:*14*
55:*1*  59:*21*  60:*8*
70:*21*  73:*17*  74:*22*
77:*16, 20, 25*  78:*3,*
*10, 14, 16, 22*  79:*1,*
*3*  95:*13*  107:*11*
108:*15*  114:*11*
123:*2, 3*  128:*12, 14,*
*15*  129:*24*  132:*23,*
*25*  133:*2, 9*  134:*8,*
*16, 18*  139:*23*
140:*2*  143:*1*
146:*15*  184:*25, 25*
191:*4, 17*  194:*5, 11,*
*16, 25, 25*  195:*8, 14*
206:*14*  220:*20*
221:*2*  223:*20*
224:*1*  227:*24*
231:*19*  235:*20*
236:*5*  242:*18*
244:*24*  245:*21*
246:*14*  248:*21, 21*
250:*6*  251:*23*
253:*17, 19*
**worked**  140:*5*
242:*19, 20, 21, 22*
245:*7*  246:*25*
252:*11*
**working**  135:*12, 19*
137:*11, 12, 17, 23*
138:*1*  156:*11*

159:*10*  205:*3*
209:*13*  234:*4, 5*
**works**  107:*12, 13,*
*17*
**world**  224:*11*
231:*14*
**Worldwide**  38:*11*
**worry**  113:*13*
166:*11*  226:*11*
**worth**  236:*19*
**worthwhile**  220:*8*
**writing**  45:*12*
61:*24*
**writings**  43:*20*
**written**  47:*16*
**wrong**  85:*7*
149:*13*  165:*6*
208:*22*
**wrote**  45:*10*  160:*21*

**< Y >**
**y'all**  205:*9*  232:*20*
239:*20*
**Yeah**  37:*6*  43:*24,*
*24*  107:*1*  121:*18*
163:*1, 12*  173:*19*
224:*13*
**year**  9:*13*  10:*19,*
*21*  12:*1, 4*  23:*9, 9*
115:*11*  116:*13*
123:*24*  124:*13*
125:*25*  136:*15*
223:*14, 15*  236:*2*
**years**  130:*14, 18*
131:*14, 14*  143:*21*
144:*7, 14, 16*  145:*4,*
*16, 19*  153:*18, 22*
154:*1*  221:*5*  223:*6*
237:*14*  238:*1*
242:*20, 21, 24*
**yesterday**  22:*22, 25*
24:*8, 15*  112:*4*
120:*22*  147:*11*
159:*15*  160:*1, 3*

**< Z >**
**zero**  190:*9*

FILED

2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 10

**To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)**

| | |
|---|---|
| **From:** | Maggie C. Crosby |
| **To:** | Terrence Collingsworth |
| **Sent:** | 4/23/2013 11:47:27 AM |
| **Subject:** | RE: while I'm gone |

Sounds good. Those computer tasks should be easy enough. I'll work with Juan to get that all worked out. If there are any passwords to the old or new computer that I wouldn't already know, please leave them on a post-it note on the machine.

It looks like you'll return while I'm off on my honeymoon, so I won't see you until June 10th! If there's anything else you think of before you leave, or that comes up while you're gone, please let me know!

Maggie

**From:** Terrence Collingsworth
**Sent:** Tuesday, April 23, 2013 11:24 AM
**To:** Maggie C. Crosby
**Subject:** while I'm gone

Maggie, I appreciate your help while I'm gone.
Here are a few issues that I wanted to clarify for while I'm gone.

n  I am being intentionally vague with CS about my plans. I do not want to start a precedent that I, or anyone else in DC office, needs to report to CS/FTL before taking a vacation. If anyone hassles you about me while I'm gone, tell them to send me an email or call my cell.

n  Please log on to my account and approve the weekly expenditures in my name

n  There is so much going on that I will be doing work on the road. I will give you my time up to tomorrow tomorrow, and then will email you my time from the road.

n  I brought in my new laptop to be set up while I'm gone. I won't worry about transferring old emails, music etc. Here is what I'd like done, and whether its Juan our the local folks, I'd think this is pretty basic stuff

1.  First, I'd like to know from a pro like Juan if taking windows 8 off the new laptop and installing windows 7, which is on my office PC, will in any way hurt, damage, slow down etc the laptop. I don't want them both on there, so if they can't easily and without impact replace 8 with 7, then never mind (my hope was to simplify, and I really get and like Windows 7. I don't want to have to use 2 different systems unless I have to)
2.  Install Office (Word, Outlook etc) and also Word Perfect
3.  Set up my IRA and CS email. I don't need the old accounts transferred; just need it to work going forward
4.  Set up my dropbox

I think that's it. I will show you how to get a screen on the windows 8 system before I go. Maybe you know, but it's not self-evident.

Thanks, Terry

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 11

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

| From: | Victoria D. Ryan <VRyan@conradscherer.com> |
|-------|--------------------------------------------|
| Sent: | Friday, January 21, 2011 9:44 AM |
| To: | Terry Collingsworth; Piper M. Hendricks; Christian Levesque |
| Cc: | Susana Telloz |
| Subject: | popping out to staples |

Hi all, popping out to staples to pick up a portable external harddrive for Terry's files. Josh Robison is here looking into his
computer info-transfer. I imagine I'll be back in by 10:30.
Please call my cell if you need me 484-431-6482.
Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Phone: 202-543-4001
Fax: 1-866-803-1125

1

CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER CS_TC011045

FILED

2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 13

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

Confidential – Pursuant to Protective Order

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DRUMMOND COMPANY, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 2:11-CV-3695-RDP |
| | ) |
| TERRENCE P. COLLINGSWORTH, individually | ) |
| and as an agent of Conrad & Scherer, LLP; and | ) |
| CONRAD & SCHERER, LLP, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

## DECLARATION OF DENNIS WILLIAMS

I, Dennis Williams, declare as follows:

1. My name is Dennis Williams. I am personally acquainted with and competent to testify to the facts herein stated. I provide this declaration based on my personal knowledge and can testify under oath to all of the facts herein.

2. I am a retired Federal Bureau of Investigation (FBI) agent with more than 32 years of law enforcement experience. In addition to my law enforcement experience at the FBI, I also became an FBI certified computer forensics examiner responsible for conducting computer forensics exams, searches, and peer reviews of computer forensic examinations. I have attended the FBI Computer Forensic Examiner Boot Camp and participated in other programs and trainings including, but not limited to, the National White Collar Crime Center for Basic Data Recovery and Analysis, the National White Collar Crime Center for Advanced Data Recovery and Analysis, and the Microsoft Advanced Forensics training.



Confidential – Pursuant to Protective Order

3. During my time at the FBI, I worked for 9 years in the FBI Washington, D.C. headquarters. I served as Supervisory Special Agent providing computer support for field operations and investigations. In this role, I worked with investigators and prosecutors on major cases and provided computer support tailored to the needs of the specific investigation.

4. Subsequently, I came to Houston in 1990 and worked on a variety of investigations related the White Collar crime, drug cases, and terrorism.

5. In 2000, I became a certified computer forensics examiner for the FBI. One of my tasks was responsibility for the collection of electronic information in the Enron investigation.

6. In 2005, I became the Director of the Greater Houston Regional Computer Forensics Laboratory (RCFL), which is a multi-agency task force and full service forensics laboratory and training center focused on examining digital evidence in criminal investigations and various types of fraud.

7. I am currently a Partner at Pathway Forensics, LLC ("Pathway"). I joined Pathway in 2008 after my retirement from 32 years of service in the FBI.

8. As a Partner at Pathway, I have extensive experience in e-Discovery, digital forensics acquisitions and analysis. Pathway is licensed as a private investigation company in the State of Texas. I have provided expert computer forensic services for business and employment disputes, compliance with discovery requests in litigation, investigations of intellectual property theft, family law matters, fraud, and criminal cases.

9. I am currently an EnCase certified examiner (EnCE), which is an internationally recognized computer forensics certification. My CV is attached to this declaration as Exhibit A.

2

Confidential – Pursuant to Protective Order

10. Pathway provides digital forensics, computer investigations, electronic discovery and forensics lab consulting services, including the acquisition, authentication, and analysis of electronic evidence.

11. The areas for which I provide services include:

    a) On-site staffing for e-discovery and/or forensics, including for Fortune 500 companies;

    b) Civil litigation support;

    c) Foreign Corrupt Practices Act; and

    d) Intellectual Property.

**Scope of Engagement**

12. Pathway was engaged in this litigation on behalf of Defendants Terrence Collingsworth ("Collingsworth") and Conrad & Scherer, LLP ("Conrad & Scherer") to do the following:

    a) attempt to locate certain electronic data that Conrad & Scherer was unable to find in connection with its recent document search in the above-referenced litigation;

    b) review the sufficiency and thoroughness of Defendants' initial e-discovery collection efforts; and

    c) determine, after finding any additional information, whether any of the information still not located appears to have been intentionally deleted or not.

13. In addition, I have been asked to review Defendant Collingsworth's computer history, including the retention and replacement of his computers and hard drives and the efforts undertaken to save and transfer electronic information from old computers and hard drives to

3

Confidential – Pursuant to Protective Order

replacement machines. The purpose of the computer history review was to determine whether discarding or replacing computers has any correlation to the remaining email gaps in Collingsworth's Conrad & Scherer and International Rights Advocates ("IRAdvocates") email accounts.

14. I have also been asked to assess how the email gaps in Collingsworth's Conrad & Scherer and IRAdvocates email accounts occurred.

## Summary of Analysis

15. Since my March 11, 2015 Preliminary Report, I have:

    a) located additional emails that further narrowed gaps in Collingsworth's email accounts;

    b) reviewed Collingsworth's use of computers and hard drives, including attempts to save, back-up or transfer electronic data from old computers and hard drives to replacement computers to determine whether replacing his computers has any correlation to the missing email gaps;

    c) analyzed whether there have been any attempts to intentionally delete, discard or destroy evidence; and

    d) assessed the reasons why the missing email gaps occurred.

16. To perform these tasks, I have done the following:

    a) interviewed Collingsworth about his computer history;

    b) interviewed current and former employees at Conrad & Scherer and IRAdvocates, including IT professionals, attorneys, paralegals, and secretaries;

    c) interviewed third-party email and web-hosting providers;

Confidential – Pursuant to Protective Order

d) interviewed third-party IT support staff;

e) conducted forensic examinations of computers, hard drives, and servers at Conrad & Scherer in an attempt to locate additional emails;

f) reviewed and analyzed emails related to Collingsworth's computer history and email issues; and

g) reviewed and analyzed the invoices and service ticket history related to computer support provided on Collingsworth's computers.

## Summary of Findings and Conclusions

17. My continued investigation revealed that Conrad & Scherer did in fact possess emails for certain time periods that were identified as missing in my March 11, 2015 Preliminary Report. In particular, Conrad & Scherer had emails for the following time periods:

a) Collingsworth's incoming emails for his IRAdvocates account from February 26, 2010 through January 27, 2011;

b) Collingsworth's outgoing emails for his IRAdvocates account from May 4, 2010 through May 17, 2011.

Further, Defendants also possessed Collingsworth's incoming emails that were sent to both his Conrad & Scherer email account and his IRAdvocates email account from February 22, 2012 through the present. Those emails were collected and searched during Defendants' December 2014 document review efforts.

18. In addition, I recovered some emails that were in a deleted folder on a hard drive connected to a server in the Conrad & Scherer DC office. Those emails included:

Confidential – Pursuant to Protective Order

a) Collingsworth's incoming and outgoing emails from his International Labor Rights Forum account from November 2, 2005 through June 20, 2007; and

b) Collingsworth's incoming emails from his IRAdvocates account from May 20, 2008 through June 2, 2008 and his outgoing emails from the same account from January 7, 2008 through June 1, 2008.

19. Despite the re-classification of certain emails and the recent recovery of other emails, some narrow gaps of missing emails remain:

a) Collingsworth's incoming IRAdvocates emails from June 21, 2007 through May 19, 2008 and his outgoing IRAdvocates emails from June 21, 2007 through January 6, 2008;

b) Collingsworth's incoming IRAdvocates emails from June 3, 2008 through February 25, 2010 (except for emails that Collingsworth either forwarded or replied to and/or emails that were also sent to or received by other IRAdvocates or Conrad & Scherer employees);

c) Collingsworth's outgoing IRAdvocates emails from May 17, 2011 through February 3, 2012 (except for outgoing emails to which the recipient replied back to Collingsworth and/or emails that were also sent to or received by other IRAdvocates or Conrad & Scherer employees);

d) Collingsworth's incoming IRAdvocates emails from October 27, 2011 through February 21, 2012 (except for emails that Collingsworth either forwarded or replied to and/or emails that were also sent to or received by other IRAdvocates or Conrad & Scherer employees) and his incoming and outgoing IRAdvocates emails from February 22, 2012 through March 22,

Confidential – Pursuant to Protective Order

2013 (that were not sent to both his Conrad & Scherer email account and his IRAdvocates email account and were not received or sent by another IRAdvocates or Conrad & Scherer employee); and

e) Collingsworth's incoming Conrad & Scherer emails from March 17, 2011 through February 21, 2012 (that Collingsworth did not forward or reply to and/or the email was not sent to another Conrad & Scherer employee) and incoming emails from February 22, 2012 through March 22, 2013 (that Collingsworth did not forward or reply to or the email was not sent to another Conrad & Scherer employee and/or the email was not sent to both his Conrad & Scherer email account and his IRAdvocates email account).

20. During my review of Collingsworth's computer history to determine whether discarding or replacing computers may, in some way, be related to the remaining missing email gaps, I found that all of Collingsworth's Conrad & Scherer computers can be accounted for.

21. There is no indication that emails or computers were intentionally disposed of or deleted to destroy evidence.

22. To the contrary, there is overwhelming evidence reflecting Collingsworth's email problems and the reasonable efforts that were taken by Collingsworth and his assistants to save or back-up his electronic information, including emails, from old computers to the Conrad & Scherer system or to save and transfer that electronic information from the old computer to a replacement computer before he replaced the old computer.

23. In nearly all instances, the emails from the old computer were saved on the Conrad & Scherer system, or properly transferred to a new or replacement computer. However, there were some anomalies that likely explain why gaps still exist.

Confidential – Pursuant to Protective Order

<u>Gaps Prior to February 26, 2010</u>

24. In May 2010, a third-party IT support company failed to properly transfer Collingsworth's archived email files from an old computer to a replacement computer, which likely caused the gap in his IRAdvocates email account from June 2008 to February 26, 2010.

<u>Gaps Between March 2011 and March 2013</u>

25. Throughout 2010, Collingsworth continued to experience problems accessing and using his emails on computers in his office and at home as well as when he traveled.

26. In January 2011, he switched to an Apple MacBook laptop to use as his main computer in an effort to resolve his email problems.

27. However, Collingsworth continued to have problems with the large size of his IRAdvocates and Conrad & Scherer email accounts on his MacBook from March 2011 through April 2013. There is substantial evidence documenting Collingsworth's and his assistants' attempts to preserve or archive his emails during this time period.

28. Unfortunately, it appears that third-party IT support personnel failed to configure his email properly on his MacBook.

29. Several attempts were made by a third-party IT support company to archive his email in April, May, October, and November of 2011. Other attempts also were made to archive his email on his MacBook, including in 2013, when Collingsworth took the MacBook to the Apple Genius bar to fix his Outlook email.

30. At some point during this period, it appears that a rule was created and set up in his Outlook profile to archive his incoming email automatically after the emails were on the server after a certain period of time (the "Auto-Archive Rule"). The exact archive settings on his

8

Confidential – Pursuant to Protective Order

computer are unknown because so many different individuals worked on the MacBook and it is no longer available.

31. The Auto-Archive Rule would have caused a copy of emails in his inbox to be downloaded and saved to an archive file on his MacBook and simultaneously, the copy of the messages on the Conrad & Scherer servers would have been removed. As a result, the only copy of the emails in his inbox would have been saved locally on Collingsworth's MacBook.

32. Collingsworth was not aware of any Outlook Rules on any computer or the Auto-Archive feature in Outlook. He believed that the emails for his Conrad & Scherer and IRAdvocates email accounts were being saved to the Conrad & Scherer servers.

33. Collingsworth was not aware that emails were stored on his MacBook and they were no longer on the Conrad & Scherer servers.

34. In or around June 2013, Collingsworth gave the MacBook to a family member and it was later stolen. As a result, Collingsworth is not currently in possession of the MacBook or the emails that were archived and saved on the MacBook.

35. As a result, the remaining gaps in Collingsworth's email accounts between March 2011 and March 2013 were likely caused by third-party IT support personnel setting a rule to archive his emails on the MacBook and not selecting the option to retain a copy of his emails on the Conrad & Scherer servers.

## Collingsworth's Computer History, Email Issues, And Attempts to Save and/or Transfer Information

36. I have tracked Collingsworth's computer history, including the dates showing when he received and used certain computers and the information related to when he transitioned to new or replacement computers between 2008 and 2014. Listed in the chart below are the five primary computers used by Collingsworth from 2008 through 2014:

Confidential – Pursuant to Protective Order

|   | Description | Dates in Use | Disposition |
|---|---|---|---|
| 1 | Dell Latitude laptop | 5/2008 – 3/2010 | Data transferred to HP Compaq desktop; Cleared and sent to Collingsworth's residence; subsequently disposed at DC DWP e-cycle recycling center (Ft. Totten station) |
| 2 | HP Compaq desktop | 3/2010 – 5/2010 | Data transferred to Dell Optiplex desktop; Sent to Collingsworth's residence; DC DWP e-cycle recycling center (Ft. Totten station) |
| 3 | Dell Optiplex desktop | 5/2010 – 2/2011 | Data transferred to MacBook; used by Admin. Assistants; returned to IT Dept. Ft. Lauderdale and in Conrad & Scherer's possession |
| 4 | MacBook laptop | 2/2011 – 6/2013 | Limited data transferred to HP laptop; given to niece in Brazil; stolen from niece |
| 5 | HP laptop | 6/2013 – 5/2014 | Dropped and screen cracked; returned to IT Dept. Ft. Lauderdale and in Conrad & Scherer's possession |

37. In addition, Collingsworth used other devices between 2008 and 2014, including an iPhone, iPad, a Dell Vostro desktop, and an Acer netbook. Collingsworth currently uses a Dell Vostro desktop in his office and a Dell Inspiron laptop, both of which have been forensically examined. The Acer netbook has been located in Ecuador and it is being shipped to Pathway for examination. The iPad used during the time period have been disposed of at a computer recycling center and the iPhone was traded in for credit for a new cell phone.

38. To understand Collingsworth's computer history, I reviewed emails, invoices, and IT service tickets. I also interviewed Collingsworth, current and former employees Conrad & Scherer and IRAdvocates employees, and third-party IT support service providers.

39. My investigation and analysis found detailed contemporaneous evidence showing Collingsworth's chronic email issues and Collingsworth's consistent and concerted efforts to:

Confidential – Pursuant to Protective Order

    a) save or back-up electronic information, including emails, from Collingsworth's old computers and hard drives to the Conrad & Scherer servers; and/or

    b) transfer electronic information, including emails, from his old computers and hard drives to replacement computers.

40. Although other employees had e-mail accounts for both Conrad & Scherer and IRAdvocates, I have found that the problems that Collingsworth experienced with his e-mail appear to be unique to him because other employees have historically reviewed, sent, and received e-mail using web versions of those e-mail accounts.

41. In contrast, Collingsworth did not use the web versions of his e-mail accounts. He used e-mail programs that were installed on his computers.

<u>Dell Latitude Laptop (5/2008 – 3/2010)</u>

42. Prior to March 30, 2010, Collingsworth used a Dell Latitude laptop.

43. As early as January 2010, emails show that there were problems locating Collingsworth's email from 2008.

44. On January 21, 2010, Victoria Ryan requested assistance from Joe Romano, Conrad & Scherer's IT Director, because she could not locate Collingsworth's email dating back to April/May 2008. *See* Exhibit B.

45. In response, Mr. Romano stated "June 6[th] of 2008 is when we upgraded and got the new network up and running but all email was converted from GroupWise to Outlook and few if any of the prior tape backups are working as we have tried." *See id.*

46. On January 22, 2010, Mr. Romano responded further and stated "I also see nothing in sent, even in all the additional folders that have been created for 10/07/2008." *See id.*

Confidential – Pursuant to Protective Order

47. There is no indication that Collingsworth's assistant or the IT Director found the missing 2008 emails at that time.

48. The migration from GroupWise to Outlook in June 2008 might explain why I recently located historical email files saved on a Conrad & Scherer DC server from Collingsworth's IRAdvocates and International Labor Rights Forum email accounts. Those emails were likely saved to that server as part of that migration. The emails have been provided to the litigation team for review.

<u>Transition from Dell Latitude Laptop to HP Compaq Desktop</u>

49. Collingsworth received an HP Compaq desktop for his office in about March 2010.

50. On March 24, 2010, Collingsworth requested that IT personnel from Cool Spring Consulting (later purchased by Computer Technical Support & Services, Inc) ("CSC/CTSS"), a third-party IT support company, transfer all of his electronic files from his Dell Latitude laptop to the HP Compaq desktop. *See* Exhibit C; Exhibit D; Exhibit E.

51. On March 30, 2010, Josh Robison from CSC/CTSS transferred Collingsworth's electronic files, including email from the Dell Latitude Laptop to the HP Compaq Desktop. *See* Exhibit F.

52. An email from Victoria Ryan to Collingsworth shows that on March 30, 2010, CSC/CTSS purported to: (1) set up his new desktop; (2) archive all of his e-mails prior to February 26, 2010; and (3) transfer all of his electronic files, including the archived e-mail files, from his old computers to the new HP Compaq Desktop. *See* Exhibit G.

53. Specifically, the email states that Robison moved email from Collingsworth's old laptop to the HP Compaq Desktop. Robison also created an "Archive" folder on the HP Compaq

Confidential – Pursuant to Protective Order

Desktop and moved and saved all emails prior to February 26, 2010 to the "Archive" folder. The email included six gigabytes of email in the inbox. *See* Exhibit G.

54. The invoice reflects that Robison purported to archive all of Collingsworth's email prior to February 26, 2010. After CSC set up the new HP Compaq desktop, it should have held all of Collingsworth's electronic files that were previously accessible on the Dell Latitude, including his e-mails prior to February 26, 2010.

55. This date is important because one of the remaining gaps in Collingsworth's IRAdvocates incoming emails is from June 3, 2008 (which is shortly after the migration from GroupWise to Outlook) through February 25, 2010.

56. After the HP Compaq Desktop was set up, it appears that Collingsworth's email was not deleted from the Dell Latitude Laptop for several days after the March 30, 2010 transition. See Exhibits E, G. An invoice also shows that on April 2, 2010, a CSC/CTSS technician "[d]eleted old email from laptop to improve email performance." *See* Exhibit H.

Transition from HP Compaq Desktop to Dell Optiplex

57. In May 2010, Collingsworth replaced the HP Compaq Desktop with a Dell Optiplex Desktop.

58. An invoice for services rendered shows that on May 11, 2010, a technician from CSC/CTSS transferred electronic data from the HP Compaq Desktop to a Dell Optiplex Desktop. The service ticket indicates that electronic data, including email, was transferred from the HP Compaq Desktop to the Dell Optiplex. *See* Exhibit I.

59. As a result, if CSC/CTSS had properly transferred Collingsworth's electronic files to the Dell Optiplex, Collingsworth's electronic files, including his emails prior to February 26, 2010, would have been transferred to and saved on the Dell Optiplex.

Confidential – Pursuant to Protective Order

60. After Collingsworth stopped using the Dell Optiplex, it was then transferred to and used by his Administrative Assistants.

61. In December 2014, the Dell Optiplex was taken offline and shipped to the Conrad & Scherer IT Department in Ft. Lauderdale.

62. I performed a forensic examination and review of the original hard drive from this computer. The examination of the Dell Optiplex showed that a copy of the email archive (active or deleted) was not on the Dell Optiplex.

63. As a result, I have determined that CSC/CTSS failed to properly transfer or save Collingsworth's e-mails prior to February 26, 2010 to the Dell Optiplex.

64. Recently discovered emails support the conclusion that the emails were not properly transferred to the Dell Optiplex.

65. On December 22, 2010, Victoria Ryan emailed a CSC/CTSS technician to get help retrieving Collingsworth's old emails, as she found that the archive folder that was created on his computer was empty. *See* Exhibit J. In the email, Ms. Ryan indicated that the last email in Collingsworth's sent mail folder only dated back to May 11, 2010 and the emails in Collingsworth's inbox mail folder only dated back to February 26, 2010 -- she could not find any emails before those dates. *See id.*

66. In response, the CSC/CTSS technician stated that he searched for the archive folder and old emails, but he could not find Collingsworth's emails from early February 2010. *See* Exhibit K.

67. This indicates that on March 30, 2010, the CSC/CTSS technician created the archive folder to save mail prior to February 26, 2010 and he deleted the email from the server, but that archive was not transferred from the HP Compaq Desktop to the Dell Optiplex.

Confidential – Pursuant to Protective Order

68. Therefore, despite Collingsworth's best efforts to retain his IRAdvocates incoming emails prior to February 26, 2010, it appears that CSC/CTSS, the third-party IT company, failed to save or failed to properly transfer Collingsworth's emails to the replacement computers (i.e., to either the HP Compaq Desktop and/or the Dell Optiplex).

69. Thus, the missing IRAdvocates emails between June 2, 2008 and February 25, 2010 appear to be caused by CSC/CTSS's failure to properly save or transfer the electronic files.

<u>Transition from Dell Optiplex to Apple MacBook Pro Laptop</u>

70. After Collingsworth switched to the Dell Optiplex, he continued to experience problems accessing and using his email. In an effort to fix those problems, Collingsworth purchased a MacBook in January 2011, to replace the Dell Optiplex at his office.

71. To facilitate this transfer, Collingsworth's assistant requested help from CSC/CTSS to transfer Collingsworth's electronic files to the MacBook and to create an archive for his emails.

72. On January 18, 2011, Victoria Ryan sent an email to have Collingsworth's new MacBook configured. *See* Exhibit L.

73. The email stated "Terry has bought a new laptop (a MACBOOK), which he is planning to have <u>take the place of</u> his current PC here in the office (Windows7), as well as his Acer Notebook that he normally uses during travel. Reason—he's had issues with files & emails when switching between the office and working while traveling internationally, especially while traveling in Colombia. However, he does plan to keep his home computer in use. He has historically had issues w/ email on multiple machines, and this is a step toward consolidating & simplfying [sic]. It will also involve a learning curve because this is his first Mac." *See id* (emphasis in original).

Confidential – Pursuant to Protective Order

74. Ms. Ryan's email also stated "I am not familiar with how Macs operate in terms of Outlook. While we're at it, Terry could use a short tutorial for archiving emails." *See id.*

75. On January 21, 2011, CSC/CTSS transferred electronic data from the Dell Optiplex to the Apple MacBook Pro Laptop. *See* Exhibit M. The Outlook email was archived from the Dell Optiplex. It appears that Outlook for Mac 2011 was installed on the MacBook laptop.

76. Because Collingsworth was switching from a Windows-based computer to an Apple computer, a CSC/CTSS technician configured an external hard drive to download and store the files from his old computer so that they would be accessible via the MacBook. *See id.*

77. With respect to transferred emails, Outlook for Mac stores emails in a different format than how emails are stored on a Windows PC. However, there is no mention in the IT work tickets that Collingsworth's PC emails were converted to a format compatible for Outlook for Mac.

78. Despite best efforts to locate all of Collingsworth's computers and hard drives, Defendants have not located the external hard drive that was used on January 21, 2011. As part of the forensic examination of Collingsworth's computers and Conrad & Scherer's computers and server, I identified that the hard drive was plugged into a Conrad & Scherer computer on December 8, 2014. It appears that the hard drive was misplaced when the Conrad & Scherer DC office was physically relocated to a new building during the week of December 14, 2014.

79. There is no evidence that there was anything new or material on that external hard drive and, therefore, there is no indication that there would be any additional responsive information on the hard drive that has not been searched for and collected previously.

<u>Email Problems on the Apple MacBook Pro Laptop and Attempts to Archive Email</u>

Confidential – Pursuant to Protective Order

80. Collingsworth continued to experience problems with his email after switching to the Apple MacBook Pro Laptop. Some of these problems were the result of having too many emails in his mail folders. As a result, there were numerous attempts to resolve his email issues by archiving and saving his emails.

81. On March 25, 2011, Victoria Ryan informed Collingsworth that she spoke with Josh from CSC/CTSS and he stated that "[a]s for creating archive folders – [it] should be the same on the MAC as it is on a PC. Here are the instructions ..." The instructions provided are wrong. The process of setting up archive folder on the MacBook is different than on a Windows PC. It appears that CTSS does not know how to work with Mac type computers." *See* Exhibit N.

82. On March 29, 2011, Victoria Ryan emailed CSC/CTSS and requested their assistance with Collingsworth's email because his "email does not send (but does receive) from his home, and now, every time he logs in on the road, it downloads literally 3,000+ messages going back to December. FYI, I don't think he has had the opportunity to archive any of his emails since Josh and I last spoke." *See* Exhibit O.

83. On March 29, 2011, Victoria Ryan also emailed Juan Rodriguez, a Conrad & Scherer IT technician, to ask for his assistance with Collingsworth's email because CSC/CTSS was not able to find a solution to Collingsworth's email problem. *See* Exhibit P.

84. On April 19, 2011, Victoria Ryan emailed CSC/CTSS and requested assistance with archiving emails on Collingsworth's MacBook. Ms. Ryan states "[i]t's not quite the same as with PC—you can save the files locally on the computer but it doesn't look like you can view/search for them within Outlook as you could on a PC." *See* Exhibit Q.

17

Confidential – Pursuant to Protective Order

85. This indicates that Ms. Ryan may have set up an archive function on the MacBook, but she could not view the files. If that occurred, the archive function might have been deleting older incoming emails from the server.

86. On April 21, 2011 service ticket, Josh Robison, a CSC/CTSS technician, wrote that he was asked to "assist in archiving the emails on Terry's Mac laptop." *See* Exhibit R. The technician initiated a remote session with Ms. Ryan to work on Collingsworth's MacBook and Mr. Robison "[d]etermined [that] there is no way to properly archive email in Outlook for Mac at this time. Future updates to Office Mac version likely to include feature. For now, discussed client continuing archiving practices on a PC instead." *See id.*

87. On May 6, 2011, Victoria Ryan contacted CSC/CTSS to discuss a potential change in the web and email host for IRAdvocates.org. *See* Exhibit Q. In the email, Ms. Ryan states "[r]ight now I do believe all of Terry's emails are still on the Siteground server—I was not able to archive his emails in his Outlook on his Mac Laptop in the office, though I was able to organize them better in his Inbox." *Id.*

88. Based on this email, it appears that Ryan tried to set up archive function on the MacBook and she did organize some folders. *See id.*

89. The MacBook is not available for examination and therefore, Pathway has not been able to verify what settings were in place on the MacBook at this time, what, if any, changes Ms. Ryan made to Collingsworth's Outlook account on the MacBook or if an archive process or rules to move Inbox emails to other folders were set up by Ms. Ryan.

90. On May 31, 2011, a CSC/CTSS technician closed a ticket related to Collingsworth's March 2011 problem that "every time [Collingsworth] logs in on the road it downloads literally

Confidential – Pursuant to Protective Order

3,000+ messages going back to December." *See* Exhibit S. CSC/CTSS recommended that Collingsworth use a new hosting exchange server to backup Collingsworth's emails. *See id.*

91. On October 11, 2011, a CSC/CTSS technician attempted to archive emails on Collingsworth's MacBook. The call description states "Collingsworth's Outlook needs a new Archive folder set up and move all emails from 4-1-11 through 10-1-11 to help clean up his Inbox. (Make sure this archive is selected in offsite data backup too.)" Other comments on the service ticket show that over 15,000 emails were archived from April 2011 to October 2011. *See* Exhibit T.

92. From the face of the ticket, it appears this archive was saved to the MacBook and not to any offsite backup. This is further supported by other contemporaneous evidence and a recent interview with the owner of CSC/CTSS.

93. Another October CSC/CTSS work ticket at the same time had a call description of "Tech to call Jim upon arrival and delete existing offsite backup so that we can move Terry's backup to new server. Please make sure ALL data including archive folders/ALL PST are being backed up to new server." The work ticket is marked "Canceled." *See* Exhibit U.

    a) In March 2015, I spoke with Jim Shores, owner of CSC/CTSS, who advised me that he recalled problems with Collingsworth's email in 2010 and 2011. According to Mr. Shores, Collingsworth was using a Mac laptop and CSC/CTSS could not archive his emails to an offsite server. Shores explained that there was no "portal" for the transfer of the email on the Mac laptop to the server and CSC/CTSS could not do an off-site backup of Collingsworth's emails. *See* Exhibit R.

Confidential – Pursuant to Protective Order

b) During our conversation, Mr. Shores also reviewed a work ticket number
SC79407, for on-site work performed on October 11, 2011 to "Terrence's
MAC book." As explained above, the work ticket indicated that more than
15,000 emails from April 2011 to October 2011 had been archived. *See*
Exhibit T. Mr. Shores believed that the emails were archived to either
Collingsworth's Mac laptop or to an external hard drive. He stated that the
files would not have been archived to a server.

c) Of additional concern, Mr. Shores, an IT Professional with numerous years
of experience, stated the Outlook for Mac software would generate PST
email containers when it archived emails. This is not correct. The archive
files from Outlook for Mac would be in an OLM format. If IT personnel
were looking for PST files on Collingsworth's Mac laptop they would not
have located those email archives because they would have been in an OLM
format.

94. On November 10, 2011, a CSC/CTSS technician went to Collingsworth's residence to
work on his home PC and determined that Collingsworth's Outlook setup was corrupted. The
CSC/CTSS technician attempted to repair the Outlook program, but he was unable to repair it.
Instead, the Technician deleted Collingsworth's old Outlook profile and created a new Outlook
profile. He also configured the email for POP setup and he restored a PST file that contained
more than 8.5 GB of data. *See* Exhibit V.

95. On November 22, 2011, Collingsworth sent an email to his new assistant, Maggie
Crosby, requesting that she confirm with CSC/CTSS that they know how to put his email on an
external hard drive that he can access. In the email, Collingsworth rejected CSC/CTSS's

Confidential – Pursuant to Protective Order

proposal to move all of his email into the cloud. He stated that he wants to save the sensitive emails to external hard drive and the routine email can be put in the cloud. *See* Exhibit W.

96. The CSC/CTSS service tickets (and Jim Shores confirmed) that CSC/CTSS could not figure out how to archive Collingsworth's email on the MacBook to an off-site backup.

97. These problems are confirmed in a November 22, 2011 email from Maggie Crosby to Collingsworth's former assistant, Victoria Ryan. In that email, Ms. Crosby states, "[a]s you can see…we're still working on the email archiving situation." *See* Exhibit W.

98. In a draft email which Victoria Ryan sent to herself on January 20, 2012, she lists the following issues with Collingsworth's email:

    a. "TC can sometimes receive, but not send, IRAdvocates emails from home

    b. His iPad and iPhone dont' [sic] receive IRAdvocates emails

    c. At some point JC merged his C&S & IRAdvocates emails, so that when he opens outlook he has a huge inbox of 14-15,000 emails mixed

    d. Hard drive- he can't access the emails that have been "archived" on his Mac."

*See* Exhibit X.

99. Item "c" above is a concern because Collingsworth's Conrad & Scherer and IRAdvocates accounts had been merged on October 27, 2011. If any rules were set up on the Mac laptop to move emails from the IRAdvocates email server to an archive folder on the Mac laptop, then the same rules could potentially move his Conrad & Scherer email from the Conrad & Scherer server to an archive folder.

100. Item "d" above is a concern because Collingsworth could not access the emails that have been archived on his Mac. Usually when email is archived, the email is deleted from the server

Confidential – Pursuant to Protective Order

but the email would still be available on his local MacBook. Item "d" indicates that a rule may

have been set up on the MacBook to archive the emails and the emails are not accessible..

101. On June 14, 2012, Maggie Crosby requested assistance from Juan Rodriguez and she

stated "I need to run searches through Terry's old emails to produce for defendants in a case." In

response, Rodriguez states that "his old emails are in the mac." *See* Exhibit Y.

102. On January 29, 2013, Maggie Crosby sent an email to Juan Rodriguez stating "I need to

find something in Terry's old emails – from 2009. Can you tell me where those are archived?"

Again, in response, Rodriguez stated "No idea… maybe on his mac..(I guess)." *See* Exhibit Z.

103. On February 15, 2013, Collingsworth emailed Rodriguez and stated "I wanted to check in

with you as my Mac has a serious problem. when [sic] I'm working in Outlook drafting emails,

which I do a lot, after virtually every letter I type I get the spinning wheel delay. This does not

happen in word [sic] nor have I noticed in other programs. It has taken me about 5 minutes to

write this because the wheel spinning keeps pausing me. I took it to Apple "Genius" bar last

week and my particular genius messed around with it but did not fix. I was able to make another

appointment for next Tuesday at 130 [sic]. … Could you take a crack at fixing remotely …" *See*

Exhibit AA.

104. In response, Rodriguez initiated a remote session into the MacBook to fix the problem.

In reply, Collingsworth states "[h]ey, it has improved some, but it is still very slow and the wheel

appears as before to prevent any typing speed." *See id.*

### The Outlook Rule that Auto-Archived Emails on Collingsworth's MacBook

105. As demonstrated above, Collingsworth experienced many problems with the size of his

email account on his MacBook.

Confidential – Pursuant to Protective Order

106. Issues related to the size of his email account were referenced by Conrad & Scherer employees and third-party IT support providers in emails and work tickets.

107. The contemporaneous evidence also suggests that CSC/CTSS or possibly someone at the Apple Genius bar implemented or set up an Outlook rule to archive Collingsworth's email to his MacBook automatically after messages were on the server after a certain period of time.

108. The Auto-Archive Rule would have caused a copy of emails in his inbox to be downloaded to an archive file on his local MacBook and simultaneously, it would have removed the copy on the Conrad & Scherer servers.

109. As a result, the only copy of the emails would have been saved locally on Collingsworth's MacBook.

110. The Outlook auto-archive procedure is set up client side (on a local computer) and it is not set up or controlled by the server. As such, the archive procedure is controlled by the local computers.

111. In the present case, this means that if the Auto-Archive feature was enabled for the MacBook, the process would run whenever Collingsworth opened Outlook while connected to the internet.

112. Collingsworth would not have had to initiate or start the auto-archive procedure in order for it to run.

113. In fact, Collingsworth was not aware of any Outlook Rules on any computer or the Auto-Archive feature.

<u>Transition from MacBook Laptop to HP Laptop</u>

114. In April 2013, Collingsworth purchased an HP Laptop to replace his MacBook laptop.

Confidential – Pursuant to Protective Order

115. At the time, Collingsworth believed that the emails in both accounts were being saved to the Conrad & Scherer servers and so he instructed the Conrad & Scherer IT department not to transfer his e-mails from his MacBook to the new HP laptop. *See* Exhibit BB.

116. Around June 10, 2013, the MacBook laptop was replaced by an HP laptop. The data transfer was handled by Conrad & Scherer personnel.

117. Collingsworth was not aware of the Outlook Rule on his MacBook that was automatically archiving and saving a copy of his e-mails on his MacBook while removing a copy from the Conrad & Scherer servers at the same time.

118. As a result, there was no attempt to transfer any email from the MacBook to the HP laptop. Any email archives on the MacBook were not copied and there is no mention of converting any Mac formatted email to a Windows-based email.

119. After he began using the HP laptop in June 2013, Collingsworth did not realize that his e-mail account was incomplete because the HP laptop began downloading any e-mails from the server that were on the server after the last day that the Auto-Archive feature ran on the MacBook.

120. In or around June 2013, Collingsworth gave the MacBook to his niece living in Brazil and it was later stolen in Brazil.

121. Pathway was unable to determine what archive settings would have been enabled on Collingsworth's MacBook during 2011 and 2013 time period because the MacBook is not available and, as is typical, there is no logging of changes to the Outlook archive setup.

122. Therefore, despite Collingsworth's belief that the emails on his MacBook were being saved to the Conrad & Scherer servers, it appears that a rule could have been created without

Confidential – Pursuant to Protective Order

Collingsworth's knowledge by CSC/CTSS, the Apple Genius bar or someone else in his Outlook account so that his emails were automatically saved and archived to his MacBook.

123. Thus, the gaps in Collingsworth's email accounts between March 2011 and March 2013 were likely caused when the Auto-Archive Rule archived emails on the MacBook and did not retain a copy of his emails on the Conrad & Scherer servers.


## CONCLUSIONS

124. We did not find any indications that emails or computers were intentionally disposed of or deleted to destroy evidence.

125. There is substantial evidence reflecting the transition and transfer of electronic information from Collingsworth's old devices to new devices.

126. Collingsworth's efforts to save and/or transfer his electronic information, including emails, from old computers to replacement computers were reasonable.

127. It appears that third-party IT support personnel failed to properly transfer some of Collingsworth's emails from one computer to a replacement computer, which is the likely cause for the gaps in Collingsworth's incoming IRAdvocates emails prior to February 26, 2010.

128. It is obvious that Collingsworth was having problems with maintaining his email accounts and archiving his email during the time period of the missing emails. The IRAdvocates email account appears to have a large number of incoming emails. It would be reasonable to have set up a method to auto-archive these incoming emails to a local storage device in order to move them from the server. However, it appears that problems related to archiving his emails might have been compounded by the way emails are archived in the Outlook for Mac software. Therefore, despite Collingsworth's best efforts to preserve his email between March 2011 and

Confidential – Pursuant to Protective Order

March 2013, the Auto-Archive Rule was likely enabled on the MacBook and copies of his emails were downloaded to the MacBook, but copies of his email were not retained on the Conrad & Scherer servers.

129. It is likely that a third-party IT personnel did not properly preserve or convert the archived emails on the Mac laptop, which is the likely cause for the gaps in Collingsworth's Conrad & Scherer and IRAdvocates emails between March 2011 and March 2013.

I declare under the penalty of perjury that the foregoing is true and correct.

FURTHER, AFFIANT SAITH NOT,

DENNIS WILLIAMS

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, by DENNIS WILLIAMS, on this ____ day of April, 2015, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

KATHLEEN BRANDON
Notary Public, State of Texas
My Commission Expires
January 11, 2017

My Commission Expires: _____

26

# EXHIBIT A



# PATHWAY FORENSICS

Pathway Forensics LLC
14405 Walters Road, Suite 630
Houston, Texas 77014
Ph: (713) 401-3380

## Dennis Williams, EnCE

Licensed Private Investigator, State of Texas #641582

**Partner**
dwilliams@pathayforensics.com

Dennis Williams is a Partner of Pathway Forensics. He has over 32 years of law enforcement experience with the Federal Bureau of Investigation (FBI) and was the Director of the Greater Houston Regional Computer Forensics Laboratory (RCFL), a multi-agency task force. Dennis was an FBI certified Computer Forensics Examiner and a Certified Forensic Computer Examiner (CFCE) with the International Association of Computer Investigative Specialists (IACIS). He has conducted hundreds of computer forensic exams involving a variety of investigations including directing the search, capture, analysis, and litigation support of electronic evidence in the largest financial corporation collapse in Houston history. He provides expert witness services including reports and testimony.

Dennis successfully completed training as an Assessor for Digital Evidence for the American Society of Crime Lab Directors – Laboratory Accreditation Board (ASCLD/LAB) and is a former officer for the Texas Gulf Coast Chapter of the High Technology Crime Investigation Association (HTCIA). He is an EnCase Certified Examiner (EnCE) and a licensed Private Investigation Manager in the State of Texas.

## Professional History

**2009 to Present: Partner, Pathway Forensics, LLC**
Computer forensics and electronic discovery services firm handling the acquisition, authentication and analysis of electronic evidence, including expert witness services

**2008 to 2009: President, Computer Investigations, Inc.**
Started computer forensics practice and provided digital/computer forensics services. Provided ASCLD and quality systems implementation consulting

**2005 to 2007: Director, Greater Houston Regional Computer Forensics Laboratory**
Implemented and managed a multi-agency law enforcement task force to provide computer forensics services for criminal investigations in Southeast Texas. Conducted computer forensics exams and reviewed and approved exams performed by laboratory personnel

**2000 to 2005: Special Agent, Computer Forensics Examiner, Federal Bureau of Investigation**
Performed computer forensics exams, searches and peer reviews. Became an FBI certified Computer Forensics Examiner and obtained the Certified Forensic Computer Examiner certification



## Certifications

EnCase Certified Examiner (EnCE)
Private Investigations Manager, State of Texas

## Education and Training

Bachelors of Science - Accounting, University of Maryland
FBI Computer Forensic Examiner Boot Camp
International Association of Computer Investigative Specialists (IACIS) Basic Training
National White Collar Crime Center Basic Data Recovery and Analysis
National White Collar Crime Center Advanced Data Recovery and Analysis
Microsoft Advanced Forensics
Certified FBI Unix/Linux Forensic Examiner
George Mason University 2001 Symposium on Computer Forensic
Ilook Training (Computer Forensic Software)
Total Seminars Net+ Training
Total Seminars A+ Training
AccessData Forensic Toolkit Training
VMWare Software training
Guidance Software Encase Forensic Training
Management training, Northwestern University, Kellogg School of Management

## Affiliations

Board of Directors, Texas Association of First Responders
Laboratory Accreditation Board Assessor, American Society of Crime Lab Directors
Member, Texas Gulf Coast Chapter of High Technology Crime Investigation Association (HTCIA)
Member, International Association of Computer Investigative Specialists (IACIS)
Member, Infragard - Houston Chapter

## Expert Witness Testimony

*Daily Instruments Corp. d/b/a Daily Thermetrics v. Eric Heidt, WIKA Instrument, LP, WIKA Process Solutions, LP, and Gayesco International, LP;* Cause No. 4:13-cv-2189; United States District Court for the Southern District of Texas, Houston Division, January 28, 2014

*Amistco Separation Products, Inc. v Robert Lasser;* Cause No. 2013-39247 in the 125th Judicial Court, District Court of Harris County, Texas, July 25, 2013

*Dr. Willis J. Pumphrey, Jr. v Worldwide Lending Fund, LLC, Ali Choudhri, et al.;* Cause No. 2012-5704 in 333rd Judicial Court, District Court of Harris County, Texas, October 22, 2012

*Vortex Ventures, Inc. v Proven Technologies, LLC and D. Conrad Pearson, Jr.;* Cause No. 2011-59099 in the 11th Judicial Court , District Court of Harris County, Texas, August 1, 2012



*Hunter Buildings & Manufacturing, L.P., et al., v MB Industries, LLC, et al.;* Cause Number 2008-50193 in the 215th Judicial District Court of Harris County, Texas, October 11, 2011

*Denise Marie Jacobsen v James Matthew Jacobsen;* Cause No. 10-03-02543-CV in the County Court at Law No. 1 in Conroe, Montgomery County, Texas, March 11, 2011

*United States of America v Santiago Damon Wesley;* 4:01-cr-00738 in the Southern District of Texas, February 2002 (Bank Fraud, Aiding and Abetting, Laundering of Monetary Instruments)

## Speaking Engagements

"What Financial Experts Need to Know about Computer Forensics", Forensic and Valuation Committee, Houston Society of CPAs, Houston, Texas

"Collection & Processing of ESI", Expert & Attorney Viewpoints on Forensic Services, Forensic Expert Witness Association (FEWA), Houston Chapter

"Who's been in the IP Cookie Jar", A forensic perspective on Intellectual Property Theft, Houston Association of Litigation Support Managers, Houston, Texas

"Decoding Electronic Evidence", 12th Annual Business Valuation, Fraud & Litigation Services Conference, Virginia Society of Certified Public Accountants (VSCPA), Richmond, Virginia


FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 14

***To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)***

| | A | B | C | D | E | F | H | I |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | Date in Use | | | |
| 2 | Make | Description | Model | | Start Date | End Date | Comments | Decommissioned |
| 3 | Dell | Server | Optiplex 755 | | Approx 2008 | 2/1/2014 | 1- O/S HD and 1 Data HD 1 TB Used for C&S Washington Office | Located in IT Dept Ft. Lauderdale |
| 5 | Unknown | Desktop | Unknown | | | | Invoice Royal no details. Not Certain | |
| 6 | Dell | Laptop | Latitude D630 | | 5/10/2008 | 4/1/2010 | Dell ship date 5/10/2008 2/22/2010 Laptop Repair Per 3/30/2010, VR email, Josh scheduled at TC's house on 4/2/2010 to setup laptop Per 3/30/2010, VR email, laptop not cleared yet. | Appears data transferred to HP Compaq DC 5800 desktop. Around 4/1/2010 went to TC's residence. Terry requested that this laptop be re-configured (wiped) so that he can use it at home, but there is no further discussion of the status of the laptop after it is re-configured to be used at home. |
| 8 | Acer | Netbook | | | 3/30/2010 | 9/13/2011 | Serviced on 3/30/2010 at home. Email 9/13/11 fm TC does anyone need a virtually new Acer "netback"? And Eric Hager responds can use it Quito. Can bring it back from my Nov. trip. Email 9/5/13 fm EH about loaning Acer netbook to someone. | Sent to Eric Hager |
| 10 | HP Compaq | Desktop | DC 5800 SFF | | 3/30/2010 | 5/X/2010 | Per 3/30/2010 VR email, Steve DeYoe created email backup. Archived anything prior to 2/26/2010. Had "6 gigs" of email in inbox. Archived email prior to 2/26/2010 to Archive folder. | Setup in Office on 3/30/2010 and then sent home. Recycled by TC. Service ticket 5/11/2013 on moving files to Optiplex. |
| 11 | | | | | | 11/10/2011 | Terry cannot receive emails at home. Email profile was corrupt. CTSS deleted his Outlook profile after backing it up - CTSS restored a PST file that had 8.5 GB of data in it. We do not know what computer this is. | May be HP Compaq DC 5800 |
| 14 | Dell | Desktop | Optiplex 780 | | 5/31/2010 | 2/X/2011 | TC/Victoria/Maggie/Grace Used by TC until Macbook used | Returned to C&S IT department in Florida |
| 16 | Apple | Cell phone | iPhone 4 | | | 4/22/2013 | In July 2010, emails show that Terry is using an iPhone (in addition to his desktops in the office and at home and his laptop) to receive email. | Check with TC and confirm data transferred to iPhone 5 by cellular carrier |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER   CS_TC011183

| | J | K | L |
|---|---|---|---|
| 1 | | | |
| 2 | Reference Items | Serial Number | DC Number |
| 3 | | 1SVL9G1 | |
| 5 | | | |
| 6 | | CFMV7G1 | |
| 8 | | | |
| 10 | Arrived 3/29/2010 | 2UA933031H | DC 0006 |
| 11 | | | |
| 14 | | 7DG4HM1 | |
| 16 | | | |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC011184

PF00002425

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC011185

|    | A      | B           | C              | D         | E         | F          | H                                                                                                                                                                                                                                                                                                           | I                                                                                                                                                                                                                                                                                               |
|----|--------|-------------|----------------|-----------|-----------|------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 18 | Apple  | Laptop      | Macbook Pro    |           | 1/21/2011 | 5/X/2013   | Purpose for Mac to be main computer since he was having problems with his emails and wants one computer.                                                                                                                                                                                                    | On April 23, 2013, TC requested that NONE of the files on his Mac be transferred to the new HP laptop that he receives in May 2013. Laptop provided to niece in Brazil. Laptop stolen from niece.                                                                                                  |
| 20 | Seagate| External HD | FreeAgent GoFlex | 500 GB  | 1/21/2011 | 12/8/2014  | On 1/21/2011, VR purchased external HD from Staples UPC 763649022405, Black Possible SN na02nq70&0 STAA500100                                                                                                                                                                                                | Last used on 12/8/2014 on Dell Vostro                                                                                                                                                                                                                                                            |
| 22 | Apple  | Tablet      | iPad           |           | 9/9/2011  | 8/X/2013   | His daughter dropped the iPad and shattered the screen. Terry had the iPad recycled. No attempt was made to save any of the data on the iPad before it was recycled.                                                                                                                                        |                                                                                                                                                                                                                                                                                                 |
| 24 | Dell   | Desktop     | Vostro         |           | 2/X/2012  | Present    | In TC office                                                                                                                                                                                                                                                                                               | In June 2012, the Vostros motherboard stops working and the computer is replaced. Electronic files (BUT NOT E-MAIL) was transferred from this old Vostro to the new Vostro that he starts using in July 2012. Natasja from C&S IT states that his electronic files were moved, but nothing was done to his e-mail. |
| 26 | HP     | Laptop      |                |           | 6/11/2013 | 5/X/2014   | 4/23/13 email fm TC brought in new laptop. Just need IRA and CS account to work going forward. Terry does not want the files from the Mac transferred to this HP laptop. TC dropped computer May 2014 and cracked screen.                                                                                    | Hard drive removed and retained in C&S IT Dept.                                                                                                                                                                                                                                                  |
| 28 | Dell   | Laptop      | Latitude E6430s|           | 5/X/2014  | 11/14/2014 | On November 14, 2014, JC had the hard drive removed and replaced.                                                                                                                                                                                                                                          | Hard drive removed and retained in C&S IT Dept.                                                                                                                                                                                                                                                  |
| 30 | Dell   | Laptop      | Inspiron 15R   |           | 11/14/2014| Present    | TC has in his possession                                                                                                                                                                                                                                                                                   |                                                                                                                                                                                                                                                                                                 |

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC011186

| | J | K | L |
|---|---|---|---|
| 18 | | | |
| 20 | | na02nq70&0 | |
| 22 | | | |
| 24 | | | |
| 26 | | | |
| 28 | | 3N649W1 | |
| 30 | | 354W1X1 | |

PF00002427

FILED

2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 15

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

```
1                    UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ALABAMA
2                          SOUTHERN DIVISION


3


4    DRUMMOND COMPANY, INC.,      *

5            Plaintiff,          *      2:11-cv-3695-RDP-TMP

6        vs.                     *      May 21, 2015
                                        10:00 a.m.
7    TERRENCE P. COLLINGSWORTH,   *
     et al.,                             Birmingham, Alabama
8                                 *
             Defendants.
9

10   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE R. DAVID PROCTOR
12                  UNITED STATES DISTRICT JUDGE

13   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

14

15   For the Plaintiff:   William Anthony Davis, III
                          H. Thomas Wells, III
16                        Benjamin T. Presley


17   For the Defendants:  Kenneth E. McNeil
                          Linda Eccles
18                        Robert K. Spotswood
                          Christopher S. Niewoehner
19                        William Thomas Paulk, II

20
     Also Present:        T. Michael Brown
21                        Special Master

22
     Court Reporter:      Leah S. Turner, RMR, CRR
23                        Federal Official Court Reporter

24

25
```

1    to a lot of discovery until the end of last year.

2           THE COURT:  Well, there's no question I have it on

3    both sides about a lackadaisical approach to discovery.

4           MR. McNEIL:  This doesn't excuse my side, but I'm

5    saying that there is a record that I think I can show you, but

6    as to what's appropriate to help you make that decision, Your

7    Honor, I'm for helping.  That's my goal.

8           THE COURT:  Your take is that these are security

9    payments.  You have given me expert testimony from a current

10   or former DEA agent in Houston saying that this is the law of

11   the jungle down there; right?

12          MR. McNEIL:  It is brutal.  I had no idea.  By the

13   way, you will find this gentleman very interesting.

14          THE COURT:  I already do.

15          MR. McNEIL:  He is one of those Americans that you

16   don't meet very often.  But, yes, absolutely.  And as we all

17   know, even in the U.S., under the -- you can just look at the

18   U.S. Marshal's website.  They have all kinds of witness

19   protection procedures and others, and I'm not -- I won't make

20   that argument right now, but I will tell you that --

21          THE COURT:  Let me ask you this.  How many times

22   does the United States give a witness protection until they

23   have testified?

24          MR. McNEIL:  A good bit.  I think it says 2500 --

25          THE COURT:  No.  You are missing the import of the

1  question.

2          MR. McNEIL:  I'm sorry.

3          THE COURT:  How many times has the United States

4  agreed among themselves we need to give this witness testimony

5  until the dep is in the can and then they are on their own?

6          MR. McNEIL:  I wish I could give you a number right

7  now, but I will get that number to you as part of this

8  discovery.  I will.

9          THE COURT:  My question really goes to this.  I have

10  seen an email where Mr. Collingsworth tells others we need to

11  keep up these monthly payments until the deps are in the can.

12  That doesn't sound like security.  That sounds like ensuring a

13  certain version of testimony.  Am I missing the mark there?

14          MR. McNEIL:  Let me say yes for the following

15  reason.  We all miss the mark when we read one document out of

16  context.  That's one of the great wonders of the courtroom.

17  Both sides are paid by good lawyers to fight that out.

18          I think -- just give one example and that's it, and

19  that is, for example, declarations -- and, look, I don't have

20  this firsthand knowledge.  This is just a general

21  understanding.  Declarations were provided.  Immediately at

22  that point in Colombia, threats were made.  Those can be

23  documented.  And the threat was that those people need some

24  protection while -- before depositions occur.  I think that

25  has a certain moral need, but you're the one that makes that

C E R T I F I C A T I O N

    I hereby certify that the foregoing transcript in the above-styled cause is true and accurate.

**Leah S. Turner, RMR, CRR**
**Federal Official Court Reporter**

FILED
2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 17

***To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)***

## Chris Graham

From: Chris Graham
Sent: Thu 3/05/2015 12:08 AM (GMT-00:00)
To: Juan Carlos Rodriguez
Cc: Dennis Williams
Bcc:
Subject: Email check

Juan,

Can you check your email around the 6-23-2013 range or slightly after for any emails regarding TC's email.

Thanks,

**Chris Graham, CCE, GCFE**

*Senior Manager*

**Pathway Forensics LLC**

14405 Walters Road, Suite 630, Houston, Texas 77014

T: (281) 299-0102 | F: (713) 513-5050

Licensed TX Private Investigators (A-15251)





CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

PF00002681

CS TC011361

FILED
2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 18

***To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)***

## Call Information

| | | | |
|---|---|---|---|
| Call number: | SC79407 | Invoice number: | IN98353 |
| Call type: | COMPUTER | Call description: | Terry Collinsworth's Outlook needs a new Archive folder set up and move all emails from 4-1-11 through 10-1-11 to help clean up his Inbox. (Make sure this archive is selected in offsite data backup too.) |

| | |
|---|---|
| Call received: | 10/07/11 02:56 pm |
| Call released: | |
| Call dispatched: | 10/11/11 11:00 am |
| Call arrived: | 10/11/11 11:00 am |
| Call finished: | 10/11/11 12:30 pm |
| Response hours: | 19.07 |
| Repair hours: | 1.50 |
| Down hours: | 20.57 |

| | |
|---|---|
| Technician: | Paul Do |
| Repair remarks: | 10/11/2011- On site, worked on Terrence's MAC book. Archived over 15000 emails from April, 2011 to Oct, 2011. |

## Labor

| Technician | Date/Time | | Hours | | Rates | Mileage | Total |
|---|---|---|---|---|---|---|---|
| Paul Do | Dispatch: | 10/11/11 11:00 am | Travel: | 0.00 | | 0.00 | $0.00 |
| | Arrival: | 10/11/11 11:00 am | Labor: | 1.50 | $100.00 | | |
| | Departure | 10/11/11 12:30 pm | Overtime: | 0.00 | $0.00 | | |

## Preventive Maintenance Schedule

| | | |
|---|---|---|
| Next PM date: | | Next PM meter: |

## Equipment Information

| | | | |
|---|---|---|---|
| Number: | C&S-Misc. | Contract Number: | 1424-01 |
| Item Number: | MISC | Contact: | Conrad & Sherer |
| Make/Model: | Equipment / Misc | Territory: | DISTRICT NE,NW |
| Serial number: | Misc | Bill code: | CSC Deposit |
| Customer: | Conrad & Scherer, LLP | Remarks: | |
| Location Cust: | Conrad & Scherer, LLP | | |
| | 1156 15th Street, NW Washington, DC 20005 | Suite 502 | |

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007538

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 19

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

| From: | Dispatch |
|---|---|
| To: | Victoria D. Ryan |
| Sent: | 2/4/2011 3:05:09 PM |
| Subject: | RE: Attached invoice and service call report |
| Attachments: | Conrad and Scherer - Jan. 2011 billing.xls |

Hello Victoria,
I have made the adjustment and forwarded a revised invoice. I do
apologize for the inconvenience ~ thank you for catching that.

Terrye Nissley
Customer Service
CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309
703-360-5552
dispatch@ctssinc.com

-----Original Message-----
From: Victoria D. Ryan [mailto:VRyan@conradscherer.com]
Sent: Friday, February 04, 2011 2:00 PM
To: Dispatch
Subject: RE: Attached invoice and service call report

Thanks, Terrye-- I have one question about the invoice & log. It looks
like the first entry "move back-up to new server" was something that we
were charged for, even though this was not a particular request on our
end, but an action that occurred due to VoltLogic wanting to change
servers. The back-up itself is part of our contract.

Do you mind looking into that to see if it's something we should
actually be charged for?

Thanks in advance.

Best,

Victoria Ryan
Legal Assistant
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, D.C. 20005
Phone: 202-543-4001
Fax: 1-866-803-1125

From: Dispatch [Dispatch@ctssinc.com]
Sent: Friday, February 04, 2011 1:54 PM
To: Victoria D. Ryan
Subject: Attached invoice and service call report

<<Invoice IN93524.pdf>> Hello Victoria,
Attached are January's billing invoice and service call report. Please
review and let me know if you have any questions.
Thank you,

Terrye Nissley
Customer Service
CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309
703-360-5552
dispatch@ctssinc.com

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007547

# Client Billing Report

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | **Client Billing Report** | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | **Client Name:** | | | | | | | | | |
| 5 | Conrad and Scherer | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | 6407 | Victoria Ryan | | 1/18/2011 03:50:00 PM | 0:00 | | Logged via email: FW: need to schedule for configure new | Terrye Nissley | | Logged via email by Terrye Nissley |
| 10 | 6407 | Victoria Ryan | | 1/18/2011 03:50:00 PM | 0:00 | | Logged via email: FW: need to schedule for configure new laptop for Terry- by sender: Dispatch@ctssinc.com | Terrye Nissley | | Terrye Nissley Customer Service CTSS, Inc. 8309 Richmond Highway Alexandria, VA 22309 703-360-5552 dispatch@ctssinc.com From: Victoria D. Ryan [mailto:VRyan@conradscherer.com] Sent: Tuesday, January 18, 2011 2:35 PM To: Tech Support; Vickie Shores; Joshua Robison; James Shores Cc: Juan C. Rodriguez Subject: need to schedule for configure new laptop for Terry Importance: High |
| 11 | 6407 | Victoria Ryan | | 1/21/2011 09:30:00 AM | 3:00 | | Logged via email: FW: need to schedule for configure new laptop for Terry- by sender: Dispatch@ctssinc.com | Josh Robison | | On-site: Configured new Mac for Terry. Configured remote attach drive for use with both Mac and PC. Archived all email older than 2011. Stored all documents on remote attach drive. Configured Adobe and Outlook on Mac. |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007548

FILED

2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 20

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*



## FW: Tech will be down late this morning to help Terry archive

**Maggie C. Crosby** <MCrosby@conradscherer.com>                    Tue, Nov 22, 2011 at 10:17 AM
To: "victoriadryan@gmail.com" <victoriadryan@gmail.com>

As you can see...we're still working on the email archiving situation. Have we done any of this in the past? Or are we just now trying to get it all resolved? If we do this the way that TC describes below, it sounds like something that I could take a couple hours and pull sensitive emails onto an external hard drive myself. What is your understanding?

**From:** Terrence Collingsworth
**Sent:** Tuesday, November 22, 2011 10:13 AM
**To:** Maggie C. Crosby
**Subject:** Re: Tech will be down late this morning to help Terry archive

Well please confirm that they know how to put it on an external hard drive that I can access. They keep wanting to do some cloud thing and I keep saying no, first let's clean out because the stuff I have is too sensitive and I don't want it out there. I'd like to be able to save really sensitive stuff om an external hard drive and then the routine stuff I don't care — they can cloud it. BUT if they aren't ready to do what I actually need, then tell them to figure it out

**From:** "Maggie C. Crosby" <MCrosby@conradscherer.com>
**Date:** Tue, 22 Nov 2011 10:06:08 -0500
**To:** Terrence Collingsworth <tc@conradscherer.com>
**Subject:** FW: Tech will be down late this morning to help Terry archive

Hey Terry,

Do you want for me to confirm this so we can get your email situation squared away? Or would you rather postpone?

Maggie

**From:** dispatch ctssinc.com [dispatch@ctssinc.com]
**Sent:** Tuesday, November 22, 2011 8:51 AM
**To:** Maggie C. Crosby
**Subject:** Tech will be down late this morning to help Terry archive

Hello Maggie,

The tech will be down later this morning to help Terry archive his email.

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007540

Terrye Nissley
Customer Service

CTSS, Inc.
8309 Richmond Highway
Alexandria, VA 22309

703-360-5552
dispatch@ctssinc.com

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC007541

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 21

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

**Dennis Williams**

| | |
|---|---|
| From: | Enyard, Kendall |
| Sent: | Mon 3/23/2015 3:12 PM (GMT-00:00) |
| To: | Dennis Williams; Juan Carlos Rodriguez |
| Cc: | Enyard, Kendall |
| Bcc: | |
| Subject: | FW: Maggie Crosby conversation |

**From:** Enyard, Kendall
**Sent:** Tuesday, March 10, 2015 6:39 PM
**To:** Enyard, Kendall
**Subject:** Maggie Crosby conversation

1. When did your employment start? August 2011 –July 2013
2. Did you have a computer – what kind? Desktop computer – Victoria Ryan had the computer before her. Maggie had her own email account. Maggie could access TC e-mail account from her computer. Never had an experience where TC asked her to look for emails and they weren't there.
    1. Who used the computer before you?
3. TC's mailbox – were you responsible for his mailbox?
    1. Do you recall what computers TC had when you were there?
4. What computers did TC have – he had a desktop and a laptop – and he got a desktop monitor. Believes he had a Mac when she was there. Had some computer changes – he got a new computer and was unhappy with it but she can't remember which was which.
5. Did TC ever ask her to help him archive any emails – she thinks that process was happening before she arrived and then she took it over when she got there. She couldn't archive the e-mails so she ordered an external hard drive from Office Depot (square box hard drive – high volume external hard drives – connects to a computer with a USB). She thinks C&S IT helped him with archiving.
6. When he switched out computers did he ask you to transfer any files from old computer to new computer – no.
7. Any time when TC left the office and couldn't read e-mails? TC had troubles with emails. He already had archived emails that were saved to an external hard drive and she ordered a second hard drive for archived emails. So she thinks the second set of emails would have been saved to an external hard drive. The older hard drive was kept at the office, doesn't know where the newer hard drive would have been.
8. Recall CTSS? Did not come in and do the archiving. She thinks the archiving was actually done by C&S.
9. She thinks that the archiving was completed by the time she had left. Archiving was done periodically and not every day.
10. TC's archived emails on her machine? Doesn't recall that happening.
11. TC would not have been the person doing the archiving – she doesn't know if he would have asked for archiving via email or phone.



CONFIDENTIAL

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

PF00000639
CS_TC012161

12. Office depot account for ordering external hard drives – she ordered two external hard drive accounts – one for TC and one for CL.

**Kendall R. Enyard**

Partner

kenyard@steptoe.com

Steptoe

+1 202 429 6489 direct          Steptoe & Johnson LLP

+1 202 429 3902 fax            1330 Connecticut Avenue, NW

                              Washington, DC 20036

                              www.steptoe.com

This message and any attached documents contain information from the law firm Steptoe & Johnson LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.

CONFIDENTIAL

PF00000640

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

CS_TC012162

FILED
2015 Jul-29  AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 22

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

**Dennis Williams**

From:     Chris Graham
Sent:     Mon 4/06/2015 8:38 PM (GMT-00:00)
To:       Dennis Williams
Cc:
Bcc:
Subject: RE: 10871 C&S External HD

http://www.upcindex.com/763649022405



| Computer Description | DeviceName | Device Serial | First Connected Date (local) | DiskDev DateUTC | Other Connect Dates |
|---|---|---|---|---|---|
| Terry's Secretary's Desktop | Seagate FreeAgent Go USB Device | 5mac jpyz | | 03/05/2012 14:27:58 | [DEVPKEY Install: 10/10/2011 18:28:28.482 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent Go USB Device | 2ge4 0gfg | | 05/07/2010 17:21:10 | [DEVPKEY Install: 05/07/2010 16:49:00.352 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent Go USB Device | 2ge6j r9s | | 08/26/2010 21:18:22 | [DEVPKEY Install: 05/07/2010 20:12:16.349 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent GoFlex USB Device | na01r qzc | 11/14/2012 11:24:50 | 11/14/2012 16:24:53 | [DEVPKEY Install: 11/14/2012 16:24:54.024 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent GoFlex USB Device | na02j ahe | | 06/07/2011 21:54:20 | [DEVPKEY Install: 03/15/2011 14:48:43.209 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent GoFlex USB Device | na02 nq70 | | 09/05/2013 21:12:32 | [DEVPKEY Install: 01/21/2011 15:20:33.465 UTC] |



CONFIDENTIAL

PF00001103

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER     CS_TC010092

| Terry's HP Laptop | Seagate FreeAgent GoFlex USB Device | na02 nq70 | 03/29/2014 11:27:51 | 03/29/20 14 15:27:52 | [DEVPKEY Install: 03/29/2014 15:27:52.783 UTC] |
|---|---|---|---|---|---|
| Terry's Dell Desktop | Seagate FreeAgent GoFlex USB Device | na02 nq70 | 09/18/2012 15:38:29 | 12/08/20 14 14:38:26 | [DEVPKEY Install: 09/18/2012 19:38:34.037 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent GoFlex USB Device | na02 v50m | | 04/13/20 11 21:22:04 | [DEVPKEY Install: 04/13/2011 21:22:05.104 UTC] |
| Terry's Secretary's Desktop | Seagate FreeAgent GoFlex USB Device | na02 w5cy | | 07/27/20 11 13:09:45 | [DEVPKEY Install: 07/15/2011 22:08:14.849 UTC] |
| Terry's Dell Desktop | Seagate FreeAgent GoFlex USB Device | na02 w5cy | 05/18/2014 19:35:08 | 05/18/20 14 23:35:10 | [DEVPKEY Install: 05/18/2014 23:35:11.031 UTC] |

**Chris Graham, CCE, GCFE**

*Senior Manager*

**Pathway Forensics LLC**

14405 Walters Road, Suite 630, Houston, Texas 77014

T: (281) 299-0102 | F: (713) 513-5050

Licensed TX Private Investigators (A-15251)


**From:** Dennis Williams
**Sent:** Monday, April 06, 2015 3:07 PM
**To:** Chris Graham
**Subject:** 10871 C&S External HD


Victoria Ryan has an email, dated 1/21/2011 at 9:44 am, subject "popping out to staples" and body "…pick up portable external harddrive for Terry's files. Josh Robison is here looking into his computer info-transfer."

CONFIDENTIAL

PF00001104

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER   CS_TC010093

In 1/18/2011 email, Victoria said TC bought new Macbook. ... Josh scheduled to transfer the files to new computer.

Regards,

**Dennis Williams**

*Partner*

**Pathway Forensics LLC**

14405 Walters Road, Suite 630, Houston, TX 77014

T: (713) 401-3380 x5909 | F: (713) 513-5050

dwilliams@pathwayforensics.com

www.pathwayforensics.com

Licensed TX Private Investigators (A-19498)



CONFIDENTIALITY NOTICE: This email message and/or its attachments may contain information that is confidential or restricted. It is intended only for the individuals named as recipients in the message. If you are not an authorized recipient, you are prohibited from using, delivering, distributing, printing, copying, or disclosing the message or contents to others. If you have received this message in error, please notify the sender by return email and delete the email and its attachments immediately. Thank you.

**CONFIDENTIAL**

PF00001105

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER    CS_TC010094



CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER   CS_TC010095

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 24

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

**From:** Maggie C. Crosby <MCrosby@conradscharer.com>
**Sent:** Tuesday, June 11, 2013 3:59 PM
**To:** Terrence Collingsworth; Juan Carlos Rodriguez
**Subject:** RE: laptop

Hey Terry,
Sorry we missed this. I don't use dropbox myself - Juan do you know how to resolve this?
Maggie

**From:** Terrence Collingsworth [tc@iradvocates.org]
**Sent:** Monday, June 10, 2013 4:48 PM
**To:** Juan C. Rodriguez
**Cc:** Maggie C. Crosby
**Subject:** laptop

Thanks to both of you for getting this set up; it is working very well. I have just one question. I am working from home and have a good internet connection. How can I access my files on Drop box? Thanks



CONFIDENTIAL

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER     CS_TC011162

PF00002403

FILED

2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 25

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*



EMAIL TIMELINE


FILED
2015 Jul-29 AM 11:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit 26

*To be filed under seal pursuant to the Stipulated Protective Order (Doc. 127)*

From:       "Terrence Collingsworth" <tc@iradvocates.org>
Subject:    [Chiquita-ATS-all] with attachment!Re: Ethics issue and C&S PROPOSAL
Date:       Tue, July 19, 2011 11:36 am
To:         "chiquita-ats-all@googlegroups.com" <chiquita-ats-all@googlegroups.com>

--------------------------------------------------------------------------------

On 7/19/11 11:21 AM, "Terrence Collingsworth" <tc@iradvocates.org> wrote:

>>
>>Folks, I look forward to our phone discussion at 10 am on Thursday, July
>>21 and our meeting in NYC on July 25 at 10 am.
>
>First attached is a memo from Piper Hendricks, one of our associates, on
>the ethics of paying costs and fees for a witness. Clearly can do;
>question is doing so in a way to minimize impact on credibility. In this
>case, we have a legitimate basis to ask if we can get Raul Hasbun to give
>us admissible evidence that will destroy Chiquita's bogus story that the
>AUC coerced Chiquita, and he has told me that Chiquita's Charles Kaiser
>helped the AUC structure itself, then we won't likely ever have to put
>him
>before a jury. We need to discuss. For those reluctant, tell me how else
>we get truthful evidence of an AUC-Chiquita discussion.
>
>I also have someone working on a memo regarding the ethics of paying
>security costs to protect a witness or his family if the testimony will
>cause violent retaliation. No question it can and should be done, but
>just
>want to be crystal clear.
>
>
>Regarding the C&S proposal for staffing and assistance in Colombia, our
>office in Cienega, Magdalena has been doing great work for us in
>gathering
>clients, meeting them regularly to keep them advised, organizing the
>files, and assisting all clients to get whatever documentation exists to
>support the claims. The office is directed by Bob Perillo, a U.S.
>National, who lives in a third country, but spends significant time in
>Colombia. There are 3 Colombian nationals working in the office, headed
>by
>Edgardo Aleman, who is connected politically in the areas we work, knows
>how to operate under the radar, and also has been extremely good at
>detecting problems that could arise and preempting them. He is assisted
>by
>two others who do all the clerical work and follow up on documents.
>
>Our basic office cost is $5,000 per month (which is the maximum monthly
>amount that can be wired to any account in Colombia). We then pay Bob
>separately and cover his travel costs, which averages about another
>2-3,000 per month.
>
>This office has found, interviewed, documented, and managed nearly 3,000
>clients. They did an excellent job and can reach any of our 3,000 clients
>with either a phone call to the client, or if client lacks a phone, to a
>neighbor or relative.
>
>We plan to continue using our office to manage our clients, but they
>would
>be available to lead efforts in Magdalena to get additional clients for
>the group (and they believe there are many still out there), and to

```
>assist
>the group in follow up work with existing clients, including getting
>documentation. They will also help us now that we need it to map out the
>plantations, create histories of the plantation staffing to match up with
>AUC contacts, and map out the family tree of the AUC in this area.
>
>Cheers, Terry
>
>
>
>
>

--
This message is privileged and confidential attorney work product.
To post to this group, send email to chiquita-ats-all@googlegroups.com
To unsubscribe from this group, send email to
chiquita-ats-all+unsubscribe@googlegroups.com
```

---

**Attachments:**

| 7.15.11 Ethics of Witness payment.doc | |
|---|---|
| Size: | 71 k |
| Type: | application/x-msword |

---

Confidential Information

| | |
|---|---|
| From: | "Terrence Collingsworth" <tc@iradvocates.org> |
| Subject: | [Chiquita-ATS-all] Ethics issue and C&S PROPOSAL |
| Date: | Tue, July 19, 2011 10:21 am |
| To: | "chiquita-ats-all@googlegroups.com" <chiquita-ats-all@googlegroups.com> |

---

>
>Folks, I look forward to our phone discussion at 10 am on Thursday, July
>21 and our meeting in NYC on July 25 at 10 am.

First attached is a memo from Piper Hendricks, one of our associates, on
the ethics of paying costs and fees for a witness. Clearly can do;
question is doing so in a way to minimize impact on credibility. In this
case, we have a legitimate basis to ask if we can get Raul Hasbun to give
us admissible evidence that will destroy Chiquita's bogus story that the
AUC coerced Chiquita, and he has told me that Chiquita's Charles Kaiser
helped the AUC structure itself, then we won't likely ever have to put him
before a jury. We need to discuss. For those reluctant, tell me how else
we get truthful evidence of an AUC-Chiquita discussion.

I also have someone working on a memo regarding the ethics of paying
security costs to protect a witness or his family if the testimony will
cause violent retaliation. No question it can and should be done, but just
want to be crystal clear.


Regarding the C&S proposal for staffing and assistance in Colombia, our
office in Cienega, Magdalena has been doing great work for us in gathering
clients, meeting them regularly to keep them advised, organizing the
files, and assisting all clients to get whatever documentation exists to
support the claims. The office is directed by Bob Perillo, a U.S.
National, who lives in a third country, but spends significant time in
Colombia. There are 3 Colombian nationals working in the office, headed by
Edgardo Aleman, who is connected politically in the areas we work, knows
how to operate under the radar, and also has been extremely good at
detecting problems that could arise and preempting them. He is assisted by
two others who do all the clerical work and follow up on documents.

Our basic office cost is $5,000 per month (which is the maximum monthly
amount that can be wired to any account in Colombia). We then pay Bob
separately and cover his travel costs, which averages about another
2-3,000 per month.

This office has found, interviewed, documented, and managed nearly 3,000
clients. They did an excellent job and can reach any of our 3,000 clients
with either a phone call to the client, or if client lacks a phone, to a
neighbor or relative.

We plan to continue using our office to manage our clients, but they would
be available to lead efforts in Magdalena to get additional clients for
the group (and they believe there are many still out there), and to assist
the group in follow up work with existing clients, including getting
documentation. They will also help us now that we need it to map out the
plantations, create histories of the plantation staffing to match up with
AUC contacts, and map out the family tree of the AUC in this area.

Cheers, Terry

--
This message is privileged and confidential attorney work product.
To post to this group, send email to chiquita-ats-all@googlegroups.com
To unsubscribe from this group, send email to
chiquita-ats-all+unsubscribe@googlegroups.com

| To: | **Terry & Christian** |
| From: | **Piper** |
| Date: | **July 15, 2011** |
| Re: | **CHIQUITA: Ethics of Paying Witness's Legal Fees** |

ISSUE:

    Would paying the legal fees in the criminal case of a fact witness ("W") who may testify in one of our civil cases be a violation of our professional/ethical duties?

SHORT ANSWER:

    No, paying W's criminal legal fees is not inherently a violation of our professional/ethical duties and is not specifically prohibited by any sources I uncovered in my research. So long as we are not paying these fees as an inducement for favorable testimony, we do not run afoul of our ethical duties. This situation is not a simple one, however, and to avoid any potential confusion of our witness (or, later, a jury), it would be in our best interest to enter a written agreement with this witness clearly stating that (1) our payment is not conditioned on the content of his testimony; and (2) his duty, should he ultimately testify, is to tell the truth. (As I am not familiar with all of the facts of this situation, my discussion notes what factors may change our analysis (e.g., whether this witness's testimony is available from another, more readily-available source).)

ANALYSIS:

    The ABA's Model Rules of Professional Conduct Rule 3.4[1] restricts the ability of a lawyer or a client to pay a witness for their testimony while allowing for payment of witnesses expenses, including the witness's attorney's fees. In making payments to fact witnesses, attorneys should consider six steps:

---

[1] Rule 3.4 states: "A lawyer shall not: . . . (b) falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." Comment 3 reads: "With regard to paragraph (b), it is not improper to pay a witness's expenses or to compensate an expert witness on terms permitted by law. The common law rule in most jurisdictions is that it is improper to pay an occurrence witness any fee for testifying and that it is improper to pay an expert witness a contingent fee." Similarly, the Florida Model Rules state that a lawyer may pay a witness "reasonable expenses incurred by the witness in attending or testifying at proceedings [. . .] and reasonable compensation to reimburse a witness for the loss of compensation incurred by reason of preparing for, attending, or testifying at proceedings."

(1)     E—Explain to the witness and her lawyer that the lawyer's fees are being paid *only* to cover a witness's expenses and are not an inducement for her testimony … At all times, she must be truthful…

(2)     T—Type an agreement between you, the witness, and her attorney … [to cover only] reasonable attorneys' fees [and ensure] that the witness understands it is neither an inducement nor a payment for her testimony.

(3)     H—Help from your state bar association … seek an advisory opinion from your state bar on the particular facts of your case …

(4)     I—Identify your intentions to your adversary … [seems optional, but] could go a long way toward demonstrating that the payment of legal fees was not an inducement for particular testimony…

(5)     C—Carefully review the witness's attorney's fees … meticulously review invoices …[2]

(6)     S—State statutes and other applicable laws. Rule 3.4 states that a lawyer shall not "offer an inducement to a witness that is prohibited by law."

Broas & Nadelhaft, Paying a Witness's Attorneys' Fees: The ABCs of an Ethical Inducement Are ETHICS, BNA Insights, July 28, 2010 at 717 (addressing the ethics of paying for attorney's fees for a witness who does not want to speak to a party's attorney without having their own lawyer and concluding that when the six ETHICS steps are taken and the fees are "reasonable," such fees are *not* a "fee for testifying" and *are* permissible); *see also* White Collar Crime § 34:30.50.

Many state bar associations to address the question of paying a witness's attorney's fees have found them permissible "so long as they are limited to the witness's participation in the proceeding and were not an inducement for a particular proceeding." Broas & Nadelhaft. For example, a Florida Bar Association opinion addressing this question in a civil suit over the sale of businesses found that the attorney's fees of "necessary and vital witnesses" who were employees of a company tied in by an indemnity agreement could be paid by a party's law firm "so long as they were limited to those incurred for the witnesses attending or testifying in the proceeding." *Id.* (citing Florida Bar Staff Opinion 23940 (July 3, 2002), which was "based on the assumption that there is no interference with the attorney-client relationship between the witness and the witness's attorney"); *see also* Ala. Gen. Counsel Op. re Payment of Expert and Lay Witnesses, 59 Ala. Law. 55 (Jan. 1998) (the payment may not be an inducement); Eye on

---

[2] An Alabama Bar opinion found no ethics violation so long as the attorney obtained an affidavit from the witness and/or his lawyer setting forth actual expenses and the nature of the services rendered. Ala. State Bar Ass'n Op. 82-699 (Jan. 5, 1983).

Ethic, 41 Ariz. Att'y 10 (Jan. 2005) ("To be safe, the committee suggests that the compensation paid to a witness should simply make the witness whole, and not leave him better off that he would have been if everybody had just stayed home."). Other states' opinions reach the same conclusion, but seem to emphasize that any payment must not hinge on the content of the testimony or the ultimate outcome of the case.[3] In other words, the fact that payments for W's expenses are not directly linked to the proceedings of our civil case does not mean they are a prohibited inducement, so long as it is clear that the payments are independent of the outcome of our case and the content of any testimony that W gives.

In some circumstances, however, a payment may not violate 18 U.S.C. § 201, which prohibits bribery of public officials and witnesses, but may still be a professional/ethical violation. *See, e.g., Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 865 F. Supp. 1516, 1525 (S.D. Fla. 1994) (sanctioning plaintiff's counsel for repeatedly paying non-expert witnesses substantial sums *for the purpose of obtaining their testimony* in a civil action where ~$750,000 in rewards were paid to witnesses (as well as intermediaries and bodyguards) for information regarding $9 million of stolen gold even where there was no evidence of false testimony where counsel advised client in making payments conditioned on the testimony being: (1) truthful; (2) material; and (3) helpful to the client's case); *Florida Bar v. Jackson,* 490 So.2d 935 (Fla. 1986) (finding it was improper for an attorney to request that his clients be paid $50,000 for their testimony in a pending insurance claim case in New York as "The very heart of the judicial system lies in the integrity of the participants.... Justice must not be bought or sold. Attorneys have a solemn responsibility to assure that not even the taint of impropriety exists as to the procurement of testimony before courts of justice. It is clear that the actions of the respondent in attempting to obtain compensation for the testimony of his clients ... violates the very essence of the integrity of the judicial system and the disciplinary rule and code of professional responsibility, the integration rules of the Florida Bar and the oath of his office").

---

[3] Though I doubt it's an option here, an opinion from the Delaware Bar looked favorably on the *sharing* of such fees between the plaintiff and defendant as a means to "further reduce[] any risk to the integrity of the testimony sought...." Del. State Bar Ass'n Comm. on Prof. Ethics Op. 1994-1 at 6.

Additional factors that may impact our reasons for paying W's expenses include:

*Essential (or at least Necessary) Witness*

I assume that W can provide testimony that is otherwise unavailable and that is essential to proving our case. I also assume that he does not have other viable options for paying for his legal defense in his criminal case and would presumably lose if he were to proceed *pro se*. A loss would make him unavailable to testify in our case. As such, we are offering to pay his expenses to increase the likelihood of this necessary witness being available for our trial, similar to the Criminal Justice Act requirement that a witness be "necessary" for court to cover the costs of a fact witness where the accused in a criminal case is indigent. Fed. R. Crim. P. 17(b);[4] *U.S. v. Morrison,* 946 F.2d 484, 491 (7th Cir. 1991) (holding that a criminal defendant seeking to have witness subpoenaed at government expense has burden of establishing necessity-which is more than mere relevance-of witness's testimony); *see also* G.C. Harris, Testimony for Sale: The Law and Ethics of Snitches and Experts, 28 Pepp. L. Rev. 1 (2000) (explaining the circumstances under which the justice system accepts payments to witnesses as "justifiable and necessary," including where it would otherwise be impossible to obtain first-hand testimony, and recognizing that the "rigors of cross-examination and the context provided by cautionary jury instructions are adequate corrections for any distorting biases").

*Interest in the Outcome of Our Case*

The optics of our paying for W's expenses improve if W has no direct interest in the outcome of our case. Naturally, many Colombians have an "interest" in a case addressing violence during the country's civil conflict, but the less W has a personal or financial interest in our case, the better. *See, e.g.,* Florida State Ethics Opinion 98-1

---

[4] The "carrots" available to the Government in criminal cases far exceed the "expenses incurred" addressed in civil cases (e.g., plea bargains in exchange for cooperation under Fed. R. Crim. P. 11; the power to confer statutory use immunity via 18 U.S. C. § 6002; witness protection programs of 18 U.S.C. § 3521; cash payments (*U.S. v. Castleberry,* 642 F.2d 1151, 1153 (9th Cir. 1981)); *see also* 18 U.S.C. § 201(d) (listing expenses and services for which fact witnesses may be compensated, including payment "by the party upon whose behalf a witness is called and receipt by a witness, of the reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at nay such trial, hearing or proceeding . . ..").) The rationale behind these tools may help inform the unique circumstances in our civil case.

Confidential Information

(finding that payment to a medical-legal consulting service (rather than directly to an expert) on a contingency basis was impermissible as the consulting service would have an interest in the outcome of the litigation; such an arrangement was too close to paying or acquiescing "in the payment of compensation to a witness contingent upon the content of the witness's testimony or the outcome of the case"); *Florida Bar v. Wohl*, 842 S.2d 811, 815 (Fla. 2003) (sanctioning counsel for drafting an agreement with a former employee to help him understand business practices that included a $100,000 to $1,000,000 "bonus" for the "usefulness of the information provided"). At a minimum, we must emphasize that the payment of W's attorney's fees are not contingent on the outcome of our case.[5]

*Substance and Strength of W's Testimony*

We must ensure that the payment of expenses in W's separate case does not impact the substance or strength of W's testimony in our case. *See, e.g., Centennial Management Services Inc. v. Axa Re Vie*, 193 FRD 671, 679-81 (D. Kan. 2000) (finding that a $20,000 lump sum payment to a fact witness and commitment to represent that witness at his deposition and trial at no cost did not amount to "buying" his cooperation and testimony where the compensation was for time spent in connection with legitimate, non-testifying activities and did not impact the substance or strength of his testimony; witness was paid for his time, not "for" or "because of" his testimony). Agreements that pay for testimony risk "leaning towards the procurement of perjury; toward the raising of a class of witnesses who, for a sufficient consideration, will give testimony that shall win or lose the lawsuit; toward the perversion of justice; and toward the perversion of our courts." *Hamilton v. General Motors Corp.*, 490 F.2d 223, 227-28 (7th Cir. 1973) (quoting a 1906 case that explained why such agreements violate public policy, which favors free access to justice, in deciding that a witness who was too interested to be considered impartial could not be treated as an expert witness and relying on 18 U.S.C. §

---

[5] The concerns addressed by ABA Formal Ethics Opinion 04-432 are not a potential hurdle here. That opinion states that a lawyer may post, or arrange for the posting of, a bond to secure the release from custody of a client whom the lawyer represents in the matter with respect to which the client has been detained, but only in those rare circumstances in which there is no significant risk that her representation of the client will be materially limited by her personal interest in recovering the amount advanced. Here, we do not represent W and, as the amount advanced will not be recovered, it will not limit our ability to represent our own clients.

Confidential Information

201 in finding that reimbursement to which fact witnesses are entitled is severely circumscribed to the reasonable cost of travel and the reasonable value of time lost in attendance); *Alexander v. Watson*, 128 F.2d 627 (4th Cir. 1942) (finding attorney and accountant were not entitled to an additional "allowance" for testifying as fact – not expert – witnesses).

*Jury Can Determine Credibility*

Courts have recognized that there is uncharted territory in the area of witness payments. *See, e.g., Goldstein v. Exxon Research and Engineering Co.*, 1997 WL 580599, *5-6 (D.N.J. Feb. 28, 1997) (noting that "it was not unreasonable for [defendant] to believe, in good faith, that there was nothing improper about paying [witness] for his substantial loss of time, especially given the fact that payment was not contingent upon his testimony" where "the precise issue presented here has never been decided in this district nor in this circuit"). Courts also recognize that juries may answer questions of credibility that many arise because of such payments, especially where jury instructions are provided. *Id.* (finding that permitting plaintiff to disclose defendant's agreement with witness at trial and cross-examine witness "accords plaintiff full relief" because while "an agreement to pay a fact witness may be void if sought to be enforced by the witness, its only effect on the trial in which the witness testimony is received is on that witness's credibility"); *see also Jamaica Time Petroleum v. Fed. Ins. Co.*, 366 F.2d 156, 158 (10th Cir. 1966) (finding that where an insurer "took a calculated risk of securing usable and believable information" by making a reward payment to a fact witness for testimony re the deliberate destruction of an airplane that (1) was not contingent on the content of the testimony or outcome of the litigation; (2) related to a past, not future, event; and (3) in a civil case, that reward did not render the witness's testimony incompetent and the question of credibility was properly submitted to the jury under adequate instructions); *Smith v. Allen,* 212 F. Supp. 713 (E.D. Va. 1962) (payment of fact witness in excess of what was allowed by law did not warrant new trial).

Assuming that W is an essential or necessary witness and we take precautions to demonstrate that we are proceeding in good faith and ensure that W understands his obligations as a witness, our paying for his defense expenses should not pose any ethical problems. By the very nature of this case, the jury should understand that some unsavory

Confidential Information

characters were involved; while there was no clear division of "good guys" and "bad guys" during the civil conflict, Defendant was not doing business with saints. For the purposes of testimony, the jury must understand that our payments were not used to influence W's testimony.