

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| DRUMMOND COMPANY, INC., and DRUMMOND LTD., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 2:15-cv-00506-RDP |
| v. | ) ) | Contains Information Designated Confidential Pursuant to Protective Order |
| TERRENCE P. COLLINGSWORTH, et al., | ) ) | |
| Defendants. | ) | |

## CONRAD & SCHERER, LLP AND WILLIAM R. SCHERER, JR.'S MOTION FOR SUMMARY JUDGMENT

Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
505 20th Street North, Suite 700
Birmingham, AL 35203
Phone (205) 986-3620
Fax (205) 986-3639
rks@spotswood.com
msansbury@spotswood.com
wpaulk@spotswood.com

*Attorneys for Defendants Conrad & Scherer, LLP and William R. Scherer, Jr.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ........................................................................................... 1

STATEMENT OF UNDISPUTED RELEVANT FACTS ("SUMF") ................................ 2

LEGAL STANDARD ....................................................................................... 24

LEGAL ARGUMENT ...................................................................................... 24

I. Count I – RICO Violation, 18 U.S.C. §§ 1962(c), 1964(c) ................................ 24

  A. The undisputed facts show that there was no "enterprise" (Element 2). ............. 25

  B. The undisputed facts show that Scherer and C&S did not "operate" or "manage" the alleged "enterprise" (Element 1).................................................... 27

  C. The undisputed facts show that Drummond was not injured "by reason of" any predicate acts (Element 5)........................................................... 29

    1. Lost Profits........................................................................... 31

    2. Expenses of Responding to Political and Public Effects ............................ 36

    3. Attorneys' Fees and Litigation Costs............................................... 37

    4. Damage to Reputation and Goodwill............................................... 39

  D. Drummond was not injured in its business or property (Element 6). ................... 40

    1. Reputational harm and attorney's fees from previous litigation are non-recoverable injuries. ................................................................ 40

    2. Drummond has not proven that its injuries were domestic......................... 42

  E. Scherer and C&S did not commit, and did not intend for anyone to commit, at least two predicate acts of racketeering  (Element 4). ........................................ 48

    1. No mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 .......... 48

    2. No extortion in Violation of Hobbs Act, 18 U.S.C. § 1951....................... 49

    3. No money laundering in violation of 18 U.S.C. § 1956(a)(2)(A)................ 50

    4. No obstruction of justice in violation of 18 U.S.C. § 1503 ........................ 51

    5. No witness bribery in violation of 18 U.S.C. § 201................................. 51

    6. No witness tampering in violation of 18 U.S.C. § 1512 ............................ 52

i

F.      Attorney's fees incurred during previous litigation between the same parties are not "damages" within the meaning of the RICO statute. ...................................... 53

II.      Count II – Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) ......................................... 55

A.      Drummond has no viable substantive RICO claim ................................................ 55

B.      Neither Scherer nor C&S conspired to commit a RICO violation ........................ 55

III.     Count III – Willful and/or Reckless Misrepresentation, Ala. Code § 6-5-101 (1975) ..... 57

IV.     Count IV – Fraudulent Concealment/Suppression, Ala. Code § 6-5-102 (1975) ............. 57

V.      Count V – Civil Conspiracy ............................................................................................. 58

VI.     Summary Judgment Is Due Under the *Noerr-Pennington* Doctrine and *Pendergraft* ...... 58

CONCLUSION ........................................................................................................................ 60

CERTIFICATE OF SERVICE ................................................................................................ 62

## TABLE OF AUTHORITIES

**Cases**

*AAL USA v. Black Hall Aerospace,*
   2018 WL 3036370 (N.D. Ala. June 19, 2018) .......................................................................... 58

*Absolute Activist Value Master Fund v. Devine,*
   233 F. Supp. 3d 1297 (M.D. Fla. 2017) ............................................................................. 43, 47

*Allied Supply v. Brown,*
   585 So. 2d 33 (Ala. 1991) .......................................................................................................... 58

*Allied World Surplus Lines Ins. v. Lovette Props.,*
   2024 WL 1142257 (N.D. Ala. Mar. 15, 2024) ......................................................................... 24

*Allstate Ins. v. Hoi Yat Kam,*
   2013 WL 12357487 (E.D.N.Y. Sept. 3, 2013) ......................................................................... 55

*Almanza v. United Airlines,*
   851 F.3d 1060 (11th Cir. 2017) ................................................................................................ 25

*Al-Rayes* v. *Willingham,*
   914 F.3d 1302 (11th Cir. 2019) ................................................................................................ 25

*Alyeska Pipeline Serv. v. Wilderness Soc.,*
   421 U.S. 240 (1975) .................................................................................................................. 53

*Am. Dental v. Cigna,*
   605 F.3d 1283 (11th Cir. 2010) ................................................................................................ 48

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006) .............................................................................................. 30, 33, 35, 37

*Bascunan v. Elsaca,*
   874 F.3d 806 (2d Cir. 2017) ............................................................................................... 43, 47

*Bayshore Cap. Advisors v. Creative Wealth Media Fin.,*
   667 F. Supp. 3d 83 (S.D.N.Y. 2023) ........................................................................................ 55

*Becks v. Emery-Richardson, Inc.,*
   1990 WL 303548 (S.D. Fla. Dec. 21, 1990) ............................................................................ 28

*Blevins v. Aksut,*
   849 F.3d 1016 (11th Cir. 2017) ................................................................................................ 40

*Bowen v. Adidas Am.*,
   541 F. Supp. 3d 670 (D.S.C. 2021) ....................................................................... 37, 41

*Calderone v. United States*,
   799 F.2d 254 (6th Cir. 1986) ...................................................................................... 24

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................................... 24

*Cement-Lock v. Gas Tech. Inst.*,
   2005 WL 2420374 (N.D. Ill. Sept. 30, 2005) ........................................................... 42

*Choice is Yours, Inc. v. Williams*,
   2016 WL 5661709 (E.D. Pa. Sept. 30, 2016) ........................................................... 40

*Cisneros v. Petland*,
   972 F.3d 1204 (11th Cir. 2020) ....................................................... 24, 25, 26, 48

*City of Almaty v. Khrapunov*,
   956 F.3d 1129 (9th Cir. 2020) .................................................................................... 36

*Compare City of Chicago Heights v. Lobue*,
   914 F. Supp. 279 (N.D. Ill. 1996) .............................................................................. 42

*Cox v. Adm'r U.S. Steel & Carnegie*,
   17 F.3d 1386 (11th Cir.) .............................................................................................. 27

*Craig Outdoor Advert. v. Viacom Outdoor*,
   528 F.3d 1001 (8th Cir. 2008) .................................................................................... 25

*Crawford's Auto Ctr. v. State Farm Mut. Auto Ins.*,
   945 F.3d 1150 (11th Cir. 2019) .................................................................................. 49

*D'Addario v. D'Addario*,
   901 F.3d 80 (2d Cir. 2018) ......................................................................................... 54

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .................................................................................................... 31

*Deck v. Eng'd Laminates*,
   2001 WL 487940 (D. Kan. Apr. 10, 2001) ............................................................... 42

*Deck v. Eng'd Laminates*,
   349 F.3d 1253 (10th Cir. 2003) .................................................................................. 42

*Discon, Inc. v. NYNEX Corp.*,
　93 F.3d 1055 (2d Cir. 1996) ................................................................ 55

*DJ Lincoln Enterprises v. Google*,
　2021 WL 184527 (S.D. Fla. Jan. 19, 2021) ........................................ 26

*Driver v. W.E. Pegues*,
　2012 WL 3042939 (N.D. Ala. July 19, 2012) ..................................... 58

*Drummond v. Zimmerman*,
　454 F. Supp. 3d 1210 (S.D. Fla. 2020) ............................................... 29

*Evans v. City of Chicago*,
　434 F.3d 916 (7th Cir. 2006) ......................................................... 39, 41

*Ex parte Graham*,
　634 So.2d 994 (Ala. 1993) ................................................................... 42

*Ex Parte Household Retail Servs.*,
　744 So. 2d 871 (Ala. 1999) .................................................................. 57

*Ex parte Maint. Grp.*,
　261 So. 3d 337 (Ala. 2017) .................................................................. 58

*Feldman v. Am. Dawn*,
　849 F.3d 1333 (11th Cir. 2017) .......................................................... 30

*Fogerty v. Fantasy, Inc.*,
　510 U.S. 517 (1994) ............................................................................. 53

*Foremost Ins.v. Parham*,
　693 So. 2d 409 (Ala. 1997) .................................................................. 57

*Global Master Int'l v. Esmond Natural*,
　76 F.4th 1266 (9th Cir. 2023) ............................................................. 45

*Glock v. Glock*,
　247 F. Supp. 3d 1307 (N.D. Ga. 2017) ............................................... 47

*Gov't Emps. Ins. v. KJ Chiropractic Ctr.*,
　2015 WL 12839140 (M.D. Fla. Feb. 16, 2015) ................................... 49

*Gratz v. Ruggiero*,
　822 F. App'x 78 (3d Cir. 2020) ........................................................... 34

*Grogan v. Platt*,
    835 F.2d 844 (11th Cir. 1988) ........................................................ 41, 55

*Halpin v. David*,
    2009 WL 2960936 (N.D. Fla. Sept. 10, 2009) .................................... 38

*Hamm v. Rhone-Poulenc Rorer Pharms.*,
    187 F.3d 941 (8th Cir. 1999) .................................................... 41, 42

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) ...................................................... 37

*Handeen v. LeMaire*,
    112 F.3d 1339 (8th Cir. 1997) ...................................................... 54

*Hemi Grp. v. City of N.Y.*,
    559 U.S. 1 (2010)........................................................... passim

*Hertz Corp. v. Friend*,
    559 U.S. 77 (2010)................................................................ 44

*Hill v. Tangherlini*,
    724 F.3d 965 (7th Cir. 2013) ................................................... 39, 41

*Holloway v. Clackamas River Water*,
    2014 WL 6998069 (D. Or. Sept. 9, 2014) ...................................... 37, 38

*Holloway v. Clackamas River Water*,
    2015 WL 13678931 (D. Or. Nov. 25, 2015).......................................... 40

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992)............................................................... 39

*Hope for Families & Comm. Serv. v. Warren*, 7
    21 F. Supp. 2d 1079 (M.D. Ala. 2010) ............................................. 33

*Horn v. Med. Marijuana, Inc.*,
    80 F.4th 130 (2d Cir. 2023) ...................................................... 41

*Humphrey v. GlaxoSmithKline*,
    905 F.3d 694 (3d Cir. 2018) ...................................................... 44

*Hyundai Motor Am. v. EFN W. Palm Motor Sales*,
    641 F. Supp. 3d 1321 (S.D. Fla. 2022) ......................................... 26, 56

*In re Managed Care Litig.*,
   430 F. Supp. 2d 1336 (S.D. Fla. 2006) ................................................................ 56

*In re Nat'l Prescription Opiate Litig.*,
   2019 WL 4279233 (N.D. Ohio Sept. 10, 2019) ..................................................... 28

*In re Search Warrant Issued to Google*,
   264 F. Supp. 3d 1268 (N.D. Ala. 2017) ................................................................ 43

*Jackson v. Sedgwick Claims Mgmt. Servs.*,
   731 F.3d 556 (6th Cir. 2013) ................................................................................ 41

*Jones v. BP Oil*,
   632 So. 2d 435 (Ala. 1993) ................................................................................... 58

*Knit With v. Knitting Fever*,
   2012 WL 2938992 (E.D. Penn. July 19, 2012) ................................. 31, 36, 37, 41

*Knit With v. Knitting Fever*,
   625 F. App'x 27 (3d Cir. 2015) ............................................................................ 40

*Levitt v. Yelp! Inc.*,
   765 F.3d 1123 (9th Cir. 2014) .............................................................................. 49

*Lightning Lube v. Witco Corp.*,
   4 F.3d 1153 (2d Cir. 1993) ................................................................................... 55

*Liquidation Comm'n of Banco Intercontinental v. Renta*,
   530 F.3d 1339 (11th Cir. 2008) ............................................................................ 30

*Local 355 Hotel, Motel, Restaurant & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*,
   599 F. Supp. 761 (S.D. Fla. 1984) ................................................................. 42, 55

*Maio v. Aetna, Inc.*,
   221 F.3d 472 (3d Cir. 2000) ................................................................................. 40

*Marshall v. City of Atlanta*,
   195 B.R. 156 (N.D. Ga. 1996) ............................................................................. 28

*Marshall v. Goguen*,
   604 F. Supp. 3d 980 (D. Mont. 2022) .................................................................. 35

*Mattel, Inc. v. MGA Ent'mt*,
   782 F. Supp. 2d 911 (C.D. Cal. 2011) ................................................................. 31

*McGuire Oil v. Mapco, Inc.*,
   958 F.2d 1552 (11th Cir. 1992) ...................................................................... 58

*MSP Recovery Claims, Series LLC v. Caring Voice Coal.*,
   2024 WL 1326402 (S.D. Fla. Mar. 22, 2024) ............................................. 26

*Off. Comm. of Unsecured Creditors of PSA v. Edwards*,
   437 F.3d 1145 (11th Cir. 2006) ...................................................................... 27

*Palantir Techs. v. Abramowitz*,
   2020 WL 9553151 (N.D. Cal. July 13, 2020) ............................................. 36

*Percival Partners Ltd. v. Nduom*,
   99 F.4th 696 (4th Cir. 2024) ............................................................... 47, 48

*Prof'l Real Estate Investors v. Columbia Pictures Indus.*,
   508 U.S. 49 (1993) ............................................................................................ 60

*Quick v. People's Bank of Cullman Cnty.*,
   993 F.2d 793 (11th Cir. 1993) ...................................................................... 27

*R.E. Davis Chem. v. Nalco Chem.*,
   757 F. Supp. 1499 (N.D. Ill. 1990) ............................................................. 27

*Ray v. Spirit Airlines*,
   836 F.3d 1340 (11th Cir. 2016) ..................................................... 26, 27, 28, 30

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
   119 F.3d 935 (11th Cir. 1997) ...................................................................... 56

*Resolute Forest Prods. v. Greenpeace Int'l*,
   302 F. Supp. 3d 1005 (N.D. Cal. 2017) ..................................................... 35

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) ............................................................................................ 28

*Ritchie v. N. Leasing Sys.*,
   2016 WL 1241531 (S.D.N.Y. Mar. 28, 2016) ............................................. 49

*RJR Nabisco v. Eur. Cmty.*,
   579 U.S. 325 (2016) ............................................................................................ 43

*Rodriguez v. Quinones*,
   813 F. Supp. 924 (D.P.R. 1993) ................................................................. 42

*Rothenberg v. Sec. Mgmt.*,
   736 F.2d 1470 (11th Cir 1984) ............................................................ 53

*Rylewicz v. Beaton Servs.*,
   698 F. Supp. 1391 (N.D. Ill. 1988) ...................................................... 41

*Saleh v. Merchant*,
   2018 WL 287748 (N.D. Ill. Jan. 4, 2018) ........................................... 27

*Salinas v. United States*,
   522 U.S. 52 (1997) ................................................................................ 56

*Schalamar Creek Mobile Homeowner's Ass'n v. Adler*,
   855 F. App'x 546 (11th Cir. 2021) ...................................................... 31

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .............................................................................. 39

*Shane v. Humana, Inc.*,
   228 F. App'x 927 (11th Cir. 2007) ...................................................... 56

*Singh v. Illusory Sys., Inc.*,
   __ F. Supp. 3d __, 2024 WL 1386356 (D. Del. Mar. 29, 2024) ............ 34

*Slay's Restoration v. Wright Nat'l Flood Ins.*,
   884 F.3d 489 (4th Cir. 2018) ............................................................... 35

*Sosa v. DIRECTV*,
   437 F.3d 923 (9th Cir. 2006) ............................................................... 58

*Stochastic Decisions v. DiDomenico*,
   995 F.2d 1158 (2d Cir. 1993) .............................................................. 54

*Summit Valley Industries v. Local 112, United Brotherhood of Carpenters*,
   456 U.S. 717 (1982) .................................................................. 53, 54, 55

*Thomas v. Baca*,
   308 F. App'x 87 (9th Cir. 2009) .......................................................... 41

*Trump v. Clinton*,
   626 F. Supp. 3d 1264 (S.D. Fla. 2022) ............................................... 41

*United States v. Barfield*,
   999 F.2d 1520 (11th Cir. 1993) ........................................................... 51

*United States v. Brand*,
    775 F.2d 1460 (11th Cir. 1985) ........................................................... 51

*United States v. Burke*,
    504 U.S. 229 (1992).............................................................................. 42

*United States v. Cianci*,
    378 F.3d 71 (1st Cir. 2004)................................................................... 26

*United States v. Gonzalez*,
    921 F.2d 1530 (11th Cir. 1991) ........................................................... 56

*United States v. Green*,
    981 F.3d 945 (11th Cir. 2020) ............................................................. 56

*United States v. Pendergraft*,
    297 F.3d 1198 (11th Cir. 2002) ..................................................... 49, 59

*United States v. Penn*,
    63 F.4th 1305 (11th Cir. 2023) ............................................................ 54

*United States v. Pizzonia*,
    577 F.3d 455 (2d Cir. 2009) ................................................................ 56

*United States v. Trejo*,
    610 F.3d 308 (5th Cir. 2010) ............................................................... 50

*United States v. Turkette*,
    452 U.S. 576 (1981).............................................................................. 25

*United States v. Velazquez-Fontanez*,
    6 F.4th 205 (1st Cir. 2021)................................................................... 56

*United States v. Zemlyansky*,
    908 F.3d 1 (2d Cir. 2018) .................................................................... 56

*Webster v. Fall*,
    266 U.S. 507 (1925).............................................................................. 55

*Yegiazaryan v. Smagin*,
    599 U.S. 533 (2023)................................................................... passim

**Statutes**

18 U.S.C. § 1341 .......................................................................................... 50

18 U.S.C. § 1343 .......................................................................................... 50

18 U.S.C. § 1503 .................................................................................................. 51

18 U.S.C. § 1512 .................................................................................................. 52

18 U.S.C. § 1951 .................................................................................................. 49

18 U.S.C. § 1956 .................................................................................................. 50

18 U.S.C. § 1961 ............................................................................................. 25, 48

18 U.S.C. § 1962 ........................................................................................... passim

18 U.S.C. § 1964 ........................................................................................... passim

18 U.S.C. § 201 ............................................................................................. 50, 51

29 U.S.C. § 187 .................................................................................................... 54

Ala. Code § 6-5-101 (1975) ................................................................................. 57

Ala. Code § 6-5-102 (1975) ................................................................................. 57

## INTRODUCTION

In denying Conrad & Scherer, LLP ("C&S") and William R. Scherer, Jr.'s ("Scherer," individually, and "C&S" when discussed jointly) motion to dismiss in March 2016, the Court concluded, "The court recognizes that some issues addressed during the motion to dismiss stage might be considered again at the summary judgment stage of proceedings." Doc. 58 at 18. That time has come. Drummond has had eight years to develop facts (not allegations) supporting its international conspiracy theory and, through crime-fraud discovery in the *Defamation* case,[1] has had unprecedented access to tens of thousands of otherwise privileged documents and obtained extensive deposition testimony on otherwise privileged topics.

The undisputed facts that have emerged from this unprecedented discovery reflect the complete absence of any agreement or conspiracy involving C&S or Scherer to engage in any illegal or criminal conduct designed to wrongfully extort money from the Drummond plaintiffs or otherwise harm their business among the international coal-buying community. More specifically, the undisputed facts show there was ***no*** RICO enterprise among the Defendants and that C&S and Scherer did not "operate" or "manage" the (non-existent) enterprise. The undisputed facts show that Drummond's alleged injuries were not proximately caused by any of C&S's conduct. The undisputed facts and relevant legal authorities establish that Drummond's alleged injuries are either non-recoverable injuries under RICO or that Drummond has not proven they are domestic injuries. Moreover, the attorney's fees it seeks are not RICO "damages." Finally, Drummond's conspiracy and state law claims fare no better, and its entire lawsuit is barred by legal doctrines protecting litigation conduct.

C&S and Scherer hereby seek summary judgment on all five counts of the complaint.

---

[1] *Drummond Co., Inc. v. Terrence P. Collingsworth et al.*, No. 11-cv-3695-RDP (N.D. Ala.) ("*Defamation*").

## STATEMENT OF UNDISPUTED RELEVANT FACTS ("SUMF")

1.     Conrad & Scherer, LLP ("C&S") is a litigation law firm based in Fort Lauderdale, Florida. It has been in business since 1974.  Doc. 318-1 (Decl. of William R. Scherer, Jr.) ¶ 2.

2.     C&S specializes in complex business litigation and, until approximately 2008, primarily represented defendants. Doc. 318-1 ¶ 6.

3.     In 2009, C&S began representing plaintiffs in business disputes. Doc. 318-1 ¶ 7.

4.     Until the mid-2000s, nearly all of C&S's practice involved cases in the United States. Doc. 318-1 ¶ 8.

5.     From the mid-2000s to the present, C&S has employed an average of 17 lawyers and an additional 30 litigation and office support staff. Doc. 318-1 ¶ 9.

6.     C&S hired Terrence Collingsworth in February 2008. Doc. 318-1 ¶ 10; Doc. 318-2 (William R. Scherer, Jr. Dep. Tr. (Sept. 28, 2022)) 36:17-24.[2]

7.     When Collingsworth joined C&S in 2008, C&S opened an office in Washington, D.C., for Collingsworth and the team he was bringing over from his non-profit law firm, International Rights Advocates. Doc. 318-1 ¶ 11.

8.     C&S gave its partners wide latitude to develop their own practices without a lot of interference from the firm, supported by a professional staff to manage the firm's business functions. Doc. 318-3 (Sept. 2, 2015 *Defamation* Hr'g Tr.) 388:1-7.

9.     C&S hired Collingsworth to start and lead a human rights litigation practice group. Doc. 318-1 ¶ 12.

---

[2] Citations to deposition and hearing transcripts are to the transcript page numbers, and citations to non-transcript evidence, or evidence that does not include paragraph numbers, are to the CM/ECF header page numbers preceded by "p." or "pp."

10.     In June 2007, C&S sued Chiquita Brands International ("Chiquita") in federal court in Florida for providing financial support to the United Self-Defense Forces of Colombia ("AUC"), a right-wing paramilitary group in Colombia. Doc. 318-4 (*Chiquita* complaint).

11.     On September 10, 2001, the U.S. Department of State designated the AUC a foreign terrorist organization ("FTO") under U.S. law. Doc. 318-5 (U.S. Dep't of State, Designation of a FTO (Sept. 10, 2001)); Doc. 318-6 (Expert Report of Victoria Sanford, Ph.D.) p.22.

12.     The FTO designation made "it illegal for persons in the United States or subject to U.S. jurisdiction to provide material support to the AUC . . . ." Doc. 318-7 (U.S. Dep't of State, Remarks of Secretary Colin L. Powell (Sept. 10, 2001)).

13.     Several months before C&S sued Chiquita, Chiquita signed a factual proffer in connection with a criminal guilty plea in the United States for providing material support to the AUC in violation of the FTO designation. Doc. 318-8 (*Chiquita* Factual Proffer).

14.     Chiquita owned banana plantations in Colombia close to Drummond's rail line and port in the Santa Marta region of the Department of Magdelena. Doc. 322-1 (Tracy Dep. Ex. 12) p.3; Doc. 318-10 (Colombia Region Maps).

15.     C&S's case against Chiquita was consolidated with other cases into multidistrict litigation in the Southern District of Florida. The first bellwether trial against Chiquita ended on June 10, 2024, with a $38.3 million plaintiffs' verdict. Doc. 318-11 (*Chiquita* Verdict Form).

16.     Scherer knew Collingsworth's reputation as a human rights defender and respected human rights attorney. Doc. 318-2, at 42:15-22, 48:10-17; Doc. 318-3, at 386:23-387:10.

17.     Before it hired Collingsworth, C&S had served as co-counsel with Collingsworth on one or more human rights cases. Doc. 318-2, at 36:25-37:7; Doc. 318-3, at 384:18-385:19.

18.     Before C&S hired Collingsworth, Scherer knew Collingsworth had sued Drummond in *Romero v. Drummond Co.*, No.: 7:03-CV-575-KOB (N.D. Ala.). Doc. 318-1 ¶ 13.

19.     "The [*Romero*] complaint alleged that the president of Drummond Ltd., the Colombian subsidiary of Drummond, with the knowledge of executives in the United States, hired Colombian paramilitaries to kill and torture union members at a Drummond coal mine in Colombia." *Romero v. Drummond Co.*, 480 F.3d 1234, 1237 (11th Cir. 2007).

20.     Before C&S hired Collingsworth, Scherer knew Collingsworth had tried *Romero* to a jury, which returned a verdict in Drummond's favor. Doc. 318-1 ¶ 14.

21.     C&S had some financial incentive to pursue human rights cases, but it was also motivated by altruistic reasons to hold multi-national companies responsible for "atrocities that happen all over the world." Doc. 318-3, at 384:18-386:3.

22.     C&S hired Collingsworth as a contract partner, not an equity partner, and he remained a contract partner until his termination in late 2015. Doc. 318-1 ¶ 15.

23.     From 2008 to 2016, Scherer was the 98% or 99% owner of C&S. Doc. 318-1 ¶ 16.

24.     From 2008 to 2016, no one other than Scherer or his children (who are attorneys) held an equity interest in C&S. Doc. 318-1 ¶ 17; Doc. 318-2, at 42:3-6.

25.     As the supermajority owner of C&S, Scherer controlled the firm and made all important decisions involving it. Doc. 318-1 ¶ 18.

26.     Scherer would never allow C&S or its lawyers to be involved, or to conspire to be involved, in any criminal or even quasi-criminal activity, especially activity that relates in any way to the practice of law or representation of firm clients. Doc. 318-1 ¶ 19.

27.     Neither C&S nor its lawyers have ever been found civilly or criminally liable for engaging in or conspiring to engage in criminal or quasi-criminal activity relating to the practice of law or representation of firm clients. Doc. 318-1 ¶ 20.

28.     From 2008 to 2016, Scherer billed 383 hours on Drummond cases. Doc. 318-1 ¶ 21.

29.     From 2008 to 2016, Scherer billed 7,934 hours on the Rothstein Ponzi case and 2,258 hours on other major cases in the firm. Doc. 318-1 ¶ 22.

30.     To the best of his knowledge, Scherer has never met with or spoken to Defendants Ivan Alfredo Otero, Franciso Ramirez Cuellar, or Albert van Bilderbeek. Doc. 318-1 ¶ 24.

31.     To the best of his knowledge, Scherer has never met with or spoken to alleged non-party co-conspirators Lorraine Leete, Rebecca Pendleton, Richard Garzon, Carlos Toro, or representatives of PAX, The Netherlands ("PAX"), Secure Pointe Partners, LLC, or Witness for Peace. Doc. 318-1 ¶ 25.

32.     Scherer has not spoken to any U.S. or Colombian criminal authorities about Drummond.  Doc. 318-1 ¶ 26.

33.     C&S attorneys are expected to litigate their cases within the confines of the courtroom, not through "public relations" campaigns in the media. Doc. 318-1 ¶ 27.

34.     Scherer is frequently called upon to speak to the media, and he does so within the confines of applicable rules of the Florida Bar and the court system. Doc. 318-1 ¶ 27.

35.     C&S occasionally relies on a public relations firm to generate publicity for its cases or assist it in responding to public information about it or its cases.  Doc. 318-2, at 61:10-63:4.

36.     Scherer was unaware of a group called PAX until after it published its 2014 Report about Colombian coal mining, nor was he aware that Collingsworth or others working for him had communicated with PAX or similar groups about Drummond. Doc. 318-1 ¶¶ 28-29.

37.     Until Drummond filed this RICO case, Scherer was unaware that Mr. Collingsworth, or others working for him, were meeting with Colombian criminal authorities regarding Drummond. Doc. 318-1 ¶ 30.

38.     Before C&S hired Collingsworth, C&S and Collingsworth had filed separate lawsuits against DynCorp relating to aerial eradication of coca plants near the border of Colombia and Ecuador. These cases presented security issues for witnesses and lawyers. Doc. 318-2, at 299:21-300:8. *See Arias v. DynCorp*, 752 F.3d 1011, 1013-14 (D.C. Cir. 2014).

39.     In March 2009, after joining C&S, Collingsworth filed *Freddy Locarno Baloco et al. v. Drummond Co. Inc. et al.*, No. 7:09-CV-557-RDP (N.D. Ala.) ("*Baloco*"). *Baloco* Doc. 1.

40.     *Baloco* was filed on behalf of the children and heirs of three Drummond union officials who were murdered by the AUC in 2001. The plaintiffs alleged that Drummond "aided and abetted or conspired with the AUC by directly funding some of its operations" in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note § 2(a), and the wrongful death law of Colombia. *Baloco v. Drummond Co.*, 767 F.3d 1229, 1233 (11th Cir. 2014).

41.     In May 2009, after joining C&S, Collingsworth filed *Claudia Balcero Giraldo et al. v. Drummond Co. et al.*, No.: 2:09-CV-1041-RDP (N.D. Ala.) ("*Balcero*"). *Balcero* Doc. 1.

42.     *Balcero* was filed on behalf of the heirs of decedents who alleged that Drummond "engaged the [AUC] . . . to eliminate suspected guerilla groups from around the company's mining operations in Colombia," and that "their innocent decedents were incidental casualties of

Defendants' arrangement with the AUC" in violation of the ATS, TVPA, and Colombian wrongful death laws. *Doe v. Drummond Co.*, 782 F.3d 576, 580 (11th Cir. 2015).[3]

43.     When C&S hired Collingsworth, Scherer was aware that litigating cases in South America could present security risks to witnesses. Doc. 318-1 ¶ 31; Doc. 318-2, at 30:22-31:3.

44.     When C&S hired Collingsworth, Scherer was aware that security measures for witnesses had been taken in *Romero*, which he understood had been disclosed to the Court and Drummond. Doc. 318-1 ¶ 32; Doc. 318-2, at 49:20-25, 67:9-11, 270:22-271:3, 271:21-25.

45.     Scherer was generally aware that, after Collingsworth joined the firm, C&S was providing security or relocation funding to some witnesses or their families in Colombia. Doc. 318-1 ¶ 33; Doc. 318-3, at 394:14-23.

46.     Collingsworth alone decided whether to provide security or relocation assistance to witnesses or their families. Doc. 318-12 (CS_TC207831) p.2; Doc. 318-13 (CS_TC196158) p.5.

47.     Scherer was not consulted about the details of security or relocation funding being sent to Colombia, nor was he involved in setting up such payments. Doc. 318-1 ¶ 34.

48.     C&S associates working under Collingsworth were not involved in setting up security or relocation funding. Doc. 318-31 (Christian Levesque Dep. Tr.) 48:6-48:25, 44:20-45:1, 50:21-51:13, 72:22-73:3, 131:5-21; Doc. 318-32 (Eric Hager Dep. Tr.) 42:23-43:6, 46:1-3.

49.     Collingsworth repeatedly told C&S that the funds he requested C&S provide to witnesses or their families were for security or relocation assistance arising from threats they received relating to testimony against Drummond. Doc. 318-1 ¶ 35.

---

[3] In 2013, C&S and Collingsworth filed another lawsuit against Drummond styled *Marisol Melo Penaloza, et al. v. Drummond Company, Inc.* et al., No. 2:13-cv-00393-RDP (N.D. Ala.) ("*Melo*"), which mirrored many of the allegations from *Balcero*. The Court stayed *Melo* pending resolution of the *Defamation* case.  *See Melo* Doc. 98.

50.     In 2009, C&S was informed that Jairo de Jesus Charris Castro ("Charris") had a large family whom Charris wanted to be moved in connection with signing his declaration. C&S provided the funds for the move and continued making payments until December 2015. Doc. 318-14 (CS_TC039101, CS_TC058951, CS_TC066328); Doc. 318-15 (*Defamation* Doc. 174-7) pp.7-9; Doc. 298-1 (Decl. of William R. Scherer, Jr. (May 3, 2024)) ¶ 7.

51.     In 2011, C&S was informed that Libardo Duarte wanted his family moved in connection with signing his declaration. C&S agreed to provide the funds for the move and made two payments to Duarte's family. Doc. 318-16 (CS_TC039652, CS_TC051565); Doc. 318-15, pp.6-7; Doc. 318-17 (*Defamation* Doc. 282) ¶¶ 58-59. Collingsworth also arranged for a third payment to Duarte or his family. Doc. 318-17, ¶¶ 60-61.

52.     In 2011, C&S was informed that Jose Gelvez Albarracin ("Gelvez") did not want to sign his declaration until his family moved out of the country. Doc. 318-18 (CS_TC241475, CS_TC145096). C&S made one payment to his wife. Doc. 318-15, p.9; Doc. 318-17, ¶ 23.

53.     In 2011, C&S was informed that witnesses "El Tigre" and "Samario" were willing to be deposed in the *Balcero* case but only if their families were moved to a safe location.  Doc. 318-19 (CS_TC049189); Doc. 318-20 (Defs.' Third Am. Resp. ROG No. 2) pp.5-8.  C&S provided funds for their families to be moved and monthly living expenses. Doc. 318-21 (CS_TC039622, CS_TC049447, CS_TC173286); Doc. 318-20, pp.6-7.

54.     In late 2008, C&S began making monthly protection payments for the benefit of witness "Halcon," whom the United Steelworkers had moved to Panama before Collingsworth joined C&S. C&S continued making payments until 2012 when Collingsworth reevaluated Halcon's security situation and decided that he was no longer in need of protection. Doc. 318-15, pp.9-10; Doc. 318-22 (T. Collingsworth Dep. Tr. (Feb. 2024)) 381:4-382:18.

55.     In 2009, C&S paid Ivan Otero $80,000. Doc. 318-23 (Drath Dep. Ex. 14). Collingsworth told C&S that it needed to make this payment pursuant to a cooperation agreement under which Otero was assisting Collingsworth in obtaining testimony from Colombian witnesses. Doc. 318-24 (Drath Dep. Ex. 9); Doc. 318-25 (Drath Dep. Exs. 12 & 13).

56.     Collingsworth has since taken the position that the cooperation agreement under which C&S paid Otero $80,000 was voided. Doc. 318-26 (CS_TC126364) p.3.

57.     In 2011, C&S began making monthly payments to Otero, typically $2,700 per month. Doc. 318-20 p.7. Once this monthly payment began, C&S's records identified only Otero as the recipient of the payments and either did not describe the purpose of the payments or described them as being "for security." Doc. 318-27 (*Defamation* Doc. 790-39).

58.     Collingsworth repeatedly told C&S that the funds being sent to Otero were for his security and the security of other unidentified persons. For example:

    a.  On July 6, 2012, Collingsworth told C&S, "The funds going to Ivan are for security of people we need to protect at least until the heat dies down." Doc. 318-28 (CS_TC050524) p.3. When pressed for more information, Collingsworth responded the funds were being used for "bodyguards, leased armour [sic] vehicle, alternative housing." *Id.* p.2.

    b.  On September 17, 2012, Collingsworth told C&S, "We are 3 months late for Ivan and as I explained to you most of this is extremely sensitive security-based money . . . ." Doc. 318-29 (CS_TC050837) p.2.

    c.  On February 17, 2014, Collingsworth told C&S, "With respect to Ivan, I neglected to mention that about 2,000 per month of his funds are for security. Since he started working on these cases, there have been several assassination attempts directed at him. . . . [W]e needed to pay for armed security, which we have been doing." Doc. 318-30 (CS_TC150277) pp.2-3.

59.     Scherer believed security or relocation payments sent to witnesses or their families in Colombia addressed legitimate security concerns. Doc. 318-1 ¶ 36; Doc. 318-3, at 394:14-23.

60.     Scherer never thought security or relocation payments were to induce witnesses to testify, whether truthfully or otherwise. Doc. 318-1 ¶ 37.

61.    Scherer never met with Colombian paramilitary witnesses who testified against Drummond, and he had no role in developing their testimony. Doc. 318-1 ¶ 39.

62.    Scherer never sent or attempted to send funds to Colombia for the benefit of any witness or witness's family member. Doc. 318-1 ¶ 38.

63.    Scherer did not know there were issues relating to the disclosure of security payments in the *Defamation* or underlying human rights cases until late 2014. Doc. 318-1 ¶ 40; Doc. 318-2, at 212:23-213:2, 219:18-25, 258:22-259:13; Doc. 318-3, at 392:11-393:23.

64.    Witnesses in Colombia are unlikely to testify against criminal interests unless they and their families are safe and secure. Doc. 318-36 (Expert Report of Javier Pena) ¶ 11.

65.    Criminal elements in Colombia will take all measures, including bribes, threats, and murder, to prevent witnesses from testifying against them. Doc. 318-36 ¶ 12.

66.    It would be uncommon and dangerous for witness security measures taken in Colombia to be carefully tracked and documented with receipts or contracts. Doc. 318-36 ¶ 13; Doc. 318-37 (Expert Report of Joseph Paonessa) ¶¶ 28-30.

67.    In May 2010, Collingsworth purported to enter into an attorney-client relationship with Albert van Bilderbeek on behalf of C&S. Doc. 318-38 (CS000891) p.4.

68.    Collingsworth did not advise any C&S partners of this engagement before entering into it. Doc. 318-1 ¶ 41.

69.    Collingsworth did not use the firm's standard retention agreement or ask the firm to perform its standard conflicts analysis. Doc. 318-39 (Decl. of Matthew Mantro) ¶¶ 4-5, 7.

70.    C&S did not open a matter for this representation. Doc. 318-39 ¶¶ 6, 8.

71.    C&S has not received any financial benefit from Collingsworth's representation of Bilderbeek. Doc. 318-1 ¶ 42.

72.     On August 24, 2010, Collingsworth corresponded with Bilderbeek regarding a meeting with "finance people." Doc. 318-40 (CSWRS-017301).

73.     On December 14, 2010, Bilderbeek asked Collingsworth to "email me a letter (with letterhead and signed) addressed to" the Dutch Prime Minister and other officials for Bilderbeek to have hand-delivered. Doc. 318-41 (CS001028) p.3. Bilderbeek also instructed Collingsworth to email the letter to four members of the House of Representatives of the Netherlands. *Id.* p.4.

74.     On January 18, 2011, Collingsworth sent his letter to the Dutch Prime Minister, Doc. 318-42 (DCI v. TC 000001), and he emailed a copy of the letter to members of the House of Representatives of the Netherlands, Doc. 318-43 (IRA-010247).

75.     On February 4, 2011, Collingsworth sent another letter to the Dutch government. Doc. 318-44 (DCI v. TC 000040).

76.     On June 17, 2011, Bilderbeek sent Collingsworth an article regarding the potential purchase by Itochu Corporation ("Itochu"), a Japanese company, of an interest in Drummond's Colombian mining operation and directed Collingsworth to "have your office write Itochu Corp. to inform them of your lawsuit." Doc. 318-45 (CS001034).

77.     On or about June 16, 2011, Itochu announced it was acquiring a 20% interest in Drummond's Colombian mining operations and related infrastructure. Doc. 318-46 (Itochu Corp. Press Release (June 26, 2011)). Drummond netted a little more than $1.6 billion from the sale. Doc. 318-82 (Tracy Dep.) 132:18-20.

78.     On September 9, 2011, Collingsworth entered into a series of agreements between and among Bilderbeek, NICOX BV, Herman de Leeuw, and James Ellwood (the "NICOX Agreements"). *See* Doc. 318-46 (Compilation of NICOX agreements).

79.     A portion of the funds flowing from these agreements was sent to Ivan Otero for the benefit of Jaime Blanco's lawyers. Doc. 318-22, at 241:23-242:11.

80.     On September 19, 2011, Collingsworth sent a letter to the President and CEO of Itochu. Doc. 318-48 (CS_TC037648).

81.     C&S did not know about the NICOX agreements. Doc. 318-1 ¶ 43.

82.     C&S did not obtain any funds from the NICOX agreements. Doc. 318-1 ¶ 43.

83.     Scherer did not know about Collingsworth's financial relationship with Bilderbeek. Doc. 318-1 ¶ 44.

84.     Scherer and C&S were unaware that Bilderbeek had facilitated payments for the benefit of Jaime Blanco's lawyers. Doc. 318-49 (CS_TC065134); Doc. 318-2, at 250:5-8, 258:22-259:13.

85.     In May 2012, Scherer asked former C&S attorney Jim Carroll to evaluate the strengths and weaknesses of *Balcero*. Doc. 318-50 (James Carroll Dep. Tr.) at 19:15-25.

86.     Carroll spent nearly twenty years at C&S, during which time he left and returned multiple times. During his nearly two decades at C&S, Carroll formed the belief that Bill Scherer is an ethical lawyer and C&S is an ethical law firm. Doc. 318-50, at 122:8-124:13.

87.     Carroll never met Collingsworth, knew nothing about his cases, and learned that Collingsworth was employed by C&S shortly before evaluating *Balcero*. Doc. 318-50, at 17:5-16.

88.     Carroll spent about twenty hours reviewing materials and testimony in *Balcero* and preparing a memorandum of his analysis. Doc. 318-51 (Carroll Dep. Ex. 2).

89.     Carroll did not talk to Collingsworth or anyone in C&S's D.C. office in connection with preparing his memorandum. Doc. 318-50,  at 111:15-112:7.

90.     Carroll's memorandum addressed issues of liability, collectability, validity of the legal claims, and potential changes in the law as part of his analysis of the *Balcero* case. Doc. 318-50, at 107:25-109:7. Doc. 318-52 (Carroll Dep. Ex. 3) pp. 5-8.

91.     Carroll is a seasoned litigator, and lawyers typically consider issues of liability, collectability, validity of legal claims, and potential changes in the law when evaluating cases. Doc. 318-50, at 19:6-11, 107:25-109:7.

92.     Carroll did <u>not</u> conclude in his memorandum that the witnesses' testimony presented in the *Balcero* case was false. Doc. 318-50, at 109:17-110:24.

93.     When Carroll prepared his memorandum in May 2012, the U.S. Supreme Court had heard oral argument in *Kiobel v. Royal Dutch Petroleum Company* but had not yet issued a decision. 569 U.S. 108 (2013). At that point, the issue pending in *Kiobel* was whether the law of nations recognized corporate liability. *Id.* at 114.[4]

94.     Carroll believed that *Kiobel* created "uncertainty" about the continued viability of *Balcero*. Doc. 318-52  p.3 ¶ 1, 4, 6; *see also* Doc. 318-53 (Carroll Dep. Ex. 18) p.3.

95.     Scherer did not see Carroll's May 2012 memorandum. Doc. 318-2, at 288:22-23, 289:10-11, 292:19-20.

96.     Carroll participated in a meeting with Scherer, Collingsworth, and Richard Drath (C&S's then-chief financial officer) on June 5, 2012. Doc. 318-50, at 112:8-14.

97.     There was no discussion at that meeting of force being used to compel Drummond to settle *Balcero* or to pay money to C&S. Doc. 318-50, at 113:16-114:2.

98.     There was no discussion at that meeting of violence being used to compel

---

[4] After oral argument, the Supreme Court directed the parties to brief the extraterritorial application of the ATS. *Kiobel*, 569 U.S. at 114. The Supreme Court resolved the case based on this question. *Id.*

Drummond to settle *Balcero*. Doc. 318-50, at 114:3-9.

99.     The next day Carroll prepared a set of "possible talking points" for settlement discussions with Drummond in which Carroll outlined reasons why it would be in Drummond's interest to settle *Balcero*. Doc. 318-53 (Carroll Dep. Ex. 18) p.3.

100.    Around this time, Scherer met with a colleague and co-counsel in other cases, Mike Madigan, who offered to approach one of Drummond's lawyers to gauge Drummond's interest in initiating settlement discussions or mediating *Balcero*. Doc. 318-1 ¶ 53.

101.     Soon thereafter, Madigan approached one of Drummond's lawyers in *Balcero*, William Jeffress, to inquire if Drummond was interested in resolving *Balcero* before the Supreme Court ruled in *Kiobel*. Doc. 318-2, at 297:12-298:23; Doc. 318-50, at 120:12-21.

102.    Scherer did not inform Collingsworth, any other defendant, or any non-party co-conspirator that he was gauging Drummond's interest in resolving *Balcero*.  Doc. 318-1 ¶ 54.

103.    Madigan reported to Scherer that Drummond was not interested in meeting or mediating the *Balcero* case. Doc. 318-1 ¶ 56; Doc. 318-54 (Carroll Dep. Ex. 21).

104.    Scherer has not obtained any property from Drummond. Doc. 318-1 ¶ 57.

105.    C&S has not obtained any property from Drummond. Doc. 318-1 ¶ 58.

106.    On July 25, 2013, the Court granted summary judgment against plaintiffs in *Balcero* based on the "seismic shift that *Kiobel*" created. *Balcero* Doc. 455 at 2.

107.    Drummond seeks four categories of damages in this case: (1) lost profits, (2) expenses and costs associated with responding to media, non-governmental organizations ("NGOs"), governmental and customer inquiries, (3) attorneys' fees and litigation costs incurred in defending against *Balcero*, *Baloco*, and *Melo*, and (4) damage to reputation and goodwill. Doc.

318-55 (Drummond Resp. to First ROG. No. 8 (Dec. 22, 2023)); Doc. 318-56 (Drummond's Supp.

Rule 26(a) Initial Disclosures (Jan. 5, 2024)) pp. 24-26.

108.    Drummond seeks "lost profit" damages from "adverse effects on its sale of coal"

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Doc. 1-1 ¶¶ 197, 204;

Doc. 322-2 (Expert Report of Pat Markey) pp.19-20.

109.    ██████████████████████████████████████████████

████████████████████████████████████████████████. Doc. 322-2 p.19.

110.    ██████████████████████████████████████████████

██████████████████████████. Doc. 322-2 p.18.

111.    ██████████████████████████████████████████████

█████████████████████. Doc. 322-2 p.18.

112.    ██████████████████████████████████████████████

██████. Doc. 322-2 pp.1-434.

113.    ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████. Doc. 322-2

pp.175, 208, 246, 289.

114.    ██████████████████████████████████████████████

███. 322-2 pp. 155-56, 190, 233, 262, 351, 307, 351, 391.[5]

115.    ██████████████████████████████████████ 322-2 p.19.

─────────────────────────────

███ ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

116.  ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████  322-2 p.19, 23.

117.  PAX, The Netherlands, is a human rights organization based in the Netherlands. Doc. 318-58 (DCI v. TC 088280-421)) p.3; Doc. 318-59 (*Defamation* Doc. 725) p.5.

118.  In 2014, PAX published a report titled "The Dark Side of Coal." Doc. 318-58.

119.  Before publishing its report, PAX sent a copy to Drummond and asked for its response. Doc. 318-58 p.92-94.

120.  Drummond communicated extensively with PAX and provided it with filings from the *Defamation* case it contended cast doubt on the truthfulness of witness testimony discussed in PAX's report. Doc. 318-60 (DCI v. TC 002339 to 002341, DCI v. TC 002526 to 002537).

121.  PAX reviewed and considered the information from Drummond, including Drummond's assertions that the testimony of some witnesses was unreliable because they or their families received payments from Collingsworth. *See* Doc. 318-58 pp. 94-95; *id*. at 95.

122.  After considering this information, PAX decided to include the witnesses' testimony and explained its reasoning as follows:

> It is also important to make clear that the statements made in the framework of the US lawsuit are certainly not the only source used in this report. The report also includes ex-paramilitaries' statements made in Colombian legal proceedings. These statements on the involvement of Drummond and Prodeco usually correspond in great detail with the statements made in the US lawsuit. . . . . Furthermore, PAX has held several interviews with the former paramilitaries in which they elaborated further on their previous statements under oath.

> This means that, with the information available to us to date, and regarding the purpose of this report, there are reasonable grounds to believe that the essence of the information contained in the witness statements deserves to be published to achieve broader public attention.

Doc. 318-58 p.97.

123.    PAX relied on multiple sources for its report, not just information from Collingsworth:

> This report is based on written sources, interviews, and statements made by witnesses in legal proceedings. The written sources include press publications, reports from social organizations, information and data from authorities, academic publications, and websites with company information and specialized information about the armed conflict in Colombia. One of our key written sources was the website of the Colombian organization Verdad Abierta . . . .
>
> Other information in this report comes from interviews that PAX held with victims of the violence in Cesar, ex-paramilitary commanders, former mining company contractors, human rights lawyers, and Colombian authorities involved with security and human rights in Cesar.

Doc. 318-58 p.13-14.

124.    The Court of the Hague recently sustained PAX's objections to Drummond's letters rogatory request seeking documents and deposition testimony relating to PAX's report. In sustaining PAX's objections, the Court of the Hague observed, "The PAX Report contains a justification of the investigation methodology and it contains numerous references to the sources used by" PAX. Doc. 318-61 (Court of the Hague "Disposition" (Mar. 28, 2024)), ¶ 4.7.

125.    Beginning in the late 2000s and continuing at least through 2017, multiple sources began reporting on and criticizing European energy companies' reliance on coal due to concerns regarding all aspects of coal extraction, including environmental factors and social issues:

    a.    In 2010, *Expatica* published an article asserting that coal companies "violate human rights and cause serious pollution" and "[e]xtraction and transport are known to produce carcinogens." Doc. 318-62 (DCI v. TC 088236-088237).

    b.    In 2010, *BothENDS* published an article criticizing bad working conditions in coal mines and the negative impacts of coal mining on the environment and local living conditions. Doc. 318-63 (DCI v. TC 088238).

    c.    In 2010, a Danish NGO, "Danwatch," issued a publication titled "The Curse of Coal," which one of Drummond's customers, EnBW, sent to Drummond. Doc. 318-64 (DCI v. TC 088492) p.5; Doc. 318-65 (May 2010 DanWatch report).

d. In 2010, *BothENDS* provided media coverage of a broadcast program called "Stroom Strink!" on the Dutch news program "Netwerk" about the origin of coal used in the Netherlands. Doc. 318-58 p.84. According to PAX, "***[m]edia coverage of the issue stirred up public and political debate about the mines' adverse impact on human rights, the environment, and community life near the mines***." *Id.* (emphasis added). PAX also noted comments from Dutch Professor of International Law Willem van Genugten, who stated, "Under international law, if you know the facts, but are willing to make economic gains from the situation anyway, you are complicit in continuing human rights violations." *Id.*

e. In 2013, Drummond's customer Vattenfall circulated a press release regarding an upcoming German television broadcast titled "Bad mine – Good Money: The Dirty Coal Business," which discussed the sourcing of coal for German energy suppliers and the potential "serious damage to nature and . . . huge suffering to the local population" of U.S. and Colombian coal mines. Doc. 318-66 (DCI v. TC 088568).

f. In 2014, the Dutch nonprofit organization "SOMO" released a report on Colombian coal that was critical of Drummond. Doc. 318-67 (DCI v. TC 088518); Doc. 318-68 (May 2014 SOMO Report).

g. In 2016, PAX issued a press release noting the "extensive network of European Civil Society Organizations, trade unions, politicians and activists who are working for the victims of blood coal." Doc. 318-69 (DCI v. TC 088556) p.69.

h. In 2016, BankTrack released a "Human Rights Impact Briefing" focused on seven banks that had financed Drummond's Colombian mining operations since 2010. Doc. 318-70 (DCI v. TC 088450).

126. Drummond's European customers acknowledged growing concern among European governments and other stakeholders regarding their reliance on coal. For example:

a. In 2013, Drummond customer EnBW sent an email to Drummond in which it

   i. Noted a "new study about German coal imports . . . published this month by German NGOs," and "articles about coal mining in Colombia . . . published in the German newspapers, a very detailed on in the German weekly newspaper "Die Zeit" with the title "The coal is blood-spattered." Doc. 318-64 p.3.

   ii. Listed multiple concerns about Drummond: the conviction of Drummond's subcontractor; the coal spill at Santa Marta; labor conditions at Santa Marta; environmental topics (e.g. water use and coal dust emissions); participation of local residents in the wealth created by mining activities; and the resettlement of Boquron. *Id.* p.3-4.

   iii. Explained that EnBW had created its own questionnaire regarding five topics (corporate policy, labor conditions, local residents, environment, and

legal information) to gauge public perception in Germany about 12 coal producers and that ten of the producers had a "red light" on one topic, while "[i]n the case of Drummond three of five topics are on red." *Id.* p.4.

    iv.   Explained that "the general reproach of the NGOs is that in Colombia the local residents do not participate in the welfare created by the coal mining industry" and listing numerous reasons for concern. *Id.* pp.6-7.

    v.   Explained that "German society is very critical against coal fired power plants in general." *Id.* p.10.

    b.   In 2017, Drummond customer RWE explained that RWE's stakeholders want to know if companies operating in Colombia "can somehow show or make clear that they have not profited from the civil war in Colombia or the instable [sic] situation in the Cesar region." Doc. 318-71 (DCI v. TC 088530).

127.    European energy companies conducted their own research into environmental and societal issues in Colombia and based their coal-purchasing decisions on several factors:

    a.   The CEO of the Italian energy conglomerate, ENEL, stated that "ENEL will start its own investigation in Cesar and if we don't like the look of the results, we will do the same as [Dong, another energy company] and stop buying coal from Cesar." Doc. 318-72 (DCI v. TC 088433).

    b.   Drummond customer EnBW explained to Drummond in 2012 that "[t]he critical discussion about Colombian coal is still going on in the German society and we expect that all aspects of corporate social responsibility will stay on the agenda in 2013 and beyond." Doc. 318-64 p.9.

    c.   PAX observed that "[p]ower companies . . . note that [their coal purchasing] decisions are always the outcome of a combination of commercial, opportunistic, technical and ethical considerations." Doc. 318-73 (DCI v. TC 088422) p.3.

128.    In February 2001, members of the U.S. and U.K. Embassies convened a meeting of representatives from extractive and energy companies to discuss a newly established set of principles "to guide Companies in maintaining the safety and security of their operations within an operating framework that ensures respect for human rights and fundamental freedoms." Doc. 318-74 (Tracy Dep. Ex. 24) pp.4, 5. These principles were titled "The Voluntary Principles on Security and Human Rights" (the "Voluntary Principles"). *Id.*; *see also* Doc. 318-75.

129.    Drummond's chief of security, General Rafael Peña, was invited to this meeting. Doc. 318-74 p.3.

130.    The Voluntary Principles "provide a framework for companies to manage risk by: [c]onducting a comprehensive assessment of human rights associated with security[;] [e]ngaging appropriately with public and private sector security service providers and surrounding communities in complex environments[;] [i]nstituting human rights screening of and training for public and private security forces[; and] [d]eveloping systems for reporting and investigating allegations of human rights abuses[.]" Doc. 318-76 (Tracy Dep. Ex. 22).

131.    Drummond did not agree to follow the Voluntary Principles until at least 2013 or 2014, Doc. 318-77 (Linares Dep. Tr.) 143:5-144:7, and it did not include an explicit commitment to follow them in its human rights policy until 2015, Doc. 318-78 (Tracy Dep. Ex. 27).

132.    Drummond decided to abide by the Voluntary Principles after "social responsibility and . . . sustainability issues became very important for [its] customers including abiding by the voluntary principles in human rights." Doc. 318-77, at 144:8-15.

133.    In 2013, in response to pressure from its customers and to "better plac[e] [its] coal in certain markets," Drummond joined the "Bettercoal," program, which is a voluntary program that audits the environmental, social, and governance processes of coal suppliers. Drummond underwent its first audit in 2014. Doc. 318-64 pp.8-12; Doc. 318-79 (Bettercoal Assessment).

134.    After the Bettercoal audit, five European companies "agreed to negotiate and buy from Drummond," including three of the companies whose coal purchasing decisions form the basis of Drummond's claim for "lost profit" damages in this case. Doc. 318-80 (DCI v. TC 088488); *see supra* ¶ 108.

135.    Drummond asked ENEL, whose coal purchasing decisions form the basis of Drummond's claim for "lost profits," to confirm "that your decision was based on a strategic/commercial decision and not because of the human rights assessment." Doc. 318-81 p.3.

136.    Environmental advocates use social media to share their messages about the environmental harm caused by coal mining. Doc. 318-82 (Mike Tracy Dep. Tr.) 137:11-15 (testifying that the "green side of society . . . is always out there in social media giving coal a black eye" because it "thinks coal is really bad for the environment and causing global warming").

137.    Energy company CEOs consider a number of factors in deciding whether to reduce their reliance on coal, such as reports about human rights concerns in Colombia, including reports about collaboration between the military and AUC, that were unconnected to the Defendants. Doc. 318-82, at 63:15-64:1; 64:2-78:2; 137:18-138:16.

138.    Drummond's expenses for responding to media, NGO, governmental, and customer inquiries arise from trips Drummond personnel took to Europe. Doc. 322-3 (Expenses).

139.    Between 2008 and 2016, Drummond's revenue from coal sales alone was more than ███████. Doc. 322-4 (Financial Statements).

140.    According to its publicly available "Sustainability Reports," which contain accurate information, Drummond Ltd.'s income from net sales between 2016 and 2022 was more than $15.7 billion. Doc. 813-85 (Tracy Dep. Ex. 1); Doc. 318-82, at 29:18-30:18.

141.    In 2017, Drummond retained Goldman Sachs to advise it with respect to a possible sale of Drummond Ltd.'s Colombian operations. The sale exploration project was named "Project Crimson." Doc. 318-82, 112:7-14; 114:1-4. Drummond rejected bids it received, which was an economically smart decision because coal prices went up over the next five years. Doc. 318-82, at 121:6-123:10.

142.     In connection with this engagement, Goldman prepared a confidential presentation for potential investors, and the information in this presentation was accurate. Doc. 318-82, 124:3-125:7; Doc. 318-86 (March 2018 Goldman Sachs "Project Crimson" presentation).

143.     Drummond Ltd.'s primary office is in Bogota, Colombia, and it has other offices at the mine near La Loma, the port in Santa Marta, and Valledupar. Doc. 318-77, at 50:8-14.

144.     Drummond's Colombian operations are "fully self-sustaining with 100% dedicated legal, treasury, accounting, and human resources functions in-country" (i.e., Colombia). Doc. 318-82, at 174:9-19; Doc. 318-86 p.49.

145.     As of March 2018, Drummond had more than 5,200 direct employees in Colombia and approximately 4,000 contractors. Doc. 318-86 p.63; Doc. 318-82, at 178:8-20.

146.     Drummond Ltd. has no full-time employees at its Birmingham office. Doc. 318-77, at 51:20-52:3.

147.     Drummond Ltd.'s president, Jose Miguel Linares (who has been Drummond Ltd.'s president for over ten years), spends only a tiny fraction (1-2%) of his time at Drummond Ltd.'s Birmingham office. Doc. 317-77, at 49:23-50:7.

148.     . Doc. 322-5 p.8.

149.     ██████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████. Doc. 322-5 p.8; Doc. 318-46.

150.     Itochu sold its 20% share back to Drummond International in 2021 for a small fraction of what it paid. Doc. 318-87 pp.12, 19; Doc. 318-82, at 136:11-12.

151.     All of the coal was mined in and shipped directly from Colombia and did not touch the United States. Title to the coal passed to the customers at Drummond's port in Santa Marta, Colombia, and the customers bore the risk of any loss to the coal after it left the Colombian port. Doc. 318-82, at 147:8-11.

152.     Drummond pays income taxes to Colombia, not the United States, on the profits from its coal sales. Doc. 318-82, at 171:17-120, 175:22-176:12.

153.     Drummond receives a dollar-for-dollar credit against U.S. tax liability for income taxes paid to Colombia, which is the foreign tax credit. Doc. 318-82, at 175:9-176:12.

154.     Drummond seeks attorney's fees incurred in the *Balcero*, *Baloco*, and *Melo* cases. Doc. 322-6 (Compilation Exhibit of Drummond's Attorney's Fees).

155.     Significant portions of Drummond's fees ███████████████████████████ ████████ Doc. 322-6, pp.6-17.

156.     Before filing the RICO case, Drummond threatened to sue non-party co-conspirator, Witness for Peace, for defamation based on allegedly defamatory statements about Drummond's human rights record in Colombia that were included in a presentation made at universities and cities and publicly accessible on the internet. Doc. 318-89 (DCI v. TC 002333).

157.     Between September 2018 and January 2023, C&S incurred approximately $1.3 million in outside counsel fees and expenses, and C&S lawyers, paralegals, and litigation support personnel devoted more than 18,000 hours to the *Defamation* and *RICO* cases, which translates into over $4.3 million worth of internal services provided by the firm. Doc. 318-39 ¶¶ 9-10.

## LEGAL STANDARD

Under Rule 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Allied World Surplus Lines Ins. v. Lovette Props.*, 2024 WL 1142257, at *4 (N.D. Ala. Mar. 15, 2024) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The party seeking summary judgment "bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact." *Id.* "Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and—by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file— designate specific facts showing that there is a genuine issue for trial." *Id.* Because Drummond bears the burden of proof at trial, C&S "need show only that [Drummond] cannot sustain [its] burden at trial." *Id.* (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

## LEGAL ARGUMENT

### I.        Count I – RICO Violation, 18 U.S.C. §§ 1962(c), 1964(c)

18 U.S.C. § 1962(c) provides, "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To prevail on a civil RICO claim, a plaintiff must prove "six elements: that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland*, 972 F.3d 1204, 1211 (11th Cir. 2020). The remedial provision of

RICO states, in relevant part, "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . . 18 U.S.C. § 1964(c).

The undisputed facts and law show that Drummond cannot sustain its burden of proof at trial on the following elements, which C&S addresses in this order: enterprise (element 2), operated or managed (element 1), causation (element 5), injury to business or property (element 6), and predicate acts (element 4). Drummond's failure to create a genuine issue of material fact as to any one of these elements means its entire RICO claim fails. *Craig Outdoor Advert. v. Viacom Outdoor*, 528 F.3d 1001, 1028 (8th Cir. 2008) ("Failure to present sufficient evidence on any one element of a RICO claim means the entire claim fails."). In addition, the attorney's fees Drummond seeks from prior litigation are not "damages" under § 1964(c).

## A.  The undisputed facts show that there was no "enterprise" (Element 2).

Drummond alleges that "[t]he RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)." Doc. 1-1 ¶ 175. An association-in-fact enterprise must have "three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cisneros*, 972 F.3d at 1211 (quoting *Almanza v. United Airlines*, 851 F.3d 1060, 1067 (11th Cir. 2017)) (cleaned up). The undisputed facts show that Drummond cannot satisfy at least the purpose prong.

"The purpose prong contemplates 'a common purpose of engaging in a course of conduct' among the enterprise's alleged participants." *Cisneros*, 972 F.3d at 1211 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "[T]he relevant 'purpose' in an association-in-fact enterprise is the members' shared purpose of engaging in illegal activity—not the purpose for which they initially became acquainted." *Al-Rayes* v. *Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019).

"[T]o establish the 'common purpose' requirement for a RICO enterprise, the plaintiff must establish not only that there was some ***commonly shared purpose*** among [the alleged associates], but also that they associated together ***for that purpose***." *Hyundai Motor Am. v. EFN W. Palm Motor Sales*, 641 F. Supp. 3d 1321, 1332 (S.D. Fla. 2022) (citation omitted) (emphasis added). "An abstract common purpose, such as a generally shared interest in making money, will not suffice." *Cisneros*, 972 F.3d at 1211. "Rather, where the participants' ultimate purpose is to make money for themselves, a RICO plaintiff must plausibly allege that the participants shared the purpose of enriching themselves through a particular criminal course of conduct." *Id.* at 1211–12.

Importantly, ***each member*** of the enterprise must share the common purpose, and a single member's failure to share the enterprise's common illegal purpose "negates the existence of a plausible RICO claim as a matter of law." *MSP Recovery Claims, Series LLC v. Caring Voice Coal.*, 2024 WL 1326402, at *10 (S.D. Fla. Mar. 22, 2024). *See also United States v. Cianci*, 378 F.3d 71, 84 (1st Cir. 2004) (affirming jury instruction stating that "it is necessary to show that all members of the alleged enterprise shared a common purpose"). In *DJ Lincoln Enterprises v. Google*, the court held that the plaintiff "failed to plausibly plead the existence of an enterprise" because the plaintiff did not allege "any facts to demonstrate that ***each member*** shared this common purpose." 2021 WL 184527, at *3 (S.D. Fla. Jan. 19, 2021) (emphasis added). The court relied on Eleventh Circuit opinions affirming the dismissal of RICO complaints that failed to establish a common purpose among each member of the enterprise. *Id.* (citing *Cisneros*, 972 F.3d at 1212–15, and *Ray v. Spirit Airlines*, 836 F.3d 1340, 1352–55 (11th Cir. 2016)).

The undisputed facts show there was no shared common purpose among all members of the alleged enterprise. Scherer has not met or talked with most of the defendants or non-party co-conspirators and, thus, shared *no* purpose with them. SUMF ¶¶ 30-31. C&S and Scherer also did

not associate with Collingsworth for the purpose of "engaging in illegal activity" or "enriching themselves through a particular course of criminal conduct." Instead, the undisputed facts show that C&S and Scherer associated with Collingsworth to prosecute human rights cases against multinational companies generally (and not Drummond, specifically). SUMF ¶¶ 9, 21. The undisputed facts show no agreement to bribe witnesses or otherwise obtain false testimony in support of these cases, as C&S and Scherer always believed and understood payments going to Colombia were to protect witnesses and their families. *Id.* ¶¶ 43-63. Indeed, C&S and Scherer were unaware of the relationship between Collingsworth and Bilderbeek or that Bilderbeek provided the funds for Blanco's lawyers. SUMF ¶¶ 68-71, 81-84.

No association-in-fact enterprise exists without a shared purpose among all members to engage in illegal or criminal activity, and the undisputed facts show no shared common purpose among <u>all members</u> of the alleged association-in-fact enterprise to engage in an illegal or criminal course of conduct. For this reason alone, Drummond's RICO claim fails as a matter of law.[6]

### B. The undisputed facts show that Scherer and C&S did not "operate" or "manage" the alleged "enterprise" (Element 1).

"[A] federal RICO violation requires affirmative and deliberate participation." *Off. Comm. of Unsecured Creditors of PSA v. Edwards*, 437 F.3d 1145, 1156 (11th Cir. 2006). "Mere participation in the activities of the enterprise is insufficient." *Saleh v. Merchant*, 2018 WL 287748, at *6 (N.D. Ill. Jan. 4, 2018).[7]

---

[6] Collingsworth's actions are not attributable to C&S for RICO purposes as a matter of agency law. C&S "derive[d] [no] benefit from the RICO violation," *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994), and Collingsworth did not hold "a sufficiently high-level position" at C&S, *Quick v. People's Bank of Cullman Cnty.*, 993 F.2d 793, 798 (11th Cir. 1993). *See also R.E. Davis Chem. v. Nalco Chem.*, 757 F. Supp. 1499, 1524 (N.D. Ill. 1990) ("[T]he upper echelons of a corporation must either have been directly involved in or at least have been aware of and acquiesced in the racketeering conduct for vicarious liability to be permissible [under RICO] . . . .").

[7] RICO "persons" must be distinct from the RICO "enterprise." *Ray*, 836 F.3d at 1355. Scherer's undisputed complete control of C&S, which Drummond alleges is a RICO "person," does not mean he controls the "enterprise."

"In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (quoting 18 U.S.C. § 1962(c)).

"Thus, in order to show that a Defendant 'conduct[s] or participate[s], directly or indirectly, in the conduct of such enterprise's affairs,' Plaintiffs must show that Defendants ***made decisions or knowingly carried out acts that helped to further the common purpose of the enterprise***." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4279233, at *3 (N.D. Ohio Sept. 10, 2019) (emphasis added). This means that "defendant must have assisted an enterprise with knowledge of its illegal activities." *Marshall v. City of Atlanta*, 195 B.R. 156, 169 (N.D. Ga. 1996). *See also Becks v. Emery-Richardson, Inc.*, 1990 WL 303548, at *37 (S.D. Fla. Dec. 21, 1990) ("Mere association with a RICO enterprise or even reckless disregard for the truth is not enough to establish RICO liability. Rather, ***RICO liability requires proof of a defendant's intentional participation in the conduct and affairs of the RICO enterprise. In other words, a necessary ingredient of every successful RICO claim is an element of criminal intent***.") (citations omitted) (emphasis added).

The Eleventh Circuit has affirmed the dismissal of a RICO complaint that failed to allege

> facts giving rise to a plausible inference that the various technology vendors and consultants, either individually or in corporate form, were in any way ***involved in the actual decisions*** of how to portray the Passenger Usage Fee, ***knew the true nature of the fee***, or worked ***intentionally to misrepresent the fee***. Thus, passing over the complaint's wholly conclusory claims, there is no plausible allegation that these vendors ***knowingly cooperated*** with Spirit in a scheme that involved misrepresenting the Passenger Usage Fee.

*Ray*, 836 F.3d at 1353 (emphasis added).

The undisputed facts show that Scherer and C&S did not conduct or participate in the affairs of any enterprise, and they certainly did not do so with the intent to further a criminal or illegal purpose of the enterprise. The undisputed facts are that C&S and Scherer hired Collingsworth, who had an impressive record as a human rights advocate, to prosecute human rights cases, provided him with an office and funding to do so, and, at Collingsworth's request, provided what they understood to be security and relocation assistance payments to witnesses (or their families) testifying against Drummond. SUMF ¶¶ 6-9, 16, 18, 43-63. The undisputed facts show that neither C&S nor Scherer conducted, or knew others were conducting, public relations campaigns against Drummond. *Id.* ¶¶ 33-36. C&S and Scherer did not communicate with any of the other defendants or the press or criminal authorities about Drummond, and they had a "hands-off"[8] approach to allowing Collingsworth to prosecute his cases. *Id.* ¶ 8. This minimal participation (if that) does not satisfy the "operate" or "manage" element, which requires intentional participation in the criminal enterprise. *See, e.g.*, *Drummond v. Zimmerman*, 454 F. Supp. 3d 1210, 1219 (S.D. Fla. 2020) ("[C]ourts have held that merely providing standard legal services will not subject an attorney to RICO liability, even where the attorney's services furthered the enterprise's goal or where the attorney knew of the illicit nature of the enterprise's affairs. . . . The actions alleged to have been taken by the Lawyer Defendants – drafting documents, participating in mediation – do not establish control or direction of an enterprise.").

### C. The undisputed facts show that Drummond was not injured "by reason of" any predicate acts (Element 5).

Drummond cannot prove the requisite direct causal link between the alleged RICO violations and an injury to its business or property. C&S denies that any RICO predicate act

---

[8] To illustrate just how "hands off" Scherer was, between 2008 and 2016, he billed an average of 1,247 hours per year on several significant cases not involving Drummond compared to an average of only 48 hours per year during that same time on Drummond cases. SUMF ¶¶ 28-29.

occurred, *see infra* Part I.E, but even assuming it did, Drummond cannot show that such predicate acts proximately caused its alleged injuries.

In addition to satisfying the four elements of a criminal RICO violation under 18 U.S.C. § 1962(c), a civil RICO plaintiff must establish "(1) the requisite injury to 'business or property,' and (2) that such injury was 'by reason of' the substantive RICO violation." *Ray*, 836 F.3d at 1348; 18 U.S.C. § 1964(c). This "statutory standing" "is really just a heightened proximate causation standard." *Liquidation Comm'n of Banco Intercontinental v. Renta*, 530 F.3d 1339, 1350 n.14 (11th Cir. 2008). The plaintiff must prove that "a RICO predicate offense not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Grp. v. City of N.Y.*, 559 U.S. 1, 9 (2010) (citations omitted). This requires a "direct causal connection between the predicate wrong and the harm." *Id.* at 17-18; *see also id.* at 9. "[T]he connection between the racketeering activity and the injury can be neither remote, purely contingent, nor indirect.'" *Feldman v. Am. Dawn*, 849 F.3d 1333, 1342 (11th Cir. 2017) (quoting *Ray*, 836 F.3d at 1349)). "Notably, the fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action—the injury must be direct." *Ray*, 836 F.3d at 1349. Thus, "[w]hen a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 1349 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006)).

Drummond claims four types of injuries from the alleged RICO enterprise: (1) lost profits, (2) expenses and costs associated with responding to media, NGO, governmental and customer inquiries, (3) attorneys' fees and litigation costs incurred in the underlying cases, and (4) damage to reputation and goodwill. SUMF ¶ 107. None of these injuries was caused directly by an alleged

predicate act and "thus were not caused 'by reason of it.'" *Hemi Grp.*, 559 U.S. at 18. Drummond, "therefore, has no RICO claim." *Id.*[9]

### 1. Lost Profits

Drummond's first claimed injury is "lost profits" from "adverse effects on its sale of coal to European customers"; specifically, ███████████████████████████ ███████████████████████████████████. SUMF ¶ 108.[10] There is no record evidence that C&S's conduct was a but-for cause—much less a proximate cause—of any lost profits, and Drummond's expert report shows that Drummond did not "lose profits" at all, much less from European customers.

First, the record is devoid of evidence that any Affected Client's decision on purchasing coal from Drummond is traceable to any act of C&S. *See Schalamar Creek Mobile Homeowner's Ass'n v. Adler*, 855 F. App'x 546, 550 (11th Cir. 2021); *Knit With v. Knitting Fever*, 2012 WL 2938992, at *11-12 (E.D. Penn. July 19, 2012) ("Plaintiff has produced absolutely no proof that the customers that stopped purchasing yarn from Plaintiff did so as a result of the recall as opposed to other factors."), *aff'd* 625 F. App'x 27, 35 (3d Cir. 2015). Drummond's expert offers no opinion ████████████████████████████████████████████████ SUMF ¶ 109. No customer has testified that it reduced coal purchases from Drummond based on any conduct by C&S or allegedly related to C&S, such as the PAX report. *Schalamar Creek*, 855 F. App'x at 550-51 (affirming summary judgment for lack of RICO standing where plaintiffs failed

---

[9] Drummond fails to explain how each alleged act of racketeering caused injury or to differentiate between the injury caused by each defendant's alleged pattern of racketeering acts. Instead, Drummond "considers the acts of racketeering *en masse*." *Mattel, Inc. v. MGA Ent'mt*, 782 F. Supp. 2d 911, 1023 (C.D. Cal. 2011). "The injuries caused by the combination of all of the alleged predicate acts are potentially recoverable only under" Count II, which claims a conspiracy to conduct the affairs of an enterprise through a pattern of racketeering. *Id.* But as in *Mattel*, Drummond's "claimed injuries to business or property (including those that aren't cognizable) were not directly caused by the alleged pattern of racketeering, whether considered individually or as a group." *Id.*

[10] C&S reserves challenges to Markey's expert report under *Daubert*.

"to produce any affidavits, testimony, or statements" to show that their alleged injury was traceable to the RICO scheme rather than some other factor).

Instead, the record shows that customers based their coal purchasing decisions on various factors. SUMF ¶ 127 (coal purchasing "decisions are always the outcome of a combination of commercial, opportunistic, technical and ethical considerations"). Besides typical commercial considerations, the Affected Clients faced growing concern among European governments and other stakeholders about their reliance on coal generally, and Colombian coal specifically, for reasons unrelated to C&S, Collingsworth, or allegedly false statements about Drummond's support of the AUC. These included concerns about the environmental impacts of coal mining, the existence of unsafe working conditions at the mines, the effect of coal mining on the local community, the displacement of local residents, and others. *Id.* ¶¶ 125-128, 136-137. Drummond's CEO explained, for example, how the "green side of society . . . is always out there in social media giving coal a black eye" because it "thinks coal is really bad for the environment and causing global warming." *Id.* ¶ 136. Affected Clients also had Drummond-specific concerns unrelated to any alleged conduct by C&S, such as the conviction of Drummond's subcontractor in the Colombian judicial system and the coal spill at Santa Marta. *Id.* ¶ 126. These concerns are completely unconnected to the asserted pattern of fraud or other predicate acts.

Moreover, during its claimed damages period, Drummond sold more total coal and more coal into Europe where it claims its customer relationships were damaged. █████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████   *Id.*

Even if Drummond lost volume to European coal customers, an assertion belied by its own expert, a customer's decision to reduce or cease purchasing coal from Drummond could result from any combination of factors and could change over time. *See, e.g.*, SUMF ¶¶ 126-127, 135 (Drummond asking ENEL to confirm that its coal buying "was based on a strategic/commercial decision and not because of the human rights assessment"), 137. ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████   *Id.* ¶¶ 115-16. Drummond has produced no summary judgment evidence that any customer reduced or stopped buying coal from Drummond due to any alleged conduct or fraud by C&S.

Second, even assuming "but-for" causation, there is no record evidence that the alleged predicate acts directly caused Drummond's lost profits. Drummond's own expert admits that the direct cause of Drummond's alleged lost profits was ██████████████████████████ █████████████████████████████   Doc. 322-2, p.28 (emphasis added). Thus, "the conduct directly causing the harm" (customers not buying coal from Drummond) is distinct from the conduct constituting the alleged RICO acts (the payment of Colombian witnesses and dissemination of false statements to the media and other organizations). *Hemi Grp.*, 559 U.S. at 11 (no proximate cause where the city's harm "was directly caused by the customers, not" the defendant); *Anza*, 547 U.S. at 458; *see also Hope for Families & Comm. Serv. v. Warren*, 721 F. Supp. 2d 1079, 1131 (M.D. Ala. 2010) (no proximate cause where the conduct directly responsible

for plaintiffs' alleged lost profits was the promulgation of rules precluding entry into the electronic bingo market, while the conduct constituting the alleged RICO act was the failure to provide honest services to the public).

Multiple intervening steps "disrupt[] any potential causal relationship between Defendants' putative predicate acts . . . and Plaintiffs' alleged" lost profits. *Singh v. Illusory Sys., Inc.*, __ F. Supp. 3d __, 2024 WL 1386356, at *2 (D. Del. Mar. 29, 2024); *see also Gratz v. Ruggiero*, 822 F. App'x 78, 81 (3d Cir. 2020) ("[P]laintiff's injury must be the direct result of an act of racketeering, rather than an attenuated harm following a long chain of intervening causes.") (citations omitted). Even under Drummond's theory (which is unsupported by record evidence), the alleged fraud (disseminating false, paid-for information about Drummond) is separated from the alleged injury (lost profits) by multiple steps, for many of which the record is devoid of any admissible evidence: (a) Collingsworth disseminated false information about Drummond to PAX and the international media; (b) PAX and other media distributed Collingsworth's false information to European politicians, consumers, and other outlets; (c) politicians and the public read and believed Collingsworth's false information distributed by PAX and other media; (d) based on Collingsworth's false information, politicians and the public pressured European energy companies to stop buying coal from Drummond; (e) European energy companies reduced their coal purchases from Drummond due to the public and political pressure from Collingsworth's false information; and (f) because the energy companies bought less coal, Drummond lost profits. Noticeably absent is any evidence that C&S (or any Defendant) communicated directly with any Affected Client that discontinued buying coal from Drummond. Instead, as in *Hemi*, Drummond's "theory of liability rests on the independent actions of third and even fourth parties"—PAX, media outlets, NGOs, politicians, public citizens, and CEOs of European energy companies. 559 U.S. at

15. The causal chain of a RICO violation cannot stretch so far. *Id.* at 11. *See also Slay's Restoration v. Wright Nat'l Flood Ins.*, 884 F.3d 489, 494 (4th Cir. 2018).

The "attenuated connection between [Drummond's] injury and the [Defendants'] injurious conduct thus implicates fundamental concerns expressed in *Holmes*." *Anza*, 547 U.S. at 459. Drummond's alleged lost profits "could have resulted from factors other than [Defendants'] alleged acts of fraud. Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of [Drummond's] lost sales were the product" of Defendants' alleged criminal conduct, *id.*, "as opposed to say, poor business practices, the independent actions of others, or market fluctuation," *Marshall v. Goguen*, 604 F. Supp. 3d 980, 1007 (D. Mont. 2022)—or other factors like downturns in the coal market, competition from other coal companies, customers' concerns about coal generally (such as environmental sustainability, unsafe working conditions, exclusion of local populations from the wealth created by coal-mining activities), or earlier reports about Drummond's human rights violations. SUMF ¶¶ 116, 137.

The proximate cause inquiry "is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation." *Anza*, 547 U.S. at 459-60 (no RICO standing because plaintiff's "lost sales could have resulted from factors other than [Defendants'] alleged acts of fraud"). *See also Resolute Forest Prods. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1023 (N.D. Cal. 2017) (no proximate cause where determining the amount of forestry company's damages allegedly attributable to environmental advocacy by Greenpeace "would be very difficult, because there are numerous reasons why a customer might cease or interrupt its relationship" with the company). Because Drummond cannot show that its alleged lost profits were either factually or proximately caused by any predicate act of C&S, they are not a compensable RICO injury.

35

### 2. Expenses of Responding to Political and Public Effects

Drummond's second claimed injury—the expenses of responding to the political and public effects of Defendants' alleged predicate acts—also fails for lack of proximate cause. Drummond's own description shows that this alleged injury was "not occasioned directly by the predicate acts in furtherance of [the] conspiracy, but rather by the costs that [Drummond] chose to incur to investigate and mitigate the effects of Defendants' conduct." *Knit With v. Knitting Fever*, 2012 WL 2938992, at *9. In its Supplemental Initial Disclosures, Drummond stated that it has

> incurred costs and been damaged in the form of time and resources that management and employees have had to devote to *responding to* the Enterprise's false allegations. Specific actions taken by Drummond include *responding in writing and verbally to media, NGO, governmental and customer inquiries* regarding the false allegations and lies spread by the Enterprise. Additionally, Drummond has (i) traveled to Europe on multiple occasions to *address customer questions* about the Enterprise's allegations, (ii) *met with NGOs and the media* in Colombia and elsewhere who reported on the Enterprise's fraudulent statements and lawsuits, and (iii) *responded in writing to media stories and NGO "reports"* which are based on the testimony of the Enterprise's bribed witnesses that the Enterprise supplied to the media and NGOs (e.g., the PAX Report).

Doc. 318-56 (emphasis added). By Drummond's own assertion, these expenses resulted not directly from any alleged RICO violation itself but from voluntary choices it made to respond to the downstream effects of the alleged scheme.

Such indirect damage is not a compensable injury under RICO. "As a general rule, incidental damages where the plaintiff was not a target of the conspiracy, as well as damages incurred by a direct target in investigating and mitigating damages, are generally not deemed direct injury flowing from a defendant's illegal conduct." *Knit With*, 2012 WL 2938992, at *7-8 (citing cases). *See also City of Almaty v. Khrapunov*, 956 F.3d 1129, 1132-33 (9th Cir. 2020) (voluntary expenditures made to track down laundered money were not a compensable injury under RICO); *Palantir Techs. v. Abramowitz*, 2020 WL 9553151, at *8 (N.D. Cal. July 13, 2020) (expenditures that are a "downstream effect of Defendants' conduct" not recoverable under RICO); *Bowen v.*

*Adidas Am.*, 541 F. Supp. 3d 670, 679 (D.S.C. 2021) (costs and legal fees voluntarily incurred to mitigate alleged RICO conduct "are, at most, an indirect injury"). As *Knit With* explained, the cases it cited "repeatedly found that although the plaintiffs' injuries resulting from discovery and mitigation of a RICO scheme may have been *factually* caused by the defendants' illegal actions, the injuries were not *proximately* caused—i.e. there was no direct link—by the defendants' actions." 2012 WL 2938992, at *9. Factual causation is insufficient for RICO liability. *See Anza*, 547 U.S. at 456 (civil RICO was not "meant to allow all factually injured plaintiffs to recover").

### 3.  Attorneys' Fees and Litigation Costs

Drummond also claims as injury the attorneys' fees, costs, and other expenses incurred defending itself in *Balcero*, *Baloco*, and *Melo*. SUMF ¶ 154. Legal fees are not cognizable as an injury to business or property under sec. 1964(c), *see infra* Part I.D.1, or recoverable as damages under RICO, *see infra* Part I.F. But even where courts have found attorneys' fees cognizable under RICO, it is only when they are directly and proximately caused by a predicate act of racketeering. *See Handeen v. Lemaire*, 112 F.3d 1339, 1354 (8th Cir. 1997). Drummond has not produced evidence showing that the alleged predicate acts here were both the but-for and proximate cause of its legal fees in *Baloco*, *Balcero*, and *Melo*.

The court in *Holloway v. Clackamas River Water*, 2014 WL 6998069 (D. Or. Sept. 9, 2014), addressed a similar situation. Plaintiff Holloway brought RICO claims asserting that she suffered injury in the form of legal fees incurred in defending against sham lawsuits. *Id.* at *9. The *Holloway* court first found that "legal fees expended to defend against sham lawsuits are not the type of injury to business or property interest which confer standing to bring a civil RICO claim." *Id.* But, even if they were, the plaintiff's claim still failed because her fees were not proximately caused by racketeering activity. "The most proximate cause of [plaintiff's] attorney-fee losses is

Defendants' act of filing lawsuits, but filing sham lawsuits is not 'racketeering activity' under RICO." *Id.* The court noted that Congress, when passing RICO's civil remedies, rejected an amendment that would have included malicious lawsuits in the definition of racketeering activity. *Id.* The court also considered plaintiff's claim that her legal expenditures were proximately caused by the defendants' wire fraud, specifically, the transmission of a report containing false information about her that was used in several of the frivolous lawsuits. *Id.* at *10. The court found that this "allegation describes a causal relationship too attenuated to form the basis for a civil RICO claim," because the alleged racketeering activity (transmission of the fraudulent report) did not lead directly to the plaintiff's injury. *Id.* Without the additional steps of the lawsuit being filed and the report introduced as evidence, the plaintiff "would not have suffered injury." *Id.* Moreover, the plaintiff "would have suffered injury in the form of defense costs whether or not the [fraudulent report] was used as evidence in the lawsuits" against her. *Id.* Thus, the RICO claim failed for lack of proximate cause. *Id.*

The same is true here. Even viewed most favorably to Drummond, the direct cause of its legal fees and expenses in *Baloco*, *Balcero*, and *Melo* is the filing of the lawsuits, which is distinct from the alleged predicate acts (all relating to the witness payments and allegedly false statements about those payments).[11] *See Hemi Grp.*, 559 U.S. at 10-11 (no proximate cause where the direct cause of harm is distinct from the RICO acts). As *Holloway* explained, filing lawsuits (even "sham lawsuits") is not itself racketeering activity, and Drummond would have incurred defense costs with or without any alleged predicate acts. *Holloway*, 2014 WL 6998069, at *10; *see also Halpin v. David*, 2009 WL 2960936, at *3 (N.D. Fla. Sept. 10, 2009).

---

[11] Drummond repeatedly refers to "fraudulent" or "sham" lawsuits, *see* Doc. 1-1 ¶¶ 2, 7, 43, 197, 204, but there has been no finding that the lawsuits were frivolous or a sham, and the mere fact that Drummond ultimately prevailed in *Balcero* and *Baloco* on legal grounds does not make it so.

Even if Drummond could show that some of its attorneys' fees were incurred as a direct result of an alleged predicate act, that would not entitle it to recover all of its attorneys' fees for all three lawsuits. A RICO plaintiff "can only recover *to the extent that* he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 495-96 (1985) (emphasis added). Drummond must show that its alleged injury is the direct result of a RICO act.[12] By lumping all its attorneys' fees together, Drummond has prevented the necessary proximate cause determination. Such speculative damage claims "are precisely the type of situation the Supreme Court was trying to avoid in *Holmes v. Securities Investor Protection Corp.*, [503 U.S. 258, 269 (1992)] when the court instituted a proximate cause requirement in order to establish standing in civil RICO cases." *Evans v. City of Chicago*, 434 F.3d 916, 933 (7th Cir. 2006) (quoting *Holmes* ("[T]he less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.")).[13] Drummond's bid for legal fees fails at summary judgment. *Evans*, 434 F.3d at 933 (no RICO standing where the evidence failed to show what portion of incurred attorney's fees was attributable to the alleged racketeering activities).

### 4.  Damage to Reputation and Goodwill

Finally, Drummond claims damage to its reputation and goodwill allegedly caused by Defendants. SUMF ¶ 107. C&S is entitled to summary judgment on this injury because it is unsupported by any admissible evidence. It also fails under both prongs of § 1964(c).

---

[12] For example, if the first act of alleged obstruction of justice occurred in 2011, fees incurred earlier could not have been "by reason of" that RICO violation.

[13] *Evans* and many other cases were overruled by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013), to the extent they suggested that a plaintiff may not rely on "self-serving" evidence to create a material factual dispute.

Damage to reputation and goodwill is not an injury to business or property cognizable under RICO. *See infra* Part I.D.1. To the extent Drummond claims harm to its reputation and goodwill separate from any actual out-of-pocket loss, the injury is not a "concrete financial loss" as required to constitute an injury to business or property under § 1964(c). *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir. 2000). *See Holloway v. Clackamas River Water*, 2015 WL 13678931, at *11 (D. Or. Nov. 25, 2015) ("'injury to reputation' does not qualify as a compensable injury under RICO"); *Choice is Yours, Inc. v. Williams*, 2016 WL 5661709, at *6 (E.D. Pa. Sept. 30, 2016) (a business reputation "may be valuable intangible property, but harm to it is not actionable under RICO"). To the extent Drummond claims harm to its reputation and goodwill that resulted in lost profits or publicity costs, the injury is non-compensable under RICO for lack of proximate cause. *See supra* Part C.1 & 2. Thus, Drummond's claim of injury to its reputation or goodwill is not cognizable under RICO.

### D.      Drummond was not injured in its business or property (Element 6).

For two reasons, Drummond cannot show it was injured "in its business or property." First, reputational harm and attorney's fees incurred in prior litigation are non-recoverable injuries. Second, Drummond has not produced admissible evidence showing that its injuries are domestic.

### 1.      Reputational harm and attorney's fees from previous litigation are non-recoverable injuries.

The "injury to business or property" requirement in § 1964(c) excludes intangible injuries. "Therefore, to prove standing . . . a plaintiff must proffer proof of a concrete financial loss and not mere injury to a valuable intangible property interest." *Knit With v. Knitting Fever*, 625 F. App'x 27, 34 (3d Cir. 2015). Likewise, the requirement excludes recovery related to personal injury. *See Blevins v. Aksut*, 849 F.3d 1016, 1021 (11th Cir. 2017). Thus, a RICO plaintiff cannot recover for damage to reputation or for economic damages or attorney fees related to personal injury. *See*

*Trump v. Clinton*, 626 F. Supp. 3d 1264, 1304 (S.D. Fla. 2022) ("Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c).") (quoting *Hamm v. Rhone-Poulenc Rorer Pharms.*, 187 F.3d 941, 954 (8th Cir. 1999)); *Knit With*, 2012 WL 2938992, at *10 ("Claimed losses to goodwill and reputation are not only speculative, but are simply not the types of injuries compensable under RICO."); *Grogan v. Platt*, 835 F.2d 844, 846–48 (11th Cir. 1988) (holding that RICO plaintiffs "cannot recover under RICO for those pecuniary losses that are most properly understood as part of a personal injury claim"); *Evans*, 434 F.3d at 931 (citing *Grogan* and holding that attorney fees incurred in an alleged malicious prosecution "represent non-compensable pecuniary losses related to personal injuries"), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 697 n.1 (7th Cir. 2013); *Jackson v. Sedgwick Claims Mgmt. Servs.*, 731 F.3d 556, 565 (6th Cir. 2013) (en banc) (discussing *Grogan* and explaining that "[a]ny pecuniary losses proximately resulting from a personal injury caused by a RICO violation, e.g. attorney fees, lost wages, and medical expenses, are . . . not recoverable"); *Rylewicz v. Beaton Servs.*, 698 F. Supp. 1391, 1396 (N.D. Ill. 1988) ("Lost effort and time are properly characterized as non-compensable personal injuries.").[14]

Moreover, the Eleventh Circuit, like some other courts, "has not recognized the incurment of legal fees as an injury cognizable under RICO" at all. *Thomas v. Baca*, 308 F. App'x 87, 88 (9th Cir. 2009) (declining to recognize legal fees in other cases as cognizable under RICO); *see also Bowen*, 541 F. Supp. 3d at 679 ("The RICO statute does not contemplate an injury in the form of legal fees and costs."). Thus, at least one court in this Circuit has held that attorney fees incurred in previous litigation are incidental damages, not an injury in property or business contemplated

---

[14] The Supreme Court recently granted certiorari from a Second Circuit decision holding, contrary to *Grogan*, *Evans* and *Jackson*, that § 1964(c) allows suit for pecuniary injuries flowing from a personal injury. *Horn v. Med. Marijuana, Inc.*, 80 F.4th 130, 142 (2d Cir. 2023), *cert. granted*, No. 23-365, 2024 WL 1839091 (U.S. Apr. 29, 2024).

by RICO. *See Local 355 Hotel, Motel, Restaurant & Hi-Rise Emps. & Bartenders Union v. Pier 66 Co.*, 599 F. Supp. 761, 765 (S.D. Fla. 1984); *accord Deck v. Eng'd Laminates*, 2001 WL 487940, at *4 (D. Kan. Apr. 10, 2001) ("Attorneys fees and costs are generally considered 'incidental damages and do not rise to the type of proprietary damage for which RICO provides compensation.'") (quoting *Local 355*), *rev'd on other grounds by Deck v. Eng'd Laminates*, 349 F.3d 1253, 1259 (10th Cir. 2003).[15]

Here, Drummond seeks redress of alleged injury to its reputation or goodwill and attorney fees resulting from the previous litigation. None of this is recoverable under RICO as an "injury to business or property," whether because injury to reputation or goodwill is unrecoverable, because attorney fees are unrecoverable, or because Drummond's claims all relate to personal injury. *See United States v. Burke*, 504 U.S. 229, 234–35 (1992) (equating recovery for a "'dignitary' or nonphysical tort such as defamation" to compensation for a personal injury under the Internal Revenue Code); *Ex parte Graham*, 634 So.2d 994, 996–97 (Ala. 1993) (equating libel with a personal injury for purposes of state venue statute); *Hamm*, 187 F.3d at 954; *Rodriguez v. Quinones*, 813 F. Supp. 924, 929 (D.P.R. 1993) (holding that "damages relating to injury to reputation are personal injuries not recoverable under RICO"; there is "ample opportunity for the plaintiff to recover" under torts like defamation, slander and libel).

### 2. Drummond has not proven that its injuries were domestic.

"Section 1964(c) requires a civil RICO plaintiff to allege *and prove* a *domestic injury* to business or property and does not allow recovery for foreign injuries." *RJR Nabisco v. Eur. Cmty.*,

---

[15] District courts have differed on applying the reputational injury exclusion to an entity. *Compare City of Chicago Heights v. Lobue*, 914 F. Supp. 279, 285 (N.D. Ill. 1996) (city's reputational injuries were personal injuries not compensable under RICO) *with Cement-Lock v. Gas Tech. Inst.*, 2005 WL 2420374, at *13 (N.D. Ill. Sept. 30, 2005) (injury to a corporation's business reputation resulting in concrete economic losses is compensable under RICO). *Cf. infra* n.21 (addressing out-of-circuit authority permitting the recovery under RICO of attorney fees incurred in previous litigation).

579 U.S. 325, 354 (2016) (emphasis added); *see also In re Search Warrant Issued to Google*, 264 F. Supp. 3d 1268, 1276 (N.D. Ala. 2017) (civil RICO "focuses upon domestic injuries . . . not all injuries resulting from alleged racketeering activity"). The domestic injury requirement is fact- and context-specific, requiring consideration of all relevant circumstances. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543-44 (2023) (a court must "engage in a case-specific analysis that looks to the circumstances surrounding the injury"). This includes "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effect of that activity," although the factors may vary. *Id.* at 544. The court must examine "the specific type of injuries alleged" and analyze each one separately "to determine whether any of the injuries alleged are domestic." *Bascunan v. Elsaca*, 874 F.3d 806, 817 (2d Cir. 2017). If "one of the alleged injuries is domestic, the plaintiff may recover" only for that injury. *Id.* at 818. *See Absolute Activist Value Master Fund v. Devine*, 233 F. Supp. 3d 1297, 1326 (M.D. Fla. 2017) ("[P]laintiffs cannot recover for injuries which occur outside the United States, even if there may be other injuries for which recovery is permissible.").

With respect to its claim for attorney's fees from the underlying cases, Drummond has refused to produce fee invoices or other information showing when the fees were incurred relative to the alleged predicate acts, on behalf of which Drummond entities the fees were incurred, and whether they related to representation or other legal activities occurring in Colombia. However, a substantial portion of the fees Drummond seeks to recover were recorded under ███████████ ███████████████ SUMF ¶ 155. By refusing to produce evidence supporting its attorney's fees, Drummond cannot carry its burden of demonstrating that they constitute a domestic injury.

With respect to its other alleged injuries, the undisputed facts and multi-factor analysis discussed above affirmatively show that the remainder of Drummond's injuries are not domestic

as required under § 1964(c). A plaintiff's domicile is not determinative to the domestic-injury inquiry. *Yegiazaryan*, 599 U.S. at 544. While a bright-line rule would be easier to apply, the RICO statute demands a more "nuanced approach." *Id.* at 545; *Humphrey v. GlaxoSmithKline*, 905 F.3d 694, 709 (3d Cir. 2018) (litigant's residence or principal place of business "is merely one factor that informs our inquiry"). Thus, that plaintiff Drummond Company, Inc. is an Alabama corporation, and plaintiff Drummond Ltd. is an Alabama Domestic limited partnership, Doc. 1-1 ¶¶ 9, 10, is not determinative.[16] Rather, the court must consider all of the circumstances surrounding the alleged injuries. *Yegiazaryan*, 599 U.S. at 543-44. That consideration shows that most of Drummond's alleged injuries were foreign and, therefore, not recoverable under RICO.

Drummond Ltd. operated the Colombian coal mine at the heart of this case. Doc. 1-1 ¶ 9. Drummond Ltd.'s principal place of business is in Colombia. *See Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010) ("principal place of business" is "best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities," i.e. the "'nerve center' and not simply an office where the corporation holds it board meetings (for example, attended by directors and officers who have traveled there for the occasion"); Doc. 1-1 ¶ 10 (failing to allege Drummond Ltd.'s principal place of business). Drummond Ltd.'s primary office is in Bogota, Colombia, and it has offices at the Colombian mine, the port in Santa Marta, and in Valledupar. SUMF ¶ 143. Drummond's Colombian operations are "fully self-sustaining with 100% dedicated legal, treasury, accounting, and human resources functions in-country" (i.e., in Colombia). *Id.* ¶ 144. As of March 2018, Drummond had more than 5,200 direct employees in Colombia, as well as approximately 4,000 contractors. *Id.* ¶ 145. On the other hand, Drummond

---

[16] Drummond's corporate structure is highly complicated with multiple domestic and foreign entities sharing in the ownership of the Colombian operations. SUMF ¶ 77, 148-150.

Ltd. has no full-time employees at its Birmingham office. *Id.* ¶ 146. Drummond Ltd.'s president for over ten years, Jose Miguel Linares, spends only a tiny fraction (1-2%) of his time at Drummond Ltd.'s Birmingham office. *Id.* ¶ 147.

The injuries alleged by Drummond are insufficiently "ground[ed] in the United States, such that it is clear the injury arose domestically." *Yegiazaryan*, 599 U.S. at 545. Drummond asserts injury to its business interests, specifically, adverse effects on its sale of coal to European customers. Doc. 1-1 ¶ 197. This alleged injury was felt from lost sales of a non-domestic product to foreign customers. Drummond claims lost coal sales from only ███████████████████

████████████████████████████████████████████████████████

██████████ SUMF ¶ 108. ████████████████████████████████████████

██████ *Id.* ¶ 112. Significantly, the seller on at least four of the coal sale contracts considered by Drummond's expert is also a foreign company, ████████████████████████████

████████████████████████████████████████████████████████

████████████. *Id.* ¶ 113. ████████████████████████

██████████████████████. *Id.* ¶ 114.

The coal sold to these European customers was not a domestic good. The coal mines, as well as Drummond's related assets for the extraction, transportation, loading, sale and shipping of coal mined in Colombia, are all located in Colombia. SUMF ¶ 151. All of the coal was mined in and shipped directly from Colombia and did not touch the United States. Title to the coal passed to the customers at Drummond's port in Santa Marta, Colombia, and the European customers bore the risk of any loss to the coal after it left the Colombian port. *Id.* ¶ 151. *Cf. Global Master Int'l v. Esmond Natural*, 76 F.4th 1266, 1276 (9th Cir. 2023) (finding domestic injury where "legal title and risk of loss" to property passed in Los Angeles). Drummond pays income taxes to Colombia,

not the United States, on the profits from its coal sales and receives a dollar-for-dollar credit against U.S. tax liability for income taxes paid to Colombia. SUMF ¶¶ 152-53.

Drummond's purported reputational injuries from, and the costs of responding to, the "political and public effects" of the RICO schemes are also insufficiently grounded in the United States to constitute a domestic injury. Doc. 1-1 ¶ 197. Drummond's own allegations establish, and it has not produced any admissible showing otherwise, that the center of the alleged smear campaign was in Europe (and, to a much lesser extent, Colombia): "Much of the Enterprise's public campaign efforts have been aimed at damaging Drummond's business interests ***in Europe***, where much of the coal from the Colombian mine is exported." Doc. 1-1 ¶ 157 (emphasis added). The primary recipient of the allegedly false information was PAX, a Dutch organization that circulated the "Dark Side of Coal" report to European government officials and businesses. Doc. 1-1 ¶¶ 161-68; SUMF ¶¶ 117-18. Drummond asserts that the purpose of the PAX report was "to stop the import of Drummond's coal ***to Europe***," and Drummond allegedly "has spent inordinate amounts of time and expense dealing with the ***European response*** (both by customers and ***European Union government's***) to PAX's anti-Drummond campaign." Doc. 1-1 ¶¶ 166, 169 (emphasis added). The only specific geographic references disclosed by Drummond relating to its alleged reputation and response injuries were Europe and Colombia. *See* Drummond's Supp. Rule 26(a) Initial Disclosures (Jan. 5, 2024) ("traveled ***to Europe*** on multiple occasions," "met with NGOs and the media ***in Colombia*** and elsewhere"); SUMF ¶ 107. Drummond's alleged expenses for responding to media, NGO, governmental, and customer inquiries all arise from multiple trips Drummond took to Europe. SUMF ¶ 138. The unions with whom Drummond's relations were allegedly damaged are in Colombia. Doc. 1-1 ¶ 15. There is no specific allegation (much less evidence) of any reputational injury in the United States.

Moreover, much of the alleged wrongful conduct was directed outside the United States—namely, the payment of witnesses located in Colombia and the dissemination of false information about Drummond in Europe and Colombia. *See Yegiazaryan*, 599 U.S. at 546 (considering where the conduct was "directed towards"). All the alleged payments were to witnesses in Colombia. *See, e.g.,* Doc. 1-1 ¶ 50 (describing alleged "schemes to corruptly influence **Colombian** witnesses"); *see also id.* ¶¶ 51-59, 66-75, 78-87. And, as just explained, the focus of the alleged public campaign against Drummond was Europe. *See supra*. The only detailed allegations about Collingsworth's alleged efforts to disseminate false information about Drummond involve the Netherlands. Doc. 1-1 ¶¶ 158-69.

That some of the alleged RICO conduct took place in the United States is not determinative. In *Glock v. Glock*, the court found no domestic injury even though "the majority of the RICO conduct alleged by the Plaintiff took place in the United States." 247 F. Supp. 3d 1307, 1318 (N.D. Ga. 2017), *aff'd*, 714 F. App'x 987 (11th Cir. 2018); *see also Absolute Activist*, 233 F. Supp. 3d at 1326 ("the focus of the matter is the geographic location of the injury to plaintiffs, not the location of a defendant's wrongful acts"). Apart from conduct in the U.S. litigation (which relates at most to Drummond's attorney fees), the alleged domestic RICO acts are primarily use of U.S. bank accounts. *See, e.g.,* Doc. 1-1 ¶¶ 73, 77, 116, 123, 127. But as the Fourth Circuit recently explained "the use of United States bank accounts and shell companies . . . is [not] enough to turn what otherwise would be a foreign injury into a domestic one." *Percival Partners Ltd. v. Nduom*, 99 F.4th 696, 703 (4th Cir. 2024); *accord Bascunan v. Elsaca*, 874 F.3d 806, 818-19 (2d Cir. 2017) ("Holding that a *defendant's* mere use of a domestic bank account could transform an otherwise foreign injury into a domestic one might well effectively eliminate the effect of the domestic inquiry requirement in a large number of cases."). *Yegiazaryan* relied in part on the existence of

domestic racketeering conduct to find a domestic injury, but "that domestic conduct was accompanied by inherently ***domestic property***—the rights under a California judgment—and resulting domestic effects," *Percival Partners*, 99 F.4th at 703-04 (emphasis added)—specifically, rights that "exist[ed] only in California," *Yegiazaryan*, 599 U.S. at 546. There is no similar connection with any "inherently domestic property . . . and resulting domestic effects" here.[17]

In short, Drummond's alleged injuries have Europe and Colombia "written all over" them. *See Percival Partners*, 99 F.4th at 702. They involve alleged payments to Colombian witnesses, who testified about events in Colombia, which were published by a Dutch organization, read by European politicians and governments, and allegedly caused European energy companies who contracted with Drummond and/or its Cayman Islands subsidiary under English law not to buy coal mined in Colombia. Any minimal domestic connections cannot overcome these circumstances showing Drummond's alleged injuries were foreign and not recoverable under RICO.

**E.  Scherer and C&S did not commit, and did not intend for anyone to commit, at least two predicate acts of racketeering (Element 4).**

Drummond must "put forward enough facts with respect to each predicate act to make each predicate act independently indictable as a crime" in violation of one of the state or federal laws described in 18 U.S.C. § 1961(1). *Cisneros*, 972 F.3d at 1215. It cannot do so.

**1.  No mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343**

 "A person commits wire fraud when they (1) intentionally participate in a scheme to defraud another of money or property and (2) use the wires in furtherance of that scheme. *Am. Dental v. Cigna*, 605 F.3d 1283, 1290 (11th Cir. 2010). The plaintiff must allege facts "with respect to ***each defendant's participation*** in the fraud." *Id.* at 1291 (emphasis added). Although a

---

[17] Drummond alleges that Collingsworth also attempted to induce U.S. authorities to criminally investigate it, Doc. 1-1 ¶ 170, but there is no evidence that any investigation resulted, much less proximately caused any injury to Drummond.

"defendant need not have personally committed each element of mail or wire fraud," the defendant must have "knowingly and willfully joined the criminal scheme" in which a "co-schemer used the emails for the purpose of exacting the same scheme." *Gov't Emps. Ins. v. KJ Chiropractic Ctr.*, 2015 WL 12839140, at *4 (M.D. Fla. Feb. 16, 2015). The undisputed facts show that Scherer and C&S did not intentionally participate in a scheme with anyone to deprive Drummond of money or property illegally. Instead, C&S and Scherer at all times understood that payments going to Colombia were to provide security or relocation to witnesses or their families, and that all such security measures had been properly disclosed. SUMF ¶¶ 43-62.

### 2.  No extortion in Violation of Hobbs Act, 18 U.S.C. § 1951

Drummond's extortion claim is based on a single inquiry from a colleague of Scherer's to Drummond in 2012 about Drummond's interest in settling *Balcero*. This does not constitute extortion under 18 U.S.C. § 1951(b)(2), which is defined as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

To prove extortion, Drummond must have "parted with property that extortionist defendants gained possession of." *Crawford's Auto Ctr. v. State Farm Mut. Auto Ins.*, 945 F.3d 1150, 1159–60 (11th Cir. 2019). "[T]hreats of economic harm made to obtain property from another are not wrongful where alleged extortioner has a legitimate claim to the property obtained through such threats." *Id.* at 1160 (quoting *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1130 (9th Cir. 2014)). "The law is clear that litigation—even if frivolous or malicious—cannot constitute extortion." *Ritchie v. N. Leasing Sys.*, 2016 WL 1241531, at *13 (S.D.N.Y. Mar. 28, 2016). *See also United States v. Pendergraft*, 297 F.3d 1198, 1207–08 (11th Cir. 2002) (holding that

defendants' "threat to file litigation against Marion County, even if made in bad faith and supported by false affidavits, was not 'wrongful' within the meaning of the Hobbs Act").

The undisputed facts show that neither C&S nor Scherer obtained property from Drummond. SUMF ¶¶ 104-105. This undisputed fact is fatal to the extortion claim. Moreover, Scherer decided to inquire about Drummond's interest in settling *Balcero* only after a colleague suggested it, *id.* ¶¶ 100-101, and following a meeting with a senior-level C&S attorney who had surveyed the strengths and weaknesses of the *Balcero* case, including uncertainty created by *Kiobel*, *id.* ¶¶ 90-93, 94, 96, 99. C&S and Scherer did not discuss using, and did not use, force or the threat of violence in the informal settlement overture to Drummond. *Id.* ¶¶ 97-98.

### 3.   No money laundering in violation of 18 U.S.C. § 1956(a)(2)(A)

The money laundering statute is a specific intent statute requiring the transportation of funds from the United States outside of the United States "with the intent to promote the carrying on of specified unlawful activity . . . ." 18 U.S.C. § 1956(a)(2)(A). *United States v. Trejo*, 610 F.3d 308, 315 (5th Cir. 2010) (holding that "Section 1956(a)(2)(A) contains an identical specific intent requirement for transportation cases as its § 1956(a)(1)(A)(i) transaction counterpart"). Drummond alleges that the "specified unlawful activity" is witness bribery (18 U.S.C. § 201), mail and wire fraud (18 U.S.C. §§ 1341, 1343), and extortion (18 U.S.C. § 1951).[18] Thus, Drummond must show that C&S and Scherer sent funds to Colombia with the specific intent to bribe witnesses, commit mail and wire fraud, and extort Drummond.

With respect to Scherer, the undisputed facts are that Scherer never ever sent or attempted to send funds to Colombia, SUMF ¶ 62, a threshold requirement for the money laundering statute

---

[18] 18 U.S.C. § 1956(c)(7) defines "specified unlawful activity" and, by reference to certain indictable RICO racketeering activities, it includes these sections of Title 18 of the United States Code.

to apply. With respect to C&S, the undisputed facts show that Collingsworth repeatedly told C&S that funds going to Colombia were to protect and/or relocate witnesses or their family members from threats resulting from their testimony against Drummond. *Id.* ¶¶ 43-60.

### 4.   No obstruction of justice in violation of 18 U.S.C. § 1503

Drummond alleges that the "RICO Defendants" made "deliberate and false representations in various federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice" in violation of 18 U.S.C. § 1503." Doc. 1-1 ¶ 192. Section 1503, "known as the omnibus clause . . . deals with a person who 'corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice.'" *United States v. Barfield*, 999 F.2d 1520, 1522 (11th Cir. 1993). A defendant violates the omnibus clause when it "knowingly and intentionally [took] an action from which an obstruction of justice was a reasonably foreseeable result" prompted, "at least in part, by a 'corrupt motive.'" *Id.* at 1524-25. *See also United States v. Brand*, 775 F.2d 1460, 1465 (11th Cir. 1985) ("The offending conduct must be prompted, at least in part, by a 'corrupt motive,' and if there is a fair doubt as to whether the defendants' conduct is embraced within the prohibition, the policy of lenity requires that the doubt be resolved in favor of the accused." (cleaned up)).

The undisputed facts show that neither Scherer nor C&S knowingly and intentionally filed, or allowed to be filed, any false filings in any litigation with a corrupt motive to influence, obstruct or impede the administration of justice.  SUMF ¶¶ 26-27, 63.

### 5.   No witness bribery in violation of 18 U.S.C. § 201

Drummond does not specify which subsection of § 201 it contends the RICO Defendants violated. Assuming it claims that they violated 18 U.S.C. § 201(b)(3), Drummond's claim fails as to C&S and Scherer. Section 201(b)(3) prohibits a person from "directly or indirectly, corruptly giv[ing], offer[ing], or promis[ing] anything of value to any person . . . with intent to influence the

testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court . . . ."

The undisputed facts show that Scherer did not give, offer, or promise anything to the witnesses at issue. SUMF ¶¶ 61-62. The undisputed facts show that C&S understood the funds being sent to Colombia were for the security and safety of witnesses and their families. *Id.* ¶¶ 43-62. Finally, the undisputed facts show Scherer and C&S were in the dark about Collingsworth's financial relationship with Bilderbeek, that they derived no benefit from that relationship, and that they did not know Bilderbeek provided funds for Blanco's attorneys. *Id.* ¶¶ 67-71, 78-84.

### 6. No witness tampering in violation of 18 U.S.C. § 1512

Drummond claims that the offers and payments of funds to witnesses constitute witness tampering. Doc. 1-1 ¶¶ 194-95. Drummond does not specify which subsection of § 1512 it contends the Defendants violated. Sections 1512(b)(1) and (b)(2), however, require the defendant act knowingly or corruptly in attempting to influence, delay or obstruct an official proceeding.

For the reasons outlined above, the undisputed facts show that neither C&S nor Scherer knowingly or corruptly paid funds to any witnesses or their families with the intent to improperly influence, delay, or obstruct an official proceeding. Moreover, under 18 U.S.C. § 1512(e), "it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." The undisputed facts show that Scherer and C&S were told, believed, and understood that payments being sent to Colombia were to protect and/or relocate witnesses or their families. SUMF ¶¶ 43-62.

52

**F.      Attorney's fees incurred during previous litigation between the same parties are not "damages" within the meaning of the RICO statute.**

Under the traditional "American Rule," a party cannot recover attorney's fees absent a statutory fee provision or enforceable contract. *See Rothenberg v. Sec. Mgmt.*, 736 F.2d 1470, 1471 (11th Cir 1984).[19] The remedial provision of RICO states in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains . . . .

18 U.S.C. § 1964(c). It thus deploys the term "damages . . . sustain[ed]" to describe the available form of recovery.

"Damages," however, do not include attorneys' fees. Instead, the American rule stands for the principle that parties bear their own costs in litigation, and Congress legislates against that background. *See Alyeska Pipeline Serv. v. Wilderness Soc.*, 421 U.S. 240, 247 (1975) (tracing origins of the American rule); *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) ("[W]e are mindful that Congress legislates against the strong background of the American Rule."). Thus, in *Summit Valley Industries v. Local 112, United Brotherhood of Carpenters*, 456 U.S. 717, 727 (1982), the Supreme Court ruled that previously incurred attorney's fees were not recoverable damages under a statute with wording nearly identical to that of RICO's § 1964(c), the Labor Management Relations Act (LMRA). Very much like RICO, the LMRA states:

> Whoever shall be injured in his business or property by reason or any violation of subsection (a) [referencing a provision of the National Labor Relations Act (NLRA)] may sue therefor in any district court of the United States . . . and shall recover the damages by him sustained . . . .

---

[19] Drummond cannot recover its fees directly in the underlying human rights cases because there is no contract allowing it to recover fees incurred in those cases, nor is there a fee-shifting provision in the ATS or TVPA. Thus, Drummond seeks to create a fee-shifting provision in the underlying cases where none exists.

*See* 29 U.S.C. § 187.[20]

Focusing on the term "damages," the Supreme Court stated, "Ordinarily a statutory right to 'damages' does not include an implicit authorization to award attorney's fees. Indeed, the American Rule presumes that the word 'damages' means damages exclusive of fees." *Summit Valley Indus.*, 456 U.S. at 722–23. Thus, where a plaintiff business had sued the defendant union for business losses and attorney's fees incurred during earlier proceedings before the National Labor Relations Board, *id*. at 721, the Supreme Court rejected the business's contention that the fees were part of the damages which could be recovered under the LMRA based on the union's unlawful activities under the NLRA. *Id*. at 725.

The same reasoning applies to the term "damages" in the RICO Act and prohibits recovery of attorney's fees from an earlier case. Courts "read terms consistently across multiple statutes on the same subject because 'practical experience in the interpretation of statutes' establishes that 'a legislative body generally uses a particular word with a consistent meaning in a given context.'" *United States v. Penn*, 63 F.4th 1305, 1313 (11th Cir. 2023). Both cited sections of RICO and the LMRA create civil causes of action and penalties for violations of each respective act, and the context of the term "damages" and the phrasing of the civil cause of action is almost identical. Accordingly, the Court should reject Drummond's attempt to shoehorn its attorney's fees from *Melo*, *Balcero*, or *Baloco* into RICO. RICO is not an all-purpose federal fee-shifting statute, and it limits recovery to "damages" which, as the Supreme Court stated of the nearly identical LMRA, "means damages exclusive of fees."[21]

---

[20] RICO's § 1964(c) also provides for "the cost of the suit, including a reasonable attorney's fee," while the LMRA's § 187 provides for "the cost of the suit."

[21] Courts in other circuits have sometimes permitted the recovery of previously incurred attorney's fees under RICO. *See, e.g.*, *Stochastic Decisions v. DiDomenico*, 995 F.2d 1158, 1166–67 (2d Cir. 1993); *D'Addario v. D'Addario*, 901 F.3d 80, 96–97 (2d Cir. 2018); *Handeen v. LeMaire*, 112 F.3d 1339, 1354 (8th Cir. 1997). But these opinions reflect no argument based on the American rule as applied in *Summit Valley* or, with the exception of an

## II.     Count II – Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

Scherer and C&S are entitled to summary judgment on the RICO conspiracy claim because Drummond does not have a viable substantive RICO claim. This claim also fails on the merits.

### A.     Drummond has no viable substantive RICO claim.

There can be no RICO conspiracy claim under Section 1962(d) without a viable substantive RICO claim. *See Allstate Ins. v. Hoi Yat Kam*, 2013 WL 12357487, at *16 (E.D.N.Y. Sept. 3, 2013) ("Inasmuch as [plaintiff] has not established a viable claim under [section 1962(a), (b), or (c) ], its section 1962(d) claim must also fail." (quoting *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (2d Cir. 1993)). Because Drummond's substantive RICO claim against C&S and Scherer under section 1962(c) fails, its conspiracy claim under section 1962(d) also fails. *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds*, 525 U.S. 128 (1998); *Bayshore Cap. Advisors v. Creative Wealth Media Fin.*, 667 F. Supp. 3d 83, 137 (S.D.N.Y. 2023) ("[B]ecause Plaintiffs have not sufficiently stated a substantive RICO claim under § 1962(c), Plaintiffs' conspiracy claim fails as a matter of law.").

### B.   Neither Scherer nor C&S conspired to commit a RICO violation.

Even if Drummond had a viable substantive RICO claim, its conspiracy claim should be dismissed on the merits. A RICO conspiracy under 18 U.S.C. § 1962(d) requires proof that "the defendants objectively manifested, through words or actions, an ***agreement to participate in the***

---

incidental mention of *Local 355* within a quote, the arguments supporting this Motion that attorney's fees are not cognizable as injury in property or business. *See supra* Part I.D.1. The cases from other circuits are thus not persuasive authority against the key *Summit Valley*, *Grogan*, and other arguments raised in this section and Part I.D.1, *supra*, that attorney's fees from previous litigation cannot be recovered. *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

*conduct of the affairs of the enterprise through the commission of two or more predicate crimes*." *United States v. Green*, 981 F.3d 945, 952 (11th Cir. 2020) (emphasis added).  "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1344 (S.D. Fla. 2006), *aff'd sub nom. Shane v. Humana, Inc.*, 228 F. App'x 927 (11th Cir. 2007) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997)). "RICO conspiracy requires proof that the defendant 'agree[d] to conduct or to participate in the conduct of [an] enterprise's affairs through a pattern of racketeering activity.'" *United States v. Zemlyansky*, 908 F.3d 1, 11–12 (2d Cir. 2018) (quoting *United States v. Pizzonia*, 577 F.3d 455, 462 (2d Cir. 2009)). "To prove the agreement element, the government must show that the defendant 'knew about and agreed to facilitate [a racketeering] scheme.'" *Zemlyansky*, 908 F.3d at 11 (quoting *Salinas v. United States*, 522 U.S. 52, 66 (1997)). *See also United States v. Velazquez-Fontanez*, 6 F.4th 205, 212 (1st Cir. 2021) ("To prove a RICO conspiracy offense, the government must show that the defendant knowingly joined the conspiracy, agreeing with one or more coconspirators to further [the] endeavor . . . .").

    "In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991). *See also Hyundai Motor Am.*, 641 F. Supp. at 1335–36.

    Drummond's conspiracy claim fails on the merits for multiple reasons. First, as discussed above, *see supra* Part I.A, there is no enterprise. This alone is fatal to the conspiracy claim. *See Gonzalez*, 921 F.2d at 1546 (RICO conspiracy requires proof of an enterprise). Second, the

undisputed facts show that Scherer and C&S did not know about and agree to the overall objective of the conspiracy—which allegedly was to bribe witnesses for false testimony—or to commit two predicate acts. Instead, Scherer and C&S understood that they were engaged in routine litigation with Drummond and providing security and relocation assistance to witnesses. SUMF ¶¶ 43-62.

## III.      Count III – Willful and/or Reckless Misrepresentation, Ala. Code § 6-5-101 (1975)

Willful or reckless misrepresentation requires a showing of "(1) a misrepresentation of material fact, (2) made willfully to deceive, recklessly, without knowledge, or mistakenly, (3) which was justifiably relied on by the plaintiff under the circumstances, and (4) which caused damage as a proximate consequence." *Foremost Ins. v. Parham*, 693 So. 2d 409, 422 (Ala. 1997).

The only statement in the 85 pages of appendices to Drummond's complaint that it attributes to Scherer is a filing that he signed in the U.S. District Court for the Southern District of Florida on June 20, 2014, which referenced payments "to relocate family members of three witnesses." The undisputed evidence shows that, as of June 2014, Scherer did not know this statement was incomplete, so he could not have signed this document with a willful or reckless intent to deceive Drummond. SUMF ¶¶ 63. Nor is there any record evidence that Drummond justifiably relied on this filing. With respect to both Scherer and C&S, this claim fails because Drummond cannot establish that all of the statements in the appendices proximately harmed it.

## IV.      Count IV – Fraudulent Concealment/Suppression, Ala. Code § 6-5-102 (1975)

A suppression claim requires a plaintiff to show (1) a duty to disclose an existing material fact, (2) that the defendant suppressed, (3) the defendant's actual knowledge of the fact, (4) that the suppression of the fact induced plaintiff to act or refrain from acting, and (5) that plaintiff suffered actual damage as a proximate cause of acting or not acting. *Ex Parte Household Retail Servs.*, 744 So. 2d 871, 879 (Ala. 1999).

Scherer is entitled to summary judgment on this claim because the undisputed facts show that he did not have actual knowledge that more than three witnesses had received assistance or that that information had not been disclosed to Drummond. SUMF ¶ 63. This claim also fails as to both Scherer and C&S due to Drummond's inability to establish proximate cause.

## V.      Count V – Civil Conspiracy

C&S and Scherer are entitled to summary judgment on this claim for the same reason they are entitled to summary judgment on the RICO conspiracy claim. First, there is no civil conspiracy claim available under Alabama law in the absence of an underlying claim. "[C]ivil conspiracy rests upon the existence of an underlying wrong." *Jones v. BP Oil*, 632 So. 2d 435, 439 (Ala. 1993). "If there is no underlying cause of action, there cannot be a conspiracy." *Driver v. W.E. Pegues*, 2012 WL 3042939, at *6 (N.D. Ala. July 19, 2012) (citing *Jones*, 632 So. 2d at 439). *See also Allied Supply v. Brown*, 585 So. 2d 33, 36 (Ala. 1991) ("[A] conspiracy itself furnishes no cause of action. . . . If the underlying cause of action is not viable, the conspiracy claim must also fail.").

Second, Drummond cannot establish a civil conspiracy claim on the merits. "Under Alabama law, the elements of a civil conspiracy claim are "(1) concerted action by two or more persons (2) to achieve an unlawful purpose or a lawful purpose by unlawful means." *AAL USA v. Black Hall Aerospace*, 2018 WL 3036370, at *4 (N.D. Ala. June 19, 2018) (quoting *Ex parte Maint. Grp.*, 261 So. 3d 337, 347 (Ala. 2017)). There are no facts that C&S and Scherer acted in concert with anyone to achieve an unlawful purpose or lawful purpose by unlawful means.

## VI.     Summary Judgment Is Due Under the *Noerr-Pennington* Doctrine and *Pendergraft*

The *Noerr-Pennington* doctrine immunizes attempts to influence the courts from federal statutory liability. *McGuire Oil v. Mapco, Inc.*, 958 F.2d 1552, 1558–59 (11th Cir. 1992). The doctrine is "a generic rule of statutory construction, applicable to any statutory interpretation that could implicate the rights protected by the Petition Clause." *Sosa v. DIRECTV*, 437 F.3d 923, 931

(9th Cir. 2006). Relatedly, in *United States v. Pendergraft*, the Eleventh Circuit held that "prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system." 297 F.3d at 1208. Together, the *Noerr-Pennington* doctrine and *Pendergraft* broadly restrict lawsuits challenging litigation conduct. Because Drummond's lawsuit squarely attacks C&S's litigation conduct, C&S is entitled to summary judgment.

The Court considered C&S's challenge to the Complaint under the *Noerr-Pennington* doctrine and *Pendergraft* at the motion to dismiss stage, rejecting it at that time because Drummond's allegations of intent had to be "taken as true." Doc. 58 at 8. As to the predicate acts of bribery, obstruction of justice, witness tampering, and money laundering, the Court accepted as true allegations that C&S (1) "knew about and participated in the Defendants' scheme of payments to the witnesses," (2) "knowingly made false representations to numerous courts regarding those payments," and (3) "willfully submitted (and suborned) perjured testimony." *Id.* That deferential standard no longer applies.

Drummond's allegations about C&S's intent for these predicate acts are not supported by record evidence, which is fatal to Drummond's claims on summary judgment under the *Noerr-Pennington* doctrine and *Pendergraft*. First, there is no admissible evidence that C&S intended to further a "scheme" regarding witness payments. Rather, the record uniformly shows that C&S understood the witness payments were grounded in security concerns, not a "scheme" to defraud Drummond. Second, there is no admissible evidence that C&S made "knowing[]" misrepresentations to "numerous courts." Third, there is no admissible evidence that C&S "willfully" submitted or suborned perjured testimony. Without admissible evidence of C&S's intent on these issues, Drummond cannot overcome the bar posed by the *Noerr-Pennington* doctrine and *Pendergraft*, as interpreted in the Court's March 8, 2016 Order (Doc. 58 at 8).

Nor are Drummond's claims saved by the sham litigation exception. While the Court found the exception applicable at the pleadings stage, that was based on what Drummond had alleged as to *Baloco*, *Balcero*, and *Melo*. Doc. 58 at 8 n.6. On summary judgment, Drummond must put forward admissible evidence that the prior lawsuits were (1) "objectively baseless" and (2) "an attempt to interfere directly with the business relationships of a competitor." *Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993). It cannot do so. *Balcero* was dismissed based on the "seismic shift that *Kiobel*" created, *Giraldo*, 2013 WL 3873960, at \*1; *Baloco* was dismissed on res judicata grounds, *Baloco*, 767 F.3d at 1239; and *Melo is* stayed. Nothing about the outcomes of these cases suggests they were "objectively baseless." Even if Drummond could raise a disputed issue of fact as to the first requirement, there is no admissible evidence that C&S attempted to interfere with one of Drummond's business relationships. Thus, the sham litigation exception does not apply.

## CONCLUSION

Drummond's RICO case is devoid of admissible evidence that could create a genuine issue of material fact as to every element of its RICO claims and at least one element of each of its state law claims. It also suffers from numerous legal deficiencies that are fatal to those claims and the damages it seeks. C&S and Scherer respectfully request that the Court enter summary judgment in its favor on all five counts of the complaint and finally end this long-running case built on wildly speculative accusations but unsupported by facts.

Dated: June 17, 2024

Respectfully submitted,

*s/ William T. Paulk*
Robert K. Spotswood
Michael T. Sansbury
William T. Paulk
SPOTSWOOD SANSOM & SANSBURY LLC
505 20th Street North, Suite 700
Birmingham, AL 35203
Phone (205) 986-3620
Fax (205) 986-3639
rks@spotswood.com
msansbury@spotswood.com
wpaulk@spotswood.com

*Attorneys for Defendants Conrad & Scherer, LLP &*
*William R. Scherer, Jr.*

## CERTIFICATE OF SERVICE

I certify that on June 17, 2024, I filed the foregoing electronically with the Clerk of Court using the CM/ECF system, which will automatically serve all counsel of record and *pro se* parties.

s/ *William T. Paulk*
William T. Paulk