FILED

2024 Dec-10  PM 02:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **DRUMMOND COMPANY, INC., et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:15-CV-506-RDP** |
| | } | |
| **TERRENCE P. COLLINGSWORTH, et al.,** | } | |
| | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on (1) Defendants Terrence P. Collingsworth's and International Rights Advocates' Motion for Summary Judgment (Doc. # 321); (2) Defendants Conrad & Scherer, LLP and William R. Scherer, Jr.'s Motion for Summary Judgment (Doc. # 324); and (3) Plaintiff Drummond Company, Inc.'s ("Drummond") Motion for Partial Summary Judgment (Doc. # 323). The Motions are fully briefed, and ripe for decision. (Docs. # 315, 317, 318, 322, 325, 331, 333, 335, 337, 341, 342. 343, 346, 347, 348-56, 358, 361, 362). For the reasons discussed below, Defendants Motions are due to be granted in part and denied in part, and Plaintiff's Motion is due to be denied.

## I.    Introduction

In its Complaint, Drummond asserted the following claims against Defendants Terrence P. Collingsworth ("Collingsworth"), Conrad & Scherer, LLP ("C&S"), International Rights Advocates, Inc. ("IRAdvocates"), William R. Scherer, Jr. ("Scherer"), Ivan Alfredo Otero Mendoza ("Otero"), Francisco Ramirez Cuellar ("Ramirez"), and Albert van Bilderbeek ("van Bilderbeek"):

(1) COUNT I - Pattern of Racketeering Activity in violation of Racketeer Influenced and Corrupt Organizations ("RICO"), 18 U.S.C. § 1962(c), including:

    (a) Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343;
    (b) Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951;
    (c) Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A);
    (d) Obstruction of Justice in Violation of 18 U.S.C. § 1503;
    (e) Witness Bribery in Violation of 18 U.S.C. § 201; and
    (f) Witness Tampering in Violation of 18 U.S.C. § 1512.

(2) COUNT II - Conspiracy to Violate RICO, 18 U.S.C. § 1962(d).

(3) COUNT III - Willful and/or Reckless Misrepresentation in Violation of Ala. Code § 6-5-101 (1975).

(4) COUNT IV - Fraudulent Concealment/Suppression of Material Facts in Violation of Ala. Code § 6-5-102 (1975).

(5) COUNT V - Civil Conspiracy.

(Doc. # 1).

On November 2, 2023, Drummond moved for sanctions and entry of default judgment against individual Defendants Otero and van Bilderbeek due to their failure to participate in discovery and comply with a court order. (Doc. # 265). On April 10, 2024, the court granted that Motion in part, entering default judgment against Otero and van Bilderbeek on liability, and granting leave for Drummond to prove damages against them at a later date. (Doc. # 284).

## II.    Relevant Undisputed Facts

The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the non-moving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that a party could establish through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

## A.    The Parties

C&S is a law firm based in Fort Lauderdale, Florida. It has been in business since 1974. (Doc. # 318-1 ¶ 2). C&S specializes in complex business litigation and, until approximately 2008, primarily represented defendants. (*Id.* ¶ 6). Until the mid-2000s, nearly all of C&S's practice involved cases in the United States. (*Id.* ¶ 8). From the mid-2000s to the present, C&S has employed an average of 17 lawyers and an additional 30 litigation and office support staff. (*Id.* ¶ 9).

In 2009, C&S began representing plaintiffs in business disputes. (Doc. # 318-1 ¶ 7). Previously, in February 2008, C&S had hired Collingsworth to start and lead a human rights litigation practice group. (*Id.* ¶ 10, 12) (Doc. # 318-2 at 36).[1] Before it hired Collingsworth, C&S had served as co-counsel with Collingsworth in one or more human rights cases. (Docs. # 318-2 at 36-37; 318-3 at 384-85).

Before C&S hired Collingsworth, Scherer knew Collingsworth had sued Drummond in *Romero v. Drummond Co.*, alleging that Drummond hired Colombian paramilitaries to torture and kill union members employed at its coal mine in Colombia. *Romero v. Drummond Co.*, 480 F.3d 1234, 1237 (11th Cir. 2007). (Doc. # 318-1 ¶ 13). Scherer also knew Collingsworth had tried *Romero* to a jury and that the jury returned a verdict in Drummond's favor. (Doc. # 318-1 ¶ 14).

When Collingsworth joined C&S, C&S opened an office in Washington, D.C. (Doc. # 318-1 ¶ 11). Collingsworth became the managing partner over that office and the team he brought with him from IRAdvocates. (*Id.*). Collingsworth became a contract partner, not an equity partner, and he remained a contract partner until his termination in late 2015. (Doc. # 318-1 ¶ 15). C&S shared

---

[1] Citations to deposition and hearing transcripts are to the transcript page numbers. Citations to other documents are to the CM/ECF page numbers.

in at least some of the financial recoveries in Collingsworth's cases. (Doc. # 318-3 at 384-86). From 2008 to 2016, Scherer was the 98% or 99% owner of C&S and no one other than Scherer or his children (who are attorneys) held an equity interest in C&S. (Docs. # 318-1 ¶¶ 16-17; 318-2 at 42). As the supermajority owner of C&S, Scherer controlled the firm. (Doc. # 318-1 ¶ 18).

In March 2009, after he joined C&S, Collingsworth filed *Freddy Locarno Baloco, et al. v. Drummond Co. Inc. et al.*, ("*Baloco*"). (Case No. 7:09-cv-557-RDP, Doc. # 1). *Baloco* was filed on behalf of the children and heirs of three Drummond union officials who were murdered by the AUC in 2001. The plaintiffs alleged that Drummond "aided and abetted or conspired with the AUC by directly funding some of its operations." *Baloco v. Drummond Co.*, 767 F.3d 1229, 1233 (11th Cir. 2014).

In May 2009, Collingsworth and C&S filed *Claudia Balcero Giraldo, et al. v. Drummond Co. et al.* ("*Balcero*"). (Case No.: 2:09-cv-1041-RDP, Doc. # 1). *Balcero* was filed on behalf of the heirs of decedents who alleged that Drummond "engaged the [AUC] . . . to eliminate suspected guerilla groups from around the company's mining operations in Colombia." *Doe v. Drummond Co.*, 782 F.3d 576, 580 (11th Cir. 2015).

Scherer billed time for reviewing draft Drummond pleadings in January, February, and May 2009. (Doc. # 343-1 (CS-TC063705- CS-TC063706)). *Balcero* was filed on May 27, 2009. (Case No. 2:09-cv-01041-RDP, Doc. # 1). From 2008 to 2016, Scherer billed 383 hours on Drummond cases. (Doc. # 318-1 ¶ 21). To the best of his knowledge, Scherer has never met with or spoken to Defendants Otero, Ramirez, or van Bilderbeek. (*Id.* ¶ 24). Nor has he met with or spoken to alleged non-party co-conspirators The Netherlands ("PAX") (an organization based in the Netherlands), Lorraine Leete, Rebecca Pendleton, Richard Garzon, Carlos Toro, or

representatives of PAX, Secure Pointe Partners, LLC, or Witness for Peace. (*Id*. ¶ 25). Scherer has not spoken to any U.S. or Colombian criminal authorities about Drummond. (*Id*. ¶ 26).

Scherer was aware that, after Collingsworth joined the firm, C&S was providing money to some witnesses and/or their families in Colombia in connection with the cases filed against Drummond. (Docs. # 318-1 ¶ 33; 318-3 at 394; 337-12 at 81-82; 337-13 at 2). In March 2008, Collingsworth emailed Scherer and others about an agreement to send $80,000 to Otero in relation to the Drummond cases. (Doc. # 337-25).

Scherer testified that in September 2015, Collingsworth was a senior lawyer in good standing with C&S, and had management responsibility over the firm's human rights cases. (Doc. 317-19 at 414, 423-24). Scherer further testified that the firm delegated to Collingsworth the responsibility for handling the *Balcero* case, Collingsworth was lead counsel for C&S in the *Balcero* case, and Collingsworth was responsible for drafting pleadings, discovery responses, briefs, and interviewing witnesses in *Balcero*. (*Id*.).

### B. Witness Payments by Defendants

In late 2008, C&S and Collingsworth began making monthly payments for the benefit of a witness who used the alias "Halcon," and they continued making payments for Halcon's benefit until 2012. (Docs. # 318-15 at 9-10; 318-22 at 381-82; 337-1 at 395-96, 408-09).

C&S and Collingsworth made payments on behalf of Jairo de Jesus Charris Castro ("Charris") to Charris's wife. (Docs. # 318-14; 318-15 at 7-9; 298-1 ¶ 7). Ramirez and his assistant, Gilma Yineth Baeza Acosta ("Baeza"), served as a conduit for the payments to Charris. (Docs. # 317-2; 317-3; 317-4; 317-5; 317-6). Between September 2009 and December 2015, roughly on a monthly basis, seventy-five payments in the approximate amounts of $840 to $860 were provided directly to Charris' wife via Ramirez and Baeza. (Docs. # 298-1 ¶ 7; 337-17 at 4 (Collingsworth

writes in an email to undisclosed recipients "I would just add that we are supporting Charris's family so if he is not cooperating we will pull the plug"); Docs. # 337-19; 337-20).

On November 28, 2011, "[w]ithin seven days" of Jose Gelvez Albarracin (a.k.a. "El Canoso") signing a declaration in *Balcero*, a wire transfer in the amount of $2,084 was made from C&S's account to the Colombian bank account of El Canoso's wife. (Doc. # 177 ¶ 112; Doc. # 317-7). Notably, this payment was made after El Canoso had reported that his family was safe. (Docs. # 318-15 at 4, 9; 318-17 ¶ 23; 337-21 at 2).

C&S and Collingsworth made multiple payments to Libardo Duarte's family totaling approximately $6,000. (Docs. # 318-16; 318-17 at 20-21; 318-31 at 137-43). On or about April 18, 2011, C&S and Collingsworth sent a $2,500 payment to Duarte's family member, Leydi Johana Perez Valencia. (Docs. # 317-1 ¶ 58; 317-10). On or about April 29, 2011, C&S and Collingsworth sent a $2,500 payment to Duarte's family member, Katerin Durango Avendano. (Docs. # 317-1 ¶ 59; 317-11). On or about May 21, 2011, Collingsworth provided a $1,102.54 payment to Duarte and/or his family. (Doc. # 317-1 ¶ 60).

In early 2009, C&S and/or Collingsworth paid Ivan Otero $80,000 after he delivered the declarations of Jhon Jairo Esquivel Cuadrado ("El Tigre") and Alcides Manuel Mattos Tabares ("Samario"). (Docs. # 337-25; 337-26). On October 7, 2010, Collinsworth sent an email to his team, including Ramirez, complaining about a statement El Tigre had given to a prosecutor that contradicted his statements to Defendants. (Doc. # 343-5). In February 2011, Collingsworth and C&S sent a $5,000 payment to Otero, and internal C&S emails reflect that $3,600 of this payment was provided to El Tigre and Samario and/or their families. (Docs. # 317-8 at 3-4; 342 at 11). In May 2011, Collingsworth gave a $5,400 cash payment to Otero, and Otero subsequently gave some of that money to El Tigre and Samario and/or their families. (Docs. # 317-19 at 3; 342 at

11). From June 2011 through at least November 2015, C&S and Collingsworth, roughly on a monthly basis, sent fifty-one payments in the amounts of $2,700 to Otero, who then delivered approximately $2,000 of that money to El Tigre, Samario, and/or their families. (Docs. # 342 at 11; 337-16; 317-21 at 222-23). On May 22, 2011, Collingsworth emailed others at C&S stating that they needed to continue making the monthly payments for El Tigre and Samario "until we get the deps in the can." (Doc. # 337-16 at 2). C&S's emails about setting up the monthly $2,700 payments to Otero indicate that $700 of those amounts was for Otero, and the remainder was support for the living expenses of the families of El Tigre and Samario.  (Doc. # 335-7 at 2). But, those emails make clear that the payments must be made "until the depos are done." In this email chain, Collingsworth instructed that "we can just call it security." (*Id*.). The $2,700 monthly payments to Otero were treated by C&S as "firm expenditures" and the payments C&S made were "part of its business." (Doc. # 317-19 at 436).

On August 24, 2011, Collingsworth was communicating with Ramirez about Ramirez's coordination with the director of prisons in Colombia to gain permission to take the depositions of imprisoned witnesses. (Doc. # 351-2 at 2). On August 25, 2011, Collingsworth and Lorraine Leete emailed about making certain payments to ensure that they had permission to take the depositions. (*Id*. at 1). In this series of emails, Collingsworth indicated that he had spoken to van Bilderbeek about funding. (*Id*.).

On September 9, 2011, Collingsworth entered into a series of agreements between and among van Bilderbeek, NICOX BV, Herman de Leeuw, and James Ellwood (collectively, the "NICOX Agreements"). (Doc. # 318-47). Under these agreements, Collingsworth and van Bilderbeek split $1,500,000, with each of them getting $750,000. (Doc. # 337-1 at 245). C&S lawyer Christian Levesque witnessed the agreements. (Docs. # 256-4 at 5; 256-6 at 4; 256-9 at 5;

256-10 at 3). Collingsworth pledged his contingency fee interest in *Balcero*, in which C&S was counsel of record for the plaintiffs, as security for at least one of these agreements. (Doc. # 256-4 at 4).

van Bilderbeek was a client of C&S. (Doc. # 317-19 at 433). At the time Bill Scherer testified at the crime-fraud hearing conducted by the court in September 2015, C&S's retainer agreement with van Bilderbeek was "still active." (Doc. # 317-19 at 433).

In 2010 and 2011, Jaime Blanco Maya ("Blanco") was "short of money" and "didn't have the means to pay [his criminal defense] attorneys' expenses." (Doc. # 317-17 at 14-15). A portion of the funds flowing from the NICOX agreements was sent to Otero to be made available to Blanco for the benefit of his lawyers. (Docs. # 318-22 at 241-42; 337-36 at 1 (Blanco "is not working on his declaration until he gets this funding"); 337-32 at 2 (Blanco's "second payment of fees is due since he signed the declaration")). If Blanco had not received money from Collingsworth, Blanco would have had to sell his assets, sell his car, or borrow money to pay his attorneys. (Doc. # 317-17 at 81).

In September 2011, Collingsworth sent, or caused to be sent, a $60,000 payment for Blanco's use via Otero. (Docs. # 317-12; 317-13; 342 at 15). In December 2011, Collingsworth sent, or caused to be sent, a $25,000 payment for Blanco's use via Otero. (Docs. # 317-14; 317-15; 342 at 15-16). In July 2012, Collingsworth sent, or caused to be sent, a $35,000 payment for Blanco's use via Otero. (Docs. # 317-16; 317-13 at 24-25).

As managing partner of C&S, Sherer approved of making these payments. (Docs. # 317-19 at 435-36; 317-21 at 222-23; 337-12 at 81-82). C&S considered the payments to be litigation expenses. (Doc. # 317-19 at 436-37).

### C.    Questions About the Witnesses's Statements

In May 2012, Scherer asked C&S attorney Jim Carroll to evaluate the strengths and weaknesses of the *Balcero* case. (Doc. # 318-50 at 19). Carroll drafted a May 23, 2012 memorandum in which he stated "[t]he witnesses appear untrustworthy, and have changed their stories," "it appears [Collingsworth] made payments directly or indirectly to one of more witnesses, e.g. Jaime Blanco," and "the witnesses are criminals, convicts and poor people vulnerable to bribery and threats." (Doc. # 318-52).

When Carroll prepared his memorandum, the Supreme Court had heard oral argument in *Kiobel v. Royal Dutch Petroleum Company*, but had not yet issued a decision. 569 U.S. 108 (2013). Carroll believed that *Kiobel* created "uncertainty" about the continued viability of *Balcero*. (Docs. # 318-52 at 3; 318-53 at 3).

On June 5, 2012, Carroll participated in a meeting with Scherer, Collingsworth, and Richard Drath (C&S's then-chief financial officer). (Doc. # 318-50 at 112). Drath was not a lawyer. (Doc. # 317-20 at 75). The next day Carroll prepared a set of "possible talking points" for settlement discussions with Drummond. (Doc. # 318-53 at 3).

Around this time, Scherer met with a colleague and co-counsel in other cases, Mike Madigan, who offered to approach one of Drummond's lawyers to gauge Drummond's interest in discussing settlement or mediating *Balcero*. (Doc. # 318-1 ¶ 53). Soon thereafter, Madigan approached one of Drummond's lawyers in *Balcero*, William Jeffress, to inquire if Drummond was interested in resolving *Balcero* before the Supreme Court ruled in *Kiobel*. (Doc. # 318-2 at 297-98; Doc. # 318-50 at 120). Scherer did not inform Collingsworth, any other defendant, or any non-party co-conspirator that he was gauging Drummond's interest in resolving *Balcero*. (Doc. #

318-1 ¶ 54). Madigan reported to Scherer that Drummond was not interested in meeting or in mediating the *Balcero* case. (Docs. # 318-1 ¶ 56; 318-54).

### D.    Drummond's Claims

On July 25, 2013, the court granted Defendants' motions for summary judgment in *Balcero* and dismissed all claims against Drummond. (Case No. 2:09-cv-01041-RDP, Docs. # 455, 456, 457, 458, 459, 460).

In this RICO case, Drummond seeks four categories of damages: (1) lost profits, (2) expenses and costs associated with responding to media, non-governmental organizations ("NGOs"), governmental and customer inquiries,[2] (3) attorneys' fees and litigation costs incurred in defending against *Balcero*, *Baloco*, and *Melo*,[3] and (4) damage to its reputation and goodwill. (Docs. # 318-55 at 6; 318-56 at 24-26).

Drummond seeks "lost profit" damages from "adverse effects on its sale of coal" to four "Tier 1" European customers (the "Affected Clients") between 2006 and 2016: EnBW (German), ENEL (Italian), RWE AG (German), and Vattenfall (Swedish). (Docs. # 1-1 ¶¶ 197, 204; 322-2 at 19-20). Drummond does not seek damages for any loss of coal sales to customers in the United States. (Doc. # 322-2).

Europe is an extremely important sales region for Drummond. (*Id*. at 19). The coal industry is extremely competitive with Drummond's "Affected Clients" being "[h]ighly sought after by many international suppliers/traders" who "vie with one another to develop sales with Tier 1 clients located in strategic markets." (*Id*. at 19, 23). Drummond's European customers

---

[2] Drummond's expenses for responding to media, NGO, governmental, and customer inquiries arise from trips Drummond personnel took to Europe. (Doc. # 322-3).

[3] Significant portions of Drummond's attorney's fees incurred in the *Balcero*, *Baloco*, and *Melo* cases were recorded under "Colombian Branch Projects." (Doc. # 322-6 at 6-17).

acknowledged growing concern among European governments and other stakeholders regarding their reliance on coal. (Doc. 318-64). In 2013, in response to pressure from its customers and to "better plac[e] [its] coal in certain markets," Drummond joined the "Bettercoal," program, which is a voluntary program that audits the environmental, social, and governance processes of coal suppliers. (Docs. # 318-64 at 8-12; 318-79; 337-42). Drummond underwent its first Bettercoal audit in 2014. (Docs. # 318-64 at 8-12; 318-79; 337-42).

PAX, The Netherlands, is an organization based in the Netherlands. (Doc. # 318-58 at 3; Doc. # 318-59 at 5). In 2014, PAX published a report titled "The Dark Side of Coal," which was based in large part on the allegations made in the cases against Drummond and the testimony of witnesses who had received payments from Defendants. (Doc. # 318-58). The report encouraged energy companies to "[r]efrain from sourcing coal from Drummond[.]" (*Id*. at 108). Before publishing its report, PAX sent a copy to Drummond and asked for its response. (*Id*. at 92-94). Drummond communicated with PAX that "most of the witnesses" cited in the report had "provided conflicting testimony" and that "Collingsworth and his associated lawyers [had] made payments and provided support to many of the witnesses or their families cited in [the] report." (Doc. # 318-60 at 13). Drummond provided PAX with some evidence of the witness payments and changes in the witnesses' testimony, but at that time it had not discovered the full extent of the payments to witnesses made by Defendants. (Docs. # 318-60; 317-13).

After the Bettercoal audit, five European companies "agreed to negotiate and buy from Drummond," including three of the companies whose coal purchasing decisions form the basis of Drummond's claim for "lost profit" damages in this case. (Doc. # 318-80). Via email, Drummond asked ENEL, whose coal purchasing decisions form the basis of Drummond's claim for "lost profits," to confirm "that your decision was based on a strategic/commercial decision and not

because of the human rights assessment." (Doc. # 318-81 at 3). In response, ENEL wrote that PAX's statement had been rephrased and provided a link to that rephrased statement, https://paxforpeace.nl/news/enel-suspends-blood-coal-imports (last visited October 30, 2024). (*Id.* at 2). PAX's rephrased statement noted that it and another NGO had attended ENEL's 2016 annual shareholder meeting and reported that ENEL had suspended imports of coal from Colombia pending "investigations into the human rights impact in the coal mining region." (*Id.* at 2 imbedded) (link https://paxforpeace.nl/news/enel-suspends-blood-coal-imports).

Environmental advocates use social media to share their messages about the environmental harm caused by coal mining. (Doc. # 318-82 at 137). Energy company CEOs consider a number of factors in deciding whether to reduce their reliance on Colombian coal, including reports about human rights concerns in Colombia, reports about collaboration between the military and AUC that were unconnected to the Defendants, and reports that coal is bad for the environment and causes global warming. (*Id.* at 63-78, 137-38).

Drummond's total export volumes grew from approximately 21.56 million tons in 2007 to 32.64 million tons in 2016. (Doc. # 322-2 at 18). Drummond's export volumes to Europe grew from 9.12 million tons in 2007 to 21.98 million tons in 2016. (Doc. # 322-2 at 18). Between 2008 and 2016, Drummond's revenue from coal sales alone was more than $17.9 billion. (*Id.*). According to its publicly available "Sustainability Reports," Drummond Ltd.'s income from net sales between 2016 and 2022 was more than $15.7 billion. (Docs. # 813-85; 318-82 at 29-30).

In 2017, Drummond retained Goldman Sachs to advise it with respect to a possible sale of Drummond Ltd.'s Colombian operations. (Doc. # 318-82 at 112-14). In connection with this engagement, Goldman prepared a confidential presentation, the "Project Crimson" presentation, which was designed for potential investors. (Docs. # 318-82 at 124-25; 318-86). Drummond

rejected bids it received and thereafter coal prices went up over the next five years. (Doc. # 318-82 at 121-23).

Drummond Ltd.'s primary office is in Bogota, Colombia, and it has other offices at the mine near La Loma, the port in Santa Marta, and Valledupar. (Doc. # 318-77 at 50). Drummond's Colombian operations are "fully self-sustaining with 100% dedicated legal, treasury, accounting, and human resources functions in-country" (*i.e.*, Colombia). (Docs. # 318-82 at 174; 318-86 at 49). As of March 2018, Drummond had more than 5,200 direct employees in Colombia and approximately 4,000 contractors. (Docs. # 318-86 at 63; 318-82 at 178).

Drummond Ltd. has no full-time employees at Drummond's Birmingham office. (Doc. # 318-77 at 51-52). Drummond Ltd.'s president, Jose Miguel Linares (who has been Drummond Ltd.'s president for over ten years), spends only a tiny fraction (1-2%) of his time at Drummond Ltd.'s Birmingham office. (*Id.* at 49-50).

As of March 2018, 4% of Drummond Ltd. was owned by non-party Drummond International LLC, which was formed in 2011 to own "100% of Colombian assets," and the other 96% of Drummond Ltd. was owned by non-party Drummond Projects LLP. (Doc. # 322-5 at 8). Drummond Projects was 100% owned by Drummond International, which in turn was owned by non-party Drummond Associates, Inc. (16.148%); Plaintiff Drummond (63.852%); and non-party Itochu Coal Americas Inc. (20%), a subsidiary of Itochu. (Docs. # 322-5 at 8; 318-46). In 2021, Itochu sold its 20% share back to Drummond International at a large loss. (Docs. # 318-87 at 12, 19; 318-82 at 136).

The title to Drummond's coal generally passed to the purchaser when it was loaded onto their vessels in Colombia. (Doc. # 318-82 at 146-47). For coal sold to Alabama Power, Drummond

transported the coal to the United States and title passed when the coal was loaded in the United States onto barges for river delivery. (*Id*.).

The owners of Drummond Ltd. are all pass through entities. (*Id*. at 174-76). They pay income taxes in the United States but receive a dollar-for-dollar foreign tax credit against U.S. tax liability for taxes paid in Colombia. (*Id*.).

Before filing this case, Drummond corresponded with non-party co-conspirator, Witness for Peace, and requested a retraction of certain allegedly defamatory statements made about Drummond's human rights record in Colombia, which were included in a presentation made at universities and cities and publicly accessible on the internet. (Doc. # 318-89). No retraction was provided.

## III.    Legal Standard

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56 requires the non-moving party to go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub.*

*Educ. for Bibb Cnty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson* teaches, under Rule 56(c) a plaintiff may not simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof at trial, he must come forward with at least some evidence to support each element essential to his case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Sw. Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Ordinarily the right to determine the credibility of witnesses belongs

to the jury and, therefore, it is inappropriate to take an issue from the jury when resolution of that issue requires the court to weigh the credibility of witnesses." *Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 919 (11th Cir. 1995) (citing *Kridler v. Bituminous Cas. Corp*., 409 F.2d 88, 91 (5th Cir. 1969)); *see also United States v. Lindstrom*, 698 F.2d 1154, 1161 (11th Cir. 1983) ("the issue of a witness' credibility is committed to the providence of the jury.").

## IV.    Analysis

Plaintiffs' Complaint asserts (1) a RICO claim based on a pattern of racketeering activity including mail and wire fraud, Hobbs Act extortion, money laundering, obstruction of justice, witness bribery, and witness tampering; (2) a conspiracy to violate RICO claim; (3) a willful and/or reckless misrepresentation claim; (4) a fraudulent concealment/suppression of material facts claim; and (5) a civil conspiracy claim. (Doc. # 1-1).

Defendants C&S and Bill Scherer have moved for summary judgment on all claims against Plaintiffs. (Doc. # 324). C&S and Scherer argue that: there was no "enterprise;" they did not "operate" or "manage" the alleged "enterprise;" Drummond was not injured "by reason of" any predicate acts; Drummond was not injured in its business or property and/or its injuries were not domestic; C&S and Scherer did not commit, and did not intend for anyone to commit, at least two predicate acts; neither C&S nor Scherer conspired to commit a RICO violation; Drummond cannot establish its state law claims; and the *Noerr-Pennington* doctrine immunizes them from federal statutory liability related to any attempts to influence the courts. (Doc. # 324).

Defendants Collingsworth and IRAdvocates have moved for summary judgment on Drummond's substantive RICO claim and the conspiracy to violate RICO, and they rely on C&S and Scherer's Motion as to the state law claims. (Doc. # 321). Collingsworth and IRAdvocates

argue that: there was no "enterprise;" they did not commit at least two predicate acts of racketeering; and they did not act with the intent required to be held liable for a RICO violation or a conspiracy to violate RICO. (*Id*.).

Plaintiff Drummond seeks partial summary judgment on whether Collingsworth was acting within the line and scope of his employment with C&S when paying witnesses and whether the witness payments qualify as a "thing of value." (Doc. # 323). Drummond also seeks to have the fact of certain witness payments be treated as established pursuant to Rule 56(g). (*Id*. at 4, 15). Drummond argues that: under the law of the case, Collingsworth was C&S's agent and was acting within the line and scope of his employment in making the witness payments; C&S ratified the witness payments; and the payments were "things of value." (*Id*., generally). Alternatively, Drummond asks the court to treat the fact of the witness payments as established for purposes of this case. (*Id*. at 18-19).

Defendant Ramirez has not moved for summary judgment, and the court has already entered default judgment against Defendants Otero and van Bilderbeek as to liability due to their failure to appear and/or defend this action.

### A.    The Substantive RICO Claim

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activity" under § 1961(1)(B) includes "any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery [of witnesses]), [] section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), [] section 1503 (relating to obstruction of justice), [] section 1512

(relating to tampering with a witness, victim, or an informant), [and] section 1956 (relating to the laundering of monetary instruments)." *Id*. § 1961(1)(B).

To establish a RICO claim, a plaintiff must prove "that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc*., 972 F.3d 1204, 1211 (11th Cir. 2020) (citing *Ray v. Spirit Airlines, Inc*., 836 F.3d 1340, 1348 (11th Cir. 2016)); *see also Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (holding that "'to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs,' § 1962(c), one must participate in the operation or management of the enterprise itself"). The court evaluates the summary judgment evidence related to these elements below.

### 1.    Enterprise

Section 1961(4) broadly defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A] RICO enterprise need not possess an 'ascertainable structure' distinct from the associations necessary to conduct the pattern of racketeering activity." *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1274-75 (11th Cir. 2000). "To plead an association-in-fact enterprise, the Supreme Court has held that a plaintiff must allege that a group of persons shares three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *Cisneros*, 972 F.3d at 1211 (internal quotations omitted) (quoting *Almanza v. United Airlines, Inc*., 851 F.3d 1060, 1067 (11th Cir. 2017) (in turn quoting *Boyle v. United States*, 556 U.S. 938, 944 (2009))). "The purpose prong contemplates 'a common

purpose of engaging in a course of conduct' among the enterprise's alleged participants." *Id.* (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). However, the Supreme Court has also held that "proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise." *Boyle*, 556 U.S. at 951.

The evidence in the Rule 56 record is sufficient to raise a genuine issue of material fact on the issue of whether Defendants were part of an enterprise. The Rule 56 evidence shows that a years-long association of actors, some formally associated and others informally, acted together to pay money to multiple witnesses and obtain their testimony (which implicated Drummond in the murders of certain individuals in Colombia) for use in litigation against Drummond. Some of these witnesses had previously given exculpatory statements about Drummond to authorities before they were paid. That is, they testified that Drummond was not involved in the crimes. But, the Rule 56 evidence could permit a jury to find that, after receiving payments from Defendants, these witnesses changed their positions and implicated Drummond and its employees in the killings. This resulting "testimony" was used in an extrajudicial media campaign designed to, among other things, tarnish Drummond's reputation, negatively affect its business, and apply extrajudicial pressure on Drummond to settle legal claims related to the murders. The purportedly paid-for testimony was also used to elicit the indictment of Drummond executives in Colombia. In several instances, the payments continued to be made until the witnesses gave depositions or declarations that implicated Drummond. Indeed, some of the internal communications of those involved in the enterprise flatly state that the payments must continue until the testimony is given, suggest the payments may be discontinued once the testimony is secured, and warn that if a payee does not continue to assist in providing testimony, the payments may be terminated. The Rule 56 record contains ample evidence from which a jury could conclude Plaintiff has established a pattern of

racketeering activity by an association-in-fact enterprise. But, to be clear, it is for a jury to decide this question.

## 2.    Pattern of Racketeering Activity and Predicate Acts

There is evidence in the Rule 56 record that Defendants made a series of payments to seven witnesses or their families: Halcon, Gelvez, Charris, Duarte, El Tigre, Samario, and Blanco. Some of these payments continued regularly for years. Again, there is evidence in the Rule 56 record that these witnesses changed their respective testimonies once the payments were made to them. Halcon received monthly payments for three to four years. Charris received seventy-five payments over approximately a six year period. Gelvez received one payment within seven days of signing a declaration. Duarte received three payments in the spring of 2011. El Tigre and Samario received initial payments after providing their declarations, and then received monthly payments for over four years until Defendants were able to "get the[ir] depo[sition]s in the can" or "until the depos [were] done." (Docs. # 337-16 at 2; 335-7 at 2). Blanco received three large payments, in the amounts of $60,000, $25,000, and $30,000, that he apparently used to pay his criminal lawyers. The evidence regarding these payments implicates Collingsworth, IRAdvocates, C&S, Scherer, Otero, van Bilderbeek, and Ramirez.

A reasonable jury could conclude from these facts that Defendants engaged in multiple instances of witness bribery (18 U.S.C. § 201), witness tampering (18 U.S.C. § 1512),  mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), obstruction of justice (18 U.S.C. § 1503), and money laundering (18 U.S.C. § 1956), all of which are RICO predicate offenses. 18 U.S.C. § 1961(1)(B); *see also Drummond, Inc. v. Collingsworth*, 2015 WL 13768169, at *18 (N.D. Ala. Dec. 7, 2015) ("there is sufficient information in the record which, if believed by the trier of fact, would establish the elements of ongoing witness bribery, subornation of perjury, and/or fraud on

the court"). This evidence, if believed by a jury, is sufficient to support a finding of a pattern of racketeering activity. Thus, a reasonable jury could find from the Rule 56 evidence that Defendants each engaged in at least two predicate RICO offenses and that there was a pattern of such offenses.

### 3.     Caused Injury

There is evidence in the record from which a jury could find that Defendants' actions caused Drummond damages. Evidence in the Rule 56 record establishes that energy company CEOs consider a number of factors in deciding whether to reduce their reliance on coal. Among these factors were reports about human rights concerns. Europe is an extremely important  and competitive sales region for Drummond. Coal clients in Europe are sought after by many international suppliers who vie with one another to develop and make sales. There is evidence that Defendants' media campaign based on Collingsworth's allegations and the testimony from paid witnesses who changed their testimony was directed at entities in Europe and was the basis for PAX's 2014 "The Dark Side of Coal" report. That report encouraged energy companies to "Refrain from sourcing coal from Drummond[.]" (Doc. # 318-58 at 108). PAX even attended the shareholder meeting of one of Drummond's clients attempting to influence its coal-purchasing decisions. Therefore, there is sufficient evidence in the record to establish a genuine issue of material fact about whether Defendants' pattern of racketeering activity caused any injury to Drummond's business.

### 4.  Defendants Operated or Managed the Enterprise

Only C&S and Scherer argue that Drummond has failed to present evidence that they operated or managed the RICO enterprise. However, evidence in the Rule 56 record establishes that Scherer, the super-majority owner of C&S, was aware that C&S was providing money to witnesses and/or their families in Colombia in connection with the cases against Drummond. There

is also Rule 56 evidence that he and C&S approved of these payments. By way of example, in March 2008, Collingsworth emailed Scherer and others regarding an agreement to send $80,000 to Otero in relation to the Drummond cases. Furthermore, Collingsworth was the managing partner of C&S's Washington, D.C. office. Thus, there is sufficient evidence in the record from which a jury could conclude that C&S and Scherer operated or managed the RICO enterprise.

### 5.    RICO Conclusion

The court has carefully considered the Rule 56 record with regard to each element of a substantive RICO claim and has determined that there is evidence supporting each element and a jury could find that those elements are established. It is for a jury to make findings about this evidence and decide whether Defendants are liable on Drummond's RICO claim. Defendants' Motions are denied as to Count One.

### B.    Conspiracy to Violate RICO

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the [RICO] provisions." 18 U.S.C. § 1962(d). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *In re Managed Care Litig.*, 430 F. Supp. 2d 1336, 1344 (S.D. Fla. 2006), *aff'd sub nom. Shane v. Humana, Inc.*, 228 F. App'x 927 (11th Cir. 2007) (quoting *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997)). "In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991).

Defendants primarily argue that they are entitled to summary judgment on the RICO conspiracy claims because Drummond cannot establish the substantive RICO claim. As discussed above, however, there is sufficient evidence in the Rule 56 record from which a jury could find all of the requisite elements of the substantive RICO claim. Therefore, this argument fails.

Collingsworth also argues that Drummond cannot prove that he or IRAdvocates acted with the "specific intent to engage in any racketeering activity." (Doc. # 321 at 28-29). However, generally "the existence of knowledge or intent is a question of fact for the factfinder, to be determined after trial." *Williams v. Obstfeld*, 314 F.3d 1270, 1277 (11th Cir. 2002) (citing *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 (11th Cir. 1991)). Here, there is ample evidence in the record from which a reasonable juror could conclude that all Defendants, including particularly Collingsworth, intended to, among other things, bribe witnesses, suborn perjury, tamper with witness testimony, and obstruct justice. For example, emails show that Defendants specifically continued to make witness payments until the witnesses' depositions or declarations were taken.

There is also evidence in the form of emails from which a jury could conclude that the payments to these witnesses were made to influence or obtain their testimony, and not made, as Defendants have repeatedly claimed, to provide security for witnesses. Some of this Rule 56 evidence is staggering. The emails include, for example: Collingsworth's May 22, 2011 email to his team, copying Richard Drath and Bill Scherer at C&S, discussing the need to continue the monthly payments for El Tigre and Samario "until we get the deps in the can." (Doc. # 337-16 at 2). Collingsworth and C&S's emails also indicate that the payments were support for El Tigre's and Samario's families and needed to be paid "until the depos are done." (Doc. # 335-7). In this email chain, Collingsworth instructed others that "we can just call [the payments] security." (*Id*.).

In a July 17, 2010 email, Collingsworth candidly stated "I would just add that we are supporting Charris's family so if he is not cooperating we will pull the plug." (Doc. # 337-17 at 4). The Rule 56 record also contains a March 13, 2012 email from Collingsworth stating "it is ILLEGAL for me to pay general support money to a plaintiff" and "miraculously when we cut [the union widows] off nothing happened (except they had to cut back on the lifestyle they had come to enjoy with my security payments)." (Doc. # 337-18 at 3).

After careful review of the record, the court concludes that there is sufficient evidence to support a jury's finding that Defendants were engaged in a conspiracy to violate RICO.

### C.    Willful and/or Reckless Misrepresentation

"'To establish a cause of action for fraudulent misrepresentation, the plaintiff must show 1) that the defendant made a misrepresentation; 2) that that misrepresentation concerned a material existing fact; 3) that the plaintiff relied on the misrepresentation; and 4) that the reliance was to the plaintiff's detriment.'" *Lawson v. Harris Culinary Enters., LLC*, 83 So. 3d 483, 492 (Ala. 2011) (quoting *Jewell v. Seaboard Indus., Inc.*, 667 So. 2d 653, 657-58 (Ala.1995) (in turn citing Ala. Code 1975, § 6-5-101; *Crowder v. Memory Hill Gardens, Inc.*, 516 So. 2d 602 (Ala. 1987))).

Defendants offer two arguments in favor of their motion on this claim. One misses the mark. The other hits it.

Defendants present only a very cursory argument that they are entitled to summary judgment on Drummond's misrepresentation claim. (Doc. # 324 at 69). First, they argue that there is no evidence that Bill Scherer knew that his June 20, 2014 filing in the Southern District of Florida, which referenced payments "to relocate family members of three witnesses," was incomplete. (*Id.*). On this particular issue, there is Rule 56 record evidence that Scherer knew that, in addition to the three mentioned witnesses, El Tigre and Samario had also been paid. (Doc. # 317-21 at 222-24).

Defendants also argue that there is no record evidence that Drummond justifiably relied on this filing. (Doc. # 324 at 69). In response, Drummond contends that it was harmed by Defendants' misrepresentation because the fabrication allowed the *Balcero* case to proceed. (Doc. # 346 at 63). This response, however, misses the mark. Drummond has failed to articulate how *it* relied on misrepresentations regarding how many witnesses had been paid.[4] It has also failed to point to any evidence in the record that would establish reliance. Reliance is an essential element of a misrepresentation claim and Drummond has failed to present evidence or argument on this issue. Therefore, Defendants are entitled to summary judgment on Drummond's misrepresentation claim.

### D.    Fraudulent Concealment/Suppression of Material Facts

"The elements of a claim of fraudulent suppression are: (1) the defendant had a duty to disclose a material fact; (2) the defendant had actual knowledge of the fact; (3) the defendant suppressed the material fact; (4) the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) the plaintiff was damaged as a result of the suppression." *Hurry v. Gen. Motors LLC*, 622 F. Supp. 3d 1132, 1152-53 (M.D. Ala. 2022) (citing *Waddell & Reed, Inc. v. United Invs. Life Ins. Co.*, 875 So. 2d 1143, 1161 (Ala. 2003)). "'Although the term "inducement" has often been used in the description of the fourth element of suppression, it is clear that a plaintiff's ["reasonable reliance"] is an essential element of a suppression claim.'" *Hurry*, 622 F. Supp. 3d at 1153 (quoting *Johnson v. Sorensen*, 914 So. 2d 830, 837 (Ala. 2005) (alteration in original)).

The two main arguments Defendants make on this claim largely mirror those presented with respect to Drummond's misrepresentation claim. Defendants again have presented only a

---

[4] There is another issue presented by this evidence related to whether the court was deceived. But, the pending motions do not offer an appropriate platform to deal with that concern.

cursory argument as to why they are entitled to summary judgment on this claim. (Doc. # 324 at 69-70). They assert Scherer did not know that more than three witnesses had been paid and that Drummond cannot establish proximate causation. (*Id.*). And, Defendants argue that there is insufficient evidence in the Rule 56 record that Drummond relied on any alleged concealment. Drummond argues that the "fraudulent concealment of the fact that El Tigre and Samario were paid, result[ed] in *Balcero* surviving a motion to dismiss based on El Tigre's declaration." (Doc. # 346 at 64).

As discussed above, although Defendants' assertions about Scherer's knowledge are without merit, Drummond has failed to either articulate how it relied on any concealment about witness payments nor has it pointed to any evidence in the record that it relied on any concealed facts. Reliance is an essential element of a suppression claim and Drummond has failed to present evidence or argument on this issue that creates a material issue of fact. Therefore, for this reason, Defendants are entitled to summary judgment on Drummond's suppression claim.

### E.      Civil Conspiracy

"Liability [under Alabama law] for civil conspiracy rests upon the existence of an underlying wrong and [] if the underlying wrong provides no cause of action, then neither does the conspiracy." *Mooneyham v. State Bd. of Chiropractic Exam'rs*, 802 So. 2d 200, 206-07 (Ala. 2001) (internal quotations marks omitted) (quoting *Ex parte Alabama Dep't of Transp.*, 764 So. 2d 1263, 1271 (Ala. 2000) (in turn quoting *Jones v. BP Oil Co.*, 632 So. 2d 435, 439 (Ala. 1993))).

Defendants argue that they are entitled to summary judgment on this claim for the same reason they are entitled to summary judgment on the RICO conspiracy claim. That argument is without merit because, as the record reveals, there is a question of fact for a jury to resolve on both the substantive RICO claim and the RICO conspiracy claim.

However, as discussed above, because Drummond has failed to present evidence that supports the essential elements of its substantive state law claims, its state law conspiracy claim is foreclosed. As the court has determined that Drummond's state law fraud claims fail, it follows that its state law conspiracy claim, which is based on those state law claims, is necessarily due to be dismissed.

### F.    The *Noerr-Pennington* Doctrine and *Pendergraft*

The *Noerr-Pennington* "doctrine holds that defendants who petition the government for redress of grievances, whether by efforts to influence legislative or executive action or by seeking redress in court, are immune from liability for such activity under the First Amendment." *Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 306 (D.D.C. 2012) (citing *Nader v. Democratic Nat'l Comm.*, 555 F. Supp. 2d 137, 156 (D.D.C. 2008), *aff'd on other grounds*, 567 F.3d 692 (D.C. Cir. 2009)). In *United States v. Pendergraft*, the Eleventh Circuit held that "prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system." 297 F.3d 1198, 1207-08 (11th Cir. 2002). As C&S argues, taken together, the *Noerr-Pennington* doctrine and the *Pendergraft* decision broadly restrict lawsuits challenging litigation conduct. (Doc. # 324 at 71).

Defendants argue that they are entitled to summary judgment on Drummond's claims because the *Noerr-Pennington* doctrine immunizes from federal statutory liability such attempts to influence the courts. (Doc. # 324 at 70 (citing *McGuire Oil v. Mapco, Inc.*, 958 F.2d 1552, 1558-59 (11th Cir. 1992)). Drummond responds that the court rejected this argument at the motion to dismiss stage and should do so now because its allegations have been supported by admissible Rule 56 evidence. (Doc. # 346 at 64-65).

"Neither the *Noerr-Pennington* doctrine[,] nor the First Amendment more generally[,] protects petitions predicated on fraud or deliberate misrepresentation." *Feld Ent.*, 873 F. Supp. 2d at 307 (quoting *United States v. Philip Morris USA Inc*., 566 F.3d 1095, 1123 (D.C. Cir. 2009)) (internal citations omitted). "Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process) are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of *Noerr*." *Id*. (quoting *Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (in turn quoting *Federal Prescription Serv., Inc. v. Am. Pharmaceutical Ass'n*, 663 F.2d 253, 263 (D.C. Cir. 1981))).

"*Noerr-Pennington* does not apply, first and foremost, to bribes, 'in any context.'" *Feld Ent.*, 873 F. Supp. 2d at 307 (quoting *Whelan*, 48 F.3d at 1255). And "[m]isrepresentations, condoned in the political arena, are *not* immunized when used in the adjudicatory process." *Id*. (quoting *Cal. Motor Transp. Co. v. Trucking Unltd*., 404 U.S. 508, 513 (1972)) (emphasis added). Drummond's remaining RICO and RICO conspiracy claims are premised on evidence, which a jury could find is more likely true than not, that establishes the predicate offenses of witness bribery, witness tampering, suborning perjury, obstruction of justice, and deliberate misrepresentations made to the parties in the case and the court. *Noerr-Pennington* does not apply to this type of conduct "in any context." *Feld Ent.*, 873 F. Supp. 2d at 307. The *Noerr-Pennington* doctrine simply does not shield Defendants' conduct in this case.

## G.    Line and Scope of Employment

Drummond has moved for partial summary judgment on the issue of whether Collingsworth was acting within the line and scope of his employment when paying witnesses. (Doc. # 323 at 15-16). Drummond first argues that the court, in its crime-fraud opinion, has already

determined that Collingsworth was acting in the course and scope of his employment with C&S and that is now law of the case. (*Id.*). Next, it argues that the undisputed facts establish that Collingsworth was C&S's agent.

### 1.    There Is No Law of the Case On This Issue

"Under the law of the case doctrine, both district courts and appellate courts are bound by prior *appellate* decisions in the *same* case." *United States v. Kaplan Univ.*, 2016 WL 3661483, at *1 (S.D. Fla. July 1, 2016) (citing *Alphamed, Inc. v. B. Braun Medical, Inc.*, 367 F.3d 1280, 1285-86 (11th Cir. 2004)) (emphasis added). First, in the interlocutory appeal of the court's crime-fraud ruling, the Eleventh Circuit declined to review the issue of whether this court erred in applying agency principles. *Drummond Co., Inc. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1328 (11th Cir. 2018). The Eleventh Circuit answered one question, but did not substantively review the merits of any decision. *Id.* Therefore, there is no appellate decision on this issue that could be viewed as the law of the case. Moreover, the crime-fraud ruling was issued in the defamation case (*Drummond Co., Inc. v. Collingsworth, et al.*, Case No. 2:11-cv-03695-RDP, Doc. # 417), not in this case; so, in any event, it could not have established the law of the case in this action.

### 2.    *Respondeat Superior* Liability for RICO Violations

The elements of *respondeat superior* liability for RICO violations are as follows: "'Under general agency rules, a corporation (principal) will be vicariously responsible for the wrongful acts of its employees (agents) when the acts are: (1) related to and committed within the course of employment; (2) committed in furtherance [of the business] of the corporation; and (3) authorized or subsequently acquiesced in by the corporation.'" *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1406-07 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) (quoting *Quick v. People's Bank of Cullman Cnty.*, 993 F.2d 793 (11th Cir. 1993) (in turn quoting *Liquid*

*Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir. 1987))). However, "*respondeat superior* liability may be applied under § 1962(b) only to those enterprises that derive some benefit from the RICO violation." *Cox*, 17 F.3d at 1406.

There are genuine issues of material fact on the issues relevant to C&S's potential *respondeat superior* liability. There is evidence that Collingsworth was the managing partner of C&S's Washington, D.C. office. But, there is also evidence that he was not an equity partner. The evidence shows that Bill Scherer owned virtually the entire firm and that no one other than family members owned any equity interest in the firm. There is evidence that Scherer and Drath were copied on numerous emails regarding the course of witness payments. Drath was not a lawyer and Scherer has denied reading some of the emails.

Additionally, *respondeat superior* liability is only appropriate in a RICO case if the entity derived some benefit from the RICO violation. Drummond argues that C&S derived some benefit because it was able to use the testimony from the paid witnesses in the *Balcero* litigation. (Doc. # 356 at 16-17). But, the court dismissed all of Plaintiffs' claims in *Balcero*, denied Plaintiffs' motion to vacate those judgments, and these decisions were affirmed on appeal. *Doe v. Drummond Co.*, 782 F.3d 576, 582, 613 (11th Cir. 2015). It is not apparent how use of the statements in *Balcero* conferred any benefit on C&S.

Because Drummond has not established all of the elements necessary to a *respondeat superior* finding with undisputed evidence as a matter of law, Drummond is not entitled to summary judgment on this issue. This is another issue that must be resolved by a jury.

### H.     Thing of Value

Under 18 U.S.C. § 201, one is guilty of witness bribery if he or she "directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such

person to give anything of value to any other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court" or other tribunal. 18 U.S.C. § 201(b)(3). Drummond seeks summary judgment on the question of whether the payments made to the witnesses, to witnesses' families, or made on behalf of the witnesses constitute "a thing of value" under the witness bribery statute. (Doc. # 323 at 14-15). C&S argues that "it is far from clear that the [c]ourt could or should find that the payments constitute a 'thing of value' as a matter of law without any input from a jury." (Doc. # 348 at 33).

Evidence in the Rule 56 record shows that these witnesses agreed to give declarations or depositions in the underlying cases implicating Drummond in certain murders. There is evidence that some of these witnesses and/or their families received threats in connection with their testimony. There is also evidence that payments were made to the witnesses or their family members. Defendants have long taken the position that these payments were for the security of the witnesses and their families and there is some evidence to support their position with regard to some of the payments.

The term "thing of value" is broadly construed and encompasses any monetary or nonmonetary benefit. *United States v. Gorman*, 807 F.2d 1299, 1305 (6th Cir. 1986). However, whether these payments constitute a "thing of value" when considered in context – *i.e.*, payments made in relation to the potential risks faced by the witnesses when they agree to give this testimony or payments made to change the witnesses' earlier testimony – is not an issue the court can determine as a matter of law. Rather, it presents a genuine issue of material fact that requires resolution by a jury.

### I.    Fact of Witness Payments

Drummond also asks the court, as an alternative to summary judgment on the "thing of value" issue, to treat the fact of the witness payments in paragraphs 1-28 of Drummond's Statement of Undisputed Material Facts as established in the case. (Doc. # 323 at 18). Drummond states that it makes this request "in the interest of streamlining trial." (*Id*. at 19). Defendants respond that there are disputes about certain aspects of the payments, such as which of those payments were approved by C&S. (Doc. # 348 at 35).

Although many aspects of the payments are not disputed by the Defendants, some are. (Doc. # 348). And, who was responsible for making the payments is a matter of dispute. (*Id*.). In light of these disputes, the better way to resolve this issue is for the parties, as part of the pretrial process, to meet and confer and to determine which of the payments, if any, are undisputed. That is, since all parties appear to agree there is no need to waste their time, the jury's time, and the court's time on some of the matters, they are directed to work together to develop a mutually agreeable stipulation through which this evidence might be efficiently presented to the jury and the areas of genuine dispute may be narrowed.

### V.    Conclusion

For all of the foregoing reasons, Collingsworth's and International Rights Advocates' Motion for Summary Judgment (Doc. # 321) and Conrad & Scherer, LLP and William R. Scherer, Jr.'s Motion for Summary Judgment (Doc. # 324) are due to be granted in part and denied in part. Drummond's Motion for Partial Summary Judgment (Doc. # 323) is due to be denied. A jury must resolve the remaining claims in this case.

A separate order on the Motions and setting a pretrial conference will be entered.

**DONE** and **ORDERED** this December 10, 2024.

**R. DAVID PROCTOR**
CHIEF U.S. DISTRICT JUDGE