FILED

2026 Apr-27  PM 03:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| DRUMMOND COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:11-cv-3695-RDP |
| | ) | ("*Defamation*") |
| TERRENCE P. COLLINGSWORTH, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| DRUMMOND COMPANY, INC., and | ) | |
| DRUMMOND LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:15-cv-00506-RDP |
| | ) | ("*RICO*") |
| TERRENCE P. COLLINGSWORTH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## TERRENCE P. COLLINGSWORTH AND IRADVOCATES' RULE 59 MOTION FOR A NEW TRIAL OR FOR REMITTITUR

# TABLE OF CONTENTS

**ARGUMENT** ............................................................................................................................... **1**

**I.    Fed. R. Civ. P. 59 (a) Requires that Defendants Be Granted a New Trial.** ...................... 1

    A.    The Excessive and Erroneous Jury Verdict Attributable to Prejudice and Unfairness Requires a New Trial. 1

    B.    Additional Erroneous Rulings by the Court that Require a New Trial. ...................................... 7

**Erroneous Pretrial Rulings.** ....................................................................................................... **7**

    1.    Improper Consolidation of Defamation and RICO Claims for Trial. .................................. 7

    2.    Refusal to Stay the Trial While the Colombian Prosecution Was Proceeding. ................... 9

    3.    Following C&S Settlement on the Eve of Trial, Depriving Defendants of Lead Counsel, Erroneous Denial of a Continuance. ........................................................................................ 10

    4.    Refusal to Permit Defendants to Review Drummond-C&S Settlement to Assess Motive and Fairness and Determine Whether to Submit to the Jury. ............................................................ 15

**Erroneous Pretrial Rulings on Motions _in Limine_.** ................................................................ **16**

    5.    Exclusion of Indictments of Drummond Officials by Colombian Prosecutor and Findings of Fact by Colombian Special Prosecutor No. 251 Supporting Prosecution of Drummond's Current and Former Presidents. ........................................................................................... 16

    6.    Exclusion of Expert Testimony of Javier Peña. .............................................................. 21

    7.    Exclusion of Expert Testimony of Joseph Paonessa. ...................................................... 23

    8.    Exclusion of Expert Testimony of Jan Jacobwitz. .......................................................... 24

    9.    Permitted Drummond's Expert, Mauricio Santamaria, to Testify. ................................... 25

    10.    Precluded Defendants From Referring to Drummond's Claims as "SLAPP Suits." ......... 26

    11.    Excluded Evidence of Colonel Villate and Operation Dragon. ...................................... 26

    12.    Excluded Evidence of Jim Adkins' Orchestration of the Iran-Contra Scandal. .............. 27

    13.    Excluded Evidence of IRAdvocates' Success in the Chiquita Trial. ............................... 28

**Erroneous Evidentiary Rulings at Trial.** ................................................................................. **29**

    14.    Excluded All Evidence at Trial from JEP Proceedings. ................................................. 29

    15.    Excluded Evidence of Roberson Bribery of EPA. ......................................................... 30

    16.    Excluded Testimony of Jairo de Jesús Charris Castro. .................................................. 31

    17.    Excluded the Testimony of Judge Herman (Rusty) Johnson. ......................................... 32

    18.    Denied Motion to Sever Defaulted Defendants Otero and van Bilderbeek. .................... 34

    19.    Erroneous Evidentiary Rulings at Trial. ....................................................................... 37

    20.    Erroneous Rulings on Jury Instructions. ...................................................................... 37

    21.    Judicial Bias and Improper Denial of Recusal. ............................................................. 37

**II.    Rule 59 (e) Requires the Excessive Damage Award Be Reduced.** .................................. **42**

    A.    RICO Damages Must be Reduced to Reflect the Evidence of RICO Damages. ...................... 43

    B.    Awarding Drummond Treble RICO Damages and Punitive Damages for Defamation Would be an Unlawful Double Recovery. .............................................................................................. 44

    C.    The Award of Defamation Damages Must be Vacated. ......................................................... 46

**CONCLUSION** ....................................................................................................................... **49**

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Sheppard*, 856 F.2d 741 (6th Cir. 1988) ................................................................. 13, 14

*BMW of North America v. Gore,* 701 So.2d 507 (Ala. 1997) ......................................................... 48

*Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981)* ....................................................... 4, 13

*Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356 (5th Cir. 2004) ............................... 46

*Cain v. Armstrong World Indus.*, 785 F. Supp. 1448 (S.D. Ala. 1992) ........................................ 8, 9

*Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278 (11th Cir. 2022) ............................... 18, 30

*Chevron* 121 F.3d 163 (5th Cir. 1997) ......................................................................................... 41

*Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975) ......................................... passim

*Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171 (3d Cir. 1992) ................................ 45

*Frow v. De La Vega*, 82 U.S. 552 (1872) ..................................................................................... 34

*Genty v. RTC*, 937 F.2d 899 (3d Cir. 1991) .................................................................................. 45

*Gil Ramirez Group, L.L.C. v. Houston Independent School Dist.*, 786 F.3d 400 (5th Cir. 2015). 45

*Green Oil Co. v. Hornsby*, 539 So.2d 218 (Ala. 1989) ................................................................. 48

*Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.*, 740 F.2d 1499 (11th Cir. 1984) ................. 35

*Hamm v. Members of the Bd. of Regents*, 708 F.2d 647 (11th Cir. 1983) .................................... 40

*Hammond v. City of Gadsden*, 493 So.2d 1374 (Ala. 1986) ......................................................... 47

*Harbor Business Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516 (3d Cir. 2025) .............. 46

*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320 (11th Cir. 1999) ................................... 42, 43

*Johnson v. Clark*, 484 F. Supp. 2d 1242 (M.D. Fla. 2007) .......................................................... 19

*Kelley v. Reyes*, No. 2:1-cv-17911, 2026 WL 25926 (D.N.J. Jan. 5, 2026) ................................. 36

*Kelly v. Kelly*, 911 F. Supp. 66 (N.D.N.Y. 1996) ........................................................................... 8

*Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988) ............................................. 38

*Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183 (11th Cir. 2001) ................... 7

*Liteky v. United States*, 510 U.S. 540 (1994) ............................................................................... 39

*Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88 (3d Cir. 1993) ....................................... 45

*Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072 (3d Cir. 1985) .................................. 19

*Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442 (10th Cir. 1997) ................................... 44

*McCullough v. City of Montgomery*, No. 2:15-cv-463 (RCL), 2019 U.S. Dist. LEXIS 82069
(M.D. Ala. May 14, 2019) ........................................................................................................ 45

*McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241 (11th Cir. 2016) ........................... 1

*Moeinpour v. Bd. of Trs. of the Univ. of Ala.*, 762 F. Supp. 3d 1129  (N.D. Ala. 2025) .... 1, 2, 3, 36

*Molever v. Levenson*, 539 F.2d 996 (4th Cir. 1976) .................................................................. 7, 8

*Montgomery Ward & Co. v. Duncan*, 311 U.S. 243 (1940) ........................................................... 1

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522 (4th
Cir 1997) ................................................................................................................................. 44

*Nichols v. Alley*, 71 F.3d 347 (10th Cir. 1995) ............................................................................ 41

*Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783 (9th Cir. 1992) ............................................ 43

*Palm Beach Atlantic College, Inc. v. First United Fund, Ltc.*, 928 F.2d 1538 (11th Cir. 1991)... 44

*Potashnick v. Port City Construction Co.*, 609 F.2d 1101 (5th Cir.) ........................................... 39

*Rice v. Ivey*, No. 2:23-cv-1382-RDP, 2024 U.S. Dist. LEXIS 145680 (N.D. Ala. Aug. 15, 2024) ................................................................................................................................... 43

*Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005) ................................................. 14

*Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259 (11th Cir. 2008) .............................. 42, 43

*RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350 (4th Cir. 2007) .................................. 13

*Santa Maria v. Metro-N. Commuter R.R.,* 81 F.3d 265 (2d Cir. 1996) ......................................... 13

*Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479 (1985). ............................................................... 43

*Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202 (2d Cir. 1984) ............................................. 25

*Simon v. Shearson Lehman Bros.*, 895 F.2d 1304 (11th Cir. 1990) ............................................ 19

*Smith v. Phillips Winters Apartments*, 599 F. App'x 365 (11th Cir. 2015) ...................................... 41

*Smith-Weik Machinery Corp. v. Murdock Machine & Engineering Co.*, 423 F.2d 842 (5th Cir. 1970).................................................................................................................... 12, 13, 14

*Tengood v. City of Philadelphia*, 529 Fed.Appx. 204 (3d Cir. 2013)............................................. 45

*U.S. v. 9.19 Acres of Land, More or Less, in Marquette Cnty.*, Mich., 416 F.2d 1244 (6th Cir. 1969)......................................................................................................................... 13

*U.S. v. Kelly*, 888 F.2d 732 (11th Cir. 1989) ......................................................................... 39

*Ungar v. Sarafite*, 376 U.S. 575 (1964) .............................................................................. 13

*United States v. Abel*, 469 U.S. 45 (1984)............................................................................. 20

*United States v. Dodds*, 347 F.3d 893 (11th Cir. 2003)............................................................. 26

*United States v. Kelly*, 888 F.2d 732 (11th Cir. 1989)............................................................... 41

*United States v. Torkington*, 874 F.2d 1441 (11th Cir. 1989)) .................................................... 41

*Unsworth v. Musk,* 2019 U.S. Dist. LEXIS 229024 (C.D. Cal. 2019)........................................... 16

*Woodruff v. Ohman*, 29 Fed.Appx.337 (6th Cir. 2002) ............................................................ 46

**Statutes**

18 U.S.C. § 1964(c) .......................................................................................................... 43, 44

28 U.S.C. § 144.................................................................................................................... 38

28 U.S.C. § 455.................................................................................................................... 39

28 U.S.C. § 455 (a) ........................................................................................................... 38, 41

42 U.S.C § 1983.................................................................................................................... 46

Title VII.............................................................................................................................. 46

**Other Authorities**

6A Moore's Federal Practice para. 59.05 [3] (1974)) ...................................................................... 5

*Federal Practice and Procedure* § 2690 (3d ed. 1998) ............................................................... 35

**Rules**

Fed. R. Civ P. 59 (e)........................................................................................................ 1, 42, 49

Fed. R. Civ. P. 50 (b).............................................................................................................. 1

Fed. R. Civ. P. 59 (a)(1)(A) ................................................................................................... 1, 49

Fed. R. Evid. 401 ............................................................................................................... 18, 19

Fed. R. Evid. 403 ......................................................................................................... 17, 20, 26, 30

Fed. R. Evid. 803(8)(A)(iii) .................................................................................................... 18, 30

iii

Defendants Terrence P. Collingsworth and International Rights Advocates ("IRAdvocates") hereby move the Court for a new trial based on Fed. R. Civ. P. 59 (a)(1)(A).  In the alternative, Defendants Collingsworth and IRAdvocates seek a Remittitur under Rule 59 (e) for the excessive, unfair, and unlawful damage award.[1]

## ARGUMENT

### I. Fed. R. Civ. P. 59 (a) Requires that Defendants Be Granted a New Trial.

Defendants Collingsworth and IRAdvocates seek a new trial based on Fed. R. Civ. P. 59 (a)(1)(A) due to legal errors "for which a new trial has heretofore been granted in an action at law in federal court." The Supreme Court has consistently emphasized  the necessity of granting a new trial  when "the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). *See also McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (applying *Montgomery Ward & Co.*).

### A. The Excessive and Erroneous Jury Verdict Attributable to Prejudice and Unfairness Requires a New Trial.

In *Moeinpour v. Bd. of Trs. of the Univ. of Ala.*, 762 F. Supp. 3d 1129  (N.D. Ala. 2025), this Court granted a new trial based on excessive damages awarded by the jury. *Id*. at 1144-47. The Court attributed these excessive damages to the erroneous joinder of the defendants and concluded that a new trial was necessary to prevent unfairness to the defendant. *Id*. In this case,

---

[1] Defendants Collingsworth and IRAdvocates also file concurrently herewith their separate Motions for Judgement as a Matter of Law under Fed. R. Civ. P. 50 (b).

as in *Moeinpour*, the jury ignored the jury instructions and awarded excessive damages that went well beyond the evidence. Drummond asked in the defamation claim for "presumed damages in an amount to be determined by the jury," Doc. No. 639[2] at 2, but the jury awarded the $26 million in damages Drummond sought for RICO for the defamation claim and also awarded $26 million in defamation punitive damages. Doc. No. 1194 (defamation) at 2. Additionally, the jury awarded a seemingly random amount of $68 million for the RICO claim, Doc. No. 706 at 3, far in excess of the (questionable) evidence Drummond introduced at trial seeking **total** **RICO** damages of $26,654,611.80. Doc. No. 639 at 3. At minimum,  remittitur is necessary to address the damage awards as excessive and beyond the evidence, see section II, *infra*, but based on *Moeinpour*, these grossly excessive and baseless damage awards require a new trial due to jury confusion and prejudice. The glaring proof of prejudice is reflected in the profoundly absurd $120,000,000 total verdict, which verdict exceeds the actual damages argued at trial ($26 million) by $94,000,000. It speaks for itself.

In *Moeinpour*, the jury awarded excessive compensatory damages against the University of Alabama compared to those against individual defendant Cagle, who was the person employed by the University who discriminated against Moeinpour. 762 F. Supp. 3d at 1144. This created "valid and substantial concerns that the jury ignored the Court's instruction to not hold [the University] liable for the alleged nine years of racial harassment by Cagle." *Id*. The Court found the disparity in damages "defies logic and the court does not hesitate to say that it appears to be against the great weight of the evidence." *Id*. The Court concluded, "[t]he jury could then have mistakenly concluded that UAB should be liable in some way for its inaction [for harassment by

---

[2] In cases in which a document was filed in both the RICO and Defamation cases, unless otherwise indicated, the RICO document will be referenced.

2

Cagle]. And, this appears to be a plausible reason for the disproportionate compensatory damages award against UAB. For this reason alone, UAB is entitled to a new trial, severed from any trial involving Cagle." *Id*. at 1145.

Similar to the damages at issue in *Moeinpour*, a "plausible reason" for the excessive damage award is the prejudice Defendants suffered by the improper joinder of the defaulting Defendants Otero and van Bilderbeek. As Defendants discuss further in section I.B.18, *infra*, joining the defaulted defendants was a reversible error and resulted in demonstrable prejudice to Defendants at trial, causing the jury to mistakenly attribute liability against the weight of the evidence like in *Moeinpour*. *Id*. at 1145. Over Defendants' objections, the Court repeatedly told the jury in the jury instructions, *see, e.g.*, Trial Transcript ("TTR") (Vol. XXI/1.14.26) at 3457:23-3458:12; 3477:6-14; 3478:11-13; 3482:3-9, and on the RICO verdict form, Doc. No. 706 at 3 ("The court has already determined that Ivan Otero and Albert van Bilderbeek are liable for RICO violations."), that Defendants Otero and van Bilderbeek were ***already found to be liable*** for RICO violations.

The Court explicitly recognized the potential for severe prejudice to Defendants due to the jury being directed by the Court that Otero and van Bilderbeek were already found to have violated RICO. When Defendants renewed their objection to the jury instructions stating that Otero and van Bilderbeek had already been found liable for RICO violations, TTR (Vol. XXI/1.14.26) at 3408:18-3412:22, the Court specifically invited a post-trial motion: "What I would expect you to do is, if things don't go well for you with the jury, re-raise these questions in a JMOL or motion for new verdict, and then I can have a chance to more squarely address them and more thoroughly address them on this issue." *Id*. at 3411:25-3412:4.

3

Given that Defendant Collingsworth did not (and could not) dispute that he had close and long-term business relationships with Defendants Otero and van Bilderbeek, as Defendants raised in their objection, the jury easily concluded, with less than a day of deliberation after a five-week trial, that if Otero and van Bilderbeek were already liable for RICO violations, so was Defendant Collingsworth. As the Court directed, Defendants now seek post-trial relief for the predicted prejudice caused by repeatedly reminding the jury that Mr. Collingsworth's close colleagues were already found to be liable for RICO violations.

Another "plausible reason" for the excessive damage award is that the jury was confused by the relationship between the defamation claim and the RICO claim. As presented in detail in section I.B.1, *infra*, Defendants moved prior to trial to sever the claims for trial to avoid jury confusion. See Doc. No. 394 (C&S Motion), which Defendants Collingsworth and IRAdvocates joined. Doc. No. 396. The Court denied the Motion. Doc. No. 399 at 5.  The jury's decision to award Drummond's demand for RICO damages, $26 million, for both defamation and punitive damages clearly suggests that the jury was confused about the distinction between claims, ignored the evidence, and failed to abide by the jury instructions. Doc. No. 1194 (Defamation) at 2.  The jury's confusion further manifested in their decision to award $68 million for the RICO claim, a figure 2.6 times the total amount of RICO damages Drummond sought at trial. *See* Doc. 706 at 3. The only explanation for this gross error in damages is jury confusion and prejudice.

As in *Moeinpour*, Defendants in this matter are entitled to a new trial because the jury's award of excessive damages was caused by prejudice and confusion. The Fifth Circuit strongly emphasized in *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276 (5th Cir. 1975), "'[i]f the verdict is the result of passion or prejudice, or for any other reason it appears that the jury erred or abused its discretion not only on the issue of damages, but also on the issue of liability, the trial

4

court **must** unconditionally order a new trial and cannot give the plaintiff the option to accept a lesser amount."' *Id*. at 283 (quoting 6A Moore's Federal Practice para. 59.05 [3], at 59-59 (1974))(emphasis in original). The Edwards decision is binding on the Eleventh Circuit.[3]

Cementing the application of *Moeinpour*, as in that case, *see* 762 F. Supp. 3d at 1150-51, Drummond's counsel made intentionally false and prejudicial statements to the jury. For example, in closing argument, Drummond's counsel, Trey Wells, seeking to enhance "presumed" defamation damages, told the jury:

> So in terms of trying to come up with how do you award presumed compensatory damages to restore an absolutely crushed reputation, I don't have any really good suggestions for you. But what I would like is -- you heard Nathaniel Drummond say he had two little ones, and it's too late for them because they were born under this cloud. But those two little boys, when they have children, their children are going to pay for the Drummond name. And I would like for, by that time, them to be able to come home from school and not be crying because some bully on the playground called their family murderers. That's what I ask you to do.

TTR (Vol. XXI/1.14.26) at 3563:15-25. During his testimony, Nathaniel Drummond did **<u>not</u>** mention that his children suffered taunts at school about accusations of Drummond's complicity in crimes against humanity; he did not mention that his children even attended school. He certainly did not mention any "cloud" over them. *See* TTR (Vol. III/12.3.25) at 582:17–628:19 and TTR (Vol. IV/12.4.25) at 668:8-695:11 (complete testimony of N. Drummond). His only reference to his children in his testimony was that he had two of them. *Id*. at 583:6-8.

It is clear based on the actual testimony that Mr. Wells' sought to convey to the jury that Nathaniel Drummond's children suffered because playground bullies taunted them with

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

accusations attributed to Mr. Collingsworth's statements. Mr. Wells' story was entirely fictional and was intended to inflame the jury. The excessive award of defamation damages shows that Mr. Wells' plan was effective.[4]

Upon ordering a new trial based on improper comments by counsel during closing argument, the Fifth Circuit stated a "***particularly indefensible tactic was the use of the closing arguments to bring before the jury damaging facts not in evidence and never established***." *Edwards*, 512 F.2d at 284 (emphasis added). There, "counsel discussed with the jury the value which his own son would place on his father's life, played on counsel's personal association with the deceased, evoked the image of deceased's children crying at graveside and forlornly awaiting the return of their father, and urged upon the jury the need for retributive payments from defendants." *Id*. at 285 (footnotes omitted). Mr. Wells' prejudicial, inflammatory, and false assertions to the jury were of the same caliber.

The Fifth Circuit explained that [closing argument] "advocacy is circumscribed both by an attorney's own professional responsibility and the court's obligation to provide the parties a

---

[4] In addition to the fictional taunts suffered by Mr. Drummond's children at school, Mr. Wells made countless improper and prejudicial statements about Mr. Collingsworth during the trial, particularly during the closing. For example, in arguing that the alleged RICO violation was an ongoing enterprise, Mr. Wells told the jury "Well, Mr. Collingsworth was trying to get us criminally prosecuted [in Colombia]". TTR (Vol. XXI/1.14.26) at 3564:4-5. He added, "Something else is going on. I can feel it. I can feel it in my bones. . . . Something is going on and we don't know what." *Id*. at 3545:12-16. Mr. Wells knew the "something else" was the ***actual*** criminal prosecution of Drummond's executives in Colombia and that the Court, at Drummond's urging, had precluded Mr. Collingsworth from even mentioning that fact to the jury (as discussed in section I. B.5, *infra*, this was error). Indeed, Mr. Wells ensured that the Court warned Mr. Collingsworth not to mention the criminal case. TTR (Vol. I/12.1.25) at 23:5-24:3. Mr. Wells thus misled the jury into thinking there was something improper, an element of the RICO claim, if Mr. Collingsworth had been involved in or was planning to contribute to a criminal prosecution of Drummond, knowing that Mr. Collingsworth could not respond that there ***was*** a legitimate and evidence-based prosecution of Drummond in Colombia for financing the AUC's crimes against humanity.

fair trial. Our review of counsel's argument convinces us that it so far exceeded proper bounds and was so conducive to prejudicing the jury's verdict that it substantially affected the total fairness of the trial." *Id*. at 283-84.[5]

This Court's decision in *Moeinpour* and the binding Fifth Circuit's decision in *Edwards* require that Defendants be granted a new trial because the jury's grossly excessive verdict was tainted by prejudice and unfairness.

**B.  Additional Erroneous Rulings by the Court that Require a New Trial.**

There were 21 distinct legal errors at trial, discussed below, any one of which is sufficient to require a new trial. With this extensive record of errors, a new trial is required to prevent "a miscarriage of justice." *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation omitted). Collectively, these errors compel this Court to grant Defendants a new trial now, rather than after a lengthy appeal process.

**Erroneous Pretrial Rulings.**

**1.  Improper Consolidation of Defamation and RICO Claims for Trial.**

As discussed in the preceding section, Drummond brought two distinct lawsuits, the 2011 defamation claim against Mr. Collingsworth (and others) and the 2015 RICO claim Mr. Collingsworth and IRAdvocates (and others). The Court combined the claims for the pretrial issues but did not formally consolidate the cases. Defendants moved to preclude consolidation. Doc. Nos. 394 and 396. The primary argument for non-consolidation was there would be a great risk of prejudice based on the reasoning in *Molever v. Levenson*, 539 F.2d 996 (4th Cir. 1976). That case involved a state law defamation case and a separate case based on a federal statute

---

[5] The *Edwards* Court expressly held that such fundamental unfairness was not waived by the failure of the defendant to specifically object to the closing during trial. 512 F.2d at 286.

(Rule 10b-5), along with a separate derivative case. *Id*. at 998. The Fourth Circuit held that it was error to consolidate the three cases because the "10b-5 claim tendered no question of law or fact like those in the derivative and defamation suits." *Id.* at 1003. In addition, the *Molever* Court found that consolidating two cases with very different types of claims (similar to the distinct defamation and RICO in these cases) and two different burdens of proof (preponderance of the evidence versus clear and convincing evidence as in these cases) would also cause confusion. *Id.*; *Kelly v. Kelly*, 911 F. Supp. 66, 69 (N.D.N.Y. 1996) ("Action No. 1 is strictly a slander action, while Action No. 2 encompasses fraud, undue influence, and many other allegations. Consolidating . . . the two actions could create considerable confusion in the minds of a jury[.]").

Citing efficiency and discounting the risk of prejudice, this Court denied the motion. Doc. No. 877 at 5. As discussed in section I.A., *supra*, the jury clearly confused the claims and awarded the $26 million in damages Drummond sought for RICO for the defamation claim in addition to $26 million in defamation punitive damages. Doc. No. 1194 at 2. The jury further awarded a seemingly random amount of $68 million for the RICO claim. Doc. 706 at 3. As in *Molever*, "[t]he effect of the ill-advised consolidation was severely harmful and so serious as to require vacation of the verdicts. . . ." 539 F.2d at 1003.

In *Cain v. Armstrong World Indus.*, 785 F. Supp. 1448 (S.D. Ala. 1992), the Court granted new trials after multiple asbestos claims were consolidated for trial. The Court reasoned:

> It is evident (unfortunately, in hindsight) that ***despite all the precautionary measures taken by the Court*** (e.g., juror notebooks, cautionary instructions before, during and after the presentation of evidence, special interrogatory forms) the joint trial of such a large number of differing cases both confused and prejudiced the jury. This confusion and ***prejudice is manifest in the identical damages awarded in the non-cancer personal injury cases and in the cancer personal injury cases, the relatively short deliberation time as well as in the inflated amounts of many of the damage awards and the lack of evidence supporting some of the damages in several cases***.

*Id*. at 1455 (emphasis added). Similarly, here, despite the limited precautionary measures taken by the Court with jury instructions, the clearly confused jury awarded the full claim for RICO damages in the defamation case and awarded that same amount as punitive damages for the defamation claim when Drummond put on no evidence for damages in the defamation claim in requesting presumed damages.

Further, the jury then invented $68 million for RICO damages, a number significantly higher than the actual RICO damages Drummond sought at trial, $26,654,611.80 (which was instead awarded as defamation damages). This shows jury "confusion and prejudice." As in *Cain*, the jury's "relatively short deliberation time," less than a day following a five-week trial, coupled with inflated damage awards not supported by the evidence, indicates that the jury confusion and prejudice Defendants warned of in their pretrial motion occurred at trial.

**2.** **Refusal to Stay the Trial While the Colombian Prosecution Was Proceeding.**

On October 9, 2018, after a lengthy independent investigation, a Colombian Special Prosecutor within the Office of the Colombian Attorney General issued an indictment for nine current and former Drummond senior managers, charging them with financing the AUC's crimes against humanity. See **Exhibit 55**. Drummond challenged the charges, and on December 16, 2020, the Special Prosecutor issued detailed findings of fact confirming the basis for the indictment and deciding to begin the first criminal trial against Drummond's current President, José Miguel Linares, and prior President, Augusto Jiménez. *See* **Exhibit 56**. On April 29, 2025, the Colombian criminal trial against these two Drummond officers began. Doc No. 860-1, ¶ 2 (Otero Decl.).

On June 12, 2025, Defendants Collingsworth and IRAdvocates made a Motion to Stay the Alabama trial to allow the Colombian criminal trial to conclude since it had already commenced. Doc. No. 382. In their Reply Brief, Doc. No. 390, Defendants reinforced that the Colombian Special Prosecutor had spent years investigating Drummond's relationship to the AUC, the

9

criminal trial had started, and the result of that trial should be determinative of whether Drummond's claims against them were viable. The Court denied the Motion. Doc. No. 393. This was legal error. Given that Drummond's case is based on the incredible argument that Mr. Collingsworth fabricated the entire story that Drummond financed the AUC, an essential aspect to revealing the truth was having the Colombian court's resolution of the issue of Drummond's complicity with the AUC following its multi-year investigation, including interviews with all of the witnesses in Colombia.

This Court rejected this argument and forced Mr. Collingsworth and IRAdvocates to go to trial without the verdict of the Colombian court. This error was greatly compounded when the Court ordered that Defendants could not even mention to the jury that Drummond was being prosecuted in Colombia. *See* Doc. No. 1034 at 3, 8. The distinct error in excluding the indictment documents is fully discussed in section I.B.5, *infra*. As far as the jury knew, Mr. Collingsworth was the only person in the world accusing Drummond of financing the AUC, and according to Drummond, this was because he completely fabricated this accusation. However, in reality, the Colombian Special Prosecutor is on the verge of putting Drummond's senior managers in prison for the very conduct Mr. Collingsworth exposed. For the reasons stated in Defendants' Motion to Stay and their Reply Brief, Doc. Nos. 382 and 390, the Court's denial of the Motion (Doc. No. 393) was an abuse of discretion and grounds for a new trial.

3. **Following C&S Settlement on the Eve of Trial, Depriving Defendants of Lead Counsel, Erroneous Denial of a Continuance.**

During most of the 15 years since Drummond first sued Mr. Collingsworth for defamation and the 11 years of the RICO litigation, he partnered with Spotswood, Sanson, & Sansbury, the law firm retained by his co-Defendants, his former law firm Conrad & Scherer (C&S). The record reflects a long history of efficient cooperation, with C&S taking the lead on discovery issues and

10

Mr. Collingsworth and IRAdvocates often joining C&S Motions. The trial plan had been that the Spotswood firm would be lead counsel and Mr. Collingsworth would assist the defense.

On the eve of the December 1, 2025 trial, C&S settled with Drummond and agreed to an onerous non-cooperation clause that prohibited C&S and the Spotswood firm from providing any assistance to Mr. Collingsworth and IRAdvocates in defending the Drummond suit. This prevented Defendants from getting trial exhibits and deposition transcripts that the Spotswood firm had previously maintained and shared with Mr. Collingsworth. Drummond's strategy was to isolate Mr. Collingsworth and IRAdvocates, hamper their defense, and force them to trial without representation by outside counsel.[6]

Defendants filed an Emergency Motion for a Continuance to get sufficient time to retain a law firm and allow that firm to get up to speed on the complex cases that had been pending for years. Doc. No. 557. At the October 30, 2026 hearing on the Motion, Richard Smith, a senior attorney from the Birmingham, Alabama, law firm, Christian & Small, appeared and stated that his firm would represent Mr. Collingsworth and IRAdvocates if the Court granted a continuance to allow his team sufficient time to get prepared for trial. The Court denied the request, effectively ordering Mr. Collingsworth to go to trial representing himself and IRAdvocates. *See* Doc. No. 393.

Mr. Smith nonetheless agreed to jump in with very limited time and attempt to get ready for trial. While working nonstop attempting to master the issues of complex cases that had been pending for years, Mr. Smith suffered a health emergency and could no longer participate in the trial. On November 17, 2025, Mr. Collingsworth and IRAdvocates then renewed their Motion for

---

[6] At the start of trial, Drummond also made a confidential settlement with Francisco Rameriz, the only other remaining RICO Defendant.

a Continuance to get additional time for their chosen attorney to recover or to allow other attorneys to join the case and have sufficient time to prepare for trial. Doc. No. 603.

On November 18, 2025, with less than two weeks to go before the scheduled December 1 trial, the Court denied that Motion as well, Doc. No. 606, allowing for no impact from the loss of Defendants' lead counsel, Mr. Smith. With this very limited time, a team of lawyers from Christian & Small jumped into the case and scrambled to get ready for trial. They were hampered not only by the severe time constraints and the loss of lead counsel, but also the non-cooperation agreement C&S signed with Drummond prevented Defendants from gaining access to key trial documents.

For the reasons stated in Defendants' initial Emergency Motion for Continuance, Doc. No. 557, and the subsequent Motion following Mr. Smith's health emergency, Doc. No. 603, the Court's refusal to grant additional time under these extremely unusual and compelling circumstances was clear legal error and an abuse of discretion. As Judge Wisdom put it in *Smith-Weik Machinery Corp. v. Murdock Machine & Engineering Co.*, 423 F.2d 842 (5th Cir. 1970):

> "Abuse of judicial discretion" as the basis for reversal of a trial court's judgment has more bark than bite -- in terms of the reviewing court's assessment of the trial judge's exercise of discretion. Here, for example, our holding involves no criticism of the district judge. The magic words mean only that in the light of the record as a whole this Court feels that the denial of the motion for a continuance severely prejudiced the defendant; that, on balance, the interests in favor of a fair trial heavily outweighed the interests in favor of an immediate trial. The trial judge did not have the benefit of the hindsight this Court has as a result of reading the record. When the case was called for trial, it may have appeared to the trial judge to have been a relatively simple breach-of-contract action, which local counsel was well enough prepared to handle. In the light of the record, we find that the matter was hotly contested on the facts and at issue were a number of [complex] legal questions . . . In Anglo-American law, with trials based on the adversary system as the best means of arriving at a just and legal result, ***the interests of justice in this case required that both parties be represented by able counsel well informed on the facts and the pertinent law.*** The illness of the defendant's principal attorney and local counsel's relative unfamiliarity with the case tipped the scales so heavily in favor of the plaintiff as to effectually deprive the defendant of its rightful day in court.

12

*Id*. at 844 (emphasis added).[7]

Numerous courts agree that a continuance to find new counsel and allowing that counsel adequate time to prepare are so fundamental that these issues must be reviewed directly, outside of any vague abuse of discretion factoring analysis. *See, e.g., Santa Maria v. Metro-N. Commuter R.R.,* 81 F.3d 265, 275 (2d Cir. 1996)(holding that the court should have granted a continuance in order for replacement counsel to be found after unanticipated circumstances required acquiring new counsel and finding that a continuance was necessary for new counsel to be brought "up to speed" "especially given the complicated . . . nature of the case"); *RZS Holdings AVV v. PDVSA Petroleo S.A.*, 506 F.3d 350, 358 (4th Cir. 2007)(vacating the decision denying defendant's motion for continuance and holding that the court abused its discretion by failing to grant a "reasonable continuance" for the defendant "to secure replacement counsel" and conduct necessary preparation for the case); *Anderson v. Sheppard*, 856 F.2d 741, 748 (6th Cir. 1988) (finding that the district court abused its discretion in failing to grant the defendant a reasonable continuance to obtain counsel and concluding that a continuance was necessary for new counsel to become familiar with a "complex case"); *U.S. v. 9.19 Acres of Land, More or Less, in Marquette Cnty.*, Mich., 416 F.2d 1244, 1245 (6th Cir. 1969) (holding that the court erred in denying the defendant's request for continuance which was necessary for them to have adequate time to retain new counsel and asserting that '"myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality"')(quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)).

---

[7] Based on *Bonner,* 661 F.2d at 1209, this Fifth Circuit decision is also binding on the Eleventh Circuit.

Here the situation is even more stark: Defendants Collingsworth and IRAdvocates were forced to go to trial without *their lead counsel* when, on November 18, 2025, the Court denied the Motion for Continuance following Mr. Smith's debilitating health emergency. *See* Doc. No. 606. This gave the new lawyers from Christian and Smith *less than two weeks to prepare for trial* against Drummond counsel who had been involved in the litigation for *over 15 years*.

The Court's denial of a continuance ensured there could not be a fair fight. As the Sixth Circuit put it in an analogous matter, "[r]ealistically, we find it untenable that a client would be able to secure new counsel for a complex [case] . . . when counsel would be aware of the district court's admonition that the case would proceed in a very short time . . . there would be no additional time granted for counsel to become familiar with the case,  or to prepare for trial." *Anderson,* 856 F.2d at 748. Defendants' new counsel, forced to trial without adequate time to prepare, made an admirable effort, but they simply were not able to master the issues on par with the Drummond lawyers whose careers have been dominated by these cases for the last 15 years.

This extreme example of abuse of discretion in denying a continuance goes to the heart of the right to counsel and "the interests of justice in this case require[ed] that both parties be represented by able counsel well informed on the facts and the pertinent law." *Smith-Weik Machinery Corp.,* 423 F.2d at 844.  This denial of what should have been a routine grant of a continuance is one of many manifestations of the Court's bias against Mr. Collingsworth. See section I.B.21, *infra*. A reasonable continuance was required to protect Defendants' right to retain counsel of their choice, allow their counsel adequate time to prepare for a very complex case, and have adequate support at trial.[8] This legal error requires a new trial.

---

[8] Defendants also demonstrated in their motions for a continuance compliance with the traditional continuance factors of *Rink v. Cheminova, Inc*., 400 F.3d 1286, 1296 (11th Cir. 2005).

4. **Refusal to Permit Defendants to Review Drummond-C&S Settlement to Assess Motive and Fairness and Determine Whether to Submit to the Jury.**

The settlement between Drummond and C&S, discussed in section I.B.3 above, was highly suspect due to its timing and the large amounts C&S agreed to pay Drummond when it was not clear when or even whether the payments would be made. Further, the settlement included a non-cooperation clause that prevented C&S and the Spotswood firm from cooperating with or assisting Defendants Collingsworth and IRAdvocates in their defense at the trial. *See* Doc. No. 567, at 2-3. The onerous non-cooperation clause strongly implies that Drummond gave C&S a sweetheart deal for the purpose of isolating Mr. Collingsworth and IRAdvocates as the sole Defendants, depriving them of the resources of C&S to defend against Drummond.

Drummond pursued this strategy with the intention of getting a verdict of liability against Mr. Collingsworth and IRAdvocates that would allow them to argue in Colombia that the criminal cases should not go forward. The Court certainly understood this was Drummond's intent. See TTR (Vol. I/12.1.25) at 18:9-18. Defendants requested that the Court provide them with a complete copy of the settlement agreement to allow them to assess whether there was improper conduct and to show if Drummond's motive was improper in pursuing the cases to trial, reinforcing the cases were merely SLAPP suits. The Court ultimately allowed Defendants' counsel to review a redacted copy of the agreement that included only the payment amounts and conditions, *see* TTR (Vol. II/12/2/25) at 337:23-338:10, but this was not sufficient to understand the complete context, terms, and motivation for the settlement. Further, the Court specifically ruled Mr. Collingsworth could

---

*See* Doc. No. 557, at 6-9, and the subsequent Motion following Mr. Smith's health emergency, Doc. No. 603, at 6-9.

not see the agreement, *id*. at 338:4-6, and he was the one person familiar enough with the facts and long history of the case to properly assess it.

As discussed in section I.B.10, *infra*, the Court erroneously ruled on Drummond's Motion *in Limine* that Defendants could not refer to Drummond's cases against them as SLAPP suits, but Defendants should have been able to examine the complete agreement to determine whether it demonstrated Drummond's improper motive in bringing the cases, and if so, introducing the agreement to the jury. *See Unsworth v. Musk,* 2019 U.S. Dist. LEXIS 229024, *7 (C.D. Cal. 2019)(because a defamation plaintiff "is seeking, actual presumed, and punitive damages for reputational harm and emotional damage, information about his motive may become relevant. The parties may use evidence of Unsworth's motivation to show a lack of actual damage").

Defendants believe that the complete settlement agreement would have supported Defendants' position that Drummond's plan was to bring the SLAPP suits against Defendants, isolate them as the sole Defendants, and severely hamper their ability to defend their cases. As the Court clearly understood, Drummond was motivated to bolster its criminal defense in Colombia with a win in this case. TTR (Vol. I/12.1.25) at 18:9-18. The Court erred in ruling that Defendants could not obtain the settlement agreement and allow the jury to see it.  TTR (Vol. XVII/1.7.26) at 2785:7-24 (denial of request for agreement).

### Erroneous Pretrial Rulings on Motions *in Limine*.

5.   **Exclusion of Indictments of Drummond Officials by Colombian Prosecutor and Findings of Fact by Colombian Special Prosecutor No. 251 Supporting Prosecution of Drummond's Current and Former Presidents.**

In pretrial proceedings, Conrad & Scherer (Doc. No. 888 (Defamation)) and Mr. Collingsworth and IRAdvocates (Doc. No. 878 (Defamation)) made Motions *in Limine* to admit

16

into evidence documents relating to the Colombian prosecution of Drummond's executives for crimes related to their financing of the AUC's crimes against humanity. Drummond made its own Motion *in Limine* to Exclude these documents. Doc. No. 907 (Defamation).

Among the documents at issue were the initial October 9, 2018 indictments of Drummond Ltd.'s former President, Augusto Jiménez, current President, José Miguel Linares, and seven other Drummond executives or agents. *See* **Exhibit 54** (original) and **Exhibit 55** (English translation). In addition, Defendants sought to introduce as evidence at trial the December 16, 2020, findings of fact of the Colombian Special Prosecutor No. 251, Diana Mercedes Salazar Solís, supporting the prosecution of Linares and Jiménez, respectively. **Exhibit 56**, English version attached hereto, is 149 pages long and reviews the evidence showing Linares and Jiménez financed and collaborated with the AUC.

Ruling on these Motions *in Limine*, the Court excluded all documents related to the Colombian prosecution, stating "this evidence is due to be excluded under Rule 403 because it would be of little relevance, is highly prejudicial, and is a waste of time." Doc. No. 1034 (Defamation) at 3, 8, and 16. Because the exclusion was clearly erroneous, Defendants made another effort at trial to introduce just **Exhibit 56**, the key document containing voluminous factual findings of the Special Prosecutor justifying the criminal prosecution of Linares and Jimenez. Doc. No. 687 (Motion to Admit Evidence). The Court relied on its prior reasoning of lack of relevance and Rule 403 prejudice and denied the Motion. TTR (Vol. XV/1/5/26) at 2549:9-2551:17.[9] The Court made clear that Mr. Collingsworth could not even mention the criminal prosecution to the jury. *See, e.g.*, TTR (Vol. I/12.1.25) at 23:5-24:3

---

[9] The Court did not rely on lack of authentication to exclude **Exhibit 56**. TTR (Vol. XV/1/5/26) at 2549:12-14.

Defendants now seek a new trial based on the erroneous exclusion of the Colombian prosecution documents. The jury would never have accepted Drummond's outrageous assertion that Mr. Collingsworth completely fabricated Drummond's collaboration with the AUC if this evidence of an independent investigation by the Colombian Attorney General's office resulting in criminal prosecution of Drummond's key officers had been presented to them.

Defendants' Motion to Admit Evidence, Doc. No. 687, provided compelling reasons to admit **Exhibit 56**. First, the Prosecutor's factual findings are highly relevant evidence under FRE 401 because the facts rebut the central factual premises of Drummond's defamation and RICO claims. Doc. No. 687 at 5-7; 12-13. Second, based on *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1300 (11th Cir. 2022), **Exhibit 56** is admissible under FRE 803(8)(A)(iii) because it is a public record that "sets out . . . factual findings from a legally authorized investigation" and "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Doc. No. 687 at 8-12.

Further, the Court should have admitted **Exhibit 56** not only because there is an applicable hearsay exception under FRE 803(8), but also because the evidence is highly probative of several critical issues and was proffered for reasons other than the truth of the matters asserted therein. Most significant, **Exhibit 56** confirms Mr. Collingsworth's subjective belief that Drummond financed the AUC, and that his belief was reasonable. *See* Doc. No. 687 at 13-16.

**Exhibit 56** should also have been considered admissible to counter Drummond's claims for damages as it establishes an alternative cause for any reputational damages Drummond claimed to have incurred. Drummond's witnesses asserted at trial that Mr. Collingsworth's statements were the sole cause of Drummond's reputational damage. *See. e.g.*, TTR (Vol. III/12.3.25) at 598:19-604:10; 607:1-17; 621:24-622:14 (testimony of N. Drummond). The

18

widely publicized fact of Drummond's criminal prosecution in Colombia for funding the AUC's crimes against humanity was a major and ongoing cause of Drummond's reputational injury. *See* Doc. No. 687, at 17-18. Courts have consistently permitted alternative causal evidence to show a plaintiff's alleged injury to reputation was not caused solely by a defendant's statements. *See, e.g.*, *Simon v. Shearson Lehman Bros.*, 895 F.2d 1304, 1319 (11th Cir. 1990); *Marcone v. Penthouse Int'l Mag. For Men*, 754 F.2d 1072, 1079 (3d Cir. 1985); *Johnson v. Clark*, 484 F. Supp. 2d 1242, 1258 (M.D. Fla. 2007), aff'd, 294 F. App'x 502 (11th Cir. 2008). It was reversible error for the Court to have restricted the jury's access to the many other credible sources, including government sources, that publicly corroborated Drummond's illicit involvement with the AUC.

At a minimum, Defendants should have been able to use **Exhibit 56** to impeach Drummond's witnesses because it demonstrates bias or interest of Drummond's witnesses under FRE 401. The document is relevant and admissible under FRE 401 because it (1) reflects on Drummond's potential motives for initiating this suit and taking the case to trial, and (2) shows that Drummond witnesses had a motive to skew their testimony to counteract the effects of the Colombian criminal proceedings.

For example, Mike Tracy swore under oath that Drummond never provided any assistance whatsoever to the AUC. *See, e.g.*, TTR (Vol. VI/12.9.25) at 1194:6-1195:18; 1236:23-1237:12. Defendants should have been able to question Mr. Tracy about his knowledge of the evidence from the criminal proceedings that directly contradicted his sworn testimony. The Court's erroneous order prevented Defendants from even mentioning the Colombian prosecution, *see* Doc. No. 1034 at 3, while Drummond's witnesses were protected in their lies about Drummond never even interacting with the AUC. Indeed, as previously discussed, see note 4, *supra*, Drummond's counsel

19

ensured Drummond's witnesses could not even be questioned about the fact of an ongoing criminal trial before eliciting their false testimony of Drummond's lack of any involvement with the AUC.

Evidence of witness bias or interest in the litigation is inherently relevant because it tends to show that the material facts to which the witness testified are less probable. *United States v. Abel*, 469 U.S. 45, 51-52 (1984). Drummond's witnesses in this case all had a strong bias and motivation to skew their testimony to assist the Drummond executives facing criminal charges in Colombia. They all knew, as Drummond argued at trial, that if Drummond lost in Colombia, it would lose its Colombian coal concession worth untold billions.

Finally, the probative value of **Exhibit 56** was not substantially outweighed by the risk of unfair prejudice to Drummond. The Court's heavy reliance on Rule 403 to save Drummond from "unfair prejudice," *see* Doc. No. 1034 at 3, does not remotely overcome the prejudice to Defendants of the Court preventing the jury from learning that while Drummond was arguing that Mr. Collingsworth fabricated the entire story that Drummond financed the AUC, a Colombian Prosecutor concluded Drummond's highest officers financed the AUC's crimes against humanity following an extensive and independent investigation. Doc. No. 687, at 18-20. Any risk of undue prejudice could have been addressed by a limiting instruction, *see* FRE 105, a tactic the Court used at Drummond's urging countless times during the trial.

Allowing Drummond to make the absolutely outrageous accusation that Mr. Collingsworth completely fabricated Drummond's funding of the AUC while depriving Defendants of this crucial evidence was reversible error. This crucial evidence established that, following a lengthy independent investigation, Colombian officials, from the Attorney General to the line investigator, concluded that Drummond's key officers should be criminally prosecuted for this same act Mr. Collingsworth was alleged to have fabricated. Preventing the jury from learning of a parallel

proceeding in which Drummond is facing criminal charges for the very conduct of funding the AUC it claims Mr. Collingsworth fabricated was unjust, unfair, and legal error.

### 6.   Exclusion of Expert Testimony of Javier Peña.

A key issue at trial was whether funds Mr. Collingsworth arranged for C&S to provide for the families of key witnesses to be relocated so they would not be killed in retaliation were necessary and appropriate for the safety and security of the families. Drummond argued they were just bribes. To further substantiate their position about the purpose of the payments, Defendants offered the testimony of an expert witness, Javier Peña, the former head of the U.S. Drug Enforcement Agency (DEA) office in Colombia (and he was featured in the *Narcos* series). Mr. Peña was offered to testify about the dangerous conditions in Colombia and that security assistance was essential to ensure that witnesses and their families would not be killed, contradicting Drummond's assertion that these payments were some sort of bribe.

There is no question Mr. Peña was qualified to testify as an expert on this matter. Indeed, the Court allowed him to testify as an expert for Defendants at the crime fraud hearing on the need for security assistance for Colombian witnesses. See September 2, 2015 Transcript of Crime Fraud Hearing at 284-316. Yet prior to the jury trial, the Court excluded this testimony, Doc. No. 1035 at 16-17, so the jury only heard about the need for witness protection from Mr. Collingsworth. The jury did not have the opportunity to hear this perspective corroborated by someone with unassailable expertise on the dangerous realities of the AUC in Colombia and the need for witness protection.

The Court's justification for excluding this testimony reflects the Court's bias against Mr. Collingsworth, as discussed in section I.B.21, *infra*, not a neutral application of the law. The Court stated, "there is a distinct difference between a sanctioned government program supervised by the DEA and ***surreptitious private payments that counsel in a civil case allegedly took pains to hide***

21

*in discovery and lied about*." *Id*. at 17 (emphasis added). The Court added, "without *particularized evidence from the paid-witnesses from this case* about threats they actually received, admission of generalized testimony about witnesses in Colombia feeling threatened would encourage the jury to base their findings on speculation rather than evidence." *Id*. (emphasis added). Thus, pretrial, the Court already assumed that the security payments were not legitimate and that the witnesses were "paid." By asserting that Mr. Collingsworth "took pains to hide in discovery and lied about" the scope of his witness security efforts, the Court failed to take account of the fact that Mr. Collingsworth disclosed at the discovery hearing on April 21, 2014 four of the potential witnesses whose families received security relocation assistance, Charris, Gelves,  Duarte, and Halcon. See Doc. No. 123, 4.21.24 Hearing, at 30:16-31:8. Any delay in disclosing witness security payments applied only to El Tigre and Samario, which were disclosed before December 12, 2014, meeting the Court's October 15, 2014 deadline. Doc. 151, at 1-2.

Further, regardless of what Mr. Collingsworth did or said before he fully disclosed all of the witness security payments by December 2014, the issue remained of establishing whether the AUC made Colombia a very dangerous place for witnesses exposing the AUC's crimes against humanity and whether relocating the families of witnesses to prevent violent retaliation was commonly done by the "sanctioned government program supervised by the DEA." Mr. Peña was uniquely qualified to testify that the steps Mr. Collingsworth took to protect the witnesses' families was essential to allow the witnesses to testify, and that regardless of who Mr. Collingsworth disclosed the security assistance to, it was normal practice for DEA, legal, and morally necessary to keep the families safe from the AUC. *See* **Exhibit 36** (Proffered Expert Report of Mr. Peña). Excluding Mr. Peña's expert testimony was legal error and a concrete example of the unfairness of the trial stemming from the Court's bias towards Mr. Collingsworth.

22

**7.** **Exclusion of Expert Testimony of Joseph Paonessa.**

Joseph Paonessa was offered as an expert on witness protection programs. He served as Chief Operations Officer (Ret.) for the Federal Witness Security Program at the U.S. Department of Justice (DOJ). He would have testified to the extensive support system the DOJ provides to witnesses in their witness protection program. He would have also testified that the security assistance Mr. Collingsworth and C&S provided was reasonable and within the parameters of what the DOJ does to protect witnesses. *See* **Exhibit 38** (Proffered Expert Report of Mr. Paonessa). These were key issues at trial, as Drummond repeatedly asserted through their seriously flawed expert, Mauricio Santamaria, discussed in section 9, *infra*, that the security payments were exorbitant. The Court excluded Mr. Paonessa's testimony, preventing the jury from gaining his expert perspective on what is reasonable to provide for witness relocation costs. *See* Doc. No. 1035 at 14-16. The jury heard only misleading testimony from Drummond's expert on the matter.

In excluding this key testimony, the Court, as with Mr. Peña, based its ruling on adverse factual assumptions that demonstrated the Court's bias against Mr. Collingsworth.[10] In excluding Mr. Paonessa, the Court stated, "[t]here is a vast and very distinct difference between a sanctioned government witness protection program and surreptitious private payments that Drummond contends counsel (1) took great pains to hide in discovery and (2) lied about. Moreover, whether the payments were bribes is a fact issue within the exclusive province of the jury." *Id*. at 15-16. Thus, once again, the Court excluded this crucial testimony because it clearly agreed with Drummond's ***contention*** that the security assistance was itself improper, when the very purpose of Mr. Paonessa's testimony was to clarify that the DOJ itself uses witness relocation and security

---

[10] For a detailed discussion of the judicial bias issue and its impact on the fairness of the trial, see section I.B.21, *infra*.

to keep witnesses and their families safe. This is true regardless of when Mr. Collingsworth fully disclosed the assistance. Whether the assistance was a legitimate witness protection effort or a bribe should have been left for the jury to decide with the benefit of Mr. Paonessa's expert testimony. This testimony directly addressed the issue itself, establishing that the DOJ routinely relocates the families of endangered witnesses and provides them with significant financial support. Excluding Mr. Paonessa's expert testimony was legal error.

8.  **Exclusion of Expert Testimony of Jan Jacobwitz.**

Defendants Collingsworth and IRAdvocates offered another expert, Jan Jacobwitz, who is a recognized expert on legal ethics. She was offered to testify that security payments to protect witnesses are legal and ethical. *See* **Exhibit 145** (Proffered Expert Rebuttal Report of Ms. Jacbowitz). The Court excluded Ms. Jacobwitz's testimony, so the jury never learned from a credible expert that witness security payments were legal, necessary, and morally required. *See* Doc. No. 1035 at 17-19. Drummond spent significant time at trial arguing that Defendants' payments for witness security were unethical and illegal. Indeed, on at least two occasions in questioning Mr. Collingsworth, Drummond attacked and ridiculed the ethics memo authored by C&S attorney Piper Henricks. *See. e.g.*, TTR (Vol. XII/12.17.25), at 2272:12-2274:1.

The Court's justification for excluding Ms. Jacobwitz's testimony was that her ethical opinion was inapplicable because the witness security payments were not disclosed. Doc. No. 1035 at 18. However, as noted above in section I.B.6, *supra*, all but two of the families of witnesses who received security relocation assistance were disclosed to the Court, and the remaining two, El Tigre and Samario, were disclosed by the Court's deadline of December 12, 2014. The issue of the timing of disclosure may well go to intent, a jury issue, but the jury should have been able to learn that Drummond's overarching theme that any payment to a fact witness was unethical and a bribe was not legally and ethically correct. This is particularly true since the Court permitted Drummond's

24

lay witnesses such as Jim Carroll and Paul Wolf to opine about the ethics of witness security payments. It was legal error for the Court to strike this highly qualified expert for reasons not related to whether her opinion was legally sound and highly relevant. This exclusion is another concrete example of the unfairness of the trial stemming from the Court's bias towards Mr. Collingsworth. See section I.B.21, *infra*.

### 9. <u>Permitted Drummond's Expert, Mauricio Santamaria, to Testify.</u>

Over the objection of Defendants, the Court did allow Drummond's proffered expert, Mauricio Santamaria, to testify as to his findings in Pls **<u>Exhibit 1240</u>** equating the security assistance C&S provided for the families of Colombian witnesses to present-day U.S. dollars. *See* Doc. No. 1035 at 3-4. The findings were extremely misleading because even in cases where a witness's family was relocated with a single payment, Santamaria extrapolated this payment into an annual income amount. See, e.g., TTR (Vol. VII/12.10.25) at 1422:24-1423:14; 1444:19-1445:7 (discussing Gelvez [alias El Canoso]). He also presented to the jury the specific payments for Jaime Blanco's attorneys as if they were annualized payments to Blanco himself for living expenses. *Id*. at 1415:6-1419:4. In both instances, this testimony allowed the jury to hear extremely large numbers for payments that were never actually provided. This framing offered an improper comparison that was extremely prejudicial. *See Shatkin v. McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (holding that expert's comparison of discounted and undiscounted figures was an "'apples and oranges' comparison [that] simply cannot withstand scrutiny"). Given all of the reasons provided above and in Defendants' Motion *in Limine* to exclude Mr. Santamaria's testimony, *see* Doc. No. 896, it was error to allow this testimony at trial. This error was greatly compounded by the Court's exclusion of Defendants' expert Mr. Paonessa, who could have provided context and an essential alternative perspective for reasonable security assistance to endangered witnesses and their families. See section I.B.7, *supra*.

**10. Precluded Defendants From Referring to Drummond's Claims as "SLAPP Suits."**

Relying solely on FRE 403, the Court ruled that Defendants Collingsworth and IRAdvocates could not refer to Drummond's claims against them as "SLAPP suits" and that Mr. Collingsworth could not refer to himself as a "human rights lawyer." Doc. No. 1034 at 21. Prior to trial, Defendants moved for reconsideration of these rulings. Doc. No. 1138. The Court denied the Motion. Doc. No. 661. These rulings set the stage for Drummond to present its claims as legitimate and prevented Defendants from arguing that the Drummond lawsuits were brought in retaliation for Mr. Collingsworth's exposure of Drummond's collaboration with the AUC.

These cases are prototypical examples of SLAPP suits, with a powerful multinational using its vast resources to crush a critical voice who, for years, was forced to self-represent due to a lack of resources. At the same time, the Court's ruling prevented Mr. Collingsworth from even telling the jury that he was a human rights lawyer who devoted his life to promoting human rights. This was error because Drummond's motive in bringing the cases and why Mr. Collingsworth was targeted as a dedicated human rights lawyer were essential for the jury to understand the context of the cases they were hearing. *See* Doc. No. 925 (Defendants' Opposition to Motion *in Limine*). The Court's expansive application of FRE 403 to shield Drummond exceeded the Eleventh Circuit's limitation: "'Rule 403 is 'an extraordinary remedy which the district court should invoke sparingly,' and the balance . . . should be struck in favor of admissibility.'" *United States v. Dodds*, 347 F.3d 893, 897 (11th Cir. 2003) (citation omitted).

**11. Excluded Evidence of Colonel Villate and Operation Dragon.**

The Court also excluded evidence that one of Drummond's key security officers, Colonel Julián Villate Leal, was hired by Drummond after he was exposed as the architect of "Operation Dragon," a plan he developed in the early 2000's to identify union leaders and human rights activists in Colombia for execution by the AUC. *See* Doc. No. 1034 at 18. This was strong evidence

26

that Drummond built a team of people to work with the AUC to cleanse its workplace and area of operation of anyone thought to be leftist. *See* **Exhibit 27** (excluded report on Operation Dragon). Because of this ruling, Mr. Collingsworth was prevented from testifying at trial that he was aware of this operation at the time it was reported to the public. Further, he would have testified that he learned in 2005 from his contacts with the Drummond union that, following this very public scandal, Col. Villate was hired by Drummond to be a "security coordinator." That Drummond hired Col. Villate in this position after it was revealed he had paramilitary connections and prepared lists with union officials and human rights activities to be targeted for execution are key facts that supported Mr. Collingsworth's subjective belief that Drummond financed the AUC's crimes against humanity. *See* Doc. No. 1106 at 12 (Defendants' Trial Brief). The Court's exclusion of this evidence was erroneous and prevented the jury from learning of Drummond's calculated staffing of security personnel who would collaborate with the AUC in targeting union leaders for execution.

**12.  Excluded Evidence of Jim Adkins' Orchestration of the Iran-Contra Scandal.**

Drummond hired James Adkins, a notorious former CIA agent, to be the head of its security team in Colombia. While at the CIA, Adkins used a false invoice payment system to hide his illegal payments to the Nicaraguan "contras," and then lied about it to federal investigators. This was all exposed in a Congressional investigation referred to as the Walsh Report. The Court excluded the Walsh Report and any other evidence indicating that Adkins might have been a "bad guy" while he had been employed by the CIA. Doc. No. 1034 at 18-19. The Court asserted that this evidence of Adkins' past actions was not relevant. *Id*. at 19. As Defendants asserted in their Trial Brief, Doc. No. 1106 at 13-14, Defendants were not seeking to merely paint Adkins as a "bad guy" to tar Drummond. Rather, the Walsh Report, **Exhibit 29**, shows Adkins had set up a false invoicing system to hide illegal payments to the Nicaraguan "contras." This is highly relevant because according to key testimony from Jaime Blanco Maya, Adkins set up a similar system of false

27

invoices that he implemented at the CIA to allow Blanco's food services company, ISA, to overcharge Drummond and provide the overage to the AUC. Blanco Dep. 73:12-75:9, 80:14-92:3. Learning that Adkins set up this false billing system for Drummond, as he did at the CIA, is a crucial fact that supported Mr. Collingsworth's subjective belief that Drummond was financing the AUC. This evidence is also important in rebutting Drummond's burden of proving that Mr. Collingsworth's statement that Drummond financed the AUC was false. This evidence further supports the assertion that Drummond was financing the AUC and the jury was prevented from hearing it. Exclusion of this evidence by the Court was reversible error and grounds for a new trial.

13. **<u>Excluded Evidence of IRAdvocates' Success in the Chiquita Trial.</u>**

Drummond's RICO claim as presented at trial is based on the fantastical allegation that IRAdvocates was formed to implement a complex, far-flung conspiracy to file fraudulent lawsuits based on fictious evidence to extort settlements from Drummond and unnamed others. To rebut Drummond's allegations and argument, Mr. Collingsworth and IRAdvocates sought to present evidence to establish that IRAdvocates is a legitimate and successful non-profit legal advocacy organization. One of its most successful cases was filed against Chiquita Brands International in 2007, and after 17 years of hard-fought litigation, the case went to a jury trial in April/May of 2024. The jury returned a verdict of 38.3 million dollars for the decedents of nine bellwether plaintiffs. *See* **<u>Exhibit 64</u>**. The Court precluded this evidence from being presented at trial. Doc. No. 1034 at 17. As Defendants clarified in their Trial Brief, Doc. No. 1106 at 18, they should have been able to present to the jury this example of IRAdvocates' successful litigation of this important case to demonstrate that IRAdvocates does not exist to file fraudulent cases to extort settlements.

Indeed, Drummond specifically identified the Chiquita litigation as an example of IRAdvocates' fraudulent scheme. RICO CT ¶ 47. The Chiquita victory was thus highly relevant to rebutting a key element of Drummond's RICO claim. The Court's concern that this evidence would

be introduced merely to allow the jury to conclude that if Chiquita paid the AUC so did Drummond, *see* Doc. No. 1034 at 17, was not an issue if the Chiquita trial victory had been introduced as evidence of IRAdvocates' legitimacy. As the Court did at trial at Drummond's request with great frequency, a limiting instruction as to the purpose of this evidence would have prevented any prejudice. Exclusion of this important evidence to rebut Drummond's RICO claim was legal error.

## **Erroneous Evidentiary Rulings at Trial.**

### 14. **Excluded All Evidence at Trial from JEP Proceedings.**

In a pretrial Motion *in Limine*, Drummond asked the Court to exclude all evidence and testimony before the Colombian Special Jurisdiction for Peace ("JEP"). The Court ruled it would assess any such evidence at trial. *See* Doc. No. 1034 at 16-17. Defendants Collingsworth and IRAdvocates then sought to introduce at trial **Exhibit 58**, a JEP document that contained factual findings indicating that Jaime Blanco, a key witness to Drummond's scheme to pay the AUC through inflated invoices from his food services company, had testified truthfully and completely about the scheme and that his testimony was corroborated by others. *Id*. at ¶¶ 65-69. Because of full and truthful cooperation in the JEP process, Blanco was released from prison. Drummond relentlessly attacked Blanco's credibility at trial. *See, e.g.*, TTR (Vol. XII/12.17.25) at 2275:13-2277:21. The Court excluded the JEP document. TTR (Vol. XX/1.12.26) at 3289:7-20, so the jury was prevented from hearing that the JEP recognized the credibility of Blanco's testimony.

For the same reasons as discussed in the context of **Exhibit 56** (the Colombian Prosecutor's Findings), the Blanco JEP document, **Exhibit 58**, should have been admitted. See section I.B.5, *supra*. The Hasbún indictment in *Chiquita* was issued by Colombian Justice and Peace and laid out an abundance of facts concerning Hasbún's involvement in the AUC, including a list of

29

homicides that Hasbún had confessed to. 47 F.4th at 1298. Similarly, the JEP's Findings in support of the authorization of Jaime Blanco's conditional release present a series of factual findings detailing Jaime Blanco's role as an intermediary between Drummond and the AUC, with respect to which Mr. Blanco fully acknowledged his guilt. *E.g.*, **Exhibit 58** ¶¶ 63-70.

Like the Hasbún indictment in *Chiquita*, **Exhibit 58** should have been admitted as factual findings from a legally authorized investigation pursuant to FRE 803(8)(A)(iii). Alternatively, it was admissible on Blanco's credibility to counter Drummond's attacks on him. This highly relevant and probative document is not "substantially outweighed" by the risk of unfair prejudice to Drummond, *see* FRE 403, and any risk could have been cured by a jury instruction.

### 15. Excluded Evidence of Roberson Bribery of EPA.

Drummond's main theme at trial was that Defendant Collingsworth's statement that Drummond financed the AUC caused significant damage to its reputation in Alabama. Defendants sought to introduce evidence that Drummond was responsible for serious pollution in North Birmingham, Alabama, such that a superfund site was ultimately created. Drummond Vice President David Roberson was convicted of bribery in trying to prevent EPA intervention. This was a massive scandal in Alabama and certainly caused significant damage to Drummond's reputation. The Court reserved ruling on Drummond's Motion *in Limine*, noting that the North Birmingham incident could have impacted Drummond's reputation in the community. Doc. No. 1034 at 20. In their trial brief, Defendants reiterated the importance of this evidence on the issue of Drummond's claimed reputational damage. *See* Doc. No. 1106 at 16-18. At trial, the Court excluded this evidence. TTR (Vol. VI/12.9.25) at 1200-02. This was error as Defendants should have been allowed to present evidence to the jury that Drummond's reputation suffered for reasons other than Mr. Collingsworth's statements.

30

**16. Excluded Testimony of Jairo de Jesús Charris Castro.**

A key witness to Drummond's financing of the AUC was Jairo de Jesús Charris Castro. He worked for Jaime Blanco and participated in the discussions between James Adkins and Blanco to plan the murders of the Drummond union leaders. *See* **Exhibit 40** (Charris's handwritten declaration). He also participated in coordinating the murders with Drummond security personnel and the AUC. *Id*. Charris was ultimately convicted for his role in the murders. While he was in prison, Charris twice failed to appear for a deposition scheduled by Drummond. *See* Doc. No. 1045 at 8. Prior to this trial, he was released from prison by the JEP for his cooperation in the Colombian investigation of Drummond. Defendants listed Charris on their witness list, Doc. No. 1023. After briefing on both sides, in a November 12, 2025 Order, the Court initially agreed that Charris's testimony could be heard by the jury if "he is subject to a pre-trial deposition to be presented at trial, allowing for a full and fair opportunity for cross examination by Drummond." Doc. No. 1073 at 2. Defendants acted swiftly, and on November 14, 2025, noticed Charris's video deposition for November 25, 2025. Rather than coordinate to take the deposition it claimed was essential, Drummond filed a Motion to Reconsider. Drummond raised various speculative arguments, including the assertion that because Defendants were able to schedule Charris's deposition he must be under Defendants' control and claiming Drummond's counsel was too busy to take the deposition. Doc. No. 601, at 4-6. In response, Defendants asserted that their counsel, new to the case and struggling to get prepared for trial, would nonetheless make time for this crucial deposition. Doc. No. 1107 at 5-6.

On December 1, 2025, the day the trial started, the Court granted Drummond's Motion to Reconsider and excluded Charris's testimony. Doc. No. 652, at 6. The Court accepted that Drummond would be pressed for time to properly depose Charris, *see id*. at 3, despite that Drummond had a huge legal team that had been in the cases since they were filed. In contrast,

31

Defendants were forced to trial giving their new counsel less than a month able to prepare, but they were willing to depose Charris on short notice.

Significantly, as a clear example of the pattern of bias against Mr. Collingsworth, the Court accepted Drummond's outrageous argument that Mr. Collingsworth first sabotaged Drummond's prior efforts to depose Charris, a witness Mr. Collingsworth clearly viewed as favorable and necessary for trial, and then also did something nefarious by managing to notice the Charris deposition within 48 hours of the Court's Order allowing the deposition. *See* Doc. No. 652 at 5. The Court accepted whole cloth Drummond's baseless accusations:

> Interestingly, once the court indicated it would allow Charris's testimony (under certain circumstances), Collingsworth and Otero had his remote deposition scheduled within forty-eight (48) hours This raises significant questions about their control of Charris, why he refused to testify on multiple occasions earlier in these cases, and why, at least on some of those occasions, Collingsworth did not even appear (suggesting he knew Charris would not be providing testimony).

*Id*. It may well have raised some questions, but the Court accepted Drummond's bare accusations that Mr. Collingsworth was somehow responsible for Charris's prior failures to testify despite his consistent efforts to obtain Charris's testimony prior to trial.

In fact, Charris would have been Defendants' star witness and they were severely prejudiced by his exclusion. Charris could have offered eyewitness testimony to Drummond's collaboration with the AUC and its role in murdering the Drummond union leaders. Based on Drummond's manipulation of the Court playing on its obvious bias, the jury was deprived of this evidence of the key issue at trial. Excluding Charris was reversible error.

## 17. Excluded the Testimony of Judge Herman (Rusty) Johnson.

The premise of Drummond's defamation and RICO claims is that Defendant Collingsworth fabricated the entire story that Drummond collaborated with the AUC. Defendants sought to call Herman (Rusty) Johnson as a witness at trial, who was Mr. Collingsworth's co-counsel in the

*Romero* trial over Drummond's role in the murder of the union leaders. Mr. Johnson is now a federal magistrate judge in Birmingham. He would have been able to testify to facts supporting the allegation that Drummond paid the AUC to murder its union leaders. This testimony would have gone to whether Mr. Collingsworth's statements about Drummond were true and also to rebut Drummond's RICO claim that the statements were fabricated for the purpose of extorting money from Drummond.

Defendants listed Judge Johnson on their October 2, 2025, Pretrial Witness List. Doc. No. 1023. Drummond moved to exclude Judge Johnson and all the other witnesses Defendants Collingsworth and IRAdvocates listed in addition to those on the C&S Witness List. *See* Doc. No. 1045. Rather than allow Defendants to respond to Drummond's motion under the existing briefing schedule, the Court issued a Show Cause Order, expediting the briefing schedule. *See* Doc. No. 1051. Defendants responded to the Show Cause Order and asserted that Judge Johnson (and the other listed witnesses) should be permitted to testify. *See* Doc. No. 1054. The Court excluded Judge Johnson and all the other lawyer witnesses using the same analysis. Doc. No. 1070 at 6-9. Focusing only on Judge Johnson, Defendants moved at trial to allow him to testify. The Court denied this request in chambers. TTR (Vol. XIV/12.22.25) at 2457:10-2458:9. This was error. As Defendants asserted in their response to the Show Cause Order, unlike the other lawyer witnesses, Judge Johnson, was equally known to Drummond and the Defendants as a person with knowledge since he had been co-counsel (and acted as lead trial counsel) in the *Romero* case.  Further, Drummond had equal access to Judge Johnson and was free to interview him. Drummond was not prejudiced by allowing Judge Johnson to testify with two months' notice to Drummond. Doc No. 1054 at 2-5. The Court abused its discretion in not allowing this witness to testify. The jury should have been able to consider the perspective of a lawyer other than Mr. Collingsworth who, familiar with the

evidence, concluded that Drummond had paid the AUC to murder the Drummond union leaders. This would have been strong corroborating evidence of Mr. Collingsworth's reasonable belief that Drummond financed the murders.

**18. <u>Denied Motion to Sever Defaulted Defendants Otero and van Bilderbeek.</u>**

The issue of the Court's erroneous failure to sever the defaulting RICO Defendants, Ivan Otero and Albert van Bilderbeek, was previously discussed in section I.A, *supra*, in the context of its impact on the excessive jury verdict. This section discusses why the failure to sever was erroneous as a matter of law.

As an initial matter, the Court erroneously exercised personal jurisdiction over these foreign national Defendants who never stepped foot in the United States in the context of this case.[11] The Court nonetheless found it had extraterritorial powers to require them to face Drummond's RICO claims in Alabama. When they chose not to respond to Drummond's onerous discovery requests, the Court entered a default judgment against them. Doc. No. 284. Yet, the law is clear that to avoid prejudice, jury confusion, and the risk of inconsistent judgments, the Court was precluded from entering default judgements against Otero and van Bilderbeek until the conclusion of the contested trial against Defendants IRAdvocates and Collingsworth. *See, e.g.*, Doc No. 404 (C&S Motion in Limine on Defaulted Defendants);[12] Doc. No. 649 (Nov. 30, 2025 Motion to Sever). *See also*, Doc. No. 703 at 1-11 (Defendants' Motion on Jury Instructions Regarding Otero and van Bilderbeek) (collecting cases that a default should not be entered if there are non-defaulting parties contesting related issues at trial).

---

[11] See Doc. No. 91, at 4-13 (denying Otero MTD for lack of personal jurisdiction) and Doc. No. 131, at 16-24 (denying van Bilderbeek MTD for lack of personal jurisdiction).

[12] Defendants adopt all arguments set forth in the C&S Motion *in Limine*, Doc. No. 404, and incorporate all arguments made in the Motion as if set forth fully herein.

As Doc. Nos. 649 and 703 make clear, the Eleventh Circuit applied the rule in *Frow v. De La Vega*, 82 U.S. 552, 554 (1872), and held that it applies to defendants who are similarly situated. *See Gulf Coast Fans, Inc. v. Midwest Elecs. Imps., Inc.*, 740 F.2d 1499, 1512 (11th Cir. 1984); *accord* 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2690, (3d ed. 1998). Despite this direct legal bar to entering the default judgments against Otero and van Bilderbeek, the Court denied Defendants' Motion to Sever, reasoning that appropriate jury instructions and verdict forms would cure any risk of jury confusion. Doc. No. 662 at 3-4.

Defendants attempted to cure the Court's error in entering the default judgements against Otero and van Bilderbeek by requesting that the Court vacate the default judgments and sever them from the trial so the jury would not be told about the default judgments against Otero and van Bilderbeek. *See, e.g.*, Doc. No. 703 (Brief on Jury Instructions) at 7-11. The Court denied Defendants' request, but specifically invited a post-trial motion: "What I would expect you to do is, if things don't go well for you with the jury, re-raise these questions in a JMOL or motion for new verdict, and then I can have a chance to more squarely address them and more thoroughly address them on this issue." TTR (Vol. XXI/1.14.26) at 3411:25-3412:4.

Defendants now urge the Court to find that it erred in entering a default judgement against Otero and van Bilderbeek in the first instance, *see* Doc. 703 at 1-11, and then in failing to correct the error by severing Otero and van Bilderbeek from the trial. As previously discussed, Defendants were subjected to a grave risk of jury confusion or prejudice by repeated references at trial by Drummond and the Court to the default judgements against Otero and van Bilderbeek, the highlighting of the default judgements in the jury instructions, and the specific inclusion on the RICO verdict form of Otero and van Bilderbeek's liability. *See* Doc. 706 at 3. Given that Otero and van Bilderbeek's liability logically hinged on whether Defendants Collingsworth and

35

IRAdvocates were also liable because the jury was instructed they all had to be in an enterprise together, these instructions erroneously predisposed the jury to find liability against Mr. Collingsworth and IRAdvocates. It constituted severe undue prejudice against them for the jury to hear from the Court that Mr. Collingsworth's alleged enterprise associates, who were admittedly Mr. Collingsworth's close business associates, were already found liable for the RICO claims. *See Kelley v. Reyes*, No. 2:1-cv-17911, 2026 WL 25926, at *2 (D.N.J. Jan. 5, 2026) (denying entry of default judgement against one defendant where factual and legal issues of defendants were "inextricably intertwined" and declining to rely on jury instructions to mitigate prejudice to non-defaulting defendants).

While in a different context, this Court in *Moeinpour* recognized that improper joinder of the University of Alabama with the alleged direct perpetrator of racial/ethnic discrimination was prejudicial and unfair to the University, requiring a new trial. 62 F. Supp. 3d at 1144-47. This was evidenced by an excessive jury verdict. *Id*.  Here, since the law is clear no default judgement should have been entered against Otero and van Bilderbeek until after the trial of Mr. Collingsworth and IRAdvocates precisely to avoid jury confusion and risk inconsistent judgements, there is a presumptive indication of jury prejudice. Mr. Collingsworth could not and did not dispute that there were long-term business relationships between him and Otero and van Bilderbeek, and once the jury learned from the Court of the latter's already determined liability, it was an easy step to conclude that Mr. Collingsworth was also liable along with his admitted colleagues and friends. The jury's excessive RICO damage award far in excess of what Drummond even sought as actual damages reinforces that the jury was prejudiced and inflamed due to the liability determination already entered by the Court against Otero and van Bilderbeek. A new trial is required at which there will be no default judgement entered and thus no reference to it before the jury.

36

**19. <u>Erroneous Evidentiary Rulings at Trial.</u>**

There were also numerous erroneous rulings in which the Court allowed Drummond to introduce inadmissible exhibits at trial, while simultaneously excluding admissible exhibits offered by Mr. Collingsworth and IRAdvocates. In addition, the Court allowed Drummond to introduce deposition testimony that should have been excluded and prevented Mr. Collingsworth and IRAdvocates from using deposition testimony that the jury should have been allowed to consider. Due to space limitations, Defendants cannot discuss these issues at this time, but they reserve for appeal any objections to evidence made at trial and any exclusion of Defendants' proffered evidence.

**20. <u>Erroneous Rulings on Jury Instructions.</u>**

Defendants have already discussed the most harmful of the jury instruction errors – informing the jury of the default judgement against Otero and van Bilderbeek. See sections I.A and I.B 18, *supra*. The Court agreed that all jury instruction and verdict form objections relating to Otero and van Bilderbeek are preserved for appeal. TTR (Vol. XXI/1.14.26) at 3426:6-10.

There are other serious errors, including the Court's rejection of Defendants request to add element by element jury instructions for finding RICO violations. *Id*. at 3428:19-3430:9. In addition, the Court rejected Defendants' instructions for requiring specific criminal intent for all RICO predicate acts. *Id*. at 3416:4-23; 3418:17-23. Whie Defendants preserve for appeal these and any other objections to the jury instructions and verdict form made at trial, these errors also support the need for a new trial.

**21. <u>Judicial Bias and Improper Denial of Recusal.</u>**

As Defendants have discussed above, the Court committed numerous legal errors and/or examples of abuse of discretion that require a new trial in this case. With all due respect, Defendants contend that many of the issues identified are attributable to the long history in this

37

case of judicial bias against Mr. Collingsworth dating back to the Court's crime fraud ruling on December 7, 2015. Responding to Mr. Collingsworth's abbreviated explanation for only disclosing three of the five witnesses[13] whose families received security assistance from Defendants to relocate them so they would not suffer violent retaliation, the Court stated, "this almost comedic response is an uncreditable and insufficient rebuttal designed to prevent the application of the crime-fraud exception to certain categories of discovery sought in this case. It fails. This case not only illustrates the comedic effect of Steve Martin's advice, but provides the makings for John Grisham's next novel." Doc. No. 417 at 2.

However justified, the Court's contempt for and bias against Mr. Collingsworth impacted virtually every subsequent decision made by the Court. Indeed, as illustrated by the numerous legal errors identified above, following the Court's crime fraud decision, Defendants never prevailed on any material issue decided by the Court, all while the open bias and risk of prejudice accumulated. At a subsequent hearing on April 19, 2016, the Court stated, "Mr. Collingsworth is wearing a target in this case now. . ." Doc. No. 848-4 (4.19.16 Hr. Tr. at 5:19-20). Upon the accumulation of these rulings, Mr. Collingsworth made a Motion to Recuse and asked the Court to step down for undue bias. Doc. No. 848. The Motion relied upon both 28 U.S.C. § 144 and 28 U.S.C. § 455 (a). The overall standard is whether the Court's "impartiality might reasonably be questioned," and whether a judge's failure to recuse when there is an appearance of unfairness will undermine public confidence in the judicial system. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859, 863-64 (1988).

---

[13] Mr. Collingsworth also arranged to provide funding for the attorneys of another witness, Jaime Blanco Maya.

The Court denied the Motion to Recuse, relying mainly on a finding that the Motion was untimely. *See* Doc. No. 376, at 4-5. However, regardless of the timing of Defendants' Motion, which Defendants maintain as timely, *see* Doc. No. 374 at 3-7, the Court was required to recuse itself when it was apparent that the Court was biased against Mr. Collingsworth. *See, e.g.*, *Liljeberg*, where the Supreme Court found error when a judge did not recuse himself upon learning of a conflict of interest because judges are required to take steps to maintain confidence in the impartiality of the judicial system. 486 U.S. at 860-62. Despite not originally knowing of the conflict or appearance of partiality, the Supreme Court found 28 U.S. § 455(a) required the judge to rectify such an issue as soon as the lack of impartiality becomes apparent. *Id.*

Indeed, in *U.S. v. Kelly*, 888 F.2d 732 (11th Cir. 1989), the Eleventh Circuit made clear that under the judicial disqualification statute, 28 U.S.C. § 455, as revised, "a judge is under an affirmative, self-enforcing obligation to recuse himself *sua sponte* whenever the proper grounds exist." *Id*. at 744. The Court continued, "Section 455 does away with the old 'duty to sit' doctrine and requires judges to resolve any doubts they may have in favor of disqualification." *Id*. at 745 (citations omitted). The *Kelly* Court continued, "[w]e also disagree with the Government's contention that Kelly's section 455(a) claim is barred for untimeliness. We noted in *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1115 (5th Cir.), *cert. denied*, 449 U.S. 820 (1980), that section 455 'imposes . . . no duty on the parties to seek disqualification, nor any time limits within which disqualification must be sought.'" *Kelly*, 888 F.2d at 846.

Thus, according to the standard on this issue, the Court should have recused itself even if Defendants had not filed a motion seeking recusal because section 455 (a) requires self-recusal whenever the Court's "impartiality might reasonably be questioned."

39

The Court alternatively found that its expressions of bias towards Mr. Collingsworth were justified and therefore did not warrant recusal because the facts supporting bias resulted from the judicial proceedings. *See* Doc. No. 376 at 9-12. Citing *Liteky v. United States*, 510 U.S. 540, 555-56 (1994), the Court stated, "[t]here are consequences to conduct, and a court's 'expressions of impatience, dissatisfaction, annoyance, and even anger,' when based on counsel's litigation conduct, are neither inappropriate, nor grounds for recusal." Doc. No. 376 at 10. However, *Liteky* imposed a clear limit: a court's reaction to events of the judicial proceedings are not normally grounds for recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." 510 U.S. at 551. As articulated by the Eleventh Circuit, "[a]n exception to this [extrajudicial source] rule is made when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Hamm v. Members of the Bd. of Regents*, 708 F.2d 647, 651 (11th Cir. 1983) (citations omitted).

Here, that limit was reached and exceeded. The Court's contempt for and bias against Mr. Collingsworth continued during pretrial and throughout the trial. Indeed, new to the Drummond case, Mr. Collingsworth's trial counsel stated in Chambers to the Court,

> Well, I'll just say I'm new to this. Y'all have seen him a bunch of times. Maybe y'all -- but the contempt for him is palpable in that room. That's my perception, and I want that on the record. I mean, I think that we need to be careful poisoning the jury how he's treated by everybody in that room. I mean, I think it's dangerous.

TTR (Vol. VII/12.10.25), at 1562:18-23.

The Court's strong bias impacted the entire judicial process and resulted in a grossly unfair trial for Mr. Collingsworth and IRAdvocates. As discussed above, virtually all of Defendants' key evidence was precluded by the Court's Motion in Limine Order, *see* Doc. No. 1034, and **all** of Defendants' experts were stricken by the Court's *Daubert* ruling. Doc. No. 1035.

40

Every witness identified by Mr. Collingsworth to add to the list submitted by C&S was also excluded by Order of the Court. *See* Doc. No. 1070.[14] Further, as discussed in section I.B.3, *supra*, the Court was prepared to force Mr. Collingsworth to trial without outside counsel, and when he obtained counsel, denied the new lawyers adequate time to prepare for a complex trial. Incredibly, when the new lead counsel suffered a serious health issue after straining to get ready for trial, the Court again denied any continuance to allow a new lawyer to assume the lead counsel role. All of this combined would certainly cause a reasonable observer to conclude that the Court was not impartial.

As the Eleventh Circuit stated in *Smith v. Phillips Winters Apartments*, 599 F. App'x 365, 366 (11th Cir. 2015), "a judge is to recuse 'himself in any proceeding in which his impartiality might reasonably be questioned.'" (citation omitted). This is the statutory requirement: Any district judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). This is an "affirmative, self-enforcing obligation." *Kelly*, 888 F.2d at 744. "The standard . . . is 'whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality.'" *Id.* at 744-45 (quoting *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989))."

Ultimately, the Court's open bias towards and contempt for Mr. Collingsworth impacted every aspect of the trial and certainly raised serious and objective questions about the Court's impartiality. For the reasons stated in Defendants' Motion to Recuse (Doc. No. 848) and their Reply (Doc. No. 852), the Court's denial of the Motion to Recuse was legal error. Regardless of

---

[14] The Court did initially allow for Jairo de Jesús Charris Castro to testify but then granted Drummond's Motion to Reconsider and precluded Defendants from taking his trial testimony by deposition. Doc. No. 1139. See section I.B.16, *supra*.

whether the Court felt subjectively justified in doing so, the record reflects the Court's clear bias and hostility towards Mr. Collingsworth. "'***If the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal***.'" *In re Chevron*, 121 F.3d 163, 165 (5th Cir. 1997) (quoting *Nichols v. Alley*, 71 F.3d 347, 352 (10th Cir. 1995)) (emphasis added). Here, the balance fell heavily in favor of recusal, and the Court's failure to do so merits a new trial.

## II.    Rule 59 (e) Requires the Excessive Damage Award Be Reduced.

As established above, for numerous reasons, a new trial is required. One of the major reasons is the excessive jury verdict itself, which demonstrates jury confusion and prejudice. See section I.A, *supra*. However if the Court does not agree, at a minimum and as a matter of law, the jury verdict in this case must be significantly reduced because it objectively reflects jury confusion and prejudice. Notably, Drummond's effort to avoid the law and set an Alabama record for a damage award against an individual defendant is a completely academic exercise; should he not succeed in overturning the result, Mr. Collingsworth will never be able to pay even a properly reduced verdict in this case.

Fed. R. Civ P. 59 (e) empowers the court to alter or amend a judgment. When the jury's award "is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999). The court should reduce the jury's award if "the jury's damage award exceeds the amount established by the evidence." *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1266 (11th Cir. 2008) (cleaned up).

Here, there was an excessive damage award by the jury that went well beyond the evidence. Ignoring the jury instructions and the evidence, the jury was confused and acted with

42

prejudice toward the Defendants. The jury awarded $68 million for the RICO claim, Doc. No. 706 at 3, a baseless number which was 2.6 times the (questionable) evidence Drummond introduced at trial seeking **total** RICO damages of $26,654,611.80. Doc. No. 639 at 3. With respect to the defamation claim, Drummond asked for "presumed damages in an amount to be determined by the jury," Doc. No. 639 at 2, but the jury awarded the $26 million in defamation damages Drummond sought for RICO in addition to $26 million in defamation punitive damages. Doc. No. 1194 at 2. Ultimately, none of these awards can be sustained by law.

### A. **RICO Damages Must be Reduced to Reflect the Evidence of RICO Damages.**

The RICO damage award of $68 million must be reduced to, at most, the maximum of $26,654,611.80 Drummond sought at trial. As the Eleventh Circuit requires, an award must be reduced if "the jury's damage award exceeds the amount established by the evidence." *Rodriguez,* 518 F.3d at 1266. This Court confirmed this fundamental rule, holding that if the jury's award of damages "is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." *Moeinpour*, 762 F. Supp. 3d at 1139 (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1330 (11th Cir. 1999). This established rule is particularly applicable in a RICO case because, under 18 U.S.C. § 1964(c), a civil RICO plaintiff "can only recover to the extent that he has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). This statutory limit requires proof of a "tangible, concrete injury," not a speculative harm. *Rice v. Ivey*, No. 2:23-cv-1382-RDP, 2024 U.S. Dist. LEXIS 145680 at *23 (N.D. Ala. Aug. 15, 2024); *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992).

Defendants questioned every aspect of the RICO damages at trial, but the most conspicuous overreach by Drummond was attributing all reductions in coal sales, $15,553,798, *see* Doc. No. 639 at 4, to Mr. Collingsworth's actions, when there was a general decline in coal usage in Europe

due to environmental concerns and a cyclical reduction in coal sales as well. *See, e.g.*, TTR (Vol. V/12.8.25) at 845:22-846:1 and (Vol. XIII/12.18.25) at 2436:19-2437:7, 2438:8-16 (Pat Markey testimony); TTR (Vol. IV/12.4.25) at 675:3-676:24 (testimony of N. Drummond). Further, Defendants objected to the Court permitting Mr. Drummond to testify based on subsequent emails that some coal customers stopped buying from Drummond because of accusations of human rights abuses. TTR (Vol. III/12.3.25) at 576:16-579:9. These post conduct explanations were inadmissible hearsay. Based on all these reasons, the Court should reduce the maximum RICO damages sought to reflect that Drummond failed to prove that 100% of reduced coal sales were attributable to Mr. Collingsworth's actions.

B.   **Awarding Drummond Treble RICO Damages and Punitive Damages for Defamation Would be an Unlawful Double Recovery.**

Following any required reduction in Drummond's RICO damages, the Court agreed that the RICO statute, 18 U.S.C. § 1964(c), allows the damage award to be trebled. *See* Doc. No. 753, at 2. However, the law is clear that Drummond cannot be awarded **both** treble damages in RICO and punitive damages in defamation. Importantly, the Eleventh Circuit has held that a plaintiff cannot recover both treble RICO damages on a claim of civil theft and punitive damages on a fraud claim because although the claims were distinct, "the acts complained of . . . were the same" in both counts and therefore awarding both punitive and trebled damages would amount to "a double recovery or an excessive penalty." *Palm Beach Atlantic College, Inc. v. First United Fund, Ltc.*, 928 F.2d 1538, 1545-47 (11th Cir. 1991).

Similarly, other Circuits have ruled against double recovery for different claims based on the same acts. For example, in a case where a district court had awarded both punitive and treble damages, the Fourth Circuit vacated the award of punitive damages because "the trebling of

44

damages is itself punitive in nature" and the additional award of punitive damages "represented a double recovery." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 528 (4th Cir 1997).

As the Tenth Circuit emphasized, many courts have held that plaintiffs "may not recover both punitive damages under a state tort law claim and treble damages under a federal statutory claim, where the state and federal claims arise from the same operative facts and merely represent alternative theories of recovery." *Mason v. Oklahoma Turnpike Authority*, 115 F.3d 1442, 1460 (10th Cir. 1997) (collecting cases). There is no question, and the jury apparently thought so in awarding Drummond's RICO damages in the defamation case, that Drummond's claims arise from the same basic allegation, that Mr. Collingsworth falsely accused Drummond of participating in the murder of the Drummond union leaders and also financing the AUC's crimes against humanity.

Moreover, the Third Circuit affirmed a district court's refusal "to allow the entry of both punitive damages [for fraud] and trebled compensatory damages [for a RICO claim] because it concluded that this would constitute double counting" since treble damages and punitive damages "were viewed as alternative methods for calculating the exemplary damages to which the plaintiffs were entitled." *Loughman v. Consol-Pennsylvania Coal Co.*, 6 F.3d 88, 99 (3d Cir. 1993). Additionally, in a different Third Circuit decision, the court held that since treble damages serve a punitive function in addition to a remedial function, a district court could require the plaintiff to elect between recovering punitive damages under tort law or treble damages under their antitrust claim. *Fineman v. Armstrong World Industries, Inc.*, 980 F.2d 171, 218-19 (3d Cir. 1992).

More recently, the Third Circuit concluded that "a civil RICO claim 'cannot be maintained against a municipal corporation' because its mandatory award of treble damages is primarily punitive in nature." *Tengood v. City of Philadelphia*, 529 Fed.Appx. 204, 210 (3d Cir. 2013)

45

(quoting *Genty v. RTC*, 937 F.2d 899, 914 (3d Cir. 1991)). Similarly, the Fifth Circuit found that "RICO's treble-damages provision is at least partially punitive." *Gil Ramirez Group, L.L.C. v. Houston Independent School Dist.*, 786 F.3d 400, 412-13 (5th Cir. 2015); *see also McCullough v. City of Montgomery*, No. 2:15-cv-463 (RCL), 2019 U.S. Dist. LEXIS 82069 at *29 (M.D. Ala. May 14, 2019) ("RICO requires mandatory treble damages, which the courts consider punitive").

While the Court is correct that RICO allows for trebling damages, Doc. No. 753, at 2, this would preclude any additional award of punitive damages for the defamation claim.

### C.  **The Award of Defamation Damages Must be Vacated.**

The fact that the jury awarded the $26 million that Drummond sought for RICO damages as both Defamation presumed compensatory damages **and** again as Defamation punitive damages conclusively demonstrates jury prejudice and confusion requiring a new trial. See section I.A, *supra*.  Perhaps the jury believed that the types of damages Drummond sought for RICO were really Defamation damages, and then simply invented a number for RICO damages of $68 million, but the fact is that Drummond only sought $26 million for RICO damages and the jury cannot award the same amount for the same underlying acts in the Defamation case. Indeed, Drummond cannot recover twice for the same injury. *See Harbor Business Compliance Corp. v. Firstbase.io, Inc.*, 152 F.4th 516, 537-38 (3d Cir. 2025) (Plaintiffs cannot recover the same lost business profits under two different theories of unfair competition and trade secrets appropriation. 'Simply because [a plaintiff] was able to wrap [its] loss into several different legal theories of recovery does not entitle it to recoup twice.'"); *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 372 (5th Cir. 2004) ("A plaintiff is not entitled to be put in a better position by recovering twice for the same harm."); *Woodruff v. Ohman*, 29 Fed.Appx.337, 344 (6th Cir. 2002) (Plaintiff cannot pursue her gender discrimination claim under both Title VII and § 1983 because "she is not entitled to recover twice for the same loss").

The requirement to vacate the RICO damages awarded as Defamation damages is strongly reinforced by the fact that, when asking the jury for presumed compensatory defamation damages, Drummond's counsel intentionally inflamed the jury by relying on a highly prejudicial and fabricated factual assertion. TTR (Vol. XXI/1.14.26) at 3563:15-25. See section I.A., *supra*, for details of Drummond counsel's fabricated story told to the jury about taunts to Nathaniel Drummond's children. This fictional account of abuse of Nathaniel Drummond's children attributed to Mr. Collingsworth's statements was clearly effective in inflaming the jury, prejudicing them against Mr. Collingsworth, and they punished him with an excessive award of defamation damages.

But if the Court does not grant a new trial, then the only fair and appropriate remedy is to vacate the award of RICO damages awarded again as Defamation damages. This double recovery is the result of a jury inflamed by improper prejudice. And regardless of why the jury made the erroneous award, based on the cases cited above, a double recovery for the same underlying act is not permitted by law.

The Court specifically alerted Drummond that "presumed damages" must be based on actual evidence of damage introduced at trial. TTR (Vol. XXI/1.14.26) at 3415:22-25. Nonetheless, Drummond made the tactical decision to introduce **no** evidence of defamation damages at trial and can't do it now. Further, Drummond should not benefit from a "***particularly indefensible tactic . . . to bring before the jury [in closing argument] damaging facts not in evidence and never established***." *Edwards,* 512 F.2d at 284)(emphasis added). Given all of this, the Court should award Drummond no more than one dollar of nominal damages. Drummond suffered no additional Defamation damages not already covered by the RICO award.

As to punitive damages in the Defamation case, as noted in section II.B, *supra,* punitive damages are precluded as a matter of law if the Court trebles the RICO award. If the Court disagrees and seeks to award punitive damages in the Defamation case, in addition to treble RICO damages, Mr. Collingsworth's financial condition and ability to pay punitive damages becomes relevant, as he is the sole remaining defamation Defendant.

Alabama Courts are uniformly clear that punitive damages are limited by several factors, including a defendant's financial condition or ability to pay. For example, in *Hammond v. City of Gadsden*, 493 So.2d 1374 (Ala. 1986), the Court identified several factors, including "the culpability of defendant's conduct," "the desirability of discouraging others from similar conduct," and "the impact upon the parties." *Id*. at 1379. The Court was clear that the impact on the party liable for damages could determine whether the award was excessive. *Id*. The Alabama Supreme Court reinforced this consideration in upholding a reduction in an award of punitive damages, stating a "defendant's financial position is . . . a consideration essential to a post-judgement critique of a punitive damages award." *Green Oil Co. v. Hornsby*, 539 So.2d 218, 222 (Ala. 1989).

More recently, in *BMW of North America v. Gore,* 701 So.2d 507 (Ala. 1997), on remand from the U.S. Supreme Court, the Alabama Supreme Court stated that punitive damages exceeding 10% of defendant's net worth suggests that the award should be reduced for excessiveness. The court continued that such an award "crosses the line from punishment to destruction . . ." *Id*. at 514.

After enduring the financial sacrifice of being a lawyer with a small non-profit human rights organization for many years and then bearing the costs of the lengthy Drummond litigation and losing significant business due to the false accusations made against him by Drummond, Mr. Collingsworth's current net financial worth was already close to zero. If the trebled RICO award

48

is then considered, Mr. Collingsworth's financial net worth will be in the negative by tens of millions of dollars. Any additional punitive award would be far beyond "the line from punishment to destruction" under the standard.

Thus, before the Court could properly consider awarding any punitive damages beyond the trebling of the RICO award, it would be appropriate for the Court to review documentation of Mr. Collingsworth's current financial condition *in camera*.  Because the law seems clear that additional defamation punitive damages are precluded, such a submission should be unnecessary. However, Mr. Collingsworth is prepared to promptly submit the financial documentation if the Court so directs.

## **CONCLUSION**

For the reasons stated, Defendants Collingsworth and IRAdvocates are entitled to a new trial based on Fed. R. Civ. P. 59 (a)(1)(A). The jury's excessive damage award was clearly based on jury prejudice and unfairness. Further, there are at least 21 distinct legal errors, any one of which justifies a new trial. In the alternative, Defendants Collingsworth and IRAdvocates seek a Remittitur under Rule 59 (e) for the excessive, unfair, and unlawful damage award.

Respectfully submitted this 27th day of April, 2026.


*/s/J  Chase Bryan*
Kenneth 0.  Simon
J. Chase Bryan *(Pro Hae Vice)*
Shauncey Hunter Ridgeway
Priscilla K. Williams
*On behalf of Defendants Terrence P. Collingsworth and International Rights Advocates*

**OF COUNSEL:**
**CHRISTIAN & SMALL, LLP**
505 20th Street North, Suite 1800
Birmingham, AL 35203
Telephone: (205) 795-6588

**CHRISTIAN & SMALL, LLP**
603 Duling Avenue, Suite 204
Jackson, MS   39216


The undersigned certifies that he has participated in the drafting and filing of this post-trial Motion with the attorneys at Christian & Small LLP, and that Christian & Small LLP has filed all Motions and advanced all arguments he wishes to raise, along with the factual and legal support for each such argument, as to any request for judgment as a matter of law or a new trial, or any other post-verdict relief sought.

*/s/ Terrence Collingsworth*
Terrence Collingsworth (*(Pro Hae Vice)*
**INTERNATIONAL RIGHTS ADVOCATES**
621 Maryland Ave NE
Washington, D.C. 20002
Tel: 202-543-5811
tc@iradvocates.org

50

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on April 27, 2026, notice of the foregoing document was provided via the CM/ECF system to the counsel of record.

*/s/ Terrence Collingsworth*

Terrence Collingsworth
